No. 17-1465

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

PALANTIR USG, INC.,

*Plaintiff-Appellee*,

v.

UNITED STATES,

*Defendant-Appellant*.

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN
No. 1:16-cv-00784C,
JUDGE MARIAN BLANK HORN

## CORRECTED BRIEF FOR APPELLEE

THEODORE B. OLSON
KAREN L. MANOS
AMIR C. TAYRANI
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500


JOSH A. KREVITT
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2490

DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8300


HAMISH P.M. HUME
JOSHUA RILEY
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
(202) 237-2727

*Counsel for Plaintiff-Appellee Palantir USG, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellee certify the following:

1. **The full name of every party represented by us is:**

   Palantir USG, Inc.

2. **The name of the real party in interest represented by us is:**

   Palantir USG, Inc.

3. **The parent corporation that owns 10 percent or more of the stock of the party represented by us is:**

   Palantir Technologies Inc., which owns one hundred percent of the stock of Palantir USG, Inc.

4. **The names of all law firms and the partners or associates that appeared for Palantir USG, Inc. in the trial court or are expected to appear in this court are:**

   BOIES SCHILLER FLEXNER LLP:  David Boies, Hamish P.M. Hume, Joshua Riley, Samuel C. Kaplan, Stacey K. Grigsby, and Jon R. Knight

   GIBSON, DUNN & CRUTCHER LLP:  Theodore B. Olson, Josh A. Krevitt, Karen L. Manos, Amir C. Tayrani


Dated:  June 23, 2017

  /s/  David Boies
DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY  10504
(914) 749-8300

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................................. i

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF RELATED CASES .................................................................... vi

GLOSSARY ........................................................................................................ vii

STATEMENT OF THE ISSUES ............................................................................ 1

STATEMENT OF THE CASE ............................................................................... 1

    I.      Statutory Background ................................................................. 4

    II.     Factual Background ................................................................... 8

           A.     DCGS-A1 Costs Billions And Fails To Deliver A Working Data Management Platform ................................ 8

           B.     Palantir Sells A Data Management Platform As A Commercial Item That Provides Concrete Benefits To Military Personnel ..................................................... 9

           C.     In 2014, The Army Learns From A DIVA Study That There Is A "Rich Set Of Options" For Commercially Available Data Management Platforms ................... 12

           D.     In Conducting The Market Research For DCGS-A2, The Army Ignores The DIVA Study And Assumes That It Would Use A Software Development Project To Design And Develop A New Data Management Platform ................... 14

           E.     In December 2015, The Army Issues A Solicitation For The Development Of A New Data Management Platform Without Having Made The Three Determinations Under Section 2377(c)(2) Regarding The Availability Of Commercial Items .................................................... 18

    III.    Procedural Background ........................................................ 19

A.     GAO Denies Palantir's Pre-Award Bid Protest........................19

B.     The Army Issues A *Post Hoc* Determination Of
Non-Commercial Item .............................................................20

C.     The Court Of Federal Claims Rules That The Army
Violated Section 2377.............................................................21

SUMMARY OF ARGUMENT .......................................................................24

STANDARD OF REVIEW ............................................................................29

ARGUMENT .................................................................................................29

I.     The Army Violated Section 2377(c)(1) By Failing To Conduct
Market Research Into The Availability Of Commercial Items..........29

A.     The Court Of Federal Claims Correctly Interpreted
Section 2377(c) .......................................................................30

B.     The Army Did Not Conduct Market Research
Appropriate To The Circumstances .........................................35

II.    The Army Violated Section 2377(c)(2) By Failing To Make
The Requisite Determinations Regarding The Availability Of
Commercial Items ...............................................................................47

A.     The Army Violated Section 2377(c)(2)(A) By Failing To
Make A Reasoned Determination As To Whether Its
Requirements Could Be Met By Commercial Items ...............48

B.     The Army Violated Section 2377(c)(2)(B) By Failing To
Make Either A Complete Or A Reasoned Determination
As To Whether Commercial Items Could Be Modified
To Meet Its Requirements........................................................54

C.     The Army Violated Section 2377(c)(2)(C) By Failing To
Make *Any* Determination As To Whether Commercial
Items Could Meet The Army's Requirements If Those
Requirements Were Modified To A Reasonable Extent ..........59

CONCLUSION...............................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axiom Res. Mgmt., Inc. v. United States*,
  564 F.3d 1374 (Fed. Cir. 2009) ...........................................................29, 58, 59

*CRAssociates, Inc. v. United States*,
  95 Fed. Cl. 357 (2010) .....................................................................................56

*Dyncorp Int'l, LLC v. United States*,
  125 Fed. Cl. 1 (2016) .......................................................................................58

*Gant v. United States*,
  417 F.3d 1328 (Fed. Cir. 2005) .......................................................................37

*Glenn Def. Marine (ASIA), PTE Ltd. v. United States*,
  720 F.3d 901 (Fed. Cir. 2013) ...................................................................29, 55

*Gose v. U.S. Postal Serv.*,
  451 F.3d 831 (Fed. Cir. 2006) .........................................................................49

*Ill. Pub. Telecomms. Ass'n v. FCC*,
  117 F.3d 555 (D.C. Cir. 1997).....................................................................27, 49

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
  238 F.3d 1324 (Fed. Cir. 2001) .......................................................................52

*McKinney v. McDonald*,
  796 F.3d 1377 (Fed. Cir. 2015) .......................................................................52

*OMV Med., Inc. v. United States*,
  219 F.3d 1337 (Fed. Cir. 2000) .......................................................................49

*Per Aarsleff A/S v. United States*,
  829 F.3d 1303 (Fed. Cir. 2016) .......................................................................29

*Raymond Express Int'l, LLC v. United States*,
  120 Fed. Cl. 413 (2015) ...................................................................................56

*In re Shinnecock Smoke Shop*,
  571 F.3d 1171 (Fed. Cir. 2009) .......................................................................31

*SMS Data Prods. Grp., Inc. v. United States*,
   853 F.2d 1547 (Fed. Cir. 1988) ..........................................................32

*Walls v. United States*,
   582 F.3d 1358 (Fed. Cir. 2009) ..........................................................59

**Statutes**

10 U.S.C. § 2304a ..............................................................................18, 24

10 U.S.C. § 2376 ........................................................................................6

10 U.S.C. § 2377 ...............................................................................*passim*

41 U.S.C. § 103 ...................................................................................6, 54

**Regulations**

48 C.F.R. § 2.101 .......................................................................................6

48 C.F.R. § 10.002 .........................................................................7, 33, 53

48 C.F.R. § 12.207 .................................................................................7, 14

48 C.F.R. § 16.301-2 ................................................................................24

48 C.F.R. § 16.301-3 .....................................................................14, 15, 43

48 C.F.R. § 16.304 .....................................................................................8

48 C.F.R. § 16.504 ..............................................................................18, 24

**Other Authorities**

Department of Defense Instruction 5000.02 ...........................................40

*Hearing to Receive Testimony on Army Modernization in Review of
   the Defense Authorization Request for Fiscal Year 2016 and the
   Future Years Defense Program* (Apr. 14, 2015) .................................9

S. Rep. No. 103-258, 1994 U.S.C.C.A.N. 2561 ......................................5

S. Rep. No. 103-259, 1994 U.S.C.C.A.N. 2598 ...................................4, 5

S. Rep. No. 112-173.................................................................................9

## **STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5 of the Rules of Practice for the United States Court of Appeals for the Federal Circuit, Appellee states that there were no prior appeals in this case that were before this Court or any other appellate court, and that there are no related cases pending in this Court or any other court.

# GLOSSARY

| | |
|---|---|
| AOB | Appellant's Opening Brief |
| COTS | Commercial Off-The-Shelf |
| DCAA | Defense Contract Audit Agency |
| DCGS-A | Distributed Common Ground System—Army |
| DFARS | Defense Federal Acquisition Regulation Supplement |
| DIVA | Data Integration, Visualization, and Analytics |
| FAR | Federal Acquisition Regulation |
| FASA | Federal Acquisition Streamlining Act |
| GOTS | Government Off-The-Shelf |
| RFI One | Distributed Common Ground System—Army Request for Information (Aug. 2014) |
| RFI Two | Distributed Common Ground System—Army Request for Information (Dec. 2014) |
| RFI Three | Distributed Common Ground System—Army Request for Information (Mar. 2015) |

## STATEMENT OF THE ISSUES

**1.**     Whether the Army violated its obligation under 10 U.S.C. § 2377(c)(1) to conduct market research into the availability of commercial items to meet the Army's requirements.

**2.**     Whether the Army violated its obligation under 10 U.S.C. § 2377(c)(2) to determine whether commercial items could (A) meet the Army's requirements; (B) be modified to meet the Army's requirements; or (C) meet the Army's requirements if those requirements were modified to a reasonable extent.

## STATEMENT OF THE CASE

The Army needs new data management software to provide Soldiers and Commanders with seamless access to vast amounts of data. This case will determine whether, in procuring that software, the Army follows procedures that Congress prescribed to prevent federal agencies from wasting taxpayer funds by developing products that are already available in the commercial marketplace. If allowed to flout those procedures here, the Army would disregard the intent of Congress and deny Soldiers access to innovative, potentially life-saving technology that is available for immediate acquisition and deployment.

The Federal Acquisition Streamlining Act ("FASA") requires federal agencies to acquire commercial products from the private sector "to the maximum extent practicable," rather than paying contractors to develop those products from

scratch. 10 U.S.C. § 2377(b). The Army's experience with its prior data management platform—Increment 1 of the Distributed Common Ground System-Army, or "DCGS-A1" (pronounced "dee-sigs")—illustrates the shortcomings that often plague a developmental approach: the Army has spent nearly two decades and approximately $6 billion developing a platform that is widely viewed as ineffective and unreliable.

Meanwhile, in only a fraction of that time—and at a fraction of the cost—Appellee Palantir USG, Inc. developed and refined a state-of-the-art data management platform, called Palantir Gotham, that allows customers to integrate, visualize, and analyze massive amounts of data. Palantir Gotham has been deployed across the public and private sectors to solve some of the world's most difficult data management challenges. Palantir's platform has been utilized throughout the Department of Defense, including by Army units in Afghanistan who repeatedly have requested it as an alternative to DCGS-A1.

Nevertheless, when the Army issued a Solicitation for DCGS-A2, the next increment of the DCGS-A program, it persisted in its developmental approach. The Solicitation commits the Army to another lengthy and costly software development effort despite the availability of Palantir Gotham and other commercial products that could meet the Army's needs now. Palantir protested the Solicitation, and the Court

of Federal Claims correctly concluded that the Solicitation violates FASA in multiple respects.

First, the Army failed to undertake market research into the availability of commercial items that could meet its requirements, in direct contravention of its statutory market-research obligations. 10 U.S.C. § 2377(c)(1). Second, the Army failed to make a complete and reasoned determination as to whether the DCGS-A2 requirements could be met by an existing commercial item, by a commercial item modified to meet the Army's requirements, or by modifications to the requirements themselves to facilitate the acquisition of a commercial item. *Id*. § 2377(c)(2). The government's attacks on the Court of Federal Claims' reasoning are uniformly unavailing.

The government does not even attempt to demonstrate that the Army fully investigated or actually evaluated the availability of commercial items to meet the DCGS-A2 requirements, but instead contends that FASA does not require full market research at all. AOB.35. The government's suggestion that less-than-thorough research could satisfy FASA makes a mockery of the statute's requirement that agencies "acquire commercial items" to "the *maximum* extent practicable." 10 U.S.C. § 2377(b)(1) (emphasis added). Nor can the government escape the fact that the market research the Army *did* conduct was entirely focused on a developmental approach.

The government likewise falls short in contending that the Army made adequate determinations about the availability of commercial items to meet the DCGS-A2 requirements. A determination about the availability of commercial items is necessarily arbitrary and capricious where, as here, it rests on inadequate market research and unsubstantiated, incomplete, and conclusory *ipse dixit*. In fact, the record makes clear that commercial items *are* available to meet the Army's DCGS-A2 requirements.

Thus, if the Army proceeds with the procurement of DCGS-A2, it must do so on a commercial-item basis. At a minimum, the Army must conduct actual market research into the availability of commercial items and, based on that research, make a complete and reasoned determination as to whether DCGS-A2 can be procured on a commercial-item basis. Anything less would obliterate FASA's statutory requirements, waste taxpayer money, and deny American troops access to the innovative products that Palantir and other companies stand ready to deliver for immediate deployment on the front lines.

## I. Statutory Background

Congress enacted FASA to address "the frequency of cost-overruns" in defense procurements and the "increasing delays in fielding new systems." S. Rep. No. 103-259, 1994 U.S.C.C.A.N. 2598, 2599. The "inefficient acquisition system" predating FASA focused on developing unique items to governmental

specifications, *id.*, which led to acquisitions that were "more costly, but not substantially more useful, than other products available through normal commercial channels," *id.* at 2606. *See also* S. Rep. No. 103-258, 1994 U.S.C.C.A.N. 2561, 2574. As Defense Secretary William Perry told Congress, that procurement system did not allow the government "to acquire state of the art commercial technology." S. Rep. No. 103-259, 1994 U.S.C.C.A.N. at 2601. According to Secretary Perry, commercial technology advancements were outpacing the development of governmental systems, which took too long and resulted in systems that were "technologically obsolete" at the time they were fielded. *Id.* at 2601-02.

Congress enacted FASA to address these problems by requiring federal agencies to solicit and procure "commercial items" "to the maximum extent practicable." 10 U.S.C. § 2377(b). In so doing, Congress sought to "eliminate the need for research and development, minimize acquisition lead time, and reduce the need for detailed design specifications or expensive product testing." S. Rep. No. 103-259, 1994 U.S.C.C.A.N. at 2604. Congress deemed it "critical" for the government to "rely to the maximum extent possible on the commercial sector rather than promote government-dependent sectors that are walled off by the acquisition system from the mainstream of American commerce." *Id.* at 2602.

A "commercial item" is one that is "customarily used by the general public or by nongovernmental entities for purposes other than governmental purposes" and

"has been sold, leased, or licensed, or offered for sale, lease, or license, to the general public." 41 U.S.C. § 103(1); *see also* 10 U.S.C. § 2376(1). The definition includes products that would satisfy those criteria but for "modifications of a type customarily available in the commercial marketplace" or "minor modifications made to meet Federal Government requirements." 41 U.S.C. § 103(3); *see also* 48 C.F.R. § 2.101 ("Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item").

FASA includes several requirements that are intended to maximize agencies' procurement of commercial items. First, "the head of an agency shall ensure that, to the maximum extent practicable," the agency's "requirements are defined so that commercial items" "may be procured to fulfill such requirements" and "offerors of commercial items" "are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a). FASA next directs agency heads to "ensure that procurement officials in that agency, to the maximum extent practicable" (1) "acquire commercial items"; (2) require prime contractors and subcontractors to incorporate commercial items "as components of items supplied"; (3) "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items"; and (4) "state specifications in terms that enable and encourage bidders and offerors to supply commercial items." *Id.* § 2377(b).

FASA also sets forth specific procedures an agency must follow to maximize the procurement of commercial items. In particular, the statute provides that, "before soliciting bids," the agency "shall conduct market research appropriate to the circumstances," 10 U.S.C. § 2377(c)(1), and "use the results of market research to determine whether there are commercial items" available that "(A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent," *id.* § 2377(c)(2).

The Federal Acquisition Regulation ("FAR") reinforces these statutory obligations. The FAR provides that, if "market research establishes that the Government's need *may* be met by" a commercial item, then the agency "*shall* solicit and award any resultant contract using the policies and procedures in" FAR Part 12, 48 C.F.R. § 10.002(d)(1) (emphases added), which governs commercial-item procurements and provides that they generally must proceed on a "firm-fixed-price" basis, *id.* § 12.207(a). If market research indicates that commercial items "might not be available to satisfy agency needs," then the agency is required to "reevaluate the need" to "determine whether the need can be restated" to allow for the acquisition of commercial items. *Id.* § 10.002(c). Only if the agency's needs cannot be restated to facilitate a commercial-item procurement may the agency proceed with a developmental solicitation. In contrast with commercial-item procurements,

developmental contracts are not governed by FAR Part 12 and typically proceed on a "cost-plus" basis (for example, the contractor's cost plus a fixed fee), *id.* §§ 16.304-306, making them much more susceptible to cost overruns.

## II. Factual Background

### A. DCGS-A1 Costs Billions And Fails To Deliver A Working Data Management Platform.

Since the 1990's, the Department of Defense has recognized the need for a software system that can access, manage, and analyze the wealth of data contained in the military's various databases. In an attempt to meet this need, the military developed the Distributed Common Ground System. DCGS is supposed "to provide an integrated intelligence information sharing system where analysts from across the military can access intelligence data from hundreds of sources, analyze it, and make the resulting intelligence products discoverable and available to other users in real time." Appx17874. It has been a costly failure. American taxpayers have paid approximately $6 billion for DCGS-A, yet it continues to be burdened by numerous critical failures in testing, training, and combat—nearly *two decades* after the Army and a cadre of defense contractors began developing it. Appx17878, 17885.

The DCGS-A1 development effort was launched in 2000. Appx17879. Despite undergoing restructurings in 2005, 2007, and 2011, DCGS-A1 still "was not operationally effective, suitable, or survivable" by 2012, Appx17880, at which point the Senate Armed Services Committee declared that it "lack[ed] confidence" in the

Army's ability to deploy the system, S. Rep. No. 112-173, at *163. During a 2015 subcommittee hearing, the Chairman explained that DCGS-A1 had been plagued by a "series of testing failures, program delays, cost overruns, and negative reports from deployed commanders and soldiers," and emphasized that "units continue to report that it does not meet their needs." *Hearing to Receive Testimony on Army Modernization in Review of the Defense Authorization Request for Fiscal Year 2016 and the Future Years Defense Program* (Apr. 14, 2015) (statement of Sen. Cotton); available at https://www.armed-services.senate.gov/imo/media/doc/15-40%20-%204-14-15.pdf.

As Palantir has explained, one of the fundamental problems with DCGS-A1 was that the Army used cost-plus contracts with private-industry contractors to develop and then "glue[ ] together" various disparate software components that were not designed from the outset to work together. Appx11886; *see also* Appx10027. As the Army discovered, the complexity of integrating a massive collection of technologies not inherently designed to interoperate resulted in cost overruns and years of delay. Appx11886.

### B. Palantir Sells A Data Management Platform As A Commercial Item That Provides Concrete Benefits To Military Personnel.

Palantir was founded in Silicon Valley in 2004 with a mission of developing software that would enable government agencies, especially those combating terrorism, to integrate, visualize, and analyze vast amounts of "stove piped" data—

*i.e.*, data from different sources that reside in different databases and different formats and that therefore can be difficult to analyze. Appx16658. Years of intensive work by world-class engineers resulted in Palantir's flagship software product, Palantir Gotham, a cutting-edge data management platform that Palantir began to market to both private sector and government customers in 2009. In the years since, Palantir Gotham has been successfully deployed by the United States Marine Corps, United States Special Operations Command, FBI, and other agencies within the Department of Defense and Intelligence Community. Appx11887-88. The Defense Intelligence Agency has designated Palantir Gotham as the Intelligence Community's "Knowledge Management Tool" responsible for integrating intelligence data from numerous intelligence sources "to address the most challenging data problems affecting agencies' ability to prosecute their critical missions." Appx18151.

Army personnel have used Palantir Gotham as well. In 2010, United States forces in Afghanistan submitted "urgent" requests "for improved theater-wide advanced analytic capabilities" "to search and link multiple data sources and visually depict data relationships." Appx17886-87. Most of these requests specifically sought access to Palantir Gotham "as the preferred solution" because it "had gained a reputation for being intuitive and easy to use, while also providing effective tools to link and visualize data." Appx17887; *see also* Appx16629, 16631, 16633-40,

16642-46, 16648-52. By 2012, the Marine Corps decided to provide Palantir Gotham to its entire force, and Special Operations Command acquired it for most of the special operations units. Appx17889-90.

The Army, meanwhile, spent approximately $33 million to acquire Palantir Gotham on a limited basis for several units. Appx17888.[1] A 2012 Army assessment compared Palantir Gotham with DCGS-A1 and concluded that Palantir Gotham "was easier to operate and saved [Soldiers] time in conducting intelligence tasks." Appx17888. A 2014 Contractor Performance Assessment Report conducted by the Army Research Laboratory concluded that Palantir's product was "Exceptional," explaining that it provides "tools that enable analysts to store, organize, access, and retrieve large amounts of intelligence from disparate data sets," which "allows the rapid analysis of massive amounts of data in order to provide their commanders with

---

[1] Despite, or perhaps because of, Palantir's success, the DCGS-A program owners resisted its expanded use. *See, e.g.*, Appx18312, Appx10690. For example, they misrepresented Palantir's capabilities in certain contexts, *see* Appx00040, and they ordered the rescission and rewording of a report that was favorable to Palantir and recommended installing more Palantir servers. *Compare* Appx17708, *with* Appx17761-62; *see also* Appx17752. An investigation into that matter found that the DCGS-A program owners were "defensive" about the relationship between DCGS-A and Palantir and had "lost some of their objectivity" with respect to Palantir. Appx16719. Although the Court of Federal Claims concluded that Palantir had not met its high burden of establishing the Army's bad faith and bias toward Palantir, it did express concern about "the unfortunate conduct of some of the Army personnel reflected in the Administrative Record." Appx00096.

a comprehensive understanding of the highly complex and dynamic counterinsurgency environment." Appx18183-84.

### C. In 2014, The Army Learns From A DIVA Study That There Is A "Rich Set Of Options" For Commercially Available Data Management Platforms.

In 2014, the Army decided to curtail the third release of DCGS-A1 and redirect its efforts to acquiring and launching DCGS-A2. Appx10007, 10091. The "focus," "heart," and "architecture foundation" of DCGS-A2 would be a new Data Management Architecture. Appx10016, 10968, 11053. A Data Management Architecture comprises (1) a "Data Integration Layer," where data from a multitude of sources are integrated into a common database and (2) a "Data Analytics Platform," which allows users to conduct searches and perform analyses of the data in the Data Integration Layer. Appx10016, 12634, 18400-01. DCGS-A2 would also provide a new "Visualization Framework," which is the interface that allows users to view and understand the data that have been gathered and analyzed. Appx10016, 18401. A Data Management Architecture that includes a Visualization Framework is referred to as a "Data Integration, Visualization, and Analytics Software Platform," or "DIVA Platform." Appx12226. For simplicity, a DIVA Platform is sometimes referred to as a "data management platform." *Compare* Appx18400, *with* Appx12226-27. The government has stipulated that Palantir Gotham is a commercially-available data management platform. Appx00816.

In early 2014, the Army commissioned a DIVA Study. Appx12222. The study—which was conducted before the Army specified the requirements for DCGS-A2, Appx10251, 10038—did not address whether commercial items could meet any specific Army requirements, but rather was designed only "to provide situational awareness and market trends" to the Army leadership of the current "'state-of-the-practice' within the DIVA software platform landscape." Appx12223.

Published in July 2014, the DIVA Study recommended a "hybrid" approach for the DCGS-A2 procurement. Under that approach, the Army would integrate a Cloud Infrastructure Platform with a DIVA "Turn Key" Platform—*i.e.*, a commercial-off-the-shelf ("COTS") platform acquired without any modifications, Appx12240—and then add "DIVA applications (when required) to provide additional capabilities." Appx12233; *see also* Appx11924, 12246. The DIVA Study concluded that the "[c]ommercial landscape provides a rich set of options largely fueled by explosion of 'big data' in [the] commercial sector." Appx11923; *see also* Appx12223. It suggested various areas for further research into the design features and capabilities of commercially available data management platforms. Appx12252.

About six months later, DCGS-A's Technical Director wrote an Information Paper that affirmed the DIVA Study's recommendation that the Army acquire a data

management platform as a commercial item. Appx12363-64. The paper described possible acquisition approaches for DCGS-A2, each of which began with the procurement of a commercially available data management platform. Appx12365-66. The paper recommended a "DIVA Competition" to meet the "key objectives" of DCGS-A2, and it stated that this "infrastructure could be a commercial stand-alone solution," such as "Palantir." Appx12363.

D.   **In Conducting The Market Research For DCGS-A2, The Army Ignores The DIVA Study And Assumes That It Would Use A Software Development Project To Design And Develop A New Data Management Platform.**

Notwithstanding the DIVA Study's recommendations, the Army issued an RFI in August 2014 ("RFI One") that contemplated a repeat of DCGS-A1's failed development effort. RFI One stated that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive-fee or cost-plus-fixed-fee"—two procurement approaches not available for the acquisition of commercial items, 48 C.F.R. § 16.301-3(b); *id.* § 12.207—"with an estimated value of $80-$100 million for development efforts over three to four years." Appx11880. RFI One requested respondents' "basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program." Appx11876. It did not ask about commercial items.

Concerned that the Army was ignoring commercial items and repeating the mistakes of DCGS-A1, Palantir responded by recommending that the Army pursue

a different acquisition strategy because "an existing commercial data integration platform is readily available for procurement." Appx11885. Palantir contrasted this platform-based approach with DCGS-A1's "custom component-based architecture that glued together" various pieces of software on a cost-plus developmental basis. Appx11886.

The Army issued a second RFI in December 2014 ("RFI Two"), which doubled-down on its developmental approach, asking companies to describe their "experience developing" software and "integrating" it with certain "applications/capabilities." Appx11904. RFI Two also asked whether respondents had "an adequate DCAA accounting system," Appx11905, which is used only in the context of cost-plus pricing and therefore does not apply to commercial-item procurements, 48 C.F.R. § 16.301-3(a)(3). RFI Two did not ask about commercial items.

In response, Palantir expressed its concern that RFI Two was "designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities," Appx11910, and it provided information relevant to a commercial-item acquisition, an approach it had previously recommended and continued to support. Appx11910.

The Army held an Industry Day in January 2015. The brief distributed to industry members discussed the DCGS-A2 "software development process" and

described the anticipated "phases of software development," confirming that the Army intended to develop new software rather than acquire existing commercial software. Appx11686, 11688.

In March 2015, the Army issued a final RFI ("RFI Three"), which again requested "respondents' specific answers regarding the basic qualifications in managing software development projects." Appx11912. Consistent with its focus on development, the RFI asked whether respondents had "experience developing a product for an Acquisition Category 1 Military program." Appx11916. RFI Three did not ask about commercial items.

Palantir responded by expressing its concern "that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities" instead of inquiring into the availability of commercial items. Appx11918.

The Army published a Market Research Report on July 13, 2015. Appx11792. The Report stated that the contract types "under consideration for this effort are cost-plus-incentive-fee or cost-plus-fixed fee." Appx11804. The Report described DCGS-A2 as "a five year Engineering and Manufacturing Development effort consisting of two releases." Appx11841. Despite Palantir's extensive responses to the RFIs, the Market Research Report deemed Palantir "non-

responsive" because Palantir "did not provide any examples of past experience relevant to the *development* of Increment 2." Appx11836 (emphasis added). The Market Research Report stated, without any explanation, analysis, or support, that "[s]ignificant portions of the anticipated Increment 2 scope of work" "are not available as a commercial product." Appx11840.

The Market Research Report did not mention the DIVA Study. Nor did it mention the Army's Trade Space Analysis, which was also published in July 2015, after the RFIs had been completed. The Trade Space Analysis was conducted to inform the Army's economic analysis and Request for Proposal for DCGS-A2, and was undertaken on the express assumption that DCGS-A2 "will be developed," Appx11953, rather than procured on a commercial-item basis. The Trade Space Analysis did not examine modified commercial items, and it did not assess whether commercial items could meet the DCGS-A2 requirements if those requirements were modified. Instead, it examined only some commercial off-the-shelf items, and it did so for only a subset of the DCGS-A2 requirements. Appx11948-51. Even with those limitations, the Trade Space Analysis found that such items could satisfy most of those requirements. Appx11948-51.

E.    **In December 2015, The Army Issues A Solicitation For The Development Of A New Data Management Platform Without Having Made The Three Determinations Under Section 2377(c)(2) Regarding The Availability Of Commercial Items.**

Despite Palantir's attempts to convince the Army to acquire a commercially available data management platform, the Army issued a draft Performance Work Statement on July 15, 2015 that defined the requirements for DCGS-A2 Task Order 0001 to include "development of new data architecture," Appx10418, and contemplated that the contractor would "complete the design, development, integration and test" for DCGS-A2. Appx10419.

On October 21, 2015, Heidi Shyu, Assistant Secretary of the Army for Acquisition, Logistics, and Technology, issued a Determination & Findings ("Shyu Determination") to explain why it would be appropriate to award the DCGS-A2 contract to a single source. Appx12298; *see also* 10 U.S.C. § 2304a(d)(3); 48 C.F.R. § 16.504(c)(1)(ii)(D)(1). The Shyu Determination explained that DCGS-A2 "is heavily focused on design and development of a new data management architecture," and it described the risks that would result if multiple vendors tried to build that architecture. Appx12299. The Shyu Determination did not address whether it was practicable to purchase the data management architecture as a commercial item instead of paying a contractor to develop it. Nor did it mention the DIVA Study or the Trade Space Analysis in its summary of the Army's market research. Appx12301-02.

On December 1, 2015, the Army produced an Acquisition Plan for DCGS-A2. Appx12255. The Acquisition Plan stated that "the contractor shall complete the design, development, integration, and test of the two planned DCGS-A2 software baseline releases" within 72 months. Appx12263-64. Release 1 would "consist of an upgraded Data Architecture," and Release 2 would "include several capability enhancements." Appx12271.

The Army released its final Performance Work Statement on December 18, 2015, which defined the requirements for DCGS-A2 as including "development of new data architecture." Appx11051. The Army issued the DCGS-A2 Solicitation five days later for "Engineering, Manufacturing and Development services" on a "Cost Plus Incentive Fee" basis. Appx10843. The Army also issued a Task Order 0001 for "Initial Delivery of Data Management Architecture Software," again on a cost-plus developmental basis. Appx11294-96, 11328-30.

## III. Procedural Background

### A. GAO Denies Palantir's Pre-Award Bid Protest.

Palantir filed its pre-award bid protest at GAO on February 16, 2016, alleging, *inter alia*, that the Army violated FASA. GAO denied the protest three months later. In so doing, GAO rejected Palantir's argument that the Army had failed to conduct appropriate market research. Appx16563-64. GAO also credited the Army's assertion that "there was no commercial solution that could meet all the requirements

19

of DCGS-A2." Appx16564. And even though the Army itself intended to deploy DCGS-A2 using two releases over six years, GAO concluded that the Army had reasonably rejected one of Palantir's proposed acquisition approaches—acquiring a data management platform and then enhancing the platform with applications—because it would have required the Army to use "a phased approach for this procurement." Appx16562.

### B. The Army Issues A *Post Hoc* Determination Of Non-Commercial Item.

Palantir filed its pre-award protest in the Court of Federal Claims on June 30, 2016. Appx00120. The next day, the Army issued a two-page "Determination of Non-Commercial Item" ("the July 1 Determination"). Appx16626-27. The July 1 Determination stated that the Army had conducted market research by issuing its three RFIs; it did not mention the DIVA Study or Trade Space Analysis in its summary of the Army's market research. Appx16626. The July 1 Determination went on to assert that "market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence, Human Intelligence, Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone upgrade are not available as commercial items." Appx16626.

The July 1 Determination did not cite any evidence or provide any reasoning to support that statement. It nevertheless concluded that DCGS-A2 "is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A2 requirement." Appx16626-27. The July 1 Determination did not address whether the Army's requirements could be met by a commercial item with modifications of a type customarily available in the commercial marketplace. Nor did it address whether a commercial item could meet the Army's requirements if those requirements were modified to a reasonable extent.

## C. The Court Of Federal Claims Rules That The Army Violated Section 2377.

Shortly after filing its complaint, Palantir moved to supplement the Administrative Record to support its allegations that the Army violated 10 U.S.C. § 2377. Appx00020. The Court of Federal Claims granted that motion in part, explaining that some of Palantir's evidence—including an expert report from Bryant Choung, Palantir's Global Defense Engineering Lead—was "necessary for effective judicial review" given the "highly technical nature of the Army's requirements and Palantir's capabilities." Appx00024-30. The court also permitted the government to submit an expert report from Shaun Cronen—a team leader with the Army's

Communications-Electronics, Research, Development and Engineering Center. Appx00025. Each party was permitted to depose the other's expert. Appx00025.

On November 3, 2016, the Court of Federal Claims issued an opinion granting Palantir's Motion for Judgment on the Administrative Record. The court applied a "'highly deferential rational basis'" standard to the Army's procurement decision and acknowledged that contracting officers "'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" Appx00055. Even under that deferential standard, however, the court held that the Army violated Section 2377(c)(1) because it failed to conduct market research into the availability of commercial items that was appropriate to the circumstances. Appx00073.

The court rejected the Army's argument that its three RFIs constituted sufficient market research, explaining that, instead "of asking about commercial items, or asking more open-ended questions about the approach to the procurement, potential respondents only were asked about developmental projects similar to the existing DCGS-A1 program." Appx00069-70. The court also rejected the Army's contention that the July 2015 Market Research Report demonstrated that the Army had adequately researched the availability of commercial items, emphasizing that the 52-page report "contained only two sentences about 'Commercial Services.'" Appx00070.

As the court explained, the government "cannot point to any contemporaneous document issued before the solicitation was issued that demonstrates that, in compliance with 10 U.S.C. § 2377, the Army had carefully considered whether commercial items were available." Appx00072. The court concluded that the "limited information" included in the RFIs, Market Research Report, and July 1 Determination "does not meet the minimal requirement of demonstrating that the defendant conducted a genuine inquiry that could enable it to reach a rational conclusion not to consider commercial items, even after Palantir had urged the Army to consider its product as a commercially available alternative." Appx00076.

The court also concluded that the Army violated Section 2377(c)(2) because it failed to determine whether commercial items were available to meet the DCGS-A2 requirements. There is no "contemporaneous document in the Administrative Record," the court explained, that "evidences that the Army used the results of the market research to determine whether there were, in fact, commercial items available." Appx00073-74. The court emphasized that, even if the statute "allows for the broadest of discretion, as defendant appears to allege," the Army still "would not have met its burden to determine if commercial items were available to meet the Army's needs pursuant to 10 U.S.C. § 2377." Appx00074. The Army's failure to

make such a determination, the court reasoned, resulted from its choice "early on to pursue a developmental option." Appx00085.[2]

Turning to the question of prejudice, the court held that Palantir had suffered a "non-trivial competitive injury" because it had shown that it "potentially could have submitted a product that would have met some, or all, of the agency's needs." Appx00096. The court therefore permanently enjoined the Army from issuing a contract award under its DCGS-A2 solicitation. Appx00104. The injunction required the Army to "satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do." Appx00104.

## SUMMARY OF ARGUMENT

**I.** The Court of Federal Claims held that the Army failed to conduct market research appropriate to the circumstances. 10 U.S.C. § 2377(c)(1). The government argues that (A) the court misinterpreted FASA's market-research

---

[2] The Court of Federal Claims did not reach several other claims raised by Palantir, including that the Army violated 48 C.F.R. § 16.301-2(a) by soliciting a cost-plus contract instead of a fixed-price contract, violated 10 U.S.C. § 2304a(f) by soliciting a task-order contract in excess of five-years, and violated 48 C.F.R. § 16.504(c)(1)(ii)(D)(1) by soliciting a single-source task order contract for more than $112 million. *See* Appx00196-00299; *see also* Appx00086-87 (not reaching argument that the Army violated the National Defense Authorization Act for Fiscal Year 2016 by failing to issue guidance prohibiting the Army from entering into contracts for "information technology products or services that are not commercial items unless the head of the agency determines in writing no commercial items are suitable to meet the agency's needs").

requirements and (B) the Army's market research was in fact sufficient under Section 2377(c)(1).  Both arguments are meritless.

**I.A.**  The government contends that the court "added requirements" to Section 2377(c)(1) by requiring the Army to "'fully investigate'" whether commercial items were available to meet the Army's requirements.  AOB.35.  That argument cannot be squared with FASA's directive that agencies conduct market research "appropriate to the circumstances," use that market research to determine whether commercial items are available, and then acquire commercial items "to the *maximum extent* practicable."  10 U.S.C. § 2377(b)-(c) (emphasis added).  The government's circumscribed view of agencies' market-research obligations would eviscerate FASA's objectives by permitting agencies to undertake half-hearted, incomplete market research before settling on a developmental approach.

**I.B.1.**  The record makes clear that the Army did not discharge its statutory obligation to research the availability of commercial items before issuing a developmental solicitation for DCGS-A2.  In the Court of Federal Claims, the government defended the Army's market research by pointing to the three RFIs.  In this Court, however, the government argues that the DIVA Study and Trade Space Analysis were the heart of the Army's market research.  These new arguments are meritless.

The DIVA Study did not satisfy the Army's market-research obligations because it did not "look at the full breadth and scope" of the DCGS-A2 requirements and considered only commercial off-the-shelf products without evaluating whether those products could be modified. Appx16293. Despite these limitations, the DIVA Study put the Army on notice that commercial items *were* available to meet its needs, as the study recommended that the Army acquire a commercially available data management platform—a recommendation the Army never even considered during its ensuing market research.

The Trade Space Analysis is equally unhelpful to the government because it expressly assumed that DCGS-A2 would be a developmental effort and said nothing about modified commercial items or modifications to the DCGS-A2 requirements. Moreover, the Trade Space Analysis was not produced until July 2015. By then, the RFIs had already been completed, and the Army had already decided on a developmental approach, as evidenced by the Market Research Report and draft Performance Work Statement published that same month.

**I.B.2.** The RFIs are similarly insufficient. All three RFIs asked companies to describe their experience *developing* certain capabilities—they did not ask about the capabilities of existing commercial items. In fact, Palantir was deemed "non-responsive" when it informed the Army of commercial items instead of providing information about software development experience. The RFIs also demonstrated

26

that the Army was, from the outset, exclusively contemplating a cost-plus contract, which cannot be used for commercial-item procurements.

**II.** The Court of Federal Claims also held that the Army violated FASA by failing to determine whether commercial items could meet the Army's requirements, could be modified to meet those requirements, or could meet the requirements if the requirements themselves were modified. 10 U.S.C. § 2377(c)(2). Although this Court need not reach this issue, the record confirms that the Court of Federal Claims was correct. The record further shows that commercial items *are* available to meet the Army's requirements.

**II.A.** The Army never made a reasoned determination as to whether commercial items were available to meet the DCGS-A2 requirements. Both the Market Research Report and the July 1 Determination state, without any explanation or support, that "significant portions of the" DCGS-A2 "scope of work" for DCGS-A2 are unavailable as commercial items. Appx11840, 16626. This type of unreasoned, unsubstantiated "*ipse dixit* conclusion" "epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997). Moreover, the July 1 Determination is also a *post hoc* rationalization issued after this litigation commenced. It therefore cannot be invoked by the government to demonstrate compliance with FASA.

**II.B.** The Army never made a reasoned *or* complete determination as to whether modified commercial items could meet the DCGS-A2 requirements. An agency must acquire commercial items if those items can meet the agency's requirements after undergoing either "minor modifications" or "modifications of a type customarily available in the commercial marketplace." At no point has the Army addressed, much less made a determination about, the latter type of modification. With respect to "minor modifications," the only purported determination is found in the July 1 Determination, which states that no commercial item "can meet the Government's requirement through minor modification." Appx16626-27. That *post hoc* reasoning finds no support in the record, and it carries no weight in this litigation. In addition, Palantir's expert offered detailed testimony that Palantir Gotham *could* meet all the requirements of DCGS-A2 with only minor modifications. The government's expert never contradicted that testimony, but instead confirmed the inadequacy of the Army's market research by stating only that he had "insufficient information" to say whether Palantir could meet the Army's requirements.

**II.C.** Finally, the Army failed to make any determination as to whether commercial items could meet the DCGS-A2 requirements if those requirements were modified to a reasonable extent. Nor does the record indicate that the Army ever considered such modifications—even though Palantir, the DIVA Study, and the

Technical Director's Information Paper all recommended an alternative approach for the DCGS-A2 acquisition whereby the Army would acquire a data management platform as a commercial item and then augment it with applications.

## STANDARD OF REVIEW

This Court reviews the Court of Federal Claims' ruling on the parties' cross-motions for judgment on the administrative record de novo. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). The Army's procurement decision must be set aside "'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (citation omitted). Evidentiary determinations, "including motions to supplement the administrative record, are reviewed for abuse of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1378 (Fed. Cir. 2009).

## ARGUMENT

### I. The Army Violated Section 2377(c)(1) By Failing To Conduct Market Research Into The Availability Of Commercial Items.

The Court of Federal Claims concluded that the Army violated Section 2377(c)(1) by failing to conduct even the most cursory inquiry into the availability of commercial items to meet the DCGS-A2 requirements. Appx00069-74, 00079, 00086. The government contends that the court's conclusion is flawed in two respects: first, the government argues that the court "added requirements" to FASA

that imposed "heightened" market-research obligations, AOB.35; second, the government argues that the court overlooked market research that evaluated commercial items but found they could not satisfy the DCGS-A2 requirements. Neither argument withstands scrutiny.

## A. The Court Of Federal Claims Correctly Interpreted Section 2377(c).

FASA requires that agencies, "to the maximum extent practicable," "acquire commercial items" "to meet the needs of the agency." 10 U.S.C. § 2377(b). To discharge that obligation, an agency must "conduct market research appropriate to the circumstances" into the availability of commercial items, *id*. § 2377(c)(1), and then "use" that market research "to determine whether there are commercial items" that could (A) meet the agency's requirements; (B) be modified to meet the agency's requirements; or (C) meet the agency's requirements if those requirements were modified to a reasonable extent, *id*. § 2377(c)(2). As the Court of Federal Claims explained, given "the congressional choice of the word 'maximum,' even when coupled with words like 'practicable' and 'appropriate,' agencies cannot ignore or superficially comply with the requirement to review the availability of commercial products to meet agency needs." Appx00067. Instead, "the statute instructs agencies to make serious and genuine efforts to review the availability of commercial products to meet their needs." Appx00067-68. Any other construction would "read out of the statute" the word "maximum." Appx00067.

Applying this standard, the court concluded that the Army "failed in its obligation under 10 U.S.C. § 2377 to fully investigate if Palantir, or any other potential offeror, could meet the requirements of the Army's procurement needs on a commercial basis, in part or in full." Appx00086. According to the government, however, the Army should not be required to "'fully investigate,'" "'fully explore,'" "'examine,'" or "'evaluate'" commercial items because Section 2377 supposedly reflects an "intent that market research be circumscribed." AOB.35 (quoting Appx00073, 00079, 00086, 00089, 00094), AOB.38.

That watered-down reading of Section 2377 finds no support in the statute's plain language. *See In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1173 (Fed. Cir. 2009) ("To construe a statute, we begin with its text and look to the words' plain meaning."). Congress could not have intended that agencies conduct less-than-full research into the availability of commercial items when it required them to use the results of that research to make the determinations required by Section 2377(c)(2) and to procure commercial items "to the maximum extent practicable." 10 U.S.C. § 2377(b). These statutory requirements necessarily presuppose that agencies will "fully investigate" the availability of commercial items. Appx00086. Adopting the government's interpretation of Section 2377 would rewrite the statutory language and directly undermine the legislative policies animating FASA. *See supra* pp. 4-5.

This Court's precedent in analogous contexts makes clear that an agency has not utilized commercial items to the "maximum extent practicable" if the agency could still "achieve a greater degree" of commercial-item utilization. *SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547, 1556 (Fed. Cir. 1988). The only way the Army could assure itself that it could not "achieve a greater degree" of commercial-item utilization for DCGS-A2 was to undertake research that would allow it to make a fully informed determination as to the availability of commercial items. The Army failed to satisfy that statutory obligation. *See infra* Part I.B.

According to the government, requiring agencies to "fully investigate" the availability of commercial items would create an "undue burden." AOB.36. But agencies may not disregard the unambiguous language of a statute on the ground that Congress's requirements are unduly burdensome; the Army should address that argument to Congress, not this Court. In any event, the government's cries of "undue burden" have no footing in reality: the government does not contend, nor could it with any credibility, that the Army lacked adequate resources and technical know-how to investigate the commercial capabilities that had been brought to its attention. *See* Appx00079-80 (recognizing that there were likely only one or two commercially available products that could serve as DCGS-A2's central data management platform).

To be sure, in some circumstances, less extensive market research may be sufficient—for example, where it is readily apparent that commercial items are available to meet an agency's needs. In other instances, such as where private sector innovation is recent and rapid, more extensive research may be needed. The "circumstances" matter, and in this case they called for far more significant market research than the non-existent investigation of commercial items undertaken by the Army. *See infra* Part I.B; *cf.* 48 C.F.R. § 10.002(b)(1) (extent of "appropriate" market research depends on whether the commercial item is needed quickly, the estimated dollar value, the complexity of the item, and the agency's experience in procuring the item). The government is thus incorrect that the phrase "appropriate to the circumstances" is an escape hatch from FASA's overarching obligation to procure commercial items "to the maximum extent practicable."

There is equally little merit to the government's argument that the court's ruling moves "'appropriate' market research into the realm of source selection." AOB.38. The government is essentially arguing that agencies should remain deliberately ignorant about commercial items' capabilities, lest they actually identify items that meet their needs. That gets it completely backwards: the purpose of FASA is to require agencies to obtain the information necessary to determine whether commercial items are available and then to procure those items, through a competitive bidding process, to the maximum extent practicable. The procurement

system becomes more competitive, not less so, when agencies conduct enough market research to determine whether commercial items are available.

Finally, the government contends that the court's opinion would upend the Army's approach whereby a Lead Systems Integrator "fully investigates, *i.e.*, selects, configures, integrates, and tests commercial software as potential components of a final solution, and determines whether it fulfills DCGS-A2 requirements." AOB.37. The Army thus would have the Lead Systems Integrator— not the Army itself—research commercial items in the first instance and determine whether they can meet the DCGS-A2 requirements. But Section 2377 requires the "*head of an agency*" to "conduct market research," and to do so "*before* developing new specifications for a procurement by that agency," "*before* soliciting bids or proposals," and "*before* awarding a task order or delivery order." 10 U.S.C. § 2377(c)(1) (emphases added). Nothing in the statute permits agencies to outsource their market-research obligations to private contractors.[3]

Nor does the Court of Federal Claims' decision require the Army to "act as a Systems Integrator" itself. AOB.39. The Army could have proceeded, for example,

---

[3] The DCGS-A2 Solicitation does not even comply with the Army's claim that the Lead Systems Integrator will fully investigate the availability of commercial items. The Solicitation requires the *development* of a Data Management Architecture, Appx10960, 11328-30, which means it will *not* be procured as a commercial item, even by the Lead Systems Integrator.

by hiring a Lead Systems Integrator to provide the data management platform on a commercial-item basis, along with any needed applications. Or it could have acquired a commercially available platform and hired a Lead Systems Integrator to add applications to it, as the DIVA Study and Information Paper suggested. Appx12246, 12363. Palantir's response to RFI One identified several other possible "implementation models," none of which would have required the Army to serve as the Lead Systems Integrator. Appx11888. The question is not whether the Army must use a Lead Systems Integrator—and, if so, who should serve in that role—but rather whether commercial items are available to meet the Army's requirements. The Army never answered that question.

Before selecting *any* procurement approach, the Army must undertake the statutorily mandated market research into commercial products. 10 U.S.C. § 2377(c)(1) (emphasis added). The Court of Federal Claims correctly rejected the government's attempt to nullify those market-research requirements.

## B. The Army Did Not Conduct Market Research Appropriate To The Circumstances.

In arguing that Section 2377 does not require agencies to "fully investigate" or even "examine" commercial items, the government betrays its recognition that the Army's market research fell well short of its statutory obligations under Section 2377. In the face of "circumstances" that should have prompted a robust review of commercial items—including the DCGS-A1 debacle, the successful and widespread

deployment of Palantir Gotham, the complexity of the technology at issue, the substantial amounts of money involved, and recent innovation in the commercial sector—the Army conducted market research that was focused "only on development and did not consider the possibility of commercial" items. Appx00073.[4]

### 1. The DIVA Study And Trade Space Analysis Did Not Satisfy The Army's Market-Research Obligations.

The inadequacy of the Army's market research is laid bare by the remarkable extent to which the government now relies on two studies—the DIVA Study and the Trade Space Analysis—that it did not rely on as "market research" satisfying its obligations under Section 2377(c)(1) when briefing its cross-Motion for Judgment on the Administrative Record in the Court of Federal Claims. Similarly, the Market Research Report, Shyu Determination, and July 1 Determination—each of which purports to summarize the Army's market research—discuss the RFIs, but *none* of those documents even mentions the DIVA Study or Trade Space Analysis. Appx11802-03; Appx12301-02; Appx16626.

---

[4] The government argues that the Court of Federal Claims erred by "jettisoning the presumption of regularity" that attaches to agency actions. AOB.44. But the court repeatedly emphasized that there is a "well-established presumption that government officials act in good faith," Appx00032-33, and that under "an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency." Appx00053. The court concluded, however, that the "presumption of regularity" had been *overcome* by the manifest deficiencies in the Army's market research here.

In this Court, however, the government dramatically changes course, pointing to the DIVA Study and Trade Space Analysis as the centerpieces of the Army's market research. AOB.41-45. The Court should disregard the government's invocation of these studies—both because it is a *post hoc* rationalization unsupported by the administrative record and because the Army failed to raise the argument when briefing the cross-Motions for Judgment on the Administrative Record. *See* Appx00898-904. It is far too late in the day to backfill the Army's market-research deficiencies with newly identified "research." *See Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) ("Arguments not made in the court or tribunal whose order is under review are normally considered waived."). In any event, even if the Court does consider the DIVA Study and Trade Space Analysis, neither document satisfies the Army's market-research obligations. In fact, they make clear that the Army *ignored* the availability of commercial items that could have met its data management needs.

**DIVA Study.** The DIVA Study—which was issued in July 2014—was designed "to provide situational awareness and market trends" to the Army leadership "of the 'state-of-the-practice' within the commercial DIVA software platform landscape." Appx12223. As the Deputy Product Manager for DCGS-A2 later explained, the DIVA Study "didn't look at the full breadth and scope" of the DCGS-A2 program because the Requirements Document for DCGS-A2 did not even

exist at the time. Appx16293, 16346, 16356. And the government itself acknowledged in the Court of Federal Claims that the DIVA Study "looked at only some portions" of DCGS-A2. Appx00905. It was therefore impossible for the DIVA Study to determine whether commercial items could fulfill those requirements.

Further, the only commercial data management platform the DIVA Study considered was a "turn-key" solution—*i.e.*, a "COTS DIVA software platform" *without modifications*. Appx12227; *see also* 10 U.S.C. § 2377(c)(2)(B). Nor did the DIVA Study consider whether commercial items could meet the Army's yet-to-be-formulated DCGS-A2 requirements if those requirements were modified to a reasonable extent. *See* 10 U.S.C. § 2377(c)(2)(C). The DIVA Study therefore did not provide research necessary to make the determinations required by Section 2377(c)(2).

The government's newfound reliance on the DIVA Study is all the more puzzling in light of the study's bottom-line recommendation that the Army acquire a "COTS DIVA" platform to establish a Data Management Architecture and then add new capabilities and applications to that architecture, Appx11928—an approach similar to one that Palantir later would recommend, Appx11885. Thus, the DIVA Study expressly put the Army on notice that there was a "possible commercial approach for at least portions of the DCGS-A2 procurement." Appx00069.

Attempting to turn the DIVA Study in its favor, the government contends that the study "evaluated acquisition approaches" and concluded that a "COTS-only solution" "carried unacceptable risks for integration." AOB.32. But the DIVA Study reached no such conclusion. To the contrary, it recommended that the Army "procure" a "COTS DIVA 'Turn Key' Platform," Appx12251, and add "additional applications onto this infrastructure," as needed, Appx11923.

Because the DIVA Study was "high level," it recommended further research, including "specific 'challenges'" that could be used "to evaluate the products." Appx12252. These challenges would focus on whether platforms could incorporate new data sources, be extended with applications, and operate in tactical environments. Appx12252. The Army, however, never followed up on these research recommendations; instead, it proceeded to issue a series of RFIs that focused exclusively on software development capabilities. *See infra* Part I.B.2. In fact, the Army official responsible for the DCGS-A2 Solicitation could not even recall whether he had been aware of the DIVA Study when the Army issued its first RFI. Appx16368; *see also* Appx16425. Thus, far from satisfying the Army's market-research obligations, the DIVA Study underscores the Army's unexcused departure from FASA's requirements.

**Trade Space Analysis.** The July 2015 Trade Space Analysis provides equally little support for the government's position. As with the DIVA Study, the

Trade Space Analysis is not even identified in the summary of market research in the Market Research Report, July 1 Determination, or Shyu Determination, and the government did not rely on it in arguing that it complied with Section 2377(c)(1) when briefing the cross-Motions for Judgment on the Administrative Record—all for good reason.

The Trade Space Analysis was produced only after the Army officials responsible for the Solicitation had concluded their market research, and it was produced the same month as the Market Research Report (which does not reference it) and the draft Performance Work Statement (which expressly calls for development of a new Data Management Architecture). Indeed, the Trade Space Analysis was not performed by the Army as market research to determine whether to pursue a commercial-item procurement, but rather "to inform an upcoming Economic Analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A2." Appx11931. "Milestone B" is the stage when a "contract for development" is awarded once the military has decided "to commit resources to the development of a product for manufacturing and fielding." Department of Defense Instruction 5000.02(5)(c)(2)(b)(3), *available at* http://www.dtic.mil/whs/directives/corres/pdf/500002_dodi_2015.pdf. Indeed, the DCGS-A Program Manager gave the Trade Space Analysis authors a multi-year Engineering, Manufacturing, and Development schedule to use in their report,

Appx11967, and the Trade Space Analysis explains that DCGS-A2 "*will be developed*," Appx11953 (emphasis added). Thus, the Trade Space Analysis does not demonstrate that the Army considered commercial items, but rather shows just the opposite.

Befitting its narrow purpose, the Trade Space Analysis evaluated only three particular capabilities that would be provided by DCGS-A2: Data Enterprise Architecture, Intelligence Support to Cyber Operations, and Standard Sharable Geospatial Framework. Appx11946-47. In addition, it evaluated "COTS-only" options for those capabilities, AOB.43, meaning that it did not address whether commercial software could be modified to provide the selected capabilities. *See* Appx11949 ("the COTS solutions were evaluated 'as is'"). Nor did the Trade Space Analysis address whether the requirements of DCGS-A2 could be modified to facilitate a commercial acquisition. *See* 10 U.S.C. § 2377(c)(2)(C).

Even with these limitations, the Trade Space Analysis concluded that "COTS and Hybrid alternatives satisfy most of the technical functionality metrics" for Data Enterprise Architecture capabilities, and that "Upper bound COTS solutions provide a turn-key technical functionality similar to that of the Hybrid solutions." Appx11948. For Intelligence Support to Cyber Operations, the study concluded that there "are COTS solutions which satisfy most of the technical performance metrics." Appx11949. And although the Trade Space Analysis found that "COTS options

won't address all Army Geospatial requirements with software out of the box," it concluded that "these capability gaps are anticipated to be closed with ongoing commercial upgrades and widgets that can be developed in the COTS Baseline software." Appx11951. It is therefore not the case, as the government suggests, that the Trade Space Analysis found COTS products inadequate to meet the three requirements that it considered.

Finally, the government argues that the Trade Space Analysis concluded that "COTS-only" options required "significant development," were "more likely to fail integration" with Department of Defense software, and "carried high integration risk." AOB.43. But the Trade Space Analysis did not evaluate the integration capabilities of Palantir Gotham, which *has* been proven to integrate with all manner of Department of Defense and Intelligence Community systems. *See* Appx16807-09, 11887-90, 11911, 18153, 18422-24; *see also infra* pp. 50-51, 57.

Accordingly, the Trade Space Analysis was insufficient to satisfy the Army's market-research obligations, and it could not have supported the Army's decision to develop a new data management platform instead of procuring one as a commercial item.

### 2. The Army's Three RFIs Failed To Research The Availability Of Commercial Items.

In the Court of Federal Claims, the government relied principally on the Army's three RFIs—not on the DIVA Study or Trade Space Analysis—in arguing

that the Army complied with Section 2377(c)(1).  As the Court of Federal Claims recognized, however, the RFIs did not satisfy the Army's market-research obligations because they presupposed a cost-plus developmental approach to DCGS-A2 and failed to ask whether commercial items could meet the Army's needs. Appx00069-70.

For example, each RFI asked companies to provide "basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program."  Appx11876, 11900, 11912.  RFI One described DCGS-A2's "incremental development and fielding of system software capabilities over time," Appx11877, and it indicated that the Army was exclusively contemplating the use of a cost-plus contract, Appx11880—which *cannot* be used when acquiring commercial items, 48 C.F.R. §16.301-3(b).  RFI Two asked about companies' "experience developing and integrating" certain software capabilities, Appx11904, and asked whether respondents had in place adequate cost accounting systems, Appx11905, which would not be applicable in a commercial-item procurement.  RFI Three also asked about respondents' software development experience.  Appx11916.

None of the RFIs asked about commercial items.  Indeed, the Army itself admitted that the purpose of the RFIs was "to determine market capability to *develop* Increment 2 of DCGS-A."  Appx11847 (emphasis added).

Cherry-picking a few sentences from RFI One, the government contends that the Army satisfied its market-research obligations because it stated that DCGS-A2 would "'continue to maximize the use of' COTS/GOTS products" and would "'focus on integrating COTS/GOTS software.'" AOB.47 (quoting RFI One); *see also* AOB.48 (citing RFIs Two and Three). This argument is a non sequitur: it is undisputed that, just like DCGS-A1, DCGS-A2 will incorporate commercial software products—such as Adobe Acrobat, McAfee antivirus software, and Microsoft Office—*regardless of whether* the Army acquires a new Data Management Architecture as a commercial item. *See* Appx10243-50 (listing commercial-off-the-shelf software applications used with DCGS-A1). Whether the Army intends to "maximize" the use of commercial-off-the-shelf programs like Adobe Acrobat is entirely beside the point.[5] The relevant question is whether the Army undertook sufficient market research into the possibility of procuring the central *Data Management Architecture* on a commercial-item basis. The RFIs make clear that it did not.

---

[5] In any event, the Performance Work Statement for Task Order 0001 does not require the contractor to "maximize" the use of commercial items but instead states that "All software shall be designed in such a manner as to *minimize or eliminate the usage of proprietary or commercial technologies* except where specifically approved by the Government." Appx11321 (emphasis added).

The Army remained committed to a developmental approach even after Palantir repeatedly urged the Army to research commercial items that could provide the necessary DCGS-A2 capabilities. Appx00016, 00082, 00084. For example, in response to RFI One, Palantir explained that "the government can buy the core functionality from the commercial market," Appx11885, and Palantir provided the Army with a list of its contracts with the Defense Intelligence Agency, Marine Corps, FBI, and Special Operations Command. Appx11886-88.

The government now points to Palantir's response, as well as those from other companies, as evidence that "Capabilities and past performance of commercial items, including Palantir's platform, were pertinent to responses to the RFI." AOB.47. But the fact that Palantir responded to the Army's development-focused RFIs "with information and recommendations regarding potential solutions that would involve the use of commercial software," Appx16564 n.7 (quoted in AOB.48), cannot cure the Army's failure to research the availability of commercial items because the Army *ignored* that information and did nothing to explore Palantir's proposed solutions.

In a similar vein, the government argues that Palantir "essentially admitted" that it could have responded to RFI Two by providing information about its commercial item contracts but declined to do so because, as the government told the Court of Federal Claims, Palantir had "already identified its commercial item

contracts in response to RFI One." AOB.48 (citing Appx00082). According to the government, Palantir's explanation somehow "demonstrates" that RFI Two "did not preclude industry responses identifying experience with commercial items." AOB.48-49. That argument gets the government nowhere. An agency cannot comply with Section 2377(c)(1)'s market-research obligations merely by declining to *prohibit* responses about commercial items; the agency must affirmatively *solicit* the information it needs to make reasoned determinations under Section 2377(c)(2).

Similarly, the government accuses the Court of Federal Claims of "Monday-morning quarterbacking the RFIs" because there "was no legal requirement for 'more open-ended questions about the approach'" to DCGS-A2. AOB.49 (quoting Appx00069). But the Army omits the rest of the excerpted sentence from the court's opinion, which faulted the Army for not "asking about commercial items." Appx00069. Besides, it was not the particular wording of any specific RFI question that led the court to find that the Army violated Section 2377(c)(1). It was the totality of the Army's market research, which was focused "only on development" and did not ask about commercial items, that the court found deficient. Appx00073.

Finally, the government argues that a few slides from a May 2015 Acquisition Contract Strategy Review show that "the Army did not presume the solicitation would be 'developmental'" because they show that the Army considered the possibility of serving as the Lead Systems Integrator for DCGS-A2—as it had for

DCGS-A1, Appx11795. AOB.50. The identity of the Lead Systems Integrator, however, has nothing to do with the availability of commercial items. It simply addresses *who*—the Army or a private contractor—would oversee *development* of the Data Management Architecture.

In sum, the record is devoid of any evidence that the Army discharged its statutory obligation to research whether the requirements of DCGS-A2 could be met by a commercial item.

## II. The Army Violated Section 2377(c)(2) By Failing To Make The Requisite Determinations Regarding The Availability Of Commercial Items.

The Army was required to "use the results of market research to determine whether there are commercial items" that could: (A) meet the Army's requirements; (B) be modified to meet the Army's requirements; or (C) meet the Army's requirements if those requirements were modified to a reasonable extent. 10 U.S.C. § 2377(c)(2). The Court of Federal Claims concluded that the Army violated these statutory requirements. Appx00074.

This Court could affirm without reaching the government's arguments regarding Section 2377(c)(2). The Army's violation of Section 2377(c)(1) is sufficient, standing alone, to sustain the judgment, and the Army's failure to conduct adequate market research also means that it necessarily violated Section 2377(c)(2) because an agency cannot make reasoned determinations as to the availability of commercial items without adequately researching those items. If the Court does

reach the merits of the government's Section 2377(c)(2) arguments, however, it should conclude that the Army acted arbitrarily, capriciously, and contrary to law because it failed to make determinations regarding the availability of commercial items that were complete, reasoned, factually supported, and timely. In fact, the record makes clear that commercial items or modified commercial items *are* available to meet the Army's requirements or modified requirements.

> **A.    The Army Violated Section 2377(c)(2)(A) By Failing To Make A Reasoned Determination As To Whether Its Requirements Could Be Met By Commercial Items.**

The government identifies only two documents that purportedly contain the determination required by Section 2377(c)(2)(A) as to whether there are commercial items that can meet the Army's requirements: the Market Research Report and the July 1 Determination. Those documents state—without any explanation, analysis, or support—that the RFIs "showed that significant portions of the scope of work" for DCGS-A2 "are not available as commercial items." Appx16626; Appx11873. These "determinations" suffer from several fatal deficiencies.

As a threshold matter, the Army did not issue the July 1 Determination until the day *after* Palantir filed this suit in the Court of Federal Claims. Appx16627-28. That litigation-driven document cannot satisfy the Army's obligations under Section 2377(c)(2) because procurement decisions must be evaluated based solely on the reasoning that the agency provided *at the time* the decision was made, not on *post*

*hoc* rationalizations generated after litigation has commenced. *See OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also Gose v. U.S. Postal Serv.*, 451 F.3d 831, 838 (Fed. Cir. 2006) ("'The courts may not accept appellate counsel's *post hoc* rationalizations for agency action'") (citation omitted).

On their merits, neither the Market Research Report nor the July 1 Determination provides any analysis or factual support for the Army's conclusory assertion that commercial items are unavailable to meet some DCGS-A2 requirements. This type of unreasoned "*ipse dixit* conclusion" "epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997).

The government's argument that commercial items are unavailable to meet the Army's DCGS-A2 requirements rests on the assumption that commercial items cannot provide capabilities to which the Army affixes the label "military unique." AOB.53. That erroneous assumption ignores the rapid pace of innovation in the commercial software sector to address precisely the types of "big data" challenges the military faces. Appx11923. As Palantir explained in response to RFI One, "the challenges of the core architecture [for DCGS-A2] are not unique to the Army." Appx11894. Large organizations across the private and public sectors face similar challenges when attempting to integrate and analyze substantial amounts of data,

Appx11894, and Palantir has developed a data management solution that is versatile enough to have been successfully deployed by both private companies and government agencies. Appx16658, 11887-88, 18406-07, 18879-81. Section 2377 requires agencies—including military agencies—to embrace that innovation, not assume it away.

But even if the Army's needs could be described as "unique" to the military, it was still required under Section 2377(c)(2) to make a reasoned determination as to whether those needs could be met by commercial items. The Army failed to do so. The record is replete with evidence demonstrating that Palantir can meet all of the Army's so-called "military unique" capabilities, *see*, *e.g.*, Appx18397-98, 18406-28; 18452-72.[6] Indeed, the Army's own expert did not deny that Palantir can

_____

[6] For example, although the Market Research Report and July 1 Determination claim that commercial items cannot provide intelligence support to cyber operations, Palantir currently provides that capability through its contract with Army Cyber Command. Appx18417, 18650-54; *see also* Appx17851. Those documents also state that commercial items cannot provide "data fusion," but the Army itself has described Palantir Gotham as an "integrated fusion and analysis platform" with "exceptional" performance. Appx18183-84. The July 1 Determination further states that commercial items cannot meet "military unique" interoperability requirements, but Palantir has demonstrated its interoperability with each of the Department of Defense systems identified in the RFIs. *See*, *e.g.*, Appx18270-71 (demonstrating Palantir Gotham's interoperability with DCGS-A Integrated Backbone, Joint Information Environment, and Defense Intelligence Information Enterprise); Appx11900-01, 11911, 18153. The record includes similarly uncontroverted evidence that Palantir can provide, on a commercial-item basis, all of the other capabilities that the Army claims to be unavailable from commercial items. *See* Appx18397-98; Appx18406-28; *see also* Appx18452-72.

meet *all* of the DCGS-A2 requirements, Appx00094, and the fact of the matter is that Palantir can do so, *see infra* p. 57. Palantir even offered to demonstrate for the Army how its products could meet all of the Army's specific needs, Appx11911— just as it had done for other customers in the Department of Defense and Intelligence Community, Appx11887—but the Army ignored Palantir's offer.

The government offers a handful of defenses of the Market Research Report and July 1 Determination. Each fails. First, the government argues that the Market Research Report "compiled narrative summaries of capabilities for individual companies, and determined, based on market research," that commercial items were not available to meet the DCGS-A2 requirements. AOB.52 (quoting Appx11840 (¶ 8.3.5)). But those summaries addressed potential contractors' *development experience*, not information about their commercial products. Appx11831-37. Indeed, the Army deemed Palantir "non-responsive" to RFI Two precisely because Palantir's "response did not provide any examples of past experience relevant to the *development* of Increment 2." Appx11835-36 (emphasis added).

Second, the government asserts that the Court of Federal Claims' assessment of the Market Research Report was "plainly erroneous because the FAR does not require that the July 2015 report capture determinations made in other documents." AOB.54. That is true as far as it goes, but the government is unable to identify any "other documents" in which the Army made a reasoned determination as to whether

commercial items could meet the DCGS-A2 requirements. For example, the Army's three-sentence summary of Palantir's response to RFI One did not contain any finding regarding Palantir's ability to meet those requirements, much less a reasoned basis for such a conclusion. Appx11868 (cited at AOB.54-55). Nor is the DIVA Study or Trade Space Analysis relevant to the adequacy of the Army's determination regarding the availability of commercial items. AOB.55. The DIVA Study was completed before the requirements for DCGS-A2 had even been set, Appx16356, and the Trade Space Analysis expressly assumed a developmental project, without looking at modifications to either commercial items or the Army's requirements, Appx11946-51. *See supra* pp. 37-42. There is no amount of creative piecing-together that would enable the government to assemble a reasonable commercial-item determination.

The government's related contention that the Army had no obligation to document its determinations regarding the availability of commercial items, AOB.52, cannot be squared with the size and importance of the DCGS-A2 procurement, FASA's directives, or the bedrock APA requirement that an agency "articulate a satisfactory explanation for its action,'" including a "'rational connection between the facts found and the choice made.'" *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015) (citation omitted); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed.

Cir. 2001) (procurement decision will be set aside where the "'contracting agency'" failed to provide "'a coherent and reasonable explanation of its exercise of discretion'") (citation omitted). Where, as here, the "choice" involves the procurement of a large, costly, and complex system such as DCGS-A2, a bald assertion that commercial items are unavailable is hardly "satisfactory." Had the Army conducted appropriate market research and made the requisite determinations, it would be reflected in the written record in more than two conclusory sentences. *See* 48 C.F.R. § 10.002(e) ("Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.").

Third, the government argues that "Palantir did not assert its platform could meet the full DCGS-A2 requirements as a 'commercial item.'" AOB.56. The government is wrong. Palantir offered to demonstrate for the Army how it could provide the capabilities listed in RFI Two. Appx11911. Then, when the Army released its draft requirements (after the RFIs were complete), Palantir told the Army that it could meet *all* of those requirements with "existing commercial technologies." Appx10713. And all of this was in the context of market research that made no effort to determine whether commercial items could meet the Army's requirements.

Ultimately, the government's attacks on Palantir's RFI responses are simply a distraction from the glaring legal deficiencies in the Army's unreasoned commercial-item determination. The record plainly does not include a reasoned

explanation, particularly one generated before the inception of this litigation, for why the Army determined that neither Palantir nor any other contractor could provide a commercial item that would meet the DCGS-A2 requirements. The Army therefore failed to comply with the requirements of Section 2377(c)(2)(A).

## B. The Army Violated Section 2377(c)(2)(B) By Failing To Make Either A Complete Or A Reasoned Determination As To Whether Commercial Items Could Be Modified To Meet Its Requirements.

The Army also violated its obligation under Section 2377(c)(2)(B) to determine whether commercial items could be modified to meet the DCGS-A2 requirements. The Army argues that it made the Section 2377(c)(2)(B) determination in the July 1 Determination, which states that "no single commercial item" "can meet the Government's requirement through minor modification." Appx16627. But that determination is untimely, incomplete, unsupported, and incorrect.

First, the July 1 Determination is untimely because it provides only *post hoc* rationalizations generated after this litigation began. It therefore cannot be used to defend the agency action at issue in this suit. *See supra* pp. 48-49.

Second, the July 1 Determination is incomplete because it addresses only one aspect of the Section 2377(c)(2)(B) determination. Commercial items may undergo "minor modifications" *or* "modifications of a type customarily available in the commercial marketplace." 41 U.S.C. § 103(3). The July 1 Determination addresses

only "minor modifications"; it says *nothing* about whether commercial items could meet the Army's requirements if those items underwent "modifications of a type customarily available in the commercial marketplace." Appx16626-27. The government does not point to any evidence that the Army ever considered that possibility.[7]

Third, the July 1 Determination is unsupported: it offers no basis for its conclusory assertion that commercial items with minor modifications are unavailable to meet the Army's needs. The government seeks support for that conclusion in the GAO testimony of Stephen J. Morton, Deputy Product Manager for DCGS-A2, as well as the contracting officer, and it faults the Court of Federal Claims for refusing to give weight to this testimony. AOB.57-60.

To be sure, "materials submitted to the GAO are part of the administrative record before the Court of Federal Claims." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 n.8 (Fed. Cir. 2015). But GAO materials have limited utility in judicial bid-protest proceedings because "declarations from the contracting officer and other agency officials" often contain "post-hoc rationalization and argument rather than a fact-driven explanation of the agency's

---

[7] In fact, during oral arguments before the Court of Federal Claims, the government argued that the Army was not even required to consider such modifications. Appx00795-96.

decision-making process." *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413, 424 (2015). And there is certainly no authority indicating that the Court of Federal Claims *abuses its discretion* when it refuses to credit an agency's *post hoc* rationalizations. *See CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377 (2010) (no authority "requires the court to give the [contracting officer's] [*post hoc*] statement any independent, let alone dispositive, weight"). A contrary rule would give agencies license to paper over violations of Section 2377 with impunity by inventing after-the-fact justifications for their procurement decisions.

Moreover, even if Mr. Morton's made-for-litigation statements could properly be considered, they add nothing to the Army's (incomplete) July 1 Determination. Like the July 1 Determination itself, Mr. Morton's two-page declaration simply asserted, without providing reasoning or evidence, that commercial items "cannot meet the government's requirement through minor modification." Appx10056. The government states that Mr. Morton also testified that the Army, using the RFI responses, "determined the extent to which commercial item software potentially could be modified" to meet DCGS-A2's requirements. AOB.58 (citing Appx16297-16319). But the cited testimony does not purport to show that the Army determined whether commercial items could be modified to meet DCGS-A2's requirements, let alone how the RFI responses—which focused only on respondents' developmental capabilities—could have been used to do so.

Nor does the "high level architectural diagram" on which Mr. Morton purportedly relied show that the Army addressed modifications to commercial items. *See* AOB.58 (citing Appx12322). That diagram addressed only commercial-off-the-shelf products, Appx12322, and Mr. Morton admitted that it was based on the Market Research Report, which was itself entirely conclusory and based on development-focused market research. Appx16393-94.

Finally, the July 1 Determination is incorrect on the merits: the Army *could* meet its DCGS-A2 needs by acquiring modified commercial items. Palantir's expert witness, Bryant Choung, submitted a detailed 36-page declaration explaining that Palantir Gotham could provide all the "military-unique" capabilities and "integration" required for DCGS-A2. Appx18391-428. He opined that "Palantir's products would meet the requirements [of DCGS-A2] with only minor modifications," Appx00093, and the government's expert did not disagree, Appx00094. Instead, even with access to the full record, he could state only that he had "insufficient information" to determine whether Palantir could meet the DCGS-A2 requirements. Appx18623, 18638, 18643-48. This testimony confirmed that the government had no basis to determine that commercial items cannot be modified to meet the Army's requirements.

The government faults Palantir for not providing the totality of Mr. Choung's opinions "during market research and at GAO." AOB.63. But Palantir *did* tell the

Army that it could meet its needs on a commercial-item basis. Appx10709-10, 11882-99, 11908-11, 11918-22. In any event, none of the RFIs asked about commercial items (or modified commercial items), so the Army can hardly be heard to complain that respondents failed to submit non-responsive information.

The government also complains that the court applied a double standard when it relied on Mr. Choung's testimony but not Mr. Morton's. AOB.62-63 (quoting Appx00029, 00093). As an initial matter, Mr. Choung's opinions about Palantir's capabilities were not essential to the Court of Federal Claims' conclusions that the Army's market research and determinations regarding the availability of commercial items were legally insufficient. Further, it is well-settled that the administrative record may be supplemented in bid protests "when it is necessary for the Court to gain a complete understanding of the issues before it." *Dyncorp Int'l, LLC v. United States*, 125 Fed. Cl. 1, 2 (2016); *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). As the Court of Federal Claims explained, the Army's failure to conduct appropriate market research here necessitated "supplementation of the Administrative Record regarding the technical requirements of the DCGS-A2 solicitation, and Palantir's ability to potentially meet those requirements." Appx00024. That decision is subject to an abuse of discretion

standard that the government never even addresses, much less comes close to satisfying.[8]

Mr. Choung's uncontroverted testimony was therefore properly before the Court of Federal Claims, and it made clear not only that the Army violated Section 2377(c)(2)(B) but also that Palantir is capable of meeting all of the Army's requirements.

### C. The Army Violated Section 2377(c)(2)(C) By Failing To Make *Any* Determination As To Whether Commercial Items Could Meet The Army's Requirements If Those Requirements Were Modified To A Reasonable Extent.

Finally, the Army never made any determination as to whether commercial items could meet the Army's requirements if those requirements were modified to a reasonable extent. Both the July 1 Determination and the Market Research Report

---

[8] The cases cited by the government (at AOB.63-64) do not call into question the court's ruling. For example, in *Walls v. United States*, 582 F.3d 1358 (Fed. Cir. 2009)—a case involving a service-member's claim for back pay—this Court held that the plaintiff's declaration should have been excluded because "the corrections board specifically requested 'a statement of … the military duties [he] performed," but plaintiff "did not respond to th[at] request." *Id*. at 1368. Here, by contrast, the Army never invited Palantir to share the technical capabilities of its data management platform. In *Axiom*, this Court held that the Court of Federal Claims abused its discretion by "freely allow[ing] the parties to supplement the record 'with whatever they want[ed].'" 564 F.3d at 1380. Here, after an extensive hearing, the court excluded certain pieces of extra-record evidence but concluded that Mr. Choung's report was necessary for judicial review. Appx00024-30. The court also ensured a level playing field by permitting the government to depose Mr. Choung and submit its own expert report. Appx00030.

are silent on the issue. In fact, nothing in the record indicates that the Army ever considered modifying its requirements to enable a commercial-item procurement. The Court need proceed no further to find that the Army violated Section 2377(c)(2)(C).

Moreover, Palantir informed the Army that it could purchase a data management platform as a commercial item and then enhance it with applications that would be seamlessly added to the platform. Appx11885-86, 11890-91, 10713.[9] This approach has been used by various Department of Defense and Intelligence Community agencies, including the Marine Corps, which acquired Palantir Gotham on a commercial-item basis and then worked with both Palantir and third parties to enhance it with applications. Appx11889-90. The DIVA Study recommended a similar approach, Appx12233, and the DCGS-A Technical Director's Information Paper likewise stated that Palantir could provide the data management infrastructure as a stand-alone commercial solution that could be augmented with applications. Appx12363. Yet, despite the wealth of evidence demonstrating the practicability of

---

[9] Palantir Gotham was designed to be "extensible," meaning it features "open" Application Programming Interfaces, or APIs, that allow customers to add tools— sometimes called "helpers," "applications," or "enhancements"—to the core data management platform. Appx11885-86, 11890-91; *see also* Appx11926, 18401, 18413-16, 18450. Palantir offers these additional tools on a fixed-price commercial-item basis, and third parties can provide them as well. Appx18452-56

this approach, the Army did not even examine it, much less offer a reasoned determination for rejecting it.

The government seeks to defend this non-decision by arguing that the Army reasonably rejected Palantir's supposedly "fragmented approach" "in favor of a single contract award for full DCGS-A2 requirements." AOB.65 & n.6. That argument is irrelevant and inaccurate. Regardless of the label the government affixes to this approach, the Army still was required to provide a reasoned and factually substantiated determination as to why the DCGS-A2 requirements could not practicably be modified in line with that approach.[10] It failed to do so.

The government contends that the Shyu Determination supports the Army's decision not to modify the DCGS-A2 requirements so as to acquire at least the Data Management Architecture on a commercial-item basis. AOB.65-66. But the Shyu Determination did not consider or discuss the acquisition of commercial items in any way. It concluded only that a single source, rather than multiple sources, should *develop* DCGS-A2's Data Management Architecture. Appx12299. It did *not* determine that the Data Management Architecture is unavailable as a commercial item or that it would be impracticable to acquire it on that basis. As the Court of

---

[10]  The words "fragmented" or "fragment" appear fifteen times in the government's opening brief, but they appear nowhere in the contemporaneous procurement record, the GAO record, or even in the Army's filings with the Court of Federal Claims.

Federal Claims explained, the Shyu Determination "does not address 10 U.S.C. § 2377, but instead, is only the justification for exceeding the DFARS stated maximum amount for a single source contract."  Appx00095.  The Shyu Determination thus stands for the unremarkable proposition that it is preferable (and less risky) to have one contractor *develop* a Data Management Architecture than to pay multiple contractors to do so; it does not explain, or even address, why that architecture should be developed in the first place, much less why the DCGS-A2 requirements could not be modified to accommodate a commercial-item procurement.[11]

The Army therefore points to nothing in the record showing that it was impracticable to modify DCGS-A2's requirements so that the Army could acquire the Data Management Architecture as a commercial item and then enhance it with applications.  In fact, the Army itself has described the "Data Management Architecture" as "the heart," "the focus," and the "architecture foundation" of DCGS-A2, Appx10016, and its own acquisition strategy contemplates that DCGS-A2 will be assembled in "releases," where "Release 1 will consist of an upgraded Data Architecture" and Release 2 will include "several capability enhancements,"

---

[11] The government also relies on the unsubstantiated and *post hoc* GAO testimony of the Principal Assistant Responsible for Contracting, AOB.66-67, even though he admitted he had *no involvement* in making the commercial-item determination. Appx16451-54.

Appx12271. The Army also contemplates that DCGS-A2 may involve different contractors for each phase. Appx10107, 10125. Thus, the difference between the Army's approach and Palantir's is not that one is "fragmented" while the other is not. The difference is that the Army wants to *develop* the Data Management Architecture over a six-year period—the same approach that failed in DCGS-A1—whereas Palantir believes (and the record bears out) that the Army can acquire an *already developed* Data Management Architecture as a commercial item.

*      *      *

Congress enacted FASA to prevent federal agencies from doing precisely what the Army proposes to do here—embarking on a costly, multi-year development effort to build a software product that is already commercially available. Left unchecked, the Army's non-compliance with FASA will deprive Soldiers of immediate access to cutting-edge commercial technology that can save lives and win battles, and it will leave taxpayers on the hook for yet-another costly system that is outperformed by commercial products already on the market. This Court should sustain Palantir's protest and reaffirm that FASA means what it says: agencies must acquire commercial items "to the *maximum* extent practicable."

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

  /s/ David Boies    

THEODORE B. OLSON

KAREN L. MANOS

AMIR C. TAYRANI

GIBSON, DUNN & CRUTCHER LLP

1050 Connecticut Avenue, N.W.

Washington, D.C.  20036

(202) 955-8500


JOSH A. KREVITT

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue

New York, NY  10166-0193

(212) 351-2490

DAVID BOIES

BOIES SCHILLER FLEXNER LLP

333 Main Street

Armonk, NY  10504

(914) 749-8300


HAMISH P.M. HUME

JOSHUA RILEY

BOIES SCHILLER FLEXNER LLP

1401 New York Avenue, N.W.

Washington, D.C.  20005

(202) 237-2727

*Counsel for Plaintiff-Appellee Palantir USG, Inc.*

June 23, 2017

# CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2017, I caused service of the foregoing Corrected Brief for Appellee to be made by electronic filing with the Clerk of the Court using the CM/ECF System, which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have appeared and consented to electronic service in this action.

_/s/ David Boies_____

DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8300

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS
AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(a) because it contains 13,928 words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface and type style requirements of Rules 32(a)(5) and (6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: June 23, 2017

 /s/  David Boies

DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY  10504
(914) 749-8300
