2017-1465

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PALANTIR USG, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

CORRECTED REPLY BRIEF FOR THE UNITED STATES

---

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044]
Tel:  (202) 307-1111
Fax:  (202) 514-8624

August 4, 2017                    Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

    I.       Market Research Was "Appropriate To The Circumstances" ..............5

    II.      The Army Did Not Violate The FAR Or Abuse Its Discretion ...........7

    III.    The Army Did Not Violate Section 2377(c)(2) .................................17

    IV.    The Court Abused Its Discretion In Supplementing The
            Administrative Record ......................................................................29

    V.      The Court Should Have Considered Agency Submissions To
            GAO ..................................................................................................33

<h1 style="text-align: center;">TABLE OF AUTHORITIES</h1>

## Cases

*Advanced American Const., Inc. v. United States*,
  111 Fed. Cl. 2015 (2013) ...............................................................................6, 33

*Advanced Data Concepts, Inc. v. United States*,
  216 F.3d 1054 (Fed. Cir. 2000) ...........................................................................7

*American Auto Logistics, LP v. United States*,
  117 Fed. Cl. 137 (2014) ........................................................................................6

*American Safety Council, Inc. v. United States*,
  122 Fed. Cl. 426 (2015) ........................................................................................5

*Assesment and Training Solutions Consulting Corp. v. United States*,
  92 Fed. Cl. 772 (2010) ..........................................................................................6

*Axiom Resource Management, Inc. v. United States*,
  564 F.3d 1374 (Fed. Cir. 2009) .................................................................... 29, 30

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002).............................................................................................6

*Califano v. Sanders*,
  430 U.S. 99 (1977)...............................................................................................7

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)................................................................................. 7, 20, 33

*CRAssociates v. United States*,
  95 Fed. Cl. 357 (2010) ........................................................................................33

*Envirocare of Utah, Inc. v. United States*,
  44 Fed. Cl. 474 (1999) ........................................................................................25

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985)..............................................................................................7

*Glenn Defense Marine v. United States*,
720 F.3d 901 (Fed. Cir. 2015) ....................................................................7, 33

*KSD, Inc. v. United States*,
72 Fed. Cl. 236 (2006) ...............................................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 23 (1983).....................................................................................20

*Parcel 49C v. United States*,
130 Fed. Cl. 103 (2016) .............................................................................30

*Raymond Express Int'l v. United States*,
120 Fed. Cl. 413 (2015) .............................................................................33

*SMS Data Prods. Grp., Inc. v. United States*,
853 F.2d 1547 (Fed. Cir. 1988) .................................................................3

*Vion Corp. v. United States*,
122 Fed. Cl. 559 (2015) .............................................................................30

*Voith Hydro, Inc.*,
B-401244.2, 2009 CPD ¶239 .....................................................................24

## Statutes

10 U.S.C. § 2377 ................................................................................. *passim*

28 U.S.C. § 1491 ...............................................................................................33

41 U.S.C. § 3307 ....................................................................................... 1, 4, 6

**Regulations**

FAR 1.102-2...................................................................................................................16

FAR 2.101 ............................................................................................................... passim

FAR 10.001 ................................................................................................... 17, 25, 27

FAR 10.002 ...................................................................................................... *passim*

FAR 11.002 ...................................................................................................................14

**Dictionary**

*Webster's II New College Dictionary*, 316 3d ed. (2005)..........................................6, 27

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PALANTIR USG, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.
_____

Appeal from the United States Court of Federal Claims in case no. 16-cv-00784C,
Judge Horn
_____

## <u>REPLY BRIEF FOR THE UNITED STATES</u>

In our opening brief (GovBr.), we demonstrated that the trial court erroneously imposed requirements upon the Army that are not found in the Federal Acquisition Streamlining Act (FASA) or the Federal Acquisition Regulation (FAR), in holding that the Army failed to conduct adequate market research before issuing a solicitation for Increment 2 of the Army's Distributed Common Ground System (DCGS-A2). Although FASA only provides that market research be "appropriate to the circumstances," 10 U.S.C. § 2377(c)(1), and Congress directed that this provision be implemented through the FAR, 41 U.S.C. § 3307(e)(1), and the FAR, for example, provides that "agencies should not request potential sources to submit more than the minimum information necessary," FAR 10.002(b), the

court held that the Army was required to "fully investigate the commercial availability of products that could meet at least some of the requirements of the procurement." Appx87. Contrary to the determinations of the U.S. Government Accountability Office (GAO) that the market research was "adequate," and "included consideration of the availability of commercial items to meet" DCGS-A2 requirements, and that the results revealed that "commercial items were available to meet some of the DCGS-A2 requirements," Appx16560, Appx16563-64, the court adopted requirements not found in FASA, or the FAR, and substituted its judgment for the Army's regarding the "appropriate" amount of market research necessary to determine whether a FAR Part 12 commercial item contract was required for DCGS-A2 requirements.

The Army needs to procure a Lead Systems Integrator (LSI) to achieve new capabilities in DCGS-A, *e.g*., Military data fusion of intelligence information, defensive and offensive cyber intelligence, and upgrade to the DCGS Integrated Backbone (DIB), the thoroughfare for sharing intelligence information throughout the military and intelligence community, as well as ease-of-use improvements, all determined to be necessary by the Army Joint Requirements Council (JROC). This large scale effort requires development and integration of software to seamlessly meet the Army's current and ever-evolving requirements for a global intelligence system.

As GAO correctly determined, Appx16565-66, the Army's judgment to use a single-Indefinite Delivery/Indefinite Quantity (IDIQ) contract award to procure the full DCGS-A2 requirements was eminently reasonable, as this effort requires a solution for a complex System of Systems that must be interconnected and integrated so that the entire effort functions to achieve military-unique specifications classified up to the Top Secret level. Appx12298-12304, Appx16626-27. There are detailed testing and verification requirements to ensure that each software unit or component functions as anticipated, and integration of units or components is successful, coupled with documentation requirements to ensure that military-unique performance specifications are achieved. Appx11123-29, Appx11377-85.

Palantir defends the court's injunction and some of its rationale, but also attempts to substitute its own rationale, and advocates that, "if the Army proceeds with the procurement of DCGS-A2, it must do so on a commercial-item basis" under FAR Part 12. PalBr.4.

Palantir argues that the Government must acquire commercial items "to the maximum extent practicable." PalBr.1, 3, 5-6, 25, 32-33, 63, citing *SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547 (Fed. Cir. 1988). Congress did not explain how to implement FASA's preference for "commercial items *or* nondevelopmental items other than commercial items," and directed that FASA be

implemented through the FAR. 41 U.S.C. § 3307(e)(1). It is not the case that a commercial item must be procured where it does not meet full Government requirements, or that a commercial item must be procured where it meets part of Government requirements. Only a "commercial item" that is "customarily available in the commercial marketplace" and meets full Government requirements must be purchased through FAR Part 12:

> (d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

FAR 10.002(d)(1).

As GAO reasoned, Appx16563, "[d]etermining whether a product or service is a commercial item is largely within the discretion of the contracting agency." As GAO concluded, Appx16564, the Army reasonably determined, based on results of market research, that the full DCGS-A2 requirements were not met by a product or service customarily available in the commercial marketplace that meets FAR 2.101's definition of "commercial item." As GAO concluded (Appx16564 n.9), the Army implemented FASA by requiring the LSI to maximize use of commercial items as components of DCGS-A2. GovBr.31; FAR 11.002(a)(2)(iv). The issue is whether the Army reasonably exercised its discretion.

# I.    Market Research Was "Appropriate To The Circumstances"

As we explained, the court erroneously declared that the market research violated section 2377(c)(1), because it was not a full investigation of whether commercial items could meet all or part of DCGS-A2 requirements. Appx80, Appx86, Appx104. Congress directed that the statutory language that market research be "appropriate to the circumstances" be implemented through the FAR, 41 U.S.C. § 3307(e)(1), *American Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 441 (2015), and the court should have looked to the FAR to determine whether the Army abused its discretion.

As the FAR recognizes, "the extent of market research" need not be exhaustive, and "the extent of market research will vary" with the circumstances, including such factors as "urgency, estimated dollar value, complexity, and past experience." FAR 10.002(b)(1). The reference to "past experience" emphasizes the crucial role of agency expertise, specialized knowledge and experience. There may be various manners of conducting appropriate market research for any situation. Accordingly, judicial review should be highly deferential in determining whether the Army abused its discretion in conducting market research.

Palantir responds that the term "maximum" and phrase "maximum extent practicable"–which are not in 10 U.S.C. § 2377(c), but are used in subsections 2377(a) and (b)--require that the Army conduct a full, *i.e.,* complete,

investigation of whether commercial items could meet all or part of DCGS-A2 requirements.  PalBr.30, 32.

"Appropriate to the circumstances" is not the same as "the maximum extent practicable."  It is more logical to assume that Congress' language in subsection (c) is not identical for a reason.  *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 452 (2002).  "Appropriate" means "suitable: fitting."  *Webster's II New College Dictionary*, 3d ed. 57 (2005).  As the FAR recognizes, market research can be suitable and fitting, even if it is not the "maximum" or "maximum extent practicable" that might be completed.  Congress' "appropriate to the circumstances" language highlights the expertise of agencies, as well as their discretion and specialized knowledge and experience.  The importance of agency discretion and expertise in determining the scope and methods of market research is well-established.  *American Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 218 (2014); *Advanced American Const., Inc. v. United States*, 111 Fed. Cl. 2015, 226 (2013); *Assessment and Training Solutions Consulting Corp. v. United States*, 92 Fed. Cl. 772, 731 (2010); *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 263 (2006).  FASA's "maximum extent practicable" language—which does not address market research—does nothing to alter this discretion.  Rather, Congress' choice of "appropriate to the circumstances" for the market research subsection 2377(c)(1) contrasts with the "maximum extent practicable" phrase in subsections

2377(a) and (b).  This demonstrates that market research need not be as exhaustive as Palantir and the court demand.

## II.     The Army Did Not Violate The FAR Or Abuse Its Discretion

This Court's review of the trial court decision proceeds *de novo*.  *Glenn Defense Marine v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2015).  In administrative appeals, where the court reviews the record before the agency, the court's factfinding capacity is "typically unnecessary to judicial review of agency decisionmaking."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  This Court's task is the same as the trial court's task in the initial review, *i.e.,* "[b]oth courts are to decide, on the basis of the record the agency provides whether the action passes muster under the appropriate APA standard of review."  *Id.*

Administrative proceedings are entitled to "a presumption of regularity," and challengers must demonstrate that the agency action was not "based on a consideration of the relevant factors," or was "a clear error of judgment."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971) (*Overton Park*), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977); *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

Here, the court improperly cast aside "the presumption of regularity," with results of RFIs totaling 1293 pages, because the court erroneously concluded that

the "market research [was] based on the presumption that the procurement would be developmental," *i.e.,* not a FAR Part 12 procurement, when no such determination had been made by the Army.  GovBr.44-51; Appx79, Appx70.

The Army obtained two market studies that canvassed the commercial marketplace, *i.e.,* the Data Integration, Visualization and Analytics (DIVA) and Trade Space Analysis (TSA) market studies.  GovBr.10-11, 16-18.  Such studies assessed the capabilities of commercial software, including platforms.  *Id.*, Appx16293-94.  GAO discussed such studies, Appx16563-64, and the Army relied on them in the trial court.  Appx904-09, Appx974, Appx10008-12.

The DIVA recommended a Hybrid approach, which would utilize commercial software and software developed by the Government (GOTS), and identified significant risks and "major integration activities" for this approach, including that the Army must "develop and integrate" software interfaces.  GovBr.10-11; Appx12249-50, Appx11926-28.  The study did not recommend simply acquiring a DIVA platform, but rather demonstrated that development and integration services were required for all of the approaches, including the Hybrid approach.  GovBr.10-11; Appx11923.

The TSA informed the "upcoming…Request for Proposal" for DCGS-A2, Appx11931, and assessed capabilities of commercial software and GOTS software, pertinent to significant DCGS-A2 requirements, but did not disclose whether

Palantir was a subject of the study. GovBr.16-18; Appx11977-78, Appx11981, Appx11987-88, Appx11992. Contrary to Palantir's claims (PalBr.26, 41, 52), the TSA addressed the modification of commercial software by determining the necessity for "significant custom development" of commercial software and software-integration to achieve DCGS-A2 requirements, and their associated risks. GovBr.17; Appx11976-81, Appx11987-88, Appx11992, Appx12007, Appx12114. The TSA concluded that a Hybrid approach, using "commercially available software" and software developed by the Government (GOTS) was best. GovBr.17; Appx11946, Appx11948-49, Appx11951, Appx11954, Appx11976, Appx11992. The TSA concluded that commercial off-the-shelf (COTS)-only solutions carry "high risk" because they are "likely to need significant custom development to provide Army specific capabilities" and "are more likely to fail integration." GovBr.17-18, 43; Appx11988, Appx11992.

Palantir contends that section 2377(c)(1) required that the Army issue RFIs that specifically "solicit information" addressing commercial products, and possibly conduct a demonstration of the capabilities of Palantir's platform and one other commercial product. PalBr.3, 35, 46. Palantir asserts that the market research should have determined whether Palantir's product and the product of one other industry-respondent meets DCGS-A2 requirements, and the Army cannot leave the determination of whether individual commercial products meet DCGS-

A2 requirements to a LSI, which "selects, configures, integrates, and tests commercial software as potential components of a final solution and determines whether it fulfills DCGS-A2 requirements." PalBr.33-34, quoting GovBr.37.

Palantir looks to the statute, which is the wrong legal source, to determine whether market research was "appropriate to the circumstances" presented by DCGS-A2 requirements. In addition to obtaining two studies on capabilities of commercial software in the commercial marketplace, the Army issued three RFIs and various draft documents to industry for comment. As we demonstrated, GovBr.11-15; Appx69-70, Appx77 n.40, the court overlooked statements in the RFIs that DCGS-A2 would continue to maximize the use of COTS/GOTS products, Appx11877, Appx11901, and "focus on integrating COTS/GOTS and internally developed software products into a software baseline," Appx11880, and that RFIs do not "obligate or restrict the Government to any particular acquisition approach." Appx11876.

In response to RFIs, Palantir and other industry-respondents provided information that addressed their commercial software, including platforms. *E.g*, Appx11887-88 (Palantir), Appx14611-12, Appx14804-07, Appx15455-60; GovBr.49, 55-56. The market research reports assessed capabilities of industry-vendors and their commercial software, including platforms. *E.g.,* Appx11867-70 (¶7.4.3.22, ¶7.4.3.23, ¶7.4.3.32, ¶7.4.3.37, ¶7.4.3.38, ¶7.4.3.44); Appx11831-37

(¶7.4.4.18, ¶7.4.4.26, ¶7.4.4.28). Contrary to Palantir's assertions (PalBr.2, 32), the other industry-respondent, referenced by the court (Appx79-80), identified its commercial product in response to RFIs, but did not claim that it could meet DCGS-A2 requirements, or serve as its central data management platform. Appx14804-07. The Army found this industry-respondent and its commercial product capable in only "one area" pertinent to DCGS-A2 requirements. GovBr.55-56; Appx11866 (¶7.4.3.9). It was not the case that the RFIs asked only about industry-respondents' "developmental projects," *i.e.,* non-commercial item contracts. Appx69-70.

Contrary to Palantir's assertions (PalBr.1, 15, 27, 53), and as GAO determined (Appx16560, Appx16562), during market research, Palantir did not assert that its platform could meet the full DCGS-A2 requirements. GovBr.12-15, 56. In response to RFI One, Palantir advocated that the Army break up DCGS-A2 requirements, and adopt a phased approach, *i.e.,* acquire firm-fixed price licenses for a core "COTS software platform" and deploy it, and subsequent procurements could fulfill gaps in DCGS-A2 requirements not met by the platform, and cost-plus contracts could be used "for optional system enhancements" and "should total less than 20 percent of the total contract value." Appx11888-89, Appx11892-93. Palantir "recommend[ed] a 'Best Value' tradeoff analysis given the complexity of software procurement." Appx11893.

11

Palantir seeks to diminish the fact that, in response to RFI One, Palantir identified commercial item contracts to indicate its capabilities, Appx1887-88, and thus understood that such contracts were pertinent to RFI responses. The Army did not "ignore[]" Palantir's information. PalBr.45. The December 2014 market research report, based on industry-responses to RFI One, stated: Palantir "has developed an intelligence fusion system that has been used by various entities within the Department of Defense… and [was] capable to provide Data management and Workflow Management upgrades, and partially capable of providing Data Fusion and Cyber capabilities to Increment 2." Appx11868 (¶7.4.3.28). At GAO, Deputy Product Manager Mr. Morton explained that Palantir supports some, but not all, DCGS-A2 capabilities and requirements. Appx16416. For example, regarding information collection, although Palantir supports link analysis, no commercial product, including Palantir, supports the collection manager function. Appx16317-19; GovBr.59-60. Mr. Morton explained that no commercial product, including Palantir, supports the Counter Intelligence/Human Intelligence (CI/HUMINT) capability, and interoperates with Defense Intelligence Agency programs and the devices managed by a soldier, which is a Task order one requirement. Appx16295, Appx16319, Appx16377-78, Appx16390-91, Appx11342-43 (¶3.2.27); GovBr.59.

In response to RFI Two, Palantir referenced the list of 23 domains included in the RFI, asserted that its platform supported "many of the domains listed," offered to demonstrate how its "platform functionally fulfills the specific domain," or arrange a discussion; Palantir failed to identify "specific domains" where it had capabilities, and did not assert that its platform meets all DCGS-A2 requirements. Appx11911; GovBr.14-15. Palantir was not deemed "nonresponsive" because Palantir provided information on its commercial platform instead of information on its experience in developing software. PalBr.26. RFI Two identified and listed 23 capability areas that were pertinent to DCGS-A2, *e.g.,* cloud-computing, ease-of-use initiatives, "big data" analytics, data fusion and pattern analysis, defensive and offensive cyber operations, sensor management, targeting, and on-the-move operations. Appx11-12; Appx11900, Appx11903-05. As explained at pp.10-11, industry-respondents, but not Palantir, responded by identifying Government contracts demonstrating their technical capabilities in the specific domains pertinent to DCGS-A2 requirements. The Army verified technical capabilities of commercial software that the industry-respondents asserted, Appx16350, and summarized such capabilities in the market research report. Appx11831-39; *see* pp.10-11 above. The July 2015 market research report, referencing Palantir's response to RFI Two, stated: "One large business did not provide capability data: 1.Palantir." Appx11839.

Palantir misstates the record when it states: "the government told the Court of Federal Claims, Palantir had 'already identified its commercial item contracts in response to RFI Two.'" PalBr.45-46. Palantir told the trial court that it was not necessary for Palantir to identify any contracts in response to RFI Two, because Palantir identified its commercial item contracts in response to RFI One. Appx82; Appx484 (Palantir stating, "Palantir had already provided the Army with information about its prior Government contracts…There was no reason to do so again."). Palantir's contention also demonstrated that commercial items were appropriate industry responses to RFI Two, as well as RFI One.

In response to a request for industry comments on a draft of sections L and M of the solicitation, Palantir did not assert that its platform could meet the full DCGS-A2 requirements. Appx10707-13. The draft of sections L and M included instructions for offerors and the evaluation factors for award. Appx10819-41. Sections L and M were not full DCGS-A2 technical requirements; those requirements were in the Performance Work Statement (PWS) and Performance Based Specification (PBS). Palantir takes statements it made in response to the draft out of context, and selectively and misleadingly quotes such statements. PalBr.53, citing Appx10713. In response to the draft of sections L and M, Palantir said: the Army should "maximize the use of existing commercial technologies"

and "break the [DCGS-A2] program into sensible components and use commercial procedures where solutions can be bought rather than built."  Appx10713.

Palantir also advocated that the Army delete multiple DCGS-A2 requirements from the PWS "so that vendors are evaluated principally on their" platforms, *i.e.*, deletion of ¶3.2.11, Military Fusion; ¶3.2.12, Intelligence Support to Cyber Operations; ¶3.2.17, Integration of DCGS Integration Backbone; and ¶3.3.36, Additional enhancements.  Appx10693-94, Appx10698.1, Appx16331; GovBr.56.

Palantir tries to diminish the burdens that the court's opinion and injunction impose by asserting that there are "likely only one or two" commercial products that could serve as DCGS-A2's core platform.  PalBr.32.  But, only a "commercial item" that is "customarily available in the commercial market place" and meets the *full* Government requirements must be purchased through FAR Part 12.  FAR 10.002(d)(1).  The burdens of conducting full investigations of whether commercial products meet all or part of DCGS-A2 requirements, or conducting demonstrations of commercial products are substantial and self-evident.  A total of 263 companies participated in the market research, Appx11810-16, and 83 of them responded to RFIs.  Appx11809-16.  The Army held one-on-one meetings with 78 industry-respondents, where they were able to address their products' capabilities, the acquisition approach, and other matters.  Appx11809.

Agencies must treat all potential offerors "fairly" and cannot favor one over another, *e.g.*, by conducting a full investigation or demonstration of one party's commercial product but ignoring another. FAR 1.102-2(c)(3); GovBr.36. Further, market research collects and analyzes "information about determining capabilities within the commercial marketplace to satisfy agency needs." FAR 2.101-1. The purpose is not, as Palantir apparently advocates (PalBr.33-34), essentially equivalent to a source-selection where the Government determines whether individual company products fulfill Government technical requirements. Appx11946, Appx11955, Appx11968; GovBr.16, 38.

Moreover, it was not the case that the Army could determine in advance, based on paper submissions or discussions, whether individual commercial products would actually meet the DCGS-A2 requirements for which they might be chosen. Accordingly, DCGS-A2 requires that the contractor submit a detailed proposal identifying all components of its proposed solution, and that it select component software and perform "integration and testing" of commercial software to ensure it satisfies DCGS-A2 requirements for which it is chosen. Appx11123-29, Appx11377-85; GovBr.37. Even if commercial software is selected and performs as anticipated, that would not demonstrate that it can be successfully integrated into the complex DCGS-A System of Systems, and consequently, the contractor also must perform integration and integration-testing. *Id*. In all of the

circumstances surrounding DCGS-A2 requirements, Palantir has failed to demonstrate that the Army's market research violated the FAR or abused its discretion.

### III.   The Army Did Not Violate Section 2377(c)(2)

Agencies shall "use results of market research to" determine if commercial items "(A) [m]eet the agency requirements; (B) [c]ould be modified to meet the agency's requirements; or (C) [c]ould meet the agency's requirements if those requirements were modified to a reasonable extent," FAR 10.001(a)(3)(ii), and the extent to which commercial items "could be incorporated at the component level." FAR 10.001(a)(3)(iii).

The Army determined that no commercial item was available to meet the full DCGS-A2 requirements.  Contrary to Palantir's claims (PalBr.16, 26), the court determined, the "conclusion that no commercial items were available to meet the Army's requirements was evident in the October 21, 2015 determination of Ms. Shyu [Assistant Secretary of the Army for Acquisition, Logistics and Technology, and the Senior Procurement Executive]," recommending that DCGS-A2 be procured through a single IDIQ contract award (Appx12298-12304), and when the solicitation issued, the Army had decided "that no suitable commercial items were available."  Appx72.

The Army reasonably determined, based on market research, that the FAR 2.101 definition of "commercial item" was not met, and FAR Part 12 was not applicable by considering both products and services. The July 2015 Market Research report found: "[s]ignificant portions of the anticipated Increment 2 scope of work such as [Military] Data Fusion, Intelligence Support to Cyber, and DIB [DCGS Integrated Backbone] upgrade are not available as a commercial product. As such the DCGS-A2 Increment 2 development effort cannot be procured as a commercial product." Appx11840. As detailed at Appx12298-12304, in October 2015, Ms. Shyu determined the necessity for a single-IDIQ contract award to procure the full DCGS-A2 requirements essentially because the solution for the complex DCGS-A2 System of Systems must be interconnected and integrated so that the entire effort functions to achieve the military-unique performance specifications, and the performance, schedule and cost risks precluded breaking up DCGS-A2 requirements. There also were detailed testing and verification requirements to ensure that each unit or component functions as anticipated, and that the integration of units or components is successful, coupled with documentation requirements to ensure that military performance specifications are achieved, and development and integration work could not reasonably be separated. Appx11123-29, Appx11377-85. DCGS-A2 requirement could not reasonably be modified.

18

In December 2015 and before issuance of the solicitation, contracting officials determined that there was "a lack of precise specifications" and "uncertainty in contract performance," and the DCGS-A2 IDIQ contract and Task order one both required developmental and integration services, and must be cost-type contracts, and could not be fixed-price contracts, the contract type required for FAR Part 12 commercial items. Appx12297, Appx10150-53.

The Army reasonably determined that commercial products could not be modified to meet all DCGS-A2 requirements as a "commercial item" as defined in FAR 2.101. As detailed in Appx10056-60, the contracting officer and Deputy Product Manager explained through affidavits and testimony that, while portions of DCGS-A2 requirements may be met through commercial software, some portions can only be met through military-unique software applications, and these military-unique software applications are not offered for sale in the commercial marketplace, and cannot meet DCGS-A2 requirements through minor modifications based on the military-unique nature of the required capabilities. Software integration and integration-testing services against military-unique specifications were further required to tie together diverse capabilities within the system, including GOTS components, and such services were not "sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices." *Id*. As detailed in Appx16626-27, the July

2016 Determination of Non-Commercial Item, contracting officials made similar

determinations, based on market research, that the FAR 2.101 definition of

"commercial item" was not met by either commercially available products or

services.

Palantir characterizes the Army's explanations that the FAR 2.101 definition

of commercial item was not met as an "unsubstantiated, incomplete, and

conclusory *ipse dixit.*" PalBr.4, 50 n.6, 53. The Army's determinations are

"entitled to a presumption of regularity," and Palantir has not demonstrated that

they were not "based on consideration of relevant factors" or were "a clear error of

judgment." *Overton Park*, 401 U.S. at 415-16. An agency need only have

articulated a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 23, 43

(1983). The Army's explanations suffice. As detailed at Appx11840, Appx12297,

Appx10150-53, Appx10056-60, Appx12298-12304, Appx16626-27, the Army

considered DCGS-A2 requirements, the capabilities of commercial software

pertinent to such requirements and the necessity for their modification through

development and integration of software and integration-testing against the unique

military performance specifications for this System of Systems, and the FAR 2.101

definitions of a commercial product or commercial service. *State Farm* does not

require a word or sentence count; a short explanation can be a reasoned explanation.

Palantir challenges the Army's findings by attempting to diminish, and thereby misrepresent, DCGS-A2 requirements. PalBr.4, 50 n.6, 53. Thus, Palantir asserts that commercial items, including Palantir's platform, can provide "data fusion," and cites a past performance rating of "excellent" issued for a 2012 Army Research Laboratory contract for Palantir's "integrated fusion and analysis platform." PalBr.50 n.6, citing Appx18183-84. Palantir did not provide the statement of work or technical requirements for this contract, or demonstrate that it contained the same requirements as DCGS-A2.

DCGS-A2 requirements are exacting. Military Data Fusion, a Key Performance Parameter (KPP), includes Fusion Levels 0-2. Appx11072-73, Appx16288. Fusion Level 0 is the organization and normalization of incoming data into a usable form and ensures that the data is uniform and ready for processing. *Id.* Fusion Level 1, "Entity Refinement," is the identification of incoming data by entity type and identity, and includes entity correlation which determines if the incoming data is total new, an update, or is ambiguous. *Id.* Fusion Level 2, "Situation Refinement," performs computer-assisted association processing that determines how entities are related to one another and captures the nature of that relationship. *Id.* The December 2014 Army market research report

stated Palantir was "partially capable of providing Data Fusion and Cyber capabilities to Increment 2," *i.e.*, it had "[s]ufficient [e]xperience or ability to fulfill some but not all anticipated requirements under the appropriate capability block." Appx11862, Appx11868.  As explained at page 12, Deputy Product Manager Mr. Morton testified that commercial items with modifications, including Palantir's platform, could meet some, but not all, DCGS-A2 requirements.  GovBr.60; Appx16302-04 (*e.g.*, Palantir could perform "link analysis" and support data analytics, and extract information automatically).

Palantir asserts that its platform provides intelligence support to cyber, citing an August 2014 Army Cyber Command contract, and a 2013 Mitre report stating Palantir has capability to log and detect cyber events, which only addresses part of defensive cyber capabilities.  PalBr.50 n.6, citing Appx18650-54, Appx17851.  This contract and report do not purport to be the same as the exacting DCGS-A2 requirements for defensive and offensive cyber.  Appx11229.

The DCGS Integrated Backbone (DIB) is the mechanism for sharing finalized intelligence products within the intelligence community and the rest of the other military service intelligence components.  Appx10270; Appx11599 (Subfactor 3), Appx16274.  Palantir asserts "Palantir has demonstrated its interoperability with each of the Department of Defense systems identified in the RFIs," *i.e.,* DIB, Joint Information Environment (JIE), and Defense Intelligence

Information Enterprise (D12E). PalBr.50 n.6, citing a U.S. Special Operations Command contract awarded in May 2016, Appx18270-71, and a Defense Intelligence Agency contract awarded in September 2015, Appx18137, Appx18153. Both contracts were outside of the market research, and are not relevant. Appx84 n.42. Moreover, DCGS-A2 requirements are not satisfied by being interoperable with the DIB, or other intelligence networks. DCGS-A2 requires a unique upgrade to DIB version 4.2, Appx11599 (Subfactor 3), Appx11075 (¶3.2.11), which requires integration of DIB version 4.2, GOTS software. *Id*.; Appx11840 (¶8.3.5).

Palantir contends that the Army failed to consider commercial products with "modifications of the type customarily available in the commercial marketplace." PalBr.54-55.[1] The market research addressed the modification of commercial software and determined the necessity for "significant custom development" of commercial software and software-integration to achieve DCGS-A2 requirements, Appx11976-81, Appx11992, Appx12007, Appx12114, and the Army determined that market research showed that "military unique capabilities classified up to the Top Secret level needed to meet" requirements associated with DCGS Integrated Backbone upgrade and other DCGS-A2 functionalities were not available as a commercial item as defined in FAR Part 2.101. Appx11840, Appx16626-27,

---

[1] In n.7, Palantir mischaracterizes our arguments. Appx960-62.

Appx10056-60. DCGS-A2 encompasses military unique specifications to such an extent that when designed and built it cannot be considered "of a type" available in the commercial marketplace. *Id.*; *Voith Hydro, Inc.*, B-401244.2, 2009 CPD ¶239 (sustaining determination of no commercial item where "while individually some of the components may be commercially available…it is only through the effective combined integration of these components that a complete workable system can be achieved").

The Army also determined that the modification of commercial software to achieve full DCGS-A2 requirements would require developmental and software-integration services, and such services do not meet the definition of a commercial service in FAR 2.101. The solicitation is "for the acquisition of services for the development and integration of" DCGS-A2 requirements. Appx11051. As the Army recognized, Appx10056-60, Appx16626-27, only two kinds of services can come within the definition of commercial item: (1) installation, maintenance, repair, training, and other services if (a) procured for support of a commercial item, and (b) the source "provides similar services contemporaneously to the general public under terms and conditions similar to those offered" to the Government; and (2) "services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieve under standard

commercial terms and conditions." FAR 2.101; *see Envirocare of Utah, Inc. v. United States*, 44 Fed. Cl. 474, 483-85 (1999).

As detailed at Appx10056-60; Appx16626-27, the Army determined that development and the integration of software, and integration-testing services against DCGS-A2's military-unique requirements were required to tie together discrete capabilities within the entire System of Systems, including GOTS components, and such services do not meet either prong of a commercial service defined in FAR 2.101. DCGS-A2 services are not "installation, maintenance, repair, training and other services" procured to support an existing commercial item. *Id.* DCGS-A2 services "are not sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices." *Id.*

The Army also determined the extent to which commercial items could be components of DCGS-A2. FAR 10.001(a)(3)(iii). DCGS-A1 contains multiple software platforms integrated together, and analyses tools enabling linking and fusing of critical pieces of intelligence information so that they are not lost in reams of data. GovBr.9; Appx10005, Appx10008, Appx16269. DCGS-A1 incorporates 151 commercial software products, including an Oracle Database, a commercial data management platform (Appx10248, Appx11835 (¶7.4.4.28), Appx15464), ArcGIS Desktop, a commercial geospatial processing system (Appx10243, Appx15318, Appx15589), and IBM Analyst's Notebook, a

commercial link analysis tool (Appx10245). The Army anticipates DCGS-A2 would contain a similar extent of commercial software, including platforms. GovBr.9; Appx16313-14, Appx16354-55, Appx11831-32 (explaining DCGS-A1 capabilities that will carry forward to DCGS-A2), Appx12305 (same).

Contrary to Palantir's assertions (PalBr.2, 8, 35), as the administrative record demonstrated, and GAO determined (Appx16561), DCGS-A1, Release 2, has been successfully developed and fielded, and "is currently deployed worldwide in support of intelligence operations in all theaters of operation." Appx10005-06, Appx10008. At the November 2015 briefing for the Chief of Staff (CSA) and the Acting Undersecretary of the Army (AUSA), the Army reported that DCGS-A1, Release 2, "completed Follow on Test and Evaluation (FOT&E) during the Network Integration Exercise (NIE) 15.2, and was found to be effective, suitable and survivable based on [Army Test and Evaluation Center] ATEC [] feedback." Appx18364. Also, in December 2015, the Assistant Secretary for Defense reported to the Under Secretary of Defense that DCGS-A1 completed FOT&E and was operational. Appx14244. The FY 2015 DOT&E Annual Report for Congress also reported that DCGS-A1, Release 2, passed operational testing. Appx17357, Appx17268. Palantir's platform was used by some of the Army units in Afghanistan, PalBr.2, 35-36, but has not subjected to the rigorous testing that was

used to determine that DCGS-A1, Release 2, is effective, suitable, and survivable, and does not have an ATEC certification.  Appx17806.

Contrary to GAO's conclusion (Appx16564 n.9), Palantir mistakenly asserts that the solicitation precludes offerors from choosing a commercial platform, such as Palantir's, as part of their solution to achieve DCGS-A2 requirements.  PalBr.35 n.3, 44 n.5.  Palantir relies on the word "develop" in the PWSs for the IDIQ contract and Task order one, and asserts "develop" means creating new software, not using existing software.  PalBr.35 n.3, citing Appx10969, Appx11328-30.

"Develop" is a broad term which includes "to aid in the growth of," *Webster's II New College Dictionary*, 316, and the PWSs demonstrate that, for DCGS-A2, the terms "develop" and "development" have this common meaning. Both PWSs require that each software release or development maximize the use of commercial products and such contract clauses amply demonstrate that commercial platforms, including Palantir's, may be part of a proposed solution for fulfilling DCGS-A2 requirements.  Appx11101 ("At a minimum, a release/development shall include…A maximization of reuse of GOTS/COTS products.") (IDIQ contract, ¶3.4.1); Appx11344-45 (same) (Task order one); Appx11081 ("The contractor's design approach shall emphasize the selection of components that are available commercially or within the DoD, to avoid the need to redevelop products

that already exist and that can be reused.") (IDIQ contract); Appx11327 (same) (Task order one).

Palantir's assertion that "[o]nly if the agency's needs cannot be restated to facilitate a commercial item procurement [under FAR Part 12] may the agency proceed with a developmental solicitation" has no legal basis. PalBr.7, 59. Rather, only "reasonable" modifications of agency requirements need be considered, and then only "in appropriate cases." 10 U.S.C. §§ 2377(b)(3)&(c)(2)(C); FAR 10.001(3)(ii)(C). The Army determined that it was unreasonable to modify DCGS-A2 requirements. DCGS-A2 technical requirements were fixed by the JROC, and could not be deleted or modified by DCGS-A2 program management. GovBr.29; Appx10026, Appx12298, Appx16268, Appx16283-85. Palantir does not contend that the Army should have deleted or altered technical requirements of DCGS-A2.

As GAO correctly concluded, Appx16565-66, the Army reasonably determined that, because of cost, scheduling and performance risks, it was not reasonable to modify the procurement of DCGS-A2 requirements by fragmenting DCGS-A2 technical requirements, *e.g.*, procuring a platform under FAR Part 12, as Palantir advocated, and using separate contracts to enhance and modify such platform, including the integration of "multiple interfaces and interoperability requirements with external intelligence systems" and integration-testing against military-unique specifications to ensure integration is successful, and all DCGS-A2

requirements are realized.  GovBr.30-33, 65-68; Appx12298-12304, Appx16321, Appx16454-55.

## IV. The Court Abused Its Discretion In Supplementing The Administrative Record

There was no necessity to add Mr. Choung's reports and deposition testimony to the administrative record in order to effectively conduct APA review of whether the market research violated section 2377(c)(1), and the Army failed to reasonably make determinations in section 2377(c)(2).  Therefore, the court abused its discretion in adding these materials to the administrative record.  *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009); GovBr.62-65.  The court did not determine that supplementation of the administrative record with these materials was required because the market research was inadequate.  PalBr.58.  The court acknowledged "concerns with regard to Mr. Choung's credibility as an employee of protestor and expert witness," but added his reports and deposition because of "the technical nature of the Army's requirements and Palantir's capabilities" and "in order to determine whether Palantir may have a commercially available product that would satisfy the Army's requirements."  Appx29.

Under *Axiom*, 564 F.3d at 1380-81, the standard for supplementation is not whether extrinsic evidence, such as expert reports and testimony, would be helpful to the court; rather, there must be a necessity for the extrinsic materials in order to

conduct APA review. *Parcel 49C v. United States*, 130 Fed. Cl. 103, 122-23

(2016) (rejecting expert report in bid protest); *Vion Corp. v. United States*, 122

Fed. Cl. 559, 569 (2015)(same). Not only was there no necessity, Palantir could

have identified "the specific domains" where it had technical capabilities pertinent

to DCGS-A2 requirements in response to RFI Two, and did not. Appx11911.

Palantir could have discussed its capabilities in a one-on-one meeting with DCGS-

A project management, but did not have such a meeting. Appx11814. There was

no necessity to add Mr. Choung's opinions where Palantir had opportunities to

inform the Army of its platform's capabilities pertinent to DCGS-A2.

Mr. Choung's reports and deposition added new evidence that was not

presented to the Army, and assessed the technical merits of the Army

determination of non-commercial item and DCGS-A2 solicitation, and challenged

their wisdom and merits. Under *Axiom*, 564 F.3d at 1381, new evidence consisting

of extrinsic expert reports and testimony that was not before the agency should not

have been added to challenge the correctness or wisdom of the agency's decision.

Testimony of outside, and in this case interested, experts is also of dubious

relevance in determining what course of action is in the public interest. The Army

is determining through a competitive process the solution that will best equip

soldiers with an intelligence system required for a multitude of missions. It was an

abuse of discretion to add Mr. Choung's reports and deposition to the

administrative record where there was not a necessity for such materials for effective APA review.

The court did not determine whether Palantir could meet DCGS-A2 requirements. Appx96. Mr. Choung's reports and deposition testimony do not demonstrate that the Army's determinations, based on market research, were arbitrary or capricious, or a clear error of judgment. Palantir, relying on Mr. Choung, asserts that Palantir could modify and develop its platform to fulfill "all of the other capabilities that the Army claims to be unavailable from commercial items" "on a commercial-item basis" for a fixed-price. PalBr.50 n.6, citing Appx18397-98, Appx18406-28, Appx18452-72.

Mr. Choung lacked expertise in procurement, and did not rely on the FAR 2.101 definition of "commercial item," Appx18874 (Tr.29), Appx18875 (Tr.30), Appx18887 (Tr.79), Appx18900 (Tr.132), and his self-serving assertions do not demonstrate that FAR 2.101 definition of "commercial item" was met for the full DCGS-A2 requirements. For example, Mr. Choung asserted: "it would be technologically feasible for Palantir to [] install the DIB software," and Palantir would charge a firm-fixed price for such software development and integration to achieve DCGS-A2 upgrade to the DIB. Appx18421. As explained in the Army's determinations of non-commercial item, Appx10056-60, Appx16626-27, the issue was not whether Palantir would charge the Army a firm-fixed price to enhance and

31

develop its platform, and integrate it with other party's software and achieve DCGS-A2 requirements; such services did not meet FAR 2.101's definition of a commercial item. FAR 2.101.

Palantir contends that Mr. Choung opined that Palantir could provide all of the "integration" required for DCGS-A2. PalBr.57. But, Mr. Choung lacked expertise in procurement and did not rely on the FAR 2.101 definition of a commercial product or commercial service. Appx18874 (Tr.29), Appx18875 (Tr.30), Appx18887 (Tr.79), Appx18900 (Tr.132). Mr. Choung asserted that Palantir's platform performs "data integration," meaning that it brings in "data from disparate sources," "copies and stores the file," accesses and catalogs the file's content, and correlates information. Appx18398, Appx18400, Appx18405. DCGS-A2 also requires integration of software, including platforms and GOTS software, and testing of software-integration against DCGS-A2 military-unique specifications. As detailed at Appx10056-60, Appx16626-27, this is not a commercial service as defined in FAR 2.101. Palantir and Mr. Choung never asserted Palantir could meet all DCGS-A2 requirements as a commercial service as defined in FAR 2.101. In response to RFIs, Palantir stated that it "do[es] not anticipate building software for the government under a services contract." Appx11911; GovBr.15.

## V.    **The Court Should Have Considered Agency Submissions To GAO**

Neither section 2377 nor the FAR address the time by which agencies must make the determinations in section 2377(c)(2), and do not require that such determinations be made, or documented in writing, before issuance of a solicitation.  Palantir acknowledges that affidavits of the contracting officer and Deputy Product Manager, Appx10056-60, and Army testimony at GAO were part of the administrative record, PalBr.55, citing *Glenn Def. Marine*, 720 F.3d 901, but argues that a court can refuse to credit such official documents, because they were made after issuance of the solicitation.  PalBr.55-56, citing *Raymond Express Int'l v. United States*, 120 Fed. Cl. 413 (2015), and *CRAssociates v. United States*, 95 Fed. Cl. 357 (2010).

Court of Federal Claims' decisions are not binding precedent, and these decisions are inconsistent with *Glenn Def. Marine*.  Here, the court ignored Army affidavits and testimony at GAO, which were not mere assertions of counsel. Although a court may "critically" review such agency materials, it could not disregard or refuse to credit them.  *Overton Park*, 401 U.S. at 420.  Indeed, there was no requirement that the Army document its determinations.  *Advanced American Const.,* 111 Fed. Cl. at 227; FAR 10.002(e).

Although Palantir Technologies is a member of Amicus TechNet, neither Palantir Technologies nor TechNet have standing in this bid protest.  28 U.S.C.

§ 1491(b)(1). The trial court dismissed Palantir Technologies for lack of standing. TechNet's brief is devoid of any citations to the administrative record, attempts to add documents to that record that Palantir did not seek to add at the trial court, and selectively quotes from and mischaracterizes such non-record materials. In light of the applicable standard of review, TechNet's extra-record evidence and arguments do not assist the Court in determining whether the Army violated the law or was arbitrary or capricious.

Because the Army's judgment to procure DCGS-A2 requirements under FAR Part 15, and not under FAR Part 12, and that such requirements were not met by either a commercial product or commercial service as defined in FAR 2.101, did not violate the FAR, and was not arbitrary or capricious or a clear error of judgment, this Court should vacate the trial court's opinion and injunction, and allow the procurement to proceed. The Army had received offers and engaged in discussions with offerors, but had not requested final proposal revisions before the injunction issued.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

/s/Domenique Kirchner
DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 307-1111
Fax: (202) 514-8624
Attorneys for Defendant-Appellant

August 4, 2017

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this  4th  day of

August 2017 , a copy of the foregoing Corrected Reply Brief of Defendant-

Appellant

was filed electronically.

___X___ This filing was served electronically to all parties by operation of the

Court's electronic filing system.

*/s/*Domenique Kirchner_____

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains 6,999 words as calculated by the word processing system used to prepare this brief.

/s/Domenique Kirchner