---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PALANTIR USG, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

Appeal from the United States Court of Federal Claims in case no. 16-cv-00784C, Judge Horn

---

JOINT APPENDIX

Volume I

Pages Appx00001 – Appx12348

---

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-1111
Fax: (202) 514-8624
Attorneys for Defendant-Appellant

August 11, 2017

**PALANTIR USG, INC.**

v.

**UNITED STATES**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
**CASE NO. 17-1465**

**NONCONFIDENTIAL JOINT APPENDIX TABLE OF CONTENTS[1]**

| I. Docket Entries – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| Document | ECF No. | Appendix Page(s) |
| Court of Federal Claims Revised Protective Order | | |
| Redacted Opinion (November 9, 2016) | 113 | Appx1-104 |
| Judgment (November 10, 2016) | 114 | Appx105 |
| Docket Sheet – Court of Federal Claims | | Appx106-119 |
| Complaint (June 30, 2016) | 1 | Appx120-202 |
| Palantir MJAR (July 27, 2016) | 37 | Appx448, Appx 484 |
| Court Hearing Transcript (September 15, 2016) | | Appx750, Appx795-796 |
| Joint Stipulations of Facts (April 24, 2017) | 125 | Appx816 |
| Government's Cross-Motion JOAR (July 17, 2016) | 19 | Appx861, Appx898-909 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 92 | Appx958-962 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 91 | Appx 969 Appx974 |

---

[1] The Confidential Joint Appendix contains material subject to a Court of Federal Claims Protective Order. A copy of this Protective Order is included immediately following the Table of Contents. This protected material includes source selection sensitive information of the Department of the Army; information that poses operational security concerns, including identify of particular military personnel or units involved; information marked as confidential by potential offerors; information marked with the dissemination control "For Official Use Only" (FOUO), and other documents covered by the Court of Federal Claims protective order that have not been released to the public.

The U.S. Court of Federal Claims's public opinion is at Appx1-104. The U.S. Court of Federal Claims's sealed opinion is at Appx20001-20104. Citations in the briefs are to the public version.

**NONCONFIDENTIAL VERSION**

| II. Administrative Record – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| Document | AR Tab | Appendix Page(s) |
| Agency Report (AR) Tab A - Contracting Officer's Statement/Legal Analysis (March 21, 2016) | 1 | Appx10001-52 |
| AR Tab B - Declaration of Stephen Morton (March 17, 2016) | 2 | Appx10056-57 |
| AR Tab C - Declaration of Christopher Fisher (March 16, 2016) | 3 | Appx10058-60 |
| AR Tab E - Approved Recommendation for a change to DCGS-A Increment 1 Acquisition Strategy (December 4, 2014) | 5 | Appx10091-92 |
| AR Tab F - Acquisition Strategy Report DCGS-A Increment 2 | 6 | Appx10093 Appx10107 Appx10125 |
| AR Tab H - DCGS-A Inc 2 Incentive Fee Contract Type D&F (December 14, 2015) | 8 | Appx10150-153 |
| AR Tab J - DCGS-A COTS Software List- DCGS-A Increment 1 | 10 | Appx10243-250 |
| AR Tab K - DCGS-A IS CDD | 11 | Appx10251 Appx10270 |
| AR Tab M - DCGS-A Inc 2 Draft Base PWS (July 15, 2015) | 13 | Appx10410 Appx10418-19 Appx10464 |
| AR Tab N - DCGS-A Inc 2 Draft TO 0001 | 14 | Appx10539, Appx10594 |
| AR Tab O - DCGS-A (Palantir) Draft TO 0001 Response | 15 | Appx10687 Appx10690 Appx10693-94 Appx10698.1 |
| AR Tab R - DCGS-A Inc 2 Palantir Section L&M White Paper | 18 | Appx10707-13 |
| AR Tab S - DCGS-A Inc 2 DRAFT RFP W56KGY-16-R-0001 | 19 | Appx10719 Appx10819-41 |
| AR Tab T - DCGS-A Inc 2 W56KGY-16-R-0001 RFP (December 23, 2105) | 20 | Appx10842-43 Appx10880 Appx10909 Appx10960 Appx10968-69 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| AR Tab V - Solicitation attachment 0001 Performance Work Statement Distributed Common Ground System - Army Inc 2 (December 18, 2015) | 22 | Appx11042 Appx11051-53 Appx11072-73 Appx11075 Appx11081 Appx11101 Appx11123-39 |
| AR Tab W - Solicitation attachment 0003 Performance Based Specification | 23 | Appx11229 |
| AR Tab X - Solicitation attachment 0010 DCGS-A Increment 2 Task Order 0001 (Includes PWS) | 24 | Appx11294-Appx11385 |
| AR Tab AB - DCGS-A Inc 2 RFP Amendment 0003 (Conformed Copy) (0001 thru 0003) (December 23, 2015) | 28 | Appx11479 Appx11599 |
| AR Tab AD - DCGS-A Inc 2 Industry day 1 Brief Part Two | 30 | Appx11661 Appx11686 Appx11688 |
| AR Tab AG - DCGS-A Inc 2 Market Research Report (Approved) (July 13, 2015) | 33 | Appx11792-Appx11841 |
| AR Tab AH - DCGS-A Inc 2 RFI One-On-One Response Analysis (December 2014) | 34 | Appx11844-Appx11874 |
| AR Tab AI - DCGS-A Inc 2 RFI # 1 | 35 | Appx11876-Appx11881 |
| AR Tab AJ - Palantir DCGS-A Inc 2 RFI # 1 Response | 36 | Appx11882-11899 |
| AR Tab AK - DCGS-A Inc 2 RFI # 2 | 37 | Appx11900-07 |
| AR Tab AL - Palantir DCGS-A Inc 2 RFI # 2 Response | 38 | Appx11908-11 |
| AR Tab AM - DCGS-A Inc 2 RFI # 3 | 39 | Appx11912-11917 |
| AR Tab AN - Palantir DCGS-A Inc 2 RFI # 3 Response | 40 | Appx11918-11922 |
| AR Tab AO - DCGS-A Inc 2 DIVA Study Findings Brief AAE to DAE | 41 | Appx11923-11928 |
| AR Tab AP - DCGS-A Inc 2 Trade Space Analysis (July 2015) | 42 | Appx11929-12114 |
| AR Tab AQ - DIVA Independent Market Study -- FINAL Report V1 1 (July 2014) | 43 | Appx12218-12252 |
| AR Tab AR - DCGS-A INC 2 Acquisition Plan 9 December v2 approved | 44 | Appx12255, Appx12263-64 Appx12271 |
| AR Tab AS - DCGS-A Inc 2 D&F for CPFF Contract Type (December 10, 2015) | 45 | Appx12297 |
| AR Tab AT - D&F (DCGS-A Inc 2) Single Award | 46 | Appx12298-12304 |

**NONCONFIDENTIAL VERSION**

| IDIQ Final (October 21, 2015) | | |
|---|---|---|
| AR Tab AU - DCGS-A Inc. 2 D&F Exceed 5 Year POP (December 15, 2015) | 47 | Appx12305 |
| AR Tab AV - DCGS- Increment 2 Technical Deep Dive with Mr. Pino (October 7, 2015) | 48 | Appx12307 Appx12312 Appx12322 |
| AR Tab AW - DCGS-A Inc 2 Contract Strategy Review to PEO Management Council (May 15, 2015) | 49 | Appx12326, Appx12329, Appx12342-48 |
| AR Tab AX - DCGS-A Inc 2 Information Paper Inc 2 Key Objectives and Approach | 50 | Appx12363-66 |
| AR Tab AZ - DCGS-A Inc 2 D&F for Government Furnished Property (November 25, 2015) | 52 | Appx12369 |
| AR Tab BL - DCGS-A Inc 2 DIVA Market Study Criteria | 64 | Appx12633-34 |
| AR Tab BN - DCGS-A Inc 2 RFI Press Release (December 5, 2014) | 66 | Appx12641 |
| AR Tab BY - DCGS-A Increment 1 Acquisition Strategy (April 2013) | 77 | Appx13096 Appx13104 |
| AR Tab CP - DAB Action Memo (December 16, 2015) | 94 | Appx14244-46 |
| AR Tab DJ - Industry Responses to RFI_ALL (December 29, 2014) | 114 | Appx14611-12, Appx14804-07, Appx15197, Appx15318, Appx15455-60, Appx15464, Appx15589, Appx15595, Appx15766 |
| Protest of Palantir Hearing Transcript dated (April 26, 2016) | 121 | Appx16253-16459 |
| PALANTIR USG INC PUBLIC DECISION issued on (May 25, 2016) | 122 | Appx16560-66 |
| Determination of Non-Commercial Item (July 1, 2016) | 134 | Appx16626-27 |
| GAO Protest No. B-412746 Exhibit 1 – Email (Feb. 3, 2016) | 135 | Appx16629 |
| GAO Protest No. B-412746 Exhibit 2 – SASCA-02-002-IFG, Information from U.S. Army to Senator Thomas Cotton (Apr. 14, 2015) | 136 | Appx16631 |
| GAO Protest No. B-412746 Exhibit 3 – Operational Needs Statement (Feb. 9, 2015) | 137 | Appx16633-40 |
| GAO Protest No. B-412746 Exhibit 4 – Operational Needs Statement (Dec. 8, 2014) | 138 | Appx16642-46 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| GAO Protest No. B-412746 Exhibit 5 – Operational Needs Statement (Sept. 20, 2014) | 139 | Appx16648-52 |
| GAO Protest No. B-412746 Exhibit 6 – Memorandum (Oct. 17, 2012) | 140 | Appx16654, Appx16658, Appx16719 |
| Industry Day Slide COL_Collins_2014 | 148 | Appx16797, Appx16802-03 |
| Signed Palantir Letter w encls 25 Sept 2014 | 149 | Appx16807-09 |
| EX. 23- 2015 DOTE Annual Report | 151 | Appx17226, Appx17268, Appx17357 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (April 2012) | 153 | Appx17701, Appx17708 |
| Email from Rachael Phillips ordering April 25, 2012 ATEC report to be rescinded and destroyed | 154 | Appx17752 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (May 2012) | 155 | Appx17754, Appx17761-62 |
| Palantir Platform Information Brief (July 2013) | 156 | Appx17805-06, Appx17851 |
| GAO 2013 Report on Distributed Common Ground System | 157 | Appx17863, Appx17874, Appx17878-79 Appx17885-89 |
| Virginia Contracting Activity (Defense Intelligence Agency), Contract No. HHM402-14-A-0005 (22 Sep 2014) | 164 | Appx18137, Appx18151, Appx18153 |
| September 2014, CPARS Review Army Research Laboratory Contract No. W911QX12F0022 | 165 | Appx18183-84 |
| SOCOM - Bridge to DCGS SOF Contract - PO (29 May 2016) | 167 | Appx18247, Appx18270-71 |
| Email of Mr. Philippone to LTG Williamson (October 7, 2015) | 168 | Appx18312 |
| Email of COL Collins to LTG Williamson and Mr. Kreider (November 4, 2015) | 169 | Appx18327, Appx18329-30 |
| Email of COL Dills to LTG Williamson (November 6, 2015) | 173 | Appx18360, Appx18362-64 |
| Expert Report of Mr. Choung (August 5, 2016) | 177 | Appx18391-18428 |
| Supplemental Expert Report of Mr. Choung (September 7, 2016) | 178 | Appx18441, Appx18450, Appx18452-72 |
| Corrected Expert Report of Mr. Cronen (August 18, 2016) | 180 | Appx18619, Appx18623, Appx18638, Appx18643-48 Appx18650-54 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| Deposition Transcript of Mr. Choung (August 11, 2016) | 184 | Appx18867, Appx18874-75 Appx18880-81, Appx18887, Appx18900 |
| Sealed Opinion (November 3, 2016) | | Appx20001-104 |

**NONCONFIDENTIAL VERSION**

# In the United States Court of Federal Claims

```
* * * * * * * * * * * * * * * *
                                    *
PALANTIR TECHNOLOGIES, INC.,        *
and PALANTIR USG, INC.,             *
                                    *
              Protestors,           *
                                    *   No. 16-784C
v.                                  *   Filed: July 28, 2016
                                    *
UNITED STATES,                      *
                                    *
              Defendant.            *
                                    *
* * * * * * * * * * * * * * * *
```

## REVISED PROTECTIVE ORDER

The court finds that certain information likely to be disclosed orally or in writing during the course of this litigation may be competition-sensitive or otherwise protectable and that entry of a Protective Order is necessary to safeguard the confidentiality of that information.  Accordingly, the parties shall comply with the terms and conditions of this Protective Order.

I.

.   <u>Protected Information Defined.</u>  "Protected information" as used in this Protective Order means information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information contained in:

    a.    any document (e.g., a pleading, motion, brief, notice, or discovery request or response) produced, filed, or served by a party to this litigation; or

    b.    any deposition, sealed testimony or argument, declaration, or affidavit taken or provided during this litigation.

2.    <u>Restrictions on the Use of Protected Information.</u>  Protected information may be used solely for the purposes of this litigation and may not be given, shown, made available, discussed, or otherwise conveyed in any form except as provided herein or as otherwise required by federal statutory law.

II.

3.      Individuals Permitted Access to Protected Information.  Except as provided in paragraphs 7, 8, and 9 below, the only individuals who may be given access to protected information are counsel for a party and independent consultants and experts assisting such counsel in connection with this litigation.

4.      Applying for Access to Protected Information.  An individual seeking access to protected information pursuant to Appendix C, Section VI of the Rules of the United States Court of Federal Claims (2015) (RCFC), except those persons noted in paragraphs 7 and 9 below, must read this Protective Order; must complete the appropriate application form (Form 9 "Application for Access to Information Under Protective Order by Outside or Inside Counsel," or Form 10 "Application for Access to Information Under Protective Order by Expert Consultant or Witness").  A copy of the appropriate application form shall be provided to each other party.  Such person shall, without further action by the court, be permitted access to protected material at the close of the second business day after the other parties have received the application, unless, in the interim, any party informs the requesting party of an objection.  Unless an objection is being brought to the court's attention, applications for access will not be filed with the court, nor will courtesy copies be provided to chambers.

5.      Objecting to an Application for Admission.  Any objection to an application for access must be filed with the court within two (2) business days of the objecting party's receipt of the application.

6.      Receiving Access to Protected Information.  If no objections have been filed by the close of the second business day after the other parties have received the application, the applicant will be granted access to protected information without further action by the court.  If any party files an objection to an application, access will only be granted by court order.

7.      Access to Protected Information by Court, Department of Justice, Agency Personnel.  Personnel of the court, the procuring agency, the Department of Justice, and other Executive Branch personnel involved with or affected by this litigation are automatically subject to the terms of this Protective Order and are entitled to access to protected information without further action.

8.      Access to Protected Information by Support Personnel.  Paralegal, clerical, and administrative support personnel assisting any counsel who has been admitted under this Protective Order may be given access to protected information by such counsel if those personnel have first been informed by counsel of the obligations imposed by this Protective Order.

9.      Access to Limited Protected Information by Protestors' Personnel. For purposes of this paragraph, "limited protected information" is defined as the sealed

complaint, the defendant's motion to dismiss, the protestors' Motion for Judgement on the Administrative Record, the defendant's Motion for Judgement on the Administrative Record, as well as response or reply briefs, and any other documents or filings the parties agree in writing are subject to this paragraph. Protestors' personnel seeking access to limited protected information under this paragraph must read this Protective Order and must complete the appropriate application form (Attachment A to this Protective Order). Such person shall, without further action by the court, be permitted access to limited protected material at the close of the second business day after the other parties have received the application, unless, in the interim, any party informs the requesting party of an objection. Unless an objection is being brought to the court's attention, applications for access will not be filed with the court, nor will courtesy copies be provided to chambers.

III.

10. <u>Identifying Protected Information.</u>  Protected information may be provided only to the court and to individuals admitted under this Protective Order and must be identified as follows:

   a.  if provided in electronic form, the subject line of the electronic transmission shall read "**CONTAINS PROTECTED INFORMATION**"; or

   b.  if provided in paper form, the document must be sealed in a parcel containing the legend "**PROTECTED INFORMATION ENCLOSED**" conspicuously marked on the outside.

The first page of each document containing protected information, including courtesy copies for use by the judge, must contain a banner stating "**Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims Protective Order**," and the portions of any document containing protected information must be clearly identified.

11. <u>Filing Protected Information.</u>  Pursuant to this order, a document containing protected information may be filed electronically under the court's electronic case filing system using the appropriate activity listed in the "**SEALED**" documents menu.  If filed in paper form, a document containing protected information must be sealed in the manner prescribed in paragraph 10(b) and must include as an attachment to the front of the parcel a copy of the certificate of service identifying the document being filed.

12. <u>Protecting Documents Not Previously Sealed.</u>  If a party determines that a previously produced or filed document contains protected information, the party may give notice in writing to the court and the other parties that the document is to be treated as protected, and thereafter the designated document must be treated in accordance with this Protective Order.

IV.

13.   Redacting Protected Documents For the Public Record.

    a.   Initial Redactions.  After filing a document containing protected information in accordance with paragraph 11, or after later sealing a document pursuant to paragraph 12, a party must promptly serve on the other parties a proposed redacted version marked "**Proposed Redacted Version**" in the upper right-hand corner of the first page with the claimed protected information deleted.

    b.   Additional Redactions.  If a party seeks to include additional redactions, it must advise the filing party of its proposed redactions within two (2) business days after receipt of the proposed redacted version, or such other time as agreed upon by the parties or directed by the court.  The filing party must then provide the other parties with a second redacted version of the document clearly marked "**Agreed-Upon Redacted Version**" in the upper right-hand corner of the page with the additional information deleted.

    c.   Final Version.  At the expiration of the applicable period noted in (b) above, or after an agreement between the parties has been reached regarding additional redactions, the filing party must file with the court the final redacted version of the document clearly marked "**Redacted Version**" in the upper right-hand corner of the first page.  This document will be available to the public.

    d.   Objecting to Redactions.  Any party at any time may object to another party's designation of certain information as protected.  If the parties are unable to reach an agreement regarding redactions, the objecting party may submit the matter to the court for resolution.  Until the court resolves the matter, the disputed information must be treated as protected.

## V.

14. <u>Copying Protected Information.</u>  The parties shall endeavor to make as few copies of protected information, paper or electronic, as possible, and to keep protected information off of networks accessible by those not admitted to this Protective Order.  No party, other than the United States, may for its own use make more than five (5) copies of a protected document received from another party, except with the consent of all other parties.  A party may make additional copies of such documents, however, for filing with the court, service on the parties, or use in discovery, and may also incorporate limited amounts of protected information into its own documents or pleadings.  All copies of such documents must be clearly labeled in the manner required by paragraph 10.

15. <u>Waiving Protection of Information.</u>  A party may at any time waive the protection of this Protective Order with respect to any information it has designated as protected by advising the court and the other parties in writing and identifying with specificity the information to which this Protective Order will no longer apply.

16. <u>Safeguarding Protected Information.</u> Any individual admitted under this Protective Order must take all necessary precautions to prevent disclosure of protected information, including but not limited to physically securing, safeguarding, and restricting access to the protected information.

17. <u>Breach of this Protective Order.</u>  If a party discovers any breach of any provision of this Protective Order, which has possibly resulted, or may still result, in the disclosure of protected information to unauthorized persons, the party must promptly report the breach to the other parties and immediately take appropriate action to cure the violation and retrieve any protected information that may have been disclosed to individuals not admitted under this Protective Order.  The parties must reasonably cooperate in determining the reasons for any such breach.

18. <u>Seeking Relief From this Protective Order.</u>  Nothing contained in this Protective Order shall preclude a party from seeking relief from this Protective Order through the filing of an appropriate motion with the court setting forth the basis for the relief sought.

## VI.

19. <u>Maintaining Filed Documents Under Seal.</u>  The court will maintain properly marked protected documents under seal throughout this litigation.

20. <u>Retaining Protected Information After the Termination of Litigation.</u>  Upon conclusion of this action (including any appeals and remands) the original version of the administrative record and any other materials that have been filed with the court under seal will be retained by the court pursuant to RCFC 77.3(c) (2015).

Copies of such materials may be returned by the court to the filing parties for disposition in accordance with paragraph 21 of this Protective Order.  In addition, on or before thirty (30) days after the conclusion of the action before this court, the parties shall review previously protected information, and shall propose to the court in a joint written motion what information requires continued protection, for what period of time, and the basis for the proposed continued protection.

21.   <u>Disposing of Protected Information.</u>  Within thirty (30) days after the conclusion of this action (including any appeals and remands), each party or counsel admitted to this Protective Order shall destroy all protected information, both electronically stored or in paper form, including backup copies, and certify in writing to each other party that such destruction has occurred, or must return the protected information to the parties from which the information was received.  Each counsel of record admitted to this Protective Order may retain one copy of such documents, provided those documents are properly marked and secured.  Any party seeking relief from the requirements of paragraph 21 may submit an appropriate motion with this court, in accordance with paragraph 18 of this Protective Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

# REDACTED OPINION

# In the United States Court of Federal Claims

No. 16-784C
Filed: November 3, 2016
Redacted Version Issued for Publication: November 9, 2016[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **PALANTIR USG, INC.,** | \* |
| | \* |
| **Protestor,** | \* |
| v. | \* |
| | \* |
| **UNITED STATES,** | \* |
| | \* |
| **Defendant.** | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pre-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Commercial Availability; 10 U.S.C. § 2377; Bad Faith; Supplementation to the Administrative Record; Permanent Injunction.

**Hamish Hume**, Boies, Schiller & Flexner LLP, Washington, D.C., for protestor. With him were **Stacey K. Grigsby**, and **Jon R. Knight**, Boies, Schiller & Flexner LLP, Washington, D.C.

**Domenique G. Kirchner**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Scott A. MacGriff**, Trial Attorney, Commercial Litigation Branch, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Scott N. Flesch**, **Major Lawrence P. Gilbert**, **Evan C. Williams**, and **Frank A. March**, United States Army Legal Services Agency, and **Debra J. Talley** and **Daniel J. Beuke**, United States Army Materiel Command.

## O P I N I O N

---

[1] This opinion was issued under seal on November 3, 2016. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**HORN, J.**

Palantir USG, Inc.[2] (Palantir) and Palantir Technologies Inc.[3] filed a pre-award bid protest in this court on June 30, 2016, challenging the United States Department of the Army, Army Contracting Command, Aberdeen Proving Group's (the agency) Request for Proposals No. W56KGY-16-R-0001 (the solicitation). Protestor Palantir USG, Inc. "is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California." Palantir USG, Inc. and Palantir Technologies Inc. filed suit in the United States Court of Federal Claims after the United States Government Accountability Office (GAO) denied Palantir USG, Inc.'s GAO protest. See generally Palantir USG, Inc., B-412746, 2016 WL 3035029 (Comp. Gen. May 18, 2016).[4]

As indicated at the GAO, "[t]he solicitation seeks a single contractor to be the system data architect, developer, and integrator of DCGS–A2 [Army's Distributed Common Ground System-Army Increment 2], which is the second increment of the DCGS–A. DCGS–A is the Army's primary system for the processing and dissemination of multi-sensor intelligence and weather information to the warfighter." Id. at *1.

Palantir asserts that the Army acted arbitrarily and capriciously when it issued the DCGS-A Increment 2 solicitation for a developmental contract, because Palantir claims it had identified to the Army a commercially available technology that Palantir believes can satisfy the Army's requirements. According to Palantir, "Palantir has developed a technology that solves the needs of DCGS." Palantir claims that the data management platform that Palantir has to offer, also called the Palantir Gotham Platform, was "initially developed between 2004 and 2009 with the help of an investment from, and a partnership with, the venture capital arm of the Central Intelligence Agency." According to Palantir, since "2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ('SOCOM'), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies)." The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." Palantir argues that,

---

[2] Palantir Technologies Inc. "owns one hundred percent of the stock" of Palantir USG, Inc.

[3] As discussed below, on August 22, 2016, the court granted defendant's motion to dismiss Palantir Technologies Inc. from the above captioned protest.

[4] Although the undersigned has high regard for GAO decisions, this court is not bound by decisions of the GAO. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")).

as written, "[t]he Solicitation for DCGS-A2 makes it impossible for Palantir to offer its Data Management Platform as a commercial or nondevelopmental item to satisfy the Army's requirements" (capitalization and emphasis removed) because the solicitation only requested proposals for the development of the required technology.

## FINDINGS OF FACT

In explaining the origin and development of the DCGS-A, the contracting officer's statement during the GAO protest indicated:

> Combat operations in Kuwait and Iraq in the early 1990's demonstrated the military potential of information dominance, and sparked a transformation in the use of information technology in intelligence operations. Subsequently, the Department of Defense instituted an initiative to unify Intelligence, Surveillance and Reconnaissance architectures, and enhance the acquisition of manned and unmanned airborne sensors and associated ground processing systems. This initiative resulted in a requirement for a Distributed Common Ground/Surface Systems (DCGS), made up of Army, Air Force, Navy and Marine Corps ground processing systems that can share information across the Joint Force. The Army component of DCGS is the Distributed Common Ground System – Army (DCGS-A). Today, DCGS-A has become the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information. It is deployed worldwide in support of intelligence operations including all Theaters of Operation.

The background section of the Performance Work Statement for the solicitation at issue explained:

> The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD. DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation. DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications.

DCGS-A Increment 1 is the ISR component of the modular and future force Mission Command System (MCS) and the Army's primary system for ISR tasking of sensors, processing and exploitation of data, and dissemination of intelligence (TPED) information about the threat, weather, and terrain at all echelons. A high percentage of Increment 2 functionality has already been developed under the DCGS-A Increment 1 efforts. DCGS-A Increment 2 will leverage the DCGS-A hardware components fielded across the Army under DCGS-A Increment 1.

According to the defendant, DCGS-A Increment 2, the subject of the solicitation at issue, "will introduce a new and modernized data management architecture (DMA) using a modular system approach to perform Army intelligence analysis capabilities." As reflected in the Army's post-hearing comments submitted to the GAO, and quoted in the GAO decision:

DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program with the ability to access and be accessed by, not only Army intelligence and command components, but also the other members of the broader distributed common ground/surface system. It is composed of many software products-commercial, government, and open source-as well as software integration that allows all the different products and components to communicate and operate seamlessly.

Palantir USG, Inc., B-412746, 2016 WL 3035029, at *2.

The Performance Work Statement for the solicitation at issue stated that the requirements of DCGS-A Increment 2 included the "development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/HUMINT, Weather, GEOINT, Geospatial Engineering and Sensor Management," and that "[t]hese efforts include Software Development, Capability Enhancements, Integration, Limited Fielding and Training support, Maintenance, and Support for logistics development, for a period of performance of six years from contract award." The draft version of the Performance Work Statement for the solicitation at issue stated that "[t]he DCGS-A Increment approach utilizes spiral deliveries to maintain interoperability with Army and Joint ISR [Intelligence, Surveillance and Reconnaissance] architectures and to address capability insertion and enhancements. This system must remain interoperable and compatible with the Joint command system infrastructure and

mission applications." As indicated by the contracting officer who issued the solicitation, "[t]he DMA [i.e., Data Management Architecture] will serve as the architecture foundation and the heart with which the rest of the capabilities will depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract."

The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that other "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." As further detailed below, in responses to the government's Requests for Information, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claims that "Palantir is currently in use by tens of thousands of users across the DOD [Department of Defense] and IC [intelligence community]." The Administrative Record filed in the above captioned protest includes a February 9, 2015 "Operational Needs Statement for Palantir Platform" from [redacted] requesting the Palantir Gotham Platform. The Statement indicated: "The Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations," and concluded that "Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units [redacted], as well as various U.S. Government agencies. [redacted]."

Pre-Solicitation Activity

The parties have stipulated that in July 2014, prior to the issuance of the DCGS-A Increment 2 solicitation, the Army Acquisition Executive, Heidi Shyu,[5] chartered a Data Integration, Visualization and Analytics (DIVA) Independent Market Study which was completed by the MITRE Corporation, a not-for-profit research and development organization. The joint stipulations of fact indicate:

The purpose of the DIVA study was to "provide situational awareness and market trends to the Army leadership of the 'state-of-the-practice' within the commercial DIVA software platform landscape." As stated in the DIVA

---

[5] Ms. Shyu is referred to by several different titles throughout the Administrative Record and filings with the court. The joint stipulations of fact indicate that when Ms. Shyu chartered the DIVA Market Study in July 2014 and when she signed the October 21, 2015 Determination & Finding, her title was the Army Acquisition Executive. On October 20, 2014, when Ms. Shyu issued a "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy," her title was "Assistant Secretary of the Army (Acquisition, Logistics and Technology)." The joint stipulations of fact also indicate when she issued the December 16, 2015 recommendation for issuance of the solicitation, her title was listed as Assistant Secretary of Defense (Acquisition).

study, the DIVA study was intended to: (1) provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study; and (2) provide recommendations for the DCGS-A Increment 2 Acquisition effort and describe the top- level risks and mitigation strategies associated with adopting recommendations. The DIVA study assessed the following acquisition approaches:

a. Cloud Infrastructure Platform Provider: Provide highly-scalable and reliable computing infrastructure services (e.g., data bases; analytic engines; computing and storage; identity management);

b. Turn-Key: Procure a commercial product as basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure,

c. Hybrid approach: both an Enterprise Cloud Platform and a Turn-Key Platform, including integration of additional applications. . . .

(all internal citations omitted). The DIVA Market Study included a "Potential Strategy: Phased Acquisition and Integration Approach," which recommended that the DCGS-A Increment 2 approach

could be structured in a phased manner. Initially, the two foundation components (e.g., COTS[6] cloud infrastructure services and COTS DIVA "Turn Key" Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA "Turn Key" platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original).

On January 7, 2015, also before the solicitation was issued, the Army generated an Information Paper, which identified key objectives and approaches to DCGS-A Increment 2. The "Increment 2 Key Objectives" listed were: "1. Modernize the Data Enterprise to a Data Integration Platform[,] 2. Easier to use visualization framework[,] 3. Best Leverage industry to deliver these capabilities with a commercially supported

---

[6] COTS, although not defined in the DIVA Market Study, appears to be an abbreviation for "commercial off the shelf." Palantir refers to "COTS" in the DIVA Market Study as commercial off the shelf, without objection from defendant. Furthermore, the Trade Space Analysis, discussed below, includes a list of acronyms and defines COTS as "Commercial off the shelf."

infrastructure[,] 4. Execute in a funding constrained environment." The Information Paper envisioned a "Three-Phase Approach (DIVA Competition, Domain-specific Capabilities Updates, Integration Environment)." For the first phase, the DIVA Competition, the Information Paper stated:

> Industry to deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A to displace the Entity (TED) and Document (MSG) - infrastructure that interoperates with the Geospatial and other Intelligence data-specific data sources using standards such as Open Geospatial Consortium (OGC), Motion Imagery Standards Profile (MISP), etc. This infrastructure could be a commercial stand-alone solution (Palantir, IBM) or it could be a collection of capabilities (RDMS + Hadoop +...) as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data.

(emphasis added).

Although conducted later in time, in July 2015, after the Army issued all three of the Requests for Information, described below, and around the time the Army issued the Market Research Report, the Army Materiel Systems Analysis Activity produced a Trade Space Analysis, which evaluated capabilities that could be leveraged for the DCGS-A Increment 2 procurement. Defendant explained that: "The TSA [Trade Space Analysis], dated July 2015, identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1." The Army Materiel Systems Analysis Activity explained:

> The U.S. Army Materiel Systems Analysis Activity (AMSAA) was directed by Headquarters, Department of the Army Deputy Chief of Staff (HQDA DCS) G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (IS CDD) to support future requirements decisions. The TSA identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. The TSA results will inform the economic analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The TSA focused on targeted DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1 for: Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR); Standard Sharable Geospatial Framework (SSGF)-

Army Geospatial Enterprise (AGE); Data Enterprise Architecture (DEA); and Intelligence Support to Cyber Operations (CO).

The Trade Space Analysis further explained:

Representative systems were assessed to reflect capabilities that are readily available for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid and are defined as follows:

• COTS - a singular software solution or compilation of commercially available software packages that provide an integrated solution, whereby the vendor owns the rights to the baseline software code.
• GOTS - a singular or compilation of software solutions, whereby the baseline software code was developed by and owned by the Government.

• Hybrid - a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS).

The Trade Space Analysis determined that: "Overall, the Hybrid alternative was rated Green and scored the highest of the three alternatives. Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions."[7] Specifically, regarding the Data Enterprise Architecture results, the Trade Space Analysis stated: "The COTS and Hybrid alternatives satisfy most of the technical functionality metrics, however, the Hybrid software solutions are currently functional in the DoD IC and provide the best 'turn-key' functionality. Upper bound COTS solutions provide a turn-key technical functionality similar to that of the Hybrid solutions." For another capability, the Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise compatibility, the Trade Space Analysis determined:

---

[7] The "Technical Risk Categorical Rating Criteria" in the Trade Space Analysis was:

-    Green: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

-    Yellow: "Moderate Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

-    Red: "High Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

Although there are some GOTS solutions that can address a few targeted technical functionality metrics, there are no viable comprehensive GOTS solutions that were identified by the Army/DOD geospatial community. The COTS alternative was assessed to have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative. The COTS options won't address all Army Geospatial requirements with software "out of the box". However, these capability gaps are anticipated to be closed with ongoing commercial upgrades and widgets that can be developed in the COTS Baseline software. There were several risk driver [sic] for both the COTS and Hybrid alternatives that were assessed to be of moderate to high risk.

On August 13, 2014, the Army issued the first Request for Information, which was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan," for the potential DCGS-A Increment 2 procurement and "request[ed] respondents' corporate overview information and basic qualifications in managing software <u>development</u> projects that are similar in scope and process to the DCGS-A program."[8] (emphasis added). The August 13, 2014 Request for Information indicated that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for <u>development efforts</u> over three to four years."[9] (emphasis added). Palantir responded to the August 13, 2014 Request for Information and stated:

The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(emphasis in original; footnote omitted). Palantir explained "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." In its response to the August 13, 2014 Request for Information, Palantir argued that:

---

[8] Palantir states that the August 13, 2014 Request for Information "failed to inquire about the availability of commercial or nondevelopmental items that could meet the requirements of DCGS-A2."

[9] Palantir believes this statement demonstrates that "[t]he Army conceded in the first RFI [the August 13, 2014 Request for Information] that it was not even contemplating the possibility of a fixed-price contract for the procurement of commercial items."

> The most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP). FFP vehicles shift performance risk to the contractor, reduce the risk of cost overruns to the Government, and shorten delivery schedules.

The parties have stipulated that "Palantir USG recommended among other things a Firm-Fixed Price (FFP) model in conjunction with 'an outcomes-based Performance Work Statement based on a proven product and incorporating support services,'" and, further, "Palantir USG stated that 'the FFP model can be used in conjunction with a Cost-Plus model for optional system enhancements. CPIF and CPFF contracts should total less than 20 percent of the total contract value.'" Palantir indicated:

> Examples of successful FFP contracts include our work at the U.S. Marines Corps, where enhancements are included as part of our regular software releases and small businesses fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC agencies and affording a COTS solution at a FFP.

After receiving the responses to the first Request for Information, the Army produced a December 2014 RFI Response Analysis which indicated that the "[v]ast majority of respondents support hiring a contractor as the LSI [Lead Systems Integrator] due to efficiencies in industry decision making and resource-marshaling processes." The 2014 RFI Response Analysis summarized Palantir's submission by noting that:

> The Palantir response listed several contracts they have been awarded, but did not include scope or description of work. However, Palantir has developed an intelligence fusion system that has been used by various entities within the Department of Defense. Palantir was found capable to provide Data management and Workflow Management upgrades, and partially capable of providing Data Fusion and Cyber capabilities to Increment 2.

The conclusion of the 2014 RFI Response Analysis stated: "Based on the responses to the first RFI, and analysis of the resulting information conducted by the DCGS-A Increment 2 Contract IPT [Solicitation Integrated Product Team], the overall conclusion of this Market Research Report is that a more capability focused RFI needs to be issued to industry."

Prior to the issuance of the 2014 RFI Response Analysis, on October 20, 2014, Ms. Shyu, Assistant Secretary of the Army (Acquisition, Logistics and Technology), issued a memorandum to the Under Secretary of Defense (Acquisition, Logistics and Technology) regarding a "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy." In the memorandum she requested approval to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." Ms. Shyu explained that:

> I believe allocating the remaining Increment 1 RDT&E funding to support potential required fixes from the Increment 1 Release 2 Limited User Test results and moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available.  In addition, Increment 1 Release 2 will deliver approximately 90 percent of the planned Increment 1 capability.

On December 5, 2014, the Army issued a second Request for Information, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." As in the August 13, 2014 Request for Information, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development</u> projects that are similar in scope and process to the DCGS-A program." (emphasis added). For the December 5, 2014 Request for Information, the Army sought "information regarding your corporate capabilities and experience related to the delivery of capabilities." Question 3.0(d) of the December 5, 2014 Request for Information asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience <u>developing</u> and integrating with these types of software applications/capabilities." (emphasis added). A copy of the table referenced in Question 3.0(d) is included below:

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company |
|---|---|---|---|---|---|---|---|
| Cloud Computing | | | | | | | |
| Big Data Analytics | | | | | | | |
| Data Architecture & Management | | | | | | | |
| Data Fusion & Pattern Analysis | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Applications for IC ITE Joint Storefront** | | | | | | | |
| **Targeting** | | | | | | | |
| **Signals Intelligence/NSA-Net Operations** | | | | | | | |
| **Defensive Cyber Operations** | | | | | | | |
| **Offensive Cyber Operations** | | | | | | | |
| **Counter Intelligence & Human Intelligence** | | | | | | | |
| **DCGS Integration** | | | | | | | |
| **Backbone (DIB) implementation** | | | | | | | |
| **Weather Effects/Analysis** | | | | | | | |
| **GEOINT (Full Motion Video/Static Imagery Intelligence)** | | | | | | | |
| **Geospatial Intelligence (Terrain & Mapping)** | | | | | | | |
| **Collection Management (Sensor Management)** | | | | | | | |
| **On-the-Move Operations** | | | | | | | |
| **Workflow Management** | | | | | | | |
| **Role/Attribute Base Access Control** | | | | | | | |
| **Protection level 3 (PL 3) security hardening** | | | | | | | |
| **Ease of Use Initiatives** | | | | | | | |
| **High/Ultra Reliability Program** | | | | | | | |

| Army Interoperability Certification | | | | | | |
|---|---|---|---|---|---|---|
| Joint Interoperability Certification | | | | | | |

Question 3.0(f) asked: "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" Question 3.0(h) asked, "[w]hat is your company's current rate of personnel retention over the last five (5) years?"

Palantir again responded[10] to try to explain the value of a commercial, not a developmental, approach:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's capability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Palantir recommended "that the Government pursue a different acquisition strategy than the long-term development used in Increment 1. We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities." Palantir emphasized:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD and the IC. However, the

---

[10] As discussed below, defendant argues that, although "Palantir USG responded to RFI No.2," Palantir did not "complete the Army's chart and identify its specific capabilities across the various DCGS-A." Defendant states that Palantir "declined to answer question 3.0(d) in RFI No.2," and "question 3.0(f) in RFI No.2," and "question 3.0(h) in Request for Information No.2." Palantir responds that the Army did not in fact request that bidders "complete the Army's chart and identify its specific capabilities across the various DCGS-A," "[r]ather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts. There was no reason to do so again." (emphasis in original; internal citations omitted).

request for information on software series contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

After the responses to the second Request for Information were received, on January 20, 2015, the Army held an "Industry Day," characterized by the Army as a "forum to share emerging requirements with Industry," which "helped to ensure the Government's requirements are defined adequately to promote high quality proposals and adequate competition." Between January 20, 2015 and May 12, 2015, the "Government conducted a one on one engagements [sic] with 78 different organizations,"[11] which the Army stated was an opportunity to "[p]rovide a forum to answer Industry's questions and elicit their feedback regarding to [sic] the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations."

On May 6, 2015, the Army issued a third Request for Information, which "[w]as released to determine if [the] rule of two exists, as defined in FAR [Federal Acquisition Register] 19.502, and if a small business set-aside is appropriate for Increment 2 development." Palantir indicated that it was not a small business and, as with the previous Requests for Information, responded:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.

Palantir also indicated in its response:[12]

---

[11] The joint stipulations of fact reflect that the Army conducted "[o]ver 80 one-on-one sessions with the Program Manager and industry." Neither the joint stipulations of fact nor any document in the Administrative Record establish whether or not any of the more than 80 meetings included Palantir.

[12] In responding to the question in the May 6, 2015 Request for Information, "[e]xplain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development," Palantir indicated:

> As a privately owned company, Palantir Technologies, the parent company of Palantir USG, Inc., does not typically release financial information. We will provide audited statements as reasonably necessary for the purposes of determining our ability to perform our obligations under the agreement subject to the appropriate confidentiality provisions being put in place.

Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?[13]

As noted above, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community."

After a second Industry Day, held on June 25, 2015, which the Army characterized as "an opportunity to discuss the draft Increment 2 requirements with industry," in July 2015, the Army issued a Market Research Report, which determined that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[14] The Market Research Report stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[15] Addressing Palantir specifically, the Market Research Report[16] stated in the "RFI Respondent Capability Assessment" that "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." (emphasis removed). The parties have stipulated that:

A November 6, 2015 paper to the Chief of Staff of the Army stated that "Extensive market research efforts were conducted to ensure requirements

---

[13] In the complaint, protestors allege that "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

[14] A chart included in the Market Research Report briefly summarized the role of each of the Requests for Information. The Market Research Report indicated: "**RFI 1** To determine level of competition and industry feedback of Acquisition Strategy[,] **RFI 2** To determine capability of individual businesses to perform as prime contractor[,] **RFI 3** Inform Increment 2 on the role of small business[.]" (emphasis in original).

[15] The Market Research Report also indicated that in September 2015, the Army would have an "Industry Engagement," which would be to "serve as a venue to discuss the Draft Increment 2 Request for Proposal (RFP) with industry following its release."

[16] Of the 43 respondents to the December 5, 2014 Request for Information, the only responder to the December 5, 2014 Request for Information the Market Research Report labeled as "non-responsive" was Palantir.

were achievable" and then listed "4-month independent DIVA study lead [sic] by MITRE, SEI, DNI, and DAU," "3 Requests for Information," "2 industry days with over 500 attendees and 224 companies," and "Over 80 one-on-one sessions with the Program Manager and industry."

Even after responding to the three Requests for Information, Palantir continued to try to express to the Army its views and frustration with the direction of the developmental procurement choice by the Army and with the Army's apparent disinterest in consideration of commercially available alternatives. In response to the draft Performance Work Statement, Palantir indicated:

> Palantir USG, Inc. . . . has reviewed the Performance Work Statement (PWS) for DCGS-A Increment 2 Task Order 0001. As written, Task Order 0001 prevents companies with commercially available technology from direct participation in the program and will result in failure. Task Order 0001 will lock the Army into an irrelevant and unusable "flagship" intelligence architecture for the next decade. Increment 1 failed because the Army attempted to build a foundational data platform from scratch while refusing to adopt proven commercial technology for core system components. After spending fifteen years and billions of dollars, the Army has not delivered a working intelligence platform to soldiers. Army ASA(ALT) acknowledged this reality and directed DCGS-A's leadership to halt Increment 1 and adopt a new strategy for Increment 2. Despite this direction, and in direct violation of Congressional intent, the Army has deliberately chosen to repeat the same strategy that resulted in the failure of Increment 1 and is once again ignoring commercially available technology that works for soldiers today. Increment 2 is an opportunity to correct this failure, but only if the Army changes its fundamental acquisition strategy. This is a consequential moment for the DCGS-A program. There is little time remaining to change the strategy, and current program leadership appears unwilling to take necessary action.

(internal reference omitted).

On October 21, 2015, Ms. Shyu, as the Army Acquisition Executive, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)." The Determination & Findings noted that "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture by a contractor as the systems integrator," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." The Determination & Findings concluded that:

Based on the above analysis, issuing a single award IDIQ contract will mitigate many of the risks identified herein and is in the best interest of the Government. Due to the complex developmental efforts this work entails, further competition at the task order level would interrupt development, ultimately increase price, and cause schedule slippages.

Ms. Shyu determined:

that a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

Finally, on July 1, 2016, notably one day after the above captioned protest was filed in this court, and significantly after the issuance of the solicitation and the conclusion of the GAO protest, Christopher Fisher, the contracting officer for the solicitation at issue and Bryon Young, the Principal Assistant Responsible for Contracting, issued a "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed). The Determination of Non-Commercial Item stated that market research was conducted and the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item stated:

Based upon market research conducted by the Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

The Solicitation, GAO Protest, and Filing in this Court

On December 16, 2015, the Army issued a recommendation for issuance of the solicitation, in which Ms. Shyu, as the Assistant Secretary of Defense (Acquisition), stated that DCGS-A Increment 1 was "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Ms. Shyu continued: "Increment 2 will provide a new Data Management Architecture, a new Workflow Management capability, improved fusion and pattern analysis, cyber security upgrades, upgrades to the DCGS Integrated Backbone and usability enhancements." After Ms. Shyu's recommendation for issuance of the solicitation, on December 23, 2015, the Army issued the solicitation at issue in this protest, Request for Proposals No. W56KGY-16-R-0001, for engineering, manufacturing, and development services. The solicitation required a single contractor to be the system data architect, developer, and integrator for DCGS-A Increment 2. The solicitation had four evaluation factors: (1) Technical; (2) Cost/Price, (3) Past Performance, and (4) Small Business Participation Plan. The solicitation contemplated the award, on a best value basis, of a single indefinite-delivery, indefinite-quantity contract, with the simultaneous issuance of a cost-reimbursement type task order and the period of performance contemplated a six year term from contract award.

The closing date for the solicitation was February 16, 2016. That same day, February 16, 2016, Palantir filed a timely protest at the GAO. The GAO subsequently issued its decision on May 18, 2016, denying the protest. See generally Palantir USG, Inc., 2016 WL 3035029. In a short decision, the GAO indicated that "[w]hile the market research revealed that commercial items were available to meet some of the DCGS–A2 requirements, the agency concluded that there was no commercial solution that could meet all the requirements of DCGS–A2," and "[b]ecause the agency concluded that significant portions of the anticipated DCSG–A2 [sic] scope of work were not available as a commercial product, the agency determined that the DCGS–A2 development effort could not be procured as a commercial product under FAR part 12 procedures." According to the GAO, "[t]he protester has failed to show that the agency's determination in this regard was unreasonable." Id. at *3 (footnote omitted). The GAO also determined "the record shows that the agency reasonably decided on its approach of having a single contractor, who would be responsible for selecting all the components of DCGS–A2, and who would bear the responsibility for making certain that those components are integrated, in contrast to the phased approach favored by Palantir." Id. at *4. The GAO concluded:

> [T]he agency's approach is reasonably related to its need for a fully integrated and interoperable system made up of a number of specific capabilities, some of which are commercially available and some of which are not. While the agency considered several potential approaches to this procurement, including the phased approach favored by the protester, the agency ultimately concluded that it would have a greater likelihood of success (in that it could avoid certain technical risks, concerns and significant schedule risk and cost uncertainty) by opting to have a single

contractor serve as the system integrator in charge of developing and selecting the components and making sure that they can be successfully integrated. As such, we have no reason to question the approach chosen by the agency or to conclude that the solicitation is unduly restrictive of competition.

Id. at *5 (internal citation omitted).

On June 30, 2016, Palantir USG, Inc. and Palantir Technologies Inc. filed the current pre-award bid protest in this court. The complaint has seven counts. Count one alleges that the Army violated 10 U.S.C. § 2377 (2012) and 48 C.F.R. § 10.002 (2016) and 48 C.F.R. § 11.002 (2016) by refusing to solicit the data management platform as a commercial item. Similarly, count two alleges that the Army violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002 by refusing to solicit a commercial item for the entirety of DCGS-A Increment 2. Count three alleges that the Army violated 10 U.S.C. § 2377(c) by failing to determine whether its needs could be met by commercial items. Count four contends that the Army violated 48 C.F.R. § 16.301-2(a) (2016) by soliciting a cost-plus contract instead of a fixed price contract, and states:

Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable 'to define its requirements sufficiently to allow for a fixed-price contract' or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

Count five alleges that the Army violated 10 U.S.C. § 2304a(f) (2012) and DFARS Part 217.204 (2016) by soliciting a task order contract with a base period of six years. Count six alleges that the Army violated 48 C.F.R. § 16.504 (2016) by soliciting an impermissibly expensive task order exceeding $112.0 million. Finally, count seven alleges that "the Army engaged in arbitrary, capricious, and unlawful conduct by refusing to allow Palantir to bid, by resisting innovation, by insisting on the failed approach of DCGS-A1, and by engaging in bad faith conduct[.]" (emphasis and capitalization removed).

The complaint alleges that:

[T]he Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2 [sic]. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to

insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

The complaint asks this court to enter

> a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations, including at a minimum through the issuance of a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements.

Initially, in response to the complaint, defendant filed a motion to dismiss Palantir USG, Inc. and Palantir Technologies Inc.'s complaint and argued that Palantir USG, Inc. and Palantir Technologies Inc. lacked standing to bring this protest and that even if Palantir USG, Inc. and Palantir Technologies Inc. had standing, they had waived any objections to the solicitation. After the parties fully briefed the motion to dismiss, the court determined that the timely protest filed at the GAO did not cause Palantir USG, Inc.'s claims to become subject to waiver in this court, and, that Palantir had standing to bring its claims in this court. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. 21, 46 (2016). The court determined, however, that Palantir Technologies Inc. had not filed a timely protest with the GAO, and, therefore, its claims were subject to waiver, and granted defendant's motion to dismiss Palantir Technologies Inc. for lack of subject matter jurisdiction.

In addition to defendant's motion to dismiss, the parties now have filed cross-motions for judgment on the Administrative Record. In response to the allegations in the complaint, the defendant generally responds that agencies have "substantial discretion" both to determine the requirements and how best to acquire those requirements. Defendant also argues that the Army's market research, and the determination based on the market research, were appropriate and that the documents in the Administrative Record do not support Palantir's argument that the Army erred in not soliciting the DCGS-A Increment 2, including the data management platform, as a commercial item. Finally, defendant argues that there is no evidence of bias and/or bad faith by the Army towards Palantir.

<u>Supplementation to the Administrative Record</u>

After Palantir filed its complaint and moved for judgment on the Administrative Record, on July 15, 2016, Palantir moved to supplement the existing Administrative Record in order to support Palantir's allegations regarding bias and/or bad faith, as well as regarding the Army's failure to comply with 10 U.S.C. § 2377. Palantir sought to supplement the Administrative Record with discovery, including depositions, interrogatories, and document production requests. In its motion to supplement the Administrative Record, Palantir argued that the Administrative Record filed by defendant was "deficient in a number of respects." Palantir argued that the Administrative Record

did "not include documents that the Army must have, or at a minimum should have, considered when it prepared the Solicitation;" "omits documents that were 'close at hand' and highly relevant to the Solicitation;" "omits documents demonstrating that the Army's DCGS Program Owners made inaccurate assertions or assumptions about the Palantir Gotham Platform;" and "omits documents demonstrating the bias and bad faith conduct alleged by Palantir in its Complaint." Palantir argued that supplementation of the Administrative Record was necessary to conduct effective judicial review of the Army's decision-making process. Specifically regarding Palantir's bias and/or bad faith allegations, Palantir asserted that the "currently assembled Administrative Record is inadequate to assess" bias and/or bad faith. In arguing that supplementation to the Administrative Record was justified to effectively review Palantir's bias and/or bad faith allegations, Palantir pointed to past alleged efforts of "certain Army personnel to delete and suppress favorable evaluations of the Palantir Gotham Platform, resist the deployment of commercial items to Soldiers in the field, and disseminate inaccurate information about Palantir's technology."

Palantir attached 53 exhibits with which it sought to supplement the Administrative Record. Of the 53 exhibits, Palantir identified 43 exhibits that were relevant to Palantir's allegations that the Army failed to comply with 10 U.S.C. § 2377.  According to Palantir, with these 43 exhibits, Palantir was "seeking to add to the record material that should have been of central importance to the market research § 2377 required the Army to conduct, the process § 2377 required the Army to follow, and the determinations and inquiries § 2377 required the Army to make."

Palantir specifically identified 12 exhibits[17] as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct."[18] Palantir moved to supplement the Administrative Record with materials that allegedly "document the DCGS-A Program Owners' years-long efforts to protect their failing program, by resisting an innovative solution and blocking the deployment of the Palantir Gotham Platform to the field."

In addition to the exhibits with which Palantir sought to supplement the Administrative Record, Palantir also requested leave of the court to conduct what it described as limited discovery, including seven requests for production of documents, seven interrogatories, and four depositions. Palantir argued that discovery was needed to resolve the central factual predicate "to the Army's decision to issue a developmental

---

[17] Palantir indicated that Exhibits 2-7 related to both the allegations that the Army failed to comply with 10 U.S.C. § 2377 and to the allegations of bias and/or bad faith.

[18] Although Palantir's motion to supplement the Administrative Record originally listed Exhibits 2-7 and 35-39 as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct," it appears that Palantir also intended to include Exhibit 52 as essential to the court's consideration of Palantir's bias and/or bad faith allegations. Exhibit 52 was not included in Palantir's motion to supplement the Administrative Record. Palantir added Exhibit 52 to its reply brief in support of its motion to supplement the Administrative Record.

solicitation rather than to define its requirements so they could be met by a commercial or nondevelopmental item." Palantir also asserted that "[t]argeted discovery is needed to get to the bottom of the bias and bad faith that infected this solicitation process" and that Palantir had "presented allegations of bad faith and bias that rest on 'a strong evidentiary footing,' and that are more than sufficient to warrant discovery." Additionally, Palantir argued that in order "[t]o engage in effective judicial review of Palantir's ability to offer a commercial item that satisfies the Army's requirements, the Court should permit testimony from individuals who have the expertise needed to translate the technical information in the Solicitation, the PWS [Performance Work Statement], and related documents into plain English." Palantir also sought leave of the court to depose four government individuals: Contracting Officer Christopher Fisher, Lieutenant General Mary Legere (now retired), the "Army's Deputy Chief of Staff for Intelligence (G-2), the Program Owners of DCGS-A," Major General Laura Richardson, who "signed the April 25, 2012 ATEC [United States Army Test and Evaluation Command] report," and Kevin Kelly, "the author of the MITRE study."

Although defendant agreed initially to supplement the Administrative Record with three of the exhibits Palantir proposed to add, defendant otherwise opposed Palantir's motion to supplement the Administrative Record and for discovery. Defendant argued that Palantir sought to supplement the Administrative Record with "stale" documents and otherwise substitute its own judgment for that of the agency's contracting personnel. Defendant further argued that Palantir "fail[ed] to demonstrate evidence of bias, much less meet the standard of 'strong evidentiary footing' needed to give this Court a basis to permit supplementation of the administrative record." According to defendant, Palantir "attempt[s] to weave a bad faith argument and bias argument into [its] disagreement with the overall Army policy decision on the type of overarching platform and other requirements for which it wanted to solicit offers." Defendant also asserted that Palantir's "mere disagreement with the overall agency policy decision does not demonstrate an individual, must [sic] less an institutional, bias or bad faith." Defendant also maintained that Palantir should not be permitted to offer testimony about its technical capabilities because "this protest is not about the capabilities of [Palantir's] software product," and those capabilities "are irrelevant to this Court's judicial review of the administrative record." Defendant also opposed Palantir's request to conduct limited discovery through interrogatories and document requests and to conduct depositions of Contracting Officer Fisher, Lieutenant General Legere, Major General Richardson, and Kevin Kelly.

In deciding whether or not to supplement the Administrative Record with the exhibits and to allow any of the additional discovery proposed by the protestor, the court considered whether the exhibits and discovery were necessary for effective judicial review. The court recognized that "the parties' ability to supplement the administrative record is limited" in a bid protest. Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. 1, 2 (2016). In a bid protest, the court should review the Administrative Record already in existence to determine whether the agency procurement action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2012). In Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that supplementation of the Administrative Record, generally, should be limited to cases in

which the omission of extra-record evidence would preclude effective judicial review. <u>See id.</u>; <u>see also</u> <u>L-3 Commc'ns Integrated Sys., L.P. v. United States</u>, 98 Fed. Cl. 45, 49 (2011). "[T]he administrative record in a bid protest 'should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA.'" <u>Tech Sys., Inc. v. United States</u>, 97 Fed. Cl. 262, 265 (2011) (citing <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381). "[A]lthough the Federal Circuit's holding in <u>Axiom</u> makes clear that supplementation of the administrative record should occur rarely, it is not prohibited and may be used when it is necessary for the Court to gain a complete understanding of the issues before it." <u>Dyncorp Int'l, LLC v. United States</u>, 125 Fed. Cl. at 2. "One of the basic reasons a record may be insufficient is when it is missing 'relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations.'" <u>Tech Sys., Inc. v. United States</u>, 97 Fed. Cl. at 265 (citing <u>Orion Int'l Techs. v. United States</u>, 60 Fed. Cl. 338, 343-44 (2004)).

Specifically concerning Palantir's motion to supplement the Administrative Record to support its bias and/or bad faith allegations, the court considered whether Palantir's allegations had a sufficiently strong evidentiary foundation to justify supplementation. "Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation." <u>See</u> <u>Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. 327, 332 (2010). "This Court and other fora resolving bid protests have traditionally considered extra-record evidence in assessing alleged bias or bad faith" because allegations of bias, prejudice and bad faith may "depend upon a Government official's past conduct toward a bidder," which "cannot be subsumed within the record of a challenged award decision." <u>Int'l Res. Recovery, Inc. v. United States</u>, 61 Fed. Cl. 38, 41-42 (2004); <u>see also</u> <u>Starry Assocs., Inc. v. United States</u>, 125 Fed. Cl. 613, 621 (2015) ("Effective judicial review is not possible when the administrative record 'is missing "relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith. . . ."'." (quoting <u>InfoReliance Corp. v. United States</u>, 118 Fed. Cl. 744, 747 (2014))). However, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." <u>Int'l Res. Recovery, Inc. v. United States</u>, 61 Fed. Cl. at 43. "[A]llegations of bad faith must rest on a strong evidentiary footing to overcome the normal presumption of regularity and good faith conduct by agency officials." <u>Orion Int'l Techs., v. United States</u>, 60 Fed Cl. at 344. "[T]o address bias, the court will entertain extrarecord evidence . . . when there has been a 'strong showing of bad faith or improper behavior,'" and the strong showing must have an evidentiary foundation and "not rest merely on counsel's argument, suspicion, or conjecture." <u>Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. at 332 (quoting <u>Ala. Aircraft Indus., Inc. v. United States</u>, 82 Fed. Cl. 757, 766 (2008)); <u>see also</u> <u>Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. at 332 ("Essentially what is required is 'a threshold showing of either a motivation for the [g]overnment[al] employee to have acted in bad faith or of conduct that is hard to explain absent bad faith.'" (quoting <u>L–3 Commc'ns Integrated Sys., L.P. v. United States</u>, 91 Fed. Cl. 347, 356 (2010))). "'[T]o put facts relating to bad faith in play'" and supplement the administrative record, allegations of bias and/or bad faith must be based on "hard facts" and sufficiently well-grounded, and not merely innuendo or suspicion. <u>See</u> <u>Madison Servs., Inc. v. United States</u>, 92 Fed. Cl. 120, 130 (2010) (quoting <u>Beta Analytics Int'l, Inc. v. United States</u>, 61 Fed. Cl. 223, 226

(2004)); see also Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. at 332; Tech Sys., Inc. v. United States, 97 Fed. Cl. at 265-66. Additionally, in considering whether extra-record evidence should be included in an administrative record, the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that documents which the agency omitted from the administrative record, but should have included in the first place, or are agency-generated, should be included for completeness).

The court held a hearing regarding Palantir's motion to supplement the Administrative Record. At the hearing, together with the parties, the court reviewed each exhibit and discovery request that Palantir proposed for supplementation to the Administrative Record to determine whether any of the exhibits or discovery requests were necessary for effective judicial review. Of the 53 exhibits proposed for supplementation, the parties only were able to agree that three of the exhibits (Exhibits 1, 22, 23 in the motion to supplement the Administrative Record) should be added to the Administrative Record in this protest. Additionally, at the hearing, Palantir withdrew, "without prejudice," eight of the exhibits proposed for supplementation, Exhibits 29-33, 35, 37-38.

After reviewing the Administrative Record, as well as Palantir's proposed exhibits, and after careful consideration, the court concluded that some, but not all, of the exhibits were necessary for effective judicial review, and, thus, supplementation to the Administrative Record was justified for only certain exhibits. Specifically, the court denied Palantir's motion to supplement the Administrative Record regarding proposed Exhibits 2, 7, 8-21, 25-28, 34, 36, 39, and 50-53 because the court found that these exhibits were not necessary for effective judicial review.[19]

The court found that Exhibits 3-6, 24, and 40-49 were necessary for effective judicial review and these exhibits were added to the Administrative Record. Exhibits 3-6 pertained to Palantir's allegations of bias and/or bad faith. As stated above, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. at 43. Thus, the court considered whether Palantir's bias and/or bad faith allegations were based on sufficient evidentiary footing to justify discovery and supplementation to the Administrative Record. The court also concluded that Exhibit 24 was necessary to effectively review the reasonableness of the Army's decision to issue a solicitation only for a developmental contract. Exhibits 40-49 were excerpts of government contracts held by Palantir that purportedly could demonstrate the potential capabilities of Palantir's commercially available product, which protestor argues the agency should have considered when it made its determination under 10 U.S.C. § 2377. Because the parties dispute whether or not Palantir has a commercially available product with the capabilities to satisfy the requirements in the DCGS-A Increment 2 solicitation, and Exhibits 40-49

_____

[19] In denying Palantir's motion to supplement the Administrative Record with these exhibits the court allowed the exhibits to be used in depositions.

contain contracts that could illustrate Palantir's capabilities, the court determined that these contracts were necessary for effective judicial review. Additionally, as discussed further below, the court determined that limited supplementation of the Administrative Record regarding the technical requirements of the DCGS-A Increment 2 solicitation, and Palantir's ability to potentially meet those requirements, was justified and the court permitted the parties each to select one expert to submit an expert report and permitted the parties to depose each side's designated expert. Subsequently, defendant proffered Shaun Cronen, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)," as its expert witness, and Palantir proffered Bryant Choung, Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc.

Before the court, regarding bias and/or bad faith, Palantir offered a summary of what it alleged were its "main points providing a 'strong evidentiary footing' for Palantir's allegations of bad faith," including:

- The order from the head of the Army's G-2 unit (the chief DCGS-A Program Owner) for the destruction of the findings in the April 25, 2012 ATEC report that were favorable to Palantir.

- The Army's decision to cease funding for another independent evaluation of the Palantir Gotham Platform by the MITRE Corporation. . . . That order came after the MITRE Corporation produced an initial slide deck showing extremely favorable findings regarding Palantir that directly contradict the inaccurate information the DCGS-A Program Owners were circulating to senior DOD management and to Congress.

- The fact that, after the MITRE Corporation study with its favorable findings on Palantir was shut down, the DCGS-A Program Owners created slide decks and talking points about Palantir that were directly contradicted by the MITRE Corporation study.

- An email from October 7, 2014, in which Palantir's Doug Philippone set forth forty-four bullet points of specific instances spanning more than two years in which Army personnel associated with the Program Owners of DCGS-A were engaged in "blocking" requests from the field for Palantir, and otherwise thwarted and openly expressed their hostile bias against Palantir.

- The fact that the Army's supposed "market research" in 2014-15 never took cognizance of the ATEC or MITRE reports, never asked questions about the information in those reports, never asked questions about the existence of Palantir's commercial products, and was all based on the predetermination that the Solicitation would be crafted as a cost-plus

developmental services contract, rather than a fixed-price acquisition of a
commercial or nondevelopmental item.

(emphasis removed). Palantir sought to use Exhibits 3-6 and Exhibit 52 included in
Palantir's motion to supplement the Administrative Record, as well as Tabs 33, 35, 37,
and 39 of the existing Administrative Record, to demonstrate the above listed allegations.
Exhibits 3-5 contain the April 25, 2012 ATEC report on Palantir's capabilities, the revised
May 25, 2012 ATEC report on Palantir's capabilities, and an e-mail directing the April 25,
2012 ATEC report to be rescinded and destroyed. Exhibit 6 is an information brief
regarding Palantir's capabilities created by the MITRE Corporation. Exhibit 52 is an e-
mail from Palantir's Douglas Philippone to an Army official recounting numerous alleged
instances of "blocking" events by Army personnel to avoid using Palantir's technology.

        Palantir's allegation that the Army was biased against it appears to rest, in part, on
the history between Palantir and the Army that occurred prior to the issuance of the
solicitation at issue in this bid protest, including during the time the market research was
conducted. Included in that history are the reports on Palantir's capabilities by ATEC in
April and May 2012 and the MITRE Corporation that were allegedly shut down or
otherwise influenced by Army personnel who allegedly did not want to publicize favorable
findings regarding Palantir's capabilities. Because these allegations of bias pertain to the
past conduct of certain Army personnel that occurred in the years before the DCGS-A
Increment 2 solicitation was issued, any evidence of this past conduct normally would not
have been included in the Administrative Record surrounding the 2015 DCGS-A
Increment 2 procurement at issue. As such, the court considered that the Administrative
Record regarding Palantir's allegations of past biased conduct might be incomplete.
Nonetheless, the court found that the Administrative Record originally submitted to the
court by defendant included an Army investigative report regarding the April 25, 2012
ATEC report and the circumstances surrounding the rescission and modification of that
report in the revised May 25, 2012 ATEC report conducted by Lieutenant General William
Grisoli. Thus, the Administrative Record contained some information relevant to Palantir's
allegations of past, biased conduct by Army personnel. The court reviewed the
investigative report in the Administrative Record, which indicated that "the Army G-2 team
is passionate and a little defensive about DCGS-A and its relationship with Palantir" and
that, at times, "some members of the G-2 staff lost some of their objectivity with respect
to how they presented information on Palantir and DCGS-A to Army senior leaders." The
investigative report also indicated that the relevant G-2 staff included Lieutenant General
Legere and the Chief Information Officer of G-2, Lynn Schnurr. Although the investigative
report concluded that the April 25, 2012 ATEC report was not changed because of undue
influence from the G-2 staff, the court found that the need to conduct an investigative
report surrounding the circumstances of the April 25, 2012 ATEC report and the findings
concerning the G-2 staff in that report were a sufficient, factual predicate to justify limited

supplementation to the Administrative Record.[20]

Thus, after hearing from the parties, reviewing the Administrative Record, and carefully considering the proposed evidence of possible bias and/or bad faith, the court concluded that Palantir's allegations of bias and/or bad faith surrounding the April 25, 2012 ATEC report and the 2013 MITRE Corporation information brief demonstrated sufficient foundation to justify supplementation to the Administrative Record with Exhibits 3-6 for further effective review of the issues and for limited discovery of documents and depositions. The court also concluded that further inquiry into Palantir's allegations of biased conduct by Lieutenant General Legere and Lynn Schnurr was necessary to effectively review Palantir's allegation that there was a long history of biased conduct towards Palantir by Army personnel. The court, therefore, permitted Palantir to seek limited document discovery related to "the modification or destruction" of the April 25, 2012 ATEC report, as well as the opportunity to take the depositions of Lieutenant General Legere and Ms. Schnurr. With regard to Exhibits 2, 7, and 52, which Palantir sought to add to the Administrative Record to support its bias and/or bad faith allegations, the court determined that there was not a sufficient factual predicate to supplement these exhibits into the Administrative Record.

Subsequently, on August 5, 2016, Palantir submitted to the court a declaration by Palantir employee Douglas Philippone, the Global Defense Lead for Palantir USG, Inc. and Palantir Technologies Inc., and an expert report written by Palantir employee Bryant Choung, the Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc. Mr. Philippone's declaration was intended to support Palantir's bias and/or bad faith allegations and Mr. Choung's expert report was submitted to assist the court with evaluating the technical issues raised in the complaint. On August 12, 2016, defendant filed a motion to strike the declaration of Douglas Philippone and the expert report of Bryant Choung. Although defendant moved to strike Mr. Philippone's declaration and the expert report of Mr. Choung, the court notes that, at the time defendant filed its motion, neither of those documents had been included in the Administrative Record by the court. Regardless, the issue for this court's consideration as to whether the declaration of Mr. Philippone and Mr. Choung's expert report should be included in the Administrative Record remained the same. This court reviewed the substance of the parties' submissions to determine whether the Administrative Record in this case should be supplemented to include Mr. Philippone's resubmitted declaration[21] and/or Mr. Choung's expert report.

---

[20] Moreover, at the hearing on July 25, 2016, defendant acknowledged that Exhibits 3, 4, and 5, which Palantir sought to add to the Administrative Record, were underlying documents to the investigative report already contained in the Administrative Record.

[21] Prior to this August 5, 2016 submission, Palantir had attached two declarations, one by Douglas Philippone and one by Bryant Choung as Exhibits 50 and 51 to its motion to supplement the Administrative Record. At the hearing on July 25, 2016, the court denied Palantir's motion to supplement the Administrative Record with the two declarations because they included legal conclusions, however, the court explained that Palantir could re-file its declarations after removing the legal conclusions and the court would review

The court considered whether the addition of Mr. Philippone's declaration to the Administrative Record, and the exhibits attached thereto, was necessary for the court to effectively review the agency procurement decisions at issue and whether they individually contained sufficient "hard facts" to support protestor's bias and/or bad faith allegations and justify supplementation to the Administrative Record. As noted above, suspicion and innuendo is not sufficient to warrant supplementation to the Administrative Record. Notwithstanding protestor's argument that "Mr. Philippone's declaration includes ample evidence of bias and/or bad faith that are the factual predicate for supplementation," the statements in the declaration do not allege reliably supported facts sufficient to support protestor's bias and/or bad faith allegations. In his declaration, Mr. Philippone also refers to hearsay evidence, continues to assert legal conclusions, and makes other statements and opinions that do not appear to be based on his personal knowledge or necessary for effective judicial review. Accordingly, the court finds that supplementation to the Administrative Record with Mr. Philippone's declaration is not appropriate.

With regard to Mr. Choung's expert report, defendant argues that "[t]he Court by entertaining expert testimony on the issues in the case goes far beyond the administrative record, all without the predicate of first determining that the agency's market research clearly violated any law or regulation." Defendant also argues that "there is a serious question of credibility regarding both Mr. Choung's declaration and his expert report," and that, "[b]ecause of the credibility issues inherent in Mr. Choung's declaration and expert report," the court should refuse to consider Mr. Choung's expert report. In arguing that this court should not consider Mr. Choung's expert report because of credibility issues, defendant focuses on statements made by Mr. Choung in his expert report and deposition about testing by the Defense Integrated Backbone (DIB) Management Office (DMO) in May 2012. According to defendant, "Mr. Choung misrepresented the conclusions of the DMO as a result of the May 2012 testing of Palantir DIB adapter," and, because of that misrepresentation, the court should not consider any part of Mr. Choung's expert report. Defendant argues that "the Court has the discretion to disregard Mr. Choung's entire declaration, expert report and deposition testimony because of discrepancies between his declaration, expert report, and deposition testimony and the reported results of the DMO tests in May 2012."

In response, protestor argues that Mr. Choung's expert report should be admitted to the Administrative Record because "[t]his Court has already noted that it would benefit from expert testimony to assist in evaluating the technical issues raised in this bid protest." Protestor asserts that "Mr. Choung's report is designed to assist the Court by explaining technical issues relating to DCGS and the Palantir Gotham Platform." Additionally, protestor argues that "[t]he Government does not dispute that Mr. Choung is qualified to offer an expert opinion," and protestor contends that defendant's accusations about the

---

and reconsider adding the declarations to the Administrative Record. Palantir did not submit a revised declaration of Mr. Choung, thus, the court only considered whether Mr. Choung's expert report is admissible to the Administrative Record.

credibility of Mr. Choung's expert report are baseless and have "nothing to do with whether Mr. Choung's report should be admitted." According to protestor, "a careful review of the relevant documents and testimony establishes that the Government either misunderstands or misrepresents both Mr. Choung's testimony and Palantir's DIB-related capabilities."

As explained above, the United States Court of Appeals for the Federal Circuit has held that the "focus of judicial review of agency action remains the Administrative Record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA [Administrative Procedure Act, 5 U.S.C. §§ 701-706]." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381. When necessary for meaningful judicial review, the court may supplement an administrative record with an expert report in order to improve or clarify the court's understanding of an important issue in a bid protest. See Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. at 3 (including expert report in the administrative record that aided "the Court in better understanding the record"). As noted in FirstLine Transportation Security, Inc. v. United States, "[s]everal post-Axiom decisions have allowed supplementation of the record when necessary for the Court to have a complete understanding of the issues before it." FirstLine Transp. Sec., Inc. v. United States, 116 Fed. Cl. 324, 326 (2014). Other judges of this court have held "that it is appropriate to supplement the record with expert testimony when necessary to assist the Court in understanding technical or complex information involved in a challenged procurement." NCL Logistics Co. v. United States, 109 Fed Cl. 596, 613 (2013); see also Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 386, 390 (2014) (admitting expert declaration because the "expertise will greatly assist the Court in understanding the evidence in the administrative record"); Guzar Mirbachakot Transp. v. United States, 104 Fed. Cl. 53, 63 (2012) (holding that "[e]ffective judicial review would be impeded where technical aspects of the procurement process remain unexplained, preventing the parties from engaging in informed advocacy and the Court from developing a full judicial record and accurate context for its decision"); East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011) (explaining that information necessary for effective judicial review "might include tacit knowledge possessed by offeror and agency personnel of a highly technical and complex nature. . ."). Expert testimony may be offered to assist the court in understanding complex or technical information. See NCL Logistics Co. v. United States, 109 Fed. Cl. at 613.

In this bid protest, although the court acknowledges some of defendant's concerns with regard to Mr. Choung's credibility as an employee of protestor and as an expert witness, the court finds that, given the highly technical nature of the Army's requirements and Palantir's capabilities, expert reports are necessary for the court to effectively review aspects of the challenged agency procurement action at issue in this bid protest. Specifically, in order to determine whether Palantir may have a commercially available product that would satisfy the Army's requirements, such that Palantir was prejudiced by the Army's decision to issue a development-only solicitation, the court finds it appropriate to consider the expert reports offered by both protestor and defendant. Defendant's arguments about Mr. Choung's credibility, while noted by the court, did not eliminate the probative value of Mr. Choung's report, so as to warrant a decision to exclude Mr. Choung's expert report. The court evaluated Mr. Choung's expert report in relation to all

the evidence in the Administrative Record. In this pre-award bid protest, which the agency and protestor were eager to resolve as fast as possible, both parties were allowed to designate one available expert witness, and then permitted to depose the opposing party's designated expert witness. Defendant had the opportunity to challenge Mr. Choung's allegedly inaccurate statements about the 2012 DMO testing results during the deposition of Mr. Choung. The deposition transcript was available for the court's consideration and has been reviewed by the court. Accordingly, the Administrative Record in this bid protest has been supplemented with the expert report of Mr. Choung, as well as with the expert report of Mr. Shaun Cronen, the government's designated expert, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)" of the Army.

Two days before defendant filed its motion to strike Douglas Philippone's declaration and Bryant Choung's expert report, defendant filed a motion for leave to file three declarations of its own. Defendant sought to file the declarations of "Patricia L. Lee, Lead Engineer for the DCGS Multiservice Execution Team Office"; "Michael Sherick, contract specialist, U.S. Army Contracting Command Aberdeen Proving Ground"; and "Jeff Stock, Chief Engineer for DCGS-A Increment 2, U.S. Army."[22] Palantir opposed defendant's motion unless the court afforded Palantir the opportunity to depose each of the three declarants and defendant was required to produce any documents referred to by one of the declarants, Mr. Sherick. The court held a status conference with the parties to discuss defendant's motion, and, as discussed with the parties during the status conference, after careful review and consideration, the court issued an Order on August 24, 2016 granting defendant's motion for leave to file the three declarations and Palantir was permitted to take depositions of each of the three declarants. Subsequently, after conducting the limited discovery that the court had permitted at the July 25, 2016 hearing and the additional discovery permitted by the August 24, 2016 court Order, Palantir moved for additional discovery on August 26, 2016 "relating to Palantir's allegations of bad faith and bias." The court held another status conference on August 30, 2016 to discuss Palantir's subsequent motion for additional discovery. After hearing from the parties, the court denied Palantir's motion because Palantir's discovery requests were too broad and not based on sufficient evidentiary footing, but indicated it would reconsider Palantir's motion for additional discovery. Shortly thereafter, at a status conference on September 6, 2016, Palantir proposed narrower discovery requests and defendant produced nine additional documents. The parties agree that these nine documents should be added to the Administrative Record and the nine documents are now part of the Administrative Record. Thereafter, the parties filed supplemental briefs to include references to the limited discovery permitted by the court, after which, the court held oral argument on the parties' cross-motions for judgment on the Administrative Record.

---

[22] Although defendant refers to the declaration of "Jeff Stock," in the declaration included with defendant's motion for leave to file declarations, the individual's name is "Jess Stock."

# D I S C U S S I O N

## Bias and/or Bad Faith

As a threshold issue, the court considers Palantir's argument that the solicitation at issue in this bid protest should be set aside because, allegedly, "the Army engaged in arbitrary, capricious, and unlawful conduct . . . by engaging in bad faith conduct." (emphasis and capitalization removed). Palantir argues that, pursuant to 5 U.S.C. § 706, "this Court must set aside as unlawful any solicitation" that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Throughout this bid protest, Palantir has alleged that a long-term pattern of bias and/or bad faith against Palantir "infected" the agency's decision-making process that led to the DCGS-A Increment 2 solicitation, which Palantir is challenging in this bid protest. Palantir alleges in its complaint that the DCGS-A Increment 2 solicitation is the product of years of irrational and bad faith conduct by program owners in certain sectors of the Army,[23] and alleges that such conduct includes "bureaucratic inertia, resistance to innovation, bias against Palantir, the destruction of evidence, and the creation of misleading and deceptive information." (emphasis and capitalization removed). According to Palantir, "there is ample evidence of malicious, bad faith conduct" that "reveals a deep-seated level of bias against Palantir," and that "[s]uch bias is irrational, arbitration [sic], and capricious." Accordingly, Palantir argues, "the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct."

Palantir contends that the DCGS-A program owners have spent years "protecting their own failed program," and are resistant to any innovation from the commercial software industry that could replace the DCGS-A, such as Palantir, and the Palantir Gotham Platform. According to Palantir, "program owners in the Army—particularly within the Army's G-2 office, Intelligence and Security Command, and Intelligence and Information Warfare Directorate of the Communications-Electronics Research and Development Center—have resisted the Palantir Gotham Platform." Palantir's complaint alleges that evidence of the Army's bad faith conduct includes the "consistent hostility that certain DCGS 'program owners' within the Army have shown to Palantir's innovative

---

[23] In its complaint, Palantir states:

The list of DCGS program owners involved in or associated with the DCGS-A program include, among others, the following: Office of the U.S. Army Intelligence Directorate (G-2, oversight and "customer" of DCGS-A); Training and Doctrine Command; Program Executive Office Intelligence, Electronic Warfare, and Sensors (PEO IEW&S) (parent office of PM DCGS-A); Program Management Office, DCGS-A; U.S. Army Intelligence and Security Command (INSCOM) (responsible for all the cloud projects, etc.); Office of the Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)); and various actors within the Defense Acquisition System, including the Joint Requirements Oversight Council (JROC), the Joint Capabilities Integration and Development System (JCIDS), and others.

technology," the suppression of "independent reports that were critical of DCGS-A and complimentary of the Palantir Gotham Platform," and the creation of "misleading presentations for Congress and senior Department of Defense officials with inaccurate descriptions of Palantir's capabilities."

In opposition to Palantir's bias and/or bad faith allegations, defendant argues that "Palantir's claims are not supported by the administrative record." Defendant also asserts that "[t]he contracting officer and agency decision is entitled to a presumption of regularity." According to defendant, "[i]n order to overcome the presumption of good faith and administrative regularity, the protestor must present 'almost irrefragable proof'" of bias or bad faith. (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir.), reh'g denied (Fed. Cir. 2004)). Although defendant acknowledges that "[t]he discovery permitted by the Court revealed a tension in the business relationship between the Army and Palantir," defendant asserts that "Palantir's arguments do not meet the stringent standard for proving bad faith." Defendant argues that none of the limited discovery that the court had permitted produced any evidence of bias and/or bad faith, and Palantir's mere disagreement with the overall agency policy decision does not demonstrate an individual, much less institutional, bias and/or bad faith.

In order to prove that a government official's actions were biased, a protestor must overcome the well-established presumption that government officials act in good faith. See Croman Corp. v. United States, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1337. A protestor must offer "clear and convincing evidence" that the government did not act in good faith in order to prevail. See Croman Corp. v. United States, 724 F.3d at 1364; see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The United States Court of Appeals for the Federal Circuit has addressed the standard for overcoming the presumption of good faith as follows:

> Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" Kalvar Corp., Inc. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting Librach v. United States, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" Id. at 1301-02 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [a protestor] must offer clear and convincing evidence that [the government] did not act in good faith in order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364; see also Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239 ("The presumption that government officials act in good faith is nothing new to our jurisprudence. See, e.g., Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954) (stating 'we start out with the presumption that the official acted in good faith')."); Square One Armoring Serv., Inc., v. United States, 123

Fed. Cl. 309, 329 (2015) (holding that a plaintiff alleging that the government has acted in bad faith must offer well-nigh irrefragable proof in support of its claim); Austin v. United States, 118 Fed. Cl. 776, 790 (2014) ("To overcome this presumption, the plaintiffs must produce 'well-nigh irrefragable proof' of bad faith on the part of the government."); Kogan v. United States, 112 Fed. Cl. 253, 266 (2013) ("The presumption of good faith 'is valid and binding unless well-nigh irrefragable proof is offered to rebut or overcome it.' McEachern v. Office of Pers. Mgmt., 776 F.2d 1539, 1545 (Fed. Cir. 1985).").

The presumption that government officials act in good faith, however, is rebuttable and not automatically accepted by the court. The Federal Circuit in Am-Pro Protective Agency defined the "clear and convincing" standard of proof a protestor must meet to prevail as:

> A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *highly probable*."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (internal citations omitted in original and emphasis in original). Moreover, the Federal Circuit described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, as

> equated with evidence of some specific intent to injure the plaintiff. Thus, in Gadsden v. United States, [111 Ct. Cl. 487, 489-90 (1948),] the court compared bad faith to actions which are "motivated alone by malice." In Knotts, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy . . . to get rid of plaintiff." Similarly, the court in Struck Constr. Co. v. United States, [96 Ct. Cl. 186, 222 (1942),] found bad faith when confronted with a course of Governmental conduct which was "designedly oppressive." But in Librach, [v. United States, 147 Ct. Cl. 605 (1959),] the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

> …

> Nothing in Brown's affidavit [whereby Am-Pro attempted to show bad faith], moreover, suggests that the government "had a specific intent to injure" Am-Pro. Caldwell [& Santmyer, Inc. v. Glickman,] 55 F.3d [1578,] 1581 [(Fed. Cir. 1995)]. And Am-Pro has not alleged that these threats were "motivated alone by malice," Gadsden v. United States, 111 Ct. Cl. 487, 489, 78 F. Supp. 126 (1948); as part of a proven "conspiracy . . . to get rid of [Am-Pro]," Knotts, 128 Ct. Cl. at 500, 121 F. Supp. 630; as part of a course of

governmental conduct which was "designedly oppressive," <u>Struck</u>, 96 Ct. Cl. at 222; or as "actuated by animus toward" Am-Pro, <u>Librach</u>, 147 Ct. Cl. at 614.

<u>Am-Pro Protective Agency, Inc. v. United States</u>, 281 F.3d at 1240, 1241 (quoting in part <u>Kalvar Corp. v. United States</u>, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976), <u>cert. denied</u>, 434 U.S. 830 (1977)) (citations omitted in original); <u>see also</u> <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d at 1330 ("'[A]llegations of bad faith . . . ha[ve] been equated with evidence of some specific intent to injure the plaintiff.'" (quoting <u>Torncello v. United States</u>, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982))); <u>Info. Tech. & Applications Corp. [ITAC] v. United States</u>, 316 F.3d 1312, 1323 n.2 (Fed. Cir.) ("ITAC has pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome the presumption that the contracting officer acted in good faith.") (citations omitted), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2003); <u>Dekatron Corp. v. United States</u>, 128 Fed. Cl. 115, 118 (2016) ("Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent judgment or remedy the contracting officer representative's animus. . . ."); <u>Madison Servs. Inc. v. United States</u>, 94 Fed. Cl. 501, 507 (2010) ("Because plaintiff submits as evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a 'clear and convincing' standard, the court must deny plaintiff's requests for relief.") (citations omitted); <u>id.</u> at 511 & 511 n.8 (adding unreliable hearsay and attorney arguments to the list of what will not meet the standard for demonstrating bad faith); <u>L-3 Commc'ns Integrated Sys., L.P. v. United States</u>, 91 Fed. Cl. at 354 (innuendo or suspicion is not enough to demonstrate bad faith); <u>N. Star Alaska Hous. Corp. v. United States</u>, 76 Fed. Cl. 158, 187-88 ("Courts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' <u>Struck Constr. Co. v. United States</u>, 96 Ct. Cl. 186, 222, 1942 WL 4411 (1942), or that 'initiated a conspiracy' to 'get rid' of a contractor, <u>Knotts v. United States</u>, 128 Ct. Cl. 489, 121 F. Supp. 630, 636 (1954)."), <u>appeal dismissed</u>, 226 F. App'x 1004 (Fed. Cir. 2007).

To support its theory that a long-term climate of bias against Palantir "infected" the path towards the solicitation, Palantir points to specific instances of alleged bias that it asserts occurred between 2009 and the present, and asks "the Court to give particular consideration to" those instances. According to Palantir, those instances cannot "be explained away, and can only mean that there was an entrenched bias against Palantir among certain DCGS-A program owners and G-2 staff within the Army." Palantir suggests that "the supplemental record supports a finding that certain personnel within the Army had a bias against Palantir." Palantir asserts that these alleged instances include: the Army's efforts to "block" Palantir from participating in certain "important" evaluations between 2009 and 2011; false statements by the DCGS Program Manager to Congress about Palantir; an e-mail from Army Major Greg Moore stating that there is an "entrenched animosity" towards Palantir; the creation and distribution of documents by G-2 staff that contained inaccurate statements about Palantir's capabilities; efforts by Army personnel to rescind and alter a report with favorable findings and recommendations regarding Palantir; and the Army's failure to investigate Palantir's specific allegations of senior Army personnel "blocking" requests in the field for Palantir's technology.

According to Palantir, the Army's G-2 staff and DCGS-A program owners blocked Palantir from participating in Joint Intelligence Laboratory (JIL) and DCGS-A Systems Integration Laboratory (SIL) evaluations between 2009 and 2011 that, according to Palantir, would have helped to demonstrate Palantir's ability to satisfy the requirements set forth in the DCGS-A Increment 2 procurement, prior to the issuance of the solicitation. Palantir alleges that, in 2009, "Palantir attempted to undertake an evaluation at the Joint Intelligence Laboratory." Palantir alleges, however, that "[j]ust before Palantir's JIL evaluation was scheduled to take place," an Army official e-mailed a Palantir employee, Douglas Philippone, notifying him that the evaluation was cancelled. Similarly, according to Palantir, in November 2010, a contract was in place for Palantir to undergo testing at the SIL. Palantir alleges that the SIL evaluation also never occurred. Palantir alleges that it was "repeatedly blocked" from participating in testing at the SIL, which would have demonstrated Palantir's capabilities to the Army. Palantir alleges that "the Army has never given a plausible explanation for why it blocked Palantir from participating" in either a JIL or SIL evaluation.

Defendant asserts that the Army gave reasonable explanations for why the JIL and SIL evaluations did not occur and that the deposition testimony of Ms. Schnurr and Mr. Cronen corroborated those explanations. Defendant also argues that "the majority of events that Palantir claims constitute 'blocking' are events that are 4 to 11 years prior to the solicitation at issue, and are outside the relevant period of time to have any impact on the current procurement." Additionally, according to defendant, "Palantir has failed to demonstrate what, if any, impact these events had" with respect to the choices made regarding the DCGS-A Increment 2 solicitation.

The e-mail sent from the Army to Palantir cancelling the JIL evaluation on February 27, 2009, more than six years before the solicitation was issued, explains that:[24]

> Lynn [Schnurr] is out of the office dealing with personal matters right now and has authorized me to handle this matter. As of right now, the JIL evaluation is cancelled.
>
> . . .
>
> The rationale for this decision is that the best way to focus your efforts at this time is with the DCGS-A Mobile lead systems integrator, Northrup Grumman. My understanding is that you have already begun discussions with them so there should be no disconnect there. This provides the most direct route to potential DCGS-A integration and fits cleanly into their established business process. I understand that Palantir has a lot to offer and ask that you concentrate your efforts on this vector and allow the PM process to work and enable their LSI [lead systems integrator] to build the

---

[24] Although Palantir did not move to supplement the Administrative Record with this e-mail, counsel for Palantir used this e-mail as an exhibit during the deposition of Lynn Schnurr, which deposition the court has deemed necessary for effective judicial review.

best system possible for our Soldiers.

During the deposition of Ms. Schnurr, counsel for Palantir asked Ms. Schnurr about the cancellation of the JIL evaluation, and referenced the above e-mail as an exhibit to the deposition. Palantir points to the deposition testimony of Lynn Schnurr as support for its allegation that the Army blocked Palantir from undergoing the JIL evaluation. The deposition transcript of Ms. Schnurr indicates that she had difficulty recalling the reason that the JIL evaluation was cancelled. When Palantir's counsel asked Ms. Schnurr the reason for the cancellation of the 2009 JIL evaluation, Ms. Schnurr responded: "My understanding -- and again, that's a long time ago -- was that it was a funding issue." After Palantir's counsel showed Ms. Schnurr the e-mail cancelling the JIL evaluation, however, Ms. Schnurr stated: "Sitting here today, based on what you've shown me, it looks as if the recommendation was to not move forward with a JIL evaluation but to have them work directly with Northrup Grumman to move things forward in a direct manner to help get Palantir capability into the program." Ms. Schnurr also was asked:

> Q. Do you have any reason to believe that a company, which is a subcontractor, would be precluded from participating in the Joint Intelligence Laboratory evaluations?
>
> A. I don't know, but I would assume it would be okay.
>
> Q. You'd assume it would be okay?
>
> A. Uh-huh. But I don't know.
>
> . . .
>
> Q. Why is working with Northrop Grumman mutually exclusive from getting an evaluation under the JIL?
>
> A. I wouldn't think it is mutually exclusive.
>
> Q. Then why did you cancel the JIL evaluation?
>
> A. I did not cancel it personally.

Palantir asserts that, by testifying that Palantir could have been evaluated at the JIL and simultaneously have worked with Northrup Grumman, "Ms. Schnurr effectively admitted that the rationale given" for cancelling the JIL evaluation "did not make any sense." Palantir, however, mischaracterizes Ms. Schnurr's testimony. While Ms. Schnurr did, in fact, testify that Palantir might have been able to simultaneously work with Northrup Grumman and undergo evaluation at the JIL, she did not, either directly or indirectly, concede that the reason for the cancellation put forth in the e-mail to Palantir "did not make any sense."

Palantir argues that "the Army has never given a plausible explanation for why it 'blocked' Palantir from participating in this evaluation" and points to Mr. Schnurr's

deposition testimony to argue that the cancellation of the JIL evaluation was motivated by bias and/or bad faith. Palantir further asserts that Ms. Schnurr's testimony reflects "shifting and contradictory explanations that reveal a lack of candor and credibility as to the reasons why this evaluation was cancelled." Without further evidence, however, Palantir's position remains based only on allegations and suspicions of bias. The apparent inconsistencies with Ms. Schnurr's testimony could be attributed to her failed memory after the passage of approximately seven years from the events in question to the date of the deposition. Moreover, Ms. Schnurr testified that she "did not cancel the JIL evaluation personally." Without more evidence of intent, the e-mail sent to Palantir cancelling the JIL evaluation on February 27, 2009 does not offer sufficient evidence of bias and/or bad faith on the part of the agency as it relates to the developmental solicitation for DCGS-A Increment 2.

Palantir's counsel also asked Ms. Schnurr about the SIL evaluation cancellation during her deposition. Ms. Schnurr was asked: "Did Palantir ever undergo an evaluation in the SIL?" To which she responded: "I think they did, but I don't recall all the details of it. It's been so long, but I know they did." Palantir's counsel asked additional questions about the SIL evaluation, but it is apparent from her deposition testimony that Ms. Schnurr was not involved with the SIL. Ms. Schnurr stated: "I don't recall because I didn't work the SIL, didn't have any responsibility for the SIL;" "Again, that SIL work was totally separate in my office. We had nothing to do with that;" "Again, I did not work the SIL;" and, later, "I don't know the details of what happened in the SIL." Given her testimony that she was not involved with the SIL and did not remember anything about the SIL evaluation, her testimony as to why the SIL evaluation did or did not occur does not provide support for protestor's allegations. In addition, the JIL and SIL evaluations were cancelled between 2009 and 2011, years before the solicitation at issue in this bid protest was released. Given the lapse in time, it is unclear, without further evidence, whether those cancellations between 2009 and 2011 were directly related to the decision to issue the DCGS-A Increment 2 procurement as a developmental one. Therefore, Palantir's allegations of "blocking" of the JIL and SIL evaluations do not provide sufficient evidence to demonstrate bias or bad faith. As stated above, a protestor must show "clear and convincing evidence" to prevail on a claim of bias and/or bad faith and Palantir has failed to do so with regards to the JIL or SIL evaluations. See Croman Corp. v. United States, 724 F.3d at 1364.

Related to Palantir's allegations that the Army "blocked" the JIL and SIL evaluations, Palantir alleges that "[a]fter Palantir was blocked from conducting the SIL evaluation, the DCGS-A Program Manager, Colonel Wells" made inaccurate statements to Congress about the SIL evaluation. Specifically, Palantir alleges that Army Colonel Charles Wells told Congress, not only that the SIL evaluation had occurred, but also, "that Palantir was unwilling to fully integrate its product with DCGS-A," and that the evaluation revealed that Palantir's features limited intelligence collaboration and sharing. According to Palantir, Colonel Wells communicated this inaccurate information to Congress via Information Papers on September 30, 2011 and October 18, 2011. Defendant argues, however, that the statements in the Information Papers submitted to Congress do not demonstrate bias and/or bad faith. Similar to Palantir's allegations that the JIL and SIL evaluations were "blocked" by the Army, Palantir's allegation that inaccurate statements made to Congress are evidence of the Army's bias and/or bad faith is not supported by

the Administrative Record. Palantir's assertion that the Army communicated to Congress information that may have been inaccurate does not, without further evidence, establish that the representations made to Congress were motivated by bias and/or bad faith on the part of the critical decision makers regarding the DCGS-A Increment 2 solicitation. It is not clear in the Administrative Record what was the source of the alleged incorrect information or whether the information was utilized by the decision makers who produced the developmental procurement at issue in this protest.

In addition to the allegedly "blocked" JIL and SIL evaluations, Palantir also alleges that the "former Chief Information Officer for G-2," Lynn Schnurr, and the "former Deputy Chief of Staff of the Army for G-2 (Intelligence)," Lieutenant General Mary Legere, were biased against Palantir and acted on that bias. To support Palantir's allegations, Palantir points to several instances that allegedly occurred after 2011. For example, Palantir points to an e-mail sent on November 6, 2015, that pertained to a slide presentation on the DCGS-A Program and Palantir's capabilities. The author of the e-mail, Colonel Jack Dills, stated: "Apparently LTG Legere had some issues with the brief and afterward expressed her issues to MG [Major General] Ostrowski." According to Palantir, in an e-mail sent on March 10, 2012 to Douglas Philippone of Palantir, Army Major Greg Moore admitted that G-2's Chief Information Officer, Lynn Schnurr, had an "entrenched animosity" toward Palantir "which has been spread and inculcated into the DA staff." (emphasis removed). Additionally, Palantir alleges that, at some unidentified point prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir that led a defense contractor to decide against working with Palantir. To support this allegation, Palantir relies on another e-mail from Army Major Greg Moore, dated December 15, 2011, in which he stated that "[n]egative feedback from the DA G2 CIO [Lynn Schnurr] at the time caused Lockheed Martin [the contractor] to wave off" and enter into discussions with companies other than Palantir. Palantir also alleges that Lynn Schnurr and Lieutenant General Mary Legere circulated various documents that contained "inaccurate" and "misleading" information about Palantir, including, but not limited to, a July 2012 memorandum that discussed Palantir's capabilities and an undated venn diagram that was allegedly distributed among Army officials and purported to compare Palantir's capabilities with that of DCGS-A. (internal citations omitted). The venn diagram depiction appeared as follows:



Defendant argues that Palantir's claim that the Army G-2 circulated inaccurate information about Palantir's capabilities lacks merit because the information was believed to be accurate at the time it was distributed. Defendant further argues that Palantir has misstated or mischaracterized the deposition testimony of Lieutenant General Legere in its attempt to support its allegations of bias and bad faith. Defendant asserts that Ms. Schnurr's deposition testimony "demonstrates the Army [sic] intent to work with Palantir and integrate the Palantir Platform into the DCGS."

As indicated above, Palantir was given the opportunity to depose Lieutenant General Legere and Ms. Schnurr. During the depositions, counsel for Palantir asked Lieutenant General Legere and Ms. Schnurr about the allegedly inaccurate information

that was circulated about Palantir within the Army. Specifically, Lieutenant General Legere was asked about a July 2012 Information Paper to Congress and slide presentation that included the venn diagram depicting Palantir's capabilities. Palantir's counsel asked Lieutenant General Legere about the accuracy of these documents and several of the statements contained therein. In response to questions about the accuracy of certain statements in the 2012 Information Paper, Lieutenant General Legere explained that the statements reflected the understanding of Palantir's capabilities in 2012. Similarly, when questioned regarding the information about Palantir depicted in the venn diagram, Lieutenant General Legere responded that the venn diagram reflected "our understanding based on how we were using it [Palantir]," which was "[b]ased on the way the soldiers were using it and the way they were describing it." Ms. Schnurr was asked about the accuracy of the venn diagram by Palantir's counsel during her deposition, she stated that "it appears to be" accurate "[b]ased on what I was told by engineers." Similarly, during Ms. Schnurr's deposition, Palantir's counsel asked her about the accuracy of statements in the July 2012 Information Paper she had signed, and she explained that the statements were based on "knowledge that engineers in the field had assessed" regarding Palantir's capabilities. Ms. Schnurr testified that as of July 2012, the July 2012 Information Paper was a fair and accurate representation of Palantir's capabilities, and "[a]s of February of 2012," the venn diagram was a fair and accurate representation of Palantir's capabilities.

Although Lieutenant General Legere admitted during her deposition that "everybody was sort of talking past each other," and that, referring to Palantir and the Army, "[b]oth sides misrepresent the capabilities of both," her deposition testimony does not amount to clear and convincing evidence of bias and/or bad faith.[25] Instead, as even defendant has agreed, the deposition testimony suggests lack of communication and tension between the Army and Palantir. Lieutenant General Legere explained during her

---

[25] During her deposition, Lieutenant General Legere was asked if she was

> familiar with the fact that the solicitation that was ultimately issued in December 2015 for the procurement of Increment 2 for DCGS sought bids from offerors who would enter into a developmental contract on some kind of cost-plus basis and did not seek bids from people who wanted to sell a commercial item[.]

Lieutenant General Legere answered "no." Although the court has serious doubts about Lieutenant General Legere's purported lack of knowledge regarding DCGS-A Increment 2, considering her leadership role within G-2 and her involvement with the DCGS-A program, during her deposition, Lieutenant General Legere denied having ever said each of the statements in the e-mail that were attributed to her, and which Palantir alleges demonstrated the Army's bias against Palantir. Although Lieutenant General Legere's credibility may be diminished in the view of the court, some of her testimony was uncontroverted. Regarding the issues of bias and/or bad faith, her testimony, and the testimony about her purported views, was not sufficient to carry protestor's high burden of proof on the issue.

deposition that the Army's presentation of Palantir's capabilities evolved and improved over time as the Army continued to communicate with Palantir.  According to Lieutenant General Legere:

> I think in our conversations in relationship with the company over time, because really there were some serious objections to the way we were describing this, and I absolutely understand from a stakeholder in the company perspective why we got a little bit more -- we got much more precise. And in turn Palantir got more precise about what DCGS is and how what we do relates. So I think we made some progress. But in 2012, this is kind of how we talked past each other.

Additionally, although Palantir points to the November 6, 2015 e-mail asserting that "LTG Legere had some issues with the brief" on the DCGS-A program overview, the e-mail is not clear as to what Lieutenant General Legere's "issues" were with the brief. The fact that Lieutenant General Legere may have expressed issues or concerns, in and of itself, is insufficient to support a finding of bias and/or bad faith.

        As referred to above, Palantir also relies on various e-mails written by Army Major Greg Moore to support its allegation that Ms. Schnurr held a bias against Palantir, specifically, Major Moore's e-mail statements that Ms. Schnurr held an "entrenched animosity" towards Palantir and that at some time prior to December 2011 Ms. Schnurr gave negative feedback about Palantir to another contractor, Lockheed Martin. Major Moore's e-mail statements, including that Ms. Schnurr had an "entrenched animosity" towards Palantir, is expressed as Major Moore's impression of Ms. Schnurr's attitude at the time the e-mail was sent in 2012, and by itself cannot support a finding of bias or bad faith, even animosity without further confirmation. It also is not evident from the Administrative Record if this statement was based on any personal knowledge on the part of Major Moore, or if he was merely repeating information obtained second-hand. The court has not been provided any context directly from Major Moore about his statement. Based on the limited information provided to the court regarding Major Moore's e-mail, the court may not depend on the accuracy or reliability of Major Moore's statement about Ms. Schnurr's alleged feelings in 2012. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability). Moreover, the court permitted Palantir to depose Ms. Schnurr and the information derived from that deposition regarding her alleged bias is more reliable and probative than what Major Moore expressed in the 2012 e-mail. In fact, Palantir's counsel asked Ms. Schnurr about Major Moore's e-mail:

Q. Is it true that you have an entrenched animosity towards Palantir?

A. No.

Q. Do you have an explanation as to why someone would say that you did?

A. That's Major Moore.

Q. Do you have any explanation as to why he would say something like that?

A. No. This is -- this is Major Moore saying this. This is not Lieutenant Colonel Gloor saying this.

. . .

Q. Do you disagree with this statement that the DA [Department of the Army] staff -- that an entrenched animosity toward Palantir has spread and inculcated into the DA staff? Do you agree with that statement?

A. I disagree with that.

Q. Why?

A. I just – staff -- working in the Army staff, it's a very, very busy place, a lot of short suspenses, high optempo. And it's just not something that people do, is sit around and talk like that.

As the deposition transcript reflects, Ms. Schnurr rejected the notion that she had an "entrenched animosity" towards Palantir or that a culture of animosity had spread among "the DA staff" towards Palantir. Without more evidence to support Major Moore's allegation of an "entrenched animosity," the court cannot find evidence of bias and/or bad faith on this basis.

Moreover, Major Moore's e-mail statement that, at some time prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir to Lockheed Martin, another contractor, is not sufficient proof of bias and/or bad faith. Even if the court assumes that Major Moore's statement is accurate, negative feedback is not itself indicative of bias and/or bad faith. Additionally, the court is not satisfied that this e-mail is reliable, and Palantir was given the opportunity to question Ms. Schnurr about this alleged negative feedback during her deposition. At her deposition, Palantir's counsel asked Ms. Schnurr if she gave Lockheed Martin negative feedback about Palantir. Ms. Schnurr responded: "I do not remember that" and "I don't think so." Even given the tentative nature of her answer, this is simply not enough to support a finding of bias and/or bad faith on the part of the Army regarding the DCGS-A Increment 2 procurement.

Additionally, to further support its allegations of bias and/or bad faith, specifically against Lieutenant General Legere and Ms. Schnurr, Palantir points to the revision of a report on Palantir's capabilities created and published by the Army Test and Evaluation Command (ATEC) on April 25, 2012. ATEC is "responsible for planning and conducting developmental, independent operational test and independent evaluations and assessments of assigned Army material, information, and acquisition systems." "ATEC plans, integrates, and conducts experiments, developmental testing, independent operational testing, and independent evaluations and assessments to provide essential information to acquisition decision makers and commanders." (internal quotations omitted). From March 9, 2012 to March 21, 2012, ATEC conducted "face-to-face surveys

and collected data on Palantir from 57 operators and 43 intermediate supervisors. . . ." After this data was collected, ATEC started drafting the Palantir Forward Operational Assessment Report. "The ATEC Forward Operational Assessment Report on Palantir was approved and signed by BG [Brigadier General] Laura Richardson, the OTC [Operational Test Command] Commanding General, **on 25 April 2012**." (emphasis in original). The approved report was "emailed directly to key individuals within USFOR-A for their information," distributed on the "USFOR-A SIPR Sharepoint portal," and sent to two Palantir field service representatives. According to Palantir, the April 25, 2012 ATEC report on Palantir contained highly favorable recommendations and findings about Palantir's capabilities and was critical of DCGS-A.

Palantir alleges, however, that "[s]hortly after the ATEC Report was published, staff within G-2 demanded that it be rescinded, destroyed, and replaced." Specifically, Palantir alleges that Lieutenant General Legere "directed the deletions of information favorable to Palantir and other changes that were made to the April 25, 2012 ATEC report." Palantir alleges that, because the Army's G-2 staff insisted upon the rescission and alteration of the favorable findings and recommendations about Palantir in the April 25, 2012 ATEC report, the report was replaced "with a modified report that removed the most favorable language recommending Palantir and reporting on its success." The Administrative Record reflects that a revised ATEC report was issued on May 25, 2012.[26]

Defendant, however, argues that "Palantir has not alleged or demonstrated that the program and contracting officials for the DCGS-A Increment 2 procurement had anything to do with either the original or the corrected ATEC 2012 report." Moreover, defendant relies on an investigation conducted in 2012 regarding the ATEC report, which

> affirmatively found that the changes to the ATEC Report were not the result of any improper motives, but instead, the report was edited to ensure it was prepared in accordance with the purpose of the report and to ensure that the warfighters received the best possible product to accomplish their mission.

Defendant asserts that "irrespective of the spin Palantir now attempts to put on the fact that the ATEC report was edited," allegations that the report was changed as a result of improper influence or interference have already been laid to rest. The Administrative Record reflects that, between July 2012 and October 2012, the Army conducted an investigation into the circumstances surrounding the rescission and alteration of the April 25, 2012 ATEC report. Lieutenant General William Grisoli conducted the independent investigation and produced a report with his findings and conclusions, which is contained in the Administrative Record. According to the investigative report, Lieutenant General Grisoli was directed

---

[26] As with the original April 25, 2012 ATEC report, the revised May 25, 2012 ATEC report is included in the Administrative Record.

to conduct an investigation into the facts and circumstances surrounding the Army's 2012 conduct of an informal battlefield assessment of Palantir. . . [and] to examine the facts and circumstances surrounding creation of one or more Forward Operational Assessment (FAO) reports by the Army Test and Evaluation Command (ATEC) related to the Palantir system, and any alleged efforts by one or more members of the Army G-2 to disrupt ATEC's objective assessment of Palantir.

As part of his investigation, Lieutenant General Grisoli identified a list of 21 "key individuals related to the events" under investigation, which included, among others, "LTG Mary Legere, Army Deputy Chief of Staff, G-2" and "Ms. Lynn Schnurr, Army Intelligence Chief Information Officer and Director, Intelligence Community Information Management, Office of the DCS, G-2."

As a result of his investigation, Lieutenant General Grisoli confirmed that ATEC approved, and published, an initial report on Palantir on April 25, 2012 and that the ATEC Commanding General, Major General Gino Dellarocco, subsequently directed that the report be rescinded. Lieutenant General Grisoli concluded "that the 25 April 2012 Palantir FOAR [Forward Operational Assessment Report] was retracted, revised and reissued as a result of [a] determination that the recommendations contained in the initial report were improper and were beyond the scope of what ATEC should recommend in a FOAR." Lieutenant General Grisoli found that:

[T]he changes made to the 25 April 2012 FOAR were not attributable to anyone attempting to improperly advance the Army's DCGS-A program of record but, rather, to the ATEC leadership's intent to ensure that the FOAR properly reflected the strengths and weaknesses of Palantir and that the recommendations in the report were in line with the report's purpose.

Lieutenant General Grisoli concluded that, based on his investigation, "no member of ATEC experienced undue or improper pressure to change the earlier FOAR, and that no one within the Army G-2 requested that ATEC change the earlier FOAR." Lieutenant General Grisoli found "no communication between any member of the Army G-2 and ATEC that was actually in furtherance of retracting and reissuing the Palantir FOA report." Lieutenant General Grisoli explained, "none of the emails I reviewed, or in any of the phone conversations described by the participants, did any member of the Army G-2 specifically demand, suggest or even encourage ATEC to retract or destroy the April Palantir FOAR." Instead, according to Lieutenant General Grisoli, "[t]he decision to retract, revise, and reissue the April FOAR was clearly made by ATEC leadership." Specifically, "[t]he decision to revise the 25 April 2012 FOAR was made by MG Dellarocco on 2 May 2012 after a discussion with LTG Legere, the DCS, G-2."

Additionally, Lieutenant General Grisoli explained that "there is no indication that there was any undue or improper pressure from the Army G-2 to 'destroy' the April Palantir FOAR." Lieutenant General Grisoli found that the "'destruction' of the April

Palantir FOAR" was "intended only to avoid any confusion that likely would result from having two published FOARs simultaneously available."

Moreover, Lieutenant General Grisoli concluded that "there was no intent on the part of any member of the Army G-2 to deceive any Army decision maker regarding the effectiveness of the Palantir commercial system." Lieutenant General Grisoli explained in his report:

> [I]t is my opinion that the Army G-2 team is passionate and a little defensive about DCGS-A and its relationship with Palantir and that this attitude resulted in their desire to ensure that any Army discussion of Palantir be precise concerning capabilities, training and future acquisitions. At times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders. . . . However, it is clear that the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission.

Lieutenant General Grisoli ultimately concluded that "the coordination between the ATEC leadership and the Army G-2, was professional and that there was no undue or improper influence exerted by any member of the Army G-2 towards any member of ATEC."

By alleging that the ATEC report was changed because of interference by Lieutenant General Legere and/or Ms. Schnurr, both of whom Palantir alleges were motivated by their bias against Palantir, Palantir would apparently have this court set aside Lieutenant General Grisoli's investigation and re-investigate the circumstances surrounding the changes to the April 25, 2012 ATEC report. This court, however, is tasked with reviewing the Administrative Record, with limited supplementation, if appropriate and necessary for effective judicial review, and making findings based on that Administrative Record. It would not be appropriate for this court to ignore Lieutenant General Grisoli's findings, which occurred much closer in time to the events under review, and the depositions of Lieutenant General Legere and Ms. Schnurr despite their imperfect memories.   Thus, the court considers Palantir's allegations in light of the entire Administrative Record.

Lieutenant General Grisoli's investigative report documents a thorough inquiry into the circumstances surrounding the rescission and modification of the April 25, 2012 ATEC report. Indeed, Lieutenant General Grisoli was specifically directed to investigate whether there was any undue influence, pressure, or intent to deceive on the part of Army G-2 personnel to change the ATEC report that was originally distributed. Lieutenant General Grisoli's investigative report indicates that he spoke with multiple individuals, including Lieutenant General Legere and Ms. Schnurr, about their roles in the rescission and/or modification of the ATEC report. Based on the information he received, Lieutenant General Grisoli set forth comprehensive remarks in his report that directly address the allegations that Palantir asserts in this court. Although Palantir raised issues about the completeness of Lieutenant General Grisoli's rationale behind his findings in its

submissions to the court, Palantir did not question Lieutenant General Grisoli's ability to conduct an independent investigation.

To support its bias and/or bad faith allegations, Palantir further points to the statements in Lieutenant General Grisoli's report that certain G-2 personnel could be "a little defensive about DCGS-A and its relationship with Palantir" and that "[a]t times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders." In referring to these statements, however, Palantir omits Lieutenant General Grisoli's conclusion that the cause of this defensiveness and lack of objectivity was that "the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission." Lieutenant General Grisoli ultimately concluded that the G-2 staff were not motivated by bias or bad faith, but, indeed, by a strong desire to provide warfighters with the best products. Moreover, when asked during her deposition if she was "defensive about Palantir," Lieutenant General Legere responded "no, I'm not defensive. . . . I'm not defensive at all. You have an opinion that I don't share." Ms. Schnurr stated at her deposition that she disagreed with Lieutenant General Grisoli's assertion that members of the G-2 staff sometimes lost their objectivity with respect to how they presented information on Palantir.

In arguing that the Army insisted upon the rescission and alteration of favorable findings and recommendations about Palantir included in the original April 25, 2012 ATEC report, Palantir points to three specific statements that were removed from the April 25, 2012 ATEC report.[27] Palantir argues that this language "removed from the April 25, 2012

---

[27] Palantir's supplemental brief highlights the following language that was allegedly favorable towards Palantir and removed from the April 25, 2012 ATEC report:

1. "Easy search tools within Palantir allows Soldiers to simultaneously search CIDNE, M3, MX (British Human Intelligence (HUMINT) system), BAT, etc."

2. "(1) (U/FOUO) Due to connectivity issues and bandwidth restrictions in Afghanistan, some users experienced the inability to connect to servers that are located on different Forward Operating Bases (FOB) from where the user operates. Recommendation: Install more Palantir servers in Afghanistan at multiple locations to mitigate issues."

3. "As compared to other analysis tools, 'Palantir is far superior to the DCGS suite. DCGS is overcomplicated, requires lengthy classroom instruction and is an easily perishable skill set if not being used constantly.' Recommendation: Incorporate a short training class on Palantir at the 35F (Intelligence Analyst) Military Occupational Specialty (MOS) Advanced Individual Training (AIT) and Company Intelligence Teams (COIST) training. Users are able to learn the system and use the analysis tools with

ATEC report directly contradicts what the Army is arguing in this case." Palantir asserts that Lieutenant General Grisoli's "investigation into the rescission and alteration of the April 2012 ATEC report provides *no explanation* for the removal of this language." (emphasis in original). Palantir appears to be arguing that, in 2012, the Army intentionally, and in bad faith, removed language in the April 25, 2012 ATEC report about Palantir's capabilities because the Army was biased against Palantir and sought to prevent Palantir from receiving a future award. To the extent Palantir is asserting this argument, the court finds it to be insufficiently supported and heavily reliant on speculation and suspicion.

In considering Palantir's bias and/or bad faith allegations, the court considered all of the evidence in the Administrative Record pertaining to the 2012 ATEC reports. As a result of supplementation, the Administrative Record contained Lieutenant General Legere's sworn statement given on August 7, 2012 as part of Lieutenant General Grisoli's investigation. The sworn statement was attached as Exhibit 3 to Lieutenant General Legere's deposition transcript. Lieutenant General Legere explained that the

> 25 April draft ATEC report contained one recommendation that concerned me. . . . [T]he particular recommendation that concerned me suggested our Intelligence Center add 40 hours of Palantir training at Fort Huachuca as part of our DCGS core curriculum. I believed this recommendation was not appropriate or helpful to our Intelligence Center. . . .

Lieutenant General Legere stated that she provided her recommendation because she

> assumed as the Senior Intelligence Officer (SIO) for the Army I had an obligation to read the report and bring any concerns with recommendations to ATEC so they could review, weigh the merits, see if any/all should be included in what I assume will stand as a document of record.

Lieutenant General Legere also explained that, prior to April 2012, she had "no previous exposure to the way ATEC coordinate[d] its reports." In her sworn statement, Lieutenant General Legere stated:

> At no point did I intend to do anything to hinder or influence ATEC's critical mission to the Army as its independent test and evaluation organization. My suggestion was a minor one in the context of the report and I was comfortable that it could either be accepted as a constructive suggestion or ignored as immaterial.

Although Palantir is correct that the information contained in the first and second ATEC reports is different, the changes in the reports and the circumstances surrounding the changes, although perhaps unusual, are not clear and convincing evidence of bias and/or bad faith against Palantir.

--------

minimal training. Offer an advanced class for NCO's with intelligence MOSs who may be deploying to an area with Palantir use."

As evidence of bias and/or bad faith against Palantir, Palantir further alleges that in October 2014 it notified the Army of specific alleged "'blocking' actions against Palantir" by "G2 or DCGS program owners," and that "the Army has not said whether it has investigated any of those allegations." Palantir's allegation refers to an e-mail sent by Palantir's Douglas Philippone to an Army official in October 2014 in which he allegedly listed "45 separate instances in which G2 or DCGS program owners engaged in specific 'blocking' actions against Palantir, dating back to September 2012." Throughout this bid protest, Palantir has attempted to admit this e-mail into the Administrative Record as support for its bias and/or bad faith allegations. Specifically, Palantir attached the e-mail to its July 15, 2016 motion to supplement the Administrative Record as Exhibit 52, and also attached it to its motion for additional discovery. Defendant argues that this e-mail is not appropriate for supplementation to the Administrative Record. Although the court did not permit Palantir to supplement the Administrative Record with this e-mail, at the hearing on July 25, 2016, Palantir referred to the e-mail as an exhibit when it deposed Lieutenant General Legere.

The e-mail contains a list of alleged instances of "blocking," however, the information in the e-mail was communicated to the e-mail writer, Mr. Philippone, by various individuals, and, as a result, the e-mail contains multiple levels of inadmissible hearsay. Protestor argues that the e-mail and the statements contained therein are not inadmissible hearsay because they are "being submitted to establish the simple fact that Mr. Philippone sent these allegations" to the Army in October 2014, and not for the truth of the matters asserted in the e-mail. Whether or not the e-mail was sent is not at issue. If Palantir is not seeking to admit the allegations for the truth of the matters asserted, including that the Army engaged in numerous efforts of "blocking" against Palantir, the fact that the e-mail was sent does not establish that any or all of the alleged "blocking" efforts ever occurred. Similarly, whether the Army investigated the allegations is not clear and convincing proof of bias and/or bad faith.

In his deposition, Mr. Philippone even stated that he could not recall the specific sources of the information contained in the e-mail:

Q. Now, these [sic] information that you're conveying in the email dated October 7th, 2014 to Gabe [Camarillo], did this information come to you through other persons?

A. Yes.

Q. And who gave you this information?

A. I don't recall specifically. But we received these reports all the time, and so I just kept track of them. And since Gabe had requested it in very specific form, where he literally told me, send this to me, I -- at his request, I put all of these things -- all of the reports that I had heard in one email to send to him.

Q. And from whom did you hear these reports?

A. So I mean, from a variety of sources. From -- from either soldiers, FSRs [Field Service Representatives], Palantir employees. Some of them came from Congress.

When defendant's counsel went through each allegation in the e-mail, and asked who reported each allegation to Mr. Philippone, he responded to nearly each question: "I don't remember" and could not specifically identify the source of all of the allegations. Because Palantir's counsel referred to the e-mail during the deposition of Lieutenant General Legere, and that deposition testimony is included in the Administrative Record, the court reviewed the e-mail again and, once again, concludes that the e-mail is made up of a series of uncorroborated allegations many of which are based on hearsay, is not appropriate for supplementation to the Administrative Record and cannot support a finding of clear and convincing evidence of bias and/or bad faith.

As discussed above, to succeed on its allegations of bias and/or bad faith, Palantir must prove its claims of bias and/or bad faith by clear and convincing evidence. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240. Even after permitting limited supplementation to the Administrative Record with some of Palantir's multiple requests for discovery and several depositions, although it appears that the relationship between Palantir and the Army was strained at times, as even defendant conceded there was "a tension in the business relationship between the Army and Palantir," and the Army representatives struggled during the depositions to remember or explain potentially unfavorable e-mails or statements about Palantir, Palantir has not produced clear and convincing evidence of bias and/or bad faith against Palantir. This procurement has been the subject of extensive discussion at the Department of Defense, particularly within the Army, before Congress, and in the press. The court is mindful that the only relevant information to be reviewed by the court is the record before the court, as supplemented in accordance with the court's rulings described above. The court, therefore, turns to consider Palantir's allegations regarding the Army's failure to comply with 10 U.S.C. § 2377.

10 U.S.C. § 2377

The parties also have filed cross-motions for judgment on the Administrative Record on the issue of the Army's compliance with 10 U.S.C. § 2377. Rule 52.1(c) of the Rules of the United States Court of Federal Claims (2016) (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the

United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), "by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]""); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319. The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d at 1363 ("'[T]he proper standard to be applied

[to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.""" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[28] see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013);

---

[28] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d at 1285–86; Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary standard] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); see also Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see

also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Const. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech

Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is

whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted

interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

In the context of a pre-award bid protest, however, the protestor has to demonstrate that it has suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7 ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a pre-award protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. at 647; Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797 (2013). This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Protestor Palantir argues that, by failing to properly evaluate whether the Army's needs could be met by procuring commercial items, including commercial items identified to the Army by Palantir, and, thereafter, by refusing to solicit either the data management platform, or the entirety of DCGS-A Increment 2, as a commercial item, the Army violated 10 U.S.C. § 2377. Palantir raises related questions about the Army's approach to the procurement, including: "Did the Army violate § 2377(c) by failing to conduct market research that was designed to determine whether there were commercial or nondevelopmental items that could meet the Army's requirements, and by assuming from the outset that the procurement would be for a developmental contract?" Palantir also asks: "Did the Army violate § 2377(c) by failing to analyze and failing to make any

determination as to whether modifications to existing commercial or nondevelopmental items could fulfill the Army's requirements?" and "[d]id the Army violate § 2377(c) by failing to analyze and failing to make any determination as to whether modifications to its requirements could be made that would allow the requirements to be fulfilled by commercial or nondevelopmental items?"

The "Preference for acquisition of commercial items" statute, 10 U.S.C. § 2377, states:

**(a) Preference.**--The head of an agency shall ensure that, to the maximum extent practicable--

**(1)** requirements of the agency with respect to a procurement of supplies or services are stated in terms of--

**(A)** functions to be performed;

**(B)** performance required; or

**(C)** essential physical characteristics;

**(2)** such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

**(3)** offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

**(b) Implementation.**--The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable--

**(1)** acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

**(2)** require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

**(3)** modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

**(4)** state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

**(5)** revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

**(6)** require training of appropriate personnel in the acquisition of commercial items.

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377 (emphasis in original).

The regulation implementing 10 U.S.C. § 2377, 48 C.F.R. § 10.002, states:

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see part 19).

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at https://www.contractdirectory.gov/contractdirectory/ and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part 12 shall not be used. When publication of the notice at 5.201 is

required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

48 C.F.R. § 10.002. The FAR also provides a definition of a "commercial item":

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101 (2016).[29]

In general, this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). As noted above, this language in 28 U.S.C.

---

[29] The court notes that the United States Code at 41 U.S.C. § 103 provides a substantially similar definition of commercial item. <u>See</u> 41 U.S.C. § 103 (2012).

§ 1491(b)(1) provides "a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381 (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))) (emphasis in original); see also Distrib. Solutions, Inc. v. United States, 539 F.3d at 1346 ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"); Nat'l Air Cargo Grp., Inc. v. United States, 126 Fed. Cl. 281, 289 (2016) (quoting 41 U.S.C. § 111 (2012)) ("[T]he term 'procurement' is itself broad, meaning 'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'"). Therefore, so long as "any stage" of the procurement is at issue, this court has jurisdiction to adjudicate the protest.

The language of 10 U.S.C. § 2377(a) instructs that "[t]he head of an agency shall ensure that, to the maximum extent practicable" the "requirements of the agency with respect to a procurement of supplies or services are stated in terms of" the functions, the characteristics, and the required performance, and that "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a) (emphasis added). As the statute contemplates that offerors of commercial items[30] have an opportunity to compete in any procurement, the court interprets an issue of 10 U.S.C. § 2377 to fall within the court's bid protest jurisdiction and proper for consideration.

As an initial matter, the court notes that the application of 10 U.S.C. § 2377 has not been squarely addressed in this court in the context of a bid protest.[31] Turning to the

---

[30] Throughout this opinion, the court uses the shorthand of "commercial items" to refer to "commercial items or nondevelopmental items."

[31] The statute, 10 U.S.C. § 2377, has been cited in two prior bid protests. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. 215 (1998), rev'd, 175 F.3d 1365 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448 (1997). In Alfa Laval, the United States Court of Federal Claims only cited 10 U.S.C. § 2377 in a footnote for defendant's statement that "one factor militating in favor of competitive bidding" was 10 U.S.C. § 2377. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. at 217 n.2. In Hydro Engineering, a decision by the undersigned, the protestor argued that the United States Army's Chemical and Biological Defense Command "violated the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, 108 Stat. 3243 (1994) (FASA), as codified at 10 U.S.C. § 2377, by giving Centech [the awardee] a technical advantage for its heating coil, which allegedly is a sole source part." Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. at 473. In Hydro Engineering, this court noted that "not only is 10 U.S.C. § 2377 introduced by the words 'to the maximum extent practicable,' but the solicitation also contemplated that the offerors could use sole source or proprietary parts" in the designs. Id. at 474. The court did not discuss the degree of discretion afforded by

language of 10 U.S.C. § 2377, Palantir first focuses on the two instances of the phrase "to the maximum extent practicable." In 10 U.S.C. § 2377(a), the statute instructs: "The head of an agency shall ensure that, to the maximum extent practicable . . . such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements," and "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." Id. In 10 U.S.C. § 2377(b), the statute requires that "[t]he head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable," "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency," and "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b). Palantir argues that:

> [T]he Army has a requirement for a Data Management Platform; Palantir has a Data Management Platform that is available as a commercial item; and the law requires the Army to meet its requirements through the procurement of commercial items "to the maximum extent practicable." 10 U.S.C. § 2377. Yet the Army chose to issue a Solicitation that makes it impossible for Palantir to compete through a bid that meets the Army's requirements by supplying its commercial item. That is a blatant violation of § 2377.

Palantir further argues that: "The use of the word 'maximum' in the phrase 'to the maximum extent practicable' cannot be ignored." (footnote omitted). Defendant, by contrast, argues that "[t]he language, 'to the maximum extent practicable,' qualifies all of the agency's responsibilities, e.g., its responsibility to define requirements in terms of functions, performance, or essential physical characteristics, and its responsibility to define requirements so that commercial items may be procured to fulfill such requirements."[32] In addition, defendant argues, citing Hydro Engineering, Inc. v. United States, 37 Fed. Cl. at 474, that "[t]his discretionary language – 'to the maximum extent practicable [sic] - qualifies the agency's obligations."

The phrases "to the maximum extent practicable" and "appropriate to the

_____

the phrase "to the maximum extent practicable," or specifically analyze the phrase. Recently, this court also referred to 10 U.S.C. § 2377 in its prior standing decision in the above captioned protest brought by Palantir USG, Inc. and Palantir Technologies Inc. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 27.

[32] Defendant makes a related argument, arguing that "the statutory provision that addresses defining requirements and contains language that 'requirements are defined so that commercial or nondevelopmental items may be procured to fulfill such requirements' is qualified by the language 'to the maximum extent practicable,' which acknowledges agency discretion."

circumstances" in 10 U.S.C. § 2377 are not further defined in the statute or the implementing regulations. Moreover, the same phrases "to the maximum extent practicable" and "appropriate to the circumstances" in the context of 10 U.S.C. § 2377, have not been judicially defined to date[33] and are not easily subject to bright line tests. Turning to dictionary definitions, "maximum" is defined as "as great, high or intense as possible as permitted" New Oxford American Dictionary 1082 (3d ed. 2010); "practicable" is defined as "able to be done or put into practice successfully," id. at 1372; and "appropriate" is defined as "suitable in the circumstance." Id. at 77.   Although these dictionary definitions provide little further clarification, the words chosen by Congress make it clear that a factual, case-by-case, compliance approach with the statutory dictate that an agency consider commercially available alternatives is expected.

The court also notes that the specific word "maximum" was a deliberate choice by Congress. In the House Report for the Federal Acquisition Streamlining Act of 1994, the House of Representatives proposed the following language regarding the acquisition of commercial items:

SEC. 111. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS

Section 16 of the Office of Federal Procurement Policy Act (41 U.S.C. 414) is amended by redesignating paragraphs (2), (3), and (4) in order as paragraphs (3), (4), and (5), respectively, and by inserting after paragraph (1) the following new paragraph:

(2) implement a preference for the acquisition of commercial items by–

(A) whenever practicable, stating specifications in solicitation for bids and proposals in terms such that bidders and offerors are enabled and encouraged to offer to supply commercial items in response to agency solicitations[.]

H. Rep. 103-545(I), at 41 (1994), 1994 WL 261997 (emphasis added). By contrast, the Senate Report first proposed the following language:

PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS AND NONDEVELOPMENTAL ITEMS

SEC. 33. (a) PREFERENCE.—The head of each executive agency shall ensure that, to the maximum extent practicable—

(1) requirements of the executive agency with respect to a procurement of supplies are stated in terms of—

---

[33] The court notes, as the parties describe in their respective briefs, other courts have discussed the phrase "maximum extent practicable" in other contexts. See, e.g., SMS Data Products Grp. v. United States, 853 F.2d 1547 (Fed. Cir. 1988).

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items may be procured to fulfill such requirements; and

(3) offerors of commercial items and other nondevelopmental items are provided an opportunity to compete in any procurement to fill such requirements.

(b) IMPLEMENTATION.—The head of each executive agency shall ensure that procurement officials in that executive agency, to the maximum extent practicable—

(1) acquire commercial items or other nondevelopmental items to meet the needs of the executive agency;

(2) require prime contractors and subcontractors at all levels under the executive agency contracts to incorporate commercial items or other nondevelopmental items as components of items supplied to the executive agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items[.]

S. Rep. 1587, at 282-83 (1994) (emphasis added). The House Conference Report, from August 21, 1994, after both the House and the Senate Reports, adopted the approach of the Senate Report, and crucially, adopted the phrase "maximum extent practicable." The House Conference Report stated:

SEC. 8104. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS.

(a) In General.-Chapter 140 of title 10, United States Code, as amended by section 8103, is further amended by adding after section 2376 the following new section:

S 2377. Preference for acquisition of commercial items

(a) Preference.-The head of an agency shall ensure that, to the <u>maximum extent practicable</u>-

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of-

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

(b) Implementation.-The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable-

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

(2) require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items[.]

H.R. Conf. Rep. 103-712, at 154 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 2607 (emphasis added). The court notes that the language of the House Conference Report closely tracked the final language of the Federal Acquisition Streamlining Act of 1994, and tracks the language at 10 U.S.C. § 2377. The word "maximum" in the phrase "to the maximum extent practicable," therefore, should not be ignored and read out of the statute. Given the congressional choice of the word "maximum," even when coupled with words like "practicable" and "appropriate," agencies cannot ignore or superficially comply with the requirement to review the availability of commercial products to meet agency needs as

the statute instructs agencies to make serious and genuine efforts to review the availability of commercial products to meet their needs. Although the statute grants discretionary authority to the agency, and agency discretionary authority can be the most difficult kind of action to test in the courts, government contract law is replete with challenges to the exercises of agency discretion as alleged to be arbitrary and capricious; the current challenge to the implementation of 10 U.S.C. § 2377 is in the same category.

Separate from the "maximum extent practicable" language, the defendant's briefs submitted in this protest focus on the language of 10 U.S.C. § 2377(c) regarding market research and emphasize the phrase: "The head of an agency shall conduct market research appropriate to the circumstances," to argue that the undertaken "market research was clearly 'appropriate in the circumstances.'" Palantir argues that "[t]he Government asks this Court to render § 2377 a nullity," regarding the "maximum extent practicable" language, and that "the clause 'appropriate to the circumstances' does not give the agency discretion to ignore § 2377(c)'s requirements." (capitalization and emphasis removed). As noted above, 10 U.S.C. § 2377(c) states:

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial

items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377(c) (emphasis in original).

The solicitation relevant to this protest was issued on December 23, 2015. As discussed above, the Army did conduct its version of market research before issuing the solicitation. Prior to the issuance of the solicitation, in July 2014, the DIVA Market Study recommended as a "Potential Strategy: Phased Acquisition and Integration Approach:"

> The acquisition approach could be structured in a phased manner. Initially, the two foundation components (e.g., COTS [commercial off the shelf] cloud infrastructure services and COTS DIVA 'Turn Key' Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA 'Turn Key' platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis and capitalization removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original). Therefore, initially on the recommendation of the MITRE Corporation, a not-for-profit research and development organization, the Army was aware of a possible commercial approach for at least portions of the DCGS-A Increment 2 procurement.[34]

The initial Request for Information, issued August 13, 2014, was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan." The August 13, 2014 Request for Information, however, "request[ed] respondents' corporate overview information and basic qualifications in managing software <u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). Instead of asking about commercial items, or asking more open-ended questions about

---

[34] Subsequently, in the Army Materiel Systems Analysis Activity's July 2015 Trade Space Analysis, "the Hybrid alternative was rated Green and scored the highest of the three alternatives." As noted above, the Green designation indicated: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance." "Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions." As noted in the Trade Space Analysis, Hybrid was "a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS)."

the approach to the procurement, potential respondents only were asked about developmental projects similar to the existing DCGS-A Increment 1 program.[35]

After the August 13, 2014 Request for Information, the Army issued a second Request for Information on December 5, 2014, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the <u>DCGS-A development effort</u>." (emphasis added). "In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development projects</u> that are similar in scope and process to the DCGS-A program." (emphasis added). As with the first Request for Information, the Army's focus in the December 5, 2014 Request for Information was on "the DCGS-A development effort" and not on the possibility of procuring commercial items.  The goal of this second Request for Information was for the Army to understand the respondent's "<u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information, the third issued by the Army,  stated, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information also asked respondents: "For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described" earlier in the May 6, 2015 Request for Information. Like the previous two Requests for Information, the May 6, 2015 Request for Information did not seek information for commercial items from the respondents, suggesting to the court that the agency likely already had decided that the DCGS-A Increment 2 was going to be another developmental project.

After the three Requests for Information, the Army generated the July 2015 Market Research Report, which, although it was over fifty pages long, contained only two sentences about "Commercial Services." Regarding "Commercial Services," the Market Research Report stated in its entirety: "Significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product." The Market Research Report also separately discussed each respondent, and for Palantir, only stated: "The Palantir response did not provide any examples of past experience relevant to the <u>development</u>

---

[35] The focus on development is consistent with Ms. Shyu's October 20, 2014 "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy" which sought to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." The October 20, 2014 Recommendation also stressed that "moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available." Therefore, the focus of the Recommendation was on development and the use of Research, Development, Test and Evaluation funds, rather than on consideration of purchasing commercial items to meet the agency's needs.

of Increment 2, and was therefore found non-responsive." (emphasis added). Just as the Market Research Report dismissed a commercial product approach, the Army's focus on Palantir's short comings centered on Palantir's lack of experience related to development.

The focus on development continued as reflected in the draft Performance Work Statement distributed by the Army in July 2015. The Scope of the Performance Work Statement begins:

> This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the <u>development</u> and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, <u>development</u> of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

(emphasis added).

Furthermore, the July 1, 2016 "DETERMINATION OF NON-COMMERCIAL ITEM" (capitalization in original; emphasis removed), authored by Contracting Officer Christopher Fisher for the solicitation at issue, and Bryon Young, the Principal Assistant Responsible for Contracting, stated that regarding the market research, the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item continued:

> Based upon market research conducted by Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

> I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

Palantir argues that "the Army felt the need to create and execute such a document *after* Palantir filed its lawsuit reveals that the Army knew it had not made the 'determinations' <u>required</u> by § 2377(c)," (first emphasis in original; second emphasis added). The court notes that, certainly, the timing is unusual. The Determination of Non-Commercial Item,[36] was made the day after the protest was filed in this court. Defendant attempts to argue that the Determination of Non-Commercial Item could be made any time, and asserts that "there is no statutory language addressing the documentation of agency determinations based on market research, and the implementing regulation, FAR 10.002(e), does not require that such determinations must be documented, or that they must be documented before issuance of a solicitation." The court agrees that there is not a specific documentation requirement in 10 U.S.C. § 2377 or the implementing regulations, but disagrees with defendant that "the July 1, 2016 D&F was not a *post-hoc* document as asserted by Palantir." (emphasis in original). The direction of a developmental approach and conclusion that no commercial items were available to meet the Army's requirements was evident in the October 21, 2015 Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," signed by Ms. Shyu. And, clearly, when the Army issued Request for Proposals No. W56KGY-16-R-0001 for engineering, manufacturing, and development services, seeking a single contractor to be the system data architect, developer, and integrator of DCGS–A Increment 2, the decision that no suitable commercial items were available was definitively made. Furthermore, although there is a not a documentation requirement in 10 U.S.C. § 2377, the Army cannot point to any contemporaneous document issued before the solicitation was issued that demonstrates that, in compliance with 10 U.S.C. § 2377, the Army had carefully considered whether commercial items were available. The absence of any determination or indication that the Army had seriously considered whether a commercial item was available at any point in the procurement process, prior to the issuance of the solicitation, together with the numerous documents in the Administrative Record documenting the choice for a developmental approach, is a strong indication that the Army had not met the requirements of 10 U.S.C. § 2377 prior to the July 1, 2016 Determination of Non-Commercial Item, which, as noted above, was issued after the closing date of the solicitation.

Even if the court were to consider the July 1, Determination of Non-Commercial Item as timely, it does not meet the requirements of compliance with 10 U.S.C. § 2377. Palantir argues that "[t]he July 1, 2016 Declaration appears to be merely parroting what the July 13, 2015, Summary of Market Research found. That document used exactly the same words—with exactly the same lack of any support whatsoever – in making the unsubstantiated assertion about the unavailability of commercial or nondevelopmental items." (internal citation omitted). The court agrees that the language in the determination mirrors that of the Market Research Report, and, although slightly longer, the court agrees

---

[36] Although defendant refers to the July 1, 2016 document as a "D&F" the July 1, 2016 document is titled: "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed).

with Palantir that "[t]here is no evidence . . . to support this repeated assertion" of the unavailability of a commercial item sufficient to meet the Army's needs. Although the Determination of Non-Commercial Item cites the Requests for Information to support the finding that a commercial item was not available, the Administrative Record reflects that even the first Request for Information was seeking information for "development projects," and, therefore, the court does not consider the Requests for Information as demonstrable evidence that no commercial items were available. This is consistent with all the market research, and, on balance, the court disagrees with defendant that the market research was "clearly appropriate" to the circumstances. The focus of the market research was only on development and did not consider the possibility of commercial or nondevelopmental items. Although it is perhaps laudable that the Army issued three separate Requests for Information, as well as held multiple Industry Days, all of the market research appears to have been designed to elicit responses about the offerors <u>developmental</u> capabilities and did not address commercial items or seek information from respondents about their commercially available products even after commercially available alternatives were suggested to the Army in responses to the Requests for Information. The market research, therefore, was not appropriate for the circumstances because the market research did not appear to examine what, if any, commercial items were available.

As stated above, the standard articulated in the implementing regulations, after the needs of the agency are identified, is "[m]arket research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs." 48 C.F.R. § 10.002. As noted above, 10 U.S.C. § 2377(c)(2) provides that—

> The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--
>
> **(A)** meet the agency's requirements;
>
> **(B)** could be modified to meet the agency's requirements;
>
> **(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c)(2) (emphasis in original).[37] There does not appear to be any contemporaneous document in the Administrative Record, nor did defendant credibly

---

[37] As discussed below, as it relates specifically to Palantir, defendant argues that even if Palantir has a commercial item, it required too many modifications to meet the Army's needs. The court concludes, however, that the Army did not make even an initial determination of what commercial items might be available, much less whether or not the

argue that any such document exists, which evidences that the Army used the results of the market research to determine whether there were, in fact, commercial items available. Even if the statute did not state to the "maximum extent practicable," or the language to the "maximum extent practicable," allows for the broadest of discretion, as defendant appears to allege, or even if the only direction to agencies was to do what was "appropriate to the circumstances," the Army would not have met its burden to determine if commercial items were available to meet the Army's needs pursuant to 10 U.S.C. § 2377.

Defendant suggests that "Palantir asserts that the statute deprives the Army of discretion to define its requirements as it wishes." As a defense to the approach the Army took with the procurement at issue, defendant claims "agencies have substantial discretion to determine how best to acquire their requirements," and cites to Lockheed Missiles & Space Co. for the proposition that "[e]ffective contracting demands broad discretion." (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; emphasis removed).[38]   The defendant also contends that Palantir fails to meet its heavy burden of demonstrating that the Army's substantial discretion was abused, or that there was any clear and prejudicial violation of statutes or regulations." Defendant cites to Savantage Financial Services, Inc. v. United States, 595 F.3d 1282, for the proposition that a protestor has the burden to show an agency decision "is so plainly unjustified as to lack a rational basis." Id. at 1287. Although the Army has substantial procurement discretion, it still must act in a rational, and legally compliant way when determining its requirements, including that the agency must comply with 10 U.S.C. § 2377.

In Savantage Financial Services, Inc. v. United States, the protestor challenged "the terms of a request for proposals from the Department of Homeland Security. . . . The request sought proposals to implement an agency-wide financial, acquisition, and asset management system. The request required proposers to offer a system that is integrated and currently fully operational within the federal government." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (internal reference omitted). By way of background, the Federal Circuit noted that:

> DHS was established in 2003 through the merger of 22 federal agencies. As a result of the merger, DHS inherited five different financial management software systems and a number of different acquisition management and asset management systems. The use of different financial systems within the agency has caused logistical difficulties and has been the subject of criticism and concern from federal auditors and lawmakers. As a result, DHS has devoted considerable effort to obtaining an integrated financial, acquisition, and asset management system. In January 2004, DHS

---

existing commercial items, such as Palantir's, could have been utilized or modified to meet the Army's needs.

[38] The proposition is a generally accepted principle for bid protests, but it does not offer unlimited discretion, as discussed above.

launched its first effort to integrate its financial systems through a project entitled Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency (eMerge$^2$). The plan underlying the eMerge$^2$ project was to purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components. That project was a complete failure; in December 2005, after spending $52 million with no discernible results, the agency abandoned the eMerge$^2$ program.

Id. (footnote omitted).  After the agency in Savantage attempted an improper sole source:

DHS spent 10 months conducting market research regarding the integration and implementation of financial systems in an effort to develop a new solicitation. The result was a new request for proposals, issued on January 9, 2009, and amended on February 14, 2009. The new request sought a financial, acquisition, and asset management system that "will be provided as an integrated solution that is currently fully operational in the Federal government."

Id. at 1285.  Before the Federal Circuit, the Savantage protestor claimed that "by requiring a system that is integrated and currently operational in the federal government, the new solicitation unduly restricts competition. Savantage contends that DHS's attempts to justify those requirements are based on conclusory statements lacking factual support in the administrative record." Id. After noting that agencies have discretion and procurement decisions are subject to highly deferential review, the Federal Circuit determined:

With respect to the requirement that the system be integrated, we agree with the trial court that it is "logical that [DHS] would want to ensure its success by seeking a fully integrated system, both on the basis of its own experiences and those of other agencies and departments." Savantage II, 86 Fed. Cl. at 706. As the administrative record amply shows, the failure of DHS's own eMerge$^2$ project—largely due to the contractors' inability to provide functional integration among components—underscored the risks of building an entirely new system using separate, unintegrated, off-the-shelf components. Internal DHS documents indicate that the Department responded to that failure by rejecting a piecemeal approach and electing to acquire a core financial system pre-integrated with other key systems. As we have held, an agency "has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review . . . [as CICA does not require the agency] to supply a historical record of failures to substantiate a risk."

Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1286 (quoting CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1355 (Fed. Cir. 2008)). The Federal Circuit continued:

> On a question such as whether to implement a pre-integrated system or to build a system by beginning with a core financial system and then integrating other systems afterwards, an agency's preferences are entitled to great weight. As the trial court noted, "competitors do not dictate an agency's minimum needs, the agency does." Savantage II, 86 Fed. Cl. at 706. And determining an agency's minimum needs "is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004). We agree with the trial court that Savantage has failed to meet its burden of showing that the agency's decision to require a fully integrated system is so plainly unjustified as to lack a rational basis.

Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1286-87. Although defendant points to Savantage for support that it does not have to substantiate "its concerns in order to survive rational basis review," as noted above, there is a deficit in the Administrative Record in the above captioned protest of information to contemporaneously demonstrate how the Army reached the decision not to pursue commercial items.[39]

Although, as discussed above, 10 U.S.C. § 2377 does not have an explicit requirement to, or how to, document a decision after proper consideration of whether there are commercially available alternatives, in order to "survive rational basis review," the agency must be able to demonstrate how it rationally reached its decision. The limited information included in the Requests for Information, the Market Research Report, or even in the July 1, 2016 Determination, does not meet the minimal requirement of demonstrating that the defendant conducted a genuine inquiry that could enable it to reach a rational conclusion not to consider commercial items, even after Palantir had urged the Army to consider its product as a commercially available alternative. The statute at 10 U.S.C. § 2377 requires "[t]he head of an agency shall use the results of market research to determine whether there are commercial items." As noted above, the Market Research Report only stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A

---

[39] The court notes that the facts and history in each bid protest are unique. In Savantage, the prior procurement involved a plan to "purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components," and, as the Federal Circuit noted: "That project was a complete failure." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284. Regarding the DCGS-A Increment 2 procurement, the procurement indicated that it seeks to build on Increment 1 which is "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Unlike the plan in Savantage to purchase "commercial off-the-shelf software products," as alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

Increment 2 development effort cannot be procured as a commercial product."[40] This language in the Market Research Report is conclusory, and without any examples or support for the conclusions. The Market Research Report does not identify which respondents indicated commercial items were available, that Palantir had repeatedly tried to inform the Army of its capabilities to provide a commercial item, or that Palantir did, in fact, provide commercial items to other Department of Defense agencies.

In addition to requiring that an agency use the results of market research to determine whether there are commercial items available, 10 U.S.C. § 2377(c)(2), indicates that:

[T]o the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c) (emphasis in original). Not only did the agency fail to explain or indicate what commercial items possibly were available or had been considered, the Market Research Report is devoid of any information regarding the possible commercial items that could be modified to meet the Army's requirements. As discussed below, defendant now claims that Palantir's data management platform would require too many modifications to meet the agency's needs, however, there is no evidence that the agency made such a determination after the market research was complete or prior to issuing the solicitation. The total absence of any discussion regarding commercial items, or possible modifications to commercial items, reinforces the court's understanding that the Army was focused on a developmental approach to the DCGS-A Increment 2 at an early point in the procurement process, to the exclusion of commercially available alternatives. Therefore, the Army did not comply with the requirements of 10 U.S.C. § 2377.

Defendant also cites to a pre-award decision in Tyler Construction Group v. United States, in which the United States Army Corps of Engineers used "Indefinite Deliver/Indefinite [sic] Quantity Contracts . . . for the design and construction of military

---

[40] Although the Market Research Report specifically mentioned Palantir, in the "RFI Respondent Capability Assessment," the Report only stated "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." (emphasis added). In addition to providing a cursory statement on the decision-making process regarding available commercial items, the Market Research Report also was searching only for evidence of past performance related to development.

buildings (barracks and related structures) in an eight-state area in the southeastern United States." Tyler Constr. Grp. v. United States, 570 F.3d at 1330 (internal reference omitted). The Tyler protestor, which did not submit a proposal in response to the solicitation, id. at 1331, contended that "the FAR does not authorize the use of IDIQ contracts for a major construction project," relying on "the anti-bundling provision of the Small Business Act, 15 U.S.C. § 631(j)(3), which requires 'each Federal agency' to 'avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors,' and the similar limitation on 'consolidation' of procurement in 10 U.S.C. § 2382(a)." Tyler Constr. Grp. v. United States, 570 F.3d at 1332.  The Federal Circuit noted:

> The Corps was faced with an unusually large and novel procurement that had to meet the Army's unusual and demanding standards and requirements. The Army was seeking what the Corps viewed as "a fundamental change in military construction strategy designed" to make the Army "a more modular expeditionary and effective fighting force." Tyler Constr. Group., 83 Fed. Cl. [94], 95 [(2008)]. The Army's new approach to housing construction required a 20% reduction in cost and a 30% reduction in the time required until the facilities could be occupied."

Tyler Constr. Grp. v. United States, 570 F.3d at 1333-34.  In light of the unusually large and novel procurement,

> the Corps carefully studied, analyzed and evaluated the situation. It conducted a research program which included a nationwide forum, four regional fora, and "a specialized forum with representatives of the pre-fabricated/pre-engineered/modular construction industry, as well as the implementation of an internet-based research questionnaire." Tyler Constr. Group, 83 Fed. Cl. at 96. The Corps concluded that there was "an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale."

Tyler Constr. Grp. v. United States, 570 F.3d at 1334. The Federal Circuit determined:

> As we have noted, the Corps conducted extensive market research before determining that consolidation of the procurement requirements was "necessary and justified." We agree with the Court of Federal Claims that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes . . . the Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Id. at 1335 (quoting Tyler Constr. Grp. v. United States, 83 Fed. Cl. at 103) (emphasis in original). Therefore, the Federal Circuit determined:

> The Corps, like other federal procurement entities, has broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation. The Corps did not abuse that discretion in concluding that in the situation here, the use of IDIQ contracts to obtain this large military construction was the most appropriate method of proceeding and therefore best served the interests of the United States. Nor did the Corps violate or ignore any statutory or regulatory requirements, prohibitions or standards in so acting.

Id. at 1334. In the protest currently before the court, the Army did market research, including three Requests for Information, Industry Days, and one-on-one meetings with potential respondents and generated reports based on the information that it learned from its market research. Unlike the Corps in Tyler, in the procurement now at issue before the court, the Army did not comply with the requirements of 10 U.S.C. § 2377, and did not evaluate whether a suitable commercial item could meet the agency's needs, even after protestor Palantir attempted to offer such an alternative.

The court notes that the facts in the above captioned bid protest are unique and distinguishable from the facts in Savantage and Tyler Construction. While the record in Savantage demonstrated that the agency made multiple attempts to satisfy its requirements by using different procurement methods, including a commercial item and an attempted sole source approach, the Administrative Record in the above captioned protest demonstrates that the Army has been singularly focused on a developmental procurement. As also alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors." Similar to Savantage, in Tyler Construction, the agency demonstrated a genuine interest and openness to using the procurement approach that would best meet its needs for building and designing military buildings. The record in Tyler Construction indicated that the agency conducted market research and pursued industry input before deciding on the procurement method to use. Distinguishable from the agencies' actions in Savantage and Tyler Construction, in this bid protest, the Army conducted market research based on the presumption that the procurement would be developmental and the procurement decisions that followed were based on the same presumption to the exclusion of consideration of commercially available alternatives, even when such possible commercial items were identified to the Army.

In a supplemental brief, defendant argues that "[t]he market research demonstrated that only one industry respondent, [redacted], other than Palantir, supported reliance on GSA Schedule 70, applicable to commercial items, and recommended Increment 2 be procured utilizing commercial procedures." The number of respondents supporting a development approach or the number trying to offer a

commercially available alternative is irrelevant. Regardless if only two companies suggested commercial alternatives might be available, whether accurate or not, the Army was obligated, pursuant to 10 U.S.C. § 2377, to investigate, determine, and conclude whether an appropriate commercial item was available for all or part of the procurement. In fact, defendant's argument demonstrates that the Army was aware that commercial items were potentially available. The statute at 10 U.S.C. § 2377 instructs that that the Army should investigate whether commercial items to meet the agency's needs are available, or could be modified. This obligation is especially true if respondents such as Palantir or [redacted] identify such a possibility during the agency's own market research. As demonstrated above, the Army did not determine what commercial items were available or could be modified to meet the agency's needs, and, therefore, did not properly comply with 10 U.S.C. § 2377.

In this protest, the government was on notice that, at a minimum, at least two respondents claimed to have a commercial item to meet the Army's requirements. The Administrative Record reflects that Palantir repeatedly tried to inform the Army of its capabilities to provide a commercial item. In its response to the draft Performance Work Statement, and in response to the May 6, 2015 Request for Information, Palantir communicated to the Army that, "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claimed that such usage is currently employed "by tens of thousands of users across the DOD and IC" in order to further inform the Army of a commercial option for the procurement instead of the Army's developmental approach. In Palantir's response to the August 13, 2014 Request for Information, Palantir stated:

> The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(footnote omitted; emphasis in original). Palantir also emphasized, "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." Then, in response to the December 5, 2014 Request for Information, Palantir reiterated its belief in its ability to offer a commercially available alternative to the developmental approach chosen by the Army for the procurement, as an alternative to the Army's apparent developmental approach, explaining to the Army that:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time

and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's ability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Moreover in response to the question in the December 5, 2014 Request for Information: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," Palantir stated:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD, and the IC. However, the request for information on software services contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

Palantir again encouraged the Army to consider a commercial approach in its response to the May 6, 2015 Request for Information, stating:

> We believe the Government should select a proven solution that is measured on metrics derived from operational success. The data integration, visualization and analytic environment required for Increment 2 should use a fielded commercial solution that is accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DoD, IC, and commercial industry.

In its response to the May 6, 2015 Request for Information, Palantir also stressed that the Army might be too focused on a developmental approach at the expense of a commercial one, observing that:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.[41]

---

[41] Palantir also posed a question to the Army in its response to the May 6, 2015 Request for Information:

In each of the three responses to the Requests for Information, Palantir tried to convey to the Army that it could offer a commercial solution, and, in its view, that such was a preferable option to the developmental approach the Army was seemingly intent on pursuing.

The court notes that defendant argues that "Palantir USG responded to RFI No.2, but declined to answer question 3.0(d) in RFI No.2 or complete the Army's chart and identify its specific capabilities across the various DCGS-A domains listed." Defendant also points out that "Palantir USG declined to answer question 3.0(f) in RFI No.2," and that "Palantir USG declined to answer question 3.0(h) in Request for Information No.2." Palantir responded that "is not what the Army requested. Rather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts," and argues that "[t]here was no reason to do so again." (emphasis in original; internal citations omitted). The court agrees with Palantir that the Army's request was more specific than just identifying specific capabilities as Question 3.0(d) asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," and the headings of the table were:

| Software Solutions or Services Delivered: | Government POC for this work (email/phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company Name)? |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Even if the court were to agree with defendant that Palantir did not fully respond to Question 3.0 of the December 5, 2014 Request for Information, that does not remove the Army's obligation to comply with 10 U.S.C. § 2377. Moreover, Palantir had already made its views on the availability of commercial items appropriate to this procurement clear in response to the August 13, 2014 Request for Information, and would do so again in response to the May 6, 2015 Request for Information. Furthermore, in response to the December 5, 2014 Request for Information, which defendant characterizes as incomplete, as noted above, Palantir still emphasized: "We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget," and, in response to Question 3.0, Palantir

---

Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?

highlighted "[o]ur commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients."

The defendant also points out that in the Market Research Report, the Army stated "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." The court first notes that of the 43 respondents to the December 5, 2014 Request for Information, the only one the Market Research Report labeled as "non-responsive" was Palantir. Moreover, the language of the Market Research Report reinforces the court's view that the Army was focused only on a developmental approach, and not on commercially available alternatives. Although Palantir was labeled "non-responsive" because it did not provide past performance examples related to the development of DCGS-A Increment 2, Palantir's goal during the entire market research process was to try to highlight for the Army the availably of its products on a commercial basis, not to provide examples of development contracts. The court notes that in its October 2015 response to the draft Performance Work Statement, Palantir was its most blunt:

> The Army has had multiple opportunities to change the strategy for Increment 2, satisfy Congressional intent, and deliver working technology to soldiers in months, not years. The Army should alter its strategy for Increment 2 to reflect the following realities:
>
> 1. The first priority of Increment 2 should be the rapid delivery of a foundational data platform;
>
> 2. The Army does not need to build that platform, as it can buy it today; and
>
> 3. The Army should use FAR Part 12 commercial contract structures to buy this platform.

Concurrently, in its response to the draft Request for Proposals in October 2015, Palantir also bluntly informed the Army:

> The Army has not corrected critical deficiencies in the overall acquisition structure of Increment 2. As written, Increment 2 will commit the Army to an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program. Increment 2 will commit the Army to the same lengthy, high-risk development effort that failed in Increment 1. We have offered our feedback to program leadership at every step of the Increment 2 process because we want the Army to succeed. But ultimately it is not in our interest or in the Army's interest for it to commit to a program that so clearly violates fundamental principles of successful enterprise software delivery.

In addition, the Administrative Record reflects three separate Operational Needs Statements requesting Palantir's data management platform. Two of the Operational Needs Statements were from 2014, and the most recent request, from the [redacted], was from February 2015. The February 2015 request was from [redacted] requesting the Palantir Gotham Platform, stating that "[t]he Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations," and concluding that "Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units [redacted], as well as various U.S. Government agencies."

The Army was, or should have been, aware of Palantir's data management platform from the requests from other Department of Defense personnel who were utilizing the Palantir product, or seeking permission to use Palantir's data management platform, as well as from Palantir's submissions in response to the Requests for Information. Also included in the Administrative Record before this court are numerous contracts with the Department of Defense and other federal agencies for which Palantir's data management platform was utilized. Regarding the Department of Defense contracts which utilized Palantir's product, the contracts could have, or should have, been identifiable by the Army, during the market research process and known, as well as reviewed by the Army, before it made a determination that no commercial item was available to meet the agency's needs.[42] The Administrative Record also reflects that, at a minimum, the Army was aware of at least three such contracts, as shown in Palantir's response to the August 13, 2014 Request for Information, in which Palantir asserted that "[t]he most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP)," and informed the Army:

> Examples of FFP contracts include our work at the U.S. Marines [sic] Corps, where enhancements are included as part of our regular software releases and small business [sic] fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA [Blanket Purchase Agreement] for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC [intelligence community] agencies and affording a COTS solution at a FFP.[[43]]

---

[42] The court notes that two of the contracts included in the Administrative Record were executed in 2016, and, therefore, after the market research was conducted and after the solicitation was issued.

[43] The court also points out that the parties in this litigation have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that "[g]overnment agencies have procured the Palantir

Also, in response to the third Request for Information, Palantir communicated to the Army that:

> In cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command,[44] representing over 15,000 accounts at peak usage across the Marine Intelligence community. Palantir helps the Marine Corps implement these deployments with the support of only eight total contractors. The very small ratio of contractors to military users demonstrates the sustainability of the Palantir platform across a large enterprise.

Finally, the court notes that, in the Army's January 7, 2015 Increment 2 Information Paper, in considering the key objectives of Increment 2, which included "Modernize the Data Enterprise to a Data Integration Platform," the Army specifically identified the possibilities of "a commercial stand-alone solution (Palantir, IBM)" for a way to "deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A." (emphasis added). Therefore, almost a year prior to the decision to issue the solicitation, the Army specifically had identified a possible solution utilizing a commercial item, and had specifically named Palantir as offering "a commercial stand-alone solution." Despite this, the Administrative Record reflects an absence of Army correspondence with Palantir regarding any follow up to review Palantir's capabilities or even obtain an in-depth description of Palantir's capabilities.

Given the protestor's multiple responses to the Requests for Information, the multiple references to the existing government contracts for Palantir's commercial platform, and the Operational Needs Statements, the Army was demonstrably aware of the possibility of a commercial option for the procurement and appears to have chosen early on to pursue a developmental option instead. As noted above, defendant repeatedly argues that:

> There are no statutory or regulatory requirements that address that mention [sic] which acquisition strategy is in the best public interest. Indeed, adopting Palantir's position, i.e., the Army must base its acquisition strategy

---

Gotham Platform and related services on a commercial item basis."

44 The Performance Work Statement for one of the Palantir's United States Marine Corps contract, Contract No. N00104-13-A-ZF34-V782, indicated that:

> Palantir USG Incorporated will be providing supplies and services to the United States Marine Corps (USMC) units. The Palantir software will be operating on the Secret Internet Protocol Router Network (SIPRNet), the Nonsecure Internet Protocol Router Network (NIPRNET), identified coalition networks, and with the potentiality of Joint Worldwide Intelligence Communication System (JWICS) installations of Palantir software post contract award.

here on speculation as to what modifications Palantir might deem appropriate to develop for the Palantir Gotham Platform would be folly as it would switch the roles here by making Palantir the master of determining the Army's acquisition needs.

The court does not agree with defendant's characterization that fully considering the available commercial options would make "Palantir the master of determining the Army's acquisition needs." The Army had a statutory obligation to consider whether the commercially available options could meet all or some of the Army's requirements, especially when the Army was explicitly informed of the possible availability of commercial options. At no point in this opinion does the court state that the Army must accept Palantir's data management platform. The court only determines that the Army failed in its obligation under 10 U.S.C. § 2377 to fully investigate if Palantir, or any other potential offeror, could meet the requirements of the Army's procurement needs on a commercial basis, in part or in full. In sum, the Army had a statutory obligation to consider commercial items before issuing the developmental solicitation and failed to do so. The Army's failure to conduct a proper 10 U.S.C. § 2377 evaluation was "so plainly unjustified as to lack a rational basis." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1287.

Without a doubt, there are circumstances in which it is clear that a "commercial alternative" offered by a prospective commercial bidder is not suitable for a procurement. The overwhelming evidence in the Administrative Record in this protest, however, demonstrates that the Army was on notice of a realistic, possible, commercially available alternative product, placing the onus on the Army to more fully consider the potential commercial options suggested before pursuing a developmental only approach to the procurement. The Army did not do so, and, therefore, acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to full investigate possible commercially available alternatives to meet the requirements of the Army's acquisition.

National Defense Authorization Act for Fiscal Year 2016

Palantir raises an additional issue regarding 10 U.S.C. § 2377. Palantir notes that "Congress recently gave the Army specific instructions with respect to the application of § 2377(c) to DCGS." (internal reference omitted). According to Palantir, the National Defense Authorization Act for Fiscal Year 2016 instructs the Department of Defense to issue guidance regarding 10 U.S.C. § 2377 to prohibit agencies from entering into contracts for "information technology products or services that are not commercial items unless the head of the agency determines in writing that no commercial items are suitable to meet the agency's needs." National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 855(a)(1), 129 Stat. 919 (2015).[45] Palantir argues that "Palantir's

---

[45] Relatedly, Palantir points to an additional requirement in the National Defense Authorization Act for Fiscal Year 2016 at section 222, which instructs that "[t]he Secretary shall submit to the appropriate congressional committees a report on the review of the distributed common ground system of the Army conducted under subsection (a)(1)." National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 222(a)-(b), 129

understanding is that the Army issued the § 222 report only after Palantir filed its notification of intent to file this lawsuit, and the Army has still not issued the issued the [sic] § 855 guidance despite a January 23, 2016 deadline." (footnote omitted). Defendant responds that "there is substantial question whether such provisions apply to the DCGS-A Increment 2 procurement," arguing that the National Defense Authorization Act for Fiscal Year 2016 "requires a determination, before contract award, that for a contract (a) in excess of the simplified acquisition threshold and (b) for 'information technology products or services that are not commercial items,' that no commercial items are suitable to meet the agency's needs as provided in subsection (c)(2) of section 2377 of title 10." Defendant claims that "Palantir fails to demonstrate any clear and prejudicial violation of the provisions of NDAA, Fiscal Year 2016," because "the provision relied upon by Palantir is applicable only before contract award. There has been no contract award for DCGS-A Increment 2, and protest grounds that merely anticipate improper agency action are speculative and premature." (footnote omitted). Defendant also argues that "the fact that the guidance contemplated by the act has not yet been issued by the Department of Defense does not give Palantir any rights." As the court has found that the agency acted arbitrarily and capriciously in violation of 10 U.S.C. § 2377, the court does not need to determine if Palantir can rely on the National Defense Authorization Act for Fiscal Year 2016 to support its argument that the Army violated 10 U.S.C. § 2377.

Prejudice

Having determined that the agency acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to fully investigate the commercial availability of products that could meet at least some of the requirements of the procurement, the court proceeds to the next step of the bid protest analysis, "to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d at 1351; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367. As noted in FirstLine Transportation Security, Inc. v. United States, 107 Fed. Cl. 189 (2012):

> "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. [Bannum, Inc. v. United States, 404 F.3d] at 1353, 1358. This prejudice determination is based on the same standard as the initial one made at the standing stage; however, at this step, the plaintiff must prove its allegations by a preponderance of the evidence. Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 207 (2011); Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011). Thus, in order to prevail on the merits, Plaintiff must demonstrate, by a preponderance of the evidence, that the unlawful or irrational terms in the solicitation caused it to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, 575 F.3d at 1362.

---

Stat. 919.

FirstLine Transp. Sec., Inc. v. United States, 107 Fed. Cl. at 197; see also Gear Wizzard, Inc. v. United States, 99 Fed. Cl. 266, 273 (2011) ("[T]o establish prejudice in the context of a pre-award bid protest, the plaintiff must show only 'that an unreasonable agency decision created a non-trivial competitive injury which can be redressed by judicial relief.'") (quoting Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007), rev'd on other grounds, Weeks Marine, Inc. v. United States, 575 F.3d 1352 (Fed. Cir. 2009)).

As earlier determined by this court after the protest was filed, Palantir had standing to proceed to the merits of the above captioned protest.  See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Palantir now bears the burden, by a preponderance of the evidence, of demonstrating that it was prejudiced by the actions of the Army and the Army's actions caused Palantir to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. As indicated above, this is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Defendant argues that Palantir did not offer a "proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal." Defendant argues that "both the Army market research requests and the RFQ solicitation requirements were applied equally to all parties. Palantir, by failing to respond fully to Army Request for Information No.2,[46] and by failing to submit a proposed solution that would meet all of the Army's requirements in response to the RFP, 'becomes a stranger to the process, and is disqualified from the procurement,'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009)), and, "[a]ccordingly, Palantir fails to establish prejudice." Defendant also argues that "Palantir's assertion of prejudice is further attenuated by the fact that the Army has received multiple proposals in response to the solicitation. Palantir cannot demonstrate that 'but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d at 1378) (internal citations omitted). [47] In response, Palantir argues that "[t]he Government's contentions are uniformly wrong and they ignore Palantir's claims. . . . [T]he Army's Solicitation

---

[46] Although defendant's briefs suggests that the failure to respond to the Request for Information might disqualify Palantir from the solicitation, at oral argument, counsel for the defendant admitted that "I don't think it's a finding that they couldn't qualify. All it is is a statement of fact . . . that they didn't respond. That's all it is." Moreover, the court agrees with Palantir that "[b]ecause the Government itself made clear that there was no legal significance to responding to or even failing to respond to the RFI and that it was purely for information-gathering purposes, the Government has no basis for arguing that Palantir's RFI response somehow barred Palantir from the procurement."

[47] Defendant alternatively claims that "[a]pplication of the alternative 'non-trivial competitive injury' test should also result in a determination that Palantir does not have the requisite economic interest to establish prejudice."

prejudiced Palantir by preventing it from offering to provide a commercial item to meet the Government's requirements."

The court first notes that, as a pre-award protest of a solicitation, it considers the proper standard for prejudice to be a "non-trivial competitive injury which can be addressed by judicial relief" and not the "but for" standard. Moreover, the court believes that the failure to submit a proposal is not dispositive in this case. As the court determined in the earlier opinion, Palantir timely filed a protest in this court before the Army made an award. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Furthermore, the Army failed to properly conduct an evaluation as to whether commercial items were available to meet any of the requirements of the solicitation, and issued the solicitation as a developmental requirement, with no opportunity to respond to the solicitation with an offer of a commercial item for all, or part of, the solicitation. Palantir's failure to submit a proposal in response to a developmental solicitation in this protest does not preclude Palantir from challenging the nature of the solicitation on a pre-award basis, nor does it prevent a showing of prejudice. Palantir contends that defendant's representation that "the Army has received multiple proposals in response to the development solicitation," is not relevant. The court agrees with Palantir that "[t]he fact that Palantir did not submit a proposal is irrelevant in this protest because the very illegalities that Palantir challenges prevented it from doing so." The court also agrees with Palantir's observation that although the Army received multiple proposals, those "proposals responded to a solicitation that sought proposals for a development effort on a cost-plus basis, not a solicitation for commercial items on a fixed-price basis." Palantir did not respond to the developmental solicitation also because the solicitation required the winning bidder to comply with Cost Accounting Standards (CAS) and to have in place an Earned Value Management System (EVMS). "As an offeror of commercial items on a fixed price basis, Palantir does not have in place the cost accounting standards and procedures, including CAS and EVMS, that are common among the typical defense contractors that engage in extensive 'cost-plus' developmental work."[48] Palantir's "failure" to submit a proposal was because the Army only offered a developmental solicitation that contemplated award of a cost plus contract, without consideration of a commercial item alternative on a firm-fixed price basis.

The parties both agree that, "[w]ithout a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue," as explained in Labatt Food Service, Inc. v. United States, 577 F.3d at 1381. Although defendant cites Labatt for support that "Palantir also did not submit a proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal," Palantir cites the language of Labatt to demonstrate that "harm specific to the asserted error" is "the loss of the ability to bid to supply commercial items as the result of defects in the Solicitation." The court believes the foregoing discussion

---

[48] The solicitation at issue in this bid protest contemplates the award of a cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts.

demonstrates that Palantir lost the opportunity to offer the Army commercial items because of the developmental approach the Army took in designing the DCGS-A Increment 2 solicitation, to the exclusion of consideration of commercial items. As demonstrated above, Palantir identified a possible, commercially available product and tried to encourage the Army to consider commercial items, to no avail.

Palantir claims that "Palantir also has demonstrated the requisite economic interest. Palantir has sustained a non-trivial competitive injury because the Government's illegal actions have prevented it from bidding to satisfy the requirements of the DCGS-A program by providing commercial items." Defendant asserts that Palantir has not demonstrated a "non-trivial competitive injury," as Palantir "has not demonstrated that it could have and would have submitted a proposal with a solution that met all of the Army's requirements with only commercial or nondevelopmental items." To meet the prejudice requirement, Palantir must make a showing that its commercial capabilities could be sufficient to allow Palantir to offer a product which could meet all or part of the DCGS-A Increment 2 procurement. In considering if Palantir potentially could meet the requirements of the DCGS-A Increment 2 procurement, the court looks to the information in the Administrative Record. Most significantly, the court looks to the admitted[49] expert report of Bryant Choung, his deposition testimony, and to the expert report and deposition testimony of defendant's expert, Shaun Cronen. In his expert report, Mr. Choung[50] stated that "Palantir offers a data management platform that meets the Army's needs," (emphasis removed), Mr. Choung specified that:

> The data integration layer is both interoperable with existing intelligence systems and capable of integrating the various types of data that the Army has stated that it wishes to include in its system, including both the data handled by DCGS A-Increment 1 (DCGS-A1) as well as the additional data sources and systems contemplated by the DCGS-A2 requirements.

Regarding Palantir's data management platform, Mr. Choung explained that:

---

[49] As explained above, defendant moved to strike Mr. Choung's expert report, which the court denied. Mr. Choung's expert report is a part of the Administrative Record, and now properly before the court and available for the court's consideration.

[50] As noted above, the court acknowledges that Mr. Choung is an employee of Palantir. As noted in his expert report:

> From July 2012 to the present, I have been the Global Defense Engineering Lead for Palantir Technologies Inc. and its domestic subsidiary corporations, including Palantir USG, Inc. In that role, I am responsible for the deployment and management of the Palantir Gotham Platform as a functional Data Management Platform for clients in the Department of Defense (DOD) and the Intelligence Community (IC), with primary responsibility for clients in the United States Army and Special Operations Command (SOCOM).

Palantir has designed the Palantir Gotham Platform to be as flexible as possible with respect to the types and formats of data it can ingest and bring into the Palantir Gotham Platform. As a result, the Palantir Gotham Platform allows a user to integrate, analyze, and visualize HUMINT, SIGINT, GEOINT, MASINT, weather, and any other type of data.

Mr. Choung also explained[51] that:

[B]ecause the Palantir Gotham Platform satisfies the Army's need for a Data Management Platform, the Army could have contracted with Palantir (or another commercial provider with similar open and interoperable capabilities) to acquire a Data Management Platform and then entered into a separate contract (or multiple contracts) to acquire any additional enhancements, configurations, or modifications that the Army may have wanted.

At his deposition, Mr. Choung noted that "[t]hose could be requirements that are supported by the data management platform, but that are enhancements or would be enhancements or additional configurations, rather, for the data management platform." Defendant takes issue with Mr. Choung's claims, and specifically argues that it is unclear whether Palantir can in fact deliver a commercial product to the Army that meets the Army's requirements. In arguing that Palantir cannot provide the Army with a product on a commercial basis, defendant cites to the definition of a commercial item in the FAR.  As noted above:

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

---

[51] Similarly, Mr. Choung explained that:

[T]he Army could have acquired a Data Management Platform to meet the needs that it describes as the "architectural foundation" of DCGS-A2, by acquiring the Palantir Gotham Platform as a commercial item on a fixed-price basis. In addition, the Army could have acquired both the Data Management Platform from the commercial marketplace *and* modifications necessary to fulfill any other requirements by procuring a commercial item on a fixed-price basis. Like most software, the Palantir Gotham Platform is readily extensible and can be configured for the customer environment in which it is operating.

(emphasis in original).

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101.

Before this court, the government tries to argue that the definition of a commercial item is a narrow one, and, it appears even more narrow than the one the Army used in the July 1, 2016 Determination of Non-Commercial Item. As noted above, the Determination of Non-Commercial Item concluded,

> based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

At oral argument, however, defendant's counsel suggested that the language of "Modifications of the type customarily available in the commercial marketplace" and "Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements" in 48 C.F.R. § 2.101 must be read together, despite the clauses being separated by an "or." Defendant's counsel stated that: "I understand, it is 'or,' but it talks about customarily available in the commercial marketplace," and "the language is very similar where it talks about being customarily available in the commercial marketplace." Defendant's counsel stated:

> I recognize it's an 'or.' I am saying that you should read them together because you see the same long, [sic] "customarily available." What we're

saying is that in terms of construing customarily available in the commercial marketplace, that's not -- that's not a government contract. That's not making modifications in order to meet government-peculiar requirements.

Despite defendant's counsel's argument, the court interprets the "or" as not requiring all subparts to be read together.[52] Moreover, even considering defendant's more restrictive version of 48 C.F.R. § 2.101, Mr. Choung's supplemental declaration indicates Palantir's products would meet the requirements with only minor modifications. Mr. Choung identified 898 requirements in the solicitation, and stated that for 581 of them, Palantir could meet those requirements "out-of-the-box," without any configuration work or enhancements or even minor modifications, "or by any other commercially available Data Management Platform," "on a commercial item, fixed-price basis." Regarding an additional 242 requirements, Mr. Choung stated Palantir could meet those requirements "through customary configurations and installations of existing helpers," with a process that "typically takes at most a matter of hours, and often less, because it just requires Palantir to plug the enhancements into the platform." Mr. Choung explained:

> Palantir customarily deploys the Palantir Gotham Platform into a customer's environment by installing and configuring the platform and plugging in existing "helpers." I explained this during my deposition when I stated: "There is a process by which we plug in our helpers into the environment, and the process by which we take our entire data management platform and plug it into the customer environment. That's called deployment, installation, configuration."

Therefore, Mr. Choung concluded, "through its 'out-of-the-box' capabilities and through customary configurations and installations of existing helpers, Palantir would satisfy a total of 823 of the 898 PBS [Performance Based Specifications] requirements," and "Palantir could meet these [additional] 75 requirements by providing 'new helpers' on a commercial item basis."[53]

---

[52] If the court believed a statutory construction analysis was required, the court notes the first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)), and "[a]s with any question of statutory interpretation, our analysis begins with the plain language of the statute." Jimenez v. Quarterman, 555 U.S. 113, 118 (2009). It is apparent to the court that plain language of "or" is, as the New Oxford American Dictionary indicates, "used to link alternatives," "otherwise," and "either." See New Oxford American Dictionary 1232.

[53] In his expert report Mr. Choung also offered the following opinion referring to the defendant's conclusions that Palantir could not meet the Army's requirements: "It is my expert opinion that the conclusions in these documents are wrong; all of these capabilities are available through the commercial marketplace—at a minimum, they are available from Palantir, which is able to provide each of these functions through the Palantir Gotham Platform on a fixed-price commercial item basis."

Addressing the defendant's expert witness, Shaun Cronen, Mr. Choung also stated that defendant's designated expert "Mr. Cronen has not offered any valid technical reason why the Army has chosen to develop software products that are available for purchase as commercial items in the commercial marketplace."

Defendant's expert witness, Shaun Cronen, stated in the defendant's expert report:

After reviewing Palantir's submitted documentation, Mr. Choung's Expert Report, listening to Mr. Choung's Deposition on 11 AUG 2016, as well as the documentation I reviewed on Palantir's public website, coupled with my previous experience with the Palantir Gotham Platform, and information provided on Palantir's other contracts, there is insufficient information that demonstrates that the Palantir Gotham Platform fully meets the DCGS-A Increment 2 Requirements as laid out within the five subfactors for technical evaluation within the DCGS-A Increment 2 Solicitation (i.e. Data Architecture, Fusion Data Analytics, Interoperability, Visualization Framework and Usability, and Data Rights), nor is there information that demonstrates that the Palantir Gotham Platform is compliant with all the requirements within the Performance Based Specification (PBS) and can be successfully tested as per the Formal Qualification Test (FQT) task within the Base Performance Work Statement (PWS).

(internal reference omitted). Palantir responded that the

Army's expert (a) makes no effort to dispute Mr. Choung's conclusion that there is no technical reason why the Army could not practicably have met its core need for a Data Management Platform by acquiring the Palantir Gotham Platform on a commercial item basis, (b) does not identify any DCGS-A2 requirement that he has determined Palantir is incapable of doing.

(internal citations omitted). Regarding the defendant's expert, it does not appear that Mr. Cronen conclusively stated that Palantir could not provide a data management platform, or that it is not compliant with "all the requirements." Therefore, it appears defendant has not conclusively stated that Palantir could not meet at least some of the requirements for DCGS-A Increment 2 through a commercial item. Moreover, it is the Army's failure to fully explore the commercial availability to determine if Palantir or any other entity could meet the agency's program requirements that is at issue here. Defendant's actions, at a minimum, put Palantir in a position in which it was unable to succeed regarding the DCGS-A Increment 2 procurement the moment the Army chose a developmental only approach without fully exploring the possibility of commercially available alternatives,

Defendant also notes that, on October 21, 2015, Ms. Shyu, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System

(DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," which determined:

> [T]hat a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

The court first notes the Determination & Findings does not address 10 U.S.C. § 2377, but instead, is only the justification for exceeding the DFARS stated maximum amount for a single source contract. Further, although the Determination & Findings does state "the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work," the determination is premised on a single, integrated developmental contract. The Determination & Findings stated that: "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." (emphasis added). The Determination & Findings does not consider utilization of a commercial item, and, therefore, is not useful to demonstrate that modifications to Palantir's commercial platform would be inappropriate or inapplicable to the procurement at issue.

> Finally, defendant argues that DCGS-A Increment 2 is
>
> not only a Data Management Platform, as Palantir argues. The total requirements for DCGS-A Increment 2 are compiled in three documents, which should be read together: (1) the Capabilities Development Document; (2) the Requirements Definition Package; and (3) and the Performance Based Specification.   Palantir ignores the "glue code," addressed by Stephen Morton, Deputy Product Manager, that must be built to tie everything together. Increment 2 includes a Data Integration Layer, without which the whole software system, including a Data Analytics Platform, could not function.

(internal citations omitted). Defendant emphasizes that it "is key to the development of DCGS-A Increment 2 that all of the components and respective subcomponents be selected or built with interoperability and usability throughout the lifecycle of the software development process." In his expert report, Mr. Choung took issue with this characterization and stated that:

> [I]tems in the PWS [Performance Work Statement] relate to the Army's core need for a Data Management Platform and could be satisfied by the procurement of Palantir's Data Management Platform without the need for additional enhancements, configurations, and modifications. Other items relate to the Army's decision to develop a Data Management Platform rather than acquire one in the commercial marketplace and thus would be

irrelevant if the Army elected instead to procure a Data Management Platform in the commercial marketplace. As to the remaining items, Palantir could readily configure or enhance its platform to provide those items on a firm fixed-price basis.

(emphasis in original). Even if defendant turns out to be correct, which remains speculative at this point, the Army failed to explore whether commercial alternatives were available, including the one offered by Palantir. Alternative commercial products were not reviewed before the decision was made that a developmental solicitation would be issued. It appears that Palantir potentially could have submitted a product that would have met some, or all, of the agency's needs. The loss of that opportunity resulted in a non-trivial competitive injury.

Therefore, based on the Administrative Record, including Mr. Choung's representations in his expert report and deposition testimony, the court determines that the Army's actions caused Palantir to suffer a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. Despite this conclusion, the court does not reach a determination as to whether Palantir, in fact, can offer a commercial item that can meet some, or all, of the requirements for Army's DCSG-A Increment 2. The Army failed to conduct a proper commercial availability evaluation in the first instance, and this court should not make one in its place. In this decision, not only is the court not taking a position on whether or not Palantir can offer the Army an appropriate commercially available alternative, nor does the court instruct the Army to accept Palantir's data management platform. As noted by the Federal Circuit in Savantage, determining an agency's minimum needs "'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. at 662); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1384.

Just as the court will not second guess the program requirements of the Army, the court will not dictate to the Army the specifics of how to conduct a proper commercial availability determination in accordance with 10 U.S.C. § 2377. Palantir, in its submissions to the court and in the multiple conferences and arguments before the court, has represented that if only given the opportunity to present its capabilities to the Army, Palantir could demonstrate how it meets or exceeds the Army's requirements for the DCGS-A Increment 2. Given the failures to properly conduct an analysis pursuant to 10 U.S.C. § 2377, and reach a considered, commercial availability determination, as well as the unfortunate conduct of some of the Army personnel reflected in the Administrative Record, it would be wise for the Army to seriously consider reviewing the commercially available products of Palantir, or any other potential offeror, before concluding that no commercially available product can meet the Army's requirements.[54]

---

[54] Palantir also points to the deposition of defendant's expert for support than Palantir might have some additional capabilities to offer, if given the opportunity. Mr. Cronen had the following exchange with Palantir's counsel:

Permanent Injunction

Having found that the Army failed to properly determine, pursuant to 10 U.S.C. § 2377, whether there are commercially available items suitable to meet the agency's needs for the procurement at issue, and having found that by its failure to do so, the Army acted in an arbitrary and capricious manner, the court turns to consider whether Palantir is entitled to the injunctive relief that it seeks, and, if so, the scope of such relief. As noted above, Palantir requests that this court "[e]nter a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations." Palantir asserts that, at a minimum, the Army should issue "a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements."

As discussed above, this court has jurisdiction to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2). In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, 389 F.3d 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 649 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 34 (citing Centech Grp., Inc. v. United States, 554 F.3d at 1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369

---

Q. I'm not asking you to give an opinion about all of them. Don't you think -- DIB upgrade, DIB interface, interoperability, those are all issues relating to increment 2. And there is some overlap between those, isn't there, and what would have been evaluated if this SIL [Systems Integration Laboratory] evaluation had been done in a comprehensive fashion?

A. I think that probably would have demonstrated some of the additional increment 2 requirements.

(2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010); see also Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

In the above captioned pre-award bid protest, as discussed above, Palantir has established success on the merits by demonstrating that the Army acted arbitrarily and capriciously when the Army failed to determine, in accordance with the requirements of 10 U.S.C. § 2377, whether there were commercially available items suitable to meet the Army's procurement requirements prior to issuing the solicitation at issue. Having concluded that Palantir has succeeded on the merits of its bid protest, the court considers the additional factors to determine whether Palantir is entitled to a permanent injunction. Palantir alleges that it will suffer irreparable harm if the court does not issue an injunction and that the balance of the hardships and the public interest weigh in favor of granting an injunction. Defendant argues that Palantir has not demonstrated irreparable harm, that the balance of hardships does not weigh in Palantir's favor, and that an injunction will not serve the public interest.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is

established by a lost opportunity to fairly compete."); <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. at 245 (citing several cases); <u>Magnum Opus Techs., Inc. v. United States</u>, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), <u>motion to amend denied</u>, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. <u>See Overstreet Elec. Co. v. United States</u>, 47 Fed. Cl. at 744 (citing <u>United Int'l Investigative Servs., Inc. v. United States</u>, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.")); <u>see also KWR Constr., Inc. v. United States</u>, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 52 Fed. Cl. at 828. According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." <u>BINL, Inc. v. United States</u>, 106 Fed. Cl. at 49 (quoting <u>Furniture by Thurston v. United States</u>, 103 Fed. Cl. 505, 520 (2012) (citing <u>BayFirst Sols., LLC v. United States</u>, 102 Fed. Cl. 677, 696 (2012))); <u>see also MORI Assocs., Inc. v. United States</u>, 102 Fed. Cl. 503, 552–53 (2011).

Palantir argues that it "will suffer irreparable harm if the Court does not issue an injunction" and stop the Army from proceeding with a contract award under the current solicitation. Palantir asserts that "[a]bsent such relief, Palantir will be deprived of an opportunity to compete for the DCGS-A2 contract, which in and of itself constitutes irreparable harm." Defendant argues, however, that Palantir could have competed for the DCGS-A Increment 2 contract by submitting a proposal in response to the solicitation, but Palantir voluntarily chose not to do so. According to defendant, this "is not a case where a potential offeror was prevented or precluded from submitting a proposal in a competitive procurement because of agency action." Defendant argues that "Palantir had an opportunity equal to all other potential offerors to tender a technical proposal that would meet the DCGS-A Increment 2 requirements," but that Palantir "made their own business choices" not to compete. According to defendant, because Palantir chose not to submit a proposal in response to the solicitation, Palantir cannot now argue that it will be irreparably harmed if it is not able to compete for the contract.

Although defendant is technically correct that Palantir could have submitted a proposal in response to the solicitation in order to participate in the DCGS-A Increment 2 competition, as described above in the prejudice analysis, it is a somewhat disingenuous argument. Because Palantir was attempting to offer the Army a commercially available product, once the solicitation was designed only as a developmental solicitation, Palantir was not able to meaningfully compete for the contract award. Even if Palantir had submitted a proposal offering a commercial item, that proposal would not have complied with all the solicitation's material terms because the solicitation at issue in this bid protest contemplates the award of a developmental, cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts. Many of these clauses,

including a clause requiring compliance with Cost Accounting Standards, would not be included in a firm-fixed price contract to procure a commercial item.[55] As Palantir asserts, it is only an "offeror of commercial items on a fixed price basis," thus, "Palantir does not have in place the cost accounting standards and procedures" that the solicitation required. It is well-established in this court that "a procuring agency may only accept an offer that conforms to the material terms of the solicitation." Furniture by Thurston v. United States, 103 Fed. Cl. at 518. Defendant's argument that Palantir simply chose not to submit a proposal in response to the solicitation does not reflect the nature of the solicitation, the strict requirements of the solicitation as issued, or the award process set out in the solicitation. Moreover, as demonstrated throughout this opinion, Palantir advised the Army on multiple occasions, in advance of the issuance of the solicitation, that it was trying to offer a commercially available product to meet the agency's needs.

Palantir also asserts that "[i]f the Army is permitted to proceed with an award under the Solicitation, Palantir . . . would lose the opportunity to earn revenues and profits from the potential sale of the Palantir Gotham Platform to the Army." Without an injunction, the Army likely will award, in the near future, a contract to develop the DCGS-A Increment 2 to an offeror who submitted a developmental proposal in response to the solicitation, as represented to the court by the Army's representatives. That pool of offerors does not include Palantir. Thus, Palantir would have lost the opportunity to compete for the DCGS-A Increment 2 contract for the life of DCGS-A Increment 2 developmental contract, which could extend for five years or more.

Additionally, a contract award will diminish, if not entirely quash, the likelihood that Palantir will have the opportunity to compete for a future commercial item contract with the Army to satisfy the DCGS-A Increment 2 requirements. Once the Army executes a contract to develop DCGS-A Increment 2, it would appear to be a significant period of time before the Army would seek commercial items related to DCGS-A Increment 2. If the agency is permitted to move forward with awarding a contract based on the solicitation issued on December 23, 2015, Palantir will have been deprived of an opportunity to compete for the contract award. As a result, Palantir will likely lose any potential profits it would have earned from selling its commercial items to the Army in order to satisfy the DCGS-A Increment 2 requirements. Moreover, the loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and

---

[55] The solicitation incorporates FAR clause 52.230-2, Cost Accounting Standards. Certain contracts are, by regulation, exempt from FAR clause 52.230-2, Cost Accounting Standards, including firm-fixed price contracts awarded on the basis of adequate price competition without submission of cost or pricing data. See 48 C.F.R. § 9903.201-1 (2016). An agency issuing a firm-fixed price contract awarded on the basis of adequate price competition cannot require an offeror to be compliant with FAR clause 52.230-2. To that end, when purchasing commercial items, agencies are required to use firm-fixed price contracts. See 48 C.F.R. §12.207 (2016). Put together, these rules direct that a contract to acquire commercial items normally will be a firm-fixed price contract, which is by regulation exempt from complying with FAR clause 52.230-2, Cost Accounting Standards.

opportunity to work with the Army for the DCGS-A Increment 2. See BINL, Inc. v. United States, 106 Fed. Cl. at 48 ("Irreparable harm is established by a lost opportunity to fairly compete."); see also Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. at 544. Palantir's lost business opportunity and loss of potential profits establishes irreparable harm.

Assessing the balance of hardships between the parties, the court recognizes the possible negative impact on the Army if the DCGS-A Increment 2 contract award is delayed. As indicated in the Administrative Record before this court, the Army appears to have a functioning system, albeit defendant has indicated that the system would benefit from an update. If no injunction is issued, however, then Palantir will be foreclosed from the opportunity to submit a proposal for the DCGS-A Increment 2 contract likely for at least five years. According to defendant, the "balance of hardships substantially tips in the Army's favor." Defendant asserts that "[t]he harm to the Government from enjoining award of a DCGS-A Increment 2 contract is substantial and greatly outweighs any asserted injury to Palantir." Defendant asserts that the "Court should defer to the military's professional judgment concerning both the risks and harms posed by enjoining the award of a contract for the DCGS-A Increment 2 procurement." Defendant submitted the declaration of Colonel Robert Collins to address the impact of a permanent injunction on the Army. Colonel Collins is the Project Manager for the DCGS-A programs and is "the Army's point of contact for the entire DCGS-A family of systems." According to Colonel Collins' declaration, a delay in the procurement of DCGS-A Increment 2 will negatively affect "the program by delaying the needed capabilities for enhanced situational awareness for military analysts and commanders." In his declaration, Colonel Collins stated:

> The enhanced DCGS-A, Increment 2, is needed to retain the interoperability of existing systems and bring on emerging Intelligence data feeds, which are expected to have significantly larger volumes of data. . . . The new DCGS-A Increment 2 DMA is desperately needed to improve data synchronization across all Army echelons. DCGS-A Increment 2 will implement cyber security measures to protect and monitor data access and activities to a significantly larger degree than the current DCGS-A Increment 1 is even capable.

Colonel Collins also stated that "[i]f the court issues an injunction enjoining the Army from awarding the contract, then the Army will be forced to use and maintain the existing Increment 1 systems," which "will become increasingly difficult to keep up with as technology becomes unsupportable over time."

Notwithstanding Colonel Collins' declaration, in its cross-motion for judgment on the Administrative Record, defendant states that the Army does not intend to immediately use or deploy DCGS-A Increment 2. Defendant explains that "it is anticipated that there would be a lengthy developmental period for Increment 2, and also testing." Additionally, defendant asserts that "DCGS-A Increment 1 is fully operational" and deployed in the field, although it is "nearing obsolescence." Based on this information from defendant, it

appears that, although an injunction may cause some delay in the procurement of the capabilities that the Army seeks to acquire through the DCGS-A Increment 2 procurement, the delay, which is in defendant's control, is manageable, assuming the Army moves quickly to comply with the requirements of 10 U.S.C. § 2377. Moreover, the impact of the delay on the "military analysts and commanders" appears speculative because the Army already anticipates a "lengthy developmental period for Increment 2, and also testing." Indeed, given that the Army intends to award a developmental contract, it would be difficult to know when Increment 2 capabilities will be available and deployable. A review of the Administrative Record indicates that DCGS-A Increment 1 took several years to develop, and DCGS-A Increment 2 is expected to be more technically advanced than Increment 1, thus it appears likely that there could be delays due to testing or other issues that typically arise during a complicated developmental process. Furthermore, if Palantir actually is capable of providing a commercial item that can meet the Army's requirements, then, most likely, the Army could more rapidly acquire the commercial technology to meet its needs either in whole or in part. Although an injunction may somewhat slow the award of a contract to satisfy the Army's requirements, "the Court of Federal Claims has observed that '"only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715–16 (2006) (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 399)); see also Insight Sys. Corp. v. United States, 110 Fed. Cl. at 582. Thus, the court concludes that the balance of hardships does not weigh in favor of the defendant in this protest.

As to the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)).