As Palantir argues, there is a public interest "in preserving the integrity of the competitive process." Insight Sys. Corp. v. United States, 110 Fed. Cl. at 583. "A permanent injunction is properly employed where there is an overriding public interest in maintaining the integrity of the federal procurement process." Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. at 608 (internal quotations omitted). Palantir argues that the public interest weighs in favor of a permanent injunction because the public "has an interest in ensuring that the Army's Solicitation complies with the law." Defendant points to national security concerns to support its position that an injunction will not serve the public interest. Defendant asserts that the "public interest factor is of 'paramount import' especially regarding national defense and national security," and that this "paramount interest is directly implicated when a procurement action involves the acquisition of services critical to the success of future military operations and to the health and safety of our servicemen and women in the field." Defendant is correct that "when military and national security interests are implicated, the public interest factor gains inflated importance in the court's balancing of the equities." Worldwide Language Res., LLC v. United States, 127 Fed. Cl. 125, 135 (2016) (internal citations omitted). The court recognizes, and respects, that in exercising jurisdiction over bid protests "the courts shall give due regard to the interests of national defense and national security. . . ." 28 U.S.C. § 1491(b)(3). Yet, "merely conclusory assertions of national security do not suffice to defeat motions for injunctive relief." Crowley Tech. Mgmt., Inc. v. United States, 123 Fed. Cl. 253, 266 (2015); see also GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 493 (2012) (explaining that "when the Government makes a claim of national security" the court "will not blindly accede to such claim" and must give the claim careful consideration) (internal quotations omitted). Although in this protest the court recognizes improvement to DCGS-A is an important part of the Army's future performance capabilities, and defendant discusses the intersection of national security and the public interest generally in its briefs, defendant does not sufficiently address how an injunction in this protest would cause a national security disruption or convince the court that efficiently taking the time to address the requirements of 10 U.S.C. § 2377 would negatively impact national security. As noted above, in his declaration, Colonel Collins explained the importance of DCGS-A Increment 2 and states that it is "desperately needed," however, Colonel Collins does not specifically assert that a delay in making an award pursuant to the DCGS-A Increment 2 solicitation will create national security concerns. In fact, the solicitation explains that the expected performance period for the DCGS-A Increment 2 development contract is six years, thus, it appears that the Army anticipates that developing DCGS-A Increment 2 could take multiple years. Therefore, the Army has not offered evidence of immediate tactical or strategic national security consequences that would sway the court from entering an injunction in this bid protest so that the Army can comply with 10 U.S.C. § 2377. As discussed above, the Army failed to satisfy the requirements of 10 U.S.C. § 2377 before issuing the December 23, 2015 solicitation, compromising the integrity of the procurement process.

Palantir asserts that the public interest weighs in favor of an injunction because the "Army's Solicitation doubles down on development efforts that have taken fifteen years and cost billions of taxpayer dollars without equipping Commanders with the capabilities they need." As directed by 10 U.S.C. § 2377, and as is intuitively obvious, it

is in the public interest to investigate whether commercial items exist that can satisfy the government's needs, in whole or in part, so as to avoid investing time and taxpayer money into developing a product that already exists. As such, the court finds that there is a public interest in permanently enjoining the Army from awarding a contract under the December 23, 2015 solicitation.

**CONCLUSION**

Accordingly, because Palantir has demonstrated success on the merits, and because the equitable factors weigh in Palantir's favor, a permanent injunction is warranted and awarded. The Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

# In the United States Court of Federal Claims

**No. 16-784 C**

**PALANTIR USG, INC.**
**Protestor**

**v.** **JUDGMENT**

**THE UNITED STATES**
**Defendant**

Pursuant to the court's Opinion, filed November 3, 2016,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements.

Lisa L. Reyes, Acting
Clerk of Court

**November 10, 2016** By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

APPEAL,CLOSED,ECF

# US Court of Federal Claims
# United States Court of Federal Claims (COFC)
# CIVIL DOCKET FOR CASE #: 1:16-cv-00784-MBH

PALANTIR USG, INC. v. USA
Assigned to: Judge Marian Blank Horn
Case in other court: 17-01465
Cause: 28:1491 Tucker Act

Date Filed: 06/30/2016
Date Terminated: 11/10/2016
Jury Demand: None
Nature of Suit: 138 Contract - (Pre Award) Injunctions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PALANTIR TECHNOLOGIES, INC.**
*and*
*TERMINATED: 08/22/2016*

represented by **Hamish Hume**
Boies Schiller & Flexner LLP (DC)
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
(202) 237-2727
Email: hhume@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PALANTIR USG, INC.**

represented by **Hamish Hume**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Domenique Grace Kirchner**
U. S. Department of Justice - Civil Div.
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-1111
Fax: (202) 514-8624
Email: domenique.kirchner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2016 | 1 | **SEALED** COMPLAINT against USA (ARM) (Filing fee $400, Receipt number 9998-3405680) (Copy Served Electronically on Department of Justice), filed by PALANTIR TECHNOLOGIES, INC., PALANTIR USG, INC.. **Answer due by 8/29/2016.**(ar) Modified on 7/1/2016 to seal complaint. (dls) (Entered: 06/30/2016) |
| 06/30/2016 | 2 | NOTICE of Assignment to Judge Marian Blank Horn. (ar) (Entered: 06/30/2016) |
| 06/30/2016 | 3 | NOTICE of Designation of Electronic Case. (ar) (Entered: 06/30/2016) |
| 06/30/2016 | 4 | ORDER: **Initial bid protest hearing set for 7/1/2016: 3:00 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 06/30/2016) |
| 07/01/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/1/2016 before Judge Marian Blank Horn: Hearing. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 07/01/2016) |
| 07/01/2016 | 5 | ORDER: Protective Order. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2016) |
| 07/05/2016 | 6 | NOTICE of Appearance by Domenique Grace Kirchner for USA . (Kirchner, Domenique) (Entered: 07/05/2016) |
| 07/05/2016 | 7 | ORDER: **Administrative Record due by 7/6/2016, 12:00 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/05/2016) |
| 07/06/2016 | 8 | NOTICE, filed by USA *of Filing of Administrative Record* (Attachments: # 1 Exhibit Index of Administrative Record)(Kirchner, Domenique) (Entered: 07/06/2016) |
| 07/06/2016 | | **SEALED** ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/07/2016) |
| 07/08/2016 | 9 | Notice Of Filing Of Certified Transcript for proceedings held on July 1, 2016 in Washington, D.C. (ew) (Entered: 07/08/2016) |
| 07/08/2016 | 10 | TRANSCRIPT of Proceedings held on July 1, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-68. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 7/15/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ew) (Entered: 07/08/2016) |
| 07/12/2016 | 11 | Unopposed MOTION for Leave to Exceed Page Limit of Motion for Judgment on The Administrative Record and Permanent Injunction by Five (5) pages , filed by All Plaintiffs.**Response due by 7/29/2016.**(Hume, Hamish) (Entered: 07/12/2016) |
| 07/12/2016 | | ORDER granting 11 Motion for Leave to File Excess Pages. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/12/2016) |

| | | |
|---|---|---|
| 07/12/2016 | 12 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit Tab 148, # 2 Corrected Index of administrative record)(Kirchner, Domenique) (Entered: 07/12/2016) |
| 07/12/2016 | 13 | **SEALED** MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA.**Response due by 8/12/2016.** (Attachments: # 1 Exhibit Tab 122, GAO decision)(Kirchner, Domenique) (Entered: 07/12/2016) |
| 07/12/2016 | 14 | **SEALED** MOTION for Judgment on the Administrative Record (Response due by 8/12/2016.), MOTION for Permanent Injunction (Response due by 7/29/2016.), filed by All Plaintiffs. (Hume, Hamish) (Entered: 07/12/2016) |
| 07/12/2016 | | **SEALED** CORRECTED ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/14/2016) |
| 07/13/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/13/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/13/2016) |
| 07/15/2016 | 15 | NOTICE, filed by USA *of Government Schedule For Award* (Kirchner, Domenique) (Entered: 07/15/2016) |
| 07/15/2016 | 16 | **SEALED** MOTION to Supplement the Administrative Record , filed by All Plaintiffs.**Response due by 8/1/2016.** (Attachments: # 1 Appendix Proposed Notices of Deposition for Lt. Gen. Mary Legere, Maj. Gen. Laura Richardson, Kevin Kelly, and Chris Fisher, # 2 Appendix Proposed Interrogatories and Requests for Production, # 3 Exhibit Index and Exhibits 1 to 15, # 4 Exhibit 16 to 30, # 5 Exhibit 31 to 51 and Certificate of Service) (Hume, Hamish) (Entered: 07/15/2016) |
| 07/15/2016 | 17 | ORDER: **Status conference set for 7/18/2016, 12:00 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/15/2016) |
| 07/18/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/18/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/18/2016) |
| 07/18/2016 | | Minute Entry - Was the proceeding sealed to the public? No. Proceeding held in Washington, DC on 7/18/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/18/2016) |
| 07/19/2016 | 18 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 07/19/2016) |
| 07/19/2016 | | CORRECTED ADMINISTRATIVE RECORD on CD, filed by USA. **[No documents uploaded]** Service: 7/19/2016.(ar) (Entered: 07/19/2016) |
| 07/19/2016 | 19 | **SEALED**CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC., filed by |

| | | |
|---|---|---|
| | | USA.**Response due by 8/19/2016.** (Attachments: # 1 Affidavit)(Kirchner, Domenique) (Entered: 07/19/2016) |
| 07/19/2016 | 20 | **SEALED**RESPONSE to 13 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by All Plaintiffs.**Reply due by 8/5/2016.** (Attachments: # 1 Affidavit)(Hume, Hamish) (Entered: 07/19/2016) |
| 07/20/2016 | 21 | ORDER: **Submissions due by 7/22/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/20/2016) |
| 07/20/2016 | 22 | ORDER: **Hearing set for 7/25/2016, 2:30 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/20/2016) |
| 07/20/2016 | 23 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit Letter, # 2 Exhibit Index)(Kirchner, Domenique) (Entered: 07/20/2016) |
| 07/20/2016 | | **SEALED**ADMINISTRATIVE RECORD on CD, filed by USA. **[No Documents Uploaded]** Service: 7/20/2016.(ar) (Entered: 07/21/2016) |
| 07/21/2016 | 24 | REDACTED DOCUMENT, filed by USA *of Court docket no. 13, Defendant's Motion To Dismiss.* (Attachments: # 1 Exhibit GAO decision)(Kirchner, Domenique) (Entered: 07/21/2016) |
| 07/21/2016 | 25 | **SEALED**RESPONSE to 16 MOTION to Supplement the Administrative Record , filed by USA.**Reply due by 8/1/2016.**(Kirchner, Domenique) (Entered: 07/21/2016) |
| 07/22/2016 | 26 | **SEALED**NOTICE, filed by All Plaintiffs re 20 Response to Motion [Dispositive] (Hume, Hamish) (Entered: 07/22/2016) |
| 07/22/2016 | 27 | **SEALED**NOTICE, filed by All Plaintiffs re 21 Order (Hume, Hamish) (Entered: 07/22/2016) |
| 07/22/2016 | 28 | **SEALED**REPLY to Response to Motion re 13 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA.(Kirchner, Domenique) (Entered: 07/22/2016) |
| 07/22/2016 | | **SEALED** ADMINISTRATIVE RECORD on CD, filed by USA. **[No documents uploaded]** Service: 7/22/2016.(ar) (Entered: 07/25/2016) |
| 07/23/2016 | 29 | **SEALED**REPLY to Response to Motion re 16 MOTION to Supplement the Administrative Record , filed by All Plaintiffs. (Attachments: # 1 Exhibit 52, # 2 Exhibit 53)(Hume, Hamish) (Entered: 07/23/2016) |
| 07/24/2016 | 30 | **SEALED**NOTICE, filed by USA *of Correction to Administrative Record* (Attachments: # 1 Exhibit Corrected Index)(Kirchner, Domenique) (Entered: 07/24/2016) |
| 07/25/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/25/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 07/25/2016) |
| | | |

| | | |
|---|---|---|
| 07/26/2016 | 31 | ORDER: **Revised Administrative Record due by 7/26/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/26/2016) |
| 07/26/2016 | | **SEALED** CORRECTED ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/29/2016) |
| 07/27/2016 | 32 | NOTICE, filed by USA *of Filing of Revised Administrative Record* (Attachments: # 1 Exhibit Index)(Kirchner, Domenique) (Entered: 07/27/2016) |
| 07/27/2016 | 33 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 1 Complaint, . (Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 34 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 14 MOTION for Judgment on the Administrative Record MOTION for Permanent Injunction . (Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 35 | REDACTED DOCUMENT, filed by USA redacting 28 Reply to Response to Motion *to Dismiss*. (Kirchner, Domenique) (Entered: 07/27/2016) |
| 07/27/2016 | 36 | **SEALED**Consent MOTION for Protective Order , filed by All Plaintiffs.**Response due by 8/15/2016.** (Attachments: # 1 Appendix A (Unopposed Amended Protective Order), # 2 Appendix B (Redline of Unopposed Amended Protective Order), # 3 Appendix C (Protective Order Applications))(Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 37 | **SEALED**REPLY to Response to Motion re 14 MOTION for Judgment on the Administrative Record MOTION for Permanent Injunction , filed by All Plaintiffs.(Hume, Hamish) (Entered: 07/27/2016) |
| 07/28/2016 | 38 | ORDER: Revised Protective Order. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/28/2016) |
| 07/28/2016 | 39 | REDACTED DOCUMENT, filed by USA redacting 19 CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC. . (Kirchner, Domenique) (Entered: 07/28/2016) |
| 07/28/2016 | 40 | Notice Of Filing Of Certified Transcript for proceedings held on July 25, 2016 in Washington, D.C. (ew) (Entered: 07/29/2016) |
| 07/28/2016 | 41 | TRANSCRIPT of Proceedings held on July 25, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-150. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 8/4/2016. Redacted Transcript Deadline set for 8/29/2016. Release of Transcript Restriction set for 10/27/2016. (ew) (Entered: 07/29/2016) |
| 08/01/2016 | 42 | **SEALED**REPLY to Response to Motion re 19 CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC. , filed by USA.(Kirchner, Domenique) (Entered: 08/01/2016) |
| 08/02/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/2/2016 before Judge Marian Blank Horn: Oral |

| | | |
|---|---|---|
| | | Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 08/02/2016) |
| 08/05/2016 | 43 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 29 Reply to Response to Motion . (Hume, Hamish) (Entered: 08/05/2016) |
| 08/05/2016 | 44 | **SEALED**NOTICE, filed by All Plaintiffs *Notice of Filing Declaration and Expert Report* (Attachments: # 1 Affidavit of Doug Philippone, # 2 Affidavit and Expert Report of Bryant Choung)(Hume, Hamish) (Entered: 08/05/2016) |
| 08/08/2016 | 45 | **SEALED**NOTICE, filed by USA *of errata in Defendant's Cross Motion for Judgment on the administrative record and opposition to plaintiffs' motion for judgment on the administrative record, court docket 19* (Kirchner, Domenique) (Entered: 08/08/2016) |
| 08/10/2016 | 46 | Notice Of Filing Of Certified Transcript for proceedings held on August 2, 2016 in Washington, D.C. (ac7) (Entered: 08/10/2016) |
| 08/10/2016 | 47 | TRANSCRIPT of Proceedings held on August 2, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-96. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 8/17/2016. Redacted Transcript Deadline set for 9/12/2016. Release of Transcript Restriction set for 11/10/2016. (ac7) (Entered: 08/10/2016) |
| 08/10/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/10/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 08/10/2016) |
| 08/10/2016 | 48 | **SEALED**NOTICE, filed by USA *of designation of expert witness* (Kirchner, Domenique) (Entered: 08/10/2016) |
| 08/10/2016 | 49 | **SEALED** MOTION for Leave to File declarations , filed by USA.**Response due by 8/29/2016.** (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit)(Kirchner, Domenique) (Entered: 08/10/2016) |
| 08/12/2016 | 50 | **SEALED**NOTICE, filed by USA *of filing of Expert Report* (Attachments: # 1 Exhibit Expert report)(Kirchner, Domenique) (Entered: 08/12/2016) |
| 08/12/2016 | 51 | **SEALED** MOTION to Strike 44 Notice (Other) , filed by USA.**Response due by 8/29/2016.** (Kirchner, Domenique) (Entered: 08/12/2016) |
| 08/15/2016 | 52 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 37 Reply to Response to Motion *for Judgment on the Administrative Record.* (Hume, Hamish) (Entered: 08/15/2016) |
| 08/16/2016 | 53 | **SEALED**Unopposed MOTION for Leave to File Defendant's Amended Motion To Strike Plaintiffs' Declaration And Expert Report , filed by USA.**Response due by 9/2/2016.** (Attachments: # 1 Supplement)(Kirchner, Domenique) (Entered: 08/16/2016) |
| 08/16/2016 | 54 | |

| | | |
|---|---|---|
| | | **SEALED**NOTICE, filed by USA *of filing Deposition Transcript* (Attachments: # 1 Exhibit Deposition transcript, # 2 Exhibit Dep. Ex. 6, # 3 Exhibit Dep. Ex. 7, # 4 Exhibit Dep. Ex. 8, # 5 Exhibit Dep. Ex. 9, # 6 Exhibit Dep. Ex. 10, # 7 Exhibit Dep. Ex. 11, # 8 Exhibit Dep. Ex. 12)(Kirchner, Domenique) (Entered: 08/16/2016) |
| 08/17/2016 | 55 | NOTICE of Additional Authority (Kirchner, Domenique) (Entered: 08/17/2016) |
| 08/17/2016 | 56 | REDACTED DOCUMENT, filed by USA redacting 25 Response to Motion *to supplement administrative record.* (Kirchner, Domenique) (Entered: 08/17/2016) |
| 08/17/2016 | 57 | ORDER: **Status conference set for 8/23/2016, 10:30 AM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/17/2016) |
| 08/18/2016 | 58 | **SEALED** MOTION for Leave to File Corrected Expert Report , filed by USA.**Response due by 9/6/2016.** (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/18/2016) |
| 08/18/2016 | 59 | **SEALED** MOTION to Unseal Document , filed by All Plaintiffs.**Response due by 9/6/2016.** (Attachments: # 1 Affidavit of Jon R. Knight, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Hume, Hamish) (Entered: 08/18/2016) |
| 08/22/2016 | 60 | **SEALED**ORDER granting in part and denying in part 13 Motion to Dismiss - Rule 12(b)(1) and (6). Palantir Technologies is dismissed. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/22/2016) |
| 08/22/2016 | 61 | **SEALED**RESPONSE to 49 MOTION for Leave to File declarations , filed by All Plaintiffs.**Reply due by 9/1/2016.** (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B)(Hume, Hamish) (Entered: 08/22/2016) |
| 08/23/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/23/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 08/23/2016) |
| 08/23/2016 | 62 | **SEALED**NOTICE, filed by USA re 60 Order on Motion to Dismiss - Rule 12(b)(1) and (6) *of proposed redactions* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/23/2016) |
| 08/24/2016 | 63 | **SEALED**NOTICE, filed by USA *of proposed redaction* (Kirchner, Domenique) (Entered: 08/24/2016) |
| 08/24/2016 | 64 | ORDER: **Response to motion to strike due by 8/24/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/24/2016) |
| 08/24/2016 | 65 | **SEALED**RESPONSE to 53 Unopposed MOTION for Leave to File Defendant's Amended Motion To Strike Plaintiffs' Declaration And Expert Report , 51 MOTION to Strike 44 Notice (Other) , filed by All Plaintiffs.**Reply due by 9/6/2016.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Hume, Hamish) (Entered: 08/24/2016) |
| 08/25/2016 | 66 | |

| | | |
|---|---|---|
| | | **SEALED**RESPONSE to 64 Order , filed by USA.(Kirchner, Domenique) (Entered: 08/25/2016) |
| 08/26/2016 | 67 | **SEALED**RESPONSE to 64 Order , filed by USA. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit)(Kirchner, Domenique) (Entered: 08/26/2016) |
| 08/26/2016 | 68 | **SEALED**NOTICE, filed by USA *re Declaration* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/26/2016) |
| 08/26/2016 | 69 | REPORTED ORDER. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 08/26/2016) |
| 08/26/2016 | 70 | **SEALED** MOTION for Discovery , filed by PALANTIR USG, INC..**Response due by 9/12/2016.** (Attachments: # 1 Exhibit Index and Exhibits A through C, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F, # 5 Exhibit G through AA)(Hume, Hamish) (Entered: 08/26/2016) |
| 08/29/2016 | 71 | ORDER. Status conference scheduled for Tuesday, August 30, 2016. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 08/29/2016) |
| 08/30/2016 | | Minute Entry - Was the proceeding sealed to the public? Yes. Proceeding held in Washington, DC on 8/30/2016, before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (ro) (Entered: 08/30/2016) |
| 09/01/2016 | 72 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 70 MOTION for Discovery . (Hume, Hamish) (Entered: 09/01/2016) |
| 09/05/2016 | 73 | **SEALED**Unopposed MOTION for Leave to File declaration , filed by USA.**Response due by 9/22/2016.** (Attachments: # 1 Affidavit)(Kirchner, Domenique) (Entered: 09/05/2016) |
| 09/06/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 9/6/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 09/06/2016) |
| 09/06/2016 | 74 | **SEALED**REPLY to Response to Motion re 51 MOTION to Strike 44 Notice (Other) , filed by USA. (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/06/2016) |
| 09/07/2016 | 75 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Cronen Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Cronen Deposition Transcript, # 2 Exhibit Cronen Dep. Ex. 1, # 3 Exhibit Cronen Dep. Ex. 2, # 4 Exhibit Cronen Dep. Ex. 3, # 5 Exhibit Cronen Dep. Ex. 4, # 6 Exhibit Cronen Dep. Ex. 5A, # 7 Exhibit Cronen Dep. Ex. 5B, # 8 Exhibit Cronen Dep. Ex. 6, # 9 Exhibit Cronen Dep. Ex. 7A, # 10 Exhibit Cronen Dep. Ex. 7B, # 11 Exhibit Cronen Dep. Ex. 8, # 12 Exhibit Cronen Dep. Ex. 9, # 13 Exhibit Cronen Dep. Ex. 10, # 14 Exhibit Cronen Dep. Ex. 11, # 15 Exhibit Cronen Dep. Ex. 12, # 16 Exhibit Cronen Dep. Ex. 13, # 17 Exhibit Cronen Dep. Ex. 14, # 18 Exhibit Cronen Dep. Ex. 15, # 19 Exhibit Cronen Dep. Ex. 16, # 20 Exhibit Cronen Dep. Ex. 17, # 21 Exhibit Cronen Dep. Ex. 18, # 22 Exhibit Cronen Dep. Ex. 19, # 23 Exhibit Cronen Dep. Ex. 20, # 24 Exhibit |

| | | |
|---|---|---|
| | | Cronen Dep. Ex. 21, # 25 Exhibit Cronen Dep. Ex. 22, # 26 Exhibit Cronen Dep. Ex. 23, # 27 Exhibit Cronen Dep. Ex. 24, # 28 Exhibit Cronen Dep. Ex. 25, # 29 Exhibit Cronen Dep. Ex. 26, # 30 Exhibit Cronen Dep. Ex. 27, # 31 Exhibit Cronen Dep. Ex. 28, # 32 Exhibit Cronen Dep. Ex. 29, # 33 Exhibit Cronen Dep. Ex. 30)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 76 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Lee Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Lee Dep. Transcript, # 2 Exhibit Lee Dep. Ex. 1, # 3 Exhibit Lee Dep. Ex. 2, # 4 Exhibit Lee Dep. Ex. 4, # 5 Exhibit Lee Dep. Ex. 5)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 77 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Legere Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Legere Dep. Transcript, # 2 Exhibit Legere Dep. Ex. 2, # 3 Exhibit Legere Dep. Ex. 3, # 4 Exhibit Legere Dep. Ex. 8, # 5 Exhibit Legere Dep. Ex. 10, # 6 Exhibit Legere Dep. Ex. 11, # 7 Exhibit Legere Dep. Ex. 12, # 8 Exhibit Legere Dep. Ex. 13, # 9 Exhibit Legere Dep. Ex. 14, # 10 Exhibit Legere Dep. Ex. 15, # 11 Exhibit Legere Dep. Ex. 16, # 12 Exhibit Legere Dep. Ex. 17, # 13 Exhibit Legere Dep. Ex. 18, # 14 Exhibit Legere Dep. Ex. 20)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 78 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Schnurr Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Schnurr Dep. Transcript, # 2 Exhibit Schnurr Dep. Ex. 1, # 3 Exhibit Schnurr Dep. Ex. 4, # 4 Exhibit Schnurr Dep. Ex. 6, # 5 Exhibit Schnurr Dep. Ex. 7, # 6 Exhibit Schnurr Dep. Ex. 8, # 7 Exhibit Schnurr Dep. Ex. 9, # 8 Exhibit Schnurr Dep. Ex. 10, # 9 Exhibit Schnurr Dep. Ex. 11, # 10 Exhibit Schnurr Dep. Ex. 12, # 11 Exhibit Schnurr Dep. Ex. 14, # 12 Exhibit Schnurr Dep. Ex. 17, # 13 Exhibit Schnurr Dep. Ex. 18, # 14 Exhibit Schnurr Dep. Ex. 24, # 15 Exhibit Schnurr Dep. Ex. 25, # 16 Exhibit Schnurr Dep. Ex. 26, # 17 Exhibit Schnurr Dep. Ex. 31, # 18 Exhibit Schnurr Dep. Ex. 34)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 79 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Sherick Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Sherick Dep. Tr., # 2 Exhibit Sherick Dep. Ex. 1A, # 3 Exhibit Sherick Dep. Ex. 1B, # 4 Exhibit Sherick Dep. Ex. 1C, # 5 Exhibit Sherick Dep. Ex. 1D, # 6 Exhibit Sherick Dep. Ex. 2, # 7 Exhibit Sherick Dep. Ex. 3, # 8 Exhibit Sherick Dep. Ex. 6, # 9 Exhibit Sherick Dep. Ex. 7, # 10 Exhibit Sherick Dep. Ex. 8, # 11 Exhibit Sherick Dep. Ex. 9, # 12 Exhibit Sherick Dep. Ex. 10, # 13 Exhibit Sherick Dep. Ex. 11, # 14 Exhibit Sherick Dep. Ex. 12, # 15 Exhibit Sherick Dep. Ex. 13, # 16 Exhibit Sherick Dep. Ex. 14)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 80 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Stock Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Stock Dep. Transcript, # 2 Exhibit Stock Dep. Ex. 1, # 3 Exhibit Stock Dep. Ex. 2, # 4 Exhibit Stock Dep. Ex. 3, # 5 Exhibit Stock Dep. Ex. 4, # 6 Exhibit Stock Dep. Ex. 5, # 7 Exhibit Stock Dep. Ex. 5A, # 8 Exhibit Stock Dep. Ex. 6, # 9 Exhibit Stock Dep. Ex. 7, # 10 Exhibit Stock Dep. Ex. 8, # 11 Exhibit Stock Dep. Ex. |

| | | |
|---|---|---|
| | | 9, # 12 Exhibit Stock Dep. Ex. 10, # 13 Exhibit Stock Dep. Ex. 11, # 14 Exhibit Stock Dep. Ex. 12)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 81 | **SEALED**SUPPLEMENTAL BRIEF *In Support of Its Motion For Judgment On The Administrative Record*, filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 (Supplemental Choung Declaration and Appendix), # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 82 | **SEALED**SUPPLEMENTAL BRIEF , filed by USA. (Attachments: # 1 Exhibit supplemental expert report, # 2 Exhibit deposition excerpt)(Kirchner, Domenique) (Entered: 09/07/2016) |
| 09/09/2016 | 83 | **SEALED**APPLICATION for Access to Protected Material by Ryan Taylor, filed by PALANTIR USG, INC.. (Hume, Hamish) (Entered: 09/09/2016) |
| 09/12/2016 | 84 | **SEALED** MOTION for Leave to File Corrected Government Cross-Motion for judgment on administrative record and Corrected Government Reply to Plaintiff's Opposition to Government Cross-Motion For Judgment on Administrative Record , filed by USA.Response due by 9/29/2016. (Attachments: # 1 Exhibit, # 2 Exhibit)(Kirchner, Domenique) (Entered: 09/12/2016) |
| 09/12/2016 | 85 | ORDER: Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 09/12/2016) |
| 09/14/2016 | 86 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *OF ADDITIONAL DOCUMENTS PRODUCED BY THE GOVERNMENT PURSUANT TO PALANTIR'S DISCOVERY REQUEST* (Attachments: # 1 Exhibit Tab 168, # 2 Exhibit Tab 169, # 3 Exhibit Tab 170, # 4 Exhibit Tab 171, # 5 Exhibit Tab 172, # 6 Exhibit Tab 173, # 7 Exhibit Tab 174, # 8 Exhibit Tab 175, # 9 Exhibit Tab 176)(Hume, Hamish) (Entered: 09/14/2016) |
| 09/15/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 9/15/2016 before Judge Marian Blank Horn: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 09/15/2016) |
| 09/16/2016 | 87 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *attaching DoD Commercial Item Handbook* (Attachments: # 1 Exhibit DoD Commercial Item Handbook)(Hume, Hamish) (Entered: 09/16/2016) |
| 09/16/2016 | 88 | ORDER: Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 09/16/2016) |
| 09/19/2016 | 89 | Notice Of Filing Of Certified Transcript for proceedings held on September 15, 2016 in Washington, D.C. (ac7) (Entered: 09/19/2016) |
| 09/19/2016 | 90 | TRANSCRIPT of Proceedings held on September 15, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-204. To purchase a copy, contact the clerk's office at (202) 357-6414. (ac7) Modified on 6/8/2017 to unseal pursuant to the order of 5/17/17. (dls). (Entered: 09/19/2016) |

| | | |
|---|---|---|
| 09/21/2016 | 91 | **SEALED**RESPONSE to 88 Order *(re Lists)*, filed by USA.(Kirchner, Domenique) (Entered: 09/21/2016) |
| 09/21/2016 | 92 | **SEALED**RESPONSE to 88 Order *(re Brief)*, filed by USA. (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/21/2016) |
| 09/21/2016 | 93 | **SEALED**RESPONSE to 88 Order *(re Brief)*, filed by PALANTIR USG, INC..(Hume, Hamish) (Entered: 09/21/2016) |
| 09/21/2016 | 94 | **SEALED**RESPONSE to 88 Order *(re Chart)*, filed by PALANTIR USG, INC.. (Attachments: # 1 Exhibit Chart of Key Documents)(Hume, Hamish) (Entered: 09/21/2016) |
| 09/23/2016 | 95 | NOTICE of Additional Authority (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/23/2016) |
| 09/23/2016 | 96 | **SEALED**STIPULATION *of Facts (Joint)*, filed by All Plaintiffs. (Hume, Hamish) (Entered: 09/23/2016) |
| 09/29/2016 | 97 | **SEALED**NOTICE, filed by USA (Attachments: # 1 Exhibit Deposition transcript, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit) (Kirchner, Domenique) (Entered: 09/29/2016) |
| 09/30/2016 | 98 | REDACTED DOCUMENT, filed by USA redacting 48 Notice (Other) . (Kirchner, Domenique) (Entered: 09/30/2016) |
| 10/05/2016 | 99 | REDACTED DOCUMENT, filed by USA redacting 42 Reply to Response to Motion, . (Kirchner, Domenique) (Entered: 10/05/2016) |
| 10/05/2016 | 100 | REDACTED DOCUMENT, filed by USA redacting 45 Notice (Other) . (Kirchner, Domenique) (Entered: 10/05/2016) |
| 10/11/2016 | 101 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 20 Response to Motion [Dispositive] . (Hume, Hamish) (Entered: 10/11/2016) |
| 10/11/2016 | 102 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 93 Response . (Hume, Hamish) (Entered: 10/11/2016) |
| 10/13/2016 | 103 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 81 Supplemental Brief, . (Hume, Hamish) (Entered: 10/13/2016) |
| 10/13/2016 | 104 | ORDER: **Hearing rescheduled for 10/31/2016, 10:30 AM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 10/13/2016) |
| 10/17/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 10/17/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 10/17/2016) |
| 10/19/2016 | 105 | REDACTED DOCUMENT, filed by USA redacting 92 Response . (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 10/19/2016) |
| 10/28/2016 | 106 | REDACTED DOCUMENT, filed by USA redacting 50 Notice (Other) . (Attachments: # 1 Exhibit Expert report)(Kirchner, Domenique) (Entered: 10/28/2016) |

| | | |
|---|---|---|
| 10/31/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 10/31/2016 before Judge Marian Blank Horn: Hearing. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 10/31/2016) |
| 11/01/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/1/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 11/01/2016) |
| 11/01/2016 | 107 | Notice Of Filing Of Certified Transcript for proceedings held on October 31, 2016 in Washington, D.C. (ew) (Entered: 11/02/2016) |
| 11/01/2016 | 108 | TRANSCRIPT of Proceedings held on October 31, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-21. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 11/8/2016. Redacted Transcript Deadline set for 12/2/2016. Release of Transcript Restriction set for 1/30/2017. (ew) (Entered: 11/02/2016) |
| 11/03/2016 | 109 | **SEALED**OPINION granting 14 Protestor's Motion for Judgment on the Administrative Record; granting 14 Motion for Permanent Injunction; denying 19 Defendant's Cross Motion. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 11/03/2016) |
| 11/04/2016 | 110 | ORDER. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 11/04/2016) |
| 11/08/2016 | 111 | **SEALED**RESPONSE to 110 Order., filed by USA.(Kirchner, Domenique) (Entered: 11/08/2016) |
| 11/08/2016 | 112 | **SEALED** MOTION for Clarification , filed by USA.Response due by **11/28/2016.** (Kirchner, Domenique) (Entered: 11/08/2016) |
| 11/09/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/9/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 11/09/2016) |
| 11/09/2016 | 113 | REPORTED OPINION. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/09/2016) |
| 11/10/2016 | 114 | JUDGMENT entered, pursuant to Rule 58, that the Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements. (Copy to parties) (dls) (Entered: 11/10/2016) |
| 11/16/2016 | 115 | ORDER: **Final Administrative Record due by 11/23/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/16/2016) |

| 11/22/2016 | 116 | NOTICE, filed by USA *of filing of "CD Rom of corrected, full Administrative Record" as directed by Court Orders dated November 4 and 16, 2016* (Kirchner, Domenique) (Entered: 11/22/2016) |
| 11/22/2016 | | **SEALED** Corrected ADMINISTRATIVE RECORD, filed by USA. Service: 11/22/16 by hand. (dls) (Entered: 11/23/2016) |
| 12/16/2016 | 117 | Unopposed MOTION for Extension of Time until 1/17/2017 to file joint proposed redactions to administrative record , filed by USA.**Response due by 1/3/2017.**(Kirchner, Domenique) (Entered: 12/16/2016) |
| 12/19/2016 | | ORDER granting 117 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 12/19/2016) |
| 01/09/2017 | 118 | NOTICE OF APPEAL as to 114 Judgment,, filed by USA. Copies to judge, opposing party and CAFC. (Kirchner, Domenique) (Entered: 01/09/2017) |
| 01/09/2017 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 118 Notice of Appeal (hw1) (Entered: 01/09/2017) |
| 01/10/2017 | | CAFC Case Number 2017-1465 for 118 Notice of Appeal filed by USA. (hw1) (Entered: 01/10/2017) |
| 01/13/2017 | 119 | Unopposed MOTION for Extension of Time until 1/24/2017 to file joint proposed redactions to the Administrative Record , filed by USA.**Response due by 1/30/2017.**(Kirchner, Domenique) (Entered: 01/13/2017) |
| 01/13/2017 | | ORDER granting 119 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 01/13/2017) |
| 01/24/2017 | 120 | Unopposed MOTION for Extension of Time until 1/31/2017 to file joint proposed redactions to administrative record , filed by USA.**Response due by 2/10/2017.**(Kirchner, Domenique) (Entered: 01/24/2017) |
| 01/25/2017 | | ORDER granting 120 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 01/25/2017) |
| 01/31/2017 | 121 | Unopposed MOTION for Extension of Time until 2/3/2017 to file joint proposed redactions to administrative record , filed by USA.**Response due by 2/17/2017.**(Kirchner, Domenique) (Entered: 01/31/2017) |
| 02/03/2017 | 122 | **SEALED**RESPONSE to *Court order dated Nov. 4, 2016*, filed by USA. (Attachments: # 1 Attachment 1, # 2 Attachment 2 part 1, # 3 Attachment 2 part 2, # 4 Attachment 3, # 5 Attachment 4, # 6 Attachment 5, # 7 Attachment 6, # 8 Attachment 7, # 9 Attachment 8)(Kirchner, Domenique) (Entered: 02/03/2017) |
| 02/03/2017 | 123 | **SEALED**RESPONSE to *Court order dated Nov. 4, 2016*, filed by USA. (Attachments: # 1 Tab 177, # 2 Tab 184, # 3 Tab 185, # 4 Tab 186, # 5 Tab 188 part 1, # 6 Tab 188 part 2)(Kirchner, Domenique) (Entered: 02/03/2017) |
| 04/13/2017 | 124 | NOTICE, filed by USA *of Waiver of Protection of Protective Order* (Attachments: # 1 Exhibit Redacted TSA)(Kirchner, Domenique) (Entered: 04/13/2017) |

Appx00118

| | | |
|---|---|---|
| 04/24/2017 | 125 | STIPULATION re 96 Stipulation *of Facts (Joint) (Unsealed)*, filed by PALANTIR USG, INC.. (Hume, Hamish) (Entered: 04/24/2017) |
| 05/11/2017 | 126 | Joint MOTION to Unseal Document 90 Transcript , filed by USA.**Response due by 5/30/2017.**(Kirchner, Domenique) (Entered: 05/11/2017) |
| 05/17/2017 | | ORDER granting 126 Motion to Unseal Document. Signed by Judge Marian Blank Horn. (jm5) (Entered: 05/17/2017) |
| 06/20/2017 | 127 | NOTICE, filed by PALANTIR USG, INC. *Joint Waiver of Protection of Information* (Attachments: # 1 Exhibit Tab 6, # 2 Exhibit Tab 44, # 3 Exhibit Tab 165)(Hume, Hamish) (Entered: 06/20/2017) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/25/2017 10:51:37 | | | |
| **PACER Login:** | Domenique | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:16-cv-00784-MBH |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

Receipt number 9998-3405680

ORIGINAL

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., and PALANTIR USG, INC.<br><br>Plaintiffs,<br><br>-vs.-<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 16-784 C |

FILED
JUNE 30, 2016
U.S. COURT OF
FEDERAL CLAIMS

**COMPLAINT**

Hamish P.M. Hume
Stacey Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Protected Information and/or Legends Redacted

## CLAIMS FOR RELIEF

### COUNT ONE
### The Army Violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002 By Refusing To Solicit The Data Management Platform As A Commercial Item

158. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

159. The law required the Army to solicit commercial items and nondevelopmental items to meet its requirements "to the maximum extent practicable." Instead of complying with that obligation, the Army did the opposite. It has sought to procure "developmental" service contracts on a cost-plus basis and to *avoid* the procurement of commercial items or nondevelopmental items "to the maximum extent practicable." This is unlawful. It is also arbitrary and capricious.

160. The decision-makers at the Army who constructed the unlawful Solicitation are irrationally committed to the proposition that the Army needs to develop and own for itself the technology that Palantir has *already developed.* The Army essentially wants to build for itself what Palantir already owns and is willing to sell. This is not only irrational, it is unlawful.

161. As a matter of law, the Army was required to "ensure" that the Solicitation define its requirements in such a manner that would allow for a commercial item or a nondevelopmental item to be procured to fulfill those requirements "to the maximum extent practicable." 10 U.S.C. § 2377(a)(2); *id.* at § 2377(b). By unnecessarily and irrationally bundling together the requirement for the Data Management Platform and the supposed requirements for certain Additional Enhancements, the Solicitation violated this statutory requirement.

162. As a matter of law, the Army was required to "ensure" that "offerors of commercial items and nondevelopmental items other than commercial items are provided an

Protected Information and/or Legends Redacted

opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a)(3). By making it impossible for Palantir and other offerors of commercial items to submit bids to satisfy the requirements of the Solicitation, the Solicitation violated this statutory requirement.

163. As a matter of law, the Army was required to "ensure" that it define its requirements in terms of "(A) functions to be performed; (B) performance required; or (C) essential physical characteristics." 10 U.S.C. § 2377(a)(1). By defining requirements solely in terms of cost-plus developmental efforts, rather than in terms of the ultimate "functions" or "performance" that is required by DCGS, the Solicitation violated this statutory requirement.

164. As a matter of law, the Army was required to "ensure" that it "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency." 10 U.S.C. § 2377(b)(1). By issuing a Solicitation that makes it impossible for the Army to meet its requirements through the procurement of commercial items or nondevelopmental items, the Army has violated this statutory requirement.

165. As a matter of law, the Army was required to "ensure" that it "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b)(3). By issuing a Solicitation that unnecessarily and irrationally bundles together the requirement for a Data Management Platform and the supposed requirements for certain Additional enhancements, and by refusing to modify this Solicitation in the way the Army itself recommended so as to unbundle these two separate requirements, the Solicitation violated § 2377(b)(3).

Protected Information and/or Legends Redacted

166. In sum, the law requires the Army to solicit and procure commercial items to the maximum extent practicable. Here, the Army has done precisely the opposite of what the law requires, and therefore has violated § 2377(a) & (b).

167. Indeed, while it was improperly conducted, the Army's own market research caused the Army *to admit* that it could have structured the DCGS-A2 acquisition through two different contracts, with the first being for the procurement of the Data Management Platform, and the second being for the procurement of the Additional enhancements. The Army's own Information Paper admitted that the Data Management Platform "could be a commercial stand alone solution." The Army's own Contracting Officer conceded that it was possible to "Procure a commercial product as basis of DCGS-A Increment 2 infrastructure"—i.e., to procure the Data Management Platform.

168. By failing to solicit bids for the procurement of the Data Management Platform as a commercial item, the Army contradicted its own admissions and violated the requirements of § 2377. It also violated numerous regulations, including those found at 48 C.F.R. § 11.002 (requiring Army to define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations), and at 48 C.F.R. § 10.002(d)(1) (requiring solicitation and award of a commercial item contract if market research establishes that its needs may be met by commercial items).

## COUNT TWO
## The Army Violated 10 U.S.C. § 2377 And 48 C.F.R §§ 10.002 And 11.002 By Refusing To Solicit A Commercial Item For The Entirety Of DCGS-A2

169. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

Protected Information and/or Legends Redacted

170. As alleged in Count 1, the Army violated § 2377 and related regulations by failing to issue a Solicitation to procure the Data Management Platform as a commercial item and by unnecessarily and irrationally bundling the requirement for the Data Management Platform with the requirement for certain Additional Enhancements. However, even if it were legally permissible for the Army to have defined its requirements by bundling together the requirements for the Data Management Platform and the Additional Enhancements, the Army still violated § 2377 and 48 C.F.R §§ 10.002 and 11.002 by refusing to solicit commercial items for that bundled set of requirements.

171. Offerors of commercial items, including Palantir, routinely provide both Data Management Platforms and associated Additional Enhancements together in one commercial offering. For example, if Palantir were permitted to submit a bid for all the requirements set forth in the Solicitation, it would propose to provide both the Data Management Platform and the Additional Enhancements as a commercial item on a fixed-price basis, just as it does for other customers. It would not submit a bid seeking to provide any of these services on cost-plus, developmental basis.

172. Thus, even if the Army's requirements were properly defined as a bundle (which they are not), those bundled requirements could still be fulfilled with a commercial item. That means that the law required the Army to ensure that the Solicitation would allow for bids that could meet the listed requirements by providing a commercial item or nondevelopmental item. By failing to allow for this, the Army violated § 2377 and the related regulations of 48 C.F.R §§ 10.002 and 11.002.

173. Stated differently, the unlawful nature of the Solicitation is not just that it rejects a "two contract" approach that would have allowed it to procure the Data Management Platform as

Protected Information and/or Legends Redacted

a commercial item. In addition, the Solicitation is unlawful because it precludes bids by offerors of commercial items or nondevelopmental items who could fulfill the entirety of the Army's *bundled* requirements for DCGS-A2. As such, the Army violated, *inter alia*: § 2377(a)(2)'s mandate that it define its requirements to the maximum extent practicable so that commercial items could be procured to fulfill such requirements; § 2377(a)(3)'s mandate that it ensure, to the maximum extent practicable, that offerors of commercial items are provided an opportunity to compete; § 2377(b)(1)'s mandate that it ensure to the maximum extent practicable that its procurement officials acquire commercial items; 48 C.F.R. § 10.002(d)(1)'s requirement that it solicit and award a commercial item contract if market research establishes that its needs may be met by commercial items; and 48 C.F.R. § 11.002's mandate that it define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations.

174. Once again, this unlawful Solicitation reflects an irrational commitment by the Army personnel who constructed the Solicitation to build and own for themselves what Palantir has already developed and is willing to sell to the Army. The Army wants to build Palantir's technology for itself. This is both irrational and unlawful.

Protected Information and/or Legends Redacted

**COUNT THREE**
**The Army Violated 10 U.S.C. § 2377(c) By Failing To Determine Whether Its Needs Could Be Met By Commercial Items**

175. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

176. Section 2377(c) provides that "[t]he head of an agency shall use the results of market research to determine whether there are commercial items . . . that – (A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. § 2377(c)(2). The Army violated these requirements in several ways.

177. First, the Army failed to design its market research in such a way that was genuinely designed to "determine" if commercial or nondevelopmental items were available to meet its requirements. This is shown by the fact that the Army's RFIs all assumed that the solicitation for DCGS-A2 would be for a developmental, cost-plus contract, and failed to genuinely investigate the ability to satisfy the requirement for a Data Management Platform through a commercial or nondevelopmental item. While it is true that the market research nonetheless resulted in the admission by the Army that a commercial item could satisfy the requirement for a Data Management Platform, the market research was nonetheless flawed in its operating assumptions and in failing to investigate properly the availability of commercial and nondevelopmental items.

178. Second, the Army failed to investigate whether a commercial or nondevelopmental item could satisfy the full bundle of requirements contained in the Solicitation—*i.e.*, both the Data Management Platform and all of the Additional Enhancements. In particular, the Army failed to consider the fact that commercial offerors such as Palantir

Protected Information and/or Legends Redacted

routinely offer, on a commercial basis for a fixed-price, both their existing commercial products (such as the Palantir Gotham Platform) and the promise to perform certain enhancement, configuration, or implementation services for those products. Palantir does do that, as do others in the sector. The Army failed to consider that and failed to use the market research to determine the extent to which that could be done to fully satisfy all of the Army's stated requirements in the Solicitation.

179. Third, the Army failed to consider what *modifications* could reasonably be made to either the existing commercial and nondevelopmental items or to the Army's requirements in order to allow commercial or nondevelopmental items to satisfy those requirements. That is a direct violation of § 2377(c).

180. Properly conducted market research would have established that (1) the Palantir Gotham Platform could satisfy the Army's requirement for a Data Management Platform; (2) Palantir (and likely others) could satisfy all of the bundled requirements of the ultimate Solicitation on a commercial or nondevelopmental basis, as the Additional Enhancements are routinely offered as part a commercial contract; and (3) reasonable modifications to either the Army's requirements or to available commercial and nondevelopmental items could ensure beyond any doubt that commercial and nondevelopmental items were available to satisfy those requirements.

181. Had the Army undertaken the market research and made the determinations required by law, it would have issued one or more solicitations to procure commercial or nondevelopmental items to satisfy the DCGS-A2 requirements.

182. That the Army refused to make the proper investigation and determinations required by § 2377(c) is further proof that the Army personnel responsible for the Solicitation are

Protected Information and/or Legends Redacted

irrationally intent upon trying to build Palantir's Gotham Platform for themselves (essentially from scratch), rather than buying it for immediate use in a rational, effective, and efficient manner.

**COUNT FOUR**
**The Army Violated 48 C.F.R. § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed Price Contract**

183. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

184. Independent of the merit of the claims set forth in Counts One through Three, the Army separately violated the law by soliciting a cost-reimbursement contract instead of a fixed-price contract.

185. Cost-reimbursement contracts may be used "only when (1) [c]ircumstances do not allow the agency to define its requirements sufficiently to allow for a fixed-price type contract . . . or (2) [u]ncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract[.]" 48 C.F.R. § 16.301-2(a).

186. Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable "to define its requirements sufficiently to allow for a fixed-price contract" or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

187. Thus, the Army could have defined its requirements sufficiently to allow for a fixed-price type contract. This is confirmed by the fact that offerors such as Palantir would have submitted firm fixed-price bids to meet the Army's requirements. Indeed, the Army notes that Palantir and at least one other respondent to the Army's RFIs stated as much. Regardless of

Protected Information and/or Legends Redacted

whether the services called for by the Solicitation are considered "commercial items" or not, the fact that Palantir and others are willing to offer a fixed-price bids confirms that the Solicitation should have solicited fixed-price contracts, and not the disfavored cost-plus contracts.

188. Palantir has previously provided its customers, including many customers within the military and intelligence communities, with a Data Management Platform and Additional enhancements on a firm, fixed-price basis. These customers purchase the Palantir Gotham Platform and also call upon Palantir to configure, enhance, and support the Palantir Gotham Platform as they deploy it for their particular needs. There is therefore no reason the Army could not have solicited the entirety of the DCGS-A2 requirement on a fixed-price basis, and the Army violated 48 C.F.R. § 16.301-2(a) when it refused to do so.

189. Again, the Army's unlawful conduct and its insistence on using the disfavored cost-plus contract confirms that the personnel in charge of this Solicitation were committed to building the Palantir technology for themselves rather than purchasing it as a commercial item, and allowed that commitment to outweigh their obligations to taxpayers and the warfighters in the field.

**COUNT FIVE**
**The Army Violated 10 U.S.C. § 2304a(f) and DFARS Part 217.204 By Soliciting A Task Order Contract In Excess of Five Years**

190. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

191. A task order contract is "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d.

Protected Information and/or Legends Redacted

192.    The base period of a task order contract may not exceed five years. *See* 10 U.S.C. § 2304a(f) ("The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract or a modification of the contract. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period."); *see also* DFARS Part 217.204(e)(i) ("[T]he ordering period of a task order or delivery order contract (including a contract for information technology) awarded by DoD pursuant to 10 U.S.C. 2304a . . . [m]ay be for any period up to 5 years[.]").

193.    Contrary to the five-year maximum set forth above, the Solicitation in this case contemplates a task order with a base period of *six years*. The Solicitation, therefore, violates Section 2304a's time limitation for task orders.

194.    The Army has not disputed that the Solicitation contemplates a task order with a base period of six years, nor has it disputed that the law limits task order base periods to five years. Indeed, the Army appears to have anticipated that it would face this very legal challenge as a result, without seeming to have any meaningful answer to it: during a June 11, 2015 meeting, Army representatives appear to have discussed the possibility that the DCGS-A2 acquisition strategy exceeded the law's five-year limitation. It does exceed the limit. And the Army has no excuse or exception for violating that limit. This violation of law has prejudiced Palantir by denying it the opportunity to compete for any subsequent DCGS-A contracts for an entire additional year.

195.    Once again, this unlawful conduct reflects the commitment of the Army personnel in charge of the Solicitation to work only with their established relationship partners in the

Protected Information and/or Legends Redacted

defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build Palantir's technology for themselves rather than to license it in a rational and efficient fashion.

**COUNT SIX**
**The Army Violated 48 C.F.R. § 16.504**
**By Soliciting An Impermissibly Expensive Task Order**

196. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

197. "No [indefinite-delivery indefinite quantity] task or delivery order contract in an amount estimated to exceed $112 million (including all options) may be awarded to a single source unless the head of the agency determines in writing that" one of four circumstances exist. 48 C.F.R. § 16.504(d)(i)(C). The first exception exists where "task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work." *Id.* The second exception exists where "[t]he contract provides only for firm fixed price task or delivery orders for [p]roducts for which unit prices are established in the contract or [s]ervices for which prices are established in the contract for the specific tasks to be performed." *Id.* The third exception exists where "[o]nly one source is qualified and capable of performing the work at a reasonable price to the Government." *Id.* The final exception exists where "[i]t is necessary in the public interest to award the contract to a single source due to exceptional circumstances." *Id.*

198. The Army does not deny that it has solicited an IDIQ task order that exceeds $112 million and that is to be awarded to a single contractor. Nor could the Army deny these basic facts about the Solicitation, which states that "the expected value of this IDIQ contract will exceed $100M" and that "[t]he IDIQ base ceiling amount is $206M."

Protected Information and/or Legends Redacted

199. Instead of denying these facts, the Army has argued that a single source IDIQ task order exceeding $112 million is acceptable here because the second exception to Part 16.504(d)(i)(C) is satisfied—*i.e.*, that the task orders expected under the contract are "so integrally related that only a single source can reasonably perform the work."

200. That determination, however, flies in the face of the Army's own market research, which, as discussed above, concluded that the Army's requirements could have been performed through *different contracts*, with the first contract focused on procurement of the Data Management Platform, and the second on the Additional Enhancements. The Army's determination that the task orders are integrally related also contradicts Congress' mandate, in FY16 NDAA, that the Army analyze the segmentation of DCGS-A2 and identify each component that could be fulfilled by commercial software. It also violates the reasonable modification requirements of § 2377.

201. Thus, the Solicitation does not satisfy the second exception to 48 CFR § 16.504(d)(i)(C). It therefore unlawfully violates the $112 million limitation set forth in 48 C.F.R. § 16.504(d)(i)(C).

202. This additional legal violation again confirms that the Army personnel in charge of the Solicitation were willing to go to any lengths to try to protect their relationship with partners in the established defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build their own version of the Palantir Gotham Platform.

Protected Information and/or Legends Redacted

**COUNT SEVEN**

**The Army Engaged In Arbitrary, Capricious, And Unlawful Conduct By Refusing To Allow Palantir To Bid, By Resisting Innovation, By Insisting On The Failed Approach Of DCGS-A1, And By Engaging In Bad Faith Conduct**

203. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

204. Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). As shown in each of the Counts set forth above, the Solicitation violated numerous provisions of law, and hence was "not in accordance with law." In addition, and independent of all of those specific legal violations set forth in Counts One through Six, the Army's conduct was also arbitrary and capricious. This is an independent ground for setting aside the Solicitation, as provided for in § 706(2)(A).

205. First, each of the legal violations described in each of the Counts above describes arbitrary and capricious action. Even if the Army were somehow able to concoct technical legal defenses to these claims, their conduct would still be arbitrary and capricious for all the reasons described in the foregoing Counts.

206. Second, the Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring

Protected Information and/or Legends Redacted

DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

207. Third, the Army personnel in charge of this Solicitation are irrationally resisting innovation. Both Congress and the Secretary of Defense have exhorted and directed the military services to encourage and seek out innovation. Yet the Army's conduct in this case does the opposite. That is arbitrary and capricious.

208. Fourth, the Army's conduct ignores reality and the requests from the commanders and troops whose lives depend upon the effectiveness of their Data Management Platform. Over half the brigades in the Army have requested Palantir's Gotham Platform. Yet the Army has constructed a Solicitation that makes it impossible for Palantir to compete. That is arbitrary and capricious.

209. Fifth, there is ample evidence of malicious, bad faith conduct toward Palantir. The Army's staff in G-2 directed the deletion and destruction of the portions of 2012 ATEC report that were highly favorable toward the Palantir Gotham Platform and highly unfavorable in its review of DCGS-A1. For the Army to order these deletions is bad faith conduct that reveals a deep-seated level of bias against Palantir and in favor of the incumbent defense contractors who were used in the disastrous DCGS-A1 contract. Such bias is irrational, arbitration, and capricious.

210. Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct.

Protected Information and/or Legends Redacted

[redacted]

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., and PALANTIR USG, INC.<br><br>Plaintiffs,<br><br>-vs.-<br><br>THE UNITED STATES<br><br>Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

# PALANTIR'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
hhume@bsfllp.com
skaplan@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

Protected Information and/or Legends Redacted

functionality is unnecessary." *Id.* (emphasis added). With respect to DIB upgrade, Palantir explained that "DIB should be treated as an interoperability standard" that applies to the Data Management Platform. *Id.* Thus, Palantir did not say that it was unwilling or unable to satisfy the Army's requirements; it merely told the Army that these requirements could be obtained more efficiently through the procurement of a Data Management Platform as a commercial item. *See* Tab 15 at A694.

Second, the Government argues that Palantir "declined to answer" a question in the Army's second RFI, but the Government misstates both the question asked and the answer given. *See* Dkt. 19 at 39, 69. As it did in its Motion to Dismiss, the Government says the Army asked prospective bidders to "complete a chart identifying their capabilities across the different DCGS-A domains." *Id.* at 68; *see also* Dkt. 13 at 12. That is not what the Army requested. Rather, it asked prospective bidders for which "Agency or Gov't Customer"—including procurement "contract number"—they had certain experience within "the last three (3) years." Tab 37 at A1904. Palantir had *already provided* the Army with information about its prior Government contracts. *See, e.g.* Tab 36 at A1886-88 (Palantir's first RFI response listing contracts). There was no reason to do so again.

By contrast, there was a pressing need to address the fact that this RFI, like the prior RFI, was inquiring only into potential bidders' experience "managing software *development projects*," and not into their ability to provide commercial items. Tab 37 at A1900, 1904; *see also* Dkt. 20 at 25-26. Thus, Palantir responded to this RFI by telling the Army that *commercial items were available on a fixed-price basis to meet the Army's needs*. *See* Tab 38 at A1910 ("We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities."); *see*

Protected Information and/or Legends Redacted

**In the Matter of:**

Palantir Technologies, Inc., et al. v. USA

*September 15, 2016*

[REDACTED]

**Condensed Transcript with Word Index**

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Protected Information and/or Legends Redacted

deposition testimony?

MS. KIRCHNER: It's our position you shouldn't consider --

THE COURT: And I shouldn't take the supplemental either?

MS. KIRCHNER: Right, all three.

THE COURT: But you are trying to argue with it now.

MS. KIRCHNER: All three. And as I said, the supplemental report for the additional reason that it's inconsistent with the deposition testimony. And then, as we said, there is from our point of view --

THE COURT: You should like that, because that questions credibility, obviously, if it's inconsistent, but I -- either way, we'll go through it. I mean, we are going to go through it very carefully and figure out what will be necessary for the Court under the Axiom principles to add to the record, and at this point, I can't give you an absolute answer on that.

MS. KIRCHNER: I understand, Your Honor. I understand it's a difficult --

THE COURT: Let me ask you two legal questions. One, do you agree with Mr. Hume that there is nothing precedential in the bid protest arena that helps us on this statutory section?

MS. KIRCHNER: Well, I think we cited all the authorities we could find.

THE COURT: But there's nothing direct.

MS. KIRCHNER: Nothing direct on in what circumstances you would modify agency requirements.

THE COURT: And let me ask you also one other question having to do with the FAR definition where, you know, we've looked at Part 3, items 1 and 2. I think you -- when you talked about it, you conflated them, but it's actually an "or."

MS. KIRCHNER: I see that it's an "or." What we're saying is that you have to read the two together in that when you read the two --

THE COURT: Well, "or" generally doesn't mean that you have to read them together.

MS. KIRCHNER: I understand, but the language is very similar where it talks about being customarily available in the commercial marketplace. So, that's repeating --

THE COURT: I mean, doesn't it reinforce the minor possibility there? I mean, it is an "or."

MS. KIRCHNER: I understand, it is "or," but it talks about customarily available in the commercial marketplace, and then, again, not customarily --

THE COURT: No, I know what it says. I'm

concerned that you've kind of pushed them together with an "and" concept rather than an "or."

MS. KIRCHNER: No, I recognize it's an "or." I am saying that you should read them together because you see the same long, "customarily available." What we're saying is that in terms of construing customarily available in the commercial marketplace, that's not -- that's not a government contract. That's not making modifications in order to meet government-peculiar requirements.

THE COURT: That's a whole different set of standards.

MS. KIRCHNER: Well, we're saying --

THE COURT: To have a modification process of an existing contract is really quite different, so...

All right. Anything else?

MS. KIRCHNER: We think that there are also additional inconsistencies in the supplemental report with Mr. Choung compared to his deposition testimony --

THE COURT: You've said that, yes.

MS. KIRCHNER: Well, there's another one, Your Honor.

THE COURT: And that is?

MS. KIRCHNER: There's a number of them. For example, with regard to the requirement to upgrade to

the DIB specifications, this is the DIB upgrade, which was -- it's part -- it's one of the areas where the market research report found that there was no commercial item available that could meet that scope of work --

THE COURT: Okay, we can compare them. I mean, we will look at the two of them if we decide to let them in. That becomes a credibility -- and he's sitting right there, so...

MS. KIRCHNER: Can I just finish what I just -- I'll be very quick, Your Honor.

THE COURT: You have no problem with him sitting there while you're talking about him?

MS. KIRCHNER: Mr. Choung sitting there? Not really, Your Honor. No, I -- I -- no.

THE COURT: Okay. He's very interested. He was leaning forward.

MS. KIRCHNER: Just to complete what I was saying, Your Honor, in deposition, Mr. Choung stated that there would have to be an enhancement developed in order for the Palantir platform to meet the requirements for upgrading to the DIB, specification 4.0, and then if you look at his supplemental report, in the supplemental report, he says that there's an existing helper for this, which is a conflict between his deposition

Protected Information and/or Legends Redacted

testimony and his supplemental report.

In the supplemental report, he -- this would be, if you looked at the chart, there are these numbers that identify the requirements, and it would be PBS 1015.2[7], which deals with complying with the DIB standards, and there, according to the chart just recently provided, there's no software development required, and that's the specification that deals with complying with the DIB standards.

As I said, in deposition and in his expert report, he talks about there being an enhancement necessary to the -- to meet those -- the upgrade to the DIB, and that is, indeed, one of the areas where we said there would have to be a real commercial item that would meet the scope of work.

So, I appreciate the Court's indulgence.

THE COURT: Thank you very much.

All right. We have a couple of procedural things that we have to deal with before we adjourn. You can go sit down and make yourself comfortable.

Number one, the Army has consistently said they are going to make an award on October 15th. Obviously, that is a short window, but more importantly, it's a Saturday. So, the question to our friends from the Army, are you really going to do it on Saturday? And if

not, I'm not going to give you that Saturday date. I'll give you the following Monday, but you have to tell me that there are really going to be people with green eye shades working and doing that in the procurement office that actually are going to award it on Saturday.

Mr. Flesch, we're -- obviously, I'm looking straight at you.

MR. FLESCH: Your Honor, I don't think it's going to be awarded on a Saturday, and --

THE COURT: I did contract formation for a long time at one point in my career, and I couldn't find the procurement people on Saturday. So, it's very rare.

MR. FLESCH: I think the procurement folks in this room here have been working Saturdays.

THE COURT: I believe that.

MR. FLESCH: Yes.

THE COURT: But some of the rest of them, not.

MR. FLESCH: Your Honor, it's always a moving target. I mean, 15 October is when we anticipated a few years ago. We still hope to do it by 15 October, which I understand is a Saturday. I think Monday is -- Monday is a safe bet.

THE COURT: Okay. So, Monday would be October 17 -- no, it's -- yes, 17. So, you all should be prepared to come to Court at 10:00 on October 17, and if

we can't give you a written decision, we will give you an oral one on that date. We will have done what we need to do to finalize our decision, but we may not have prettified the opinion in ways that I want posterity to put it in Westlaw and Lexis and other reporting things. So, we would be editing more than anything. That's the only thing that would be left to do, would be editing essentially. So, 10:00 on the 17th, we'll be prepared.

Let me actually make sure that that works. It's going to have to work, I think, but let me just get there. Yeah, that should be fine. So, 10:00 on October 17th, be prepared to come and get your decision if we haven't electronically issued it.

Mr. Hume?

MR. HUME: Are there more procedural issues to deal with?

THE COURT: Yes.

MR. HUME: Oh, sorry.

THE COURT: Now, the next question for you all is I indicated at the beginning of this that, just to make our lives a little bit easier in the short time that we have -- and I should say, Mr. Flesch, you have just said it's a moving target, and it always is a bit of a moving target. If the target moves, would you please let me know so that I can get the benefit of the move? And if,

in fact, you know you're not going to do it that week, you are going to do it the next week, let me have that time, and I will be eternally grateful.

What you're hitting unfortunately for me, and that's one of the problems, is there's about a ten-day period in the middle, between now and then, when I am otherwise committed, and so although I'm perfectly happy, as you all are, to do what I have to do during the day and then work at night until as late as I have to work into the next day, and I would prefer not to do that if I don't have to. You know, I was up at 3:00 in the morning last night, but I would really prefer not to do that if, in fact, your target award date moves.

MR. FLESCH: Yes, Your Honor. It's an ongoing source selection, but, yes, it's a moving target, and we will come back to the Court if it's going to push past 15 October.

THE COURT: Excellent, okay.

Now, at the beginning I said to you all that I wanted, for us to be able to work through some of this, to get from you two lists, and they can literally be lists. I don't want argument. I have got all the argument I need, the basics in the briefs, the supplements, and the supplements to the supplements, and whatever. I want a list of those precise citations in

Protected Information and/or Legends Redacted

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| PALANTIR USG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT STIPULATIONS OF FACT**

In compliance with the Court's Order on September 15, 2016, defendant, the United States, and protestor, Palantir USG, Inc., set out the following Joint Statement of Facts drawing upon and citing to the portions of the Administrative Record.

1. On June 30, 2016, Protestors, Palantir Technologies Inc. ("PTI") and Palantir USG, Inc., ("Palantir USG") filed a pre-award bid protest, challenging the Department of the Army, Army Contracting Command, Aberdeen Proving Ground's Request for Proposals No. W56KGY-16-R-0001 ("Solicitation").

2. Palantir USG is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California. Dkt. 1 at ¶ 21. PTI owns one hundred percent of the stock of Palantir USG. Dkt. 1 at ¶ 20.

3. The Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis. The GSA Schedule lists both term licenses and perpetual licenses for the Palantir Gotham Platform, as well as related services.[1]

4. Government agencies have procured the Palantir Gotham Platform and related services on a commercial item basis.

[1] https://www.gsaadvantage.gov/ref_text/GSF0086U/0PMLGO.3B99FI_GS-35F-0086U_PALANTIRTSC04072016.PDF.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| PALANTIR TECHNOLOGIES, INC., and PALANTIR USG, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the rules of the United States Court of Federal Claims (COFC), defendant, the United States, respectfully requests that the Court enter judgment on the administrative record in defendant's favor, and dismiss the plaintiffs' complaint. Plaintiff, Palantir USG, Inc., previously filed a bid protest before the United States Government Accountability Office (GAO) on February 16, 2016, and filed this suit after losing at GAO on May 18, 2016. Plaintiff, Palantir Technologies, sells licenses to allow other entities to use its proprietary product, the Palantir Gotham Platform. A6793 (Tab 145), A6794 (Tab 146), A6795 (Tab 147). Hereinafter, Palantir refers to both plaintiffs.

**STATEMENT OF FACTS**

The Distributed Common Ground System Army (DCGS-A) is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the warfighter. A6561 (Tab 122); A4245 (Tab 94). DCGS-A facilitates the rapid planning, execution, and synchronization of all war fighting functions. DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program. A6561 (Tab

Protected Information and/or Legends Redacted

subcomponents be selected or built with interoperability and usability throughout the lifecycle of the software development process.

### D. The Market Research Report Does Not Support Palantir's Arguments

The July 2015 Market Research Report compiles the results of the Army's market research. A1792-1843 (Tab 33). The Army directly engaged with industry in conducting market research to include three Requests for Information (RFIs), Industry Days, and Industry-Government one-on-one meetings, the details of which are found in the Army Market Research Report, dated July 2015. AR1792-1843 (Tab 33).

The first RFI was released on August 13, 2014, and closed on September 12, 2014. A1802 (Tab 33). It "was conducted to assess the level of relevant competition and capabilities in the market place and elicit feedback to assist the Program Office in developing the Acquisition Plan." A1802 (Tab 33). The RFI, among other things requested information on "contract vehicles [that industry] has been awarded that address the scope of services required to develop and integrate a system such as DCGS, focused on integrating COTS/GOTS and internally developed software products into a software baseline to be fielded on commercial hardware (laptops, servers, etc.) with software updates/enhancements delivered every 6-12 months. A1804 (Tab 33). The RFI posed acquisition strategy questions about a change from (a) the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation to (b) a Prime contractor approach, leveraging industry's innovation and proven processes to deliver increment 2 capabilities. A1804 (Tab 33). The RFI also posed questions about the use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as a baseline to develop Increment 2



Protected Information and/or Legends Redacted

[redacted]

enhancements, but noted that offerors had the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions of the provided Increment 1 baseline package. A1805 (Tab 33).

The second RFI was released on December 5, 2014, and closed on December 29, 2014. A1805 (Tab 33). It "was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." A1802 (Tab 33). RFI No.2 requested, in item 3.0(d), that contractors complete a chart identifying their capabilities across the different DCGS-A domains. A1900, 1904-05 (Tab 37); A1806 (Tab 33). The domains listed were:

- Cloud Computing,
- Big Data Analytics,
- Data Architecture & Management,
- Data Fusion & Pattern Analysis,
- Applications for IC ITE Joint Storefront,
- Targeting,
- Signals Intelligence/NS A-Net Operations,
- Defensive Cyber Operations,
- Offensive Cyber Operations,
- Counter Intelligence & Human Intelligence,
- DCGS Integration,
- Backbone (DIB) implementation,
- Weather effects/analysis,
- GEOINT (Full Motion Video/Static Imagery Intelligence),
- Geospatial Intelligence (Terrain & Mapping),
- Collection Management (Sensor Management),
- On-the Move Operations,
- Workflow Management,
- Role/Attribute Base Access Control,
- Protection level 3 security hardening,
- Ease of use initiatives,
- High/Ultra reliability program,
- Army interoperability certification, and
- Joint interoperability certification.

*Id.*

Palantir USG responded to RFI No.2, but declined to answer question 3.0(d) in RFI No.2 or complete the Army's chart and identify its specific capabilities across the various DCGS-A

Protected Information and/or Legends Redacted

[redacted]

domains listed. A1908 (Tab 38). Instead, Palantir USG stated that it had "support[ed] . . . many of the domains listed," and "[i]f the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion." A1911 (Tab 38). Palantir USG did not assert that it had supported all of these domains, and did not even specify the domains that it had supported or provide supporting information so that such assertions could be verified. *Id.*

In addition, Palantir USG declined to answer question 3.0(f) in RFI No.2, *i.e.*, "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" A1905 (Tab 37). Palantir USG's response to question 3.0(f) was: "We view DCAA accounting as not relevant to an acquisition strategy for a COTS-Based solution at a FFP [firm-fixed price]." A1991 (Tab 38). Palantir USG declined to answer question 3.0(h) in Request for Information No.2, *i.e.*, "What is your company's current rate of personnel retention over the last five (5) years?" A1906 (Tab 37). Palantir USG's response to question 3.0(h) was: "We believe the retention rate of a large business software company is not relevant to the evaluation of a COTS-based solution and FFP contracts." A1911 (Tab 38). Palantir USG also declined to answer question 3.0(i), *i.e.*, "Does your company utilize best practices for software development, *i.e.* Capability Maturity Model Integration (CMMI) certification? If so, what is your certification level? If not, can your company obtain one prior to the time of proposal submission?" A1906 (Tab 37). Palantir USG's response to question 3.0(i) was: "Although we adhere to industry best practices in developing world-class software internally, we do not view CMMI certification as relevant to a contract requiring a finished COTS-based product and do not anticipate building software for the government under a services contract. We do not feel CMMI certification is relevant in this

Protected Information and/or Legends Redacted

[redacted]

evaluation." A1911 (Tab 38). Palantir USG essentially admitted that it would not be building any software in response to the anticipated DCGS-A Increment 2 solicitation, but was advocating for more sales of licenses for use of its finished COTS-based product.

The third RFI was released on May 6, 2015, and closed on May 22, 2015. A1808 (Tab 33). It "was released to determine if [the] rule of two exists, as defined in FAR 19.502, and if a small business set-aside is appropriate for Increment 2 development." A1802 (Tab 33).

The first Industry Day, conducted on January 20, 2015, "provided a forum to share emerging requirements with industry." A1802 (Tab 33). The second Industry Day, conducted on June 25, 2015, provided "an opportunity to discuss the draft Increment 2 requirements with industry." A1802, 1808 (Tab 33).

The Army conducted Industry One-On-Ones from January 20, to May 12, 2015, and "provided a forum to answer Industry's questions and elicit their feedback regarding the elements of the Increment 2 Acquisition Strategy, and Acquisition Plan, such as small business involvement and data management considerations." A1802 (Tab 33). A total of 78 companies participated. Common themes discussed during the one-on-ones were that many participants recommended that Increment 2 leverage the investments made in DCGS-A Increment 1, that DCGS-A create an open Data Architecture, free from the expense and restrictions of a proprietary model, and that this would ensure that the Data Infrastructure is decoupled from the Application Layer. A1809 (Tab 33).

A Market Research Report, dated July 13, 2015, summarizes the market research for the DCGS-A Increment 2 procurement. A1792-1843 (Tab 33). The market research found that the "[v]ast majority of respondents support hiring a contractor as the Lead Systems Integrator (LSI) due to efficiencies in industry decision making and resource-marshaling processes." A1822 (Tab

Protected Information and/or Legends Redacted

33). "Several respondents recommended the Government maintain LSI role citing belief that an Industry LSI will make decisions that may extend the program or place undue risk to the government, and that a government LSI would maintain impartiality with response to identification of subcontractors." A1822 (Tab 33). The market research found that industry strongly supports the use of Government Furnished Information to reduce performance risk, program costs, and to increase competition. A1822 (Tab 33). Companies who responded to a question about successive releases of software unanimously supported multiple software builds, with varying recommendations as to the frequency of releases. A1823 (Tab 33).

The market research determined that while commercial capabilities could potentially satisfy one or more portions of the DCGS-A requirement, "significant portions of the anticipated scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product." A1840 (¶8.3.5)(Tab 33); *see also* A12 (Tab 1). Therefore, development and integration services sold competitively in the commercial marketplace based on established catalog or market prices for these specific tasks and/or specific outcomes do not exist. *Id.* The July 2015 market research report concluded that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product." A1840 (¶8.3.5)(Tab 33).

According to Palantir, the July 2015 Market Research Report, AR1792 (Tab 33), demonstrates that the Army knew it could and should procure a Data Management Platform as an available commercial item. Br.21, 26. This is incorrect. As explained above, the results of the market research were that while commercial capabilities could potentially satisfy one or more portions of the DCGS-A requirement, "significant portions of the anticipated scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a

Protected Information and/or Legends Redacted

[redacted]

commercial product." A1840 (¶8.3.5) (Tab 33). The market research report concluded that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product." *Id.*

To support its arguments in favor of a phased acquisition strategy, Palantir cites the November 2015 DCGS-A Increment 2 Acquisition Strategy Report, which generally describes two Releases, the first of which would "consist of a new data management architecture and data analytics platform; the second of which would involve certain "enhancements." Br.26; A105 (Tab 6). Palantir also refers to the following statement in the July 2015 Market Research Report:

> The IPT recommends PM DCGS-A utilize separate contracts to develop and field DCGS-A Increment 2 Releases 1 and 2. For the development of Release 1 the PM plans to conduct a full and open source selection, best value, competitive contract. This award would be for a single vendor who would assume the role of system Data Architecture developer/system integrator. This contract is envisioned to be a single award indefinite Delivery, Indefinite Quantity (IDIQ) contract type.

A1842 (tab 33); Br.26. Palantir cites other documents that mention two Releases for DCGS-A Increment 2. Br.26, citing Tab 71 at A2748, Tab 73 at A3075, Tab 87 at A3883-84.

We agree that there will be at least two software Releases for DCGS-A Increment 2, but that fact does not support Palantir's arguments. Palantir's argument highlights the Data Management Platform, and ignores other components of DCGS-A Increment 2, Release 1, *e.g.*, (1) the Data Integration Layer, which works with a Data Management Platform, and is a requisite part of DCGS-A, Increment 2, Release 1, *see* pages 35-36; (2) "glue code," as explained by Stephen Morton, Deputy Product Manager, A56-57 (Tab 2), *see* page 35; and (3) the Data Access Layer.

The Data Access Layer is a collection of services and other interfaces that will serve the DCGS data to internal and some external sources. Tab 24, A1328-29 (¶¶3.2.6.2, 3.2.6.3), A1340-41 (¶3.2.24) (requiting a "data integration layer. . . with standardized data access layer").

Protected Information and/or Legends Redacted

This would include web services for structured data, and a geo server for map layers. *Id.* The Data Access Layer will also enforce the security to ensure users or systems only access the data that they are authorized to view and/or edit. *Id.* DCGS-A tools will connect to the Data Access Layer to get data from, or store data to, the Data Management Architecture. *Id.*

## E. The Other Documents Cited Do Not Support Palantir's Arguments

### 1. DIVA Study, July 2014

The Data Integration, Visualization and Analytics (DIVA) Independent Market Study was directed by the Army Acquisition Executive (AAE), the Honorable Heidi Shyu, "to provide situational awareness and market trends to the Army leadership of the 'state-of-the-practice' within the commercial DIVA software platform landscape." A2218-54 (Tab 43), at A2223. The DIVA Independent Market Study, dated July 2014, was conducted by MITRE, and its scope included:

- Conduct a market survey of representative sample of Commercial Off The Shelf (COTS) vendors within the DIVA software landscape
- Establish DIVA Functional and Architectural Considerations
- Review COTS vendors' products and map into the DIVA Functional and Architectural Considerations
- Review DoD/Intelligence Community Enterprise Architectures, Standards, and Capabilities to understand the potential leverage points for a DIVA software platform
- Investigate the commercial industry pricing strategies and document industry trends
- Assess overall market trends and identify potential gaps.

A2223 (Tab 43). Specifically out of the scope were "vendor comparison or vendor down selection" and "specific acquisition recommendations." A2223 (Tab 43). The study was intended to provide: (1) "high-level overview of the ASA (ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study"; and (2) "recommendations for the DCGS-A Increment #2 Acquisition effort and describe the top-level risks and mitigation strategies associated with adopting these recommendations." A2222 (Tab 43).

Protected Information and/or Legends Redacted

The DIVA study looked at three acquisition approaches: (1) Cloud Infrastructure Platform; (2) DIVA "Turn Key" Platform; and (3) Hybrid Approach. As envisioned, a Cloud Infrastructure Platform approach would host a Cloud platform, and develop custom applications and integrate with the Cloud Platform. A2231 (Tab 43). A DIVA Turn Key Platform approach would host a Turn Key Platform, and develop and integrate data integration, analytics, and visualization applications. A2232 (Tab 43). A turn-key solution is one that operates or works out of the box with no additional work, development or effort needed to make the function operate. A Hybrid Approach would host both a Cloud Platform and a Turn Key Platform, integrate the Turn Key Platform with the Cloud Platform, and develop and integrate data integration, analytics, and visualization applications. A2233 (Tab 43). Validation of capabilities of technical approaches was out of scope for the study. A2223 (Tab 43).

The DIVA study concluded that there were COTS products available that could meet some of the DCGS-A Increment 2 capability requirements. Tab 43, A2246-51. The DIVA study concluded that a Hybrid Approach, employing a combination of Enterprise Cloud and Turn-Key approach tailored to the Government's requirements, would be the best solution for DCGS-A Increment 2, which included software development and integration tasks. A2242 (Tab 43). The DIVA study considered and rejected a COTS-only system because there was a large risk that the interfaces between the DCGS-A components would not be mature. A2254 (Tab 43).

As Stephen Morton, Deputy Product Manager, explained, the DIVA study "didn't look at the full breadth and scope" of the Increment 2 program, it looked at only some portions. Tab121, A6293 (Tr.41); A6346 (Tr.94). Mr. Morton further explained that the Requirements Document for Increment 2 did not exist at the time that the DIVA study was performed. Tab 121, A6356 (Tr.104), referring to the Requirements Definition Package, Tab 12, A338-409 (dated October

Protected Information and/or Legends Redacted

[redacted]

30, 2015). The total requirements for DCGS-A Increment 2 are compiled in three documents, which should be considered together: (1) the Capabilities Development Document, Tab 11, A251-337 (JROC approval on July 7, 2015); (2) the Requirements Definition Package, Tab 12, A338-409 (dated October 30, 2015); and (3) and the Performance Based Specification, Tab 23, A1189-1293.

**2. Palantir Misconstrues The July 2014 DIVA Market Study**

According to Palantir, the July 2014 DIVA Study "recommended that the Army (a) first procure 'a new technical foundation,' which would consist of a Data Management Platform that could be procured as a commercial item, and (b) then procure functionality upgrades (i.e., Additional Enhancements)." Br.23. The July 2014 DIVA Market Study, detailed at pages of our brief, does not contain that specific recommendation of an acquisition approach. According to Palantir, "the DIVA Market Study concluded that it was not only possible, but also preferable, to structure the DCGS-A Solicitation in two phases: one to acquire the Data Management Platform as a commercial item and another to procure any Additional Enhancements." Br.23. The specific conclusion is not contained in the July 2014 DIVA Market Study.

Close reading of the July 2014 DIVA study demonstrates that it looks at various acquisition approaches, and considers plusses and minuses of each approach. The study examined a Hybrid Approach for DCGS-A, which would consist of hosting a Cloud Platform and a Turn Key Platform, integrating the Turn Key Platform with the Cloud Platform, and developing and integrating data integration, analytics, and visualization applications. A2233, 2246 (Tab 43). The advantages of the Hybrid Approach were envisioned as being: blends benefits of other approaches, provides global scale with out-of-box applications, and potential tactical edge. A2234 (Tab 43). The disadvantages of the Hybrid Approach were envisioned as

Protected Information and/or Legends Redacted

[redacted]

including that: (1) "interfaces have not matured to the point that allows seamless migration from one cloud infrastructure provider to another"; and (2) "specific [application programmer interfaces] are not standardized across COTS vendors; therefore separate software code must be developed to have applications that work with different cloud infrastructure providers." A2249 (Tab 43). Thus, the Army "has to develop multiple cloud infrastructure interfaces to interoperate in DoD/IC/Army cloud environments." A2249 (Tab 43). Contrary to Palantir's argument that the DIVA Market Study advocated a COTS-only solution for DCGS-A Increment 2, the study demonstrates that a COTS-only solution ought to be rejected because the interfaces are not sufficiently "mature" and "not standardized," and the Army would have to develop "multiple cloud infrastructure interfaces.' A2249 (Tab 43).

Moreover, as Stephen Morton, Deputy Product Manager, explained, the DIVA study "didn't look at the full breadth and scope" of the Increment 2 program; it looked at only some portions. Tab 121, A6293 (Tr.41), A6346 (Tr.94). In sum, Palantir's arguments are not supported by the July 2014 DIVA Market Study.

3. **Trade Space Analysis, July 2015**

The U.S. Army Material Systems Analysis Activity (AMSAA) was directed by HQDA DCS G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (CDD) to support future requirements decisions. A1929-2217 (Tab 42), at A1946. The TSA, dated July 2015, identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. Tab 42, A1931, 1946.

Protected Information and/or Legends Redacted

[redacted]

DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. A1946 (Tab 42). The TSA focused on only four DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1:

1) Data Enterprise Architecture (DEA)
2) Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise (AGE)
3) Intelligence Support to Cyber Operations (CO)
4) Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR)

A1946 (Tab 42). Representative systems were assessed to reflect capabilities that are readily available for three alternatives: (1) Commercial off the shelf (COTS); (2) Government off the shelf (GOTS); and (3) a Hybrid, which was described as a compilation of commercially available software packages augmented by integrated tools written by a third-party using requirements and specifications generated by the Government, *i.e.*, a combination of COTS and GOTS. A1946 (Tab 42). Specific software solutions were not evaluated. A1946 (Tab 42).

The TSA study concluded that, for DEA, a hybrid solution (combination of COTS and GOTS) provides "the best 'turn-key' functionality," but there were several moderate to high risk drivers identified for all three options. A1948 (Tab 42). As noted, a turn-key solution is one that operates or works out of the box with no additional work, development or effort needed to make the function operate. For the SSGF (Geospatial), the study determined that COTS solutions "have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative," A1951 (Tab 42), but "[t]he COTS options won't address all Army Geospatial requirements with software 'out of the box'," A2030 (Tab 42), and there were moderate to high risk drivers for both the COTS and Hybrid alternatives. A2030 (Tab 42). For the Cyber effort,

Protected Information and/or Legends Redacted

[redacted]

the study determined that a Hybrid solution "satisfies most technical performance metrics and is the least costly solution." Tab 42 (A1949, 2029). The findings for the Mission Command Support PED were captured under the other capability findings. A1947 (Tab 42).

According to Palantir, the TSA study demonstrates that the DCGS-A Increment 2 procurement should have been structured in separate acquisition phases so as to allow for acquisition of a Data Management Platform as a commercial item first, followed by other separate acquisitions. Br.24. Palantir contends that the TSA concluded that best acquisition approach was to buy a commercially available Data Management Platform and then augment it as necessary with additional tools and widgets. Br.24, citing Tab 42, at A1946. Neither the page cited nor the report generally support Palantir's argument.

Further, as Stephen Morton, the Deputy Product Manager, explained, the TSA study looked at only four areas of the Army's requirements, and "didn't look at the entire breath and scope" of Increment 2. Tab 121 (A6294 (Tr.42), A6345 (Tr.93)). The market research that the Army did through its requests for information and Industry days was "much more extensive or thorough." Tab 121 (A6294 (Tr.42)). In addition, the TSA study compared, and contrasted only three options: (1) COTS; (2) GOTS; and (3) a Hybrid (COTS/GOTS). The Army ultimately chose an acquisition strategy that allows the contractor to be the sole-developer throughout the process—an approach that neither relies solely on COTS, GOTS, or a combination of the two. Accordingly, the TSA study did not consider all of the requirements of DCGS-A Increment 2, or the acquisition approach that was chosen.

4. **<u>January 7, 2015 Information Paper Of Mark Kitz</u>**

Palantir (Br.16) relies on an "Information Paper" identifying four "Key Objectives" for DCGS-A Increment 2 as "Modernize the Data Enterprise to a Data Integration Platform," "Easier

Protected Information and/or Legends Redacted

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| PALANTIR USG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO SEPTEMBER 16, 2016 COURT ORDER**

Agency action is entitled to a presumption of regularity, and Palantir fails to satisfy its "heavy burden" of demonstrating that the Army acted without a rational basis or "a clear and prejudicial violation of applicable statutes or regulations." *Banknote Corp of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004); *see Infor. Tech. & App. Corp. v. United States*, 316 F.3d 1312, 1323 (Fed. Cir. 2003)(giving deference to contracting officer interpretation of FAR).

**COUNT ONE**: The market research demonstrated that only one industry respondent, other than Palantir, supported reliance on GSA Schedule 70, applicable to commercial items, and recommended Increment 2 be procured utilizing commercial procedures. Tab 114, A4804-05. Palantir, however, relies on Mr. Choung's opinions in an attempt to refute the Army's acquisition judgment that it was unreasonable to break up Increment 2 requirements, including requirements for software design, development, testing, integration, and integration testing. Pl. Supp. Br.6-41. Palantir's argument demonstrates its improper premise, *i.e.*, Palantir is entitled to trial *de novo*, and may rely on what it deems expert opinions, from a company employee with no demonstrated competency to address procurement or acquisition strategy, in a proceeding governed by the Administrative Procedure Act (APA) scope of review. 5 U.S.C. § 706(2) (A). Palantir suggests that Army documents in the administrative record carry little or no weight,

Protected Information and/or Legends Redacted

**COUNT TWO**: The term "general public" in the definition of "commercial item" excludes the Federal government, DFARS 202.1, which indicates that the focus of determining commerciality is on non-Government contracts. To determine the extent to which an existing item could be modified, yet still retain its commerciality, FAR 2.101 gives guidance in 3(i) and (ii). First, (i) provides for "modifications of a type customarily available in the commercial marketplace." Second, (ii) provides for "minor modifications . . . not customarily available made to meet the Federal Government requirements," which requires consideration of non-government contracts. The first category in (i) should also be reasonably read as limited to consideration of non-government contracts. The primary reason is that modifications "customarily available in the commercial marketplace" normally present low cost risks, and the cost risk is low because prices are presumed reasonable due to competition in the commercial marketplace. It seems that for this reason (i) allow items to be considered commercial when they receive modifications so long as the type of modification is "customarily available in the commercial marketplace."

However, when modifications are performed for the Government, but not customarily performed in the commercial marketplace, the same market dynamics do not exist to ensure low cost risk. The price of a Government contract need only be fair and reasonable, not necessarily the best value in the market. This is especially true here where Palantir received Government contracts without competition on a sole source basis. As a result, the Government only inquired as to whether the prices were fair and reasonable. Considering Government contracts as being in

"[p]roposed acquisition cannot be divided into reasonably small lots" and why "[b]undling is necessary and justified." FAR 19.202-1(e)(2). The agency previously procured management software and acquisition software separately, both were commercial-off-the-shelf products, and SRA, an agency contractor, supplied the integration services separately. Without any rationale, the agency removed the software products "from direct procurement," "combining two types [of software] where separate responses were originally solicited." *Id.* at 383. The Court found that the agency "failed to adequately support the deviation from the proposed direct procurement." *Id.* In contrast to the detailed statutory and regulatory provisions applicable in *Distributed Solutions*, section 2377 and the implementing regulations impose lesser requirements.

Protected Information and/or Legends Redacted

the commercial market place for purposes of (i), would undermine the safeguards provided by the commercial *(i.e.* non-Government) marketplace in terms of minimizing cost risk to the Government. This interpretation also is supported by the language of (ii) which refers to "minor" modifications to meet Federal Government requirements. It makes sense that because Government contracts do not ensure low cost risk as the commercial marketplace does, the FAR requires Government-specific modifications to be "minor." This is further supported by the language in (ii) that discusses scope and cost to determine whether a modification is "minor."

Palantir asserts that it provides certain enhancements that are "modifications of a type customarily available in the commercial marketplace," those allegedly being "integration of particular data sources, additional analytics capabilities, and customized visualizations of data." Pl. Supp. Br. 43, citing Choung Report 23-24. Critically, however, Mr. Choung's report and deposition testimony *do not demonstrate* that these modifications are: (1) "Modifications of a type customarily available in the commercial marketplace," or (2) "Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements." FAR 2.101.

The marketing practices of one company do not demonstrate "[m]odifications of a type customarily available in the commercial marketplace" within the meaning of 3(i). The fact that Palantir sells certain software design, development, and implementation tasks on a fixed price basis to meet customer needs does not demonstrate that the particular modification is "of a type customarily available in the commercial marketplace." The term "customarily" contemplates consideration of marketing practices generally, not merely Palantir marketing practices. This interpretation is supported by the phrase "in the commercial marketplace," which is greater than Palantir's product list. The Army reasonably determined that while commercial items could

Protected Information
and/or Legends Redacted

become components of Increment 2, no commercial item(s) meet all the military unique Increment 2 requirements and it is only through the effective, combined integration of components that a complete workable and effective system can be achieved. Tab 46, 2298-2304; Tab 33, A1840; Tab 2, A56; Tab 3, A58; Tab 134, A6626. Increment 2 encompasses military unique specifications to such an extent that it cannot be considered as a commercial item or when designed and built, cannot be considered "of a type" available in the commercial marketplace, given the unique Army requirements of the complete system sought to be developed and integrated here. *Voith Hydro, Inc.*, B-401244.2, 2009 CPD ¶239 (sustaining determination of no commercial item where "while individually some of the components may be commercially available . . . however it is only through the effective combined integration of these components that a complete workable system can be achieved").

Palantir argues that Mr. Chong's supplemental declaration demonstrates that all the modifications required in order that the Palantir Platform be enhanced, configured, and modified, so as to meet the Increment 2 requirements are (1) "Modifications of a type customarily available in the commercial marketplace," or (2) "Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements." Pl. Supp. Br.54, citing Choung Decl. ¶¶32-37. Mr. Choung treats the detailed requirements of the Performance Based Specification (PBS), Tab 23, as a checklist, goes down the list, and assigns one of three ratings: (1) out of the box, (2) existing helpers, or (3) new helpers. In his lexicon, a "helper" is an enhancement. He totals his conclusory assignments, and asserts Palantir could provide: (1) 581 PBS requirements "out-of-the-box," without any configurations or enhancements; (2) 242 PBS requirements with existing helpers; and (3) new helpers to meet the other 75 PBS requirements. For the 75 PBS requirements, Mr. Choung asserts that Palantir would design, develop, and implement software on a fixed-price basis, if the Army provides

Protected Information and/or Legends Redacted

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| PALANTIR USG, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO SEPTEMBER 16, 2016 COURT ORDER**

Pursuant to the Court's direction to file two lists; one list containing specific citations to the record, identifying the instances of alleged bad faith by the Army or lack thereof; and a second list, with specific citations to the record, detailing the decision making process the Army engaged in, or failed to engage in, to determine commercial availability, Defendant respectfully submits the following lists. These lists, accompanied by our briefs, demonstrates that the Army acted reasonably, that there was no clear and prejudicial violation of procurement statutes and regulations, and no bad faith. For the bad faith claim, the Plaintiff's allegations are in bold and the Defendant's list of citations and explanations follow each assertion.

## I. List of Citations in the Administrative Record that Demonstrate the Absence of Bad Faith on the Part of the Army:

### A. Palantir does not demonstrate bad faith in its assertions that the Army blocked Palantir from participating in important evaluations.

1. The Army included Palantir in market research. *See* Tab 33, A1792-1843 (Instances where Palantir is mentioned by name, found at A1814, A1828, A1835); Tab 34, A1868.
2. The Army addressed Palantir's responses to Requests for Information. *See* Tab 34, A1868; Tab 33, A1814, 1828, 1835.
3. The events that Palantir describe as "blocking" were addressed by Lynn Schnurr and Shawn Cronin in deposition testimony and those events occurred 4 to 11 years prior to the solicitation at issue. *See* Ct Dkt 78-1, Schnurr Deposition; Ct Dkt 75-1, Cronen Deposition.

Protected Information and/or Legends Redacted

[redacted]

## II. List of Citations in the Administrative Record that Demonstrate the Army Properly Determined Commercial Availability under 10 U.S.C. § 2377.

### A. 10 U.S.C. § 2377(c) and FAR 10.001, 10.002: The Army conducted market research for Increment 2 that was "appropriate in the circumstances."

1. Early on, the Assistant Secretary of the Army for Acquisition commissioned a Data, Integration, Visualization and Analytics (DIVA) study to provide information on market trends of the commercial state of the practice within the DIVA software platform landscape, performed by MITRE. Tab 43, A2218-2255. The DIVA study, dated July 2014, assessed three approaches for implementation and determined that the best of the three was a DIVA-hybrid implementation approach, consisting of hosting a cloud platform and a turnkey platform, and integrating them and developing and integrating data integration, analytics, and visualization applications. Tab 43, A2233-34, 2246. The DIVA study recommended against a COTS-only solution because there was a large risk that interfaces between components would not be mature. Tab 43, A2249, 2254.

2. The Army also obtained independent information provided in a Trade Space Analysis Study, dated July 2015, Tab 42, A1929-2218, that examined three options for procuring Increment 2, and recommended a Hybrid option, that consisted of combining COTS and GOTS software. Tab 42, A1948. The study also noted the risk factors of the Hybrid option (COTS and GOTS). Tab 42, A2030.

3. Although the final Information System Capability Development Document (IS CDD) is dated April 20, 2015, it was first drafted in January 2013, and was at the Joint Requirements Oversight Council (JROC) for comment resolution on August 1, 2014. Tab 11, A251, 255.

4. Request for Information (RFI) No. 1, issued on August 13, 2014, assessed the level of competition and the capabilities in the market place and elicited feedback to assist the Program Office in developing the Acquisition Plan. Tab 35, A1876-1881. It noted that "DCGA-A Increment 2 will provide additional capabilities to enhance the intelligence processing and fusion capabilities across intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information, task organic sensors and synchronize non-organic sensor assets with their organic assets." It further stated that to meet evolving needs, Increment 2 may include capability enhancements of net-readiness, data fusion, embedded training, sustainment, reliability, usability, geospatial information, cyber operations, data and intelligence visualization, counterintelligence and Human Intelligence convergence, and alignment to the IC ITE and JIE Standards. Tab 35, A1879.
    a) In item 3.1, RFI No. 1 asked companies for information on their capabilities and experience, including the contract vehicles that the company "has been awarded that address the scope of services required to develop and integrate a system such as DCGS-A, focused on integrating COTS/GOTS and internal-developed software

Protected Information and/or Legends Redacted

CONTRACTING OFFICER'S STATEMENT/LEGAL MEMORANDUM

GAO Protest No. B-412746

By Palantir USG, Inc.

## INTRODUCTION

Palantir USG, Inc. (Protester) by letter to the Government Accountability Office (GAO), dated 16 February 2016 (Tab D), filed a protest against Request for Proposal (RFP or Solicitation) W56KGY-16-R-0001 (Tab T) issued by the Army Contracting Command-Aberdeen Proving Ground (ACC-APG) on 23 December 2015, with an initial proposal closing date of 08 February 2016, which was extended to 16 February 2016. (Tab AA) The protester asserts that the Army failed to implement the preference required by law for the acquisition of commercial items, that the Agency cannot justify the use of a cost-reimbursement type contract, that the Solicitation anticipates the award of an unlawful indefinite delivery/indefinite quantity contract (IDIQ), and that the flaws in the Solicitation unduly restrict competition in violation of the Competition in Contracting Act (CICA) and Federal Acquisition Regulation (FAR) Part 6. For the reasons which follow, these allegations are without merit.

## FACTS

The facts as presented in this response are set out using the same numbering as the protester provided.

### I. Palantir

1. Protester's line of business includes providing computer programming services. While Protester claims that its system can import and export to any system, some type of interface would be needed to make that possible[1].

[1] Palantir's Gotham software, out of the box, would not be able to meet all of the interface requirements listed in the DCGS-A Information System Capability Design Document (IS CDD) (Tab K). In order for Palantir's Gotham

Protected Information and/or Legends Redacted

2. Protester makes the statement that it is the "authoritative data integration and analysis platform for commercial and Government organizations worldwide" and that its software, Protester Gotham, is used by tens of thousands in the intelligence community. (Tab D, at 2). However, this is patently unsubstantiated. Nonetheless, Protester's Gotham integrates structured and unstructured data, provides advanced search and discovery capabilities, enables knowledge management, and facilitates secure collaboration. In accordance with the pricing available on the DoD Enterprise Software Initiative (ESI) website, one perpetual software license for Protester Gotham costs [redacted] per computer core. In order to field the Protester Gotham software Army-wide, the Government would need to procure approximately [redacted] licenses (56 Core per 1200 Server instances in the Army) for a total initial procurement cost of [redacted]. In addition, annual software maintenance would cost [redacted] per computer core, for a total annual cost of [redacted] per year. This does not take in to account the Field Service Representatives, which cost [redacted] each for CONUS support and [redacted] each for OCONUS support. [2]

## II. The Distributed Common Ground System

### A. Origin and Early Development

3. Combat operations in Kuwait and Iraq in the early 1990's demonstrated the military potential of information dominance, and sparked a transformation in the use of information technology in intelligence operations. Subsequently, the Department of Defense instituted an initiative to unify Intelligence, Surveillance and Reconnaissance architectures, and enhance the acquisition of manned and unmanned airborne sensors and associated ground processing systems. This initiative resulted in a requirement for

---

software to meet all of the DCGS-A interface requirements, there would need to be middleware software developed to allow for the different exchanges (especially the military messaging interfaces) called out in the SV-6 attachment of the IS CDD (Tab K).

[2] The cost estimate assumed that software would be applied to all computer cores on our existing hardware platforms and that the cost was as advertised (no discounts). Palantir DOD ESI Pricing can be found at: [redacted]

Protected Information and/or Legends Redacted

a Distributed Common Ground/Surface Systems (DCGS), made up of Army, Air Force, Navy and Marine Corps ground processing systems that can share information across the Joint Force. The Army component of DCGS is the Distributed Common Ground System – Army (DCGS-A). Today, DCGS-A has become the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information[3]. It is deployed worldwide in support of intelligence operations including all Theaters of Operation.[4] DCGS-A is a Major Automated Information System as defined in 10 U.S.C. § 2445a.

4. One of the Key Performance Parameters of DCGS-A Increment 2 is "Net Ready," which is ingestion/receipt, processing, and exploitation of data from a wide variety of disparate sources and networks, as well as dissemination to Army Mission Command and joint information platforms. DCGS-A shall support net-centric military operations by being interoperable with current Army, Unified Action Partners, Joint, Service (to include Service DCGS), Allied, Coalition, and Command and Control (C2) information and Intelligence, Surveillance, Reconnaissance systems as specified in the DCGS-A Operational View (OV)-3/System View (SV)-6 (*e.g.*, Mission Command, Global Command and Control System (Joint and Army), Universal Ground Control Station (UGCS) (Tab F, at 17).

5. The Army's DCGS-A Program consists of the consolidation of nine (9) separate Program of Record (POR) systems: All Source Analysis (ASAS) Family of Systems (FOS); JointStars Common Ground Station; DTSS FOS; Tactical Exploitation System (TES) FOS; CI&I OPS Work Station; IMETS; Guardrail Common Sensor (GRCS); Prophet Control; and Enhanced TracWolf (ETW). The ultimate goal is the consolidation of these 9 stove-piped systems into a single program. Since its inception, the Army has made changes to the DCGS-A Increment 1 Acquisition Strategy (Tab BY). The original approach was overtaken by events, such as the events of September 11, 2001, and the

[3] When weather is used, it is not like getting the weather on weatherchannel.com; rather, it is getting micro-weather, i.e., that in the immediate vicinity of Army units, in support of Artillery and Aerostats
[4] Source- https://dcgsa.army mil/about/history-of-dcgs-a/

Protected Information and/or Legends Redacted

DCGS Integrated Backbone (DIB). Now all services could seamlessly discover data from hundreds of data sources with just one query.

9. After the successful fielding of the combined DCGS-A and JIOC-I system, the Army embarked on a project that would further enhance capabilities and allow for the de-fielding of all nine of the Army's intelligence PORs, eventually replacing them with a single DCGS-A baseline. From 2005-2007, the Army increased DCGS-A capabilities (shared messaging capability, access to the JIOC-I data sets and DIB federation) to the existing PORs. This allowed the Army to quickly provide capability without waiting for a major program to complete its development, integration and test process.

10. As stated in the Protester's protest, DCGS-A Increment 1 was procured via various contracting vehicles. The protester is incorrect when they state ". . . the Army conducted a series of independent competitions among IDIQ contractors, largely foregoing commercial software products in favor of cost reimbursement type task orders . . .", as the Army through the Program Manager (PM) for DCGS-A has effectively leveraged the integration of COTS items when appropriate as shown in the 151 individual COTS items currently utilized in the DCGS-A Increment 1 program. Full detail provided in the DCGS-A COTS Software List- DCGS-A Increment 1 (Tab J).

11. As per the Classified Army Test and Evaluation Command (ATEC) Operational Test Report, there were portions of the DCGS-A System that were rated as not "Effective" or "Suitable." However, there were elements that constituted the majority of the program that were deemed "Effective" and "Suitable" (not fully "Survivable")[6]. The program has now overcome the Survivability limitations discovered during the test and has now received a Full Material Release (FMR) (Tab BZ).[7] An FMR allows the PM to field those systems to any location without restriction.

---

[6] Survivability in the case of DCGS-A is primarily tied to the ability of the system to protect itself from cyber threats, to detect cyber threats against the system, to react to those threats and to restore the system in case a threat is able to access the system. For further guidance, see the memo signed by the Director, Operational Test and Evaluation Procedures for Operational Test and Evaluation of Information Assurance in Acquisition Programs at Tab CB.

[7] *See* Army Regulation (AR) 700-142 for further guidance on Full Material Release.

Protected Information and/or Legends Redacted

12. Government Developmental Testing was used by DCGS-A in 2011 in preparation for the Operational Test, in which ATEC identified issues with the DCGS-A system. Operational testing is why there has to be a methodical approach for ensuring that systems are capable in their objective User environment. The PM conducted lab-based and field-based developmental testing. Conditions in the field environment are much different than lab-based testing and until an application is exposed to that environment, certain issues may not be apparent.

13. In response to Protester's protest, and as discussed fully above, while the Operational Test Report found there were portions of the DCGS-A System that were deemed not "Effective" or "Suitable," the program has since overcome the issues and has now received a Full Material Release (FMR) (Tab BZ).

14. The DCGS-A Top Secret/Sensitive Compartmented Information (TS/SCI) enclave makes up approximately [redacted] of the equipment and unique capability of the DCGS-A program. Also mentioned above in the response to paragraph number 5, the DCGS-A program began by "enabling" the existing Programs of Record (PORs). [redacted]

15. DCGS-A Increment 1, Release 2 was initiated to address the shortcomings in the Top Secret/Sensitive Compartmented Information (TS/SCI) enclave, enhance the fusion software, and adopt methods for more effectively transferring data within and between systems. That is why the Army chooses to do incremental software development: deliver a capability given time and budget constraints, then enhance it in the next increment to increase capability. Full software development, where 100% functionality is delivered up front, is incredibly risky, time consuming, and has an expensive software development life-cycle cost.

Protected Information and/or Legends Redacted

16.  PM DCGS-A followed the DoDI 5000.02 process (Tab CA, at 11) to fully test the software baseline and addressed all priority one and two issues as they were found during Functional and Developmental Testing.  It is standard practice to hold developmental tests to find and resolve defects prior to moving to formal operational test.  Many priority three defects were resolved in the process by documenting a TRADOC approved workaround. Commercial software goes through the same process, and oftentimes, is shipped out to the user with known defects. Those defects are resolved through life of the software along with other issues, like security patches and performance enhancements.

17.  In a 2015 report, the Director of Operational Test & Evaluation (DOT&E) reported on a Follow-on Operational Test & Evaluation ("FOT&E") that ATEC conducted of DCGS-A Increment 1, Release 2. Some of the reported DOT&E findings were found to be out of the control of PM DCGS-A, specifically the finding that "Army Test and Evaluation Command (ATEC) failed to adequately collect, reduce, and analyze FOT&E test data in accordance with the DOT&E-approved test plan" and "data were not sufficient for DOT&E to evaluate DCGS-A system performance."  ATEC is an Independent Test organization. All details regarding the results of the 2015 Operational Test can be found in ATEC's classified test report. Based on the results of the test, the Army has been able to secure a fielding decision, meaning that the system is ready to be fielded.

18.  The former Army Acquisition Executive, the Honorable Heidi Shyu, submitted a request for approval to the Defense Acquisition Executive, the Honorable Frank Kendall, to end DCGS-A Increment 1, Release 3 and instead shift those requirements to a separate procurement called Increment 2 for the reasons detailed in the attached memo (Tab E). The final DCGS-A Increment 2 Acquisition Strategy, detailing the contract strategy that was reflected in the Solicitation, was approved on 22 December 2015 by the Defense Acquisition Executive, the Honorable Frank Kendall (Tab F).

Protected Information and/or Legends Redacted

19. Although DCGS-A Increment contains a single integrated software baseline developed by the Army and the Government, DCGS-A incorporates a significant amount of COTS products; however, custom application development is necessary when there are no existing COTS applications. During the formal evaluation and testing of the DCGS-A INC 1 software baseline by ATEC, the software was fully tested and met the approved Fusion Key Performance Parameter in an operational environment. While Protester claims the Government DCGS-A Increment 2 is an unaffordable waste of taxpayer funds, it should be noted that based on Protester's Federal Supply Schedule (FSS) license prices (or even the discounts Protester has given the Army on previous FSS purchases), the cost far exceeds, by many multiples, the total DCGS-A Increment 2 estimated cost of $206 million.[8]

## C. Field Requests for Commercial Data Integration and Analysis Platforms

20. As referenced in Protester's protest, in a July 2010 Joint Urgent Operational Need Statement ("JUONS"), the Army's Deputy Chief of Staff for Intelligence "requested a 'theater-wide web-based advanced analytical platform' to store, organize, access, retrieve and enable full understanding of intelligence and information from multiple disparate data sets."

21. In response to Protester's protest, and as stated above, much of the DCGS-A Increment 1 solution is based on COTS software. The baseline includes software from companies like Microsoft, Oracle, and ESRI, just to name a few, and the Agency Report contains a list of the 151 DCGS-A Increment 1 COTS software items (Tab J). PM DCGS-A added several COTS software segments to the baseline that were requested by the user community and vetted through the TRADOC capabilities manager.

[8] As stated previously, the cost for using Protester's licensees at Federal Supply Schedule (FSS) prices would be for a total initial procurement cost of [redacted]. In addition, annual software maintenance would cost [redacted] per computer core, for a total annual cost of [redacted] per year.

Protected Information and/or Legends Redacted

22. In response to Protester's protest, and as stated above, DCGS-A Increment 1 currently uses many COTS products. It should be noted that while Protester may meet a portion of the DCGS-A requirement, there are many user requirements that are outside the scope of Protester's known commercial offerings that the Army must address.

23. As stated above, and DCGS-A has effectively leveraged the integration of COTS items when appropriate as shown in the 151 individual COTS items currently utilized in the DCGS-A Increment 1 program, as detailed in the DCGS-A COTS Software List-DCGS-A Increment 1 (Tab J). The mention of Government approval for COTS usage, in the DCGS-A Increment 2 Solicitation (Tab T) is standard in military acquisitions, and in response to the protestor's claim, the Government did not place restrictions on any potential DCGS-A Increment 2 offeror related to the use of COTS software, as expanded on at paragraph number 37 below.

## III. DCGS-A Increment 2: Requests For Information ("RFIs") and Draft Performance Work Statements ("PWSs")

24. Industry was directly engaged on the DCGS-A Increment 2 requirements via a series of market research events to include Requests for Information (RFI), Industry Days, and Industry-Government one-on-one meetings, the details of which can be found in the Market Research Report (Tab AG). The first RFI pertaining to Increment 1 was released in August 2014 (Tab AI). This RFI was conducted to assess the level of relevant competition and capabilities in the market place and elicit feedback to assist the Program Office in developing the Acquisition Plan. *Id*.

25. The responses to the RFIs, Industry Days, and Industry-Government one-on-one meetings conducted from August 14 to June 2015 have shown that the industry as a whole is capable and interested in performing DCGS-A Increment 2 development. The Government anticipated sufficient competition, as multiple companies have cited relevant experience and competencies that show they are well have the ability to enhance DCGS-A capabilities. In addition to business capability data, industry provided

valuable Acquisition Strategy input. Specifically, they have expressed that the use of multiple software releases, and availability of Increment 1 products as GFI would greatly enhance their ability to successfully support the Increment 2 EMD effort. (Tab AG at 51). Based on the DoD Service Acquisition Process, the Government developed a detailed schedule to guide its activities, including a planning phase with a comprehensive Market Research Approach that included the following Industry engagements:

- RFI 1 – 13 Aug 2014 – 12 Sep 2014: Was conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan.
- RFI 2 – 5 Dec 2014 – 29 Dec 2014: Was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort.
- RFI 3 – 6 May 2015 – 22 May 2015: Was released to determine if rule of two exists, as defined in FAR 19.502, and if a small business set-aside is appropriate for Increment 2 development.
- Industry Day 1 – 20 Jan 2015: Provided a forum to share emerging requirements with Industry.
- Industry One on Ones – 20 Jan 2015 - 12 May 2015: Provide a forum to answer Industry's questions and elicit their feedback regarding to the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations.
- Industry Day 2 – 25 Jun 2015: Provided an opportunity to discuss the draft Increment 2 requirements with industry.

In addition to the above activities, the Army G3/5/7 contacted the Army Materiel Systems Analysis Agency and requested a Trade Space Analysis (TSA) (Tab AP) of the DCGS-A Information Systems Capability Development Document (IS CDD) for use in a Milestone B acquisition decision for DCGS-A Increment 2. The TSA identified and evaluated technical functionality, cost, usability, schedule risk, and technical risk trade space for the technical and operational capabilities required for DCGS-A Increment 2.

Protected Information and/or Legends Redacted

Representative DCGS-A systems were assessed to determine whether a COTS, Government off the shelf (GOTS), or Hybrid (combined COTS/GOTS) solution should be pursued. The TSA found that for the Data Enterprise Architecture, among others, "due to the absence of historical requirements, the lower bound COTS solution needs major capability development for all technical functionality metric categories" (Tab AP at 20), meaning there is still a need for significant development and integration effort with the procurement of COTS items in support of DCGS-A Increment 2. The full breakdown of the analysis can be found at (Tab AP).

In addition to the TSA and the Program Office activities, a Data Integration, Visualization and Analytics (DIVA) Independent Market Study was chartered by the Army Acquisition Executive, the Honorable Heidi Shyu, and conducted by MITRE[9]. The purpose of the DIVA study was two-fold. The first was to provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study. The second was to codify the DIVA Independent Mark Study into recommendations for the DCGS-A Increment 2 Acquisition effort and describe the top-level risks and mitigation strategies associated with adopting recommendations. The DIVA study assessed the following acquisition approaches:

- System Integrator: Employ a prime contractor to integrate and manage the DCGS-A Increment 2
- Turn-Key: Procure a commercial product as basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure
- Specialized Applications: Purchase individual applications based on requirements to build onto the DCGS-A Increment 2 infrastructure
- Enterprise Cloud Service: Adopt a cloud infrastructure and integrate DCGS-A Increment 2 infrastructure and capabilities

[9] MITRE is a private, not-for-profit corporation that operates FFRDCs—federally funded research and development centers.

Protected Information and/or Legends Redacted

- Hybrid approach: Employ a combination of Enterprise Cloud and Turn-Key approach tailored to the government's requirements. Integrate additional applications

The DIVA Market Study concluded that the Hybrid Approach would serve as the best solution for DCGS-A Increment 2, which included software development and integration tasks (Tab AQ at 21). Additionally, the DIVA study considered and rejected a COTS-only system because there was a large risk that the interfaces between the DCGS-A components would not be mature (Tab AQ, at 33).

The Government was able to determine through the comprehensive market research analysis to include Program Office activities, the DIVA study, and the Trade Space Analysis, that while commercial capabilities could potentially[10] satisfy one or more portions of the DCGS-A requirement, there are significant portions of the scope of work, such as: Data Fusion, Intelligence Support to Cyber, and DIB upgrades that are not available as commercial products (Tab AG, at 50). Therefore, development and integration services sold competitively in the commercial marketplace based on established catalog or market prices for these specific tasks and or specific outcomes do not exist. A further breakdown of these capabilities is provided in the DCGS-A Increment 2 COTS capability chart[11] (Tab AV, at 16).

26. Protester responded to the Army's invitation for industry feedback along with responses received from 263 other companies. PM DCGS-A carefully reviewed all responses received from the companies participating in Industry Day, including Protester's responses which focused on recommendations to utilize commercial solutions (Tab AG, at 18). Through engagements with 263 companies who participated

[10] This must be caveated as potentially, since neither the RFIs nor the One on One sessions required validation that any of these products have been used/tested in a military environment.
[11] The DCGS-A Increment 2 COTS Capability chart is a slide pulled from the PM DCGS-A Increment 2 Technical Deep Dive prepared for Mr. Pino. This chart highlights the Increment 2 Capability Blocks by availability in the COTS market place. Mr. Richard Pino serves as the Deputy Assistant Secretary of Defense for Command Control Communications, Cyber and Business Systems.

Protected Information and/or Legends Redacted

in the market research process, Protester was only one of two companies[12] who provided the recommendation to procure DCGS-A Increment 2 utilizing commercial procedures (Tab AG).

27. In response to Protester's protest, Protester's response to the RFI number 1 makes the correct statement that the ". . . requirements for a data management infrastructure and data visualization are distinguishing factors that are critical to Increment 2 mission success" (Tab AJ, at 16).

28. In response to Protester's protest, and as stated above, through the comprehensive market research analysis, it was determined that while commercial capabilities could potentially satisfy one or more parts of the DCGS-A requirement, there are significant portions of the anticipated Increment 2 requirement that are not commercially available (Tab AG, at 50). Because of this fact, development will be required to satisfy the Army's requirements.

29. Draft DCGS-A Increment 2 Performance Work Statements (for the base IDIQ contract and Task Order 0001) and draft RFP Sections L and M were released to industry for comment. A total of 122 questions were received from nine (9) companies regarding draft RFP Sections L & M alone, and all questions submitted were reviewed and evaluated internally by the Government. If changes were merited, revisions were then made to the appropriate documents (Tabs L, M, and R). Protester's comments to the draft L&M documents focused on recommending the removal of requirements for DCAA-compliant accounting infrastructure, the removal of the earned value management system (EVMS) requirement, clarification on the technical data rights Subfactor, as well as a recommendation to amend the past performance criteria (Tab Q, at 2 and 4). Protester's comments to the draft Task Order 0001 PWS included recommended deletions of PWS paragraphs 3.2.11 "Fusion" and 3.2.12 "Intelligence Support to Cyber Operations," the deletion or de-prioritization of all requirements in

[12] In addition to Protester, [redacted]. recommended utilizing available GSA schedules.

Protected Information and/or Legends Redacted

architecture limitations and other requirements as defined in the Task Order 0001 PWS needs." (Tab X, at 15).

36. As referenced in Protester's protest, the DCGS-A Increment 2 Task Order 0001 PWS paragraph 3.2 states in part, "The contractor shall perform system engineering activities, to include but not limited to, system architecture and design; requirements definition and analysis; interface with external agencies; quantitative and qualitative analysis of system performance and reliability; and support of Army and Joint Interoperability." (Tab X, at 28).

37. In keeping with the Government's goal for a Modular Open Systems Architecture, the DCGS-A Increment 2, Engineering, Manufacturing and Development Task Order 0001 PWS dated 18 December 2015, paragraph 3.2 states in part "All software shall be designed in such a manner as to minimize or eliminate the usage of proprietary or commercial technologies except where specifically approved by the Government." This language is included with the goal to greatly enhance modularity and system flexibility for the lifecycle of the software going forward by componentizing the major capabilities into distinct capability blocks and adopting open standards. Each component will adopt industry standards and interfaces to interoperate with each other, while providing a fair and open competition for future updates and enhancements to the architecture (Tab X).

38. The components are broken down into three key groupings: the Data Integration Layer, the Data Analytics Platform (DAP), and the Visualization Framework. The Data Integration Layer and the DAP together make up the Data Management Architecture (DMA). These components and respective subcomponents will be built with interoperability and usability as key design focus areas throughout the lifecycle of the software development process. The DMA will serve as the architecture foundation and the heart with which the rest of the capabilities will depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract. Contained within the DMA, the DAP will process and fuse data so the Data Integration Layer can efficiently and effectively deliver the data to the user

Protected Information and/or Legends Redacted

support services. This includes software maintenance, configuration management, risk management, and quality assurance. This is also done to support the DCGS-A software suite. The capabilities defined promote collaboration among information systems, and software development and integration work are required (Tab K). DCGS-A Increment 2 will include a contractor developed architecture that is layered and modular and uses standards-based COTS/Non-Developmental item (NDI) products, operating systems, and middleware that all utilize either non-proprietary or non-vendor-unique key module or component interfaces (Tab F, at 19). Much of DCGS-A Increment 2 expects to utilize COTS software as part of the system framework (and this is borne out by the proposals received), as was DCGS-A Increment 1, and this is fully consistent with Department of Defense policy concerning the use of COTS software in systems. *See* DFARS Subpart 208.74; DFARS 212.212(2).[16] However, it is recognized that government-unique GOTS and custom software is also needed within the system, and the integration of the overall system, pulling all of the pieces of the system into a single, common user experience, requires unique development that is sometimes referred to as "Glue Code." The ultimate structure of DCGS-A Increment 2 showed that, with its adoption of the Model 3 Incrementally Deployed Software Intensive Program, in accordance with DoDI 5000.02, as an acquisition strategy to iteratively *develop and field* Intelligence, Surveillance, and Reconnaissance (ISR) capabilities, whether COTS, GOTS or military unique capabilities developed for by the Army and hosted on COTS equipment/hardware, providing low risk, efficient releases of capability would satisfy the Army's operational needs. (Tab F, at 11). Such a development of ISR capabilities in not a commercial item or service.

51. Further, for some user requirements, no COTS or commercial item software is available, so software development is needed and for both known and unknown requirements, the amount and required delivery dates for needed software is unknown. Lastly, all user requirements must be interoperable with one another, and as such, will require software integration. Software integration tasks are best acquired on a cost-

[16] Additionally, the manner in which the Army seeks software licenses is consistent with the policy set forth in DFARS 208.74.

Protected Information and/or Legends Redacted

reimbursement basis.[17] The DCGS-A Increment 2 requirement plans for multiple software releases and an undefined level of software development and integration to make all capabilities interoperable. For these many reasons, a FAR Part 12 contract is not a viable solution.

52. Finally, it is important to note that Protester's product on the relevant Federal Supply Schedule (FSS) is listed as "software maintenance." Yet, as stated above, DCGS-A Increment 1 and DCGS-A Increment 2 are systems which encompass more than "software maintenance," they are systems which combine software of various types (COTS, GOTS and custom software) to interoperate and require services to make the above-mentioned software interoperate. .

## I. The Army Met the Requirements of the Statutory/Regulatory Preference for Commercial Items.

53. Protester initially argues that the Army did not meet the statutory and regulatory requirements to utilize commercial items to meet requirements. Specifically, Protester contends that the Army did not define requirements that would maximize the utilization of commercial items. Second, Protester contends that the Army failed to perform the market research required by law. For the reasons discussed below, the Army will show that each of these claims is meritless.

### A. The Army Met its Obligations to Define Requirements in Terms That Allow the Use of Commercial Items.

54. Protester makes two arguments on this point, contending that the Army is not complying with 10 U.S.C. § 2377, which discusses market research for commercial items, and the National Defense Authorization Act for Fiscal Year 2016. The Federal Acquisition Streamlining Act of 1994 (FASA) established a preference and specific requirements for acquiring commercial items that meet the needs of an agency. FAR

[17] COTS products do provide some level of interoperability based on commercial standards. However, most do not support any of the military standards or message formats that the Army must meet.

Protected Information and/or Legends Redacted

> whether such services are provided by the same source or at the same time as the item; and
> (ii) The source of such services provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government;
> (6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions. For purposes of these services—
> (i) "Catalog price" means a price included in a catalog, price list, schedule, or other form that is regularly maintained by the manufacturer or vendor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public; and
>
> (ii) "Market prices" means current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated through competition or from sources independent of the offerors.
>
> (7) Any item, combination of items, or service referred to in paragraphs (1) through (6) of this definition, notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a contractor; or
>
> (8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local governments.

FAR 2.101. However, the DCGS-A Increment 2 requirement does not fit this definition, whether it is considered a software suite or a service or both. The DCGS-A Increment 2 requirements are based on the JCIDS process, which means that changes can only be instituted by the Vice Chief of Staff for the Army and then the process still takes time: Put differently, the PM has no power to directly change them in a procurement (Tab C, at 1) As pointed out in the declaration of the contracting officer, market research has found that there is no one single commercial item of a type customarily used by the

Protected Information and/or Legends Redacted

general public or can meet the Government's requirement through minor modification, nor a combination of commercial items, that can satisfy the entirety of the DCGS-A Increment 2 requirement (Tab C, at 2; Tab B, at 1).

55. Insofar as the FAR 2.101 definition of "commercial Item" applies to commercial services, market research has found that the acquisition of the military unique capabilities required for DCGS-A Increment 2 does not fit the definition of installation services, maintenance services, repair services, training services, services in support of a commercial end items, or services available to the general public (Tab C, at 1). Furthermore, in addition to the software development services required to fill the capability gaps of the commercial market place to meet military unique needs, there are also development services that are needed to tie together the overall capabilities used within the entire system. The integration of the overall system, pulling all of the pieces of the system into a single, common user experience, requires unique development that is sometimes referred to as "Glue Code." (Tab B, at 1). This "Glue Code" development, integration, and testing services for a National Security System are not of a type offered or sold competitively in substantial quantities in the commercial marketplace and are not based on established catalog or market prices for these specific tasks and outcomes.

56. Additionally, statutory law, the FAR and DFARS place special limitations on the use of commercial item contracting. Under FAR 12.207, only fixed price and time & materials/labor hour contracts may be used for commercial item procurements. However, the risks associated with developing and/or integrating a mixture of military unique software technologies make performance under a cost type contract, especially here, where there does not exist well-defined functional requirements to meet unique military mission needs. Moreover, 41 U.S.C. § 2310 limits commercial items acquisitions to $25 million, an amount far below the ceiling value of the contract and task order 001 value.

57. While Firm-Fixed-Price contracts work well for routine or recurring services, such as administrative support or certain types of training, when it comes to system

Protester's attempt to narrow the reading of that provision for its own benefit is unavailing.

71. Overall, the Army's acquisition strategy based on the AMSAA and DIVA studies and the responses to the three RFIs was reasonable. For example, in *Voith Hydro, Inc.*, B-401244.2, 401771, November 13, 2009, 2009 CPD ¶ 239, the Department of the Interior issued a Solicitation for generator and excitation systems for the Folsom Power Plant at the Folsom Dam, Folsom, California. *Id.* at 1. Initially, the systems were sought utilizing FAR Part 15 procedures for construction, a position the agency reaffirmed after a protest because it reviewed its requirements for the Folsom Power Plant project, conducted market research regarding the work required, and consulted with individuals familiar with the technical requirements. *Id.* at 3. *Voith Hydro* protested, arguing that the procurement should have been conducted as a "commercial item" procurement. The GAO rejected that argument, noting all the potential offerors answering the RFI thought a "commercial item" procurement inappropriate and noting the large amount of design work that had to be done. *Id.* at 5. The GAO also found relevant the agency's technical specialist statement explaining why FAR Part 12 procedures were inappropriate, where it stated:

> The record also includes a lengthy and detailed statement from an agency senior electrical engineer, explaining, for example, that RFP -0017 'is for the retrofitting of an existing hydroelectric facility by reusing some existing components, rewinding [refurbishing] and upgrading others, and providing some new components that must be custom made for the Project so that they will work with the existing components and dimensional constraints.' . . . . . This individual adds that '[i]n addition, the Project requires: a technical evaluation of the mechanical limitations of the existing generators that are going to be retrofitted; custom designed and installed equipment platforms and walkways; environmental work consisting of asbestos removal and a five-year extended warranty for the completed system.' In addition to providing further detailed explanation as to why certain items of work involve 'one-of-a-kind construction,' while others are "clearly site and job specific and must be customized for the Folsom job,' the senior electrical engineer concludes that the work required cannot be 'bought pursuant to Part 12 of the FAR.'

Protected Information and/or Legends Redacted

AG, at 51). This conclusion implies that FAR Part 12 procedures are inadequate to address the requirements.

77. The market research showed that there are no COTS solutions for all areas of the anticipated Increment 2 scope of work, such as, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone upgrade (Tab AG, at 50). Consequently, there is still a great deal of integration and development to do for DCGS-A Increment 2 contractor, including importing DCGS-A Increment 1 capabilities and also designing mature interfaces for them. This is true for any contractor, including Protester. DCGS-A Increment 2 also calls for increased functionality, which would also require design and development work. Unlike fixed price contracts where the risks are easily identified and the cost impacts can be reasonably estimated, this is simply not true here because of the development work and the risks in contract performance are not sufficiently definite for use of a fixed-price contract. FAR 16.301(a)(2).

78. Even Protester acknowledged in its response to RFI 1 that development work would have to take place (Tab AJ, at 4). Important is the Government's experience with fixed price development contracting in the 1980s. *See*, *e.g.*, Kara M. Sacilotto, *Déjà Vu All Over Again: Cost Reimbursement Contracts Fall Out of Favor (Again), But Should They?* 40 Pub. Cont. L.J. 681, 692-97 (Spring 2011) (recounting use of fixed price development contracts in the 1980s). Thus, based on the requirement and the market research, a cost reimbursement strategy was chosen.

79. The two cases that Protester relies on to show the Government did not do market research are totally inapplicable here. In *Smelkinson Sysco Food Servs.*, B-281631, March 15, 1999, 99-1 CPD ¶ 57 which was a commercial item procurement, but the dispute there was over whether the Government tailoring of certain clauses conformed to commercial practice or whether they violated FAR 11.302(c). Nor is the situation here like that in *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711 (2011) where the Air Force not only did not synopsize the intent to award the sole source contract, but conducted no market research at all. *Id.* at 729-31.

Protected Information and/or Legends Redacted

91. Protester's next claim is that the six-year (72 month) term of the DCGS-A Increment 2 contract violates 10 U.S.C. 2304a(f), which provides:

> **(f)Contract Period.—**
> The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract **or a modification of the contract**. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period.

10 U.S.C. § 2304a(f) (Emphasis added.) FAR 17.204 provides in relevant part that:

> (d) The period may extend beyond the contract completion date for service contracts. This is necessary for situations when exercise of the option would result in the obligation of funds that are not available in the fiscal year in which the contract would otherwise be completed.
>
> * * * *
>
> (g) Contracts may express extensions of the term of the contract as an amended completion date or as additional time for performance; *e.g.*, days, weeks, or months.

FAR 17.204. Further, DFARS 217.204 provides in relevant part as follows:

> (e)(i) Notwithstanding FAR 17.204(e), the ordering period of a task order or delivery order contract (including a contract for information technology) awarded by DoD pursuant to 10 U.S.C. 2304a—
>
> (A) May be for any period up to 5 years;
>
> (B) May be subsequently extended for one or more successive periods in accordance with an option provided in the contract or a modification of the contract; and
>
> (C) Shall not exceed 10 years unless the head of the agency determines in writing that exceptional circumstances require a longer ordering period.

DFARS 217.204 (emphasis added). Further, AFARS 5117.204 provides that the:

Protected Information and/or Legends Redacted

DECLARATION OF STEPHEN J. MORTON
17 March 2016

SUBJECT: Review of the Protest from Palantir, Inc. against Army Solicitation W56KGY-16-R-0001for DCGS-A Increment 2

I, Stephen Morton, declaring in lieu of affidavit and in accordance with 28 U.S.C. § 1746, state as follows:

1. I am the Deputy Product Manager for Project Manager Distributed Common Ground Systems-Army (PM DCGS-A), which is under the Program Executive Office for Intelligence Electronic Warfare and Sensors (PEO IEW&S). As Deputy Product Manager, I have overseen preparation of the acquisition requirements package for the DCGS-A Increment 2 requirement, issued under Army Solicitation W56KGY-16-R-0001.

2. I have reviewed the Protest submitted by Palantir, Inc. against the Request for Proposal (RFP) of Army Solicitation W56KGY-16-R-0001. In their protest, Palantir states that the DCGS-A Increment 2 requirement should be purchased under commercial procedures, using Commercial-Off-The-Shelf (COTS) software.

3. The PM DCGS-A, as a part of preparing the acquisition requirements package, conducted substantial, continuous market research. This included 78 one-on-one meetings with industry, reviewing Requests for Information (RFI) responses from 84 companies, reviewing comments to the draft RFP from 9 companies, Independent Studies and Surveys; one commissioned by United States Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)), conducted by MITRE; and a study conducted by The United States Army Materiel Systems Analysis Activity (AMSAA), and answering questions from two separate Industry Days attended by over 200 companies. The PM DCGS-A also researched relevant procurement history by contacting cognizant Government personnel responsible for similar military (MAIS) programs entering into contracts; DCGS-Special Operations Forces (DCGS-SOF), Integrated Personnel and Pay System-Army (IPPS-A), Joint Air-to-Ground Missile (JAGM), and Electronic Health Records (EHR).

4. Reviews of PM DCGS-A's market research indicated there is no singular piece of commercial or COTS software and no commercial services that meets all DCGS-A Increment 2 requirements. The DCGS-A Increment 2 System is a National Security System consisting of collection of software infrastructure, applications, and tools that encompass the full spectrum of Military Intelligence operations for the Army. While portions of the DCGS-A Increment 2 requirement can be procured through commercial software, some portions can only be met with the custom development of military-unique software applications. Some of these capabilities are classified up to the level of Top Secret and require contractors working on them to have equivalent clearances. Based on market research, military-unique software applications are not offered in the commercial marketplace and cannot meet the government's requirement through minor modification based on the military-unique nature of the required capability. The military-unique software applications needed to meet requirements under DCGS-A Increment 2 include Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, and Interoperability capabilities. Further, DCGS-A Increment 2 requirements include additional development services

Protected Information and/or Legends Redacted

needed to tie together the discrete capabilities used within the entire system. This integration of the overall system, essentially pulling all of the software components, infrastructure, applications, and tools, used for the system into a single, common user experience, requires unique development that is sometimes referred to as "glue code." Based on the market research, services required for glue code development of the DCGS-A Increment 2 requirements and testing for the DCGS-A Increment 2 are not offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices. The relevant procurement history that was looked at supported this assessment, as each similar program that was looked at was not being procured as a commercial item or service.

5. The DCGS-A Increment 2 requirement, including some of the software applications and development services, are necessary to meet end-user requirements as determined by the Army's Training and Doctrine Command (TRADOC). The TRADOC uses the Joint Capabilities Integration and Development System (JCIDS) process for collecting, codifying and approving end-user requirements. The DCGS-A Information System Capabilities Development Document (IS CDD) was approved by the Vice Chairman of the Joint Chiefs of Staff and consists of over 400 unique end-user requirements, each necessary for the successful performance of DCGS-A Increment 2. The PM DCGS-A is responsible for decomposing the approved end-user requirements into testable specification requirements. The 400-plus end-user requirements have been further decomposed into over 1000 specification statements, as defined in the DCGS-A Increment 2 Performance Based Specification (PBS). The PBS was included as an attachment to the Increment 2 RFP. The PM does not have the latitude or flexibility of deciding what user requirements are or are not needed. There are requirements that are deemed more important than others called Key Performance Parameters (KPPs), which are used for testing and measuring contractor performance against the end-user requirements. In Palantir's response to the draft RFP, dated 2 October 2105, they requested deleting one of the program's KPPs, Fusion.

6. The DCGS-A Increment 2 requirement is an Acquisition Category (ACAT) 1 program. The ACAT 1 programs require approval and scrutiny from many offices within the leadership of the Army and Department of Defense. In order to receive approval for releasing the RFP for the DCGS-A Increment 2 requirement, PM DCGS-A produced 58 different documents, requiring concurrence or approval from more than 120 different persons with signature authority along with face-to-face meetings or briefings. This series of checks and balances was used to make sure that the DCGS-A Program Office performed their due diligence in the selection of the correct Acquisition Strategy for the program. Throughout this process, all options, including commercial procurement of certain requirements, were considered; the current approach was selected by the senior leadership for military acquisition as the most appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17 March 2016 by Stephen Morton

MORTON.STEPHEN.J.1228933550

Digitally signed by MORTON.STEPHEN.J.1228933550
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=MORTON.STEPHEN.J.1228933550
Date: 2016.03.17 16:39:35 -04'00'

STEPHEN J. MORTON

Protected Information and/or Legends Redacted

DECLARATION OF CHRISTOPHER M. FISHER
17 March 2016

SUBJECT: Review of the Protest from Palantir, Inc. against Army Solicitation W56KGY-16-R-0001 for Distributed Common Ground System –Army (DCGS-A) Increment 2

I, Christopher Fisher, declaring in lieu of affidavit and in accordance with 28 U.S.C. § 1746, state as follows:

1. I am a Government employee employed by Army Contracting Command- Aberdeen Proving Ground (ACC-APG). I serve as the Procuring Contracting Officer for the DCGS-A Increment 2 requirement being conducted under Army Solicitation W56KGY-16-R-0001.

2. I have reviewed the protest submitted by Palantir, Inc. against Request for Proposal (RFP) issued as Army Solicitation W56KGY-16-R-0001. The protester asserts in part that the Army failed to perform sufficient market research, failed to implement the preference required by law for the acquisition of commercial items, and should procure the requirement under Federal Acquisition Regulation (FAR) part 12.

3. As required by FAR Part 10, extensive market research was conducted to determine if qualified vendors could meet the DCGS-A Increment 2 requirement. The DCGS-A Program Office proactively discussed the DCGS-A Increment 2 requirement with industry. In order to get industry feedback on the DCGS-A Increment 2 requirement, the Army released three (3) Requests for Information (RFIs) to Industry and received responses from 84 different organizations. Additionally, the Government conducted one-on-one engagements with 84 different organizations from 20 January 2015 to 30 July 2015. The Program Manager (PM) DCGS-A office also hosted two Industry Days and accepted questions and comments from Industry before and after the sessions and fully considered them.

The results of the market research were that no single commercial item could meet the DCGS-A Increment 2 requirement. Further, while some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement, the market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items. As market research showed no commercial products available for those portions of the DCGS-A Increment 2 requirement, they would need to be developed to meet the requirement. It should be noted that the Data Fusion portion in particular is one (1) of the four (4) Key Performance Parameters (KPP) for the DCGS-A Increment 2 Program. The KPPs are defined in the Manual for the Operation of the Joint Capabilities Integration and Development Systems (JCIDS), updated February 2015, as the performance attributes of a system considered critical or essential to the development of an effective military capability. Further, the DCGS-A Increment 2 requirement includes developmental and integration services required to tie together the individual capabilities. These individual capabilities when combined complete the DCGS-A

Protected Information and/or Legends Redacted

Increment 2 system. Based on the market research, this military-unique integration services for the specific tasks and outcomes of SIGINT, HUMINT, Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DIB upgrades are not of a type offered or sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices.

Additionally, the market research that was conducted included questions to industry regarding terms and conditions of the proposed contract. The first RFI asked, among other things, for feedback and suggestions related to whether a cost-type contract was appropriate for the DCGS-A Increment 2 effort. The majority of respondents indicated in their response that a cost-type contract was appropriate.

4. The market research conducted has supported the determination that the definition of "commercial item" at FAR 2.101 does not apply to the DCGS-A Increment 2 requirement. Significant portions of the Increment 2 requirement are military-unique capabilities that are not available as commercial items or services.

a. As the definition applies to commercial items, market research has found that there is not one single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

b. As the definition applies to commercial services, market research has found that the acquisition of the military-unique capabilities required of DCGS-A Increment 2 does not fit the definition of installation services, maintenance services, repair services, training services, or other services in support of a commercial item as significant portions of the DCGS-A Increment 2 requirement are not commercial items. Nor are the required services provided to the general public. Furthermore, the development services required to integrate the capabilities into the overall DCGS-A Increment 2 requirement are not sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices.

5. Additionally, it was determined that the nature of the DCGS-A Increment 2 requirement, consisting of developing and integrating a mixture of military-unique software applications that are not well defined, would not appropriately procured under a cost-type contract structure and terms, which are not permitted for procuring commercial items in accordance with FAR part 12 procedures. Procuring this effort exclusively as a Firm-Fixed-Price, Time-and–Material, or /Labor-Hour contract, which are the only contract types permitted, or permitted with waiver, under FAR part 12, would increase the risk to the Government. This further supports the agency to not use FAR part 12.

a. While Firm-Fixed-Price contracts work well for routine or recurring services, such as administrative support and training, when it comes to system development and the integration of a tactical military intelligence system with over 700 unique data feeds, numerous interoperability requirements, and complex fusion requirements as is necessary to meet the DCGS-A Increment 2 requirement, a Firm-Fixed-Price type contract would greatly increase the risk to the Government. As work requirements expand or decline to address development of military-unique software

Protected Information and/or Legends Redacted

applications and uncertainties in the development, integration, and testing services, they may cause Government delays, false starts, re-work related to changes in priority or in response to findings from testing, and issues with contractor accreditation, funding, or testing and approvals. Firm-Fixed-Price contracts by their nature lack the flexibility to respond to these changes and uncertainties in a responsible and timely manner. With Firm-Fixed-Price contracts this lack of flexibility would require either additional task orders or change orders that would need to be negotiated upfront or issued initially undefinitized and later negotiated. Without those task or change orders, the Government would be subject to one or more contractor claims. The risks to successful performance of the DCGS-A Increment 2 requirement under a Firm-Fixed-Price contract are unacceptable because of the critical nature of the military intelligence mission.

b. Furthermore, while Time-and-Materials and Labor-Hour contracts have a place in Government contracting for activities, such as, diagnostic services, these types of contracts provide no positive profit incentive to the Contractor for cost control or labor efficiency, thereby putting the majority of the risk on the Government. As discussed above, in order for a contractor to successfully deliver the DCGS-A Increment 2 requirement, portions of the DCGS-A Increment 2 requirement must be met through custom software development of military-unique software applications. Further, the uncertainty associated with the required development, integration, and testing services necessary to integrate software capabilities, coupled with the lack of positive profit incentive to the contractor, would put the Government in a position of significant risk as it relates to performance, cost, and schedule.

6. Based on the results of the extensive market research performed, which showed that commercial items and services were not available to meet the Government's requirement, FAR part 12 procedures could not be utilized and the best solution for the DCGS-A Increment 2 requirement was to conduct a full-and-open source selection in accordance with the FAR 15.101-1 Tradeoff Process including use of contract types not available under FAR part 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17 March 2016 by Christopher Fisher

FISHER.CHRISTOPH
ER.M.1387943605

Digitally signed by FISHER.CHRISTOPHER.M.1387943605
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=FISHER.CHRISTOPHER.M.1387943605
Date: 2016.03.17 16:36:29 -04'00'

Christopher M. Fisher

[redacted]

Protected Information
and/or Legends Redacted



**DEPARTMENT OF THE ARMY**
**OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY**
**ACQUISITION LOGISTICS AND TECHNOLOGY**
**103 ARMY PENTAGON**
**WASHINGTON, DC 20310-0103**

SAAL-ZS

OCT 20 2014

MEMORANDUM FOR UNDER SECRETARY OF DEFENSE (ACQUISITION, TECHNOLOGY AND LOGISTICS)

SUBJECT: Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy

1. Reference, DCGS-A Increment 1 Acquisition Strategy, dated April 2013.

2. I request your approval to change the 8 August 2013 DCGS-A Acquisition Strategy as follows:

a. Base the Increment 1 Full Deployment (FD) on Release 2.

b. End the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to:

(1) Address software regression testing and priority fixes identified as a result of Release 2 operational test results.

(2) Initiate Increment 2 preparatory activities.

3. Funds that are available to develop and test a viable third software release are insufficient. Increased resource requirements are needed to execute the DCGS-A Increment 1 Release 2 Developmental Test and related risk reduction efforts.

4. I believe allocating the remaining Increment 1 RDT&E funding to support potential required fixes from the Increment 1 Release 2 Limited User Test results, and moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available. In addition, Increment 1 Release 2 will deliver approximately 90 percent of the planned Increment 1 capability.

5. Keeping Increment 1, Release 2 in the field until Increment 2 Release 1 enhancements are ready supports Army training and operational fielded software stabilization initiatives. The Army will continue to sustain and modernize Release 2 until it is replaced in the Force by Increment 2, Release 1. This will enable the de-fielding of the All Source Analysis System Block II Analysis and Control Element and implementation of emerging Army Common Operating Environment and Command Post Computing Environment requirements.

Protected Information and/or Legends Redacted

SAAL-ZS
SUBJECT: Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy

6. Upon receiving your approval of this request, my team will prepare an addendum document reflecting this change for your review and signature, to be attached to the current Increment 1 Acquisition Strategy document.

7. The point of contact is Mr. Edgar McAnderson, (571) 256-9390, or e-mail: edgar.l.mcanderson.ctr@mail.mil.

Heidi Shyu
Assistant Secretary of the Army
(Acquisition, Logistics and Technology)

Approved

DEC 4 2014

2

Appx10092

A92

Protected Information and/or Legends Redacted



A93

Protected Information
and/or Legends Redacted

The contract(s) to be used for DCGS-A Increment 2, Release 2 will be decided at a Decision Point approximately 24 months into the Increment 2, Release 1 effort. This Decision Point will determine whether the follow-on releases will either use the PM managed IDIQ contract, request capabilities from existing Multiple Award Task Oder Contracts (MATOCs) or selectively compete for the development and test of other Increment 2 applications.

Protected Information and/or Legends Redacted

Follow-on Releases focused on the incorporation of modernized DCGS-A capabilities running on the new Data Infrastructure will leverage the PM managed IDIQ contract, request capabilities from existing Contracts or selectively compete for the development and test of Increment 2 capabilities.

Protected Information and/or Legends Redacted

DEPARTMENT OF THE ARMY
U.S. ARMY CONTRACTING COMMAND
ABERDEEN PROVING GROUND
6001 COMBAT DRIVE
ABERDEEN PROVING GROUND, MARYLAND 21005-1846

REPLY TO
ATTENTION OF

# DETERMINATION & FINDINGS

For

Use of Incentive Fee (IF) contract type for Task Order 0001 (TO 0001) of the Project Manager Distributed Common Ground System- Army (DCGS-A) Increment 2 (Inc. 2) Indefinite Delivery Indefinite Quantity (IDIQ) Contract for Continued Engineering and Manufacturing Development Phase (EMD) Research and Development (R&D) Efforts in accordance with (IAW) Federal Acquisition Regulation (FAR) 16.401(a), 35.006(c), and 16.401(d)

## FINDINGS

1. In support of PM-DCGS-A's Inc. 2 EMD requirement a single IDIQ award is believed the most appropriate contract type (See D&F the analysis for award of a single source IDIQ single award contract exceeding $103 million for DCGS-A Inc. 2, EMD). Consequently, The Army Contracting Command-Aberdeen Proving Ground (ACC-APG) Division C Branch Five propositions to award TO 0001 as a FAR Part 16.405-1 Cost Plus Incentive Fee Contract (CPIF) type. The CPIF TO shall be a cost-reimbursement action that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target cost (FAR 16.304). Under this type of TO, a target cost, a target fee, a minimum and maximum fee, and a fee adjustment formula are negotiated initially. After contract performance, the fee payable to the contractor is determined in accordance with the formula. The formula provides, within limits, for increases in fee above target fee when total allowable costs are less than target cost, and decreases in fee below target fee when total allowable costs exceed target costs. The provision for increase or decrease in fee is intended to provide an incentive for maximum effort on the part of the contractor to manage the contract effectively. When total allowable cost is greater or less than the range of costs within which the fee adjustment formula operates, the contractor is paid total allowable costs plus the minimum or maximum fee (FAR 16.405-1). A multiple-incentive arrangement is preferred to encourage positive contract performance, discouraging inefficiency and waste, striving for outstanding outcomes in total contract Performance and Cost/Price factors.

2. The TO will utilize an incentive pool structure, combining the (multiple) incentives fee agreements. The performance incentive will equal 60%, with the cost incentive equaling 40% of fee pool. The total maximum fee allowable under this TO will be

Protected Information and/or Legends Redacted

13%, and the total minimum fee allowable under this TO will be 0%. The Government will solicit the total fee pool amount.

- Performance Incentives: shall motivate, eliminate or reduce anomalies in contractor developed software. The contractor will receive a 10% performance incentive fee reductions per every anomaly discovered.
- Cost Incentives: will motivate effective contractor cost management. The incentive arrangement will include a fee adjustment formula of 30/70 for underruns and 70/30 for overruns. Target cost and target fee will be proposed.

| Incentive Strategy | | |
| --- | --- | --- |
| Incentive | Description | Pool % |
| Performance | 100% fee incentive earned upon the successful delivery of SW with zero priority 1 or 2 SW anomalies | 60% |
| | The contractor's final adjusted fee incentive will be reduced by 10% for each priority 1 or 2 SW anomaly discovered. | |
| Cost | Contractor proposed (Government accepted) target cost and target fee shall be evaluated against a Government predetermined share ratios of 30/70 for underruns and 70/30 for overruns. | 40% |

Establishing the Fee (Cost Incentive): Upon the completion of TO, actual costs will be compared with the target costs established. Overruns and underruns result in adjustment of the fee according to the determined sharing formulas. The adjusted amount must fall within the agreed maximum and minimum fee levels. The fee adjustment amount shall equal the target cost subtract the final cost multiplied by the contractor's percentage of cost risk (Fee Adjustment = share ratio (target cost subtract final cost). The TO's final fee equals the fee adjustment plus the target fee equals final fee amount (Fee adjustment + target fee = final fee amount). The final fee is subject to the minimum and maximum fees. If the final fee is less than the minimum fee, the minimum fee becomes the final fee. If the final fee is more than the maximum fee, the maximum fee becomes the final fee. The final price to Government is calculated where final cost plus final fee equals final price.

3. Because the nature of this requirement is developmental and there's a lack of precise specifications, resulting in difficulties when developing accurate cost estimates, a cost-reimbursement contract type is deemed appropriate IAW FAR 35.006(c).

Protected Information and/or Legends Redacted

4. The cost-reimbursement contract limitation factors outlined in FAR 16.301-3(a) have been considered and documented in Acquisition Plan 15-C-006 (Enclosure 1).

5. IAW FAR 16.401(a), the Incentive fee contract type is highly appropriate for TO 0001 due to the nature and timing of PWS efforts. The incentive arrangement will ensure there's a meaningful connection between overall Performance and Cost/Price factors.

6. A DCGS-A Inc. 2 Working Integrated Product Team (WIPT) has been charted to promote collaboration and communication effectively for applying and administrating an incentive strategy which meets the Government's object of incentivizing contract Performance while controlling Cost/Price. WIPT tasks focused on:

   - Ensuring all Contract Line Items (CLINS) associated with travel or Other Direct Costs (ODC's) are cost (no fee) CLINs.

   - Established reasonable and attainable incentive targets, and ensure they are clearly communicated to the contractor (IAW FAR 16.401(a)(1)).

   - Included appropriate incentive arrangements designed to: motivate contractor efforts that might not otherwise be emphasized (FAR 16.401(a)(2)(i)); and discouraged contractor inefficiency and waste (FAR 16.401(a)(2)(ii)). The use of IF will ensure that contractor keeps striving for increased efficiency and manages the program with a keen eye towards reducing wasteful processes. During the source selection process, open and candid discussion of the fee adjustment formula will be conducted, with the objective of developing an incentive that is conducive of contract performance and cost/price motivation. The arrangement will reflect an incentive worthy of contractor's desire to continue striving for higher efficiency to earn the maximum fee available.

7. Incentive administration: The use of incentives is administratively practical. This effort requires significant EVM reporting, which captures sufficient data for adequately accessing contract performance and cost. Contract clause 52.216-10 Incentive Fee shall be incorporated in the resulting contract/task order. The clause shall outline the terms and conditions associated with the incentive fee. The Procuring Contracting Officer (PCO) and Administrative Contracting Officer (ACO) will work in tandem, reporting and documenting financial management, quality assurance, and interim tests or milestone accomplishment reports for comparison with planned expenditure and manning levels. This comparison will provide a good factual basis for incentive analysis.

8. Although the Government may complete a Weighted Guidelines (WGL) form IAW Defense Acquisition Regulation Supplement (DFARS) 215.404-70 to determine a fee objective, it's the Government's intent to solicit competitive pricing for fee.

Protected Information and/or Legends Redacted

Regardless of offeror's proposed fee, the total max fee shall not exceed 13% of the negotiated target cost.

DETERMINATION

On the basis of the above findings and the approved Acquisition Plan, I hereby determine that no other contract type other than the use of a Cost-Reimbursement type contract is suitable for this acquisition, and that use of a Cost Plus Incentive Fee contract type is in the best interest of the Government pursuant to Federal Acquisition Regulation Subparts 16.401(d), 35.006(c), and 16.401(a).

DATE:14 December, 2015

FISHER.CHRISTOPHER.M.1387943605 Digitally signed by FISHER.CHRISTOPHER.M.1387943605 DN c US, o U.S. Government, ou DoD, ou PKI, ou USA, cn FISHER.CHRISTOPHER.M.1387943605 Date 2015.12.14 12 45 11 -05'00'

Christopher Fisher
Procuring Contracting Officer

APPROVAL

Based on foregoing findings, I hereby approve this Determination and Finding for Use of an Incentive Fee contract type for Task Order 0001 of the Distributed Common Ground System, Increment 2 Engineering and Manufacturing Development contract pursuant to Federal Acquisition Regulation Subparts 16.401(d), 35.006(c), and16.401 (a), and provided the requirement herein described has otherwise been authorized for acquisition.

DATE: 14 December, 2015

MANGANARO.JOSEPH.C.1229042609 Digitally signed by MANGANARO.JOSEPH.C.1229042609 DN c US, o U.S. Government, ou DoD, ou PKI, ou USA, cn MANGANARO.JOSEPH.C.1229042609 Date 2015.12.14 13 29 31 -05'00'

Joseph Manganaro
Branch Chief

Enclosure 1: Acquisition Plan for the Distributed Common Ground System-Army Increment 2 Engineering, Manufacturing, and Development dated 09 September 2015

Protected Information and/or Legends Redacted

COTS SW Applications Used with DCGS-A Increment 1

| Software Components | Version | Vendor | Functionality | COTS, GOTS, Open Source |
|---|---|---|---|---|
| Adobe Acrobat X Pro 10.1.13 English | 10.1.13 | Adobe Systems | Portable Document File (PDF) Reader | COTS – Licensed |
| Adobe Flash Player 17 ActiveX English | 17.0.0.134 | Adobe Systems | Adobe Flash is the authoring environment and Flash Player is the virtual machine used to run the Flash files | COTS – Free download |
| Adobe Flash Player 17 NPAPI English | 17.0.0.134 | Adobe Systems | Portable Document File (PDF) Reader | COTS – Free download |
| AgileGraph 2.14.1337.14 English | 2.14.1337.14 | Ringtail Design | Transforms raw data into knowledge through rapid, visual data discovery | COTS – Licensed |
| AIMES Exploit and Reporter 1.5.2 English | 1.5.2 | Leidos | For video processing to receive, process & archive motion imagery (MI) data | COTS – Licensed |
| ArcGIS ArcInfo Workstation 10.0.2414 | 10.0.2414 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS ArcInfo Workstation 10.0.2414 English | 10.0.2414 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Desktop 10 English | 10.0.4400 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Desktop 10 Service Pack 5 | 10.0.4400 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Engine Runtime 10 English | 10.0.4400 | ESRI | Complete library of embeddable geographic information system (GIS) components for developers to build custom applications | COTS – Licensed |
| ArcGIS Engine Runtime 10 Service Pack 5 | 10.0.4400 | ESRI | Complete library of embeddable geographic information system (GIS) components for developers to build custom applications | COTS – Licensed |
| ArcGIS Explorer Desktop (32 bit) | 10.1.2500 | ESRI | Geospatial viewer for local data and map services | COTS – Free Download |
| ArcGIS Explorer Desktop 10.1.2500 | 10.1.2500 | ESRI | Geospatial viewer for local data and map services | COTS – Free Download |
| ArcGIS Military Analyst 10 English | 10.0.3600 | ESRI | National Geospatial-Intelligence Agency data loading and terrain analysis | COTS – Free download |
| ArcGIS Military Analyst 10 Service Pack 3 | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS Military Overlay Editor 10 English | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS Military Overlay Editor 10 Service Pack 3 | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS VBA Resources 10.0.2414 | 10.0.2414 | ESRI | Provides an integrated programming environment | COTS – Licensed |

Protected Information and/or Legends Redacted

| ArcGIS Workflow Manager 10 SP5 - Desktop Edition English | 10.0.0 377 | ESRI | GIS workflow creation and management tool | COTS – Licensed |
|---|---|---|---|---|
| BioAPI Framework 1.0.1 | 1.0.1 | Dell Inc. | BioAPI Framework | COTS – Free Download |
| Data Interoperability Extension 10.0.3200 | 10.0.3200 | ESRI | Esri extension supporting read/write of geospatial formats. Provides dll required for Web services | COTS - Licensed **License is not provided, on baseline to support Web services** |
| Data Interoperability Extension 10.0.3200 English | 10.0.3200 | ESRI | Esri extension supporting read/write of geospatial formats. Provides dll required for Web services | COTS - Licensed **License is not provided, on baseline to support Web services** |
| Data Interoperability Extension Service Pack 2 | 10.0 3200 | ESRI | Service Pack 2 for Data Interoperability Extension | COTS - Licensed |
| Dell ControlVault Host Components Installer 64Bit x64 | 1.7.459.360 | Broadcom Corporation | Dell ControlVault Host Components Installer 64Bit | COTS – Free download |
| ERDAS IMAGINE 2010 English | 10 | ERDAS Inc. | Geospatial data authoring software | COTS – Licensed |
| ERDAS-Net Licensing 2010 English | 10 | ERDAS Inc. | Comes with ERDAS Imagine | COTS – Licensed |
| ESRI Defense Mapping 10 English | 10.00.54.00 | ESRI | Allows defense industry users to produce and maintain high-quality topographic databases and cartographic products | COTS – Licensed |
| ESRI MapObjects 2.0 | 10.00.53.00 | ESRI | Set of mapping software components that allows embedding maps into applications | COTS – Licensed |
| ESRI Production Mapping 10 English | 10.00.53.00 | ESRI | Geospatial database production tool | COTS – Licensed |
| GeoRover« Coordinate Viewer Extension 1.0.3 English | 1.0 3 | SAIC/Leidos | Provides rapid map zooming and enhanced coordinate functionality | COTS – Licensed |
| GeoRover« Digital Data Tracker Extension 3.3.0 English | 3.3.0 | SAIC/Leidos | Flexible GPS software tools that easily work with field collected data including data collected from geotagging devices and can support real-time GPS navigation | COTS – Licensed |
| GeoRover« License Manager 2.0.0.17 English | 2.0.0.17 | SAIC/Leidos | Provides access to GeoRover features | COTS – Licensed |
| GeoRover« Locus Track Extension 3.3.0 English | 3.3.0 | SAIC/Leidos | Powerful tools for geospatial feature data creation, editing, and geospatial data fusion | COTS – Licensed |
| GeoRover« Magnetic Model 2010 English | 1.00.0000 | SAIC/Leidos | Provides geomagnetic fields tools to GeoRover | COTS – Licensed |
| GeoRover« Range Tools Extension 1.1.1 English | 1.1.1 | SAIC/Leidos | Geospatial feature data creation, editing, and ingestion of ring, ellipse, and arc feature data | COTS – Licensed |
| GeoRover« RPF Tools Extension - DCGS-A 1.1.0.6 English | 1.1.0.6 | SAIC/Leidos | High-speed indexing, display, and management of large file-based raster product format (RPF) datasets, typically map and imagery data | COTS – Licensed |
| GeoRover« Zoom Tools Extension 3.2.5 English | 3.2.5 | SAIC/Leidos | Rapid map zooming and "go-to" capabilities | COTS – Licensed |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Google Earth EC 6.2.2.6613 | 6.2.2.6613 | Google | Virtual globe, map and geographic information | COTS – Free download |
| Google Earth Plug-in 7.0.3.8542 English | 7.0.3.8542 | Google | Virtual globe, map and geographic information | COTS – Free download |
| GXP License Manager (C:\Program Files (x86)\BAE SYSTEMS\GXP License Manager) | 8.4.1.5 | BAE Systems | Data management application that makes it easy to locate, retrieve, and share geospatial data on a local network or across an enterprise | COTS – Licensed |
| IBM i2 Analyst's Notebook 8 English | 8.9.5 | IBM | Link & Timeline Analysis tool w/ graphical representation | COTS – Licensed |
| IBM i2 Chart Reader 8 English | 8.9 3 | IBM | Charts Reader | COTS – Free download |
| IBM Lotus Forms Viewer 3.5.1 English | 7.6.1.123 | IBM | Provides a single interface for users to open, fill out, and save forms | COTS – Free download |
| IDL 8.3 and ENVI 5.1 English x64 | 5.1.0.1 | Exelis Visual Information Solutions | Software for visualization Analysis Presentation | COTS – Licensed |
| Java 7 Update 76 | 7.0.760 | Oracle | Programming language compiler and environment | COTS – Free download |
| Java 7 Update 76 (64-bit) x64 | 7.0.760 | Oracle | Programming language compiler and environment | COTS – Free download |
| Java Auto Updater 2.1.76.13 English | 2.1.76.13 | Oracle | Java Auto Updater | COTS – Free download |
| Jericho MFWS Auth Library 2.2.0.0 English | 2.2.0.0 | Jericho Systems Corporation | Jericho MFWS Auth Library | COTS – Licensed |
| LPS 2010 English | 10.0.0 | ERDAS Inc. | Leica Photogrammetry Suite (LPS) is part of ERDAS Imagine | COTS – Licensed |
| McAfee Agent 4.8.0.1500 | 4.8.0.1500 | McAfee | Agent for anti-virus software | COTS |
| McAfee Agent 4.8.2003 | 4.8.2003 | McAfee | Agent for anti-virus software | COTS |
| McAfee Host Intrusion Prevention 8.00.0402 x64 | 8.00.0402 | McAfee | Anti-virus software | COTS |
| McAfee VirusScan Enterprise 8.8.02004 | 8.8.02004 | McAfee | Anti-virus software | COTS |
| Microsoft .NET Framework 4 Client Profile x64 | 4.0.30319 | Microsoft | Microsoft .NET Framework 4 Client Profile | COTS – Free download |
| Microsoft .NET Framework 4 Extended x64 | 4.0.30319 | Microsoft | Installation Script will deploy Shared Add-in Extensibility Update for Microsoft .NET Framework 4.0 to workstation | COTS – Free download |
| Microsoft Office 2003 Web Components English | 11.0.8173.0 | Microsoft | Microsoft Office 2003 Web Components | COTS – Free download |
| Microsoft Office 2007 Service Pack 3 (SP3) | 12.0.6612.1000 | Microsoft | Microsoft Office 2003 Service Pack | COTS – Free download |
| Microsoft Office Access MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Access MUI (English) 2007 | COTS – Free download |
| Microsoft Office Access Setup Metadata MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Access Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Excel MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Excel MUI (English) 2007 | COTS – Free download |
| Microsoft Office File Validation Add-In 14.0.5130.5003 | 14.0.5130.5003 | Microsoft | Used to validate that Binary File Format files conform to the Microsoft Office File Format | COTS – Free download |
| Microsoft Office InfoPath MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office InfoPath MUI (English) 2007 | COTS – Free download |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft Office Office 64-bit Components 2007 x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Office 64-bit Components 2007 | COTS – Free download |
| Microsoft Office Outlook MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Outlook MUI (English) 2007 | COTS – Free download |
| Microsoft Office PowerPoint MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office PowerPoint MUI (English) 2007 | COTS – Free download |
| Microsoft Office Professional Plus 2007 | 12.0.6612.1000 | Microsoft | Microsoft Office Professional Plus 2007 | COTS – Licensed |
| Microsoft Office Proof (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (English) 2007 | COTS – Free download |
| Microsoft Office Proof (French) 2007 French | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (French) 2007 | COTS – Free download |
| Microsoft Office Proof (Spanish) 2007 Spanish | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (Spanish) 2007 | COTS – Free download |
| Microsoft Office Proofing (English) 2007 English | 12.0.4518.1014 | Microsoft | Microsoft Office Proofing (English) 2007 | COTS – Free download |
| Microsoft Office Proofing Tools 2007 Service Pack 3 (SP3) | 12.0.4518.1014 | Microsoft | Microsoft Office Proofing (English) 2007 | COTS – Free download |
| Microsoft Office Publisher MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Publisher MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared 64-bit MUI (English) 2007 English x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Shared 64-bit MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared 64-bit Setup Metadata MUI (English) 2007 English x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Shared 64-bit Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Shared MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared Setup Metadata MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Shared Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Word MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Word MUI (English) 2007 | COTS – Free download |
| Microsoft Office XP Web Components 10.0.6619.0 English | 10.0.6619.0 | Microsoft | Microsoft Office XP Web Components | COTS – Free download |
| Microsoft Silverlight 5.1.30514.0 English x64 | 5.1.30514.0 | Microsoft | Application framework for writing and running rich Internet applications, with features and purposes similar to those of Adobe Flash | COTS – Free download |
| Microsoft SOAP Toolkit 3.0 English | 3.0.1325.4 | Microsoft | Microsoft SOAP Toolkit | COTS – Free download |
| Microsoft SQL Server 2005 | 9.4.5000.00 | Microsoft | Database | COTS – Licensed |
| Microsoft SQL Server 2005 (DCGSA) English | 9.4.5000.00 | Microsoft | Database | COTS – Licensed |
| Microsoft SQL Server 2005 Backward compatibility English x64 | 8.05.2312 | Microsoft | Microsoft SQL Server 2005 Backward compatibility | COTS – Free download |
| Microsoft SQL Server 2005 Books Online (English) (September 2007) English | 9.00.3104 | Microsoft | Microsoft SQL Server 2005 Books Online (English) (September 2007) | COTS – Free download |
| Microsoft SQL Server 2005 Tools English | 9.4.5000.00 | Microsoft | Microsoft SQL Server 2005 Tools | COTS – Free download |
| Microsoft SQL Server Native Client 9.00.5000.00 English x64 | 9.00.5000.00 | Microsoft | Microsoft SQL Server Native Client | COTS – Free download |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft SQL Server Setup Support Files (English) 9.00.5000.00 English | 9.00.5000.00 | Microsoft | Microsoft SQL Server Setup Support Files (English) | COTS – Free download |
| Microsoft SQL Server VSS Writer 9.00.5000.00 English x64 | 9.00.5000.00 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.56336 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.59193 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.61001 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.56336 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.59192 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.61000 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.21022.218 English x64 | 9.0.21022.218 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.17 English x64 | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.4148 English x64 | 9.0.30729.4148 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.6161 English x64 | 9.0.30729.6161 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.21022 English | 9.0.21022 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.21022.218 English | 9.0.21022.218 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729 English | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.17 English | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.4148 English | 9.0.30729.4148 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.6161 English | 9.0.30729.6161 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft Visual C++ 2010 x64 Redistributable - 10.0.40219 x64 | 10.0.40219 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2010 x86 Redistributable - 10.0.40219 | 10.0.40219 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 Redistributable (x64) - 11.0.60610 | 11.0.60610.1 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 Redistributable (x86) - 11.0.60610 | 11.0.60610.1 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x64 Additional Runtime - 11.0 60610 English x64 | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x64 Minimum Runtime - 11.0.60610 English x64 | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x86 Additional Runtime - 11.0 60610 English | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x86 Minimum Runtime - 11.0.60610 English | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | 10.0.40303 | Microsoft | Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | COTS – Free download |
| Microsoft Visual Studio 2010 Tools for Office Runtime (x64) x64 | 10.0.40308 | Microsoft | Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | COTS – Free download |
| Microsoft WSE 3.0 English | 3.0.5305.0 | Microsoft | Web Service Enhancements (WSE) enables developers to create interoperable Web services | COTS – Free download |
| Mozilla Firefox 31.5.0 ESR (x86 en-US) | 31.5.0 | Mozilla | Web Browser | COTS – Free download |
| Mozilla Maintenance Service 31.5.0 | 31.5.0 | Mozilla | Web Browser | COTS – Free download |
| MSXML 4.0 SP2 (KB954430) English | 4.20.9870.0 | Microsoft | Microsoft XML Core Services | COTS – Free download |
| MSXML 4.0 SP2 (KB973688) English | 4.20.9876.0 | Microsoft | Microsoft XML Core Services | COTS – Free download |
| MSXML 4.0 SP3 Parser (KB2758694) English | 4.30.2117.0 | Microsoft | Text parser | COTS – Free download |
| NEXTimage 1.00.0000 English | 1.00.0000 | Contex | Wide-format scanning software, comes with Scanner (HW) purchase | COTS – Licensed |
| NVIDIA PhysX 9.10.0514 English | 9.10.0514 | NVIDIA Corporation | NVIDIA PhysX | COTS – Free download |
| NVIDIA PhysX System Software 9.10.0514 | 9.10.0514 | NVIDIA Corporation | Display and Video | COTS – Free download |
| NVIDIA WMI 2.15.0 | 2.15.0 | NVIDIA Corporation | Display and Video | COTS – Free download |
| Oracle Data Provider for .NET Help 11.1.0720 English | 11.1.0720 | Oracle | Database | COTS – Free download |
| Oracle Developer Tools for Visual Studio Help 11.1.0720 English | 11.1.0720 | Oracle | Makes it easier and Tightly integrated "Add-in" for MS Visual Studio | COTS – Free download |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Oracle Providers for ASP.NET Help 11.1.0720 English | 11.1.0720 | Oracle | For writing Oracle applications | COTS – Free download |
| Overwatch LIDAR Analyst v5.1.2 B1 for ArcGIS English | 5.01.0002.0001 | Overwatch Systems | 3D feature extraction solution for airborne LIDAR data, advancing the capability of Esri ArcGIS by providing LIDAR point cloud visualization and 3D exploitation, high-quality bare earth generation, and precision 3D feature extraction | COTS – Licensed |
| PAR Government GV 3.0.982.62462 | 3.0.982.62462 | PAR Government Systems | Imagery viewer and metadata editor that supports read, write, and display of NITF | COTS – Free download |
| Sentinel Protection Installer 7.6.1 English | 7.6.1 | SafeNet | Sentinel System Driver | COTS – Free download |
| Service Pack 4 for SQL Server Database Services 2005 ENU | 9.4.5000 | Microsoft | Service Pack for SQL | COTS – Free download |
| SOCET GXP 4.1.0 | 4.1.0 | BAE SYSTEMS Geospatial eXploitation Products | Geospatial-intelligence software package that uses imagery from satellite and aerial sources to identify, analyze, and extract ground features quickly, allowing for rapid product creation | COTS – Licensed |
| SOCET GXP 4.1.0 Integration with TerraGo English x64 | 4.1.0 | BAE SYSTEMS Geospatial eXploitation Products | Geospatial Exploitation Products | COTS – Licensed |
| SQLXML4 English x64 | 9.00.5000.00 | Microsoft | Provides methods for accessing the XML value as a String, a Reader or Writer, or as a Stream | COTS – Free download |
| Task Assistant Manager 10.0.0.378 English | 10.0.0 378 | ESRI | Task Manager for ESRI | COTS – Free download |
| TerraBuilder 6.0.3.328 | 6.0.3.328 | Skyline Software Systems Inc. | Geospatial Analysis Tool for 3D support | COTS – Licensed |
| TerraExplorer Pro 6.1.2.1290 | 6.1.2.1290 | Skyline Software Systems Inc. | Geospatial Analysis Tool for 3D support | COTS – Licensed |
| TerraExplorer TerraGo-GeoPDF Extension 1.0.4 English | 1.0.4 | Skyline Software Systems | Geospatial Analysis Tool for 3D support | COTS - Licensed |
| TerraGo Composer 6.0.0400 English | 6.0.0400 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Composer 6.0.04073 English | 6.0.04073 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Publisher for ArcGIS 6.0.04096 | 6.0.04096 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Publisher for ArcGIS 6.0.04096 English | 6.0.04096 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TGSClient 01.02.00.07 | 01.02.00.07 | Trusted Computer Solutions | TGS Client | COTS – Licensed |
| Timeline+ 1.1.1337.18 English | 1.1.1337.18 | Ringtail Design | Provides a graphed representation (over time) of various Timeline+ TED entities | COTS – Free download |
| TIPCI 2.00.0005 | 2.00.0005 | Texas Instruments Inc. | TIPCI | COTS – Free download |
| Visual Basic for Applications (R) Core - English 6.5.10.32 English | 6.5.10.32 | Microsoft | Visual Basic for Applications (R) Core | COTS – Free download |
| Visual Basic for Applications (R) Core 6.5.10.32 English | 6.5.10.32 | Microsoft | Visual Basic for Applications (R) Core - English | COTS – Free download |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Visual Entity Browser 1.1.1337.17 English | 1.1.1337.17 | Ringtail Design | Provides an intuitive graphical display of TED entities, supports zooming for multiple levels of detail | COTS – Licensed |
| Windows 7 Enterprise x64 | 6.1.7601 | Microsoft | Windows OS system | COTS - Licensed |
| Windows Support Tools 5 2.3790.1830 English | 5.2.3790.1830 | Microsoft | OS Support Tools | COTS – Free download |
| XML Notepad 2007 English | 2.3.0.0 | Microsoft | XML processing package | COTS – Free download |

Protected Information and/or Legends Redacted



Protected Information
and/or Legends Redacted



A270

Appx10270

Protected Information and/or Legends Redacted

UNCLASSIFIED//FOUO//PROCUREMENT SENSITIVE

**DRAFT** – 15 July 2015

# PERFORMANCE WORK STATEMENT

FOR

Distributed Common Ground System – Army
Increment 2, Engineering, Manufacturing and Development

SOLICITATION NUMBER: W56KGY-15-R-0029

DRAFT

Unclassified/FOUO/Procurement Sensitive

1

Appx10410

A410

Protected Information and/or Legends Redacted

# 1 SCOPE

This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the development and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

DCGS-A Increment 2 is technically a New Start program. However, Increment 2 is a logical successor to the DCGS-A Increment 1 and it is envisioned that the hardware platforms and a high percentage of the SW capabilities developed in Increment 1 will be leveraged/used for Increment 2.

Each DCGS-A Increment 2 software release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.
The planned Increment 2 release for data integration foundation, capability & KPP enhancements on modernized infrastructure focus primarily on:

- Data Integration Layer
- Data Analytics Platform (Fusion)
- Interoperability (Net Ready)
- Visualization Framework
- Training
- Sustainment
- Ops and Support
- Cyber Security
- Fact of Life Upgrades
- Logistics and Readiness

The planned Increment 2 release for usability enhancements considering unified user interface & Intel support to cyber capability focus primarily on:

- Consistent User Interface
- Cyber Operations
- DARPA Insight Integration
- Continued INC 2, Release Improvements
- DCGS Integration Backbone (DIB) Upgrade

Protected Information and/or Legends Redacted

DRAFT

- Fact of Life Upgrades
- Logistics and Readiness

As used in this PWS, the term "DCGS-A INC 2, EMD" incorporates the framework, architecture, software and other capabilities that may be developed and integrated in support of the DCGS-A Family of Systems (FoS).

The contractor shall be responsible for system and software engineering, product design, development, integration, testing, and limited deployment support to include software maintenance, configuration management, risk management, and quality assurance. The contractor is also responsible for developing and delivering documentation In Accordance With (IAW) the Contract Data Requirements List (CDRL) associated with this Performance Work Statement (PWS).

This PWS also includes specific program management, system engineering, design and development, software engineering, integration and test, software quality assurance, system platform integration & test, demonstration support, and logistics support for the DCGS-A Increment 2 software baseline.

The Contractor shall complete the design, development, integration and test, to include supporting Development and Operational Test events for the DCGS-A Increment 2 software baseline and any future DCGS-A Increment 2 software baseline releases.

## 1.1 Background

The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD.

DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.

The DCGS-A Increment approach utilizes spiral deliveries to maintain interoperability with Army and Joint ISR architectures and to address capability insertion and enhancements. This system must

Protected Information and/or Legends Redacted

## 3.4 SOFTWARE DESIGN

### *3.4.1 DESIGN PRINCIPLES*

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing. Because of the evolutionary nature of this program, the contractor may be developing different software release/versions concurrently. The contractor shall refine the process as agreed to by the Government. At a minimum, a release/version development shall include:

a. Functionality defined for that release as defined by the Release Objectives.

b. A maximization of reuse of GOTS/COTS products.

Each release and version shall consist of field installable, and field de-installable segments. Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required. Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS.
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor. The DCGS-A Incremental development model is an Agile Development process.

a. Each product release builds on the foundation and functionality of the prior release. These releases are built as planned or in response to events. These blocks are referred to as cycles.

b. The requirements are defined in the contract and vetted through the User Panel.

c. The contractor shall work with the Government to allocate product release objectives into the lower level development cycles.

d. The requirements of each cycle are defined by the contractor at the planning session at the start of the cycle. The contractor shall record the requirements defined at the planning sessions in the form of release objectives and send the requirements to the government for tracking. Problem report corrections and patch development cycles are conducted IAW the Software Development Methodology.

e. Human Factors Engineering, Heuristics and Usability Studies will be continually performed on the DCGS-A system.

At the end of each release/version, the software shall be placed under Configuration Management control.

a. All development products in the cycle shall be stored in the Software Development Folders.

DRAFT

Protected Information and/or Legends Redacted

Section A – Solicitation/Contract Form

SUPPLEMENTAL INFORMATION

This section was intentionally left blank.

P o
a da

lower priority stories that may be worked in the sprint if time allows) will be established during the planning process  At the end of each sprint, a showcase of the work performed will be demonstrated to the stakeholders and feedback elicited to ensure the capabilities under development meet objectives  This close interaction between developer and SME benefits the developer, in clearly understanding the problem domain and the unique operational needs of the user based upon the first-hand experience of the integrated User Panel  It is not unusual for "team exercises – opportunities for the warfighters to use the software in simulated but unscripted settings" to be used as part of the process to define a set of development goals; oftentimes CONOPS will evolve as an integral part of this design and development process    Once a sufficient group of stories have been achieved and tested, a release will be delivered    Showcase software may be selected for additional usage by stakeholders  Stakeholders will be provided an instance of the software during the next grooming session with the intent to provide feedback as to whether the functionality successfully provides a key operational capability to the Warfighter   Oftentimes, a mock field exercise will be used to prove out the developed concepts    Based upon the results of the capabilities validation, additional adjustment of the functionality may take place, which will leverage the backlog grooming process to ensure feedback is captured and correctly prioritized in the context of the wider development effort

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing  Because of the evolutionary nature of this program, the contractor may be developing different software releases concurrently   The contractor shall refine the process as agreed to by the Government   At a minimum, a release development shall include

    a   Functionality defined for that release as defined by the Release Objectives

    b   A maximization of reuse of GOTS/COTS products

Each release and version shall consist of field installable, and field de-installable segments   Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required   Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor

    a   Each product release builds on the foundation and functionality of the prior release   These releases are built as planned or in response to events  These blocks are referred to as cycles

    b   The requirements are defined in the contract and vetted through the User Panel

    c   The contractor shall work with the Government to allocate product release objectives into the lower level development cycles

Protected Information
and/or Legends Redacted

# PALANTIR USG, INC. RESPONSE TO DCGS-A INCREMENT 2 TASK ORDER 0001 DRAFT PERFORMANCE WORK STATEMENT

**Solicitation Number: PM-DCGS-INC2-TASKORDER0001-DRAFTPWS**

**Prepared For:**

Mr. Stephen Morton

Mr. Mike Sherick

ACC-APG-Aberdeen Division C

**Prepared By:**

Palantir USG, Inc.

www.palantir.com

**Palantir POCs:**

Bryant Choung

Copyright © 2015 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

Protected Information and/or Legends Redacted

The Army's stated goals for Increment 2 are to (1) exploit best-in-class commercially available technologies, (2) accelerate delivery of a modern data management architecture, and (3) increase competition within the program. The strategy outlined in draft Increment 2 documents, which is the product of more than eighteen months of planning, will achieve none of these goals and runs counter to all existing guidance and the clear intent of the Secretary of Defense and Congress.

The Army can change the acquisition strategy for Increment 2 to avoid another failure. The solution is straightforward – buy and field proven commercially available technology for core system components using FAR Part 12 procedures instead of trying to reinvent what already exists.

For years, Palantir has fought to provide this candid feedback about the DCGS-A program and software development best practices to the Army (see Appendix). The Army has resisted our attempts to help DCGS-A succeed. In these exchanges, the Army has repeatedly stated that it has studied the lessons of Increment 1 and will allow for direct competition from companies with commercially available technology so that soldiers can have access to technology that works right now. The draft PWS clearly proves otherwise.

***Salvaging the DCGS-A Program – The Need for Fundamental Change***

Absent a senior-level evaluation of the Increment 2 strategy, conducted independently of those leaders currently tied to the program, and fundamental changes to the current PWS, the decision to proceed with Increment 2 will be fatal to the DCGS-A program. The provisional contract structure, draft requirements, and deliverables are emblematic of an obsolete acquisition model that consistently fails when applied to software. Adhering to this model leaves the Army further and further behind the global commercial market. Increment 2 should not be allowed to proceed as is.

However, it is clear that the current program leadership believes that nothing is wrong with Increment 1 and that taking the same approach for Increment 2 is the best course of action. The plan these leaders are presenting to Congress on behalf of the Army runs counter to central goals for Increment 2 and will saddle taxpayers with another expensive failure by design. Already, the work done to date is fostering conditions similar to those that justified the termination of the Army Future Combat System. These conditions also invite public scrutiny of DCGS-A's cost, schedule, and performance.

New program leadership, free from the biases of those currently invested in the program, is needed to introduce a rational strategy and avoid failure of the program. Beyond budgetary and programmatic consequences, rubber-stamping this PWS would jeopardize the performance of the Army Intelligence enterprise for a generation, depriving soldiers of their ability to do their jobs effectively. An entirely different outcome is possible. The Army can buy and field commercially available technology that works and give soldiers what they need now, not years from now.

*Each DCGS-A Increment 2 software release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.*

Additionally, the contractor that wins this task order *"shall be responsible for system and software engineering, product design, development, integration, testing…"* Numerous other components of the document explicitly ask for the development of new software. As software development is highly failure-prone, it is likely that this work will extend well beyond the three to four years stated in the proposed Task Order 0001, if it is completed at all. The lack of clear prioritization of requirements further exacerbates this possibility. At a minimum, soldiers will have waited nearly two decades for the DCGS-A program to successfully deliver an integrated intelligence platform, and taxpayers will incur greater risks and higher costs.

***A New Strategy for Increment 2***

The Army has had multiple opportunities to change the strategy for Increment 2, satisfy Congressional intent, and deliver working technology to soldiers in months, not years. The Army should alter its strategy for Increment 2 to reflect the following realities:

1. The first priority of Increment 2 should be the rapid delivery of a foundational data platform;
2. The Army does not need to build that platform, as it can buy it today; and
3. The Army should use FAR Part 12 commercial contract structures to buy this platform.

*Prioritizing Requirements on the Data Platform*

Just as it should have been for Increment 1, the first priority of Increment 2 should be to acquire a working data integration, visualization, and analytics platform. A system that can integrate all of the Army's disparate data sets into a unified repository with search and analysis is fundamental to delivering a comprehensive "Seeing and Knowing" capability. The acquisition of all other enhancements and functionalities should be subordinate to this goal.

The draft Task Order 0001 includes requirements describing the core data integration platform and architecture. However, it also includes many other extraneous requirements that divert focus away from providing a working baseline and, even under optimistic assumptions, will delay the delivery of core capabilities for years.

The following are a few examples of included requirements that are unnecessary to deliver a working data integration layer. We propose deprioritizing all capabilities not directly related to data integration, so that vendors are evaluated principally on their ability to deliver a data integration layer.

P o
a da

| SECTION | EXPLANATION FOR WHY REQUIREMENT IS NOT NECESSARY |
|---|---|
| Section 3.2.11<br>Fusion | The technology and activities described in this section are better understood as automatic entity extraction, rather than fusion. Automatic entity extraction is not required for the functioning of the core data layer. Furthermore, the commercial market offers numerous existing tools for automatic entity extraction, yet the Task Order, as written, envisions building this capability from scratch. Therefore, evaluation or design of the data platform should not include requirements for the Automatic Entity extraction, but should only include the requirements that the platform be able to exploit and use various automatic entity extraction capabilities. |
| Section 3.2.12<br>Intelligence Support to Cyber Operations | If the Army acquires a working data platform, they can extend and adapt that platform to accommodate any mission area. A separate requirement for cyber intelligence functionality is unnecessary. |
| Section 3.2.17<br>Interoperability Engineering | The requirement to integrate the DCGS Integration Backbone (DIB) Version 4.x is not needed. The DIB should be treated as an interoperability standard, not a software platform that should be integrated. The intended benefit of government and commercial interoperability standards and specifications is the ability for a variety of implementations of software to interoperate in a manner that is predefined and prescribed. This does not mean that all participating members need to use or integrate the same software components. The DIB exists as a metadata discovery and exchange standard. There is a reference implementation for purposes of clarifying the standard. In Increment 2, the Army should seek to adopt any compliant implementation of the specifications and standards. |
| Section 3.2.26<br>Additional Enhancements | This section includes many extraneous requirements that do not affect the delivery of a working data platform and only encourage the haphazard development of new, custom software. These include the following:<br>• Design and implement a chat capability<br>• Design and implement an "undo" feature<br>• Design and implement an automatic map zoom function<br>• Design and implement 3-D walk and fly-through capabilities<br>• Design and implement more "automation" features, which are not defined |

***Buying the Platform - What Can the Army Have Today?***

As Task Order 0001 is currently written, soldiers will wait years from contract award for the delivery of a working data platform. The Army tried and failed to develop the foundational data platform from scratch

P o
a da

| Comment # | Source | Page | Paragraph | Line # | Comment | Comment Type | Rationale | Rationale Type |
|---|---|---|---|---|---|---|---|---|
| 1 | Palantir USG, Inc. | 3.21-44 | All paragraphs in Section 3.2 | | Change the title for Section 3.2 to "System Acquisition and Fielding" and rewrite requirements to provide for the acquisition of the best commercially-available product to fulfill desired capabilities. | Substantive | This section describes a range of design, engineering, and development activities to build a data integration layer, but offers no assurance that such efforts will be successful. In contrast, working data integration layers exist today and can be purchased commercially at lower cost and risk to the Government. Accordingly, we propose that the title for this section be amended to read "System Acquisition and Fielding," and requirements be rewritten to provide for the acquisition of the best commercially available product to fulfill desired capabilities.<br>For example, section 3.2.17 – Interoperability Engineering requires that the contractor develop interoperability with other Army data systems. However, commercial platforms have an inherent incentive to offer openness and interoperability on a global, rather than DOD-specific, level. Therefore, a commercial data integration layer can better satisfy the interoperability requirement, without any additional development. | Consistency |
| 2 | Palantir USG, Inc. | 3.33 | All paragraphs in Section 3.2.11 | | Delete requirement 3.2.11. | Substantive | The technology and activities described in this section are better understood as automatic entity extraction, rather than fusion. Automatic entity extraction is not required for the functioning of the core data layer. Furthermore, the commercial market offers numerous existing tools for automatic entity extraction, yet the Task Order, as written, envisions building this capability from scratch. Therefore, evaluation or design of the data integration platform should not include requirements for the Automatic Entity extraction, but should only include the requirements that the platform be able to exploit and use various automatic entity extraction capabilities. | Correc ness |
| 3 | Palantir USG, Inc. | 3.33 | All paragraphs in Section 3.2.12 | | Delete requirement 3.2.12. | Substantive | A working data integration layer is necessary for the functioning of Increment 2, no matter the mission. A separate requirement for cyber intelligence functionality is unnecessary. | Clarity |
| 4 | Palantir USG, Inc. | 3.35-37 | All paragraphs in Section 3.2.17 | | Amend requirement 3.2.17 to allow any compliant implementation of the specifications and standards. | Substantive | The requirement to integrate the DCGS Integration Backbone (DIB) Version 4.x is not needed. The DIB should be treated as an interoperability standard, not a software platform that should be integrated. The intended benefit of government and commercial interoperability standards and specifications is the ability for a variety of implementations of software to interoperate in a manner that is predefined and prescribed. This does not mean that all participating members need to use or integrate the same software components. The DIB exists as a metadata discovery and exchange standard. There is a reference implementation for purposes of clarifying the standard. In Increment 2, the Army should seek to adopt any compliant implementation of the specifications and standards. | Correctness |
| 5 | Palantir USG, Inc. | 3.42-3.43 | All paragraphs in Section 3.2.26 | | Delete or deprioritize all requirements in 3.2.26. | Substantive | This section includes many extraneous requirements that do not affect the delivery of a working data integration layer and only encourage the haphazard development of new, custom software. | Clarity |
| 6 | Palantir USG, Inc. | 3.44-59 | All paragraphs in Section 3.3 | | Remove software development requirements in Section 3.3. | Substantive | New software development is not required for the data integration layer. Working data integration layers exist today and can be purchased commercially. Accordingly, we would propose that the Army remove requirements related to software development where existing technologies are available. | Clarity |
| 7 | Palantir USG, Inc. | 3.44-46 | All paragraphs in Section 3.3.1 | | Conform Section 3.3.1 to incorporate all (and not only a subset of) Agile software development principles. | Substantive | This section prescribes a particular software development approach (SRCUM/Agile) that is common in commercial software development. We note that the Agile software development manifesto states that "working software is the primary measure of progress," and that "the art of maximizing the amount of work not done--is essential." This Task Order, as written, plainly violates these and other elements of the Agile approach by seeking to re-create technology that already exists. | Completeness |
| 8 | Palantir USG, Inc. | 3.60-62 | All paragraphs in Section 3.4 | | Remove prescriptive "ease of use" requirements from Section 3.4 and add in evaluative criteria to assess ease of use based on proven user experience with the product across a variety of environments. | Substantive | This section contains expansive "ease of use" requirements, aimed specifically at overcoming the lack of a preexisting market and prior use of a custom-build product. Ease of use, however, is a natural outcome of well-designed software that has been refined across time and incorporates the feedback of many users, such as is the case for mature solutions that are available commercially. The Army should amend its approach to emphasize the acquisition of an existing best-of-breed platform that is intuitive and easy to use. | Correctness |

# PALANTIR USG, INC. RESPONSE TO DCGS-A INCREMENT 2 DRAFT RFP SECTIONS L AND M

**Solicitation Number: PM-DCGS-INC2-DRAFTRFPSECTIONSLM**

**Prepared For:**

Mr. Stephen Morton

Mike Sherick

ACC-APG-Aberdeen Division C

**Prepared By:**

Palantir USG, Inc.
www.palantir.com

**Palantir POCs:**

Bryant Choung

Copyright © 2015 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

Protected Information and/or Legends Redacted

# TABLE OF CONTENTS

Executive Summary ........ 1
Remove Barriers for Commercial Competition ........ 3
Avoid Reinventing Technologies that Already Exist ........ 5
Appendix ........ 6

Protected Information and/or Legends Redacted

## Executive Summary

Palantir USG, Inc. ("Palantir") has reviewed sections L and M of the Increment 2 Draft Request for Proposals (RFP). The Army has not corrected critical deficiencies in the overall acquisition structure of Increment 2. As written, Increment 2 will commit the Army to an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program. Increment 2 will commit the Army to the same lengthy, high-risk development effort that failed in Increment 1. We have offered our feedback to program leadership at every step of the Increment 2 process because we want the Army to succeed. But ultimately it is not in our interest or in the Army's interest for it to commit to a program that so clearly violates fundamental principles of successful enterprise software delivery.

Two years ago, Increment 1 was halted so that the Army could adopt a different acquisition strategy for Increment 2. However, no substantive changes have been made. This leaves the Army in the same position it has been in for years. Despite the fact that the capabilities of commercial data integration, analysis, and visualization tools exceed those of DCGS-A, the Army persists in promoting its inferior flagship software and trying to develop capabilities that already exist.

When Palantir has pointed out these facts to the DCGS-A program office and Army ASAALT, we have been consistently told that we are the only company that has expressed concerns regarding barriers to commercial competition and about the basic acquisition structure of Increment 2. If this is true, it is because the Department of Defense (DOD) acquisition system is generally hostile to commercial innovations, leading many potential sources of innovation to exit the DOD market or ignore it entirely. This leaves the DOD with a closed and relatively small pool of traditional contractors with a core competency in compliance rather than innovation or delivery of effective software. This reality is bad for soldiers and bad for taxpayers.

It is also why the Secretary of Defense and Congress are reaching out to companies from places like Silicon Valley. They recognize that the old way of doing things with the same partners will not work. As they have heard, we are far from the only innovative company facing these barriers.

Those in charge of the DCGS-A program are not only consciously saddling taxpayers and soldiers with another failure but are undermining the efforts of the Secretary of Defense and Congress to change a broken system. Increment 2 is an opportunity to prove that the Army is capable of executing the type of agile and innovative acquisition strategy that the DOD seeks to adopt. However, absent fundamental changes to the Army's proposed acquisition strategy, Increment 2 will prove just the opposite.

The DCGS-A PM has stated that the formal RFP for Increment 2 will be released in Q1 of FY 2016. There is little time to reconsider or halt the Army's strategy for the program. Those currently invested in the program have clearly shown they have no intention of doing so and cannot answer a fundamental question: How will Increment 2 be any different from Increment 1? The appointment of new program leadership offers the only realistic chance of avoiding failure.

The DCGS-A program began at the turn of the millennium. Fifteen years and close to $4 billion later, soldiers still do not have a working capability. No one has been held to account for this failure. The Army is acutely aware of the fact that this outcome was avoidable; they have seen and continue to see soldiers request and adopt commercially available alternatives that are in use at this very moment.

The Army already has the tools and the authority necessary to correct course. It can buy existing commercially available technologies that can be fielded well ahead of 2022 (the expiration date of the proposed IDIQ contract). If the course remains unchanged, the Army's multi-decade flagship intelligence investment will consume billions more and produce nothing.

Although our feedback to date has been ignored by the current program leadership, we believe there are two primary areas of concern that new program leadership can and should address before releasing the final RFP for Increment 2.

Protected Information and/or Legends Redacted

*Remove Barriers for Commercial Competitors*

As written, these documents suggest that only responses from competitors who possess DOD-unique compliance capabilities will be entertained. These requirements present significant barriers for innovative commercial companies that do not rely primarily on the DOD for business. These barriers include:

1. The use of cost-type contract structures such that *"lack of supporting evidence of an adequate accounting system at the time of proposal submittal as approved by the Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration and award."*

2. Unclear requirements for Data Rights

3. The requirement for an accredited Earned Value Management System (EVMS)

4. The limitation of past performance relevant only to *"those contracts, whether performed as a prime or major subcontractor, which required Engineering and Manufacturing Development or System Development and Demonstration contracts for development."*

*Avoid Reinventing Technologies that Already Exist*

It should be noted that all of the requirements listed above are necessary only when the DOD is attempting to build technologies itself. The DCGS-A program leadership is aware that many components of the program, including the fundamental data architecture, can be satisfied by existing commercially available technologies. Key program decision makers are aware that Palantir has fielded this capability to half the brigades in the Army and is currently in use by tens of thousands of users across the DOD and Intelligence Community.

According to the Federal Acquisition Regulation (FAR) and all existing and pending Congressional guidance, the Army should break out any such components and compete them using the commercial procedures found in FAR Part 12. Congressional intent on this issue is clearly spelled out in sections 222 and 855 of the 2016 National Defense Authorization Act (see Appendix). The Army's acquisition strategy, as currently outlined in these documents, is plainly at odds with that intent and will result in another lengthy and expensive failure, leaving soldiers with a flagship intelligence program that does not work.

Protected Information and/or Legends Redacted

## Remove Barriers for Commercial Competition

As we have noted in our previous responses to the Army, the draft Increment 2 documents to date outline an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program at the prime contractor and most likely sub-contractor level. Sections L and M of the Draft RFP reinforce and strengthen these preventive barriers.

The barriers put forth in these documents run directly counter to the intent and guidance of Congress, the Secretary of Defense, USDAT&L, and ASAALT. Principally, they discourage the use of commercially available technologies and, instead, incentivize the Army and any contractors selected to build technologies from scratch.

These barriers, and the approach they reflect, were all present in Increment 1. That strategy led to failure. The Army's decision to move to Increment 2 was, in part, an acknowledgement of that failure. In Palantir's conversations with DCGS-A program leadership at industry days and through other channels, it has been repeatedly stated that the Army would make maximum use of existing commercial technologies, particularly as they relate to the data architecture and integration and analytics layer. The following items contained in Sections L and M will prevent the Army from doing so:

***1. The use of cost-type contract structures***

- Section L: Supporting Documents (pg. 10), Volume IV – Cost/Price (pg. 17), Volume VI Price/Cost Supporting Documents (pgs. 22)
- Section M: Factor 3 Cost/Price (pg. 1), Cost/Price Factor (pg. 8)

The Army envisions using a 72-month IDIQ base contract and issuing Task Order 0001 as a cost-plus incentive fee contract type. The performance cost-type work requires the ability to provide certified cost and pricing data and an associated cost accounting system. The Draft RFP states that, *"lack of supporting evidence of an adequate accounting system at the time of proposal submittal as approved by the Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration and award."*

***2. Unclear Requirements for Data Rights***

- Section L: Subfactor 5 Data Rights (pg. 13)
- Section M: Subfactor 5 Data Rights (pg. 4)

These components of the Draft RFP, which read "TBD," make it unclear whether or not the Army will seek to own data rights as they pertain to source code or other software that would be utilized as part of Increment 2. In previous draft Increment 2 documents the Army has stated that *"the government requires delivery of all contractors and sub-contractors technical data and computer software that is generated, developed, or used when performing tasks called for by contract."* Given this ambiguity, it is difficult for Palantir or any other company with commercially available technology to submit a bid against this RFP.

This language should be clarified and, more importantly, the Army should be seeking to buy existing commercially available technologies rather than build them from scratch. In this scenario, companies providing existing commercially available technologies should not be expected to turn over technical data rights to the government.

***3. Requirement for an accredited Earned Value Management System (EVMS)***

- Section L: Award Documents/Certifications/Representations (pg. 11)

Protected Information and/or Legends Redacted

[redacted]

***4. Considerations of Past Performance***

- Section L: Volume III – Past Performance (pg. 14)

The Draft RFP states that past performance will be the second most important selection criteria. It states that "relevant" past performance is limited to *"those contracts, whether performed as a prime or major subcontractor, which required Engineering and Manufacturing Development or System Development and Demonstration contracts for development..."*

The Army's past performance requirements limits "relevance" to traditional systems integrators who develop software from scratch. This limitation would exclude the experiences and performance of companies with proven commercially available technologies, such as Palantir. The end result is that the Army will repeat the same strategy and partner with the same type of company as they did in Increment 1.

[redacted]

Protected Information and/or Legends Redacted

## Avoid Reinventing Technologies that Already Exist

The barriers listed above are inherent to an approach where the Army seeks to build software from scratch, as it tried to do with Increment 1. The Army can and should seek to maximize the use of existing commercial technologies before attempting to reinvent them. Congressional guidance, the intent of the Secretary of Defense and USDAT&L, and the FAR clearly state this. This guidance and intent are in place precisely because the development of new software is highly failure prone. In the case of the DCGS-A program, the program leadership knows that existing commercial technologies are being successfully used across the DOD and IC that can satisfy the 4 major technical factors listed in the Draft RFP.

The Draft RFP states that *"the technical factor is the most important [factor] and is significantly more important than the other three factors combined."* The technical factor is broken down into 5 components, in order of importance:

1. Subfactor 1 Data Architecture
2. Subfactor 2 Fusion Data Analytics
3. Subfactor 3 Interoperability
4. Subfactor 4 Visualization Framework/Usability
5. Subfactor 5 Data Rights

All of the technical factors can be satisfied by existing commercially available technologies acquired under fixed-price contracts using FAR Part 12 procedures. Doing so would significantly shift risk from the Army to private industry and gives soldiers working technology well ahead of the Army's proposed Increment 2 fielding date of 2019. This would require the Army to break the program into sensible components and use commercial procedures where solutions can be bought rather than built.

It should be noted that subfactor 5 is largely irrelevant in this case and the Army has not yet defined its evaluation criteria. As we have noted previously, subfactor 2 is more appropriately labeled "automatic entity extraction" rather than "fusion." Additionally, the interoperability of any foundational component of DCGS-A is vastly more important to the overall success of the program than the ability to perform automatic entity extraction.

While the Army has properly recognized that the delivery of a working Data Architecture is by far the most important step in correcting the failure of Increment 1. Section L of Draft RFP explicitly states that they intend another attempt to build that architecture under task order 0001: "The Offeror shall propose a resource loaded IMS, and information that substantiates Sustainment Strategy, and a detailed technical approach to ***build*** a DCGS-A Increment 2 Data Management Architecture…" This is unnecessary and is in direct conflict with Congressional intent as expressed in sections 855 and 222 of the FY 2016 NDAA.[1]

---

[1] See Appendix

Protected Information and/or Legends Redacted

| SOLICITATION, OFFER AND AWARD | 1. This Contract Is A Rated Order Under DPAS (15 CFR 700) | Rating DOA7 | Page 1 of 123 Pages |
|---|---|---|---|

| 2. Contract Number | 3. Solicitation Number W56KGY-16-R-0001 | 4. Type of Solicitation ☐ Sealed Bid (IFB) ☒ Negotiated (RFP) | 5. Date Issued | 6. Requisition/Purchase Number SEE SCHEDULE |
|---|---|---|---|---|

| 7. Issued By — Code W56KGY | 8. Address Offer To (If Other Than Item 7) |
|---|---|
| ACC-APG Division C (W56KGY)<br>CCAP-CCC<br>6001 Combat Drive<br><br>APG, MD 21005-1846 | |

NOTE: In sealed bid solicitations 'offer' and 'offeror' mean 'bid' and 'bidder'.

## SOLICITATION

9. Sealed offers in original and ______________ copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in ______________ until ______________ (hour) local time ______________ (Date).

Caution - Late Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All ers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name | B. Telephone (No Collect C — Area Code | Number | t | C. E-mail Address |
|---|---|---|---|---|---|
| | [REDACTED] | | [REDACTED] | | [REDACTED] |

11. Table Of Contents

| (X) | Sec. | Description | Page(s) | (X) | Sec. | Descrip | Page(s) |
|---|---|---|---|---|---|---|---|
| | | Part I - The Schedule | | | | Part II - Contract C es | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 37 |
| X | B | Supplies or Services and Prices/Costs | 3 | | | P III - List Of Documents, Exhibits, An Other Attach. | |
| X | C | Description/Specs./Work Statement | 29 | X | J | List of achments | 88 |
| X | D | Packaging and Marking | 30 | | | Part IV Representations And Instructions | |
| X | E | Inspection and Acceptance | 31 | X | | R esentations, Certifications, and ther Statements of Offerors | 89 |
| X | F | Deliveries or Performance | 32 | | | | |
| X | G | Contract Administration Data | 33 | X | L | strs., Conds., and Notices to Offerors | 101 |
| X | H | Special Contract Requirements | 35 | X | M | uation Factors for Award | 118 |

## OFFER (Must b fully pleted by off r)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 214-16, Mi Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accep d withi _____ cal days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to ish y or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time d in the sched

| 13. Discount For Prompt Payment (See Section I, Clause No. 52.232-8) | Calenda ays (%) | 2 alendar Days (%) | 30 Calendar Days (%) | Calendar Days (%) |
|---|---|---|---|---|

| 14. Acknowledgment of Amendments (The offe acknowledges receipt of amendments to the SOLICITATIO or offerors and related documents numbered and dated): | Amen ent No. | Date | Amendment No. | Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

| 15A. Name and Address of Offeror — Code — Facility | 16. Name and Title of Person Authorized to Sign Offer (Type or Print) |
|---|---|
| | |

| 15B. Telephone Nu er — Area Code / Number / Ext. | 15C. Ch f Remitta Address is ☐ Diff t From Above – Enter such Add In Schedule | 17. Signature | 18. Offer Date |
|---|---|---|---|
| | | | |

## AWARD (To be completed by Government)

| 19. Accepted As To Items Num d | 20. Amount | 21. Accounting And Appropriation |
|---|---|---|
| | | |

| 22. Authority For Using Other Than A Open Competition: ☐ 10 U.S.C. 2304(c)( ) ☐ U.S.C. 253(c)( ) | 23. Submit Invoices To Address Shown In (4 copies unless otherwise specified) | Item 25 |
|---|---|---|

| 24. Administered By (If other than Item 7) — Code | 25. Payment Will Be Made By — Code |
|---|---|
| | |

| 26. Name of Contracting Officer (Type or Print) | 27. United States Of America<br><br>(Signature of Contracting Officer) | 28. Award Date |
|---|---|---|
| | | |

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

Standard Form 33 (Rev. 9-97)
Prescribed By GSA-FAR (48 CFR) 53.214(c)

DRAFT

Protected Information and/or Legends Redacted

SECTION L - INSTRUCTIONS, CONDITIONS, AND NOTICES TO OFFERORS

| | Regulatory Cite | Title | Date |
|---|---|---|---|
| L-1 | 52.204-7 | SYSTEM FOR AWARD MANAGEMENT | JUL/2013 |
| L-2 | 52.204-16 | COMMERCIAL AND GOVERNMENT ENTITY CODE REPORTING | JUL/2015 |
| L-3 | 52.215-1 | INSTRUCTIONS TO OFFERORS--COMPETITIVE | JAN/2004 |
| L-4 | 52.215-1 | INSTRUCTIONS TO OFFERORS--COMPETITVE (JAN 2004) -- ALTERNATE I (OCT 1997) | OCT/1997 |
| L-5 | 52.215-16 | FACILITIES CAPITAL COST OF MONEY | JUN/2003 |
| L-6 | 52.215-22 | LIMITATIONS ON PASS-THROUGH CHARGES -- IDENTIFICATION OF SUBCONTRACT EFFORT | OCT/2009 |
| L-7 | 52.222-24 | PREAWARD ON-SITE EQUAL OPPORTUNITY COMPLIANCE EVALUATION | FEB/1999 |
| L-8 | 52.222-46 | EVALUATION OF COMPENSATION FOR PROFESSIONAL EMPLOYEES | FEB/1993 |
| L-9 | 252.209-7008 | NOTICE OF PROHIBITION RELATING TO ORGANIZATIONAL CONFLI[illegible] INTEREST -- MAJOR DEFENSE ACQUISITION PROGRAM | DEC/2010 |
| L-10 | 252.215-7008 | ONLY ONE OFFER | OCT/2013 |
| L-11 | 252.225-7003 | REPORT OF INTENDED PERFORMANCE OUTSIDE THE UNITED STATES AND CAN[illegible] - SUBMISSION WITH OFFER | OCT/2015 |
| L-12 | 252.234-7003 | NOTICE OF COST AND SOFTWARE DATA REPORTING [illegible]TEM--BASIC | NOV/2014 |
| L-13 | 252.239-7017 | NOTICE OF SUPPLY CHAIN RISK | NOV/2013 |
| L-14 | 252.211-7001 | AVAILABILITY OF SPECIFICATIONS, STAND[illegible]S AND DATA [illegible]EM DESCRIPTIONS NOT LISTED IN THE ACQUISITION STREAMLINI[illegible] AND ST[illegible]ARDIZATION INFORMATION SYSTEM (ASSIST), AND PLANS, DR[illegible]N[illegible] AND OTHER PERTINENT DOCUMENTS | MAY/2006 |

Insert Army Contracting Command- Aberdeeen Proving Ground d[redacted] in the blanks within the above referenced clause.

| | | | |
|---|---|---|---|
| L-15 | 52.211-14 | NOTICE OF PRIORITY RATING FOR[illegible]TION DEFENSE, EMERGENCY PREPAREDNESS[illegible]NERGY PROGR[illegible]E | APR/2008 |

Any contract awarded as a result of this [illegible]licitation [illegible]ill be (TB[illegible] certified for national defense, emergency preparedness, and energy program use under the Defense Prioriti[illegible] and Allocati[illegible]s System (D[illegible] (15 CFR 700), and the Contractor will be required to follow all of the requirements of this regulati[illegible]

End of Provis[illegible]n)

| | | | |
|---|---|---|---|
| L-16 | 52.216 | TYPE [illegible] CONTRACT | APR/1984 |

The Government con[illegible]lates award of a In[illegible]inite-Delivery Indefinite-Quantity (IDIQ)contract resulting from this solicitation.

(End of Provision)

| | | | |
|---|---|---|---|
| L-17 | 52.233-2 | SERVICE OF PROTEST | SEP/2006 |

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

[redacted]

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

(End of Provision)

DRAFT

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued<br>PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 102 of 123 |
|---|---|---|

Name of Offeror or Contractor:

L-18 52.211-2 AVAILABILITY OF SPECIFICATIONS, STANDARDS, AND DATA ITEM DESCRIPTIONS LISTED IN THE ACQUISITION STREAMLINING AND STANDARDIZATION INFORMATION SYSTEM (ASSIST) MAY/2014

(a) Most unclassified Defense specifications and standards may be downloaded from the following ASSIST websites:

(1) ASSIST https://assist.dla.mil/online/start/

(2) Quick Search http://quicksearch.dla.mil/

(3) ASSISTdocs.com (http://assistdocs.com).

(b) Documents not available from ASSIST may be ordered from the Department of Defense Single Stoc int (DoDSSP) by

(1) Using the ASSIST Shopping Wizard https://assist.dla.mil/wizard/index.c

(2) Phoning the DoDSSP Customer Service Desk (215) 697-2197, Mon-Fri 30 to 1600 E or

(3) Ordering from DoDSSP, Building 4, Section D, 700 Robbins Avenue, Ph delphi PA 19111-5094, Telephone (215) 697-2667/2179, Facsimile (215) 697-1462.

(End of Provision)

L-19 52.215-20 REQUIREMENTS FOR CERTIFIED T OR PRI ATA AND DATA OTHER THAN CERTIFIED COST OR PRICING DA OCT/2010

(a) Exceptions from certified cost or pricing

(1) In lieu of submitting certified co or pricing ata, offer may submit a written request for exception by submitting the information described in the following bparagraphs he Contract Officer may require additional supporting information, but only to the extent necessary to determine wh er an except should be gr ed, and whether the price is fair and reasonable.

(i) Identification of the law or reg tio tablishing th price offered. If the price is controlled under law by periodic rulings, reviews, or similar actions of a nmental body, attach a copy of the controlling document, unless it was previously submitted to the contractin

(ii) Commercial it exception. F commerc item exception, the offeror shall submit, at a minimum, information on prices at which the same item similar items ha reviously been sold in the commercial market that is adequate for evaluating the reasonableness of price for this acqu tion. Such information may include --

(A) For catalog i s, a copy of or entification of the catalog and its date, or the appropriate pages for the offered items, or a statement that the cata is on file the buying office to which the proposal is being submitted. Provide a copy or describe current discount policies an rice li (published or unpublished), e.g., wholesale, original equipment manufacturer, or reseller. Also explain the basis of each fer price and its relationship to the established catalog price, including how the proposed price relates to the price of recent s in quantities similar to the proposed quantities;

(B) For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts. In addition, describe the nature of the market;

(C) For items included on an active Federal Supply Service Multiple Award Schedule contract, proof that an exception has been granted for the schedule item.

(2) The offeror grants the Contracting Officer or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this provision, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the offerors determination of the prices to be offered in the catalog or marketplace.

(b) Requirements for certified cost or pricing data. If the offeror is not granted an exception from the requirement to submit certified cost or pricing data, the following applies:

DRAFT

A820

Appx10820

Protected Information and/or Legends Redacted

(1) The offeror shall prepare and submit certified cost or pricing data, data other than certified cost or pricing data, and supporting attachments in accordance with the instructions contained in Table 15-2 of FAR 15.408, which is incorporated by reference with the same force and effect as though it were inserted here in full text. The instructions in Table 15-2 are incorporated as a mandatory format to be used in this contract, unless the Contracting Officer and the Contractor agree to a different format and change this clause to use Alternate I.

(2) As soon as practicable after agreement on price, but before contract award (except for unpriced actions such as letter contracts), the offeror shall submit a Certificate of Current Cost or Pricing Data, as prescribed by FAR 15.406-2.

(End of Provision)

L-20 52.252-1 SOLICITATION PROVISIONS INCORPORATED BY REFERENCE FEB/1998

This solicitation incorporates one or more solicitation provisions by reference, with sa orce and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text availabl he offer is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotat or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragr identifier and p de the appropriate information with its quotation or offer. Also, the full text of a solicitation provision y be accessed electroni y at this/these address(es):

http://www.arnet.gov/far/ or http://www.acq.osd.mil/dpap/dars/ind htm or htt //farsite.hill.af.mil/VFAFARa.HTM

L-21 52.252-5 AUTHORIZED DEVIATIONS IN O NS APR/1984

(a) The use in this solicitation of any Federal Acquisition ulation R Chapter 1) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the date of th rovisi

(b) The use in this solicitation of any DoD FA LEMENT (48 hapter 2) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the name of t regul on.

(E of clause)

L-22 252.204-7008 COMPLIANC H SAFEGUARDING COVERED DEFENSE INFORMATION CONTROLS OCT/2015
(DEV 2016- EVIATION -O0001)
O0001)

(a) Definitions. As d in this pr ion--

"Controlled techn information," "cove contractor information system," and "covered defense information" are defined in clause 252.204-7012, Safegu ng Covered Defense nformation and Cyber Incident Reporting (DEVIATION 2016-O0001)(OCT 2015).

(b) The security require s required b contract clause 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting (DEVIATION 2016-O (OCT 2 ) shall be implemented for all covered defense information on all covered contractor information systems that suppo he rformance of this contract.

(c) If the Offeror anticipates that additional time will be necessary to implement derived security requirement 3.5.3 "Use of multifactor authentication for local and network access to privileged accounts and for network access to non-privileged accounts" within National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, "Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations (see http://dx.doi.org/10.6028/NIST.SP.800-171), the Offeror shall notify the Contracting Officer that they will implement the requirement within 9 months of contract award.

(d) If the Offeror proposes to deviate from any of the security requirements in NIST SP 800-171that is in effect at the time the solicitation is issued or as authorized by the Contracting Officer, the Offeror shall submit to the Contracting Officer, for consideration by the DoD Chief Information Officer (CIO), a written explanation of--

(1) Why a particular security requirement is not applicable; or

(2) How an alternative, but equally effective, security measure is used to compensate for the inability to satisfy a particular requirement and achieve equivalent protection.

DRAFT

Protected Information and/or Legends Redacted

(e) An authorized representative of the DoD CIO will approve or disapprove offeror requests to deviate from NIST SP 800-171 requirements in writing prior to contract award. Any approved deviation from NIST SP 800-171 shall be incorporated into the resulting contract.

(End of provision)

L-23 252.234-7001 (DEV 2015-00017) NOTICE OF EARNED VALUE MANAGEMENT SYSTEM (DEVIATION 2015-00017) SEP/2015

(a) If the offeror submits a proposal in the amount of $100,000,000 or more--

(1) The offeror shall provide documentation that the Cognizant Federal Agency (CFA) has determined that the proposed Earned Value Management System (EVMS) complies with the EVMS guidelines in the American National Standards Institute/Electronic Industries Alliance Standard 748, Earned Value Management Systems (ANSI/EIA-748) (current version at time of solicitation). The Government reserves the right to perform reviews of the EVMS when deemed necessary to verify compliance.

(2) If the offeror proposes to use a system that has not been determined to be in compliance with the requirements of paragraph (a)(1) of this provision, the offeror shall submit a comprehensive plan for compliance with the guidelines in ANSI/EIA-748.

(i) The plan shall--

(A) Describe the EVMS the offeror intends to use in performance of the contract, and how the proposed EVMS complies with the EVMS guidelines in ANSI/EIA-748;

(B) Distinguish between the offerors existing management system and modifications proposed to meet the EVMS guidelines;

(C) Describe the management system and its application in terms of the EVMS guidelines;

(D) Describe the proposed procedure for administration of the EVMS guidelines as applied to subcontractors; and

(E) Describe the process the offeror will use to determine subcontractor compliance with ANSI/EIA-748.

(ii) The offeror shall provide information and assistance as required by the Contracting Officer to support review of the plan.

(iii) The offerors EVMS plan must provide milestones that indicate when the offeror anticipates that the EVMS will be compliant with the guidelines in ANSI/EIA-748.

(b) If the offeror submits a proposal in an amount less than $100,000,000--

(1) The offeror shall submit a written description of the management procedures it will use and maintain in the performance of any resultant contract to comply with the requirements of the Earned Value Management System clause of the contract. The description shall include--

(i) A matrix that correlates each guideline in ANSI/EIA-748 (current version at time of solicitation) to the corresponding process in the offerors written management procedures; and

(ii) The process the offeror will use to determine subcontractor compliance with ANSI/EIA-748.

(2) If the offeror proposes to use an EVMS that has been determined by the CFA to be in compliance with the EVMS guidelines in ANSI/EIA-748, the offeror may submit a copy of the documentation of such determination instead of the written description required by paragraph (b)(1) of this provision.

(c) The offeror shall identify the subcontractors (or the subcontracted effort if subcontractors have not been selected) to whom the EVMS requirements will apply. The offeror and the Government shall agree to the subcontractors or the subcontracted effort selected for application of the EVMS requirements. The offeror shall be responsible for ensuring that the selected subcontractors comply with the requirements of the Earned Value Management System clause of the contract.

(End of provision)

L- 21 PROPOSAL SUBMISSION INSTRUCTIONS

1. Introduction. Offerors shall submit digital copies of proposals through the Federal Business Opportunities (hereby known as FedBizOpps) web portal. Offerors proposal shall consist of six (6) volumes.

DRAFT

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued<br>PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 105 of 123 |
|---|---|---|

Name of Offeror or Contractor:

The Volumes are as follows:

| | |
|---|---|
| I | Executive Summary |
| II | Technical |
| III | Cost/Price |
| IV | Past Performance |
| V | Small Business Participation Plan |
| VI | Price/Cost Supporting Documentation |

Offerors are cautioned that parroting of the Technical requirements or the PWS with a statement intent to perform does not reflect an understanding of the requirement or capability to perform except as otherwise stated in the P compliance matrix. Offerors are responsible for including sufficient details to permit a complete and accurate evaluation ach proposal. Proprietary information shall be clearly marked.

Offer and Award Documents and Certifications/Representations. Each proposal volume all incl the prescribed files identified in paragraph 2 Proposal Files below. Electronic submission of proposal is mandatory in accordance the Request for Proposals (RFP) due date listed in the solicitation, with the time of receipt of the required tronic proposal v es to FBO serving as the compliance time for proposal. The electronic proposal file submission to FB ill be the official sub ion used for evaluation purposes.

Files to be posted on FBO shall NOT contain CLASSIFIED data. The use xternal hy links in proposals is prohibited. The use of hyperlinks that link within a document, such as table of contents links, allow

FBO Resources:

- The Uniform Resource Locator (URL) for FBO is: https://w ov/

- Directions for navigating this Internet site are contained FBO User found at: https://www.fbo.gov/downloads/FBO_Vendor_Guide.pdf

- For Technical assistance, The FedBizOpps hel can be rea at https://www.fbo.gov/utils/help_desk, or 1-866-606-8220 (national), 1-334-206-7828 (international)

- FedBizOpps registration and (active) stem for Awa Management AM https://www.sam.gov) account is required to submit proposals.

WARNING: Do not wait until the last m e to sub p To avoid late proposal submissions, offerors are encouraged to submit proposals 24 hours prior to the require e d and time.

Offerors are encouraged to demonstr n videos available at: https://www.fbo.gov/inde tatic=vi =getstar ode=list&tab=list&tabmode=list

Acquisition Source ection Interactiv pport To (ASSIST):
During the conduc this acquisition, t Acquisition Source Selection Interactive Support Tool (ASSIST) will be used by the Government to suppor e proposal evalua n and source selection process. A separate tool, the ASSIST2Industry, will be used in conjunction with ASSIS accomplish all changes with Offerors after receipt of proposals pursuant to Federal Acquisition Regulation (FAR) 15.306. ASSIST2Ind y provides ability for the Government to issue, and the Offerors to receive and respond to, all Evaluation Notices (ENs) in cure o ne environment.

In order to initiate the use of A ST2Industry, the Government requires the names, company titles, telephone numbers, and email addresses of two (2) individuals that the Offeror has designated as responsible for receiving and responding to Government ENs through ASSIST2Industry. The designation of two (2) individuals is for the purpose of insuring availability of one individual if the other individual is not available. The required information regarding these two (2) individuals must be submitted with the Offerors proposal and included in the cover letter.

After the solicitations closing date, the Government will establish an account in ASSIST2Industry for each individual identified by the Offeror that has submitted a proposal in response to this solicitation. The two individuals named by the Offeror will be authorized access to that account. Two (2) separate system generated emails will be sent to each individual. One of the emails will contain the individuals ASSIST2Industry username. The other email will contain the individuals temporary password. Using the provided username and temporary password, each individual can then go to https://ASSIST2Industry.army.mil to access the account. NOTE: The first time a user logs in, the user will be required to change the temporary password before the user can proceed to use the site.

Whenever the Government issues ENs to the Offeror through ASSIST2Industry, the Governments Contracting Officer will notify the Offeror through a medium independent of ASSIST2Industry (e.g., e-mail) that the Offeror has ENs in ASSIST2Industry waiting for a response. There will be no ENs in ASSIST2Industry until such notice is issued by the Contracting Officer.

DRAFT

A823

Appx10823

Protected Information and/or Legends Redacted

All Offerors are advised that ASSIST2Industry has been updated, and it is now the responsibility of PRIME Contractors to establish accounts for their SUBCONTRACTORS to respond to Government ENs. A separate area within ASSIST2Industry has been created to allow authorized Subcontractor POCs to upload proposal files only. Subcontractors will not be able to access any other information on the ASSIST2Industry website (e.g., Questions/Evaluation Notices, Responses, etc.). Once a Subcontractor has been added, they will receive a user ID (e.g., subcontractor0001) and password (an initial password) that will be sent via two separate system generated e-mails. A Subcontractor will have one user ID for all PRIMES and solicitation responses, i.e., if you are a Subcontractor to multiple Prime Contractors and multiple solicitation responses, you will only have one user ID. Once an account has been established for the Subcontractor, go to https://ASSIST2Industry.army.mil access the account. Prime Contractors will only be able to see the number of files submitted by their Subcontractors; but, will be UNABLE TO VIEW the Subcontractors files.

NOTE: Both Prime Contractors and Subcontractors are instructed to review the ASSIST2Industry ers Guide, located under the Getting Started tab on the website. The guide has been updated and provides step by step instructi on how to perform functions and navigate the website.

Offerors can contact the ASSIST2Industry Helpdesk via e-mail at usarmy.jbmdl.acc.list.vce-helpdesk@mail.mil or by telephone at (609) 562-5988 or (609) 562-7050 f ny technical assistance that may be needed.

THE OFFERORS ARE CAUTIONED THAT THE SYSTEM GENERATED EMAILS REFERRED TO AB ARE INTENDED FOR ADMINISTR VE PURPOSES ONLY. RECEIPT OF THESE EMAILS DOES NOT CONSTITUTE THE COMMENCEMENT OF ANY TYPE OF EXCHANG WITH THE OFFE OR IN ACCORDANCE WITH FAR 15.306(A), (B), OR (D) (I.E., CLARIFICATIONS, COMMUNICATIONS, OR DISCUSSIONS). ALSO, RECEIPT THESE EMAI DOES NOT SIGNIFY THAT A COMPETITIVE RANGE DETERMINATION IN ACCORDANCE WITH FAR 15.306(C) HAS BEEN MADE OR THAT THE ERORS POSAL WILL BE INCLUDED IN THE COMPETITIVE RANGE WHEN THAT DETERMINATION IS MADE. ALL NOTIFICATIONS THAT ANY TYPE OF EXCHAN WI THE OFFEROR HAS COMMENCED AND THE OFFEROR HAS EVALUATION NOTICES (ENS) AVAILABLE TO RESPOND TO, OR ANY NOTIFICATION THAT TH FFERORS PROPOSAL HAS BEEN INCLUDED IN OR EXCLUDED FROM THE COMPETITIVE RANGE, WILL BE SENT TO THE OFFEROR BY THE CO TRACTING OFFICER IN ENDENTLY OF THE ASSIST2INDUSTRY.

2. PROPOSAL SUBMISSION REQUIREMENTS

a) Demonstration: The Amazon Web Service (AWS) Gov Cloud will rve as e de tion host environment to emulate the use of the Intelligence Community Information Technology Enterprise (IC I Co rcial Cloud Services (C2S). Offerors will provide the name and email address of an appropriate demonstration of contact their proposal submission. This information will be used by the Government to set up a unique and secure AW ccoun r offeror he Government will provide each vendor with a username and password to provide secure access to their respect e Amazon W Service ( ) virtual computing resources. General information about AWS services can be found at https://aws.a on.com/, and n AWS GovCl overview can be found at https://aws.amazon.com/govcloud-us/.

The offerors capability(s) are requir o be lo tion ready within 5 business days after account access is granted. After the 5 business days, access to th te be locked an only opened at the scheduled time of the offerors presentation and demonstration. The offeror can choose to ct the demonstration either in person at the Aberdeen Proving Ground (APG) campus or virtually. The demonstrati begin wit presentation, and the combined time of the presentation and demonstration will be no longer than 2 hours. Th resenta will ne o be submitted via email to the government at [redacted] prior to the AWS accou lockdown. Th overnmen ll randomly assign offeror demonstration times by drawing lots.

b) Format. The su sion shall be clear indexed and logically assembled. Each volume shall be clearly identified and shall begin at the top of a page. A pages of each volu shall be appropriately numbered and identified by the complete company name, date and solicitation number in header and/or f ter.

As indicated in Table A bel Filenam and Page Limits) all files shall be submitted as Microsoft Office Word (MS) no earlier than 2007 version, (.docx), Excel x) nd/or Acrobat (pdf). A table of contents should be created using the table of content feature in MS Word. MS Word (doc) files sh use the following page setup parameters:

Font Size 12 Point Arial or Times New Roman
Margins Top, Bottom, Left, Right 1
Gutter 0
From Edge Header, Footer 0.5
Page Size, Width 8.5
Page Size, Height 11

NOTE: 11X17 folder pages are acceptable for tables/graphic representations; however, each 11X17 page counts as two pages. The previously noted font size and type are applicable for all tables/graphics and illustrations.

Characters shall be set at no less than normal spacing and 100% scale. Tables and illustrations may use a reduced font size not less than 8-point and may be landscape. Line spacing shall be set at no less than single space.

Each paragraph shall be separated by at least one (1) blank line. Page numbers, company logos, and headers and footers may be within

DRAFT

Protected Information and/or Legends Redacted

the page margins ONLY, and are not bound by the 12-point font requirement. Footnotes to text shall not be used. If the Offeror submits annexes, documentation, attachments or the like, not specifically required by this solicitation, such will count against the Offerors page limitations unless otherwise indicated in the specific Volume instructions below. Pages in violation of these instructions, either by exceeding the margin, font or spacing restrictions or by exceeding the total page limit for a particular volume, will not be evaluated. Pages not evaluated due to violation of the margin, font or spacing restrictions will not count against the page limitations. The page count will be determined by counting the pages in the order they come up in the print layout view.

c) File Packaging. Offeror shall submit proposal files under the associated filenames and file format stated in Table A. If proposal files are compressed (zipped), using WinZip version 6.2 or later, into multiple zip files, each zip file must be clearly identified by Volume, as per Table 1 instructions. Please note, Offerors are cautioned that large file sizes of proposals significantly delay submissions, or may not be permitted due to file size restrictions on FBO. High resolution graph s and logos may greatly increase file sizes. Up to five (5) files can be uploaded at one time. The combined size of the five (5) es cannot exceed 20Mb. Also note, self-extracting .exe files will not be accepted. Additionally, the Government does not accept r ponsibility for the organization of electronic proposal submissions. If proposal files are missing or not identified per th ructions provided by this solicitation, the proposal may be eliminated from the competition. The Offeror is responsible for ring l appropriate files are included in the proposal submission. Proposal files may be submitted individually without compress at Offer discretion.

File size for each title/topic MUST not exceed the file size limits as indicat n Table A. Break achments into smaller files or use the upload utility multiple times if files exceed the 20Mb size limit. enames MUST be labeled ndicated in Table A.

Updated computer software virus protection is required, Offerors should t submit pro sals absent updated computer virus protection software. Uploading files with viruses may jeopardize bid submission.

The Government will not accept any other submission methods in lieu of thos tted by the submission instructions provided by this RFP.

d) Content Requirements. The Offeror shall confine submis o essential matte sufficient to define the proposal and provide an adequate basis for evaluation. Offerors are responsible fo inclu fficient de s, in a concise manner, to permit a complete and accurate evaluation of each proposal. Each volume of the pr osal shall ist of a Table of Contents, Glossary of Abbreviations and Acronyms, Summary Section, and the narrative discussion. The mmary S tion contain a brief abstract of the volume. Any proprietary information shall be clearly marked. No price inf ati shall be presented in any part of the proposal except as provided In Volume I, Executive Summary, Volume III, C ce Factor, olume VI Price/Cost Supporting Documentation. Each volume shall be prepared on a standalone basis, so that its nten y be eval ed with minimum cross-referencing to other volume of the proposal. Each Table of Contents shall delineate th subparagra s with tha olume to the proposal content when applicable. Cross-referencing shall be included in the appropriate v mes, and acr s the propo to ensure that the Offeror has addressed all required elements in the proposal and compliance with the overnments re rements. The bmission of alternate proposals shall not be allowed.

The titles and page limits requirements ea ile are shown n the Table below:

DRAFT

Table A- Filenames d Page Limits

| Volume | Title | Fi name | Page Limit |
|---|---|---|---|
| I | Executive Summary | | |
| | Proposal Synopsis | OPSYN.docx or.PDF | 10 pages |
| | Glossary of Abbreviations and Acronyms | GLOSSARY.docx or.PDF | No page limit |
| | Contract Work Breakdown Structure | CWBS.docx or PDF | No page limit |
| | Supporting Documents | SUPPDOCS_FILENAME.DOCX or SUPPDOCS_FILENAME.PDF or SUPPDOCS_FILENAME.XLSX | No page limit |
| | Award Documents /Certifications/ Representations | AWARDDOCS_FILENAME.DOCX or AWARDDOCS_FILENAME.PDF or AWARDDOCS_FILENAME.XLSX | No page limit |

Protected Information and/or Legends Redacted

| | | | |
|---|---|---|---|
| | IPT Structure | IPTstructure_FILENAME.DOCX or IPTstructure_FILENAME.PDF | 5 pages |
| II | Technical Factor | | |
| | Technical Approach | TECHAPP.docx or.pdf | 150 pages and Technology Readiness Level (TRL) Evidence |
| | DCGS-A Increment 2 Software Capability Demonstration and Presentation | DEMOBRIEF.ppxt or .pdf | No page limit |
| | Integrated Master Schedule | MASTRSCHED.PDF | No page limit |
| | PWS Compliance Matrix | PWSCOMPMAT.XLSX | No page [illegible]mit |
| | Technical Addendum | REDLINED PWS.DOCX<br>REDLINED PBS.DOCX<br>REDLINED TO 0001PWS.DOCX | No page l[illegible]t |
| | Data Assertions | DATAASSERT.XLSX | [illegible] page limit |
| | Organizational Conflict of Interest Mitigation Plan | OCIMITIGATION.DOCX | No page [illegible] |
| | Quality Assurance Surveillance Plan | QASP.DOCX | [illegible] page limit |
| III | Cost Factor | | [illegible] page limit |
| | Price Methodology | COSTPM[illegible]r .DOCX | No page limit |
| | Cost Workbook | [illegible] xlsx | No page limit |
| | Sanitized C[illegible] Workbook | SCWB[illegible]x | No page limit |
| | Basis of Esti[illegible]e | BOE.doc[illegible] or .PDF or.xlsx | No page limit |
| IV | Past Performance Fact[illegible] | PAS[illegible]RF.docx or P[illegible]PERF.PDF | 5 pages per each Referenced contract for Section 2 Only |
| V | Small Business Participation Plan Factor | SBPP.docx or SBPP.PDF | No page limit |
| | Small Business Subcontracting Plan (For Large Business Primes only) | SBSP.docx or SBSP.pdf | No page limit |
| VI | Price/Cost Supporting | PCSUPP_FILENAME.DOCX | No page limit |

DRAFT

Protected Information and/or Legends Redacted

Documentation or PCSUPP_FILENAME.PDF
or PCSUPP_FILENAME.XLSX

Note: Cover Letter, Title Page, Table of Contents/List of Figures, Acronyms and Glossary, and Cross Reference Matrix for each volume will be excluded from page count.

General Instructions: No assumptions will be made by evaluators regarding areas that are not addressed in the Offerors written proposal or written responses to Government ENs. Mere statements of compliance or repetition of the technical requirements without a complete discussion and analysis may be deemed to be deficiencies unless otherwise noted in the PWS compliance matrix.

Offerors' proposals shall not contain terms, conditions, and/or assumptions.

All responses shall adhere to the PWS Compliance Matrix.

Offerors are advised that employees of the firms identified below may serve as non- rnment sors in the task order evaluation process. These individuals will be authorized access only to those portions of the proposal data d discussions that are necessary to enable them to perform their respective duties. These individuals are non-voti members of the ev tion team.

Firms Point of contact (POC) information:

MITRE Corp
POC: Robert A. Orlosky
rorlosky@mitre.org
(703) 983-7622

Booz Allen Hamilton Inc.
POC: Ryan Ludwig
Ludwig_ryan@bah.com
732-936-3539

Exeter Inc.
POC: Mike Davis
mdavis@exetergov.com
(301) 545-0977

Alliance Consulting
POC: Jennifer Stroh
jen@consultalliance.net
(443) 861-2456

Millennium
POC: Loran Bateman-M zie
loranbateman.mckenzie@m groupinc.com
(571) 527-2212

ADC Management Solutions
POC: Tonya S. Manago
tonya.manago@adc-ms.com
(202) 380-9935

In accomplishing their duties related to the Technical Factor and Small Business Participation Factor evaluation and negotiation process, the aforementioned firms may require access to proprietary information contained in the offerors proposals. Therefore, pursuant to FAR 9.505-4(b), these firms must execute an agreement with each offeror that states that they will (1) protect the offerors information from unauthorized use or disclosure for as long as it remains proprietary, and (2) refrain from using the information for any purpose other than that for which it was furnished. To expedite the evaluation process here, each offeror must contact the above companies to effect execution of such an agreement, and the failure to contact the contractor and execute the agreement prior to the proposal due date and time will be regarded as a waiver of the ability to seek such an agreement. Such 9.505-4(b) proposals must be submitted to the contracting officer. Since the contractor employees have submitted non-disclosure agreement in conformity with DFARS 209.505-(b), an offeror may also waive the requirements of FAR 9.505-4(b) if they so desire by notifying the contracting officer of their desire to take this route.

Note: This requirement shall flow down to all Subcontractors.

DRAFT

Protected Information and/or Legends Redacted

(i) VOLUME I EXECUTIVE SUMMARY. The Offeror shall utilize this volume to provide an overview of the proposal and summarize pertinent information contained in all volumes of the proposal. The information contained in this volume must be consistent with data in the other volumes. References to the proposal locations providing substantiating data shall be given as appropriate.

This volume shall be organized into the following sections:

(1) Proposal Synopsis: The Offeror shall utilize this section of the Executive Summary to summarize pertinent information contained in all volumes of the proposal. The Offeror is free to submit this section of the Executive Summary in any format desired, subject to the limitations previously set forth above, and to include any and all information it believes will support its proposal. Offerors are reminded that the Executive Summary is an introductory summation of the proposal. Therefore, n nformation shall be in the Executive Summary that does not appear elsewhere in the proposal. The Executive Summary will not be ev ated.

(2) Glossary of Abbreviations and Acronyms: The Executive Summary shall contain a glossar ll abbreviations and acronyms used, with an explanation for each. The glossary of abbreviations and acronyms does not count t ds page limits contained in Table A.

(3) Contract Work Breakdown Structure (CWBS): The Offeror shall provide a CWBS for Task Order 0001. The Offeror shall develop, maintain, and present an extended CWBS, as provided in MIL-STD-881C, Appendix B, which pr des visibility an countability to two (2) levels below the level that is being reported. The extended CWBS shall be to the l st level necessary to r ct the way the work is being performed, while ensuring correlation of these lower level tasks to the PB CLINs, and Contract Data Re rements List (CDRLs). The CWBS shall be the key reference document for planning, controlling, and porting requ ements. The Offeror shall ensure subcontractor data supports the prime contract CWBS. The Offeror shall maintain thi WBS, use it the basis for defining all tasks associated with the Task Order, and maintain traceability of all Offeror efforts to the nts the CWBS.

(4) Supporting Documents: The Offeror may provide any supporting documents supp enting the submission. Supporting documentation may not include any technical information.

IMPORTANT NOTE: In accordance with FAR 16.301-3(a)(3), Cost imbu t contracts m be used only when the contractor's accounting system is adequate for determining costs applicable to the c ract. Al e Offerors are required to submit support from the applicable DCAA office that its accounting system has been de mined quat determining costs applicable to the contract. In the event an Offerors accounting system has not been evaluated:

Consult the Audit Process OverviewInformati for ractors Ma l (under the Guidance tab on DCAAs website), specifically Enclosure 2, Preaward Surveys of Prospective Contr or Accoun g System. ter reading Enclosure 2, complete the Preaward Accounting System Adequacy Checklist and submit it to yo contracting ficer. In a tion, you should refer to DFARS 252.242-7006, Accounting system administration, for requirements of acceptable a unting system Your contracting officer will determine the need for a DCAA audit. Contracting officers can request DCA dit serv

(5) Award Documents/Certifications/Represent ns: The Offeror shall provide any Award Documents, Certifications, and/or Representations to accompany the proposal s

The Offeror shall pos a Capability turity M Integration for Development (CMMI-DEV) appraisal Level of III or higher.

The Offeror shall p ess an Earned Value nagement System (EVMS) compliant with the requirements of DFARS 252.234-7001 and 252.234-7002 for contracts v d at $100M or more

The prime Offeror shall h an approved p Secret facility clearance and Top Secret safeguarding for classified material and property in effect at time roposal ased on the DCGS-A DoD Security Classification Specification, DD Form 254, PM DCGS-A requirements. Offerors must b ad for access to SCI and have an accredited Sensitive Compartmented Information Facility (SCIF) to store SCI information. The foll g information must be provided via FBO to verify the secure facility clearance:

- Contractor Name
- Commercial and Government Entity (CAGE) Code
- Corporate Mailing Address
- Classified Mailing Address
- Security Office Information including:

i. Name
ii. Title
iii. E-mail address
iv. Telephone number

(6) IPT Structure: The Offeror shall provide a detailed breakdown of program team structure, subcontractors, and teammates; as well as detail of IPT structure, or other organization details related to the execution of Task Order 0001.

DRAFT

Protected Information and/or Legends Redacted

(ii) VOLUME II TECHNICAL. The Offerors technical proposal shall demonstrate that its approach meets, at a minimum, the requirements in the base PWS and Task Order 0001 PWS as specified in the PWS Compliance Matrix, located in Section J of the solicitation. The Government is specifically interested in a demonstration of a DCGS-A Increment 2 software capability and the five (5) Technical Sub-factors: Data Architecture, Fusion, Interoperability, and Visualization Framework/Usability.

Note: Every document submitted in the Technical Volume shall be submitted devoid of all dollar figures, company names, and/or logos.

The technical approach shall address and be organized into the following sections:

1) DCGS-A Increment 2 software capability demonstration: To begin the DCGS-A Increment 2 source selection process, each Offeror will demonstrate a DCGS-A Increment 2 software capability or set of capabilities of their own choosi . The capability(s) could include a Government Furnished Information (GFI), Commercial Off-The-Shelf (COTS), Government Off-the-S f (GOTS), or Open Source product(s). The Amazon Web Service (AWS) Gov Cloud will serve as the demonstration host environment to emul the use of the Intelligence Community Information Technology Enterprise (IC ITE) Commercial Cloud Services (C2S). The Governm ll provide each vendor with secure access to their respective AWS virtual computing resources at the same time, no later than fi bus s days after the DCGS-A Increment 2 Request for Proposal (RFP) due date.

Offerors will provide the name and email of an appropriate demonstration point contact with thei oposal submission. This information will be used by the Government to set up a unique and secure acc t per offeror. General formation about AWS services can be found at https://aws.amazon.com/, and an AWS GovCloud overview can found at https://aws.amazon /govcloud-us/.

AWS will provide virtual capabilities emulating the Armys Common Opera Environme (COE) current Tactical Server Infrastructure (TSI) with the following specifications:
4 x Dell R430 Servers with Dual Intel Xeon E5-2695 (14 core) processors, 19 R , and Dual 200GB SSD
2 x Mellanox SX6018 switches with 18 x 40GbE/56Gb Infiniband ports
2 x NetApp FAS2552 SANs with 20 x 1.2TB HDD/4-400GB SSD (25 TB RAW)

The presentation, at a minimum, will include the following forma
- DCGS-A Increment 2 requirement(s), with corresponding requ ment iden tion numbers, the offeror capability(s) satisfies
- Any license fee costs and data rights associated with the d nstrat capa (s)
- If the capability(s) is presently being used, where it is be us and the requisite Technology Readiness Level

2) Subfactor 1 Data Architecture: The Offe shal ropose a r urce loaded IMS, and information that substantiates their proposed Sustainment Strategy, a Software Assurna Sample Rep t, and a d iled technical approach to build a DCGS-A Increment 2 Data Management Architecture and CI and HUMI , IAW task o er 0001 PWS d the Compliance Matrix. The Offeror shall develop the DCGS-A Data Management Architecture software bas ne and CI an UMINT IAW cap lities outlined in the task order PWS sections 3.2.6.1 through 3 2 6 9 and 3 2 27

3.2.6.1: Data Ingress Capability
3.2.6.2: Data Persistence E
3.2.6.3: Data Egress and sualiza Platform
3.2.6.4: Data Analyti
3.2.6.5: Data Integ y
3.2.6.6: Data and r Authorization Serv s
3.2.6.7: Training Ma als
3.2.6.8: Continuous In tion & Delivery
3.2.6.9: Software Source Delivery.
3.2.27 : Single CI and HUMI oftware lution requirements

The Data management architecture l consist of a conceptual data integration layer and data analytics platform. The data integration layer will modularize the data management architecture to abstract away specific database instances with a standardized data access layer, and implement a logical data model. The proposed design should include how the data management architecture will integrate with the provided mission application architecture.

The Data management architecture should include a data analytics platform that will use customizable algorithms to examine raw and processed data for the purpose of drawing conclusions about the information, to include but not limited to entity, relationship, and pattern identification. The platform will allow for the addition of new algorithms, and adjustment to existing algorithms, to meet ever changing threat environment and mission needs.

The Offeror shall provide a block diagram and/or other engineering design artifacts for the architecture, describing all components and their relationships.

The Software Assurance Analysis Report shall contain two sections:

Section 1: Details how static analysis for Software Assurance is used within the offerors development lifecycle in writing and in

DRAFT

Protected Information and/or Legends Redacted

diagrammatic form for illustrative purposes.

Section 2: Details the output from a minimum of two software static analysis tools used by the offeror.

3) Subfactor 2 Fusion Data Analytics: The Offeror shall propose a detailed technical solution to perform automated fusion Level 0, 1, and 2 functions: Source Processing, Entity Refinement, and Situation Refinement. See task order PWS paragraph 3.2.11 Fusion.

4) Subfactor 3 Interoperability: The Offeror shall propose a detailed technical solution of how it will interoperate with other DCGS-A fielded systems, MCS systems, the Joint systems, and Coalitions in accordance with the DCGS-A SV-6 (Attachment 0007) and task order 0001 PWS paragraph 3.2.17. Additionally, offerors should describe how the proposed DCGS-A, Increment 2 solution will integrate into the DCGS Integration Backbone (DIB) Version 4.2 (for evaluation purposes only), into the DCGS-A, Increment 2 baselines for interoperability with the Joint DCGS Family of System (FoS). The DIB is a cohesive set of modular, community-governed, standards-based data services focused on enterprise information sharing. The DIB provides a common framework to enable the construction of cloud services such as Platform as a Service (PaaS) type of services for data exposure and transformation, and for enabling applications and users to discover and access information from a wide range of distributed sources. The offeror shall describe how the proposed design operates with multiple environments (JIE, COE, ICITE) (for evaluation purposes only). The offeror shall describe how the proposed design will interface with current mission applications (for evaluation purposes only). The offeror shall describe how the proposed design will allow for components to be updated and replaced via a Modular and Open System Architecture (MOSA).

5) Subfactor 4 Visualization Framework/Usability: The Offeror shall propose a solution which describes how DCGS-A, Increment 2 shall organize the user facing functionality for the system. The visualization framework should dictate a consistent way to present and interact with alerts and geospatial data, e.g., overlays, symbols, asset tracks, and intelligence folders. To improve usability, Increment 2 shall also deliver a user customizable workflow utility that is integrated with all domains and the data management infrastructure, to improve the efficiency of intelligence task execution.

6) Subfactor 5 Data Rights: Pursuant to the requirements set forth in DFARS 252.227-7017, Offerors are required to specifically identify Data/Software Rights Assertions related to technical data and software deliverables. As indicated in DFARS 252.227-7017(e), an Offerors failure to submit, complete, or sign the aforementioned Data and Software Rights Assertions with its offer may render the offer ineligible for award. In accordance with the content and formatting requirements for Data and Software Rights Assertions (set forth in DFARS 252.227-7017), the Offerors Data and Software Rights Assertions shall comply with the following requirements:

i. The Offeror shall not assert license restrictions on items, components, or processes themselves. The asserted license restrictions shall pertain to software or technical data that relates to items, components, or processes.

ii. The Offerors Assertions shall not include technical data or software that will not be furnished to the Government under this Contract.

iii. The Offeror shall provide a concise (but specific) description of the technical data and software deliverables that will be furnished to the Government with restrictions rather than generically asserting license restrictions in "technical data" or "technology".

iv. The Offerors Data and Software Rights Assertions shall not include any technical data or software for which the Government is entitled to an "unlimited rights" license under DFARS 252.227-7013(b)(1) and DFARS 252.227-7014(b)(1).

v. The Offeror is responsible for ensuring that Data and Software Rights Assertions from its subcontractors comply with the aforementioned content and formatting requirements (in accordance with DFARS 252.227-7017).

Offerors shall provide Data/Software Rights Assertions in a tabular format prescribed in DFARS 252.227-7017. However, in addition to the content and formatting requirements set forth in DFARS 252.227-7017, the Offerors Data/Software Rights Assertions table shall list technical data and software items that the Offeror intends to furnish to the Government with and without license restrictions. Thus, the Data/Software Rights Assertions table may include technical data and software items that are provided to the Government with an unlimited rights license. In the Offerors identification of technical data and software license rights, the Offeror shall use the prescribed categories of license rights referenced in DFARS 252.227-7014 and DFARS 252.227-7015 (e.g., Limited Rights, Government Purpose Rights, Unlimited Rights, Unrestricted Rights, or Commercial Software License Agreement). The Assertions table will become a contract attachment at contract award.

If any license restrictions are proposed, the Offeror shall explain how such license restrictions placed on software deliverables will impact the Government's ability to competitively procure software maintenance/sustainment support and services from third parties, particularly in instances where the Government will be provided "Restricted Rights" in software deliverables or other license restrictions (such as restrictions in commercial software license agreements).

IMPORTANT NOTES:

I. Performance Work Statement Compliance Matrix: The Offeror shall complete and submit the PWS Compliance matrix located in section J of the RFP (Attachment 0006).

DRAFT

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued<br>PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 113 of 123 |
|---|---|---|

Name of Offeror or Contractor:

DRAFT

II. Technical Addendum: An Offeror, as part of the first round of Evaluation Notice responses or upon request, shall provide a redlined Technical Addendum of the one contained in the solicitation. The Offeror shall include a tailored (as applicable) base PWS, TO 0001 PWS, Data Rights attachment, and PBS as part of the redlined Technical Addendum. The PWS and PBS will be based on the Offerors proposed capabilities, removing capabilities that are not proposed. Offerors redlined PWS and PBS shall become part of the contract. Offeror shall ensure that the Technical Addendum paragraphs contain clear, concise, unambiguous, and testable requirements. When the performance of a specification paragraph is dependent on specific conditions, those conditions shall be identified. Failure to update the applicable PWS and PBS documents for proposed capabilities that exceed the current PWS/PBS requirements will result in removal of any strengths applicable to those capabilities for proposal evaluation purposes. Offerors redlined Technical Addendum shall become part of the contract, and will be used as the criteria against which the system shall be tested. The Offerors redlined Technical Addendum shall not contain any proprietary information. The redlined Technical Addendum shall not provi any explanatory information as to how the requirements will be met. Offerors redlined Technical Addendum shall not contain any tas that the Offeror will not undertake if awarded the contract. The Technical Addendum shall contain rationale for paragraph modifi on if Offerors redlined Technical Addendum differs from the Governments PWS and PBS.

III. Organizational Conflict of Interest (OCI) Mitigation Plan: Offeror shall ident and addr in a separate document OCIMITIGATION.docx all actual or potential Organizational Conflicts of Interests (OCI), per FAR 9 or indicate that there are no known potential OCIs. If any actual or potential OCIs are identified, then the offer hall submit a mit ion plan. If the contracting officer determines that any actual or potential OCIs cannot be mitigated, th the offeror shall not b igible for award.

IV. Quality Assurance Surveillance Plan (QASP): Pursuant to FAR Part 37 4, the Gover ent requires the offerors to submit a proposed quality assurance surveillance plan (QASP) for the Governments conside on in deve ment of the Governments plan. The offeror shall insure the QASP be tailored to address the performance risks inherent in speci work effort addressed within the Performance Work Statement (PWS) and in accordance with FAR 46.4. Offerors shall submit a Q t includes key metrics that will be used throughout the period of performance by the Government to assess the contractors quality performance. At minimum, offerors proposals shall include the following key metrics within their proposed QASP

Each metric proposed including the above key metrics shall clude inimum its p ormance objective, standard to be met for evaluation of performance success, and how the Government sh conduct rveillance to ensure the metric proposed is accurately measured and assessed. The metrics proposed shall be logical relevant o th rt, and sufficient to measure performance. The proposed standard to be met shall be quantifiable.

This QASP should not detail how the contrac plan o accompli the work. Rather, the QASP should detail management and quality control actions to meet the terms of the ntract. QASP is a ving document and the Government may review and revise it on a regular basis before or after contract ard. Howeve the Govern t shall coordinate changes with the winning offeror. Updates shall ensure that the QASP remains a valid seful, and e orceable docum . A copy of the finalized QASP shall be provided to the contractor prior to the start of serv or cont

Each offeror shall submit their proposed Q ith their proposal in the QASP.docx document. This is a submission requirement. Offeror will not be eligible for aw out meeti his requirement.

(III) VOLUME III - COS PRICE. This me shall sist of all information, required to support proposed costs, target costs, and target fee. Certif cost and pricing a is not urrently required. However, the Government reserves the right to request such data prior to award. T nformation submitte n this volume shall comply with FAR 15.408, Table 15-2, and the requirements set forth below. There are no e limitations for is volume.

IMPORTANT NOTE: Adequate unting Syst In accordance with FAR 16.301-3(a)(3), a cost reimbursement contract may be used only when the contractor's accounting tem is quate for determining costs applicable to the contract. Lack of supporting evidence of an adequate accounting system at o roposal submittal as approved by Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration award. Offerors shall demonstrate its accounting system is adequate in the executive summary supporting documents.

1. Offerors are instructed to provide proposed costs for Task Order 0001 only. Task order 0001 will be issued on a Cost-Plus-Incentive-Fee, and Cost basis.

Pricing Methodology (CostPM{}.pdf or.doc: The pricing methodology shall include an index of the Cost/Price Volume, as well as Volume VI Price/Cost Supporting Documentation. Offerors shall propose a Pricing Methodology that provides a detail of the subcontractors/ inter-company entities (S/IE) proposed to support task order 0001, and applicable contract type, competitive/ non-competitive nature, and cost/price proposed for each. Supporting information required to support the S/IE proposed cost is detailed in the Volume VI Cost/Price Supporting Documentation. S/IE proprietary data shall be provided directly to the Government as instructed in Volume VI. The Pricing Methodology shall include the basis used to propose the direct and indirect rates and provide a description of each indirect rate and how it is applied (provide applicable base cost elements used to develop the indirect cost). The Offeror shall state if proposed rates are based on a Forward Pricing Rate Agreement (FPRA), a Forward Pricing Rate Recommendation (FPRR), a Forward Pricing Rate Proposal (FPRP), or proposed/ accepted billing rates. The pricing methodology shall include the cage code and the applicable Defense Contract Audit Agency (DCAA) and Defense Contract Management Agency (DCMA) office and POC information, to include addresses and telephone

A831

Appx10831

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued<br>PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 114 of 123 |
|---|---|---|

Name of Offeror or Contractor:

numbers. The location of the offerors accounting records shall be included in the Pricing Methodology. If a particular Offeror/subcontractor does not have a cognizant DCAA/DCMA office, please make note of such in the Price Methodology. Narrative on any real or anticipated changes of ownership, significant expansion or contraction of business base, extraordinary events, etc. shall be included in the Price Methodology.

2. The anticipated CLIN structure for task order award is found in Section J, as Attachment 0010, DCGS-A Increment 2 (Sample) Task Order 0001.

3. The proposal shall set forth a summary of the total estimated costs by cost element, and shall provide a breakdown of the proposed estimated cost of each CLIN and WBS separately; including all direct and indirect charges and fees. The detail of the proposed costs shall be submitted in excel (cost workbook (Cost{}.xlsx)). In order to maintain a minimum level of commonality between proposals, each proposal submission shall include:

Summary Worksheet: The summary worksheet shall list the Target Cost and target fee for each CPIF CLIN, and list the proposed cost for the cost CLINs. The summary worksheet shall not include hard numbers, but shall use formulas that include the cell reference of the applicable CLIN worksheet.

CLIN worksheets: The CLIN worksheets shall be bottoms up cost builds. However, they shall not include any hard numbers in the cost build. All costs proposed shall be based on formulas adding the applicable WBS worksheets to derive the CLIN cost/target cost and target fee.

WBS worksheets: The WBS worksheets shall be bottoms up cost builds at level five as provided in MIL-STD-881C, Appendix B, and may include hard number entries in cells proposing hours. All other cells shall be formula based, referencing labor rates from the labor rate worksheets, or indirect rates from the indirect rate worksheet, or direct costs from the subcontractor, materials, travel, or other direct cost worksheets.

Direct Labor Rate worksheet: The direct labor rate worksheet shall include a listing of the proposed direct labor categories and rates per year. Calculations of escalation shall be detailed on the direct labor rate worksheet. In order to trace proposed direct labor rates to supporting documentation required in Volume VI, consistency in labor category naming convention to supporting documentation is required. A mapping of labor categories to supporting labor category names may be sufficient. Distinction of labor category pools shall also be detailed on this worksheet. The direct labor rate worksheet shall also specify the number of hours for a full time equivalent man year used to develop the proposed rate.

Indirect Rate worksheet: The indirect worksheet shall include all indirect rates used in the development of the proposed cost/ target cost. Each rate shall identify the cost elements that make up the basis the indirect rate is applied to. The proposed indirect rates shall be described sufficiently to trace to the supporting documentation used to substantiate the realism of the proposed rate in Volume VI.

Subcontractor/Intercompany Entity (S/IE) worksheet(s): S/IE worksheets shall trace to supporting subcontractor submissions. Each S/IE worksheet shall list the proposed costs per WBS and align to the S/IE supporting documentation as required in Volume VI. Any discrepancies between the proposed S/IE cost submission in the supporting documentation and the Prime offeror proposed submission may result in an undeterminable price. Lack of sufficient information to perform realism of the subcontractor costs will result in an undeterminable price. Prime Indirect costs applicable to Subcontractor costs shall be calculated on the WBS worksheet using the rates on the indirect rate worksheet.

Material worksheet(s) per CLIN: A material worksheet shall be proposed for each CLIN that includes material costs. The material cost worksheet shall provide a consolidated priced summary of individual material quantities proposed, and the basis for pricing (vendor quotes, invoice prices, etc.). Include raw materials, parts, components, assemblies, and incidental fixed priced services to be produced or performed by others. For all items proposed, identify the item and show the WBS, Part # (if applicable), source, quantity, and price. Indirect costs associated with the material costs shall be calculated on the applicable WBS worksheet using the indirect rates available on the indirect worksheet.

Travel: Offerors shall propose a travel worksheet for each applicable CLIN. Travel costs shall be calculated to show the proposed travel costs per trip. Trips that are consistent in duration from location and to location and number of travelers may be consolidated by WBS. Each trip shall detail the applicable WBS, the location travelling from, the location travelling to, the number of travelers, the number of days and the number of nights. Each trip shall address the method of travel. The costs per trip shall be calculated in a formula, and use direct input cost for per Diem rates, lodging rates, airfare or other transportation unit costs (car rental per day if applicable), and fuel costs or mileage rate(as applicable). Additional allowable costs shall be listed as applicable to develop the proposed travel costs. Indirect costs applicable to Travel shall be calculated on the WBS worksheet using the rates on the indirect rate worksheet.

Other Direct Cost worksheet(s): Separate ODC worksheets shall be provided by CLIN as applicable. List all other costs by WBS not otherwise included in the categories described above (e.g., special tooling, computer and consultant services, preservation, packaging and packing, spoilage and rework, and Federal excise tax on finished articles), and provide details for pricing. Indirect costs applicable to ODCs shall be calculated on the WBS worksheet using the rates on the indirect rate worksheet.

DRAFT

A832

Appx10832

Protected Information and/or Legends Redacted

DRAFT

The rates detailed in the direct and indirect rate worksheets shall be the basis of formulas used to develop the proposed cost in the cost builds for the WBS worksheets. The WBS worksheets shall be the basis for the formulas in the CLIN worksheets. The CLIN worksheets shall be the basis for the formulas in the Summary worksheet. The excel workbook shall not be a read only file, shall include all formulas, and shall not have any protected cells. The WBS worksheets shall align to the WBS proposed in the Volume I Executive Summary. The WBS detail shall also trace to the Basis of Estimate described below.

Sanitized Cost workbook(SCWB{}.xlsx): The SCWB shall be a sanitized version of the proposal workbook listed above. No direct costs, indirect costs, or calculated shall remain in the SCWB. In addition to the sanitized version of the above cost file, offerors shall include a detail of the S/IE labor mix (no cost data), materials (types and quantities), Travel (trips, locations to and from, personnel, duration- no cost data), and Other Direct Cost items (no cost data) proposed per WBS the S/IE worksheets. The sanitized cost workbook shall be submitted devoid of all company names and/or logos.

Basis of Estimate (BOE {}.docx, or xlsx or pdf): The BOE shall not include rates, costs rices. The BOE shall be proposed by WBS to at least WBS level 4. Each WBS shall include the technical rationale used to develop pr ed labor mix, materials, travel, or other direct costs. If cost estimating relationships (CERs) are used to estimate h , the f la and basis for the proposed CERs shall be provided in the applicable WBS detail. The Offeror shall provide a crosswalk table that ws the traceability to the CLINs, Cost elements, and CWBS.

Note: The BOE will be provided to the technical evaluation team to suppor he price evaluation team wi ost realism analysis.

The Offeror shall not propose alternative share ratios, or an alternat minimum or ximum fee percentage, other than what the RFP requires. The Offeror shall submit zipped files, subject to the limitati of th le size restrictions, consisting of Microsoft Excel workbooks and/or Microsoft Word or Adobe pdf files that develop, calculate, d ovide the data necessary to meet the requirements of the Price/Cost Volume.

The Offeror shall ensure that the Price/Cost volume is org i s to ensure that porting documentation is clearly associated with the appropriate cost elements.

a) The Offeror shall submit the applicable FPRA, FPRR, FPRP, ling r acc in the cost supporting documents.

b) If the proposal includes Facilities Capital of Money as lement of cost, include the percentage distribution of fixed assets for land, buildings, and equipment for each sines it involv State whether the distribution has been reviewed and/or accepted by the Administrating Contracting Officer (A /Defense ntract Aud Agency (DCAA).

IMPORTANT NOTE: The Government does ot take respo bility for th rganization of electronic proposal files submitted under this effort. Missing files, to include sa zed cost m the proposal non responsive. Files not submitted in accordance with the instructions for submission shall b eme n responsive.

(iv) VOLUME IV PAST PERFORM Past Pe mance evaluation will assess the relative risks and confidence associated with an Offerors likelihood of s ess in p rming th olicitation's requirements. Recency is defined as a Government contract within the three (3) years prior the release of this P. Up to ten (10) past performance references are requested, with at least one from each major subcontr or. Relevance is ined as ose contracts, whether performed as a prime or major subcontractor, which required Engineering and Ma cturing Development System Development and Demonstration contracts for development, and/or integration of some or all of the followi components: data chitecture, visualization and analytical tools, cloud computing and big data analytic capabilities, cyber an tics and data in gration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intell ce (HUMINT) ignals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT), and Sensor Management. A major subcon tor und this effort is defined as those subcontractors anticipated to perform 20% or more of the total labor cost of the contract.

1) Section 1 Contract Descriptions: This section shall include the following information in the following format:

a. Identify if reference submitted is for the Prime Offeror or a proposed major subcontractor;

b. Offeror/Subcontractor place of performance, CAGE Code, and DUNS Number. If the work was performed as a subcontractor, also provide the name of the prime contractor and POC within the prime contractors organization (name, email address, and telephone number.

c. Government contracting activity, Procuring Contracting Officers (PCO) name, email address, and telephone number;

d. Governments technical representative/Contracting Officers Representative (COR) activity, name, email address, and telephone number;

e. Government contract administration activity and Administrative Contracting Officers (ACO) name, email address, and telephone number;

f. Contract number and, in the case of Indefinite Delivery type contracts, GSA contracts, and Blanket Purchase Agreements, also include Delivery Order number;

Protected Information and/or Legends Redacted

g. Contract Type (specific type such as Firm-fixed-price (FFP), Cost Reimbursement (CR), Time and Materials (T&M), etc. ;

h. Awarded price/cost;

i. Final or projected price/cost;

j. Original delivery schedule, including dates of start and completion of work; and

k. Final or projected delivery schedule, including dates of start and completion of work.

2) Section 2 Performance: Offerors shall provide a specific narrative explanation of each co[ntr]act listed in Section 1 Contract Description, describing the objectives achieved and detailing how the effort is relevant, [as] defined above) to the requirements of this RFP.

a. For Government contracts that did not meet cost, schedule, or technical performa[nce] requirem[ent]s, provide a brief explanation of the reason(s) for the shortcomings and any corrective actions taken to avoid recurrence. The Offeror [sha]ll list each time the delivery schedule was revised and provide an explanation of why the revision was necess[ary]. The Offeror sha[ll a]lso provide a copy of any cure notices or show cause letters received on each contract listed and a descrip[tio]n of any corrective ac[tions] implemented by the Offeror or proposed subcontractor. The Offeror shall indicate if any of the contract[s li]sted were terminated, and t[he t]ype and reasons for the termination.

b. For all contracts, the Offeror shall provide narrative as to the exten[t t]o whi[ch] the relevant contracts demonstrate compliance to approved Small Business Subcontracting Plans on those efforts, and the exte[nt] t[o w]hich small business concerns were utilized on previous efforts to include where small business concerns were not utilized as propose[d o]r where small business concerns were utilized to a greater extent than proposed.

3) Section 3 Subcontracts: The Offeror shall provide an o[ut]line [of how] the effort r[equ]ired by the solicitation will be assigned for performance within the Offerors corporate entity, and among [the] propose[d] subcontractors. Major Subcontractor is defined as subcontract efforts that will be at least 20% of the total pr[opo]sed lab[or] cos[t. The] information provided for the prime Offeror and each proposed subcontractor must include the entire company name, c[omp]any [ad]dress, CAGE Code, DUNS Number, and type of work to be performed, by citing the applicable Government PWS subpar[agraph] number.

4) Section 4 New Corporate Entities: N[ew] corporate [en]tities may [su]bmit data on prior contracts involving its officers and employees. However, in addition to the other requ[ire]ments in thi[s] section, th[e O]fferor shall discuss in detail the role performed by such person(s) in the prior contracts cited. Infor[mat]ion should b[e i]ncluded in th[e f]iles described in the sections above. Letters of Commitment shall be included in the proposal for these [emp]loyees i[f con]sidered.

5) Section 5 Past Performance Assessment Q[uest]ionnaire: For all contracts identified in Section 1, Contract Descriptions, a Past Performance Assessment Ques[tionnaire]s (PPAQ) [mus]t be completed. The Offeror shall complete Part I of the PPAQ and email the questionnaire to both th[e G]overnmen[t co]ntractin[g a]ctivity and technical representative responsible for the past/current contract. The POCs shall be instruct[ed] to electroni[call]y comple[te] Part II of the questionnaire, and email the entire questionnaire to the Contracting Specialist at [REDACTED] and Co[nt]racting Officer at [REDACTED], by proposal submission date. The Offeror [sha]ll specifically req[ues]t that each Government customer/client prepared questionnaire response NOT be provided back to the Offeror, eith[er a]s an original or a [cop]y copy. The Offeror shall request that the Government POCs maintain the original/signed questionnaire as a rec[ord] of its response. The Offeror shall also email to the Contracting Officer a list of all the POCs who were sent a questionnaire. It is r[eque]sted that th[e] Government be provided this list within 45 calendar days after release of RFP; but this list must be provided NLT the pr[oposa]l subm[iss]ion time/date. The POC List shall be submitted in Microsoft Word Table format to include the following fields: Company Name, [Co]nt[rac]t Number, Government Agency, POC Last Name, POC First Name, POC Title, POC Telephone Number, POC Email Address, and Date Emailed [to P]OC (month/day).

The PPAQ is provided in Section J, attachment 0008 of the RFP.

(v) VOLUME V - Small Business Participation Plan: All Offerors (both large and small businesses) are required to complete a Small Business Participation Plan. Offerors should propose the level of participation of small businesses (as a small business prime and/or small business subcontractors) in the performance of the acquisition, relative to the objectives/goals set forth in the evaluation of this area. See Appendix F, Attachment 0009, in section J of this RFP.

IMPORTANT NOTE: Separate from the Small Business Participation Plan, other than U.S. Small Business offerors must also submit a subcontracting plan meeting the requirements of FAR 52.219-9 and DFARS 252.219-7003, or DFARS 252.219-7004, if the offeror has a comprehensive subcontracting plan. Other than U.S. Small Businesses must submit acceptable subcontracting plans to be eligible for award. Subcontracting Plans shall reflect and be consistent with the commitments offered in the Small Business Participation Plan.

Offers submitted by a Small Business concern need not include a subcontracting plan.

DRAFT

Protected Information and/or Legends Redacted

DRAFT

(VI) VOLUME VI - Price/Cost Supporting Documents: Supporting documentation may include but is not to be limited to:

- Copies of existing FPRA, FPRR, FPRP, Proposed/Accepted Billing rates.

- Copies of any recent DCAA reports.

- Copies of any recent Defense Contract Management Agency (DCMA) reports.

- If there is no FPRA or FPRR to support direct labor rates, the offeror shall provide the basis of estimate for the direct labor rates, to include salary survey data (provide salary surveys do not simply reference the survey), payroll data, or signed employment agreement letters inclusive of salary information as applicable.

- If there is no FPRA or FPRR to support indirect rates, support shall include the propose dgeted expense pools (by expense account) and allocation base detail, along with the last two (2) years' actual pool and base info n. The proposed rates shall reflect the provided support, or the Offeror and/or its subcontractor(s) shall provide sufficient tail laining how the proposed rates are realistic.

Materials supporting documentation: Conduct price analyses of all subcontract proposals. Conduc st analyses for all subcontracts when certified cost or pricing data are submitted by the subcontractor. Incl e these analyses as par f your pricing data submissions for subcontracts expected to exceed the appropriate threshold in FAR 15.40 . Submit the subcontractor rtified cost or pricing data and data other than certified cost or pricing data as part of your own p cing data. T ese requirements also apply to all subcontractors if required to submit certified cost or pricing data.
(1) Adequate Price Competition. Provide data showing the degree of comp ion an the basis for establishing the source and reasonableness of price for those acquisitions (such as subcontracts, purch rs, material order, etc.) exceeding or expected to exceed the appropriate threshold set forth at FAR 15.403-4, priced on the bas f adequate price competition. For inter-organizational transfers priced at other than the cost of comparable compet tive commercial wor f the division, subsidiary, or affiliate of the contractor, explain the pricing method (see FAR 31.205-26(

(2) All Other. Obtain certified cost or pricing data from p pective s for those acquisitions (such as subcontracts, purchase orders, material order, etc.) exceeding the threshold set for in FAR 403 d not otherwise exempt, in accordance with FAR 15.403-1(b) (i.e., adequate price competition, commercial items, pric set law, regulation, or waiver). When certified cost or pricing data is required of a prospective source, the hall be sub d in the same format required of the Prime offeror detailed in Volume IV above, and supporting information all b rovided at e same level as the prime. The Prime offeror shall also provide data showing the basis for establishing sourc nd reasona eness of p e. In addition, provide a summary of your cost analysis, and a copy of certified cost or pricing data subm ed by the pr pective sou in support of each subcontract or purchase order, that is the lower of either $12.5 million or mor or both more an the pertin cost or pricing data threshold, and more than 10 percent of the prime contractors proposed price. Al submit asonably required to explain your estimating process (including the judgmental factors applied and the math ical other method used in the estimate, including those used in projecting from known data, and the nature and amount of any con ncies included in the price). Subcontractor certified cost or pricing data must be accurate, complete, and cur of the da f final proposal submission. The prime contractor is responsible for updating a prospective subcontracto data. tandard mercial items fabricated by the offeror that are generally stocked in inventory, provide a separate co breakdown, if ced base cost. For inter-organizational transfers priced at cost, provide a separate breakdown of cost e ents in the forma quired o the Prime and detailed in Volume IV above. Analyze the certified cost or pricing data, and submit results of your anal s of the prospective sources proposal. When submission of a prospective sources certified cost or pricing data required as descri d in this paragraph, it must be included as part of your own cost or pricing data. You must also submit any data o than certified st or pricing data obtained from a subcontractor, either actually or by specific identification, along wit e results o ny analysis performed on that data. At a minimum all hours and price per labor category shall be clearly identified ny pro ctive source for services, regardless of thresholds set forth in FAR 15.403-4.

At a minimum all hours/ labor ca ries shall be clearly identified.

When certified cost or pricing data from prospective sources is not required in accordance with FAR part 15.403-4, however the cost proposed for the source is greater than $750,000 or 10% of the proposed price (whichever is lower), Offerors shall provide its price analysis of the proposed pricing in accordance with 15.403-1(b). Note: Further guidance is available through DCAA website www.dcaa.mil/audit process_overview.html detailing what constitutes an adequate proposal in its "Information for Contractors" memo dated June 26,2012 (this publication has not been updated for the increase in the certified cost or pricing data threshold from $700,000 to $750,000.) Also available on the DCAA website is a slideshow called out as "Proposal Adequacy" that will assist in providing adequate detail.

E. DISCUSSIONS: In accordance with FAR 15.306(d), discussion sessions with each offeror may be held.

*** END OF NARRATIVE L0001 ***

Protected Information and/or Legends Redacted

SECTION M - EVALUATION FACTORS FOR AWARD

M-3 EVALUATION APPROACH

A. BASIS FOR AWARD

Initially, there will be a DCGS-A Increment 2 software capability demonstration by the offeror evaluated on a pass/fail basis. Only those offerors who successfully complete the demonstration will be further evaluated and considered for award.

The award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the evaluation factors: Technical, Past Pe rmance, Cost/Price, and Small Business Participation Plan. The Technical factor is significantly more important than Cost/Price. P t Performance and the Small Business Participation Factors will be rated on an acceptable/unacceptable (pass/fail) basis. A rati of acceptable or neutral must be achieved for the Past Performance Factor. A rating of acceptable must be achieved for the Small B s Participation Factor in order to be eligible for award. Offerors are cautioned that the award may not necessarily be mad th ghest technically rated or lowest cost or price offer.

B. FACTORS AND SUB-FACTORS TO BE EVALUATED

The following evaluation factors and Subfactors will be used to evaluat ach proposal fter the DCGS-A Increment 2 software capability demonstration: Award will be made to the offeror whose proposal is th st advanta us to the Government based upon an integrated assessment of the evaluation factors and Subfactors described below in a dance th the evaluation criteria.

FACTOR 1: TECHNICAL: The technical factor includes the DCGS-A Increment 2 So re Capability Demonstration as well as the offerors technical approach of the following Subfactors:

(a) Subfactor 1 Data Architecture
(b) Subfactor 2 Fusion Data Analytics
(c) Subfactor 3 Interoperability
(d) Subfactor 4 Visualization Framework/Usability
(e) Subfactor 5 Data Rights

An offeror must receive a rating of Accep ble for th capability monstration in order for the technical volume to be subject to further evaluation. Subfactor 1 is sig icantly more mportant th Subfactor 2. Subfactor 2 is equal to Subfactor 3. Subfactor 3 is equal to Subfactor 4. Subfactor 4 i ore importan han Subfactor Subfactor 1 is equivalent in importance to Subfactors 2-5 combined. An offeror must achieve a ng of n table on all Technical Subfactors to be considered for award.

FACTOR 2 COST/PRICE: The resulting award w e a six year IDIQ base contract with the concurrent award of Task Order 0001 as a Cost-Plus-Incentive- Fee (CPIF) type. Th st realism of the proposed approach for Task Order 001 will be evaluated.

FACTOR 3 PAST PERFORMA E: Each offer past per ance will be reviewed to determine the acceptability of their Past performance.

FACTOR 4 SMALL BUSI SS PARTICIPATION PLA The extent of Small Business Participation will be evaluated on an acceptable/unacceptable basis.

C. EVALUATION APPROACH

1. The evaluation approach fo ch al Factors to include Demonstration and Subfactors is as follows:

DCGS-A Increment 2 software capability demonstration: Each offeror will demonstrate a DCGS-A Increment 2 software capability or set of capabilities of their own choosing. In order to be considered for award, offerors must receive an acceptable rating.

Each demonstration will be evaluated as acceptable or unacceptable. To achieve an acceptable rating, the criteria listed below must be met:

1. Successful install of chosen DCGS-A Increment 2 capability(s) software and use of the Amazon Web Service (AWS) environment, to be provided by the Government.
2. Mapping of the offerors demonstrated capability(s) to a DCGS-A Increment 2 requirement or set of requirements identified in the DCGS-A Performance Based Specification located in Section J as Attachment 0003.
3. Acceptable presentation of the demonstrated capability(s).
4. Presentation and demonstration conclude within 2 hour limit.

Understanding of Requirements and Feasibility of Approach. The proposal will be evaluated to determine the extent to which the proposed approach is meets minimum requirements, and the end results achievable. The proposal will be evaluated to determine the extent to which

DRAFT

Protected Information and/or Legends Redacted

successful performance is contingent upon low risk technologies and techniques. The proposal will also be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

All proposals shall be subject to evaluation by a team of Government personnel and non-Government advisors from the following companies:

- MITRE Corp.
- Booz Allen Hamilton Inc.
- Exeter Inc.
- Alliance Consulting Services
- Millennium
- ADC Management Solutions

The Subject Matter Experts (SME) will have access to all the necessary parts of the Offe roposal pertinent to the SMEs area of expertise. As such, all of the above-listed Government contactor companies are preclu fr eing a Prime contractor or participating in any teaming arrangement with potential Offerors due to Organizational Conflict o nterest concerns. The Offeror shall advise the Contracting Officer as soon as possible of any concerns/questions with regard to the use of t Non-Government SMEs from the companies listed above. Any Offeror that is affiliated with, or is contemplati a contractual rel nship with any of the above listed firms, must notify the Contracting Officer for the solicitation as so as possible.

<u>THE TECHNICAL FACTOR IS DIVIDED INTO THE FOLLOWING SUBFACTORS:</u>

<u>Subfactor 1 Data Architecture:</u> This Subfactor evaluates the offerors Dat chite e proposal to the degree it:

a) Provides Data Ingress capability that performs data acquisition and ingest This effort shall support external subsystems that enable data harvesting and acquisition. This effort shall pport internal subs ms that perform artifact parsing, artifact decomposition, and artifact knowledge extraction based on d data models. predefined data models, standards StdV-1 and StdV-2, provided as GFI and available upon request. These includ DDMS partment of nse Discovery Metadata Specification (DDMS), Version 2.0, 17 July 2008; ISO 15836:2003: The Dublin Core M data Elem t; OGC SensorML: v.2.0.0: OGC SensorML: Model and XML Encoding Standard, v.2.0.0, 2014-02-04; and STANAG 4559 (Edit 3): NA Sta ISR Library Interface, Edition 3, 12 November 2010.
b) Provides a Data Persistence Ecosystem that performs data in ing d persistence in a data store appropriate for datas particular characteristics and behavior. The data persi ecosystem s at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Stores.
3) Data Persistence.
4) Data Semantic Discovery.

c) Provides Data Egress and Visualization performs data retrieval while enforcing oversight and compliance policies. The data egress and visualization sh minimum represented by the following attributes:

1) Data Access.
2) Data Security.
3) Web Framework.

d) Provides Data Analy that enables cl d-scale analytics. These analytics shall enable streaming analytics for low latency fast in memory processing and big a batch anal ics for petabyte data observations.
e) Provides Data Integrity asure ensure that data can be trusted. The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree.
2) Data Provenance.
3) Data Security.

f) Provides Data and User Authorization Services that provides legal oversight and compliance. The system shall separate users and systems from data to deliver content based on legal oversight and compliance policies, and provide authentication and authorization.
g) Provides their proposed deliverable software which meets or exceeds the requirements stated in the DCGS-A Increment 2 Task Order (TO) 0001 Performance Work Statement (PWS) requirements for the Counter Intelligence & Human Intelligence (CI&HUMINT) single Software (SW) baseline. The single CI&HUMINT SW baseline consolidates the capabilities of both the CI & HUMINT reporting system along with the capability of the CI&HUMINT Analysis system.
h) Provides a high level of confidence approach that DCGS-A, Increment 2 will meet the required sustainability and training requirements.
i) Provides a resource loaded Integrated Master Schedule (IMS) detailing how the Data Architecture and CI&HUMINT efforts are feasible and meet or is less than the maximum Government Period of Performance for TO 0001.
j) Provides a proposed software development methodology approach, in particular the degree to which the methodology would meet the

DRAFT

Protected Information and/or Legends Redacted

requirements of the major System Engineering Technical Review (SETR) events in the schedule and how the methodology would provide/support:
- Early insight into product functionality
- Vertical integration with a mission/business application
- Early insight into data layer integration
- Early feedback from users

k) Provides a Software Assurance Sample Report that contain details of how static analysis for Software Assurance is used within the offerors development lifecycle in writing and in diagrammatic form for illustrative purposes.

Subfactor 2 Fusion Data Analytics: This Subfactor evaluates the offerors Fusion and Data Analytics proposal submission. Major emphasis will be placed on:

a) The degree to which the proposed detailed technical solution meets or exceeds the Fusion y Performance Parameter (KPP) as detailed in the DCGS-A, Increment 2 Performance Based Specifications (PBS) and introduces a data ics capability that will provide enhanced analytics and fusion services as well as accommodate multiple data models and data fr ll intelligence domains (e.g., HUMINT, GEOINT, and All Source).

b) The degree to which the fusion solution will be capable of performing semi- puter controlled n lization for all data, semi-computer controlled correlation for all intelligence disciplines, semi-compu controlled pattern dis ry, and semi-computer controlled relationship detection. In summary, the preferred alternative l:

1) Meet or exceed the Semi-computer controlled Level 0 Fusion requirem as stated the PBS.
2) Meet or exceed the Semi-computer controlled Level 1 Fusion requiremen stat n the PBS.
3) Meet or exceed the Semi-computer controlled Level 2 Fusion requirement a t d in the PBS.

Subfactor 3 Interoperability: This Subfactor evaluates the fferors Interoperab ty proposal approach, and

1. The degree to which the proposed approach provides a hig level fidence tha GS-A, Increment 2 will meet the required interoperability as stated in the System View-6 (SV-6) (See achment section J of the solicitation).
2. Ability to operate in multiple environments (JIE, COE, ICI
3. Ability to interface with current mission applications
4. Ability to update, replace add internal com s via a Mod and Open System Architecture (MOSA).

Subfactor 4 Visualization Framework/Usabi ity: This bfactor ev ates the offerors Visualization Framework/Usability proposal approach and the degree to which the a oach meets o exceeds the S requirements, and provides a high level of feasibility that DCGS-A Increment 2 will effectively, effi ntly, and sa factorily all a user to interact with the proposed Visualization Framework/User Interface IAW the PWS.

Subfactor 5 Data Rights: The Offerors prop s will be evaluated based on the Governments ability to competitively procure software sustainment and maintenance s from th parties. The Offerors proposal will be given a strength for a proposed software rights approach that permits th overnmen competi ly procure maintenance and sustainment services for DCGS-A Increment 2 software deliverables from thir parties. The erors pr al will be given a weakness for a proposed software rights approach that does NOT permit the Governme to competitively p ure main nance and sustainment services for DCGS-A Increment 2 software deliverables from third parties.

Note: To receive consi tion for award rating of no less than "Acceptable" must be achieved for the Technical factor. To receive an Acceptable rating for Technical f or, all Subfactors must achieve at least an Acceptable rating.

TE NIC /RISK RATINGS

| Rating | Description |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no |

DRAFT

Protected Information and/or Legends Redacted

| | |
|---|---|
| | impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

a. Strength. An aspect of an Offerors proposal that has merit, or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. A significant strength appreciably enhances the merit of the proposal, or appreciably increases the probability of successful contract performance.

b. Deficiency. A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

c. Weakness. A flaw in the proposal that increases the risk of unsuccessful contract performance. A significant weakness in the proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

2. COST/PRICE FACTOR:

The contract will be a 72 month Indefinite Delivery, Indefinite Quantity (IDIQ) base contract with the concurrent award of task order 0001 as a Cost-plus-incentive-fee (CPIF) contract type.

a) Cost Realism: Proposed target cost and fee will be evaluated IAW FAR 15.40 Cost Realism Analysis. The Government will evaluate the realism of the Offerors proposed costs in relation to the Offerors specific technical approach for Task Order 0001. The Offerors proposed cost will be evaluated by determining what the Government predicts the Offerors approach would most probably cost the Government when the work performed under Task Order 0001 is completed. To the degree that the Government's most probable cost estimate differs from the Offerors proposed cost, the Offerors proposed cost may be adjusted upward and/or downward for the purposes of evaluation only. The probable cost will include an adjustment to fee using the incentive formula provided in the solicitation (as set forth in FAR Clause 52.216-10 located in Section I of TO 0001), assuming zero Priority 1 or Priority 2 software anomalies as defined in ISO/EIA 12207:2008 at each test checkpoint (Initial Government Acceptance Testing, Developmental Testing, and Operational Testing), for the performance incentive and through use of the probable cost in comparison to the proposed target cost for the cost incentive fee. The result will be the Evaluated Price.

b) Realism Support: In the event insufficient support is provided to determine the realism of the proposed costs, the evaluated cost may be undeterminable and therefore, the proposal shall be ineligible for award.

3. PAST PERFORMANCE FACTOR:

The Past Performance evaluation will assess the relative risks associated with an Offerors likelihood of success in performing the contracts requirements as indicated by the offerors record of relevant and recent past performance. Recency is defined as a Government contract within three (3) years prior to the release date of this solicitation. In this context, an offeror refers to the proposed prime contractor and all proposed major subcontractors. A major subcontractor is defined as a subcontractor anticipated to perform more than twenty (20) percent of total proposed labor for TO 0001. In either case, the prime contractor and its proposed major subcontractors will be assessed individually, and the results will be assessed collectively to derive the Offerors overall Past Performance confidence rating.

The past performance evaluation includes an assessment of whether the offerors efforts are relevant or not relevant. Relevance is defined as those contracts, whether performed as a prime or as a major subcontractor, which required Engineering and Manufacturing Development and/or System Development and Demonstration contracts for development, and/or integration of some or all of the following components: data architecture, visualization and analytical tools, cloud computing and big data analytic capabilities, cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, CI, HUMINT, Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT), and Sensor Management.

RELEVANCY: The first aspect of the past performance evaluation is to assess the offerors past performance to determine if a recent effort accomplished by the offeror is relevant or not relevant to the effort to be acquired through the source selection. The following criteria will be used to establish what is relevant, which shall include similarity of service/support, complexity, dollar value, contract type, and degree of subcontract/teaming.

DRAFT

Protected Information and/or Legends Redacted

Past Performance Relevancy Ratings

| Rating | Definition |
|---|---|
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

QUALITY ASSESSMENT: Assess the quality of the offerors Past Performance on those recent efforts that were determined relevant, by determining how well the contractor performed on the contracts. Documented results from Past Performance Questionnaires, interviews, CPARS, and other sources form the support and basis for this assessment.

PERFORMANCE RATING: Based on an integrated assessment of recency, relevancy, and quality of work, the Government will assign an overall Past Performance Rating as follows:

Past Performance Rating

| Rating | Definition |
|---|---|
| Acceptable | Based on the offerors recent/relevant/quality performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Unacceptable | Based on the offerors recent/relevant/quality performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| Neutral | No recent/relevant/quality performance record is available, or the offerors performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

The Government will conduct a past performance assessment of the quality, effectiveness, relevancy, and recency of the Offerors past performance; as well as that of its major subcontractors, as it relates to the Governments confidence in an offerors ability to successfully perform the required effort. The evaluation team will arrive at a single consensus performance rating for each Offeror, selecting the most appropriate rating from the past performance factor rating definitions contained in Section D of this plan below. When assessing past performance, the Government will focus its inquiry on the past performance of the Offeror, and its proposed major subcontractors as it relates to all solicitation requirements. These requirements include all aspects of cost, schedule, performance, effectiveness of Program Management, and supportability; including the Offerors record of: (1) conformance to specifications and standards of good workmanship; (2) forecasting and containing costs on any previously performed cost reimbursement contracts; (3) adherence to contract schedules, including the administrative aspects of performance; (4) ability to resolve technical and manufacturing problems quickly and effectively; (5) business-like concern for the interest of its customers; (6) establishing and maintaining effective management of subcontractors; and (7) overall customer satisfaction.

Offerors are reminded to include all relevant and recent past efforts, including demonstrated corrective actions, in their proposal. Offerors are cautioned that in conducting the past performance assessment, the Government may use data provided in the Offerors proposal and data obtained from other sources including the Past Performance Information Retrieval System (PPIRS). Since the Government may not necessarily interview all of the sources provided by the Offerors it is incumbent upon the Offerors to explain the relevance of the data provided. Offerors are reminded that while the Government may elect to consider data obtained from other sources, the burden of providing past performance rests with the Offerors.

IMPORTANT NOTE: Offerors must receive at least a rating of Acceptable, or a Neutral rating to be eligible for contract award.

4. SMALL BUSINESS PARTICIPATION FACTOR:

All Offerors (both large and small businesses) will be evaluated on the level of proposed participation of U.S small businesses in the performance of acquisitions (as small business prime offerors or small business subcontractors) relative to the objectives and goals established herein, or in compliance with DoD (DFARS Subpart 219.7), The Small Business Subcontracting Program.

DRAFT

Protected Information and/or Legends Redacted

**Name of Offeror or Contractor:**

Small Business Goals for this procurement are:

- Small Business: 31.7%
- Small Disadvantaged Business: 5%
- Women-Owned Small Business: 5%
- Historically Underutilized Business Zone (HUBZone) Business: 3%
- Veteran Owned Small Business: 3%
- Service Disabled Veteran Owned Small Business: 3%

The Government will evaluate:

a) The extent to which such firms, as defined in FAR Part 19, are specifically identified in posals;

b) The extent of commitment to use such firms (enforceable commitments will be weighed m avily than non-enforceable ones);

c) Identification of the complexity and variety of the work small firms are to perf

d) Past performance of the Offeror in complying with requirements of the claus t FAR 52.219-8, U zation of Small Business Concerns, and for all large business Offerors, FAR 52.219-9, Small Business contracting Plan;

e) The extent of participation of small business prime Offerors and smal business sub ntractors in terms of the percentage of the value of the total acquisition. The Government will evaluate the exte o which th fferor meets or exceeds the goals:

Small Business Participation Factor Rating Definitions

| Rating | Description |
|---|---|
| Acceptable | Proposal meets requirements and indicates a dequ approach and understanding of the requiremen Risk of unsuccessful performance is no worse than mod te. |
| Unacceptable | Proposal does not meet requir and contain or more deficiencies. Proposa s un dable. |

IMPORTANT NOTE: To receive a Small Bu ess Particip ion Factor ing of at least "acceptable," an offeror must either meet the subcontracting goals for each type o mall busines or provide an equate justification as to why the particular goal(s) can't be met. The Small Business Participatio an and i g ls, i.e., those goals determined by the Government after evaluation of the eventual awardee's proposal that ca re tically met b ed on the Offerors proposal, and response to discussion questions) will become a firm contract requirement, not a faith effort. The content of the plan will be utilized in the compliance evaluations to be conducted thereafter.

*** D OF NARRATIVE M0001 ***

DRAFT

Protected Information and/or Legends Redacted

| SOLICITATION, OFFER AND AWARD | 1. This Contract Is A Rated Order Under DPAS (15 CFR 700) | Rating DOA7 | Page 1 of Pages 132 |
|---|---|---|---|

| 2. Contract Number | 3. Solicitation Number | 4. Type of Solicitation | 5. Date Issued | 6. Requisition/Purchase Number |
|---|---|---|---|---|
| | W56KGY-16-R-0001 | ☐ Sealed Bid (IFB)<br>☒ Negotiated (RFP) | 2015DEC23 | SEE SCHEDULE |

| 7. Issued By Code W56KGY | 8. Address Offer To (If Other Than Item 7) |
|---|---|
| ACC-APG Division C (W56KGY)<br>CCAP-CCC<br>6001 Combat Drive<br><br>APG, MD 21005-1846 | |

NOTE: In sealed bid solicitations 'offer' and 'offeror' mean 'bid' and 'bidder'.

## SOLICITATION

9. Sealed offers in original and ______________ copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in ______________ until 04:00pm (hour) local time 2016FEB08 (Date).

Caution - Late Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name | B. Telephone (No Collect Calls) Area Code | Number | Ext. | C. E-mail Address |
|---|---|---|---|---|---|
| | MICHAEL SHERICK | (443) | 861-4808 | | MICHAEL.G.SHERICK.CIV@MAIL.MIL |

11. Table Of Contents

| (X) | Sec. | Description | Page(s) | (X) | Sec. | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| | | Part I - The Schedule | | | | Part II - Contract Clauses | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 39 |
| X | B | Supplies or Services and Prices/Costs | 4 | | | Part III - List Of Documents, Exhibits, And Other Attach. | |
| X | C | Description/Specs./Work Statement | 31 | X | J | List of Attachments | 96 |
| X | D | Packaging and Marking | 32 | | | Part IV - Representations And Instructions | |
| X | E | Inspection and Acceptance | 33 | X | K | Representations, Certifications, and Other Statements of Offerors | 97 |
| X | F | Deliveries or Performance | 34 | | | | |
| X | G | Contract Administration Data | 35 | X | L | Instrs., Conds., and Notices to Offerors | 108 |
| X | H | Special Contract Requirements | 37 | X | M | Evaluation Factors for Award | 127 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. Discount For Prompt Payment (See Section I, Clause No. 52.232-8) | 10 Calendar Days (%) | 20 Calendar Days (%) | 30 Calendar Days (%) | Calendar Days (%) |
|---|---|---|---|---|
| | | | | |

| 14. Acknowledgment of Amendments (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated): | Amendment No. | Date | Amendment No. | Date |
|---|---|---|---|---|
| | | | | |

| 15A. Name and Address of Offeror | Code | Facility | 16. Name and Title of Person Authorized to Sign Offer (Type or Print) |
|---|---|---|---|
| | | | |

| 15B. Telephone Number: Area Code | Number | Ext. | 15C. Check if Remittance Address is Different From Above – Enter such Address In Schedule | 17. Signature | 18. Offer Date |
|---|---|---|---|---|---|
| | | | ☐ | | |

## AWARD (To be completed by Government)

| 19. Accepted As To Items Numbered | 20. Amount | 21. Accounting And Appropriation |
|---|---|---|
| | | |

| 22. Authority For Using Other Than Full And Open Competition: ☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( ) | 23. Submit Invoices To Address Shown In (4 copies unless otherwise specified) | Item 25 |
|---|---|---|

| 24. Administered By (If other than Item 7) Code | 25. Payment Will Be Made By Code |
|---|---|
| | |

| 26. Name of Contracting Officer (Type or Print) | 27. United States Of America (Signature of Contracting Officer) | 28. Award Date |
|---|---|---|
| | | |

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

Standard Form 33 (Rev. 9-97)
Prescribed By GSA-FAR (48 CFR) 53.214(c)

Protected Information and/or Legends Redacted

SECTION A - SUPPLEMENTAL INFORMATION

Buyer Name: MICHAEL SHERICK
Buyer Office Symbol/Telephone Number: CCAP-CCC/(443)861-4808
Type of Contract 1: Cost Plus Incentive Fee (Cost Based)
Kind of Contract: System Acquisition Contracts

*** End of Narrative A0000 ***

Executive Summary

1. The Army Contracting Command-Aberdeen Proving Ground (ACC-APG) has the need to acquire Engineering, Manufacturing and Development services in support of the Project Manager Distributed Common Ground System Army (PM DCGS-A) Distributed Common Ground System - Army (DCGS-A) Increment 2 requirement. This acquisition is issued in accordance with FAR 15.101-1 Tradeoff Process. This noticed is prepared in accordance with the format in FAR Subpart 15.203, and as supplemented with additional information included in this notice. Solicitation W56KGY-16-R-0001 is issued as Request for Proposals (RFP).

2. As a result of this solicitation, the Government intends to award a single Indefinite Delivery, Indefinite Quantity (IDIQ) contract award, with the simultaneous award of Task Order (TO) 0001. The IDIQ base ceiling amount is $206M.

3. The guaranteed minimum for this IDIQ contract is $6,000,000.00.

4. Task Order 0001 will be Cost Plus Incentive Fee (CPIF) and Cost Only. A multiple Incentive structure will focus on performance and cost factors to encourage positive results. The incentive structure can be viewed in Attachment 0010, DCGS-A Increment 2 (SAMPLE) Task Order 0001, located in section J.

5. The Government is requesting proposals in support of the base IDIQ Performance Work Statement (PWS) and TO 0001 PWS attached RFP section J. Offerors' proposals shall include all information outlined in RFP section L. Offerors' shall provide Cost/Price proposals for TO 0001 (Volume IV RFP section L).

6. As noted in Section L, the expected value of this IDIQ contract will exceed $100M and therefore Offerors' shall be compliant with the requirements of DFARS 252.234-7001(a).

7. A Quality Assurance Program Plan (QAPP) submission is required with the issuance of TO 0001. The QAPP particulars are delineated in IDIQ PWS section 4.3.16 and Contract Data Requirement List (CDRL) C005 DI-QCIC-81794. The Government will review and comment on the QAPP, (if required), within 30 working days from initial submission. In return, and upon the receipt of Government comments, a finalized QAPP is due no later than 15 working days.

8. Offerors' are advised that the Government intends to utilize electronic commerce IAW FAR Subpart 4.5, and will be using the Acquisition Source Selection Interactive Support Tool (ASSIST) in support of the source selection process as outlined in RFP section L. Proposals shall be effective for 180 days upon the RFP due date.

9. The RFP Solicitation number is W56KGY-16-R-0001, and the due date is 4:00 PM EST on 08 February 2016. Proposals will not be accepted beyond the due date and time.

10. The POCs for this action are:

| Chris Fisher | Mike Sherick |
|---|---|
| Contracting Officer | Contract Specialist |
| Christopher.M.Fisher.civ@mail.mil | Michael.G.Sherick.civ@mail.mil |

11. Offerors' are notified that as applicable, the cost(s) proposed for the Task Order 0001 award (initial competition) will serve as a baseline for negotiation of similar costs on subsequent orders issued on non-competitive basis.

12. A (15) calendar day (RFP) question and answer period will be open from the date the Federal Business Opportunities (FBO) RFP announcement is released. Questions should be uploaded directly to FBO and Michael.G.Sherick.civ@mail.mil. Answers will be posted on FBO. Questions will not be accepted upon the closing of the (15) day period.

13. Offeror's are hereby notified of the Government Furnished Information restrictions outlined in PWS paragraph 3.13, section J attachment 0001.

14. All questions and concerns should be submitted to michael.g.sherick.civ@mail.mil no later than the close of business (COB) 08 January 2015. Questions will not be accepted beyond COB 04 January 2016.

Protected Information and/or Legends Redacted

SECTION I - CONTRACT CLAUSES

| | Regulatory Cite | Title | Date |
|---|---|---|---|
| I-1 | 52.202-1 | DEFINITIONS | NOV/2013 |
| I-2 | 52.203-3 | GRATUITIES | APR/1984 |
| I-3 | 52.203-5 | COVENANT AGAINST CONTINGENT FEES | MAY/2014 |
| I-4 | 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | SEP/2006 |
| I-5 | 52.203-7 | ANTI-KICKBACK PROCEDURES | MAY/2014 |
| I-6 | 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY | MAY/2014 |
| I-7 | 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | MAY/2014 |
| I-8 | 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | OCT/2010 |
| I-9 | 52.203-16 | PREVENTING PERSONAL CONFLICTS OF INTEREST | DEC/2011 |
| I-10 | 52.204-2 | SECURITY REQUIREMENTS | AUG/1996 |
| I-11 | 52.204-4 | PRINTED OR COPIED DOUBLE-SIDED ON POSTCONSUMER FIBER CONTENT PAPER | MAY/2011 |
| I-12 | 52.204-9 | PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL | JAN/2011 |
| I-13 | 52.204-10 | REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS | OCT/2015 |
| I-14 | 52.204-13 | SYSTEM FOR AWARD MANAGEMENT MAINTENANCE | JUL/2013 |
| I-15 | 52.204-18 | COMMERCIAL AND GOVERNMENT ENTITY CODE MAINTENANCE | JUL/2015 |
| I-16 | 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | OCT/2015 |
| I-17 | 52.209-9 | UPDATES OF PUBLICLY AVAILABLE INFORMATION REGARDING RESPONSIBILITY MATTERS | JUL/2013 |
| I-18 | 52.209-10 | PROHIBITION ON CONTRACTING WITH INVERTED DOMESTIC CORPORATIONS | NOV/2015 |
| I-19 | 52.210-1 | MARKET RESEARCH | APR/2011 |
| I-20 | 52.211-5 | MATERIAL REQUIREMENTS | AUG/2000 |
| I-21 | 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | APR/2008 |
| I-22 | 52.215-2 | AUDIT AND RECORDS--NEGOTIATIONS | OCT/2010 |
| I-23 | 52.215-8 | ORDER OF PRECEDENCE--UNIFORM CONTRACT FORMAT | OCT/1997 |
| I-24 | 52.215-10 | PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA | AUG/2011 |
| I-25 | 52.215-11 | PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA--MODIFICATIONS | AUG/2011 |
| I-26 | 52.215-12 | SUBCONTRACTOR CERTIFIED COST OR PRICING DATA | OCT/2010 |
| I-27 | 52.215-13 | SUBCONTRACTOR CERTIFIED COST OR PRICING DATA--MODIFICATIONS | OCT/2010 |
| I-28 | 52.215-14 | INTEGRITY OF UNIT PRICES | OCT/2010 |
| I-29 | 52.215-15 | PENSION ADJUSTMENTS AND ASSET REVERSIONS | OCT/2010 |
| I-30 | 52.215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB) OTHER THAN PENSIONS | JUL/2005 |
| I-31 | 52.215-21 | REQUIREMENTS FOR CERTIFIED COST OR PRICING DATA AND DATA OTHER THAN CERTIFIED COST OR PRICING DATA --MODIFICATIONS | OCT/2010 |
| I-32 | 52.215-23 | LIMITATIONS ON PASS-THROUGH CHARGES | OCT/2009 |
| I-33 | 52.216-8 | FIXED FEE | JUN/2011 |
| I-34 | 52.216-11 | COST CONTRACT--NO FEE | APR/1984 |
| I-35 | 52.219-8 | UTILIZATION OF SMALL BUSINESS CONCERNS | OCT/2014 |
| I-36 | 52.219-16 | LIQUIDATED DAMAGES--SUBCONTRACTING PLAN | JAN/1999 |
| I-37 | 52.222-3 | CONVICT LABOR | JUN/2003 |
| I-38 | 52.222-17 | NONDISPLACEMENT OF QUALIFIED WORKERS | MAY/2014 |
| I-39 | 52.222-19 | CHILD LABOR--COOPERATION WITH AUTHORITIES AND REMEDIES | JAN/2014 |
| I-40 | 52.222-20 | CONTRACTS FOR MATERIALS, SUPPLIES, ARTICLES, AND EQUIPMENT EXCEEDING $15,000 | MAY/2014 |
| I-41 | 52.222-21 | PROHIBITION OF SEGREGATED FACILITIES | APR/2015 |
| I-42 | 52.222-26 | EQUAL OPPORTUNITY | APR/2015 |
| I-43 | 52.222-29 | NOTIFICATION OF VISA DENIAL | APR/2015 |
| I-44 | 52.222-37 | EMPLOYMENT REPORTS ON VETERANS | OCT/2015 |
| I-45 | 52.222-40 | NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT | DEC/2010 |
| I-46 | 52.222-41 | SERVICE CONTRACT LABOR STANDARDS | MAY/2014 |
| I-47 | 52.222-43 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS--PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) | MAY/2014 |
| I-48 | 52.222-50 | COMBATING TRAFFICKING IN PERSONS | MAR/2015 |
| I-49 | 52.222-54 | EMPLOYMENT ELIGIBILITY VERIFICATION | OCT/2015 |
| I-50 | 52.222-55 | MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 | DEC/2015 |
| I-51 | 52.223-5 | POLLUTION PREVENTION AND RIGHT-TO-KNOW INFORMATION | MAY/2011 |
| I-52 | 52.223-6 | DRUG-FREE WORKPLACE | MAY/2001 |
| I-53 | 52.223-18 | ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE DRIVING | AUG/2011 |

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued<br>PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 68 of 132 |
|---|---|---|

Name of Offeror or Contractor:

(End of Clause)

I-191 52.219-28 POST-AWARD SMALL BUSINESS PROGRAM REREPRESENTATION JUL/2013

(a) Definitions. As used in this clause--

"Long-term contract" means a contract of more than five years in duration, including options. However, the term does not include contracts that exceed five years in duration because the period of performance has been extended for a cumulative period not to exceed six months under the clause at 52.217-8, Option to Extend Services, or other appropriate authority.

"Small business concern" means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR part 121 and the size standard in paragraph (c) of this clause. Such a concern is "not dominant in its field of operation" when it does not exercise a controlling or major influence on a national basis in a kind of business activity in which a number of business concerns are primarily engaged. In determining whether dominance exists, consideration shall be given to all appropriate factors, including volume of business, number of employees, financial resources, competitive status or position, ownership or control of materials, processes, patents, license agreements, facilities, sales territory, and nature of business activity.

(b) If the Contractor represented that it was a small business concern prior to award of this contract, the Contractor shall rerepresent its size status according to paragraph (e) of this clause or, if applicable, paragraph (g) of this clause, upon the occurrence of any of the following:

(1) Within 30 days after execution of a novation agreement or within 30 days after modification of the contract to include this clause, if the novation agreement was executed prior to inclusion of this clause in the contract.

(2) Within 30 days after a merger or acquisition that does not require a novation or within 30 days after modification of the contract to include this clause, if the merger or acquisition occurred prior to inclusion of this clause in the contract.

(3) For long-term contracts

(i) Within 60 to 120 days prior to the end of the fifth year of the contract; and

(ii) Within 60 to 120 days prior to the date specified in the contract for exercising any option thereafter.

(c) The Contractor shall rerepresent its size status in accordance with the size standard in effect at the time of this rerepresentation that corresponds to the North American Industry Classification System (NAICS) code assigned to this contract. The small business size standard corresponding to this NAICS code can be found at http://www.sba.gov/content/table-small-business-size-standards

(d) The small business size standard for a Contractor providing a product which it does not manufacture itself, for a contract other than a construction or service contract, is 500 employees.

(e) Except as provided in paragraph (g) of this clause, the Contractor shall make the representation required by paragraph (b) of this clause by validating or updating all its representations in the Representations and Certifications section of the System for Award Management (SAM) and its other data in SAM, as necessary, to ensure that they reflect the Contractor's current status. The Contractor shall notify the contracting office in writing within the timeframes specified in paragraph (b) of this clause that the data have been validated or updated, and provide the date of the validation or update.

(f) If the Contractor represented that it was other than a small business concern prior to award of this contract, the Contractor may, but is not required to, take the actions required by paragraphs (e) or (g) of this clause.

(g) If the Contractor does not have representations and certifications in SAM, or does not have a representation in SAM for the NAICS code applicable to this contract, the Contractor is required to complete the following rerepresentation and submit it to the contracting office, along with the contract number and the date on which the rerepresentation was completed:

The Contractor represents that it [ ] is, [ ] is not a small business concern under NAICS Code ______________ assigned to contract number ________________________. [Contractor to sign and date and insert authorized signer's name and title].

(End of clause)

A909

Appx10909

Protected Information and/or Legends Redacted

* Security Office Information including:

i. Name
ii. Title
iii. E-mail address
iv. Telephone number

(6) IPT Structure:

The Offeror shall provide a detailed breakdown of program team structure, subcontractors, and teammates; as well as detail of IPT structure, or other organization details related to the execution of Task Order 0001.

(7) DCGS-A Increment 2 software capability demonstration:

To begin the DCGS-A Increment 2 source selection process, each Offeror will demonstrate a DCGS-A Increment 2 software. The capability could include a Government Furnished Information (GFI), Commercial Off-The-Shelf (COTS), Government Off-the-Shelf (GOTS), or Open Source product(s). The Amazon Web Service (AWS) Gov Cloud will serve as the demonstration host environment to emulate the use of the Intelligence Community Information Technology Enterprise (IC ITE) Commercial Cloud Services (C2S). The Government will provide each vendor with secure access to their respective AWS virtual computing resources at the same time, no later than five business days after the DCGS-A Increment 2 Request for Proposal (RFP) due date.

Offerors will provide the name and e-mail of an appropriate demonstration point of contact with their proposal submission. This information will be used by the Government to set up a unique and secure account per offeror. General information about AWS services can be found at https://aws.amazon.com/, and an AWS GovCloud overview can be found at https://aws.amazon.com/govcloud-us/.

AWS will provide virtual capabilities emulating the Armys Common Operating Environment (COE) current Tactical Server Infrastructure (TSI) with the following specifications:

* 4 x Dell R430 Servers with Dual Intel Xeon E5-2695 (14 core) processors, 196GB RAM, and Dual 200GB SSD

* 2 x Mellanox SX6018 switches with 18 x 40GbE/56Gb Infiniband ports

* 2 x NetApp FAS2552 SANs with 20 x 1.2TB HDD/4-400GB SSD (25.6TB RAW)

The presentation shall conclude within 30 minutes and cover the following information:
- DCGS-A Increment 2 Performance Based Specifications requirement(s), with corresponding requirement identification numbers, the offeror capability(s) satisfies

- Any license fee costs and data rights associated with the demonstrated capability(s)

- If the capability(s) is presently being used, where it is being used, and the requisite Technology Readiness Level

(ii) VOLUME II TECHNICAL. The Offerors technical proposal shall demonstrate that its approach meets, at a minimum, the requirements in the base PWS and Task Order 0001 PWS as specified in the PWS Compliance Matrix, located in Section J of the solicitation. The Government is specifically interested in a demonstration of a DCGS-A Increment 2 software capability and the five (5) Technical Sub-factors: Data Architecture, Fusion, Interoperability, Visualization Framework/Usability, and Data Rights.

Note: Every document submitted in the Technical Volume shall be submitted devoid of all dollar figures.

The technical approach shall address and be organized into the following sections:

1) Subfactor 1 Data Architecture: The Offeror shall propose a resource loaded IMS, and information that substantiates their proposed Sustainment Strategy, a Software Assurance Sample Report, and a detailed technical approach to build a DCGS-A Increment 2 Data Management Architecture and CI and HUMINT, IAW task order 0001 PWS and the Compliance Matrix. The Offeror shall develop the DCGS-A Data Management Architecture software baseline and CI and HUMINT IAW capabilities outlined in the task order PWS sections 3.2.6.1 through 3.2.6.9 and 3.2.27.

3.2.6.1: Data Ingress Capability
3.2.6.2: Data Persistence Ecosystem
3.2.6.3: Data Egress and Visualization Platform
3.2.6.4: Data Analytics
3.2.6.5: Data Integrity
3.2.6.6: Data and User Authorization Services
3.2.6.7: Training Materials

Protected Information and/or Legends Redacted

CONTINUATION SHEET | Reference No. of Document Being Continued PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 127 of 132

Name of Offeror or Contractor:

SECTION M - EVALUATION FACTORS FOR AWARD

M-3 EVALUATION APPROACH

A. BASIS FOR AWARD (Section M)

Initially, there will be a DCGS-A Increment 2 software capability demonstration by the offeror evaluated on a acceptable/unacceptable basis. Only those offerors who successfully complete the demonstration will be further evaluated and considered for award.
The award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the evaluation factors: Technical, Past Performance, Cost/Price, and Small Business Participation Plan. The Technical factor is significantly more important than Cost/Price. Past Performance and the Small Business Participation Factors will be rated on an acceptable/unacceptable basis. A rating of acceptable or neutral must be achieved for the Past Performance Factor. A rating of acceptable must be achieved for the Small Business Participation Factor in order to be eligible for award. Offerors are cautioned that the award may not necessarily be made to the highest technically rated or lowest cost or price offer.

B. FACTORS AND SUB-FACTORS TO BE EVALUATED

The following evaluation factors and subfactors will be used to evaluate each proposal after the DCGS-A Increment 2 software capability demonstration: Award will be made to the offeror whose proposal is the most advantageous to the Government based upon an integrated assessment of the evaluation factors and subfactors described below in accordance with the evaluation criteria.

FACTOR 1: TECHNICAL:_

The technical factor includes the DCGS-A Increment 2 software capability demonstration as well as the offerors technical approach of the following Subfactors:

(a) Subfactor 1 Data Architecture
(b) Subfactor 2 Fusion Data Analytics
(c) Subfactor 3 Interoperability
(d) Subfactor 4 Visualization Framework/Usability
(e) Subfactor 5 Data Rights

An offeror must receive a rating of Acceptable for the capability demonstration in order for the technical volume to be subject to further evaluation. Subfactor 1 is significantly more important than Subfactor 2. Subfactor 2 is equal to Subfactor 3. Subfactor 3 is equal to Subfactor 4. Subfactor 4 is more important than Subfactor 5. Subfactor 1 is equivalent in importance to Subfactors 2-5 combined. The overall factor rating will be a roll-up of the ratings of all Technical Subfactors in accordance with evaluation criteria.

FACTOR 2 COST/PRICE: The resulting award will be a six year IDIQ base contract with the concurrent award of Task Order 0001 as a Cost-Plus-Incentive- Fee (CPIF) contract type. The cost realism of the proposed approach for Task Order 001 will be evaluated.

FACTOR 3 PAST PERFORMANCE: Each offerors past performance will be reviewed to determine the acceptability on an acceptable/unacceptable basis.

FACTOR 4 SMALL BUSINESS PARTICIPATION PLAN: The extent of Small Business Participation will be evaluated on an acceptable/unacceptable basis.

C. EVALUATION APPROACH

1. DCGS-A Increment 2 software capability demonstration: Each offeror will demonstrate a DCGS-A Increment 2 software capability. In order to be considered for award, offerors must receive an acceptable rating.

Each demonstration will be evaluated as acceptable or unacceptable. To achieve an acceptable rating, the criteria listed below must be met:

1. Successful installation of chosen DCGS-A Increment 2 capability software and use of the Amazon Web Service (AWS) environment, to be provided by the Government. If multiple capabilities are chosen, at least one needs to be successfully installed and used to be determined to be acceptable. If there are any Priority 1 Software Anomalies, as defined by ISO/EIA 12207:2008, Figure J.2, recorded during the demonstration, the offerors demonstration will be deemed unacceptable.

2. Mapping of the offerors demonstrated capability to a DCGS-A Increment 2 requirement or set of requirements identified in the DCGS-A Performance Based Specification located in Section J as Attachment 0003.

3. Presentation of the demonstrated capability in accordance with the presentation requirements identified in the Section L proposal

A968

Appx10968

Protected Information and/or Legends Redacted

CONTINUATION SHEET | Reference No. of Document Being Continued PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | Page 128 of 132

Name of Offeror or Contractor:

instructions. Presentation/slides will be emailed to the government on the last day (day 5) of the offerors access to the AWS environment.

4. The presentation shall be no longer than thirty (30) minutes, and the presentation and demonstration combined shall conclude within 2 hour limit.

All presentations and demonstrations will be recorded. The presentation and the information contained therein WILL NOT be considered as part of the Technical evaluation.

Understanding of Requirements and Feasibility of Approach. The proposal will be evaluated to determine the extent to which the proposed approach is meets minimum requirements, and the end results achievable. The proposal will be evaluated to determine the extent to which successful performance is contingent upon low risk technologies and techniques. The proposal will also be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

All proposals shall be subject to evaluation by a team of Government personnel and non-Government advisors from the following companies:

* MITRE Corp.
* Booz Allen Hamilton Inc.
* Alliance Consulting Services
* Millennium
* ADC Management Solutions

The Subject Matter Experts (SME) will have access to all the necessary parts of the Offerors proposal pertinent to the SMEs area of expertise. As such, all of the above-listed Government contactor companies are precluded from being a Prime contractor or participating in any teaming arrangement with potential Offerors due to Organizational Conflict of Interest (OCI) concerns. The Offeror shall advise the Contracting Officer as soon as possible of any concerns/questions with regard to the use of the Non-Government SMEs from the companies listed above. Any Offeror that is affiliated with, or is contemplating a contractual relationship with any of the above listed firms, must notify the Contracting Officer for the solicitation as soon as possible.

2. THE TECHNICAL FACTOR IS DIVIDED INTO THE FOLLOWING SUBFACTORS:

Subfactor 1 Data Architecture: This Subfactor evaluates the offerors Data Architecture proposal to the degree it:

a) Provides Data Ingress capability that performs data acquisition and ingestion. This effort shall support external subsystems that enable data harvesting and acquisition. This effort shall support internal subsystems that perform artifact parsing, artifact decomposition, and artifact knowledge extraction based on predefined data models. The predefined data models, standards StdV-1 and StdV-2, provided as GFI and available upon request. These include DDMS 2.0: Department of Defense Discovery Metadata Specification (DDMS), Version 2.0, 17 July 2008; ISO 15836:2003: The Dublin Core Metadata Element Set; OGC SensorML: v.2.0.0: OGC SensorML: Model and XML Encoding Standard, v.2.0.0, 2014-02-04; and STANAG 4559 (Edition 3): NATO Standard ISR Library Interface, Edition 3, 12 November 2010.

b) Provides a Data Persistence Ecosystem that performs data indexing and persistence in a data store appropriate for datas particular characteristics and behavior. The data persistence ecosystem shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Stores.
3) Data Persistence.
4) Data Semantic Discovery.

c) Provides Data Egress and Visualization that performs data retrieval while enforcing oversight and compliance policies. The data egress and visualization shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Security.
3) Web Framework.

d) Provides Data Analytics that enables cloud-scale analytics. These analytics shall enable streaming analytics for low latency fast in memory processing and big data batch analytics for petabyte data observations.

e) Provides Data Integrity to measure and ensure that data can be trusted. The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree.
2) Data Provenance.
3) Data Security.

A969

Appx10969

Protected Information and/or Legends Redacted

18 December 2015

# PERFORMANCE WORK STATEMENT

FOR

Distributed Common Ground System – Army

Increment 2, Engineering, Manufacturing and Development

SOLICITATION NUMBER: W56KGY-16-R-0001

Protected Information and/or Legends Redacted

# 1 SCOPE

This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the development and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

DCGS-A Increment 2 is technically a New Start program. However, Increment 2 is a logical successor to DCGS-A Increment 1. It is envisioned that the hardware platforms and a percentage of the SW capabilities developed in Increment 1 will be leveraged/used for Increment 2.

Each DCGS-A Increment 2 software version release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.

The planned Increment 2 release for data integration foundation, capability & KPP enhancements on modernized infrastructure focus primarily on:

- Data Integration Layer
- Data Analytics Platform (Fusion)
- Interoperability (Net Ready)
- Visualization Framework
- Training
- Sustainment
- Ops and Support
- Cyber Security
- Fact of Life Upgrades
- Logistics and Readiness

The planned Increment 2 version release for usability enhancements considering unified user interface & Intel support to cyber capability focus primarily on:

- Consistent User Interface
- Cyber Operations
- Continued INC 2, Release Improvements
- DCGS Integration Backbone (DIB) Upgrade
- Fact of Life Upgrades

Protected Information
and/or Legends Redacted

- Logistics and Readiness

As used in this PWS, the term "DCGS-A INC 2, EMD" incorporates the framework, architecture, software and other capabilities that may be developed and integrated in support of the DCGS-A Family of Systems (FoS).

The contractor shall be responsible for system and software engineering, product design, development, integration, testing, and limited deployment support to include software maintenance, configuration management, risk management, and quality assurance. The contractor is also responsible for developing and delivering documentation In Accordance With (IAW) the Contract Data Requirements List (CDRL) associated with this Performance Work Statement (PWS).

This PWS also includes specific program management, system engineering, design and development, software engineering, integration and test, software quality assurance, system platform integration & test, demonstration support, and logistics support for the DCGS-A Increment 2 software baseline.

The Contractor shall complete the design, development, integration and test, to include supporting Development and Operational Test events for the DCGS-A Increment 2 software baseline and any future DCGS-A Increment 2 software baseline releases.

## 1.1 BACKGROUND

The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs.   The MA ICD has since been updated to an Enterprise ICD.

DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.

DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications.

Protected Information
and/or Legends Redacted

DCGS-A Increment 1 is the ISR component of the modular and future force Mission Command System (MCS) and the Army's primary system for ISR tasking of sensors, processing and exploitation of data, and dissemination of intelligence (TPED) information about the threat, weather, and terrain at all echelons. A high percentage of Increment 2 functionality has already been developed under the DCGS-A Increment 1 efforts. DCGS-A Increment 2 will leverage the DCGS-A hardware components fielded across the Army under DCGS-A Increment 1. In addition, DCGS-A Increment 2 will completely displace the legacy Program of Record (POR) systems that make up the basis of DCGS-A. DCGS-A Increment 2 will provide new data architecture and additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, Measurement and Signature Intelligence (MASINT), GEOINT (Full Motion Video/Static Imagery Intelligence), Geospatial Engineering (Geospatial Data Management, Analysis, and Dissemination), to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The DCGS-A system and data enterprise must conform to and leverage the Army Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

### 1.2 Contract Type

The contractor shall provide the required support for these efforts in accordance with (IAW) this PWS on a single award, Indefinite Delivery Indefinite Quantity (IDIQ) basis within the government established funding constraints.

### 1.3 Order Types

The associated Task Orders will be issued under a Cost and/or Firm-Fixed-Price (FFP) basis.

## 2 Applicable Documents

The following documents are applicable to this PWS and task orders issued against this IDIQ.

### 2.1 Government Documents

**Table 2-1: DCGS-A Program Documents**

| Number | Title | Date |
|---|---|---|

Protected Information and/or Legends Redacted

- For failure modes that impact individual operators, the impacts shall be minimized via automated detection and recovery. Automated recovery should require no or minimal operator action (e.g., error message with a click OK).
- All software components will provide error messages that are understandable by the operator and provide actionable information for the operator or maintainer to be able to restore operations.
- All software components shall be capable of logging all faults (correctable or not) with sufficient supporting information for the maintainer to performance diagnostics.
- Any failure of a software component will generate a message with sufficient details to allow it to be isolated to the component in which the failure occurred.

### *3.2.5 NET READY*

DCGS-A shall support net-centric military operations by being interoperable with current Army, Unified Action Partners, Joint, Service (to include Service DCGS), Allied, Coalition, and Command and Control (C2) information and ISR systems as specified in the DCGS-A Operational View (OV)-3/System View (SV)-6 (e.g., Mission Command, Global Command and Control System (Joint and Army), Universal Ground Control Station (UGCS).

#### 3.2.5.1 Network Operations

DCGS-A shall enter and be managed in the network by operating across all echelons (from the Company Intelligence Support Team (CoIST) to the Joint Task Force (JTF) within all security domains (Nonsecure Internet Protocol Router (NIPR), Secret Internet Protocol Router (SIPR), Joint Worldwide Intelligence Communications System (JWICS), and NSANet and within and across all common operating environment (COE) computing environments.

#### 3.2.5.2 Information Exchange

DCGS-A shall employ effective Information Exchanges by satisfying all Information Exchange Requirements (IER) for operating at JTF and below identified in the DCGS-A OV-3/SV-6.

### *3.2.6 FUSION*

DCGS-A shall be capable of performing automated fusion Level 0, 1 and 2 functions.

#### 3.2.6.1 Source Processing

Protected Information and/or Legends Redacted

DCGS-A shall perform Fusion Level 0, which includes semi-computer controlled data organization which converts incoming data without anomalies into a usable, normalized form with a 99.9% accuracy rate, and supports computer-assisted user resolution of data with anomalies.

#### 3.2.6.2 Entity Refinement

DCGS-A Shall perform Fusion Level 1, which includes computer-assisted identification of incoming preprocessed entity data by reported entity type and identity with a 99% accuracy rate, semi-computer controlled entity correlation which (1) assesses whether an incoming entity is either totally new to the fused set of entities, new data about an already-held entity, or ambiguous and (2) uses the new data to update the fused knowledge about already-held entities with a 99.9% accuracy rate, and supports computer-assisted user resolution of ambiguous cases or data update conflicts.

#### 3.2.6.3 Situation Refinement

DCGS-A Shall perform Fusion Level 2, which includes semi-computer controlled association processing that determines, based on actual reporting or inferred from valid models, that entities are related to each other and captures the reported nature of that relationship with a 95% accuracy rate; semi-computer controlled aggregation processing that determines, based on actual reporting or inferred from valid models, how entities aggregate into a higher order entity with a 95% accuracy rate, and supports computer-assisted user interpretation/hypothesis of what an entity is currently doing and may do next.

### *3.2.7 Intelligence Support to Cyber Operations*

DCGS-A shall support the Army Cyber Command intelligence analysis effort by providing cyber data ingest, management, and access to support the Cyber Electromagnetic (CEM) Cell in both Defensive Cyber Operations (DCO) and Offensive Cyber Operations (OCO).

### *3.2.8 Demonstrations / IPTs*

PM DCGS-A receives frequent requests for product demonstrations of the DCGS-A system. Such demonstrations may take place at locations both Contiguous United States (CONUS) and Outside Contiguous United States (OCONUS). The contractor will conduct such demonstrations as required by the Government.

Integrated Product Teams (IPTs) external to DCGS-A may require DCGS-A support. These IPTs may range from technical to strategic. The Government may request the contractor to represent the DCGS-A program as part of this IPT support. IPT support may require meeting participation, travel

Protected Information and/or Legends Redacted

The contractor shall travel to Government and contractor sites throughout the Contiguous United States (CONUS) and Outside Contiguous United States (OCONUS) in the performance of this task.

#### 3.2.10.2 3PDK Training Classes

The contractor shall be required to provide training classes for users of the 3PDK or other APIs. These may include any combination of introductory, intermediate, and advanced 3PDK training weeks and may cover any and all versions of the 3rd Party Development Kit in usage during the period of performance.

The contractor shall travel as required to Government and contractor CONUS and OCONUS sites in the performance of this task.

### *3.2.11 INTEROPERABILITY ENGINEERING*

The Contractor shall design and develop the DCGS-A Increment 2 Baseline software releases so that it is interoperable with other DCGS-A fielded systems, MCS systems, the Joint systems, and Coalitions in accordance with the DCGS-A SV-6 delivered prior to PDR.

For CDRL-DI-MGMT-81644B, B012, DoD Architecture Framework Documentation, the following are Viewpoints required and delivery schedule:

1. Preliminary Design Review (PDR) or similar - - all of the following views in their initial contractor draft as either Excel files for data and PowerPoint for pictorial representation: DIV-1, DIV-2, DIV-3, SV-1, SV-2, SV-4, SV-5a, SV-6 and SV-7; and

2. Critical Design Review (CDR) or similar - - all of the following views in their contractor final as either Excel files for data and PowerPoint for pictorial representation: DIV-1, DIV-2, DIV-3, SV-1, SV-2, SV-4, SV-5a, SV-6, SV-7 and SV-10c with Government 30 day review comments incorporated.

NOTE: Contractor viewpoints in Excel and PowerPoint must be consistent, correct and able to satisfy J-6 ISP review process for Milestone C and sufficient for all testing.

See CDRL DI-MGMT-81644B, B012

The Contractor shall integrate the DCGS Integration Backbone (DIB) Version 4.x (or other versions as directed) into the DCGS-A Increment 2 baselines for interoperability with the Joint DCGS Family of System (FoS).

Protected Information and/or Legends Redacted

shall define the functional partitioning and the physical modularity of the system to facilitate future replacement of specific subsystems and components without impacting other parts of the system and to encourage third-party vendor's participation.

The contractor shall provide a MOSA plan for evaluation and acceptance that describes the contractor's approach and planning for the Increment 2 system architecture that can adapt to evolving requirements and threats; reduce the development cycle time and total life cycle cost; maintain continued access to cutting edge technologies and products from multiple suppliers; and mitigate the risks associated with: (1) technology obsolescence, (2) being locked into proprietary or vendor-unique technology, and (3) reliance on a single source of supply over the life of the system.

The contractor's design approach shall emphasize the selection of components that are available commercially or within the DoD, to avoid the need to redevelop products that already exist and that can be reused. The Contractor shall consider reuse of components from the DI2E Storefront. The contractor shall use the best practice of investigating the DI2E storefront first to identify software candidates for reuse prior to making the decision to develop a capability. The contractor's rationale shall explicitly address any tradeoffs performed, particularly those that compromise the modular and open nature of the system. The weighted attributes that provide the objective evaluation criteria in the conduct of a software tradeoff for the DI2E storefront or elsewhere shall be provided during various appropriate formal reviews.

The contractor shall conduct an architecture quality attribute assessment where customer and user stakeholders are brought together to assess whether the contractors proposed architecture tradeoffs and architecture qualities meet the customer intent.

The contractor's design approach shall result in modules that have minimal dependencies on other modules (loose coupling), e.g. inserting a new application or component without disrupting the rest of the system, well defined interfaces and by the absence of implicit data sharing. The purpose is to ensure that any changes to one module will not necessitate extensive changes to other modules, and hence facilitate module replacement and system enhancement.

The contractor shall implement the MOSA Interface Design and Management principle that the Contractor shall:

- Define and document all subsystem and configuration item level interfaces to provide full functional, logical, and physical specifications;

- Identify the interface and data exchange standards between the component, module or system and the interconnectivity or underlying information exchange medium;

- Select external interfaces from existing open or Government standards with an emphasis on enterprise-level interoperability. The contractor shall describe how its selection of interfaces

Protected Information and/or Legends Redacted

- Design and implement APIs and software components that permit non-DCGS-A applications and capabilities to collaborate natively with the DCGS-A through the integration of the developed APIs and/or software components into the non-DCGS-A systems or capabilities.

## 3.4 Software Design

### *3.4.1 Design Principles*

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing. Because of the evolutionary nature of this program, the contractor may be developing different software releases concurrently. The contractor shall refine the process as agreed to by the Government. At a minimum, a release/development shall include:

a. Functionality defined for that release as defined by the Release Objectives.

b. A maximization of reuse of GOTS/COTS products.

Each release and version shall consist of field installable, and field de-installable segments. Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required. Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS.
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor.

a. Each product release builds on the foundation and functionality of the prior release. These releases are built as planned or in response to events. These blocks are referred to as cycles.

b. The requirements are defined in the contract and vetted through the User Panel.

c. The contractor shall work with the Government to allocate product release objectives into the lower level development cycles.

d. The requirements of each cycle are defined by the contractor at the planning session at the start of the cycle. The contractor shall record the requirements defined at the planning sessions in the form of release objectives and send the requirements to the government for tracking. Problem report corrections and patch development cycles are conducted IAW the Software Development Methodology.

e. Human Factors Engineering, Heuristics and Usability Studies will be continually performed on the DCGS-A system.

At the end of each release, the software shall be placed under Configuration Management control.

Protected Information and/or Legends Redacted

restrictions. Thus, the Data/Software Rights Assertions table may include technical data and software items that are provided to the Government with an "unlimited rights" license. In the Offeror's identification of technical data and software license rights, the Offeror shall use the prescribed categories of license rights referenced in DFARS 252.227-7014 and DFARS 252.227-7015 (e.g. "Limited Rights", Government Purpose Rights", "Unlimited Rights", "Unrestricted Rights", or "Commercial Software License Agreement").

If any license restrictions are proposed, the Offeror shall explain how such license restrictions placed on software deliverables will impact the Government's ability to competitively procure software maintenance/sustainment support and services from third parties, particularly in instances where the Government will be provided "Restricted Rights" in software deliverables or other license restrictions (such as restrictions in commercial software license agreements).

## 3.5 DCGS-A SYSTEM PLATFORM INTEGRATION

### *3.5.1 SOFTWARE BASELINE INTEGRATION AND TEST*

The Contractor shall conduct a software engineering test program documented in the Software Test Plan (STP) and submit the STP to the Government for approval prior to commencement of the test program. The STP shall include the planning for testing with external systems to verify the Interoperability requirements and the planning of iterative SCR Regression tests.

The Contractor shall perform the tests for all components and threads. The Contractor shall perform the software baseline integration and test activities for the DCGS-A Increment 2. System integration and test shall include verification of external interfaces as specified in the SV-6 approved after the PDR.

The Contractor shall perform a software performance test and the stability assessments in accordance with the Test Plan. The Contractor shall test selected builds of the integrated system to ensure adequate resource utilization and performance. Results shall be provided in a Performance Assessment Report (PAR).

The Contractor shall support the User Jury assessment events by the Government with the target software baseline for user feedback on the operational capabilities. The output of this effort will generate SCRs, SPRs, and/or Requirements Change Requests (RCRs) that will follow the normal engineering change processes. The Contractor shall plan for up to two User Jury events for each of the Increment 2 releases.

The contractor shall possess an in-house capability for classified development and storage on a closed internal network without having to access Government classified networks. Integration

Protected Information and/or Legends Redacted

engineering efforts shall be conducted at Aberdeen Proving Ground, MD unless otherwise directed by the Government.
See CDRL DI-IPSC-81438A, A011

### 3.5.2 *Certification, Security Accreditation, Testing and Audit*

The Contractor shall support Information Assurance certification accreditation testing for all security networks. The Contractor shall prepare and validate the Certification Test and Evaluation / Security Test and Evaluation (CT&E/ST&E) test procedures for each security enclave in dry run and with Designated Accreditation Authority (DAA) certifying representatives.

The Contractor shall develop system CT&E/ST&E documentation and test procedures for each security enclave and Cross Domain Solution devices in concert with ongoing accreditation processes.

The Contractor shall support site accreditation support at the designated OT&E locations and test events directed by the Government.

#### 3.5.2.1 Information Assurance Scan

The Contractor shall perform and support all Information Assurance Scans as required by DoD/AR policies.

#### 3.5.2.2 Formal Qualification Test (FQT)

The Contractor shall conduct an FQT for the Increment 2 software baseline release to verify the baseline operational capabilities and the compliance with the PBS, SRS and IRS. The Contractor shall provide a Test Plan for the FQT with a detailed test execution planning and test requirements.

The Contractor will apply best efforts to combine the FQT with the Functional Configuration Audit (FCA). The Contractor shall develop traceability from the DCGS-A Increment 2 PBS to the Verification and Cross-Reference Matrix (VCRM) to ensure that the completeness of the FQT is maintained with the FCA.

The Contractor shall prepare the test cases, test procedures and mission threads required for the execution on the FQT. The FQT Test Plan shall be provided to the Government for approval 30 days prior the start of the FQT.

The Contractor shall document the FQT results in a Test Report no later 30 days from the completion of the FQT event.

Protected Information and/or Legends Redacted

The Contractor shall provide hands-on validation opportunity to the Government on selected test procedures during the Contractor's Dry Runs.

The Contractor shall conduct a Test Readiness Review (TRR) at least 7 days prior to FQT. The TRR shall be performed in accordance with Government approved entrance and exit criteria. At a minimum, the TRR shall provide metrics (to be agreed to by the Government), overview of the test environment, conduct, requirements traceability, and test constraints or limitation.

The Contractor shall conduct the FQT on the DCGS-A target platform configurations. The FQT shall include requirements verification (including performance testing), interoperability/interface testing (as documented in the Interoperability/Interface Test Plan Appendix to the System Test Plan (STP)), system stability and system-level thread testing.

The Contractor shall use actual and simulated test data for all FQT testing. The Contractor shall ensure repeatability by using the same test data sets.

The Contractor shall establish and maintain a core test data set for performance measurements and benchmarks. The Contractor shall establish and maintain a test data set as required for all information requirements including sensors for the DCGS-A Increment 2 as specified in the SV-6.

The Contractor shall ensure the FQT meets the combined CT/DT Government requirements should the Government decide to use the FQT as a Government Developmental Test Event See CDRL DI-MISC-80711A, B023

#### 3.5.2.3 Reserved

## 3.6 Test Events Support

### *3.6.1 Operational Test and Evaluation (OT&E) Support*

The Contractor shall provide support to the Government in preparing the DCGS-A Increment 2 Release for the required OTE events as well as any additional releases as required.

### *3.6.2 Network Integration Event (NIE) and Exercise Support*

The Contractor shall support the Government in conducting NIE and exercises such as Enterprise Challenge or Joint Field Exercise as required by the Government.

Protected Information and/or Legends Redacted

### *3.6.3 Army Interoperability Certification (AIC) Testing Support*

The Contractor shall support the AIC test events at CTSF for the required Capability Sets certification. The Contractor shall resolve any discrepancies that occurred during the CTSF tests and provide resolution within the CTSF AIC schedule.

### *3.6.4 Joint Interoperability Test Center (JITC) Joint Certification Testing Events*

The Contractor shall support the JITC Joint Certification test events required for the Increment 2 Releases. Test locations for the Joint Certification will be specified by the Government . The Contractor shall resolve any discrepancies, which occur during the JITC test events.

## 3.7 Cyber Security

Building cybersecurity into the system early and throughout the lifecycle will ensure that operational cybersecurity risks are sufficiently mitigated throughout the acquisition process. *DoD I 8500.01, Cybersecurity*, states, "Cybersecurity must be fully integrated into system life cycles so that it will be a visible element of organizational, joint, and DoD Component architectures, capability identification and development processes, integrated testing, information technology portfolios, acquisition, operational readiness assessments, supply chain risk management, System Security Engineering, and operations and maintenance activities."

DoD cybersecurity policy as implemented through the RMF process is based on the application of security controls, the selection and implementation of which are based on cybersecurity risk assessments conducted throughout the system lifecycle. A security control is "a safeguard or countermeasure prescribed for an information system or an organization designed to protect the confidentiality, integrity, and availability of its information and to meet a set of defined security requirements."

The contractor shall design and develop the product that meets the requirements of DoD I 8500.01, Cybersecurity, DODI 8510.01, Risk Management Framework (RMF), applicable DISA Security Technical Implementation Guides (STIGs), Intelligence Community Directive (ICD) 503, Intelligence Community Information Technology Systems Security Risk Management, Certification and Accreditation, National Institute of Standards and Technology (NIST) Special Publication 800-37, "Guide for Applying the Risk Management Framework to Federal Information Systems", NIST 800-53, Revision 4, Security and Privacy Controls for Federal Information Systems and Organizations and Army Regulation (AR) 25-2, Information Assurance/Cybersecurity in order to fully integrate Cybersecurity into the program, processes, and products throughout the program lifecycle.

Protected Information and/or Legends Redacted

The security control selection process shall be governed by applicable baselines and overlays, including CNSSI No. 1253 Security Categorization and Control Selection for National Security Systems and CNSSI No.1253F, Attachment 5 for Classified Information Overlay.

The Contractor shall be staffed with security certified personnel such as Certified Information System Security Professional (CISSP) certified Information Systems Security Engineer (ISSE) dedicated to the program to support all the Security Engineering activities required for the Security Certification and Accreditation tasks for the DCGS-A Increment 2 system configurations.

The contractor shall create a Data Governance Plan to help ensure confidentiality, integrity, and availability of the data by reducing data security risks due to unauthorized access or misuse of data. The Data Governance Plan shall address the contractors approach to data and information management formalized as a set of policies and procedures that encompass the full life cycle of data, from acquisition to use and disposal. This includes establishing decision-making authority, policies, procedures, and standards regarding data security and protection, data inventories, content and records management, data quality control, data access, data security and risk management, data sharing and dissemination, as well as ongoing compliance monitoring of all the above-mentioned activities.

The plan will include:

- protection of sensitive data;
- vulnerability assessment and risk management;
- enforcement of legal, regulatory, contractual, and architectural compliance requirements;
- identification of stakeholders, their roles and responsibilities; and
- access management.

### *3.7.1 Design Considerations*

#### 3.7.1.1 System Security

The contractor shall incorporate all security features as required by the DCGS-A Information System Capability Development Document (IS CDD).

The contractor shall support the process of mapping and allocating Cybersecurity requirements to the hardware and software design for the system as part of the overall system development process and to support test and evaluation planning.

The contractor shall identify potential threats and vulnerabilities of the developing system from Cybersecurity risk perspective and characterize the attack surface before performing component and system integration testing.

Protected Information and/or Legends Redacted

The contractor shall perform Security Vulnerability Analysis to provide results of contractor's efforts to quantitatively and qualitatively define system security functional requirements and residual clandestine vulnerabilities. The analysis shall be classified no lower than SECRET NOFORN.

See DI-MISC-80841, C014

The contractor shall provide the Vulnerability Scan Compliance (VSC) Report, for use by the government to assess the security vulnerability and residual risks of the system software build.

See DI-MGMT-81842, C015

The contractor shall complete the detailed build-to design of the system, ensuring that all required cybersecurity requirements are included, mapped, and allocated to the hardware and software design.

The contractor shall employ DoD-evaluated and certified/approved products, this includes using hardware from the Defense Information Systems Agency (DISA) Unified Capabilities (UC) Approved Products List (APL), and software that has undergone National Information Assurance Partnership (NIAP) evaluation and has been published on the Approved Products Compliance List (APCL).

The contractor shall demonstrate during Critical Design Review (CDR) the adequacy of the system design to meet the system requirements, including Cybersecurity, and readiness to begin developmental prototype hardware fabrication and/or software coding with acceptable risk.

The contractor shall conduct self-assessment or support Cybersecurity penetration testing based on the system Cyber Attack Surface during the development phase in order to prepare the system for formal Developmental Test & Evaluation (DT&E) and support Program Protection Plan requirement.

### 3.7.1.2 Security Technical Implementation Guides (STIGs)

The contractor shall implement STIGs within 30 days from release of a new DISA STIG. Where an update cannot be technically applied due to system functionality, that STIG item shall be documented in the classified system Plan of Action & Milestone (POA&M) with appropriate mitigations. If an update cannot be applied within 30 days, the contractor shall provide a milestone schedule in the POA&M item for application for Government approval.

### 3.7.1.3 Information Assurance Vulnerability Alert (IAVAs)/Security Patches

The contractor shall incorporate all applicable IAVAs and vendor security patches to the baseline of the system in a timely manner during the entire contract period.

Protected Information and/or Legends Redacted

### *3.7.2 Cybersecurity Documentation*

The contractor shall provide all applicable accreditation documents to support Secret and below systems accreditation per DODI 8510.01, Risk Management Framework (RMF) and approval authority requirements.

The contractor shall provide all applicable accreditation documents to support Top Secret and Cross Domain Solution components per Intelligence Community Directive (ICD) 503 and approval authority requirements.

During development, the contractor shall develop and provide all IA and IA-Enabled software application Cybersecurity Certification Test Procedure (CTP) or Hardening Guide along with system CTPs as part of accreditation documents to support Cybersecurity certification process.

The contractor shall ensure the decomposed component specifications, with inherent cybersecurity requirements, are fully defined, including verification criteria, and traced to the security controls documented in the Security Plan.

### *3.7.3 (Cybersecurity) Certifications and Accreditation*

The contractor shall address all identified Cybersecurity concern/issues during the period of the contract so that system can meet accreditation requirements and to achieve all necessary IATT and ATO approvals to meet program schedule.

The contractor shall follow DoDI 8500.01 and DoDI 8510.01 guidance for Secret and below accreditation requirement.

The contractor shall follow ICD 503 guidance for Top Secret and Cross Domain Solution accreditation requirement.

## 3.8 Integrated Logistics Support (ILS)

The following efforts for logistics, training and support are limited to the technical support that the Government requires the software developer to provide for logistics support. This support would be technical services, documentation and data to assist with the development of documentation and training as well as assist with the initial training for logistics developers, field support and help desk personnel, as required. This is necessary to ensure the development of adequate documentation/training and provide required field support for any DCGS-A software that is developed under this effort and fielded to the Army. In addition, utilize the Supportability Analysis (SA) per AR 700-127 Integrated Product Support, 7 October 2014, system approach which permits

Protected Information and/or Legends Redacted

timely identification of SA design guides needed to influence the DCGS-A software design for supportability. The contractor software design engineers shall optimize the design performance within SA constraints and minimize any design risk that could create a supportability problem.

The contractor shall provide Post Development Software Support (PDSS) for up to, but not to exceed two (2) years post software release, which consists of Field Support Engineer/Interim Contractor Support to allow for patching/IAVA/Hot Fix support during test and sustainment of the SW until it is successfully transitioned into formal Post Production Sustainment Support (PPSS).

The following paragraphs are representative of the tasks that may be issued in accordance with this PWS paragraph or under a specific Task Order.

The Contractor shall develop, deliver, and facilitate required logistics support and products for the DCGS-A Increment 2 Program. The Contractor shall conduct, support and facilitate verification and validation of all ILS products.

The Contractor shall maintain an ILS program as an element of this overall effort. The ILS elements specified for this area are:

a. Training
b. Technical Manuals or User Manuals
c. ILS Planning
d. ILS Engineering
e. Logistics Demonstrations
f. Supply Support
g. Safety Assessment
h. Field Service Engineer
i. Item Unique Identification (IUID)

### *3.8.1 Supply Support*

The Contractor shall provide all supply support activities as it relates to developing and integrating, the DCGS-A platform configurations.

### *3.8.2 Logistics Support Analyses (LSA)*

**The Contractor shall provide data/information to support Logistics Support Analyses (LSA) development in the Government format for the DCGS-A Increment 2 baselines to ensure that supportability requirements are incorporated into the ILS program and provide Logistics Support Analysis Plan. See CDRL DI-ILSS-80531, C010.**

Protected Information and/or Legends Redacted

### *3.8.3 TRAINING*

#### 3.8.3.1 New Equipment Training (NET)

The Contractor shall complete development of the NET materials. The Contractor shall validate the NET material in accordance with the IMS, prior to the Instructor Key Personnel Training (IKPT) and training material certification. The NET materials shall be developed to the Training & Doctrine Command (TRADOC) 350-70 standard.

The Contractor shall develop and update the DCGS-A Increment 2 Gross Task List. Common MOS specific tasks will be identified at a high level, as required based on requirements changes, and shall enter the new or revised critical tasks into Army Training Development Capability (TDC). Training should be developed in accordance with DI-SESS-81523C Training Conduct Support Document. The training material shall include Lesson Plans, Visual Aids, and Training Guides.

The Contractor shall develop all Lesson Plans for the DCGS-A Increment 2. Existing Program of Record Training materials that are currently in TDC shall be leveraged to the fullest extent possible. The Contractor shall validate the Training Support Package (TSP) and make it available to the Government for verification.

See CDRL DI-SESS-81523C, C011.

#### 3.8.3.2 On-Line Help

The Contractor shall develop an On-Line Help capability

#### 3.8.3.3 Training Certifications

The Contractor shall support the government certification of the DCGS-A Increment 2 Training Support Packages with one (1) Subject Matter Expert per Intelligence domain for the duration of the domain program of instruction. The contractor shall support government validation & verification of all training support packages.

#### 3.8.3.4 Instructional Media Package

The contractor shall utilize the instructional media design package findings, and conclusions to support the Interactive Multimedia Instruction (IMI) development. When IMI is identified as a training solution, the system training data products shall be SCORM 2004, 3rd edition compliant for

Protected Information and/or Legends Redacted

both content and the targeted Learning Management system to ensure that they are interoperable, accessible, reusable, playable, and durable.

This training data product shall provide specific data necessary to support the transfer of knowledge, skills, and aptitudes by use of instructional media. The Government will conduct an acceptance review of the final courseware to include all lessons/modules, tests, assessments, and exercises to verify SCORM 2004 3rd edition compliance and proper courseware functioning to include proper implementation of the instructional strategy on the targeted ALMS. The contractor shall validate all courseware online prior to final acceptance by the Government. This includes: test validation, content validation and educational (that is, group Trials) validation in accordance TRADOC Pam 350-70-10 and the identified criticality standard for each TLO in the courseware. The Government will provide the subject matter experts (SME) needed for content validation and test validation and the target audience for the individual and group trials.

See DI-SESS-81526CB, C012

### *3.8.4 Technical Manuals*

The Contractor shall provide a complete Software User Manual (SUM) IAW MIL-STD-40051-1B (IETM based manuals) and MIL-STD-40051-2B (page-based manuals) that will support NET, Maintainer and System Administration training development. The interactive SUM shall leverage whenever possible, previously existing Technical Manuals supporting DCGS-A and related systems.

See CDRL DI-IPSC-81443A, C001

### *3.8.5 Technical Support*

The contractor shall provide technical support services to/for:

a. FSE/ICS Technical Support to the user during SW transition period(s).
b. The field support prime contractor, as designated by the Government.

The contractor shall provide technical support services to include, but is not limited to, participating in meetings, teleconferences, traveling to Government or other locations, and/or conducting engineering or technical analyses of reported problems.

### *3.8.6 Data Products in Support of Logistics Development*

Protected Information and/or Legends Redacted

### 3.8.6.1 Source Documentation

The contractor shall provide source documentation for each DCGS-A INC 2 SW release that will enable the production of system administration and system user manuals for each DCGS-A INC 2 SW release. The source documentation provided by this contract will be provided through the Government to third party contractors for production and integration into SW technical manuals under separate contract vehicles. Existing data as well as the delta data shall be used to update existing documentation where applicable. The contractor shall use as much existing data as possible to create the documentation.
See CDRL DI-IPSC-81443A, C001 and CDRL DI-MISC-80711A, C017

### 3.8.6.2 Field Support Technical Manuals

The contractor shall produce an interactive Field Support Technical Manual for each DCGS-A INC 2 SW release that will identify and document system level troubleshooting, maintenance, and system administration. This document will provide advanced subject matter expertise material required for Field Support personnel to assist in the installation, configuration, operation and administration of the DCGS-A SW in the tactical environment. Existing data as well as the delta data shall be used to update existing manuals where applicable. The contractor shall use as much existing data as possible to create the manuals.
See CDRL DI-MISC-80711A, C003

### 3.8.6.3 Subject Matter Expert Support

The contractor shall provide subject matter expertise in support of DCGS-A INC 2 SW to a limited number of Field Support and Trainer Personnel. The contractor shall develop a Program of Instruction POI to support this effort. The POI shall contain a course outline that depicts the training sequence of all learning objectives, Learning Step/Activities, and supporting Skills/Knowledge. The POI shall also indicate the Individual Tasks trained within each course of instruction. The POI will be used to do initial training for a limited number of FSRs and senior trainers, and used by the government to expand the knowledge base across the field support team. The contractor is not expected to provide training for the entire field support team, but provide this POI as a "train the trainer" type product.

In conjunction with the "train the trainer" activities, the contractor shall provide subject matter expertise that will support the production of a training repository and library components for the DCGS-A INC 2 Master Repository that coincides with each major DCGS-A INC 2 SW release. This support will include interaction with Field Support and Senior Training personnel and may include

Protected Information and/or Legends Redacted

development of SW components that will be submitted to the government as part of the DCGS-A INC 2 SW release or included as an update to a release. The government will coordinate the required meetings and facilitate any interactions with 3rd party contractors as required. Any necessary data from training products being produced by third party contractors shall be provided by the Government to the Contractor as source data.

### *3.8.7. Field Support*

#### 3.8.7.1 Post Fielding Support

The contractor shall provide technical support services, information and data relative to the software developed under this contract to assist with the train up of FSRs to support the initial deployment and sustainment of software developed under this contract. This support would also include initial train-the-trainer support for FSRs for any new software releases and technical support for the initial fielding of the software at either a CONUS or OCONUS location as requested by the Government.

#### 3.8.7.2 Contingency Deployment Support

The contractor shall be prepared to provide technical support for the initial deployment of new DCGS-A INC 2 software capabilities to Army units in theaters of operation. This support would include both 24/7 reach back support for deployment teams as well as limited deployment of technical support personnel to assist deployment support teams with the initial fielding of software in theater.

#### 3.8.7.3 CONUS Help Desk Support

The contractor will provide support to the DCGS-A help desk operations established by the government. As directed, the contractor will either be requested to provide personnel to operate a CONUS based help desk at a facility located in the continental US or to provide technical assistance to the Government in addressing help desk trouble tickets that are submitted by DCGS-A users.

### *3.8.8 ILS Planning*

The Contractor shall have an ILS Manager, responsible directly to the Program Manager/Product Support Manager, to serve as the single point of contact for the Government and the Contractor in all ILS matters.

### *3.8.9 Reserved*

Protected Information and/or Legends Redacted

### *3.8.10 Demonstrations*

#### 3.8.10.1 Maintenance and Logistics Demonstrations

The Contractor shall update the Maintenance Demonstration Plan and conduct a Maintenance Demonstration (MD).

The Contractor shall support a Logistics Demonstration (LD) IAW AR-700-127 to evaluate the elements of Logistics required to support the DCGS-A Increment 2 supportability elements.

The Contractor shall incorporate all red-lines identified during the MD and LD into the logistics documentation.

### *3.8.11 Reliability, Availability and Maintainability (RAM) Engineering*

#### 3.8.11.1 RAM Engineering Framework

The RAM engineering processes establish the framework for a closed-loop failure mode mitigation software reliability program. The main purpose is to ensure reliability system maturation and achievement of the program's objectives and to establish a feasible path to demonstrate system-level reliability requirements with statistical confidence. The Contractor shall create, follow and flow down RAM requirements to any Subcontractor(s)/Supplier(s).

#### 3.8.11.2 RAM Lead

The Contractor will nominate a RAM Lead to coordinate RAM efforts.

#### 3.8.11.3 RAM Program Plan (RPP)

The Contractor shall develop and submit for Government approval a RAM Program Plan (RPP) as a comprehensive compendium of the system's RAM activities, functions, processes, test strategies, measurements, data collections, resources, and timelines required to ensure that the specified reliability of the system will be achieved before fielding (or as planned).
See CDRL DI-SESS-81613A, C007

Protected Information and/or Legends Redacted

### 3.8.11.4 System Software Reliability Model (SSRM)

The Contractor shall develop a System Software Reliability Model (SSRM) using operational workflows and user tasks. All required software, data architecture, databases, etc. shall be mapped to the SSRM. The SSRM shall encompass all software and non-software items, including, but not limited to: Commercial Off-the-Shelf (COTS), Non-Developmental Software Items (NDSI), Government Furnished Software (GFS) and human computer interface issues.
See CDRL DI-SESS-81613A, C007

### 3.8.11.5 System Software Reliability Model (SSRM) Risk Assessment

The Contractor shall perform a risk assessment using the SSRM and identify critical system weaknesses in the system design after any major changes to the baseline are completed. Critical items are defined as those items whose inoperability impacts mission completion, essential functions, or safety; or items whose failure rates contribute significantly to the overall system degradation. The assessment shall identify low, medium, and high-risk critical tasks. The assessment can be based on the following methods: (1) reliability analysis from comparable software; (2) historical reliability from systems with similar software complexity; or (3) documented subject matter expert engineering estimation. The Contractor shall provide a table with all items contributing to critical weaknesses using the SSRM. Each SSRM element shall include risk criteria based upon the following guidance:

a) Low Risk – Test data or reliability analysis of comparable systems (under similar operating conditions)

b) Medium Risk – Historical reliability of systems of similar software complexity, test data, or reliability analysis of comparable systems (not under similar conditions)

c) High Risk – Subject Matter Expert (SME) engineering estimates

### 3.8.11.6 Mitigation Plans

The Contractor shall develop a plan to mitigate all critical items rated as high or medium risk. Mitigation plans may include additional testing, redesign, etc. The Contractor shall prepare and provide risk mitigation plans and Risk Management Status Reports to the Government.

See CDRL DI-MGMT-81809, B019

### 3.8.11.7 Failure Mode Analysis

The Contractor shall identify, confirm, and mitigate the critical failure modes (through modeling, analysis, and test) that will result when requirements are imposed. The Contractor shall start to

Protected Information and/or Legends Redacted

identify the failure modes immediately upon contract award and continue to identify and analyze failure modes throughout the system's life cycle. Failure modes that may be induced by user or maintainer error shall be identified and confirmed through analysis or test. When applicable, the Contractor shall use, at a minimum, Failure Modes and Effects Analysis (FMEA) and software analytical tools (e.g. dynamic test methods, static analysis and debugging.)
See CDRL DI-SESS-80980A, C002

### 3.8.11.8 Failure Reporting, Analysis, and Corrective Action System (FRACAS)

The Contractor shall establish and utilize a closed-loop Failure Reporting, Analysis, and Corrective Action System (FRACAS) as its mechanism for monitoring and communicating descriptions of: test and field failures, analyses of failure modes and root cause failure modes, the status of design and/or process corrective actions, risk-mitigation decisions, the effectiveness of corrective actions, and lessons learned. The Contractor shall address all failure modes found within the software architecture, to include, but not limited to, COTS, NDIS, GFS, and non-software items as applicable. The FRACAS shall include all failure modes, from initial modeling and analysis through the fielding of the system. The Contractor shall address and mitigate failure modes in a timely manner, consistent with their impact on reliability, performance, priority level and total life cycle cost. The Contractor shall mitigate failure modes to ensure that reliability requirements are met, and reliability does not degrade with each software upgrade. The Contractor shall provide the Government with Failure Analysis and Corrective Action Reports (FACAR). See MIL-HDBK-2155 and CDRL DI-SESS-81315B, C013

### 3.8.11.9 Software Reliability Evaluations

The Contractor shall perform software reliability evaluations on data from analysis, modeling, test, and the field. The Contractor shall track the evaluations as a function of time (and/or configuration) and compare them against the system and software reliability allocations, requirements, metrics, and values to be achieved at various points during development and deployment to verify the implementation of corrective actions.

### 3.8.11.10 Software Quality Maturity Plan

The Contractor shall develop and implement a software quality maturity plan. The Contractor shall provide, at a minimum; (1) planned test events where quality and reliability data will be collected, (2) planned corrective action period(s), (3) planned capability drops and the effect on quality and reliability, (4) planned degradation due to test environment and scalability, and (5) software quality and reliability goals. The Contractor and Government will review and update the plan to account for any impact due to Government directed changes. The Contractor shall: (1) incorporate reliability activities as an integral part of disciplined and documented systems engineering process and plan, (2) manage and control reliability critical items, and (3) coordinate all reliability activities and findings with the system's design team."

Protected Information and/or Legends Redacted

### 3.8.11.11 Software Reliability Qualification Test

The Contractor shall conduct a Software Reliability Qualification Test as part of Qualification Testing to verify continued compliance with the system's reliability requirement. Demonstration of reliability compliance following institution of corrective actions shall be conducted by the Contractor at no additional expense to the Government. The scope of this event and subsequent demonstrations shall be determined by the contractor and government.

### 3.8.11.12 Technical Interchanges

The Contractor shall conduct technical interchanges with the Government. These technical reviews will be scheduled as part of the Integrated Master Plan/Master Schedule. The Contractor shall support the Government-conducted failure reviews and assessment conferences. The Contractor shall provide the reliability test results in a written report within 30 days of completion of each reliability test. The report shall be in Contractor format and shall include, but not be limited to, a test summary, test description, identification of item(s) under test, test group number, performance requirements, measured values taken during the test, conclusions, and Test Incident Reports (TIRs), Help Desk Tickets, or other applicable incident documents.

### 3.8.11.13 Software Configuration Management (SCM)

The Contractor shall implement Software Configuration Management (SCM). SCM provides baseline identification for developing and released software products; provides a snapshot of dynamically changing software; tracks concurrent modification of items (i.e. modules); ensure the orderly release and implementation of new or revised software products. The Contractor shall at least perform the basic SCM functions: (1) configuration identification, (2) configuration control (change control), (3) configuration status accounting, (4) audits and reviews and (5) release processing.

### 3.8.11.14 Reliability and Maintainability Analysis

The Contractor shall conduct a Reliability and Maintainability analysis on the DCGS-A Increment 2 software baseline release in conjunction with the PDR and CDR. The Reliability analysis shall account for software reliability.

### *3.8.12 PURCHASE OF EQUIPMENT, MATERIAL OR SUPPLIES*

The contractor shall obtain prior written authorization and approval from the COR or KO as applicable for any equipment, material or supplies purchased to support the performance of any detailed requirement under this contract. The contractor shall purchase all Information Technology (IT) software and equipment from the Computer Hardware, Enterprise Software Solutions (CHESS) contract. If IT items are not available via a purchase from CHESS, a CHESS "Statement of Non-

Protected Information and/or Legends Redacted

Availability" and Goal 1 Waiver (https://adminapps.hqda.pentagon.mil/akmg1w/index.html) shall be obtained before making purchases within the commercial market. When making purchases the contractor shall receive at least three quotes or a sole-source justification for those purchases that can only be acquired from one supplier. All quotes or justifications shall be provided to the Contracting Officer (KO) or the Contracting Officers Representative (COR) for approval. Approvals shall be obtained prior to making any purchases. The contractor shall be liable for any purchases made without KO or COR approval.

#### *3.8.13 MAINTENANCE*

The Contractor shall provide all supply support activities as it relates to developing, integrating, maintaining, and operating the DCGS-A platform configurations.

The Contractor shall provide proper care and housing of all GFE provided under this POP and all GFE provided from prior contracts. In the event that the GFE requires maintenance or becomes inoperable, the Contractor shall notify the Government IPT lead and provide recommendations and a cost estimate for maintaining, repairing or replacing the GFE.

##### 3.8.13.1 Field Service Engineer (FSE)

The Contractor shall provide FSE/ICS to support DCGS-A Increment 2 releases during demonstration and testing activities as directed by the Government.

#### *3.8.14 ITEM UNIQUE IDENTIFICATION (IUID)*

The Contractor shall comply with the requirements of FAR 52.245-1 for all Government Property furnished to the contractor. The requirements include the management, control, caretaking and reporting of the Government Property.

The Contractor shall comply with the Item Identification requirements of DFARS 252.211-7003 as they apply to all hardware deliverables, end items and spares, on this contract. Requirements include uniquely marking and registering with DoD IUID Registry of all qualifying hardware deliverables.

The Contractor shall comply with the Item Unique Identification requirements of DFARS 252.211-7007 as they apply to Government Property in possession of the contractor. Requirements include uniquely marking and registering with DoD IUID Registry of all qualifying Government Property in possession of contractor not already so marked.

### 3.9 CONFIGURATION MANAGEMENT

Protected Information and/or Legends Redacted



A1229

Appx11229

Protected Information and/or Legends Redacted

**Section A – Supplement Information**

EXECUTIVE SUMMARY

**A-1 This Task Order (TO)(0001):** is a Cost-Reimbursement action that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to target cost.

The Target Cost, Target Fee, Maximum Fee and adjustment formula are negotiated initially. After contract performance, the fee payable is determined in accordance with the formula. The formula provides, (within limits), for increase in fee above the target fee when the total allowable costs are less than the target costs, and a decrease in fee below target fee.

The provision for increase or decrease in fee is intended to provide an incentive for maximum effort on the part of the contractor to manage the contract effectively. When total allowable cost is greater or less than the range of costs within which the fee adjustment formula operates, the contractor is paid the total allowable costs in addition to the minimum or maximum fee.

**A-2 Task Order 0001 Incentive Arrangement:** TO 0001 is a multiple incentive arrangement, comprised of multiple incentives for each CLIN. The order will utilize an incentive pool structure for each CLIN. Each CLIN comprises of a Performance and Cost/Price incentive. The Performance incentive amounts to 60% of each CLIN's incentive pool's total, with the Cost/Price amounting to 40% of each CLIN's incentive pool's total.

**A-3 Establishing the Payable Fee (Performance Incentive):** The Performance Incentive for each CLIN shall be proposed, negotiated and agreed upon as a process of awarding TO 0001. The contractor's final adjusted performance fee incentive will be reduced by 10% for each Priority 1 and Priority 2 SW anomaly (as defined in Task Order 0001 PWS paragraph 3.6.13) discovered during each identified testing event. The Performance Incentive Fee will be disbursed incrementally based on number of Priority 1 or Priority 2 anomalies discovered during one of the four (4) identified test events, in accordance with the approved Integrated Master Schedule as required by Task Order 0001 PWS paragraph 3.1.3, in the percentages described below:

| Test Event | % of Performance Incentive Pool Disbursed |
|---|---|
| Initial Delivery of Data Management Architecture Software | 50 |
| Government Acceptance Test | 20 |
| Developmental Test | 20 |
| Operational test | 10 |

**A-4 Establishing the Payable Fee (Cost/Price Incentive):** The Cost/Price Incentive for each CLIN shall be proposed, negotiated and agreed upon as a process of awarding TO 0001. Upon the completion of TO 0001 actual costs will be compared with the target costs. Overruns and underruns result in adjustment of the fee according to the determined sharing formulas established in 52.216-10. The adjustment amount must fall within the agreed maximum and minimum fee levels. The fee adjustment amount shall equal the target cost subtract the final cost multiplied by the contractor's percentage of cost risk. The final fee shall amount to the fee adjustment plus the target fee. The final

Protected Information and/or Legends Redacted

fee is subject to the minimum and maximum fees. If the final fee is less than the minimum fee, the minimum fee becomes the final fee. If the final fee is more than the maximum fee, the maximum fee becomes the final fee.

**A-5 Final Task Order 0001 Price:** The final TO is the final cost plus final fee (for both CLINs) equals final TO price.

Protected Information and/or Legends Redacted

Section B – Supplies or services and prices/costs

| ITEM NO | SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | **<u>Data Management Architecture</u>**<br>Cost Plus Incentive Fee (CPIF)<br><br>The work performed under this CLIN shall be IAW all Task Order 0001 PWS paragraphs with the exception of paragraph 3.2.27 (CI HUMINT), and paragraph 5 (Travel)<br><br>CLIN 0001 shall include a Performance and Cost/Price multiple incentive structure.<br><br>**<u>CLIN 0001 Incentive Pool:</u>**<br>Performance: 60%<br>Cost/Price: 40%<br><br>Target Cost: Proposed<br>Target Fee: Proposed<br>Minimum Fee: 0%<br>Maximum Fee: 13%<br><br>**<u>CLIN 0001 Performance Incentive Factor:</u>**<br>100% incentive fee earned upon the successful delivery of Data Management Architecture software with Zero 1 or 2 priority anomalies.<br><br>Software 1 & 2 priority anomalies are defined IAW Task Order 0001 PWS Section 3.6.13<br><br>The final Performance Incentive fee shall be reduced by 10% for each priority 1 or 2 anomalies discovered during each test event as defined in section A-3.<br><br>**<u>CLIN 0001 Cost Incentive Factor:</u>**<br><br>Share ratio as stated in 52.216-10.<br><br>**<u>Inspection and Acceptance:</u>**<br>In accordance with section E<br><br>**<u>Deliveries or Performance:</u>**<br>The period of performance shall be 36 months from the date of contract award. | | | Target Cost:<br>Target Fee: | $ TBD |

## 3.2 SYSTEMS DESIGN, ENGINEERING, AND DEVELOPMENT

The contractor shall perform system engineering activities, to include but not limited to, system architecture and design; requirements definition and analysis; interface with external agencies; quantitative and qualitative analysis of system performance and reliability; and support of Army and Joint Interoperability.

The contractor shall provide detailed system design and engineering support to all other functional areas of contract activity (*i.e.* software design/development/integration, test, safety, security, etc.), as required, to ensure that program objectives are met.

The contractor shall provide System Engineering services to support Army exercises such as preparing and verifying data loads and post exercise analysis of issues and enhancements to the DCGS-A INC 2.

The contractor shall support architecture evaluations by the government throughout the contract period of performance.

The following are the system and software design objectives for the DCGS-A INC 2.

- The contractor shall implement a system and software design to support "edge" users (i.e., disconnected, low bandwidth operations) and must emphasize performance, flexibility, supportability, security and extensibility.

- Interfaces shall be designed with a focus on maintainability, extensibility, supportability, performance, reuse, and system security.

- All software shall be designed with an emphasis on reliability, availability, modifiability and maintainability.

- All software shall be designed in such a manner as to minimize or eliminate the usage of proprietary or commercial technologies except where specifically approved by the Government..

- The system architecture shall be flexible to ensure successful implementation of changing requirements and emerging technologies.

- Human factors engineering, analysis, and heuristics shall be used to make changes and enhancements to the common look and feel.

Protected Information
and/or Legends Redacted

needed to perform the task, and utilize the latest version of MagicDraw and use of Teamworks Server for collaboration and to electronically verify traceability of enterprise architecture.

The contractor shall design and develop the DCGS-A Increment 2 system architecture that incorporates appropriate considerations for scalability, modular design, reconfigurability, portability, maintainability, support future technology insertion, vendor independence, reusability, and interoperability.

The Contractor shall implement and design the system architecture in a Modular Open Systems Architecture (MOSA) construct for the development of DCGS-A Increment 2. The Contractor shall apply commercially supported practices in developing the architecture and functional capabilities by using: (1) a layered software approach, (2) products, specifications, and standards that are selected based on performance, cost, and industry acceptance, (3) emphasis on nonproprietary interfaces, (4) long-term availability and supportability, and (5) upgrade potential. The open architecture will exploit innovation and continuous technology insertion to mitigate obsolescence. The contractor's architectural approach shall support the rapid and affordable insertion and refreshment of technology through modular design, the use of open standards and open interfaces. The contractor shall define the functional partitioning and the physical modularity of the system to facilitate future replacement of specific subsystems and components without impacting other parts of the system and to encourage third-party vendor's participation.

The contractor shall provide a MOSA plan for evaluation and acceptance that describes the contractor's approach and planning for the Increment 2 system architecture that can adapt to evolving requirements and threats; reduce the development cycle time and total life cycle cost; maintain continued access to cutting edge technologies and products from multiple suppliers; and mitigate the risks associated with: (1) technology obsolescence, (2) being locked into proprietary or vendor-unique technology, and (3) reliance on a single source of supply over the life of the system.

The contractor's design approach shall emphasize the selection of components that are available commercially or within the DoD, to avoid the need to redevelop products that already exist and that can be reused. The Contractor shall consider reuse of components from the DI2E Storefront. The contractor shall use the best practice of investigating the DI2E storefront first to identify software candidates for reuse prior to making the decision to develop a capability. The contractor's rationale shall explicitly address any tradeoffs performed, particularly those that compromise the modular and open nature of the system. The weighted attributes that provide the objective evaluation criteria in the conduct of a software tradeoff for the DI2E storefront or elsewhere shall be provided during various appropriate formal reviews.

The contractor shall conduct an architecture quality attribute assessment where customer and user stakeholders are brought together to assess whether the contractors proposed architecture tradeoffs and architecture qualities meet the customer intent.

The contractor's design approach shall result in modules that have minimal dependencies on other modules (loose coupling), e.g. inserting a new application or component without disrupting the rest

Protected Information and/or Legends Redacted

of the system, well defined interfaces and by the absence of implicit data sharing. The purpose is to ensure that any changes to one module will not necessitate extensive changes to other modules, and hence facilitate module replacement and system enhancement.

The contractor shall implement the MOSA Interface Design and Management principle that the Contractor shall:

- Define and document all subsystem and configuration item level interfaces to provide full functional, logical, and physical specifications;
- Identify the interface and data exchange standards between the component, module or system and the interconnectivity or underlying information exchange medium;
- Select external interfaces from existing open or Government standards with an emphasis on enterprise-level interoperability. The contractor shall describe how its selection of interfaces will maximize the ability of the system o easily accommodate technology insertion and facilitate the insertion of alternative or reusable modular system elements.

### *3.2.6 DCGS-A Increment 2 Data Management Architecture Required Capabilities*

The contractor shall develop the DCGS-A Data Management Architecture software baseline with the following capabilities:

#### 3.2.6.1 Data Ingress Capability

The contractor shall develop a Data Ingress capability that performs data acquisition and ingestion. This effort shall support external subsystems that enable data harvesting and acquisition. This effort shall support internal subsystems that perform artifact parsing, artifact decomposition and artifact knowledge extraction based on predefined data models.

#### 3.2.6.2 Data Persistence Ecosystem

The contractor shall develop a Data Persistence Ecosystem that performs data indexing and persistence in a data store appropriate for data's particular characteristics and behavior. The data persistence ecosystem shall, at a minimum, be represented by the following attributes:

1) Data Access - An Application Program Interface (API) layer shall provide standardized/Open APIs to store and retrieve data.

2) Data Stores - Data stores shall provide a means to enable event data, entity relationships and knowledge information to simultaneously coexist.

Protected Information and/or Legends Redacted

3) Data Persistence – The contractor shall provide a persistence container where all mission data is stored and is the base storage system upon which the data stores reside.

4) Data Semantic Discovery - The contractor shall links together "like-meaning-content" across the data stores to synthesize uniform word/content meaning in support of advanced queries. A shared semantic dictionary shall be used with a mapping capability on ingest to facilitate semantic discovery.

### 3.2.6.3 Data Egress and Visualization Platform

The contractor shall develop a Data Egress and Visualization platform that performs data retrieval while enforcing oversight and compliance policies. The data egress and visualization shall, at a minimum, be represented by the following attributes:

1) Data Access – The contractor shall establish the API layer to store and retrieve data to enable; machine to machine, data interoperability, homo and heterogeneous data exchange; and machine to human, data federation and searching.

2) Data Security – The contractor shall provide user and data authentication and authorization by means of a connected set of external and internal (cell level security) system services to enforce legal oversight and compliance.

3) Web Framework – The contractor shall provide user visualization through a Web-based Framework.

### 3.2.6.4 Data Analytics

The contractor shall develop a system that enables cloud-scale analytics. These analytics shall be able to enable streaming analytics for low latency fast in memory processing and big data batch analytics for petabyte data observations.

### 3.2.6.5 Data Integrity

The contractor shall develop a means to measure and ensure that the data can be trusted. The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree – The contractor shall assure that source data is authentic. A record of the ancestry of data as well as metrics of their reliability and confidence shall be computed, stored and tracked.

2) Data Provenance – The contractor shall include the chronology of the ownership of an artifact. All incoming data shall be marked and tracked with a unique identifier enforced as part of the ingest process.

Protected Information and/or Legends Redacted