UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PALANTIR USG, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in case no. 16-cv-00784C, Judge Horn

JOINT APPENDIX

Volume I

Pages Appx00001 – Appx12348

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-1111
Fax: (202) 514-8624

August 11, 2017          Attorneys for Defendant-Appellant

**PALANTIR USG, INC.**

v.

**UNITED STATES**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
CASE NO. 17-1465**

**NONCONFIDENTIAL JOINT APPENDIX TABLE OF CONTENTS[1]**

| I. Docket Entries – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| **Document** | **ECF No.** | **Appendix Page(s)** |
| Court of Federal Claims Revised Protective Order | | |
| Redacted Opinion (November 9, 2016) | 113 | Appx1-104 |
| Judgment (November 10, 2016) | 114 | Appx105 |
| Docket Sheet – Court of Federal Claims | | Appx106-119 |
| Complaint (June 30, 2016) | 1 | Appx120-202 |
| Palantir MJAR (July 27, 2016) | 37 | Appx448, Appx 484 |
| Court Hearing Transcript (September 15, 2016) | | Appx750, Appx795-796 |
| Joint Stipulations of Facts (April 24, 2017) | 125 | Appx816 |
| Government's Cross-Motion JOAR (July 17, 2016) | 19 | Appx861, Appx898-909 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 92 | Appx958-962 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 91 | Appx 969 Appx974 |

---

[1] The Confidential Joint Appendix contains material subject to a Court of Federal Claims Protective Order. A copy of this Protective Order is included immediately following the Table of Contents. This protected material includes source selection sensitive information of the Department of the Army; information that poses operational security concerns, including identify of particular military personnel or units involved; information marked as confidential by potential offerors; information marked with the dissemination control "For Official Use Only" (FOUO), and other documents covered by the Court of Federal Claims protective order that have not been released to the public.

The U.S. Court of Federal Claims's public opinion is at Appx1-104. The U.S. Court of Federal Claims's sealed opinion is at Appx20001-20104. Citations in the briefs are to the public version.

**NONCONFIDENTIAL VERSION**

| II. Administrative Record – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| Document | AR Tab | Appendix Page(s) |
| Agency Report (AR) Tab A - Contracting Officer's Statement/Legal Analysis (March 21, 2016) | 1 | Appx10001-52 |
| AR Tab B - Declaration of Stephen Morton (March 17, 2016) | 2 | Appx10056-57 |
| AR Tab C - Declaration of Christopher Fisher (March 16, 2016) | 3 | Appx10058-60 |
| AR Tab E - Approved Recommendation for a change to DCGS-A Increment 1 Acquisition Strategy (December 4, 2014) | 5 | Appx10091-92 |
| AR Tab F - Acquisition Strategy Report DCGS-A Increment 2 | 6 | Appx10093 Appx10107 Appx10125 |
| AR Tab H - DCGS-A Inc 2 Incentive Fee Contract Type D&F (December 14, 2015) | 8 | Appx10150-153 |
| AR Tab J - DCGS-A COTS Software List- DCGS-A Increment 1 | 10 | Appx10243-250 |
| AR Tab K - DCGS-A IS CDD | 11 | Appx10251 Appx10270 |
| AR Tab M - DCGS-A Inc 2 Draft Base PWS (July 15, 2015) | 13 | Appx10410 Appx10418-19 Appx10464 |
| AR Tab N - DCGS-A Inc 2 Draft TO 0001 | 14 | Appx10539, Appx10594 |
| AR Tab O - DCGS-A (Palantir) Draft TO 0001 Response | 15 | Appx10687 Appx10690 Appx10693-94 Appx10698.1 |
| AR Tab R - DCGS-A Inc 2 Palantir Section L&M White Paper | 18 | Appx10707-13 |
| AR Tab S - DCGS-A Inc 2 DRAFT RFP W56KGY-16-R-0001 | 19 | Appx10719 Appx10819-41 |
| AR Tab T - DCGS-A Inc 2 W56KGY-16-R-0001 RFP (December 23, 2105) | 20 | Appx10842-43 Appx10880 Appx10909 Appx10960 Appx10968-69 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| AR Tab V - Solicitation attachment 0001 Performance Work Statement Distributed Common Ground System - Army Inc 2 (December 18, 2015) | 22 | Appx11042 Appx11051-53 Appx11072-73 Appx11075 Appx11081 Appx11101 Appx11123-39 |
| AR Tab W - Solicitation attachment 0003 Performance Based Specification | 23 | Appx11229 |
| AR Tab X - Solicitation attachment 0010 DCGS-A Increment 2 Task Order 0001 (Includes PWS) | 24 | Appx11294-Appx11385 |
| AR Tab AB - DCGS-A Inc 2 RFP Amendment 0003 (Conformed Copy) (0001 thru 0003) (December 23, 2015) | 28 | Appx11479 Appx11599 |
| AR Tab AD - DCGS-A Inc 2 Industry day 1 Brief Part Two | 30 | Appx11661 Appx11686 Appx11688 |
| AR Tab AG - DCGS-A Inc 2 Market Research Report (Approved) (July 13, 2015) | 33 | Appx11792-Appx11841 |
| AR Tab AH - DCGS-A Inc 2 RFI One-On-One Response Analysis (December 2014) | 34 | Appx11844-Appx11874 |
| AR Tab AI - DCGS-A Inc 2 RFI # 1 | 35 | Appx11876-Appx11881 |
| AR Tab AJ - Palantir DCGS-A Inc 2 RFI # 1 Response | 36 | Appx11882-11899 |
| AR Tab AK - DCGS-A Inc 2 RFI # 2 | 37 | Appx11900-07 |
| AR Tab AL - Palantir DCGS-A Inc 2 RFI # 2 Response | 38 | Appx11908-11 |
| AR Tab AM - DCGS-A Inc 2 RFI # 3 | 39 | Appx11912-11917 |
| AR Tab AN - Palantir DCGS-A Inc 2 RFI # 3 Response | 40 | Appx11918-11922 |
| AR Tab AO - DCGS-A Inc 2 DIVA Study Findings Brief AAE to DAE | 41 | Appx11923-11928 |
| AR Tab AP - DCGS-A Inc 2 Trade Space Analysis (July 2015) | 42 | Appx11929-12114 |
| AR Tab AQ - DIVA Independent Market Study -- FINAL Report V1 1 (July 2014) | 43 | Appx12218-12252 |
| AR Tab AR - DCGS-A INC 2 Acquisition Plan 9 December v2 approved | 44 | Appx12255, Appx12263-64 Appx12271 |
| AR Tab AS - DCGS-A Inc 2  D&F for CPFF Contract Type (December 10, 2015) | 45 | Appx12297 |
| AR Tab AT - D&F (DCGS-A Inc 2) Single Award | 46 | Appx12298-12304 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| IDIQ Final (October 21, 2015) | | |
| AR Tab AU - DCGS-A Inc. 2 D&F Exceed 5 Year POP (December 15, 2015) | 47 | Appx12305 |
| AR Tab AV - DCGS- Increment 2 Technical Deep Dive with Mr. Pino (October 7, 2015) | 48 | Appx12307 Appx12312 Appx12322 |
| AR Tab AW - DCGS-A Inc 2 Contract Strategy Review to PEO Management Council (May 15, 2015) | 49 | Appx12326, Appx12329, Appx12342-48 |
| AR Tab AX - DCGS-A Inc 2 Information Paper Inc 2 Key Objectives and Approach | 50 | Appx12363-66 |
| AR Tab AZ - DCGS-A Inc 2 D&F for Government Furnished Property (November 25, 2015) | 52 | Appx12369 |
| AR Tab BL - DCGS-A Inc 2 DIVA Market Study Criteria | 64 | Appx12633-34 |
| AR Tab BN - DCGS-A Inc 2 RFI Press Release (December 5, 2014) | 66 | Appx12641 |
| AR Tab BY - DCGS-A Increment 1 Acquisition Strategy (April 2013) | 77 | Appx13096 Appx13104 |
| AR Tab CP - DAB Action Memo (December 16, 2015) | 94 | Appx14244-46 |
| AR Tab DJ - Industry Responses to RFI_ALL (December 29, 2014) | 114 | Appx14611-12, Appx14804-07, Appx15197, Appx15318, Appx15455-60, Appx15464, Appx15589, Appx15595, Appx15766 |
| Protest of Palantir Hearing Transcript dated (April 26, 2016) | 121 | Appx16253-16459 |
| PALANTIR USG INC PUBLIC DECISION issued on (May 25, 2016) | 122 | Appx16560-66 |
| Determination of Non-Commercial Item (July 1, 2016) | 134 | Appx16626-27 |
| GAO Protest No. B-412746 Exhibit 1 – Email (Feb. 3, 2016) | 135 | Appx16629 |
| GAO Protest No. B-412746 Exhibit 2 – SASCA-02-002-IFG, Information from U.S. Army to Senator Thomas Cotton (Apr. 14, 2015) | 136 | Appx16631 |
| GAO Protest No. B-412746 Exhibit 3 – Operational Needs Statement (Feb. 9, 2015) | 137 | Appx16633-40 |
| GAO Protest No. B-412746 Exhibit 4 – Operational Needs Statement (Dec. 8, 2014) | 138 | Appx16642-46 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| GAO Protest No. B-412746 Exhibit 5 – Operational Needs Statement (Sept. 20, 2014) | 139 | Appx16648-52 |
| GAO Protest No. B-412746 Exhibit 6 – Memorandum (Oct. 17, 2012) | 140 | Appx16654, Appx16658, Appx16719 |
| Industry Day Slide COL_Collins_2014 | 148 | Appx16797, Appx16802-03 |
| Signed Palantir Letter w encls 25 Sept 2014 | 149 | Appx16807-09 |
| EX. 23- 2015 DOTE Annual Report | 151 | Appx17226, Appx17268, Appx17357 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (April 2012) | 153 | Appx17701, Appx17708 |
| Email from Rachael Phillips ordering April 25, 2012 ATEC report to be rescinded and destroyed | 154 | Appx17752 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (May 2012) | 155 | Appx17754, Appx17761-62 |
| Palantir Platform Information Brief (July 2013) | 156 | Appx17805-06, Appx17851 |
| GAO 2013 Report on Distributed Common Ground System | 157 | Appx17863, Appx17874, Appx17878-79 Appx17885-89 |
| Virginia Contracting Activity (Defense Intelligence Agency), Contract No. HHM402-14-A-0005 (22 Sep 2014) | 164 | Appx18137, Appx18151, Appx18153 |
| September 2014, CPARS Review Army Research Laboratory Contract No. W911QX12F0022 | 165 | Appx18183-84 |
| SOCOM - Bridge to DCGS SOF Contract - PO (29 May 2016) | 167 | Appx18247, Appx18270-71 |
| Email of Mr. Philippone to LTG Williamson (October 7, 2015) | 168 | Appx18312 |
| Email of COL Collins to LTG Williamson and Mr. Kreider (November 4, 2015) | 169 | Appx18327, Appx18329-30 |
| Email of COL Dills to LTG Williamson (November 6, 2015) | 173 | Appx18360, Appx18362-64 |
| Expert Report of Mr. Choung (August 5, 2016) | 177 | Appx18391-18428 |
| Supplemental Expert Report of Mr. Choung (September 7, 2016) | 178 | Appx18441, Appx18450, Appx18452-72 |
| Corrected Expert Report of Mr. Cronen (August 18, 2016) | 180 | Appx18619, Appx18623, Appx18638, Appx18643-48 Appx18650-54 |

**NONCONFIDENTIAL VERSION**

| Deposition Transcript of Mr. Choung (August 11, 2016) | 184 | Appx18867, Appx18874-75 Appx18880-81, Appx18887, Appx18900 |
| Sealed Opinion (November 3, 2016) | | Appx20001-104 |

**NONCONFIDENTIAL VERSION**

# In the United States Court of Federal Claims

```
* * * * * * * * * * * * * * * *
                                    *
PALANTIR TECHNOLOGIES, INC.,        *
and PALANTIR USG, INC.,             *
                                    *
              Protestors,           *
                                    *   No. 16-784C
v.                                  *   Filed: July 28, 2016
                                    *
UNITED STATES,                      *
                                    *
              Defendant.            *
                                    *
* * * * * * * * * * * * * * * *     *
```

## REVISED PROTECTIVE ORDER

The court finds that certain information likely to be disclosed orally or in writing during the course of this litigation may be competition-sensitive or otherwise protectable and that entry of a Protective Order is necessary to safeguard the confidentiality of that information.  Accordingly, the parties shall comply with the terms and conditions of this Protective Order.

I.

. Protected Information Defined. "Protected information" as used in this Protective Order means information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information contained in:

a.   any document (e.g., a pleading, motion, brief, notice, or discovery request or response) produced, filed, or served by a party to this litigation; or

b.   any deposition, sealed testimony or argument, declaration, or affidavit taken or provided during this litigation.

2.   Restrictions on the Use of Protected Information.  Protected information may be used solely for the purposes of this litigation and may not be given, shown, made available, discussed, or otherwise conveyed in any form except as provided herein or as otherwise required by federal statutory law.

II.

3.   <u>Individuals Permitted Access to Protected Information.</u>  Except as provided in paragraphs 7, 8, and 9 below, the only individuals who may be given access to protected information are counsel for a party and independent consultants and experts assisting such counsel in connection with this litigation.

4.   <u>Applying for Access to Protected Information.</u>  An individual seeking access to protected information pursuant to Appendix C, Section VI of the Rules of the United States Court of Federal Claims (2015) (RCFC), except those persons noted in paragraphs 7 and 9 below, must read this Protective Order; must complete the appropriate application form (Form 9 "Application for Access to Information Under Protective Order by Outside or Inside Counsel," or Form 10 "Application for Access to Information Under Protective Order by Expert Consultant or Witness").  A copy of the appropriate application form shall be provided to each other party.  Such person shall, without further action by the court, be permitted access to protected material at the close of the second business day after the other parties have received the application, unless, in the interim, any party informs the requesting party of an objection.  Unless an objection is being brought to the court's attention, applications for access will not be filed with the court, nor will courtesy copies be provided to chambers.

5.   <u>Objecting to an Application for Admission.</u>  Any objection to an application for access must be filed with the court within two (2) business days of the objecting party's receipt of the application.

6.   <u>Receiving Access to Protected Information.</u>  If no objections have been filed by the close of the second business day after the other parties have received the application, the applicant will be granted access to protected information without further action by the court.  If any party files an objection to an application, access will only be granted by court order.

7.   <u>Access to Protected Information by Court, Department of Justice, Agency Personnel.</u>  Personnel of the court, the procuring agency, the Department of Justice, and other Executive Branch personnel involved with or affected by this litigation are automatically subject to the terms of this Protective Order and are entitled to access to protected information without further action.

8.   <u>Access to Protected Information by Support Personnel.</u>  Paralegal, clerical, and administrative support personnel assisting any counsel who has been admitted under this Protective Order may be given access to protected information by such counsel if those personnel have first been informed by counsel of the obligations imposed by this Protective Order.

9.   <u>Access to Limited Protected Information by Protestors' Personnel.</u> For purposes of this paragraph, "limited protected information" is defined as the sealed

complaint, the defendant's motion to dismiss, the protestors' Motion for Judgement on the Administrative Record, the defendant's Motion for Judgement on the Administrative Record, as well as response or reply briefs, and any other documents or filings the parties agree in writing are subject to this paragraph. Protestors' personnel seeking access to limited protected information under this paragraph must read this Protective Order and must complete the appropriate application form (Attachment A to this Protective Order). Such person shall, without further action by the court, be permitted access to limited protected material at the close of the second business day after the other parties have received the application, unless, in the interim, any party informs the requesting party of an objection. Unless an objection is being brought to the court's attention, applications for access will not be filed with the court, nor will courtesy copies be provided to chambers.

III.

10.   <u>Identifying Protected Information.</u>  Protected information may be provided only to the court and to individuals admitted under this Protective Order and must be identified as follows:

    a.   if provided in electronic form, the subject line of the electronic transmission shall read "**CONTAINS PROTECTED INFORMATION**"; or

    b.   if provided in paper form, the document must be sealed in a parcel containing the legend "**PROTECTED INFORMATION ENCLOSED**" conspicuously marked on the outside.

The first page of each document containing protected information, including courtesy copies for use by the judge, must contain a banner stating "**Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims Protective Order**," and the portions of any document containing protected information must be clearly identified.

11.   <u>Filing Protected Information.</u>  Pursuant to this order, a document containing protected information may be filed electronically under the court's electronic case filing system using the appropriate activity listed in the "**SEALED**" documents menu. If filed in paper form, a document containing protected information must be sealed in the manner prescribed in paragraph 10(b) and must include as an attachment to the front of the parcel a copy of the certificate of service identifying the document being filed.

12.   <u>Protecting Documents Not Previously Sealed.</u>  If a party determines that a previously produced or filed document contains protected information, the party may give notice in writing to the court and the other parties that the document is to be treated as protected, and thereafter the designated document must be treated in accordance with this Protective Order.

3

IV.

13.   <u>Redacting Protected Documents For the Public Record.</u>

    a.    <u>Initial Redactions.</u>  After filing a document containing protected information in accordance with paragraph 11, or after later sealing a document pursuant to paragraph 12, a party must promptly serve on the other parties a proposed redacted version marked "**Proposed Redacted Version**" in the upper right-hand corner of the first page with the claimed protected information deleted.

    b.    <u>Additional Redactions.</u>  If a party seeks to include additional redactions, it must advise the filing party of its proposed redactions within two (2) business days after receipt of the proposed redacted version, or such other time as agreed upon by the parties or directed by the court.  The filing party must then provide the other parties with a second redacted version of the document clearly marked "**Agreed-Upon Redacted Version**" in the upper right-hand corner of the page with the additional information deleted.

    c.    <u>Final Version.</u>  At the expiration of the applicable period noted in (b) above, or after an agreement between the parties has been reached regarding additional redactions, the filing party must file with the court the final redacted version of the document clearly marked "**Redacted Version**" in the upper right-hand corner of the first page.  This document will be available to the public.

    d.    <u>Objecting to Redactions.</u>  Any party at any time may object to another party's designation of certain information as protected.  If the parties are unable to reach an agreement regarding redactions, the objecting party may submit the matter to the court for resolution.  Until the court resolves the matter, the disputed information must be treated as protected.

V.

14.  <u>Copying Protected Information.</u>  The parties shall endeavor to make as few copies of protected information, paper or electronic, as possible, and to keep protected information off of networks accessible by those not admitted to this Protective Order.  No party, other than the United States, may for its own use make more than five (5) copies of a protected document received from another party, except with the consent of all other parties.  A party may make additional copies of such documents, however, for filing with the court, service on the parties, or use in discovery, and may also incorporate limited amounts of protected information into its own documents or pleadings.  All copies of such documents must be clearly labeled in the manner required by paragraph 10.

15.  <u>Waiving Protection of Information.</u>  A party may at any time waive the protection of this Protective Order with respect to any information it has designated as protected by advising the court and the other parties in writing and identifying with specificity the information to which this Protective Order will no longer apply.

16.  <u>Safeguarding Protected Information.</u> Any individual admitted under this Protective Order must take all necessary precautions to prevent disclosure of protected information, including but not limited to physically securing, safeguarding, and restricting access to the protected information.

17.  <u>Breach of this Protective Order.</u>  If a party discovers any breach of any provision of this Protective Order, which has possibly resulted, or may still result, in the disclosure of protected information to unauthorized persons, the party must promptly report the breach to the other parties and immediately take appropriate action to cure the violation and retrieve any protected information that may have been disclosed to individuals not admitted under this Protective Order.  The parties must reasonably cooperate in determining the reasons for any such breach.

18.  <u>Seeking Relief From this Protective Order.</u>  Nothing contained in this Protective Order shall preclude a party from seeking relief from this Protective Order through the filing of an appropriate motion with the court setting forth the basis for the relief sought.

VI.

19.  <u>Maintaining Filed Documents Under Seal.</u>  The court will maintain properly marked protected documents under seal throughout this litigation.

20.  <u>Retaining Protected Information After the Termination of Litigation.</u>  Upon conclusion of this action (including any appeals and remands) the original version of the administrative record and any other materials that have been filed with the court under seal will be retained by the court pursuant to RCFC 77.3(c) (2015).

5

Copies of such materials may be returned by the court to the filing parties for disposition in accordance with paragraph 21 of this Protective Order.  In addition, on or before thirty (30) days after the conclusion of the action before this court, the parties shall review previously protected information, and shall propose to the court in a joint written motion what information requires continued protection, for what period of time, and the basis for the proposed continued protection.

21.    Disposing of Protected Information.  Within thirty (30) days after the conclusion of this action (including any appeals and remands), each party or counsel admitted to this Protective Order shall destroy all protected information, both electronically stored or in paper form, including backup copies, and certify in writing to each other party that such destruction has occurred, or must return the protected information to the parties from which the information was received.  Each counsel of record admitted to this Protective Order may retain one copy of such documents, provided those documents are properly marked and secured.  Any party seeking relief from the requirements of paragraph 21 may submit an appropriate motion with this court, in accordance with paragraph 18 of this Protective Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

# REDACTED OPINION

# In the United States Court of Federal Claims

No. 16-784C
Filed: November 3, 2016
Redacted Version Issued for Publication: November 9, 2016[1]

```
* * * * * * * * * * * * *
PALANTIR USG, INC.,              *
                                 *
              Protestor,         *
      v.                         *
                                 *
UNITED STATES,                   *
                                 *
              Defendant.         *
                                 *
* * * * * * * * * * * * *
```

Pre-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Commercial Availability; 10 U.S.C. § 2377; Bad Faith; Supplementation to the Administrative Record; Permanent Injunction.

**Hamish Hume**, Boies, Schiller & Flexner LLP, Washington, D.C., for protestor. With him were **Stacey K. Grigsby**, and **Jon R. Knight**, Boies, Schiller & Flexner LLP, Washington, D.C.

**Domenique G. Kirchner**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Scott A. MacGriff**, Trial Attorney, Commercial Litigation Branch, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Scott N. Flesch**, **Major Lawrence P. Gilbert**, **Evan C. Williams**, and **Frank A. March**, United States Army Legal Services Agency, and **Debra J. Talley** and **Daniel J. Beuke**, United States Army Materiel Command.

**O P I N I O N**

---

[1] This opinion was issued under seal on November 3, 2016. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**HORN, J.**

Palantir USG, Inc.[2] (Palantir) and Palantir Technologies Inc.[3] filed a pre-award bid protest in this court on June 30, 2016, challenging the United States Department of the Army, Army Contracting Command, Aberdeen Proving Group's (the agency) Request for Proposals No. W56KGY-16-R-0001 (the solicitation). Protestor Palantir USG, Inc. "is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California." Palantir USG, Inc. and Palantir Technologies Inc. filed suit in the United States Court of Federal Claims after the United States Government Accountability Office (GAO) denied Palantir USG, Inc.'s GAO protest. See generally Palantir USG, Inc., B-412746, 2016 WL 3035029 (Comp. Gen. May 18, 2016).[4]

As indicated at the GAO, "[t]he solicitation seeks a single contractor to be the system data architect, developer, and integrator of DCGS–A2 [Army's Distributed Common Ground System-Army Increment 2], which is the second increment of the DCGS–A. DCGS–A is the Army's primary system for the processing and dissemination of multi-sensor intelligence and weather information to the warfighter." Id. at *1.

Palantir asserts that the Army acted arbitrarily and capriciously when it issued the DCGS-A Increment 2 solicitation for a developmental contract, because Palantir claims it had identified to the Army a commercially available technology that Palantir believes can satisfy the Army's requirements. According to Palantir, "Palantir has developed a technology that solves the needs of DCGS." Palantir claims that the data management platform that Palantir has to offer, also called the Palantir Gotham Platform, was "initially developed between 2004 and 2009 with the help of an investment from, and a partnership with, the venture capital arm of the Central Intelligence Agency." According to Palantir, since "2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ('SOCOM'), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies)." The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." Palantir argues that,

---

[2] Palantir Technologies Inc. "owns one hundred percent of the stock" of Palantir USG, Inc.

[3] As discussed below, on August 22, 2016, the court granted defendant's motion to dismiss Palantir Technologies Inc. from the above captioned protest.

[4] Although the undersigned has high regard for GAO decisions, this court is not bound by decisions of the GAO. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")).

as written, "[t]he Solicitation for DCGS-A2 makes it impossible for Palantir to offer its Data Management Platform as a commercial or nondevelopmental item to satisfy the Army's requirements" (capitalization and emphasis removed) because the solicitation only requested proposals for the development of the required technology.

## FINDINGS OF FACT

In explaining the origin and development of the DCGS-A, the contracting officer's statement during the GAO protest indicated:

> Combat operations in Kuwait and Iraq in the early 1990's demonstrated the military potential of information dominance, and sparked a transformation in the use of information technology in intelligence operations. Subsequently, the Department of Defense instituted an initiative to unify Intelligence, Surveillance and Reconnaissance architectures, and enhance the acquisition of manned and unmanned airborne sensors and associated ground processing systems. This initiative resulted in a requirement for a Distributed Common Ground/Surface Systems (DCGS), made up of Army, Air Force, Navy and Marine Corps ground processing systems that can share information across the Joint Force. The Army component of DCGS is the Distributed Common Ground System – Army (DCGS-A). Today, DCGS-A has become the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information. It is deployed worldwide in support of intelligence operations including all Theaters of Operation.

The background section of the Performance Work Statement for the solicitation at issue explained:

> The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD. DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.  DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications.

DCGS-A Increment 1 is the ISR component of the modular and future force Mission Command System (MCS) and the Army's primary system for ISR tasking of sensors, processing and exploitation of data, and dissemination of intelligence (TPED) information about the threat, weather, and terrain at all echelons. A high percentage of Increment 2 functionality has already been developed under the DCGS-A Increment 1 efforts. DCGS-A Increment 2 will leverage the DCGS-A hardware components fielded across the Army under DCGS-A Increment 1.

According to the defendant, DCGS-A Increment 2, the subject of the solicitation at issue, "will introduce a new and modernized data management architecture (DMA) using a modular system approach to perform Army intelligence analysis capabilities." As reflected in the Army's post-hearing comments submitted to the GAO, and quoted in the GAO decision:

DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program with the ability to access and be accessed by, not only Army intelligence and command components, but also the other members of the broader distributed common ground/surface system. It is composed of many software products-commercial, government, and open source-as well as software integration that allows all the different products and components to communicate and operate seamlessly.

Palantir USG, Inc., B-412746, 2016 WL 3035029, at *2.

The Performance Work Statement for the solicitation at issue stated that the requirements of DCGS-A Increment 2 included the "development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/HUMINT, Weather, GEOINT, Geospatial Engineering and Sensor Management," and that "[t]hese efforts include Software Development, Capability Enhancements, Integration, Limited Fielding and Training support, Maintenance, and Support for logistics development, for a period of performance of six years from contract award." The draft version of the Performance Work Statement for the solicitation at issue stated that "[t]he DCGS-A Increment approach utilizes spiral deliveries to maintain interoperability with Army and Joint ISR [Intelligence, Surveillance and Reconnaissance] architectures and to address capability insertion and enhancements. This system must remain interoperable and compatible with the Joint command system infrastructure and

mission applications." As indicated by the contracting officer who issued the solicitation, "[t]he DMA [i.e., Data Management Architecture] will serve as the architecture foundation and the heart with which the rest of the capabilities will depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract."

The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that other "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." As further detailed below, in responses to the government's Requests for Information, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claims that "Palantir is currently in use by tens of thousands of users across the DOD [Department of Defense] and IC [intelligence community]." The Administrative Record filed in the above captioned protest includes a February 9, 2015 "Operational Needs Statement for Palantir Platform" from [redacted] requesting the Palantir Gotham Platform. The Statement indicated: "The Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations," and concluded that "Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units [redacted], as well as various U.S. Government agencies. [redacted]."

<u>Pre-Solicitation Activity</u>

The parties have stipulated that in July 2014, prior to the issuance of the DCGS-A Increment 2 solicitation, the Army Acquisition Executive, Heidi Shyu,[5] chartered a Data Integration, Visualization and Analytics (DIVA) Independent Market Study which was completed by the MITRE Corporation, a not-for-profit research and development organization. The joint stipulations of fact indicate:

The purpose of the DIVA study was to "provide situational awareness and market trends to the Army leadership of the 'state-of-the-practice' within the commercial DIVA software platform landscape." As stated in the DIVA

---

[5] Ms. Shyu is referred to by several different titles throughout the Administrative Record and filings with the court. The joint stipulations of fact indicate that when Ms. Shyu chartered the DIVA Market Study in July 2014 and when she signed the October 21, 2015 Determination & Finding, her title was the Army Acquisition Executive. On October 20, 2014, when Ms. Shyu issued a "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy," her title was "Assistant Secretary of the Army (Acquisition, Logistics and Technology)." The joint stipulations of fact also indicate when she issued the December 16, 2015 recommendation for issuance of the solicitation, her title was listed as Assistant Secretary of Defense (Acquisition).

study, the DIVA study was intended to: (1) provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study; and (2) provide recommendations for the DCGS-A Increment 2 Acquisition effort and describe the top- level risks and mitigation strategies associated with adopting recommendations. The DIVA study assessed the following acquisition approaches:

a. Cloud Infrastructure Platform Provider: Provide highly-scalable and reliable computing infrastructure services (e.g., data bases; analytic engines; computing and storage; identity management);

b. Turn-Key: Procure a commercial product as basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure,

c. Hybrid approach: both an Enterprise Cloud Platform and a Turn-Key Platform, including integration of additional applications. . . .

(all internal citations omitted). The DIVA Market Study included a "Potential Strategy: Phased Acquisition and Integration Approach," which recommended that the DCGS-A Increment 2 approach

could be structured in a phased manner. Initially, the two foundation components (e.g., COTS[6] cloud infrastructure services and COTS DIVA "Turn Key" Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA "Turn Key" platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original).

On January 7, 2015, also before the solicitation was issued, the Army generated an Information Paper, which identified key objectives and approaches to DCGS-A Increment 2. The "Increment 2 Key Objectives" listed were: "1. Modernize the Data Enterprise to a Data Integration Platform[,] 2. Easier to use visualization framework[,] 3. Best Leverage industry to deliver these capabilities with a commercially supported

---

[6] COTS, although not defined in the DIVA Market Study, appears to be an abbreviation for "commercial off the shelf." Palantir refers to "COTS" in the DIVA Market Study as commercial off the shelf, without objection from defendant. Furthermore, the Trade Space Analysis, discussed below, includes a list of acronyms and defines COTS as "Commercial off the shelf."

infrastructure[,] 4. Execute in a funding constrained environment." The Information Paper envisioned a "Three-Phase Approach (DIVA Competition, Domain-specific Capabilities Updates, Integration Environment)." For the first phase, the DIVA Competition, the Information Paper stated:

> Industry to deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A to displace the Entity (TED) and Document (MSG) - infrastructure that interoperates with the Geospatial and other Intelligence data-specific data sources using standards such as Open Geospatial Consortium (OGC), Motion Imagery Standards Profile (MISP), etc. This infrastructure could be a commercial stand-alone solution (Palantir, IBM) or it could be a collection of capabilities (RDMS + Hadoop +…) as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data.

(emphasis added).

Although conducted later in time, in July 2015, after the Army issued all three of the Requests for Information, described below, and around the time the Army issued the Market Research Report, the Army Materiel Systems Analysis Activity produced a Trade Space Analysis, which evaluated capabilities that could be leveraged for the DCGS-A Increment 2 procurement. Defendant explained that: "The TSA [Trade Space Analysis], dated July 2015, identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1." The Army Materiel Systems Analysis Activity explained:

> The U.S. Army Materiel Systems Analysis Activity (AMSAA) was directed by Headquarters, Department of the Army Deputy Chief of Staff (HQDA DCS) G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (IS CDD) to support future requirements decisions. The TSA identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. The TSA results will inform the economic analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The TSA focused on targeted DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1 for: Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR); Standard Sharable Geospatial Framework (SSGF)-

Army Geospatial Enterprise (AGE); Data Enterprise Architecture (DEA); and Intelligence Support to Cyber Operations (CO).

The Trade Space Analysis further explained:

Representative systems were assessed to reflect capabilities that are readily available for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid and are defined as follows:

• COTS - a singular software solution or compilation of commercially available software packages that provide an integrated solution, whereby the vendor owns the rights to the baseline software code.
• GOTS - a singular or compilation of software solutions, whereby the baseline software code was developed by and owned by the Government.

• Hybrid - a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS).

The Trade Space Analysis determined that: "Overall, the Hybrid alternative was rated Green and scored the highest of the three alternatives. Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions."[7] Specifically, regarding the Data Enterprise Architecture results, the Trade Space Analysis stated: "The COTS and Hybrid alternatives satisfy most of the technical functionality metrics, however, the Hybrid software solutions are currently functional in the DoD IC and provide the best 'turn-key' functionality. Upper bound COTS solutions provide a turn-key technical functionality similar to that of the Hybrid solutions." For another capability, the Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise compatibility, the Trade Space Analysis determined:

---

[7] The "Technical Risk Categorical Rating Criteria" in the Trade Space Analysis was:

- Green: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

- Yellow: "Moderate Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

- Red: "High Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

Although there are some GOTS solutions that can address a few targeted technical functionality metrics, there are no viable comprehensive GOTS solutions that were identified by the Army/DOD geospatial community. The COTS alternative was assessed to have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative. The COTS options won't address all Army Geospatial requirements with software "out of the box". However, these capability gaps are anticipated to be closed with ongoing commercial upgrades and widgets that can be developed in the COTS Baseline software. There were several risk driver [sic] for both the COTS and Hybrid alternatives that were assessed to be of moderate to high risk.

On August 13, 2014, the Army issued the first Request for Information, which was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan," for the potential DCGS-A Increment 2 procurement and "request[ed] respondents' corporate overview information and basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program."[8] (emphasis added). The August 13, 2014 Request for Information indicated that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years."[9] (emphasis added). Palantir responded to the August 13, 2014 Request for Information and stated:

The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(emphasis in original; footnote omitted). Palantir explained "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." In its response to the August 13, 2014 Request for Information, Palantir argued that:

---

[8] Palantir states that the August 13, 2014 Request for Information "failed to inquire about the availability of commercial or nondevelopmental items that could meet the requirements of DCGS-A2."

[9] Palantir believes this statement demonstrates that "[t]he Army conceded in the first RFI [the August 13, 2014 Request for Information] that it was not even contemplating the possibility of a fixed-price contract for the procurement of commercial items."

> The most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP). FFP vehicles shift performance risk to the contractor, reduce the risk of cost overruns to the Government, and shorten delivery schedules.

The parties have stipulated that "Palantir USG recommended among other things a Firm-Fixed Price (FFP) model in conjunction with 'an outcomes-based Performance Work Statement based on a proven product and incorporating support services,'" and, further, "Palantir USG stated that 'the FFP model can be used in conjunction with a Cost-Plus model for optional system enhancements. CPIF and CPFF contracts should total less than 20 percent of the total contract value.'" Palantir indicated:

> Examples of successful FFP contracts include our work at the U.S. Marines Corps, where enhancements are included as part of our regular software releases and small businesses fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC agencies and affording a COTS solution at a FFP.

After receiving the responses to the first Request for Information, the Army produced a December 2014 RFI Response Analysis which indicated that the "[v]ast majority of respondents support hiring a contractor as the LSI [Lead Systems Integrator] due to efficiencies in industry decision making and resource-marshaling processes." The 2014 RFI Response Analysis summarized Palantir's submission by noting that:

> The Palantir response listed several contracts they have been awarded, but did not include scope or description of work. However, Palantir has developed an intelligence fusion system that has been used by various entities within the Department of Defense. Palantir was found capable to provide Data management and Workflow Management upgrades, and partially capable of providing Data Fusion and Cyber capabilities to Increment 2.

The conclusion of the 2014 RFI Response Analysis stated: "Based on the responses to the first RFI, and analysis of the resulting information conducted by the DCGS-A Increment 2 Contract IPT [Solicitation Integrated Product Team], the overall conclusion of this Market Research Report is that a more capability focused RFI needs to be issued to industry."

Prior to the issuance of the 2014 RFI Response Analysis, on October 20, 2014, Ms. Shyu, Assistant Secretary of the Army (Acquisition, Logistics and Technology), issued a memorandum to the Under Secretary of Defense (Acquisition, Logistics and Technology) regarding a "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy." In the memorandum she requested approval to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." Ms. Shyu explained that:

> I believe allocating the remaining Increment 1 RDT&E funding to support potential required fixes from the Increment 1 Release 2 Limited User Test results and moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available.  In addition, Increment 1 Release 2 will deliver approximately 90 percent of the planned Increment 1 capability.

On December 5, 2014, the Army issued a second Request for Information, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." As in the August 13, 2014 Request for Information, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development</u> projects that are similar in scope and process to the DCGS-A program." (emphasis added). For the December 5, 2014 Request for Information, the Army sought "information regarding your corporate capabilities and experience related to the delivery of capabilities." Question 3.0(d) of the December 5, 2014 Request for Information asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience <u>developing</u> and integrating with these types of software applications/capabilities." (emphasis added). A copy of the table referenced in Question 3.0(d) is included below:

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company |
|---|---|---|---|---|---|---|---|
| Cloud Computing | | | | | | | |
| Big Data Analytics | | | | | | | |
| Data Architecture & Management | | | | | | | |
| Data Fusion & Pattern Analysis | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Applications for IC ITE Joint Storefront** | | | | | | |
| **Targeting** | | | | | | |
| **Signals Intelligence/NSA-Net Operations** | | | | | | |
| **Defensive Cyber Operations** | | | | | | |
| **Offensive Cyber Operations** | | | | | | |
| **Counter Intelligence & Human Intelligence** | | | | | | |
| **DCGS Integration** | | | | | | |
| **Backbone (DIB) implementation** | | | | | | |
| **Weather Effects/Analysis** | | | | | | |
| **GEOINT (Full Motion Video/Static Imagery Intelligence)** | | | | | | |
| **Geospatial Intelligence (Terrain & Mapping)** | | | | | | |
| **Collection Management (Sensor Management)** | | | | | | |
| **On-the-Move Operations** | | | | | | |
| **Workflow Management** | | | | | | |
| **Role/Attribute Base Access Control** | | | | | | |
| **Protection level 3 (PL 3) security hardening** | | | | | | |
| **Ease of Use Initiatives** | | | | | | |
| **High/Ultra Reliability Program** | | | | | | |

| Army Interoperability Certification | | | | | | |
|---|---|---|---|---|---|---|
| Joint Interoperability Certification | | | | | | |

Question 3.0(f) asked: "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" Question 3.0(h) asked, "[w]hat is your company's current rate of personnel retention over the last five (5) years?"

Palantir again responded[10] to try to explain the value of a commercial, not a developmental, approach:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's capability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Palantir recommended "that the Government pursue a different acquisition strategy than the long-term development used in Increment 1. We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities." Palantir emphasized:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD and the IC. However, the

---

[10] As discussed below, defendant argues that, although "Palantir USG responded to RFI No.2," Palantir did not "complete the Army's chart and identify its specific capabilities across the various DCGS-A." Defendant states that Palantir "declined to answer question 3.0(d) in RFI No.2," and "question 3.0(f) in RFI No.2," and "question 3.0(h) in Request for Information No.2." Palantir responds that the Army did not in fact request that bidders "complete the Army's chart and identify its specific capabilities across the various DCGS-A," "[r]ather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts. There was no reason to do so again." (emphasis in original; internal citations omitted).

request for information on software series contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

After the responses to the second Request for Information were received, on January 20, 2015, the Army held an "Industry Day," characterized by the Army as a "forum to share emerging requirements with Industry," which "helped to ensure the Government's requirements are defined adequately to promote high quality proposals and adequate competition." Between January 20, 2015 and May 12, 2015, the "Government conducted a one on one engagements [sic] with 78 different organizations,"[11] which the Army stated was an opportunity to "[p]rovide a forum to answer Industry's questions and elicit their feedback regarding to [sic] the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations."

On May 6, 2015, the Army issued a third Request for Information, which "[w]as released to determine if [the] rule of two exists, as defined in FAR [Federal Acquisition Register] 19.502, and if a small business set-aside is appropriate for Increment 2 development." Palantir indicated that it was not a small business and, as with the previous Requests for Information, responded:

The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.

Palantir also indicated in its response:[12]

---

[11] The joint stipulations of fact reflect that the Army conducted "[o]ver 80 one-on-one sessions with the Program Manager and industry." Neither the joint stipulations of fact nor any document in the Administrative Record establish whether or not any of the more than 80 meetings included Palantir.

[12] In responding to the question in the May 6, 2015 Request for Information, "[e]xplain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development," Palantir indicated:

As a privately owned company, Palantir Technologies, the parent company of Palantir USG, Inc., does not typically release financial information. We will provide audited statements as reasonably necessary for the purposes of determining our ability to perform our obligations under the agreement subject to the appropriate confidentiality provisions being put in place.

> Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?[13]

As noted above, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community."

After a second Industry Day, held on June 25, 2015, which the Army characterized as "an opportunity to discuss the draft Increment 2 requirements with industry," in July 2015, the Army issued a Market Research Report, which determined that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[14] The Market Research Report stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[15] Addressing Palantir specifically, the Market Research Report[16] stated in the "RFI Respondent Capability Assessment" that "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." (emphasis removed). The parties have stipulated that:

> A November 6, 2015 paper to the Chief of Staff of the Army stated that "Extensive market research efforts were conducted to ensure requirements

---

[13] In the complaint, protestors allege that "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

[14] A chart included in the Market Research Report briefly summarized the role of each of the Requests for Information. The Market Research Report indicated: "**RFI 1** To determine level of competition and industry feedback of Acquisition Strategy[,] **RFI 2** To determine capability of individual businesses to perform as prime contractor[,] **RFI 3** Inform Increment 2 on the role of small business[.]" (emphasis in original).

[15] The Market Research Report also indicated that in September 2015, the Army would have an "Industry Engagement," which would be to "serve as a venue to discuss the Draft Increment 2 Request for Proposal (RFP) with industry following its release."

[16] Of the 43 respondents to the December 5, 2014 Request for Information, the only responder to the December 5, 2014 Request for Information the Market Research Report labeled as "non-responsive" was Palantir.

were achievable" and then listed "4-month independent DIVA study lead [sic] by MITRE, SEI, DNI, and DAU," "3 Requests for Information," "2 industry days with over 500 attendees and 224 companies," and "Over 80 one-on-one sessions with the Program Manager and industry."

Even after responding to the three Requests for Information, Palantir continued to try to express to the Army its views and frustration with the direction of the developmental procurement choice by the Army and with the Army's apparent disinterest in consideration of commercially available alternatives. In response to the draft Performance Work Statement, Palantir indicated:

> Palantir USG, Inc. . . . has reviewed the Performance Work Statement (PWS) for DCGS-A Increment 2 Task Order 0001. As written, Task Order 0001 prevents companies with commercially available technology from direct participation in the program and will result in failure. Task Order 0001 will lock the Army into an irrelevant and unusable "flagship" intelligence architecture for the next decade. Increment 1 failed because the Army attempted to build a foundational data platform from scratch while refusing to adopt proven commercial technology for core system components. After spending fifteen years and billions of dollars, the Army has not delivered a working intelligence platform to soldiers. Army ASA(ALT) acknowledged this reality and directed DCGS-A's leadership to halt Increment 1 and adopt a new strategy for Increment 2. Despite this direction, and in direct violation of Congressional intent, the Army has deliberately chosen to repeat the same strategy that resulted in the failure of Increment 1 and is once again ignoring commercially available technology that works for soldiers today. Increment 2 is an opportunity to correct this failure, but only if the Army changes its fundamental acquisition strategy. This is a consequential moment for the DCGS-A program. There is little time remaining to change the strategy, and current program leadership appears unwilling to take necessary action.

(internal reference omitted).

On October 21, 2015, Ms. Shyu, as the Army Acquisition Executive, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)." The Determination & Findings noted that "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture by a contractor as the systems integrator," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." The Determination & Findings concluded that:

Based on the above analysis, issuing a single award IDIQ contract will mitigate many of the risks identified herein and is in the best interest of the Government. Due to the complex developmental efforts this work entails, further competition at the task order level would interrupt development, ultimately increase price, and cause schedule slippages.

Ms. Shyu determined:

that a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

Finally, on July 1, 2016, notably one day after the above captioned protest was filed in this court, and significantly after the issuance of the solicitation and the conclusion of the GAO protest, Christopher Fisher, the contracting officer for the solicitation at issue and Bryon Young, the Principal Assistant Responsible for Contracting, issued a "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed). The Determination of Non-Commercial Item stated that market research was conducted and the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item stated:

Based upon market research conducted by the Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

The Solicitation, GAO Protest, and Filing in this Court

On December 16, 2015, the Army issued a recommendation for issuance of the solicitation, in which Ms. Shyu, as the Assistant Secretary of Defense (Acquisition), stated that DCGS-A Increment 1 was "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Ms. Shyu continued: "Increment 2 will provide a new Data Management Architecture, a new Workflow Management capability, improved fusion and pattern analysis, cyber security upgrades, upgrades to the DCGS Integrated Backbone and usability enhancements." After Ms. Shyu's recommendation for issuance of the solicitation, on December 23, 2015, the Army issued the solicitation at issue in this protest, Request for Proposals No. W56KGY-16-R-0001, for engineering, manufacturing, and development services. The solicitation required a single contractor to be the system data architect, developer, and integrator for DCGS-A Increment 2. The solicitation had four evaluation factors: (1) Technical; (2) Cost/Price, (3) Past Performance, and (4) Small Business Participation Plan. The solicitation contemplated the award, on a best value basis, of a single indefinite-delivery, indefinite-quantity contract, with the simultaneous issuance of a cost-reimbursement type task order and the period of performance contemplated a six year term from contract award.

The closing date for the solicitation was February 16, 2016. That same day, February 16, 2016, Palantir filed a timely protest at the GAO. The GAO subsequently issued its decision on May 18, 2016, denying the protest. See generally Palantir USG, Inc., 2016 WL 3035029. In a short decision, the GAO indicated that "[w]hile the market research revealed that commercial items were available to meet some of the DCGS–A2 requirements, the agency concluded that there was no commercial solution that could meet all the requirements of DCGS–A2," and "[b]ecause the agency concluded that significant portions of the anticipated DCSG–A2 [sic] scope of work were not available as a commercial product, the agency determined that the DCGS–A2 development effort could not be procured as a commercial product under FAR part 12 procedures." According to the GAO, "[t]he protester has failed to show that the agency's determination in this regard was unreasonable." Id. at *3 (footnote omitted). The GAO also determined "the record shows that the agency reasonably decided on its approach of having a single contractor, who would be responsible for selecting all the components of DCGS–A2, and who would bear the responsibility for making certain that those components are integrated, in contrast to the phased approach favored by Palantir." Id. at *4. The GAO concluded:

> [T]he agency's approach is reasonably related to its need for a fully integrated and interoperable system made up of a number of specific capabilities, some of which are commercially available and some of which are not. While the agency considered several potential approaches to this procurement, including the phased approach favored by the protester, the agency ultimately concluded that it would have a greater likelihood of success (in that it could avoid certain technical risks, concerns and significant schedule risk and cost uncertainty) by opting to have a single

contractor serve as the system integrator in charge of developing and selecting the components and making sure that they can be successfully integrated. As such, we have no reason to question the approach chosen by the agency or to conclude that the solicitation is unduly restrictive of competition.

Id. at *5 (internal citation omitted).

On June 30, 2016, Palantir USG, Inc. and Palantir Technologies Inc. filed the current pre-award bid protest in this court. The complaint has seven counts. Count one alleges that the Army violated 10 U.S.C. § 2377 (2012) and 48 C.F.R. § 10.002 (2016) and 48 C.F.R. § 11.002 (2016) by refusing to solicit the data management platform as a commercial item. Similarly, count two alleges that the Army violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002 by refusing to solicit a commercial item for the entirety of DCGS-A Increment 2. Count three alleges that the Army violated 10 U.S.C. § 2377(c) by failing to determine whether its needs could be met by commercial items. Count four contends that the Army violated 48 C.F.R. § 16.301-2(a) (2016) by soliciting a cost-plus contract instead of a fixed price contract, and states:

Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable 'to define its requirements sufficiently to allow for a fixed-price contract' or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

Count five alleges that the Army violated 10 U.S.C. § 2304a(f) (2012) and DFARS Part 217.204 (2016) by soliciting a task order contract with a base period of six years. Count six alleges that the Army violated 48 C.F.R. § 16.504 (2016) by soliciting an impermissibly expensive task order exceeding $112.0 million. Finally, count seven alleges that "the Army engaged in arbitrary, capricious, and unlawful conduct by refusing to allow Palantir to bid, by resisting innovation, by insisting on the failed approach of DCGS-A1, and by engaging in bad faith conduct[.]" (emphasis and capitalization removed).

The complaint alleges that:

[T]he Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2 [sic]. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to

insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

The complaint asks this court to enter

a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations, including at a minimum through the issuance of a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements.

Initially, in response to the complaint, defendant filed a motion to dismiss Palantir USG, Inc. and Palantir Technologies Inc.'s complaint and argued that Palantir USG, Inc. and Palantir Technologies Inc. lacked standing to bring this protest and that even if Palantir USG, Inc. and Palantir Technologies Inc. had standing, they had waived any objections to the solicitation. After the parties fully briefed the motion to dismiss, the court determined that the timely protest filed at the GAO did not cause Palantir USG, Inc.'s claims to become subject to waiver in this court, and, that Palantir had standing to bring its claims in this court. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. 21, 46 (2016). The court determined, however, that Palantir Technologies Inc. had not filed a timely protest with the GAO, and, therefore, its claims were subject to waiver, and granted defendant's motion to dismiss Palantir Technologies Inc. for lack of subject matter jurisdiction.

In addition to defendant's motion to dismiss, the parties now have filed cross-motions for judgment on the Administrative Record. In response to the allegations in the complaint, the defendant generally responds that agencies have "substantial discretion" both to determine the requirements and how best to acquire those requirements. Defendant also argues that the Army's market research, and the determination based on the market research, were appropriate and that the documents in the Administrative Record do not support Palantir's argument that the Army erred in not soliciting the DCGS-A Increment 2, including the data management platform, as a commercial item. Finally, defendant argues that there is no evidence of bias and/or bad faith by the Army towards Palantir.

Supplementation to the Administrative Record

After Palantir filed its complaint and moved for judgment on the Administrative Record, on July 15, 2016, Palantir moved to supplement the existing Administrative Record in order to support Palantir's allegations regarding bias and/or bad faith, as well as regarding the Army's failure to comply with 10 U.S.C. § 2377. Palantir sought to supplement the Administrative Record with discovery, including depositions, interrogatories, and document production requests. In its motion to supplement the Administrative Record, Palantir argued that the Administrative Record filed by defendant was "deficient in a number of respects." Palantir argued that the Administrative Record

did "not include documents that the Army must have, or at a minimum should have, considered when it prepared the Solicitation;" "omits documents that were 'close at hand' and highly relevant to the Solicitation;" "omits documents demonstrating that the Army's DCGS Program Owners made inaccurate assertions or assumptions about the Palantir Gotham Platform;" and "omits documents demonstrating the bias and bad faith conduct alleged by Palantir in its Complaint." Palantir argued that supplementation of the Administrative Record was necessary to conduct effective judicial review of the Army's decision-making process. Specifically regarding Palantir's bias and/or bad faith allegations, Palantir asserted that the "currently assembled Administrative Record is inadequate to assess" bias and/or bad faith. In arguing that supplementation to the Administrative Record was justified to effectively review Palantir's bias and/or bad faith allegations, Palantir pointed to past alleged efforts of "certain Army personnel to delete and suppress favorable evaluations of the Palantir Gotham Platform, resist the deployment of commercial items to Soldiers in the field, and disseminate inaccurate information about Palantir's technology."

Palantir attached 53 exhibits with which it sought to supplement the Administrative Record. Of the 53 exhibits, Palantir identified 43 exhibits that were relevant to Palantir's allegations that the Army failed to comply with 10 U.S.C. § 2377. According to Palantir, with these 43 exhibits, Palantir was "seeking to add to the record material that should have been of central importance to the market research § 2377 required the Army to conduct, the process § 2377 required the Army to follow, and the determinations and inquiries § 2377 required the Army to make."

Palantir specifically identified 12 exhibits[17] as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct."[18] Palantir moved to supplement the Administrative Record with materials that allegedly "document the DCGS-A Program Owners' years-long efforts to protect their failing program, by resisting an innovative solution and blocking the deployment of the Palantir Gotham Platform to the field."

In addition to the exhibits with which Palantir sought to supplement the Administrative Record, Palantir also requested leave of the court to conduct what it described as limited discovery, including seven requests for production of documents, seven interrogatories, and four depositions. Palantir argued that discovery was needed to resolve the central factual predicate "to the Army's decision to issue a developmental

---

[17] Palantir indicated that Exhibits 2-7 related to both the allegations that the Army failed to comply with 10 U.S.C. § 2377 and to the allegations of bias and/or bad faith.

[18] Although Palantir's motion to supplement the Administrative Record originally listed Exhibits 2-7 and 35-39 as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct," it appears that Palantir also intended to include Exhibit 52 as essential to the court's consideration of Palantir's bias and/or bad faith allegations. Exhibit 52 was not included in Palantir's motion to supplement the Administrative Record. Palantir added Exhibit 52 to its reply brief in support of its motion to supplement the Administrative Record.

solicitation rather than to define its requirements so they could be met by a commercial or nondevelopmental item." Palantir also asserted that "[t]argeted discovery is needed to get to the bottom of the bias and bad faith that infected this solicitation process" and that Palantir had "presented allegations of bad faith and bias that rest on 'a strong evidentiary footing,' and that are more than sufficient to warrant discovery." Additionally, Palantir argued that in order "[t]o engage in effective judicial review of Palantir's ability to offer a commercial item that satisfies the Army's requirements, the Court should permit testimony from individuals who have the expertise needed to translate the technical information in the Solicitation, the PWS [Performance Work Statement], and related documents into plain English." Palantir also sought leave of the court to depose four government individuals: Contracting Officer Christopher Fisher, Lieutenant General Mary Legere (now retired), the "Army's Deputy Chief of Staff for Intelligence (G-2), the Program Owners of DCGS-A," Major General Laura Richardson, who "signed the April 25, 2012 ATEC [United States Army Test and Evaluation Command] report," and Kevin Kelly, "the author of the MITRE study."

Although defendant agreed initially to supplement the Administrative Record with three of the exhibits Palantir proposed to add, defendant otherwise opposed Palantir's motion to supplement the Administrative Record and for discovery. Defendant argued that Palantir sought to supplement the Administrative Record with "stale" documents and otherwise substitute its own judgment for that of the agency's contracting personnel. Defendant further argued that Palantir "fail[ed] to demonstrate evidence of bias, much less meet the standard of 'strong evidentiary footing' needed to give this Court a basis to permit supplementation of the administrative record." According to defendant, Palantir "attempt[s] to weave a bad faith argument and bias argument into [its] disagreement with the overall Army policy decision on the type of overarching platform and other requirements for which it wanted to solicit offers." Defendant also asserted that Palantir's "mere disagreement with the overall agency policy decision does not demonstrate an individual, must [sic] less an institutional, bias or bad faith." Defendant also maintained that Palantir should not be permitted to offer testimony about its technical capabilities because "this protest is not about the capabilities of [Palantir's] software product," and those capabilities "are irrelevant to this Court's judicial review of the administrative record." Defendant also opposed Palantir's request to conduct limited discovery through interrogatories and document requests and to conduct depositions of Contracting Officer Fisher, Lieutenant General Legere, Major General Richardson, and Kevin Kelly.

In deciding whether or not to supplement the Administrative Record with the exhibits and to allow any of the additional discovery proposed by the protestor, the court considered whether the exhibits and discovery were necessary for effective judicial review. The court recognized that "the parties' ability to supplement the administrative record is limited" in a bid protest. Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. 1, 2 (2016). In a bid protest, the court should review the Administrative Record already in existence to determine whether the agency procurement action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2012). In Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that supplementation of the Administrative Record, generally, should be limited to cases in

which the omission of extra-record evidence would preclude effective judicial review. <u>See id.</u>; <u>see also</u> <u>L-3 Commc'ns Integrated Sys., L.P. v. United States</u>, 98 Fed. Cl. 45, 49 (2011). "[T]he administrative record in a bid protest 'should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA.'" <u>Tech Sys., Inc. v. United States</u>, 97 Fed. Cl. 262, 265 (2011) (citing <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381). "[A]lthough the Federal Circuit's holding in <u>Axiom</u> makes clear that supplementation of the administrative record should occur rarely, it is not prohibited and may be used when it is necessary for the Court to gain a complete understanding of the issues before it." <u>Dyncorp Int'l, LLC v. United States</u>, 125 Fed. Cl. at 2. "One of the basic reasons a record may be insufficient is when it is missing 'relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations.'" <u>Tech Sys., Inc. v. United States</u>, 97 Fed. Cl. at 265 (citing <u>Orion Int'l Techs. v. United States</u>, 60 Fed. Cl. 338, 343-44 (2004)).

Specifically concerning Palantir's motion to supplement the Administrative Record to support its bias and/or bad faith allegations, the court considered whether Palantir's allegations had a sufficiently strong evidentiary foundation to justify supplementation. "Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation." <u>See Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. 327, 332 (2010). "This Court and other fora resolving bid protests have traditionally considered extra-record evidence in assessing alleged bias or bad faith" because allegations of bias, prejudice and bad faith may "depend upon a Government official's past conduct toward a bidder," which "cannot be subsumed within the record of a challenged award decision." <u>Int'l Res. Recovery, Inc. v. United States</u>, 61 Fed. Cl. 38, 41-42 (2004); <u>see also Starry Assocs., Inc. v. United States</u>, 125 Fed. Cl. 613, 621 (2015) ("Effective judicial review is not possible when the administrative record 'is missing "relevant information that by its very nature would not be found in an agency record— such as evidence of bad faith. . .".'" (quoting <u>InfoReliance Corp. v. United States</u>, 118 Fed. Cl. 744, 747 (2014))). However, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." <u>Int'l Res. Recovery, Inc. v. United States</u>, 61 Fed. Cl. at 43. "[A]llegations of bad faith must rest on a strong evidentiary footing to overcome the normal presumption of regularity and good faith conduct by agency officials." <u>Orion Int'l Techs., v. United States</u>, 60 Fed Cl. at 344. "[T]o address bias, the court will intreat extrarecord evidence . . . when there has been a 'strong showing of bad faith or improper behavior,'" and the strong showing must have an evidentiary foundation and "not rest merely on counsel's argument, suspicion, or conjecture." <u>Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. at 332 (quoting <u>Ala. Aircraft Indus., Inc. v. United States</u>, 82 Fed. Cl. 757, 766 (2008)); <u>see also Pitney Bowes Gov't Sols., Inc. v. United States</u>, 93 Fed. Cl. at 332 ("Essentially what is required is 'a threshold showing of either a motivation for the [g]overnment[al] employee to have acted in bad faith or of conduct that is hard to explain absent bad faith.'" (quoting <u>L–3 Commc'ns Integrated Sys., L.P. v. United States</u>, 91 Fed. Cl. 347, 356 (2010))). "'[T]o put facts relating to bad faith in play'" and supplement the administrative record, allegations of bias and/or bad faith must be based on "hard facts" and sufficiently well-grounded, and not merely innuendo or suspicion. <u>See Madison Servs., Inc. v. United States</u>, 92 Fed. Cl. 120, 130 (2010) (quoting <u>Beta Analytics Int'l, Inc. v. United States</u>, 61 Fed. Cl. 223, 226

(2004)); see also Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. at 332; Tech Sys., Inc. v. United States, 97 Fed. Cl. at 265-66. Additionally, in considering whether extra-record evidence should be included in an administrative record, the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that documents which the agency omitted from the administrative record, but should have included in the first place, or are agency-generated, should be included for completeness).

The court held a hearing regarding Palantir's motion to supplement the Administrative Record. At the hearing, together with the parties, the court reviewed each exhibit and discovery request that Palantir proposed for supplementation to the Administrative Record to determine whether any of the exhibits or discovery requests were necessary for effective judicial review. Of the 53 exhibits proposed for supplementation, the parties only were able to agree that three of the exhibits (Exhibits 1, 22, 23 in the motion to supplement the Administrative Record) should be added to the Administrative Record in this protest. Additionally, at the hearing, Palantir withdrew, "without prejudice," eight of the exhibits proposed for supplementation, Exhibits 29-33, 35, 37-38.

After reviewing the Administrative Record, as well as Palantir's proposed exhibits, and after careful consideration, the court concluded that some, but not all, of the exhibits were necessary for effective judicial review, and, thus, supplementation to the Administrative Record was justified for only certain exhibits. Specifically, the court denied Palantir's motion to supplement the Administrative Record regarding proposed Exhibits 2, 7, 8-21, 25-28, 34, 36, 39, and 50-53 because the court found that these exhibits were not necessary for effective judicial review.[19]

The court found that Exhibits 3-6, 24, and 40-49 were necessary for effective judicial review and these exhibits were added to the Administrative Record. Exhibits 3-6 pertained to Palantir's allegations of bias and/or bad faith. As stated above, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. at 43. Thus, the court considered whether Palantir's bias and/or bad faith allegations were based on sufficient evidentiary footing to justify discovery and supplementation to the Administrative Record. The court also concluded that Exhibit 24 was necessary to effectively review the reasonableness of the Army's decision to issue a solicitation only for a developmental contract. Exhibits 40-49 were excerpts of government contracts held by Palantir that purportedly could demonstrate the potential capabilities of Palantir's commercially available product, which protestor argues the agency should have considered when it made its determination under 10 U.S.C. § 2377. Because the parties dispute whether or not Palantir has a commercially available product with the capabilities to satisfy the requirements in the DCGS-A Increment 2 solicitation, and Exhibits 40-49

_____

[19] In denying Palantir's motion to supplement the Administrative Record with these exhibits the court allowed the exhibits to be used in depositions.

contain contracts that could illustrate Palantir's capabilities, the court determined that these contracts were necessary for effective judicial review. Additionally, as discussed further below, the court determined that limited supplementation of the Administrative Record regarding the technical requirements of the DCGS-A Increment 2 solicitation, and Palantir's ability to potentially meet those requirements, was justified and the court permitted the parties each to select one expert to submit an expert report and permitted the parties to depose each side's designated expert. Subsequently, defendant proffered Shaun Cronen, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)," as its expert witness, and Palantir proffered Bryant Choung, Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc.

Before the court, regarding bias and/or bad faith, Palantir offered a summary of what it alleged were its "main points providing a 'strong evidentiary footing' for Palantir's allegations of bad faith," including:

- The order from the head of the Army's G-2 unit (the chief DCGS-A Program Owner) for the destruction of the findings in the April 25, 2012 ATEC report that were favorable to Palantir.

- The Army's decision to cease funding for another independent evaluation of the Palantir Gotham Platform by the MITRE Corporation. . . . That order came after the MITRE Corporation produced an initial slide deck showing extremely favorable findings regarding Palantir that directly contradict the inaccurate information the DCGS-A Program Owners were circulating to senior DOD management and to Congress.

- The fact that, after the MITRE Corporation study with its favorable findings on Palantir was shut down, the DCGS-A Program Owners created slide decks and talking points about Palantir that were directly contradicted by the MITRE Corporation study.

- An email from October 7, 2014, in which Palantir's Doug Philippone set forth forty-four bullet points of specific instances spanning more than two years in which Army personnel associated with the Program Owners of DCGS-A were engaged in "blocking" requests from the field for Palantir, and otherwise thwarted and openly expressed their hostile bias against Palantir.

- The fact that the Army's supposed "market research" in 2014-15 never took cognizance of the ATEC or MITRE reports, never asked questions about the information in those reports, never asked questions about the existence of Palantir's commercial products, and was all based on the predetermination that the Solicitation would be crafted as a cost-plus

developmental services contract, rather than a fixed-price acquisition of a
commercial or nondevelopmental item.

(emphasis removed). Palantir sought to use Exhibits 3-6 and Exhibit 52 included in
Palantir's motion to supplement the Administrative Record, as well as Tabs 33, 35, 37,
and 39 of the existing Administrative Record, to demonstrate the above listed allegations.
Exhibits 3-5 contain the April 25, 2012 ATEC report on Palantir's capabilities, the revised
May 25, 2012 ATEC report on Palantir's capabilities, and an e-mail directing the April 25,
2012 ATEC report to be rescinded and destroyed. Exhibit 6 is an information brief
regarding Palantir's capabilities created by the MITRE Corporation. Exhibit 52 is an e-
mail from Palantir's Douglas Philippone to an Army official recounting numerous alleged
instances of "blocking" events by Army personnel to avoid using Palantir's technology.

        Palantir's allegation that the Army was biased against it appears to rest, in part, on
the history between Palantir and the Army that occurred prior to the issuance of the
solicitation at issue in this bid protest, including during the time the market research was
conducted. Included in that history are the reports on Palantir's capabilities by ATEC in
April and May 2012 and the MITRE Corporation that were allegedly shut down or
otherwise influenced by Army personnel who allegedly did not want to publicize favorable
findings regarding Palantir's capabilities. Because these allegations of bias pertain to the
past conduct of certain Army personnel that occurred in the years before the DCGS-A
Increment 2 solicitation was issued, any evidence of this past conduct normally would not
have been included in the Administrative Record surrounding the 2015 DCGS-A
Increment 2 procurement at issue. As such, the court considered that the Administrative
Record regarding Palantir's allegations of past biased conduct might be incomplete.
Nonetheless, the court found that the Administrative Record originally submitted to the
court by defendant included an Army investigative report regarding the April 25, 2012
ATEC report and the circumstances surrounding the rescission and modification of that
report in the revised May 25, 2012 ATEC report conducted by Lieutenant General William
Grisoli. Thus, the Administrative Record contained some information relevant to Palantir's
allegations of past, biased conduct by Army personnel. The court reviewed the
investigative report in the Administrative Record, which indicated that "the Army G-2 team
is passionate and a little defensive about DCGS-A and its relationship with Palantir" and
that, at times, "some members of the G-2 staff lost some of their objectivity with respect
to how they presented information on Palantir and DCGS-A to Army senior leaders." The
investigative report also indicated that the relevant G-2 staff included Lieutenant General
Legere and the Chief Information Officer of G-2, Lynn Schnurr. Although the investigative
report concluded that the April 25, 2012 ATEC report was not changed because of undue
influence from the G-2 staff, the court found that the need to conduct an investigative
report surrounding the circumstances of the April 25, 2012 ATEC report and the findings
concerning the G-2 staff in that report were a sufficient, factual predicate to justify limited

supplementation to the Administrative Record.[20]

Thus, after hearing from the parties, reviewing the Administrative Record, and carefully considering the proposed evidence of possible bias and/or bad faith, the court concluded that Palantir's allegations of bias and/or bad faith surrounding the April 25, 2012 ATEC report and the 2013 MITRE Corporation information brief demonstrated sufficient foundation to justify supplementation to the Administrative Record with Exhibits 3-6 for further effective review of the issues and for limited discovery of documents and depositions. The court also concluded that further inquiry into Palantir's allegations of biased conduct by Lieutenant General Legere and Lynn Schnurr was necessary to effectively review Palantir's allegation that there was a long history of biased conduct towards Palantir by Army personnel. The court, therefore, permitted Palantir to seek limited document discovery related to "the modification or destruction" of the April 25, 2012 ATEC report, as well as the opportunity to take the depositions of Lieutenant General Legere and Ms. Schnurr. With regard to Exhibits 2, 7, and 52, which Palantir sought to add to the Administrative Record to support its bias and/or bad faith allegations, the court determined that there was not a sufficient factual predicate to supplement these exhibits into the Administrative Record.

Subsequently, on August 5, 2016, Palantir submitted to the court a declaration by Palantir employee Douglas Philippone, the Global Defense Lead for Palantir USG, Inc. and Palantir Technologies Inc., and an expert report written by Palantir employee Bryant Choung, the Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc. Mr. Philippone's declaration was intended to support Palantir's bias and/or bad faith allegations and Mr. Choung's expert report was submitted to assist the court with evaluating the technical issues raised in the complaint. On August 12, 2016, defendant filed a motion to strike the declaration of Douglas Philippone and the expert report of Bryant Choung. Although defendant moved to strike Mr. Philippone's declaration and the expert report of Mr. Choung, the court notes that, at the time defendant filed its motion, neither of those documents had been included in the Administrative Record by the court. Regardless, the issue for this court's consideration as to whether the declaration of Mr. Philippone and Mr. Choung's expert report should be included in the Administrative Record remained the same. This court reviewed the substance of the parties' submissions to determine whether the Administrative Record in this case should be supplemented to include Mr. Philippone's resubmitted declaration[21] and/or Mr. Choung's expert report.

---

[20] Moreover, at the hearing on July 25, 2016, defendant acknowledged that Exhibits 3, 4, and 5, which Palantir sought to add to the Administrative Record, were underlying documents to the investigative report already contained in the Administrative Record.

[21] Prior to this August 5, 2016 submission, Palantir had attached two declarations, one by Douglas Philippone and one by Bryant Choung as Exhibits 50 and 51 to its motion to supplement the Administrative Record. At the hearing on July 25, 2016, the court denied Palantir's motion to supplement the Administrative Record with the two declarations because they included legal conclusions, however, the court explained that Palantir could re-file its declarations after removing the legal conclusions and the court would review

The court considered whether the addition of Mr. Philippone's declaration to the Administrative Record, and the exhibits attached thereto, was necessary for the court to effectively review the agency procurement decisions at issue and whether they individually contained sufficient "hard facts" to support protestor's bias and/or bad faith allegations and justify supplementation to the Administrative Record. As noted above, suspicion and innuendo is not sufficient to warrant supplementation to the Administrative Record. Notwithstanding protestor's argument that "Mr. Philippone's declaration includes ample evidence of bias and/or bad faith that are the factual predicate for supplementation," the statements in the declaration do not allege reliably supported facts sufficient to support protestor's bias and/or bad faith allegations. In his declaration, Mr. Philippone also refers to hearsay evidence, continues to assert legal conclusions, and makes other statements and opinions that do not appear to be based on his personal knowledge or necessary for effective judicial review. Accordingly, the court finds that supplementation to the Administrative Record with Mr. Philippone's declaration is not appropriate.

With regard to Mr. Choung's expert report, defendant argues that "[t]he Court by entertaining expert testimony on the issues in the case goes far beyond the administrative record, all without the predicate of first determining that the agency's market research clearly violated any law or regulation." Defendant also argues that "there is a serious question of credibility regarding both Mr. Choung's declaration and his expert report," and that, "[b]ecause of the credibility issues inherent in Mr. Choung's declaration and expert report," the court should refuse to consider Mr. Choung's expert report. In arguing that this court should not consider Mr. Choung's expert report because of credibility issues, defendant focuses on statements made by Mr. Choung in his expert report and deposition about testing by the Defense Integrated Backbone (DIB) Management Office (DMO) in May 2012. According to defendant, "Mr. Choung misrepresented the conclusions of the DMO as a result of the May 2012 testing of Palantir DIB adapter," and, because of that misrepresentation, the court should not consider any part of Mr. Choung's expert report. Defendant argues that "the Court has the discretion to disregard Mr. Choung's entire declaration, expert report and deposition testimony because of discrepancies between his declaration, expert report, and deposition testimony and the reported results of the DMO tests in May 2012."

In response, protestor argues that Mr. Choung's expert report should be admitted to the Administrative Record because "[t]his Court has already noted that it would benefit from expert testimony to assist in evaluating the technical issues raised in this bid protest." Protestor asserts that "Mr. Choung's report is designed to assist the Court by explaining technical issues relating to DCGS and the Palantir Gotham Platform." Additionally, protestor argues that "[t]he Government does not dispute that Mr. Choung is qualified to offer an expert opinion," and protestor contends that defendant's accusations about the

---

and reconsider adding the declarations to the Administrative Record. Palantir did not submit a revised declaration of Mr. Choung, thus, the court only considered whether Mr. Choung's expert report is admissible to the Administrative Record.

credibility of Mr. Choung's expert report are baseless and have "nothing to do with whether Mr. Choung's report should be admitted." According to protestor, "a careful review of the relevant documents and testimony establishes that the Government either misunderstands or misrepresents both Mr. Choung's testimony and Palantir's DIB-related capabilities."

As explained above, the United States Court of Appeals for the Federal Circuit has held that the "focus of judicial review of agency action remains the Administrative Record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA [Administrative Procedure Act, 5 U.S.C. §§ 701-706]." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381. When necessary for meaningful judicial review, the court may supplement an administrative record with an expert report in order to improve or clarify the court's understanding of an important issue in a bid protest. See Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. at 3 (including expert report in the administrative record that aided "the Court in better understanding the record"). As noted in FirstLine Transportation Security, Inc. v. United States, "[s]everal post-Axiom decisions have allowed supplementation of the record when necessary for the Court to have a complete understanding of the issues before it." FirstLine Transp. Sec., Inc. v. United States, 116 Fed. Cl. 324, 326 (2014). Other judges of this court have held "that it is appropriate to supplement the record with expert testimony when necessary to assist the Court in understanding technical or complex information involved in a challenged procurement." NCL Logistics Co. v. United States, 109 Fed Cl. 596, 613 (2013); see also Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 386, 390 (2014) (admitting expert declaration because the "expertise will greatly assist the Court in understanding the evidence in the administrative record"); Guzar Mirbachakot Transp. v. United States, 104 Fed. Cl. 53, 63 (2012) (holding that "[e]ffective judicial review would be impeded where technical aspects of the procurement process remain unexplained, preventing the parties from engaging in informed advocacy and the Court from developing a full judicial record and accurate context for its decision"); East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011) (explaining that information necessary for effective judicial review "might include tacit knowledge possessed by offeror and agency personnel of a highly technical and complex nature. . ."). Expert testimony may be offered to assist the court in understanding complex or technical information. See NCL Logistics Co. v. United States, 109 Fed. Cl. at 613.

In this bid protest, although the court acknowledges some of defendant's concerns with regard to Mr. Choung's credibility as an employee of protestor and as an expert witness, the court finds that, given the highly technical nature of the Army's requirements and Palantir's capabilities, expert reports are necessary for the court to effectively review aspects of the challenged agency procurement action at issue in this bid protest. Specifically, in order to determine whether Palantir may have a commercially available product that would satisfy the Army's requirements, such that Palantir was prejudiced by the Army's decision to issue a development-only solicitation, the court finds it appropriate to consider the expert reports offered by both protestor and defendant. Defendant's arguments about Mr. Choung's credibility, while noted by the court, did not eliminate the probative value of Mr. Choung's report, so as to warrant a decision to exclude Mr. Choung's expert report. The court evaluated Mr. Choung's expert report in relation to all

the evidence in the Administrative Record. In this pre-award bid protest, which the agency and protestor were eager to resolve as fast as possible, both parties were allowed to designate one available expert witness, and then permitted to depose the opposing party's designated expert witness. Defendant had the opportunity to challenge Mr. Choung's allegedly inaccurate statements about the 2012 DMO testing results during the deposition of Mr. Choung. The deposition transcript was available for the court's consideration and has been reviewed by the court. Accordingly, the Administrative Record in this bid protest has been supplemented with the expert report of Mr. Choung, as well as with the expert report of Mr. Shaun Cronen, the government's designated expert, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)" of the Army.

Two days before defendant filed its motion to strike Douglas Philippone's declaration and Bryant Choung's expert report, defendant filed a motion for leave to file three declarations of its own. Defendant sought to file the declarations of "Patricia L. Lee, Lead Engineer for the DCGS Multiservice Execution Team Office"; "Michael Sherick, contract specialist, U.S. Army Contracting Command Aberdeen Proving Ground"; and "Jeff Stock, Chief Engineer for DCGS-A Increment 2, U.S. Army."[22] Palantir opposed defendant's motion unless the court afforded Palantir the opportunity to depose each of the three declarants and defendant was required to produce any documents referred to by one of the declarants, Mr. Sherick. The court held a status conference with the parties to discuss defendant's motion, and, as discussed with the parties during the status conference, after careful review and consideration, the court issued an Order on August 24, 2016 granting defendant's motion for leave to file the three declarations and Palantir was permitted to take depositions of each of the three declarants. Subsequently, after conducting the limited discovery that the court had permitted at the July 25, 2016 hearing and the additional discovery permitted by the August 24, 2016 court Order, Palantir moved for additional discovery on August 26, 2016 "relating to Palantir's allegations of bad faith and bias." The court held another status conference on August 30, 2016 to discuss Palantir's subsequent motion for additional discovery. After hearing from the parties, the court denied Palantir's motion because Palantir's discovery requests were too broad and not based on sufficient evidentiary footing, but indicated it would reconsider Palantir's motion for additional discovery. Shortly thereafter, at a status conference on September 6, 2016, Palantir proposed narrower discovery requests and defendant produced nine additional documents. The parties agree that these nine documents should be added to the Administrative Record and the nine documents are now part of the Administrative Record. Thereafter, the parties filed supplemental briefs to include references to the limited discovery permitted by the court, after which, the court held oral argument on the parties' cross-motions for judgment on the Administrative Record.

---

[22] Although defendant refers to the declaration of "Jeff Stock," in the declaration included with defendant's motion for leave to file declarations, the individual's name is "Jess Stock."

# D I S C U S S I O N

## Bias and/or Bad Faith

As a threshold issue, the court considers Palantir's argument that the solicitation at issue in this bid protest should be set aside because, allegedly, "the Army engaged in arbitrary, capricious, and unlawful conduct . . . by engaging in bad faith conduct." (emphasis and capitalization removed). Palantir argues that, pursuant to 5 U.S.C. § 706, "this Court must set aside as unlawful any solicitation" that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Throughout this bid protest, Palantir has alleged that a long-term pattern of bias and/or bad faith against Palantir "infected" the agency's decision-making process that led to the DCGS-A Increment 2 solicitation, which Palantir is challenging in this bid protest. Palantir alleges in its complaint that the DCGS-A Increment 2 solicitation is the product of years of irrational and bad faith conduct by program owners in certain sectors of the Army,[23] and alleges that such conduct includes "bureaucratic inertia, resistance to innovation, bias against Palantir, the destruction of evidence, and the creation of misleading and deceptive information." (emphasis and capitalization removed). According to Palantir, "there is ample evidence of malicious, bad faith conduct" that "reveals a deep-seated level of bias against Palantir," and that "[s]uch bias is irrational, arbitration [sic], and capricious." Accordingly, Palantir argues, "the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct."

Palantir contends that the DCGS-A program owners have spent years "protecting their own failed program," and are resistant to any innovation from the commercial software industry that could replace the DCGS-A, such as Palantir, and the Palantir Gotham Platform. According to Palantir, "program owners in the Army—particularly within the Army's G-2 office, Intelligence and Security Command, and Intelligence and Information Warfare Directorate of the Communications-Electronics Research and Development Center—have resisted the Palantir Gotham Platform." Palantir's complaint alleges that evidence of the Army's bad faith conduct includes the "consistent hostility that certain DCGS 'program owners' within the Army have shown to Palantir's innovative

---

[23] In its complaint, Palantir states:

> The list of DCGS program owners involved in or associated with the DCGS-A program include, among others, the following: Office of the U.S. Army Intelligence Directorate (G-2, oversight and "customer" of DCGS-A); Training and Doctrine Command; Program Executive Office Intelligence, Electronic Warfare, and Sensors (PEO IEW&S) (parent office of PM DCGS-A); Program Management Office, DCGS-A; U.S. Army Intelligence and Security Command (INSCOM) (responsible for all the cloud projects, etc.); Office of the Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)); and various actors within the Defense Acquisition System, including the Joint Requirements Oversight Council (JROC), the Joint Capabilities Integration and Development System (JCIDS), and others.

technology," the suppression of "independent reports that were critical of DCGS-A and complimentary of the Palantir Gotham Platform," and the creation of "misleading presentations for Congress and senior Department of Defense officials with inaccurate descriptions of Palantir's capabilities."

In opposition to Palantir's bias and/or bad faith allegations, defendant argues that "Palantir's claims are not supported by the administrative record." Defendant also asserts that "[t]he contracting officer and agency decision is entitled to a presumption of regularity." According to defendant, "[i]n order to overcome the presumption of good faith and administrative regularity, the protestor must present 'almost irrefragable proof'" of bias or bad faith. (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir.), reh'g denied (Fed. Cir. 2004)). Although defendant acknowledges that "[t]he discovery permitted by the Court revealed a tension in the business relationship between the Army and Palantir," defendant asserts that "Palantir's arguments do not meet the stringent standard for proving bad faith." Defendant argues that none of the limited discovery that the court had permitted produced any evidence of bias and/or bad faith, and Palantir's mere disagreement with the overall agency policy decision does not demonstrate an individual, much less institutional, bias and/or bad faith.

In order to prove that a government official's actions were biased, a protestor must overcome the well-established presumption that government officials act in good faith. See Croman Corp. v. United States, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1337. A protestor must offer "clear and convincing evidence" that the government did not act in good faith in order to prevail. See Croman Corp. v. United States, 724 F.3d at 1364; see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The United States Court of Appeals for the Federal Circuit has addressed the standard for overcoming the presumption of good faith as follows:

> Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" Kalvar Corp., Inc. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting Librach v. United States, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" Id. at 1301-02 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [a protestor] must offer clear and convincing evidence that [the government] did not act in good faith in order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364; see also Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239 ("The presumption that government officials act in good faith is nothing new to our jurisprudence. See, e.g., Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954) (stating 'we start out with the presumption that the official acted in good faith')."); Square One Armoring Serv., Inc., v. United States, 123

Fed. Cl. 309, 329 (2015) (holding that a plaintiff alleging that the government has acted in bad faith must offer well-nigh irrefragable proof in support of its claim); Austin v. United States, 118 Fed. Cl. 776, 790 (2014) ("To overcome this presumption, the plaintiffs must produce 'well-nigh irrefragable proof' of bad faith on the part of the government."); Kogan v. United States, 112 Fed. Cl. 253, 266 (2013) ("The presumption of good faith 'is valid and binding unless well-nigh irrefragable proof is offered to rebut or overcome it.' McEachern v. Office of Pers. Mgmt., 776 F.2d 1539, 1545 (Fed. Cir. 1985).").

The presumption that government officials act in good faith, however, is rebuttable and not automatically accepted by the court. The Federal Circuit in Am-Pro Protective Agency defined the "clear and convincing" standard of proof a protestor must meet to prevail as:

A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *highly probable*."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (internal citations omitted in original and emphasis in original). Moreover, the Federal Circuit described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, as

equated with evidence of some specific intent to injure the plaintiff. Thus, in Gadsden v. United States, [111 Ct. Cl. 487, 489-90 (1948),] the court compared bad faith to actions which are "motivated alone by malice." In Knotts, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy . . . to get rid of plaintiff." Similarly, the court in Struck Constr. Co. v. United States, [96 Ct. Cl. 186, 222 (1942),] found bad faith when confronted with a course of Governmental conduct which was "designedly oppressive." But in Librach, [v. United States, 147 Ct. Cl. 605 (1959),] the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

...

Nothing in Brown's affidavit [whereby Am-Pro attempted to show bad faith], moreover, suggests that the government "had a specific intent to injure" Am-Pro. Caldwell [& Santmyer, Inc. v. Glickman,] 55 F.3d [1578,] 1581 [(Fed. Cir. 1995)]. And Am-Pro has not alleged that these threats were "motivated alone by malice," Gadsden v. United States, 111 Ct. Cl. 487, 489, 78 F. Supp. 126 (1948); as part of a proven "conspiracy . . . to get rid of [Am-Pro]," Knotts, 128 Ct. Cl. at 500, 121 F. Supp. 630; as part of a course of

governmental conduct which was "designedly oppressive," Struck, 96 Ct. Cl. at 222; or as "actuated by animus toward" Am-Pro, Librach, 147 Ct. Cl. at 614.

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240, 1241 (quoting in part Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976), cert. denied, 434 U.S. 830 (1977)) (citations omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'[A]llegations of bad faith . . . ha[ve] been equated with evidence of some specific intent to injure the plaintiff.'" (quoting Torncello v. United States, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982)); Info. Tech. & Applications Corp. [ITAC] v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir.) ("ITAC has pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome the presumption that the contracting officer acted in good faith.") (citations omitted), reh'g and reh'g en banc denied (Fed. Cir. 2003); Dekatron Corp. v. United States, 128 Fed. Cl. 115, 118 (2016) ("Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent judgment or remedy the contracting officer representative's animus. . . ."); Madison Servs. Inc. v. United States, 94 Fed. Cl. 501, 507 (2010) ("Because plaintiff submits as evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a 'clear and convincing' standard, the court must deny plaintiff's requests for relief.") (citations omitted); id. at 511 & 511 n.8 (adding unreliable hearsay and attorney arguments to the list of what will not meet the standard for demonstrating bad faith); L-3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 354 (innuendo or suspicion is not enough to demonstrate bad faith); N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 187-88 ("Courts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' Struck Constr. Co. v. United States, 96 Ct. Cl. 186, 222, 1942 WL 4411 (1942), or that 'initiated a conspiracy' to 'get rid' of a contractor, Knotts v. United States, 128 Ct. Cl. 489, 121 F. Supp. 630, 636 (1954)."), appeal dismissed, 226 F. App'x 1004 (Fed. Cir. 2007).

To support its theory that a long-term climate of bias against Palantir "infected" the path towards the solicitation, Palantir points to specific instances of alleged bias that it asserts occurred between 2009 and the present, and asks "the Court to give particular consideration to" those instances. According to Palantir, those instances cannot "be explained away," and can only mean that there was an entrenched bias against Palantir among certain DCGS-A program owners and G-2 staff within the Army." Palantir suggests that "the supplemental record supports a finding that certain personnel within the Army had a bias against Palantir." Palantir asserts that these alleged instances include: the Army's efforts to "block" Palantir from participating in certain "important" evaluations between 2009 and 2011; false statements by the DCGS Program Manager to Congress about Palantir; an e-mail from Army Major Greg Moore stating that there is an "entrenched animosity" towards Palantir; the creation and distribution of documents by G-2 staff that contained inaccurate statements about Palantir's capabilities; efforts by Army personnel to rescind and alter a report with favorable findings and recommendations regarding Palantir; and the Army's failure to investigate Palantir's specific allegations of senior Army personnel "blocking" requests in the field for Palantir's technology.

According to Palantir, the Army's G-2 staff and DCGS-A program owners blocked Palantir from participating in Joint Intelligence Laboratory (JIL) and DCGS-A Systems Integration Laboratory (SIL) evaluations between 2009 and 2011 that, according to Palantir, would have helped to demonstrate Palantir's ability to satisfy the requirements set forth in the DCGS-A Increment 2 procurement, prior to the issuance of the solicitation. Palantir alleges that, in 2009, "Palantir attempted to undertake an evaluation at the Joint Intelligence Laboratory." Palantir alleges, however, that "[j]ust before Palantir's JIL evaluation was scheduled to take place," an Army official e-mailed a Palantir employee, Douglas Philippone, notifying him that the evaluation was cancelled. Similarly, according to Palantir, in November 2010, a contract was in place for Palantir to undergo testing at the SIL. Palantir alleges that the SIL evaluation also never occurred. Palantir alleges that it was "repeatedly blocked" from participating in testing at the SIL, which would have demonstrated Palantir's capabilities to the Army. Palantir alleges that "the Army has never given a plausible explanation for why it blocked Palantir from participating" in either a JIL or SIL evaluation.

Defendant asserts that the Army gave reasonable explanations for why the JIL and SIL evaluations did not occur and that the deposition testimony of Ms. Schnurr and Mr. Cronen corroborated those explanations. Defendant also argues that "the majority of events that Palantir claims constitute 'blocking' are events that are 4 to 11 years prior to the solicitation at issue, and are outside the relevant period of time to have any impact on the current procurement." Additionally, according to defendant, "Palantir has failed to demonstrate what, if any, impact these events had" with respect to the choices made regarding the DCGS-A Increment 2 solicitation.

The e-mail sent from the Army to Palantir cancelling the JIL evaluation on February 27, 2009, more than six years before the solicitation was issued, explains that:[24]

> Lynn [Schnurr] is out of the office dealing with personal matters right now and has authorized me to handle this matter. As of right now, the JIL evaluation is cancelled.
>
> . . .
>
> The rationale for this decision is that the best way to focus your efforts at this time is with the DCGS-A Mobile lead systems integrator, Northrup Grumman. My understanding is that you have already begun discussions with them so there should be no disconnect there. This provides the most direct route to potential DCGS-A integration and fits cleanly into their established business process. I understand that Palantir has a lot to offer and ask that you concentrate your efforts on this vector and allow the PM process to work and enable their LSI [lead systems integrator] to build the

---

[24] Although Palantir did not move to supplement the Administrative Record with this e-mail, counsel for Palantir used this e-mail as an exhibit during the deposition of Lynn Schnurr, which deposition the court has deemed necessary for effective judicial review.

best system possible for our Soldiers.

During the deposition of Ms. Schnurr, counsel for Palantir asked Ms. Schnurr about the cancellation of the JIL evaluation, and referenced the above e-mail as an exhibit to the deposition. Palantir points to the deposition testimony of Lynn Schnurr as support for its allegation that the Army blocked Palantir from undergoing the JIL evaluation. The deposition transcript of Ms. Schnurr indicates that she had difficulty recalling the reason that the JIL evaluation was cancelled. When Palantir's counsel asked Ms. Schnurr the reason for the cancellation of the 2009 JIL evaluation, Ms. Schnurr responded: "My understanding -- and again, that's a long time ago -- was that it was a funding issue." After Palantir's counsel showed Ms. Schnurr the e-mail cancelling the JIL evaluation, however, Ms. Schnurr stated: "Sitting here today, based on what you've shown me, it looks as if the recommendation was to not move forward with a JIL evaluation but to have them work directly with Northrup Grumman to move things forward in a direct manner to help get Palantir capability into the program." Ms. Schnurr also was asked:

Q. Do you have any reason to believe that a company, which is a subcontractor, would be precluded from participating in the Joint Intelligence Laboratory evaluations?

A. I don't know, but I would assume it would be okay.

Q. You'd assume it would be okay?

A. Uh-huh. But I don't know.

. . .

Q. Why is working with Northrop Grumman mutually exclusive from getting an evaluation under the JIL?

A. I wouldn't think it is mutually exclusive.

Q. Then why did you cancel the JIL evaluation?

A. I did not cancel it personally.

Palantir asserts that, by testifying that Palantir could have been evaluated at the JIL and simultaneously have worked with Northrup Grumman, "Ms. Schnurr effectively admitted that the rationale given" for cancelling the JIL evaluation "did not make any sense." Palantir, however, mischaracterizes Ms. Schnurr's testimony. While Ms. Schnurr did, in fact, testify that Palantir might have been able to simultaneously work with Northrup Grumman and undergo evaluation at the JIL, she did not, either directly or indirectly, concede that the reason for the cancellation put forth in the e-mail to Palantir "did not make any sense."

Palantir argues that "the Army has never given a plausible explanation for why it 'blocked' Palantir from participating in this evaluation" and points to Mr. Schnurr's

deposition testimony to argue that the cancellation of the JIL evaluation was motivated by bias and/or bad faith. Palantir further asserts that Ms. Schnurr's testimony reflects "shifting and contradictory explanations that reveal a lack of candor and credibility as to the reasons why this evaluation was cancelled." Without further evidence, however, Palantir's position remains based only on allegations and suspicions of bias. The apparent inconsistencies with Ms. Schnurr's testimony could be attributed to her failed memory after the passage of approximately seven years from the events in question to the date of the deposition. Moreover, Ms. Schnurr testified that she "did not cancel the JIL evaluation personally." Without more evidence of intent, the e-mail sent to Palantir cancelling the JIL evaluation on February 27, 2009 does not offer sufficient evidence of bias and/or bad faith on the part of the agency as it relates to the developmental solicitation for DCGS-A Increment 2.

Palantir's counsel also asked Ms. Schnurr about the SIL evaluation cancellation during her deposition. Ms. Schnurr was asked: "Did Palantir ever undergo an evaluation in the SIL?" To which she responded: "I think they did, but I don't recall all the details of it. It's been so long, but I know they did." Palantir's counsel asked additional questions about the SIL evaluation, but it is apparent from her deposition testimony that Ms. Schnurr was not involved with the SIL. Ms. Schnurr stated: "I don't recall because I didn't work the SIL, didn't have any responsibility for the SIL;" "Again, that SIL work was totally separate in my office. We had nothing to do with that;" "Again, I did not work the SIL;" and, later, "I don't know the details of what happened in the SIL." Given her testimony that she was not involved with the SIL and did not remember anything about the SIL evaluation, her testimony as to why the SIL evaluation did or did not occur does not provide support for protestor's allegations. In addition, the JIL and SIL evaluations were cancelled between 2009 and 2011, years before the solicitation at issue in this bid protest was released. Given the lapse in time, it is unclear, without further evidence, whether those cancellations between 2009 and 2011 were directly related to the decision to issue the DCGS-A Increment 2 procurement as a developmental one. Therefore, Palantir's allegations of "blocking" of the JIL and SIL evaluations do not provide sufficient evidence to demonstrate bias or bad faith. As stated above, a protestor must show "clear and convincing evidence" to prevail on a claim of bias and/or bad faith and Palantir has failed to do so with regards to the JIL or SIL evaluations. See Croman Corp. v. United States, 724 F.3d at 1364.

Related to Palantir's allegations that the Army "blocked" the JIL and SIL evaluations, Palantir alleges that "[a]fter Palantir was blocked from conducting the SIL evaluation, the DCGS-A Program Manager, Colonel Wells" made inaccurate statements to Congress about the SIL evaluation. Specifically, Palantir alleges that Army Colonel Charles Wells told Congress, not only that the SIL evaluation had occurred, but also, "that Palantir was unwilling to fully integrate its product with DCGS-A," and that the evaluation revealed that Palantir's features limited intelligence collaboration and sharing. According to Palantir, Colonel Wells communicated this inaccurate information to Congress via Information Papers on September 30, 2011 and October 18, 2011. Defendant argues, however, that the statements in the Information Papers submitted to Congress do not demonstrate bias and/or bad faith. Similar to Palantir's allegations that the JIL and SIL evaluations were "blocked" by the Army, Palantir's allegation that inaccurate statements made to Congress are evidence of the Army's bias and/or bad faith is not supported by

the Administrative Record. Palantir's assertion that the Army communicated to Congress information that may have been inaccurate does not, without further evidence, establish that the representations made to Congress were motivated by bias and/or bad faith on the part of the critical decision makers regarding the DCGS-A Increment 2 solicitation. It is not clear in the Administrative Record what was the source of the alleged incorrect information or whether the information was utilized by the decision makers who produced the developmental procurement at issue in this protest.

In addition to the allegedly "blocked" JIL and SIL evaluations, Palantir also alleges that the "former Chief Information Officer for G-2," Lynn Schnurr, and the "former Deputy Chief of Staff of the Army for G-2 (Intelligence)," Lieutenant General Mary Legere, were biased against Palantir and acted on that bias. To support Palantir's allegations, Palantir points to several instances that allegedly occurred after 2011. For example, Palantir points to an e-mail sent on November 6, 2015, that pertained to a slide presentation on the DCGS-A Program and Palantir's capabilities. The author of the e-mail, Colonel Jack Dills, stated: "Apparently LTG Legere had some issues with the brief and afterward expressed her issues to MG [Major General] Ostrowski." According to Palantir, in an e-mail sent on March 10, 2012 to Douglas Philippone of Palantir, Army Major Greg Moore admitted that G-2's Chief Information Officer, Lynn Schnurr, had an "entrenched animosity" toward Palantir "which has been spread and inculcated into the DA staff." (emphasis removed). Additionally, Palantir alleges that, at some unidentified point prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir that led a defense contractor to decide against working with Palantir. To support this allegation, Palantir relies on another e-mail from Army Major Greg Moore, dated December 15, 2011, in which he stated that "[n]egative feedback from the DA G2 CIO [Lynn Schnurr] at the time caused Lockheed Martin [the contractor] to wave off" and enter into discussions with companies other than Palantir. Palantir also alleges that Lynn Schnurr and Lieutenant General Mary Legere circulated various documents that contained "inaccurate" and "misleading" information about Palantir, including, but not limited to, a July 2012 memorandum that discussed Palantir's capabilities and an undated venn diagram that was allegedly distributed among Army officials and purported to compare Palantir's capabilities with that of DCGS-A. (internal citations omitted). The venn diagram depiction appeared as follows:



Defendant argues that Palantir's claim that the Army G-2 circulated inaccurate information about Palantir's capabilities lacks merit because the information was believed to be accurate at the time it was distributed. Defendant further argues that Palantir has misstated or mischaracterized the deposition testimony of Lieutenant General Legere in its attempt to support its allegations of bias and bad faith. Defendant asserts that Ms. Schnurr's deposition testimony "demonstrates the Army [sic] intent to work with Palantir and integrate the Palantir Platform into the DCGS."

As indicated above, Palantir was given the opportunity to depose Lieutenant General Legere and Ms. Schnurr. During the depositions, counsel for Palantir asked Lieutenant General Legere and Ms. Schnurr about the allegedly inaccurate information

that was circulated about Palantir within the Army. Specifically, Lieutenant General Legere was asked about a July 2012 Information Paper to Congress and slide presentation that included the venn diagram depicting Palantir's capabilities. Palantir's counsel asked Lieutenant General Legere about the accuracy of these documents and several of the statements contained therein. In response to questions about the accuracy of certain statements in the 2012 Information Paper, Lieutenant General Legere explained that the statements reflected the understanding of Palantir's capabilities in 2012. Similarly, when questioned regarding the information about Palantir depicted in the venn diagram, Lieutenant General Legere responded that the venn diagram reflected "our understanding based on how we were using it [Palantir]," which was "[b]ased on the way the soldiers were using it and the way they were describing it." Ms. Schnurr was asked about the accuracy of the venn diagram by Palantir's counsel during her deposition, she stated that "it appears to be" accurate "[b]ased on what I was told by engineers." Similarly, during Ms. Schnurr's deposition, Palantir's counsel asked her about the accuracy of statements in the July 2012 Information Paper she had signed, and she explained that the statements were based on "knowledge that engineers in the field had assessed" regarding Palantir's capabilities. Ms. Schnurr testified that as of July 2012, the July 2012 Information Paper was a fair and accurate representation of Palantir's capabilities, and "[a]s of February of 2012," the venn diagram was a fair and accurate representation of Palantir's capabilities.

Although Lieutenant General Legere admitted during her deposition that "everybody was sort of talking past each other," and that, referring to Palantir and the Army, "[b]oth sides misrepresent the capabilities of both," her deposition testimony does not amount to clear and convincing evidence of bias and/or bad faith.[25] Instead, as even defendant has agreed, the deposition testimony suggests lack of communication and tension between the Army and Palantir. Lieutenant General Legere explained during her

---

[25] During her deposition, Lieutenant General Legere was asked if she was

> familiar with the fact that the solicitation that was ultimately issued in December 2015 for the procurement of Increment 2 for DCGS sought bids from offerors who would enter into a developmental contract on some kind of cost-plus basis and did not seek bids from people who wanted to sell a commercial item[.]

Lieutenant General Legere answered "no." Although the court has serious doubts about Lieutenant General Legere's purported lack of knowledge regarding DCGS-A Increment 2, considering her leadership role within G-2 and her involvement with the DCGS-A program, during her deposition, Lieutenant General Legere denied having ever said each of the statements in the e-mail that were attributed to her, and which Palantir alleges demonstrated the Army's bias against Palantir. Although Lieutenant General Legere's credibility may be diminished in the view of the court, some of her testimony was uncontroverted. Regarding the issues of bias and/or bad faith, her testimony, and the testimony about her purported views, was not sufficient to carry protestor's high burden of proof on the issue.

deposition that the Army's presentation of Palantir's capabilities evolved and improved over time as the Army continued to communicate with Palantir.  According to Lieutenant General Legere:

> I think in our conversations in relationship with the company over time, because really there were some serious objections to the way we were describing this, and I absolutely understand from a stakeholder in the company perspective why we got a little bit more -- we got much more precise. And in turn Palantir got more precise about what DCGS is and how what we do relates. So I think we made some progress. But in 2012, this is kind of how we talked past each other.

Additionally, although Palantir points to the November 6, 2015 e-mail asserting that "LTG Legere had some issues with the brief" on the DCGS-A program overview, the e-mail is not clear as to what Lieutenant General Legere's "issues" were with the brief. The fact that Lieutenant General Legere may have expressed issues or concerns, in and of itself, is insufficient to support a finding of bias and/or bad faith.

As referred to above, Palantir also relies on various e-mails written by Army Major Greg Moore to support its allegation that Ms. Schnurr held a bias against Palantir, specifically, Major Moore's e-mail statements that Ms. Schnurr held an "entrenched animosity" towards Palantir and that at some time prior to December 2011 Ms. Schnurr gave negative feedback about Palantir to another contractor, Lockheed Martin. Major Moore's e-mail statements, including that Ms. Schnurr had an "entrenched animosity" towards Palantir, is expressed as Major Moore's impression of Ms. Schnurr's attitude at the time the e-mail was sent in 2012, and by itself cannot support a finding of bias or bad faith, even animosity without further confirmation. It also is not evident from the Administrative Record if this statement was based on any personal knowledge on the part of Major Moore, or if he was merely repeating information obtained second-hand. The court has not been provided any context directly from Major Moore about his statement. Based on the limited information provided to the court regarding Major Moore's e-mail, the court may not depend on the accuracy or reliability of Major Moore's statement about Ms. Schnurr's alleged feelings in 2012. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability). Moreover, the court permitted Palantir to depose Ms. Schnurr and the information derived from that deposition regarding her alleged bias is more reliable and probative than what Major Moore expressed in the 2012 e-mail. In fact, Palantir's counsel asked Ms. Schnurr about Major Moore's e-mail:

Q. Is it true that you have an entrenched animosity towards Palantir?

A. No.

Q. Do you have an explanation as to why someone would say that you did?

A. That's Major Moore.

Q. Do you have any explanation as to why he would say something like that?

A. No. This is -- this is Major Moore saying this. This is not Lieutenant Colonel Gloor saying this.

. . .

Q. Do you disagree with this statement that the DA [Department of the Army] staff -- that an entrenched animosity toward Palantir has spread and inculcated into the DA staff? Do you agree with that statement?

A. I disagree with that.

Q. Why?

A. I just – staff -- working in the Army staff, it's a very, very busy place, a lot of short suspenses, high optempo. And it's just not something that people do, is sit around and talk like that.

As the deposition transcript reflects, Ms. Schnurr rejected the notion that she had an "entrenched animosity" towards Palantir or that a culture of animosity had spread among "the DA staff" towards Palantir. Without more evidence to support Major Moore's allegation of an "entrenched animosity," the court cannot find evidence of bias and/or bad faith on this basis.

Moreover, Major Moore's e-mail statement that, at some time prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir to Lockheed Martin, another contractor, is not sufficient proof of bias and/or bad faith. Even if the court assumes that Major Moore's statement is accurate, negative feedback is not itself indicative of bias and/or bad faith. Additionally, the court is not satisfied that this e-mail is reliable, and Palantir was given the opportunity to question Ms. Schnurr about this alleged negative feedback during her deposition. At her deposition, Palantir's counsel asked Ms. Schnurr if she gave Lockheed Martin negative feedback about Palantir. Ms. Schnurr responded: "I do not remember that" and "I don't think so." Even given the tentative nature of her answer, this is simply not enough to support a finding of bias and/or bad faith on the part of the Army regarding the DCGS-A Increment 2 procurement.

Additionally, to further support its allegations of bias and/or bad faith, specifically against Lieutenant General Legere and Ms. Schnurr, Palantir points to the revision of a report on Palantir's capabilities created and published by the Army Test and Evaluation Command (ATEC) on April 25, 2012. ATEC is "responsible for planning and conducting developmental, independent operational test and independent evaluations and assessments of assigned Army material, information, and acquisition systems." "ATEC plans, integrates, and conducts experiments, developmental testing, independent operational testing, and independent evaluations and assessments to provide essential information to acquisition decision makers and commanders." (internal quotations omitted). From March 9, 2012 to March 21, 2012, ATEC conducted "face-to-face surveys

and collected data on Palantir from 57 operators and 43 intermediate supervisors. . . ." After this data was collected, ATEC started drafting the Palantir Forward Operational Assessment Report. "The ATEC Forward Operational Assessment Report on Palantir was approved and signed by BG [Brigadier General] Laura Richardson, the OTC [Operational Test Command] Commanding General, **on 25 April 2012**." (emphasis in original). The approved report was "emailed directly to key individuals within USFOR-A for their information," distributed on the "USFOR-A SIPR Sharepoint portal," and sent to two Palantir field service representatives. According to Palantir, the April 25, 2012 ATEC report on Palantir contained highly favorable recommendations and findings about Palantir's capabilities and was critical of DCGS-A.

Palantir alleges, however, that "[s]hortly after the ATEC Report was published, staff within G-2 demanded that it be rescinded, destroyed, and replaced." Specifically, Palantir alleges that Lieutenant General Legere "directed the deletions of information favorable to Palantir and other changes that were made to the April 25, 2012 ATEC report." Palantir alleges that, because the Army's G-2 staff insisted upon the rescission and alteration of the favorable findings and recommendations about Palantir in the April 25, 2012 ATEC report, the report was replaced "with a modified report that removed the most favorable language recommending Palantir and reporting on its success." The Administrative Record reflects that a revised ATEC report was issued on May 25, 2012.[26]

Defendant, however, argues that "Palantir has not alleged or demonstrated that the program and contracting officials for the DCGS-A Increment 2 procurement had anything to do with either the original or the corrected ATEC 2012 report." Moreover, defendant relies on an investigation conducted in 2012 regarding the ATEC report, which

affirmatively found that the changes to the ATEC Report were not the result of any improper motives, but instead, the report was edited to ensure it was prepared in accordance with the purpose of the report and to ensure that the warfighters received the best possible product to accomplish their mission.

Defendant asserts that "irrespective of the spin Palantir now attempts to put on the fact that the ATEC report was edited," allegations that the report was changed as a result of improper influence or interference have already been laid to rest. The Administrative Record reflects that, between July 2012 and October 2012, the Army conducted an investigation into the circumstances surrounding the rescission and alteration of the April 25, 2012 ATEC report. Lieutenant General William Grisoli conducted the independent investigation and produced a report with his findings and conclusions, which is contained in the Administrative Record. According to the investigative report, Lieutenant General Grisoli was directed

---

[26] As with the original April 25, 2012 ATEC report, the revised May 25, 2012 ATEC report is included in the Administrative Record.

to conduct an investigation into the facts and circumstances surrounding the Army's 2012 conduct of an informal battlefield assessment of Palantir. . . [and] to examine the facts and circumstances surrounding creation of one or more Forward Operational Assessment (FAO) reports by the Army Test and Evaluation Command (ATEC) related to the Palantir system, and any alleged efforts by one or more members of the Army G-2 to disrupt ATEC's objective assessment of Palantir.

As part of his investigation, Lieutenant General Grisoli identified a list of 21 "key individuals related to the events" under investigation, which included, among others, "LTG Mary Legere, Army Deputy Chief of Staff, G-2" and "Ms. Lynn Schnurr, Army Intelligence Chief Information Officer and Director, Intelligence Community Information Management, Office of the DCS, G-2."

As a result of his investigation, Lieutenant General Grisoli confirmed that ATEC approved, and published, an initial report on Palantir on April 25, 2012 and that the ATEC Commanding General, Major General Gino Dellarocco, subsequently directed that the report be rescinded. Lieutenant General Grisoli concluded "that the 25 April 2012 Palantir FOAR [Forward Operational Assessment Report] was retracted, revised and reissued as a result of [a] determination that the recommendations contained in the initial report were improper and were beyond the scope of what ATEC should recommend in a FOAR." Lieutenant General Grisoli found that:

> [T]he changes made to the 25 April 2012 FOAR were not attributable to anyone attempting to improperly advance the Army's DCGS-A program of record but, rather, to the ATEC leadership's intent to ensure that the FOAR properly reflected the strengths and weaknesses of Palantir and that the recommendations in the report were in line with the report's purpose.

Lieutenant General Grisoli concluded that, based on his investigation, "no member of ATEC experienced undue or improper pressure to change the earlier FOAR, and that no one within the Army G-2 requested that ATEC change the earlier FOAR." Lieutenant General Grisoli found "no communication between any member of the Army G-2 and ATEC that was actually in furtherance of retracting and reissuing the Palantir FOA report." Lieutenant General Grisoli explained, "none of the emails I reviewed, or in any of the phone conversations described by the participants, did any member of the Army G-2 specifically demand, suggest or even encourage ATEC to retract or destroy the April Palantir FOAR." Instead, according to Lieutenant General Grisoli, "[t]he decision to retract, revise, and reissue the April FOAR was clearly made by ATEC leadership." Specifically, "[t]he decision to revise the 25 April 2012 FOAR was made by MG Dellarocco on 2 May 2012 after a discussion with LTG Legere, the DCS, G-2."

Additionally, Lieutenant General Grisoli explained that "there is no indication that there was any undue or improper pressure from the Army G-2 to 'destroy' the April Palantir FOAR." Lieutenant General Grisoli found that the "'destruction' of the April

Palantir FOAR" was "intended only to avoid any confusion that likely would result from having two published FOARs simultaneously available."

Moreover, Lieutenant General Grisoli concluded that "there was no intent on the part of any member of the Army G-2 to deceive any Army decision maker regarding the effectiveness of the Palantir commercial system." Lieutenant General Grisoli explained in his report:

> [I]t is my opinion that the Army G-2 team is passionate and a little defensive about DCGS-A and its relationship with Palantir and that this attitude resulted in their desire to ensure that any Army discussion of Palantir be precise concerning capabilities, training and future acquisitions. At times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders. . . . However, it is clear that the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission.

Lieutenant General Grisoli ultimately concluded that "the coordination between the ATEC leadership and the Army G-2, was professional and that there was no undue or improper influence exerted by any member of the Army G-2 towards any member of ATEC."

By alleging that the ATEC report was changed because of interference by Lieutenant General Legere and/or Ms. Schnurr, both of whom Palantir alleges were motivated by their bias against Palantir, Palantir would apparently have this court set aside Lieutenant General Grisoli's investigation and re-investigate the circumstances surrounding the changes to the April 25, 2012 ATEC report. This court, however, is tasked with reviewing the Administrative Record, with limited supplementation, if appropriate and necessary for effective judicial review, and making findings based on that Administrative Record. It would not be appropriate for this court to ignore Lieutenant General Grisoli's findings, which occurred much closer in time to the events under review, and the depositions of Lieutenant General Legere and Ms. Schnurr despite their imperfect memories.   Thus, the court considers Palantir's allegations in light of the entire Administrative Record.

Lieutenant General Grisoli's investigative report documents a thorough inquiry into the circumstances surrounding the rescission and modification of the April 25, 2012 ATEC report. Indeed, Lieutenant General Grisoli was specifically directed to investigate whether there was any undue influence, pressure, or intent to deceive on the part of Army G-2 personnel to change the ATEC report that was originally distributed. Lieutenant General Grisoli's investigative report indicates that he spoke with multiple individuals, including Lieutenant General Legere and Ms. Schnurr, about their roles in the rescission and/or modification of the ATEC report. Based on the information he received, Lieutenant General Grisoli set forth comprehensive remarks in his report that directly address the allegations that Palantir asserts in this court. Although Palantir raised issues about the completeness of Lieutenant General Grisoli's rationale behind his findings in its

submissions to the court, Palantir did not question Lieutenant General Grisoli's ability to conduct an independent investigation.

To support its bias and/or bad faith allegations, Palantir further points to the statements in Lieutenant General Grisoli's report that certain G-2 personnel could be "a little defensive about DCGS-A and its relationship with Palantir" and that "[a]t times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders." In referring to these statements, however, Palantir omits Lieutenant General Grisoli's conclusion that the cause of this defensiveness and lack of objectivity was that "the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission." Lieutenant General Grisoli ultimately concluded that the G-2 staff were not motivated by bias or bad faith, but, indeed, by a strong desire to provide warfighters with the best products. Moreover, when asked during her deposition if she was "defensive about Palantir," Lieutenant General Legere responded "no, I'm not defensive. . . . I'm not defensive at all. You have an opinion that I don't share." Ms. Schnurr stated at her deposition that she disagreed with Lieutenant General Grisoli's assertion that members of the G-2 staff sometimes lost their objectivity with respect to how they presented information on Palantir.

In arguing that the Army insisted upon the rescission and alteration of favorable findings and recommendations about Palantir included in the original April 25, 2012 ATEC report, Palantir points to three specific statements that were removed from the April 25, 2012 ATEC report.[27] Palantir argues that this language "removed from the April 25, 2012

---

[27] Palantir's supplemental brief highlights the following language that was allegedly favorable towards Palantir and removed from the April 25, 2012 ATEC report:

1. "Easy search tools within Palantir allows Soldiers to simultaneously search CIDNE, M3, MX (British Human Intelligence (HUMINT) system), BAT, etc."

2. "(1) (U/FOUO) Due to connectivity issues and bandwidth restrictions in Afghanistan, some users experienced the inability to connect to servers that are located on different Forward Operating Bases (FOB) from where the user operates. Recommendation: Install more Palantir servers in Afghanistan at multiple locations to mitigate issues."

3. "As compared to other analysis tools, 'Palantir is far superior to the DCGS suite. DCGS is overcomplicated, requires lengthy classroom instruction and is an easily perishable skill set if not being used constantly.' Recommendation: Incorporate a short training class on Palantir at the 35F (Intelligence Analyst) Military Occupational Specialty (MOS) Advanced Individual Training (AIT) and Company Intelligence Teams (COIST) training. Users are able to learn the system and use the analysis tools with

ATEC report directly contradicts what the Army is arguing in this case." Palantir asserts that Lieutenant General Grisoli's "investigation into the rescission and alteration of the April 2012 ATEC report provides *no explanation* for the removal of this language." (emphasis in original). Palantir appears to be arguing that, in 2012, the Army intentionally, and in bad faith, removed language in the April 25, 2012 ATEC report about Palantir's capabilities because the Army was biased against Palantir and sought to prevent Palantir from receiving a future award. To the extent Palantir is asserting this argument, the court finds it to be insufficiently supported and heavily reliant on speculation and suspicion.

In considering Palantir's bias and/or bad faith allegations, the court considered all of the evidence in the Administrative Record pertaining to the 2012 ATEC reports. As a result of supplementation, the Administrative Record contained Lieutenant General Legere's sworn statement given on August 7, 2012 as part of Lieutenant General Grisoli's investigation. The sworn statement was attached as Exhibit 3 to Lieutenant General Legere's deposition transcript. Lieutenant General Legere explained that the

> 25 April draft ATEC report contained one recommendation that concerned me. . . . [T]he particular recommendation that concerned me suggested our Intelligence Center add 40 hours of Palantir training at Fort Huachuca as part of our DCGS core curriculum. I believed this recommendation was not appropriate or helpful to our Intelligence Center. . . .

Lieutenant General Legere stated that she provided her recommendation because she

> assumed as the Senior Intelligence Officer (SIO) for the Army I had an obligation to read the report and bring any concerns with recommendations to ATEC so they could review, weigh the merits, see if any/all should be included in what I assume will stand as a document of record.

Lieutenant General Legere also explained that, prior to April 2012, she had "no previous exposure to the way ATEC coordinate[d] its reports." In her sworn statement, Lieutenant General Legere stated:

> At no point did I intend to do anything to hinder or influence ATEC's critical mission to the Army as its independent test and evaluation organization. My suggestion was a minor one in the context of the report and I was comfortable that it could either be accepted as a constructive suggestion or ignored as immaterial.

Although Palantir is correct that the information contained in the first and second ATEC reports is different, the changes in the reports and the circumstances surrounding the changes, although perhaps unusual, are not clear and convincing evidence of bias and/or bad faith against Palantir.

------

minimal training. Offer an advanced class for NCO's with intelligence MOSs who may be deploying to an area with Palantir use."

As evidence of bias and/or bad faith against Palantir, Palantir further alleges that in October 2014 it notified the Army of specific alleged "'blocking' actions against Palantir" by "G2 or DCGS program owners," and that "the Army has not said whether it has investigated any of those allegations." Palantir's allegation refers to an e-mail sent by Palantir's Douglas Philippone to an Army official in October 2014 in which he allegedly listed "45 separate instances in which G2 or DCGS program owners engaged in specific 'blocking' actions against Palantir, dating back to September 2012." Throughout this bid protest, Palantir has attempted to admit this e-mail into the Administrative Record as support for its bias and/or bad faith allegations. Specifically, Palantir attached the e-mail to its July 15, 2016 motion to supplement the Administrative Record as Exhibit 52, and also attached it to its motion for additional discovery. Defendant argues that this e-mail is not appropriate for supplementation to the Administrative Record. Although the court did not permit Palantir to supplement the Administrative Record with this e-mail, at the hearing on July 25, 2016, Palantir referred to the e-mail as an exhibit when it deposed Lieutenant General Legere.

The e-mail contains a list of alleged instances of "blocking," however, the information in the e-mail was communicated to the e-mail writer, Mr. Philippone, by various individuals, and, as a result, the e-mail contains multiple levels of inadmissible hearsay. Protestor argues that the e-mail and the statements contained therein are not inadmissible hearsay because they are "being submitted to establish the simple fact that Mr. Philippone sent these allegations" to the Army in October 2014, and not for the truth of the matters asserted in the e-mail. Whether or not the e-mail was sent is not at issue. If Palantir is not seeking to admit the allegations for the truth of the matters asserted, including that the Army engaged in numerous efforts of "blocking" against Palantir, the fact that the e-mail was sent does not establish that any or all of the alleged "blocking" efforts ever occurred. Similarly, whether the Army investigated the allegations is not clear and convincing proof of bias and/or bad faith.

In his deposition, Mr. Philippone even stated that he could not recall the specific sources of the information contained in the e-mail:

Q. Now, these [sic] information that you're conveying in the email dated October 7th, 2014 to Gabe [Camarillo], did this information come to you through other persons?

A. Yes.

Q. And who gave you this information?

A. I don't recall specifically. But we received these reports all the time, and so I just kept track of them. And since Gabe had requested it in very specific form, where he literally told me, send this to me, I -- at his request, I put all of these things -- all of the reports that I had heard in one email to send to him.

Q. And from whom did you hear these reports?

> A. So I mean, from a variety of sources. From -- from either soldiers, FSRs [Field Service Representatives], Palantir employees. Some of them came from Congress.

When defendant's counsel went through each allegation in the e-mail, and asked who reported each allegation to Mr. Philippone, he responded to nearly each question: "I don't remember" and could not specifically identify the source of all of the allegations. Because Palantir's counsel referred to the e-mail during the deposition of Lieutenant General Legere, and that deposition testimony is included in the Administrative Record, the court reviewed the e-mail again and, once again, concludes that the e-mail is made up of a series of uncorroborated allegations many of which are based on hearsay, is not appropriate for supplementation to the Administrative Record and cannot support a finding of clear and convincing evidence of bias and/or bad faith.

As discussed above, to succeed on its allegations of bias and/or bad faith, Palantir must prove its claims of bias and/or bad faith by clear and convincing evidence. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240. Even after permitting limited supplementation to the Administrative Record with some of Palantir's multiple requests for discovery and several depositions, although it appears that the relationship between Palantir and the Army was strained at times, as even defendant conceded there was "a tension in the business relationship between the Army and Palantir," and the Army representatives struggled during the depositions to remember or explain potentially unfavorable e-mails or statements about Palantir, Palantir has not produced clear and convincing evidence of bias and/or bad faith against Palantir. This procurement has been the subject of extensive discussion at the Department of Defense, particularly within the Army, before Congress, and in the press. The court is mindful that the only relevant information to be reviewed by the court is the record before the court, as supplemented in accordance with the court's rulings described above. The court, therefore, turns to consider Palantir's allegations regarding the Army's failure to comply with 10 U.S.C. § 2377.

10 U.S.C. § 2377

The parties also have filed cross-motions for judgment on the Administrative Record on the issue of the Army's compliance with 10 U.S.C. § 2377. Rule 52.1(c) of the Rules of the United States Court of Federal Claims (2016) (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the

United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), "by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]""); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319. The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), "provides a broad grant of jurisdiction because '[p]rocurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d at 1363 ("'[T]he proper standard to be applied

[to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[28] see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013);

---

[28] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d at 1285–86; Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary standard] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); see also Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "''If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.''" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see

also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Const. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech

Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is

whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted

interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

In the context of a pre-award bid protest, however, the protestor has to demonstrate that it has suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7 ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a pre-award protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. at 647; Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797 (2013). This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Protestor Palantir argues that, by failing to properly evaluate whether the Army's needs could be met by procuring commercial items, including commercial items identified to the Army by Palantir, and, thereafter, by refusing to solicit either the data management platform, or the entirety of DCGS-A Increment 2, as a commercial item, the Army violated 10 U.S.C. § 2377. Palantir raises related questions about the Army's approach to the procurement, including: "Did the Army violate § 2377(c) by failing to conduct market research that was designed to determine whether there were commercial or nondevelopmental items that could meet the Army's requirements, and by assuming from the outset that the procurement would be for a developmental contract?" Palantir also asks: "Did the Army violate § 2377(c) by failing to analyze and failing to make any

determination as to whether modifications to existing commercial or nondevelopmental items could fulfill the Army's requirements?" and "[d]id the Army violate § 2377(c) by failing to analyze and failing to make any determination as to whether modifications to its requirements could be made that would allow the requirements to be fulfilled by commercial or nondevelopmental items?"

The "Preference for acquisition of commercial items" statute, 10 U.S.C. § 2377, states:

**(a) Preference.**--The head of an agency shall ensure that, to the maximum extent practicable--

**(1)** requirements of the agency with respect to a procurement of supplies or services are stated in terms of--

**(A)** functions to be performed;

**(B)** performance required; or

**(C)** essential physical characteristics;

**(2)** such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

**(3)** offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

**(b) Implementation.**--The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable--

**(1)** acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

**(2)** require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

**(3)** modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

**(4)** state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

**(5)** revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

**(6)** require training of appropriate personnel in the acquisition of commercial items.

**(c)  Preliminary  market  research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377 (emphasis in original).

The regulation implementing 10 U.S.C. § 2377, 48 C.F.R. § 10.002, states:

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see part 19).

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at https://www.contractdirectory.gov/contractdirectory/ and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part 12 shall not be used. When publication of the notice at 5.201 is

required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

48 C.F.R. § 10.002. The FAR also provides a definition of a "commercial item":

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101 (2016).[29]

In general, this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). As noted above, this language in 28 U.S.C.

---

[29] The court notes that the United States Code at 41 U.S.C. § 103 provides a substantially similar definition of commercial item. See 41 U.S.C. § 103 (2012).

§ 1491(b)(1) provides "a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381 (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))) (emphasis in original); see also Distrib. Solutions, Inc. v. United States, 539 F.3d at 1346 ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"); Nat'l Air Cargo Grp., Inc. v. United States, 126 Fed. Cl. 281, 289 (2016) (quoting 41 U.S.C. § 111 (2012)) ("[T]he term 'procurement' is itself broad, meaning 'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'"). Therefore, so long as "any stage" of the procurement is at issue, this court has jurisdiction to adjudicate the protest.

The language of 10 U.S.C. § 2377(a) instructs that "[t]he head of an agency shall ensure that, to the maximum extent practicable" the "requirements of the agency with respect to a procurement of supplies or services are stated in terms of" the functions, the characteristics, and the required performance, and that "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a) (emphasis added). As the statute contemplates that offerors of commercial items[30] have an opportunity to compete in any procurement, the court interprets an issue of 10 U.S.C. § 2377 to fall within the court's bid protest jurisdiction and proper for consideration.

As an initial matter, the court notes that the application of 10 U.S.C. § 2377 has not been squarely addressed in this court in the context of a bid protest.[31] Turning to the

---

[30] Throughout this opinion, the court uses the shorthand of "commercial items" to refer to "commercial items or nondevelopmental items."

[31] The statute, 10 U.S.C. § 2377, has been cited in two prior bid protests. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. 215 (1998), rev'd, 175 F.3d 1365 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448 (1997). In Alfa Laval, the United States Court of Federal Claims only cited 10 U.S.C. § 2377 in a footnote for defendant's statement that "one factor militating in favor of competitive bidding" was 10 U.S.C. § 2377. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. at 217 n.2. In Hydro Engineering, a decision by the undersigned, the protestor argued that the United States Army's Chemical and Biological Defense Command "violated the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, 108 Stat. 3243 (1994) (FASA), as codified at 10 U.S.C. § 2377, by giving Centech [the awardee] a technical advantage for its heating coil, which allegedly is a sole source part." Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. at 473.  In Hydro Engineering, this court noted that "not only is 10 U.S.C. § 2377 introduced by the words 'to the maximum extent practicable,' but the solicitation also contemplated that the offerors could use sole source or proprietary parts" in the designs. Id. at 474. The court did not discuss the degree of discretion afforded by

language of 10 U.S.C. § 2377, Palantir first focuses on the two instances of the phrase "to the maximum extent practicable." In 10 U.S.C. § 2377(a), the statute instructs: "The head of an agency shall ensure that, to the maximum extent practicable . . . such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements," and "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." Id. In 10 U.S.C. § 2377(b), the statute requires that "[t]he head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable," "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency," and "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b). Palantir argues that:

> [T]he Army has a requirement for a Data Management Platform; Palantir has a Data Management Platform that is available as a commercial item; and the law requires the Army to meet its requirements through the procurement of commercial items "to the maximum extent practicable." 10 U.S.C. § 2377. Yet the Army chose to issue a Solicitation that makes it impossible for Palantir to compete through a bid that meets the Army's requirements by supplying its commercial item. That is a blatant violation of § 2377.

Palantir further argues that: "The use of the word 'maximum' in the phrase 'to the maximum extent practicable' cannot be ignored." (footnote omitted). Defendant, by contrast, argues that "[t]he language, 'to the maximum extent practicable,' qualifies all of the agency's responsibilities, e.g., its responsibility to define requirements in terms of functions, performance, or essential physical characteristics, and its responsibility to define requirements so that commercial items may be procured to fulfill such requirements."[32] In addition, defendant argues, citing Hydro Engineering, Inc. v. United States, 37 Fed. Cl. at 474, that "[t]his discretionary language – 'to the maximum extent practicable [sic] - qualifies the agency's obligations."

The phrases "to the maximum extent practicable" and "appropriate to the

---

the phrase "to the maximum extent practicable," or specifically analyze the phrase. Recently, this court also referred to 10 U.S.C. § 2377 in its prior standing decision in the above captioned protest brought by Palantir USG, Inc. and Palantir Technologies Inc. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 27.

[32] Defendant makes a related argument, arguing that "the statutory provision that addresses defining requirements and contains language that 'requirements are defined so that commercial or nondevelopmental items may be procured to fulfill such requirements' is qualified by the language 'to the maximum extent practicable,' which acknowledges agency discretion."

circumstances" in 10 U.S.C. § 2377 are not further defined in the statute or the implementing regulations. Moreover, the same phrases "to the maximum extent practicable" and "appropriate to the circumstances" in the context of 10 U.S.C. § 2377, have not been judicially defined to date[33] and are not easily subject to bright line tests. Turning to dictionary definitions, "maximum" is defined as "as great, high or intense as possible as permitted" New Oxford American Dictionary 1082 (3d ed. 2010); "practicable" is defined as "able to be done or put into practice successfully," id. at 1372; and "appropriate" is defined as "suitable in the circumstance." Id. at 77. Although these dictionary definitions provide little further clarification, the words chosen by Congress make it clear that a factual, case-by-case, compliance approach with the statutory dictate that an agency consider commercially available alternatives is expected.

The court also notes that the specific word "maximum" was a deliberate choice by Congress. In the House Report for the Federal Acquisition Streamlining Act of 1994, the House of Representatives proposed the following language regarding the acquisition of commercial items:

SEC. 111. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS

Section 16 of the Office of Federal Procurement Policy Act (41 U.S.C. 414) is amended by redesignating paragraphs (2), (3), and (4) in order as paragraphs (3), (4), and (5), respectively, and by inserting after paragraph (1) the following new paragraph:

(2) implement a preference for the acquisition of commercial items by–

(A) whenever practicable, stating specifications in solicitation for bids and proposals in terms such that bidders and offerors are enabled and encouraged to offer to supply commercial items in response to agency solicitations[.]

H. Rep. 103-545(I), at 41 (1994), 1994 WL 261997 (emphasis added). By contrast, the Senate Report first proposed the following language:

PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS AND NONDEVELOPMENTAL ITEMS

SEC. 33. (a) PREFERENCE.—The head of each executive agency shall ensure that, to the maximum extent practicable—

(1) requirements of the executive agency with respect to a procurement of supplies are stated in terms of—

---

[33] The court notes, as the parties describe in their respective briefs, other courts have discussed the phrase "maximum extent practicable" in other contexts. See, e.g., SMS Data Products Grp. v. United States, 853 F.2d 1547 (Fed. Cir. 1988).

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items may be procured to fulfill such requirements; and

(3) offerors of commercial items and other nondevelopmental items are provided an opportunity to compete in any procurement to fill such requirements.

(b) IMPLEMENTATION.—The head of each executive agency shall ensure that procurement officials in that executive agency, to the maximum extent practicable—

(1) acquire commercial items or other nondevelopmental items to meet the needs of the executive agency;

(2) require prime contractors and subcontractors at all levels under the executive agency contracts to incorporate commercial items or other nondevelopmental items as components of items supplied to the executive agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items[.]

S. Rep. 1587, at 282-83 (1994) (emphasis added). The House Conference Report, from August 21, 1994, after both the House and the Senate Reports, adopted the approach of the Senate Report, and crucially, adopted the phrase "maximum extent practicable." The House Conference Report stated:

SEC. 8104. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS.

(a) In General.-Chapter 140 of title 10, United States Code, as amended by section 8103, is further amended by adding after section 2376 the following new section:

S 2377. Preference for acquisition of commercial items

(a) Preference.-The head of an agency shall ensure that, to the <u>maximum extent practicable</u>-

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of-

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

(b) Implementation.-The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable-

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

(2) require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items[.]

H.R. Conf. Rep. 103-712, at 154 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 2607 (emphasis added). The court notes that the language of the House Conference Report closely tracked the final language of the Federal Acquisition Streamlining Act of 1994, and tracks the language at 10 U.S.C. § 2377. The word "maximum" in the phrase "to the maximum extent practicable," therefore, should not be ignored and read out of the statute. Given the congressional choice of the word "maximum," even when coupled with words like "practicable" and "appropriate," agencies cannot ignore or superficially comply with the requirement to review the availability of commercial products to meet agency needs as

the statute instructs agencies to make serious and genuine efforts to review the availability of commercial products to meet their needs. Although the statute grants discretionary authority to the agency, and agency discretionary authority can be the most difficult kind of action to test in the courts, government contract law is replete with challenges to the exercises of agency discretion as alleged to be arbitrary and capricious; the current challenge to the implementation of 10 U.S.C. § 2377 is in the same category.

Separate from the "maximum extent practicable" language, the defendant's briefs submitted in this protest focus on the language of 10 U.S.C. § 2377(c) regarding market research and emphasize the phrase: "The head of an agency shall conduct market research appropriate to the circumstances," to argue that the undertaken "market research was clearly 'appropriate in the circumstances.'" Palantir argues that "[t]he Government asks this Court to render § 2377 a nullity," regarding the "maximum extent practicable" language, and that "the clause 'appropriate to the circumstances' does not give the agency discretion to ignore § 2377(c)'s requirements." (capitalization and emphasis removed). As noted above, 10 U.S.C. § 2377(c) states:

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial

items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377(c) (emphasis in original).

The solicitation relevant to this protest was issued on December 23, 2015. As discussed above, the Army did conduct its version of market research before issuing the solicitation. Prior to the issuance of the solicitation, in July 2014, the DIVA Market Study recommended as a "Potential Strategy: Phased Acquisition and Integration Approach:"

> The acquisition approach could be structured in a phased manner. Initially, the two foundation components (e.g., COTS [commercial off the shelf] cloud infrastructure services and COTS DIVA 'Turn Key' Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA 'Turn Key' platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis and capitalization removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original). Therefore, initially on the recommendation of the MITRE Corporation, a not-for-profit research and development organization, the Army was aware of a possible commercial approach for at least portions of the DCGS-A Increment 2 procurement.[34]

The initial Request for Information, issued August 13, 2014, was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan." The August 13, 2014 Request for Information, however, "request[ed] respondents' corporate overview information and basic qualifications in managing software <u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). Instead of asking about commercial items, or asking more open-ended questions about

---

[34] Subsequently, in the Army Materiel Systems Analysis Activity's July 2015 Trade Space Analysis, "the Hybrid alternative was rated Green and scored the highest of the three alternatives." As noted above, the Green designation indicated: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance." "Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions." As noted in the Trade Space Analysis, Hybrid was "a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS)."

the approach to the procurement, potential respondents only were asked about developmental projects similar to the existing DCGS-A Increment 1 program.[35]

After the August 13, 2014 Request for Information, the Army issued a second Request for Information on December 5, 2014, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the <u>DCGS-A development effort</u>." (emphasis added). "In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development projects</u> that are similar in scope and process to the DCGS-A program." (emphasis added). As with the first Request for Information, the Army's focus in the December 5, 2014 Request for Information was on "the DCGS-A development effort" and not on the possibility of procuring commercial items. The goal of this second Request for Information was for the Army to understand the respondent's "<u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information, the third issued by the Army, stated, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information also asked respondents: "For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described" earlier in the May 6, 2015 Request for Information. Like the previous two Requests for Information, the May 6, 2015 Request for Information did not seek information for commercial items from the respondents, suggesting to the court that the agency likely had decided that the DCGS-A Increment 2 was going to be another developmental project.

After the three Requests for Information, the Army generated the July 2015 Market Research Report, which, although it was over fifty pages long, contained only two sentences about "Commercial Services." Regarding "Commercial Services," the Market Research Report stated in its entirety: "Significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product." The Market Research Report also separately discussed each respondent, and for Palantir, only stated: "The Palantir response did not provide any examples of past experience relevant to the <u>development</u>

---

[35] The focus on development is consistent with Ms. Shyu's October 20, 2014 "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy" which sought to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." The October 20, 2014 Recommendation also stressed that "moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available." Therefore, the focus of the Recommendation was on development and the use of Research, Development, Test and Evaluation funds, rather than on consideration of purchasing commercial items to meet the agency's needs.

of Increment 2, and was therefore found non-responsive." (emphasis added). Just as the Market Research Report dismissed a commercial product approach, the Army's focus on Palantir's short comings centered on Palantir's lack of experience related to development.

The focus on development continued as reflected in the draft Performance Work Statement distributed by the Army in July 2015. The Scope of the Performance Work Statement begins:

> This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the <u>development</u> and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, <u>development</u> of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

(emphasis added).

Furthermore, the July 1, 2016 "DETERMINATION OF NON-COMMERCIAL ITEM" (capitalization in original; emphasis removed), authored by Contracting Officer Christopher Fisher for the solicitation at issue, and Bryon Young, the Principal Assistant Responsible for Contracting, stated that regarding the market research, the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item continued:

> Based upon market research conducted by Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

> I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

Palantir argues that "the Army felt the need to create and execute such a document *after* Palantir filed its lawsuit reveals that the Army knew it had not made the 'determinations' <u>required</u> by § 2377(c)," (first emphasis in original; second emphasis added). The court notes that, certainly, the timing is unusual. The Determination of Non-Commercial Item,[36] was made the day after the protest was filed in this court. Defendant attempts to argue that the Determination of Non-Commercial Item could be made any time, and asserts that "there is no statutory language addressing the documentation of agency determinations based on market research, and the implementing regulation, FAR 10.002(e), does not require that such determinations must be documented, or that they must be documented before issuance of a solicitation." The court agrees that there is not a specific documentation requirement in 10 U.S.C. § 2377 or the implementing regulations, but disagrees with defendant that "the July 1, 2016 D&F was not a *post-hoc* document as asserted by Palantir." (emphasis in original). The direction of a developmental approach and conclusion that no commercial items were available to meet the Army's requirements was evident in the October 21, 2015 Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," signed by Ms. Shyu. And, clearly, when the Army issued Request for Proposals No. W56KGY-16-R-0001 for engineering, manufacturing, and development services, seeking a single contractor to be the system data architect, developer, and integrator of DCGS–A Increment 2, the decision that no suitable commercial items were available was definitively made. Furthermore, although there is a not a documentation requirement in 10 U.S.C. § 2377, the Army cannot point to any contemporaneous document issued before the solicitation was issued that demonstrates that, in compliance with 10 U.S.C. § 2377, the Army had carefully considered whether commercial items were available. The absence of any determination or indication that the Army had seriously considered whether a commercial item was available at any point in the procurement process, prior to the issuance of the solicitation, together with the numerous documents in the Administrative Record documenting the choice for a developmental approach, is a strong indication that the Army had not met the requirements of 10 U.S.C. § 2377 prior to the July 1, 2016 Determination of Non-Commercial Item, which, as noted above, was issued after the closing date of the solicitation.

Even if the court were to consider the July 1, Determination of Non-Commercial Item as timely, it does not meet the requirements of compliance with 10 U.S.C. § 2377. Palantir argues that "[t]he July 1, 2016 Declaration appears to be merely parroting what the July 13, 2015, Summary of Market Research found. That document used exactly the same words—with exactly the same lack of any support whatsoever – in making the unsubstantiated assertion about the unavailability of commercial or nondevelopmental items." (internal citation omitted). The court agrees that the language in the determination mirrors that of the Market Research Report, and, although slightly longer, the court agrees

---

[36] Although defendant refers to the July 1, 2016 document as a "D&F" the July 1, 2016 document is titled: "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed).

with Palantir that "[t]here is no evidence . . . to support this repeated assertion" of the unavailability of a commercial item sufficient to meet the Army's needs. Although the Determination of Non-Commercial Item cites the Requests for Information to support the finding that a commercial item was not available, the Administrative Record reflects that even the first Request for Information was seeking information for "development projects," and, therefore, the court does not consider the Requests for Information as demonstrable evidence that no commercial items were available. This is consistent with all the market research, and, on balance, the court disagrees with defendant that the market research was "clearly appropriate" to the circumstances. The focus of the market research was only on development and did not consider the possibility of commercial or nondevelopmental items. Although it is perhaps laudable that the Army issued three separate Requests for Information, as well as held multiple Industry Days, all of the market research appears to have been designed to elicit responses about the offerors developmental capabilities and did not address commercial items or seek information from respondents about their commercially available products even after commercially available alternatives were suggested to the Army in responses to the Requests for Information. The market research, therefore, was not appropriate for the circumstances because the market research did not appear to examine what, if any, commercial items were available.

As stated above, the standard articulated in the implementing regulations, after the needs of the agency are identified, is "[m]arket research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs." 48 C.F.R. § 10.002. As noted above, 10 U.S.C. § 2377(c)(2) provides that—

> The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--
>
> **(A)** meet the agency's requirements;
>
> **(B)** could be modified to meet the agency's requirements;
>
> **(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c)(2) (emphasis in original).[37] There does not appear to be any contemporaneous document in the Administrative Record, nor did defendant credibly

---

[37] As discussed below, as it relates specifically to Palantir, defendant argues that even if Palantir has a commercial item, it required too many modifications to meet the Army's needs. The court concludes, however, that the Army did not make even an initial determination of what commercial items might be available, much less whether or not the

argue that any such document exists, which evidences that the Army used the results of the market research to determine whether there were, in fact, commercial items available. Even if the statute did not state to the "maximum extent practicable," or the language to the "maximum extent practicable," allows for the broadest of discretion, as defendant appears to allege, or even if the only direction to agencies was to do what was "appropriate to the circumstances," the Army would not have met its burden to determine if commercial items were available to meet the Army's needs pursuant to 10 U.S.C. § 2377.

Defendant suggests that "Palantir asserts that the statute deprives the Army of discretion to define its requirements as it wishes." As a defense to the approach the Army took with the procurement at issue, defendant claims "agencies have substantial discretion to determine how best to acquire their requirements," and cites to Lockheed Missiles & Space Co. for the proposition that "[e]ffective contracting demands broad discretion." (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; emphasis removed).[38] The defendant also contends that Palantir fails to meet its heavy burden of demonstrating that the Army's substantial discretion was abused, or that there was any clear and prejudicial violation of statutes or regulations." Defendant cites to Savantage Financial Services, Inc. v. United States, 595 F.3d 1282, for the proposition that a protestor has the burden to show an agency decision "is so plainly unjustified as to lack a rational basis." Id. at 1287. Although the Army has substantial procurement discretion, it still must act in a rational, and legally compliant way when determining its requirements, including that the agency must comply with 10 U.S.C. § 2377.

In Savantage Financial Services, Inc. v. United States, the protestor challenged "the terms of a request for proposals from the Department of Homeland Security. . . . The request sought proposals to implement an agency-wide financial, acquisition, and asset management system. The request required proposers to offer a system that is integrated and currently fully operational within the federal government." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (internal reference omitted). By way of background, the Federal Circuit noted that:

> DHS was established in 2003 through the merger of 22 federal agencies. As a result of the merger, DHS inherited five different financial management software systems and a number of different acquisition management and asset management systems. The use of different financial systems within the agency has caused logistical difficulties and has been the subject of criticism and concern from federal auditors and lawmakers. As a result, DHS has devoted considerable effort to obtaining an integrated financial, acquisition, and asset management system. In January 2004, DHS

---

existing commercial items, such as Palantir's, could have been utilized or modified to meet the Army's needs.

[38] The proposition is a generally accepted principle for bid protests, but it does not offer unlimited discretion, as discussed above.

launched its first effort to integrate its financial systems through a project entitled Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency (eMerge$^2$). The plan underlying the eMerge$^2$ project was to purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components. That project was a complete failure; in December 2005, after spending $52 million with no discernible results, the agency abandoned the eMerge$^2$ program.

Id. (footnote omitted).  After the agency in Savantage attempted an improper sole source:

DHS spent 10 months conducting market research regarding the integration and implementation of financial systems in an effort to develop a new solicitation. The result was a new request for proposals, issued on January 9, 2009, and amended on February 14, 2009. The new request sought a financial, acquisition, and asset management system that "will be provided as an integrated solution that is currently fully operational in the Federal government."

Id. at 1285.  Before the Federal Circuit, the Savantage protestor claimed that "by requiring a system that is integrated and currently operational in the federal government, the new solicitation unduly restricts competition. Savantage contends that DHS's attempts to justify those requirements are based on conclusory statements lacking factual support in the administrative record." Id. After noting that agencies have discretion and procurement decisions are subject to highly deferential review, the Federal Circuit determined:

With respect to the requirement that the system be integrated, we agree with the trial court that it is "logical that [DHS] would want to ensure its success by seeking a fully integrated system, both on the basis of its own experiences and those of other agencies and departments." Savantage II, 86 Fed. Cl. at 706. As the administrative record amply shows, the failure of DHS's own eMerge$^2$ project—largely due to the contractors' inability to provide functional integration among components—underscored the risks of building an entirely new system using separate, unintegrated, off-the-shelf components. Internal DHS documents indicate that the Department responded to that failure by rejecting a piecemeal approach and electing to acquire a core financial system pre-integrated with other key systems. As we have held, an agency "has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review . . . [as CICA does not require the agency] to supply a historical record of failures to substantiate a risk."

Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1286 (quoting CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1355 (Fed. Cir. 2008)). The Federal Circuit continued:

On a question such as whether to implement a pre-integrated system or to build a system by beginning with a core financial system and then integrating other systems afterwards, an agency's preferences are entitled to great weight. As the trial court noted, "competitors do not dictate an agency's minimum needs, the agency does." Savantage II, 86 Fed. Cl. at 706. And determining an agency's minimum needs "is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004). We agree with the trial court that Savantage has failed to meet its burden of showing that the agency's decision to require a fully integrated system is so plainly unjustified as to lack a rational basis.

Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1286-87. Although defendant points to Savantage for support that it does not have to substantiate "its concerns in order to survive rational basis review," as noted above, there is a deficit in the Administrative Record in the above captioned protest of information to contemporaneously demonstrate how the Army reached the decision not to pursue commercial items.[39]

Although, as discussed above, 10 U.S.C. § 2377 does not have an explicit requirement to, or how to, document a decision after proper consideration of whether there are commercially available alternatives, in order to "survive rational basis review," the agency must be able to demonstrate how it rationally reached its decision. The limited information included in the Requests for Information, the Market Research Report, or even in the July 1, 2016 Determination, does not meet the minimal requirement of demonstrating that the defendant conducted a genuine inquiry that could enable it to reach a rational conclusion not to consider commercial items, even after Palantir had urged the Army to consider its product as a commercially available alternative. The statute at 10 U.S.C. § 2377 requires "[t]he head of an agency shall use the results of market research to determine whether there are commercial items." As noted above, the Market Research Report only stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A

---

[39] The court notes that the facts and history in each bid protest are unique. In Savantage, the prior procurement involved a plan to "purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components," and, as the Federal Circuit noted: "That project was a complete failure." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284. Regarding the DCGS-A Increment 2 procurement, the procurement indicated that it seeks to build on Increment 1 which is "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Unlike the plan in Savantage to purchase "commercial off-the-shelf software products," as alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

Increment 2 development effort cannot be procured as a commercial product."[40] This language in the Market Research Report is conclusory, and without any examples or support for the conclusions. The Market Research Report does not identify which respondents indicated commercial items were available, that Palantir had repeatedly tried to inform the Army of its capabilities to provide a commercial item, or that Palantir did, in fact, provide commercial items to other Department of Defense agencies.

In addition to requiring that an agency use the results of market research to determine whether there are commercial items available, 10 U.S.C. § 2377(c)(2), indicates that:

> [T]o the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--
>
> **(A)** meet the agency's requirements;
>
> **(B)** could be modified to meet the agency's requirements; or
>
> **(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c) (emphasis in original). Not only did the agency fail to explain or indicate what commercial items possibly were available or had been considered, the Market Research Report is devoid of any information regarding the possible commercial items that could be modified to meet the Army's requirements. As discussed below, defendant now claims that Palantir's data management platform would require too many modifications to meet the agency's needs, however, there is no evidence that the agency made such a determination after the market research was complete or prior to issuing the solicitation. The total absence of any discussion regarding commercial items, or possible modifications to commercial items, reinforces the court's understanding that the Army was focused on a developmental approach to the DCGS-A Increment 2 at an early point in the procurement process, to the exclusion of commercially available alternatives. Therefore, the Army did not comply with the requirements of 10 U.S.C. § 2377.

Defendant also cites to a pre-award decision in Tyler Construction Group v. United States, in which the United States Army Corps of Engineers used "Indefinite Deliver/Indefinite [sic] Quantity Contracts . . . for the design and construction of military

---

[40] Although the Market Research Report specifically mentioned Palantir, in the "RFI Respondent Capability Assessment," the Report only stated "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." (emphasis added). In addition to providing a cursory statement on the decision-making process regarding available commercial items, the Market Research Report also was searching only for evidence of past performance related to development.

buildings (barracks and related structures) in an eight-state area in the southeastern United States." Tyler Constr. Grp. v. United States, 570 F.3d at 1330 (internal reference omitted). The Tyler protestor, which did not submit a proposal in response to the solicitation, id. at 1331, contended that "the FAR does not authorize the use of IDIQ contracts for a major construction project," relying on "the anti-bundling provision of the Small Business Act, 15 U.S.C. § 631 (j)(3), which requires 'each Federal agency' to 'avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors,' and the similar limitation on 'consolidation' of procurement in 10 U.S.C. § 2382(a)." Tyler Constr. Grp. v. United States, 570 F.3d at 1332.  The Federal Circuit noted:

> The Corps was faced with an unusually large and novel procurement that had to meet the Army's unusual and demanding standards and requirements. The Army was seeking what the Corps viewed as "a fundamental change in military construction strategy designed" to make the Army "a more modular expeditionary and effective fighting force." Tyler Constr. Group., 83 Fed. Cl. [94], 95 [(2008)]. The Army's new approach to housing construction required a 20% reduction in cost and a 30% reduction in the time required until the facilities could be occupied."

Tyler Constr. Grp. v. United States, 570 F.3d at 1333-34.  In light of the unusually large and novel procurement,

> the Corps carefully studied, analyzed and evaluated the situation. It conducted a research program which included a nationwide forum, four regional fora, and "a specialized forum with representatives of the pre-fabricated/pre-engineered/modular construction industry, as well as the implementation of an internet-based research questionnaire." Tyler Constr. Group, 83 Fed. Cl. at 96. The Corps concluded that there was "an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale."

Tyler Constr. Grp. v. United States, 570 F.3d at 1334. The Federal Circuit determined:

> As we have noted, the Corps conducted extensive market research before determining that consolidation of the procurement requirements was "necessary and justified." We agree with the Court of Federal Claims that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes . . . the Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Id. at 1335 (quoting Tyler Constr. Grp. v. United States, 83 Fed. Cl. at 103) (emphasis in original). Therefore, the Federal Circuit determined:

> The Corps, like other federal procurement entities, has broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation. The Corps did not abuse that discretion in concluding that in the situation here, the use of IDIQ contracts to obtain this large military construction was the most appropriate method of proceeding and therefore best served the interests of the United States. Nor did the Corps violate or ignore any statutory or regulatory requirements, prohibitions or standards in so acting.

Id. at 1334. In the protest currently before the court, the Army did market research, including three Requests for Information, Industry Days, and one-on-one meetings with potential respondents and generated reports based on the information that it learned from its market research. Unlike the Corps in Tyler, in the procurement now at issue before the court, the Army did not comply with the requirements of 10 U.S.C. § 2377, and did not evaluate whether a suitable commercial item could meet the agency's needs, even after protestor Palantir attempted to offer such an alternative.

The court notes that the facts in the above captioned bid protest are unique and distinguishable from the facts in Savantage and Tyler Construction. While the record in Savantage demonstrated that the agency made multiple attempts to satisfy its requirements by using different procurement methods, including a commercial item and an attempted sole source approach, the Administrative Record in the above captioned protest demonstrates that the Army has been singularly focused on a developmental procurement. As also alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors." Similar to Savantage, in Tyler Construction, the agency demonstrated a genuine interest and openness to using the procurement approach that would best meet its needs for building and designing military buildings. The record in Tyler Construction indicated that the agency conducted market research and pursued industry input before deciding on the procurement method to use. Distinguishable from the agencies' actions in Savantage and Tyler Construction, in this bid protest, the Army conducted market research based on the presumption that the procurement would be developmental and the procurement decisions that followed were based on the same presumption to the exclusion of consideration of commercially available alternatives, even when such possible commercial items were identified to the Army.

In a supplemental brief, defendant argues that "[t]he market research demonstrated that only one industry respondent, [redacted], other than Palantir, supported reliance on GSA Schedule 70, applicable to commercial items, and recommended Increment 2 be procured utilizing commercial procedures." The number of respondents supporting a development approach or the number trying to offer a

commercially available alternative is irrelevant. Regardless if only two companies suggested commercial alternatives might be available, whether accurate or not, the Army was obligated, pursuant to 10 U.S.C. § 2377, to investigate, determine, and conclude whether an appropriate commercial item was available for all or part of the procurement. In fact, defendant's argument demonstrates that the Army was aware that commercial items were potentially available. The statute at 10 U.S.C. § 2377 instructs that that the Army should investigate whether commercial items to meet the agency's needs are available, or could be modified. This obligation is especially true if respondents such as Palantir or [redacted] identify such a possibility during the agency's own market research. As demonstrated above, the Army did not determine what commercial items were available or could be modified to meet the agency's needs, and, therefore, did not properly comply with 10 U.S.C. § 2377.

In this protest, the government was on notice that, at a minimum, at least two respondents claimed to have a commercial item to meet the Army's requirements. The Administrative Record reflects that Palantir repeatedly tried to inform the Army of its capabilities to provide a commercial item. In its response to the draft Performance Work Statement, and in response to the May 6, 2015 Request for Information, Palantir communicated to the Army that, "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claimed that such usage is currently employed "by tens of thousands of users across the DOD and IC" in order to further inform the Army of a commercial option for the procurement instead of the Army's developmental approach. In Palantir's response to the August 13, 2014 Request for Information, Palantir stated:

> The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(footnote omitted; emphasis in original). Palantir also emphasized, "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." Then, in response to the December 5, 2014 Request for Information, Palantir reiterated its belief in its ability to offer a commercially available alternative to the developmental approach chosen by the Army for the procurement, as an alternative to the Army's apparent developmental approach, explaining to the Army that:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time

and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's ability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Moreover in response to the question in the December 5, 2014 Request for Information: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," Palantir stated:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD, and the IC. However, the request for information on software services contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

Palantir again encouraged the Army to consider a commercial approach in its response to the May 6, 2015 Request for Information, stating:

> We believe the Government should select a proven solution that is measured on metrics derived from operational success. The data integration, visualization and analytic environment required for Increment 2 should use a fielded commercial solution that is accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DoD, IC, and commercial industry.

In its response to the May 6, 2015 Request for Information, Palantir also stressed that the Army might be too focused on a developmental approach at the expense of a commercial one, observing that:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.[41]

---

[41] Palantir also posed a question to the Army in its response to the May 6, 2015 Request for Information:

In each of the three responses to the Requests for Information, Palantir tried to convey to the Army that it could offer a commercial solution, and, in its view, that such was a preferable option to the developmental approach the Army was seemingly intent on pursuing.

The court notes that defendant argues that "Palantir USG responded to RFI No.2, but declined to answer question 3.0(d) in RFI No.2 or complete the Army's chart and identify its specific capabilities across the various DCGS-A domains listed." Defendant also points out that "Palantir USG declined to answer question 3.0(f) in RFI No.2," and that "Palantir USG declined to answer question 3.0(h) in Request for Information No.2." Palantir responded that "is not what the Army requested. Rather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts," and argues that "[t]here was no reason to do so again." (emphasis in original; internal citations omitted). The court agrees with Palantir that the Army's request was more specific than just identifying specific capabilities as Question 3.0(d) asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," and the headings of the table were:

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company Name)? |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Even if the court were to agree with defendant that Palantir did not fully respond to Question 3.0 of the December 5, 2014 Request for Information, that does not remove the Army's obligation to comply with 10 U.S.C. § 2377. Moreover, Palantir had already made its views on the availability of commercial items appropriate to this procurement clear in response to the August 13, 2014 Request for Information, and would do so again in response to the May 6, 2015 Request for Information. Furthermore, in response to the December 5, 2014 Request for Information, which defendant characterizes as incomplete, as noted above, Palantir still emphasized: "We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget," and, in response to Question 3.0, Palantir

---

Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?

highlighted "[o]ur commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients."

The defendant also points out that in the Market Research Report, the Army stated "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." The court first notes that of the 43 respondents to the December 5, 2014 Request for Information, the only one the Market Research Report labeled as "non-responsive" was Palantir. Moreover, the language of the Market Research Report reinforces the court's view that the Army was focused only on a developmental approach, and not on commercially available alternatives. Although Palantir was labeled "non-responsive" because it did not provide past performance examples related to the <u>development</u> of DCGS-A Increment 2, Palantir's goal during the entire market research process was to try to highlight for the Army the availably of its products on a commercial basis, not to provide examples of development contracts. The court notes that in its October 2015 response to the draft Performance Work Statement, Palantir was its most blunt:

> The Army has had multiple opportunities to change the strategy for Increment 2, satisfy Congressional intent, and deliver working technology to soldiers in months, not years. The Army should alter its strategy for Increment 2 to reflect the following realities:
>
> 1. The first priority of Increment 2 should be the rapid delivery of a foundational data platform;
>
> 2. The Army does not need to build that platform, as it can buy it today; and
>
> 3. The Army should use FAR Part 12 commercial contract structures to buy this platform.

Concurrently, in its response to the draft Request for Proposals in October 2015, Palantir also bluntly informed the Army:

> The Army has not corrected critical deficiencies in the overall acquisition structure of Increment 2. As written, Increment 2 will commit the Army to an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program. Increment 2 will commit the Army to the same lengthy, high-risk development effort that failed in Increment 1. We have offered our feedback to program leadership at every step of the Increment 2 process because we want the Army to succeed. But ultimately it is not in our interest or in the Army's interest for it to commit to a program that so clearly violates fundamental principles of successful enterprise software delivery.

In addition, the Administrative Record reflects three separate Operational Needs Statements requesting Palantir's data management platform. Two of the Operational Needs Statements were from 2014, and the most recent request, from the [redacted], was from February 2015. The February 2015 request was from [redacted] requesting the Palantir Gotham Platform, stating that "[t]he Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations," and concluding that "Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units [redacted], as well as various U.S. Government agencies."

The Army was, or should have been, aware of Palantir's data management platform from the requests from other Department of Defense personnel who were utilizing the Palantir product, or seeking permission to use Palantir's data management platform, as well as from Palantir's submissions in response to the Requests for Information. Also included in the Administrative Record before this court are numerous contracts with the Department of Defense and other federal agencies for which Palantir's data management platform was utilized. Regarding the Department of Defense contracts which utilized Palantir's product, the contracts could have, or should have, been identifiable by the Army, during the market research process and known, as well as reviewed by the Army, before it made a determination that no commercial item was available to meet the agency's needs.[42] The Administrative Record also reflects that, at a minimum, the Army was aware of at least three such contracts, as shown in Palantir's response to the August 13, 2014 Request for Information, in which Palantir asserted that "[t]he most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP)," and informed the Army:

> Examples of FFP contracts include our work at the U.S. Marines [sic] Corps, where enhancements are included as part of our regular software releases and small business [sic] fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA [Blanket Purchase Agreement] for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC [intelligence community] agencies and affording a COTS solution at a FFP.[43]

---

[42] The court notes that two of the contracts included in the Administrative Record were executed in 2016, and, therefore, after the market research was conducted and after the solicitation was issued.

[43] The court also points out that the parties in this litigation have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that "[g]overnment agencies have procured the Palantir

Also, in response to the third Request for Information, Palantir communicated to the Army that:

> In cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command,[44] representing over 15,000 accounts at peak usage across the Marine Intelligence community. Palantir helps the Marine Corps implement these deployments with the support of only eight total contractors. The very small ratio of contractors to military users demonstrates the sustainability of the Palantir platform across a large enterprise.

Finally, the court notes that, in the Army's January 7, 2015 Increment 2 Information Paper, in considering the key objectives of Increment 2, which included "Modernize the Data Enterprise to a Data Integration Platform," the Army specifically identified the possibilities of "a commercial stand-alone solution (Palantir, IBM)" for a way to "deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A." (emphasis added). Therefore, almost a year prior to the decision to issue the solicitation, the Army specifically identified a possible solution utilizing a commercial item, and had specifically named Palantir as offering "a commercial stand-alone solution." Despite this, the Administrative Record reflects an absence of Army correspondence with Palantir regarding any follow up to review Palantir's capabilities or even obtain an in-depth description of Palantir's capabilities.

Given the protestor's multiple responses to the Requests for Information, the multiple references to the existing government contracts for Palantir's commercial platform, and the Operational Needs Statements, the Army was demonstrably aware of the possibility of a commercial option for the procurement and appears to have chosen early on to pursue a developmental option instead. As noted above, defendant repeatedly argues that:

> There are no statutory or regulatory requirements that address that mention [sic] which acquisition strategy is in the best public interest. Indeed, adopting Palantir's position, *i.e.*, the Army must base its acquisition strategy

---

Gotham Platform and related services on a commercial item basis."

44 The Performance Work Statement for one of the Palantir's United States Marine Corps contract, Contract No. N00104-13-A-ZF34-V782, indicated that:

> Palantir USG Incorporated will be providing supplies and services to the United States Marine Corps (USMC) units. The Palantir software will be operating on the Secret Internet Protocol Router Network (SIPRNet), the Nonsecure Internet Protocol Router Network (NIPRNET), identified coalition networks, and with the potentiality of Joint Worldwide Intelligence Communication System (JWICS) installations of Palantir software post contract award.

here on speculation as to what modifications Palantir might deem appropriate to develop for the Palantir Gotham Platform would be folly as it would switch the roles here by making Palantir the master of determining the Army's acquisition needs.

The court does not agree with defendant's characterization that fully considering the available commercial options would make "Palantir the master of determining the Army's acquisition needs." The Army had a statutory obligation to consider whether the commercially available options could meet all or some of the Army's requirements, especially when the Army was explicitly informed of the possible availability of commercial options. At no point in this opinion does the court state that the Army must accept Palantir's data management platform. The court only determines that the Army failed in its obligation under 10 U.S.C. § 2377 to fully investigate if Palantir, or any other potential offeror, could meet the requirements of the Army's procurement needs on a commercial basis, in part or in full. In sum, the Army had a statutory obligation to consider commercial items before issuing the developmental solicitation and failed to do so. The Army's failure to conduct a proper 10 U.S.C. § 2377 evaluation was "so plainly unjustified as to lack a rational basis." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1287.

Without a doubt, there are circumstances in which it is clear that a "commercial alternative" offered by a prospective commercial bidder is not suitable for a procurement. The overwhelming evidence in the Administrative Record in this protest, however, demonstrates that the Army was on notice of a realistic, possible, commercially available alternative product, placing the onus on the Army to more fully consider the potential commercial options suggested before pursuing a developmental only approach to the procurement. The Army did not do so, and, therefore, acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to full investigate possible commercially available alternatives to meet the requirements of the Army's acquisition.

National Defense Authorization Act for Fiscal Year 2016

Palantir raises an additional issue regarding 10 U.S.C. § 2377. Palantir notes that "Congress recently gave the Army specific instructions with respect to the application of § 2377(c) to DCGS." (internal reference omitted). According to Palantir, the National Defense Authorization Act for Fiscal Year 2016 instructs the Department of Defense to issue guidance regarding 10 U.S.C. § 2377 to prohibit agencies from entering into contracts for "information technology products or services that are not commercial items unless the head of the agency determines in writing that no commercial items are suitable to meet the agency's needs." National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 855(a)(1), 129 Stat. 919 (2015).[45] Palantir argues that "Palantir's

---

[45] Relatedly, Palantir points to an additional requirement in the National Defense Authorization Act for Fiscal Year 2016 at section 222, which instructs that "[t]he Secretary shall submit to the appropriate congressional committees a report on the review of the distributed common ground system of the Army conducted under subsection (a)(1)." National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 222(a)-(b), 129

understanding is that the Army issued the § 222 report only after Palantir filed its notification of intent to file this lawsuit, and the Army has still not issued the issued the [sic] § 855 guidance despite a January 23, 2016 deadline." (footnote omitted). Defendant responds that "there is substantial question whether such provisions apply to the DCGS-A Increment 2 procurement," arguing that the National Defense Authorization Act for Fiscal Year 2016 "requires a determination, before contract award, that for a contract (a) in excess of the simplified acquisition threshold and (b) for 'information technology products or services that are not commercial items,' that no commercial items are suitable to meet the agency's needs as provided in subsection (c)(2) of section 2377 of title 10." Defendant claims that "Palantir fails to demonstrate any clear and prejudicial violation of the provisions of NDAA, Fiscal Year 2016," because "the provision relied upon by Palantir is applicable only before contract award. There has been no contract award for DCGS-A Increment 2, and protest grounds that merely anticipate improper agency action are speculative and premature." (footnote omitted). Defendant also argues that "the fact that the guidance contemplated by the act has not yet been issued by the Department of Defense does not give Palantir any rights." As the court has found that the agency acted arbitrarily and capriciously in violation of 10 U.S.C. § 2377, the court does not need to determine if Palantir can rely on the National Defense Authorization Act for Fiscal Year 2016 to support its argument that the Army violated 10 U.S.C. § 2377.

Prejudice

Having determined that the agency acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to fully investigate the commercial availability of products that could meet at least some of the requirements of the procurement, the court proceeds to the next step of the bid protest analysis, "to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d at 1351; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367. As noted in FirstLine Transportation Security, Inc. v. United States, 107 Fed. Cl. 189 (2012):

"Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. [Bannum, Inc. v. United States, 404 F.3d] at 1353, 1358. This prejudice determination is based on the same standard as the initial one made at the standing stage; however, at this step, the plaintiff must prove its allegations by a preponderance of the evidence. Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 207 (2011); Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011). Thus, in order to prevail on the merits, Plaintiff must demonstrate, by a preponderance of the evidence, that the unlawful or irrational terms in the solicitation caused it to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, 575 F.3d at 1362.

---

Stat. 919.

FirstLine Transp. Sec., Inc. v. United States, 107 Fed. Cl. at 197; see also Gear Wizzard, Inc. v. United States, 99 Fed. Cl. 266, 273 (2011) ("[T]o establish prejudice in the context of a pre-award bid protest, the plaintiff must show only 'that an unreasonable agency decision created a non-trivial competitive injury which can be redressed by judicial relief.'") (quoting Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007), rev'd on other grounds, Weeks Marine, Inc. v. United States, 575 F.3d 1352 (Fed. Cir. 2009)).

As earlier determined by this court after the protest was filed, Palantir had standing to proceed to the merits of the above captioned protest.  See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Palantir now bears the burden, by a preponderance of the evidence, of demonstrating that it was prejudiced by the actions of the Army and the Army's actions caused Palantir to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. As indicated above, this is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Defendant argues that Palantir did not offer a "proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal." Defendant argues that "both the Army market research requests and the RFQ solicitation requirements were applied equally to all parties. Palantir, by failing to respond fully to Army Request for Information No.2,[46] and by failing to submit a proposed solution that would meet all of the Army's requirements in response to the RFP, 'becomes a stranger to the process, and is disqualified from the procurement,'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009)), and, "[a]ccordingly, Palantir fails to establish prejudice." Defendant also argues that "Palantir's assertion of prejudice is further attenuated by the fact that the Army has received multiple proposals in response to the solicitation. Palantir cannot demonstrate that 'but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d at 1378) (internal citations omitted). [47] In response, Palantir argues that "[t]he Government's contentions are uniformly wrong and they ignore Palantir's claims. . . . [T]he Army's Solicitation

---

[46] Although defendant's briefs suggests that the failure to respond to the Request for Information might disqualify Palantir from the solicitation, at oral argument, counsel for the defendant admitted that "I don't think it's a finding that they couldn't qualify. All it is is a statement of fact . . . that they didn't respond. That's all it is." Moreover, the court agrees with Palantir that "[b]ecause the Government itself made clear that there was no legal significance to responding to or even failing to respond to the RFI and that it was purely for information-gathering purposes, the Government has no basis for arguing that Palantir's RFI response somehow barred Palantir from the procurement."

[47] Defendant alternatively claims that "[a]pplication of the alternative 'non-trivial competitive injury' test should also result in a determination that Palantir does not have the requisite economic interest to establish prejudice."

prejudiced Palantir by preventing it from offering to provide a commercial item to meet the Government's requirements."

The court first notes that, as a pre-award protest of a solicitation, it considers the proper standard for prejudice to be a "non-trivial competitive injury which can be addressed by judicial relief" and not the "but for" standard.  Moreover, the court believes that the failure to submit a proposal is not dispositive in this case.  As the court determined in the earlier opinion, Palantir timely filed a protest in this court before the Army made an award.  See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Furthermore, the Army failed to properly conduct an evaluation as to whether commercial items were available to meet any of the requirements of the solicitation, and issued the solicitation as a developmental requirement, with no opportunity to respond to the solicitation with an offer of a commercial item for all, or part of, the solicitation. Palantir's failure to submit a proposal in response to a developmental solicitation in this protest does not preclude Palantir from challenging the nature of the solicitation on a pre-award basis, nor does it prevent a showing of prejudice. Palantir contends that defendant's representation that "the Army has received multiple proposals in response to the development solicitation," is not relevant. The court agrees with Palantir that "[t]he fact that Palantir did not submit a proposal is irrelevant in this protest because the very illegalities that Palantir challenges prevented it from doing so." The court also agrees with Palantir's observation that although the Army received multiple proposals, those "proposals responded to a solicitation that sought proposals for a development effort on a cost-plus basis, not a solicitation for commercial items on a fixed-price basis." Palantir did not respond to the developmental solicitation also because the solicitation required the winning bidder to comply with Cost Accounting Standards (CAS) and to have in place an Earned Value Management System (EVMS). "As an offeror of commercial items on a fixed price basis, Palantir does not have in place the cost accounting standards and procedures, including CAS and EVMS, that are common among the typical defense contractors that engage in extensive 'cost-plus' developmental work."[48] Palantir's "failure" to submit a proposal was because the Army only offered a developmental solicitation that contemplated award of a cost plus contract, without consideration of a commercial item alternative on a firm-fixed price basis.

The parties both agree that, "[w]ithout a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue," as explained in  Labatt Food Service, Inc. v. United States, 577 F.3d at 1381. Although defendant cites Labatt for support that "Palantir also did not submit a proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal," Palantir cites the language of Labatt to demonstrate that "harm specific to the asserted error" is "the loss of the ability to bid to supply commercial items as the result of defects in the Solicitation." The court believes the foregoing discussion

---

[48] The solicitation at issue in this bid protest contemplates the award of a cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts.

demonstrates that Palantir lost the opportunity to offer the Army commercial items because of the developmental approach the Army took in designing the DCGS-A Increment 2 solicitation, to the exclusion of consideration of commercial items. As demonstrated above, Palantir identified a possible, commercially available product and tried to encourage the Army to consider commercial items, to no avail.

Palantir claims that "Palantir also has demonstrated the requisite economic interest. Palantir has sustained a non-trivial competitive injury because the Government's illegal actions have prevented it from bidding to satisfy the requirements of the DCGS-A program by providing commercial items." Defendant asserts that Palantir has not demonstrated a "non-trivial competitive injury," as Palantir "has not demonstrated that it could have and would have submitted a proposal with a solution that met all of the Army's requirements with only commercial or nondevelopmental items." To meet the prejudice requirement, Palantir must make a showing that its commercial capabilities could be sufficient to allow Palantir to offer a product which could meet all or part of the DCGS-A Increment 2 procurement. In considering if Palantir potentially could meet the requirements of the DCGS-A Increment 2 procurement, the court looks to the information in the Administrative Record. Most significantly, the court looks to the admitted[49] expert report of Bryant Choung, his deposition testimony, and to the expert report and deposition testimony of defendant's expert, Shaun Cronen. In his expert report, Mr. Choung[50] stated that "Palantir offers a data management platform that meets the Army's needs," (emphasis removed), Mr. Choung specified that:

The data integration layer is both interoperable with existing intelligence systems and capable of integrating the various types of data that the Army has stated that it wishes to include in its system, including both the data handled by DCGS A-Increment 1 (DCGS-A1) as well as the additional data sources and systems contemplated by the DCGS-A2 requirements.

Regarding Palantir's data management platform, Mr. Choung explained that:

---

[49] As explained above, defendant moved to strike Mr. Choung's expert report, which the court denied. Mr. Choung's expert report is a part of the Administrative Record, and now properly before the court and available for the court's consideration.

[50] As noted above, the court acknowledges that Mr. Choung is an employee of Palantir. As noted in his expert report:

From July 2012 to the present, I have been the Global Defense Engineering Lead for Palantir Technologies Inc. and its domestic subsidiary corporations, including Palantir USG, Inc. In that role, I am responsible for the deployment and management of the Palantir Gotham Platform as a functional Data Management Platform for clients in the Department of Defense (DOD) and the Intelligence Community (IC), with primary responsibility for clients in the United States Army and Special Operations Command (SOCOM).

Palantir has designed the Palantir Gotham Platform to be as flexible as possible with respect to the types and formats of data it can ingest and bring into the Palantir Gotham Platform. As a result, the Palantir Gotham Platform allows a user to integrate, analyze, and visualize HUMINT, SIGINT, GEOINT, MASINT, weather, and any other type of data.

Mr. Choung also explained[51] that:

[B]ecause the Palantir Gotham Platform satisfies the Army's need for a Data Management Platform, the Army could have contracted with Palantir (or another commercial provider with similar open and interoperable capabilities) to acquire a Data Management Platform and then entered into a separate contract (or multiple contracts) to acquire any additional enhancements, configurations, or modifications that the Army may have wanted.

At his deposition, Mr. Choung noted that "[t]hose could be requirements that are supported by the data management platform, but that are enhancements or would be enhancements or additional configurations, rather, for the data management platform." Defendant takes issue with Mr. Choung's claims, and specifically argues that it is unclear whether Palantir can in fact deliver a commercial product to the Army that meets the Army's requirements. In arguing that Palantir cannot provide the Army with a product on a commercial basis, defendant cites to the definition of a commercial item in the FAR.  As noted above:

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

---

[51] Similarly, Mr. Choung explained that:

[T]he Army could have acquired a Data Management Platform to meet the needs that it describes as the "architectural foundation" of DCGS-A2, by acquiring the Palantir Gotham Platform as a commercial item on a fixed-price basis. In addition, the Army could have acquired both the Data Management Platform from the commercial marketplace *and* modifications necessary to fulfill any other requirements by procuring a commercial item on a fixed-price basis. Like most software, the Palantir Gotham Platform is readily extensible and can be configured for the customer environment in which it is operating.

(emphasis in original).

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101.

Before this court, the government tries to argue that the definition of a commercial item is a narrow one, and, it appears even more narrow than the one the Army used in the July 1, 2016 Determination of Non-Commercial Item. As noted above, the Determination of Non-Commercial Item concluded,

> based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

At oral argument, however, defendant's counsel suggested that the language of "Modifications of the type customarily available in the commercial marketplace" and "Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements" in 48 C.F.R. § 2.101 must be read together, despite the clauses being separated by an "or." Defendant's counsel stated that: "I understand, it is 'or,' but it talks about customarily available in the commercial marketplace," and "the language is very similar where it talks about being customarily available in the commercial marketplace." Defendant's counsel stated:

> I recognize it's an 'or.' I am saying that you should read them together because you see the same long, [sic] "customarily available." What we're

saying is that in terms of construing customarily available in the commercial marketplace, that's not -- that's not a government contract. That's not making modifications in order to meet government-peculiar requirements.

Despite defendant's counsel's argument, the court interprets the "or" as not requiring all subparts to be read together.[52] Moreover, even considering defendant's more restrictive version of 48 C.F.R. § 2.101, Mr. Choung's supplemental declaration indicates Palantir's products would meet the requirements with only minor modifications. Mr. Choung identified 898 requirements in the solicitation, and stated that for 581 of them, Palantir could meet those requirements "out-of-the-box," without any configuration work or enhancements or even minor modifications, "or by any other commercially available Data Management Platform," "on a commercial item, fixed-price basis." Regarding an additional 242 requirements, Mr. Choung stated Palantir could meet those requirements "through customary configurations and installations of existing helpers," with a process that "typically takes at most a matter of hours, and often less, because it just requires Palantir to plug the enhancements into the platform." Mr. Choung explained:

> Palantir customarily deploys the Palantir Gotham Platform into a customer's environment by installing and configuring the platform and plugging in existing "helpers." I explained this during my deposition when I stated: "There is a process by which we plug in our helpers into the environment, and the process by which we take our entire data management platform and plug it into the customer environment. That's called deployment, installation, configuration."

Therefore, Mr. Choung concluded, "through its 'out-of-the-box' capabilities and through customary configurations and installations of existing helpers, Palantir would satisfy a total of 823 of the 898 PBS [Performance Based Specifications] requirements," and "Palantir could meet these [additional] 75 requirements by providing 'new helpers' on a commercial item basis."[53]

---

[52] If the court believed a statutory construction analysis was required, the court notes the first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)), and "[a]s with any question of statutory interpretation, our analysis begins with the plain language of the statute." Jimenez v. Quarterman, 555 U.S. 113, 118 (2009). It is apparent to the court that plain language of "or" is, as the New Oxford American Dictionary indicates, "used to link alternatives," "otherwise," and "either." See New Oxford American Dictionary 1232.

[53] In his expert report Mr. Choung also offered the following opinion referring to the defendant's conclusions that Palantir could not meet the Army's requirements: "It is my expert opinion that the conclusions in these documents are wrong; all of these capabilities are available through the commercial marketplace—at a minimum, they are available from Palantir, which is able to provide each of these functions through the Palantir Gotham Platform on a fixed-price commercial item basis."

Addressing the defendant's expert witness, Shaun Cronen, Mr. Choung also stated that defendant's designated expert "Mr. Cronen has not offered any valid technical reason why the Army has chosen to develop software products that are available for purchase as commercial items in the commercial marketplace."

Defendant's expert witness, Shaun Cronen, stated in the defendant's expert report:

After reviewing Palantir's submitted documentation, Mr. Choung's Expert Report, listening to Mr. Choung's Deposition on 11 AUG 2016, as well as the documentation I reviewed on Palantir's public website, coupled with my previous experience with the Palantir Gotham Platform, and information provided on Palantir's other contracts, there is insufficient information that demonstrates that the Palantir Gotham Platform fully meets the DCGS-A Increment 2 Requirements as laid out within the five subfactors for technical evaluation within the DCGS-A Increment 2 Solicitation (i.e. Data Architecture, Fusion Data Analytics, Interoperability, Visualization Framework and Usability, and Data Rights), nor is there information that demonstrates that the Palantir Gotham Platform is compliant with all the requirements within the Performance Based Specification (PBS) and can be successfully tested as per the Formal Qualification Test (FQT) task within the Base Performance Work Statement (PWS).

(internal reference omitted). Palantir responded that the

Army's expert (a) makes no effort to dispute Mr. Choung's conclusion that there is no technical reason why the Army could not practicably have met its core need for a Data Management Platform by acquiring the Palantir Gotham Platform on a commercial item basis, (b) does not identify any DCGS-A2 requirement that he has determined Palantir is incapable of doing.

(internal citations omitted). Regarding the defendant's expert, it does not appear that Mr. Cronen conclusively stated that Palantir could not provide a data management platform, or that it is not compliant with "all the requirements." Therefore, it appears defendant has not conclusively stated that Palantir could not meet at least some of the requirements for DCGS-A Increment 2 through a commercial item. Moreover, it is the Army's failure to fully explore the commercial availability to determine if Palantir or any other entity could meet the agency's program requirements that is at issue here. Defendant's actions, at a minimum, put Palantir in a position in which it was unable to succeed regarding the DCGS-A Increment 2 procurement the moment the Army chose a developmental only approach without fully exploring the possibility of commercially available alternatives,

Defendant also notes that, on October 21, 2015, Ms. Shyu, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System

(DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," which determined:

> [T]hat a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

The court first notes the Determination & Findings does not address 10 U.S.C. § 2377, but instead, is only the justification for exceeding the DFARS stated maximum amount for a single source contract. Further, although the Determination & Findings does state "the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work," the determination is premised on a single, integrated developmental contract. The Determination & Findings stated that: "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." (emphasis added). The Determination & Findings does not consider utilization of a commercial item, and, therefore, is not useful to demonstrate that modifications to Palantir's commercial platform would be inappropriate or inapplicable to the procurement at issue.

> Finally, defendant argues that DCGS-A Increment 2 is
>
> not only a Data Management Platform, as Palantir argues. The total requirements for DCGS-A Increment 2 are compiled in three documents, which should be read together: (1) the Capabilities Development Document; (2) the Requirements Definition Package; and (3) and the Performance Based Specification.   Palantir ignores the "glue code," addressed by Stephen Morton, Deputy Product Manager, that must be built to tie everything together. Increment 2 includes a Data Integration Layer, without which the whole software system, including a Data Analytics Platform, could not function.

(internal citations omitted). Defendant emphasizes that it "is key to the development of DCGS-A Increment 2 that all of the components and respective subcomponents be selected or built with interoperability and usability throughout the lifecycle of the software development process." In his expert report, Mr. Choung took issue with this characterization and stated that:

> [I]tems in the PWS [Performance Work Statement] relate to the Army's core need for a Data Management Platform and could be satisfied by the procurement of Palantir's Data Management Platform without the need for additional enhancements, configurations, and modifications. Other items relate to the Army's decision to *develop* a Data Management Platform rather than acquire one in the commercial marketplace and thus would be

irrelevant if the Army elected instead to procure a Data Management Platform in the commercial marketplace. As to the remaining items, Palantir could readily configure or enhance its platform to provide those items on a firm fixed-price basis.

(emphasis in original). Even if defendant turns out to be correct, which remains speculative at this point, the Army failed to explore whether commercial alternatives were available, including the one offered by Palantir. Alternative commercial products were not reviewed before the decision was made that a developmental solicitation would be issued. It appears that Palantir potentially could have submitted a product that would have met some, or all, of the agency's needs. The loss of that opportunity resulted in a non-trivial competitive injury.

Therefore, based on the Administrative Record, including Mr. Choung's representations in his expert report and deposition testimony, the court determines that the Army's actions caused Palantir to suffer a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. Despite this conclusion, the court does not reach a determination as to whether Palantir, in fact, can offer a commercial item that can meet some, or all, of the requirements for Army's DCSG-A Increment 2. The Army failed to conduct a proper commercial availability evaluation in the first instance, and this court should not make one in its place. In this decision, not only is the court not taking a position on whether or not Palantir can offer the Army an appropriate commercially available alternative, nor does the court instruct the Army to accept Palantir's data management platform. As noted by the Federal Circuit in Savantage, determining an agency's minimum needs "'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. at 662); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1384.

Just as the court will not second guess the program requirements of the Army, the court will not dictate to the Army the specifics of how to conduct a proper commercial availability determination in accordance with 10 U.S.C. § 2377. Palantir, in its submissions to the court and in the multiple conferences and arguments before the court, has represented that if only given the opportunity to present its capabilities to the Army, Palantir could demonstrate how it meets or exceeds the Army's requirements for the DCGS-A Increment 2. Given the failures to properly conduct an analysis pursuant to 10 U.S.C. § 2377, and reach a considered, commercial availability determination, as well as the unfortunate conduct of some of the Army personnel reflected in the Administrative Record, it would be wise for the Army to seriously consider reviewing the commercially available products of Palantir, or any other potential offeror, before concluding that no commercially available product can meet the Army's requirements.[54]

---

[54] Palantir also points to the deposition of defendant's expert for support than Palantir might have some additional capabilities to offer, if given the opportunity. Mr. Cronen had the following exchange with Palantir's counsel:

Permanent Injunction

Having found that the Army failed to properly determine, pursuant to 10 U.S.C. § 2377, whether there are commercially available items suitable to meet the agency's needs for the procurement at issue, and having found that by its failure to do so, the Army acted in an arbitrary and capricious manner, the court turns to consider whether Palantir is entitled to the injunctive relief that it seeks, and, if so, the scope of such relief. As noted above, Palantir requests that this court "[e]nter a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations." Palantir asserts that, at a minimum, the Army should issue "a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements."

As discussed above, this court has jurisdiction to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2). In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, 389 F.3d 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 649 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 34 (citing Centech Grp., Inc. v. United States, 554 F.3d at 1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369

---

Q. I'm not asking you to give an opinion about all of them. Don't you think -- DIB upgrade, DIB interface, interoperability, those are all issues relating to increment 2. And there is some overlap between those, isn't there, and what would have been evaluated if this SIL [Systems Integration Laboratory] evaluation had been done in a comprehensive fashion?

A. I think that probably would have demonstrated some of the additional increment 2 requirements.

(2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010); see also Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

In the above captioned pre-award bid protest, as discussed above, Palantir has established success on the merits by demonstrating that the Army acted arbitrarily and capriciously when the Army failed to determine, in accordance with the requirements of 10 U.S.C. § 2377, whether there were commercially available items suitable to meet the Army's procurement requirements prior to issuing the solicitation at issue. Having concluded that Palantir has succeeded on the merits of its bid protest, the court considers the additional factors to determine whether Palantir is entitled to a permanent injunction. Palantir alleges that it will suffer irreparable harm if the court does not issue an injunction and that the balance of the hardships and the public interest weigh in favor of granting an injunction. Defendant argues that Palantir has not demonstrated irreparable harm, that the balance of hardships does not weigh in Palantir's favor, and that an injunction will not serve the public interest.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is

established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 245 (citing several cases); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), motion to amend denied, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.")); see also KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828. According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 696 (2012))); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 552–53 (2011).

Palantir argues that it "will suffer irreparable harm if the Court does not issue an injunction" and stop the Army from proceeding with a contract award under the current solicitation. Palantir asserts that "[a]bsent such relief, Palantir will be deprived of an opportunity to compete for the DCGS-A2 contract, which in and of itself constitutes irreparable harm." Defendant argues, however, that Palantir could have competed for the DCGS-A Increment 2 contract by submitting a proposal in response to the solicitation, but Palantir voluntarily chose not to do so. According to defendant, this "is not a case where a potential offeror was prevented or precluded from submitting a proposal in a competitive procurement because of agency action." Defendant argues that "Palantir had an opportunity equal to all other potential offerors to tender a technical proposal that would meet the DCGS-A Increment 2 requirements," but that Palantir "made their own business choices" not to compete. According to defendant, because Palantir chose not to submit a proposal in response to the solicitation, Palantir cannot now argue that it will be irreparably harmed if it is not able to compete for the contract.

Although defendant is technically correct that Palantir could have submitted a proposal in response to the solicitation in order to participate in the DCGS-A Increment 2 competition, as described above in the prejudice analysis, it is a somewhat disingenuous argument. Because Palantir was attempting to offer the Army a commercially available product, once the solicitation was designed only as a developmental solicitation, Palantir was not able to meaningfully compete for the contract award. Even if Palantir had submitted a proposal offering a commercial item, that proposal would not have complied with all the solicitation's material terms because the solicitation at issue in this bid protest contemplates the award of a developmental, cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts. Many of these clauses,

including a clause requiring compliance with Cost Accounting Standards, would not be included in a firm-fixed price contract to procure a commercial item.[55] As Palantir asserts, it is only an "offeror of commercial items on a fixed price basis," thus, "Palantir does not have in place the cost accounting standards and procedures" that the solicitation required. It is well-established in this court that "a procuring agency may only accept an offer that conforms to the material terms of the solicitation." Furniture by Thurston v. United States, 103 Fed. Cl. at 518. Defendant's argument that Palantir simply chose not to submit a proposal in response to the solicitation does not reflect the nature of the solicitation, the strict requirements of the solicitation as issued, or the award process set out in the solicitation. Moreover, as demonstrated throughout this opinion, Palantir advised the Army on multiple occasions, in advance of the issuance of the solicitation, that it was trying to offer a commercially available product to meet the agency's needs.

Palantir also asserts that "[i]f the Army is permitted to proceed with an award under the Solicitation, Palantir . . . would lose the opportunity to earn revenues and profits from the potential sale of the Palantir Gotham Platform to the Army." Without an injunction, the Army likely will award, in the near future, a contract to develop the DCGS-A Increment 2 to an offeror who submitted a developmental proposal in response to the solicitation, as represented to the court by the Army's representatives. That pool of offerors does not include Palantir. Thus, Palantir would have lost the opportunity to compete for the DCGS-A Increment 2 contract for the life of DCGS-A Increment 2 developmental contract, which could extend for five years or more.

Additionally, a contract award will diminish, if not entirely quash, the likelihood that Palantir will have the opportunity to compete for a future commercial item contract with the Army to satisfy the DCGS-A Increment 2 requirements. Once the Army executes a contract to develop DCGS-A Increment 2, it would appear to be a significant period of time before the Army would seek commercial items related to DCGS-A Increment 2. If the agency is permitted to move forward with awarding a contract based on the solicitation issued on December 23, 2015, Palantir will have been deprived of an opportunity to compete for the contract award. As a result, Palantir will likely lose any potential profits it would have earned from selling its commercial items to the Army in order to satisfy the DCGS-A Increment 2 requirements. Moreover, the loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and

---

[55] The solicitation incorporates FAR clause 52.230-2, Cost Accounting Standards. Certain contracts are, by regulation, exempt from FAR clause 52.230-2, Cost Accounting Standards, including firm-fixed price contracts awarded on the basis of adequate price competition without submission of cost or pricing data. See 48 C.F.R. § 9903.201-1 (2016). An agency issuing a firm-fixed price contract awarded on the basis of adequate price competition cannot require an offeror to be compliant with FAR clause 52.230-2. To that end, when purchasing commercial items, agencies are required to use firm-fixed price contracts. See 48 C.F.R. §12.207 (2016). Put together, these rules direct that a contract to acquire commercial items normally will be a firm-fixed price contract, which is by regulation exempt from complying with FAR clause 52.230-2, Cost Accounting Standards.

opportunity to work with the Army for the DCGS-A Increment 2. See BINL, Inc. v. United States, 106 Fed. Cl. at 48 ("Irreparable harm is established by a lost opportunity to fairly compete."); see also Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. at 544. Palantir's lost business opportunity and loss of potential profits establishes irreparable harm.

Assessing the balance of hardships between the parties, the court recognizes the possible negative impact on the Army if the DCGS-A Increment 2 contract award is delayed. As indicated in the Administrative Record before this court, the Army appears to have a functioning system, albeit defendant has indicated that the system would benefit from an update. If no injunction is issued, however, then Palantir will be foreclosed from the opportunity to submit a proposal for the DCGS-A Increment 2 contract likely for at least five years. According to defendant, the "balance of hardships substantially tips in the Army's favor." Defendant asserts that "[t]he harm to the Government from enjoining award of a DCGS-A Increment 2 contract is substantial and greatly outweighs any asserted injury to Palantir." Defendant asserts that the "Court should defer to the military's professional judgment concerning both the risks and harms posed by enjoining the award of a contract for the DCGS-A Increment 2 procurement." Defendant submitted the declaration of Colonel Robert Collins to address the impact of a permanent injunction on the Army. Colonel Collins is the Project Manager for the DCGS-A programs and is "the Army's point of contact for the entire DCGS-A family of systems." According to Colonel Collins' declaration, a delay in the procurement of DCGS-A Increment 2 will negatively affect "the program by delaying the needed capabilities for enhanced situational awareness for military analysts and commanders." In his declaration, Colonel Collins stated:

> The enhanced DCGS-A, Increment 2, is needed to retain the interoperability of existing systems and bring on emerging Intelligence data feeds, which are expected to have significantly larger volumes of data. . . . The new DCGS-A Increment 2 DMA is desperately needed to improve data synchronization across all Army echelons. DCGS-A Increment 2 will implement cyber security measures to protect and monitor data access and activities to a significantly larger degree than the current DCGS-A Increment 1 is even capable.

Colonel Collins also stated that "[i]f the court issues an injunction enjoining the Army from awarding the contract, then the Army will be forced to use and maintain the existing Increment 1 systems," which "will become increasingly difficult to keep up with as technology becomes unsupportable over time."

Notwithstanding Colonel Collins' declaration, in its cross-motion for judgment on the Administrative Record, defendant states that the Army does not intend to immediately use or deploy DCGS-A Increment 2. Defendant explains that "it is anticipated that there would be a lengthy developmental period for Increment 2, and also testing." Additionally, defendant asserts that "DCGS-A Increment 1 is fully operational" and deployed in the field, although it is "nearing obsolescence." Based on this information from defendant, it

appears that, although an injunction may cause some delay in the procurement of the capabilities that the Army seeks to acquire through the DCGS-A Increment 2 procurement, the delay, which is in defendant's control, is manageable, assuming the Army moves quickly to comply with the requirements of 10 U.S.C. § 2377. Moreover, the impact of the delay on the "military analysts and commanders" appears speculative because the Army already anticipates a "lengthy developmental period for Increment 2, and also testing." Indeed, given that the Army intends to award a developmental contract, it would be difficult to know when Increment 2 capabilities will be available and deployable. A review of the Administrative Record indicates that DCGS-A Increment 1 took several years to develop, and DCGS-A Increment 2 is expected to be more technically advanced than Increment 1, thus it appears likely that there could be delays due to testing or other issues that typically arise during a complicated developmental process. Furthermore, if Palantir actually is capable of providing a commercial item that can meet the Army's requirements, then, most likely, the Army could more rapidly acquire the commercial technology to meet its needs either in whole or in part. Although an injunction may somewhat slow the award of a contract to satisfy the Army's requirements, "the Court of Federal Claims has observed that '"only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715–16 (2006) (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 399)); see also Insight Sys. Corp. v. United States, 110 Fed. Cl. at 582. Thus, the court concludes that the balance of hardships does not weigh in favor of the defendant in this protest.

As to the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)).

As Palantir argues, there is a public interest "in preserving the integrity of the competitive process." Insight Sys. Corp. v. United States, 110 Fed. Cl. at 583. "A permanent injunction is properly employed where there is an overriding public interest in maintaining the integrity of the federal procurement process." Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. at 608 (internal quotations omitted). Palantir argues that the public interest weighs in favor of a permanent injunction because the public "has an interest in ensuring that the Army's Solicitation complies with the law." Defendant points to national security concerns to support its position that an injunction will not serve the public interest. Defendant asserts that the "public interest factor is of 'paramount import' especially regarding national defense and national security," and that this "paramount interest is directly implicated when a procurement action involves the acquisition of services critical to the success of future military operations and to the health and safety of our servicemen and women in the field." Defendant is correct that "when military and national security interests are implicated, the public interest factor gains inflated importance in the court's balancing of the equities." Worldwide Language Res., LLC v. United States, 127 Fed. Cl. 125, 135 (2016) (internal citations omitted). The court recognizes, and respects, that in exercising jurisdiction over bid protests "the courts shall give due regard to the interests of national defense and national security. . . ." 28 U.S.C. § 1491(b)(3). Yet, "merely conclusory assertions of national security do not suffice to defeat motions for injunctive relief." Crowley Tech. Mgmt., Inc. v. United States, 123 Fed. Cl. 253, 266 (2015); see also GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 493 (2012) (explaining that "when the Government makes a claim of national security" the court "will not blindly accede to such claim" and must give the claim careful consideration) (internal quotations omitted). Although in this protest the court recognizes improvement to DCGS-A is an important part of the Army's future performance capabilities, and defendant discusses the intersection of national security and the public interest generally in its briefs, defendant does not sufficiently address how an injunction in this protest would cause a national security disruption or convince the court that efficiently taking the time to address the requirements of 10 U.S.C. § 2377 would negatively impact national security. As noted above, in his declaration, Colonel Collins explained the importance of DCGS-A Increment 2 and states that it is "desperately needed," however, Colonel Collins does not specifically assert that a delay in making an award pursuant to the DCGS-A Increment 2 solicitation will create national security concerns. In fact, the solicitation explains that the expected performance period for the DCGS-A Increment 2 development contract is six years, thus, it appears that the Army anticipates that developing DCGS-A Increment 2 could take multiple years. Therefore, the Army has not offered evidence of immediate tactical or strategic national security consequences that would sway the court from entering an injunction in this bid protest so that the Army can comply with 10 U.S.C. § 2377. As discussed above, the Army failed to satisfy the requirements of 10 U.S.C. § 2377 before issuing the December 23, 2015 solicitation, compromising the integrity of the procurement process.

Palantir asserts that the public interest weighs in favor of an injunction because the "Army's Solicitation doubles down on development efforts that have taken fifteen years and cost billions of taxpayer dollars without equipping Commanders with the capabilities they need." As directed by 10 U.S.C. § 2377, and as is intuitively obvious, it

is in the public interest to investigate whether commercial items exist that can satisfy the government's needs, in whole or in part, so as to avoid investing time and taxpayer money into developing a product that already exists. As such, the court finds that there is a public interest in permanently enjoining the Army from awarding a contract under the December 23, 2015 solicitation.

## CONCLUSION

Accordingly, because Palantir has demonstrated success on the merits, and because the equitable factors weigh in Palantir's favor, a permanent injunction is warranted and awarded. The Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

# In the United States Court of Federal Claims

### No. 16-784 C

**PALANTIR USG, INC.**
   **Protestor**

   v.                                                    **JUDGMENT**

**THE UNITED STATES**
   **Defendant**


   Pursuant to the court's Opinion, filed November 3, 2016,

   IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements.


                                        Lisa L. Reyes, Acting
                                        Clerk of Court


**November 10, 2016**          By:    s/ Debra L. Samler

                                        Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:16-cv-00784-MBH

PALANTIR USG, INC. v. USA
Assigned to: Judge Marian Blank Horn
Case in other court: 17-01465
Cause: 28:1491 Tucker Act

Date Filed: 06/30/2016
Date Terminated: 11/10/2016
Jury Demand: None
Nature of Suit: 138 Contract - (Pre
Award) Injunctions
Jurisdiction: U.S. Government
Defendant

**Plaintiff**

**PALANTIR TECHNOLOGIES, INC.**
*and*
*TERMINATED: 08/22/2016*

represented by **Hamish Hume**
Boies Schiller & Flexner LLP (DC)
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
(202) 237-2727
Email: hhume@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PALANTIR USG, INC.**

represented by **Hamish Hume**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Domenique Grace Kirchner**
U. S. Department of Justice - Civil Div.
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-1111
Fax: (202) 514-8624
Email: domenique.kirchner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2016 | 1 | **SEALED** COMPLAINT against USA (ARM) (Filing fee $400, Receipt number 9998-3405680) (Copy Served Electronically on Department of Justice), filed by PALANTIR TECHNOLOGIES, INC., PALANTIR USG, INC.. Answer due by 8/29/2016.(ar) Modified on 7/1/2016 to seal complaint. (dls) (Entered: 06/30/2016) |
| 06/30/2016 | 2 | NOTICE of Assignment to Judge Marian Blank Horn. (ar) (Entered: 06/30/2016) |
| 06/30/2016 | 3 | NOTICE of Designation of Electronic Case. (ar) (Entered: 06/30/2016) |
| 06/30/2016 | 4 | ORDER: Initial bid protest hearing set for 7/1/2016: 3:00 PM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 06/30/2016) |
| 07/01/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/1/2016 before Judge Marian Blank Horn: Hearing. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio copy of the proceeding, click HERE.(jm5) (Entered: 07/01/2016) |
| 07/01/2016 | 5 | ORDER: Protective Order. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2016) |
| 07/05/2016 | 6 | NOTICE of Appearance by Domenique Grace Kirchner for USA . (Kirchner, Domenique) (Entered: 07/05/2016) |
| 07/05/2016 | 7 | ORDER: Administrative Record due by 7/6/2016, 12:00 PM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/05/2016) |
| 07/06/2016 | 8 | NOTICE, filed by USA *of Filing of Administrative Record* (Attachments: # 1 Exhibit Index of Administrative Record)(Kirchner, Domenique) (Entered: 07/06/2016) |
| 07/06/2016 | | **SEALED** ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/07/2016) |
| 07/08/2016 | 9 | Notice Of Filing Of Certified Transcript for proceedings held on July 1, 2016 in Washington, D.C. (ew) (Entered: 07/08/2016) |
| 07/08/2016 | 10 | TRANSCRIPT of Proceedings held on July 1, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-68. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 7/15/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (ew) (Entered: 07/08/2016) |
| 07/12/2016 | 11 | Unopposed MOTION for Leave to Exceed Page Limit of Motion for Judgment on The Administrative Record and Permanent Injunction by Five (5) pages , filed by All Plaintiffs.Response due by 7/29/2016.(Hume, Hamish) (Entered: 07/12/2016) |
| 07/12/2016 | | ORDER granting 11 Motion for Leave to File Excess Pages. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/12/2016) |

| 07/12/2016 | 12 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit Tab 148, # 2 Corrected Index of administrative record)(Kirchner, Domenique) (Entered: 07/12/2016) |
|---|---|---|
| 07/12/2016 | 13 | **SEALED** MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA.Response due by 8/12/2016. (Attachments: # 1 Exhibit Tab 122, GAO decision)(Kirchner, Domenique) (Entered: 07/12/2016) |
| 07/12/2016 | 14 | **SEALED** MOTION for Judgment on the Administrative Record (Response due by 8/12/2016.), MOTION for Permanent Injunction (Response due by 7/29/2016.), filed by All Plaintiffs. (Hume, Hamish) (Entered: 07/12/2016) |
| 07/12/2016 | | **SEALED** CORRECTED ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/14/2016) |
| 07/13/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/13/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/13/2016) |
| 07/15/2016 | 15 | NOTICE, filed by USA *of Government Schedule For Award* (Kirchner, Domenique) (Entered: 07/15/2016) |
| 07/15/2016 | 16 | **SEALED** MOTION to Supplement the Administrative Record , filed by All Plaintiffs.Response due by 8/1/2016. (Attachments: # 1 Appendix Proposed Notices of Deposition for Lt. Gen. Mary Legere, Maj. Gen. Laura Richardson, Kevin Kelly, and Chris Fisher, # 2 Appendix Proposed Interrogatories and Requests for Production, # 3 Exhibit Index and Exhibits 1 to 15, # 4 Exhibit 16 to 30, # 5 Exhibit 31 to 51 and Certificate of Service) (Hume, Hamish) (Entered: 07/15/2016) |
| 07/15/2016 | 17 | ORDER: Status conference set for 7/18/2016, 12:00 PM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/15/2016) |
| 07/18/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/18/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/18/2016) |
| 07/18/2016 | | Minute Entry - Was the proceeding sealed to the public? No. Proceeding held in Washington, DC on 7/18/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/18/2016) |
| 07/19/2016 | 18 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 07/19/2016) |
| 07/19/2016 | | CORRECTED ADMINISTRATIVE RECORD on CD, filed by USA. [**No documents uploaded**] Service: 7/19/2016.(ar) (Entered: 07/19/2016) |
| 07/19/2016 | 19 | **SEALED**CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC., filed by |

| | | |
|---|---|---|
| | | USA.**Response due by 8/19/2016.** (Attachments: # 1 Affidavit)(Kirchner, Domenique) (Entered: 07/19/2016) |
| 07/19/2016 | 20 | **SEALED**RESPONSE to 13 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by All Plaintiffs.**Reply due by 8/5/2016.** (Attachments: # 1 Affidavit)(Hume, Hamish) (Entered: 07/19/2016) |
| 07/20/2016 | 21 | ORDER: Submissions due by 7/22/2016. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/20/2016) |
| 07/20/2016 | 22 | ORDER: Hearing set for 7/25/2016, 2:30 PM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/20/2016) |
| 07/20/2016 | 23 | **SEALED**NOTICE, filed by USA *of Correction of Administrative Record* (Attachments: # 1 Exhibit Letter, # 2 Exhibit Index)(Kirchner, Domenique) (Entered: 07/20/2016) |
| 07/20/2016 | | **SEALED**ADMINISTRATIVE RECORD on CD, filed by USA. **[No Documents Uploaded]** Service: 7/20/2016.(ar) (Entered: 07/21/2016) |
| 07/21/2016 | 24 | REDACTED DOCUMENT, filed by USA *of Court docket no. 13, Defendant's Motion To Dismiss.* (Attachments: # 1 Exhibit GAO decision)(Kirchner, Domenique) (Entered: 07/21/2016) |
| 07/21/2016 | 25 | **SEALED**RESPONSE to 16 MOTION to Supplement the Administrative Record , filed by USA.**Reply due by 8/1/2016.**(Kirchner, Domenique) (Entered: 07/21/2016) |
| 07/22/2016 | 26 | **SEALED**NOTICE, filed by All Plaintiffs re 20 Response to Motion [Dispositive] (Hume, Hamish) (Entered: 07/22/2016) |
| 07/22/2016 | 27 | **SEALED**NOTICE, filed by All Plaintiffs re 21 Order (Hume, Hamish) (Entered: 07/22/2016) |
| 07/22/2016 | 28 | **SEALED**REPLY to Response to Motion re 13 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA.(Kirchner, Domenique) (Entered: 07/22/2016) |
| 07/22/2016 | | **SEALED** ADMINISTRATIVE RECORD on CD, filed by USA. **[No documents uploaded]** Service: 7/22/2016.(ar) (Entered: 07/25/2016) |
| 07/23/2016 | 29 | **SEALED**REPLY to Response to Motion re 16 MOTION to Supplement the Administrative Record , filed by All Plaintiffs. (Attachments: # 1 Exhibit 52, # 2 Exhibit 53)(Hume, Hamish) (Entered: 07/23/2016) |
| 07/24/2016 | 30 | **SEALED**NOTICE, filed by USA *of Correction to Administrative Record* (Attachments: # 1 Exhibit Corrected Index)(Kirchner, Domenique) (Entered: 07/24/2016) |
| 07/25/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/25/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 07/25/2016) |
| | | |

| 07/26/2016 | 31 | ORDER: Revised Administrative Record due by 7/26/2016. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/26/2016) |
| 07/26/2016 | | **SEALED** CORRECTED ADMINISTRATIVE RECORD, contained on one CD-Rom, filed by USA. (dls) (Entered: 07/29/2016) |
| 07/27/2016 | 32 | NOTICE, filed by USA *of Filing of Revised Administrative Record* (Attachments: # 1 Exhibit Index)(Kirchner, Domenique) (Entered: 07/27/2016) |
| 07/27/2016 | 33 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 1 Complaint, . (Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 34 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 14 MOTION for Judgment on the Administrative Record MOTION for Permanent Injunction . (Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 35 | REDACTED DOCUMENT, filed by USA redacting 28 Reply to Response to Motion *to Dismiss*. (Kirchner, Domenique) (Entered: 07/27/2016) |
| 07/27/2016 | 36 | **SEALED**Consent MOTION for Protective Order , filed by All Plaintiffs.Response due by 8/15/2016. (Attachments: # 1 Appendix A (Unopposed Amended Protective Order), # 2 Appendix B (Redline of Unopposed Amended Protective Order), # 3 Appendix C (Protective Order Applications))(Hume, Hamish) (Entered: 07/27/2016) |
| 07/27/2016 | 37 | **SEALED**REPLY to Response to Motion re 14 MOTION for Judgment on the Administrative Record MOTION for Permanent Injunction , filed by All Plaintiffs.(Hume, Hamish) (Entered: 07/27/2016) |
| 07/28/2016 | 38 | ORDER: Revised Protective Order. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/28/2016) |
| 07/28/2016 | 39 | REDACTED DOCUMENT, filed by USA redacting 19 CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC. . (Kirchner, Domenique) (Entered: 07/28/2016) |
| 07/28/2016 | 40 | Notice Of Filing Of Certified Transcript for proceedings held on July 25, 2016 in Washington, D.C. (ew) (Entered: 07/29/2016) |
| 07/28/2016 | 41 | TRANSCRIPT of Proceedings held on July 25, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-150. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 8/4/2016. Redacted Transcript Deadline set for 8/29/2016. Release of Transcript Restriction set for 10/27/2016. (ew) (Entered: 07/29/2016) |
| 08/01/2016 | 42 | **SEALED**REPLY to Response to Motion re 19 CROSS MOTION and RESPONSE to 14 Motion for Judgment on the Administrative Record, Motion for Permanent Injunction filed by PALANTIR USG, INC., PALANTIR TECHNOLOGIES, INC. , filed by USA.(Kirchner, Domenique) (Entered: 08/01/2016) |
| 08/02/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/2/2016 before Judge Marian Blank Horn: Oral |

| | | |
|---|---|---|
| | | Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 08/02/2016) |
| 08/05/2016 | 43 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 29 Reply to Response to Motion . (Hume, Hamish) (Entered: 08/05/2016) |
| 08/05/2016 | 44 | **SEALED**NOTICE, filed by All Plaintiffs *Notice of Filing Declaration and Expert Report* (Attachments: # 1 Affidavit of Doug Philippone, # 2 Affidavit and Expert Report of Bryant Choung)(Hume, Hamish) (Entered: 08/05/2016) |
| 08/08/2016 | 45 | **SEALED**NOTICE, filed by USA *of errata in Defendant's Cross Motion for Judgment on the administrative record and opposition to plaintiffs' motion for judgment on the administrative record, court docket 19* (Kirchner, Domenique) (Entered: 08/08/2016) |
| 08/10/2016 | 46 | Notice Of Filing Of Certified Transcript for proceedings held on August 2, 2016 in Washington, D.C. (ac7) (Entered: 08/10/2016) |
| 08/10/2016 | 47 | TRANSCRIPT of Proceedings held on August 2, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-96. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 8/17/2016. Redacted Transcript Deadline set for 9/12/2016. Release of Transcript Restriction set for 11/10/2016. (ac7) (Entered: 08/10/2016) |
| 08/10/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/10/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 08/10/2016) |
| 08/10/2016 | 48 | **SEALED**NOTICE, filed by USA *of designation of expert witness* (Kirchner, Domenique) (Entered: 08/10/2016) |
| 08/10/2016 | 49 | **SEALED** MOTION for Leave to File declarations , filed by USA.Response due by 8/29/2016. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit)(Kirchner, Domenique) (Entered: 08/10/2016) |
| 08/12/2016 | 50 | **SEALED**NOTICE, filed by USA *of filing of Expert Report* (Attachments: # 1 Exhibit Expert report)(Kirchner, Domenique) (Entered: 08/12/2016) |
| 08/12/2016 | 51 | **SEALED** MOTION to Strike 44 Notice (Other) , filed by USA.Response due by 8/29/2016. (Kirchner, Domenique) (Entered: 08/12/2016) |
| 08/15/2016 | 52 | REDACTED DOCUMENT, filed by All Plaintiffs redacting 37 Reply to Response to Motion *for Judgment on the Administrative Record*. (Hume, Hamish) (Entered: 08/15/2016) |
| 08/16/2016 | 53 | **SEALED**Unopposed MOTION for Leave to File Defendant's Amended Motion To Strike Plaintiffs' Declaration And Expert Report , filed by USA.Response due by 9/2/2016. (Attachments: # 1 Supplement)(Kirchner, Domenique) (Entered: 08/16/2016) |
| 08/16/2016 | 54 | |

| | | |
|---|---|---|
| | | **SEALED**NOTICE, filed by USA *of filing Deposition Transcript* (Attachments: # 1 Exhibit Deposition transcript, # 2 Exhibit Dep. Ex. 6, # 3 Exhibit Dep. Ex. 7, # 4 Exhibit Dep. Ex. 8, # 5 Exhibit Dep. Ex. 9, # 6 Exhibit Dep. Ex. 10, # 7 Exhibit Dep. Ex. 11, # 8 Exhibit Dep. Ex. 12)(Kirchner, Domenique) (Entered: 08/16/2016) |
| 08/17/2016 | 55 | NOTICE of Additional Authority (Kirchner, Domenique) (Entered: 08/17/2016) |
| 08/17/2016 | 56 | REDACTED DOCUMENT, filed by USA redacting 25 Response to Motion *to supplement administrative record.* (Kirchner, Domenique) (Entered: 08/17/2016) |
| 08/17/2016 | 57 | ORDER: Status conference set for 8/23/2016, 10:30 AM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/17/2016) |
| 08/18/2016 | 58 | **SEALED** MOTION for Leave to File Corrected Expert Report , filed by USA.Response due by 9/6/2016. (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/18/2016) |
| 08/18/2016 | 59 | **SEALED** MOTION to Unseal Document , filed by All Plaintiffs.Response due by 9/6/2016. (Attachments: # 1 Affidavit of Jon R. Knight, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Hume, Hamish) (Entered: 08/18/2016) |
| 08/22/2016 | 60 | **SEALED**ORDER granting in part and denying in part 13 Motion to Dismiss - Rule 12(b)(1) and (6). Palantir Technologies is dismissed. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/22/2016) |
| 08/22/2016 | 61 | **SEALED**RESPONSE to 49 MOTION for Leave to File declarations , filed by All Plaintiffs.Reply due by 9/1/2016. (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B)(Hume, Hamish) (Entered: 08/22/2016) |
| 08/23/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 8/23/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 08/23/2016) |
| 08/23/2016 | 62 | **SEALED**NOTICE, filed by USA re 60 Order on Motion to Dismiss - Rule 12(b)(1) and (6) *of proposed redactions* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/23/2016) |
| 08/24/2016 | 63 | **SEALED**NOTICE, filed by USA *of proposed redaction* (Kirchner, Domenique) (Entered: 08/24/2016) |
| 08/24/2016 | 64 | ORDER: Response to motion to strike due by 8/24/2016. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 08/24/2016) |
| 08/24/2016 | 65 | **SEALED**RESPONSE to 53 Unopposed MOTION for Leave to File Defendant's Amended Motion To Strike Plaintiffs' Declaration And Expert Report , 51 MOTION to Strike 44 Notice (Other) , filed by All Plaintiffs.Reply due by 9/6/2016. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Hume, Hamish) (Entered: 08/24/2016) |
| 08/25/2016 | 66 | |

**Appx00112**

| | | |
|---|---|---|
| | | **SEALED**RESPONSE to 64 Order , filed by USA.(Kirchner, Domenique) (Entered: 08/25/2016) |
| 08/26/2016 | 67 | **SEALED**RESPONSE to 64 Order , filed by USA. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit)(Kirchner, Domenique) (Entered: 08/26/2016) |
| 08/26/2016 | 68 | **SEALED**NOTICE, filed by USA re *Declaration* (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 08/26/2016) |
| 08/26/2016 | 69 | REPORTED ORDER. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 08/26/2016) |
| 08/26/2016 | 70 | **SEALED** MOTION for Discovery , filed by PALANTIR USG, INC..Response due by 9/12/2016. (Attachments: # 1 Exhibit Index and Exhibits A through C, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F, # 5 Exhibit G through AA)(Hume, Hamish) (Entered: 08/26/2016) |
| 08/29/2016 | 71 | ORDER. Status conference scheduled for Tuesday, August 30, 2016. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 08/29/2016) |
| 08/30/2016 | | Minute Entry - Was the proceeding sealed to the public? Yes. Proceeding held in Washington, DC on 8/30/2016, before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (ro) (Entered: 08/30/2016) |
| 09/01/2016 | 72 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 70 MOTION for Discovery . (Hume, Hamish) (Entered: 09/01/2016) |
| 09/05/2016 | 73 | **SEALED**Unopposed MOTION for Leave to File declaration , filed by USA.Response due by 9/22/2016. (Attachments: # 1 Affidavit)(Kirchner, Domenique) (Entered: 09/05/2016) |
| 09/06/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 9/6/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 09/06/2016) |
| 09/06/2016 | 74 | **SEALED**REPLY to Response to Motion re 51 MOTION to Strike 44 Notice (Other) , filed by USA. (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/06/2016) |
| 09/07/2016 | 75 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Cronen Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Cronen Deposition Transcript, # 2 Exhibit Cronen Dep. Ex. 1, # 3 Exhibit Cronen Dep. Ex. 2, # 4 Exhibit Cronen Dep. Ex. 3, # 5 Exhibit Cronen Dep. Ex. 4, # 6 Exhibit Cronen Dep. Ex. 5A, # 7 Exhibit Cronen Dep. Ex. 5B, # 8 Exhibit Cronen Dep. Ex. 6, # 9 Exhibit Cronen Dep. Ex. 7A, # 10 Exhibit Cronen Dep. Ex. 7B, # 11 Exhibit Cronen Dep. Ex. 8, # 12 Exhibit Cronen Dep. Ex. 9, # 13 Exhibit Cronen Dep. Ex. 10, # 14 Exhibit Cronen Dep. Ex. 11, # 15 Exhibit Cronen Dep. Ex. 12, # 16 Exhibit Cronen Dep. Ex. 13, # 17 Exhibit Cronen Dep. Ex. 14, # 18 Exhibit Cronen Dep. Ex. 15, # 19 Exhibit Cronen Dep. Ex. 16, # 20 Exhibit Cronen Dep. Ex. 17, # 21 Exhibit Cronen Dep. Ex. 18, # 22 Exhibit Cronen Dep. Ex. 19, # 23 Exhibit Cronen Dep. Ex. 20, # 24 Exhibit |

| | | |
|---|---|---|
| | | Cronen Dep. Ex. 21, # 25 Exhibit Cronen Dep. Ex. 22, # 26 Exhibit Cronen Dep. Ex. 23, # 27 Exhibit Cronen Dep. Ex. 24, # 28 Exhibit Cronen Dep. Ex. 25, # 29 Exhibit Cronen Dep. Ex. 26, # 30 Exhibit Cronen Dep. Ex. 27, # 31 Exhibit Cronen Dep. Ex. 28, # 32 Exhibit Cronen Dep. Ex. 29, # 33 Exhibit Cronen Dep. Ex. 30)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 76 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Lee Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Lee Dep. Transcript, # 2 Exhibit Lee Dep. Ex. 1, # 3 Exhibit Lee Dep. Ex. 2, # 4 Exhibit Lee Dep. Ex. 4, # 5 Exhibit Lee Dep. Ex. 5)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 77 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Legere Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Legere Dep. Transcript, # 2 Exhibit Legere Dep. Ex. 2, # 3 Exhibit Legere Dep. Ex. 3, # 4 Exhibit Legere Dep. Ex. 8, # 5 Exhibit Legere Dep. Ex. 10, # 6 Exhibit Legere Dep. Ex. 11, # 7 Exhibit Legere Dep. Ex. 12, # 8 Exhibit Legere Dep. Ex. 13, # 9 Exhibit Legere Dep. Ex. 14, # 10 Exhibit Legere Dep. Ex. 15, # 11 Exhibit Legere Dep. Ex. 16, # 12 Exhibit Legere Dep. Ex. 17, # 13 Exhibit Legere Dep. Ex. 18, # 14 Exhibit Legere Dep. Ex. 20)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 78 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Schnurr Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Schnurr Dep. Transcript, # 2 Exhibit Schnurr Dep. Ex. 1, # 3 Exhibit Schnurr Dep. Ex. 4, # 4 Exhibit Schnurr Dep. Ex. 6, # 5 Exhibit Schnurr Dep. Ex. 7, # 6 Exhibit Schnurr Dep. Ex. 8, # 7 Exhibit Schnurr Dep. Ex. 9, # 8 Exhibit Schnurr Dep. Ex. 10, # 9 Exhibit Schnurr Dep. Ex. 11, # 10 Exhibit Schnurr Dep. Ex. 12, # 11 Exhibit Schnurr Dep. Ex. 14, # 12 Exhibit Schnurr Dep. Ex. 17, # 13 Exhibit Schnurr Dep. Ex. 18, # 14 Exhibit Schnurr Dep. Ex. 24, # 15 Exhibit Schnurr Dep. Ex. 25, # 16 Exhibit Schnurr Dep. Ex. 26, # 17 Exhibit Schnurr Dep. Ex. 31, # 18 Exhibit Schnurr Dep. Ex. 34)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 79 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Sherick Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Sherick Dep. Tr., # 2 Exhibit Sherick Dep. Ex. 1A, # 3 Exhibit Sherick Dep. Ex. 1B, # 4 Exhibit Sherick Dep. Ex. 1C, # 5 Exhibit Sherick Dep. Ex. 1D, # 6 Exhibit Sherick Dep. Ex. 2, # 7 Exhibit Sherick Dep. Ex. 3, # 8 Exhibit Sherick Dep. Ex. 6, # 9 Exhibit Sherick Dep. Ex. 7, # 10 Exhibit Sherick Dep. Ex. 8, # 11 Exhibit Sherick Dep. Ex. 9, # 12 Exhibit Sherick Dep. Ex. 10, # 13 Exhibit Sherick Dep. Ex. 11, # 14 Exhibit Sherick Dep. Ex. 12, # 15 Exhibit Sherick Dep. Ex. 13, # 16 Exhibit Sherick Dep. Ex. 14)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | 80 | **SEALED**NOTICE, filed by PALANTIR USG, INC. *of Filing of Stock Deposition Transcript and Exhibits* (Attachments: # 1 Exhibit Stock Dep. Transcript, # 2 Exhibit Stock Dep. Ex. 1, # 3 Exhibit Stock Dep. Ex. 2, # 4 Exhibit Stock Dep. Ex. 3, # 5 Exhibit Stock Dep. Ex. 4, # 6 Exhibit Stock Dep. Ex. 5, # 7 Exhibit Stock Dep. Ex. 5A, # 8 Exhibit Stock Dep. Ex. 6, # 9 Exhibit Stock Dep. Ex. 7, # 10 Exhibit Stock Dep. Ex. 8, # 11 Exhibit Stock Dep. Ex. |

Appx00114

| | | |
|---|---|---|
| | | 9, # <u>12</u> Exhibit Stock Dep. Ex. 10, # <u>13</u> Exhibit Stock Dep. Ex. 11, # <u>14</u> Exhibit Stock Dep. Ex. 12)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | <u>81</u> | **SEALED**SUPPLEMENTAL BRIEF *In Support of Its Motion For Judgment On The Administrative Record*, filed by All Plaintiffs. (Attachments: # <u>1</u> Exhibit 1 (Supplemental Choung Declaration and Appendix), # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6)(Hume, Hamish) (Entered: 09/07/2016) |
| 09/07/2016 | <u>82</u> | **SEALED**SUPPLEMENTAL BRIEF , filed by USA. (Attachments: # <u>1</u> Exhibit supplemental expert report, # <u>2</u> Exhibit deposition excerpt)(Kirchner, Domenique) (Entered: 09/07/2016) |
| 09/09/2016 | <u>83</u> | **SEALED**APPLICATION for Access to Protected Material by Ryan Taylor, filed by PALANTIR USG, INC.. (Hume, Hamish) (Entered: 09/09/2016) |
| 09/12/2016 | <u>84</u> | **SEALED** MOTION for Leave to File Corrected Government Cross-Motion for judgment on administrative record and Corrected Government Reply to Plaintiff's Opposition to Government Cross-Motion For Judgment on Administrative Record , filed by USA.Response due by 9/29/2016. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit)(Kirchner, Domenique) (Entered: 09/12/2016) |
| 09/12/2016 | <u>85</u> | ORDER: Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 09/12/2016) |
| 09/14/2016 | <u>86</u> | **SEALED**NOTICE, filed by PALANTIR USG, INC. *OF ADDITIONAL DOCUMENTS PRODUCED BY THE GOVERNMENT PURSUANT TO PALANTIR'S DISCOVERY REQUEST* (Attachments: # <u>1</u> Exhibit Tab 168, # <u>2</u> Exhibit Tab 169, # <u>3</u> Exhibit Tab 170, # <u>4</u> Exhibit Tab 171, # <u>5</u> Exhibit Tab 172, # <u>6</u> Exhibit Tab 173, # <u>7</u> Exhibit Tab 174, # <u>8</u> Exhibit Tab 175, # <u>9</u> Exhibit Tab 176)(Hume, Hamish) (Entered: 09/14/2016) |
| 09/15/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 9/15/2016 before Judge Marian Blank Horn: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click <u>HERE</u> (jm5) (Entered: 09/15/2016) |
| 09/16/2016 | <u>87</u> | **SEALED**NOTICE, filed by PALANTIR USG, INC. *attaching DoD Commercial Item Handbook* (Attachments: # <u>1</u> Exhibit DoD Commercial Item Handbook)(Hume, Hamish) (Entered: 09/16/2016) |
| 09/16/2016 | <u>88</u> | ORDER: Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 09/16/2016) |
| 09/19/2016 | <u>89</u> | Notice Of Filing Of Certified Transcript for proceedings held on September 15, 2016 in Washington, D.C. (ac7) (Entered: 09/19/2016) |
| 09/19/2016 | <u>90</u> | TRANSCRIPT of Proceedings held on September 15, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-204. To purchase a copy, contact the clerk's office at (202) 357-6414. (ac7) Modified on 6/8/2017 to unseal pursuant to the order of 5/17/17. (dls). (Entered: 09/19/2016) |

**Appx00115**

| 09/21/2016 | 91 | **SEALED**RESPONSE to 88 Order *(re Lists)*, filed by USA.(Kirchner, Domenique) (Entered: 09/21/2016) |
| 09/21/2016 | 92 | **SEALED**RESPONSE to 88 Order *(re Brief)*, filed by USA. (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/21/2016) |
| 09/21/2016 | 93 | **SEALED**RESPONSE to 88 Order *(re Brief)*, filed by PALANTIR USG, INC..(Hume, Hamish) (Entered: 09/21/2016) |
| 09/21/2016 | 94 | **SEALED**RESPONSE to 88 Order *(re Chart)*, filed by PALANTIR USG, INC.. (Attachments: # 1 Exhibit Chart of Key Documents)(Hume, Hamish) (Entered: 09/21/2016) |
| 09/23/2016 | 95 | NOTICE of Additional Authority (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 09/23/2016) |
| 09/23/2016 | 96 | **SEALED**STIPULATION *of Facts (Joint)*, filed by All Plaintiffs. (Hume, Hamish) (Entered: 09/23/2016) |
| 09/29/2016 | 97 | **SEALED**NOTICE, filed by USA (Attachments: # 1 Exhibit Deposition transcript, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit) (Kirchner, Domenique) (Entered: 09/29/2016) |
| 09/30/2016 | 98 | REDACTED DOCUMENT, filed by USA redacting 48 Notice (Other) . (Kirchner, Domenique) (Entered: 09/30/2016) |
| 10/05/2016 | 99 | REDACTED DOCUMENT, filed by USA redacting 42 Reply to Response to Motion, . (Kirchner, Domenique) (Entered: 10/05/2016) |
| 10/05/2016 | 100 | REDACTED DOCUMENT, filed by USA redacting 45 Notice (Other) . (Kirchner, Domenique) (Entered: 10/05/2016) |
| 10/11/2016 | 101 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 20 Response to Motion [Dispositive] . (Hume, Hamish) (Entered: 10/11/2016) |
| 10/11/2016 | 102 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 93 Response . (Hume, Hamish) (Entered: 10/11/2016) |
| 10/13/2016 | 103 | REDACTED DOCUMENT, filed by PALANTIR USG, INC. redacting 81 Supplemental Brief, . (Hume, Hamish) (Entered: 10/13/2016) |
| 10/13/2016 | 104 | ORDER: Hearing rescheduled for 10/31/2016, 10:30 AM. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 10/13/2016) |
| 10/17/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 10/17/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 10/17/2016) |
| 10/19/2016 | 105 | REDACTED DOCUMENT, filed by USA redacting 92 Response . (Attachments: # 1 Exhibit)(Kirchner, Domenique) (Entered: 10/19/2016) |
| 10/28/2016 | 106 | REDACTED DOCUMENT, filed by USA redacting 50 Notice (Other) . (Attachments: # 1 Exhibit Expert report)(Kirchner, Domenique) (Entered: 10/28/2016) |

**Appx00116**

| 10/31/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 10/31/2016 before Judge Marian Blank Horn: Hearing. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding, click HERE (jm5) (Entered: 10/31/2016) |
|---|---|---|
| 11/01/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/1/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 11/01/2016) |
| 11/01/2016 | 107 | Notice Of Filing Of Certified Transcript for proceedings held on October 31, 2016 in Washington, D.C. (ew) (Entered: 11/02/2016) |
| 11/01/2016 | 108 | TRANSCRIPT of Proceedings held on October 31, 2016 before Judge Marian Blank Horn. Total No. of Pages: 1-21. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 11/8/2016. Redacted Transcript Deadline set for 12/2/2016. Release of Transcript Restriction set for 1/30/2017. (ew) (Entered: 11/02/2016) |
| 11/03/2016 | 109 | **SEALED**OPINION granting 14 Protestor's Motion for Judgment on the Administrative Record; granting 14 Motion for Permanent Injunction; denying 19 Defendant's Cross Motion. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 11/03/2016) |
| 11/04/2016 | 110 | ORDER. Signed by Judge Marian Blank Horn. (ro) Copy to parties. (Entered: 11/04/2016) |
| 11/08/2016 | 111 | **SEALED**RESPONSE to 110 Order , filed by USA.(Kirchner, Domenique) (Entered: 11/08/2016) |
| 11/08/2016 | 112 | **SEALED** MOTION for Clarification , filed by USA.Response due by 11/28/2016. (Kirchner, Domenique) (Entered: 11/08/2016) |
| 11/09/2016 | | Minute Entry - Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/9/2016 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 11/09/2016) |
| 11/09/2016 | 113 | REPORTED OPINION. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/09/2016) |
| 11/10/2016 | 114 | JUDGMENT entered, pursuant to Rule 58, that the Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements. (Copy to parties) (dls) (Entered: 11/10/2016) |
| 11/16/2016 | 115 | ORDER: Final Administrative Record due by 11/23/2016. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/16/2016) |
| | | |

| 11/22/2016 | 116 | NOTICE, filed by USA *of filing of "CD Rom of corrected, full Administrative Record" as directed by Court Orders dated November 4 and 16, 2016* (Kirchner, Domenique) (Entered: 11/22/2016) |
| 11/22/2016 | | **SEALED** Corrected ADMINISTRATIVE RECORD, filed by USA. Service: 11/22/16 by hand. (dls) (Entered: 11/23/2016) |
| 12/16/2016 | 117 | Unopposed MOTION for Extension of Time until 1/17/2017 to file joint proposed redactions to administrative record , filed by USA.Response due by 1/3/2017.(Kirchner, Domenique) (Entered: 12/16/2016) |
| 12/19/2016 | | ORDER granting 117 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 12/19/2016) |
| 01/09/2017 | 118 | NOTICE OF APPEAL as to 114 Judgment,, filed by USA. Copies to judge, opposing party and CAFC. (Kirchner, Domenique) (Entered: 01/09/2017) |
| 01/09/2017 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 118 Notice of Appeal (hw1) (Entered: 01/09/2017) |
| 01/10/2017 | | CAFC Case Number 2017-1465 for 118 Notice of Appeal filed by USA. (hw1) (Entered: 01/10/2017) |
| 01/13/2017 | 119 | Unopposed MOTION for Extension of Time until 1/24/2017 to file joint proposed redactions to the Administrative Record , filed by USA.Response due by 1/30/2017.(Kirchner, Domenique) (Entered: 01/13/2017) |
| 01/13/2017 | | ORDER granting 119 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 01/13/2017) |
| 01/24/2017 | 120 | Unopposed MOTION for Extension of Time until 1/31/2017 to file joint proposed redactions to administrative record , filed by USA.Response due by 2/10/2017.(Kirchner, Domenique) (Entered: 01/24/2017) |
| 01/25/2017 | | ORDER granting 120 Motion for Extension of Time. Signed by Judge Marian Blank Horn. (jm5) (Entered: 01/25/2017) |
| 01/31/2017 | 121 | Unopposed MOTION for Extension of Time until 2/3/2017 to file joint proposed redactions of administrative record , filed by USA.Response due by 2/17/2017.(Kirchner, Domenique) (Entered: 01/31/2017) |
| 02/03/2017 | 122 | **SEALED**RESPONSE to *Court order dated Nov. 4, 2016*, filed by USA. (Attachments: # 1 Attachment 1, # 2 Attachment 2 part 1, # 3 Attachment 2 part 2, # 4 Attachment 3, # 5 Attachment 4, # 6 Attachment 5, # 7 Attachment 6, # 8 Attachment 7, # 9 Attachment 8)(Kirchner, Domenique) (Entered: 02/03/2017) |
| 02/03/2017 | 123 | **SEALED**RESPONSE to *Court order dated Nov. 4, 2016*, filed by USA. (Attachments: # 1 Tab 177, # 2 Tab 184, # 3 Tab 185, # 4 Tab 186, # 5 Tab 188 part 1, # 6 Tab 188 part 2)(Kirchner, Domenique) (Entered: 02/03/2017) |
| 04/13/2017 | 124 | NOTICE, filed by USA *of Waiver of Protection of Protective Order* (Attachments: # 1 Exhibit Redacted TSA)(Kirchner, Domenique) (Entered: 04/13/2017) |

Appx00118

| 04/24/2017 | 125 | STIPULATION re 96 Stipulation *of Facts (Joint) (Unsealed)*, filed by PALANTIR USG, INC.. (Hume, Hamish) (Entered: 04/24/2017) |
| 05/11/2017 | 126 | Joint MOTION to Unseal Document 90 Transcript , filed by USA.Response due by 5/30/2017.(Kirchner, Domenique) (Entered: 05/11/2017) |
| 05/17/2017 | | ORDER granting 126 Motion to Unseal Document. Signed by Judge Marian Blank Horn. (jm5) (Entered: 05/17/2017) |
| 06/20/2017 | 127 | NOTICE, filed by PALANTIR USG, INC. *Joint Waiver of Protection of Information* (Attachments: # 1 Exhibit Tab 6, # 2 Exhibit Tab 44, # 3 Exhibit Tab 165)(Hume, Hamish) (Entered: 06/20/2017) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">07/25/2017 10:51:37</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>Domenique</td><td><strong>Client Code:</strong></td><td></td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>1:16-cv-00784-MBH</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>10</td><td><strong>Cost:</strong></td><td>1.00</td></tr>
</table>

# ORIGINAL

## UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

PALANTIR TECHNOLOGIES INC., and
PALANTIR USG, INC.

                        Plaintiffs,

        -vs.-

UNITED STATES OF AMERICA,

                    Defendant.

Case No. _____ **16-784 C**

## FILED
JUNE 30, 2016
U.S. COURT OF
FEDERAL CLAIMS

## COMPLAINT

Hamish P.M. Hume
Stacey Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Appx00120

Protected Information
and/or Legends Redacted

## CLAIMS FOR RELIEF

### COUNT ONE
**The Army Violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002
By Refusing To Solicit The Data Management Platform As A Commercial Item**

158.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

159.    The law required the Army to solicit commercial items and nondevelopmental items to meet its requirements "to the maximum extent practicable." Instead of complying with that obligation, the Army did the opposite. It has sought to procure "developmental" service contracts on a cost-plus basis and to *avoid* the procurement of commercial items or nondevelopmental items "to the maximum extent practicable." This is unlawful. It is also arbitrary and capricious.

160.    The decision-makers at the Army who constructed the unlawful Solicitation are irrationally committed to the proposition that the Army needs to develop and own for itself the technology that Palantir has *already developed*. The Army essentially wants to build for itself what Palantir already owns and is willing to sell. This is not only irrational, it is unlawful.

161.    As a matter of law, the Army was required to "ensure" that the Solicitation define its requirements in such a manner that would allow for a commercial item or a nondevelopmental item to be procured to fulfill those requirements "to the maximum extent practicable." 10 U.S.C. § 2377(a)(2); *id.* at § 2377(b). By unnecessarily and irrationally bundling together the requirement for the Data Management Platform and the supposed requirements for certain Additional Enhancements, the Solicitation violated this statutory requirement.

162.    As a matter of law, the Army was required to "ensure" that "offerors of commercial items and nondevelopmental items other than commercial items are provided an

Appx00189

Protected Information and/or Legends Redacted

opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a)(3). By making it impossible for Palantir and other offerors of commercial items to submit bids to satisfy the requirements of the Solicitation, the Solicitation violated this statutory requirement.

163.   As a matter of law, the Army was required to "ensure" that it define its requirements in terms of "(A) functions to be performed; (B) performance required; or (C) essential physical characteristics." 10 U.S.C. § 2377(a)(1). By defining requirements solely in terms of cost-plus developmental efforts, rather than in terms of the ultimate "functions" or "performance" that is required by DCGS, the Solicitation violated this statutory requirement.

164.   As a matter of law, the Army was required to "ensure" that it "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency." 10 U.S.C. § 2377(b)(1). By issuing a Solicitation that makes it impossible for the Army to meet its requirements through the procurement of commercial items or nondevelopmental items, the Army has violated this statutory requirement.

165.   As a matter of law, the Army was required to "ensure" that it "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b)(3). By issuing a Solicitation that unnecessarily and irrationally bundles together the requirement for a Data Management Platform and the supposed requirements for certain Additional enhancements, and by refusing to modify this Solicitation in the way the Army itself recommended so as to unbundle these two separate requirements, the Solicitation violated § 2377(b)(3).

Protected Information
and/or Legends Redacted

166.    In sum, the law requires the Army to solicit and procure commercial items to the maximum extent practicable.  Here, the Army has done precisely the opposite of what the law requires, and therefore has violated § 2377(a) & (b).

167.    Indeed, while it was improperly conducted, the Army's own market research caused the Army *to admit* that it could have structured the DCGS-A2 acquisition through two different contracts, with the first being for the procurement of the Data Management Platform, and the second being for the procurement of the Additional enhancements.  The Army's own Information Paper admitted that the Data Management Platform "could be a commercial stand alone solution."  The Army's own Contracting Officer conceded that it was possible to "Procure a commercial product as basis of DCGS-A Increment 2 infrastructure"—i.e., to procure the Data Management Platform.

168.    By failing to solicit bids for the procurement of the Data Management Platform as a commercial item, the Army contradicted its own admissions and violated the requirements of § 2377.  It also violated numerous regulations, including those found at 48 C.F.R. § 11.002 (requiring Army to define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations), and at 48 C.F.R. § 10.002(d)(1) (requiring solicitation and award of a commercial item contract if market research establishes that its needs may be met by commercial items).

<u>COUNT TWO</u>
**The Army Violated 10 U.S.C. § 2377 And 48 C.F.R §§ 10.002 And 11.002**
**By Refusing To Solicit A Commercial Item For The Entirety Of DCGS-A2**

169.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

Protected Information
and/or Legends Redacted

170.    As alleged in Count 1, the Army violated § 2377 and related regulations by failing to issue a Solicitation to procure the Data Management Platform as a commercial item and by unnecessarily and irrationally bundling the requirement for the Data Management Platform with the requirement for certain Additional Enhancements.   However, even if it were legally permissible for the Army to have defined its requirements by bundling together the requirements for the Data Management Platform and the Additional Enhancements, the Army still violated § 2377 and 48 C.F.R §§ 10.002 and 11.002 by refusing to solicit commercial items for that bundled set of requirements.

171.    Offerors of commercial items, including Palantir, routinely provide both Data Management Platforms and associated Additional Enhancements together in one commercial offering.   For example, if Palantir were permitted to submit a bid for all the requirements set forth in the Solicitation, it would propose to provide both the Data Management Platform and the Additional Enhancements as a commercial item on a fixed-price basis, just as it does for other customers.   It would not submit a bid seeking to provide any of these services on cost-plus, developmental basis.

172.    Thus, even if the Army's requirements were properly defined as a bundle (which they are not), those bundled requirements could still be fulfilled with a commercial item.   That means that the law required the Army to ensure that the Solicitation would allow for bids that could meet the listed requirements by providing a commercial item or nondevelopmental item. By failing to allow for this, the Army violated § 2377 and the related regulations of 48 C.F.R §§ 10.002 and 11.002.

173.    Stated differently, the unlawful nature of the Solicitation is not just that it rejects a "two contract" approach that would have allowed it to procure the Data Management Platform as

70

Appx00192

Protected Information and/or Legends Redacted

a commercial item. In addition, the Solicitation is unlawful because it precludes bids by offerors of commercial items or nondevelopmental items who could fulfill the entirety of the Army's *bundled* requirements for DCGS-A2. As such, the Army violated, *inter alia*: § 2377(a)(2)'s mandate that it define its requirements to the maximum extent practicable so that commercial items could be procured to fulfill such requirements; § 2377(a)(3)'s mandate that it ensure, to the maximum extent practicable, that offerors of commercial items are provided an opportunity to compete; § 2377(b)(1)'s mandate that it ensure to the maximum extent practicable that its procurement officials acquire commercial items; 48 C.F.R. § 10.002(d)(1)'s requirement that it solicit and award a commercial item contract if market research establishes that its needs may be met by commercial items; and 48 C.F.R. § 11.002's mandate that it define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations.

174.   Once again, this unlawful Solicitation reflects an irrational commitment by the Army personnel who constructed the Solicitation to build and own for themselves what Palantir has already developed and is willing to sell to the Army. The Army wants to build Palantir's technology for itself. This is both irrational and unlawful.

71

Protected Information
and/or Legends Redacted

## COUNT THREE
### The Army Violated 10 U.S.C. § 2377(c) By Failing To Determine
### Whether Its Needs Could Be Met By Commercial Items

175.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

176.    Section 2377(c) provides that "[t]he head of an agency shall use the results of market research to determine whether there are commercial items . . . that – (A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. § 2377(c)(2).  The Army violated these requirements in several ways.

177.    First, the Army failed to design its market research in such a way that was genuinely designed to "determine" if commercial or nondevelopmental items were available to meet its requirements.  This is shown by the fact that the Army's RFIs all assumed that the solicitation for DCGS-A2 would be for a developmental, cost-plus contract, and failed to genuinely investigate the ability to satisfy the requirement for a Data Management Platform through a commercial or nondevelopmental item.  While it is true that the market research nonetheless resulted in the admission by the Army that a commercial item could satisfy the requirement for a Data Management Platform, the market research was nonetheless flawed in its operating assumptions and in failing to investigate properly the availability of commercial and nondevelopmental items.

178.    Second, the Army failed to investigate whether a commercial or nondevelopmental item could satisfy the full bundle of requirements contained in the Solicitation—*i.e.*, both the Data Management Platform and all of the Additional Enhancements. In particular, the Army failed to consider the fact that commercial offerors such as Palantir

72

Appx00194

Protected Information and/or Legends Redacted

routinely offer, on a commercial basis for a fixed-price, both their existing commercial products (such as the Palantir Gotham Platform) and the promise to perform certain enhancement, configuration, or implementation services for those products.  Palantir does do that, as do others in the sector.  The Army failed to consider that and failed to use the market research to determine the extent to which that could be done to fully satisfy all of the Army's stated requirements in the Solicitation.

179.    Third, the Army failed to consider what *modifications* could reasonably be made to either the existing commercial and nondevelopmental items or to the Army's requirements in order to allow commercial or nondevelopmental items to satisfy those requirements.  That is a direct violation of § 2377(c).

180.    Properly conducted market research would have established that (1) the Palantir Gotham Platform could satisfy the Army's requirement for a Data Management Platform; (2) Palantir (and likely others) could satisfy all of the bundled requirements of the ultimate Solicitation on a commercial or nondevelopmental basis, as the Additional Enhancements are routinely offered as part a commercial contract; and (3) reasonable modifications to either the Army's requirements or to available commercial and nondevelopmental items could ensure beyond any doubt that commercial and nondevelopmental items were available to satisfy those requirements.

181.    Had the Army undertaken the market research and made the determinations required by law, it would have issued one or more solicitations to procure commercial or nondevelopmental items to satisfy the DCGS-A2 requirements.

182.    That the Army refused to make the proper investigation and determinations required by § 2377(c) is further proof that the Army personnel responsible for the Solicitation are

Appx00195

Protected Information
and/or Legends Redacted

irrationally intent upon trying to build Palantir's Gotham Platform for themselves (essentially from scratch), rather than buying it for immediate use in a rational, effective, and efficient manner.

## COUNT FOUR
### The Army Violated 48 C.F.R. § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed Price Contract

183.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

184.    Independent of the merit of the claims set forth in Counts One through Three, the Army separately violated the law by soliciting a cost-reimbursement contract instead of a fixed-price contract.

185.    Cost-reimbursement contracts may be used "only when (1) [c]ircumstances do not allow the agency to define its requirements sufficiently to allow for a fixed-price type contract . . . or (2) [u]ncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract[.]"  48 C.F.R. § 16.301-2(a).

186.    Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable "to define its requirements sufficiently to allow for a fixed-price contract" or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

187.    Thus, the Army could have defined its requirements sufficiently to allow for a fixed-price type contract.  This is confirmed by the fact that offerors such as Palantir would have submitted firm fixed-price bids to meet the Army's requirements.  Indeed, the Army notes that Palantir and at least one other respondent to the Army's RFIs stated as much.  Regardless of

74

Protected Information and/or Legends Redacted

whether the services called for by the Solicitation are considered "commercial items" or not, the fact that Palantir and others are willing to offer a fixed-price bids confirms that the Solicitation should have solicited fixed-price contracts, and not the disfavored cost-plus contracts.

188.    Palantir has previously provided its customers, including many customers within the military and intelligence communities, with a Data Management Platform and Additional enhancements on a firm, fixed-price basis.   These customers purchase the Palantir Gotham Platform and also call upon Palantir to configure, enhance, and support the Palantir Gotham Platform as they deploy it for their particular needs.   There is therefore no reason the Army could not have solicited the entirety of the DCGS-A2 requirement on a fixed-price basis, and the Army violated 48 C.F.R. § 16.301-2(a) when it refused to do so.

189.    Again, the Army's unlawful conduct and its insistence on using the disfavored cost-plus contract confirms that the personnel in charge of this Solicitation were committed to building the Palantir technology for themselves rather than purchasing it as a commercial item, and allowed that commitment to outweigh their obligations to taxpayers and the warfighters in the field.

### COUNT FIVE
**The Army Violated 10 U.S.C. § 2304a(f) and DFARS Part 217.204**
**By Soliciting A Task Order Contract In Excess of Five Years**

190.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

191.    A task order contract is "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract."   10 U.S.C. § 2304d.

75

Appx00197

Protected Information and/or Legends Redacted

192.     The base period of a task order contract may not exceed five years. *See* 10 U.S.C. § 2304a(f) ("The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract or a modification of the contract. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period."); *see also* DFARS Part 217.204(e)(i) ("[T]he ordering period of a task order or delivery order contract (including a contract for information technology) awarded by DoD pursuant to 10 U.S.C. 2304a . . . [m]ay be for any period up to 5 years[.]").

193.     Contrary to the five-year maximum set forth above, the Solicitation in this case contemplates a task order with a base period of *six years*. The Solicitation, therefore, violates Section 2304a's time limitation for task orders.

194.     The Army has not disputed that the Solicitation contemplates a task order with a base period of six years, nor has it disputed that the law limits task order base periods to five years. Indeed, the Army appears to have anticipated that it would face this very legal challenge as a result, without seeming to have any meaningful answer to it: during a June 11, 2015 meeting, Army representatives appear to have discussed the possibility that the DCGS-A2 acquisition strategy exceeded the law's five-year limitation. It does exceed the limit. And the Army has no excuse or exception for violating that limit. This violation of law has prejudiced Palantir by denying it the opportunity to compete for any subsequent DCGS-A contracts for an entire additional year.

195.     Once again, this unlawful conduct reflects the commitment of the Army personnel in charge of the Solicitation to work only with their established relationship partners in the

Protected Information
and/or Legends Redacted

defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build Palantir's technology for themselves rather than to license it in a rational and efficient fashion.

## COUNT SIX
### The Army Violated 48 C.F.R. § 16.504
### By Soliciting An Impermissibly Expensive Task Order

196.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

197.    "No [indefinite-delivery indefinite quantity] task or delivery order contract in an amount estimated to exceed $112 million (including all options) may be awarded to a single source unless the head of the agency determines in writing that" one of four circumstances exist. 48 C.F.R. § 16.504(d)(i)(C). The first exception exists where "task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work." *Id.* The second exception exists where "[t]he contract provides only for firm fixed price task or delivery orders for [p]roducts for which unit prices are established in the contract or [s]ervices for which prices are established in the contract for the specific tasks to be performed." *Id.* The third exception exists where "[o]nly one source is qualified and capable of performing the work at a reasonable price to the Government." *Id.* The final exception exists where "[i]t is necessary in the public interest to award the contract to a single source due to exceptional circumstances." *Id.*

198.    The Army does not deny that it has solicited an IDIQ task order that exceeds $112 million and that is to be awarded to a single contractor. Nor could the Army deny these basic facts about the Solicitation, which states that "the expected value of this IDIQ contract will exceed $100M" and that "[t]he IDIQ base ceiling amount is $206M."

77

Appx00199

Protected Information and/or Legends Redacted

199.    Instead of denying these facts, the Army has argued that a single source IDIQ task order exceeding $112 million is acceptable here because the second exception to Part 16.504(d)(i)(C) is satisfied—*i.e.*, that the task orders expected under the contract are "so integrally related that only a single source can reasonably perform the work."

200.    That determination, however, flies in the face of the Army's own market research, which, as discussed above, concluded that the Army's requirements could have been performed through *different contracts*, with the first contract focused on procurement of the Data Management Platform, and the second on the Additional Enhancements.    The Army's determination that the task orders are integrally related also contradicts Congress' mandate, in FY16 NDAA, that the Army analyze the segmentation of DCGS-A2 and identify each component that could be fulfilled by commercial software.    It also violates the reasonable modification requirements of § 2377.

201.    Thus, the Solicitation does not satisfy the second exception to 48 CFR § 16.504(d)(i)(C).    It therefore unlawfully violates the $112 million limitation set forth in 48 C.F.R. § 16.504(d)(i)(C).

202.    This additional legal violation again confirms that the Army personnel in charge of the Solicitation were willing to go to any lengths to try to protect their relationship with partners in the established defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build their own version of the Palantir Gotham Platform.

Protected Information
and/or Legends Redacted

## COUNT SEVEN
### The Army Engaged In Arbitrary, Capricious, And Unlawful Conduct By Refusing To Allow Palantir To Bid, By Resisting Innovation, By Insisting On The Failed Approach Of DCGS-A1, And By Engaging In Bad Faith Conduct

203.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

204.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). As shown in each of the Counts set forth above, the Solicitation violated numerous provisions of law, and hence was "not in accordance with law." In addition, and independent of all of those specific legal violations set forth in Counts One through Six, the Army's conduct was also arbitrary and capricious. This is an independent ground for setting aside the Solicitation, as provided for in § 706(2)(A).

205.    First, each of the legal violations described in each of the Counts above describes arbitrary and capricious action. Even if the Army were somehow able to concoct technical legal defenses to these claims, their conduct would still be arbitrary and capricious for all the reasons described in the foregoing Counts.

206.    Second, the Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring

79

Protected Information and/or Legends Redacted

DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

207.    Third, the Army personnel in charge of this Solicitation are irrationally resisting innovation. Both Congress and the Secretary of Defense have exhorted and directed the military services to encourage and seek out innovation. Yet the Army's conduct in this case does the opposite. That is arbitrary and capricious.

208.    Fourth, the Army's conduct ignores reality and the requests from the commanders and troops whose lives depend upon the effectiveness of their Data Management Platform. Over half the brigades in the Army have requested Palantir's Gotham Platform. Yet the Army has constructed a Solicitation that makes it impossible for Palantir to compete. That is arbitrary and capricious.

209.    Fifth, there is ample evidence of malicious, bad faith conduct toward Palantir. The Army's staff in G-2 directed the deletion and destruction of the portions of 2012 ATEC report that were highly favorable toward the Palantir Gotham Platform and highly unfavorable in its review of DCGS-A1. For the Army to order these deletions is bad faith conduct that reveals a deep-seated level of bias against Palantir and in favor of the incumbent defense contractors who were used in the disastrous DCGS-A1 contract. Such bias is irrational, arbitration, and capricious.

210.    Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct.

Appx00202

Protected Information and/or Legends Redacted

███

## UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

PALANTIR TECHNOLOGIES INC., and
PALANTIR USG, INC.

          Plaintiffs,

-vs.-

THE UNITED STATES

          Defendant.

Case No. 16-784C
Judge Marian Blank Horn

## PALANTIR'S REPLY IN SUPPORT OF ITS MOTION
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD
## AND OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
hhume@bsfllp.com
skaplan@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

Protected Information
and/or Legends Redacted

functionality is unnecessary." *Id.* (emphasis added). With respect to DIB upgrade, Palantir explained that "DIB should be treated as an interoperability standard" that applies to the Data Management Platform. *Id.* Thus, Palantir did not say that it was unwilling or unable to satisfy the Army's requirements; it merely told the Army that these requirements could be obtained more efficiently through the procurement of a Data Management Platform as a commercial item. *See* Tab 15 at A694.

Second, the Government argues that Palantir "declined to answer" a question in the Army's second RFI, but the Government misstates both the question asked and the answer given. *See* Dkt. 19 at 39, 69. As it did in its Motion to Dismiss, the Government says the Army asked prospective bidders to "complete a chart identifying their capabilities across the different DCGS-A domains." *Id.* at 68; *see also* Dkt. 13 at 12. That is not what the Army requested. Rather, it asked prospective bidders for which "Agency or Gov't Customer"—including procurement "contract number"—they had certain experience within "the last three (3) years." Tab 37 at A1904. Palantir had *already provided* the Army with information about its prior Government contracts. *See, e.g.* Tab 36 at A1886-88 (Palantir's first RFI response listing contracts). There was no reason to do so again.

By contrast, there was a pressing need to address the fact that this RFI, like the prior RFI, was inquiring only into potential bidders' experience "managing software *development projects*," and not into their ability to provide commercial items. Tab 37 at A1900, 1904; *see also* Dkt. 20 at 25-26. Thus, Palantir responded to this RFI by telling the Army that *commercial items were available on a fixed-price basis to meet the Army's needs. See* Tab 38 at A1910 ("We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities."); *see*

29

Protected Information and/or Legends Redacted

# In the Matter of:

# Palantir Technologies, Inc., et al. v. USA

*September 15, 2016*

████████████

Condensed Transcript with Word Index



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Protected Information
and/or Legends Redacted

177

1  deposition testimony?
2      MS. KIRCHNER: It's our position you shouldn't
3  consider --
4      THE COURT: And I shouldn't take the supplemental
5  either?
6      MS. KIRCHNER: Right, all three.
7      THE COURT: But you are trying to argue with it
8  now.
9      MS. KIRCHNER: All three. And as I said, the
10  supplemental report for the additional reason that it's
11  inconsistent with the deposition testimony. And then,
12  as we said, there is from our point of view --
13      THE COURT: You should like that, because that
14  questions credibility, obviously, if it's inconsistent,
15  but I -- either way, we'll go through it. I mean, we
16  are going to go through it very carefully and figure out
17  what will be necessary for the Court under the Axiom
18  principles to add to the record, and at this point, I
19  can't give you an absolute answer on that.
20      MS. KIRCHNER: I understand, Your Honor. I
21  understand it's a difficult --
22      THE COURT: Let me ask you two legal questions.
23  One, do you agree with Mr. Hume that there is nothing
24  precedential in the bid protest arena that helps us on
25  this statutory section?

178

1      MS. KIRCHNER: Well, I think we cited all the
2  authorities we could find.
3      THE COURT: But there's nothing direct.
4      MS. KIRCHNER: Nothing direct on in what
5  circumstances you would modify agency requirements.
6      THE COURT: And let me ask you also one other
7  question having to do with the FAR definition where, you
8  know, we've looked at Part 3, items 1 and 2. I think
9  you -- when you talked about it, you conflated them, but
10  it's actually an "or."
11      MS. KIRCHNER: I see that it's an "or." What
12  we're saying is that you have to read the two together
13  in that when you read the two --
14      THE COURT: Well, "or" generally doesn't mean
15  that you have to read them together.
16      MS. KIRCHNER: I understand, but the language is
17  very similar where it talks about being customarily
18  available in the commercial marketplace. So, that's
19  repeating --
20      THE COURT: I mean, doesn't it reinforce the
21  minor possibility there? I mean, it is an "or."
22      MS. KIRCHNER: I understand, it is "or," but it
23  talks about customarily available in the commercial
24  marketplace, and then, again, not customarily --
25      THE COURT: No, I know what it says. I'm

179

1  concerned that you've kind of pushed them together with
2  an "and" concept rather than an "or."
3      MS. KIRCHNER: No, I recognize it's an "or." I
4  am saying that you should read them together because you
5  see the same long, "customarily available." What we're
6  saying is that in terms of construing customarily
7  available in the commercial marketplace, that's not --
8  that's not a government contract. That's not making
9  modifications in order to meet government-peculiar
10  requirements.
11      THE COURT: That's a whole different set of
12  standards.
13      MS. KIRCHNER: Well, we're saying --
14      THE COURT: To have a modification process of an
15  existing contract is really quite different, so...
16  All right. Anything else?
17      MS. KIRCHNER: We think that there are also
18  additional inconsistencies in the supplemental report
19  with Mr. Choung compared to his deposition testimony --
20      THE COURT: You've said that, yes.
21      MS. KIRCHNER: Well, there's another one, Your
22  Honor.
23      THE COURT: And that is?
24      MS. KIRCHNER: There's a number of them. For
25  example, with regard to the requirement to upgrade to

180

1  the DIB specifications, this is the DIB upgrade, which
2  was -- it's part -- it's one of the areas where the
3  market research report found that there was no
4  commercial item available that could meet that scope of
5  work --
6      THE COURT: Okay, we can compare them. I mean,
7  we will look at the two of them if we decide to let them
8  in. That becomes a credibility -- and he's sitting
9  right there, so...
10      MS. KIRCHNER: Can I just finish what I just --
11  I'll be very quick, Your Honor.
12      THE COURT: You have no problem with him sitting
13  there while you're talking about him?
14      MS. KIRCHNER: Mr. Choung sitting there? Not
15  really, Your Honor. No, I -- I -- no.
16      THE COURT: Okay. He's very interested. He was
17  leaning forward.
18      MS. KIRCHNER: Just to complete what I was
19  saying, Your Honor, in deposition, Mr. Choung stated
20  that there would have to be an enhancement developed in
21  order for the Palantir platform to meet the requirements
22  for upgrading to the DIB, specification 4.0, and then if
23  you look at his supplemental report, in the supplemental
24  report, he says that there's an existing helper for
25  this, which is a conflict between his deposition

45 (Pages 177 to 180)

Appx00795

Protected Information
and/or Legends Redacted

181

1    testimony and his supplemental report.
2        In the supplemental report, he -- this would be,
3    if you looked at the chart, there are these numbers that
4    identify the requirements, and it would be PBS
5    1015.2[7], which deals with complying with the DIB
6    standards, and there, according to the chart just
7    recently provided, there's no software development
8    required, and that's the specification that deals with
9    complying with the DIB standards.
10       As I said, in deposition, and in his expert
11   report, he talks about there being an enhancement
12   necessary to the -- to meet those -- the upgrade to the
13   DIB, and that is, indeed, one of the areas where we said
14   there would have to be a real commercial item that would
15   meet the scope of work.
16       So, I appreciate the Court's indulgence.
17       THE COURT: Thank you very much.
18       All right. We have a couple of procedural things
19   that we have to deal with before we adjourn. You can go
20   sit down and make yourself comfortable.
21       Number one, Ms. Flesch, you and I consistently said they
22   are going to make an award on October 15th. Obviously,
23   that is a short window, but more importantly, it's a
24   Saturday. So, the question to our friends from the
25   Army, are you really going to do it on Saturday? And if

182

1    not, I'm not going to give you that Saturday date. I'll
2    give you the following Monday, but you have to tell me
3    that there are really going to be people with green eye
4    shades working and doing that in the procurement office
5    that actually are going to award it on Saturday.
6        Mr. Flesch, we're -- obviously, I'm looking
7    straight at you.
8        MR. FLESCH: Your Honor, I don't think it's going
9    to be awarded on a Saturday, and --
10       THE COURT: I did contract formation for a long
11   time at one point in my career, and I couldn't find the
12   procurement people on Saturday. So, it's very rare.
13       MR. FLESCH: I think the procurement folks in
14   this room here have been working Saturdays.
15       THE COURT: I believe that.
16       MR. FLESCH: Yes.
17       THE COURT: But some of the rest of them, not.
18       MR. FLESCH: Your Honor, it's always a moving
19   target. I mean, 15 October is when we anticipated a few
20   years ago. We still hope to do it by 15 October, which
21   I understand is a Saturday. I think Monday is -- Monday
22   is a safe bet.
23       THE COURT: Okay. So, Monday would be October
24   17 -- no, it's -- yes, 17. So, you all should be
25   prepared to come to Court at 10:00 on October 17, and if

183

1    we can't give you a written decision, we will give you
2    an oral one on that date. We will have done what we
3    need to do to finalize our decision, but we may not have
4    prettified the opinion in ways that I want posterity to
5    put it in Westlaw and Lexis and other reporting things.
6    So, we would be editing more than anything. That's the
7    only thing that would be left to do, would be editing
8    essentially. So, 10:00 on the 17th, we'll be prepared.
9        Let me actually make sure that that works. It's
10   going to have to work, I think, but let me just get
11   there. Yeah, that should be fine. So, 10:00 on October
12   17th, be prepared to come and get your decision if we
13   haven't electronically issued it.
14       Mr. Hume?
15       MR. HUME: Are there more procedural issues to
16   deal with?
17       THE COURT: Yes.
18       MR. HUME: Oh, sorry.
19       THE COURT: Now, the next question for you all is
20   I indicated at the beginning of this that, just to make
21   our lives a little bit easier in the short time that we
22   have -- and I should say, Mr. Flesch, you have just said
23   it's a moving target, and it always is a bit of a moving
24   target. If the target moves, would you please let me
25   know so that I can get the benefit of the move? And if,

184

1    in fact, you know you're not going to do it that week,
2    you are going to do it the next week, let me have that
3    time, and I will be eternally grateful.
4        What you're hitting unfortunately for me, and
5    that's one of the problems, is there's about a ten-day
6    period in the middle, between now and then, when I am
7    otherwise committed, and so although I'm perfectly
8    happy, as you all are, to do what I have to do during
9    the day and then work at night until as late as I have
10   to work into the next day, and I would prefer not to do
11   that if I don't have to. You know, I was up at 3:00 in
12   the morning last night, but I would really prefer not to
13   do that if, in fact, your target award date moves.
14       MR. FLESCH: Yes, Your Honor. It's an ongoing
15   source selection, but, yes, it's a moving target, and we
16   will come back to the Court if it's going to push past
17   15 October.
18       THE COURT: Excellent, okay.
19       Now, at the beginning I said to you all that I
20   wanted, for us to be able to work through some of this,
21   to get from you two lists, and they can literally be
22   lists. I don't want argument. I have got all the
23   argument I need, the basics in the briefs, the
24   supplements, and the supplements to the supplements, and
25   whatever. I want a list of those precise citations in

46 (Pages 181 to 184)

Appx00796

Protected Information
and/or Legends Redacted

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| PALANTIR USG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT STIPULATIONS OF FACT**

In compliance with the Court's Order on September 15, 2016, defendant, the United

States, and protestor, Palantir USG, Inc., set out the following Joint Statement of Facts

drawing upon and citing to the portions of the Administrative Record.

1. On June 30, 2016, Protestors, Palantir Technologies Inc. ("PTI") and Palantir

USG, Inc., ("Palantir USG") filed a pre-award bid protest, challenging the Department of the

Army, Army Contracting Command, Aberdeen Proving Ground's Request for Proposals No.

W56KGY-16-R-0001 ("Solicitation").

2. Palantir USG is a corporation incorporated under the laws of the State of

Delaware, having its principal place of business in Palo Alto, California. Dkt. 1 at ¶ 21. PTI

owns one hundred percent of the stock of Palantir USG. Dkt. 1 at ¶ 20.

3. The Palantir Gotham Platform is a Data Management Platform that is licensed to

customers on a commercial item basis. The GSA Schedule lists both term licenses and perpetual

licenses for the Palantir Gotham Platform, as well as related services.[1]

4. Government agencies have procured the Palantir Gotham Platform and related

services on a commercial item basis.

---

[1] https://www.gsaadvantage.gov/ref_text/GSF0086U/0PMLGO.3B99FL_GS-35F-
0086U_PALANTIRTSC04072016.PDF.

1

███████████████████████████████████████████████

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

PALANTIR TECHNOLOGIES, INC., and )
PALANTIR USG, INC., )
                                   )
          Plaintiffs, )
                                    )
          v. )    No. 16-784
                                    )    (Judge Marian Blank Horn)
THE UNITED STATES, )
                                    )
          Defendant. )
                                    )

## DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the rules of the United States Court of Federal Claims (COFC), defendant, the United States, respectfully requests that the Court enter judgment on the administrative record in defendant's favor, and dismiss the plaintiffs' complaint. Plaintiff, Palantir USG, Inc., previously filed a bid protest before the United States Government Accountability Office (GAO) on February 16, 2016, and filed this suit after losing at GAO on May 18, 2016. Plaintiff, Palantir Technologies, sells licenses to allow other entities to use its proprietary product, the Palantir Gotham Platform. A6793 (Tab 145), A6794 (Tab 146), A6795 (Tab 147). Hereinafter, Palantir refers to both plaintiffs.

### STATEMENT OF FACTS

The Distributed Common Ground System Army (DCGS-A) is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the warfighter. A6561 (Tab 122); A4245 (Tab 94). DCGS-A facilitates the rapid planning, execution, and synchronization of all war fighting functions. DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program. A6561 (Tab

1

Protected Information and/or Legends Redacted

███████████████████████████████████████████████

subcomponents be selected or built with interoperability and usability throughout the lifecycle of the software development process.

**D.   The Market Research Report Does Not Support Palantir's Arguments**

The July 2015 Market Research Report compiles the results of the Army's market research. A1792-1843 (Tab 33). The Army directly engaged with industry in conducting market research to include three Requests for Information (RFIs), Industry Days, and Industry-Government one-on-one meetings, the details of which are found in the Army Market Research Report, dated July 2015. AR1792-1843 (Tab 33).

The first RFI was released on August 13, 2014, and closed on September 12, 2014. A1802 (Tab 33). It "was conducted to assess the level of relevant competition and capabilities in the market place and elicit feedback to assist the Program Office in developing the Acquisition Plan." A1802 (Tab 33). The RFI, among other things requested information on "contract vehicles [that industry] has been awarded that address the scope of services required to develop and integrate a system such as DCGS, focused on integrating COTS/GOTS and internally developed software products into a software baseline to be fielded on commercial hardware (laptops, servers, etc.) with software updates/enhancements delivered every 6-12 months. A1804 (Tab 33). The RFI posed acquisition strategy questions about a change from (a) the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation to (b) a Prime contractor approach, leveraging industry's innovation and proven processes to deliver increment 2 capabilities. A1804 (Tab 33). The RFI also posed questions about the use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as a baseline to develop Increment 2

38

**Appx00898**

Protected Information and/or Legends Redacted

enhancements, but noted that offerors had the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions of the provided Increment 1 baseline package. A1805 (Tab 33).

The second RFI was released on December 5, 2014, and closed on December 29, 2014. A1805 (Tab 33). It "was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." A1802 (Tab 33). RFI No.2 requested, in item 3.0(d), that contractors complete a chart identifying their capabilities across the different DCGS-A domains. A1900, 1904-05 (Tab 37); A1806 (Tab 33). The domains listed were:

- Cloud Computing,
- Big Data Analytics,
- Data Architecture & Management,
- Data Fusion & Pattern Analysis,
- Applications for IC ITE Joint Storefront,
- Targeting,
- Signals Intelligence/NS A-Net Operations,
- Defensive Cyber Operations,
- Offensive Cyber Operations,
- Counter Intelligence & Human Intelligence,
- DCGS Integration,
- Backbone (DIB) implementation,
- Weather effects/analysis,
- GEOINT (Full Motion Video/Static Imagery Intelligence),
- Geospatial Intelligence (Terrain & Mapping),
- Collection Management (Sensor Management),
- On-the Move Operations,
- Workflow Management,
- Role/Attribute Base Access Control,
- Protection level 3 security hardening,
- Ease of use initiatives,
- High/Ultra reliability program,
- Army interoperability certification, and
- Joint interoperability certification.

*Id.*

Palantir USG responded to RFI No.2, but declined to answer question 3.0(d) in RFI No.2 or complete the Army's chart and identify its specific capabilities across the various DCGS-A

39

**Appx00899**

Protected Information and/or Legends Redacted

domains listed. A1908 (Tab 38). Instead, Palantir USG stated that it had "support[ed] . . . many of the domains listed," and "[i]f the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion." A1911 (Tab 38). Palantir USG did not assert that it had supported all of these domains, and did not even specify the domains that it had supported or provide supporting information so that such assertions could be verified. *Id.*

In addition, Palantir USG declined to answer question 3.0(f) in RFI No.2, *i.e.*, "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" A1905 (Tab 37). Palantir USG's response to question 3.0(f) was: "We view DCAA accounting as not relevant to an acquisition strategy for a COTS-Based solution at a FFP [firm-fixed price]." A1991 (Tab 38). Palantir USG declined to answer question 3.0(h) in Request for Information No.2, *i.e.*, "What is your company's current rate of personnel retention over the last five (5) years?" A1906 (Tab 37). Palantir USG's response to question 3.0(h) was: "We believe the retention rate of a large business software company is not relevant to the evaluation of a COTS-based solution and FFP contracts." A1911 (Tab 38). Palantir USG also declined to answer question 3.0(i), *i.e.*, "Does your company utilize best practices for software development, *i.e.* Capability Maturity Model Integration (CMMI) certification? If so, what is your certification level? If not, can your company obtain one prior to the time of proposal submission?" A1906 (Tab 37). Palantir USG's response to question 3.0(i) was: "Although we adhere to industry best practices in developing world-class software internally, we do not view CMMI certification as relevant to a contract requiring a finished COTS-based product and do not anticipate building software for the government under a services contract. We do not feel CMMI certification is relevant in this

40

**Appx00900**

Protected Information and/or Legends Redacted

███████████████████████████████

evaluation." A1911 (Tab 38). Palantir USG essentially admitted that it would not be building any software in response to the anticipated DCGS-A Increment 2 solicitation, but was advocating for more sales of licenses for use of its finished COTS-based product.

The third RFI was released on May 6, 2015, and closed on May 22, 2015. A1808 (Tab 33). It "was released to determine if [the] rule of two exists, as defined in FAR 19.502, and if a small business set-aside is appropriate for Increment 2 development." A1802 (Tab 33).

The first Industry Day, conducted on January 20, 2015, "provided a forum to share emerging requirements with industry." A1802 (Tab 33). The second Industry Day, conducted on June 25, 2015, provided "an opportunity to discuss the draft Increment 2 requirements with industry." A1802, 1808 (Tab 33).

The Army conducted Industry One-On-Ones from January 20, to May 12, 2015, and "provided a forum to answer Industry's questions and elicit their feedback regarding the elements of the Increment 2 Acquisition Strategy, and Acquisition Plan, such as small business involvement and data management considerations." A1802 (Tab 33). A total of 78 companies participated. Common themes discussed during the one-on-ones were that many participants recommended that Increment 2 leverage the investments made in DCGS-A Increment 1, that DCGS-A create an open Data Architecture, free from the expense and restrictions of a proprietary model, and that this would ensure that the Data Infrastructure is decoupled from the Application Layer. A1809 (Tab 33).

A Market Research Report, dated July 13, 2015, summarizes the market research for the DCGS-A Increment 2 procurement. A1792-1843 (Tab 33). The market research found that the "[v]ast majority of respondents support hiring a contractor as the Lead Systems Integrator (LSI) due to efficiencies in industry decision making and resource-marshaling processes." A1822 (Tab

41

**Appx00901**

Protected Information and/or Legends Redacted

33). "Several respondents recommended the Government maintain LSI role citing belief that an Industry LSI will make decisions that may extend the program or place undue risk to the government, and that a government LSI would maintain impartiality with response to identification of subcontractors." A1822 (Tab 33). The market research found that industry strongly supports the use of Government Furnished Information to reduce performance risk, program costs, and to increase competition. A1822 (Tab 33). Companies who responded to a question about successive releases of software unanimously supported multiple software builds, with varying recommendations as to the frequency of releases. A1823 (Tab 33).

The market research determined that while commercial capabilities could potentially satisfy one or more portions of the DCGS-A requirement, "significant portions of the anticipated scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product." A1840 (¶8.3.5)(Tab 33); *see also* A12 (Tab 1). Therefore, development and integration services sold competitively in the commercial marketplace based on established catalog or market prices for these specific tasks and/or specific outcomes do not exist. *Id.* The July 2015 market research report concluded that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product." A1840 (¶8.3.5)(Tab 33).

According to Palantir, the July 2015 Market Research Report, AR1792 (Tab 33), demonstrates that the Army knew it could and should procure a Data Management Platform as an available commercial item. Br.21, 26. This is incorrect. As explained above, the results of the market research were that while commercial capabilities could potentially satisfy one or more portions of the DCGS-A requirement, "significant portions of the anticipated scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a

42

**Appx00902**

Protected Information and/or Legends Redacted

████████████████████████████

commercial product." A1840 (¶8.3.5) (Tab 33). The market research report concluded that "the

DCGS-A Increment 2 development effort cannot be procured as a commercial product." *Id.*

To support its arguments in favor of a phased acquisition strategy, Palantir cites the

November 2015 DCGS-A Increment 2 Acquisition Strategy Report, which generally describes

two Releases, the first of which would "consist of a new data management architecture and data

analytics platform; the second of which would involve certain "enhancements." Br.26; A105

(Tab 6). Palantir also refers to the following statement in the July 2015 Market Research Report:

> The IPT recommends PM DCGS-A utilize separate contracts to
> develop and field DCGS-A Increment 2 Releases 1 and 2. For the
> development of Release 1 the PM plans to conduct a full and open
> source selection, best value, competitive contract. This award
> would be for a single vendor who would assume the role of system
> Data Architecture developer/system integrator. This contract is
> envisioned to be a single award indefinite Delivery, Indefinite
> Quantity (IDIQ) contract type.

A1842 (tab 33); Br.26. Palantir cites other documents that mention two Releases for DCGS-A

Increment 2. Br.26, citing Tab 71 at A2748, Tab 73 at A3075, Tab 87 at A3883-84.

We agree that there will be at least two software Releases for DCGS-A Increment 2, but

that fact does not support Palantir's arguments. Palantir's argument highlights the Data

Management Platform, and ignores other components of DCGS-A Increment 2, Release 1, *e.g.*,

(1) the Data Integration Layer, which works with a Data Management Platform, and is a requisite

part of DCGS-A, Increment 2, Release 1, *see* pages 35-36; (2) "glue code," as explained by

Stephen Morton, Deputy Product Manager, A56-57 (Tab 2), *see* page 35; and (3) the Data

Access Layer.

The Data Access Layer is a collection of services and other interfaces that will serve the

DCGS data to internal and some external sources. Tab 24, A1328-29 (¶¶3.2.6.2, 3.2.6.3),

A1340-41 (¶3.2.24) (requiting a "data integration layer. . . with standardized data access layer").

43

**Appx00903**

Protected Information
and/or Legends Redacted

████████████████████

This would include web services for structured data, and a geo server for map layers. *Id.* The

Data Access Layer will also enforce the security to ensure users or systems only access the data

that they are authorized to view and/or edit. *Id.* DCGS-A tools will connect to the Data Access

Layer to get data from, or store data to, the Data Management Architecture. *Id.*

### E.   The Other Documents Cited Do Not Support Palantir's Arguments

#### 1.   DIVA Study, July 2014

The Data Integration, Visualization and Analytics (DIVA) Independent Market Study

was directed by the Army Acquisition Executive (AAE), the Honorable Heidi Shyu, "to provide

situational awareness and market trends to the Army leadership of the 'state-of-the-practice'

within the commercial DIVA software platform landscape." A2218-54 (Tab 43), at A2223.  The

DIVA Independent Market Study, dated July 2014, was conducted by MITRE, and its scope

included:

- Conduct a market survey of representative sample of Commercial Off The Shelf (COTS) vendors within the DIVA software landscape
- Establish DIVA Functional and Architectural Considerations
- Review COTS vendors' products and map into the DIVA Functional and Architectural Considerations
- Review DoD/Intelligence Community Enterprise Architectures, Standards, and Capabilities to understand the potential leverage points for a DIVA software platform
- Investigate the commercial industry pricing strategies and document industry trends
- Assess overall market trends and identify potential gaps.

A2223 (Tab 43).  Specifically out of the scope were "vendor comparison or vendor down

selection" and "specific acquisition recommendations." A2223 (Tab 43).  The study was

intended to provide:  (1) "high-level overview of the ASA (ALT) Data Integration, Visualization

and Analytics (DIVA) Independent Market Study"; and (2) "recommendations for the DCGS-A

Increment #2 Acquisition effort and describe the top-level risks and mitigation strategies

associated with adopting these recommendations." A2222 (Tab 43).

44

**Appx00904**

Protected Information and/or Legends Redacted

███████████████████

The DIVA study looked at three acquisition approaches: (1) Cloud Infrastructure Platform; (2) DIVA "Turn Key" Platform; and (3) Hybrid Approach. As envisioned, a Cloud Infrastructure Platform approach would host a Cloud platform, and develop custom applications and integrate with the Cloud Platform. A2231 (Tab 43). A DIVA Turn Key Platform approach would host a Turn Key Platform, and develop and integrate data integration, analytics, and visualization applications. A2232 (Tab 43). A turn-key solution is one that operates or works out of the box with no additional work, development or effort needed to make the function operate. A Hybrid Approach would host both a Cloud Platform and a Turn Key Platform, integrate the Turn Key Platform with the Cloud Platform, and develop and integrate data integration, analytics, and visualization applications. A2233 (Tab 43). Validation of capabilities of technical approaches was out of scope for the study. A2223 (Tab 43).

The DIVA study concluded that there were COTS products available that could meet some of the DCGS-A Increment 2 capability requirements. Tab 43, A2246-51. The DIVA study concluded that a Hybrid Approach, employing a combination of Enterprise Cloud and Turn-Key approach tailored to the Government's requirements, would be the best solution for DCGS-A Increment 2, which included software development and integration tasks. A2242 (Tab 43). The DIVA study considered and rejected a COTS-only system because there was a large risk that the interfaces between the DCGS-A components would not be mature. A2254 (Tab 43).

As Stephen Morton, Deputy Product Manager, explained, the DIVA study "didn't look at the full breadth and scope" of the Increment 2 program, it looked at only some portions. Tab121, A6293 (Tr.41); A6346 (Tr.94). Mr. Morton further explained that the Requirements Document for Increment 2 did not exist at the time that the DIVA study was performed. Tab 121, A6356 (Tr.104), referring to the Requirements Definition Package, Tab 12, A338-409 (dated October

45

Protected Information and/or Legends Redacted

30, 2015). The total requirements for DCGS-A Increment 2 are compiled in three documents, which should be considered together: (1) the Capabilities Development Document, Tab 11, A251-337 (JROC approval on July 7, 2015); (2) the Requirements Definition Package, Tab 12, A338-409 (dated October 30, 2015); and (3) and the Performance Based Specification, Tab 23, A1189-1293.

### 2.  Palantir Misconstrues The July 2014 DIVA Market Study

According to Palantir, the July 2014 DIVA Study "recommended that the Army (a) first procure 'a new technical foundation,' which would consist of a Data Management Platform that could be procured as a commercial item, and (b) then procure functionality upgrades (i.e., Additional Enhancements)." Br.23. The July 2014 DIVA Market Study, detailed at pages of our brief, does not contain that specific recommendation of an acquisition approach. According to Palantir, "the DIVA Market Study concluded that it was not only possible, but also preferable, to structure the DCGS-A Solicitation in two phases: one to acquire the Data Management Platform as a commercial item and another to procure any Additional Enhancements." Br.23. The specific conclusion is not contained in the July 2014 DIVA Market Study.

Close reading of the July 2014 DIVA study demonstrates that it looks at various acquisition approaches, and considers plusses and minuses of each approach. The study examined a Hybrid Approach for DCGS-A, which would consist of hosting a Cloud Platform and a Turn Key Platform, integrating the Turn Key Platform with the Cloud Platform, and developing and integrating data integration, analytics, and visualization applications. A2233, 2246 (Tab 43). The advantages of the Hybrid Approach were envisioned as being: blends benefits of other approaches, provides global scale with out-of-box applications, and potential tactical edge. A2234 (Tab 43). The disadvantages of the Hybrid Approach were envisioned as

46

**Appx00906**

Protected Information and/or Legends Redacted

including that: (1) "interfaces have not matured to the point that allows seamless migration from one cloud infrastructure provider to another"; and (2) "specific [application programmer interfaces] are not standardized across COTS vendors; therefore separate software code must be developed to have applications that work with different cloud infrastructure providers." A2249 (Tab 43). Thus, the Army "has to develop multiple cloud infrastructure interfaces to interoperate in DoD/IC/Army cloud environments." A2249 (Tab 43). Contrary to Palantir's argument that the DIVA Market Study advocated a COTS-only solution for DCGS-A Increment 2, the study demonstrates that a COTS-only solution ought to be rejected because the interfaces are not sufficiently "mature" and "not standardized," and the Army would have to develop "multiple cloud infrastructure interfaces.' A2249 (Tab 43).

Moreover, as Stephen Morton, Deputy Product Manager, explained, the DIVA study "didn't look at the full breadth and scope" of the Increment 2 program; it looked at only some portions. Tab 121, A6293 (Tr.41), A6346 (Tr.94). In sum, Palantir's arguments are not supported by the July 2014 DIVA Market Study.

### 3. Trade Space Analysis, July 2015

The U.S. Army Material Systems Analysis Activity (AMSAA) was directed by HQDA DCS G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (CDD) to support future requirements decisions. A1929-2217 (Tab 42), at A1946. The TSA, dated July 2015, identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. Tab 42, A1931, 1946.

47

Protected Information
and/or Legends Redacted

&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. A1946 (Tab 42). The TSA focused on only four DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1:

1) Data Enterprise Architecture (DEA)
2) Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise (AGE)
3) Intelligence Support to Cyber Operations (CO)
4) Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR)

A1946 (Tab 42). Representative systems were assessed to reflect capabilities that are readily available for three alternatives: (1) Commercial off the shelf (COTS); (2) Government off the shelf (GOTS); and (3) a Hybrid, which was described as a compilation of commercially available software packages augmented by integrated tools written by a third-party using requirements and specifications generated by the Government, *i.e.*, a combination of COTS and GOTS. A1946 (Tab 42). Specific software solutions were not evaluated. A1946 (Tab 42).

The TSA study concluded that, for DEA, a hybrid solution (combination of COTS and GOTS) provides "the best 'turn-key' functionality," but there were several moderate to high risk drivers identified for all three options. A1948 (Tab 42). As noted, a turn-key solution is one that operates or works out of the box with no additional work, development or effort needed to make the function operate. For the SSGF (Geospatial), the study determined that COTS solutions "have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative," A1951 (Tab 42), but "[t]he COTS options won't address all Army Geospatial requirements with software 'out of the box'," A2030 (Tab 42), and there were moderate to high risk drivers for both the COTS and Hybrid alternatives. A2030 (Tab 42). For the Cyber effort,

48

Protected Information and/or Legends Redacted

the study determined that a Hybrid solution "satisfies most technical performance metrics and is the least costly solution." Tab 42 (A1949, 2029). The findings for the Mission Command Support PED were captured under the other capability findings, A1947 (Tab 42).

According to Palantir, the TSA study demonstrates that the DCGS-A Increment 2 procurement should have been structured in separate acquisition phases so as to allow for acquisition of a Data Management Platform as a commercial item first, followed by other separate acquisitions. Br.24. Palantir contends that the TSA concluded that best acquisition approach was to buy a commercially available Data Management Platform and then augment it as necessary with additional tools and widgets. Br.24, citing Tab 42, at A1946. Neither the page cited nor the report generally support Palantir's argument.

Further, as Stephen Morton, the Deputy Product Manager, explained, the TSA study looked at only four areas of the Army's requirements, and "didn't look at the entire breath and scope" of Increment 2. Tab 121 (A6294 (Tr.42), A6345 (Tr.93)). The market research that the Army did through its requests for information and Industry days was "much more extensive or thorough." Tab 121 (A6294 (Tr.42)). In addition, the TSA study compared, and contrasted only three options: (1) COTS; (2) GOTS; and (3) a Hybrid (COTS/GOTS). The Army ultimately chose an acquisition strategy that allows the contractor to be the sole-developer throughout the process—an approach that neither relies solely on COTS, GOTS, or a combination of the two. Accordingly, the TSA study did not consider all of the requirements of DCGS-A Increment 2, or the acquisition approach that was chosen.

#### 4. January 7, 2015 Information Paper Of Mark Kitz

Palantir (Br.16) relies on an "Information Paper" identifying four "Key Objectives" for DCGS-A Increment 2 as "Modernize the Data Enterprise to a Data Integration Platform," "Easier

49

**Appx00909**

Protected Information and/or Legends Redacted

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

PALANTIR USG, INC.,                )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )     No. 16-784
                                   )     (Judge Marian Blank Horn)
THE UNITED STATES,                 )
                                   )
        Defendant.                 )

## DEFENDANT'S RESPONSE TO SEPTEMBER 16, 2016 COURT ORDER

Agency action is entitled to a presumption of regularity, and Palantir fails to satisfy its

"heavy burden" of demonstrating that the Army acted without a rational basis or "a clear and

prejudicial violation of applicable statutes or regulations." *Banknote Corp of Am. v. United

States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004); *see Infor. Tech. & App. Corp. v. United States*, 316

F.3d 1312, 1323 (Fed. Cir. 2003)(giving deference to contracting officer interpretation of FAR).

**COUNT ONE**:  The market research demonstrated that only one industry respondent,

other than Palantir, supported reliance on GSA Schedule 70, applicable to commercial items, and

recommended Increment 2 be procured utilizing commercial procedures. Tab 114, A4804-05.

Palantir, however, relies on Mr. Choung's opinions in an attempt to refute the Army's

acquisition judgment that it was unreasonable to break up Increment 2 requirements, including

requirements for software design, development, testing, integration, and integration testing. Pl.

Supp. Br.6-41. Palantir's argument demonstrates its improper premise, *i.e.*, Palantir is entitled to

trial *de novo*, and may rely on what it deems expert opinions, from a company employee with no

demonstrated competency to address procurement or acquisition strategy, in a proceeding

governed by the Administrative Procedure Act (APA) scope of review. 5 U.S.C. § 706(2) (A).

Palantir suggests that Army documents in the administrative record carry little or no weight,

Protected Information
and/or Legends Redacted

**COUNT TWO**: The term "general public" in the definition of "commercial item" excludes the Federal government, DFARS 202.1, which indicates that the focus of determining commerciality is on non-Government contracts. To determine the extent to which an existing item could be modified, yet still retain its commerciality, FAR 2.101 gives guidance in 3(i) and (ii). First, (i) provides for "modifications of a type customarily available in the commercial marketplace." Second, (ii) provides for "minor modifications . . . not customarily available made to meet the Federal Government requirements," which requires consideration of non-government contracts. The first category in (i) should also be reasonably read as limited to consideration of non-government contracts. The primary reason is that modifications "customarily available in the commercial marketplace" normally present low cost risks, and the cost risk is low because prices are presumed reasonable due to competition in the commercial marketplace. It seems that for this reason (i) allow items to be considered commercial when they receive modifications so long as the type of modification is "customarily available in the commercial marketplace."

However, when modifications are performed for the Government, but not customarily performed in the commercial marketplace, the same market dynamics do not exist to ensure low cost risk. The price of a Government contract need only be fair and reasonable, not necessarily the best value in the market. This is especially true here where Palantir received Government contracts without competition on a sole source basis. As a result, the Government only inquired as to whether the prices were fair and reasonable. Considering Government contracts as being in

---

"[p]roposed acquisition cannot be divided into reasonably small lots" and why "[b]undling is necessary and justified." FAR 19.202-1(e)(2). The agency previously procured management software and acquisition software separately, both were commercial-off-the-shelf products, and SRA, an agency contractor, supplied the integration services separately. Without any rationale, the agency removed the software products "from direct procurement," "combining two types [of software] where separate responses were originally solicited." *Id.* at 383. The Court found that the agency "failed to adequately support the deviation from the proposed direct procurement." *Id.* In contrast to the detailed statutory and regulatory provisions applicable in *Distributed Solutions*, section 2377 and the implementing regulations impose lesser requirements.

Protected Information and/or Legends Redacted

the commercial market place for purposes of (i), would undermine the safeguards provided by the commercial *(i.e.* non-Government) marketplace in terms of minimizing cost risk to the Government. This interpretation also is supported by the language of (ii) which refers to "minor" modifications to meet Federal Government requirements. It makes sense that because Government contracts do not ensure low cost risk as the commercial marketplace does, the FAR requires Government-specific modifications to be "minor." This is further supported by the language in (ii) that discusses scope and cost to determine whether a modification is "minor."

Palantir asserts that it provides certain enhancements that are "modifications of a type customarily available in the commercial marketplace," those allegedly being "integration of particular data sources, additional analytics capabilities, and customized visualizations of data." Pl. Supp. Br. 43, citing Choung Report 23-24. Critically, however, Mr. Choung's report and deposition testimony *do not demonstrate* that these modifications are: (1) "Modifications of a type customarily available in the commercial marketplace," or (2) "Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements." FAR 2.101.

The marketing practices of one company do not demonstrate "[m]odifications of a type customarily available in the commercial marketplace" within the meaning of 3(i). The fact that Palantir sells certain software design, development, and implementation tasks on a fixed price basis to meet customer needs does not demonstrate that the particular modification is "of a type customarily available in the commercial marketplace." The term "customarily" contemplates consideration of marketing practices generally, not merely Palantir marketing practices. This interpretation is supported by the phrase "in the commercial marketplace," which is greater than Palantir's product list. The Army reasonably determined that while commercial items could

Protected Information and/or Legends Redacted

become components of Increment 2, no commercial item(s) meet all the military unique Increment 2 requirements and it is only through the effective, combined integration of components that a complete workable and effective system can be achieved. Tab 46, 2298-2304; Tab 33, A1840; Tab 2, A56; Tab 3, A58; Tab 134, A6626. Increment 2 encompasses military unique specifications to such an extent that it cannot be considered as a commercial item or when designed and built, cannot be considered "of a type" available in the commercial marketplace, given the unique Army requirements of the complete system sought to be developed and integrated here. *Voith Hydro, Inc.*, B-401244.2, 2009 CPD ¶239 (sustaining determination of no commercial item where "while individually some of the components may be commercially available . . . however it is only through the effective combined integration of these components that a complete workable system can be achieved").

Palantir argues that Mr. Chong's supplemental declaration demonstrates that all the modifications required in order that the Palantir Platform be enhanced, configured, and modified, so as to meet the Increment 2 requirements are (1) "Modifications of a type customarily available in the commercial marketplace," or (2) "Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements." Pl. Supp. Br.54, citing Choung Decl. ¶¶32-37. Mr. Choung treats the detailed requirements of the Performance Based Specification (PBS), Tab 23, as a checklist, goes down the list, and assigns one of three ratings: (1) out of the box, (2) existing helpers, or (3) new helpers. In his lexicon, a "helper" is an enhancement. He totals his conclusory assignments, and asserts Palantir could provide: (1) 581 PBS requirements "out-of-the-box," without any configurations or enhancements; (2) 242 PBS requirements with existing helpers; and (3) new helpers to meet the other 75 PBS requirements. For the 75 PBS requirements, Mr. Choung asserts that Palantir would design, develop, and implement software on a fixed-price basis, if the Army provides

Protected Information
and/or Legends Redacted

███████

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | | |
|---|---|---|
| PALANTIR USG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO SEPTEMBER 16, 2016 COURT ORDER

Pursuant to the Court's direction to file two lists; one list containing specific citations to the record, identifying the instances of alleged bad faith by the Army or lack thereof; and a second list, with specific citations to the record, detailing the decision making process the Army engaged in, or failed to engage in, to determine commercial availability, Defendant respectfully submits the following lists. These lists, accompanied by our briefs, demonstrates that the Army acted reasonably, that there was no clear and prejudicial violation of procurement statutes and regulations, and no bad faith. For the bad faith claim, the Plaintiff's allegations are in bold and the Defendant's list of citations and explanations follow each assertion.

**I. List of Citations in the Administrative Record that Demonstrate the Absence of Bad Faith on the Part of the Army:**

    **A. Palantir does not demonstrate bad faith in its assertions that the Army blocked Palantir from participating in important evaluations.**

1. The Army included Palantir in market research. *See* Tab 33, A1792-1843 (Instances where Palantir is mentioned by name, found at A1814, A1828, A1835); Tab 34, A1868.
2. The Army addressed Palantir's responses to Requests for Information. *See* Tab 34, A1868; Tab 33, A1814, 1828, 1835.
3. The events that Palantir describe as "blocking" were addressed by Lynn Schnurr and Shawn Cronin in deposition testimony and those events occurred 4 to 11 years prior to the solicitation at issue. *See* Ct Dkt 78-1, Schnurr Deposition; Ct Dkt 75-1, Cronen Deposition.

Protected Information
and/or Legends Redacted

## II. List of Citations in the Administrative Record that Demonstrate the Army Properly Determined Commercial Availability under 10 U.S.C. § 2377.

### A. 10 U.S.C. § 2377(c) and FAR 10.001, 10.002: The Army conducted market research for Increment 2 that was "appropriate in the circumstances."

1. Early on, the Assistant Secretary of the Army for Acquisition commissioned a Data, Integration, Visualization and Analytics (DIVA) study to provide information on market trends of the commercial state of the practice within the DIVA software platform landscape, performed by MITRE. Tab 43, A2218-2255. The DIVA study, dated July 2014, assessed three approaches for implementation and determined that the best of the three was a DIVA-hybrid implementation approach, consisting of hosting a cloud platform and a turnkey platform, and integrating them and developing and integrating data integration, analytics, and visualization applications. Tab 43, A2233-34, 2246. The DIVA study recommended against a COTS-only solution because there was a large risk that interfaces between components would not be mature. Tab 43, A2249, 2254.

2. The Army also obtained independent information provided in a Trade Space Analysis Study, dated July 2015, Tab 42, A1929-2218, that examined three options for procuring Increment 2, and recommended a Hybrid option, that consisted of combining COTS and GOTS software. Tab 42, A1948. The study also noted the risk factors of the Hybrid option (COTS and GOTS). Tab 42, A2030.

3. Although the final Information System Capability Development Document (IS CDD) is dated April 20, 2015, it was first drafted in January 2013, and was at the Joint Requirements Oversight Council (JROC) for comment resolution on August 1, 2014. Tab 11, A251, 255.

4. Request for Information (RFI) No. 1, issued on August 13, 2014, assessed the level of competition and the capabilities in the market place and elicited feedback to assist the Program Office in developing the Acquisition Plan. Tab 35, A1876-1881. It noted that "DCGA-A Increment 2 will provide additional capabilities to enhance the intelligence processing and fusion capabilities across intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information, task organic sensors and synchronize non-organic sensor assets with their organic assets." It further stated that to meet evolving needs, Increment 2 may include capability enhancements of net-readiness, data fusion, embedded training, sustainment, reliability, usability, geospatial information, cyber operations, data and intelligence visualization, counterintelligence and Human Intelligence convergence, and alignment to the IC ITE and JIE Standards. Tab 35, A1879.

   a) In item 3.1, RFI No. 1 asked companies for information on their capabilities and experience, including the contract vehicles that the company "has been awarded that address the scope of services required to develop and integrate a system such as DCGS-A, focused on integrating COTS/GOTS and internal-developed software

Protected Information and/or Legends Redacted

██████████████████████████████████████████████████

██████████████████████████████

CONTRACTING OFFICER'S STATEMENT/LEGAL MEMORANDUM

GAO Protest No. B-412746

By Palantir USG, Inc.

## INTRODUCTION

Palantir USG, Inc. (Protester) by letter to the Government Accountability Office (GAO), dated 16 February 2016 (Tab D), filed a protest against Request for Proposal (RFP or Solicitation) W56KGY-16-R-0001 (Tab T) issued by the Army Contracting Command-Aberdeen Proving Ground (ACC-APG) on 23 December 2015, with an initial proposal closing date of 08 February 2016, which was extended to 16 February 2016. (Tab AA)  The protester asserts that the Army failed to implement the preference required by law for the acquisition of commercial items, that the Agency cannot justify the use of a cost-reimbursement type contract, that the Solicitation anticipates the award of an unlawful indefinite delivery/indefinite quantity contract (IDIQ), and that the flaws in the Solicitation unduly restrict competition in violation of the Competition in Contracting Act (CICA) and Federal Acquisition Regulation (FAR) Part 6.  For the reasons which follow, these allegations are without merit.

## FACTS

The facts as presented in this response are set out using the same numbering as the protester provided.

## I. Palantir

1.  Protester's line of business includes providing computer programming services. While Protester claims that its system can import and export to any system, some type of interface would be needed to make that possible[1].

---

[1] Palantir's Gotham software, out of the box, would not be able to meet all of the interface requirements listed in the DCGS-A Information System Capability Design Document (IS CDD) (Tab K).  In order for Palantir's Gotham

████████████████████████████████████████████    ████████████

Protected Information
and/or Legends Redacted

2.  Protester makes the statement that it is the "authoritative data integration and analysis platform for commercial and Government organizations worldwide" and that its software, Protester Gotham, is used by tens of thousands in the intelligence community. (Tab D, at 2).  However, this is patently unsubstantiated.  Nonetheless, Protester's Gotham integrates structured and unstructured data, provides advanced search and discovery capabilities, enables knowledge management, and facilitates secure collaboration.  In accordance with the pricing available on the DoD Enterprise Software Initiative (ESI) website, one perpetual software license for Protester Gotham costs ▮▮▮▮▮ per computer core.  In order to field the Protester Gotham software Army-wide, the Government would need to procure approximately ▮▮▮ licenses (56 Core per 1200 Server instances in the Army) for a total initial procurement cost of ▮▮▮▮▮▮▮▮.  In addition, annual software maintenance would cost ▮▮▮▮ per computer core, for a total annual cost of ▮▮▮▮▮▮ per year.  This does not take in to account the Field Service Representatives, which cost ▮▮▮▮▮ each for CONUS support and ▮▮▮▮ each for OCONUS support. [2]

## II.  The Distributed Common Ground System

### A.  Origin and Early Development

3.  Combat operations in Kuwait and Iraq in the early 1990's demonstrated the military potential of information dominance, and sparked a transformation in the use of information technology in intelligence operations. Subsequently, the Department of Defense instituted an initiative to unify Intelligence, Surveillance and Reconnaissance architectures, and enhance the acquisition of manned and unmanned airborne sensors and associated ground processing systems.  This initiative resulted in a requirement for

---

software to meet all of the DCGS-A interface requirements, there would need to be middleware software developed to allow for the different exchanges (especially the military messaging interfaces) called out in the SV-6 attachment of the IS CDD (Tab K).

[2] The cost estimate assumed that software would be applied to all computer cores on our existing hardware platforms and that the cost was as advertised (no discounts). Palantir DOD ESI Pricing can be found at: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A2
Protected Information and/or Legends Redacted

a Distributed Common Ground/Surface Systems (DCGS), made up of Army, Air Force, Navy and Marine Corps ground processing systems that can share information across the Joint Force. The Army component of DCGS is the Distributed Common Ground System – Army (DCGS-A). Today, DCGS-A has become the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information[3]. It is deployed worldwide in support of intelligence operations including all Theaters of Operation.[4] DCGS-A is a Major Automated Information System as defined in 10 U.S.C. § 2445a.

4. One of the Key Performance Parameters of DCGS-A Increment 2 is "Net Ready," which is ingestion/receipt, processing, and exploitation of data from a wide variety of disparate sources and networks, as well as dissemination to Army Mission Command and joint information platforms. DCGS-A shall support net-centric military operations by being interoperable with current Army, Unified Action Partners, Joint, Service (to include Service DCGS), Allied, Coalition, and Command and Control (C2) information and Intelligence, Surveillance, Reconnaissance systems as specified in the DCGS-A Operational View (OV)-3/System View (SV)-6 (*e.g.*, Mission Command, Global Command and Control System (Joint and Army), Universal Ground Control Station (UGCS) (Tab F, at 17).

5. The Army's DCGS-A Program consists of the consolidation of nine (9) separate Program of Record (POR) systems: All Source Analysis (ASAS) Family of Systems (FOS); JointStars Common Ground Station; DTSS FOS; Tactical Exploitation System (TES) FOS; CI&I OPS Work Station; IMETS; Guardrail Common Sensor (GRCS); Prophet Control; and Enhanced TracWolf (ETW). The ultimate goal is the consolidation of these 9 stove-piped systems into a single program. Since its inception, the Army has made changes to the DCGS-A Increment 1 Acquisition Strategy (Tab BY). The original approach was overtaken by events, such as the events of September 11, 2001, and the

---

[3] When weather is used, it is not like getting the weather on weatherchannel.com; rather, it is getting micro-weather, i.e., that in the immediate vicinity of Army units, in support of Artillery and Aerostats

[4] Source- https://dcgsa.army.mil/about/history-of-dcgs-a/

A3

Protected Information
and/or Legends Redacted

DCGS Integrated Backbone (DIB). Now all services could seamlessly discover data from hundreds of data sources with just one query.

9. After the successful fielding of the combined DCGS-A and JIOC-I system, the Army embarked on a project that would further enhance capabilities and allow for the de-fielding of all nine of the Army's intelligence PORs, eventually replacing them with a single DCGS-A baseline. From 2005-2007, the Army increased DCGS-A capabilities (shared messaging capability, access to the JIOC-I data sets and DIB federation) to the existing PORs. This allowed the Army to quickly provide capability without waiting for a major program to complete its development, integration and test process.

10. As stated in the Protester's protest, DCGS-A Increment 1 was procured via various contracting vehicles. The protester is incorrect when they state ". . . the Army conducted a series of independent competitions among IDIQ contractors, largely foregoing commercial software products in favor of cost reimbursement type task orders . . .", as the Army through the Program Manager (PM) for DCGS-A has effectively leveraged the integration of COTS items when appropriate as shown in the 151 individual COTS items currently utilized in the DCGS-A Increment 1 program. Full detail provided in the DCGS-A COTS Software List- DCGS-A Increment 1 (Tab J).

11. As per the Classified Army Test and Evaluation Command (ATEC) Operational Test Report, there were portions of the DCGS-A System that were rated as not "Effective" or "Suitable." However, there were elements that constituted the majority of the program that were deemed "Effective" and "Suitable" (not fully "Survivable")[6]. The program has now overcome the Survivability limitations discovered during the test and has now received a Full Material Release (FMR) (Tab BZ).[7] An FMR allows the PM to field those systems to any location without restriction.

---

[6] Survivability in the case of DCGS-A is primarily tied to the ability of the system to protect itself from cyber threats, to detect cyber threats against the system, to react to those threats and to restore the system in case a threat is able to access the system. For further guidance, see the memo signed by the Director, Operational Test and Evaluation Procedures for Operational Test and Evaluation of Information Assurance in Acquisition Programs at Tab CB.

[7] *See* Army Regulation (AR) 700-142 for further guidance on Full Material Release.

A5

Protected Information
and/or Legends Redacted

12.  Government Developmental Testing was used by DCGS-A in 2011 in preparation for the Operational Test, in which ATEC identified issues with the DCGS-A system. Operational testing is why there has to be a methodical approach for ensuring that systems are capable in their objective User environment.  The PM conducted lab-based and field-based developmental testing.  Conditions in the field environment are much different than lab-based testing and until an application is exposed to that environment, certain issues may not be apparent.

13.  In response to Protester's protest, and as discussed fully above, while the Operational Test Report found there were portions of the DCGS-A System that were deemed not "Effective" or "Suitable," the program has since overcome the issues and has now received a Full Material Release (FMR) (Tab BZ).

14.  The DCGS-A Top Secret/Sensitive Compartmented Information (TS/SCI) enclave makes up approximately ███ of the equipment and unique capability of the DCGS-A program.  Also mentioned above in the response to paragraph number 5, the DCGS-A program began by "enabling" the existing Programs of Record (PORs). ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████

15.  DCGS-A Increment 1, Release 2 was initiated to address the shortcomings in the Top Secret/Sensitive Compartmented Information (TS/SCI) enclave, enhance the fusion software, and adopt methods for more effectively transferring data within and between systems.  That is why the Army chooses to do incremental software development: deliver a capability given time and budget constraints, then enhance it in the next increment to increase capability. Full software development, where 100% functionality is delivered up front, is incredibly risky, time consuming, and has an expensive software development life-cycle cost.

6

A6
Protected Information
and/or Legends Redacted

16.  PM DCGS-A followed the DoDI 5000.02 process (Tab CA, at 11) to fully test the software baseline and addressed all priority one and two issues as they were found during Functional and Developmental Testing.  It is standard practice to hold developmental tests to find and resolve defects prior to moving to formal operational test.  Many priority three defects were resolved in the process by documenting a TRADOC approved workaround. Commercial software goes through the same process, and oftentimes, is shipped out to the user with known defects. Those defects are resolved through life of the software along with other issues, like security patches and performance enhancements.

17.  In a 2015 report, the Director of Operational Test & Evaluation (DOT&E) reported on a Follow-on Operational Test & Evaluation ("FOT&E") that ATEC conducted of DCGS-A Increment 1, Release 2. Some of the reported DOT&E findings were found to be out of the control of PM DCGS-A, specifically the finding that "Army Test and Evaluation Command (ATEC) failed to adequately collect, reduce, and analyze FOT&E test data in accordance with the DOT&E-approved test plan" and "data were not sufficient for DOT&E to evaluate DCGS-A system performance."  ATEC is an Independent Test organization. All details regarding the results of the 2015 Operational Test can be found in ATEC's classified test report. Based on the results of the test, the Army has been able to secure a fielding decision, meaning that the system is ready to be fielded.

18.  The former Army Acquisition Executive, the Honorable Heidi Shyu, submitted a request for approval to the Defense Acquisition Executive, the Honorable Frank Kendall, to end DCGS-A Increment 1, Release 3 and instead shift those requirements to a separate procurement called Increment 2 for the reasons detailed in the attached memo (Tab E). The final DCGS-A Increment 2 Acquisition Strategy, detailing the contract strategy that was reflected in the Solicitation, was approved on 22 December 2015 by the Defense Acquisition Executive, the Honorable Frank Kendall (Tab F).

A7

Protected Information and/or Legends Redacted

19. Although DCGS-A Increment contains a single integrated software baseline developed by the Army and the Government, DCGS-A incorporates a significant amount of COTS products; however, custom application development is necessary when there are no existing COTS applications. During the formal evaluation and testing of the DCGS-A INC 1 software baseline by ATEC, the software was fully tested and met the approved Fusion Key Performance Parameter in an operational environment. While Protester claims the Government DCGS-A Increment 2 is an unaffordable waste of taxpayer funds, it should be noted that based on Protester's Federal Supply Schedule (FSS) license prices (or even the discounts Protester has given the Army on previous FSS purchases), the cost far exceeds, by many multiples, the total DCGS-A Increment 2 estimated cost of $206 million.[8]

### C. Field Requests for Commercial Data Integration and Analysis Platforms

20. As referenced in Protester's protest, in a July 2010 Joint Urgent Operational Need Statement ("JUONS"), the Army's Deputy Chief of Staff for Intelligence "requested a 'theater-wide web-based advanced analytical platform' to store, organize, access, retrieve and enable full understanding of intelligence and information from multiple disparate data sets."

21. In response to Protester's protest, and as stated above, much of the DCGS-A Increment 1 solution is based on COTS software. The baseline includes software from companies like Microsoft, Oracle, and ESRI, just to name a few, and the Agency Report contains a list of the 151 DCGS-A Increment 1 COTS software items (Tab J). PM DCGS-A added several COTS software segments to the baseline that were requested by the user community and vetted through the TRADOC capabilities manager.

---

[8] As stated previously, the cost for using Protester's licensees at Federal Supply Schedule (FSS) prices would be for a total initial procurement cost of ███████. In addition, annual software maintenance would cost ███ per computer core, for a total annual cost of ███████ per year.

A8
Protected Information
and/or Legends Redacted

22.  In response to Protester's protest, and as stated above, DCGS-A Increment 1 currently uses many COTS products.  It should be noted that while Protester may meet a portion of the DCGS-A requirement, there are many user requirements that are outside the scope of Protester's known commercial offerings that the Army must address.

23.  As stated above, and DCGS-A has effectively leveraged the integration of  COTS items when appropriate as shown in the 151 individual COTS items currently utilized in the DCGS-A Increment 1 program, as detailed in the DCGS-A COTS Software List-DCGS-A Increment 1 (Tab J).  The mention of Government approval for COTS usage, in the DCGS-A Increment 2 Solicitation (Tab T) is standard in military acquisitions, and in  response to the protestor's claim, the Government did not place restrictions on any potential DCGS-A Increment 2 offeror related to the use of COTS software, as expanded on at paragraph number 37 below.

III.  **DCGS-A Increment 2: Requests For Information ("RFIs") and Draft Performance Work Statements ("PWSs")**

24.  Industry was directly engaged on the DCGS-A Increment 2 requirements via a series of market research events to include Requests for Information (RFI), Industry Days, and Industry-Government one-on-one meetings, the details of which can be found in the Market Research Report (Tab AG).  The first RFI pertaining to Increment 1 was released in August 2014 (Tab AI). This RFI was conducted to assess the level of relevant competition and capabilities in the market place and elicit feedback to assist the Program Office in developing the Acquisition Plan. *Id*.

25.  The responses to the RFIs, Industry Days, and Industry-Government one-on-one meetings conducted from August 14 to June 2015 have shown that the industry as a whole is capable and interested in performing DCGS-A Increment 2 development. The Government anticipated sufficient competition, as multiple companies have cited relevant experience and competencies that show they are well have the ability to enhance DCGS-A capabilities.  In addition to business capability data, industry provided

Protected Information and/or Legends Redacted

valuable Acquisition Strategy input. Specifically, they have expressed that the use of multiple software releases, and availability of Increment 1 products as GFI would greatly enhance their ability to successfully support the Increment 2 EMD effort. (Tab AG at 51). Based on the DoD Service Acquisition Process, the Government developed a detailed schedule to guide its activities, including a planning phase with a comprehensive Market Research Approach that included the following Industry engagements:

- RFI 1 – 13 Aug 2014 – 12 Sep 2014: Was conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan.
- RFI 2 – 5 Dec 2014 – 29 Dec 2014: Was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort.
- RFI 3 – 6 May 2015 – 22 May 2015: Was released to determine if rule of two exists, as defined in FAR 19.502, and if a small business set-aside is appropriate for Increment 2 development.
- Industry Day 1 – 20 Jan 2015: Provided a forum to share emerging requirements with Industry.
- Industry One on Ones – 20 Jan 2015 - 12 May 2015: Provide a forum to answer Industry's questions and elicit their feedback regarding to the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations.
- Industry Day 2 – 25 Jun 2015: Provided an opportunity to discuss the draft Increment 2 requirements with industry.

In addition to the above activities, the Army G3/5/7 contacted the Army Materiel Systems Analysis Agency and requested a Trade Space Analysis (TSA) (Tab AP) of the DCGS-A Information Systems Capability Development Document (IS CDD) for use in a Milestone B acquisition decision for DCGS-A Increment 2. The TSA identified and evaluated technical functionality, cost, usability, schedule risk, and technical risk trade space for the technical and operational capabilities required for DCGS-A Increment 2.

Protected Information
and/or Legends Redacted

Representative DCGS-A systems were assessed to determine whether a COTS, Government off the shelf (GOTS), or Hybrid (combined COTS/GOTS) solution should be pursued. The TSA found that for the Data Enterprise Architecture, among others, "due to the absence of historical requirements, the lower bound COTS solution needs major capability development for all technical functionality metric categories" (Tab AP at 20), meaning there is still a need for significant development and integration effort with the procurement of COTS items in support of DCGS-A Increment 2. The full breakdown of the analysis can be found at (Tab AP).

In addition to the TSA and the Program Office activities, a Data Integration, Visualization and Analytics (DIVA) Independent Market Study was chartered by the Army Acquisition Executive, the Honorable Heidi Shyu, and conducted by MITRE[9]. The purpose of the DIVA study was two-fold. The first was to provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study. The second was to codify the DIVA Independent Mark Study into recommendations for the DCGS-A Increment 2 Acquisition effort and describe the top-level risks and mitigation strategies associated with adopting recommendations. The DIVA study assessed the following acquisition approaches:

- System Integrator: Employ a prime contractor to integrate and manage the DCGS-A Increment 2
- Turn-Key: Procure a commercial product as basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure
- Specialized Applications: Purchase individual applications based on requirements to build onto the DCGS-A Increment 2 infrastructure
- Enterprise Cloud Service: Adopt a cloud infrastructure and integrate DCGS-A Increment 2 infrastructure and capabilities

---

[9] MITRE is a private, not-for-profit corporation that operates FFRDCs—federally funded research and development centers.

Protected Information and/or Legends Redacted

- Hybrid approach: Employ a combination of Enterprise Cloud and Turn-Key approach tailored to the government's requirements. Integrate additional applications

The DIVA Market Study concluded that the Hybrid Approach would serve as the best solution for DCGS-A Increment 2, which included software development and integration tasks (Tab AQ at 21). Additionally, the DIVA study considered and rejected a COTS-only system because there was a large risk that the interfaces between the DCGS-A components would not be mature (Tab AQ, at 33).

The Government was able to determine through the comprehensive market research analysis to include Program Office activities, the DIVA study, and the Trade Space Analysis, that while commercial capabilities could potentially[10] satisfy one or more portions of the DCGS-A requirement, there are significant portions of the scope of work, such as: Data Fusion, Intelligence Support to Cyber, and DIB upgrades that are not available as commercial products (Tab AG, at 50). Therefore, development and integration services sold competitively in the commercial marketplace based on established catalog or market prices for these specific tasks and or specific outcomes do not exist. A further breakdown of these capabilities is provided in the DCGS-A Increment 2 COTS capability chart[11] (Tab AV, at 16).

26. Protester responded to the Army's invitation for industry feedback along with responses received from 263 other companies. PM DCGS-A carefully reviewed all responses received from the companies participating in Industry Day, including Protester's responses which focused on recommendations to utilize commercial solutions (Tab AG, at 18). Through engagements with 263 companies who participated

---

[10] This must be caveated as potentially, since neither the RFIs nor the One on One sessions required validation that any of these products have been used/tested in a military environment.
[11] The DCGS-A Increment 2 COTS Capability chart is a slide pulled from the PM DCGS-A Increment 2 Technical Deep Dive prepared for Mr. Pino. This chart highlights the Increment 2 Capability Blocks by availability in the COTS market place. Mr. Richard Pino serves as the Deputy Assistant Secretary of Defense for Command Control Communications, Cyber and Business Systems.

A12

Protected Information and/or Legends Redacted

in the market research process, Protester was only one of two companies[12] who provided the recommendation to procure DCGS-A Increment 2 utilizing commercial procedures (Tab AG).

27. In response to Protester's protest, Protester's response to the RFI number 1 makes the correct statement that the ". . . requirements for a data management infrastructure and data visualization are distinguishing factors that are critical to Increment 2 mission success" (Tab AJ, at 16).

28. In response to Protester's protest, and as stated above, through the comprehensive market research analysis, it was determined that while commercial capabilities could potentially satisfy one or more parts of the DCGS-A requirement, there are significant portions of the anticipated Increment 2 requirement that are not commercially available (Tab AG, at 50). Because of this fact, development will be required to satisfy the Army's requirements.

29. Draft DCGS-A Increment 2 Performance Work Statements (for the base IDIQ contract and Task Order 0001) and draft RFP Sections L and M were released to industry for comment. A total of 122 questions were received from nine (9) companies regarding draft RFP Sections L & M alone, and all questions submitted were reviewed and evaluated internally by the Government. If changes were merited, revisions were then made to the appropriate documents (Tabs L, M, and R). Protester's comments to the draft L&M documents focused on recommending the removal of requirements for DCAA-compliant accounting infrastructure, the removal of the earned value management system (EVMS) requirement, clarification on the technical data rights Subfactor, as well as a recommendation to amend the past performance criteria (Tab Q, at 2 and 4). Protester's comments to the draft Task Order 0001 PWS included recommended deletions of PWS paragraphs 3.2.11 "Fusion" and 3.2.12 "Intelligence Support to Cyber Operations," the deletion or de-prioritization of all requirements in

---

[12] In addition to Protester, ███████████████████ recommended utilizing available GSA schedules.

A13

Protected Information and/or Legends Redacted

architecture limitations and other requirements as defined in the Task Order 0001 PWS needs." (Tab X, at 15).

36.  As referenced in Protester's protest, the DCGS-A Increment 2 Task Order 0001 PWS paragraph 3.2 states in part, "The contractor shall perform system engineering activities, to include but not limited to, system architecture and design; requirements definition and analysis; interface with external agencies; quantitative and qualitative analysis of system performance and reliability; and support of Army and Joint Interoperability." (Tab X, at 28).

37.  In keeping with the Government's goal for a Modular Open Systems Architecture, the DCGS-A Increment 2, Engineering, Manufacturing and Development Task Order 0001 PWS dated 18 December 2015, paragraph 3.2 states in part "All software shall be designed in such a manner as to minimize or eliminate the usage of proprietary or commercial technologies except where specifically approved by the Government."  This language is included with the goal to greatly enhance modularity and system flexibility for the lifecycle of the software going forward by componentizing the major capabilities into distinct capability blocks and adopting open standards.  Each component will adopt industry standards and interfaces to interoperate with each other, while providing a fair and open competition for future updates and enhancements to the architecture (Tab X).

38. The components are broken down into three key groupings: the Data Integration Layer, the Data Analytics Platform (DAP), and the Visualization Framework. The Data Integration Layer and the DAP together make up the Data Management Architecture (DMA).  These components and respective subcomponents will be built with interoperability and usability as key design focus areas throughout the lifecycle of the software development process.  The DMA will serve as the architecture foundation and the heart with which the rest of the capabilities will depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract. Contained within the DMA, the DAP will process and fuse data so the Data Integration Layer can efficiently and effectively deliver the data to the user

16

A16
Protected Information
and/or Legends Redacted

support services.  This includes software maintenance, configuration management, risk management, and quality assurance.  This is also done to support the DCGS-A software suite. The capabilities defined promote collaboration among information systems, and software development and integration work are required (Tab K).  DCGS-A Increment 2 will include a contractor developed architecture that is layered and modular and uses standards-based COTS/Non-Developmental item (NDI) products, operating systems, and middleware that all utilize either non-proprietary or non-vendor-unique key module or component interfaces (Tab F, at 19).  Much of DCGS-A Increment 2 expects to utilize COTS software as part of the system framework (and this is borne out by the proposals received), as was DCGS-A Increment 1, and this is fully consistent with Department of Defense policy concerning the use of COTS software in systems.  *See* DFARS Subpart 208.74; DFARS 212.212(2).[16]  However, it is recognized that government-unique GOTS and custom software is also needed within the system, and the integration of the overall system, pulling all of the pieces of the system into a single, common user experience, requires unique development that is sometimes referred to as "Glue Code."  The ultimate structure of DCGS-A Increment 2 showed that, with its adoption of the Model 3 Incrementally Deployed Software Intensive Program, in accordance with DoDI 5000.02, as an acquisition strategy to iteratively *develop and field* Intelligence, Surveillance, and Reconnaissance (ISR) capabilities, whether COTS, GOTS or military unique capabilities developed for by the Army and hosted on COTS equipment/hardware, providing low risk, efficient releases of capability would satisfy the Army's operational needs.  (Tab F, at 11).  Such a development of ISR capabilities in not a commercial item or service.

51. Further, for some user requirements, no COTS or commercial item software is available, so software development is needed and for both known and unknown requirements, the amount and required delivery dates for needed software is unknown. Lastly, all user requirements must be interoperable with one another, and as such, will require software integration.  Software integration tasks are best acquired on a cost-

---

[16] Additionally, the manner in which the Army seeks software licenses is consistent with the policy set forth in DFARS 208.74.

**A22**

Protected Information
and/or Legends Redacted

reimbursement basis.[17]  The DCGS-A Increment 2 requirement plans for multiple software releases and an undefined level of software development and integration to make all capabilities interoperable.  For these many reasons, a FAR Part 12 contract is not a viable solution.

52. Finally, it is important to note that Protester's product on the relevant Federal Supply Schedule (FSS) is listed as "software maintenance."  Yet, as stated above, DCGS-A Increment 1 and DCGS-A Increment 2 are systems which encompass more than "software maintenance," they are systems which combine software of various types (COTS, GOTS and custom software) to interoperate and require services to make the above-mentioned software interoperate. .

> I.    **The Army Met the Requirements of the Statutory/Regulatory Preference for Commercial Items.**

53. Protester initially argues that the Army did not meet the statutory and regulatory requirements to utilize commercial items to meet requirements.  Specifically, Protester contends that the Army did not define requirements that would maximize the utilization of commercial items.  Second, Protester contends that the Army failed to perform the market research required by law.  For the reasons discussed below, the Army will show that each of these claims is meritless.

> A.    **The Army Met its Obligations to Define Requirements in Terms That Allow the Use of Commercial Items.**

54. Protester makes two arguments on this point, contending that the Army is not complying with 10 U.S.C. § 2377, which discusses market research for commercial items, and the National Defense Authorization Act for Fiscal Year 2016.  The Federal Acquisition Streamlining Act of 1994 (FASA) established a preference and specific requirements for acquiring commercial items that meet the needs of an agency.  FAR

---

[17] COTS products do provide some level of interoperability based on commercial standards. However, most do not support any of the military standards or message formats that the Army must meet.

**A23**

Protected Information and/or Legends Redacted

whether such services are provided by the same source or at the same time as the item; and

(ii) The source of such services provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government;

(6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions. For purposes of these services—

(i) "Catalog price" means a price included in a catalog, price list, schedule, or other form that is regularly maintained by the manufacturer or vendor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public; and

(ii) "Market prices" means current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated through competition or from sources independent of the offerors.

(7) Any item, combination of items, or service referred to in paragraphs (1) through (6) of this definition, notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a contractor; or

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local governments.

FAR 2.101. However, the DCGS-A Increment 2 requirement does not fit this definition, whether it is considered a software suite or a service or both. The DCGS-A Increment 2 requirements are based on the JCIDS process, which means that changes can only be instituted by the Vice Chief of Staff for the Army and then the process still takes time: Put differently, the PM has no power to directly change them in a procurement (Tab C, at 1)   As pointed out in the declaration of the contracting officer, market research has found that there is no one single commercial item of a type customarily used by the

Protected Information and/or Legends Redacted

general public or can meet the Government's requirement through minor modification, nor a combination of commercial items, that can satisfy the entirety of the DCGS-A Increment 2 requirement (Tab C, at 2; Tab B, at 1).

55. Insofar as the FAR 2.101 definition of "commercial Item" applies to commercial services, market research has found that the acquisition of the military unique capabilities required for DCGS-A Increment 2 does not fit the definition of installation services, maintenance services, repair services, training services, services in support of a commercial end items, or services available to the general public (Tab C, at 1). Furthermore, in addition to the software development services required to fill the capability gaps of the commercial market place to meet military unique needs, there are also development services that are needed to tie together the overall capabilities used within the entire system. The integration of the overall system, pulling all of the pieces of the system into a single, common user experience, requires unique development that is sometimes referred to as "Glue Code." (Tab B, at 1). This "Glue Code" development, integration, and testing services for a National Security System are not of a type offered or sold competitively in substantial quantities in the commercial marketplace and are not based on established catalog or market prices for these specific tasks and outcomes.

56. Additionally, statutory law, the FAR and DFARS place special limitations on the use of commercial item contracting. Under FAR 12.207, only fixed price and time & materials/labor hour contracts may be used for commercial item procurements. However, the risks associated with developing and/or integrating a mixture of military unique software technologies make performance under a cost type contract, especially here, where there does not exist well-defined functional requirements to meet unique military mission needs. Moreover, 41 U.S.C. § 2310 limits commercial items acquisitions to $25 million, an amount far below the ceiling value of the contract and task order 001 value.

57. While Firm-Fixed-Price contracts work well for routine or recurring services, such as administrative support or certain types of training, when it comes to system

27

A27
Protected Information
and/or Legends Redacted

Protester's attempt to narrow the reading of that provision for its own benefit is unavailing.

71. Overall, the Army's acquisition strategy based on the AMSAA and DIVA studies and the responses to the three RFIs was reasonable. For example, in *Voith Hydro, Inc.*, B-401244.2, 401771, November 13, 2009, 2009 CPD ¶ 239, the Department of the Interior issued a Solicitation for generator and excitation systems for the Folsom Power Plant at the Folsom Dam, Folsom, California. *Id.* at 1. Initially, the systems were sought utilizing FAR Part 15 procedures for construction, a position the agency reaffirmed after a protest because it reviewed its requirements for the Folsom Power Plant project, conducted market research regarding the work required, and consulted with individuals familiar with the technical requirements. *Id.* at 3. *Voith Hydro* protested, arguing that the procurement should have been conducted as a "commercial item" procurement. The GAO rejected that argument, noting all the potential offerors answering the RFI thought a "commercial item" procurement inappropriate and noting the large amount of design work that had to be done. *Id.* at 5. The GAO also found relevant the agency's technical specialist statement explaining why FAR Part 12 procedures were inappropriate, where it stated:

> The record also includes a lengthy and detailed statement from an agency senior electrical engineer, explaining, for example, that RFP -0017 'is for the retrofitting of an existing hydroelectric facility by reusing some existing components, rewinding [refurbishing] and upgrading others, and providing some new components that must be custom made for the Project so that they will work with the existing components and dimensional constraints.' . . . . . This individual adds that '[i]n addition, the Project requires: a technical evaluation of the mechanical limitations of the existing generators that are going to be retrofitted; custom designed and installed equipment platforms and walkways; environmental work consisting of asbestos removal and a five-year extended warranty for the completed system.' In addition to providing further detailed explanation as to why certain items of work involve 'one-of-a-kind construction,' while others are "clearly site and job specific and must be customized for the Folsom job,' the senior electrical engineer concludes that the work required cannot be 'bought pursuant to Part 12 of the FAR.'

38

A38

Protected Information and/or Legends Redacted

AG, at 51). This conclusion implies that FAR Part 12 procedures are inadequate to address the requirements.

77. The market research showed that there are no COTS solutions for all areas of the anticipated Increment 2 scope of work, such as, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone upgrade (Tab AG, at 50). Consequently, there is still a great deal of integration and development to do for DCGS-A Increment 2 contractor, including importing DCGS-A Increment 1 capabilities and also designing mature interfaces for them. This is true for any contractor, including Protester. DCGS-A Increment 2 also calls for increased functionality, which would also require design and development work. Unlike fixed price contracts where the risks are easily identified and the cost impacts can be reasonably estimated, this is simply not true here because of the development work and the risks in contract performance are not sufficiently definite for use of a fixed-price contract. FAR 16.301(a)(2).

78. Even Protester acknowledged in its response to RFI 1 that development work would have to take place (Tab AJ, at 4). Important is the Government's experience with fixed price development contracting in the 1980s. *See, e.g.,* Kara M. Sacilotto, *Déjà Vu All Over Again: Cost Reimbursement Contracts Fall Out of Favor (Again), But Should They?* 40 Pub. Cont. L.J. 681, 692-97 (Spring 2011) (recounting use of fixed price development contracts in the 1980s). Thus, based on the requirement and the market research, a cost reimbursement strategy was chosen.

79. The two cases that Protester relies on to show the Government did not do market research are totally inapplicable here. In *Smelkinson Sysco Food Servs.*, B-281631, March 15, 1999, 99-1 CPD ¶ 57 which was a commercial item procurement, but the dispute there was over whether the Government tailoring of certain clauses conformed to commercial practice or whether they violated FAR 11.302(c). Nor is the situation here like that in *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711 (2011) where the Air Force not only did not synopsize the intent to award the sole source contract, but conducted no market research at all. *Id.* at 729-31.

44

A44

Protected Information
and/or Legends Redacted

91. Protester's next claim is that the six-year (72 month) term of the DCGS-A Increment 2 contract violates 10 U.S.C. 2304a(f), which provides:

> **(f)Contract Period.—**
> The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract **or a modification of the contract**. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period.

10 U.S.C. § 2304a(f) (Emphasis added.)  FAR 17.204 provides in relevant part that:

> (d) The period may extend beyond the contract completion date for service contracts. This is necessary for situations when exercise of the option would result in the obligation of funds that are not available in the fiscal year in which the contract would otherwise be completed.
>
> * * * *
>
> (g) Contracts may express extensions of the term of the contract as an amended completion date or as additional time for performance; *e.g.*, days, weeks, or months.

FAR 17.204.  Further, DFARS 217.204 provides in relevant part as follows:

> (e)(i) Notwithstanding FAR 17.204(e), the ordering period of a task order or delivery order contract (including a contract for information technology awarded by DoD pursuant to 10 U.S.C. 2304a—
>     (A) May be for any period up to 5 years;
>     (B) May be subsequently extended for one or more successive periods in accordance with an option provided in the contract or a modification of the contract; and
>     (C) Shall not exceed 10 years unless the head of the agency determines in writing that exceptional circumstances require a longer ordering period.

DFARS 217.204 (emphasis added).  Further, AFARS 5117.204 provides that the:

52

A52
Protected Information and/or Legends Redacted

SUBJECT: Review of the Protest from Palantir, Inc. against Army Solicitation W56KGY-16-R-0001for DCGS-A Increment 2

I, Stephen Morton, declaring in lieu of affidavit and in accordance with 28 U.S.C. § 1746, state as follows:

1. I am the Deputy Product Manager for Project Manager Distributed Common Ground Systems-Army (PM DCGS-A), which is under the Program Executive Office for Intelligence Electronic Warfare and Sensors (PEO IEW&S). As Deputy Product Manager, I have overseen preparation of the acquisition requirements package for the DCGS-A Increment 2 requirement, issued under Army Solicitation W56KGY-16-R-0001.

2. I have reviewed the Protest submitted by Palantir, Inc. against the Request for Proposal (RFP) of Army Solicitation W56KGY-16-R-0001. In their protest, Palantir states that the DCGS-A Increment 2 requirement should be purchased under commercial procedures, using Commercial-Off-The-Shelf (COTS) software.

3. The PM DCGS-A, as a part of preparing the acquisition requirements package, conducted substantial, continuous market research. This included 78 one-on-one meetings with industry, reviewing Requests for Information (RFI) responses from 84 companies, reviewing comments to the draft RFP from 9 companies, Independent Studies and Surveys; one commissioned by United States Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)), conducted by MITRE; and a study conducted by The United States Army Materiel Systems Analysis Activity (AMSAA), and answering questions from two separate Industry Days attended by over 200 companies. The PM DCGS-A also researched relevant procurement history by contacting cognizant Government personnel responsible for similar military (MAIS) programs entering into contracts; DCGS-Special Operations Forces (DCGS-SOF), Integrated Personnel and Pay System-Army (IPPS-A), Joint Air-to-Ground Missile (JAGM), and Electronic Health Records (EHR).

4. Reviews of PM DCGS-A's market research indicated there is no singular piece of commercial or COTS software and no commercial services that meets all DCGS-A Increment 2 requirements. The DCGS-A Increment 2 System is a National Security System consisting of collection of software infrastructure, applications, and tools that encompass the full spectrum of Military Intelligence operations for the Army. While portions of the DCGS-A Increment 2 requirement can be procured through commercial software, some portions can only be met with the custom development of military-unique software applications. Some of these capabilities are classified up to the level of Top Secret and require contractors working on them to have equivalent clearances. Based on market research, military-unique software applications are not offered in the commercial marketplace and cannot meet the government's requirement through minor modification based on the military-unique nature of the required capability. The military-unique software applications needed to meet requirements under DCGS-A Increment 2 include Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, and Interoperability capabilities. Further, DCGS-A Increment 2 requirements include additional development services

Protected Information
and/or Legends Redacted

needed to tie together the discrete capabilities used within the entire system. This integration of the overall system, essentially pulling all of the software components, infrastructure, applications, and tools, used for the system into a single, common user experience, requires unique development that is sometimes referred to as "glue code." Based on the market research, services required for glue code development of the DCGS-A Increment 2 requirements and testing for the DCGS-A Increment 2 are not offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices. The relevant procurement history that was looked at supported this assessment, as each similar program that was looked at was not being procured as a commercial item or service.

5. The DCGS-A Increment 2 requirement, including some of the software applications and development services, are necessary to meet end-user requirements as determined by the Army's Training and Doctrine Command (TRADOC). The TRADOC uses the Joint Capabilities Integration and Development System (JCIDS) process for collecting, codifying and approving end-user requirements. The DCGS-A Information System Capabilities Development Document (IS CDD) was approved by the Vice Chairman of the Joint Chiefs of Staff and consists of over 400 unique end-user requirements, each necessary for the successful performance of DCGS-A Increment 2. The PM DCGS-A is responsible for decomposing the approved end-user requirements into testable specification requirements. The 400-plus end-user requirements have been further decomposed into over 1000 specification statements, as defined in the DCGS-A Increment 2 Performance Based Specification (PBS). The PBS was included as an attachment to the Increment 2 RFP. The PM does not have the latitude or flexibility of deciding what user requirements are or are not needed. There are requirements that are deemed more important than others called Key Performance Parameters (KPPs), which are used for testing and measuring contractor performance against the end-user requirements. In Palantir's response to the draft RFP, dated 2 October 2105, they requested deleting one of the program's KPPs, Fusion.

6. The DCGS-A Increment 2 requirement is an Acquisition Category (ACAT) 1 program. The ACAT 1 programs require approval and scrutiny from many offices within the leadership of the Army and Department of Defense. In order to receive approval for releasing the RFP for the DCGS-A Increment 2 requirement, PM DCGS-A produced 58 different documents, requiring concurrence or approval from more than 120 different persons with signature authority along with face-to-face meetings or briefings. This series of checks and balances was used to make sure that the DCGS-A Program Office performed their due diligence in the selection of the correct Acquisition Strategy for the program. Throughout this process, all options, including commercial procurement of certain requirements, were considered; the current approach was selected by the senior leadership for military acquisition as the most appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17 March 2016 by Stephen Morton

MORTON.STEPHE
N.J.1228933550
Digitally signed by MORTON.STEPHEN.J.1228933550
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
ou=USA, cn=MORTON.STEPHEN.J.1228933550
Date: 2016.03.17 16:39:35 -04'00'

STEPHEN J. MORTON

Protected Information
and/or Legends Redacted

DECLARATION OF CHRISTOPHER M. FISHER
17 March 2016

SUBJECT:  Review of the Protest from Palantir, Inc. against Army Solicitation W56KGY-16-R-0001 for Distributed Common Ground System –Army (DCGS-A) Increment 2

I, Christopher Fisher, declaring in lieu of affidavit and in accordance with 28 U.S.C. § 1746, state as follows:

1.  I am a Government employee employed by Army Contracting Command- Aberdeen Proving Ground (ACC-APG).  I serve as the Procuring Contracting Officer for the DCGS-A Increment 2 requirement being conducted under Army Solicitation W56KGY-16-R-0001.

2.  I have reviewed the protest submitted by Palantir, Inc. against Request for Proposal (RFP) issued as Army Solicitation W56KGY-16-R-0001.  The protester asserts in part that the Army failed to perform sufficient market research, failed to implement the preference required by law for the acquisition of commercial items, and should procure the requirement under Federal Acquisition Regulation (FAR) part 12.

3.  As required by FAR Part 10, extensive market research was conducted to determine if qualified vendors could meet the DCGS-A Increment 2 requirement. The DCGS-A Program Office proactively discussed the DCGS-A Increment 2 requirement with industry. In order to get industry feedback on the DCGS-A Increment 2 requirement, the Army released three (3) Requests for Information (RFIs) to Industry and received responses from 84 different organizations.  Additionally, the Government conducted one-on-one engagements with 84 different organizations from 20 January 2015 to 30 July 2015.  The Program Manager (PM) DCGS-A office also hosted two Industry Days and accepted questions and comments from Industry before and after the sessions and fully considered them.

The results of the market research were that no single commercial item could meet the DCGS-A Increment 2 requirement.  Further, while some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement, the market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items. As market research showed no commercial products available for those portions of the DCGS-A Increment 2 requirement, they would need to be developed to meet the requirement.  It should be noted that the Data Fusion portion in particular is one (1) of the four (4) Key Performance Parameters (KPP) for the DCGS-A Increment 2 Program.  The KPPs are defined in the Manual for the Operation of the Joint Capabilities Integration and Development Systems (JCIDS), updated February 2015, as the performance attributes of a system considered critical or essential to the development of an effective military capability. Further, the DCGS-A Increment 2 requirement includes developmental and integration services required to tie together the individual capabilities. These individual capabilities when combined complete the DCGS-A

Increment 2 system. Based on the market research, this military-unique integration services for the specific tasks and outcomes of SIGINT, HUMINT, Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DIB upgrades are not of a type offered or sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices.

Additionally, the market research that was conducted included questions to industry regarding terms and conditions of the proposed contract. The first RFI asked, among other things, for feedback and suggestions related to whether a cost-type contract was appropriate for the DCGS-A Increment 2 effort. The majority of respondents indicated in their response that a cost-type contract was appropriate.

4. The market research conducted has supported the determination that the definition of "commercial item" at FAR 2.101 does not apply to the DCGS-A Increment 2 requirement. Significant portions of the Increment 2 requirement are military-unique capabilities that are not available as commercial items or services.

a. As the definition applies to commercial items, market research has found that there is not one single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

b. As the definition applies to commercial services, market research has found that the acquisition of the military-unique capabilities required of DCGS-A Increment 2 does not fit the definition of installation services, maintenance services, repair services, training services, or other services in support of a commercial item as significant portions of the DCGS-A Increment 2 requirement are not commercial items. Nor are the required services provided to the general public. Furthermore, the development services required to integrate the capabilities into the overall DCGS-A Increment 2 requirement are not sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices.

5. Additionally, it was determined that the nature of the DCGS-A Increment 2 requirement, consisting of developing and integrating a mixture of military-unique software applications that are not well defined, would not appropriately procured under a cost-type contract structure and terms, which are not permitted for procuring commercial items in accordance with FAR part 12 procedures. Procuring this effort exclusively as a Firm-Fixed-Price, Time-and–Material, or /Labor-Hour contract, which are the only contract types permitted, or permitted with waiver, under FAR part 12, would increase the risk to the Government. This further supports the agency to not use FAR part 12.

a. While Firm-Fixed-Price contracts work well for routine or recurring services, such as administrative support and training, when it comes to system development and the integration of a tactical military intelligence system with over 700 unique data feeds, numerous interoperability requirements, and complex fusion requirements as is necessary to meet the DCGS-A Increment 2 requirement, a Firm-Fixed-Price type contract would greatly increase the risk to the Government. As work requirements expand or decline to address development of military-unique software

applications and uncertainties in the development, integration, and testing services, they may cause Government delays, false starts, re-work related to changes in priority or in response to findings from testing, and issues with contractor accreditation, funding, or testing and approvals. Firm-Fixed-Price contracts by their nature lack the flexibility to respond to these changes and uncertainties in a responsible and timely manner. With Firm-Fixed-Price contracts this lack of flexibility would require either additional task orders or change orders that would need to be negotiated upfront or issued initially undefinitized and later negotiated. Without those task or change orders, the Government would be subject to one or more contractor claims. The risks to successful performance of the DCGS-A Increment 2 requirement under a Firm-Fixed-Price contract are unacceptable because of the critical nature of the military intelligence mission.

b. Furthermore, while Time-and-Materials and Labor-Hour contracts have a place in Government contracting for activities, such as, diagnostic services, these types of contracts provide no positive profit incentive to the Contractor for cost control or labor efficiency, thereby putting the majority of the risk on the Government. As discussed above, in order for a contractor to successfully deliver the DCGS-A Increment 2 requirement, portions of the DCGS-A Increment 2 requirement must be met through custom software development of military-unique software applications. Further, the uncertainty associated with the required development, integration, and testing services necessary to integrate software capabilities, coupled with the lack of positive profit incentive to the contractor, would put the Government in a position of significant risk as it relates to performance, cost, and schedule.

6. Based on the results of the extensive market research performed, which showed that commercial items and services were not available to meet the Government's requirement, FAR part 12 procedures could not be utilized and the best solution for the DCGS-A Increment 2 requirement was to conduct a full-and-open source selection in accordance with the FAR 15.101-1 Tradeoff Process including use of contract types not available under FAR part 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17 March 2016 by Christopher Fisher


FISHER.CHRISTOPH ER.M.1387943605

Digitally signed by FISHER.CHRISTOPHER.M.1387943605 DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=FISHER.CHRISTOPHER.M.1387943605 Date: 2016.03.17 16:36:29 -04'00'

Christopher M. Fisher

██████████████████████████████████████████

Protected Information and/or Legends Redacted



SAAL-ZS

OCT 2 0 2014

MEMORANDUM FOR UNDER SECRETARY OF DEFENSE (ACQUISITION, TECHNOLOGY AND LOGISTICS)

SUBJECT: Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy

1. Reference, DCGS-A Increment 1 Acquisition Strategy, dated April 2013.

2. I request your approval to change the 8 August 2013 DCGS-A Acquisition Strategy as follows:

   a. Base the Increment 1 Full Deployment (FD) on Release 2.

   b. End the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to:

      (1) Address software regression testing and priority fixes identified as a result of Release 2 operational test results.

      (2) Initiate Increment 2 preparatory activities.

3. Funds that are available to develop and test a viable third software release are insufficient. Increased resource requirements are needed to execute the DCGS-A Increment 1 Release 2 Developmental Test and related risk reduction efforts.

4. I believe allocating the remaining Increment 1 RDT&E funding to support potential required fixes from the Increment 1 Release 2 Limited User Test results, and moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available. In addition, Increment 1 Release 2 will deliver approximately 90 percent of the planned Increment 1 capability.

5. Keeping Increment 1, Release 2 in the field until Increment 2 Release 1 enhancements are ready supports Army training and operational fielded software stabilization initiatives. The Army will continue to sustain and modernize Release 2 until it is replaced in the Force by Increment 2, Release 1. This will enable the de-fielding of the All Source Analysis System Block II Analysis and Control Element and implementation of emerging Army Common Operating Environment and Command Post Computing Environment requirements.

Protected Information
and/or Legends Redacted

SAAL-ZS
SUBJECT: Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy

6. Upon receiving your approval of this request, my team will prepare an addendum document reflecting this change for your review and signature, to be attached to the current Increment 1 Acquisition Strategy document.

7. The point of contact is Mr. Edgar McAnderson, (571) 256-9390, or e-mail: edgar.l.mcanderson.ctr@mail.mil.

Heidi Shyu
Assistant Secretary of the Army
(Acquisition, Logistics and Technology)

*Approved for*

DEC 4 2014

2

A92
Protected Information
and/or Legends Redacted



A93

Protected Information
and/or Legends Redacted

190  The contract(s) to be used for DCGS-A Increment 2, Release 2 will be decided at a Decision Point
191  approximately 24 months into the Increment 2, Release 1 effort.   This Decision Point will
192  determine whether the follow-on releases will either use the PM managed IDIQ contract, request
193  capabilities from existing Multiple Award Task Oder Contracts (MATOCs) or selectively compete
194  for the development and test of other Increment 2 applications. ████████████████

Protected Information
and/or Legends Redacted

654
655
656
657

Follow-on Releases focused on the incorporation of modernized DCGS-A capabilities running on the new Data Infrastructure will leverage the PM managed IDIQ contract, request capabilities from existing Contracts or selectively compete for the development and test of Increment 2 capabilities.

A125

Protected Information
and/or Legends Redacted

**DEPARTMENT OF THE ARMY**
U.S. ARMY CONTRACTING COMMAND
ABERDEEN PROVING GROUND
6001 COMBAT DRIVE
ABERDEEN PROVING GROUND, MARYLAND 21005-1846

REPLY TO
ATTENTION OF

## DETERMINATION & FINDINGS

### For

Use of Incentive Fee (IF) contract type for Task Order 0001 (TO 0001) of the Project Manager Distributed Common Ground System- Army (DCGS-A) Increment 2 (Inc. 2) Indefinite Delivery Indefinite Quantity (IDIQ) Contract for Continued Engineering and Manufacturing Development Phase (EMD) Research and Development (R&D) Efforts in accordance with (IAW) Federal Acquisition Regulation (FAR) 16.401(a), 35.006(c), and 16.401(d)

### FINDINGS

1. In support of PM-DCGS-A's Inc. 2 EMD requirement a single IDIQ award is believed the most appropriate contract type (See D&F the analysis for award of a single source IDIQ single award contract exceeding $103 million for DCGS-A Inc. 2, EMD). Consequently, The Army Contracting Command-Aberdeen Proving Ground (ACC-APG) Division C Branch Five propositions to award TO 0001 as a FAR Part 16.405-1 Cost Plus Incentive Fee Contract (CPIF) type. The CPIF TO shall be a cost-reimbursement action that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target cost (FAR 16.304). Under this type of TO, a target cost, a target fee, a minimum and maximum fee, and a fee adjustment formula are negotiated initially. After contract performance, the fee payable to the contractor is determined in accordance with the formula. The formula provides, within limits, for increases in fee above target fee when total allowable costs are less than target cost, and decreases in fee below target fee when total allowable costs exceed target costs. The provision for increase or decrease in fee is intended to provide an incentive for maximum effort on the part of the contractor to manage the contract effectively. When total allowable cost is greater or less than the range of costs within which the fee adjustment formula operates, the contractor is paid total allowable costs plus the minimum or maximum fee (FAR 16.405-1). A multiple-incentive arrangement is preferred to encourage positive contract performance, discouraging inefficiency and waste, striving for outstanding outcomes in total contract Performance and Cost/Price factors.

2. The TO will utilize an incentive pool structure, combining the (multiple) incentives fee agreements. The performance incentive will equal 60%, with the cost incentive equaling 40% of fee pool. The total maximum fee allowable under this TO will be

13%, and the total minimum fee allowable under this TO will be 0%. The Government will solicit the total fee pool amount.

- Performance Incentives: shall motivate, eliminate or reduce anomalies in contractor developed software. The contractor will receive a 10% performance incentive fee reductions per every anomaly discovered.

- Cost Incentives: will motivate effective contractor cost management. The incentive arrangement will include a fee adjustment formula of 30/70 for underruns and 70/30 for overruns. Target cost and target fee will be proposed.

| Incentive Strategy | | |
|---|---|---|
| Incentive | Description | Pool % |
| Performance | 100% fee incentive earned upon the successful delivery of SW with zero priority 1 or 2 SW anomalies | 60% |
| | The contractor's final adjusted fee incentive will be reduced by 10% for each priority 1 or 2 SW anomaly discovered. | |
| Cost | Contractor proposed (Government accepted) target cost and target fee shall be evaluated against a Government predetermined share ratios of 30/70 for underruns and 70/30 for overruns. | 40% |

Establishing the Fee (Cost Incentive): Upon the completion of TO, actual costs will be compared with the target costs established. Overruns and underruns result in adjustment of the fee according to the determined sharing formulas. The adjusted amount must fall within the agreed maximum and minimum fee levels. The fee adjustment amount shall equal the target cost subtract the final cost multiplied by the contractor's percentage of cost risk (Fee Adjustment = share ratio (target cost subtract final cost). The TO's final fee equals the fee adjustment plus the target fee equals final fee amount (Fee adjustment + target fee = final fee amount). The final fee is subject to the minimum and maximum fees. If the final fee is less than the minimum fee, the minimum fee becomes the final fee. If the final fee is more than the maximum fee, the maximum fee becomes the final fee. The final price to Government is calculated where final cost plus final fee equals final price.

3. Because the nature of this requirement is developmental and there's a lack of precise specifications, resulting in difficulties when developing accurate cost estimates, a cost-reimbursement contract type is deemed appropriate IAW FAR 35.006(c).

Protected Information and/or Legends Redacted

4. The cost-reimbursement contract limitation factors outlined in FAR 16.301-3(a) have been considered and documented in Acquisition Plan 15-C-006 (Enclosure 1).

5. IAW FAR 16.401(a), the Incentive fee contract type is highly appropriate for TO 0001 due to the nature and timing of PWS efforts. The incentive arrangement will ensure there's a meaningful connection between overall Performance and Cost/Price factors.

6. A DCGS-A Inc. 2 Working Integrated Product Team (WIPT) has been charted to promote collaboration and communication effectively for applying and administrating an incentive strategy which meets the Government's object of incentivizing contract Performance while controlling Cost/Price. WIPT tasks focused on:

   - Ensuring all Contract Line Items (CLINS) associated with travel or Other Direct Costs (ODC's) are cost (no fee) CLINs.

   - Established reasonable and attainable incentive targets, and ensure they are clearly communicated to the contractor (IAW FAR 16.401(a)(1)).

   - Included appropriate incentive arrangements designed to: motivate contractor efforts that might not otherwise be emphasized (FAR 16.401(a)(2)(i)); and discouraged contractor inefficiency and waste (FAR 16.401(a)(2)(ii)). The use of IF will ensure that contractor keeps striving for increased efficiency and manages the program with a keen eye towards reducing wasteful processes. During the source selection process, open and candid discussion of the fee adjustment formula will be conducted, with the objective of developing an incentive that is conducive of contract performance and cost/price motivation. The arrangement will reflect an incentive worthy of contractor's desire to continue striving for higher efficiency to earn the maximum fee available.

7. Incentive administration: The use of incentives is administratively practical. This effort requires significant EVM reporting, which captures sufficient data for adequately accessing contract performance and cost. Contract clause 52.216-10 Incentive Fee shall be incorporated in the resulting contract/task order. The clause shall outline the terms and conditions associated with the incentive fee. The Procuring Contracting Officer (PCO) and Administrative Contracting Officer (ACO) will work in tandem, reporting and documenting financial management, quality assurance, and interim tests or milestone accomplishment reports for comparison with planned expenditure and manning levels. This comparison will provide a good factual basis for incentive analysis.

8. Although the Government may complete a Weighted Guidelines (WGL) form IAW Defense Acquisition Regulation Supplement (DFARS) 215.404-70 to determine a fee objective, it's the Government's intent to solicit competitive pricing for fee.

A152

Protected Information
and/or Legends Redacted

Regardless of offeror's proposed fee, the total max fee shall not exceed 13% of the negotiated target cost.

## DETERMINATION

On the basis of the above findings and the approved Acquisition Plan, I hereby determine that <u>no other contract type</u> other than the use of a Cost-Reimbursement type contract is suitable for this acquisition, and that use of a Cost Plus Incentive Fee contract type is in the best interest of the Government pursuant to Federal Acquisition Regulation Subparts 16.401(d), 35.006(c), and 16.401(a).

DATE:14 December, 2015

FISHER.CHRISTOP
HER.M.1387943605

Digitally signed by
FISHER.CHRISTOPHER.M.1387943605
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
ou=USA, cn=FISHER.CHRISTOPHER.M.1387943605
Date: 2015.12.14 12:45:11 -05'00'

Christopher Fisher
Procuring Contracting Officer

## APPROVAL

Based on foregoing findings, I hereby approve this Determination and Finding for Use of an Incentive Fee contract type for Task Order 0001 of the Distributed Common Ground System, Increment 2 Engineering and Manufacturing Development contract pursuant to Federal Acquisition Regulation Subparts 16.401(d), 35.006(c), and16.401 (a), and provided the requirement herein described has otherwise been authorized for acquisition.

DATE: 14 December, 2015

MANGANARO.JOS
EPH.C.1229042609

Digitally signed by
MANGANARO.JOSEPH.C.1229042609
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
ou=USA, cn=MANGANARO.JOSEPH.C.1229042609
Date: 2015.12.14 13:29:31 -05'00'

Joseph Manganaro
Branch Chief

Enclosure 1: Acquisition Plan for the Distributed Common Ground System-Army Increment 2 Engineering, Manufacturing, and Development dated 09 September 2015

A153

Protected Information
and/or Legends Redacted

# COTS SW Applications Used with DCGS-A Increment 1

| Software Components | Version | Vendor | Functionality | COTS, GOTS, Open Source |
|---|---|---|---|---|
| Adobe Acrobat X Pro 10.1.13 English | 10.1.13 | Adobe Systems | Portable Document File (PDF) Reader | COTS – Licensed |
| Adobe Flash Player 17 ActiveX English | 17.0.0.134 | Adobe Systems | Adobe Flash is the authoring environment and Flash Player is the virtual machine used to run the Flash files | COTS – Free download |
| Adobe Flash Player 17 NPAPI English | 17.0.0.134 | Adobe Systems | Portable Document File (PDF) Reader | COTS – Free download |
| AgileGraph 2.14.1337.14 English | 2.14.1337.14 | Ringtail Design | Transforms raw data into knowledge through rapid, visual data discovery | COTS – Licensed |
| AIMES Exploit and Reporter 1.5.2 English | 1.5.2 | Leidos | For video processing to receive, process & archive motion imagery (MI) data | COTS – Licensed |
| ArcGIS ArcInfo Workstation 10.0.2414 | 10.0.2414 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS ArcInfo Workstation 10.0.2414 English | 10.0.2414 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Desktop 10 English | 10.0.4400 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Desktop 10 Service Pack 5 | 10.0.4400 | ESRI | Geospatial mapping and visualization, spatial analysis, editing, and data management | COTS – Licensed |
| ArcGIS Engine Runtime 10 English | 10.0.4400 | ESRI | Complete library of embeddable geographic information system (GIS) components for developers to build custom applications | COTS – Licensed |
| ArcGIS Engine Runtime 10 Service Pack 5 | 10.0.4400 | ESRI | Complete library of embeddable geographic information system (GIS) components for developers to build custom applications | COTS – Licensed |
| ArcGIS Explorer Desktop (32 bit) | 10.1.2500 | ESRI | Geospatial viewer for local data and map services | COTS – Free Download |
| ArcGIS Explorer Desktop 10.1.2500 | 10.1.2500 | ESRI | Geospatial viewer for local data and map services | COTS – Free Download |
| ArcGIS Military Analyst 10 English | 10.0.3600 | ESRI | National Geospatial-Intelligence Agency data loading and terrain analysis | COTS – Free download |
| ArcGIS Military Analyst 10 Service Pack 3 | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS Military Overlay Editor 10 English | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS Military Overlay Editor 10 Service Pack 3 | 10.0.3600 | ESRI | Provides Military symbols layer package. MIL-STD-2525B symbology | COTS – Free download |
| ArcGIS VBA Resources 10.0.2414 | 10.0.2414 | ESRI | Provides an integrated programming environment | COTS – Licensed |

A243
Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| ArcGIS Workflow Manager 10 SP5 - Desktop Edition English | 10.0.0 377 | ESRI | GIS workflow creation and management tool | COTS – Licensed |
| BioAPI Framework 1.0.1 | 1.0.1 | Dell Inc. | BioAPI Framework | COTS – Free Download |
| Data Interoperability Extension 10.0.3200 | 10.0.3200 | ESRI | Esri extension supporting read/write of geospatial formats. Provides dll required for Web services | COTS - Licensed **License is not provided, on baseline to support Web services** |
| Data Interoperability Extension 10.0.3200 English | 10.0.3200 | ESRI | Esri extension supporting read/write of geospatial formats. Provides dll required for Web services | COTS - Licensed **License is not provided, on baseline to support Web services** |
| Data Interoperability Extension Service Pack 2 | 10.0 3200 | ESRI | Service Pack 2 for Data Interoperability Extension | COTS - Licensed |
| Dell ControlVault Host Components Installer 64Bit x64 | 1.7.459.360 | Broadcom Corporation | Dell ControlVault Host Components Installer 64Bit | COTS – Free download |
| ERDAS IMAGINE 2010 English | 10 | ERDAS Inc. | Geospatial data authoring software | COTS – Licensed |
| ERDAS-Net Licensing 2010 English | 10 | ERDAS Inc. | Comes with ERDAS Imagine | COTS – Licensed |
| ESRI Defense Mapping 10 English | 10.00.54.00 | ESRI | Allows defense industry users to produce and maintain high-quality topographic databases and cartographic products | COTS – Licensed |
| ESRI MapObjects 2.0 | 10.00.53.00 | ESRI | Set of mapping software components that allows embedding maps into applications | COTS – Licensed |
| ESRI Production Mapping 10 English | 10.00.53.00 | ESRI | Geospatial database production tool | COTS – Licensed |
| GeoRover« Coordinate Viewer Extension 1.0.3 English | 1.0 3 | SAIC/Leidos | Provides rapid map zooming and enhanced coordinate functionality | COTS – Licensed |
| GeoRover« Digital Data Tracker Extension 3.3.0 English | 3.3.0 | SAIC/Leidos | Flexible GPS software tools that easily work with field collected data including data collected from geotagging devices and can support real-time GPS navigation | COTS – Licensed |
| GeoRover« License Manager 2.0.0.17 English | 2.0.0.17 | SAIC/Leidos | Provides access to GeoRover features | COTS – Licensed |
| GeoRover« Locus Track Extension 3.3.0 English | 3.3.0 | SAIC/Leidos | Powerful tools for geospatial feature data creation, editing, and geospatial data fusion | COTS – Licensed |
| GeoRover« Magnetic Model 2010 English | 1.00.0000 | SAIC/Leidos | Provides geomagnetic fields tools to GeoRover | COTS – Licensed |
| GeoRover« Range Tools Extension 1.1.1 English | 1.1.1 | SAIC/Leidos | Geospatial feature data creation, editing, and ingestion of ring, ellipse, and arc feature data | COTS – Licensed |
| GeoRover« RPF Tools Extension - DCGS-A 1.1.0.6 English | 1.1.0.6 | SAIC/Leidos | High-speed indexing, display, and management of large file-based raster product format (RPF) datasets, typically map and imagery data | COTS – Licensed |
| GeoRover« Zoom Tools Extension 3.2.5 English | 3.2.5 | SAIC/Leidos | Rapid map zooming and "go-to" capabilities | COTS – Licensed |

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Google Earth EC 6.2.2.6613 | 6.2.2.6613 | Google | Virtual globe, map and geographic information | COTS – Free download |
| Google Earth Plug-in 7.0.3.8542 English | 7.0.3.8542 | Google | Virtual globe, map and geographic information | COTS – Free download |
| GXP License Manager (C:\Program Files (x86)\BAE SYSTEMS\GXP License Manager) | 8.4.1.5 | BAE Systems | Data management application that makes it easy to locate, retrieve, and share geospatial data on a local network or across an enterprise | COTS – Licensed |
| IBM i2 Analyst's Notebook 8 English | 8.9.5 | IBM | Link & Timeline Analysis tool w/ graphical representation | COTS – Licensed |
| IBM i2 Chart Reader 8 English | 8.9 3 | IBM | Charts Reader | COTS – Free download |
| IBM Lotus Forms Viewer 3.5.1 English | 7.6.1.123 | IBM | Provides a single interface for users to open, fill out, and save forms | COTS – Free download |
| IDL 8.3 and ENVI 5.1 English x64 | 5.1.0.1 | Exelis Visual Information Solutions | Software for visualization Analysis Presentation | COTS – Licensed |
| Java 7 Update 76 | 7.0.760 | Oracle | Programming language compiler and environment | COTS – Free download |
| Java 7 Update 76 (64-bit) x64 | 7.0.760 | Oracle | Programming language compiler and environment | COTS – Free download |
| Java Auto Updater 2.1.76.13 English | 2.1.76.13 | Oracle | Java Auto Updater | COTS – Free download |
| Jericho MFWS Auth Library 2.2.0.0 English | 2.2.0.0 | Jericho Systems Corporation | Jericho MFWS Auth Library | COTS – Licensed |
| LPS 2010 English | 10.0.0 | ERDAS Inc. | Leica Photogrammetry Suite (LPS) is part of ERDAS Imagine | COTS – Licensed |
| McAfee Agent 4.8.0.1500 | 4.8.0.1500 | McAfee | Agent for anti-virus software | COTS |
| McAfee Agent 4.8.2003 | 4.8.2003 | McAfee | Agent for anti-virus software | COTS |
| McAfee Host Intrusion Prevention 8.00.0402 x64 | 8.00.0402 | McAfee | Anti-virus software | COTS |
| McAfee VirusScan Enterprise 8.8.02004 | 8.8.02004 | McAfee | Anti-virus software | COTS |
| Microsoft .NET Framework 4 Client Profile x64 | 4.0.30319 | Microsoft | Microsoft .NET Framework 4 Client Profile | COTS – Free download |
| Microsoft .NET Framework 4 Extended x64 | 4.0.30319 | Microsoft | Installation Script will deploy Shared Add-in Extensibility Update for Microsoft .NET Framework 4.0 to workstation | COTS – Free download |
| Microsoft Office 2003 Web Components English | 11.0.8173.0 | Microsoft | Microsoft Office 2003 Web Components | COTS – Free download |
| Microsoft Office 2007 Service Pack 3 (SP3) | 12.0.6612.1000 | Microsoft | Microsoft Office 2003 Service Pack | COTS – Free download |
| Microsoft Office Access MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Access MUI (English) 2007 | COTS – Free download |
| Microsoft Office Access Setup Metadata MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Access Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Excel MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Excel MUI (English) 2007 | COTS – Free download |
| Microsoft Office File Validation Add-In 14.0.5130.5003 | 14.0.5130.5003 | Microsoft | Used to validate that Binary File Format files conform to the Microsoft Office File Format | COTS – Free download |
| Microsoft Office InfoPath MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office InfoPath MUI (English) 2007 | COTS – Free download |

**A245**

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft Office Office 64-bit Components 2007 x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Office 64-bit Components 2007 | COTS – Free download |
| Microsoft Office Outlook MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Outlook MUI (English) 2007 | COTS – Free download |
| Microsoft Office PowerPoint MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office PowerPoint MUI (English) 2007 | COTS – Free download |
| Microsoft Office Professional Plus 2007 | 12.0.6612.1000 | Microsoft | Microsoft Office Professional Plus 2007 | COTS – Licensed |
| Microsoft Office Proof (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (English) 2007 | COTS – Free download |
| Microsoft Office Proof (French) 2007 French | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (French) 2007 | COTS – Free download |
| Microsoft Office Proof (Spanish) 2007 Spanish | 12.0.6612.1000 | Microsoft | Microsoft Office Proof (Spanish) 2007 | COTS – Free download |
| Microsoft Office Proofing (English) 2007 English | 12.0.4518.1014 | Microsoft | Microsoft Office Proofing (English) 2007 | COTS – Free download |
| Microsoft Office Proofing Tools 2007 Service Pack 3 (SP3) | 12.0.4518.1014 | Microsoft | Microsoft Office Proofing (English) 2007 | COTS – Free download |
| Microsoft Office Publisher MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Publisher MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared 64-bit MUI (English) 2007 English x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Shared 64-bit MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared 64-bit Setup Metadata MUI (English) 2007 English x64 | 12.0.6612.1000 | Microsoft | Microsoft Office Shared 64-bit Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Shared MUI (English) 2007 | COTS – Free download |
| Microsoft Office Shared Setup Metadata MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Shared Setup Metadata MUI (English) 2007 | COTS – Free download |
| Microsoft Office Word MUI (English) 2007 English | 12.0.6612.1000 | Microsoft | Microsoft Office Word MUI (English) 2007 | COTS – Free download |
| Microsoft Office XP Web Components 10.0.6619.0 English | 10.0.6619.0 | Microsoft | Microsoft Office XP Web Components | COTS – Free download |
| Microsoft Silverlight 5.1.30514.0 English x64 | 5.1.30514.0 | Microsoft | Application framework for writing and running rich Internet applications, with features and purposes similar to those of Adobe Flash | COTS – Free download |
| Microsoft SOAP Toolkit 3.0 English | 3.0.1325.4 | Microsoft | Microsoft SOAP Toolkit | COTS – Free download |
| Microsoft SQL Server 2005 | 9.4.5000.00 | Microsoft | Database | COTS – Licensed |
| Microsoft SQL Server 2005 (DCGSA) English | 9.4.5000.00 | Microsoft | Database | COTS – Licensed |
| Microsoft SQL Server 2005 Backward compatibility English x64 | 8.05.2312 | Microsoft | Microsoft SQL Server 2005 Backward compatibility | COTS – Free download |
| Microsoft SQL Server 2005 Books Online (English) (September 2007) English | 9.00.3104 | Microsoft | Microsoft SQL Server 2005 Books Online (English) (September 2007) | COTS – Free download |
| Microsoft SQL Server 2005 Tools English | 9.4.5000.00 | Microsoft | Microsoft SQL Server 2005 Tools | COTS – Free download |
| Microsoft SQL Server Native Client 9.00.5000.00 English x64 | 9.00.5000.00 | Microsoft | Microsoft SQL Server Native Client | COTS – Free download |

A246

Protected Information
and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft SQL Server Setup Support Files (English) 9.00.5000.00 English | 9.00.5000.00 | Microsoft | Microsoft SQL Server Setup Support Files (English) | COTS – Free download |
| Microsoft SQL Server VSS Writer 9.00.5000.00 English x64 | 9.00.5000.00 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.56336 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.59193 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable | 8.0.61001 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.56336 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.59192 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2005 Redistributable (x64) x64 | 8.0.61000 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.21022.218 English x64 | 9.0.21022.218 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.17 English x64 | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.4148 English x64 | 9.0.30729.4148 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x64 9.0.30729.6161 English x64 | 9.0.30729.6161 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.21022 English | 9.0.21022 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.21022.218 English | 9.0.21022.218 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729 English | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.17 English | 9.0.30729 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.4148 English | 9.0.30729.4148 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2008 Redistributable - x86 9.0.30729.6161 English | 9.0.30729.6161 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |

A247

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Microsoft Visual C++ 2010 x64 Redistributable - 10.0.40219 x64 | 10.0.40219 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2010 x86 Redistributable - 10.0.40219 | 10.0.40219 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 Redistributable (x64) - 11.0.60610 | 11.0.60610.1 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 Redistributable (x86) - 11.0.60610 | 11.0.60610.1 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x64 Additional Runtime - 11.0 60610 English x64 | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x64 Minimum Runtime - 11.0.60610 English x64 | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x86 Additional Runtime - 11.0 60610 English | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual C++ 2012 x86 Minimum Runtime - 11.0.60610 English | 11.0.60610 | Microsoft | Install runtime components that are required to run C++ applications built with Visual Studio | COTS – Free download |
| Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | 10.0.40303 | Microsoft | Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | COTS – Free download |
| Microsoft Visual Studio 2010 Tools for Office Runtime (x64) x64 | 10.0.40308 | Microsoft | Microsoft Visual Studio 2010 Tools for Office Runtime (x64) | COTS – Free download |
| Microsoft WSE 3.0 English | 3.0.5305.0 | Microsoft | Web Service Enhancements (WSE) enables developers to create interoperable Web services | COTS – Free download |
| Mozilla Firefox 31.5.0 ESR (x86 en-US) | 31.5.0 | Mozilla | Web Browser | COTS – Free download |
| Mozilla Maintenance Service 31.5.0 | 31.5.0 | Mozilla | Web Browser | COTS – Free download |
| MSXML 4.0 SP2 (KB954430) English | 4.20.9870.0 | Microsoft | Microsoft XML Core Services | COTS – Free download |
| MSXML 4.0 SP2 (KB973688) English | 4.20.9876.0 | Microsoft | Microsoft XML Core Services | COTS – Free download |
| MSXML 4.0 SP3 Parser (KB2758694) English | 4.30.2117.0 | Microsoft | Text parser | COTS – Free download |
| NEXTimage 1.00.0000 English | 1.00.0000 | Contex | Wide-format scanning software, comes with Scanner (HW) purchase | COTS – Licensed |
| NVIDIA PhysX 9.10.0514 English | 9.10.0514 | NVIDIA Corporation | NVIDIA PhysX | COTS – Free download |
| NVIDIA PhysX System Software 9.10.0514 | 9.10.0514 | NVIDIA Corporation | Display and Video | COTS – Free download |
| NVIDIA WMI 2.15.0 | 2.15.0 | NVIDIA Corporation | Display and Video | COTS – Free download |
| Oracle Data Provider for .NET Help 11.1.0720 English | 11.1.0720 | Oracle | Database | COTS – Free download |
| Oracle Developer Tools for Visual Studio Help 11.1.0720 English | 11.1.0720 | Oracle | Makes it easier and Tightly integrated "Add-in" for MS Visual Studio | COTS – Free download |

**A248**

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Oracle Providers for ASP.NET Help 11.1.0720 English | 11.1.0720 | Oracle | For writing Oracle applications | COTS – Free download |
| Overwatch LIDAR Analyst v5.1.2 B1 for ArcGIS English | 5.01.0002.0001 | Overwatch Systems | 3D feature extraction solution for airborne LIDAR data, advancing the capability of Esri ArcGIS by providing LIDAR point cloud visualization and 3D exploitation, high-quality bare earth generation, and precision 3D feature extraction | COTS – Licensed |
| PAR Government GV 3.0.982.62462 | 3.0.982.62462 | PAR Government Systems | Imagery viewer and metadata editor that supports read, write, and display of NITF | COTS – Free download |
| Sentinel Protection Installer 7.6.1 English | 7.6.1 | SafeNet | Sentinel System Driver | COTS – Free download |
| Service Pack 4 for SQL Server Database Services 2005 ENU | 9.4.5000 | Microsoft | Service Pack for SQL | COTS – Free download |
| SOCET GXP 4.1.0 | 4.1.0 | BAE SYSTEMS Geospatial eXploitation Products | Geospatial-intelligence software package that uses imagery from satellite and aerial sources to identify, analyze, and extract ground features quickly, allowing for rapid product creation | COTS – Licensed |
| SOCET GXP 4.1.0 Integration with TerraGo English x64 | 4.1.0 | BAE SYSTEMS Geospatial eXploitation Products | Geospatial Exploitation Products | COTS – Licensed |
| SQLXML4 English x64 | 9.00.5000.00 | Microsoft | Provides methods for accessing the XML value as a String, a Reader or Writer, or as a Stream | COTS – Free download |
| Task Assistant Manager 10.0.0.378 English | 10.0.0 378 | ESRI | Task Manager for ESRI | COTS – Free download |
| TerraBuilder 6.0.3.328 | 6.0.3.328 | Skyline Software Systems Inc. | Geospatial Analysis Tool for 3D support | COTS – Licensed |
| TerraExplorer Pro 6.1.2.1290 | 6.1.2.1290 | Skyline Software Systems Inc. | Geospatial Analysis Tool for 3D support | COTS – Licensed |
| TerraExplorer TerraGo-GeoPDF Extension 1.0.4 English | 1.0.4 | Skyline Software Systems | Geospatial Analysis Tool for 3D support | COTS - Licensed |
| TerraGo Composer 6.0.0400 English | 6.0.0400 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Composer 6.0.04073 English | 6.0.04073 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Publisher for ArcGIS 6.0.04096 | 6.0.04096 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TerraGo Publisher for ArcGIS 6.0.04096 English | 6.0.04096 | TerraGo Technologies | Geospatial Analysis Tool for GeoPDF Support | COTS – Licensed |
| TGSClient 01.02.00.07 | 01.02.00.07 | Trusted Computer Solutions | TGS Client | COTS – Licensed |
| Timeline+ 1.1.1337.18 English | 1.1.1337.18 | Ringtail Design | Provides a graphed representation (over time) of various Timeline+ TED entities | COTS – Free download |
| TIPCI 2.00.0005 | 2.00.0005 | Texas Instruments Inc. | TIPCI | COTS – Free download |
| Visual Basic for Applications (R) Core - English 6.5.10.32 English | 6.5.10.32 | Microsoft | Visual Basic for Applications (R) Core | COTS – Free download |
| Visual Basic for Applications (R) Core 6.5.10.32 English | 6.5.10.32 | Microsoft | Visual Basic for Applications (R) Core - English | COTS – Free download |

**A249**

Protected Information and/or Legends Redacted

| | | | | |
|---|---|---|---|---|
| Visual Entity Browser 1.1.1337.17 English | 1.1.1337.17 | Ringtail Design | Provides an intuitive graphical display of TED entities, supports zooming for multiple levels of detail | COTS – Licensed |
| Windows 7 Enterprise x64 | 6.1.7601 | Microsoft | Windows OS system | COTS - Licensed |
| Windows Support Tools 5 2.3790.1830 English | 5.2.3790.1830 | Microsoft | OS Support Tools | COTS – Free download |
| XML Notepad 2007 English | 2.3.0.0 | Microsoft | XML processing package | COTS – Free download |

A250

Protected Information and/or Legends Redacted



A251

Protected Information
and/or Legends Redacted



A270

Protected Information
and/or Legends Redacted

UNCLASSIFIED//FOUO//PROCUREMENT SENSITIVE

**DRAFT** – 15 July 2015

PERFORMANCE WORK STATEMENT

FOR

Distributed Common Ground System – Army
Increment 2, Engineering, Manufacturing and Development

SOLICITATION NUMBER: W56KGY-15-R-0029



**Appx10410**

**A410**
Protected Information
and/or Legends Redacted

# 1  SCOPE

This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the development and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD).  The requirements for Increment 2, EMD include, development of new data architecture,  standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities;  cyber analytics and data integration, visualization capabilities,  Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

DCGS-A Increment 2 is technically a New Start program.  However, Increment 2 is a logical successor to the DCGS-A Increment 1 and it is envisioned that the hardware platforms and a high percentage of the SW capabilities developed in Increment 1 will be leveraged/used for Increment 2.

Each DCGS-A Increment 2 software release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.
The planned Increment 2 release for data integration foundation, capability & KPP enhancements on modernized infrastructure focus primarily on:

- Data Integration Layer
- Data Analytics Platform (Fusion)
- Interoperability (Net Ready)
- Visualization Framework
- Training
- Sustainment
- Ops and Support
- Cyber Security
- Fact of Life Upgrades
- Logistics and Readiness

The planned Increment 2 release for usability enhancements considering unified user interface & Intel support to cyber capability focus primarily on:

- Consistent User Interface
- Cyber Operations
- DARPA Insight Integration
- Continued INC 2, Release Improvements
- DCGS Integration Backbone (DIB) Upgrade

Protected Information and/or Legends Redacted

- Fact of Life Upgrades
- Logistics and Readiness

As used in this PWS, the term "DCGS-A INC 2, EMD" incorporates the framework, architecture, software and other capabilities that may be developed and integrated in support of the DCGS-A Family of Systems (FoS).

The contractor shall be responsible for system and software engineering, product design, development, integration, testing, and limited deployment support to include software maintenance, configuration management, risk management, and quality assurance. The contractor is also responsible for developing and delivering documentation In Accordance With (IAW) the Contract Data Requirements List (CDRL) associated with this Performance Work Statement (PWS).

This PWS also includes specific program management, system engineering, design and development, software engineering, integration and test, software quality assurance, system platform integration & test, demonstration support, and logistics support for the DCGS-A Increment 2 software baseline.

The Contractor shall complete the design, development, integration and test, to include supporting Development and Operational Test events for the DCGS-A Increment 2 software baseline and any future DCGS-A Increment 2 software baseline releases.

## 1.1 BACKGROUND

The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD.

DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.

The DCGS-A Increment approach utilizes spiral deliveries to maintain interoperability with Army and Joint ISR architectures and to address capability insertion and enhancements. This system must

Protected Information and/or Legends Redacted

## 3.4 SOFTWARE DESIGN

### 3.4.1 DESIGN PRINCIPLES

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing. Because of the evolutionary nature of this program, the contractor may be developing different software release/versions concurrently. The contractor shall refine the process as agreed to by the Government. At a minimum, a release/version development shall include:

    a. Functionality defined for that release as defined by the Release Objectives.

    b. A maximization of reuse of GOTS/COTS products.

Each release and version shall consist of field installable, and field de-installable segments. Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required. Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS.
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor. The DCGS-A Incremental development model is an Agile Development process.

    a. Each product release builds on the foundation and functionality of the prior release. These releases are built as planned or in response to events. These blocks are referred to as cycles.

    b. The requirements are defined in the contract and vetted through the User Panel.

    c. The contractor shall work with the Government to allocate product release objectives into the lower level development cycles.

    d. The requirements of each cycle are defined by the contractor at the planning session at the start of the cycle. The contractor shall record the requirements defined at the planning sessions in the form of release objectives and send the requirements to the government for tracking. Problem report corrections and patch development cycles are conducted IAW the Software Development Methodology.

    e. Human Factors Engineering, Heuristics and Usability Studies will be continually performed on the DCGS-A system.

At the end of each release/version, the software shall be placed under Configuration Management control.

    a. All development products in the cycle shall be stored in the Software Development Folders.

A464

Protected Information and/or Legends Redacted

Section A – Solicitation/Contract Form

SUPPLEMENTAL INFORMATION

This section was intentionally left blank.



A539

| P | o |
|---|---|
| a | da |

lower priority stories that may be worked in the sprint if time allows) will be established during the planning process  At the end of each sprint, a showcase of the work performed will be demonstrated to the stakeholders and feedback elicited to ensure the capabilities under development meet objectives  This close interaction between developer and SME benefits the developer, in clearly understanding the problem domain and the unique operational needs of the user based upon the first-hand experience of the integrated User Panel  It is not unusual for "team exercises – opportunities for the warfighters to use the software in simulated but unscripted settings" to be used as part of the process to define a set of development goals; oftentimes CONOPS will evolve as an integral part of this design and development process    Once a sufficient group of stories have been achieved and tested, a release will be delivered    Showcase software may be selected for additional usage by stakeholders  Stakeholders will be provided an instance of the software during the next grooming session with the intent to provide feedback as to whether the functionality successfully provides a key operational capability to the Warfighter  Oftentimes, a mock field exercise will be used to prove out the developed concepts    Based upon the results of the capabilities validation, additional adjustment of the functionality may take place, which will leverage the backlog grooming process to ensure feedback is captured and correctly prioritized in the context of the wider development effort

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing  Because of the evolutionary nature of this program, the contractor may be developing different software releases concurrently   The contractor shall refine the process as agreed to by the Government   At a minimum, a release development shall include

    a   Functionality defined for that release as defined by the Release Objectives

    b   A maximization of reuse of GOTS/COTS products

Each release and version shall consist of field installable, and field de-installable segments   Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required   Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor

    a   Each product release builds on the foundation and functionality of the prior release   These releases are built as planned or in response to events  These blocks are referred to as cycles

    b   The requirements are defined in the contract and vetted through the User Panel

    c   The contractor shall work with the Government to allocate product release objectives into the lower level development cycles

A594
Protected Information and/or Legends Redacted

# PALANTIR USG, INC. RESPONSE TO DCGS-A INCREMENT 2 TASK ORDER 0001 DRAFT PERFORMANCE WORK STATEMENT

**Solicitation Number: PM-DCGS-INC2-TASKORDER0001-DRAFTPWS**

**Prepared For:**

Mr. Stephen Morton

Mr. Mike Sherick

ACC-APG-Aberdeen Division C

**Prepared By:**

Palantir USG, Inc.

www.palantir.com

**Palantir POCs:**

Bryant Choung

Copyright © 2015 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

A687

Protected Information and/or Legends Redacted

The Army's stated goals for Increment 2 are to (1) exploit best-in-class commercially available technologies, (2) accelerate delivery of a modern data management architecture, and (3) increase competition within the program. The strategy outlined in draft Increment 2 documents, which is the product of more than eighteen months of planning, will achieve none of these goals and runs counter to all existing guidance and the clear intent of the Secretary of Defense and Congress.

The Army can change the acquisition strategy for Increment 2 to avoid another failure. The solution is straightforward – buy and field proven commercially available technology for core system components using FAR Part 12 procedures instead of trying to reinvent what already exists.

For years, Palantir has fought to provide this candid feedback about the DCGS-A program and software development best practices to the Army (see Appendix). The Army has resisted our attempts to help DCGS-A succeed. In these exchanges, the Army has repeatedly stated that it has studied the lessons of Increment 1 and will allow for direct competition from companies with commercially available technology so that soldiers can have access to technology that works right now. The draft PWS clearly proves otherwise.

### *Salvaging the DCGS-A Program – The Need for Fundamental Change*

Absent a senior-level evaluation of the Increment 2 strategy, conducted independently of those leaders currently tied to the program, and fundamental changes to the current PWS, the decision to proceed with Increment 2 will be fatal to the DCGS-A program. The provisional contract structure, draft requirements, and deliverables are emblematic of an obsolete acquisition model that consistently fails when applied to software. Adhering to this model leaves the Army further and further behind the global commercial market. Increment 2 should not be allowed to proceed as is.

However, it is clear that the current program leadership believes that nothing is wrong with Increment 1 and that taking the same approach for Increment 2 is the best course of action. The plan these leaders are presenting to Congress on behalf of the Army runs counter to central goals for Increment 2 and will saddle taxpayers with another expensive failure by design. Already, the work done to date is fostering conditions similar to those that justified the termination of the Army Future Combat System. These conditions also invite public scrutiny of DCGS-A's cost, schedule, and performance.

New program leadership, free from the biases of those currently invested in the program, is needed to introduce a rational strategy and avoid failure of the program. Beyond budgetary and programmatic consequences, rubber-stamping this PWS would jeopardize the performance of the Army Intelligence enterprise for a generation, depriving soldiers of their ability to do their jobs effectively. An entirely different outcome is possible. The Army can buy and field commercially available technology that works and give soldiers what they need now, not years from now.

*Each DCGS-A Increment 2 software release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.*

Additionally, the contractor that wins this task order *"shall be responsible for system and software engineering, product design, development, integration, testing…"* Numerous other components of the document explicitly ask for the development of new software. As software development is highly failure-prone, it is likely that this work will extend well beyond the three to four years stated in the proposed Task Order 0001, if it is completed at all. The lack of clear prioritization of requirements further exacerbates this possibility. At a minimum, soldiers will have waited nearly two decades for the DCGS-A program to successfully deliver an integrated intelligence platform, and taxpayers will incur greater risks and higher costs.

### A New Strategy for Increment 2

The Army has had multiple opportunities to change the strategy for Increment 2, satisfy Congressional intent, and deliver working technology to soldiers in months, not years. The Army should alter its strategy for Increment 2 to reflect the following realities:

1. The first priority of Increment 2 should be the rapid delivery of a foundational data platform;
2. The Army does not need to build that platform, as it can buy it today; and
3. The Army should use FAR Part 12 commercial contract structures to buy this platform.

### Prioritizing Requirements on the Data Platform

Just as it should have been for Increment 1, the first priority of Increment 2 should be to acquire a working data integration, visualization, and analytics platform. A system that can integrate all of the Army's disparate data sets into a unified repository with search and analysis is fundamental to delivering a comprehensive "Seeing and Knowing" capability. The acquisition of all other enhancements and functionalities should be subordinate to this goal.

The draft Task Order 0001 includes requirements describing the core data integration platform and architecture. However, it also includes many other extraneous requirements that divert focus away from providing a working baseline and, even under optimistic assumptions, will delay the delivery of core capabilities for years.

The following are a few examples of included requirements that are unnecessary to deliver a working data integration layer. We propose deprioritizing all capabilities not directly related to data integration, so that vendors are evaluated principally on their ability to deliver a data integration layer.

| SECTION | EXPLANATION FOR WHY REQUIREMENT IS NOT NECESSARY |
|---|---|
| Section 3.2.11<br><br>Fusion | The technology and activities described in this section are better understood as automatic entity extraction, rather than fusion. Automatic entity extraction is not required for the functioning of the core data layer. Furthermore, the commercial market offers numerous existing tools for automatic entity extraction, yet the Task Order, as written, envisions building this capability from scratch. Therefore, evaluation or design of the data platform should not include requirements for the Automatic Entity extraction, but should only include the requirements that the platform be able to exploit and use various automatic entity extraction capabilities. |
| Section 3.2.12<br><br>Intelligence Support to Cyber Operations | If the Army acquires a working data platform, they can extend and adapt that platform to accommodate any mission area. A separate requirement for cyber intelligence functionality is unnecessary. |
| Section 3.2.17<br><br>Interoperability Engineering | The requirement to integrate the DCGS Integration Backbone (DIB) Version 4.x is not needed. The DIB should be treated as an interoperability standard, not a software platform that should be integrated. The intended benefit of government and commercial interoperability standards and specifications is the ability for a variety of implementations of software to interoperate in a manner that is predefined and prescribed. This does not mean that all participating members need to use or integrate the same software components. The DIB exists as a metadata discovery and exchange standard. There is a reference implementation for purposes of clarifying the standard. In Increment 2, the Army should seek to adopt any compliant implementation of the specifications and standards. |
| Section 3.2.26<br><br>Additional Enhancements | This section includes many extraneous requirements that do not affect the delivery of a working data platform and only encourage the haphazard development of new, custom software. These include the following:<br><br>• Design and implement a chat capability<br>• Design and implement an "undo" feature<br>• Design and implement an automatic map zoom function<br>• Design and implement 3-D walk and fly-through capabilities<br>• Design and implement more "automation" features, which are not defined |

*Buying the Platform - What Can the Army Have Today?*

As Task Order 0001 is currently written, soldiers will wait years from contract award for the delivery of a working data platform. The Army tried and failed to develop the foundational data platform from scratch

| Comment # | Source | Page | Paragraph | Line # | Comment | Comment Type | Rationale | Rationale Type |
|---|---|---|---|---|---|---|---|---|
| 1 | Palantir USG, Inc. | 3.21-44 | All paragraphs in Section 3.2 | | Change the title for Section 3.2 to "System Acquisition and Fielding" and rewrite requirements to provide for the acquisition of the best commercially-available product to fulfill desired capabilities. | Substantive | This section describes a range of design, engineering, and development activities to build a data integration layer, but offers no assurance that such efforts will be successful. In contrast, working data integration layers exist today and can be purchased commercially at lower cost and risk to the Government. Accordingly, we propose that the title for this section be amended to read "System Acquisition and Fielding," and requirements be rewritten to provide for the acquisition of the best commercially available product to fulfill desired capabilities. For example, section 3.2.17 – Interoperability Engineering requires that the contractor develop interoperability with other Army data systems. However, commercial platforms have an inherent incentive to offer openness and interoperability on a global, rather than DOD-specific, level. Therefore, a commercial data integration layer can better satisfy the interoperability requirement, without any additional development. | Consistency |
| 2 | Palantir USG, Inc. | 3.33 | All paragraphs in Section 3.2.11 | | Delete requirement 3.2.11. | Substantive | The technology and activities described in this section are better understood as automatic entity extraction, rather than fusion. Automatic entity extraction is not required for the functioning of the core data layer. Furthermore, the commercial market offers numerous existing tools for automatic entity extraction, yet the Task Order, as written, envisions building this capability from scratch. Therefore, evaluation or design of the data integration platform should not include requirements for the Automatic Entity extraction, but should only include the requirements that the platform be able to exploit and use various automatic entity extraction capabilities. | Correctness |
| 3 | Palantir USG, Inc. | 3.33 | All paragraphs in Section 3.2.12 | | Delete requirement 3.2.12. | Substantive | A working data integration layer is necessary for the functioning of Increment 2, no matter the mission. A separate requirement for cyber intelligence functionality is unnecessary. | Clarity |
| 4 | Palantir USG, Inc. | 3.35-37 | All paragraphs in Section 3.2.17 | | Amend requirement 3.2.17 to allow any compliant implementation of the specifications and standards. | Substantive | The requirement to integrate the DCGS Integration Backbone (DIB) Version 4.x is not needed. The DIB should be treated as an interoperability standard, not a software platform that should be integrated. The intended benefit of government and commercial interoperability standards and specifications is the ability for a variety of implementations of software to interoperate in a manner that is predefined and prescribed. This does not mean that all participating members need to use or integrate the same software components. The DIB exists as a metadata discovery and exchange standard. There is a reference implementation for purposes of clarifying the standard. In Increment 2, the Army should seek to adopt any compliant implementation of the specifications and standards. | Correctness |
| 5 | Palantir USG, Inc. | 3.42-3.43 | All paragraphs in Section 3.2.26 | | Delete or deprioritize all requirements in 3.2.26. | Substantive | This section includes many extraneous requirements that do not affect the delivery of a working data integration layer and only encourage the haphazard development of new, custom software. | Clarity |
| 6 | Palantir USG, Inc. | 3.44-59 | All paragraphs in Section 3.3 | | Remove software development requirements in Section 3.3. | Substantive | New software development is not required for the data integration layer. Working data integration layers exist today and can be purchased commercially. Accordingly, we would propose that the Army remove requirements related to software development where existing technologies are available. | Clarity |
| 7 | Palantir USG, Inc. | 3.44-46 | All paragraphs in Section 3.3.1 | | Conform Section 3.3.1 to incorporate all (and not only a subset of) Agile software development principles. | Substantive | This section prescribes a particular software development approach (SRCUM/Agile) that is common in commercial software development. We note that the Agile software development manifesto states that "working software is the primary measure of progress," and that "the art of maximizing the amount of work not done--is essential." This Task Order, as written, plainly violates these and other elements of the Agile approach by seeking to re-create technology that already exists. | Completeness |
| 8 | Palantir USG, Inc. | 3.60-62 | All paragraphs in Section 3.4 | | Remove prescriptive "ease of use" requirements from Section 3.4 and add in evaluative criteria to assess ease of use based on proven user experience with the product across a variety of environments. | Substantive | This section contains expansive "ease of use" requirements, aimed specifically at overcoming the lack of a preexisting market and prior use of a custom-build product. Ease of use, however, is a natural outcome of well-designed software that has been refined across time and incorporates the feedback of many users, such as is the case for mature solutions that are available commercially.. The Army should amend its approach to emphasize the acquisition of an existing best-of-breed platform that is intuitive and easy to use. | Correctness |

# PALANTIR USG, INC. RESPONSE TO DCGS-A INCREMENT 2 DRAFT RFP SECTIONS L AND M

**Solicitation Number: PM-DCGS-INC2-DRAFTRFPSECTIONSLM**

**Prepared For:**

Mr. Stephen Morton

Mike Sherick

ACC-APG-Aberdeen Division C

**Prepared By:**

Palantir USG, Inc.

www.palantir.com

**Palantir POCs:**

Bryant Choung

Copyright © 2015 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

A707

Protected Information and/or Legends Redacted

# TABLE OF CONTENTS

Executive Summary ........................................................................................................................... 1

Remove Barriers for Commercial Competition ...................................................................................... 3

Avoid Reinventing Technologies that Already Exist ............................................................................... 5

Appendix ........................................................................................................................................ 6

**A708**

Protected Information
and/or Legends Redacted

# Executive Summary

Palantir USG, Inc. ("Palantir") has reviewed sections L and M of the Increment 2 Draft Request for Proposals (RFP). The Army has not corrected critical deficiencies in the overall acquisition structure of Increment 2. As written, Increment 2 will commit the Army to an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program. Increment 2 will commit the Army to the same lengthy, high-risk development effort that failed in Increment 1. We have offered our feedback to program leadership at every step of the Increment 2 process because we want the Army to succeed. But ultimately it is not in our interest or in the Army's interest for it to commit to a program that so clearly violates fundamental principles of successful enterprise software delivery.

Two years ago, Increment 1 was halted so that the Army could adopt a different acquisition strategy for Increment 2. However, no substantive changes have been made. This leaves the Army in the same position it has been in for years. Despite the fact that the capabilities of commercial data integration, analysis, and visualization tools exceed those of DCGS-A, the Army persists in promoting its inferior flagship software and trying to develop capabilities that already exist.

When Palantir has pointed out these facts to the DCGS-A program office and Army ASAALT, we have been consistently told that we are the only company that has expressed concerns regarding barriers to commercial competition and about the basic acquisition structure of Increment 2. If this is true, it is because the Department of Defense (DOD) acquisition system is generally hostile to commercial innovations, leading many potential sources of innovation to exit the DOD market or ignore it entirely. This leaves the DOD with a closed and relatively small pool of traditional contractors with a core competency in compliance rather than innovation or delivery of effective software. This reality is bad for soldiers and bad for taxpayers.

It is also why the Secretary of Defense and Congress are reaching out to companies from places like Silicon Valley. They recognize that the old way of doing things with the same partners will not work. As they have heard, we are far from the only innovative company facing these barriers.

Those in charge of the DCGS-A program are not only consciously saddling taxpayers and soldiers with another failure but are undermining the efforts of the Secretary of Defense and Congress to change a broken system. Increment 2 is an opportunity to prove that the Army is capable of executing the type of agile and innovative acquisition strategy that the DOD seeks to adopt. However, absent fundamental changes to the Army's proposed acquisition strategy, Increment 2 will prove just the opposite.

The DCGS-A PM has stated that the formal RFP for Increment 2 will be released in Q1 of FY 2016. There is little time to reconsider or halt the Army's strategy for the program. Those currently invested in the program have clearly shown they have no intention of doing so and cannot answer a fundamental question: How will Increment 2 be any different from Increment 1? The appointment of new program leadership offers the only realistic chance of avoiding failure.

The DCGS-A program began at the turn of the millennium. Fifteen years and close to $4 billion later, soldiers still do not have a working capability. No one has been held to account for this failure. The Army is acutely aware of the fact that this outcome was avoidable; they have seen and continue to see soldiers request and adopt commercially available alternatives that are in use at this very moment.

The Army already has the tools and the authority necessary to correct course. It can buy existing commercially available technologies that can be fielded well ahead of 2022 (the expiration date of the proposed IDIQ contract). If the course remains unchanged, the Army's multi-decade flagship intelligence investment will consume billions more and produce nothing.

Although our feedback to date has been ignored by the current program leadership, we believe there are two primary areas of concern that new program leadership can and should address before releasing the final RFP for Increment 2.

*Remove Barriers for Commercial Competitors*

As written, these documents suggest that only responses from competitors who possess DOD-unique compliance capabilities will be entertained. These requirements present significant barriers for innovative commercial companies that do not rely primarily on the DOD for business. These barriers include:

1. The use of cost-type contract structures such that *"lack of supporting evidence of an adequate accounting system at the time of proposal submittal as approved by the Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration and award."*

2. Unclear requirements for Data Rights

3. The requirement for an accredited Earned Value Management System (EVMS)

4. The limitation of past performance relevant only to *"those contracts, whether performed as a prime or major subcontractor, which required Engineering and Manufacturing Development or System Development and Demonstration contracts for development."*

*Avoid Reinventing Technologies that Already Exist*

It should be noted that all of the requirements listed above are necessary only when the DOD is attempting to build technologies itself. The DCGS-A program leadership is aware that many components of the program, including the fundamental data architecture, can be satisfied by existing commercially available technologies. Key program decision makers are aware that Palantir has fielded this capability to half the brigades in the Army and is currently in use by tens of thousands of users across the DOD and Intelligence Community.

According to the Federal Acquisition Regulation (FAR) and all existing and pending Congressional guidance, the Army should break out any such components and compete them using the commercial procedures found in FAR Part 12. Congressional intent on this issue is clearly spelled out in sections 222 and 855 of the 2016 National Defense Authorization Act (see Appendix). The Army's acquisition strategy, as currently outlined in these documents, is plainly at odds with that intent and will result in another lengthy and expensive failure, leaving soldiers with a flagship intelligence program that does not work.

Protected Information and/or Legends Redacted

# Remove Barriers for Commercial Competition

As we have noted in our previous responses to the Army, the draft Increment 2 documents to date outline an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program at the prime contractor and most likely sub-contractor level. Sections L and M of the Draft RFP reinforce and strengthen these preventive barriers.

The barriers put forth in these documents run directly counter to the intent and guidance of Congress, the Secretary of Defense, USDAT&L, and ASAALT. Principally, they discourage the use of commercially available technologies and, instead, incentivize the Army and any contractors selected to build technologies from scratch.

These barriers, and the approach they reflect, were all present in Increment 1. That strategy led to failure. The Army's decision to move to Increment 2 was, in part, an acknowledgement of that failure. In Palantir's conversations with DCGS-A program leadership at industry days and through other channels, it has been repeatedly stated that the Army would make maximum use of existing commercial technologies, particularly as they relate to the data architecture and integration and analytics layer. The following items contained in Sections L and M will prevent the Army from doing so:

1.  *The use of cost-type contract structures*

    -   Section L: Supporting Documents (pg. 10), Volume IV – Cost/Price (pg. 17), Volume VI Price/Cost Supporting Documents (pgs. 22)
    -   Section M: Factor 3 Cost/Price (pg. 1), Cost/Price Factor (pg. 8)

The Army envisions using a 72-month IDIQ base contract and issuing Task Order 0001 as a cost-plus incentive fee contract type. The performance cost-type work requires the ability to provide certified cost and pricing data and an associated cost accounting system. The Draft RFP states that, *"lack of supporting evidence of an adequate accounting system at the time of proposal submittal as approved by the Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration and award."*

2.  *Unclear Requirements for Data Rights*

    -   Section L: Subfactor 5 Data Rights (pg. 13)
    -   Section M: Subfactor 5 Data Rights (pg. 4)

These components of the Draft RFP, which read "TBD," make it unclear whether or not the Army will seek to own data rights as they pertain to source code or other software that would be utilized as part of Increment 2. In previous draft Increment 2 documents the Army has stated that *"the government requires delivery of all contractors and sub-contractors technical data and computer software that is generated, developed, or used when performing tasks called for by contract."* Given this ambiguity, it is difficult for Palantir or any other company with commercially available technology to submit a bid against this RFP.

This language should be clarified and, more importantly, the Army should be seeking to buy existing commercially available technologies rather than build them from scratch. In this scenario, companies providing existing commercially available technologies should not be expected to turn over technical data rights to the government.

3.  *Requirement for an accredited Earned Value Management System (EVMS)*

    -   Section L: Award Documents/Certifications/Representations (pg. 11)

### 4. Considerations of Past Performance

- Section L: Volume III – Past Performance (pg. 14)

The Draft RFP states that past performance will be the second most important selection criteria. It states that "relevant" past performance is limited to *"those contracts, whether performed as a prime or major subcontractor, which required Engineering and Manufacturing Development or System Development and Demonstration contracts for development..."*

The Army's past performance requirements limits "relevance" to traditional systems integrators who develop software from scratch. This limitation would exclude the experiences and performance of companies with proven commercially available technologies, such as Palantir. The end result is that the Army will repeat the same strategy and partner with the same type of company as they did in Increment 1.

Protected Information and/or Legends Redacted

# Avoid Reinventing Technologies that Already Exist

The barriers listed above are inherent to an approach where the Army seeks to build software from scratch, as it tried to do with Increment 1. The Army can and should seek to maximize the use of existing commercial technologies before attempting to reinvent them. Congressional guidance, the intent of the Secretary of Defense and USDAT&L, and the FAR clearly state this. This guidance and intent are in place precisely because the development of new software is highly failure prone. In the case of the DCGS-A program, the program leadership knows that existing commercial technologies are being successfully used across the DOD and IC that can satisfy the 4 major technical factors listed in the Draft RFP.

The Draft RFP states that *"the technical factor is the most important [factor] and is significantly more important than the other three factors combined."* The technical factor is broken down into 5 components, in order of importance:

1. Subfactor 1 Data Architecture

2. Subfactor 2 Fusion Data Analytics

3. Subfactor 3 Interoperability

4. Subfactor 4 Visualization Framework/Usability

5. Subfactor 5 Data Rights

All of the technical factors can be satisfied by existing commercially available technologies acquired under fixed-price contracts using FAR Part 12 procedures. Doing so would significantly shift risk from the Army to private industry and gives soldiers working technology well ahead of the Army's proposed Increment 2 fielding date of 2019. This would require the Army to break the program into sensible components and use commercial procedures where solutions can be bought rather than built.

It should be noted that subfactor 5 is largely irrelevant in this case and the Army has not yet defined its evaluation criteria. As we have noted previously, subfactor 2 is more appropriately labeled "automatic entity extraction" rather than "fusion." Additionally, the interoperability of any foundational component of DCGS-A is vastly more important to the overall success of the program than the ability to perform automatic entity extraction.

While the Army has properly recognized that the delivery of a working Data Architecture is by far the most important step in correcting the failure of Increment 1. Section L of Draft RFP explicitly states that they intend another attempt to build that architecture under task order 0001: "The Offeror shall propose a resource loaded IMS, and information that substantiates Sustainment Strategy, and a detailed technical approach to **_build_** a DCGS-A Increment 2 Data Management Architecture…" This is unnecessary and is in direct conflict with Congressional intent as expressed in sections 855 and 222 of the FY 2016 NDAA.[1]

---

[1] See Appendix

Protected Information and/or Legends Redacted

| SOLICITATION, OFFER AND AWARD | | | 1. This Contract Is A Rated Order Under DPAS (15 CFR 700) | | Rating | Page | of | Pages |
|---|---|---|---|---|---|---|---|---|
| | | | | | DOA7 | 1 | | 123 |

| 2. Contract Number | 3. Solicitation Number | 4. Type of Solicitation | 5. Date Issued | 6. Requisition/Purchase Number |
|---|---|---|---|---|
| | W56KGY-16-R-0001 | ☐ Sealed Bid (IFB)<br>☒ Negotiated (RFP) | | SEE SCHEDULE |

| 7. Issued By | Code | W56KGY | 8. Address Offer To (If Other Than Item 7) |
|---|---|---|---|
| ACC-APG Division C (W56KGY)<br>CCAP-CCC<br>6001 Combat Drive<br><br>APG, MD 21005-1846 | | | |

NOTE: In sealed bid solicitations 'offer' and 'offeror' mean 'bid' and 'bidder'.

## SOLICITATION

9.  Sealed offers in original and _____ copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in _____ until _____ (hour) local time _____ (Date).

Caution - Late Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name | | B. Telephone (No Collect Calls) | | C. E-mail Address |
|---|---|---|---|---|---|
| | | | Area Code | Number | |

### 11. Table Of Contents

| (X) | Sec. | Description | Page(s) | (X) | Sec. | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| | | Part I - The Schedule | | | | Part II - Contract Clauses | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 37 |
| X | B | Supplies or Services and Prices/Costs | 3 | | | Part III - List of Documents, Exhibits, And Other Attach. | |
| X | C | Description/Specs./Work Statement | 29 | X | J | List of Attachments | 88 |
| X | D | Packaging and Marking | 30 | | | Part IV - Representations And Instructions | |
| X | E | Inspection and Acceptance | 31 | | | Representations, Certifications, and | |
| X | F | Deliveries or Performance | 32 | X | K | Other Statements of Offerors | 89 |
| X | G | Contract Administration Data | 33 | X | L | Instrs., Conds., and Notices to Offerors | 101 |
| X | H | Special Contract Requirements | 35 | X | M | Evaluation Factors for Award | 118 |

### OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. Discount For Prompt Payment (See Section I, Clause No. 52.232-8) | Calendar Days (%) | 20 Calendar Days (%) | 30 Calendar Days (%) | Calendar Days (%) |
|---|---|---|---|---|
| | | | | |

| 14. Acknowledgment of Amendments (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated): | Amendment No. | Date | Amendment No. | Date |
|---|---|---|---|---|
| | | | | |

| 15A. Name and Address of Offeror | Code | | Facility | | 16. Name and Title of Person Authorized to Sign Offer (Type or Print) |
|---|---|---|---|---|---|
| | | | | | |

| 15B. Telephone Number | | | 15C. Check if Remittance Address is Different From Above – Enter such Address In Schedule | 17. Signature | 18. Offer Date |
|---|---|---|---|---|---|
| Area Code | Number | Ext. | ☐ | | |

### AWARD (To be completed by Government)

| 19. Accepted As To Items Numbered | 20. Amount | 21. Accounting And Appropriation |
|---|---|---|
| | | |

| 22. Authority For Using Other Than Full And Open Competition: ☐ 10 U.S.C. 2304(c)( )  ☐ 41 U.S.C. 253(c)( ) | 23. Submit Invoices To Address Shown In (4 copies unless otherwise specified) | Item 25 |
|---|---|---|

| 24. Administered By (If other than Item 7) | Code | 25. Payment Will Be Made By | Code |
|---|---|---|---|
| | | | |

| 26. Name of Contracting Officer (Type or Print) | 27. United States Of America<br><br>(Signature of Contracting Officer) | 28. Award Date |
|---|---|---|

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

Standard Form 33 (Rev. 9-97)
Prescribed By GSA-FAR (48 CFR) 53.214(c)

**A719**

Protected Information and/or Legends Redacted

Name of Offeror or Contractor:

SECTION L - INSTRUCTIONS, CONDITIONS, AND NOTICES TO OFFERORS

| | Regulatory Cite | Title | Date |
|---|---|---|---|
| L-1 | 52.204-7 | SYSTEM FOR AWARD MANAGEMENT | JUL/2013 |
| L-2 | 52.204-16 | COMMERCIAL AND GOVERNMENT ENTITY CODE REPORTING | JUL/2015 |
| L-3 | 52.215-1 | INSTRUCTIONS TO OFFERORS--COMPETITIVE | JAN/2004 |
| L-4 | 52.215-1 | INSTRUCTIONS TO OFFERORS--COMPETITVE (JAN 2004) -- ALTERNATE I (OCT 1997) | OCT/1997 |
| L-5 | 52.215-16 | FACILITIES CAPITAL COST OF MONEY | JUN/2003 |
| L-6 | 52.215-22 | LIMITATIONS ON PASS-THROUGH CHARGES -- IDENTIFICATION OF SUBCONTRACT EFFORT | OCT/2009 |
| L-7 | 52.222-24 | PREAWARD ON-SITE EQUAL OPPORTUNITY COMPLIANCE EVALUATION | FEB/1999 |
| L-8 | 52.222-46 | EVALUATION OP COMPENSATION FOR PROFESSIONAL EMPLOYEES | FEB/1993 |
| L-9 | 252.209-7008 | NOTICE OF PROHIBITION RELATING TO ORGANIZATIONAL CONFLI___ INTEREST -- MAJOR DEFENSE ACQUISITION PROGRAM | DEC/2010 |
| L-10 | 252.215-7008 | ONLY ONE OFFER | OCT/2013 |
| L-11 | 252.225-7003 | REPORT OF INTENDED PERFORMANCE OUTSIDE THE UNITED STATES AND CAN___ SUBMISSION WITH OFFER | OCT/2015 |
| L-12 | 252.234-7003 | NOTICE OF COST AND SOFTWARE DATA REPORTING ___ TEM--BASIC | NOV/2014 |
| L-13 | 252.239-7017 | NOTICE OF SUPPLY CHAIN RISK | NOV/2013 |
| L-14 | 252.211-7001 | AVAILABILITY OF SPECIFICATIONS, STAND___ S, AND DATA ___ EM DESCRIPTIONS NOT LISTED IN THE ACQUISITION STREAMLIN___ AND ST___ARDIZATION INFORMATION SYSTEM (ASSIST), AND PLANS, DR___ AND OTHER PERTINENT DOCUMENTS | MAY/2006 |

Insert Army Contracting Command- Aberdeeen Proving Ground ___ d▬▬▬▬▬▬▬▬▬
in the blanks within the above referenced clause.

| L-15 | 52.211-14 | NOTICE OF PRIORITY RATING FOR ___TION DEFENSE, EMERGENCY PREPAREDNESS ___ NERGY PROGR___ E | APR/2008 |

Any contract awarded as a result of this ___licitation ___ll be (TB___ certified for national defense, emergency preparedness, and energy
program use under the Defense Priorit___ and Allocat___s System (D___ (15 CFR 700), and the Contractor will be required to follow all
of the requirements of this regulat___

(End of Provis___n)

| L-16 | 52.216 | TYPE ___ CONTRACT | APR/1984 |

The Government con___lates award of a In___inite-Delivery Indefinite-Quantity (IDIQ)contract resulting from this solicitation.

(End of Provision)

| L-17 | 52.233-2 | SERVICE OF PROTEST | SEP/2006 |

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of
any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as
follows) by obtaining written and dated acknowledgment of receipt from▬

▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬ ▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬
▬▬▬▬▬▬▬ ▬▬▬▬▬▬

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

(End of Provision)

A819

Protected Information
and/or Legends Redacted

| **CONTINUATION SHEET** | **Reference No. of Document Being Continued** | **Page**102 **of** 123 |
|---|---|---|
| | **PIIN/SIIN** W56KGY-16-R-0001      **MOD/AMD** | |

Name of Offeror or Contractor:

L-18    52.211-2    AVAILABILITY OF SPECIFICATIONS, STANDARDS, AND DATA ITEM DESCRIPTIONS    MAY/2014
    LISTED IN THE ACQUISITION STREAMLINING AND STANDARDIZATION
    INFORMATION SYSTEM (ASSIST)

(a) Most unclassified Defense specifications and standards may be downloaded from the following ASSIST websites:

(1) ASSIST https://assist.dla.mil/online/start/

(2) Quick Search http://quicksearch.dla.mil/

(3) ASSISTdocs.com (http://assistdocs.com).

(b) Documents not available from ASSIST may be ordered from the Department of Defense Single Stock Point (DoDSSP) by

(1) Using the ASSIST Shopping Wizard https://assist.dla.mil/wizard/index.

(2) Phoning the DoDSSP Customer Service Desk (215) 697-2197, Mon-Fri, 30 to 1600 EST, or

(3) Ordering from DoDSSP, Building 4, Section D, 700 Robbins Avenue, Philadelphia, PA 19111-5094, Telephone (215) 697-2667/2179, Facsimile (215) 697-1462.

(End of Provision)

L-19    52.215-20    REQUIREMENTS FOR CERTIFIED COST OR PRICING DATA AND DATA OTHER THAN    OCT/2010
    CERTIFIED COST OR PRICING DATA

(a) Exceptions from certified cost or pricing

(1) In lieu of submitting certified cost or pricing data, offerors may submit a written request for exception by submitting the information described in the following subparagraphs. The Contracting Officer may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable.

(i) Identification of the law or regulation establishing the price offered. If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document, unless it was previously submitted to the contracting

(ii) Commercial item exception. For a commercial item exception, the offeror shall submit, at a minimum, information on prices at which the same item or similar items have previously been sold in the commercial market that is adequate for evaluating the reasonableness of the price for this acquisition. Such information may include --

(A) For catalog items, a copy of or identification of the catalog and its date, or the appropriate pages for the offered items, or a statement that the catalog is on file in the buying office to which the proposal is being submitted. Provide a copy or describe current discount policies and price lists (published or unpublished), e.g., wholesale, original equipment manufacturer, or reseller. Also explain the basis of each offered price and its relationship to the established catalog price, including how the proposed price relates to the price of recent sales in quantities similar to the proposed quantities;

(B) For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts. In addition, describe the nature of the market;

(C) For items included on an active Federal Supply Service Multiple Award Schedule contract, proof that an exception has been granted for the schedule item.

(2) The offeror grants the Contracting Officer or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this provision, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the offerors determination of the prices to be offered in the catalog or marketplace.

(b) Requirements for certified cost or pricing data. If the offeror is not granted an exception from the requirement to submit certified cost or pricing data, the following applies:

A820

Protected Information
and/or Legends Redacted

Name of Offeror or Contractor:

(1) The offeror shall prepare and submit certified cost or pricing data, data other than certified cost or pricing data, and supporting attachments in accordance with the instructions contained in Table 15-2 of FAR 15.408, which is incorporated by reference with the same force and effect as though it were inserted here in full text. The instructions in Table 15-2 are incorporated as a mandatory format to be used in this contract, unless the Contracting Officer and the Contractor agree to a different format and change this clause to use Alternate I.

(2) As soon as practicable after agreement on price, but before contract award (except for unpriced actions such as letter contracts), the offeror shall submit a Certificate of Current Cost or Pricing Data, as prescribed by FAR 15.406-2.

(End of Provision)

L-20    52.252-1    SOLICITATION PROVISIONS INCORPORATED BY REFERENCE    FEB/1998

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at this/these address(es):

http://www.arnet.gov/far/ or http://www.acq.osd.mil/dpap/dars/index.htm or http://farsite.hill.af.mil/VFAPARa.HTM

L-21    52.252-5    AUTHORIZED DEVIATIONS IN PROVISIONS    APR/1984

(a) The use in this solicitation of any Federal Acquisition Regulation (48 CFR Chapter 1) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the date of the provision.

(b) The use in this solicitation of any DoD FAR SUPPLEMENT (48 CFR Chapter 2) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the name of the regulation.

(End of clause)

L-22    252.204-7008    COMPLIANCE WITH SAFEGUARDING COVERED DEFENSE INFORMATION CONTROLS    OCT/2015
(DEV 2016-O0001)    (DEVIATION 2016-O0001)

(a)  Definitions.  As used in this provision--

"Controlled technical information," "covered contractor information system," and "covered defense information" are defined in clause 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting (DEVIATION 2016-O0001)(OCT 2015).

(b)  The security requirements required by contract clause 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting (DEVIATION 2016-O0001) (OCT 2015) shall be implemented for all covered defense information on all covered contractor information systems that support the performance of this contract.

(c)  If the Offeror anticipates that additional time will be necessary to implement derived security requirement 3.5.3 "Use of multifactor authentication for local and network access to privileged accounts and for network access to non-privileged accounts" within National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, "Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations (see http://dx.doi.org/10.6028/NIST.SP.800-171), the Offeror shall notify the Contracting Officer that they will implement the requirement within 9 months of contract award.

(d)  If the Offeror proposes to deviate from any of the security requirements in NIST SP 800-171that is in effect at the time the solicitation is issued or as authorized by the Contracting Officer, the Offeror shall submit to the Contracting Officer, for consideration by the DoD Chief Information Officer (CIO), a written explanation of--

(1)  Why a particular security requirement is not applicable; or

(2)  How an alternative, but equally effective, security measure is used to compensate for the inability to satisfy a particular requirement and achieve equivalent protection.

A821

Protected Information
and/or Legends Redacted

Name of Offeror or Contractor:

(e)   An authorized representative of the DoD CIO will approve or disapprove offeror requests to deviate from NIST SP 800-171 requirements in writing prior to contract award.  Any approved deviation from NIST SP 800-171 shall be incorporated into the resulting contract.

(End of provision)

L-23      252.234-7001     NOTICE OF EARNED VALUE MANAGEMENT SYSTEM  (DEVIATION 2015-00017)        SEP/2015
          (DEV 2015-
          00017)

(a)   If the offeror submits a proposal in the amount of $100,000,000 or more--

   (1)   The offeror shall provide documentation that the Cognizant Federal Agency (CFA) has determined that the proposed Earned Value Management System (EVMS) complies with the EVMS guidelines in the American National Standards Institute/Electronic Industries Alliance Standard 748, Earned Value Management Systems (ANSI/EIA-748) (current version at time of solicitation).  The Government reserves the right to perform reviews of the EVMS when deemed necessary to verify compliance.

   (2)   If the offeror proposes to use a system that has not been determined to be in compliance with the requirements of paragraph (a)(1) of this provision, the offeror shall submit a comprehensive plan for compliance with the guidelines in ANSI/EIA-748.

   (i)   The plan shall--

      (A)   Describe the EVMS the offeror intends to use in performance of the contract, and how the proposed EVMS complies with the EVMS guidelines in ANSI/EIA-748;

      (B)   Distinguish between the offerors existing management system and modifications proposed to meet the EVMS guidelines;

      (C)   Describe the management system and its application in terms of EVMS guidelines;

      (D)   Describe the proposed procedure for administration of the EVMS guidelines as applied to subcontractors; and

      (E)   Describe the process the offeror will use to determine subcontractor compliance with ANSI/EIA-748.

   (ii)   The offeror shall provide information and assistance as required by the Contracting Officer to support review of the plan.

   (iii)   The offerors EVMS plan must provide milestones that indicate when the offeror anticipates that the EVMS will be compliant with the guidelines in ANSI/EIA-748.

(b)   If the offeror submits a proposal in an amount less than $100,000,000--

   (1)   The offeror shall submit a written description of the management procedures it will use and maintain in the performance of any resultant contract to comply with the requirements of the Earned Value Management System clause of the contract.  The description shall include--

   (i)   A matrix that correlates each guideline in ANSI/EIA-748 (current version at time of solicitation) to the corresponding process in the offerors written management procedures; and

   (ii)   The process the offeror will use to determine subcontractor compliance with ANSI/EIA-748.

   (2)   If the offeror proposes to use an EVMS that has been determined by the CFA to be in compliance with the EVMS guidelines in ANSI/EIA-748, the offeror may submit a copy of the documentation of such determination instead of the written description required by paragraph (b)(1) of this provision.

(c)   The offeror shall identify the subcontractors (or the subcontracted effort if subcontractors have not been selected) to whom the EVMS requirements will apply.  The offeror and the Government shall agree to the subcontractors or the subcontracted effort selected for application of the EVMS requirements.  The offeror shall be responsible for ensuring that the selected subcontractors comply with the requirements of the Earned Value Management System clause of the contract.

(End of provision)

L- 21    PROPOSAL SUBMISSION INSTRUCTIONS

1. Introduction. Offerors shall submit digital copies of proposals through the Federal Business Opportunities (hereby known as FedBizOpps) web portal. Offerors proposal shall consist of six (6) volumes.

A822

Protected Information
and/or Legends Redacted

**CONTINUATION SHEET**

| Reference No. of Document Being Continued | | Page 105 of 123 |
| --- | --- | --- |
| PIIN/SIIN W56KGY-16-R-0001 | MOD/AMD | |

Name of Offeror or Contractor:

The Volumes are as follows:

| | |
| --- | --- |
| I | Executive Summary |
| II | Technical |
| III | Cost/Price |
| IV | Past Performance |
| V | Small Business Participation Plan |
| VI | Price/Cost Supporting Documentation |

Offerors are cautioned that parroting of the Technical requirements or the PWS with a statement of intent to perform does not reflect an understanding of the requirement or capability to perform except as otherwise stated in the PWS compliance matrix. Offerors are responsible for including sufficient details to permit a complete and accurate evaluation of each proposal. Proprietary information shall be clearly marked.

Offer and Award Documents and Certifications/Representations. Each proposal volume will include the prescribed files identified in paragraph 2 Proposal Files below. Electronic submission of proposal is mandatory in accordance with the Request for Proposals (RFP) due date listed in the solicitation, with the time of receipt of the required electronic proposal volumes to FBO serving as the compliance time for proposal. The electronic proposal file submission to FBO will be the official submission used for evaluation purposes.

Files to be posted on FBO shall NOT contain CLASSIFIED data. The use of external hyperlinks in proposals is prohibited. The use of hyperlinks that link within a document, such as table of contents links, is allow.

FBO Resources:

- The Uniform Resource Locator (URL) for FBO is: https://www.fbo.gov/

- Directions for navigating this Internet site are contained in FBO User found at: https://www.fbo.gov/downloads/FBO_Vendor_Guide.pdf

- For Technical assistance, The FedBizOpps help can be reached at https://www.fbo.gov/utils/help_desk, or 1-866-606-8220 (national), 1-334-206-7828 (international)

- FedBizOpps registration and (active) System for Award Management SAM https://www.sam.gov) account is required to submit proposals.

WARNING: Do not wait until the last minute to submit. To avoid late proposal submissions, offerors are encouraged to submit proposals 24 hours prior to the required date and time.

Offerors are encouraged to view demonstration videos available at: https://www.fbo.gov/index?static=vi&getstar&code=list&tab=list&tabmode=list

Acquisition Source Selection Interactive Support Tool (ASSIST).
During the conduct of this acquisition, the Acquisition Source Selection Interactive Support Tool (ASSIST) will be used by the Government to support the proposal evaluation and source selection process. A separate tool, the ASSIST2Industry, will be used in conjunction with ASSIST to accomplish all exchanges with Offerors after receipt of proposals pursuant to Federal Acquisition Regulation (FAR) 15.306. ASSIST2Industry provides the ability for the Government to issue, and the Offerors to receive and respond to, all Evaluation Notices (ENs) in a secure on-line environment.

In order to initiate the use of ASSIST2Industry, the Government requires the names, company titles, telephone numbers, and email addresses of two (2) individuals that the Offeror has designated as responsible for receiving and responding to Government ENs through ASSIST2Industry. The designation of two (2) individuals is for the purpose of insuring availability of one individual if the other individual is not available. The required information regarding these two (2) individuals must be submitted with the Offerors proposal and included in the cover letter.

After the solicitations closing date, the Government will establish an account in ASSIST2Industry for each individual identified by the Offeror that has submitted a proposal in response to this solicitation. The two individuals named by the Offeror will be authorized access to that account. Two (2) separate system generated emails will be sent to each individual. One of the emails will contain the individuals ASSIST2Industry username. The other email will contain the individuals temporary password. Using the provided username and temporary password, each individual can then go to https://ASSIST2Industry.army.mil to access the account. NOTE: The first time a user logs in, the user will be required to change the temporary password before the user can proceed to use the site.

Whenever the Government issues ENs to the Offeror through ASSIST2Industry, the Governments Contracting Officer will notify the Offeror through a medium independent of ASSIST2Industry (e.g., e-mail) that the Offeror has ENs in ASSIST2Industry waiting for a response. There will be no ENs in ASSIST2Industry until such notice is issued by the Contracting Officer.

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page106 of 123 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001    MOD/AMD | |

Name of Offeror or Contractor:

All Offerors are advised that ASSIST2Industry has been updated, and it is now the responsibility of PRIME Contractors to establish accounts for their SUBCONTRACTORS to respond to Government ENs. A separate area within ASSIST2Industry has been created to allow authorized Subcontractor POCs to upload proposal files only. Subcontractors will not be able to access any other information on the ASSIST2Industry website (e.g., Questions/Evaluation Notices, Responses, etc.). Once a Subcontractor has been added, they will receive a user ID (e.g., subcontractor0001) and password (an initial password) that will be sent via two separate system generated e-mails. A Subcontractor will have one user ID for all PRIMES and solicitation responses, i.e., if you are a Subcontractor to multiple Prime Contractors and multiple solicitation responses, you will only have one user ID. Once an account has been established for the Subcontractor, go to https://ASSIST2Industry.army.mil access the account. Prime Contractors will only be able to see the number of files submitted by their Subcontractors; but, will be UNABLE TO VIEW the Subcontractors files.

NOTE: Both Prime Contractors and Subcontractors are instructed to review the ASSIST2Industry Users Guide, located under the Getting Started tab on the website. The guide has been updated and provides step by step instructions on how to perform functions and navigate the website.

Offerors can contact the ASSIST2Industry Helpdesk via e-mail at usarmy.jbmdl.acc.list.vce-helpdesk@mail.mil or by telephone at (609) 562-5988 or (609) 562-7050 for any technical assistance that may be needed.

THE OFFERORS ARE CAUTIONED THAT THE SYSTEM GENERATED EMAILS REFERRED TO ABOVE ARE INTENDED FOR ADMINISTRATIVE PURPOSES ONLY. RECEIPT OF THESE EMAILS DOES NOT CONSTITUTE THE COMMENCEMENT OF ANY TYPE OF EXCHANGE WITH THE OFFEROR IN ACCORDANCE WITH PAR 15.306(A), (B), OR (D) (I.E., CLARIFICATIONS, COMMUNICATIONS, OR DISCUSSIONS). ALSO, RECEIPT OF THESE EMAIL DOES NOT SIGNIFY THAT A COMPETITIVE RANGE DETERMINATION IN ACCORDANCE WITH PAR 15.306(C) HAS BEEN MADE OR THAT THE OFFERORS PROPOSAL WILL BE INCLUDED IN THE COMPETITIVE RANGE WHEN THAT DETERMINATION IS MADE. ALL NOTIFICATIONS THAT ANY TYPE OF EXCHANGE WITH THE OFFEROR HAS COMMENCED AND THE OFFEROR HAS EVALUATION NOTICES (ENS) AVAILABLE TO RESPOND TO, OR ANY NOTIFICATION THAT THE OFFERORS PROPOSAL HAS BEEN INCLUDED IN OR EXCLUDED FROM THE COMPETITIVE RANGE, WILL BE SENT TO THE OFFEROR BY THE CONTRACTING OFFICER INDEPENDENTLY OF THE ASSIST2INDUSTRY.

2. PROPOSAL SUBMISSION REQUIREMENTS

a) Demonstration: The Amazon Web Service (AWS) Gov Cloud will serve as a demonstration host environment to emulate the use of the Intelligence Community Information Technology Enterprise (IC ITE) Commercial Cloud Services (C2S). Offerors will provide the name and email address of an appropriate demonstration POC of contact for their proposal submission. This information will be used by the Government to set up a unique and secure AWS account for offeror. The Government will provide each vendor with a username and password to provide secure access to their respective Amazon Web Service (AWS) virtual computing resources. General information about AWS services can be found at https://aws.amazon.com/, and an AWS GovCloud overview can be found at https://aws.amazon.com/govcloud-us/.

The offerors capability(s) are required to be loaded, demonstration ready within 5 business days after account access is granted. After the 5 business days, access to the site will be locked and only opened at the scheduled time of the offerors presentation and demonstration. The offeror can choose to conduct the demonstration either in person at the Aberdeen Proving Ground (APG) campus or virtually. The demonstration will begin with the presentation, and the combined time of the presentation and demonstration will be no longer than 2 hours. The presentation will need to be submitted via email to the government at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ prior to the AWS account lockdown. The Government will randomly assign offeror demonstration times by drawing lots.

b) Format. The submission shall be clearly indexed and logically assembled. Each volume shall be clearly identified and shall begin at the top of a page. The pages of each volume shall be appropriately numbered and identified by the complete company name, date and solicitation number in the header and/or footer.

As indicated in Table A below (Filename and Page Limits) all files shall be submitted as Microsoft Office Word (MS) no earlier than 2007 version, (.docx), Excel (xlsx) and/or Acrobat (pdf). A table of contents should be created using the table of content feature in MS Word. MS Word (doc) files shall use the following page setup parameters:

Font Size 12 Point Arial or Times New Roman
Margins  Top, Bottom, Left, Right  1
Gutter  0
From Edge  Header, Footer 0.5
Page Size, Width  8.5
Page Size, Height  11

NOTE: 11X17 folder pages are acceptable for tables/graphic representations; however, each 11X17 page counts as two pages. The previously noted font size and type are applicable for all tables/graphics and illustrations.

Characters shall be set at no less than normal spacing and 100% scale. Tables and illustrations may use a reduced font size not less than 8-point and may be landscape. Line spacing shall be set at no less than single space.

Each paragraph shall be separated by at least one (1) blank line. Page numbers, company logos, and headers and footers may be within

**Name of Offeror or Contractor:**

the page margins ONLY, and are not bound by the 12-point font requirement.  Footnotes to text shall not be used.  If the Offeror submits annexes, documentation, attachments or the like, not specifically required by this solicitation, such will count against the Offerors page limitations unless otherwise indicated in the specific Volume instructions below.  Pages in violation of these instructions, either by exceeding the margin, font or spacing restrictions or by exceeding the total page limit for a particular volume, will not be evaluated.  Pages not evaluated due to violation of the margin, font or spacing restrictions will not count against the page limitations.  The page count will be determined by counting the pages in the order they come up in the print layout view.

c) File Packaging.  Offeror shall submit proposal files under the associated filenames and file format stated in Table A.  If proposal files are compressed (zipped), using WinZip version 6.2 or later, into multiple zip files, each zip file must be clearly identified by Volume, as per Table 1 instructions.  Please note, Offerors are cautioned that large file sizes of proposals significantly delay submissions, or may not be permitted due to file size restrictions on PBO. High resolution graphics and logos may greatly increase file sizes.  Up to five (5) files can be uploaded at one time.  The combined size of the five (5) files cannot exceed 20Mb.  Also note, self-extracting .exe files will not be accepted.  Additionally, the Government does not accept responsibility for the organization of electronic proposal submissions.  If proposal files are missing or not identified per the instructions provided by this solicitation, the proposal may be eliminated from the competition.  The Offeror is responsible for ensuring appropriate files are included in the proposal submission.  Proposal files may be submitted individually without compression at Offeror discretion.

File size for each title/topic MUST not exceed the file size limits as indicated in Table A.  Break attachments into smaller files or use the upload utility multiple times if files exceed the 20Mb size limit.  Filenames MUST be labeled as indicated in Table A.

Updated computer software virus protection is required, Offerors should not submit proposals absent updated computer virus protection software.  Uploading files with viruses may jeopardize bid submission.

The Government will not accept any other submission methods in lieu of those permitted by the submission instructions provided by this RFP.

d) Content Requirements.  The Offeror shall confine submission of essential matter sufficient to define the proposal and provide an adequate basis for evaluation.  Offerors are responsible for efficient documents, in a concise manner, to permit a complete and accurate evaluation of each proposal.  Each volume of the proposal shall consist of a Table of Contents, Glossary of Abbreviations and Acronyms, Summary Section, and the narrative discussion.  The Summary Section shall contain a brief abstract of the volume.  Any proprietary information shall be clearly marked.  No price information shall be presented in any part of the proposal except as provided in Volume I, Executive Summary, Volume III, Cost/Price Factor, Volume VI Price/Cost Supporting Documentation.  Each volume shall be prepared on a standalone basis, so that its content may be evaluated with minimum cross-referencing to other volume of the proposal.  Each Table of Contents shall delineate the subparagraphs with that volume to the proposal content when applicable.  Cross-referencing shall be included in the appropriate volumes, and across the proposal to ensure that the Offeror has addressed all required elements in the proposal and compliance with the governments requirements.  The submission of alternate proposals shall not be allowed.

The titles and page limits requirements per file are shown in the Table below:

Table A- Filenames and Page Limits

| Volume | Title | Filename | Page Limit |
|---|---|---|---|
| I | Executive Summary | | |
| | Proposal Synopsis | PROPSYN.docx or.PDF | 10 pages |
| | Glossary of Abbreviations and Acronyms | GLOSSARY.docx or.PDF | No page limit |
| | Contract Work Breakdown Structure | CWBS.docx or PDF | No page limit |
| | Supporting Documents | SUPPDOCS_FILENAME.DOCX or SUPPDOCS_FILENAME.PDF or SUPPDOCS_FILENAME.XLSX | No page limit |
| | Award Documents /Certifications/ Representations | AWARDDOCS_FILENAME.DOCX or AWARDDOCS_FILENAME.PDF or AWARDDOCS_FILENAME.XLSX | No page limit |

A825

Protected Information and/or Legends Redacted

Name of Offeror or Contractor:

| | | | |
|---|---|---|---|
| | IPT Structure | IPTstructure_FILENAME.DOCX or IPTstructure_FILENAME.PDF | 5 pages |
| II | Technical Factor | | |
| | Technical Approach | TECHAPP.docx or.pdf | 150 pages and Technology Readiness Level (TRL) Evidence |
| | DCGS-A Increment 2 Software Capability Demonstration and Presentation | DEMOBRIEF.ppxt or .pdf | No page limit |
| | Integrated Master Schedule | MASTRSCHED.PDF | No page limit |
| | PWS Compliance Matrix | PWSCOMPMAT.XLSX | No page limit |
| | Technical Addendum | REDLINED PWS.DOCX REDLINED PBS.DOCX REDLINED TO 0001PWS.DOCX | No page limit |
| | Data Assertions | DATAASSERT.XLSX | page limit |
| | Organizational Conflict of Interest Mitigation Plan | OCIMITIGATION.DOCX | No page |
| | Quality Assurance Surveillance Plan | QASP.DOCX | page limit |
| III | Cost Factor | | page limit |
| | Price Methodology | COSTPM.DOCX | No page limit |
| | Cost Workbook | .xlsx | No page limit |
| | Sanitized Cost Workbook | SCWB.xlsx | No page limit |
| | Basis of Estimate | BOE.doc or .PDF or.xlsx | No page limit |
| IV | Past Performance Factor | PAST PERF.docx or PAST PERF.PDF | 5 pages per each Referenced contract for Section 2 Only |
| V | Small Business Participation Plan Factor | SBPP.docx or SBPP.PDF | No page limit |
| | Small Business Subcontracting Plan (For Large Business Primes only) | SESP.docx or SESP.pdf | No page limit |
| VI | Price/Cost Supporting | PCSUPP_FILENAME.DOCX | No page limit |

A826

Protected Information and/or Legends Redacted

Name of Offeror or Contractor:

```
Documentation              or PCSUPP_FILENAME.PDP
                           or PCSUPP_FILENAME.XLSX
```

Note: Cover Letter, Title Page, Table of Contents/List of Figures, Acronyms and Glossary, and Cross Reference Matrix for each volume will be excluded from page count.

General Instructions:  No assumptions will be made by evaluators regarding areas that are not addressed in the Offerors written proposal or written responses to Government ENs.  Mere statements of compliance or repetition of the technical requirements without a complete discussion and analysis may be deemed to be deficiencies unless otherwise noted in the PWS compliance matrix.

Offerors' proposals shall not contain terms, conditions, and/or assumptions.

All responses shall adhere to the PWS Compliance Matrix.

Offerors are advised that employees of the firms identified below may serve as non-government advisors in the task order evaluation process.  These individuals will be authorized access only to those portions of the proposal data and discussions that are necessary to enable them to perform their respective duties.  These individuals are non-voting members of the evaluation team.

Firms Point of contact (POC) information:

MITRE Corp
POC: Robert A. Orlosky
rorlosky@mitre.org
(703) 983-7622

Booz Allen Hamilton Inc.
POC: Ryan Ludwig
Ludwig_ryan@bah.com
732-936-3539

Exeter Inc.
POC: Mike Davis
mdavis@exetergov.com
(301) 545-0977

Alliance Consulting
POC: Jennifer Stroh
jen@consultalliance.net
(443) 861-2456

Millennium
POC: Loran Bateman-Mckenzie
loranbateman.mckenzie@mgroupinc.com
(571) 527-2212

ADC Management Solutions
POC: Tonya S. Manago
tonya.manago@adc-ms.com
(202) 380-9935

In accomplishing their duties related to the Technical Factor and Small Business Participation Factor evaluation and negotiation process, the aforementioned firms may require access to proprietary information contained in the offerors proposals.  Therefore, pursuant to FAR  9.505-4(b), these firms must execute an agreement with each offeror that states that they will (1) protect the offerors information from unauthorized use or disclosure for as long as it remains proprietary, and (2) refrain from using the information for any purpose other than that for which it was furnished.  To expedite the evaluation process here, each offeror must contact the above companies to effect execution of such an agreement, and the failure to contact the contractor and execute the agreement prior to the proposal due date and time will be regarded as a waiver of the ability to seek such an agreement.  Such 9.505-4(b) proposals must be submitted to the contracting officer.  Since the contractor employees have submitted non-disclosure agreement in conformity with DFARS 209.505-(b), an offeror may also waive the requirements of FAR 9.505-4(b) if they so desire by notifying the contracting officer of their desire to take this route.

Note:  This requirement shall flow down to all Subcontractors.

A827

Protected Information
and/or Legends Redacted

**CONTINUATION SHEET**

| Reference No. of Document Being Continued | | Page110 of 123 |
| --- | --- | --- |
| PIIN/SIIN W56KGY-16-R-0001 | MOD/AMD | |

Name of Offeror or Contractor:

(i)VOLUME I EXECUTIVE SUMMARY. The Offeror shall utilize this volume to provide an overview of the proposal and summarize pertinent information contained in all volumes of the proposal. The information contained in this volume must be consistent with data in the other volumes. References to the proposal locations providing substantiating data shall be given as appropriate.

This volume shall be organized into the following sections:

(1)Proposal Synopsis: The Offeror shall utilize this section of the Executive Summary to summarize pertinent information contained in all volumes of the proposal. The Offeror is free to submit this section of the Executive Summary in any format desired, subject to the limitations previously set forth above, and to include any and all information it believes will support its proposal. Offerors are reminded that the Executive Summary is an introductory summation of the proposal. Therefore, no information shall be in the Executive Summary that does not appear elsewhere in the proposal. The Executive Summary will not be evaluated.

(2)Glossary of Abbreviations and Acronyms: The Executive Summary shall contain a glossary all abbreviations and acronyms used, with an explanation for each. The glossary of abbreviations and acronyms does not count towards page limits contained in Table A.

(3)Contract Work Breakdown Structure (CWBS): The Offeror shall provide a CWBS for Task Order 0001. The Offeror shall develop, maintain, and present an extended CWBS, as provided in MIL-STD-881C, Appendix B, which provides visibility and accountability to two (2) levels below the level that is being reported. The extended CWBS shall be to the least level necessary to reflect the way the work is being performed, while ensuring correlation of these lower level tasks to the PWS CLINs, and Contract Data Requirements List (CDRLs). The CWBS shall be the key reference document for planning, controlling, and reporting requirements. The Offeror shall ensure subcontractor data supports the prime contract CWBS. The Offeror shall maintain this CWBS, use it as the basis for defining all tasks associated with the Task Order, and maintain traceability of all Offeror efforts to the contents of the CWBS.

(4)Supporting Documents: The Offeror may provide any supporting documents supplementing the submission. Supporting documentation may not include any technical information.

IMPORTANT NOTE: In accordance with FAR 16.301-3(a)(3), Cost reimbursement contracts may be used only when the contractor's accounting system is adequate for determining costs applicable to the contract. Additionally Offerors are required to submit support from the applicable DCAA office that its accounting system has been determined adequate for determining costs applicable to the contract. In the event an Offerors accounting system has not been evaluated:

Consult the Audit Process OverviewInformation for Contractors Manual (under the Guidance tab on DCAAs website), specifically Enclosure 2, Preaward Surveys of Prospective Contractor Accounting System. After reading Enclosure 2, complete the Preaward Accounting System Adequacy Checklist and submit it to your Contracting Officer. In addition, you should refer to DFARS 252.242-7006, Accounting system administration, for requirements of an acceptable accounting system. Your contracting officer will determine the need for a DCAA audit. Contracting officers can request DCAA audit services.

(5)Award Documents/Certifications/Representations: The Offeror shall provide any Award Documents, Certifications, and/or Representations to accompany the proposals.

The Offeror shall possess a Capability Maturity Model Integration for Development (CMMI-DEV) appraisal Level of III or higher.

The Offeror shall possess an Earned Value Management System (EVMS) compliant with the requirements of DFARS 252.234-7001 and 252.234-7002 for contracts valued at $100M or more.

The prime Offeror shall have an approved Top Secret facility clearance and Top Secret safeguarding for classified material and property in effect at time of proposal based on the DCGS-A DoD Security Classification Specification, DD Form 254, PM DCGS-A requirements. Offerors must be ready for access to SCI and have an accredited Sensitive Compartmented Information Facility (SCIP) to store SCI information. The following information must be provided via FBO to verify the secure facility clearance:

- Contractor Name
- Commercial and Government Entity (CAGE) Code
- Corporate Mailing Address
- Classified Mailing Address
- Security Office Information including:

i. Name
ii. Title
iii. E-mail address
iv. Telephone number

(6) IPT Structure: The Offeror shall provide a detailed breakdown of program team structure, subcontractors, and teammates; as well as detail of IPT structure, or other organization details related to the execution of Task Order 0001.

**CONTINUATION SHEET**

| Reference No. of Document Being Continued | | Page111 of 123 |
|---|---|---|
| PIIN/SIIN W56KGY-16-R-0001 | MOD/AMD | |

Name of Offeror or Contractor:

(ii)     VOLUME II  TECHNICAL.  The Offerors technical proposal shall demonstrate that its approach meets, at a minimum, the requirements in the base PWS and Task Order 0001 PWS as specified in the PWS Compliance Matrix, located in Section J of the solicitation.  The Government is specifically interested in a demonstration of a DCGS-A Increment 2 software capability and the five (5) Technical Sub-factors: Data Architecture, Fusion, Interoperability, and Visualization Framework/Usability.

Note: Every document submitted in the Technical Volume shall be submitted devoid of all dollar figures, company names, and/or logos.

The technical approach shall address and be organized into the following sections:

1) DCGS-A Increment 2 software capability demonstration: To begin the DCGS-A Increment 2 source selection process, each Offeror will demonstrate a DCGS-A Increment 2 software capability or set of capabilities of their own choosing.  The capability(s) could include a Government Furnished Information (GFI), Commercial Off-The-Shelf (COTS), Government Off-the-Shelf (GOTS), or Open Source product(s).  The Amazon Web Service (AWS) Gov Cloud will serve as the demonstration host environment to emulate the use of the Intelligence Community Information Technology Enterprise (IC ITE) Commercial Cloud Services (C2S).  The Government will provide each vendor with secure access to their respective AWS virtual computing resources at the same time, no later than five business days after the DCGS-A Increment 2 Request for Proposal (RFP) due date.

Offerors will provide the name and email of an appropriate demonstration point of contact with their proposal submission.  This information will be used by the Government to set up a unique and secure account per offeror.  General information about AWS services can be found at https://aws.amazon.com/, and an AWS GovCloud overview can be found at https://aws.amazon.com/govcloud-us/.

AWS will provide virtual capabilities emulating the Armys Common Operating Environment (COB) current Tactical Server Infrastructure (TSI) with the following specifications:
4 x Dell R430 Servers with Dual Intel Xeon E5-2695 (14 core) processors, 192GB and Dual 200GB SSD
2 x Mellanox SX6018 switches with 18 x 40GbE/56Gb Infiniband ports
2 x NetApp FAS2552 SANs with 20 x 1.2TB HDD/4-400GB SSD (25 TB RAW)

The presentation, at a minimum, will include the following information:
- DCGS-A Increment 2 requirement(s), with corresponding requirement identification numbers, the offeror capability(s) satisfies
- Any license fee costs and data rights associated with the demonstrated capability(s)
- If the capability(s) is presently being used, where it is being used, and the requisite Technology Readiness Level

2) Subfactor 1 Data Architecture:  The Offeror shall propose a resource loaded IMS, and information that substantiates their proposed Sustainment Strategy, a Software Assurance Sample Report, and a detailed technical approach to build a DCGS-A Increment 2 Data Management Architecture and CI and HUMINT, IAW task order 0001 PWS and the Compliance Matrix.  The Offeror shall develop the DCGS-A Data Management Architecture software based on the CI and HUMINT IAW capabilities outlined in the task order PWS sections 3.2.6.1 through 3 2 6 9 and 3 2 27

3.2.6.1: Data Ingress Capability
3.2.6.2: Data Persistence B
3.2.6.3: Data Egress and Visualization Platform
3.2.6.4: Data Analytics
3.2.6.5: Data Integrity
3.2.6.6: Data and Authorization Service
3.2.6.7: Training Materials
3.2.6.8: Continuous Integration & Delivery
3.2.6.9: Software Source Delivery.
3.2.27 : Single CI and HUMINT Software Solution requirements

The Data management architecture will consist of a conceptual data integration layer and data analytics platform.  The data integration layer will modularize the data management architecture to abstract away specific database instances with a standardized data access layer, and implement a logical data model.  The proposed design should include how the data management architecture will integrate with the provided mission application architecture.

The Data management architecture should include a data analytics platform that will use customizable algorithms to examine raw and processed data for the purpose of drawing conclusions about the information, to include but not limited to entity, relationship, and pattern identification.  The platform will allow for the addition of new algorithms, and adjustment to existing algorithms, to meet ever changing threat environment and mission needs.

The Offeror shall provide a block diagram and/or other engineering design artifacts for the architecture, describing all components and their relationships.

The Software Assurance Analysis Report shall contain two sections:

Section 1: Details how static analysis for Software Assurance is used within the offerors development lifecycle in writing and in

A829

Protected Information
and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 112 of 123 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001    MOD/AMD | |

Name of Offeror or Contractor:

diagrammatic form for illustrative purposes.

Section 2: Details the output from a minimum of two software static analysis tools used by the offeror.

3) Subfactor 2 Fusion Data Analytics:  The Offeror shall propose a detailed technical solution to perform automated fusion Level 0, 1, and 2 functions:  Source Processing, Entity Refinement, and Situation Refinement.  See task order PWS paragraph 3.2.11 Fusion.

4) Subfactor 3 Interoperability:  The Offeror shall propose a detailed technical solution of how it will interoperate with other DCGS-A fielded systems, MCS systems, and the Joint systems, and Coalitions in accordance with the DCGS-A SV-6 (Attachment 0007) and task order 0001 PWS paragraph 3.2.17.  Additionally, offerors should describe how the proposed DCGS-A, Increment 2 solution will integrate into the DCGS Integration Backbone (DIB) Version 4.2 (for evaluation purposes only), into the DCGS-A, Increment 2 baselines for interoperability with the Joint DCGS Family of System (PoS).  The DIB is a cohesive set of modular, community-governed, standards-based data services focused on enterprise information sharing.  The DIB provides a common framework to enable the construction of cloud services such as Platform as a Service (PaaS) type of services for data exposure and transformation, and for enabling applications and users to discover and access information from a wide range of distributed sources.  The offeror shall describe how the proposed design operates with multiple environments (JIE, COE, ICITE) (for evaluation purposes only).  The offeror shall describe how the proposed design will interface with current mission applications (for evaluation purposes only).  The offeror shall describe how the proposed design will allow for components to be updated and replaced via a Modular and Open System Architecture (MOSA).

5) Subfactor 4 Visualization Framework/Usability:  The Offeror shall propose a solution which describes the DCGS-A, Increment 2 shall organize the user facing functionality for the system.  The visualization framework should dictate a consistent way to present and interact with alerts and geospatial data, e.g., overlays, symbols, assets, tracks, and intelligence folders.  To improve usability, Increment 2 shall also deliver a user customizable workflow utility that is integrated with all domains and the data management infrastructure, to improve the efficiency of intelligence task execution.

6) Subfactor 5 Data Rights:  Pursuant to the requirements set forth in DPARS 252.227-7017, Offerors are required to specifically identify Data/Software Rights Assertions related to technical and software deliverables.  As indicated in DPARS 252.227-7017(e), an Offerors failure to submit, complete, or sign the aforementioned Data and Software Rights Assertions with its offer may render the offer ineligible for award.  In accordance with the content and formatting requirements for Data and Software Rights Assertions (set forth in DPARS 252.227-7017), the Offerors Data and Software Rights Assertions will comply with the following requirements:

i. The Offeror shall not assert license restriction items, equipment, or processes themselves.  The asserted license restrictions shall pertain to software or technical data that relates to items, components, or processes.

ii. The Offerors Assertions shall not include technical data or software that will not be furnished to the Government under this Contract.

iii. The Offeror shall provide a concise (but specific) description of the technical data and software deliverables that will be furnished to the Government with restrictions rather than generically asserting license restrictions in "technical data" or "technology".

iv. The Offerors Data and Software Rights Assertion shall not include any technical data or software for which the Government is entitled to an "unlimited rights" license, under DPARS 252.227-7013(b)(1) and DPARS 252.227-7014(b)(1).

v. The Offeror is responsible for ensuring that Data and Software Rights Assertions from its subcontractors comply with the aforementioned content and formatting requirements (in accordance with DPARS 252.227-7017).

Offerors shall provide Data/Software Rights Assertions in a tabular format prescribed in DPARS 252.227-7017.  However, in addition to the content and formatting requirements set forth in DPARS 252.227-7017, the Offerors Data/Software Rights Assertions table shall list technical data and software items that the Offeror intends to furnish to the Government with and without license restrictions.  Thus, the Data/Software Rights Assertions table may include technical data and software items that are provided to the Government with an unlimited rights license.  In the Offerors identification of technical data and software license rights, the offeror shall use the prescribed categories of license rights referenced in DPARS 252.227-7014 and DPARS 252.227-7015 (e.g., Limited Rights, Government Purpose Rights, Unlimited Rights, Unrestricted Rights, or Commercial Software License Agreement).  The Assertions table will become a contract attachment at contract award.

If any license restrictions are proposed, the Offeror shall explain how such license restrictions placed on software deliverables will impact the Government's ability to competitively procure software maintenance/sustainment support and services from third parties, particularly in instances where the Government will be provided "Restricted Rights" in software deliverables or other license restrictions (such as restrictions in commercial software license agreements).

IMPORTANT NOTES:

I. Performance Work Statement Compliance Matrix:  The Offeror shall complete and submit the PWS Compliance matrix located in section J of the RFP (Attachment 0006).

Protected Information and/or Legends Redacted

II. Technical Addendum:  An Offeror, as part of the first round of Evaluation Notice responses or upon request, shall provide a redlined Technical Addendum of the one contained in the solicitation.  The Offeror shall include a tailored (as applicable) base PWS, TO 0001 PWS, Data Rights attachment, and PBS as part of the redlined Technical Addendum.  The PWS and PBS will be based on the Offerors proposed capabilities, removing capabilities that are not proposed.  Offerors redlined PWS and PBS shall become part of the contract.  Offeror shall ensure that the Technical Addendum paragraphs contain clear, concise, unambiguous, and testable requirements.  When the performance of a specification paragraph is dependent on specific conditions, those conditions shall be identified.  Failure to update the applicable PWS and PBS documents for proposed capabilities that exceed the current PWS/PBS requirements will result in removal of any strengths applicable to those capabilities for proposal evaluation purposes.  Offerors redlined Technical Addendum shall become part of the contract, and will be used as the criteria against which the system shall be tested.  The Offerors redlined Technical Addendum shall not contain any proprietary information.  The redlined Technical Addendum shall not provide any explanatory information as to how the requirements will be met.  Offerors redlined Technical Addendum shall not contain any task that the Offeror will not undertake if awarded the contract.  The Technical Addendum shall contain rationale for paragraph modification if Offerors redlined Technical Addendum differs from the Governments PWS and PBS.

III. Organizational Conflict of Interest (OCI) Mitigation Plan: Offeror shall identify and address in a separate document OCIMITIGATION.docx all actual or potential Organizational Conflicts of Interests (OCI), per FAR 9.5 or indicate that there are no known potential OCIs. If any actual or potential OCIs are identified, then the offeror shall submit a mitigation plan. If the contracting officer determines that any actual or potential OCIs cannot be mitigated, then the offeror shall not be eligible for award.

IV. Quality Assurance Surveillance Plan (QASP): Pursuant to FAR Part 37.6, the Government requires the Offerors to submit a proposed quality assurance surveillance plan (QASP) for the Governments consideration in development of the Governments plan.  The offeror shall insure the QASP be tailored to address the performance risks inherent in the specific work effort addressed within the Performance Work Statement (PWS) and in accordance with FAR 46.4.  Offerors shall submit a QASP that includes key metrics that will be used throughout the period of performance by the Government to assess the contractors quality performance.  At minimum, offerors proposals shall include the following key metrics within their proposed QASP.

Each metric proposed including the above key metrics shall include a minimum its performance objective, standard to be met for evaluation of performance success, and how the Government shall conduct surveillance to ensure the metric proposed is accurately measured and assessed.  The metrics proposed shall be logical, relevant to the effort, and sufficient to measure performance. The proposed standard to be met shall be quantifiable.

This QASP should not detail how the contractor plans to accomplish the work.  Rather, the QASP should detail management and quality control actions to meet the terms of the contract.  This QASP is a living document and the Government may review and revise it on a regular basis before or after contract award.  However the Government shall coordinate changes with the winning offeror.  Updates shall ensure that the QASP remains a valid, useful, and enforceable document.  A copy of the finalized QASP shall be provided to the contractor prior to the start of services or contract.

Each offeror shall submit their proposed QASP with their proposal in the QASP.docx document.  This is a submission requirement.  Offeror will not be eligible for award without meeting this requirement.

(III) VOLUME III - COST/PRICE.  This volume shall consist of all information, required to support proposed costs, target costs, and target fee.  Certified cost and pricing data is not currently required. However, the Government reserves the right to request such data prior to award.  The information submitted in this volume shall comply with FAR 15.408, Table 15-2, and the requirements set forth below.  There are no page limitations for this volume.

IMPORTANT NOTE: Adequate Accounting System.  In accordance with FAR 16.301-3(a)(3), a cost reimbursement contract may be used only when the contractor's accounting system is adequate for determining costs applicable to the contract.  Lack of supporting evidence of an adequate accounting system at time of proposal submittal as approved by Defense Contract Audit Agency (DCAA) will make the Offeror unable for further consideration for award.  Offerors shall demonstrate its accounting system is adequate in the executive summary supporting documents.

1. Offerors are instructed to provide proposed costs for Task Order 0001 only.  Task order 0001 will be issued on a Cost-Plus-Incentive-Fee, and Cost basis.

Pricing Methodology (CostPM[].pdf or .doc): The pricing methodology shall include an index of the Cost/Price Volume, as well as Volume VI Price/Cost Supporting Documentation.  Offerors shall propose a Pricing Methodology that provides a detail of the subcontractors/ inter-company entities (S/IE) proposed to support task order 0001, and applicable contract type, competitive/ non-competitive nature, and cost/price proposed for each.  Supporting information required to support the S/IE proposed cost is detailed in the Volume VI Cost/Price Supporting Documentation.  S/IE proprietary data shall be provided directly to the Government as instructed in Volume VI.  The Pricing Methodology shall include the basis used to propose the direct and indirect rates and provide a description of each indirect rate and how it is applied (provide applicable base cost elements used to develop the indirect cost).  The Pricing Methodology shall state if proposed rates are based on a Forward Pricing Rate Agreement (FPRA), a Forward Pricing Rate Recommendation (FPRR), a Forward Pricing Rate Proposal (FPRP), or proposed/ accepted billing rates.  The pricing methodology shall include the cage code and the applicable Defense Contract Audit Agency (DCAA) and Defense Contract Management Agency (DCMA) office and POC information, to include addresses and telephone

**CONTINUATION SHEET**

| Reference No. of Document Being Continued | | Page 114 of 123 |
|---|---|---|
| PIIN/SIIN W56KGY-16-R-0001 | MOD/AMD | |

Name of Offeror or Contractor:

numbers. The location of the offerors accounting records shall be included in the Pricing Methodology. If a particular Offeror/subcontractor does not have a cognizant DCAA/DCMA office, please make note of such in the Price Methodology. Narrative on any real or anticipated changes of ownership, significant expansion or contraction of business base, extraordinary events, etc. shall be included in the Price Methodology.

2. The anticipated CLIN structure for task order award is found in Section J, as Attachment 0010, DCGS-A Increment 2 (Sample) Task Order 0001.

3. The proposal shall set forth a summary of the total estimated costs by cost element, and shall provide a breakdown of the proposed estimated cost of each CLIN and WES separately; including all direct and indirect charges and fees. The detail of the proposed costs shall be submitted in excel (cost workbook (Cost().xlsx). In order to maintain a minimum level of commonality between proposals, each proposal submission shall include:

Summary Worksheet: The summary worksheet shall list the Target Cost and target fee for each FIP CLIN, and list the proposed cost for the cost CLINs. The summary worksheet shall not include hard numbers, but shall use formulas that include the cell reference of the applicable CLIN worksheet.

CLIN worksheets: The CLIN worksheets shall be bottoms up cost builds. However they shall not include any hard numbers in the cost build. All costs proposed shall be based on formulas adding the applicable WES worksheets to derive the CLIN cost/target cost and target fee.

WES worksheets: The WES worksheets shall be bottoms up cost builds at all five as provided in MIL-STD-881C, Appendix B, and may include hard number entries in cells proposing hours. All other cells shall be formula based, referencing labor rates from the labor rate worksheets, or indirect rates from the indirect rate worksheet, or direct costs from the subcontractor, materials, travel, or other direct cost worksheets.

Direct Labor Rate worksheet: The direct labor rate worksheet shall include a listing of the proposed direct labor categories and rates per year. Calculations of escalation shall be detailed on the direct labor rate worksheet. In order to trace proposed direct labor rates to supporting documentation required in Volume VI, consistency in the category naming convention to supporting documentation is required. A mapping of labor categories to supporting labor category systems may be sufficient. Distinction of labor category pools shall also be detailed on this worksheet. The direct labor rate worksheet shall also specify the number of hours for a full time equivalent man year used to develop the proposal.

Indirect Rate worksheet: The indirect worksheet shall include all indirect rates used in the development of the proposed cost/ target cost. Each rate shall identify the cost elements that make up the basis the indirect rate is applied to. The proposed indirect rates shall be described sufficiently to trace to the supporting documentation used to substantiate the realism of the proposed rate in Volume VI.

Subcontractor/Intercompany Entity (S/IE) worksheet(s): S/IE worksheets shall trace to supporting subcontractor submissions. Each S/IE worksheet shall list the proposed costs per CLIN and align to the S/IE supporting documentation as required in Volume VI. Any discrepancies between the proposed cost and the cost submission in the supporting documentation and the Prime offeror proposed submission may result in an undeterminable price. Lack of sufficient information to perform realism of the subcontractor costs will result in an undeterminable price. Prime Indirect costs applicable to Subcontractor costs shall be calculated on the WES worksheet using the rates on the indirect rate worksheet.

Material worksheet(s) per CLIN: A material worksheet shall be proposed for each CLIN that includes material costs. The material cost worksheet shall provide a consolidated priced summary of individual material quantities proposed, and the basis for pricing (vendor quotes, invoice prices, etc.). Include raw materials, parts, components, assemblies, and incidental fixed priced services to be produced or performed by others. For a material proposed, identify the item and show the WES, Part # (if applicable), source, quantity, and price. Indirect costs associated to the material costs shall be calculated on the applicable WES worksheet using the indirect rates available on the indirect worksheet.

Travel: Offerors shall propose a travel worksheet for each applicable CLIN. Travel costs shall be calculated to show the proposed travel costs per trip. Trips that are consistent in duration from location and to location and number of travelers may be consolidated by WES. Each trip shall detail the applicable WES, the location travelling from, the location travelling to, the number of travelers, the number of days and the number of nights. Each trip shall address the method of travel. The costs per trip shall be calculated in a formula, and use direct cost for per Diem rates, lodging rates, airfare or other transportation unit costs (car rental per day if applicable), and fuel costs or mileage rate(as applicable). Additional allowable costs shall be listed as applicable to develop the proposed travel costs. Indirect costs applicable to Travel shall be calculated on the WES worksheet using the rates on the indirect rate worksheet.

Other Direct Cost worksheet(s): Separate ODC worksheets shall be provided by CLIN as applicable. List all other costs by WES not otherwise included in the categories described above (e.g., special tooling, computer and consultant services, preservation, packaging and packing, spoilage and rework, and Federal excise tax on finished articles), and provide details for pricing. Indirect costs applicable to ODCs shall be calculated on the WES worksheet using the rates on the indirect rate worksheet.

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 115 of 123 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001     MOD/AMD | |

**Name of Offeror or Contractor:**

The rates detailed in the direct and indirect rate worksheets shall be the basis of formulas used to develop the proposed cost in the cost builds for the WBS worksheets. The WBS worksheets shall be the basis for the formulas in the CLIN worksheets. The CLIN worksheets shall be the basis for the formulas in the Summary worksheet. The excel workbook shall not be a read only file, shall include all formulas, and shall not have any protected cells. The WBS worksheets shall align to the WBS proposed in the Volume I Executive Summary. The WBS detail shall also trace to the Basis of Estimate described below.

Sanitized Cost workbook(SCWB{}.xlsx): The SCWB shall be a sanitized version of the proposal workbook listed above. No direct costs, indirect costs, or calculated shall remain in the SCWB. In addition to the sanitized version of the above cost file, offerors shall include a detail of the S/IE labor mix (no cost data), materials (types and quantities), Travel (trips, locations to and from, personnel, duration- no cost data), and Other Direct Cost items (no cost data) proposed per WBS in the S/IE worksheets. The sanitized cost workbook shall be submitted devoid of all company names and/or logos.

Basis of Estimate (BOE {}.docx, or xlsx or pdf): The BOE shall not include rates, costs, or prices. The BOE shall be proposed by WBS to at least WBS level 4. Each WBS shall include the technical rationale used to develop the proposed labor mix, materials, travel, or other direct costs. If cost estimating relationships (CERs) are used to estimate hours, the formula and basis for the proposed CERs shall be provided in the applicable WBS detail. The Offeror shall provide a crosswalk table that shows the traceability to the CLINs, Cost elements, and CWBS.

Note: The BOE will be provided to the technical evaluation team to support the price evaluation team with cost realism analysis.

The Offeror shall not propose alternative share ratios, or an alternate minimum or maximum fee percentage, other than what the RFP requires. The Offeror shall submit zipped files, subject to the limitation of the file size restrictions, consisting of Microsoft Excel workbooks and/or Microsoft Word or Adobe pdf files that develop, calculate, and provide the data necessary to meet the requirements of the Price/Cost Volume.

The Offeror shall ensure that the Price/Cost volume is organized to ensure that supporting documentation is clearly associated with the appropriate cost elements.

a) The Offeror shall submit the applicable PPRA, PPRR, PPRP, falling rates, etc. in the cost supporting documents.

b) If the proposal includes Facilities Capital Cost of Money as an element of cost, include the percentage distribution of fixed assets for land, buildings, and equipment for each business unit involved. State whether the distribution has been reviewed and/or accepted by the Administrating Contracting Officer (ACO)/Defense Contract Audit Agency (DCAA).

IMPORTANT NOTE: The Government does not take responsibility for the organization of electronic proposal files submitted under this effort. Missing files, to include sanitized cost files, make the proposal non responsive. Files not submitted in accordance with the instructions for submission shall be deemed non responsive.

(iv) VOLUME IV PAST PERFORMANCE. Past Performance evaluation will assess the relative risks and confidence associated with an Offerors likelihood of success in performing the solicitation's requirements. Recency is defined as a Government contract within the three (3) years prior to the release date of this RFP. Up to ten (10) past performance references are requested, with at least one from each major subcontractor. Relevance is defined as those contracts, whether performed as a prime or major subcontractor, which required Engineering and Manufacturing Development, or System Development and Demonstration contracts for development, and/or integration of some or all of the following components: data architecture, visualization and analytical tools, cloud computing and big data analytic capabilities, cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT), and Sensor Management. A major subcontractor under this effort is defined as those subcontractors anticipated to perform 20% or more of the total labor cost of the contract.

1) Section 1 Contract Descriptions: This section shall include the following information in the following format:

a. Identify if reference submitted is for the Prime Offeror or a proposed major subcontractor;

b. Offeror/Subcontractor place of performance, CAGE Code, and DUNS Number. If the work was performed as a subcontractor, also provide the name of the prime contractor and POC within the prime contractors organization (name, email address, and telephone number.

c. Government contracting activity, Procuring Contracting Officers (PCO) name, email address, and telephone number;

d. Governments technical representative/Contracting Officers Representative (COR) activity, name, email address, and telephone number;

e. Government contract administration activity and Administrative Contracting Officers (ACO) name, email address, and telephone number;

f. Contract number and, in the case of Indefinite Delivery type contracts, GSA contracts, and Blanket Purchase Agreements, also include Delivery Order number;

A833

Protected Information and/or Legends Redacted

| **CONTINUATION SHEET** | Reference No. of Document Being Continued | Page 116 of 123 |
| | PIIN/SIIN W56KGY-16-R-0001   MOD/AMD | |

Name of Offeror or Contractor:

g. Contract Type (specific type such as Firm-fixed-price (FFP), Cost Reimbursement (CR), Time and Materials (T&M), etc. ;

h. Awarded price/cost;

i. Final or projected price/cost;

j. Original delivery schedule, including dates of start and completion of work; and

k. Final or projected delivery schedule, including dates of start and completion of work.

2) Section 2 Performance: Offerors shall provide a specific narrative explanation of each contract listed in Section 1 Contract Description, describing the objectives achieved and detailing how the effort is relevant, (as defined above) to the requirements of this RFP.

a. For Government contracts that did not meet cost, schedule, or technical performance requirements, provide a brief explanation of the reason(s) for the shortcomings and any corrective actions taken to avoid recurrence. The Offeror shall list each time the delivery schedule was revised and provide an explanation of why the revision was necessary. The Offeror shall also provide a copy of any cure notices or show cause letters received on each contract listed and a description of any corrective action implemented by the Offeror or proposed subcontractor. The Offeror shall indicate if any of the contracts listed were terminated, and the type and reasons for the termination.

b. For all contracts, the Offeror shall provide narrative as to the extent to which the relevant contracts demonstrate compliance to approved Small Business Subcontracting Plans on those efforts, and the extent to which small business concerns were utilized on previous efforts to include where small business concerns were not utilized as proposed or where small business concerns were utilized to a greater extent than proposed.

3) Section 3 Subcontracts: The Offeror shall provide an outline of the effort required by the solicitation will be assigned for performance within the Offerors corporate entity, and among its proposed subcontractors. Major Subcontractor is defined as subcontract efforts that will be at least 20% of the total proposed labor cost. Information provided for the prime Offeror and each proposed subcontractor must include the entire company name, company address, CAGE Code, DUNS Number, and type of work to be performed, by citing the applicable Government PWS subparagraph number.

4) Section 4 New Corporate Entities: New corporate entities may submit data on prior contracts involving its officers and employees. However, in addition to the other requirements in this section, the Offeror shall discuss in detail the role performed by such person(s) in the prior contracts cited. Information should be included in the files described in the sections above. Letters of Commitment shall be included in the proposal for these employees if considered.

5) Section 5 Past Performance Assessment Questionnaire: For all contracts identified in Section 1, Contract Descriptions, a Past Performance Assessment Questionnaire (PPAQ) is to be completed. The Offeror shall complete Part I of the PPAQ and email the questionnaire to both the Government contracting activity and technical representative responsible for the past/current contract. The POCs shall be instructed to electronically complete Part II of the questionnaire, and email the entire questionnaire to the Contracting Specialist at ▇▇▇▇▇▇▇▇▇▇ and Contracting Officer at ▇▇▇▇▇▇▇▇▇▇, by proposal submission date. The Offeror shall specifically request that each Government customer/client prepared questionnaire response NOT be provided back to the Offeror, either as an original or a PDF copy. The Offeror shall request that the Government POCs maintain the original/signed questionnaire as a record of its response. The Offeror shall also email to the Contracting Officer a list of all the POCs who were sent a questionnaire. It is requested that the Government be provided this list within 45 calendar days after release of RFP; but this list must be provided NLT the proposal submission time/date. The POC List shall be submitted in Microsoft Word Table format to include the following fields: Company Name, Contract Number, Government Agency, POC Last Name, POC First Name, POC Title, POC Telephone Number, POC Email Address, and Date Emailed to POC (month/day).

The PPAQ is provided in Section J, attachment 0008 of the RFP.

(v) VOLUME V - Small Business Participation Plan: All Offerors (both large and small businesses) are required to complete a Small Business Participation Plan. Offerors should propose the level of participation of small businesses (as a small business prime and/or small business subcontractors) in the performance of the acquisition, relative to the objectives/goals set forth in the evaluation of this area. See Appendix F, Attachment 0009, in section J of this RFP.

IMPORTANT NOTE: Separate from the Small Business Participation Plan, other than U.S. Small Business offerors must also submit a subcontracting plan meeting the requirements of FAR 52.219-9 and DFARS 252.219-7003, or DFARS 252.219-7004, if the offeror has a comprehensive subcontracting plan. Other than U.S. Small Businesses must submit acceptable subcontracting plans to be eligible for award. Subcontracting Plans shall reflect and be consistent with the commitments offered in the Small Business Participation Plan.

Offers submitted by a Small Business concern need not include a subcontracting plan.

A834
Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 117 of 123 |
| | PIIN/SIIN  W56KGY-16-R-0001          MOD/AMD | |

Name of Offeror or Contractor:

(VI)  VOLUME VI - Price/Cost Supporting Documents:  Supporting documentation may include but is not to be limited to:

- Copies of existing FPRA, FPRR, PPRP, Proposed/Accepted Billing rates.

- Copies of any recent DCAA reports.

- Copies of any recent Defense Contract Management Agency (DCMA) reports.

- If there is no FPRA or PPRR to support direct labor rates, the offeror shall provide the basis of estimate for the direct labor rates, to include salary survey data (provide salary surveys do not simply reference the survey), payroll data, or signed employment agreement letters inclusive of salary information as applicable.

- If there is no FPRA or PPRR to support indirect rates, support shall include the proposed budgeted expense pools (by expense account) and allocation base detail, along with the last two (2) years' actual pool and base information.  The proposed rates shall reflect the provided support, or the Offeror and/or its subcontractor(s) shall provide sufficient detail explaining how the proposed rates are realistic.

Materials supporting documentation:  Conduct price analyses of all subcontract proposals.  Conduct cost analyses for all subcontracts when certified cost or pricing data are submitted by the subcontractor.  Include these analyses as part of your pricing data submissions for subcontractors expected to exceed the appropriate threshold in FAR 15.403.  Submit the subcontractor certified cost or pricing data and data other than certified cost or pricing data as part of your own pricing data.  These requirements also apply to all subcontractors if required to submit certified cost or pricing data.

(1) Adequate Price Competition.  Provide data showing the degree of competition and the basis for establishing the source and reasonableness of price for those acquisitions (such as subcontracts, purchase orders, material order, etc.) exceeding or expected to exceed the appropriate threshold set forth at PAR 15.403-4, priced on the basis of adequate price competition.  For inter-organizational transfers priced at other than the cost of comparable competitive commercial work of the division, subsidiary, or affiliate of the contractor, explain the pricing method (see FAR 31.205-26).

(2) All Other.  Obtain certified cost or pricing data from prospective sources for those acquisitions (such as subcontracts, purchase orders, material order, etc.) exceeding the threshold set forth in FAR 15.403, and not otherwise exempt, in accordance with FAR 15.403-1(b) (i.e., adequate price competition, commercial items, price set by law, regulation, or waiver).  When certified cost or pricing data is required of a prospective source, the data shall be submitted in the same format required of the Prime offeror detailed in Volume IV above, and supporting information shall be provided at the same level as the prime.  The Prime offeror shall also provide data showing the basis for establishing source and reasonableness of price.  In addition, provide a summary of your cost analysis, and a copy of certified cost or pricing data submitted by the prospective source in support of each subcontract or purchase order, that is the lower of either $12.5 million or more for both more than the pertinent cost or pricing data threshold, and more than 10 percent of the prime contractors proposed price.  Also submit data reasonably required to explain your estimating process (including the judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data, and the nature and amount of any contingencies included in the price).  Subcontractor certified cost or pricing data must be accurate, complete, and current as of the date of final proposal submission.  The prime contractor is responsible for updating a prospective subcontractor data.  For standard commercial items fabricated by the offeror that are generally stocked in inventory, provide a separate cost breakdown, if priced based on cost.  For inter-organizational transfers priced at cost, provide a separate breakdown of cost elements in the format required of the Prime and detailed in Volume IV above.  Analyze the certified cost or pricing data, and submit results of your analysis of the prospective sources proposal.  When submission of a prospective sources certified cost or pricing data is required as described in this paragraph, it must be included as part of your own cost or pricing data.  You must also submit any data other than certified cost or pricing data obtained from a subcontractor, either actually or by specific identification, along with the results of any analysis performed on that data.  At a minimum all hours and price per labor category shall be clearly identified.  Any prospective source for services, regardless of thresholds set forth in FAR 15.403-4.

At a minimum all hours/ labor categories shall be clearly identified.

When certified cost or pricing data from prospective sources is not  required in accordance with FAR part 15.403-4, however the cost proposed for the source is greater than $750,000 or 10% of the proposed price (whichever is lower), Offerors shall provide its price analysis of the proposed pricing in accordance with 15.403-1(b).  Note: Further guidance is available through DCAA website www.dcaa.mil/audit process_overview.html  detailing what constitutes an adequate proposal in its "Information for Contractors" memo dated June 26,2012 (this publication has not been updated for the increase in the certified cost or pricing data threshold from $700,000 to $750,000.)  Also available on the DCAA website is a slideshow called out as "Proposal Adequacy" that will assist in providing adequate detail.

E. DISCUSSIONS:  In accordance with FAR 15.306(d), discussion sessions with each offeror may be held.

*** END OF NARRATIVE L0001 ***

Protected Information
and/or Legends Redacted

| **CONTINUATION SHEET** | **Reference No. of Document Being Continued** | **Page**118 **of** 123 |
|---|---|---|
| | **PIIN/SIIN** W56KGY-16-R-0001      **MOD/AMD** | |

Name of Offeror or Contractor:

SECTION M - EVALUATION FACTORS FOR AWARD

M-3    EVALUATION APPROACH

A.  BASIS FOR AWARD

Initially, there will be a DCGS-A Increment 2 software capability demonstration by the offeror evaluated on a pass/fail basis.  Only those offerors who successfully complete the demonstration will be further evaluated and considered for award.

The award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the evaluation factors:  Technical, Past Performance, Cost/Price, and Small Business Participation Plan.  The Technical factor is significantly more important than Cost/Price.  Past Performance and the Small Business Participation Factors will be rated on an acceptable/unacceptable (pass/fail) basis. A rating of acceptable or neutral must be achieved for the Past Performance Factor. A rating of acceptable must be achieved for the Small Business Participation Factor in order to be eligible for award.  Offerors are cautioned that the award may not necessarily be made to the highest technically rated or lowest cost or price offer.

B.  FACTORS AND SUB-FACTORS TO BE EVALUATED

The following evaluation factors and Subfactors will be used to evaluate each proposal after the DCGS-A Increment 2 software capability demonstration:  Award will be made to the offeror whose proposal is the most advantageous to the Government based upon an integrated assessment of the evaluation factors and Subfactors described below in accordance with the evaluation criteria.

FACTOR 1: TECHNICAL:  The technical factor includes the DCGS-A Increment 2 Software Capability Demonstration as well as the offerors technical approach of the following Subfactors:

(a) Subfactor 1 Data Architecture
(b) Subfactor 2 Fusion Data Analytics
(c) Subfactor 3 Interoperability
(d) Subfactor 4 Visualization Framework/Usability
(e) Subfactor 5 Data Rights

An offeror must receive a rating of Acceptable for the capability demonstration in order for the technical volume to be subject to further evaluation. Subfactor 1 is significantly more important than Subfactor 2.  Subfactor 2 is equal to Subfactor 3.  Subfactor 3 is equal to Subfactor 4.  Subfactor 4 is more important than Subfactor 5.  Subfactor 1 is equivalent in importance to Subfactors 2-5 combined.  An offeror must achieve a rating of no less than acceptable on all Technical Subfactors to be considered for award.

FACTOR 2 COST/PRICE: The resulting award will be a six year IDIQ base contract with the concurrent award of Task Order 0001 as a Cost-Plus-Incentive- Fee (CPIF) type.  The cost realism of the proposed approach for Task Order 001 will be evaluated.

FACTOR 3 PAST PERFORMANCE: Each offeror's past performance will be reviewed to determine the acceptability of their Past performance.

FACTOR 4 SMALL BUSINESS PARTICIPATION PLAN:  The extent of Small Business Participation will be evaluated on an acceptable/unacceptable basis.

C.  EVALUATION APPROACH

1.  The evaluation approach for Technical Factors to include Demonstration and Subfactors is as follows:

DCGS-A Increment 2 software capability demonstration: Each offeror will demonstrate a DCGS-A Increment 2 software capability or set of capabilities of their own choosing. In order to be considered for award, offerors must receive an acceptable rating.

Each demonstration will be evaluated as acceptable or unacceptable. To achieve an acceptable rating, the criteria listed below must be met:

1. Successful install of chosen DCGS-A Increment 2 capability(s) software and use of the Amazon Web Service (AWS) environment, to be provided by the Government.
2. Mapping of the offerors demonstrated capability(s) to a DCGS-A Increment 2 requirement or set of requirements identified in the DCGS-A Performance Based Specification located in Section J as Attachment 0003.
3. Acceptable presentation of the demonstrated capability(s).
4. Presentation and demonstration conclude within 2 hour limit.

Understanding of Requirements and Feasibility of Approach.  The proposal will be evaluated to determine the extent to which the proposed approach is meets minimum requirements, and the end results achievable.  The proposal will be evaluated to determine the extent to which

A836

Protected Information
and/or Legends Redacted

Name of Offeror or Contractor:

successful performance is contingent upon low risk technologies and techniques. The proposal will also be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

All proposals shall be subject to evaluation by a team of Government personnel and non-Government advisors from the following companies:

- MITRE Corp.
- Booz Allen Hamilton Inc.
- Exeter Inc.
- Alliance Consulting Services
- Millennium
- ADC Management Solutions

The Subject Matter Experts (SME) will have access to all the necessary parts of the Offeror proposal pertinent to the SMEs area of expertise. As such, all of the above-listed Government contactor companies are precluded from being a Prime contractor or participating in any teaming arrangement with potential Offerors due to Organizational Conflict of Interest concerns. The Offeror shall advise the Contracting Officer as soon as possible of any concerns/questions with regards to the use of the Non-Government SMEs from the companies listed above. Any Offeror that is affiliated with, or is contemplating a contractual relationship with any of the above listed firms, must notify the Contracting Officer for the solicitation as soon as possible.

THE TECHNICAL FACTOR IS DIVIDED INTO THE FOLLOWING SUBFACTORS:

Subfactor 1 Data Architecture: This Subfactor evaluates the offerors Data Architecture proposal to the degree it:

a) Provides Data Ingress capability that performs data acquisition and ingestion. This effort shall support external subsystems that enable data harvesting and acquisition. This effort shall support internal subsystems that perform artifact parsing, artifact decomposition, and artifact knowledge extraction based on defined data models. The predefined data models, standards StdV-1 and StdV-2, provided as GPI and available upon request. These include DIMS, Department of Defense Discovery Metadata Specification (DDMS), Version 2.0, 17 July 2008; ISO 15836:2003: The Dublin Core Metadata Element Set, OGC SensorML: v.2.0.0: OGC SensorML: Model and XML Encoding Standard, v.2.0.0, 2014-02-04; and STANAG 4559 (Edition 3): NATO Standard ISR Library Interface, Edition 3, 12 November 2010.
b) Provides a Data Persistence Ecosystem that performs data ingestion and persistence in a data store appropriate for datas particular characteristics and behavior. The data persistence ecosystem shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Stores.
3) Data Persistence.
4) Data Semantic Discovery.

c) Provides Data Egress and Visualization that performs data retrieval while enforcing oversight and compliance policies. The data egress and visualization shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Security.
3) Web Framework.

d) Provides Data Analytics that enables cloud-scale analytics. These analytics shall enable streaming analytics for low latency fast in memory processing and big data batch analytics for petabyte data observations.
e) Provides Data Integrity measures to ensure that data can be trusted. The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree.
2) Data Provenance.
3) Data Security.

f) Provides Data and User Authorization Services that provides legal oversight and compliance. The system shall separate users and systems from data to deliver content based on legal oversight and compliance policies, and provide authentication and authorization.
g) Provides their proposed deliverable software which meets or exceeds the requirements stated in the DCGS-A Increment 2 Task Order (TO) 0001 Performance Work Statement (PWS) requirements for the Counter Intelligence & Human Intelligence (CI&HUMINT) single Software (SW) baseline. The single CI&HUMINT SW baseline consolidates the capabilities of both the CI & HUMINT reporting system along with the capability of the CI&HUMINT Analysis system.
h) Provides a high level of confidence approach that DCGS-A, Increment 2 will meet the required sustainability and training requirements.
i) Provides a resource loaded Integrated Master Schedule (IMS) detailing how the Data Architecture and CI&HUMINT efforts are feasible and meet or is less than the maximum Government Period of Performance for TO 0001.
j) Provides a proposed software development methodology approach, in particular the degree to which the methodology would meet the

A837
Protected Information and/or Legends Redacted

| **CONTINUATION SHEET** | Reference No. of Document Being Continued | Page 120 of 123 |
| | PIIN/SIIN W56KGY-16-R-0001 MOD/AMD | |

Name of Offeror or Contractor:

requirements of the major System Engineering Technical Review (SETR) events in the schedule and how the methodology would provide/support:
- Early insight into product functionality
- Vertical integration with a mission/business application
- Early insight into data layer integration
- Early feedback from users

k) Provides a Software Assurance Sample Report that contain details of how static analysis for Software Assurance is used within the offerors development lifecycle in writing and in diagrammatic form for illustrative purposes.

Subfactor 2 Fusion Data Analytics:  This Subfactor evaluates the offerors Fusion and Data Analytics proposal submission.  Major emphasis will be placed on:

a) The degree to which the proposed detailed technical solution meets or exceeds the Fusion ___ Performance Parameter (KPP) as detailed in the DCGS-A, Increment 2 Performance Based Specifications (PBS) and introduces a data ___ ics capability that will provide enhanced analytics and fusion services as well as accommodate multiple data models and data fr__ ll ___ intelligence domains (e.g., HUMINT, GEOINT, and All Source).

b) The degree to which the fusion solution will be capable of performing semi-__puter controlled n__ lization for all data, semi-computer controlled correlation for all intelligence disciplines, semi-comp__ controlled pattern dis__ry, and semi-computer controlled relationship detection.  In summary, the preferred alternative __:

1) Meet or exceed the Semi-computer controlled Level 0 Fusion requireme__ as stated __ the PBS.
2) Meet or exceed the Semi-computer controlled Level 1 Fusion requiremen__ stat__ n the PBS.
3) Meet or exceed the Semi-computer controlled Level 2 Fusion requirement a__ __ d in the PBS.

Subfactor 3 Interoperability:  This Subfactor evaluates the__ offerors Interoperab__ y proposal approach, and

1. The degree to which the proposed approach provides a hig__ level __ __fidence tha__ __ CGS-A, Increment 2 will meet the required interoperability as stated in the System View-6 (SV-6) (See __ __ achment __ ___ section J of the solicitation).
2. Ability to operate in multiple environments (JIE, COE, IC__
3. Ability to interface with current mission applications
4. Ability to update, replace and internal com__ __ via a Mod__ __nd Open System Architecture (MOSA).

Subfactor 4 Visualization Framework/Usability:  This __bfactor ev__ates the offerors Visualization Framework/Usability proposal approach and the degree to which the a__ __oach meets o__ exceeds the __S requirements, and provides a high level of feasibility that DCGS-A Increment 2 will effectively, eff__ntly, and sa__factorily all__ a user to interact with the proposed Visualization Framework/User Interface IAW the PWS.

Subfactor 5 Data Rights:  The Offerors prop__ __ will be evaluated based on the Governments ability to competitively procure software sustainment and maintenance __ from th__ __ parties.  The Offerors proposal will be given a strength for a proposed software rights approach that permits th__ __vernmen__ __ competi__ly procure maintenance and sustainment services for DCGS-A Increment 2 software deliverables from thi__ parties.  The __ rors pr__al will be given a weakness for a proposed software rights approach that does NOT permit the Governm__ __ to competitively p__cure main__nance and sustainment services for DCGS-A Increment 2 software deliverables from third parties.

Note:  To receive consi__ __tion for award __ rating of no less than "Acceptable" must be achieved for the Technical factor.  To receive an Acceptable rating for __ Technical t__tor, all Subfactors must achieve at least an Acceptable rating.

__E __I__/RISK RATINGS

| Rating | Description |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Strengths and weaknesses are offsetting or will have little or no |

A838
Protected Information and/or Legends Redacted

Name of Offeror or Contractor:

|  |  |
|---|---|
| | impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

a. Strength. An aspect of an Offerors proposal that has merit, or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. A significant strength appreciably enhances the merit of the proposal, or appreciably increases the probability of successful contract performance.

b. Deficiency. A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

c. Weakness. A flaw in the proposal that increases the risk of unsuccessful contract performance. A significant weakness in the proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

2.   COST/PRICE FACTOR:

The contract will be a 72 month Indefinite Delivery, Indefinite Quantity (IDIQ) based contract with the concurrent award of task order 0001 as a Cost-plus-incentive-fee (CPIF) contract type.

a) Cost Realism: Proposed target cost and fee will be evaluated IAW FAR 15.404 Cost Realism Analysis. The Government will evaluate the realism of the Offerors proposed costs in relation to the Offerors specific technical approach for Task Order 0001. The Offerors proposed cost will be evaluated by determining the Government predicts the Offerors approach would most probably cost the Government when the work performed under Task Order 0001 is completed. To the degree that the Government's most probable cost estimate differs from the Offerors proposed costs may be adjusted upward and/or downward for the purposes of evaluation only. The probable cost will include an adjustment to fee using the incentive formula provided in the solicitation (as set forth in FAR Clause 52.216-10 located in Section 1 of TO 0001), assuming zero Priority 1 or Priority 2 software anomalies as defined in ISO/EIA 12207:2008 at each test checkpoint (Initial Establishment Acceptance Testing, Developmental Testing, and Operational Testing), for the performance incentive. Through use of the probable cost in comparison to the proposed target cost for the cost incentive fee. The result will be the Evaluated Price.

b) Realism Support: In the event insufficient support is provided to determine the realism of the proposed costs, the evaluated cost may be undeterminable and, therefore, the proposal shall be ineligible for award.

3. PAST PERFORMANCE FACTOR:

The Past Performance evaluation will assess the relative risks associated with an Offerors likelihood of success in performing the contracts requirements as indicated by the Offerors record of relevant and recent past performance. Recency is defined as a Government contract within three (3) years prior to the release date of this solicitation. In this context, an offeror refers to the proposed prime contractor and all proposed subcontractors. A major subcontractor is defined as a subcontractor anticipated to perform more than twenty (20) percent of total proposed labor for TO 0001. In either case, the prime contractor and its proposed major subcontractors will be assessed individually, and the results will be assessed collectively to derive the Offerors overall Past Performance confidence rating.

The past performance evaluation includes an assessment of whether the offerors efforts are relevant or not relevant. Relevance is defined as those contracts, whether performed as a prime or as a major subcontractor, which required Engineering and Manufacturing Development and/or System Development and Demonstration contracts for development, and/or integration of some or all of the following components: data architecture, visualization and analytical tools, cloud computing and big data analytic capabilities, cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, CI, HUMINT, Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT), and Sensor Management.

RELEVANCY: The first aspect of the past performance evaluation is to assess the offerors past performance to determine if a recent effort accomplished by the offeror is relevant or not relevant to the effort to be acquired through the source selection. The following criteria will be used to establish what is relevant, which shall include similarity of service/support, complexity, dollar value, contract type, and degree of subcontract/teaming.

A839

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 122 of 123 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001     MOD/AMD | |

Name of Offeror or Contractor:

Past Performance Relevancy Ratings

| Rating | Definition |
|---|---|
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

QUALITY ASSESSMENT: Assess the quality of the offerors Past Performance on those recent efforts that were determined relevant, by determining how well the contractor performed on the contracts. Documented results from Performance Questionnaires, interviews, CPARS, and other sources form the support and basis for this assessment.

PERFORMANCE RATING: Based on an integrated assessment of recency, relevancy, and quality of work the Government will assign an overall Past Performance Rating as follows:

Past Performance Rating

| Rating | Definition |
|---|---|
| Acceptable | Based on the offerors recent/relevant/quality performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Unacceptable | Based on the offerors recent/relevant/quality performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| Neutral | No recent/relevant/quality performance record available, or the offerors performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

The Government will conduct a past performance assessment the quality, effectiveness, relevancy, and recency of the Offerors past performance, as well as that of its major subcontractors, as it relates to the Governments confidence in an offerors ability to successfully perform the required effort. The evaluation team will arrive at a single consensus performance rating for each Offeror, selecting the most appropriate rating from the past performance factor rating definitions contained in Section D of this plan below. When assessing past performance, the Government will focus its inquiry on the past performance of the Offeror, and its proposed major subcontractors as it relates to all solicitation requirements. These requirements include all aspects of cost, schedule, performance, effectiveness of Program Management, and supportability, including the Offerors record of: (1) conformance to specifications and standards of good workmanship; (2) forecasting and containing costs on any previously performed cost reimbursement contracts; (3) adherence to contract schedules, including the administrative aspects of performance; (4) ability to resolve technical and manufacturing problems quickly and effectively; (5) business-like concern for the interest of its customers, (6) establishing and maintaining effective management of subcontractors; (7) overall customer satisfaction.

Offerors are reminded to include all relevant and recent past efforts, including demonstrated corrective actions, in their proposal. Offerors are cautioned that in conducting the past performance assessment, the Government may use data provided in the Offerors proposal and data obtained from other sources including the Past Performance Information Retrieval System (PPIRS). Since the Government may not necessarily interview all of the sources provided by the Offerors it is incumbent upon the Offerors to explain the relevance of the data provided. Offerors are reminded that while the Government may elect to consider data obtained from other sources, the burden of providing past performance rests with the Offerors.

IMPORTANT NOTE: Offerors must receive at least a rating of Acceptable, or a Neutral rating to be eligible for contract award.

4.   SMALL BUSINESS PARTICIPATION FACTOR:

All Offerors (both large and small businesses) will be evaluated on the level of proposed participation of U.S small businesses in the performance of acquisitions (as small business prime offerors or small business subcontractors) relative to the objectives and goals established herein, or in compliance with DoD (DPARS Subpart 219.7), The Small Business Subcontracting Program.

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 123 of 123 |
|---|---|---|
| | PIIN/SIIN  W56KGY-16-R-0001          MOD/AMD | |

Name of Offeror or Contractor:

Small Business Goals for this procurement are:

- Small Business: 31.7%
- Small Disadvantaged Business: 5%
- Women-Owned Small Business: 5%
- Historically Underutilized Business Zone (HUBZone) Business: 3%
- Veteran Owned Small Business: 3%
- Service Disabled Veteran Owned Small Business: 3%

The Government will evaluate:

a) The extent to which such firms, as defined in FAR Part 19, are specifically identified in proposals;

b) The extent of commitment to use such firms (enforceable commitments will be weighed more heavily than non-enforceable ones);

c) Identification of the complexity and variety of the work small firms are to perform;

d) Past performance of the Offeror in complying with requirements of the clause at FAR 52.219-8, Utilization of Small Business Concerns, and for all large business Offerors, FAR 52.219-9, Small Business Subcontracting Plan;

e) The extent of participation of small business prime Offerors and small business subcontractors in terms of the percentage of the value of the total acquisition.  The Government will evaluate the extent to which the Offeror meets or exceeds the goals:

Small Business Participation Factor Rating Definitions

| Rating | Description |
|---|---|
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Risk of unsuccessful performance is no worse than moderate. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies.  Proposal is unawardable. |

IMPORTANT NOTE:  To receive a Small Business Participation Factor rating of at least "acceptable," an offeror must either meet the subcontracting goals for each type of small business or provide an adequate justification as to why the particular goal(s) can't be met.  The Small Business Participation Plan and final goals (i.e., those goals determined by the Government after evaluation of the eventual awardee's proposal that can be realistically met based on the Offerors proposal, and response to discussion questions) will become a firm contract requirement, not a good faith effort.  The content of the plan will be utilized in the compliance evaluations to be conducted thereafter.

*** END OF NARRATIVE M0001 ***

A841

Protected Information
and/or Legends Redacted

| SOLICITATION, OFFER AND AWARD | | | 1. This Contract Is A Rated Order Under DPAS (15 CFR 700) | | Rating DOA7 | Page 1 | of | Pages 132 |
|---|---|---|---|---|---|---|---|---|
| 2. Contract Number | 3. Solicitation Number W56KGY-16-R-0001 | | 4. Type of Solicitation ☐ Sealed Bid (IFB) ☒ Negotiated (RFP) | | 5. Date Issued 2015DEC23 | 6. Requisition/Purchase Number SEE SCHEDULE | | |
| 7. Issued By          Code    W56KGY ACC-APG Division C (W56KGY) CCAP-CCC 6001 Combat Drive APG, MD 21005-1846 | | | 8. Address Offer To (If Other Than Item 7) | | | | | |

NOTE: In sealed bid solicitations 'offer' and 'offeror' mean 'bid' and 'bidder'.

## SOLICITATION

9. Sealed offers in original and _____ copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in _____ until 04:00pm (hour) local time 2016FEB08 (Date).
Caution - Late Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name MICHAEL SHERICK | B. Telephone (No Collect Calls) | | | C. E-mail Address |
|---|---|---|---|---|---|
| | | Area Code (443) | Number 861-4808 | Ext. | MICHAEL.G.SHERICK.CIV@MAIL.MIL |

### 11. Table Of Contents

| (X) | Sec. | Description | Page(s) | (X) | Sec. | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| | | Part I - The Schedule | | | | Part II - Contract Clauses | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 39 |
| X | B | Supplies or Services and Prices/Costs | 4 | | | Part III - List Of Documents, Exhibits, And Other Attach. | |
| X | C | Description/Specs./Work Statement | 31 | X | J | List of Attachments | 96 |
| X | D | Packaging and Marking | 32 | | | Part IV – Representations And Instructions | |
| X | E | Inspection and Acceptance | 33 | | K | Representations, Certifications, and Other Statements of Offerors | 97 |
| X | F | Deliveries or Performance | 34 | X | | | |
| X | G | Contract Administration Data | 35 | X | L | Instrs., Conds., and Notices to Offerors | 108 |
| X | H | Special Contract Requirements | 37 | X | M | Evaluation Factors for Award | 127 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. Discount For Prompt Payment (See Section I, Clause No. 52.232-8) | 10 Calendar Days (%) | 20 Calendar Days (%) | 30 Calendar Days (%) | Calendar Days (%) |
|---|---|---|---|---|
| 14. Acknowledgment of Amendments (The offer or acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated): | Amendment No. | Date | Amendment No. | Date |

| 15A. Name and Address of Offeror | Code | | Facility | 16. Name and Title of Person Authorized to Sign Offer (Type or Print) |
|---|---|---|---|---|
| 15B. Telephone Number | | 15C. Check if Remittance Address is ☐ Different From Above – Enter such Address In Schedule | 17. Signature | 18. Offer Date |
| Area Code | Number | Ext. | | |

## AWARD (To be completed by Government)

| 19. Accepted As To Items Numbered | 20. Amount | 21. Accounting And Appropriation | |
|---|---|---|---|
| 22. Authority For Using Other Than Full And Open Competition: ☐ 10 U.S.C. 2304(c)(  )    ☐ 41 U.S.C. 253(c)(  ) | | 23. Submit Invoices To Address Shown In (4 copies unless otherwise specified) | Item 25 |
| 24. Administered By (If other than Item 7)    Code | | 25. Payment Will Be Made By    Code | |
| 26. Name of Contracting Officer (Type or Print) | | 27. United States Of America (Signature of Contracting Officer) | 28. Award Date |

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

Standard Form 33 (Rev. 9-97)
Prescribed By GSA-FAR (48 CFR) 53.214(c)

Appx10842

A842

Protected Information and/or Legends Redacted

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 2 of 132 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001          MOD/AMD | |

Name of Offeror or Contractor:

SECTION A - SUPPLEMENTAL INFORMATION

Buyer Name: MICHAEL SHERICK
Buyer Office Symbol/Telephone Number: CCAP-CCC/(443)861-4808
Type of Contract 1: Cost Plus Incentive Fee (Cost Based)
Kind of Contract: System Acquisition Contracts

*** End of Narrative A0000 ***

Executive Summary

1. The Army Contracting Command-Aberdeen Proving Ground (ACC-APG) has the need to acquire Engineering, Manufacturing and Development services in support of the Project Manager Distributed Common Ground System Army (PM DCGS-A) Distributed Common Ground System - Army (DCGS-A) Increment 2 requirement. This acquisition is issued in accordance with FAR 15.101-1 Tradeoff Process. This noticed is prepared in accordance with the format in FAR Subpart 15.203, and as supplemented with additional information included in this notice. Solicitation W56KGY-16-R-0001 is issued as Request for Proposals (RPP).

2. As a result of this solicitation, the Government intends to award a single Indefinite Delivery, Indefinite Quantity (IDIQ) contract award, with the simultaneous award of Task Order (TO) 0001. The IDIQ base ceiling amount is $206M.

3. The guaranteed minimum for this IDIQ contract is $6,000,000.00.

4. Task Order 0001 will be Cost Plus Incentive Fee (CPIP) and Cost Only.  A multiple Incentive structure will focus on performance and cost factors to encourage positive results. The incentive structure can be viewed in Attachment 0010, DCGS-A Increment 2 (SAMPLE) Task Order 0001,  located in section J.

5. The Government is requesting proposals in support of the base IDIQ Performance Work Statement (PWS) and TO 0001 PWS attached RPP section J. Offerors' proposals shall include all information outlined in RPP section L. Offerors' shall provide Cost/Price proposals for TO 0001 (Volume IV RPP section L).

6. As noted in Section L, the expected value of this IDIQ contract will exceed $100M and therefore Offerors' shall be compliant with the requirements of DFARS 252.234-7001(a).

7. A Quality Assurance Program Plan (QAPP) submission is required with the issuance of TO 0001. The QAPP particulars are delineated in IDIQ PWS section 4.3.16 and Contract Data Requirement List (CDRL) C005 DI-QCIC-81794. The Government will review and comment on the QAPP, (if required), within 30 working days from initial submission. In return, and upon the receipt of Government comments, a finalized QAPP is due no later than 15 working days.

8. Offerors' are advised that the Government intends to utilize electronic commerce IAW FAR Subpart 4.5, and will be using the Acquisition Source Selection Interactive Support Tool (ASSIST) in support of the source selection process as outlined in RFP section L. Proposals shall be effective for 180 days upon the RFP due date.

9. The RFP Solicitation number is W56KGY-16-R-0001, and the due date is 4:00 PM EST on 08 February 2016. Proposals will not be accepted beyond the due date and time.

10. The POCs for this action are:

     Chris Fisher                     Mike Sherick
     Contracting Officer              Contract Specialist
     Christopher.M.Fisher.civ@mail.mil    Michael.G.Sherick.civ@mail.mil

11. Offerors' are notified that as applicable, the cost(s) proposed for the Task Order 0001 award (initial competition) will serve as a baseline for negotiation of similar costs on subsequent orders issued on non-competitive basis.

12. A (15) calendar day (RFP) question and answer period will be open from the date the Federal Business Opportunities (FBO) RFP announcement is released. Questions should be uploaded directly to FBO and Michael.G.Sherick.civ@mail.mil. Answers will be posted on FBO. Questions will not be accepted upon the closing of the (15) day period.

13. Offeror's are hereby notified of the Government Furnished Information restrictions outlined in PWS paragraph 3.13, section J attachment 0001.

14. All questions and concerns should be submitted to michael.g.sherick.civ@mail.mil no later than the close of business (COB)  08 January 2015. Questions will not be accepted beyond COB 04 January 2016.

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 39 of 132 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001        MOD/AMD | |

**Name of Offeror or Contractor:**

SECTION I - CONTRACT CLAUSES

| | Regulatory Cite | Title | Date |
|---|---|---|---|
| I-1 | 52.202-1 | DEFINITIONS | NOV/2013 |
| I-2 | 52.203-3 | GRATUITIES | APR/1984 |
| I-3 | 52.203-5 | COVENANT AGAINST CONTINGENT FEES | MAY/2014 |
| I-4 | 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | SEP/2006 |
| I-5 | 52.203-7 | ANTI-KICKBACK PROCEDURES | MAY/2014 |
| I-6 | 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY | MAY/2014 |
| I-7 | 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | MAY/2014 |
| I-8 | 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | OCT/2010 |
| I-9 | 52.203-16 | PREVENTING PERSONAL CONFLICTS OF INTEREST | DEC/2011 |
| I-10 | 52.204-2 | SECURITY REQUIREMENTS | AUG/1996 |
| I-11 | 52.204-4 | PRINTED OR COPIED DOUBLE-SIDED ON POSTCONSUMER FIBER CONTENT PAPER | MAY/2011 |
| I-12 | 52.204-9 | PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL | JAN/2011 |
| I-13 | 52.204-10 | REPORTING EXECUTIVE COMPENSATION AND FIRST-TIER SUBCONTRACT AWARDS | OCT/2015 |
| I-14 | 52.204-13 | SYSTEM FOR AWARD MANAGEMENT MAINTENANCE | JUL/2013 |
| I-15 | 52.204-18 | COMMERCIAL AND GOVERNMENT ENTITY CODE MAINTENANCE | JUL/2015 |
| I-16 | 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | OCT/2015 |
| I-17 | 52.209-9 | UPDATES OF PUBLICLY AVAILABLE INFORMATION REGARDING RESPONSIBILITY MATTERS | JUL/2013 |
| I-18 | 52.209-10 | PROHIBITION ON CONTRACTING WITH INVERTED DOMESTIC CORPORATIONS | NOV/2015 |
| I-19 | 52.210-1 | MARKET RESEARCH | APR/2011 |
| I-20 | 52.211-5 | MATERIAL REQUIREMENTS | AUG/2000 |
| I-21 | 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | APR/2008 |
| I-22 | 52.215-2 | AUDIT AND RECORDS--NEGOTIATIONS | OCT/2010 |
| I-23 | 52.215-8 | ORDER OF PRECEDENCE--UNIFORM CONTRACT FORMAT | OCT/1997 |
| I-24 | 52.215-10 | PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA | AUG/2011 |
| I-25 | 52.215-11 | PRICE REDUCTION FOR DEFECTIVE CERTIFIED COST OR PRICING DATA-- MODIFICATIONS | AUG/2011 |
| I-26 | 52.215-12 | SUBCONTRACTOR CERTIFIED COST OR PRICING DATA | OCT/2010 |
| I-27 | 52.215-13 | SUBCONTRACTOR CERTIFIED COST OR PRICING DATA--MODIFICATIONS | OCT/2010 |
| I-28 | 52.215-14 | INTEGRITY OF UNIT PRICES | OCT/2010 |
| I-29 | 52.215-15 | PENSION ADJUSTMENTS AND ASSET REVERSIONS | OCT/2010 |
| I-30 | 52.215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB) OTHER THAN PENSIONS | JUL/2005 |
| I-31 | 52.215-21 | REQUIREMENTS FOR CERTIFIED COST OR PRICING DATA AND DATA OTHER THAN CERTIFIED COST OR PRICING DATA --MODIFICATIONS | OCT/2010 |
| I-32 | 52.215-23 | LIMITATIONS ON PASS-THROUGH CHARGES | OCT/2009 |
| I-33 | 52.216-8 | FIXED FEE | JUN/2011 |
| I-34 | 52.216-11 | COST CONTRACT--NO FEE | APR/1984 |
| I-35 | 52.219-8 | UTILIZATION OF SMALL BUSINESS CONCERNS | OCT/2014 |
| I-36 | 52.219-16 | LIQUIDATED DAMAGES--SUBCONTRACTING PLAN | JAN/1999 |
| I-37 | 52.222-3 | CONVICT LABOR | JUN/2003 |
| I-38 | 52.222-17 | NONDISPLACEMENT OF QUALIFIED WORKERS | MAY/2014 |
| I-39 | 52.222-19 | CHILD LABOR--COOPERATION WITH AUTHORITIES AND REMEDIES | JAN/2014 |
| I-40 | 52.222-20 | CONTRACTS FOR MATERIALS, SUPPLIES, ARTICLES, AND EQUIPMENT EXCEEDING $15,000 | MAY/2014 |
| I-41 | 52.222-21 | PROHIBITION OF SEGREGATED FACILITIES | APR/2015 |
| I-42 | 52.222-26 | EQUAL OPPORTUNITY | APR/2015 |
| I-43 | 52.222-29 | NOTIFICATION OF VISA DENIAL | APR/2015 |
| I-44 | 52.222-37 | EMPLOYMENT REPORTS ON VETERANS | OCT/2015 |
| I-45 | 52.222-40 | NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT | DEC/2010 |
| I-46 | 52.222-41 | SERVICE CONTRACT LABOR STANDARDS | MAY/2014 |
| I-47 | 52.222-43 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS--PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) | MAY/2014 |
| I-48 | 52.222-50 | COMBATING TRAFFICKING IN PERSONS | MAR/2015 |
| I-49 | 52.222-54 | EMPLOYMENT ELIGIBILITY VERIFICATION | OCT/2015 |
| I-50 | 52.222-55 | MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 | DEC/2015 |
| I-51 | 52.223-5 | POLLUTION PREVENTION AND RIGHT-TO-KNOW INFORMATION | MAY/2011 |
| I-52 | 52.223-6 | DRUG-FREE WORKPLACE | MAY/2001 |
| I-53 | 52.223-18 | ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE DRIVING | AUG/2011 |

Protected Information and/or Legends Redacted

Name of Offeror or Contractor:

(End of Clause)

I-191    52.219-28    POST-AWARD SMALL BUSINESS PROGRAM REREPRESENTATION    JUL/2013

(a) Definitions. As used in this clause--

"Long-term contract" means a contract of more than five years in duration, including options. However, the term does not include contracts that exceed five years in duration because the period of performance has been extended for a cumulative period not to exceed six months under the clause at 52.217-8, Option to Extend Services, or other appropriate authority.

"Small business concern" means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR part 121 and the size standard in paragraph (c) of this clause. Such a concern is "not dominant in its field of operation" when it does not exercise a controlling or major influence on a national basis in a kind of business activity in which a number of business concerns are primarily engaged. In determining whether dominance exists, consideration shall be given to all appropriate factors, including volume of business, number of employees, financial resources, competitive status or position, ownership or control of materials, processes, patents, license agreements, facilities, sales territory, and nature of business activity.

(b) If the Contractor represented that it was a small business concern prior to award of this contract, the Contractor shall rerepresent its size status according to paragraph (e) of this clause or, if applicable, paragraph (g) of this clause, upon the occurrence of any of the following:

    (1) Within 30 days after execution of a novation agreement or within 30 days after modification of the contract to include this clause, if the novation agreement was executed prior to inclusion of this clause in the contract.

    (2) Within 30 days after a merger or acquisition that does not require a novation or within 30 days after modification of the contract to include this clause, if the merger or acquisition occurred prior to inclusion of this clause in the contract.

    (3) For long-term contracts

      (i) Within 60 to 120 days prior to the end of the fifth year of the contract; and

      (ii) Within 60 to 120 days prior to the date specified in the contract for exercising any option thereafter.

(c) The Contractor shall rerepresent its size status in accordance with the size standard in effect at the time of this rerepresentation that corresponds to the North American Industry Classification System (NAICS) code assigned to this contract. The small business size standard corresponding to this NAICS code can be found at http://www.sba.gov/content/table-small-business-size-standards

(d) The small business size standard for a Contractor providing a product which it does not manufacture itself, for a contract other than a construction or service contract, is 500 employees.

(e) Except as provided in paragraph (g) of this clause, the Contractor shall make the representation required by paragraph (b) of this clause by validating or updating all its representations in the Representations and Certifications section of the System for Award Management (SAM) and its other data in SAM, as necessary, to ensure that they reflect the Contractor's current status. The Contractor shall notify the contracting office in writing within the timeframes specified in paragraph (b) of this clause that the data have been validated or updated, and provide the date of the validation or update.

(f) If the Contractor represented that it was other than a small business concern prior to award of this contract, the Contractor may, but is not required to, take the actions required by paragraphs (e) or (g) of this clause.

(g) If the Contractor does not have representations and certifications in SAM, or does not have a representation in SAM for the NAICS code applicable to this contract, the Contractor is required to complete the following rerepresentation and submit it to the contracting office, along with the contract number and the date on which the rerepresentation was completed:

The Contractor represents that it [ ] is, [ ] is not a small business concern under NAICS Code _____ assigned to contract number _____. [Contractor to sign and date and insert authorized signer's name and title].

(End of clause)

A909

Appx10909

Protected Information
and/or Legends Redacted

**Name of Offeror or Contractor:**

* Security Office Information including:

i.   Name
ii.  Title
iii. E-mail address
iv.  Telephone number

(6) IPT Structure:

The Offeror shall provide a detailed breakdown of program team structure, subcontractors, and teammates; as well as detail of IPT structure, or other organization details related to the execution of Task Order 0001.

(7) DCGS-A Increment 2 software capability demonstration:

To begin the DCGS-A Increment 2 source selection process, each Offeror will demonstrate a DCGS-A Increment 2 software. The capability could include a Government Furnished Information (GFI), Commercial Off-The-Shelf (COTS), Government Off-the-Shelf (GOTS), or Open Source product(s). The Amazon Web Service (AWS) Gov Cloud will serve as the demonstration host environment to emulate the use of the Intelligence Community Information Technology Enterprise (IC ITE) Commercial Cloud Services (C2S). The Government will provide each vendor with secure access to their respective AWS virtual computing resources at the same time, no later than five business days after the DCGS-A Increment 2 Request for Proposal (RFP) due date.

Offerors will provide the name and e-mail of an appropriate demonstration point of contact with their proposal submission. This information will be used by the Government to set up a unique and secure account per offeror. General information about AWS services can be found at https://aws.amazon.com/, and an AWS GovCloud overview can be found at https://aws.amazon.com/govcloud-us/.

AWS will provide virtual capabilities emulating the Armys Common Operating Environment (COE) current Tactical Server Infrastructure (TSI) with the following specifications:

* 4 x Dell R430 Servers with Dual Intel Xeon E5-2695 (14 core) processors, 196GB RAM, and Dual 200GB SSD

* 2 x Mellanox SX6018 switches with 18 x 40GbE/56Gb Infiniband ports

* 2 x NetApp FAS2552 SANs with 20 x 1.2TB HDD/4-400GB SSD (25.6TB RAW)

The presentation shall conclude within 30 minutes and cover the following information:
- DCGS-A Increment 2 Performance Based Specifications requirement(s), with corresponding requirement identification numbers, the offeror capability(s) satisfies

- Any license fee costs and data rights associated with the demonstrated capability(s)

- If the capability(s) is presently being used, where it is being used, and the requisite Technology Readiness Level

(ii) VOLUME II TECHNICAL. The Offerors technical proposal shall demonstrate that its approach meets, at a minimum, the requirements in the base PWS and Task Order 0001 PWS as specified in the PWS Compliance Matrix, located in Section J of the solicitation. The Government is specifically interested in a demonstration of a DCGS-A Increment 2 software capability and the five (5) Technical Sub-factors: Data Architecture, Fusion, Interoperability, Visualization Framework/Usability, and Data Rights.

Note: Every document submitted in the Technical Volume shall be submitted devoid of all dollar figures.

The technical approach shall address and be organized into the following sections:

1) Subfactor 1 Data Architecture: The Offeror shall propose a resource loaded IMS, and information that substantiates their proposed Sustainment Strategy, a Software Assurance Sample Report, and a detailed technical approach to build a DCGS-A Increment 2 Data Management Architecture and CI and HUMINT, IAW task order 0001 PWS and the Compliance Matrix. The Offeror shall develop the DCGS-A Data Management Architecture software baseline and CI and HUMINT IAW capabilities outlined in the task order PWS sections 3.2.6.1 through 3.2.6.9 and 3.2.27.

    3.2.6.1: Data Ingress Capability
    3.2.6.2: Data Persistence Ecosystem
    3.2.6.3: Data Egress and Visualization Platform
    3.2.6.4: Data Analytics
    3.2.6.5: Data Integrity
    3.2.6.6: Data and User Authorization Services
    3.2.6.7: Training Materials

**A960**
Protected Information
and/or Legends Redacted

| **CONTINUATION SHEET** | **Reference No. of Document Being Continued** | **Page**127 **of** 132 |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001          MOD/AMD | |

Name of Offeror or Contractor:

SECTION M - EVALUATION FACTORS FOR AWARD

M-3   EVALUATION APPROACH

A. BASIS FOR AWARD (Section M)

Initially, there will be a DCGS-A Increment 2 software capability demonstration by the offeror evaluated on a acceptable/unacceptable basis.  Only those offerors who successfully complete the demonstration will be further evaluated and considered for award. The award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the evaluation factors: Technical, Past Performance, Cost/Price, and Small Business Participation Plan.  The Technical factor is significantly more important than Cost/Price.  Past Performance and the Small Business Participation Factors will be rated on an acceptable/unacceptable basis. A rating of acceptable or neutral must be achieved for the Past Performance Factor. A rating of acceptable must be achieved for the Small Business Participation Factor in order to be eligible for award.  Offerors are cautioned that the award may not necessarily be made to the highest technically rated or lowest cost or price offer.

B. FACTORS AND SUB-FACTORS TO BE EVALUATED

The following evaluation factors and subfactors will be used to evaluate each proposal after the DCGS-A Increment 2 software capability demonstration:  Award will be made to the offeror whose proposal is the most advantageous to the Government based upon an integrated assessment of the evaluation factors and subfactors described below in accordance with the evaluation criteria.

FACTOR 1: TECHNICAL:

The technical factor includes the DCGS-A Increment 2 software capability demonstration as well as the offerors technical approach of the following Subfactors:

        (a) Subfactor 1 Data Architecture
        (b) Subfactor 2 Fusion Data Analytics
        (c) Subfactor 3 Interoperability
        (d) Subfactor 4 Visualization Framework/Usability
        (e) Subfactor 5 Data Rights

An offeror must receive a rating of Acceptable for the capability demonstration in order for the technical volume to be subject to further evaluation. Subfactor 1 is significantly more important than Subfactor 2.  Subfactor 2 is equal to Subfactor 3.  Subfactor 3 is equal to Subfactor 4.  Subfactor 4 is more important than Subfactor 5.  Subfactor 1 is equivalent in importance to Subfactors 2-5 combined.  The overall factor rating will be a roll-up of the ratings of all Technical Subfactors in accordance with evaluation criteria.

FACTOR 2 COST/PRICE: The resulting award will be a six year IDIQ base contract with the concurrent award of Task Order 0001 as a Cost-Plus-Incentive- Fee (CPIF) contract type. The cost realism of the proposed approach for Task Order 001 will be evaluated.

FACTOR 3 PAST PERFORMANCE: Each offerors past performance will be reviewed to determine the acceptability on an acceptable/unacceptable basis.

FACTOR 4 SMALL BUSINESS PARTICIPATION PLAN: The extent of Small Business Participation will be evaluated on an acceptable/unacceptable basis.

C. EVALUATION APPROACH

1. DCGS-A Increment 2 software capability demonstration: Each offeror will demonstrate a DCGS-A Increment 2 software capability. In order to be considered for award, offerors must receive an acceptable rating.

Each demonstration will be evaluated as acceptable or unacceptable. To achieve an acceptable rating, the criteria listed below must be met:

   1. Successful installation of chosen DCGS-A Increment 2 capability software and use of the Amazon Web Service (AWS) environment, to be provided by the Government.  If multiple capabilities are chosen, at least one needs to be successfully installed and used to be determined to be acceptable. If there are any Priority 1 Software Anomalies, as defined by ISO/EIA 12207:2008, Figure J.2, recorded during the demonstration, the offerors demonstration will be deemed unacceptable.

   2. Mapping of the offerors demonstrated capability to a DCGS-A Increment 2 requirement or set of requirements identified in the DCGS-A Performance Based Specification located in Section J as Attachment 0003.

   3. Presentation of the demonstrated capability in accordance with the presentation requirements identified in the Section L proposal

A968

Protected Information
and/or Legends Redacted

| **CONTINUATION SHEET** | **Reference No. of Document Being Continued** | **Page**128 **of** 132 |
| | **PIIN/SIIN** W56KGY-16-R-0001      **MOD/AMD** | |

Name of Offeror or Contractor:

instructions.  Presentation/slides will be emailed to the government on the last day (day 5) of the offerors access to the AWS environment.

4. The presentation shall be no longer than thirty (30) minutes, and the presentation and demonstration combined shall conclude within 2 hour limit.

All presentations and demonstrations will be recorded. The presentation and the information contained therein WILL NOT be considered as part of the Technical evaluation.

Understanding of Requirements and Feasibility of Approach.  The proposal will be evaluated to determine the extent to which the proposed approach is meets minimum requirements, and the end results achievable.  The proposal will be evaluated to determine the extent to which successful performance is contingent upon low risk technologies and techniques.  The proposal will also be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

All proposals shall be subject to evaluation by a team of Government personnel and non-Government advisors from the following companies:

* MITRE Corp.
* Booz Allen Hamilton Inc.
* Alliance Consulting Services
* Millennium
* ADC Management Solutions

The Subject Matter Experts (SME) will have access to all the necessary parts of the Offerors proposal pertinent to the SMEs area of expertise.  As such, all of the above-listed Government contactor companies are precluded from being a Prime contractor or participating in any teaming arrangement with potential Offerors due to Organizational Conflict of Interest (OCI) concerns.  The Offeror shall advise the Contracting Officer as soon as possible of any concerns/questions with regard to the use of the Non-Government SMEs from the companies listed above.  Any Offeror that is affiliated with, or is contemplating a contractual relationship with any of the above listed firms, must notify the Contracting Officer for the solicitation as soon as possible.

2. THE TECHNICAL FACTOR IS DIVIDED INTO THE FOLLOWING SUBFACTORS:

Subfactor 1 Data Architecture: This Subfactor evaluates the offerors Data Architecture proposal to the degree it:

a) Provides Data Ingress capability that performs data acquisition and ingestion.  This effort shall support external subsystems that enable data harvesting and acquisition.  This effort shall support internal subsystems that perform artifact parsing, artifact decomposition, and artifact knowledge extraction based on predefined data models. The predefined data models, standards StdV-1 and StdV-2, provided as GFI and available upon request. These include DDMS 2.0: Department of Defense Discovery Metadata Specification (DDMS), Version 2.0, 17 July 2008; ISO 15836:2003: The Dublin Core Metadata Element Set; OGC SensorML: v.2.0.0: OGC SensorML: Model and XML Encoding Standard, v.2.0.0, 2014-02-04; and STANAG 4559 (Edition 3): NATO Standard ISR Library Interface, Edition 3, 12 November 2010.

b) Provides a Data Persistence Ecosystem that performs data indexing and persistence in a data store appropriate for datas particular characteristics and behavior.  The data persistence ecosystem shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Stores.
3) Data Persistence.
4) Data Semantic Discovery.

c) Provides Data Egress and Visualization that performs data retrieval while enforcing oversight and compliance policies.  The data egress and visualization shall, at a minimum, be represented by the following attributes:

1) Data Access.
2) Data Security.
3) Web Framework.

d) Provides Data Analytics that enables cloud-scale analytics.  These analytics shall enable streaming analytics for low latency fast in memory processing and big data batch analytics for petabyte data observations.

e) Provides Data Integrity to measure and ensure that data can be trusted.  The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree.
2) Data Provenance.
3) Data Security.

Protected Information and/or Legends Redacted

18 December 2015

PERFORMANCE WORK STATEMENT

FOR

Distributed Common Ground System – Army

Increment 2, Engineering, Manufacturing and Development

SOLICITATION NUMBER: W56KGY-16-R-0001

Appx11042

A1042

Protected Information
and/or Legends Redacted

# 1 SCOPE

This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the development and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

DCGS-A Increment 2 is technically a New Start program. However, Increment 2 is a logical successor to DCGS-A Increment 1. It is envisioned that the hardware platforms and a percentage of the SW capabilities developed in Increment 1 will be leveraged/used for Increment 2.

Each DCGS-A Increment 2 software version release will undergo a 24-36 month cycle consisting of requirements definition, development, and T&E activities, followed by up to 6 months of stakeholder review of documentation/reports in support of a software release fielding decision.

The planned Increment 2 release for data integration foundation, capability & KPP enhancements on modernized infrastructure focus primarily on:

- Data Integration Layer
- Data Analytics Platform (Fusion)
- Interoperability (Net Ready)
- Visualization Framework
- Training
- Sustainment
- Ops and Support
- Cyber Security
- Fact of Life Upgrades
- Logistics and Readiness

The planned Increment 2 version release for usability enhancements considering unified user interface & Intel support to cyber capability focus primarily on:

- Consistent User Interface
- Cyber Operations
- Continued INC 2, Release Improvements
- DCGS Integration Backbone (DIB) Upgrade
- Fact of Life Upgrades

A1051

Protected Information
and/or Legends Redacted

- Logistics and Readiness

As used in this PWS, the term "DCGS-A INC 2, EMD" incorporates the framework, architecture, software and other capabilities that may be developed and integrated in support of the DCGS-A Family of Systems (FoS).

The contractor shall be responsible for system and software engineering, product design, development, integration, testing, and limited deployment support to include software maintenance, configuration management, risk management, and quality assurance. The contractor is also responsible for developing and delivering documentation In Accordance With (IAW) the Contract Data Requirements List (CDRL) associated with this Performance Work Statement (PWS).

This PWS also includes specific program management, system engineering, design and development, software engineering, integration and test, software quality assurance, system platform integration & test, demonstration support, and logistics support for the DCGS-A Increment 2 software baseline.

The Contractor shall complete the design, development, integration and test, to include supporting Development and Operational Test events for the DCGS-A Increment 2 software baseline and any future DCGS-A Increment 2 software baseline releases.

## 1.1 BACKGROUND

The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD.

DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.

DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications.

Protected Information
and/or Legends Redacted

DCGS-A Increment 1 is the ISR component of the modular and future force Mission Command System (MCS) and the Army's primary system for ISR tasking of sensors, processing and exploitation of data, and dissemination of intelligence (TPED) information about the threat, weather, and terrain at all echelons. A high percentage of Increment 2 functionality has already been developed under the DCGS-A Increment 1 efforts. DCGS-A Increment 2 will leverage the DCGS-A hardware components fielded across the Army under DCGS-A Increment 1. In addition, DCGS-A Increment 2 will completely displace the legacy Program of Record (POR) systems that make up the basis of DCGS-A. DCGS-A Increment 2 will provide new data architecture and additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, Measurement and Signature Intelligence (MASINT), GEOINT (Full Motion Video/Static Imagery Intelligence), Geospatial Engineering (Geospatial Data Management, Analysis, and Dissemination), to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The DCGS-A system and data enterprise must conform to and leverage the Army Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

## 1.2 CONTRACT TYPE

The contractor shall provide the required support for these efforts in accordance with (IAW) this PWS on a single award, Indefinite Delivery Indefinite Quantity (IDIQ) basis within the government established funding constraints.

## 1.3 ORDER TYPES

The associated Task Orders will be issued under a Cost and/or Firm-Fixed-Price (FFP) basis.

# 2 APPLICABLE DOCUMENTS

The following documents are applicable to this PWS and task orders issued against this IDIQ.

## 2.1 GOVERNMENT DOCUMENTS

**Table 2-1: DCGS-A Program Documents**

| Number | Title | Date |
|--------|-------|------|
|        |       |      |

Appx11053

A1053

Protected Information and/or Legends Redacted

- For failure modes that impact individual operators, the impacts shall be minimized via automated detection and recovery. Automated recovery should require no or minimal operator action (e.g., error message with a click OK).

- All software components will provide error messages that are understandable by the operator and provide actionable information for the operator or maintainer to be able to restore operations.

- All software components shall be capable of logging all faults (correctable or not) with sufficient supporting information for the maintainer to performance diagnostics.

- Any failure of a software component will generate a message with sufficient details to allow it to be isolated to the component in which the failure occurred.

### 3.2.5 NET READY

DCGS-A shall support net-centric military operations by being interoperable with current Army, Unified Action Partners, Joint, Service (to include Service DCGS), Allied, Coalition, and Command and Control (C2) information and ISR systems as specified in the DCGS-A Operational View (OV)-3/System View (SV)-6 (e.g., Mission Command, Global Command and Control System (Joint and Army), Universal Ground Control Station (UGCS).

### 3.2.5.1 Network Operations

DCGS-A shall enter and be managed in the network by operating across all echelons (from the Company Intelligence Support Team (CoIST) to the Joint Task Force (JTF) within all security domains (Nonsecure Internet Protocol Router (NIPR), Secret Internet Protocol Router (SIPR), Joint Worldwide Intelligence Communications System (JWICS), and NSANet and within and across all common operating environment (COE) computing environments.

### 3.2.5.2 Information Exchange

DCGS-A shall employ effective Information Exchanges by satisfying all Information Exchange Requirements (IER) for operating at JTF and below identified in the DCGS-A OV-3/SV-6.

### 3.2.6 FUSION

DCGS-A shall be capable of performing automated fusion Level 0, 1 and 2 functions.

### 3.2.6.1 Source Processing

DCGS-A shall perform Fusion Level 0, which includes semi-computer controlled data organization which converts incoming data without anomalies into a usable, normalized form with a 99.9% accuracy rate, and supports computer-assisted user resolution of data with anomalies.

## 3.2.6.2 Entity Refinement

DCGS-A Shall perform Fusion Level 1, which includes computer-assisted identification of incoming preprocessed entity data by reported entity type and identity with a 99% accuracy rate, semi-computer controlled entity correlation which (1) assesses whether an incoming entity is either totally new to the fused set of entities, new data about an already-held entity, or ambiguous and (2) uses the new data to update the fused knowledge about already-held entities with a 99.9% accuracy rate, and supports computer-assisted user resolution of ambiguous cases or data update conflicts.

## 3.2.6.3 Situation Refinement

DCGS-A Shall perform Fusion Level 2, which includes semi-computer controlled association processing that determines, based on actual reporting or inferred from valid models, that entities are related to each other and captures the reported nature of that relationship with a 95% accuracy rate; semi-computer controlled aggregation processing that determines, based on actual reporting or inferred from valid models, how entities aggregate into a higher order entity with a 95% accuracy rate, and supports computer-assisted user interpretation/hypothesis of what an entity is currently doing and may do next.

## 3.2.7 INTELLIGENCE SUPPORT TO CYBER OPERATIONS

DCGS-A shall support the Army Cyber Command intelligence analysis effort by providing cyber data ingest, management, and access to support the Cyber Electromagnetic (CEM) Cell in both Defensive Cyber Operations (DCO) and Offensive Cyber Operations (OCO).

## 3.2.8 DEMONSTRATIONS / IPTs

PM DCGS-A receives frequent requests for product demonstrations of the DCGS-A system. Such demonstrations may take place at locations both Contiguous United States (CONUS) and Outside Contiguous United States (OCONUS). The contractor will conduct such demonstrations as required by the Government.

Integrated Product Teams (IPTs) external to DCGS-A may require DCGS-A support. These IPTs may range from technical to strategic. The Government may request the contractor to represent the DCGS-A program as part of this IPT support. IPT support may require meeting participation, travel

Protected Information and/or Legends Redacted

The contractor shall travel to Government and contractor sites throughout the Contiguous United States (CONUS) and Outside Contiguous United States (OCONUS) in the performance of this task.

## 3.2.10.2 3PDK Training Classes

The contractor shall be required to provide training classes for users of the 3PDK or other APIs. These may include any combination of introductory, intermediate, and advanced 3PDK training weeks and may cover any and all versions of the 3rd Party Development Kit in usage during the period of performance.

The contractor shall travel as required to Government and contractor CONUS and OCONUS sites in the performance of this task.

### 3.2.11 *INTEROPERABILITY ENGINEERING*

The Contractor shall design and develop the DCGS-A Increment 2 Baseline software releases so that it is interoperable with other DCGS-A fielded systems, MCS systems, the Joint systems, and Coalitions in accordance with the DCGS-A SV-6 delivered prior to PDR.

For CDRL-DI-MGMT-81644B, B012, DoD Architecture Framework Documentation, the following are Viewpoints required and delivery schedule:

1. Preliminary Design Review (PDR) or similar - - all of the following views in their initial contractor draft as either Excel files for data and PowerPoint for pictorial representation: DIV-1, DIV-2, DIV-3, SV-1, SV-2, SV-4, SV-5a, SV-6 and SV-7; and

2. Critical Design Review (CDR) or similar - - all of the following views in their contractor final as either Excel files for data and PowerPoint for pictorial representation: DIV-1, DIV-2, DIV-3, SV-1, SV-2, SV-4, SV-5a, SV-6, SV-7 and SV-10c with Government 30 day review comments incorporated.

NOTE: Contractor viewpoints in Excel and PowerPoint must be consistent, correct and able to satisfy J-6 ISP review process for Milestone C and sufficient for all testing.

See CDRL DI-MGMT-81644B, B012

The Contractor shall integrate the DCGS Integration Backbone (DIB) Version 4.x (or other versions as directed) into the DCGS-A Increment 2 baselines for interoperability with the Joint DCGS Family of System (FoS).

shall define the functional partitioning and the physical modularity of the system to facilitate future replacement of specific subsystems and components without impacting other parts of the system and to encourage third-party vendor's participation.

The contractor shall provide a MOSA plan for evaluation and acceptance that describes the contractor's approach and planning for the Increment 2 system architecture that can adapt to evolving requirements and threats; reduce the development cycle time and total life cycle cost; maintain continued access to cutting edge technologies and products from multiple suppliers; and mitigate the risks associated with: (1) technology obsolescence, (2) being locked into proprietary or vendor-unique technology, and (3) reliance on a single source of supply over the life of the system.

The contractor's design approach shall emphasize the selection of components that are available commercially or within the DoD, to avoid the need to redevelop products that already exist and that can be reused. The Contractor shall consider reuse of components from the DI2E Storefront. The contractor shall use the best practice of investigating the DI2E storefront first to identify software candidates for reuse prior to making the decision to develop a capability. The contractor's rationale shall explicitly address any tradeoffs performed, particularly those that compromise the modular and open nature of the system. The weighted attributes that provide the objective evaluation criteria in the conduct of a software tradeoff for the DI2E storefront or elsewhere shall be provided during various appropriate formal reviews.

The contractor shall conduct an architecture quality attribute assessment where customer and user stakeholders are brought together to assess whether the contractors proposed architecture tradeoffs and architecture qualities meet the customer intent.

The contractor's design approach shall result in modules that have minimal dependencies on other modules (loose coupling), e.g. inserting a new application or component without disrupting the rest of the system, well defined interfaces and by the absence of implicit data sharing. The purpose is to ensure that any changes to one module will not necessitate extensive changes to other modules, and hence facilitate module replacement and system enhancement.

The contractor shall implement the MOSA Interface Design and Management principle that the Contractor shall:

- Define and document all subsystem and configuration item level interfaces to provide full functional, logical, and physical specifications;

- Identify the interface and data exchange standards between the component, module or system and the interconnectivity or underlying information exchange medium;

- Select external interfaces from existing open or Government standards with an emphasis on enterprise-level interoperability. The contractor shall describe how its selection of interfaces

Protected Information
and/or Legends Redacted

- Design and implement APIs and software components that permit non-DCGS-A applications and capabilities to collaborate natively with the DCGS-A through the integration of the developed APIs and/or software components into the non-DCGS-A systems or capabilities.

## 3.4 SOFTWARE DESIGN

### 3.4.1 DESIGN PRINCIPLES

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing. Because of the evolutionary nature of this program, the contractor may be developing different software releases concurrently. The contractor shall refine the process as agreed to by the Government. At a minimum, a release/development shall include:

a. Functionality defined for that release as defined by the Release Objectives.

b. A maximization of reuse of GOTS/COTS products.

Each release and version shall consist of field installable, and field de-installable segments. Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required. Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS.
The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor.

a. Each product release builds on the foundation and functionality of the prior release. These releases are built as planned or in response to events. These blocks are referred to as cycles.

b. The requirements are defined in the contract and vetted through the User Panel.

c. The contractor shall work with the Government to allocate product release objectives into the lower level development cycles.

d. The requirements of each cycle are defined by the contractor at the planning session at the start of the cycle. The contractor shall record the requirements defined at the planning sessions in the form of release objectives and send the requirements to the government for tracking. Problem report corrections and patch development cycles are conducted IAW the Software Development Methodology.

e. Human Factors Engineering, Heuristics and Usability Studies will be continually performed on the DCGS-A system.

At the end of each release, the software shall be placed under Configuration Management control.

restrictions. Thus, the Data/Software Rights Assertions table may include technical data and software items that are provided to the Government with an "unlimited rights" license. In the Offeror's identification of technical data and software license rights, the Offeror shall use the prescribed categories of license rights referenced in DFARS 252.227-7014 and DFARS 252.227-7015 (e.g. "Limited Rights", Government Purpose Rights", "Unlimited Rights", "Unrestricted Rights", or "Commercial Software License Agreement").

If any license restrictions are proposed, the Offeror shall explain how such license restrictions placed on software deliverables will impact the Government's ability to competitively procure software maintenance/sustainment support and services from third parties, particularly in instances where the Government will be provided "Restricted Rights" in software deliverables or other license restrictions (such as restrictions in commercial software license agreements).

## 3.5 DCGS-A SYSTEM PLATFORM INTEGRATION

### 3.5.1 SOFTWARE BASELINE INTEGRATION AND TEST

The Contractor shall conduct a software engineering test program documented in the Software Test Plan (STP) and submit the STP to the Government for approval prior to commencement of the test program. The STP shall include the planning for testing with external systems to verify the Interoperability requirements and the planning of iterative SCR Regression tests.

The Contractor shall perform the tests for all components and threads. The Contractor shall perform the software baseline integration and test activities for the DCGS-A Increment 2. System integration and test shall include verification of external interfaces as specified in the SV-6 approved after the PDR.

The Contractor shall perform a software performance test and the stability assessments in accordance with the Test Plan. The Contractor shall test selected builds of the integrated system to ensure adequate resource utilization and performance. Results shall be provided in a Performance Assessment Report (PAR).

The Contractor shall support the User Jury assessment events by the Government with the target software baseline for user feedback on the operational capabilities. The output of this effort will generate SCRs, SPRs, and/or Requirements Change Requests (RCRs) that will follow the normal engineering change processes. The Contractor shall plan for up to two User Jury events for each of the Increment 2 releases.

The contractor shall possess an in-house capability for classified development and storage on a closed internal network without having to access Government classified networks. Integration

engineering efforts shall be conducted at Aberdeen Proving Ground, MD unless otherwise directed by the Government.
See CDRL DI-IPSC-81438A, A011

### 3.5.2 CERTIFICATION, SECURITY ACCREDITATION, TESTING AND AUDIT

The Contractor shall support Information Assurance certification accreditation testing for all security networks. The Contractor shall prepare and validate the Certification Test and Evaluation / Security Test and Evaluation (CT&E/ST&E) test procedures for each security enclave in dry run and with Designated Accreditation Authority (DAA) certifying representatives.

The Contractor shall develop system CT&E/ST&E documentation and test procedures for each security enclave and Cross Domain Solution devices in concert with ongoing accreditation processes.

The Contractor shall support site accreditation support at the designated OT&E locations and test events directed by the Government.

### 3.5.2.1 Information Assurance Scan

The Contractor shall perform and support all Information Assurance Scans as required by DoD/AR policies.

### 3.5.2.2 Formal Qualification Test (FQT)

The Contractor shall conduct an FQT for the Increment 2 software baseline release to verify the baseline operational capabilities and the compliance with the PBS, SRS and IRS. The Contractor shall provide a Test Plan for the FQT with a detailed test execution planning and test requirements.

The Contractor will apply best efforts to combine the FQT with the Functional Configuration Audit (FCA). The Contractor shall develop traceability from the DCGS-A Increment 2 PBS to the Verification and Cross-Reference Matrix (VCRM) to ensure that the completeness of the FQT is maintained with the FCA.

The Contractor shall prepare the test cases, test procedures and mission threads required for the execution on the FQT. The FQT Test Plan shall be provided to the Government for approval 30 days prior the start of the FQT.

The Contractor shall document the FQT results in a Test Report no later 30 days from the completion of the FQT event.

The Contractor shall provide hands-on validation opportunity to the Government on selected test procedures during the Contractor's Dry Runs.

The Contractor shall conduct a Test Readiness Review (TRR) at least 7 days prior to FQT. The TRR shall be performed in accordance with Government approved entrance and exit criteria. At a minimum, the TRR shall provide metrics (to be agreed to by the Government), overview of the test environment, conduct, requirements traceability, and test constraints or limitation.

The Contractor shall conduct the FQT on the DCGS-A target platform configurations. The FQT shall include requirements verification (including performance testing), interoperability/interface testing (as documented in the Interoperability/Interface Test Plan Appendix to the System Test Plan (STP)), system stability and system-level thread testing.

The Contractor shall use actual and simulated test data for all FQT testing. The Contractor shall ensure repeatability by using the same test data sets.

The Contractor shall establish and maintain a core test data set for performance measurements and benchmarks. The Contractor shall establish and maintain a test data set as required for all information requirements including sensors for the DCGS-A Increment 2 as specified in the SV-6.

The Contractor shall ensure the FQT meets the combined CT/DT Government requirements should the Government decide to use the FQT as a Government Developmental Test Event See CDRL DI-MISC-80711A, B023

### 3.5.2.3 Reserved

## 3.6 TEST EVENTS SUPPORT

### 3.6.1 OPERATIONAL TEST AND EVALUATION (OT&E) SUPPORT

The Contractor shall provide support to the Government in preparing the DCGS-A Increment 2 Release for the required OTE events as well as any additional releases as required.

### 3.6.2 NETWORK INTEGRATION EVENT (NIE) AND EXERCISE SUPPORT

The Contractor shall support the Government in conducting NIE and exercises such as Enterprise Challenge or Joint Field Exercise as required by the Government.

A1125
Protected Information and/or Legends Redacted

### 3.6.3 ARMY INTEROPERABILITY CERTIFICATION (AIC) TESTING SUPPORT

The Contractor shall support the AIC test events at CTSF for the required Capability Sets certification. The Contractor shall resolve any discrepancies that occurred during the CTSF tests and provide resolution within the CTSF AIC schedule.

### 3.6.4 JOINT INTEROPERABILITY TEST CENTER (JITC) JOINT CERTIFICATION TESTING EVENTS

The Contractor shall support the JITC Joint Certification test events required for the Increment 2 Releases. Test locations for the Joint Certification will be specified by the Government . The Contractor shall resolve any discrepancies, which occur during the JITC test events.

## 3.7 CYBER SECURITY

Building cybersecurity into the system early and throughout the lifecycle will ensure that operational cybersecurity risks are sufficiently mitigated throughout the acquisition process. *DoD I 8500.01, Cybersecurity*, states, "Cybersecurity must be fully integrated into system life cycles so that it will be a visible element of organizational, joint, and DoD Component architectures, capability identification and development processes, integrated testing, information technology portfolios, acquisition, operational readiness assessments, supply chain risk management, System Security Engineering, and operations and maintenance activities."

DoD cybersecurity policy as implemented through the RMF process is based on the application of security controls, the selection and implementation of which are based on cybersecurity risk assessments conducted throughout the system lifecycle. A security control is "a safeguard or countermeasure prescribed for an information system or an organization designed to protect the confidentiality, integrity, and availability of its information and to meet a set of defined security requirements."

The contractor shall design and develop the product that meets the requirements of DoD I 8500.01, Cybersecurity, DODI 8510.01, Risk Management Framework (RMF), applicable DISA Security Technical Implementation Guides (STIGs), Intelligence Community Directive (ICD) 503, Intelligence Community Information Technology Systems Security Risk Management, Certification and Accreditation, National Institute of Standards and Technology (NIST) Special Publication 800-37, "Guide for Applying the Risk Management Framework to Federal Information Systems", NIST 800-53, Revision 4, Security and Privacy Controls for Federal Information Systems and Organizations and Army Regulation (AR) 25-2, Information Assurance/Cybersecurity in order to fully integrate Cybersecurity into the program, processes, and products throughout the program lifecycle.

Protected Information
and/or Legends Redacted

The security control selection process shall be governed by applicable baselines and overlays, including CNSSI No. 1253 Security Categorization and Control Selection for National Security Systems and CNSSI No.1253F, Attachment 5 for Classified Information Overlay.

The Contractor shall be staffed with security certified personnel such as Certified Information System Security Professional (CISSP) certified Information Systems Security Engineer (ISSE) dedicated to the program to support all the Security Engineering activities required for the Security Certification and Accreditation tasks for the DCGS-A Increment 2 system configurations.

The contractor shall create a Data Governance Plan to help ensure confidentiality, integrity, and availability of the data by reducing data security risks due to unauthorized access or misuse of data. The Data Governance Plan shall address the contractors approach to data and information management formalized as a set of policies and procedures that encompass the full life cycle of data, from acquisition to use and disposal. This includes establishing decision-making authority, policies, procedures, and standards regarding data security and protection, data inventories, content and records management, data quality control, data access, data security and risk management, data sharing and dissemination, as well as ongoing compliance monitoring of all the above-mentioned activities.

The plan will include:

- protection of sensitive data;
- vulnerability assessment and risk management;
- enforcement of legal, regulatory, contractual, and architectural compliance requirements;
- identification of stakeholders, their roles and responsibilities; and
- access management.

### 3.7.1 DESIGN CONSIDERATIONS

### 3.7.1.1 System Security

The contractor shall incorporate all security features as required by the DCGS-A Information System Capability Development Document (IS CDD).

The contractor shall support the process of mapping and allocating Cybersecurity requirements to the hardware and software design for the system as part of the overall system development process and to support test and evaluation planning.

The contractor shall identify potential threats and vulnerabilities of the developing system from Cybersecurity risk perspective and characterize the attack surface before performing component and system integration testing.

Protected Information and/or Legends Redacted

The contractor shall perform Security Vulnerability Analysis to provide results of contractor's efforts to quantitatively and qualitatively define system security functional requirements and residual clandestine vulnerabilities. The analysis shall be classified no lower than SECRET NOFORN.

See DI-MISC-80841, C014

The contractor shall provide the Vulnerability Scan Compliance (VSC) Report, for use by the government to assess the security vulnerability and residual risks of the system software build.

See DI-MGMT-81842, C015

The contractor shall complete the detailed build-to design of the system, ensuring that all required cybersecurity requirements are included, mapped, and allocated to the hardware and software design.

The contractor shall employ DoD-evaluated and certified/approved products, this includes using hardware from the Defense Information Systems Agency (DISA) Unified Capabilities (UC) Approved Products List (APL), and software that has undergone National Information Assurance Partnership (NIAP) evaluation and has been published on the Approved Products Compliance List (APCL).

The contractor shall demonstrate during Critical Design Review (CDR) the adequacy of the system design to meet the system requirements, including Cybersecurity, and readiness to begin developmental prototype hardware fabrication and/or software coding with acceptable risk.

The contractor shall conduct self-assessment or support Cybersecurity penetration testing based on the system Cyber Attack Surface during the development phase in order to prepare the system for formal Developmental Test & Evaluation (DT&E) and support Program Protection Plan requirement.

## 3.7.1.2 Security Technical Implementation Guides (STIGs)

The contractor shall implement STIGs within 30 days from release of a new DISA STIG. Where an update cannot be technically applied due to system functionality, that STIG item shall be documented in the classified system Plan of Action & Milestone (POA&M) with appropriate mitigations. If an update cannot be applied within 30 days, the contractor shall provide a milestone schedule in the POA&M item for application for Government approval.

## 3.7.1.3 Information Assurance Vulnerability Alert (IAVAs)/Security Patches

The contractor shall incorporate all applicable IAVAs and vendor security patches to the baseline of the system in a timely manner during the entire contract period.

Protected Information and/or Legends Redacted

### 3.7.2 CYBERSECURITY DOCUMENTATION

The contractor shall provide all applicable accreditation documents to support Secret and below systems accreditation per DODI 8510.01, Risk Management Framework (RMF) and approval authority requirements.

The contractor shall provide all applicable accreditation documents to support Top Secret and Cross Domain Solution components per Intelligence Community Directive (ICD) 503 and approval authority requirements.

During development, the contractor shall develop and provide all IA and IA-Enabled software application Cybersecurity Certification Test Procedure (CTP) or Hardening Guide along with system CTPs as part of accreditation documents to support Cybersecurity certification process.

The contractor shall ensure the decomposed component specifications, with inherent cybersecurity requirements, are fully defined, including verification criteria, and traced to the security controls documented in the Security Plan.

### 3.7.3 (CYBERSECURITY) CERTIFICATIONS AND ACCREDITATION

The contractor shall address all identified Cybersecurity concern/issues during the period of the contract so that system can meet accreditation requirements and to achieve all necessary IATT and ATO approvals to meet program schedule.

The contractor shall follow DoDI 8500.01 and DoDI 8510.01 guidance for Secret and below accreditation requirement.

The contractor shall follow ICD 503 guidance for Top Secret and Cross Domain Solution accreditation requirement.

## 3.8 INTEGRATED LOGISTICS SUPPORT (ILS)

The following efforts for logistics, training and support are limited to the technical support that the Government requires the software developer to provide for logistics support. This support would be technical services, documentation and data to assist with the development of documentation and training as well as assist with the initial training for logistics developers, field support and help desk personnel, as required. This is necessary to ensure the development of adequate documentation/training and provide required field support for any DCGS-A software that is developed under this effort and fielded to the Army. In addition, utilize the Supportability Analysis (SA) per AR 700-127 Integrated Product Support, 7 October 2014, system approach which permits

Protected Information and/or Legends Redacted

timely identification of SA design guides needed to influence the DCGS-A software design for supportability. The contractor software design engineers shall optimize the design performance within SA constraints and minimize any design risk that could create a supportability problem.

The contractor shall provide Post Development Software Support (PDSS) for up to, but not to exceed two (2) years post software release, which consists of Field Support Engineer/Interim Contractor Support to allow for patching/IAVA/Hot Fix support during test and sustainment of the SW until it is successfully transitioned into formal Post Production Sustainment Support (PPSS).

The following paragraphs are representative of the tasks that may be issued in accordance with this PWS paragraph or under a specific Task Order.

The Contractor shall develop, deliver, and facilitate required logistics support and products for the DCGS-A Increment 2 Program. The Contractor shall conduct, support and facilitate verification and validation of all ILS products.

The Contractor shall maintain an ILS program as an element of this overall effort. The ILS elements specified for this area are:

    a. Training
    b. Technical Manuals or User Manuals
    c. ILS Planning
    d. ILS Engineering
    e. Logistics Demonstrations
    f. Supply Support
    g. Safety Assessment
    h. Field Service Engineer
    i. Item Unique Identification (IUID)

## 3.8.1 SUPPLY SUPPORT

The Contractor shall provide all supply support activities as it relates to developing and integrating, the DCGS-A platform configurations.

## 3.8.2 LOGISTICS SUPPORT ANALYSES (LSA)

The Contractor shall provide data/information to support Logistics Support Analyses (LSA) development in the Government format for the DCGS-A Increment 2 baselines to ensure that supportability requirements are incorporated into the ILS program and provide Logistics Support Analysis Plan. See CDRL DI-ILSS-80531, C010.

*3.8.3 TRAINING*

### 3.8.3.1 New Equipment Training (NET)

The Contractor shall complete development of the NET materials. The Contractor shall validate the NET material in accordance with the IMS, prior to the Instructor Key Personnel Training (IKPT) and training material certification. The NET materials shall be developed to the Training & Doctrine Command (TRADOC) 350-70 standard.

The Contractor shall develop and update the DCGS-A Increment 2 Gross Task List. Common MOS specific tasks will be identified at a high level, as required based on requirements changes, and shall enter the new or revised critical tasks into Army Training Development Capability (TDC). Training should be developed in accordance with DI-SESS-81523C Training Conduct Support Document. The training material shall include Lesson Plans, Visual Aids, and Training Guides.

The Contractor shall develop all Lesson Plans for the DCGS-A Increment 2. Existing Program of Record Training materials that are currently in TDC shall be leveraged to the fullest extent possible. The Contractor shall validate the Training Support Package (TSP) and make it available to the Government for verification.

See CDRL DI-SESS-81523C, C011.

### 3.8.3.2 On-Line Help

The Contractor shall develop an On-Line Help capability

### 3.8.3.3 Training Certifications

The Contractor shall support the government certification of the DCGS-A Increment 2 Training Support Packages with one (1) Subject Matter Expert per Intelligence domain for the duration of the domain program of instruction. The contractor shall support government validation & verification of all training support packages.

### 3.8.3.4 Instructional Media Package

The contractor shall utilize the instructional media design package findings, and conclusions to support the Interactive Multimedia Instruction (IMI) development. When IMI is identified as a training solution, the system training data products shall be SCORM 2004, 3rd edition compliant for

Protected Information and/or Legends Redacted

both content and the targeted Learning Management system to ensure that they are interoperable, accessible, reusable, playable, and durable.

This training data product shall provide specific data necessary to support the transfer of knowledge, skills, and aptitudes by use of instructional media. The Government will conduct an acceptance review of the final courseware to include all lessons/modules, tests, assessments, and exercises to verify SCORM 2004 3rd edition compliance and proper courseware functioning to include proper implementation of the instructional strategy on the targeted ALMS. The contractor shall validate all courseware online prior to final acceptance by the Government. This includes: test validation, content validation and educational (that is, group Trials) validation in accordance TRADOC Pam 350-70-10 and the identified criticality standard for each TLO in the courseware. The Government will provide the subject matter experts (SME) needed for content validation and test validation and the target audience for the individual and group trials.

See DI-SESS-81526CB, C012

### 3.8.4 TECHNICAL MANUALS

The Contractor shall provide a complete Software User Manual (SUM) IAW MIL-STD-40051-1B (IETM based manuals) and MIL-STD-40051-2B (page-based manuals) that will support NET, Maintainer and System Administration training development. The interactive SUM shall leverage whenever possible, previously existing Technical Manuals supporting DCGS-A and related systems.

See CDRL DI-IPSC-81443A, C001

### 3.8.5 TECHNICAL SUPPORT

The contractor shall provide technical support services to/for:

a. FSE/ICS Technical Support to the user during SW transition period(s).
b. The field support prime contractor, as designated by the Government.

The contractor shall provide technical support services to include, but is not limited to, participating in meetings, teleconferences, traveling to Government or other locations, and/or conducting engineering or technical analyses of reported problems.

### 3.8.6 DATA PRODUCTS IN SUPPORT OF LOGISTICS DEVELOPMENT

**A1132**

Appx11132

Protected Information and/or Legends Redacted

### 3.8.6.1 Source Documentation

The contractor shall provide source documentation for each DCGS-A INC 2 SW release that will enable the production of system administration and system user manuals for each DCGS-A INC 2 SW release. The source documentation provided by this contract will be provided through the Government to third party contractors for production and integration into SW technical manuals under separate contract vehicles. Existing data as well as the delta data shall be used to update existing documentation where applicable. The contractor shall use as much existing data as possible to create the documentation.

See CDRL DI-IPSC-81443A, C001 and CDRL DI-MISC-80711A, C017

### 3.8.6.2 Field Support Technical Manuals

The contractor shall produce an interactive Field Support Technical Manual for each DCGS-A INC 2 SW release that will identify and document system level troubleshooting, maintenance, and system administration. This document will provide advanced subject matter expertise material required for Field Support personnel to assist in the installation, configuration, operation and administration of the DCGS-A SW in the tactical environment. Existing data as well as the delta data shall be used to update existing manuals where applicable. The contractor shall use as much existing data as possible to create the manuals.

See CDRL DI-MISC-80711A, C003

### 3.8.6.3 Subject Matter Expert Support

The contractor shall provide subject matter expertise in support of DCGS-A INC 2 SW to a limited number of Field Support and Trainer Personnel. The contractor shall develop a Program of Instruction POI to support this effort. The POI shall contain a course outline that depicts the training sequence of all learning objectives, Learning Step/Activities, and supporting Skills/Knowledge. The POI shall also indicate the Individual Tasks trained within each course of instruction. The POI will be used to do initial training for a limited number of FSRs and senior trainers, and used by the government to expand the knowledge base across the field support team. The contractor is not expected to provide training for the entire field support team, but provide this POI as a "train the trainer" type product.

In conjunction with the "train the trainer" activities, the contractor shall provide subject matter expertise that will support the production of a training repository and library components for the DCGS-A INC 2 Master Repository that coincides with each major DCGS-A INC 2 SW release. This support will include interaction with Field Support and Senior Training personnel and may include

Protected Information
and/or Legends Redacted

development of SW components that will be submitted to the government as part of the DCGS-A INC 2 SW release or included as an update to a release. The government will coordinate the required meetings and facilitate any interactions with 3rd party contractors as required.  Any necessary data from training products being produced by third party contractors shall be provided by the Government to the Contractor as source data.

### 3.8.7. *FIELD SUPPORT*

### 3.8.7.1 Post Fielding Support

The contractor shall provide technical support services, information and data relative to the software developed under this contract to assist with the train up of FSRs to support the initial deployment and sustainment of software developed under this contract.  This support would also include initial train-the-trainer support for FSRs for any new software releases and technical support for the initial fielding of the software at either a CONUS or OCONUS location as requested by the Government.

### 3.8.7.2 Contingency Deployment Support

The contractor shall be prepared to provide technical support for the initial deployment of new DCGS-A INC 2 software capabilities to Army units in theaters of operation.  This support would include both 24/7 reach back support for deployment teams as well as limited deployment of technical support personnel to assist deployment support teams with the initial fielding of software in theater.

### 3.8.7.3 CONUS Help Desk Support

The contractor will provide support to the DCGS-A help desk operations established by the government.  As directed, the contractor will either be requested to provide personnel to operate a CONUS based help desk at a facility located in the continental US or to provide technical assistance to the Government in addressing help desk trouble tickets that are submitted by DCGS-A users.

### 3.8.8 *ILS PLANNING*

The Contractor shall have an ILS Manager, responsible directly to the Program Manager/Product Support Manager, to serve as the single point of contact for the Government and the Contractor in all ILS matters.

### 3.8.9 *RESERVED*

### *3.8.10 DEMONSTRATIONS*

### 3.8.10.1 Maintenance and Logistics Demonstrations

The Contractor shall update the Maintenance Demonstration Plan and conduct a Maintenance Demonstration (MD).

The Contractor shall support a Logistics Demonstration (LD) IAW AR-700-127 to evaluate the elements of Logistics required to support the DCGS-A Increment 2 supportability elements.

The Contractor shall incorporate all red-lines identified during the MD and LD into the logistics documentation.

### *3.8.11 RELIABILITY, AVAILABILITY AND MAINTAINABILITY (RAM) ENGINEERING*

### 3.8.11.1 RAM Engineering Framework

The RAM engineering processes establish the framework for a closed-loop failure mode mitigation software reliability program. The main purpose is to ensure reliability system maturation and achievement of the program's objectives and to establish a feasible path to demonstrate system-level reliability requirements with statistical confidence. The Contractor shall create, follow and flow down RAM requirements to any Subcontractor(s)/Supplier(s).

### 3.8.11.2 RAM Lead

The Contractor will nominate a RAM Lead to coordinate RAM efforts.

### 3.8.11.3 RAM Program Plan (RPP)

The Contractor shall develop and submit for Government approval a RAM Program Plan (RPP) as a comprehensive compendium of the system's RAM activities, functions, processes, test strategies, measurements, data collections, resources, and timelines required to ensure that the specified reliability of the system will be achieved before fielding (or as planned).
See CDRL DI-SESS-81613A, C007

A1135
Protected Information
and/or Legends Redacted

### 3.8.11.4  System Software Reliability Model (SSRM)

The Contractor shall develop a System Software Reliability Model (SSRM) using operational workflows and user tasks.  All required software, data architecture, databases, etc. shall be mapped to the SSRM.  The SSRM shall encompass all software and non-software items, including, but not limited to: Commercial Off-the-Shelf (COTS), Non-Developmental Software Items (NDSI), Government Furnished Software (GFS) and human computer interface issues.
See CDRL DI-SESS-81613A, C007

### 3.8.11.5 System Software Reliability Model (SSRM) Risk Assessment

The Contractor shall perform a risk assessment using the SSRM and identify critical system weaknesses in the system design after any major changes to the baseline are completed.  Critical items are defined as those items whose inoperability impacts mission completion, essential functions, or safety; or items whose failure rates contribute significantly to the overall system degradation.  The assessment shall identify low, medium, and high-risk critical tasks. The assessment can be based on the following methods: (1) reliability analysis from comparable software; (2) historical reliability from systems with similar software complexity; or (3) documented subject matter expert engineering estimation. The Contractor shall provide a table with all items contributing to critical weaknesses using the SSRM.  Each SSRM element shall include risk criteria based upon the following guidance:

   a) Low Risk – Test data or reliability analysis of comparable systems (under similar operating conditions)

   b) Medium Risk – Historical reliability of systems of similar software complexity, test data, or reliability analysis of comparable systems (not under similar conditions)

   c) High Risk – Subject Matter Expert (SME) engineering estimates

### 3.8.11.6  Mitigation Plans

The Contractor shall develop a plan to mitigate all critical items rated as high or medium risk. Mitigation plans may include additional testing, redesign, etc. The Contractor shall prepare and provide risk mitigation plans and Risk Management Status Reports to the Government.

See CDRL DI-MGMT-81809, B019

### 3.8.11.7  Failure Mode Analysis

The Contractor shall identify, confirm, and mitigate the critical failure modes (through modeling, analysis, and test) that will result when requirements are imposed.  The Contractor shall start to

A1136
Protected Information
and/or Legends Redacted

identify the failure modes immediately upon contract award and continue to identify and analyze failure modes throughout the system's life cycle. Failure modes that may be induced by user or maintainer error shall be identified and confirmed through analysis or test. When applicable, the Contractor shall use, at a minimum, Failure Modes and Effects Analysis (FMEA) and software analytical tools (e.g. dynamic test methods, static analysis and debugging.)
See CDRL DI-SESS-80980A, C002

### 3.8.11.8 Failure Reporting, Analysis, and Corrective Action System (FRACAS)

The Contractor shall establish and utilize a closed-loop Failure Reporting, Analysis, and Corrective Action System (FRACAS) as its mechanism for monitoring and communicating descriptions of: test and field failures, analyses of failure modes and root cause failure modes, the status of design and/or process corrective actions, risk-mitigation decisions, the effectiveness of corrective actions, and lessons learned. The Contractor shall address all failure modes found within the software architecture, to include, but not limited to, COTS, NDIS, GFS, and non-software items as applicable. The FRACAS shall include all failure modes, from initial modeling and analysis through the fielding of the system. The Contractor shall address and mitigate failure modes in a timely manner, consistent with their impact on reliability, performance, priority level and total life cycle cost. The Contractor shall mitigate failure modes to ensure that reliability requirements are met, and reliability does not degrade with each software upgrade. The Contractor shall provide the Government with Failure Analysis and Corrective Action Reports (FACAR). See MIL-HDBK-2155 and CDRL DI-SESS-81315B, C013

### 3.8.11.9 Software Reliability Evaluations

The Contractor shall perform software reliability evaluations on data from analysis, modeling, test, and the field. The Contractor shall track the evaluations as a function of time (and/or configuration) and compare them against the system and software reliability allocations, requirements, metrics, and values to be achieved at various points during development and deployment to verify the implementation of corrective actions.

### 3.8.11.10 Software Quality Maturity Plan

The Contractor shall develop and implement a software quality maturity plan. The Contractor shall provide, at a minimum; (1) planned test events where quality and reliability data will be collected, (2) planned corrective action period(s), (3) planned capability drops and the effect on quality and reliability, (4) planned degradation due to test environment and scalability, and (5) software quality and reliability goals. The Contractor and Government will review and update the plan to account for any impact due to Government directed changes. The Contractor shall: (1) incorporate reliability activities as an integral part of disciplined and documented systems engineering process and plan, (2) manage and control reliability critical items, and (3) coordinate all reliability activities and findings with the system's design team."

Protected Information and/or Legends Redacted

### 3.8.11.11  Software Reliability Qualification Test

The Contractor shall conduct a Software Reliability Qualification Test as part of Qualification Testing to verify continued compliance with the system's reliability requirement.  Demonstration of reliability compliance following institution of corrective actions shall be conducted by the Contractor at no additional expense to the Government. The scope of this event and subsequent demonstrations shall be determined by the contractor and government.

### 3.8.11.12  Technical Interchanges

The Contractor shall conduct technical interchanges with the Government.  These technical reviews will be scheduled as part of the Integrated Master Plan/Master Schedule.  The Contractor shall support the Government-conducted failure reviews and assessment conferences.  The Contractor shall provide the reliability test results in a written report within 30 days of completion of each reliability test.  The report shall be in Contractor format and shall include, but not be limited to, a test summary, test description, identification of item(s) under test, test group number, performance requirements, measured values taken during the test, conclusions, and Test Incident Reports (TIRs), Help Desk Tickets, or other applicable incident documents.

### 3.8.11.13  Software Configuration Management (SCM)

The Contractor shall implement Software Configuration Management (SCM). SCM provides baseline identification for developing and released software products; provides a snapshot of dynamically changing software; tracks concurrent modification of items (i.e. modules); ensure the orderly release and implementation of new or revised software products. The Contractor shall at least perform the basic SCM functions:  (1) configuration identification, (2) configuration control (change control), (3) configuration status accounting, (4) audits and reviews and (5) release processing.

### 3.8.11.14  Reliability and Maintainability Analysis

The Contractor shall conduct a Reliability and Maintainability analysis on the DCGS-A Increment 2 software baseline release in conjunction with the PDR and CDR.  The Reliability analysis shall account for software reliability.

### 3.8.12  PURCHASE OF EQUIPMENT, MATERIAL OR SUPPLIES

The contractor shall obtain prior written authorization and approval from the COR or KO as applicable for any equipment, material or supplies purchased to support the performance of any detailed requirement under this contract.  The contractor shall purchase all Information Technology (IT) software and equipment from the Computer Hardware, Enterprise Software Solutions (CHESS) contract.  If IT items are not available via a purchase from CHESS, a CHESS "Statement of Non-

A1138
Protected Information and/or Legends Redacted

Availability" and Goal 1 Waiver (https://adminapps.hqda.pentagon.mil/akmg1w/index.html) shall be obtained before making purchases within the commercial market. When making purchases the contractor shall receive at least three quotes or a sole-source justification for those purchases that can only be acquired from one supplier. All quotes or justifications shall be provided to the Contracting Officer (KO) or the Contracting Officers Representative (COR) for approval. Approvals shall be obtained prior to making any purchases. The contractor shall be liable for any purchases made without KO or COR approval.

### 3.8.13 MAINTENANCE

The Contractor shall provide all supply support activities as it relates to developing, integrating, maintaining, and operating the DCGS-A platform configurations.

The Contractor shall provide proper care and housing of all GFE provided under this POP and all GFE provided from prior contracts. In the event that the GFE requires maintenance or becomes inoperable, the Contractor shall notify the Government IPT lead and provide recommendations and a cost estimate for maintaining, repairing or replacing the GFE.

#### 3.8.13.1  Field Service Engineer (FSE)

The Contractor shall provide FSE/ICS to support DCGS-A Increment 2 releases during demonstration and testing activities as directed by the Government.

### 3.8.14 ITEM UNIQUE IDENTIFICATION (IUID)

The Contractor shall comply with the requirements of FAR 52.245-1 for all Government Property furnished to the contractor. The requirements include the management, control, caretaking and reporting of the Government Property.

The Contractor shall comply with the Item Identification requirements of DFARS 252.211-7003 as they apply to all hardware deliverables, end items and spares, on this contract. Requirements include uniquely marking and registering with DoD IUID Registry of all qualifying hardware deliverables.

The Contractor shall comply with the Item Unique Identification requirements of DFARS 252.211-7007 as they apply to Government Property in possession of the contractor. Requirements include uniquely marking and registering with DoD IUID Registry of all qualifying Government Property in possession of contractor not already so marked.

## 3.9 CONFIGURATION MANAGEMENT

Protected Information
and/or Legends Redacted



A1229

Protected Information
and/or Legends Redacted

**Section A – Supplement Information**

EXECUTIVE SUMMARY

**A-1 This Task Order (TO)(0001):** is a Cost-Reimbursement action that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to target cost.

The Target Cost, Target Fee, Maximum Fee and adjustment formula are negotiated initially. After contract performance, the fee payable is determined in accordance with the formula. The formula provides, (within limits), for increase in fee above the target fee when the total allowable costs are less than the target costs, and a decrease in fee below target fee.

The provision for increase or decrease in fee is intended to provide an incentive for maximum effort on the part of the contractor to manage the contract effectively. When total allowable cost is greater or less than the range of costs within which the fee adjustment formula operates, the contractor is paid the total allowable costs in addition to the minimum or maximum fee.

**A-2 Task Order 0001 Incentive Arrangement:** TO 0001 is a multiple incentive arrangement, comprised of multiple incentives for each CLIN. The order will utilize an incentive pool structure for each CLIN. Each CLIN comprises of a Performance and Cost/Price incentive. The Performance incentive amounts to 60% of each CLIN's incentive pool's total, with the Cost/Price amounting to 40% of each CLIN's incentive pool's total.

**A-3 Establishing the Payable Fee (Performance Incentive):** The Performance Incentive for each CLIN shall be proposed, negotiated and agreed upon as a process of awarding TO 0001. The contractor's final adjusted performance fee incentive will be reduced by 10% for each Priority 1 and Priority 2 SW anomaly (as defined in Task Order 0001 PWS paragraph 3.6.13) discovered during each identified testing event.  The Performance Incentive Fee will be disbursed incrementally based on number of Priority 1 or Priority 2 anomalies discovered during one of the four (4) identified test events, in accordance with the approved Integrated Master Schedule as required by Task Order 0001 PWS paragraph 3.1.3, in the percentages described below:

| Test Event | % of Performance Incentive Pool Disbursed |
|---|---|
| Initial Delivery of Data Management Architecture Software | 50 |
| Government Acceptance Test | 20 |
| Developmental Test | 20 |
| Operational test | 10 |

**A-4 Establishing the Payable Fee (Cost/Price Incentive):**  The Cost/Price Incentive for each CLIN shall be proposed, negotiated and agreed upon as a process of awarding TO 0001. Upon the completion of TO 0001 actual costs will be compared with the target costs. Overruns and underruns result in adjustment of the fee according to the determined sharing formulas established in 52.216-10. The adjustment amount must fall within the agreed maximum and minimum fee levels. The fee adjustment amount shall equal the target cost subtract the final cost multiplied by the contractor's percentage of cost risk. The final fee shall amount to the fee adjustment plus the target fee. The final

A1294

Protected Information and/or Legends Redacted

fee is subject to the minimum and maximum fees. If the final fee is less than the minimum fee, the minimum fee becomes the final fee. If the final fee is more than the maximum fee, the maximum fee becomes the final fee.

**A-5 Final Task Order 0001 Price:** The final TO is the final cost plus final fee (for both CLINs) equals final TO price.

2

Protected Information and/or Legends Redacted

Section B – Supplies or services and prices/costs

| ITEM NO | SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | **Data Management Architecture**<br>Cost Plus Incentive Fee (CPIF)<br><br>The work performed under this CLIN shall be IAW all Task Order 0001 PWS paragraphs with the exception of paragraph 3.2.27 (CI HUMINT),  and paragraph 5 (Travel)<br><br>CLIN 0001 shall include a Performance and Cost/Price multiple incentive structure.<br><br>**CLIN 0001 Incentive Pool:**<br>Performance: 60%<br>Cost/Price: 40%<br><br>Target Cost: Proposed<br>Target Fee: Proposed<br>Minimum Fee: 0%<br>Maximum Fee: 13%<br><br>**CLIN 0001 Performance Incentive Factor:**<br>100% incentive fee earned upon the successful delivery of Data Management Architecture software with Zero 1 or 2 priority anomalies.<br><br>Software 1 & 2 priority anomalies are defined IAW Task Order 0001 PWS Section 3.6.13<br><br>The final Performance Incentive fee shall be reduced by 10% for each priority 1 or 2 anomalies discovered during each test event as defined in section A-3.<br><br>**CLIN 0001 Cost Incentive Factor:**<br><br>Share ratio as stated in 52.216-10.<br><br>**Inspection and Acceptance:**<br>In accordance with  section E<br><br>**Deliveries or Performance:**<br>The period of performance shall be 36 months from the date of contract award. |  |  | Target Cost:<br>Target Fee: | $ TBD |

A1296

Protected Information and/or Legends Redacted

## 3.2 SYSTEMS DESIGN, ENGINEERING, AND DEVELOPMENT

The contractor shall perform system engineering activities, to include but not limited to, system architecture and design; requirements definition and analysis; interface with external agencies; quantitative and qualitative analysis of system performance and reliability; and support of Army and Joint Interoperability.

The contractor shall provide detailed system design and engineering support to all other functional areas of contract activity (*i.e.* software design/development/integration, test, safety, security, etc.), as required, to ensure that program objectives are met.

The contractor shall provide System Engineering services to support Army exercises such as preparing and verifying data loads and post exercise analysis of issues and enhancements to the DCGS-A INC 2.

The contractor shall support architecture evaluations by the government throughout the contract period of performance.

The following are the system and software design objectives for the DCGS-A INC 2.

- The contractor shall implement a system and software design to support "edge" users (i.e., disconnected, low bandwidth operations) and must emphasize performance, flexibility, supportability, security and extensibility.

- Interfaces shall be designed with a focus on maintainability, extensibility, supportability, performance, reuse, and system security.

- All software shall be designed with an emphasis on reliability, availability, modifiability and maintainability.

- All software shall be designed in such a manner as to minimize or eliminate the usage of proprietary or commercial technologies except where specifically approved by the Government..

- The system architecture shall be flexible to ensure successful implementation of changing requirements and emerging technologies.

- Human factors engineering, analysis, and heuristics shall be used to make changes and enhancements to the common look and feel.

Protected Information and/or Legends Redacted

needed to perform the task, and utilize the latest version of MagicDraw and use of Teamworks Server for collaboration and to electronically verify traceability of enterprise architecture.

The contractor shall design and develop the DCGS-A Increment 2 system architecture that incorporates appropriate considerations for scalability, modular design, reconfigurability, portability, maintainability, support future technology insertion, vendor independence, reusability, and interoperability.

The Contractor shall implement and design the system architecture in a Modular Open Systems Architecture (MOSA) construct for the development of DCGS-A Increment 2.  The Contractor shall apply commercially supported practices in developing the architecture and functional capabilities by using: (1) a layered software approach, (2) products, specifications, and standards that are selected based on performance, cost, and industry acceptance, (3) emphasis on nonproprietary interfaces, (4) long-term availability and supportability, and (5) upgrade potential.  The open architecture will exploit innovation and continuous technology insertion to mitigate obsolescence.  The contractor's architectural approach shall support the rapid and affordable insertion and refreshment of technology through modular design, the use of open standards and open interfaces. The contractor shall define the functional partitioning and the physical modularity of the system to facilitate future replacement of specific subsystems and components without impacting other parts of the system and to encourage third-party vendor's participation.

The contractor shall provide a MOSA plan for evaluation and acceptance that describes the contractor's approach and planning for the Increment 2 system architecture that can adapt to evolving requirements and threats; reduce the development cycle time and total life cycle cost; maintain continued access to cutting edge technologies and products from multiple suppliers; and mitigate the risks associated with: (1) technology obsolescence, (2) being locked into proprietary or vendor-unique technology, and (3) reliance on a single source of supply over the life of the system.

The contractor's design approach shall emphasize the selection of components that are available commercially or within the DoD, to avoid the need to redevelop products that already exist and that can be reused.  The Contractor shall consider reuse of components from the DI2E Storefront.  The contractor shall use the best practice of investigating the DI2E storefront first to identify software candidates for reuse prior to making the decision to develop a capability.  The contractor's rationale shall explicitly address any tradeoffs performed, particularly those that compromise the modular and open nature of the system. The weighted attributes that provide the objective evaluation criteria in the conduct of a software tradeoff for the DI2E storefront or elsewhere shall be provided during various appropriate formal reviews.

The contractor shall conduct an architecture quality attribute assessment where customer and user stakeholders are brought together to assess whether the contractors proposed architecture tradeoffs and architecture qualities meet the customer intent.

The contractor's design approach shall result in modules that have minimal dependencies on other modules (loose coupling), e.g. inserting a new application or component without disrupting the rest

A1327
Protected Information
and/or Legends Redacted

of the system, well defined interfaces and by the absence of implicit data sharing. The purpose is to ensure that any changes to one module will not necessitate extensive changes to other modules, and hence facilitate module replacement and system enhancement.

The contractor shall implement the MOSA Interface Design and Management principle that the Contractor shall:

- Define and document all subsystem and configuration item level interfaces to provide full functional, logical, and physical specifications;

- Identify the interface and data exchange standards between the component, module or system and the interconnectivity or underlying information exchange medium;

- Select external interfaces from existing open or Government standards with an emphasis on enterprise-level interoperability. The contractor shall describe how its selection of interfaces will maximize the ability of the system o easily accommodate technology insertion and facilitate the insertion of alternative or reusable modular system elements.

### 3.2.6 DCGS-A INCREMENT 2 DATA MANAGEMENT ARCHITECTURE REQUIRED CAPABILITIES

The contractor shall develop the DCGS-A Data Management Architecture software baseline with the following capabilities:

### 3.2.6.1 Data Ingress Capability

The contractor shall develop a Data Ingress capability that performs data acquisition and ingestion. This effort shall support external subsystems that enable data harvesting and acquisition. This effort shall support internal subsystems that perform artifact parsing, artifact decomposition and artifact knowledge extraction based on predefined data models.

### 3.2.6.2 Data Persistence Ecosystem

The contractor shall develop a Data Persistence Ecosystem that performs data indexing and persistence in a data store appropriate for data's particular characteristics and behavior. The data persistence ecosystem shall, at a minimum, be represented by the following attributes:

1) Data Access - An Application Program Interface (API) layer shall provide standardized/Open APIs to store and retrieve data.

2) Data Stores - Data stores shall provide a means to enable event data, entity relationships and knowledge information to simultaneously coexist.

A1328

Protected Information and/or Legends Redacted

3) Data Persistence – The contractor shall provide a persistence container where all mission data is stored and is the base storage system upon which the data stores reside.

4) Data Semantic Discovery - The contractor shall links together "like-meaning-content" across the data stores to synthesize uniform word/content meaning in support of advanced queries. A shared semantic dictionary shall be used with a mapping capability on ingest to facilitate semantic discovery.

### 3.2.6.3  Data Egress and Visualization Platform

The contractor shall develop a Data Egress and Visualization platform that performs data retrieval while enforcing oversight and compliance policies. The data egress and visualization shall, at a minimum, be represented by the following attributes:

1) Data Access – The contractor shall establish the API layer to store and retrieve data to enable; machine to machine, data interoperability, homo and heterogeneous data exchange; and machine to human, data federation and searching.

2) Data Security – The contractor shall provide user and data authentication and authorization by means of a connected set of external and internal (cell level security) system services to enforce legal oversight and compliance.

3) Web Framework – The contractor shall provide user visualization through a Web-based Framework.

### 3.2.6.4 Data Analytics

The contractor shall develop a system that enables cloud-scale analytics. These analytics shall be able to enable streaming analytics for low latency fast in memory processing and big data batch analytics for petabyte data observations.

### 3.2.6.5 Data Integrity

The contractor shall develop a means to measure and ensure that the data can be trusted.  The data integrity shall, at a minimum, be represented by the following attributes:

1) Data Pedigree – The contractor shall assure that source data is authentic. A record of the ancestry of data as well as metrics of their reliability and confidence shall be computed, stored and tracked.

2) Data Provenance – The contractor shall include the chronology of the ownership of an artifact. All incoming data shall be marked and tracked with a unique identifier  enforced as part of the ingest process.

A1329

Protected Information
and/or Legends Redacted

Data Security – The contractor shall provide data tagging, enforced at ingest and persisted with cell level security.

### 3.2.6.6 Data and User Authorization Services

The contractor shall develop a system that provides the data necessary to support legal oversight and compliance. The system shall separate users and systems from data to deliver content based on legal oversight and compliance policies and provide authentication and authorization (PKI, CRL/OCSP, ABAC, PBAC, etc.).

The contractor shall develop a scalable and extensible architecture for providing PKI revocation information in the full range of operational environments. This architecture shall support operations in DIL environments, provide effective and efficient delivery and maintenance of revocation information (CRL and OCSP) to all potential DCGS-A services and systems that rely on public key enabled (PKE) protocols and services, and provide revocation information from enterprise or tactical sources for human and NPE users.

### 3.2.6.7 Training Materials

The contractor shall prepare the required documentation for training materials.

### 3.2.6.8 Continuous Integration & Delivery

The contractor shall support Continuous Integration & Delivery efforts.

### 3.2.6.9 Software Source Code Delivery

The contractor shall deliver either their full software source code baseline or source code deltas with every delivery. In cases where the government does not own the source code rights (open source, proprietary code), the contractor shall deliver all libraries required for successful creation of executable code.

1) The contractor shall deliver valid build scripts with every delivery.

2) The contractor shall commit source code changes to the PM's Configuration Management repository.

3) The contractor shall maintain a log, which includes comments for any Bugs and describing other changes with every delivery.

4) The contractor shall provide documentation that details their current build environment, build processes and all required software dependencies and versions.

**A1330**

Protected Information
and/or Legends Redacted

### 3.2.27 SINGLE COUNTERINTELLIGENCE (CI) AND HUMAN INTELLIGENCE (HUMINT) SOFTWARE SOLUTION REQUIREMENTS

The contractor shall design and develop a DCGS-A Single CI and HUMINT Software Solution.

The contractor's design approach shall result in a modular architecture that incorporates appropriate considerations for re-configurability, accessibility, flexibility, maintainability, technology insertion, vendor independence, reusability, scalability, and interoperability. Development of the Single CI and HUMINT Software Solution shall be IAW the DCGS-A unified data model.

The contractor shall develop a capability that will provide doctrinally correct collection, reporting, mission support, Source Operations, investigations, and force protection support functions to the CI and HUMINT Warfighter at the tactical and strategic level.

The contractor shall develop a single software application that provides a browser based interface that enables a synchronized online and offline capability.

1) The contractor shall develop an online web-based application to allow full accessibility to the CI and HUMINT solution from any approved network worldwide.

2) The contractor shall build an offline application to allow for collection reporting and mission support to be conducted when no network is available. The application shall properly synchronize with the web-based application to provide an automated transition of intelligence reports and requirements data.

The contractor shall develop an integrated reporting workflow capability, for seamless Automation, standardization, and management of CI and HUMINT operational information, in accordance with DIA and Army policies and regulations.

1) The User Interface shall support the integration of a flexible reporting capability to allow for on-site report updates to remain IAW Defense HUMINT Enterprise Manual (DHEM) standards. The contractor shall develop a bidirectional interface with external National Enterprise CI and HUMINT systems, (i.e. HUMINT On-line Tasking and Reporting (HOT-R), CI HUMINT Requirements and Operations Management Module (CHROME), Cross-Domain Interface Repository (CDIR), Source Operations Management Module (SOMM), and Army Counterintelligence Operations Portal (ACOP)).

The contractor shall develop an integrated Role Based Access Control (RBAC) security function using the provided DCGS-A infrastructure to control user permissions.

**A1342**

Protected Information
and/or Legends Redacted

The contractor shall Design and develop the DCGS-A single CI and HUMINT Software solution with the following capabilities:

1) Create, receive, store, edit, and disseminate CI and HUMINT reports and user defined activity summaries and unit status from any approved network.

2) Manage, assign and synchronize CI and HUMINT requirements and associated Responses to current missions, and provide oversight of metrics on requirements satisfaction, and operational management of CI and HUMINT missions and collection requirements.

3) Asset management capability for CI and HUMINT managers and collectors to conduct an analysis of collection team's mission readiness and coordinate the qualifications and status of personnel (military, civilian, and contractor), vehicles and equipment.

4) Assists CI leadership in tracking and managing case files, Preliminary Credibility Assessment Screening System (PCASS) records, administrative tasking, screenings and investigations.

5) Source Operations capability to create, store, manage, and share Source Dossier data.

6) Computer-assisted interrogation operations capability for CI and HUMINT managers and collectors to screen and manage detainees, schedule, oversee, and report interrogations.

7) Semi-Automated system to submit and manage funds and sub vouchers.

The contractor shall conduct an architecture quality attribute assessment where customer and user stakeholders are brought together to assess whether the contractors proposed Single CI and HUMINT Software Solution architecture qualities meet the customer intent.

## 3.3 SOFTWARE DEVELOPMENT

The contractor shall conduct all software development activities for contractor-developed components IAW this PWS. The contractor must plan and schedule software activities based upon realistic assessments of technical challenges and risks. The contractor must plan, schedule and manage appropriate work activities to accomplish the work, including the activities necessary for the identification and resolution of uncertainty. In performing the effort, the contractor should ensure that the technical and operational requirements are complete and traceable in the software design; and demonstrable during the software development and implementation.

### 3.3.1 SOFTWARE DEVELOPMENT PRINCIPLES AND OBJECTIVES

The contractor shall conduct all software development activities for contractor-developed components. The prime contractor will define the release. Releases should allow for addition and

A1343
Protected Information
and/or Legends Redacted

modification of functionality, schedule, and resources based upon feedback from the customer, the users, Subject Matter Experts (SME), Field Support Representatives (FSR), etc. This results in on-going, integrated risk management activities and an increased likelihood that functionality delivered to the Warfighter will meet the highest priority needs in an exceptional operational manner.

The prime contractor will develop and maintain a "Product Roadmap." This Product Roadmap will define the DCGS-A INC 2 capabilities planned for each release. For each release, the capabilities outlined on the Product Roadmap will be further defined as software functionality and assigned for each iteration in the Release. The planned functionality for each iteration, or Release Objectives, will be available to the Government at the commencement of the iteration, via the contractor's website. Likewise, the actual functionality completed for each iteration will be available at the conclusion of the iteration, via the contractor's website. A compiled planned vs. actual functionality document will be available at the conclusion of the release, via the contractors website. The prime contractor will retain historical records of planned vs. actual functionality per iteration release and release.

During each release, an iterative paradigm of "plan – develop – validate – adjust" will be followed. Stakeholders such as SME's, user representatives and the Government will interact with the contractor identified product owner during backlog grooming in order to prioritize stories to be worked into the release. The resulting prioritized backlog will then be used to define the next release's objective. During release planning, the development team will assess the backlog, in priority order, and determine the size of the effort and what will be achieved during the release. Stretch goals (i.e. lower priority stories that may be worked in the release if time allows) will be established during the planning process. At the end of each release, a showcase of the work performed will be demonstrated to the stakeholders and feedback elicited to ensure the capabilities under development meet objectives. This close interaction between developer and SME benefits the developer, in clearly understanding the problem domain and the unique operational needs of the user based upon the first-hand experience of the integrated User Panel. It is not unusual for "team exercises – opportunities for the warfighters to use the software in simulated but unscripted settings" to be used as part of the process to define a set of development goals; oftentimes CONOPS will evolve as an integral part of this design and development process. Once a sufficient group of stories have been achieved and tested, a release will be delivered. Showcase software may be selected for additional usage by stakeholders. Stakeholders will be provided an instance of the software during the next grooming session with the intent to provide feedback as to whether the functionality successfully provides a key operational capability to the Warfighter. Oftentimes, a mock field exercise will be used to prove out the developed concepts. Based upon the results of the capabilities validation, additional adjustment of the functionality may take place, which will leverage the backlog grooming process to ensure feedback is captured and correctly prioritized in the context of the wider development effort

Each release effort shall include iterative cycles of planning, design, coding, integrating, and testing. Because of the evolutionary nature of this program, the contractor may be developing different software releases concurrently. The contractor shall refine the process as agreed to by the Government. At a minimum, a release development shall include:

    a.  Functionality defined for that release as defined by the Release Objectives.

    b.  A maximization of reuse of GOTS/COTS products.

Each release and version shall consist of field installable, and field de-installable segments.  Each segment shall be developed to allow the government the capability to prototype/test/field the independent segments individually as they are completed if required.  Every software release, version and segment shall be submitted IAW this paragraph and delivered IAW this PWS. The following is a summary of the DCGS-A INC 2 Development Model and Control mechanisms that shall be implemented by the Contractor.

  a.  Each product release builds on the foundation and functionality of the prior release.  These releases are built as planned or in response to events.

  b.  The requirements are defined in the contract and vetted through the User Panel.

  c.  The contractor shall work with the Government to allocate product release objectives into the lower level development cycles.

  d.  The requirements of each cycle are defined by the contractor at the planning session at the start of the cycle. The contractor shall record the requirements defined at the planning sessions in the form of release objectives and send the requirements to the government for tracking. Problem report corrections are conducted IAW the Software Development Methodology.

  e.  Human Factors Engineering, Heuristics and Usability Studies will be continually performed on the DCGS-A system.

At the end of each release, the software shall be placed under Configuration Management control.

  a.  All development products in the cycle shall be stored in the Software Development Folders.

  b.  The contractor shall perform internal unit and integration testing.   As-built requirements, to include performance and stability (established as release objectives), shall be demonstrated at the end of the release.

  c.  Issues discovered with software within a release will be handled by the Contractor's internal problem reporting process.

  d.  Engineering drops within each release may be used for User Panel and integration efforts.  The purpose of providing engineering drops is to gain insight and feedback into the acceptability of particular technical implementation strategies.  The feedback and problem reports associated

A1345
Protected Information
and/or Legends Redacted

The contractor shall progressively improve the supportability of the DCGS-A INC 2 workstation and server components with the objective of minimizing the support staff and support costs necessary to effectively maintain DCGS-A in operation.

DCGS-A shall have an operational availability (Ao) of at least 90% by Full Deployment (FD). Ao is the minimum percentage of time over a 72-hour mission (as delineated in the Operational Mode Summary/Mission Profile (OMS/MP) the system must be fully mission capable. This equates to a Maximum Time To Repair (MaxTTR) of no greater than 60 minutes 90% of the time and an Administrative and Logistics Delay Time (ALDT) no greater than six (6) hours. A fully mission capable system is able to execute all DCGS-A operational essential functions (Net-Ready, Fusion, and Visualization). The initial minimum Ao supports the mission equipment Level 1 percentage requirements assigned to DCGS-A items as derived from AR 220-1, Army Unit Status Reporting. DCGS-A shall build toward a mission reliability of 85% at the conclusion of Increment 2 supporting the missions delineated in the DCGS-A Operational Mode Summary/Mission Profile (OMS/MP).

The following paragraphs are tasks required in accordance with this PWS paragraph.

- Design and implement solutions that minimize the length of time and simplify the process required to back-up and maintain the DCGS-A repository. Solutions will also reduce or remove disruptions to DCGS-A users during scheduled and unscheduled back-ups.

- Automate routine DCGS-A server maintenance tasks, such as repository back up and restoration of back-ups.

- Design and implement software solutions that minimize the need for on-site field support.

- Automate the deployment of new software versions, patches, and hot-fixes. Installations and upgrades will minimize the user actions required to successfully complete the installation or upgrade. Maximize use of standard software installation programs.

- Design, engineer and implement software solutions for new and emerging requirements that support a reduced logistics footprint and increased system supportability.

- Design and implement tools that eliminate the need for field support engineers to administer the system.

- Design and implement tools and capabilities that allow for remote administration and maintenance of DCGS-A enclaves to the greatest extent practicable, including administration and troubleshooting of OCONUS enclaves from CONUS locations.

- Provide an installation that requires minimal user intervention and automates configuration settings, including security settings, to the largest extent possible.

Certification (AIC) testing, testing at the Central Technical Support Facility (CTSF), Ft Hood, TX; the series of Army Network Integration Events (NIE) and Army Warfighter Assessment (AWA) at Ft Bliss, TX; and ad-hoc tests and evaluations held at other locations as mutually agreed upon.

The contractor shall review and analyze the current and subsequent versions of the DCGS-A INC 2 test documentation with revisions for consistency, program impacts, and conformity to guidance policy and provide Field Support Engineer (FSE) Interim Contractor Support (ICS) for test and evaluation support.

The contractor shall provide a copy of test data and details of analysis to include test plans and test reports.

The following paragraphs are tasks required in accordance with this PWS paragraph.

### 3.6.1 SOFTWARE TEST AND EVALUATION

The contractor shall conduct a tailored software test and evaluation program IAW this PWS. The contractor shall make all necessary revisions to the contractor-developed code and documentation, conduct all necessary re-testing and shall update Software Development Folders (SDFs) of all software units that undergo design or coding changes based on results of various software tests and evaluations. The Government reserves the right to observe all tests.

### 3.6.1.1 Software Reliability Qualification Test

The Contractor shall conduct a Software Reliability Qualification Test as part of Qualification Testing to verify continued compliance with the system's reliability requirement. Demonstration of reliability compliance following institution of corrective actions shall be conducted by the Contractor at no additional expense to the Government. The scope of this event and subsequent demonstrations shall be determined by the contractor and government.

### 3.6.2 COTS/GOTS SOFTWARE TESTING

The contractor shall perform integration and testing of Commercial-Off-The-Shelf (COTS) and Government-Off-The-Shelf (GOTS) software to ensure that it satisfies the DCGS-A INC 2 requirements for which it was selected. The contractor shall not be responsible for unit testing of COTS/GOTS software provided by the government (GFE) nor fixing any problems with the GFE SW. The contractor shall inform the government of any issues with the government provided COTS/GOTS SW. The contractor shall be responsible for testing any contractor selected COTS/GOTS products allocated to DCGS-A INC 2 Functionality.

The Contractor shall notify the Government as soon as they determine that a directed GOTS and/or COTS component (GFE/GFP) is defective or will otherwise not meet the desired requirements. The Government will decide whether a realignment of the DCGS-A INC 2 requirement, relief from the requirement, or correction to the component is required. If the Government determines a correction to the component is required, the Government will coordinate with the Contractor to implement a correction plan that meets the release delivery date while adhering to the acceptance criteria specified in PWS 3.6.13 "Software Acceptance." If the correction of this problem impacts the acceptance criteria then the Government will give contractual relief to the specified delivery dates to account for this delay.

### 3.6.3 DCGS-A INC 2 INTEGRATION TESTING

The contractor shall provide technical support for the Integration and Test Efforts conducted at Aberdeen Proving Ground and other locations, as required, to independently verify functionality, performance, and gain user feedback on system software releases. The contractor shall demonstrate integration with, at minimum COE, DIB, JIE, IC ITE, and DI2E. The contractor shall also demonstrate the ability to integrate 3PDK and/or other supplied API as directed by the government.

### 3.6.4 SOFTWARE CODING AND UNIT TESTING

The contractor shall code and test each software unit ensuring that the algorithms and logic employed by each software unit are correct and that the proposed testing exercises all critical logical paths and as many different logical paths as possible to demonstrate that the software unit satisfies its intended design.

The contractor shall make all necessary revisions to the contractor-developed design documentation and code, perform all necessary re-testing and update the SDFs of all software units that undergo design or coding changes based on software unit tests. The contractor shall provide source materials for code and test as requested by the Government. The contractor shall not be required to perform unit level test on Government directed GOTS or COTS.

### 3.6.5 CSC AND CSCI INTEGRATION AND TESTING

The contractor shall perform integration and testing on software that has successfully undergone unit testing. Integration and testing at this level shall include testing of interfaces within a module and progress to integration and testing between modules. Target hardware will be used as early as possible in the conduct of these tests. The contractor will develop test procedures/checklists during this phase of testing. The contractor shall record the test results of all integration and testing in each corresponding individual software CSC/CSCI SDF along with the expected results and evaluation criteria for each test. The contractor shall make all necessary revisions to the contractor-developed

4) The Offeror's Data and Software Rights Assertions shall not include any technical data or software for which the Government is entitled to an "unlimited rights" license, under DFARS 252.227-7013(b)(1) and DFARS 252.227-7014(b)(1).

5) The Offeror is responsible for ensuring that Data and Software Rights Assertions from its subcontractors comply with the aforementioned content and formatting requirements (in accordance with DFARS 252.227-7017).

Offeror's shall provide Data/Software Rights Assertions in a tabular format prescribed in DFARS 252.227-7017. However, in addition to the content and formatting requirements set forth in DFARS 252.227-7017, the Offeror's Data/Software Rights Assertions table shall list technical data and software items that the Offeror intends to furnish to the Government with and without license restrictions. Thus, the Data/Software Rights Assertions table may include technical data and software items that are provided to the Government with an "unlimited rights" license. In the Offeror's identification of technical data and software license rights, the Offeror shall use the prescribed categories of license rights referenced in DFARS 252.227-7014 and DFARS 252.227-7015 (e.g. "Limited Rights", Government Purpose Rights", "Unlimited Rights", "Unrestricted Rights", or "Commercial Software License Agreement").

If any license restrictions are proposed, the Offeror shall explain how such license restrictions placed on software deliverables will impact the Government's ability to competitively procure software maintenance/sustainment support and services from third parties, particularly in instances where the Government will be provided "Restricted Rights" in software deliverables or other license restrictions (such as restrictions in commercial software license agreements).

## 3.7 DCGS-A SYSTEM PLATFORM INTEGRATION

### 3.7.1 SOFTWARE BASELINE INTEGRATION AND TEST

The Contractor shall conduct a software engineering test program documented in the Software Test Plan (STP) and submit the STP to the Government for approval prior to commencement of the test program. The STP shall include the planning for testing with external systems to verify the Interoperability requirements and the planning of iterative SCR Regression tests.

The Contractor shall perform the tests for all components and threads. The Contractor shall perform the software baseline integration and test activities for the DCGS-A Increment 2. System integration and test shall include verification of external interfaces as specified in the SV-6 approved after the PDR.

The Contractor shall perform a software performance test and the stability assessments in accordance with the Test Plan. The Contractor shall test selected builds of the integrated system to

ensure adequate resource utilization and performance. Results shall be provided in a Performance Assessment Report (PAR).

The Contractor shall support the User Jury assessment events by the Government with the target software baseline for user feedback on the operational capabilities. The output of this effort will generate SCRs, SPRs, and/or Requirements Change Requests (RCRs) that will follow the normal engineering change processes. The Contractor shall plan for up to two User Jury events for each of the Increment 2 releases.

The contractor shall possess an in-house capability for classified development and storage on a closed internal network without having to access Government classified networks. Integration engineering efforts shall be conducted at Aberdeen Proving Ground, MD unless otherwise directed by the Government.

See CDRL DI-IPSC-81438A, A011

## 3.8 CERTIFICATION, SECURITY ACCREDITATION, TESTING AND AUDIT

The Contractor shall support Information Assurance certification accreditation testing for all security networks. The Contractor shall prepare and validate the Certification Test and Evaluation / Security Test and Evaluation (CT&E/ST&E) test procedures for each security enclave in dry run and with Designated Accreditation Authority (DAA) certifying representatives.

The Contractor shall develop system CT&E/ST&E documentation and test procedures for each security enclave and Cross Domain Solution devices in concert with ongoing accreditation processes.

The Contractor shall support site accreditation support at the designated OT&E locations and test events directed by the Government.

### 3.8.1 INFORMATION ASSURANCE SCAN

The Contractor shall perform and support all Information Assurance Scans as required by DoD/AR policies.

### 3.8.2 FORMAL QUALIFICATION TEST (FQT)

The Contractor shall conduct an FQT for the Increment 2 software baseline release to verify the baseline operational capabilities and the compliance with the PBS, SRS and IRS. The Contractor shall provide a Test Plan for the FQT with a detailed test execution planning and test requirements.

If feasible, the Contractor shall combine the FQT with the Functional Configuration Audit (FCA).  The Contractor shall develop traceability from the DCGS-A Increment 2 PBS to the Verification and Cross-Reference Matrix (VCRM) to ensure that the completeness of the FQR is maintained with the FCA.

The Contractor shall prepare the test cases, test procedures and mission threads required for the execution on the FQT.  The FQT Test Procedures shall be provided to the Government for approval 30 days prior the start of the FQT.

The Contractor shall document the FQT results in a Test Report no later 30 days from the completion of the FQT event.

The Contractor shall provide hands-on validation opportunity to the Government on selected test procedures during the Contractor's Engineering Dry Runs (EDR).

The Contractor shall conduct a Test Readiness Review (TRR) at least 7 days prior to FQT.  The TRR shall be performed in accordance with Government approved entrance and exit criteria.  At a minimum, the TRR shall provide metrics (to be agreed to by the Government), overview of the test environment, conduct, requirements traceability, and test constraints or limitation.

The Contractor shall conduct the FQT on the DCGS-A target platform configurations.  The FQT shall include requirements verification (including performance testing), interoperability/interface testing (as documented in the Interoperability/Interface Test Plan Appendix to the System Test Plan (STP)), system stability and system-level thread testing.

The Contractor shall use actual and simulated test data for all FQT testing. The Contractor shall ensure repeatability by using the same test data sets.

The Contractor shall establish and maintain a core test data set for performance measurements and benchmarks. The Contractor shall establish and maintain a test data set as required for all information requirements including sensors for the DCGS-A Increment 2 as specified in the SV-6.

The Contractor shall ensure the FQT meets the combined CT/DT Government requirements should the Government decide to use the FQT as a Government Developmental Test Event.
See CDRL DI-MISC-80711A, B023


### 3.8.3  RESERVED

### 3.8.4  RESERVED

### 3.8.5  NETWORK INTEGRATION EVENT (NIE) AND EXERCISE SUPPORT

Appx11379

A1379

The Contractor shall support the Government in conducting NIE and exercises such as Enterprise Challenge or Joint Field Exercise as required by the Government.

### 3.8.6 ARMY INTEROPERABILITY CERTIFICATION (AIC) TESTING SUPPORT

The Contractor shall support the AIC test events at CTSF for the required Capability Sets certification. The Contractor shall resolve any discrepancies that occurred during the CTSF tests and provide resolution within the CTSF AIC schedule.

### 3.8.7 JOINT INTEROPERABILITY TEST CENTER (JITC) JOINT CERTIFICATION TESTING EVENTS

The Contractor shall support the JITC Joint Certification test events required for the Increment 2 Releases. Test locations for the Joint Certification will be specified by the Government . The Contractor shall resolve any discrepancies, which occur during the JITC test events.

## 3.9 CYBER SECURITY

Building cybersecurity into the system early and throughout the lifecycle will ensure that operational cybersecurity risks are sufficiently mitigated throughout the acquisition process. *DoD I 8500.01, Cybersecurity*, states, "Cybersecurity must be fully integrated into system life cycles so that it will be a visible element of organizational, joint, and DoD Component architectures, capability identification and development processes, integrated testing, information technology portfolios, acquisition, operational readiness assessments, supply chain risk management, System Security Engineering, and operations and maintenance activities."

DoD cybersecurity policy as implemented through the RMF process is based on the application of security controls, the selection and implementation of which are based on cybersecurity risk assessments conducted throughout the system lifecycle. A security control is "a safeguard or countermeasure prescribed for an information system or an organization designed to protect the confidentiality, integrity, and availability of its information and to meet a set of defined security requirements."

The contractor shall design and develop the product that meets the requirements of DoD I 8500.01, Cybersecurity, DODI 8510.01, Risk Management Framework (RMF), applicable DISA Security Technical Implementation Guides (STIGs), Intelligence Community Directive (ICD) 503, Intelligence Community Information Technology Systems Security Risk Management, Certification and Accreditation, National Institute of Standards and Technology (NIST) Special Publication 800-37, "Guide for Applying the Risk Management Framework to Federal Information Systems", NIST 800-53, Revision 4, Security and Privacy Controls for Federal Information Systems and Organizations and Army Regulation (AR) 25-2, Information Assurance/Cybersecurity in order to fully integrate Cybersecurity into the program, processes, and products throughout the program lifecycle.

The security control selection process shall be governed by applicable baselines and overlays, including CNSSI No. 1253 Security Categorization and Control Selection for National Security Systems and CNSSI No.1253F, Attachment 5 for Classified Information Overlay.

The Contractor shall be staffed with security certified personnel such as Certified Information System Security Professional (CISSP) certified Information Systems Security Engineer (ISSE) dedicated to the program to support all the Security Engineering activities required for the Security Certification and Accreditation tasks for the DCGS-A Increment 2 system configurations.

### 3.9.1. INFORMATION ASSURANCE

The contractor shall create a Data Governance Plan to help ensure confidentiality, integrity, and availability of the data by reducing data security risks due to unauthorized access or misuse of data.

The Data Governance Plan shall address the contractors approach to data and information management formalized as a set of policies and procedures that encompass the full life cycle of data, from acquisition to use and disposal. This includes establishing decision-making authority, policies, procedures, and standards regarding data security and protection, data inventories, content and records management, data quality control, data access, data security and risk management, data sharing and dissemination, as well as ongoing compliance monitoring of all the above-mentioned activities.

The plan will include:

- protection of sensitive data;
- vulnerability assessment and risk management;
- enforcement of legal, regulatory, contractual, and architectural compliance requirements;
- identification of stakeholders, their roles and responsibilities; and
- access management.

### 3.9.1.1 Software Deliverables

The Contractor shall install their developed software deliverables as well as any software components the Contractor is dependent upon, on the DCGS-A provided Army Gold Master (AGM) baseline or a LiSTA baseline (if using Linux), throughout the Contractor's software development lifecycle. AGM or LiSTA discs shall be provided by DCGS-A as GFE.

1) The contractor's software must function properly, without introducing vulnerabilities, on the hardened DCGS-A hardware system.

2) The contractor shall troubleshoot and correct any security-related software anomalies that may arise during software installation, integration, and testing before the government will accept the contractor developed software as a deliverable.

3) The contractor shall ensure that remediation techniques do not compromise security on the hardened baseline system.

4) The Contractor shall understand and use all STIGs applicable to their software, and define and provide an explanation of all issues that are not compliant with the STIGs. The contractor shall utilize ACAS/NESSUS and the Security Content Automation Protocol (SCAP) Compliance Checker (SCC) tools and utilize, manual checks as required to ensure STIG compliance.

5) The contractor shall provide Ports, Protocols, and Services (PPS) documentation to the government. This information is required for system accreditation and maintenance, and is required to be documented in the system User Security Manual, and Security Operating Procedure manual (USM/SOP). PPS information shall not be made available to the general public, and shall be considered FOUO between the contractor and the government. PPS information shall be electronically transmitted with encryption.

6) The Contractor shall, at the discretion of the government, provide on-site support to security remediation activities for their software deliverables to the government at Aberdeen Proving Ground, MD.

7) The Contractor shall, maintain and identify to PM DCGS-A their points of contact for their IA trained staff (IAT Level II certified or higher), in accordance with DoDD 8140. Contractor IA personnel shall coordinate with DCGS-A IA staff on a bi-weekly basis, and shall participate in the development, integration, and test all software deliverables in this document.

8) All web-based software delivered by the contractor shall use Transport Layer Security (TLS) 1.2 or higher and HTTPS. The contractor shall not use unsecured HTTP.

### 3.9.2 SECURITY ENGINEERING SERVICES

Security Engineering services shall be required to support this effort by providing technical support and recommendations for implementing, verifying, and validating secure architecture, design, and configuration; regulation compliance assessments; meeting and briefing support, and engineering support necessary to the development of a securely configured system so that the system being supported can achieve Approval To Operate (ATO). Support includes but is not limited to the following:

1) Verification and validation that that the system is compliant with IA controls and requirements are implemented IAW DoD and Army policy as they apply to the system under evaluation. The contractor shall provide documentation to support this.

2) Provide certification and accreditation artifacts that are compliant with AR 25-2 and the DoD Risk Management Framework (RMF) in the case of collateral systems. Using only Army approved tools. No tools are authorized for generation of artifacts except those posted to the Army OIA&C site or Knowledge Service (KS) site. Artifacts provided must meet the requirements of Army and DoD guidance.

3) Contractor developed software components that manipulate DCGS-A entity data shall be designed with schemas to support CAPCO data security labeling standards and the data used to populate the databases will be marked in accordance with CAPCO labeling standards.

4) IC ISM provides the table and data structures supporting DDMS and interoperability with DCGS DMO DIB standards. DCGS-A must follow DODIIS guidance currently following DIIG and DCID 6/3. Rationale: DODIIS guidance enables DCGS-A to participate in the IC community and share data in a collaborative manner. Items specific to DODIIS include the support of IC ISM and incorporating PL3 guidance to enable a common baseline to be deployed to networks with different classifications.

5) Developers shall provide mechanisms and documentation on how to tune the DCGS-A platform to meet use in the different network classifications in which DCGS-A operates. Flexible configuration options are required to shut down unused services (ports and protocols) if a given application is unused in a specific network.

### 3.9.3 System Security

The contractor shall incorporate all security features as required by the DCGS-A Capability Description Document (CDD).

The contractor shall support the process of mapping and allocating Cybersecurity requirements to the hardware and software design for the system as part of the overall system development process and to support test and evaluation planning.

The contractor shall identify potential threats and vulnerabilities of the developing system from Cybersecurity risk perspective and characterize the attack surface before performing component and system integration testing.

The contractor shall perform Security Vulnerability Analysis to provide results of contractor's efforts to quantitatively and qualitatively define system security functional requirements and residual clandestine vulnerabilities. The analysis shall be classified no lower than SECRET NOFORN.

See DI-MISC-80841, C015

The contractor shall provide the Vulnerability Scan Compliance (VSC) Report, for use by the government to assess the security vulnerability and residual risks of the system software build.

See DI-MGMT-81842, C016

The contractor shall complete the detailed build-to design of the system, ensuring that all required cybersecurity requirements are included, mapped, and allocated to the hardware and software design.

The contractor shall employ DoD-evaluated and certified/approved products, this includes using hardware from the Defense Information Systems Agency (DISA) Unified Capabilities (UC) Approved Products List (APL), and software that has undergone National Information Assurance Partnership (NIAP) evaluation and has been published on the Approved Products Compliance List (APCL).

The contractor shall demonstrate during Critical Design Review (CDR) the adequacy of the system design to meet the system requirements, including Cybersecurity, and readiness to begin developmental prototype hardware fabrication and/or software coding with acceptable risk.

The contractor shall conduct self-assessment or support Cybersecurity penetration testing based on the system Cyber Attack Surface during the development phase in order to prepare the system for formal Developmental Test & Evaluation (DT&E) and support Program Protection Plan requirement.

### 3.9.4 SECURITY TECHNICAL IMPLEMENTATION GUIDES (STIGS)

The contractor shall implement STIGs within 30 days from release of a new DISA STIG. Where an update cannot be technically applied due to system functionality, that STIG item shall be documented in the classified system Plan of Action & Milestone (POA&M) with appropriate mitigations. If an update cannot be applied within 30 days, the contractor shall provide a milestone schedule in the POA&M item for application for Government approval.

### 3.9.5 INFORMATION ASSURANCE VULNERABILITY ALERT (IAVAS)/SECURITY PATCHES

The contractor shall incorporate all applicable IAVAs and vendor security patches to the baseline of the system in a timely manner during the entire contract period.

### 3.9.6 CYBERSECURITY DOCUMENTATION

Appx11384

A1384

The contractor shall provide all applicable accreditation documents to support Secret and below systems accreditation per DODI 8510.01, Risk Management Framework (RMF) and approval authority requirements.

The contractor shall provide all applicable accreditation documents to support Top Secret and Cross Domain Solution components per Intelligence Community Directive (ICD) 503 and approval authority requirements.

During development, the contractor shall develop and provide all IA and IA-Enabled software application Cybersecurity Certification Test Procedure (CTP) or Hardening Guide along with system CTPs as part of accreditation documents to support Cybersecurity certification process.

The contractor shall ensure the decomposed component specifications, with inherent cybersecurity requirements, are fully defined, including verification criteria, and traced to the security controls documented in the Security Plan.

### 3.9.7 (CYBERSECURITY) CERTIFICATIONS AND ACCREDITATION

The contractor shall address all identified Cybersecurity concern/issues during the period of the contract so that system can meet accreditation requirements and to achieve all necessary IATT and ATO approvals to meet program schedule.

The contractor shall follow DoDI 8500.01 and DoDI 8510.01 guidance for Secret and below accreditation requirement.

The contractor shall follow ICD 503 guidance for Top Secret and Cross Domain Solution accreditation requirement.

### 3.9.8 SECURITY SUPPORT

The contractor shall provide security support to conduct software security testing, prepare security related documentation, provide input to security accreditation documentation, validate the conduct of each task to ensure security requirements are being met, ensure facility security and program protection, and personnel security functions.

## 3.10 INTEGRATED LOGISTICS SUPPORT (ILS)

The following efforts for logistics, training and support are limited to the technical support that the Government requires the software developer to provide for logistics support. This support would be technical services, documentation and data to assist with the development of documentation and training as well as assist with the initial training for logistics developers and field support, as required. This is necessary to ensure the development of adequate documentation/training and provide required field support for any DCGS-A software that is developed under this effort and

| SOLICITATION, OFFER AND AWARD | 1. This Contract Is A Rated Order Under DPAS (15 CFR 700) | Rating DOA7 | Page 1 | of | Pages 134 |
|---|---|---|---|---|---|

| 2. Contract Number | 3. Solicitation Number W56KGY-16-R-0001 | 4. Type of Solicitation ☐ Sealed Bid (IFB) ☒ Negotiated (RFP) | 5. Date Issued 2015DEC23 | 6. Requisition/Purchase Number SEE SCHEDULE |
|---|---|---|---|---|

| 7. Issued By | Code | W56KGY | 8. Address Offer To (If Other Than Item 7) |
|---|---|---|---|

ACC-APG Division C (W56KGY)
CCAP-CCC
6001 Combat Drive

APG, MD 21005-1846

NOTE: In sealed bid solicitations 'offer' and 'offeror' mean 'bid' and 'bidder'.

## SOLICITATION

9. Sealed offers in original and _____ copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in _____ until 04:00pm (hour) local time 2016FEB16 (Date).

Caution - Late Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name MICHAEL SHERICK | B. Telephone (No Collect Calls) | | | C. E-mail Address |
|---|---|---|---|---|---|
| | | Area Code (443) | Number 861-4808 | Ext. | MICHAEL.G.SHERICK.CIV@MAIL.MIL |

### 11. Table Of Contents

| (X) | Sec. | Description | Page(s) | (X) | Sec. | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| | | **Part I - The Schedule** | | X | I | **Part II – Contract Clauses** | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 44 |
| X | B | Supplies or Services and Prices/Costs | 5 | | | **Part III - List Of Documents, Exhibits, And Other Attach.** | |
| X | C | Description/Specs./Work Statement | 36 | X | J | List of Attachments | 98 |
| X | D | Packaging and Marking | 37 | | | **Part IV – Representations And Instructions** | |
| X | E | Inspection and Acceptance | 38 | | K | Representations, Certifications, and | 99 |
| X | F | Deliveries or Performance | 39 | X | | Other Statements of Offerors | |
| X | G | Contract Administration Data | 40 | X | L | Instrs., Conds., and Notices to Offerors | 110 |
| X | H | Special Contract Requirements | 42 | X | M | Evaluation Factors for Award | 129 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. Discount For Prompt Payment (See Section I, Clause No. 52.232-8) | 10 Calendar Days (%) | 20 Calendar Days (%) | 30 Calendar Days (%) | Calendar Days (%) |
|---|---|---|---|---|

| 14. Acknowledgment of Amendments (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated): | Amendment No. | Date | Amendment No. | Date |
|---|---|---|---|---|

| 15A. Name and Address of Offeror | Code | | Facility | 16. Name and Title of Person Authorized to Sign Offer (Type or Print) |
|---|---|---|---|---|

| 15B. Telephone Number | | | 15C. Check if Remittance Address is ☐ Different From Above – Enter such Address In Schedule | 17. Signature | 18. Offer Date |
|---|---|---|---|---|---|
| Area Code | Number | Ext. | | | |

## AWARD (To be completed by Government)

| 19. Accepted As To Items Numbered | 20. Amount | 21. Accounting And Appropriation |
|---|---|---|

| 22. Authority For Using Other Than Full And Open Competition: ☐ 10 U.S.C. 2304(c)(  )   ☐ 41 U.S.C. 253(c)(  ) | 23. Submit Invoices To Address Shown In (4 copies unless otherwise specified) | Item 25 |
|---|---|---|

| 24. Administered By (If other than Item 7) | Code | 25. Payment Will Be Made By | Code |
|---|---|---|---|

| 26. Name of Contracting Officer (Type or Print) | 27. United States Of America (Signature of Contracting Officer) | 28. Award Date |
|---|---|---|

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is unusable

Standard Form 33 (Rev. 9-97)
Prescribed By GSA-FAR (48 CFR) 53.214(c)

Appx11479

A1479

| CONTINUATION SHEET | Reference No. of Document Being Continued | Page 121 of 134 REPRINT |
|---|---|---|
| | PIIN/SIIN W56KGY-16-R-0001  MOD/AMD | |

Name of Offeror or Contractor:

The Data management architecture will consist of a conceptual data integration layer and data analytics platform. The data integration layer will modularize the data management architecture to abstract away specific database instances with a standardized data access layer, and implement a logical data model. The proposed design should include how the data management architecture will integrate with the provided mission application architecture and provides a high level of confidence that the proposed data architecture will integrate with the future mission application architecture without significant rework. Architectural differences between the two paradigms are highlighted and that appropriate trades (such as: software residing near the data or centralized) were considered.

The Data management architecture should include a data analytics platform that will use customizable algorithms to examine raw and processed data for the purpose of drawing conclusions about the information, to include but not limited to entity, relationship, and pattern identification. The platform will allow for the addition of new algorithms, and adjustment to existing algorithms, to meet ever changing threat environment and mission needs.

The Offeror shall provide a block diagram and/or other engineering design artifacts for the architecture, describing all components and their relationships.

The Software Assurance Analysis Report shall contain two sections:

Section 1: Details how static analysis for Software Assurance is used within the offerors development lifecycle in writing and in diagrammatic form for illustrative purposes.

Section 2: Details the output from a minimum of two software static analysis tools used by the offeror.

2) Subfactor 2 Fusion Data Analytics: The Offeror shall propose a detailed technical solution to perform automated fusion Level 0, 1, and 2 functions: Source Processing, Entity Refinement, and Situation Refinement. See task order PWS paragraph 3.2.11 Fusion.

3) Subfactor 3 Interoperability: The Offeror shall propose a detailed technical solution of how it will interoperate with other DCGS-A fielded systems, MCS systems, the Joint systems, and Coalitions in accordance with the DCGS-A SV-6 (Attachment 0007) and task order 0001 PWS paragraph 3.2.17. Additionally, offerors should describe how the proposed DCGS-A, Increment 2 solution will integrate into the DCGS Integration Backbone (DIB) Version 4.2 into the DCGS-A, Increment 2 baselines for interoperability with the Joint DCGS Family of System (PoS). The DIB is a cohesive set of modular, community-governed, standards-based data services focused on enterprise information sharing. The DIB provides a common framework to enable the construction of cloud services such as Platform as a Service (PaaS) type of services for data exposure and transformation, and for enabling applications and users to discover and access information from a wide range of distributed sources. The offeror shall describe how the proposed design operates within multiple environments (JIE, COE, ICITE) (for evaluation purposes only). The offeror shall describe how the proposed design will interface with current mission applications (for evaluation purposes only). The offeror shall describe how the proposed design will allow for components to be updated and replaced via a Modular and Open System Architecture (MOSA).

4) Subfactor 4 Visualization Framework/Usability: The Offeror shall propose a solution which describes how DCGS-A, Increment 2 shall build usability into the design and be designed for users, to support users and their intelligence tasks.

5) Subfactor 5 Data Rights: Pursuant to the requirements set forth in DPARS 252.227-7017, Offerors are required to specifically identify Data/Software Rights Assertions related to technical data and software deliverables. As indicated in DPARS 252.227-7017(e), an Offeror's failure to submit, complete, or sign the aforementioned Data and Software Rights Assertions with its offer may render the offer ineligible for award. In accordance with the content and formatting requirements for Data and Software Rights Assertions (set forth in DPARS 252.227-7017), the Offeror's Data and Software Rights Assertions shall comply with the following requirements:

i. The Offeror shall not assert license restrictions on items, component, or processes themselves. The asserted license restrictions shall pertain to software or technical data that relates to items, components, or processes.

ii. The Offeror's Assertions shall not include technical data or software that will not be furnished to the Government under this Contract.

iii. The Offeror shall provide a concise (but specific) description of the technical data and software deliverables that will be furnished to the Government with restrictions, rather than generically asserting license restrictions in "technical data" or "technology".

v. The Offeror is responsible for ensuring that Data and Software Rights Assertions from its subcontractors comply with the aforementioned content and formatting requirements (in accordance with DPARS 252.227-7017).

Offerors shall provide Data/Software Rights Assertions in a tabular format prescribed in DPARS 252.227-7017. However, in addition to

A1599




# Increment 1 Hardware Configuration

**Vicky Baker**

**PM DCGS-A**




COL Robert M. Collins| Project Manager, DCGS-A | COM: 443-861-2442 | DSN: 848-2442 | robert.n.collins4.mil@mail.mil

LTC Laura N. Poston | PdM, DCGS-A | COM: 443-861-2580 | DSN: 861-2580 | laura.n.poston.mil@mail.mil

**Appx11661**

A1661

 

# PM DCGS-A Human Systems Integration (HSI)

- Who: Team of Human Factors Engineers and Former Soldiers

- What
  - Qualitative and Quantitative Analysis
  - Tracking Usability issues
  - Collect, assess, and incorporate Soldier (User) feedback
  - **Soldier advocates** throughout software development process

*Usability Requirement – DCGS-A shall enable users to successfully execute a goal-oriented operational task with 80% success rate. Success is based upon the time the user takes to complete representative task (time on task) using an appropriate workflow, the ability of the user to successfully complete the task (success rate), and completing the task without experiencing a critical usability defect.*




# Usability in the Design Process

- User Centered Design (UCD) is a process that focuses on the user throughout each of the phases of software development and supports the key principles of the ISO standard Human-Centered Design for Interactive Systems:

  1. **Analyze:** design is based upon an explicit understanding of the user
  2. **Define Requirements:** Incorporate Soldier Feedback
  3. **Design:** driven and refined by user-centered evaluation
  4. **Iteratively Prototype:** test and modify design with Soldier participant



A1688

# Distributed Common Ground System-Army (DCGS-A)
# Increment 2

## Market Research Report

## 13 July 2015

**PREPARED BY:**

Solicitation Integrated Product Team (IPT)

**Chair:** MAJ Derek G. Johnson derek.g.johnson.mil@mail.mil

**Members:**

PM DCGS-A Increment 2 staff

AMC, ACC Contracting Officer

PEO IEW&S Contract Planners

AMC, CECOM Legal Advisor

AMC, CECOM Small Business Advisor

A1792

Protected Information
and/or Legends Redacted

## Table of Contents

Executive Summary ......................................................................................................... 4

1  Authority ............................................................................................................... 5

2  North American Industry Classification System (NAICS)........................................ 5

3  Market Research Objectives................................................................................... 5

4  Background............................................................................................................. 5

5  Scope of Development............................................................................................ 8

    5.1  Key Performance Parameters (KPPs)................................................................ 8

    5.1.1  Net Ready............................................................................................... 8

    5.1.2  Fusion..................................................................................................... 8

    5.1.3  Training................................................................................................... 9

    5.1.4  Sustainment........................................................................................... 9

    5.2  Key System Attributes (KSAs)............................................................... 9

    5.2.1  Operations and Support (O&S) Cost...................................................... 9

    5.2.2  Ease of Use/Usability.... ........................................................................ 9

    5.2.3  Geospatial Information........................................................................ 10

    5.2.4  Intelligence Support to Cyber Operations ........... ............................... 10

6  Market Research Approach................................................................................... 11

7  Market Research.................................................................................................... 12

    7.1 Industry Engagement....................................................................................... 13

    7.1.1  Request for Information 1(RFI1)........................................................... 13

    7.1.2  Request for Information 2(RFI2)........................................................... 14

    7.1.3  Request for Information 3(RFI3)........................................................... 17

    7.1.4  Industry Day......................................................................................... 17

    7.1.5  One on Ones......................................................................................... 18

    7.2  RFI Respondents.................................................................................. 21

    7.3 Industry Feedback on Acquisition and Market Trends..................................... 24

    7.3.1  RFI Questions and Trends..................................................................... 24

    7.4 RFI Respondent Capability Assessment........................................................... 28

    7.4.1  Capability Domain Assessment Criteria............................................... 28

    7.4.2  Respondent Capability Domain Assessment Summary......................... 28

Appx11793

A1793
Protected Information and/or Legends Redacted

7.4.3    Capability Criteria Not Included in Capability Domain Assessment Summary........................ 31

7.4.4    Respondent Capability Assessment Narratives........................................................ 33

8    Findings ................................................................................................. 39

8.1    Large Business Capability Findings........................................................... 40

8.2    Small Business Capability Findings............................................................ 41

8.3    General Findings ....................................................................................... 41

8.3.1    Performance and Efficiencies..................................................... 41

8.3.2    Better Buying Power ................................................................... 42

8.3.3    Ability One Program ................................................................... 42

8.3.4    Contract Types............................................................................ 42

8.3.5    Commercial Services ................................................................... 42

8.3.6    Market Prices .............................................................................. 42

9    Conclusion ............................................................................................. 43

## List of Tables

Table 1: Market Research Sources ................................................................. 12

Table 2: One on One Participants (Large Business)........................................ 19

Table 3: One on One Participants (Small Business)........................................ 20

Table 4: One on One Participants (Non Profit)............................................... 21

Table 5: List of RFI Respondents.................................................................... 21

Table 6: Large Business Capability Assessment............................................. 30

Table 7: Small Business Capability Assessment............................................. 31

## List of Figures

Figure 1: DCGS-A Capability Description......................................................... 7

Figure 2: Market Research Approach .............................................................. 12

Figure 3: Evaluation Factors............................................................................ 25

A1794
Protected Information
and/or Legends Redacted

## Executive Summary

This report documents the analysis and findings of the Market Research Report conducted by a multi-functional Integrated Product Team (IPT) to determine market capability to develop Increment 2 of Distributed Common Ground System- Army (DCGS-A). The Increment 2 scope of development includes a more robust Data Architecture and the addition of a Cyber Analytic capability (Intelligence Support to Cyber Operations), as well as enhancements to some of the current DCGS-A capabilities such as Data Fusion & Pattern Analysis and improvements to overall ease of use.

Following the Department of Defense (DoD) Framework for a Development Acquisition, the DCGS-A Increment 2 Contract IPT was chartered by Project Manager (PM) DCGS-A to establish a contracting approach to provide for the analysis, design and development to support the DCGS-A Increment 2 Engineering and Manufacturing Development (EMD) Phase. The major objectives of the acquisition are to incorporate better buying power initiatives, maximize competition, and utilize small business, while developing a DCGS-A Increment 2 capability that meets or exceeds all the requirements that have been identified.

The DCGS-A program has continued to actively coordinate with Industry on competitive efforts for Increment 2. The PM has assessed a transition from the current acquisition approach, which has the Government serving as lead integrator for DCGS-A Increment 1. Under a new construct, Industry will take a more active role in the final product and program delivery. This will serve to better leverage Industry's innovation, emerging technologies, and proven processes to deliver a more fully integrated capability. The PM's Industry engagement activities include a series of Requests for Information (RFI) to solicit industry feedback on the program's requirements and proposed acquisition strategy, several Industry Day forums that support open communication, and continuous dialogue at one on one meetings with individual companies. While the acquisition strategy has not yet been approved, Increment 2 is envisioned to have two major software releases. Toward this aim, the IPT conducted market research to understand the overall marketplace landscape for Information Technology (IT) Services to perform DCGS-A Increment 2 development contract; gather Industry feedback on trends and new or innovative contracting concepts; and analyze lessons learned, best practices, and common approaches for development of IT systems.

The Government released three (3) RFIs to Industry, and received responses from 84 different organizations, which included 45 large businesses, 35 small businesses, three (3) non-profit organizations, and one (1) Federally Funded Research and Development Center (FFRDC). PM DCGS-A received responses to its first RFI on 12 September 2014. Responses to the second RFI were received on 29 December 2014. Responses to the third RFI were received on 22 May 2015. Additionally, the Government conducted a one on one engagements with 78 different organizations from 20 January 2015 to 12 May 2015.

Based on current market research and analysis of the resulting information, the overall conclusion of this Market Research Report is that a full and open competition is appropriate for the DCGS-A Increment 2 Engineering and Development effort. Going forward, the Acquisition Strategy will maximize the utilization of small business while managing program performance risk. Partial small business set-asides and Small Business sub-contracting goals have been analyzed to inform the selected Acquisition Strategy and Source Selection Evaluation Plan (SSEP).

The information contained in this Market Research Report has been updated throughout the acquisition effort and will continue to be refreshed as necessary to inform key decisions.

# 1 Authority

Market Research is required in accordance with Federal and Department of Defense (DoD) policy including, but not limited to:

- 41 U.S.C. 253a(a)(1)B, Planning and Solicitation Requirements
- 41 U.S.C. 264b, Preference for Acquisition of Commercial Items
- FAR 7.102, Acquisition Planning Policy
- FAR Part 10, Market Research
- FAR 19.202-2, Locating Small Business Sources
- DFARS Part 210, Market Research Policy and Procedures
- AFARS Part 5110, Market Research
- DoD Services Acquisition Guidebook
- DoD Better Buying Power
- AR 70-13 Management and Oversight of Service Acquisitions

# 2 North American Industry Classification System (NAICS) Code and Product Service Code (PSC)

For the purposes of this Market Research, the anticipated NAICS code for this acquisition is 541330 Engineering Services, with a small business size standard of $38.5 Million. The final determination will be based on the preponderance of the work detailed within the completed Independent Government Cost Estimate (IGCE). In addition, the anticipated Product Service Code (PSC) is AC63: Electronics & Communications Equipment R&D – Advanced Development because DCGS-A Increment 2 will build on the capabilities of Increment 1.

# 3 Market Research Objectives

The objectives of the DCGS-A Increment 2 Market Research are to:

- Understand the overall marketplace landscape for DCGS-A Increment 2 and large Information Technology contracts
- Assess the capability of small business to perform the DCGS-A Increment 2 development scope
- Gather Industry feedback on trends and new or innovative contracting concepts
- Determine Industry's ability to enhance DCGS-A capability blocks, either through existing COTS products or through new development
- Validate the accuracy of Industry's experience developing or enhancing capabilities required for Increment 2 by consulting with their government "customers"

# 4 Background

The DCGS-A program was created in response to the DoD Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems (FoS) that

A1796

Protected Information
and/or Legends Redacted

will contribute to Joint and combined Warfighter needs. The DCG/SS MA was converted into the DCGS Enterprise ICD in March 2009. The DCGS-A Information System Capability Development Document (IS CDD) is currently being staffed, and is an update of the ICD to support application of the IT Box construct to continue DCGS-A system development beyond initial capabilities. The JROC is expected to approve the DCGS-A IS CDD in June 2015.

DCGS-A is an evolving program made up of a foundational network, hardware, software, sensors, people, and processes. It is comprised of an extensive network architecture that enables distributed processing and information sharing of data from sensors and other sources across the globe; software tools to help the users perform the analyses, update, and share intelligence products; servers that store data and collected intelligence; and alignment to a set of common standards that enable integration of new technology, processes, and ideas. As technology evolves and new Warfighting requirements emerge, the DCGS-A capability set needs to be updated to meet the user needs.

DCGS-A is the Army's primary system for ISR tasking of sensors, processing, exploitation and dissemination (TPED) of collected data converted into warfighting information and intelligence regarding the threat, weather, and terrain at all Army echelons. For Increment 2, overarching goals are to modernize the Data Enterprise with a Data Integration Platform to reduce complexity, build upon a commercially supported framework, and modernize the data architecture throughout DCGS-A; leverage a visualization framework that spans thin and thick clients to provide a more seamless 'look and feel' across the portfolio of applications and capabilities, and; incorporate cyber security considerations in design and support to emerging cyber analytic requirements. The DCGS-A system and data enterprise must conform to and leverage the Army Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

DCGS-A facilitates SEEing and KNOWing on the battlefield—the fundamental precursor to the UNDERSTANDing that underpins the Army's Mission Command concept. DCGS-A will continue to contribute to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum.

The current acquisition approach for Increment 2 will leverage the CJCSI 3170.01H Information Technology Box (IT Box) Requirements Process for incremental software releases. This streamlined approach will support incremental development and fielding of system software capabilities over time to meet the user needs and improve system capabilities by allowing greater flexibility and response to evolving technologies.

A significant component of the DCGS-A Increment 2 acquisition approach via the IT Box requirements methodology is the ability to grow system capability over time through a series of software releases and hardware modernizations/refresh cycles. DCGS-A software releases provide a mechanism to build agility within the program to satisfy requirements in an accelerated fashion. Each DCGS-A software release will be synchronized with Army interoperability and Cyber Security standards. DCGS-A will continue to maximize the use of Commercial off-the-Shelf (COTS) /Government off-the-Shelf (GOTS) products. The IT Box construct will have a Requirements Oversight Council, which is made up of the Army requirements organizations, user representatives, and acquisition operations officials who provide the PM a prioritized list of requirements to pursue in each software release. The PM, user

**A1797**

Appx11797

Protected Information
and/or Legends Redacted

representative, and industry integrator will execute to the prioritized list in accordance with capability maturity assessment, cost, and schedule constraints per software release. DCGS-A Increment 2 software releases will leverage the Intelligence Community (IC) investments in Information System technology and align to the applicable initiatives of the National Functional Managers (NSA, DIA, and CIA).

The primary focus of the Increment 2 program capability approach will be the alignment to the Intelligence Community Information Technology Enterprise (IC ITE). Compliance with the IC ITE standards will ensure that the Army delivers a capability that will endure across Intelligence domains and continue the evolution of the Intelligence processing capabilities over time.

Capability growth will be implemented as part of the DCGS-A program life cycle. DCGS-A will continue to adapt and integrate advanced technology, new sensor requirements, cybersecurity advances, and other necessary system evolutions to remain relevant and avoid obsolescence through system life.

### 2.2 Capability Description
Figure 1 below provides a general depiction of DCGS-A and its overall mission as an intelligence enterprise.



Figure 1: DCGS-A Capability Description

A1798
Protected Information
and/or Legends Redacted

# 5 Scope of Development

DCGS-A, Increment 2 will meet or exceed the following Key Performance Parameters (KPP's) and Key System Attributes (KSA's):

## 5.1 KPPs

### 5.1.1 Net Ready



### 5.1.2 Fusion

DCGS-A shall be capable of performing three automated fusion functions:



A1799

Appx11799

Protected Information
and/or Legends Redacted

### 5.1.3 Training

Department of the Army shall provide the necessary resources to conduct required DCGS-A systems training in the Institutional, Operational, and Self-Development training domains through the appropriate Planning, Programming, Budgeting, and Execution (PPBE) process. Department of the Army, with the Training Developer, Materiel Developer, and Combat Developer, shall establish and integrate all DCGS-A systems-related training development activities and training across the Institutional, Operational, and Self-Development training domains prior to or no later than the Full Deployment (FD). [KPP 3] This will include:

- Developing the DCGS-A Gross Task List (GTL) (Initial Minimum)

- Developing the DCGS-A Training Support Package (TSP) that supports individual, unit and collective training (Initial Minimum)

- Developing a New Equipment Training Plan (NETP) for each new, improved, or modified version of DCGS-A (Initial Minimum)

- Conducting NET and Instructor/Key Personnel Training (I/KPT) supplemented with subsequent Live Environment Training (LET) (Initial Minimum) [KPP 3]
  (Note: Incremental Requirements Definition Packages (RDP) and Capability Drops (CD) will be used to increase future Training capabilities (e.g., Embedded Training (ET)) through the life of the program.)

### 5.1.4 Sustainment

Operational Availability (Ao). DCGS-A shall have an operational availability (Ao) of at least 90% by Full Deployment (FD). Ao is the minimum percentage of time over a 72 hour mission (as delineated in the Operational Mode Summary/Mission Profile (OMS/MP) the system must be fully mission capable. This equates to a Maximum Time To Repair (MaxTTR) of no greater than 60 minutes 90% of the time and an Administrative and Logistics Delay Time (ALDT) no greater than six (6) hours. A fully mission capable system is able to execute all DCGS-A operational essential functions (Net-Ready, Fusion, and Visualization). The initial minimum Ao supports the mission equipment Level 1 percentage requirements assigned to DCGS-A items as derived from AR 220-1, Army Unit Status Reporting (Initial Minimum).

## 5.2 KSAs

### 5.2.1 Operations and Support (O&S) Cost.

DCGS-A shall not exceed a total O&S cost o[                              ] DCGS-A shall institute a planned approach to monitoring, collecting, and validating operating and support cost data to support this KSA (Initial Minimum).

### 5.2.2 Ease of Use/Usability

DCGS-A shall enable users to successfully execute a goal-oriented operational task with no less than an

80% success rate. Success is based upon the time the user takes to complete representative task (time on task) using an appropriate workflow, the ability of the user to successfully complete the task (success rate), and completing the task without experiencing a critical usability defect (Initial Minimum).

### 5.2.3 Geospatial Information



### 5.2.4 Intelligence Support to Cyber Operations



# 6 Market Research Approach

A1801

Protected Information
and/or Legends Redacted

Based on the DoD Service Acquisition Process, the DCGS-A, Increment 2 Contract IPT developed a detailed schedule to guide its activities, including a planning phase with a comprehensive Market Research Approach.

- **RFI 1 – 13 Aug 2014 – 12 Sep 2014:** Was conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan.

- **RFI 2 – 5 Dec 2014 – 29 Dec 2014:** Was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort.

- **RFI 3 – 6 May 2015 – 22 May 2015:** Was released to determine if rule of two exists, as defined in FAR 19.502, and if a small business set-aside is appropriate for Increment 2 development.

- **Industry Day 1 – 20 Jan 2015:** Provided a forum to share emerging requirements with Industry.

- **Industry One on Ones – 20 Jan 2015 - 12 May 2015:** Provide a forum to answer Industry's questions and elicit their feedback regarding to the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations.

- **Industry Day 2 – 25 Jun 2015:** Will provide an opportunity to discuss the draft Increment 2 requirements with industry.

- **Industry Engagement 3 – Sep 2015:** To serve as a venue to discuss the Draft Increment 2 Request for Proposal (RFP) with industry following its release.

The IPT developed unique data collection questionnaires for each of the three RFIs described above. The industry responses to each RFI are maintained in the IPT's document repository, along with a summary of each respondent's answers documenting the organization POC, business category, capabilities, and key take-aways. A full list of the RFI questions and their key take-aways are included in Section 7: Market Research.

Additionally, the PM hosted an Industry Day on 20 January 2015 to share information about the acquisition and answer Industry's questions in real-time. The Industry Day also helped to ensure the Government's requirements are defined adequately to promote high quality proposals and adequate competition. Follow on Industry Days are planned to elicit Industry feedback on the upcoming draft PWS and RFP. In conjunction with the first Industry Day, PM DCGS-A hosted a series of One on One sessions to elicit additional Acquisition Strategy feedback from Industry.

Figure 2 below provides a graphical summary of the DCGS-A Increment 2 Contract IPT's Market Research Approach.

A1802

Protected Information and/or Legends Redacted



Figure 2: Market Research Approach

## 7    Market Research

Table 1 below describes all of the Primary Market Research sources and activities leveraged or planned by the DCGS-A Increment 2 Contract IPT.

| Source/Activity | Description |
|---|---|
| RFI 1 | Determine level of competition and elicit industry feedback of Acquisition Strategy |
| RFI 2 | Determine capability of individual businesses to perform as prime contractor |
| RFI 3 | Inform the small business role for Increment 2/Determine if SBSA is appropriate |
| Industry Days | An open forum during which the IPT sponsors shared information about the DCGS-A Increment 2 acquisition |
| One-on-Ones | Dialogue with individual companies to enable the IPT to receive more detailed feedback on Acquisition Strategy and answer Industry's questions in real-time |

Table 1: Market Research Sources

Appx11803

**A1803**
Protected Information
and/or Legends Redacted

**7.1 Industry Engagement**

**7.1.1 Request for Information 1 (RFI1)**

The first Sources Sought RFI was posted to the FedBizOpps website (www.fbo.gov) on 13 August 2014 with responses received by 12 September 2014. Background and limited scope information were provided in the RFI (the same information is included in Section 4 of this Market Research Report). The questions asked in the first RFI were as follows:

1. Company Information

Provide the following information about your company.
- Company Name
- Point of Contact
- Address
- Phone Number
- Business Type (*i.e.*, Large Business, Small Business, Small Disadvantaged Business, 8(a), HUBZone, Woman-owned Small Business, Service Disabled Veteran Owned Small Business, Veteran Owned Small Business) and applicable NAICS code(s). As applicable, do you anticipate transitioning to other than a "small business" in the next eighteen months?
- Contract vehicles your company has been awarded that address the scope of services required to develop and integrate a system such as DCGS-A, focused on integrating COTS/GOTS and internally-developed software products into a software baseline to be fielded on commercial hardware (laptops, servers, etc.) with software updates/enhancements delivered every 6-12 months. For each contract vehicle, specify:
  - Agency
  - Vehicle name and type (*e.g.*, Indefinite Delivery/Indefinite Quantity (ID/IQ) contract, Blanket Purchasing Agreement)
  - Prime or Subcontractor
  - Period of Performance
  - Specify whether your company possesses or can obtain a Facility Security Clearance and if so, at what level.

2. Acquisition Strategy Questions

1) A change from the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation, to a competitive Prime contractor approach, leveraging industry's innovation and proven processes to deliver Increment 2 capabilities. Proposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years.

2) Use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as applicable as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as the baseline to develop required Increment 2 enhancements. Offerors will also have the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions

of the provided Increment 1 baseline package, to best meet the performance and life cycle supportability requirements in a cost effective manner. As applicable, the government may request to review the data and processes (*i.e.*, Trade Studies, Best of Breed Processes, etc.) used that led to the selections.

3) Regular delivery of software builds for evaluation by the Government program office in support of a comprehensive and operationally tested Software Release baseline to be fielded incrementally (two full Software Releases are anticipated to be required to deliver DCGS-A Increment 2 requirements). The Government may decide to field specific enhancements made available for evaluation in software builds prior to incorporation into a full Software Release in support of emerging operational needs, critical technology enhancements that significantly improve operational capability, or resultant cost efficiencies. Government program office evaluation of pre-release software builds at regular intervals will also support timely provision of Government feedback to the Prime contractor throughout the software release development process to lower the risk of a software release not meeting Government expectations during Development and Operational Test, and to provide the Prime contractor opportunities to meet contractual incentives tied to performance and schedule at regular intervals throughout the contract period of performance.

4) With regard to the required Source Selection evaluation factors, *i.e.* Technical/Management Approach, Past Performance, Small Business Participation and Price/Cost, what specific factors/sub-factors do you recommend the Government evaluate that are "discriminators" based on the Increment 2 scope of deliverables and services? In addition, what incentives would you recommend the Government incorporate into this contract effort, assuming a Cost-Plus-Incentive-Fee structure is chosen?

5) Referencing prior experience in efforts of this size, scope, and complexity, provide feedback regarding the suitability of designating this work as a Small Business Set Aside.

6) Please provide feedback on how the government should consider requirements for modern data management infrastructure and data visualization, to include implications of emerging standards such as JIE, COE, and ICITE when drafting the RFP.

### 7.1.2 Request for Information 2 (RFI2)

The second Sources Sought RFI was posted to the FedBizOpps website (www.fbo.gov) on 5 December 2014 with responses received by 29 December 2014. Background and limited scope information were provided in the RFI (the same information is included in Section 4 of this Market Research Report). The questions asked in the second RFI were as follows:

a) Company name; address; Commercial and Government Entity (CAGE) Code and Data Universal Numbering System (DUNS) number; POC name, phone, email.

b) If you are a small business, please identify your company's small business size standard based on the assigned NAICS. For more information refer to http://www.sba.gov/content/table-small-business-size-standards.

**A1805**

**Appx11805**

Protected Information
and/or Legends Redacted

c) What percentage of your company personnel are cleared for TOP SECRET/SCI? Does your company have a TOP SECRET/SCI cleared facility or access to a TOP SECRET/SCI cleared facility? Additionally, does your company have the ability to safeguard SECRET information?

d) Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities.

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company Name)? |
|---|---|---|---|---|---|---|---|
| Cloud Computing | | | | | | | |
| Big Data Analytics | | | | | | | |
| Data Architecture & Management | | | | | | | |
| Data Fusion & Pattern Analysis | | | | | | | |
| Applications for IC ITE Joint Storefront | | | | | | | |
| Targeting | | | | | | | |
| Signals Intelligence/NS A-Net Operations | | | | | | | |
| Defensive Cyber Operations | | | | | | | |
| Offensive Cyber Operations | | | | | | | |
| Counter Intelligence & Human Intelligence | | | | | | | |
| DCGS Integration Backbone (DIB) implementation | | | | | | | |
| Weather Effects/Analysis | | | | | | | |
| GEOINT (Full | | | | | | | |

Appx11806

A1806
Protected Information
and/or Legends Redacted

| | | | | | |
|---|---|---|---|---|---|
| Motion Video/Static Imagery Intelligence) | | | | | |
| Geospatial Intelligence (Terrain & Mapping) | | | | | |
| Collection Management (Sensor Management) | | | | | |
| On-the-Move Operations | | | | | |
| Workflow Management | | | | | |
| Role/Attribute Base Access Control | | | | | |
| Protection level 3 (PL 3) security hardening | | | | | |
| Ease of Use Initiatives | | | | | |
| High/Ultra Reliability Program | | | | | |
| Army Interoperability Certification | | | | | |
| Joint Interoperability Certification | | | | | |

e) Is your company interested in bidding as the Prime Contractor for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program?

f) Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?

g) Does your company have experience with Acquisition Management, Administrative Support, and Program Budget and Execution with specific emphasis on project planning, cost estimating, scheduling, program tracking, financial planning and execution, contract management, acquisition documentation and reporting/briefing efforts? If so, please provide an example, including contract number; indicating whether your firm acted as a prime contractor or subcontractor; contract value; Government/Agency point of contact and current telephone number; and a brief description of the work your company performed under said contract.

A1807

Appx11807

Protected Information and/or Legends Redacted

h) What is your company's current rate of personnel retention over the last five (5) years?

i) Does your company utilize best practices for software development, i.e. Capability Maturity Model Integration (CMMI) certification? If so, what is your certification level? If not, can your company obtain one prior to the time of proposal submission?

### 7.1.3    Request for Information 3 (RFI3)

The third Sources Sought RFI was posted to the FedBizOpps website (www.fbo.gov) on 6 May 2015 with responses received by 22 May 2015. Background and limited scope information were provided in the RFI (the same information is included in Section 4 of this Market Research Report). The questions asked in the third RFI were as follows:

a) Company name; address; CAGE Code and DUNS; POC name, phone, email.

b) If you are a small business, please identify your company's small business size standard and category (i.e., Veteran Owned, Hub Zone, etc). For more information refer to http://www.sba.gov/content/table-small-business-size-standards.

c) Does your business have an accredited Earned Value Management System (EVMS) system (Yes or No)? If yes, please provide Government POC (name, email address, and phone number) who can verify.

d) Does your company have experience putting a product through Operational Testing with the United States Government? If yes, please provide an example and a Government POC (name, email address, and phone number) who can verify.

e) Does your Company have experience developing a product for an Acquisition Category 1 (ACAT 1) Military program?

f) Explain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development.

g) Has your company developed a product that can be used to monitor all user activities?

h) Does your company have experience developing a Training Support Package that supports individual, unit and collective training, developing New Equipment Training Plans or conducting NET and Instructor/Key Personnel Training supplemented with subsequent Live Environment Training?

### 7.1.4    Industry Day

DCGS-A Increment 2 conducted an Industry Day on 20 January 2015. A total of 476 Industry representatives from 177 companies attended. The Industry Day provided a valuable opportunity for Industry stakeholders to gain deeper insight into the DCGS-A Increment 2 Acquisition early in the acquisition process. Government PM Leaders and SMEs briefed topics ranging from an overview of the current Increment 1 system, to Increment 2 requirements and Data Architecture considerations. A second Industry Day was conducted on 25 June of 2015. This Industry Day allowed the DCGS-A team to communicate the specific requirements of Increment 2 to Industry and answer some of their questions.

**A1808**
Appx11808
Protected Information
and/or Legends Redacted

### 7.1.5   One on Ones

DCGS-A Increment 2 commenced Industry One on Ones from 20 January 2015. A total of 78 companies have participated. The One on One sessions provided a closed venue for the vendors and the Increment 2 team to candidly discuss the emerging Acquisition Strategy. Industry provided plenty of useful and informative feedback for consideration. Common discussion themes were as follows:

*7.1.5.1*  **GFE and GFI:** Many of the Industry participants recommended that Increment 2 leverage the investments made in DCGS-A Increment 1. The PM plans to establish a Reading Library as a FedBizOps Secure Technical Package, wherein all unclassified documentation related to Increment 1 will be available for industry to access. Classified data will be provided upon request.

7.1.5.2  **Data Architecture:** Industry recommends DCGS-A create an open Data Architecture, free from the expense and restrictions of a proprietary model.   This would ensure that the Data Infrastructure is decoupled from the Application Layer.  Applications could then be competed out based on compliance to standards.

7.1.5.3  **Acquisition Strategy Feedback:** Many Industry representatives recommend an Acquisition Strategy which separates Data Architecture development from application development, either through separate contracts or separate task orders under a Single Award Indefinite Delivery Indefinite Quantity (IDIQ) contract vehicle.   Responses about the exact type of contract to be used for work under Increment 2 covered the gambit of contract types, to include, Cost-Plus-Fixed-Fee (CPFF), Cost-Plus-Incentive-Fee (CPIF), Cost–Plus-Award-Term (CPAT), Firm-Fixed-Price (FFP) and Fixed-Price-Incentive-Fee (FPIF).

7.1.5.4  **Role of Small Business:** As a result of Market Research and One-on-One sessions, the general consensus is that small businesses possess innovative solutions for individual capabilities that should be harnessed to develop some of the anticipated capability enhancements under the Increment 2 framework. While several small businesses felt they had the ability to perform the entire mission, there were some large business who questioned whether the entire Increment 2 development effort is suitable for a Small Business Set-Aside (SBSA).

7.1.5.5 **Market Research Participants:** A total of 263 companies contributed to market research (103 Large, 151 Small, 8 Non-Profit, and 1 Federally Funded Research and Development Company (FFRDC)). Table 2 below lists all organizations that participated in DCGS-A, Increment 2 Market Research, their contribution, and their business size standard:

**A1809**

Protected Information
and/or Legends Redacted

Appx11809



| | Company | Business Size | Industry Day #1 | One on One | Industry Day #2 | Any of 3 RFIs |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | | | | | |
| 30 | | | | | | |
| 31 | | | | | | |
| 32 | | | | | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 | | | | | | |

A1810

Appx11810

Protected Information and/or Legends Redacted



| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|----|---------|---------------|-------|------------|-------|-----|
| 39 | | | | | | |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | | | | | |
| 48 | | | | | | |
| 49 | | | | | | |
| 50 | | | | | | |
| 51 | | | | | | |
| 52 | | | | | | |
| 53 | | | | | | |
| 54 | | | | | | |
| 55 | | | | | | |
| 56 | | | | | | |
| 57 | | | | | | |
| 58 | | | | | | |
| 59 | | | | | | |
| 60 | | | | | | |
| 61 | | | | | | |
| 62 | | | | | | |
| 63 | | | | | | |
| 64 | | | | | | |
| 65 | | | | | | |
| 66 | | | | | | |
| 67 | | | | | | |
| 68 | | | | | | |
| 69 | | | | | | |
| 70 | | | | | | |
| 71 | | | | | | |
| 72 | | | | | | |
| 73 | | | | | | |
| 74 | | | | | | |
| 75 | | | | | | |
| 76 | | | | | | |

A1811
Appx11811
Protected Information and/or Legends Redacted

| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|---|---|---|---|---|---|---|
| 77 | | | | | | |
| 78 | | | | | | |
| 79 | | | | | | |
| 80 | | | | | | |
| 81 | | | | | | |
| 82 | | | | | | |
| 83 | | | | | | |
| 84 | | | | | | |
| 85 | | | | | | |
| 86 | | | | | | |
| 87 | | | | | | |
| 88 | | | | | | |
| 89 | | | | | | |
| 90 | | | | | | |
| 91 | | | | | | |
| 92 | | | | | | |
| 93 | | | | | | |
| 94 | | | | | | |
| 95 | | | | | | |
| 96 | | | | | | |
| 97 | | | | | | |
| 98 | | | | | | |
| 99 | | | | | | |
| 100 | | | | | | |
| 101 | | | | | | |
| 102 | | | | | | |
| 103 | | | | | | |
| 104 | | | | | | |
| 105 | | | | | | |
| 106 | | | | | | |
| 107 | | | | | | |
| 108 | | | | | | |
| 109 | | | | | | |
| 110 | | | | | | |
| 111 | | | | | | |
| 112 | | | | | | |
| 113 | | | | | | |
| 114 | | | | | | |

A1812

Protected Information
and/or Legends Redacted

Appx11812

| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|---|---|---|---|---|---|---|
| 115 | | | | | | |
| 116 | | | | | | |
| 117 | | | | | | |
| 118 | | | | | | |
| 119 | | | | | | |
| 120 | | | | | | |
| 121 | | | | | | |
| 122 | | | | | | |
| 123 | | | | | | |
| 124 | | | | | | |
| 125 | | | | | | |
| 126 | | | | | | |
| 127 | | | | | | |
| 128 | | | | | | |
| 129 | | | | | | |
| 130 | | | | | | |
| 131 | | | | | | |
| 132 | | | | | | |
| 133 | | | | | | |
| 134 | | | | | | |
| 135 | | | | | | |
| 136 | | | | | | |
| 137 | | | | | | |
| 138 | | | | | | |
| 139 | | | | | | |
| 140 | | | | | | |
| 141 | | | | | | |
| 142 | | | | | | |
| 143 | | | | | | |
| 144 | | | | | | |
| 145 | | | | | | |
| 146 | | | | | | |
| 147 | | | | | | |
| 148 | | | | | | |
| 149 | | | | | | |
| 150 | | | | | | |
| 151 | | | | | | |
| 152 | | | | | | |

A1813

Appx11813

Protected Information
and/or Legends Redacted

| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|---|---|---|---|---|---|---|
| 153 | | | | | | |
| 154 | | | | | | |
| 155 | | | | | | |
| 156 | | | | | | |
| 157 | | | | | | |
| 158 | | | | | | |
| 159 | | | | | | |
| 160 | | | | | | |
| 161 | | | | | | |
| 162 | | | | | | |
| 163 | | | | | | |
| 164 | | | | | | |
| 165 | | | | | | |
| 166 | | | | | | |
| 167 | | | | | | |
| 168 | | | | | | |
| 169 | | | | | | |
| 170 | | | | | | |
| 171 | | | | | | |
| 172 | | | | | | |
| 173 | | | | | | |
| 174 | Palantir Technologies, Inc. | Large | X | | X | X |
| 175 | | | | | | |
| 176 | | | | | | |
| 177 | | | | | | |
| 178 | | | | | | |
| 179 | | | | | | |
| 180 | | | | | | |
| 181 | | | | | | |
| 182 | | | | | | |
| 183 | | | | | | |
| 184 | | | | | | |
| 185 | | | | | | |
| 186 | | | | | | |
| 187 | | | | | | |
| 188 | | | | | | |
| 189 | | | | | | |
| 190 | | | | | | |

A1814

Appx11814

Protected Information and/or Legends Redacted

| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|---|---|---|---|---|---|---|
| 191 | | | | | | |
| 192 | | | | | | |
| 193 | | | | | | |
| 194 | | | | | | |
| 195 | | | | | | |
| 196 | | | | | | |
| 197 | | | | | | |
| 198 | | | | | | |
| 199 | | | | | | |
| 200 | | | | | | |
| 201 | | | | | | |
| 202 | | | | | | |
| 203 | | | | | | |
| 204 | | | | | | |
| 205 | | | | | | |
| 206 | | | | | | |
| 207 | | | | | | |
| 208 | | | | | | |
| 209 | | | | | | |
| 210 | | | | | | |
| 211 | | | | | | |
| 212 | | | | | | |
| 213 | | | | | | |
| 214 | | | | | | |
| 215 | | | | | | |
| 216 | | | | | | |
| 217 | | | | | | |
| 218 | | | | | | |
| 219 | | | | | | |
| 220 | | | | | | |
| 221 | | | | | | |
| 222 | | | | | | |
| 223 | | | | | | |
| 224 | | | | | | |
| 225 | | | | | | |
| 226 | | | | | | |
| 227 | | | | | | |
| 228 | | | | | | |

**A1815**

**Appx11815**

Protected Information and/or Legends Redacted

| | Company | Business Size | ID #1 | One on One | ID #2 | RFI |
|---|---|---|---|---|---|---|
| 229 | | | | | | |
| 230 | | | | | | |
| 231 | | | | | | |
| 232 | | | | | | |
| 233 | | | | | | |
| 234 | | | | | | |
| 235 | | | | | | |
| 236 | | | | | | |
| 237 | | | | | | |
| 238 | | | | | | |
| 239 | | | | | | |
| 240 | | | | | | |
| 241 | | | | | | |
| 242 | | | | | | |
| 243 | | | | | | |
| 244 | | | | | | |
| 245 | | | | | | |
| 246 | | | | | | |
| 247 | | | | | | |
| 248 | | | | | | |
| 249 | | | | | | |
| 250 | | | | | | |
| 251 | | | | | | |
| 252 | | | | | | |
| 253 | | | | | | |
| 254 | | | | | | |
| 255 | | | | | | |
| 256 | | | | | | |
| 257 | | | | | | |
| 258 | | | | | | |
| 259 | | | | | | |
| 260 | | | | | | |
| 261 | | | | | | |
| 262 | | | | | | |
| 263 | | | | | | |

Appx11816

A1816
Protected Information
and/or Legends Redacted

**7.1.5.6 One on One Participants:** Tables 3 – 5 below lists all of the companies that participated in One on One sessions and their stated capabilities:

| | Large Business One on One Capability Listing | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Vendor | Data Arch & MGMT | Data Fusion & Pattern Analysis | Targeting | Def. Cyber Ops | (PL 3) hardening | SIGINT/ NSA-Net Ops | Counter Intel & HUMINT | DIB Implement | Weather | GEOINT | Geospatial | Sensor MGMT | OTM Ops | Workflow | Ease of Use | Hardware Provider | Cloud | Data Analytics | Training Software | IT and Government Research |
| 1 | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | | | | | | |
| 34 | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | |
| 36 | | | | | | | | | | | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | | |
| 42 | | | | | | | | | | | | | | | | | | | | | |

Table 3: One on One Participants (Large Business)

| | | Small Business One on One Capability Listing | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Vendor | Data Arch & MGMT | Data Fusion & Pattern Analysis | Targeting | Def. Cyber Ops | (PL 3) hardening | SIGINT/ NSA-Net Ops | Counter Intel & HUMINT | DIB Implement | Weather | GEOINT | Geospatial | Sensor MGMT | OTM Ops | Workflow | Ease of Use | Hardware Provider | Cloud | Data Analytics | Training Software | IT and Government Reasearch |
| 1 | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | | | | | | |

Table 4: One on One Participants (Small Business)

Appx11818

A1818

Protected Information
and/or Legends Redacted

| | | Non Profit Business One on One Capability Listing | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Vendor | Data Arch & MGMT | Data Fusion & Pattern Analysis | Targeting | Def. Cyber Ops | (PL 3) hardening | SIGINT/ NSA-Net Ops | Counter Intel & HUMINT | DIB Implement | Weather | GEOINT | Geospatial | Sensor MGMT | OTM Ops | Workflow | Ease of Use | Hardware Provider | Cloud | Data Analytics | Training Software | IT and Government Reasearch |
| 1 | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | | |

Table 5: One on One Participants (Non Profit)

## 7.2 RFI Respondents

The Government received RFI responses from a total of 84 business entities. The respondents included 45 large businesses, 35 small businesses, three (3) non-profit organizations, and one (1) Federally Funded Research and Development Center (FFRDC). Of the small businesses, there were several different small business categories, as documented in the DoD Office of Small Business Programs' Goals, including:

- Small Business (SB)
- Historically Underutilized Business Zones (HUBZone)
- Small Disadvantaged Business (SDB) (including 8(a))
- Small Disadvantaged Veteran-Owned Small Business (SDVOSB)
- Woman-Owned Small Business (WOSB)
- Economically-Disadvantaged, Woman-Owned Small Business (EDWOSB)
- Veteran-Owned Small Business (VOSB)

A1819
Protected Information
and/or Legends Redacted

Appx11819

Table 6 below contains a list of all RFI respondents, their applicable business size, and any special designations.



| # | Respondent (Company) Name | Business Size | Small Business Designation(s) |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | | | |
| 30 | | | |
| 31 | | | |
| 32 | | | |
| 33 | | | |
| 34 | | | |
| 35 | | | |
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |

A1820
Protected Information
and/or Legends Redacted

Appx11820



| 43 | |
|----|---|
| 44 | |
| 45 | |
| 46 | |
| 47 | |
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | |
| 53 | |
| 54 | Palantir | Large | N/A |
| 55 | |
| 56 | |
| 57 | |
| 58 | |
| 59 | |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | |
| 66 | |
| 67 | |
| 68 | |
| 69 | |
| 70 | |
| 71 | |
| 72 | |
| 73 | |
| 74 | |
| 75 | |
| 76 | |
| 77 | |
| 78 | |
| 79 | |
| 80 | |
| 81 | |
| 82 | |
| 83 | |
| 84 | |

Table 6: List of RFI Respondents

Protected Information
and/or Legends Redacted

## 7.3 Industry Feedback on Acquisition and Market Trends

In addition to requesting information on Industry capabilities, the RFI requested Industry feedback on several other topics of interest to the acquisition. Key feedback from Industry and take-aways from those additional questions are summarized below.

### 7.3.1 RFI Questions and Trends

*7.3.1.1 A change from the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation, to a competitive Prime contractor approach, leveraging industry's innovation and proven processes to deliver Increment 2 capabilities. Proposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years.*

- Vast majority of respondents support hiring a contractor as the Lead Systems Integrator (LSI) due to efficiencies in industry decision making and resource –marshaling processes.
- Several respondents recommend the Government maintain LSI role citing belief that an Industry LSI will make decisions that may extend the program or place undue risk to the government, and that a government LSI would maintain impartiality with respect to identification of subcontractors and "best of breed" capability selection.
- Some recommend the government contract with one Industry LSI while also directly contracting with multiple other vendors for different components of the enterprise.
- Majority of respondents recommend CPFF or CPIF; no trend in preferred incentive type
- FFP supporters believe a Cost Reimbursement type contract will result in cost and schedule overruns and that requisite technology is mature enough to justify a FFP contract vehicle.

*7.3.1.2 Use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as applicable as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as the baseline to develop required Increment 2 enhancements. Offerors will also have the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions of the provided Increment 1 baseline package, to best meet the performance and life cycle supportability requirements in a cost effective manner. As applicable, the government may request to review the data and processes (i.e., Trade Studies, Best of Breed Processes, etc.) used that led to the selections*

- Industry strongly supports use of GFI to reduce performance risk, program cost, and to increase competition

*7.3.1.3 Regular delivery of software builds for evaluation by the Government program office in support of a comprehensive and operationally tested Software Release baseline to be fielded incrementally (two full Software Releases are anticipated to be required to deliver DCGS-A Increment 2 requirements). The Government may decide to field specific enhancements made available for evaluation in software builds prior to incorporation into a full Software Release in support of emerging operational needs, critical technology enhancements that significantly improve operational capability, or resultant cost efficiencies. Government program office evaluation of pre-release software builds at regular intervals will also support timely provision of Government feedback to the*

A1822
Protected Information
and/or Legends Redacted

*Prime contractor throughout the software release development process to lower the risk of a software release not meeting Government expectations during Development and Operational Test, and to provide the Prime contractor opportunities to meet contractual incentives tied to performance and schedule at regular intervals throughout the contract period of performance.*

- Companies who answered this question unanimously support multiple software builds
- Industry offered a variety of recommendations as to frequency of releases, ranging from three (3) months to two (2) years
- Respondents showed strong support for Agile software build methods

**7.3.1.4** *With regard to the required Source Selection evaluation factors, i.e. Technical/Management Approach, Past Performance, Small Business Participation and Price/Cost, what specific factors/sub-factors do you recommend the Government evaluate that are "discriminators" based on the Increment 2 scope of deliverables and services? In addition, what incentives would you recommend the Government incorporate into this contract effort, assuming a Cost-Plus-Incentive-Fee structure is chosen?*

- Strongest support for technical evaluation factor, while respondents also value management ability and past performance
- Cost and schedule evaluation factors were valued much less



Figure 3: Evaluation Factors
* Note: Some respondents recommend multiple evaluation factors

**7.3.1.5** *Referencing prior experience in efforts of this size, scope, and complexity, provide feedback regarding the suitability of designating this work as a Small Business Set-Aside (SBSA).*

- Majority of large businesses believe Increment 2 effort is too large in scope and complexity for a small business to manage
- Some small businesses believe many small businesses are technically capable to be a successful

A1823
Protected Information and/or Legends Redacted

Appx11823

Prime. Some also noted that a SBSA would allow DCGS-A program to leverage their agility and innovation

***7.3.1.6    Please provide feedback on how the government should consider requirements for modern data management infrastructure and data visualization, to include implications of emerging standards such as JIE, COE, and ICITE when drafting the RFP.***

- Require Increment 2 to conform to JIE, COE, and IC ITE data management and visualization standards
- Recommend RFP provide specific data MGMT and visualization standards, and the source selection includes the evaluation of each offeror's plan to comply with these standards
- Adopt open data architecture wherever possible

***7.3.1.7    What percentage of your company personnel are cleared for TOP SECRET/SCI? Does your company have a TOP SECRET/SCI cleared facility or access to a TOP SECRET/SCI cleared facility? Additionally, does your company have the ability to safeguard SECRET information?***

- Majority of respondents had between 1% and 25% SCI cleared personnel, while many had between 25% and 50% SCI cleared personnel, and a few had more than 50% SCI cleared personnel
- Vast majority of respondents have a TOP SECRET/SCI cleared facility or access to a TOP SECRET/SCI cleared facility
- Majority of respondents have the ability to safeguard SECRET information

***7.3.1.8    Is your company interested in bidding as the Prime Contractor for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program?***

- Majority of respondents intend to bid as Prime Contractor for Increment 2 (31 of 43 RFI 2 respondents)

***7.3.1.9    Does your company have an adequate Defense Contract Auditing Agency (DCAA) accounting system?  If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?***

- Nearly all respondents report to have an adequate DCAA accounting system

***7.3.1.10   Does your company have experience with Acquisition Management, Administrative Support, and Program Budget and Execution with specific emphasis on project planning, cost estimating, scheduling, program tracking, financial planning and execution, contract management, acquisition documentation and reporting/briefing efforts? If so, please provide an example, including contract number; indicating whether your firm acted as a prime contractor or subcontractor; contract value; Government/Agency point of contact and current telephone number; and a brief description of the work your company performed under said contract.***

- Nearly all respondents provided an example detailing their experience with Acquisition Management, Administrative Support, and Program Budget and Execution

***7.3.1.11   What is your company's current rate of personnel retention over the last five (5) years?***

**A1824**
Protected Information
and/or Legends Redacted

Appx11824

- Majority of respondents cited a retention rate of 80% or greater over the last five years

**7.3.1.12   Does your company utilize best practices for software development, i.e. Capability Maturity Model Integration (CMMI) certification? If so, what is your certification level? If not, can your company obtain one prior to the time of proposal submission?**

- Most large businesses reported possessing a CMMI certification of three or higher
- Most small businesses do not possess a CMMI certification, however, one (1) small business possesses a level 3 CMMI certification, two (2) small businesses answered that they could obtain one prior to proposal submission, several more are in the process of obtaining level 2, and two (2) small businesses utilize alternate certification models (International Organization for Standardization (ISO) 27001 and System Engineering Assessment Model (SEAM) respectively).

**7.3.1.13   Does your business have an accredited Earned Value Management System (EVMS) system (Yes or No)? If yes, please provide Government POC (name, email address, and phone number) who can verify.**

- Most large businesses reported possessing an accredited EVMS
- Only one (1) small business (Future Skies) reported possessing an accredited EVMS

**7.3.1.14   Does your company have experience putting a product through Operational Testing with the United States Government? If yes, please provide an example and a Government POC (name, email address, and phone number) who can verify.**

- Majority of Businesses (Large and Small) reported relevant Operational Testing experience

**7.3.1.15   Does your Company have experience developing a product for an Acquisition Category 1 (ACAT 1) Military program?**

- Majority of Businesses (Large and Small) reported relevant ACAT 1 development experience

**7.3.1.16   Explain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development.**

- Majority of businesses (large and small) reported ability to operate without payment for up to 90 days
- Most large businesses reported possessing sufficient capital to operate with little to no reliance on using credit to finance operations
- Most small businesses reported possessing sufficient lines of credit to continue operations while awaiting payment

**7.3.1.17   Has your company developed a product that can be used to monitor all user activities?**

- Majority of large businesses have developed a product or capability designed to monitor user activities
- Few small businesses have developed a product or capability designed to monitor user activities

**7.3.1.18   Does your company have experience developing Training Support Package that supports individual, unit and collective training, developing New Equipment Training (NET)**

A1825
Protected Information and/or Legends Redacted

Appx11825

*Plans or conducting NET and Instructor/Key Personnel Training supplemented with subsequent Live Environment Training?*

- Nearly all Businesses (Large and Small) reported developing relevant Training Support Packages as well as developing and conducting New Equipment Training (NET)

## 7.4   RFI Respondent Capability Assessment

### 7.4.1   Capability Domain Assessment Criteria

#### 7.4.1.1   RFI Response Assessment Criteria

The following criteria were used to determine capability.

**Sufficiently Responsive** - YES/NO:   A "Yes or No" determination is based on whether or not the respondent provided the requested Company and Capabilities information in part three of the RFI.

*Note:  As delineated in the RFI Instructions, marketing brochures will not be considered adequate information in response to this RFI.

**Applicable Experience** - YES/NO/Partial:  A "Yes or No" determination is based on whether or not the respondent provided evidence of applicable experience with some or all of the DCGS-A Increment 2 Scope required to either provide a complete product or specific skill sets to accomplish the scope of development described in part two of the RFI.

#### 7.4.1.2   Capability Criteria Definitions

The following definitions/criteria were used to assess the capability of RFI respondents:

**Capable –** The potential source shows (current or anticipated) broad software development experience, sufficient company infrastructure, and ability to manage subcontractors as a Prime Contractor for all anticipated size, scope, and complexity of the DCGS-A development effort scope of work for that particular capability block.   The Government has a reasonable expectation that the potential source can successfully manage as a Prime Contractor performing at least 50% of the cost of contract performance.

**Partially Capable –** The potential source shows they have a teaming relationship with another company that possesses broad software development experience, sufficient company infrastructure, and ability to manage subcontractors as a Prime Contractor for all anticipated size, scope, and complexity of all aspects of a particular DCGS-A capability block congruent with anticipated size, scope, and complexity.

**Not Capable –** The potential source does not show (current or anticipated) broad software development experience, sufficient company infrastructure, or ability to manage subcontractors as a Prime Contractor to develop any part of a particular DCGS-A capability block congruent with anticipated size, scope, and complexity.

### 7.4.2   Respondent Capability Domain Assessment Summary

Respondent's capabilities across the anticipated Increment 2 scope of development were assessed based on their written responses to the second RFI that was cross referenced with government

**A1826**
Protected Information
and/or Legends Redacted

representatives such as Contracting Officer Representatives (CORs) and Product Managers (PdMs). EVMS accreditation is also displayed for companies that responded to the second and third RFIs. Respondents received one of three (3) different capability assessments based on the criteria provided in Section 7.4.1.2 for each individual capability category. The capability assessment Legend is as follows:

- Capable (Green): Sufficient Experience or ability to fulfill all anticipated requirements under the appropriate capability block. Green rating within the EVMS block indicates the company possesses an accredited EVMS.
- Partially Capable (Grey): Has partnered with a company with Sufficient Experience or ability to fulfill the anticipated requirements under the appropriate capability block.
- Not Capable (Red): Does not possess sufficient experience or ability to fulfill any of the anticipated requirements under the appropriate capability block. Red rating within the EVMS block indicates the company does not possess an accredited EVMS.
- No Answer (X): Company provided no data for the capability block.
- Percentage of Work: This column represents the percentage of work anticipated for each individual capability block, based on costing assumption of $219 Million allocation for Increment 2.
- Prime (P): Company intends to bid as Prime Contractor for Increment 2 development.
- Subcontractor (S): Company intends to bid as Sub Contractor for Increment 2 development.
- CMMI Equivalent (E): Company possesses certification from a standards board other than CMMI, i.e. System Engineering Assessment Model (SEAM) or International Standards Organization (ISO) 9001.
- Capable of obtaining CMMI certification (C): Company claims to be capable of obtaining (and plans to obtain) a CMMI certification prior to proposal submission.
- Increment 1 Reuse (R): Capability will be carried over from Increment 1 with no enhancement currently planned.



* Capability Table represents Anticipated Development Contract Costs of $166M (219M total RDT&E Budget for Inc 2 over 5 years) divided between Release1 and Release 2

A1827
Protected Information
and/or Legends Redacted

Appx11827

The assessment of respondents' capabilities is provided in Tables 7 and 8 below:



| Company Name | Prime or Sub | CMMI Level | EVMS | | Release 1 | | | | | | | | | | | | | | | Release 2 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Data Arch & MGMT | Ease of Use | Cyber (IA) | Targeting | SIGINT/ NSA-Net Ops | Counter Intel & HUMINT | Weather | GEOINT | Geospatial | Sensor MGMT | OTM Ops | Workflow | Overall % | | Data Fusion & Pattern Analysis | Intel SPT to Cyber | Ease of Use | DIB Upgrade | Cyber (IA) | Overall % |
| Percentage of Work | | | | | | | | | | | | | | | | | | | | | | | | | |
| Palantir | P | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | 0% | | X | X | X | X | X | 0% |

Table 7: Large Business Capability Assessment

Appx11828

A1828
Protected Information
and/or Legends Redacted



Table 8: Small Business Capability Assessment

### 7.4.3 *Capability Criteria Not Included in Capability Domain Assessment Summary*

Due to Increment 2 cost estimates, projected budget, and scope of Increment 2 development, several capability domains listed on RFI 2 were either included as a portion of the Data Architecture and Management capability block, were not included, or were defined as reuse (R) in the Domain Assessment Summary (Tables 6 and 7). The Increment 2 scope currently includes enhancements to Data Architecture & Management, Ease of Use, Information Assurance, Data Fusion & Pattern Analysis, Intel Support to Cyber (Cyber Analytics), and DCGS-A Integration Backbone (DIB). If the projected budget for Increment 2 is increased than all areas currently labeled (R) on tables 6 and 7 will be re-evaluated for inclusion into the Increment 2 baseline. A brief explanation of this consolidation is listed below.

#### 7.4.3.1 *Big Data Analytics*

The PM's approach to meeting Increment 2 data requirements includes procurement and development of a new Data Management Architecture. The architecture will include a customizable data analytics layer that can evolve with the threat and accommodate data on a "big data" scale. The Big Data Analytics domain is therefore included in the Data Management Architecture work scope.

#### 7.4.3.2 *Cloud*

A1829

Appx11829

Protected Information
and/or Legends Redacted

The PM assumes that the Increment 2 provider(s) will propose a cloud based technology to meet the Data Management Architecture requirements. The Cloud domain is therefore included in the Data Management Architecture work scope.

### 7.4.3.3  Access Control

The Data Management Architecture will need to accommodate necessary data tagging and protection policies to enable necessary Access Controls as dictated in the requirements and Risk Management Framework (RMF). The Access Control domain is therefore included in the Data Management Architecture work scope.

### 7.4.3.4  High/Ultra High Reliability

New reliability principles and oversight processes will be applied throughout the Increment 2 development effort, and is therefore already included in each blocks' cost estimate.

### 7.4.3.5  Targeting

Upgrades to Targeting capability will not be feasible under current funding. Therefore, Increment 1 capability will be carried into Increment 2.

### 7.4.3.6  Defensives Cyber Operations

Defensive Cyber Operations is out of scope for Increment 2 development as dictated by the ARCYBER draft CDD for Defensive Cyber Operations.

### 7.4.3.7  Applications for IC ITE Joint Storefront

Upgrades to IC ITE Joint Storefront is not applicable to the DCGS-A mission scope. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.8  SIGINT/NSA Net Ops

Upgrades to SIGINT/NSA Net Ops capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.9  Offensive Cyber Operations

Offensive Cyber Operations is out of scope for Increment 2 development as dictated by the ARCYBER draft CDD for Offensive Cyber Operations.

### 7.4.3.10  Counter Intelligence and Human Intelligence (HUMINT)

Upgrades to Counter Intelligence and HUMINT capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.11  Weather

Upgrades to Weather capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.12  GEOINT

Upgrades to GEOINT capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

A1830

Protected Information
and/or Legends Redacted

### 7.4.3.13 Geospatial

Upgrades to Weather capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.14 Sensor Management

Upgrades to Sensor Management capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.15 On the Move Operations (OTM)

Upgrades to OTM capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.16 Workflow

Upgrades to Workflow capability will not be feasible under current funding. Therefore, Increment 1 capability will be brought forward into Increment 2.

### 7.4.3.17 Army Interoperability Certification

Army Interoperability Certification testing for Increment 2 will be performed by the Government.

### 7.4.3.18 Joint Interoperability Certification

Joint Interoperability Certification testing for Increment 2 will be performed by the Government.

### 7.4.3.19 Intelligence Support to Cyber Operations

Intelligence Support to Cyber Operations was not in scope for Increment 2 development at the time RFI 2 was released. TCM Sensor Processing has since added it to the Increment 2 RDP. Therefore, none of the companies surveyed provided any example of relevant experience for that capability block.

### 7.4.4 Respondent Capability Assessment Narratives

Of the 43 total respondents to the second RFI, thirteen large businesses were deemed capable of performing the entire anticipated scope of work IAW current funding levels for the Increment 2 development efforts. All but six respondents (three Large and three Small) were deemed capable of performing some portion of the anticipated scope of work. No small businesses were found capable in all scope areas. There were 13 small businesses found capable of performing at least 50% of the anticipated scope of Release 1 development and four (4) found capable of performing at least 50% of the anticipated scope of Release 2 development IAW current funding levels. However, none of them reported possessing an accredited EVMS.



**A1831**

Appx11831

Protected Information
and/or Legends Redacted



A1832

Appx11832

Protected Information
and/or Legends Redacted



Appx11833

A1833

Protected Information
and/or Legends Redacted



**A1834**

Protected Information
and/or Legends Redacted



*7.4.4.30 Palantir*

The Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive.

A1836

Protected Information
and/or Legends Redacted



A1837
Protected Information
and/or Legends Redacted

# 8 Findings

## 8.1 Large Business Capability Findings

A total of 26 large businesses responded to the second RFI.

- Of the 26 large business respondents, thirteen were deemed capable of performing the entire anticipated scope of work for the Increment 2 development effort:



- Five (5) large businesses were found capable of performing the development of at least 50% (but not all) of the anticipated scope of work for Release 1:



- 17 large businesses were found capable of performing the development of at least 50% (but not all) of the anticipated scope of work for Release 2:



**A1838**
Protected Information and/or Legends Redacted

**Appx11838**

[black redaction bar]

- One (1) large business was found not capable of developing any of the twenty-three capability blocks under the anticipated scope of work:

  [black redaction bar]

- One large business did not provide capability data:
  1. Palantir

## 8.2    Small Business Capability Findings

A total of sixteen (16) small businesses responded to the second RFI.

- None of the small businesses were found capable of performing the entire anticipated scope of work.
- The number of Small Businesses that were found capable or partially capable of supporting individual Increment 2 capability block upgrades is as follows:
  - **Data Architecture and Management:** Thirteen (13) small businesses
  - **Data Fusion and Pattern Analysis:** Five (5)  small businesses
  - **Cyber Operations (IA):** Seven (7) small businesses
  - **DCGS Integrated Backbone (DIB) Upgrade:** Six (6) small businesses
  - **Ease of Use:** Six (6) small businesses

Of the sixteen total small business respondents, 13 were found capable for completing at least 50% of the anticipated development effort for release 1; four (4) were found capable for completing at least 50% of the anticipated scope of work for Release 2; and three (3) were not found capable for completing any of the anticipated scope of work.

Of the 13 small business respondents found capable of completing at least 50% of the anticipated Release 1 development effort, two (2) had CMMI (or equivalent) certification and also intend to bid as a Prime Contractor for the Increment 2 development contract. Those Companies are [black redaction] and [black redaction]. Two (2) small businesses responded to the second and third RFI. Both reported that they do not possess an accredited EVMS.

## 8.3    General Findings

### 8.3.1    Performance and Efficiencies

This RFI analysis concluded that industry favors some type of incentive fee to promote performance and/or cost control. However, the RFI respondents were split on whether cost, schedule, or performance should be incentivized.

### 8.3.2    Better Buying Power

Based on RFI responses received, Industry appears willing to accept specific actions consistent with DoD's Better Buying Power initiatives, such as:

PRE-DECISIONAL – PROCUREMENT SENSITIVE

A1839

Protected Information
and/or Legends Redacted

- Increased use of Modular Open Systems Architecture
- Provide draft technical requirements to industry early
- Performance incentives/disincentives

### 8.3.3 AbilityOne Program

In accordance to FAR Part 8.002(a)(2), the DCGS-A Increment 2 IPT determined that the scope of work cannot be provided by the AbilityOne Program (www.abilityone.gov). The scope and complexity of the capabilities sought are not offered under the AbilityOne Program.

### 8.3.4 Contract Types

The vast majority of respondents prefer a fee type contract structure, with CPIF as the most popular contract type, citing the ability of the Government to tailor requirements, while holding the Prime contractor accountable for performance. Some respondents favor a FFP structure for all or part of the Increment 2 development effort. They point to technology maturity which could provide confidence in contract cost estimation. The Government should take a look at which aspects of development can be accurately priced and consider applying FFP to those elements.

### 8.3.5 Commercial Services

Significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product.

### 8.3.6 Market Prices

A fair market price is anticipated from both large and small businesses. The high number of RFI respondents with significant information technology experience indicates a competitive market place for DGCS-A Increment 2 development. However, small businesses does not appear to possess non-technical requirements to act as a prime contractor for the Increment 2 development i.e. possessing an accredited EVMS. The IPT also intends to consider multiple Acquisition Strategies, in order to promote on-going competition within a Basic contract award.

# 9 Conclusion

Extensive Market Research from August 14 to June 2015 has shown that Industry as a whole is very capable and interested in performing Increment 2 development. The IPT anticipates sufficient competition, as multiple companies have cited relevant experience and competencies that show they are well suited ability to enhance DCGS-A capabilities. The IPT has verified these claims with the appropriate Government points of contact. In addition to business capability data, Industry provided valuable Acquisition Strategy input. Specifically, they have expressed that the use of multiple software releases, and availability of Increment 1 products as GFI would greatly enhance their ability to successfully support the Increment 2 EMD effort.

The IPT carefully considered competing the Increment 2 development contract as a Small Business Set Aside (SBSA). Many questions asked in the 3 RFIs were tailored to gauge the ability of a Small Business to perform as the Prime Contractor. Based on a comprehensive review of both large and small businesses, a Small Business Set Aside (SBSA) is not likely to yield the best scientific and technological sources consistent with the demands of this acquisition IAW FAR 19.502-2 (b), and would pose unnecessary cost, schedule, and performance risk to the Government. Therefore, the Acquisition Strategy for this requirement will pursue a full and open competition. Small business cited considerable experience in developing capabilities relevant to Increment 2. However, their RFI responses did not make it clear that they possessed the required engineering development capabilities vs. technology development capabilities. Furthermore, large businesses as a whole was able to cite significantly more capability development experience than small businesses. This does not mean a small business could not provide the best technical solution and be best suited to serve as the Systems Integrator for Increment 2. However, the results of this Market Research show it would not be in the Government's best interest to reduce competitive opportunity by excluding large business.

Aside from possessing less capability development experience than large business, no small businesses have shown that they possess the requisite infrastructure to prime a contract of the anticipated size and scope of DCGS-A Increment 2 development. Of the 13 small businesses deemed technically capable of developing either Release 1 or Release 2, none have been shown to possess an accredited EVMS. Additionally, only one (1) of these small businesses possesses a level 3 CMMI certification, while multiple large businesses possess both an accredited EVMS and CMMI certification of 3 or higher. Possessing an accredited EVMS is a statutory requirement for this acquisition, as DFARS 234.201 requires the contractor to possess an accredited EVMS for any cost or incentive contracts and subcontracts valued at $50 Million or above. The Defense Contract Management Association (DCMA) 16 step EVMS accreditation process is exhaustive, and can take up to three (3) years to complete. While, CMMI certification of 3 or higher shows that a company utilizes best practices and repeatable processes in areas such as project planning, risk management, and quality assurance.

Based on the Market Research to date, the recommended approach is a five (5) year Engineering and Manufacturing Development (EMD) effort consisting of two releases. Release 1 would consist of an upgraded Data Architecture with some usability enhancements. Due to available funding, all other capability would be carried forward from Increment 1. Release 2 would include several capability enhancements including improvements to Data Fusion & Pattern Analysis and the addition of a Cyber analytics capability (Intelligence Support to Cyber).

The IPT continues to consider multiple approaches to maximize the utilization of small business while managing performance risk. Additionally, partial set-asides either by dollar value, scope area, or a combination of both of these have been analyzed to inform the proposed Acquisition Strategy. Small

Protected Information
and/or Legends Redacted

# Distributed Common Ground System-Army (DCGS-A) Increment 2

Increment 2

---

## Request for Information (RFI)
## Response Analysis

**December 2014**

**PREPARED BY:**

Solicitation Integrated Product Team (IPT) Chair: MAJ Derek G. Johnson

## Table of Contents

Executive Summary ................................................................................................................ 4

1    Authority ........................................................................................................................ 5

2    North American Industry Classification System (NAICS)............................................... 5

3    Market Research Objectives .......................................................................................... 5

4    Background..................................................................................................................... 5

5    Scope of Development ................................................................................................... 8

    5.1    Key Performance Parameters (KPPs)........................................................................ 8

        5.1.1    Net Ready................................................................................................ 8

        5.1.2    Fusion..................................................................................................... 8

        5.1.3    Training................................................................................................... 9

        5.1.4    Sustainment........................................................................................... 9

    5.2    Key System Attributes (KSAs)................................................................................... 9

        5.2.1    Ownership Cost ...................................................................................... 9

        5.2.2    Reliability.............................................................................................. 10

        5.2.3    Ease of Use/Usability............................................................................ 10

        5.2.4    Geospatial Information.......................................................................... 10

        5.2.5    Cyber Operations.................................................................................. 10

6    Market Research Approach .......................................................................................... 11

7    Market Research........................................................................................................... 12

    7.1    Industry Engagement .............................................................................................. 12

        7.1.1    Request for Information (RFI)................................................................ 12

        7.1.2    Industry Day.......................................................................................... 14

    7.2    RFI Respondents...................................................................................................... 14

    7.3    Industry Feedback on Acquisition and Market Trends............................................ 16

        7.3.1    RFI Questions and Trends...................................................................... 16

    7.4    RFI Respondent Capability Assessment.................................................................. 18

        7.4.1    Capability Assessment Criteria............................................................. 18

        7.4.2    Respondent Capability Assessment Summary by Capability Block....................................... 19

        7.4.3    Respondent Capability Assessment Narratives........................................................ 22

Appx11845

A1845

Protected Information
and/or Legends Redacted

8    Findings ...................................................................................................................... 28

  8.1    Large Business Capability Findings.................................................................... 28

  8.2    Small Business Capability Findings.................................................................... 28

  8.3    General Findings ............................................................................................... 29

    8.3.1    Performance and Efficiencies........................................................................ 29

    8.3.2    Better Buying Power ..................................................................................... 29

    8.3.3    Ability One Program ...................................................................................... 29

    8.3.4    Contract Types............................................................................................... 30

    8.3.5    Commercial Services ..................................................................................... 30

    8.3.6    Market Prices ................................................................................................. 30

10   Conclusion .................................................................................................................. 31

## List of Tables

Table 1: Market Research Sources.................................................................................... 12

Table 2: List of RFI Respondents..................................................................................... 15

Table 3: Respondent Capability Assessment ................................................................... 20

## List of Figures

Figure 1: DCGS-A Capability Description............................................................................ 7

Figure 2: Market Research Approach ............................................................................... 12

Figure 3: Evaluation Factors............................................................................................. 18

Figure 4: Number of Small Businesses by Capability Block............................................. 29

Appx11846

A1846

Protected Information
and/or Legends Redacted

## Executive Summary

This report documents the analysis and findings of the RFI #1 Response Analysis conducted by a multi-functional Integrated Product Team (IPT) to determine market capability to develop Increment 2 of DCGS-A.

Following the Department of Defense (DoD) Framework for a Development Acquisition, the DCGS-A Increment 2 Contract IPT was chartered by PM DCGS-A to establish a contracting approach to provide for the analysis, design and development to support the DCGS-A Increment 2 Engineering and Manufacturing Development (EMD) Phase. The major objectives of the acquisition are to incorporate better buying power initiatives, maximize competition, and utilize Small Business, while developing a DCGS-A Increment 2 capability that meets or exceeds all the requirements that have been identified.

The DCGS-A program is actively engaged in coordination with Industry on competitive efforts for Increment 2. The PM is assessing a transition from the current acquisition approach, which has the Government serving as lead integrator for DCGS-A Increment 1. Under the new construct, Industry would take a more active role in the final product and program delivery. This would potentially better leverage Industry's innovation, emerging technologies and proven processes to deliver a more fully integrated capability. The PM's Industry engagement plan includes a series of Requests for Information (RFI) to solicit industry feedback on the program's requirements and proposed acquisition strategy, several Industry Day forums that will support open communication, and continuous dialogue at individual meetings. While the acquisition strategy is still in early stages of development, Increment 2 is envisioned to have two major software releases. Toward this aim, the IPT conducted market research to understand the overall marketplace landscape for Information Technology (IT) Services to perform DCGS-A Increment 2 development contract; gather Industry feedback on trends and new or innovative contracting concepts; and, analyze lessons learned, best practices, and common approaches to development of IT systems. Two more RFIs are planned and further feedback from industry will be obtained through a planned Industry Day to share information about the acquisition and respond to Industry's questions in real-time.

PM DCGS-A released the first RFI on 13 August 2014, with a response date no later than 12 September 2014. The Government received a total of 44 responses, which included 28 Large Businesses, 13 Small Businesses, two non-profit organizations and one Federally Funded Research and Development Center (FFRDC). A second RFI was released on 5 December 2014 with results due no later than 29 December 2014.

Based on initial market research (RFI) and analysis of the resulting information, the overall conclusion of this Market Research Analysis is that additional RFIs and industry engagements are needed to determine whether a Small Business set aside is suitable for the DCGS-A Increment 2 Engineering and Development effort. Going forward, the Acquisition Strategy will consider multiple approaches to maximize the utilization of Small Business while managing program performance risk. Small business set aside as well as partial set-asides either by dollar value, scope area, or a combination of both of these concepts will be analyzed to inform the selected Acquisition Strategy.

The information contained in this RFI Response Analysis will be utilized throughout the lifecycle of this acquisition effort and will be refreshed as necessary to inform key decisions.

**A1847**

Protected Information
and/or Legends Redacted



MinoritOwned,

Certified
8(a)/Small

**Table 2: List of RFI Respondents**

Disadvantaged

## 7.3   Industry Feedback on Acquisition and Market Trends

8(m) Business

In addition to requesting information on Industry capabilities, the RFI requested Industry feedback on several other topics of interest to the acquisition. Key feedback from Industry and take-aways from those additional questions are summarized below.

### 7.3.1   RFI Questions and Trends

*7.3.1.1   A change from the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation, to a competitive Prime contractor approach, leveraging industry's innovation and proven processes to deliver Increment 2 capabilities.  Proposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years.*

- Vast majority of respondents support hiring a contractor as the LSI due to efficiencies in industry decision making and resource –marshaling processes.

- Several respondents recommend the Government maintain LSI role citing belief that an Industry LSI will make decisions that may extend the program or place undue risk to the government, and that a government LSI would maintain impartiality with respect to identification of subcontractors and "best of breed" capability selection.

- Some recommend the government contract with one Industry LSI while also directly contracting with multiple other vendors for different components of the enterprise.

- Majority of respondents recommend CPFF or CPIF; no trend in preferred incentive type

- FFP supporters believe a Cost Reimbursement type contract will result in cost and schedule overruns and that requisite technology is mature enough to justify a FFP contract vehicle.


*7.3.1.2   Use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as applicable as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as the baseline to develop required Increment 2 enhancements.  Offerors will also have the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions of*

**A1859**

Appx11859

Protected Information
and/or Legends Redacted



Figure 3: Evaluation Factors

**7.3.1.5    Referencing prior experience in efforts of this size, scope, and complexity, provide feedback regarding the suitability of designating this work as a Small Business Set Aside.**

- Majority of Large Businesses believe Increment 2 effort is too large in scope and complexity for a small business to manage
- Some small businesses believe many small businesses are technically capable to be a successful Prime. Some also noted that a SBSA would allow DCGS-A program to leverage their agility and innovation

**7.3.1.6    Please provide feedback on how the government should consider requirements for modern data management infrastructure and data visualization, to include implications of emerging standards such as JIE, COE, and ICITE when drafting the RFP.**

- Require Increment 2 to conform to JIE, COE, and IC ITE data management and visualization standards
- Recommend RFP provide specific data MGMT and visualization standards, and the source selection includes the evaluation of each vender's plan to comply with these standards
- Adopt open data architecture wherever possible

## 7.4    RFI Respondent Capability Assessment

### 7.4.1    Capability Assessment Criteria

#### 7.4.1.1    RFI Response Assessment Criteria

The following criteria were used to determine capability or the need for a follow-up one-on-one to validate capability.

**Sufficiently Responsive** - YES/NO:  A "Yes or No" determination is based on whether or not the respondent provided the requested Company and Capabilities information in part three of the RFI.

Protected Information
and/or Legends Redacted

*Note: As delineated in the RFI Instructions, marketing brochures will not be considered adequate information in response to this RFI.

**Applicable Experience** - YES/NO/Partial: A "Yes, No, or P" determination is based on whether or not the respondent provided evidence of applicable experience with some or all of the DCGS-A Increment 2 Scope required to either provide a complete product or specific skill sets to accomplish the scope of development described in part two of the RFI

### 7.4.1.2    Capability Criteria Definitions

The following definitions/criteria were used to assess the capability of RFI respondents:

**Capable –** The potential source shows (current or anticipated) broad software development experience, sufficient company infrastructure, and ability to manage subcontractors as a Prime Contractor for all anticipated size, scope, and complexity of the DCGS-A development effort scope of work for that particular capability block.  The Government has a reasonable expectation that the potential source can successfully manage as a Prime Contractor performing at least 50% of the cost of contract performance.

**Partially Capable –** The potential source shows (current or anticipated) broad software development experience, sufficient company infrastructure, and ability to manage subcontractors as a Prime Contractor to develop one or more (but not all) aspects of a particular DCGS-A capability block congruent with anticipated size, scope, and complexity.  The Government has a reasonable expectation that the potential source can successfully manage as a Prime Contractor performing at least 50% of the cost of contract performance.

**Not Capable –** The potential source does not show (current or anticipated) broad software development experience, sufficient company infrastructure, or ability to manage subcontractors as a Prime Contractor to develop any part of a particular DCGS-A capability block congruent with anticipated size, scope, and complexity. The Government does not have a reasonable expectation that the potential source can successfully manage as a Prime Contractor performing at least 50% of the cost of contract performance.

### 7.4.2    *Respondent Capability Assessment Summary by Capability Block*

Respondent's capabilities across the anticipated Increment 2 scope of development were assessed based on their written responses to the RFI and the information gathered from their corporate website. Respondents received one of three (3) different capability assessments based on the criteria provided in Section 7.4.1.2 for each individual capability category. The capability assessments are as follows:

- Capable (Sufficient Experience or ability to fulfill all anticipated requirements under the appropriate capability block).
- Partially Capable (Sufficient Experience or ability to fulfill some but not all anticipated requirements under the appropriate capability block)
- Not Capable

The assessment of respondents' capabilities is provided in Table 3 below.

**A1862**

Protected Information
and/or Legends Redacted

## DCGS-A Increment 2
## RFI Response Analysis



| Company | Business | Cloud Computing | Big Data Analytics | Data Fusion and Pattern Analysis | Targeting | SIGINT | Cyber | C-HUMINT | Data Management | DCGS Integrated Backbone | Weather Effects Analysis | IMINT | Geospatial | Collection MGMT/ISR Sync | Workflow Management |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Palantir | Large | No | No | P | No | No | P | No | Yes | No | No | No | No | No | Yes |
| Total Yes | | 12 | 9 | 11 | 2 | 4 | 2 | 6 | 25 | 11 | 3 | 16 | 14 | 14 | 3 |

Table 3: Respondent Capability Assessment

Protected Information
and/or Legends Redacted

Of the 44 total RFI respondents, only one (1) was deemed capable of performing the entire anticipated scope of work for the Increment 2 development efforts. In addition, 25 Large Businesses, nine (9) Small Businesses, and one Non-Profit Business were found capable of performing some portion of the anticipated scope of work. No Small Businesses were found capable in all scope areas.

### 7.4.3   *Respondent Capability Assessment Narratives*

Appx11865

A1865

Protected Information and/or Legends Redacted



PRE-DECISIONAL – PROCUREMENT SENSITIVE

A1866

Protected Information
and/or Legends Redacted



**A1867**

Appx11867

Protected Information
and/or Legends Redacted



### 7.4.3.28 Palantir

The Palantir response listed several contracts they have been awarded, but did not include scope or description of work. However, Palantir has developed an intelligence fusion system that has been used by various entities within the Department of Defense. Palantir was found capable to provide Data management and Workflow Management upgrades, and partially capable of providing Data Fusion and Cyber capabilities to Increment 2.

Appx11868

A1868

Protected Information and/or Legends Redacted



**A1869**

Protected Information
and/or Legends Redacted

Appx11869



Appx11870

**A1870**
Protected Information
and/or Legends Redacted

popular contract type, citing the ability of the Government to tailor requirements, while holding the Prime contractor accountable for performance. Some respondents favor a FFP structure for all or part of the Increment 2 development effort. They point to technology maturity which could provide confidence in contract cost estimation. The Government should take a look at which aspects of development can be accurately priced and consider applying FFP to those elements.

### 8.3.5 Commercial Services

Significant portions of the anticipated Increment 2 scope of work are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product.

### 8.3.6 Market Prices

A fair market price is anticipated from both Large and Small Businesses. The high number of RFI respondents with significant information technology experience indicates a competitive market place for DGCS-A Increment 2 development. However, further research is needed to determine how many businesses are truly capable of successfully conducting the scope of work required as the Increment 2 Prime Contractor. The IPT also intends to consider multiple Acquisition Strategies, in order to promote on-going competition within a Basic contract award.

A1873
Protected Information
and/or Legends Redacted

# 9 Conclusion

Based on the responses to the first RFI, and analysis of the resulting information conducted by the DCGS-A Increment 2 Contract IPT, the overall conclusion of this Market Research Report is that a more capability focused RFI needs to be issued to industry. The second RFI's purpose is to determine the level of competition that exists and if the role as DCGS-A Increment 2 Prime Contractor is suitable for a Small Business set-aside. Only One (1) Large Business was found capable of performing the entire anticipated scope of work. No Small Businesses were found capable of performing the entire anticipated scope of work, and few Small Businesses were found capable of performing several scope areas. This is likely attributed to the wording of the RFI. The RFI asked for respondents to cite relevant past contracts but failed to specify which DCGS-A capability blocks comprised relevant experience. As a result, few businesses highlighted many of those capability blocks in their response. As such, the IPT will conduct follow on RFIs and Industry engagement to determine business capabilities. Furthermore, the Acquisition Strategy for this requirement will consider multiple approaches to maximize the utilization of Small Business while managing performance risk. Partial set-asides either by dollar value, scope area, or a combination of both of these will be analyzed to inform the selected Acquisition Strategy.

In addition to failing to specify desired capability, the RFI did not require respondents to provide a government POC to verify their work on relevant contracts. Therefore, the contract IPT was unable to verify if cited contract experience was relevant to anticipated Increment 2 development efforts.

The information contained in this RFI Response Analysis will be utilized throughout the lifecycle of this acquisition effort, and will be refreshed as necessary to inform key decisions. Specifically, the findings and conclusions in this report will be leveraged during development of the Market Research Report, Acquisition Strategy, Acquisition Plan, Analysis of Contracting Alternatives/Business Case Analysis, and Acquisition Requirements Package.

Protected Information
and/or Legends Redacted

# 1.0 Introduction

This is a Request for Information (RFI), as defined in Federal Acquisition Regulation (FAR) 15.201(e).

The purpose of this RFI is to solicit industry feedback on the requirements and proposed acquisition strategy for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program. This RFI is part of a set of industry engagements in support of enhancing the Industry-Government partnership critical to providing an effective and evolvable end-product for Army DCGS-A operators and information consumers. The Government intends to consider all Industry inputs and initiatives as it prepares for and executes the solicitation process. In addition, this RFI requests respondents' corporate overview information and basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program. The Army plans to leverage industry recommendations on the delivery of DCGS-A software to implement best practices, improve productivity, gain efficiencies, and realize cost savings.

This is not a request for proposal, request for quotation, or an invitation for bid, nor does its issuance obligate or restrict the Government to any particular acquisition approach. This RFI does not obligate the Government to issue a solicitation. This RFI is being conducted solely for information and planning purposes and does not constitute a solicitation. Neither unsolicited proposal (s) nor any other offers will be considered in response to this request or accepted by the Government to form a binding contract. Contractors are solely responsible for all expenses associated with responding to this RFI. Acknowledgement of receipt of submitted items will not be made nor will respondents be notified of the outcome of the information received.

Small Businesses are encouraged to submit responses to this RFI.

# 2.0 Background

## 2.1 DCGS-A Program Overview

The Distributed Common Ground System-Army (DCGS-A) program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems (FoS) that will contribute to Joint and combined Warfighter needs. The DCG/SS MA was converted into the DCGS Enterprise ICD in March 2009.

DCGS-A is an evolving program made up of a foundational network, hardware, software, sensors, people, and processes. It is comprised of an extensive network architecture that enables distributed processing and information sharing of data from sensors and other sources across the globe; software tools to help the users perform the analyses, update, and share intelligence products; servers that store data and collected intelligence; and alignment to a set of common standards that enable integration of new technology, processes, and ideas. As technology evolves and new warfigthing requirements emerge, the DCGS-A capability set needs to be updated to meet the user needs.

DCGS-A is the Army's primary system for ISR tasking of sensors, processing, exploitation and dissemination (TPED) of collected data converted into warfighting information and intelligence regarding the threat, weather, and terrain at all Army echelons. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The DCGS-A system and data enterprise must conform to and leverage the Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence

A1876

Protected Information
and/or Legends Redacted

Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

DCGS-A facilitates SEEing and KNOWing on the battlefield—the fundamental precursor to the UNDERSTANDing that underpins the Army's Mission Command concept. DCGS-A will continue to contribute to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum.

The current acquisition approach for Increment 2 will leverage the CJCSI 3170.01H Information Technology Box (IT Box) Requirements Process for incremental software releases (see https://acc.dau.mil/jcids for more information on the IT Box process). This streamlined approach will support incremental development and fielding of system software capabilities over time to meet the user needs.

A significant component of the DCGS-A Increment 2 acquisition approach via the IT Box requirements methodology is the ability to grow system capability over time through a series of software releases and hardware modernizations/refresh cycles.  DCGS-A software releases provide a mechanism to build agility within the program to satisfy requirements in an accelerated fashion.  Each DCGS-A software release will be synchronized with Army interoperability and Cyber Security standards.  DCGS-A will continue to maximize the use of Commercial off-the-Shelf (COTS) /Government off-the-Shelf (GOTS) products and will procure them through DoD/Army enterprise contracting vehicles where possible.  The IT Box construct will have a Requirements Oversight Council, which is made up of the requirements organizations, user representatives, and acquisition officials who provide the PM a prioritized list of requirements to pursue in each software release. The PM, user representative, and industry integrator will execute to the prioritized list in accordance with capability maturity assessment, cost, and schedule constraints per software release.  DCGS-A Increment 2 software releases will leverage the Intelligence Community (IC) investments in information system technology and align to the applicable initiatives of the National Functional Managers (NSA, DIA, and CIA).

The primary focus of the Increment 2 program capability approach will be the alignment to the Intelligence Community Information Technology Enterprise (IC ITE).  Compliance with the IC ITE standards will ensure that the Army delivers a capability that will endure across Intelligence domains and continue the evolution of the Intelligence processing capabilities over time.

Capability growth will be implemented as part of the DCGS-A program life cycle.  DCGS-A will continue to adapt and address technology advances, sensor upgrades, cybersecurity advances, and other necessary system evolutions to remain current and avoid obsolescence through system life.  It will consist of providing new capabilities associated with emerging requirements, new sensor capability (*i.e.*, Gray Eagle UAS and Enhanced Medium Altitude Reconnaissance Surveillance System (EMARSS)), Cross Security Domain solutions, Fusion Workflow Data Management, Machine Foreign Language Translation, and Thin Client Framework Technologies.

**2.2 Capability Description**
To assist in Industry's understanding of the development and testing scope of the Increment 2 effort and to give context to Industry's RFI response, the figure below provides a general depiction of DCGS-A and its overall mission as an intelligence enterprise.

A1877

Protected Information
and/or Legends Redacted



Warfare is changing as follows:

➢ Frequently rotating troops require persistent information over time.

➢ Volume of data and intelligence continues to grow exponentially increasing the need and criticality of high performance processing and analytics.

➢ Commanders needs, mission requirements, and environments are constantly changing.

➢ The Warfighter requires the ability to operate in an unpredictable and changing environment across the operational spectrum.

➢ Rapid technology advances increase the capability and effectiveness potential of the Warfighter.

DCGS-A currently addresses these changes by:

➢ Gathering available data from SEE-ers through:

- Data Ingestion for Battlespace Awareness, Cultural Awareness, Physical Environment Awareness (Weather and Terrain)

- Sensor Tasking and Cross Cueing

- Direct Data Downlink Receipt

- Alert and Alarm Monitoring

- Enterprise Search and Query

- Access to greater data and information not previously available

  ▪ National and Joint intelligence

  ▪ Tactical reports

  ▪ Non-traditional sources

A1878

Protected Information
and/or Legends Redacted

➢ Providing soldiers and commanders an UNDERSTANDing of their environment through:
- Visualization of a Common Integrated Picture
- Collaboration
- Timely Data Mining
- Product Content Exploitation
- Threat Assessment
- Collection Management
- Fusion

➢ Enabling ACTion through:
- Interoperability
- Exposure of information
- Joint and Coalition Interfaces such that decision makers are empowered with the ISR data, information, and knowledge they need

To meet evolving needs of DCGS-A customers while also considering opportunities afforded by relevant commercial advancements, DCGS-A Increment 2 may include capability enhancement of:

➢ Net-Readiness
➢ Data Fusion
➢ Embedded Training
➢ Sustainment, to include operational and material availability
➢ Reliability
➢ Usability, to include Ease of Use
➢ Geospatial Information
➢ Cyber Operations
➢ Data and Intelligence Visualization
➢ Counterintelligence and HUMINT Convergence
➢ Alignment to the IC ITE and JIE Standards


## 3.0 Information Requested

For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described in section 2.2, and Industry feedback/suggestions on the proposed acquisition strategy as described in section 3.2. Specifically, the Government is interested in the following information:

### 3.1 Corporate Capabilities and Experience:
Provide the following information about your company.
- Company Name
- Point of Contact
- Address
- Phone Number
- Business Type (*i.e.*, Large Business, Small Business, Small Disadvantaged Business, 8(a), HUBZone, Woman-owned Small Business, Service Disabled Veteran Owned Small Business, Veteran Owned

A1879
Protected Information
and/or Legends Redacted

Small Business) and applicable NAICS code(s). As applicable, do you anticipate transitioning to other than a "small business" in the next eighteen months?

- Contract vehicles your company has been awarded that address the scope of services required to develop and integrate a system such as DCGS-A, focused on integrating COTS/GOTS and internally-developed software products into a software baseline to be fielded on commercial hardware (laptops, servers, etc.) with software updates/enhancements delivered every 6-12 months. For each contract vehicle, specify:
  - Agency
  - Vehicle name and type (e.g., Indefinite Delivery/Indefinite Quantity (ID/IQ) contract, Blanket Purchasing Agreement)
  - Prime or Subcontractor
  - Period of Performance
- Specify whether your company possesses or can obtain a Facility Security Clearance and if so, at what level.

## 3.2 Proposed Acquisition Strategy Feedback

The proposed acquisition strategy for DCGS-A Increment 2 includes the following aspects. In response to this RFI, please provide feedback as to the feasibility of this overall approach. Please include any suggestions or lessons learned on successful acquisition approaches to this type of effort the Government should consider when formalizing the acquisition strategy.

1) A change from the Increment 1 approach of the Government acting as the Prime integrator of DCGS-A components, responsible for delivery of a final product/program for evaluation, to a competitive Prime contractor approach, leveraging industry's innovation and proven processes to deliver Increment 2 capabilities. Proposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years.

2) Use of DCGS-A Increment 1, Release 2 and other DCGS-A systems and software as applicable as Government Furnished Information (GFI) to be provided to offerors during the solicitation process as the baseline to develop required Increment 2 enhancements. Offerors will also have the option to propose solutions that meet Increment 2 requirements using new solutions/baselines, or portions of the provided Increment 1 baseline package, to best meet the performance and life cycle supportability requirements in a cost effective manner. As applicable, the government may request to review the data and processes (i.e., Trade Studies, Best of Breed Processes, etc.) used that led to the selections.

3) Regular delivery of software builds for evaluation by the Government program office in support of a comprehensive and operationally tested Software Release baseline to be fielded incrementally (two full Software Releases are anticipated to be required to deliver DCGS-A Increment 2 requirements). The Government may decide to field specific enhancements made available for evaluation in software builds prior to incorporation into a full Software Release in support of emerging operational needs, critical technology enhancements that significantly improve operational capability, or resultant cost efficiencies. Government program office evaluation of pre-release software builds at regular intervals will also support timely provision of Government feedback to the Prime contractor throughout the software release development process to lower the risk of a software release not meeting Government expectations during Development and Operational Test, and to provide the Prime contractor opportunities to meet contractual incentives tied to performance and schedule at regular intervals throughout the contract period of performance.

4) With regard to the required Source Selection evaluation factors, i.e. Technical/Management Approach, Past Performance, Small Business Participation and Price/Cost, what specific factors/sub-factors do you

A1880
Protected Information
and/or Legends Redacted

recommend the Government evaluate that are "discriminators" based on the Increment 2 scope of deliverables and services?  In addition, what incentives would you recommend the Government incorporate into this contract effort, assuming a Cost-Plus-Incentive-Fee structure is chosen?

5) Referencing prior experience in efforts of this size, scope, and complexity, provide feedback regarding the suitability of designating this work as a Small Business Set Aside.

6) Please provide feedback on how the government should consider requirements for modern data management infrastructure and data visualization, to include implications of emerging standards such as JIE, COE, and ICITE when drafting the RFP.


## 4.0 Response Submittal Instructions

Participation in response to this RFI will not preclude any vendor from responding to future acquisitions, either individually or as part of a team.

Limit responses to a total page limit of fifteen (15) pages.  Marketing brochures will not be considered adequate information in response to this RFI.  The font shall be Times New Roman and no smaller than 10pt with at least a one-inch margin.   Please submit your responses electronically by 900 EST 12 September 2014 to Mr. Stephen Morton at stephen.j.morton8.civ@mail.mil in a Microsoft Word compatible file.  Files greater than 5MB cannot be transmitted through the network firewall.  Therefore, any file greater than 5MB must be submitted by CD-ROM media to the address below.  If submitting via CD-ROM, please also send an email with the mailing confirmation or tracking information to Mr. Morton for awareness.

Mr. Stephen Morton
PM DCGS-A
6006 Combat Drive, 2nd Floor
Aberdeen Proving Ground, MD 21005-0001

Questions regarding this RFI should be submitted via e-mail to Mr. Morton no later than 0900 EST on 5 September  2014.  If answered, questions will be non-attribution published through the Federal Business Opportunities Website at www.fedbizopps.gov.

If the Government has additional questions or a need for information following the evaluation of your response, you may be contacted and asked to provide that information.  An industry outreach event is anticipated in the future.  Details will be published through the Federal Business Opportunities website at www.fedbizopps.gov.

Disclaimer:  THE GOVERNMENT DOES NOT INTEND TO AWARD A CONTRACT ON THE BASIS OF THIS RFI OR REIMBURSE ANY COSTS ASSOCIATED WITH THE PREPARATION OF RESPONSES.

This announcement is issued solely for information and planning purposes and does not constitute a solicitation.  Proprietary information and trade secrets, if any, must be clearly marked on all materials.  All information received that is marked Proprietary will be handled accordingly.   Responses will not be returned nor will the Government confirm receipt.  Whatever information is provided will be used to assess tradeoffs and alternatives available for determining how to proceed in the acquisition process.  In accordance with FAR 15.201(e), responses are not offers and cannot be accepted by the Government to form a binding contract. All Government and Contractor personnel reviewing responses will have signed non-disclosure agreements and understand their responsibility for proper use and protection from unauthorized disclosure of proprietary information as described in 41 USC §2101-2107.  The Government shall not be liable for or suffer any consequential damages for any proprietary information not properly identified.  Proprietary information will be safeguarded in accordance with the applicable Government regulations.

A1881

Protected Information
and/or Legends Redacted

# DELIVERING INCREMENT 2 ON A COMMERCIAL SOFTWARE PLATFORM

**Response to Distributed Common Ground System—Army Increment 2 Program RFI (DCGSAINC2RFI)**

**Prepared For:**

Mr. Stephen Morton

PM DCGS-A

**Prepared By:**

Palantir USG, Inc.

www.palantir.com

**Palantir POC:**

██████████        ████████

██████████        ██████████

████████          ████████

Copyright © 2014 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

████████████████████████████████████████

A1882

Protected Information and/or Legends Redacted

# TABLE OF CONTENTS

Executive Summary .................................................................................................................. 4

Corporate Capabilities and Experience ...................................................................................... 5

   Contract Vehicles .................................................................................................................. 6

Proposed Acquisition Strategy Feedback .................................................................................. 7

   1. Competitive Prime Contractor Approach ........................................................................... 7

      Proposed Transition to a Private Contractor ..................................................................... 7

      Proposed Contract Value and Types ................................................................................. 8

      Effective Deployment of Software Solutions ................................................................... 9

   2. GFI Provision During the Solicitation Process ................................................................... 9

      Open Framework ............................................................................................................. 9

      Proven Interoperability ................................................................................................. 10

   3. Government Evaluation of Software Builds ...................................................................... 10

   4. Discriminators and Incentives .......................................................................................... 11

   5. Small Business Set Aside Suitability ................................................................................ 12

   6. Requirements for Data Management and Visualization .................................................... 13

      A Successful Increment 2 Solution Requires a Core, Comprehensive Platform ............ 13

      Proprietary and Interoperability are Distinct Concepts, Increment 2 Requires Interoperability.... 14

         Open Source and Proprietary Licensing Structures ................................................... 14

         Interoperability and Extensibility ............................................................................. 15

      The Critical Requirements for the Foundational Intelligence Layer ............................... 15

         SEEing Requirements ............................................................................................... 16

         UNDERSTANDing Requirements ............................................................................ 17

         ACTion Requirements .............................................................................................. 17

         Emerging Standards .................................................................................................. 18

**A1883**

Protected Information
and/or Legends Redacted

████████████████████████████████████████

**A1884**

Protected Information
and/or Legends Redacted

## Executive Summary

In order to ensure the successful delivery of DCGS-A Increment 2, we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges.

As explained at the Industry Day, Increment 2 will rely on a 2-year procurement process followed by a 3-4 year development contract. This timeline creates a 2-year capability gap for warfighters that is unacceptably slow compared to the rapid development cycles in the commercial sector. Conducting a two-year competition to reset the Intelligence foundation layer is unnecessary when an existing commercial data integration platform is readily available for procurement through ESI and GSA.

The acquisition cycle should fully leverage existing commercial solutions.[1] Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

Increment 2 Should Leverage COTS Software

COTS solutions, in contrast to developing Government off-the-shelf (GOTS) and Custom IT Solutions (CITS), represent technologies that are ready-made and immediately available for sale. According to the International Council on Systems Engineering, COTS products carry:

- **Lower costs**: COTS products cost less than custom development because development costs are shared over many users with private industry paying for continuous improvement and innovation
- **Higher quality**: COTS products have been developed and improved over time, with other parties participating in finding bugs and limitations in the product
- **Fewer customer start-up costs**: Productized solutions are designed for quick implementation, with full documentation accompanying the start-up process
- **Less development time**: Customer organizations can spend time learning about and customizing the product, rather than developing it from scratch[2]

Developing new GOTS solutions carries significant risk because most software development projects fail.[3] This failure only becomes more likely as the project becomes more complex. Organizations that choose to develop software are accepting the associated cost and time-related risks.

These considerations form the basis for U.S. Code Title 10, Section 2377 and The Federal Acquisition Regulation (FAR) stipulations that government agencies should acquire commercial items whenever they are available to meet the needs of the agency.[4] By choosing a proven COTS solution, the Government can quickly deploy the highest quality product at the lowest cost and with the least risk.

The COTS Software should be Open and Extensible, Using a Platform-Based Architecture

Nevertheless, not all COTS solutions offer the same benefits. For a COTS solution to be successful within DCGS-A, it must be extensible, scalable, and adaptable in ways that facilitate interoperability and accommodate evolving mission-critical workflows in secure environments and sub-optimal terrains. A

---

[1] *See* FAR Part 11.002 ("Define requirements in terms that enable offerors to supply commercial items" and to "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items….").

[2] Numerous International Council on Systems Engineering (INCOSE) publications detail the advantages of COTS (e.g., http://www.incose.org/northstar/2001 Slides/McKinney%20Charts.pdf).

[3] The Standish Group, Chaos Manifesto 2013: Think Big, Act Small (Version 1). The Standish Group International, 2013. pp. 4.

[4] See FAR Parts 10 (Market Research) and 12 (Acquisition of Commercial Items) as two examples.

A1885

Protected Information
and/or Legends Redacted

successful Increment 2 program requires a COTS solution with an open architecture, non-proprietary data formats, and extensibility points that will allow it to thrive within a legacy environment by leveraging previous investments. Because DCGS-A missions are critical to warfighter and national security, technical capabilities must be proven, not promised. Technologies should have proven interoperability with Increment 1 components in conjunction with proven security compliance as demonstrated through ATOs on classified networks and alignment with relevant standards, including DI2E and IC ITE.

In the process of building Increment 1, the Government conducted a series of independent Cost-Plus competitions that required significant software development and complex integrations rather than relying on commercially-developed software. The Cost-Plus contracts required the Government to shoulder the entire risk of project failure while simultaneously dis-incentivizing reliance on pre-existing solutions.

As a result, Increment 1 relied on a custom **component-based architecture** that glued together a unique array of independent software vendor products, open source projects, and custom software solutions. In theory, each individual component would be independently evaluated, acquired, and integrated. In practice, the complexity of integrating a massive collection of technologies not inherently designed to interoperate resulted in cost overruns and years of delay in delivering a fully functional capability.

In the acquisition of Increment 2, the Government should adopt a **platform-based architecture** that relies on proven commercial software demonstrated to provide an enterprise-scale data integration, processing, visualization, and analysis framework and software baseline. The Government should rely on a software platform that has been deployed across many industries and includes sophisticated data management technologies, robust application interoperability, mature software deployment infrastructures, and the ability to scale and deploy on a variety of hosting environments.

<u>FFP Contract Vehicles Are Best-Suited for COTS Software and Eliminating Risk to the Government</u>
The most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP). FFP vehicles shift performance risk to the contractor, reduce the risk of cost overruns to the Government, and shorten delivery schedules.

The Government's choice of a FFP contract type is the single most important factor to encourage bidders to rely on a commercial solution rather than embarking on expensive development efforts. FFP vehicles are preferred where, in the course of an acquisition program, a series of contracts, or a single long-term contract, changing circumstances make a different contract appropriate in later periods. Specifically, "contracting officers should avoid protracted use of a cost-reimbursement or time-and-materials contract after experience provides a basis for firmer pricing."[5]

Several additional factors will promote cost-effective solutions for DCGS-A, including selecting a software platform that meets the following requirements:

- Accredited and deployed on operational networks at multiple classification levels
- Existing fusion and interoperability points with current DCGS-A data sources and systems
- Prior deployment to the Intelligence Community and Foreign Mission Partners
- Software delivery on day one and an Initial Operating Capability within the first month of receiving data access and all necessary permissions
- Shorter contract lengths in order to discourage lengthy timelines that mask project failure

## Corporate Capabilities and Experience

| Company Name | Palantir USG, Inc. |
| --- | --- |

---

[5] FAR Part 16.103(c).

**A1886**
Protected Information
and/or Legends Redacted

| Points of Contact | ██████████████████████████████ |
|---|---|
| Address | ██████████████████████████████ |
| Phone Number | ██████████████████████████████ |
| Business Type | Large Business |
| Facility Security Clearance | Top Secret and secure facilities in two locations |

## Contract Vehicles

Palantir maintains a BPA contract on both GSA IT Schedule 70 and DoD ESI vehicles.

| Agency | General Services Administration |
|---|---|
| Vehicle Name and Type | GSA IT Schedule 70 (GS-35F-0086U), Multiple Award BPA |
| Prime or Subcontractor | Prime |
| Period of Performance | 11/14/2007 – 11/13/2017 |

| Agency | Department of Defense |
|---|---|
| Vehicle Name and Type | DoD ESI (N00104-13-AZF34), Multiple Award BPA |
| Prime or Subcontractor | Prime |
| Period of Performance | 7/26/2013 – 7/25/2018 |

Using these vehicles, we have contracted with DIA, USMC, FBI, and USSOCOM, among others.

| Agency | Defense Intelligence Agency |
|---|---|
| Vehicle Name and Type | IC ITE KMT Expansion, Competed BPA issued off GSA Contract Number: GS-35F-0086U, Single Award BP |
| Prime or Subcontractor | Prime |
| Period of Performance | 7/26/2014 – 7/26/2019 |

| Agency | United States Marine Corps |
|---|---|
| Vehicle Name and Type | BPA Call on the ESI BPA: N00104-13-AZF34 and order issued off GSA Contract Number: GS-35F-0086U |
| Prime or Subcontractor | Prime |
| Period of Performance | 12/21/10 – 1/24/2015 |

| Agency | Federal Bureau of Investigation |
|---|---|
| Vehicle Name and Type | Enterprise Knowledge Analytic Platform, competed BPA issued off GSA Contract Number: GS-35F-0086U |
| Prime or Subcontractor | Prime |
| Period of Performance | 4/10/2012 – 6/30/2017 |

| Agency | USSOCOM |
|---|---|

A1887
Protected Information and/or Legends Redacted

| Vehicle Name and Type | USSOCOM Mesh, a series of Task Orders issued off GSA Contract Number: GS-35F-0086U |
|---|---|
| Prime or Subcontractor | Prime |
| Period of Performance | 2/22/2013 – 2/21/2016 |

## Proposed Acquisition Strategy Feedback

### 1. Competitive Prime Contractor Approach

**Proposed Transition to a Private Contractor**

The transition to a vendor with a software baseline in use by government and commercial sectors will allow DCGS-A to benefit from new features and enhancements cultivated across a broad ecosystem of users. The commercial sector continues to invest heavily in technology, resulting in the continued development of innovations outside of the Government. Incorporation of a commercial software baseline allows DCGS-A to evolve and improve with a fractional investment in time and resources.

The transition in Increment 2 to a private contractor and a proven software platform will also allow the Government to benefit from a comprehensive software baseline management and delivery infrastructure. A vendor with a mature software platform should be able to provide a centralized management infrastructure that allows for delivery of innovation at the rapid pace of industry while also allowing the Government to provide guidance and oversight through a Control Configuration Board. A centralized management approach should feature integrated management tools that allow for operation and maintenance of Increment 2 with reduced manpower, minimal operational overhead, and low sustainment costs. ████████████████████████████████████████████

In Increment 1, the program office cost was $29M in FY2012 alone. By replacing the software baseline with a COTS software platform with centralized management, the Government can realize significant reductions in overall program costs and the physical support footprint required to maintain the intelligence enterprise. Palantir has successfully used the following implementation models:

**A1888**

Protected Information and/or Legends Redacted



**Proposed Contract Value and Types**

We understand the Government is considering Cost-Plus-Incentive Fee (CPIF) and Cost-Plus-Fixed-Fee (CPFF) contract types for Increment 2. These vehicles require the Government to continue to shoulder project risk and are only appropriate where projects require significant software development.

Renewing the Cost-Plus model of Increment 1 will increase the probability of failure in Increment 2. A Firm-Fixed-Price (FFP) model is a preferred contract vehicle for commercial products[7] and is imperative to ensuring the rapid, cost-effective delivery of capabilities while shifting the performance risk from the Government to the contractor. "The contractor has full responsibility for performance costs" in a FFP contract, whereas "the contractor has minimal responsibility for the performance costs" under a Cost-Plus environment.[8] Additionally, FFP models are encouraged by the FAR to avoid protracted use of Cost-Reimbursement contracts after experience provides a basis for a firmer pricing model.[9]

The FFP model should use an outcomes-based Performance Work Statement based on a proven product and incorporating support services. This method allows for the deployment of additional capabilities in conjunction with the commercial software development cycle while providing the Government with the ability to evaluate software builds before fielding incremental enhancements. A FFP model:

- Encourages rapid deployment and aligns execution goals with lower man-hours and shorter timelines
- Places the execution and performance risk on the contractor, who must absorb the additional costs if the product does not deliver the required capabilities
- Provides pricing predictability for long-term budget planning
- Encourages reliance on existing solutions to minimize development expense

The FFP model can be used in conjunction with a Cost-Plus model for optional system enhancements.[10] CPIF and CPFF contracts should total less than 20 percent of the total contract value. Examples of successful FFP contracts include our work at the U.S. Marine Corps, where enhancements are included as part of our regular software releases and small businesses fulfill highly custom development requests by building on top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues

---

[6] *See* FAR Part 39.103 for guidelines on Modular Contracting ("[A]gencies should, to the maximum extent practicable, use modular contracting to acquire major systems (see 2.101) of information technology.").

[7] FAR Part 16.201(a) ("The contracting officer shall use firm-fixed-price or fixed-price with economic price adjustment contracts when acquiring commercial items, except as provided in 12.207(b).").

[8] FAR Part 16.101(b).

[9] FAR Part 16.103(c) ("In the course of an acquisition program, a series of contracts, or a single long-term contract, changing circumstances may make a different contract type appropriate in later periods than that used at the outset. In particular, contracting officers should avoid protracted use of a cost-reimbursement or time-and-materials contract after experience provides a basis for firmer pricing.").

[10] FAR Part 16.104(e) ("If the entire contract cannot be firm-fixed-price, the contracting officer shall consider whether or not a portion of the contract can be established on a firm-fixed price basis.").

**A1889**

Protected Information
and/or Legends Redacted

to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA for the IC ITE expansion at DIA available to all IC agencies and affording a COTS solution at a FFP.

███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

**Effective Deployment of Software Solutions**

In the context of Increment 2, changing from a Government Prime integrator to a competitive Prime contractor will not fully leverage industry innovation without a corresponding change in process. A private contractor will encounter many of the same issues encountered in Increment 1 unless COTS products constitute core elements in Increment 2.

We deliver capabilities through a partnership with each customer in combination with the rapid deployment of our fully developed COTS product. In order for the Government to benefit from a low-risk COTS solution, the Government needs to look for solutions and partnerships that properly leverage COTS software. Specifically, the Government must account for:

- Basing Increment 2 on the acquisition of an existing comprehensive platform that can be configured for the specific needs of DCGS-A with minimal development cost and risk
- Fixed licensing fees in place of development costs, recognizing that the core system is already developed
- A development model focused on product enhancement and configuration rather than initial product development
- Rejecting custom component-based architectures requiring acquisition and integration of independently developed disjointed products and functions
- Rapid iteration to incorporate improvements made across both government and commercial deployments

## 2. GFI Provision During the Solicitation Process

Increment 2 should not rely on the Increment 1 baseline. Increment 1 was a custom software development project, and relying on the Increment 1 baseline encourages the same problematic patterns to continue into Increment 2. Instead, the Government should require any Increment 2 solution to interoperate with the data formats and interfaces defined in Increment 1.

Many of the data formats and interfaces created in DCGS-A Increment 1 are closed, prohibiting interoperability. Because many of the solutions in Increment 1 were custom developed for use within DCGS-A only, they are not well documented and only used within the Army. Any available documentation of the data formats and interfaces from Increment 1 should be provided to offerors.

To minimize risk, accelerate the deployment timeline, and eliminate system downtime, a minimally acceptable technical solution should have 1) an open framework designed for rapid interoperability with existing and future systems and 2) proven and established interoperability with Increment 1. The open framework and interoperability requirements described below exist today in commercial software that can be implemented immediately.

**Open Framework**

████████████████████████████████████████████████████████████████████████████

A1890

Protected Information
and/or Legends Redacted

In order to interoperate with Increment 1 and other intelligence platforms throughout DoD and the IC, a platform with open APIs and an open data model is required to interface easily with other systems and adapt to evolving mission needs.[11] At a minimum, an open framework should include:



**Proven Interoperability**

Lack of interoperability often manifests despite claims of open architectures and adaptable infrastructures. We believe it is imperative that Increment 2 technologies carry a proven record of interoperability with Increment 1 components in order to eliminate the risk of stove-piped functionality. Specifically, the Increment 2 system should include a proven ability to allow:

- MFWS users to import entities and links to the Tactical Entity Database (TED) from within the Increment 2 system
- Increment 2 system users to import entities and links from TED
- DCGS Integration Backbone (DIB) queries to pull information from the Increment 2 system
- Increment 2 system users to query the DIBs and import results
- Queries sent from the Ozone Widget Framework (OWF) to the Increment 2 system
- Integration of all Increment 2 system data and analysis into the DCGS Brain

Proven interoperability will provide the Government with a solution that eliminates the interoperability risk that is so often the cause of failed systems and will allow for an accelerated timeline with IOC within one month of gaining access to the required data sets and all Government-provided authorizations.

## 3. Government Evaluation of Software Builds

---

[11] Guidance from the Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics (AT&L) advises open architectures help reduce switching costs and allows for continuous competition to address changing mission needs. "Guidelines For Creating and Maintaining a Competitive Environment for Supplies and Services in the Department of Defense," Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics.

A1891
Protected Information
and/or Legends Redacted

The RFI anticipates 2 major Software Releases over the 3-4 year contract under an IT Box approach,

[REDACTED]

**External Development of Enhancements**

The core platform should support development of extensions by the Prime contractor, the Government, or third-party developers. As new enhancements and extensions are developed, the CCB tests these third-party developments on their staging environment in addition to testing core platform upgrades and patches provided with the licensing costs. This delineation allows CCB to manage the release cadence and to own all Intellectual Property developed by third parties in association with Army-specific enhancements while benefiting from the underlying COTS framework.

## 4. Discriminators and Incentives

We believe that specific subfactors of the Source Selection evaluation factor should be centered on minimizing risk. Risk is minimized by selecting a system that has proven its interoperability with Increment 1 components, has deployed its functionality within working environments and classified networks, and can provide IOC within the first month of gaining the necessary permissions and access. Associated evaluation subfactors are described on the following page and are met by existing commercial software.

| Evaluation Factors | Proposed Subfactors |
|---|---|
| Technical Approach | Use of proven data fusion, visualization, and analytic platforms already in use in DoD and the IC: <br> • [REDACTED] <br> ▪ [REDACTED] |

---

[12] National Defense Authorization Act, 2010. Section 804.

**A1892**

Protected Information
and/or Legends Redacted

| | |
|---|---|
| | Alignment to standards and interoperability:<br><br>Security:<br><br>Scalability:<br><br>Cross Domain: |
| **Management Approach** | Delivery: Software delivery starting on day one<br>Deployment Management: Developing a deployment plan with the Government to provide IOC within 1 month<br>Transition Strategy: Feasibility of transitioning to Increment 2 capabilities |
| **Past Performance** | |
| **Small Business Participation** | We encourage the involvement of Small Businesses in the federal procurement process and have extensive experience working with Small Businesses in both Prime contractor and subcontractor roles. |
| **Price and Cost** | We recommend a "Best Value" tradeoff analysis given the complexity of software procurement. |

## 5. Small Business Set Aside Suitability

Because of the scope of required capabilities, we believe a Small Business would not be suitable for development of the core Increment 2 capabilities. However, depending on the maturity and incorporation of COTS products into the Increment 2 System, a Small Business may be able to operate and maintain the licensed system as well as develop custom enhancements on top of the primary platform. Please see Section 2 for information on open frameworks. A Small Business set aside is our second preference for Increment 2 acquisition following operation as a Prime contractor under a Configuration Control Board.

A1893<br>Protected Information<br>and/or Legends Redacted

## 6. Requirements for Data Management and Visualization

**A Successful Increment 2 Solution Requires a Core, Comprehensive Platform**

DCGS-A Increment 2 requires a comprehensive, enterprise-wide data integration, visualization, and analysis platform. In order for this core platform to be successful, it needs to be architected, designed, and developed to be:

- Open and easily extensible to meet current and unforeseen Army intelligence needs
- Scalable, robust, and reliable to support the volume and velocity of current and future data
- Flexible to deploy in fixed, mobile, and austere environments
- Secure enough to be deployed in any number of secure configurations to protect data
- Sophisticated enough to enable a consistent data picture and seamless synchronization at each site across the entire DCGS-A enterprise

While the Army has many unique requirements external to the core intelligence platform, the challenges of the core architecture are not unique to the Army. Government and commercial organizations around the world face challenges similar to the intelligence pipeline defined by "See, Understand, Act." The Army should leverage industry advances rather than redevelop them, and focus on correctly identifying where the Army has unique challenges for development.



*Figure 1: Proposed DCGS-A Increment 2 Intelligence Foundation Layer Architecture*



A1894

Protected Information
and/or Legends Redacted

[REDACTED]

**Proprietary and Interoperability are Distinct Concepts, Increment 2 Requires Interoperability**

<u>Open Source and Proprietary Licensing Structures</u>
The software terms "**Open source**" and "**Proprietary**" refer solely to the licensing structure and not to the functionality of the software itself. "**Open source**" software means the software source code is freely available and can be examined and reverse engineered. Whether or not software is "open source" has no bearing on interoperability, extensibility, ease of management, proper functionality, code quality, or cost of ownership. Open source software can function either as an open framework or closed environment.

Nevertheless, there are benefits in using open source software that has broad adoption within the developer community. The software baseline improves due to the crowd-sourcing development model. A proper evaluation of open source software always incorporates an evaluation of the developer community around the software to assess development of the future baseline.

Software developed by the Government has source code that is open to the Government and under certain provisions can be released as open source outside of the government. However, because of the limited community around the software project, the continued quality of the software baseline is poor, leading to the failure of software projects because the:

- Software does not function properly
- Software is not easily manageable or extensible
- Software is expensive to maintain
- Software is not interoperable

The term "Proprietary" is often misused to imply a lack of interoperability. "**Proprietary**" software solutions mean that the source code and Intellectual Property of the core platform belong to the original software developer. Again, the model of software licensing has little bearing on the overall quality or performance of the software platform. Both open and closed software systems exist under proprietary licensing arrangements. Increment 1 incorporates successful proprietary software components, including ArcGIS and Google Earth. Proprietary software solutions allow the Government to benefit from the investment and innovation in software provided by the commercial software industry at minimal cost without requiring the Government to incur the cost and risk of attempting to redevelop its own software.

Additionally, proprietary software baselines often incorporate open source software. Many proprietary software solutions and companies make extensive use of open source software in their platforms and contribute back to the open source community with their own advancements. Companies like Facebook, Google, and Palantir make extensive use of open source software and an Increment 2 solution should look

A1895
Protected Information and/or Legends Redacted

for, and value, the incorporation of well-supported, documented, and advanced open source software into the baseline, even in otherwise proprietary solutions.

Interoperability and Extensibility

**Interoperability** is a functional determination of software that is completely independent of whether the licensing rubric is open source or proprietary. Interoperability is judged by the software interfaces and file formats that are used by the platform. A highly interoperable system should be evaluated upon:

- **The native file format**: Whether or not the native file format used by the system is open, documented, and readable by external systems
- **Support for other file formats**: The number and quality of file formats that the platform can ingest and export data to and from
- **Data ingest and export interfaces**: The number and quality of endpoints that can be use to push data into the system and export data programmatically
- **Extensibility**: The ability for the system to be easily tailored to meet unforeseen requirements for interoperability with new file formats and interfaces
- **Overall**: The quality of the available documentation on each of the points above and the community of users of each of the points above

**Extensibility** means that a core software platform is easily tailored and modified to be suitable in any number of contexts. Extensibility is exemplified by platforms that can meet a large variety of use cases. A platform that is used in multiple domains and contexts is proven to be more extensible than a platform that is only applicable to a single use case. Extensibility means the software platform can:

- Meet unforeseen mission challenges
- Integrate new and emerging technologies
- Integrate with custom solutions and algorithms developed by third parties

The main evaluation criterion for interoperability and extensibility is the **breadth of use**. The economies of scale afforded by a commercial product quickly outpace even the most talented software team working on a custom product used in limited use cases and narrow quantities. Breadth of use has many benefits:

- **Lower Development Costs**: Development costs are shared across customers and over time. Likewise, the cost of an enhancement is fractionally shared across the community with higher quality and faster deployment because the same baseline is used across enhancements
- **Lower Risk**: Commercial products carry lower risk because their baseline is proven by a large number of "flight hours," which provides a reliable understanding of performance characteristics
- **Deployment Experience**: Broad deployment results in experience and accreditation across different networks and environments. Experience includes integrating with existing data sources, interoperating with industry standards and tools, and centralized management

**The Critical Requirements for the Foundational Intelligence Layer**

True data fusion involves the collection of all data types under a flexible data model within a platform with fully interoperable applications. Data sharing and collaboration must be able to work across data models and security domains while protecting individual pieces of data at a granular level. Additionally, data sharing should not duplicate or destroy data while incorporating user changes across the enterprise, even when users are modifying the same piece of information.

A1896

Protected Information
and/or Legends Redacted



A1897
Protected Information
and/or Legends Redacted



A1898
Protected Information
and/or Legends Redacted



A1899

Protected Information
and/or Legends Redacted

## 1.0 Introduction

This is a Follow-on Request for Information (RFI), as defined in Federal Acquisition Regulation (FAR) 15.201(e).

The purpose of this RFI is to solicit industry feedback on some of the specific capabilities and requirements that will be part of the proposed acquisition strategy for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program. This RFI is part of a series of industry engagements in support of enhancing the Industry-Government partnership critical to providing an effective and evolvable end-product for Army DCGS-A operators and information consumers. The Government intends to consider all Industry inputs and initiatives as it prepares for and executes the solicitation process. In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program. The Army plans to leverage industry recommendations on the delivery of DCGS-A software to implement best practices, improve productivity, gain efficiencies, and realize cost savings.

This is not a request for proposal, request for quotation, or an invitation for bid, nor does its issuance obligate or restrict the Government to any particular acquisition approach. This RFI does not obligate the Government to issue a solicitation. This RFI is being conducted solely for information and planning purposes and does not constitute a solicitation. Neither unsolicited proposal (s) nor any other offers will be considered in response to this request or accepted by the Government to form a binding contract. Contractors are solely responsible for all expenses associated with responding to this RFI. Acknowledgement of receipt of submitted items will not be made nor will respondents be notified of the outcome of the information received.

Small Businesses are encouraged to submit responses to this RFI.

## 2.0 Background

### 2.1 DCGS-A Program Overview
The Distributed Common Ground System-Army (DCGS-A) program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems (FoS) that will contribute to Joint and combined Warfighter needs. The DCG/SS MA was converted into the DCGS Enterprise ICD in March 2009.

DCGS-A is an evolving program made up of a foundational network, hardware, software, sensors, people, and processes. It is comprised of an extensive network architecture that enables distributed processing and information sharing of data from sensors and other sources across the globe; software tools to help the users perform the analyses, update, and share intelligence products; servers that store data and collected intelligence; and alignment to a set of common standards that enable integration of new technology, processes, and ideas. As technology evolves and new warfigthing requirements emerge, the DCGS-A capability set needs to be updated to meet the user needs.

DCGS-A is the Army's primary system for ISR tasking of sensors, processing, exploitation and dissemination (TPED) of collected data converted into warfighting information and intelligence regarding the threat, weather, and terrain at all Army echelons. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The DCGS-A system and data enterprise must conform to and leverage the Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence

**A1900**

Protected Information
and/or Legends Redacted

Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

DCGS-A facilitates SEEing and KNOWing on the battlefield—the fundamental precursor to the UNDERSTANDing that underpins the Army's Mission Command concept. DCGS-A will continue to contribute to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum.

The current acquisition approach for Increment 2 will leverage the CJCSI 3170.01H Information Technology Box (IT Box) Requirements Process for incremental software releases (see https://acc.dau.mil/jcids for more information on the IT Box process). This streamlined approach will support incremental development and fielding of system software capabilities over time to meet the user needs.

A significant component of the DCGS-A Increment 2 acquisition approach via the IT Box requirements methodology is the ability to grow system capability over time through a series of software releases and hardware modernizations/refresh cycles. DCGS-A software releases provide a mechanism to build agility within the program to satisfy requirements in an accelerated fashion. Each DCGS-A software release will be synchronized with Army interoperability and Cyber Security standards. DCGS-A will continue to maximize the use of Commercial off-the-Shelf (COTS) /Government off-the-Shelf (GOTS) products and will procure them through DoD/Army enterprise contracting vehicles where possible. The IT Box construct will have a Requirements Oversight Council, which is made up of the requirements organizations, user representatives, and acquisition officials who provide the PM a prioritized list of requirements to pursue in each software release. The PM, user representative, and industry integrator will execute to the prioritized list in accordance with capability maturity assessment, cost, and schedule constraints per software release. DCGS-A Increment 2 software releases will leverage the Intelligence Community (IC) investments in information system technology and align to the applicable initiatives of the National Functional Managers (NSA, DIA, and CIA).

The primary focus of the Increment 2 program capability approach will be the alignment to the Intelligence Community Information Technology Enterprise (IC ITE). Compliance with the IC ITE standards will ensure that the Army delivers a capability that will endure across Intelligence domains and continue the evolution of the Intelligence processing capabilities over time.

Capability growth will be implemented as part of the DCGS-A program life cycle. DCGS-A will continue to adapt and address technology advances, sensor upgrades, cybersecurity advances, and other necessary system evolutions to remain current and avoid obsolescence through system life. It will consist of providing new capabilities associated with emerging requirements, new sensor capability (*i.e.*, Gray Eagle UAS and Enhanced Medium Altitude Reconnaissance Surveillance System (EMARSS)), Cross Security Domain solutions, Fusion Workflow Data Management, Machine Foreign Language Translation, and Thin Client Framework Technologies.

A1901

Protected Information
and/or Legends Redacted

## 2.2 Capability Description

To assist in Industry's understanding of the development and testing scope of the Increment 2 effort and to give context to Industry's RFI response, the figures below provides a general depiction of DCGS-A and its overall mission as an intelligence enterprise.



Warfare is changing as follows:

- ➢ Frequently rotating troops require persistent information over time.
- ➢ Volume of data and intelligence continues to grow exponentially increasing the need and criticality of high performance processing and analytics.
- ➢ Commanders needs, mission requirements, and environments are constantly changing.
- ➢ The Warfighter requires the ability to operate in an unpredictable and changing environment across the operational spectrum.
- ➢ Rapid technology advances increase the capability and effectiveness potential of the Warfighter.

DCGS-A currently addresses these changes by:

- ➢ Gathering available data from SEE-ers through:
  - Data Ingestion for Battlespace Awareness, Cultural Awareness, Physical Environment Awareness (Weather and Terrain)
  - Sensor Tasking and Cross Cueing
  - Direct Data Downlink Receipt
  - Alert and Alarm Monitoring

- Enterprise Search and Query
- Access to greater data and information not previously available
  - National and Joint intelligence
  - Tactical reports
  - Non-traditional sources

➢ Providing soldiers and commanders an UNDERSTANDing of their environment through:
- Visualization of a Common Integrated Picture
- Collaboration
- Timely Data Mining
- Product Content Exploitation
- Threat Assessment
- Collection Management
- Fusion

➢ Enabling ACTion through:
- Interoperability
- Exposure of information
- Joint and Coalition Interfaces such that decision makers are empowered with the ISR data, information, and knowledge they need

To meet evolving needs of DCGS-A customers while also considering opportunities afforded by relevant commercial advancements, DCGS-A Increment 2 may include capability enhancement of:

➢ Net-Readiness
➢ Data Fusion
➢ Embedded Training
➢ Sustainment, to include operational and material availability
➢ Reliability
➢ Usability, to include Ease of Use
➢ Geospatial Information
➢ Cyber Operations
➢ Data and Intelligence Visualization
➢ Counterintelligence and HUMINT Convergence
➢ Alignment to the IC ITE and JIE Standards

## 3.0 Information Requested

For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described in section 2.2. Specifically, the Government is interested in the following information:

a) Company name; address; CAGE Code and DUNS; POC name, phone, email.

A1903

Protected Information
and/or Legends Redacted

b) If you are a small business, please identify your company's small business size standard based on the assigned NAICS. For more information refer to http://www.sba.gov/content/table-small-business-size-standards.

c) What percentage of your company personnel are cleared for TOP SECRET/SCI? Does your company have a TOP SECRET/SCI cleared facility or access to a TOP SECRET/SCI cleared facility? Additionally, does your company have the ability to safeguard SECRET information?

d) Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities.

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company Name)? |
|---|---|---|---|---|---|---|---|
| Cloud Computing | | | | | | | |
| Big Data Analytics | | | | | | | |
| Data Architecture & Management | | | | | | | |
| Data Fusion & Pattern Analysis | | | | | | | |
| Applications for IC ITE Joint Storefront | | | | | | | |
| Targeting | | | | | | | |
| Signals Intelligence/NS A-Net Operations | | | | | | | |
| Defensive Cyber Operations | | | | | | | |
| Offensive Cyber Operations | | | | | | | |
| Counter Intelligence & Human Intelligence | | | | | | | |
| DCGS Integration | | | | | | | |

Protected Information and/or Legends Redacted

| | | | | | | |
|---|---|---|---|---|---|---|
| Backbone (DIB) implementation | | | | | | |
| Weather Effects/Analysis | | | | | | |
| GEOINT (Full Motion Video/Static Imagery Intelligence) | | | | | | |
| Geospatial Intelligence (Terrain & Mapping) | | | | | | |
| Collection Management (Sensor Management) | | | | | | |
| On-the-Move Operations | | | | | | |
| Workflow Management | | | | | | |
| Role/Attribute Base Access Control | | | | | | |
| Protection level 3 (PL 3) security hardening | | | | | | |
| Ease of Use Initiatives | | | | | | |
| High/Ultra Reliability Program | | | | | | |
| Army Interoperability Certification | | | | | | |
| Joint Interoperability Certification | | | | | | |

e) Is your company interested in bidding as the Prime Contractor for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program?

f) Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?

g) Does your company have experience with Acquisition Management, Administrative Support, and Program Budget and Execution with specific emphasis on project planning, cost estimating, scheduling, program tracking, financial planning and execution, contract

Appx11905

A1905

Protected Information
and/or Legends Redacted

management, acquisition documentation and reporting/briefing efforts? If so, please provide an example, including contract number; indicating whether your firm acted as a prime contractor or subcontractor; contract value; Government/Agency point of contact and current telephone number; and a brief description of the work your company performed under said contract.

h) What is your company's current rate of personnel retention over the last five (5) years?

i) Does your company utilize best practices for software development, i.e. Capability Maturity Model Integration (CMMI) certification? If so, what is your certification level? If not, can your company obtain one prior to the time of proposal submission?

## 4.0 Response Submittal Instructions

Participation in response to this RFI will not preclude any vendor from responding to future acquisitions, either individually or as part of a team.

Limit responses to a total page limit of ten (10) pages. Marketing brochures will not be considered adequate information in response to this RFI. The font shall be Times New Roman and no smaller than 10pt with at least a one-inch margin. Please submit your responses electronically by 0900 EST 29 Dec 2014 to Ms. Kailyn Bloom at kailyn.n.bloom.civ@mail.mil in a Microsoft Word compatible file. Files greater than 10MB cannot be transmitted through the network firewall. Therefore, any file greater than 10MB must be submitted by CD-ROM media to the address below. If submitting via CD-ROM, please also send an email with the mailing confirmation or tracking information.

Kailyn Bloom, PM DCGS-A
6006 Combat Drive, 2nd Floor
Aberdeen Proving Ground, MD 21005-0001

Questions regarding this RFI should be submitted via e-mail to Mr. Stephen Morton at stephen.j.morton8.civ@mail.mil no later than 0900 EST on 16 December 2014. If answered, questions will be non-attribution published through the Federal Business Opportunities Website at www.fedbizopps.gov.

If the Government has additional questions or a need for information following the evaluation of your response, you may be contacted and asked to provide that information. An industry outreach event is anticipated in the future. Details will be published through the Federal Business Opportunities website at www.fedbizopps.gov.

Disclaimer: THE GOVERNMENT DOES NOT INTEND TO AWARD A CONTRACT ON THE BASIS OF THIS RFI OR REIMBURSE ANY COSTS ASSOCIATED WITH THE PREPARATION OF RESPONSES.

This announcement is issued solely for information and planning purposes and does not constitute a solicitation. Proprietary information and trade secrets, if any, must be clearly marked on all materials. All information received that is marked Proprietary will be handled accordingly. Responses will not be returned nor will the Government confirm receipt. Whatever information is provided will be used to assess tradeoffs and alternatives available for determining how to proceed in the acquisition process. In accordance with FAR 15.201(e), responses are not offers and cannot be accepted by the Government to form a binding contract. All Government and Contractor personnel reviewing responses will have signed non-disclosure agreements and understand their responsibility for proper use and protection from unauthorized disclosure of proprietary information as described in 41 USC §2101-2107. The Government shall not be liable for or suffer any

A1906
Protected Information
and/or Legends Redacted

consequential damages for any proprietary information not properly identified.  Proprietary information will be safeguarded in accordance with the applicable Government regulations.

Appx11907

A1907

Protected Information
and/or Legends Redacted

# Palantir

# DELIVERING INCREMENT 2 ON A COMMERCIAL SOFTWARE PLATFORM

**Response to Distributed Common Ground System—Army Increment 2 Program RFI (DCGS-A INC2 RFI2)**

**Prepared For:**

Ms. Kailyn Bloom
PM DCGS-A

**Prepared By:**

Palantir USG, Inc.
www.palantir.com

**Palantir POC:**

Copyright © 2014 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir Technologies. The data subject to this restriction are contained in all sheets of this proposal.

A1908

Protected Information and/or Legends Redacted

# Palantir

# TABLE OF CONTENTS

Executive Summary ........................................................................................................................... 1

Response for Information Requested ............................................................................................... 1

    3.0 A ................................................................................................................................................ 1

    3.0 B ................................................................................................................................................ 1

    3.0 C ................................................................................................................................................ 1

    3.0 D ............................................................................................................................................... 2

    3.0 E ................................................................................................................................................ 2

    3.0 F ................................................................................................................................................ 2

    3.0 G ............................................................................................................................................... 2

    3.0 H ............................................................................................................................................... 2

    3.0 I ................................................................................................................................................. 2

A1909

Protected Information
and/or Legends Redacted

## Palantir

### Executive Summary

In response to Solicitation DCGSA-INC2-RFI, the first RFI in the Increment 2 re-compete process, Palantir USG, Inc. recommended that the Government pursue a different acquisition strategy than the long-term development strategy used in Increment 1. We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities. Our response explained that a FFP vehicle is the most important factor in encouraging commercial solutions over expensive development efforts.

We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's ability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps. As a result, our responses to these questions provide information relevant to the commercial product acquisition strategy we previously recommended and continue to support.

### Response for Information Requested

#### 3.0 A

| | |
|---|---|
| **Company Name** | Palantir USG, Inc. |
| **Points of Contact** | ████████  ████████ ████████  ████████ ████████ |
| **Address** | 1660 International Drive, 8th Floor McLean, VA 22102 |
| **Phone Number** | ████████ |
| **CAGE Code** | 51W88 |
| **DUNS** | 82-528-4321 |

#### 3.0 B

N/A

#### 3.0 C

We provide a commercially developed data integration and analytic platform. ████████████

██████████████████████████████████

██████████████████████████████████

████████

████████████████████████████

████████████████████

████████████████████████████

**A1910**

Protected Information and/or Legends Redacted

# Palantir

### 3.0 D

Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD, and the IC.

However, the request for information on software services contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

### 3.0 E

We are interested in bidding as Prime Contractor.

### 3.0 F

We view DCAA accounting as not relevant to an acquisition strategy for a COTS-based solution at a FFP.

### 3.0 G

Palantir USG, Inc. is experienced working as a prime on several contracts for commercial software, but does not perform on services-based contracts that require cost estimation and large-scale custom software engineering.

### 3.0 H

We believe the retention rate of a large business software company is not relevant to the evaluation of a COTS-based solution and FFP contracts.

### 3.0 I

Although we adhere to industry best practices in developing world-class software internally, we do not view the CMMI certification as relevant to a contract requiring a finished COTS-based product and do not anticipate building software for the government under a services contract. We do not feel CMMI certification is relevant in this evaluation.

# 1.0 Introduction

This is a Follow-on Request for Information (RFI), as defined in Federal Acquisition Regulation (FAR) 15.201(e).

The purpose of this RFI is to solicit industry feedback on some of the specific capabilities and requirements that will be part of the proposed acquisition strategy for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program. This RFI is part of a series of industry engagements in support of enhancing the Industry-Government partnership critical to providing an effective and evolvable end-product for Army DCGS-A operators and information consumers. The Government intends to consider all Industry inputs and initiatives as it prepares for and executes the solicitation process. In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program. The Army plans to leverage industry recommendations on the delivery of DCGS-A software to implement best practices, improve productivity, gain efficiencies, and realize cost savings.

This is not a request for proposal, request for quotation, or an invitation for bid, nor does its issuance obligate or restrict the Government to any particular acquisition approach. This RFI does not obligate the Government to issue a solicitation. This RFI is being conducted solely for information and planning purposes and does not constitute a solicitation. Neither unsolicited proposal (s) nor any other offers will be considered in response to this request or accepted by the Government to form a binding contract. Contractors are solely responsible for all expenses associated with responding to this RFI. Acknowledgement of receipt of submitted items will not be made nor will respondents be notified of the outcome of the information received.

Small Businesses are encouraged to submit responses to this RFI.

# 2.0 Background

## 2.1 DCGS-A Program Overview
The Distributed Common Ground System-Army (DCGS-A) program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems (FoS) that will contribute to Joint and combined Warfighter needs. The DCG/SS MA was converted into the DCGS Enterprise ICD in March 2009.

DCGS-A is an evolving program made up of a foundational network, hardware, software, sensors, people, and processes. It is comprised of an extensive network architecture that enables distributed processing and information sharing of data from sensors and other sources across the globe; software tools to help the users perform the analyses, update, and share intelligence products; servers that store data and collected intelligence; and alignment to a set of common standards that enable integration of new technology, processes, and ideas. As technology evolves and new warfighting requirements emerge, the DCGS-A capability set needs to be updated to meet the user needs.

DCGS-A is the Army's primary system for ISR tasking of sensors, processing, exploitation and dissemination (TPED) of collected data converted into warfighting information and intelligence regarding the threat, weather, and terrain at all Army echelons. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The DCGS-A system and data enterprise must conform to and leverage the Common Operating Environment (COE), DCGS Integration Backbone (DIB), Joint Information Environment (JIE), Intelligence Community Information Technology Enterprise (IC ITE), and Defense Intelligence

Information Enterprise (DI2E) standards to enhance interoperability of ISR information through the use of common enterprise standards and services.

DCGS-A facilitates SEEing and KNOWing on the battlefield—the fundamental precursor to the UNDERSTANDing that underpins the Army's Mission Command concept. DCGS-A will continue to contribute to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum.

The current acquisition approach for Increment 2 will leverage the CJCSI.01I Information Technology Box (IT Box) Requirements Process for incremental software releases (see https://acc.dau.mil/jcids for more information on the IT Box process). This streamlined approach will support incremental development and fielding of system software capabilities over time to meet the user needs.

A significant component of the DCGS-A Increment 2 acquisition approach via the IT Box requirements methodology is the ability to grow system capability over time through a series of software releases and hardware modernizations/refresh cycles. DCGS-A software releases provide a mechanism to build agility within the program to satisfy requirements in an accelerated fashion. Each DCGS-A software release will be synchronized with Army interoperability and Cyber Security standards. DCGS-A will continue to maximize the use of Commercial off-the-Shelf (COTS) /Government off-the-Shelf (GOTS) products and will procure them through DoD/Army enterprise contracting vehicles where possible. The IT Box construct will have a Requirements Oversight Council, which is made up of the requirements organizations, user representatives, and acquisition officials who provide the PM a prioritized list of requirements to pursue in each software release. The PM, user representative, and industry integrator will execute to the prioritized list in accordance with capability maturity assessment, cost, and schedule constraints per software release. DCGS-A Increment 2 software releases will leverage the Intelligence Community (IC) investments in information system technology and align to the applicable initiatives of the National Functional Managers (NSA, DIA, and CIA).

The primary focus of the Increment 2 program capability approach will be the alignment to the Intelligence Community Information Technology Enterprise (IC ITE). Compliance with the IC ITE standards will ensure that the Army delivers a capability that will endure across Intelligence domains and continue the evolution of the Intelligence processing capabilities over time.

Capability growth will be implemented as part of the DCGS-A program life cycle. DCGS-A will continue to adapt and address technology advances, sensor upgrades, cybersecurity advances, and other necessary system evolutions to remain current and avoid obsolescence through system life. It will consist of providing new capabilities associated with emerging requirements, new sensor capability (*i.e.*, Gray Eagle UAS and Enhanced Medium Altitude Reconnaissance Surveillance System (EMARSS)), Cross Security Domain solutions, Fusion Workflow Data Management, Machine Foreign Language Translation, and Thin Client Framework Technologies.

**A1913**

Protected Information
and/or Legends Redacted

## 2.2 Capability Description

To assist in Industry's understanding of the development and testing scope of the Increment 2 effort and to give context to Industry's RFI response, the ~~attached~~ image titled "~~f~~Figures A~~" below~~ provides a general depiction of DCGS-A and its overall mission as an intelligence enterprise.



Warfare is changing as follows:

➢ Frequently rotating troops require persistent information over time.
➢ Volume of data and intelligence continues to grow exponentially increasing the need and criticality of high performance processing and analytics.
➢ Commanders needs, mission requirements, and environments are constantly changing.
➢ The Warfighter requires the ability to operate in an unpredictable and changing environment across the operational spectrum.
➢ Rapid technology advances increase the capability and effectiveness potential of the Warfighter.

DCGS-A currently addresses these changes by:

➢ Gathering available data from SEE-ers through:

- Data Ingestion for Battlespace Awareness, Cultural Awareness, Physical Environment Awareness (Weather and Terrain)
- Sensor Tasking and Cross Cueing
- Direct Data Downlink Receipt
- Alert and Alarm Monitoring

A1914
Protected Information
and/or Legends Redacted

- Enterprise Search and Query
- Access to greater data and information not previously available
  - National and Joint intelligence
  - Tactical reports
  - Non-traditional sources

➢ Providing soldiers and commanders an UNDERSTANDing of their environment through:
- Visualization of a Common Integrated Picture
- Collaboration
- Timely Data Mining
- Product Content Exploitation
- Threat Assessment
- Collection Management
- Fusion

➢ Enabling ACTion through:
- Interoperability
- Exposure of information
- Joint and Coalition Interfaces such that decision makers are empowered with the ISR data, information, and knowledge they need

To meet evolving needs of DCGS-A customers while also considering opportunities afforded by relevant commercial advancements, DCGS-A Increment 2 may include capability enhancement of:

➢ Net-Readiness
➢ Data Fusion
➢ Embedded Training
➢ Sustainment, to include operational and material availability
➢ Reliability
➢ Usability, to include Ease of Use
➢ Geospatial Information
➢ Cyber Operations
➢ Data and Intelligence Visualization
➢ Counterintelligence and HUMINT Convergence
➢ Alignment to the IC ITE and JIE Standards

## 3.0 Information Requested

For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described in section 2.2. Specifically, the Government is interested in the following information:

    a)   Company name; address; CAGE Code and DUNS; POC name, phone, email.

A1915

Protected Information
and/or Legends Redacted

Appx11915

b)  If you are a small business, please identify your company's small business size standard and category (i.e., Veteran Owned, Hub Zone, etc).  For more information refer to http://www.sba.gov/content/table-small-business-size-standards.

c)  Does your business have an accredited Earned Value Management System (EVMS) system (Yes or No)? If yes, please provide Government POC (name, email address, and phone number) who can verify.

d)  Does your company have experience putting a product through Operational Testing with the United States Government? If yes, please provide an example and a Government POC (name, email address, and phone number) who can verify.

e)  Does your Company have experience developing a product for an Acquisition Category 1 (ACAT 1) Military program?

f)  Explain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development.

g)  Has your company developed a product that can be used to monitor all user activities?

h)  Does your company have experience developing Training Support Package that supports individual, unit and collective training, developing New Equipment Training Plans or conducting NET and Instructor/Key Personnel Training supplemented with subsequent Live Environment Training?

## 4.0 Response Submittal Instructions

Participation in response to this RFI will not preclude any vendor from responding to future acquisitions, either individually or as part of a team.

Limit responses to a total page limit of five (5) pages.  Marketing brochures will not be considered adequate information in response to this RFI.  The font shall be Times New Roman and no smaller than 10pt with at least a one-inch margin.   Please submit your responses electronically by 0900 EST 22 April 2015 to Ms. Kailyn Bloom at kailyn.n.bloom.civ@mail.mil  in a Microsoft Word compatible file.  Files greater than 10MB cannot be transmitted through the network firewall.  Therefore, any file greater than 10MB must be submitted by CD-ROM media to the address below.  If submitting via CD-ROM, please also send an email with the mailing confirmation or tracking information.

Kailyn Bloom, PM DCGS-A
6006 Combat Drive, 2nd Floor
Aberdeen Proving Ground, MD 21005-0001

Questions regarding this RFI should be submitted via e-mail to Mr. Stephen Morton at stephen.j.morton8.civ@mail.mil no later than 0900 EST on 17 April 2015.   If answered, questions will be non-attribution published through the Federal Business Opportunities Website at www.fedbizopps.gov.

If the Government has additional questions or a need for information following the evaluation of your response, you may be contacted and asked to provide that information.  An industry outreach event is anticipated in the future.  Details will be published through the Federal Business Opportunities website at www.fedbizopps.gov.

Appx11916

A1916
Protected Information and/or Legends Redacted

**Disclaimer:** THE GOVERNMENT DOES NOT INTEND TO AWARD A CONTRACT ON THE BASIS OF THIS RFI OR REIMBURSE ANY COSTS ASSOCIATED WITH THE PREPARATION OF RESPONSES.

This announcement is issued solely for information and planning purposes and does not constitute a solicitation. Proprietary information and trade secrets, if any, must be clearly marked on all materials. All information received that is marked Proprietary will be handled accordingly. Responses will not be returned nor will the Government confirm receipt. Whatever information is provided will be used to assess tradeoffs and alternatives available for determining how to proceed in the acquisition process. In accordance with FAR 15.201(e), responses are not offers and cannot be accepted by the Government to form a binding contract. All Government and Contractor personnel reviewing responses will have signed non-disclosure agreements and understand their responsibility for proper use and protection from unauthorized disclosure of proprietary information as described in 41 USC §2101-2107. The Government shall not be liable for or suffer any consequential damages for any proprietary information not properly identified. Proprietary information will be safeguarded in accordance with the applicable Government regulations.

Appx11917

A1917

Protected Information
and/or Legends Redacted

# Palantir

# DELIVERING INC2 ON A COMMERCIAL PLATFORM
## Palantir USG, Inc. Response to RFI DCGSAINC2RFI3

The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.

Specifically, EVMS and ACAT 1 product development are largely irrelevant to the acquisition of a COTS platform data layer. These programmatic controls do not ensure successful acquisition or development and have been a part of every failed large-scale acquisition the Government has attempted.

We believe the Government should select a proven solution that is measured on metrics derived from operational success. The data integration, visualization and analytic environment required for Increment 2 should use a fielded commercial solution that is accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DoD, IC, and commercial industry.

Delivering Increment 2 on a commercial platform ensures the data layer advances at the same pace as commercial technology. Technologies that lag behind will ultimately become incompatible with other commonly used systems—and crucially, users will abandon them. Interoperability is not an end-state; it must be demonstrated in practice and sustained by adapting systems over time.

Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?

| a) Company name; address; Cage CODE and DUNS; POC Name, phone, email. | |
|---|---|
| Company Name | Palantir USG, Inc. |
| Company Address | 1660 International Drive, 8th Floor, McLean, VA 22102 |
| Cage CODE | ▮▮ |
| DUNS | ▮▮▮▮ |
| Point of Contact | ▮▮▮▮ |

**b) If you are a small business, please identify your company's small business size standard and category (i.e., Veteran Owned, Hub Zone, etc). For more information refer to http://www.sba.gov/content/table-small-business-size-standards.**

Palantir USG, Inc. is not a small business.

**c) Does your business have an accredited Earned Value Management System (EVMS) system (Yes or No)? If yes, please provide Government POC (name, email address, and phone number) who can verify.**

N/A. EVMS is applicable to service contracts and not commercial software purchased under a Firm Fixed Price vehicle, as explained above.

**d) Does your company have experience putting a product through Operational Testing with the United States Government? If yes, please provide an example and a Government POC (name, email address, and phone number) who can verify.**

▮▮▮▮▮▮▮▮

Copyright © 2015 Palantir USG, Inc. All rights reserved. The information herein contains trade secrets and commercial or financial information which is privileged and confidential within the meaning of all relevant laws. This information shall not be disclosed without the prior written approval of Palantir USG, Inc. The data subject to this restriction are contained in all sheets of this proposal.

A1918

Protected Information
and/or Legends Redacted



**c) Does your Company have experience developing a product for an Acquisition Category 1 (ACAT 1) Military program?**

N/A. Development projects are inapplicable to commercial software, as explained above.

**f) Explain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development.**

**g) Has your company developed a product that can be used to monitor all user activities?**

Palantir USG, Inc. | DCGSAINC2RFI3 | 2

Protected Information and/or Legends Redacted



Appx11920

A1920

Protected Information
and/or Legends Redacted





**h) Does your company have experience developing Training Support Package that supports individual, unit and collective training, developing New Equipment Training Plans or conducting NET and Instructor/Key Personnel Training supplemented with subsequent Live Environment Training?**

**A1921**

Protected Information and/or Legends Redacted

![Palantir]



In cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community. Palantir helps the Marine Corps implement these deployments with the support of only eight total contractors. The very small ratio of contractors to military users demonstrates the sustainability of the Palantir platform across a large enterprise.



A1922
Protected Information
and/or Legends Redacted

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GOVERNMENT
ACCOUNTABILITY OFFICE PROTECTIVE ORDER




# DIVA Study Findings

- There are multiple acquisition approaches the government could employ to procure the DCGS-A Inc 2 infrastructure
    - *System Integrator:* Employ a prime contractor to integrate and manage the DCGS-A Inc 2
    - *Turn-Key:* Procure a commercial product as basis of DCGS-A Inc 2 infrastructure. Integrate additional applications onto this infrastructure
    - *Specialized Applications:* Purchase individual applications based on requirements to build onto the DCGS-A Inc 2 infrastructure
    - *Enterprise Cloud Service:* Adopt a cloud infrastructure and integrate DCGS-A Inc 2 infrastructure and capabilities
    - *Hybrid approach:* Employ a combination of Enterprise Cloud and Turn-Key approach tailored to the government's requirements. Integrate additional applications

- Certain risks inherent in any DCCS-A Increment 2 acquisition approach
    - Cloud interoperability given various implementations (DIA, CIA, DISA)
    - Technology maturity for use in austere environments
    - Affordability & system integration

- DoD/IC Enterprise Architectures & Standards continue to evolve, and DCGS-A must comply with those standards

> **Commercial Landscape provides a <u>rich set of options</u> largely fueled by explosion of "big data" in commercial sector and supports <u>moving forward</u> with DCGS-A <u>Increment 2</u>**



DESIGN • DEVELOP • DELIVER • DOMINATE
*SOLDIERS AS THE DECISIVE EDGE*

1

A1923

Protected Information
and/or Legends Redacted

# Implementation Approach #3
## Hybrid – Cloud Infrastructure/"Turn Key"



Adopt a DIVA "Turn Key" Solution

Develop **additional** Data Integration, Analytics and Visualization

**Legend**
- Visualization Apps
- Analytics
- Data Sources

- Step #1 –COTS Cloud Infrastructure (deploy in Data Center)
- Step #2 –COTS DIVA "Turn Key" software platform and Deploy in enterprise/tactical environment. Integrate and deploy in Data Center
- Step #3 – Develop *additional* Data Integration, Visualization, and Analytics Capabilities and Integrate with DIVA "Turn Key" Platform
  - Integrate data sources
  - Extend DIVA apps and/or develop/integrate additional Applications
  - Host and integrate COTS specialized applications

**Observations – Blends benefits of approaches**
Global scale. Out-of-box apps. Potential tactical edge.
Required cloud infrastructure-DIVA "Turn Key" platform integration

2

A1924

**Appx11924**

Protected Information and/or Legends Redacted

# DCGS-A Enterprise – Regional/Tactical Edge
## DIVA Hybrid Approach 3

**Enterprise (Fixed Sites)**

**Regional/Tactical/Tactical Edge**





<u>DCGS-A Inc 2</u>

- Cloud Infrastructure
- DIVA "Turnkey" Platform
- Specialized Apps
- Systems Integration

**Appx11925**

A1925

Protected Information
and/or Legends Redacted

# Risk/Risk Mitigation

- **Risk: DoD/IC cloud infrastructure interoperability (JWICS/SIPR/NIPR)**

  - Description:  Standard Interfaces exist for mature cloud services (e.g., computing & storage).  Non-standard interfaces exist for other cloud services (e.g., workflow; identity & access management; notification; …)

  - Consequence: DCGS-A may have to develop multiple cloud infrastructure interfaces to interoperate in DoD/IC/Army environments

    - Interface to an *individual* cloud service
      - (e.g.) Identify and Access Management (IdAM) Service (100 page API specification)
      - Design/develop/test/certification effort required to support interface
      - "Dual-honing" doubles the effort.  Potential re-integration when specification changes.

    - Interaction across *multiple* cloud services to perform workflow
      - (e.g.,) Cyber Detection Event utilizing Auditing Service and Notification Service

  - Potential Mitigation Strategy:
    - (Best) Leverage the IC Commercial Cloud Services to have same commercial solution across the JWICS/SIPR/NIPR
    - (Good) Work with Army/JIE to instantiate a market-leading (with very stable interfaces) Commercial Cloud Services capability in SIPR/NIPR
    - (Bad) Commercial or GOTS solution with non-mature interface specifications

A1926

**Appx11926**

Protected Information
and/or Legends Redacted

# Risk/Risk Mitigation

- **Risk: Selection of COTS DIVA "Turn Key" Platform without Adequately Addressing Architectural Considerations**

    - Description: Functionality and the Right Technical Architecture are Critical. Difficult to evaluate the architecture based on "paper" evaluation.

    - Consequence. Future environment very unpredictable – what data sources? Applications? Analytic capabilities? Insufficient consideration of architecture (e.g., extensibility; usability; scalability) may not support evolving for the future operational environment.

    - Potential Mitigation Strategy:  Challenge-Based Acquisition (example challenges)

        - Extensibility – Time to integrate data source; Time to extend application
        - Scalability – Scale-up to cloud infrastructure; Scale-down to laptop environment
        - Tactical Edge Distribution – Demonstrate tactical information distribution in a tactical communications environment.  Sync/re-sync of disconnected tactical node.

Protected Information and/or Legends Redacted

# Risk/Risk Mitigation

- **Risk: Acquisition & Systems Integration**

  - Description: Requires acquisition of multiple components (e.g., cloud infrastructure; DIVA "Turn Key" Platform; Application); integration of these components; and integration into DoD/IC Enterprise Environment

  - Consequences: Different acquisition approaches may lead to sub-optimal approach
    - Prime Contractor – May not lead to "best" COTS cloud infrastructure and/or COTS DIVA platform
    - LSI – Insufficient technical expertise

  - Potential Mitigation Strategy: Phased Acquisition Approach
    - Phase I: Establish new technical baseline with Core Operational Capabilities
      - Adopt COTS cloud infrastructure
      - Select COTS DIVA "Turn Key".
      - Integrate COTS cloud and DIVA "Turn Key"; instantiate DCGS-A Increment #2 Data Management Architecture; Initial deployment of core suite of DIVA applications
    - Phase II: Transition existing (and new) DCGS-A capabilities into new technical baseline
      - Acquire Systems Integration contractor.
      - Migrate enduring DCGS-A Inc1 applications & capabilities
      - Integrate in additional needed COTS applications. DoD/IC enterprise environment; ...

A1928

Appx11928

Protected Information
and/or Legends Redacted

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

  

**Army Materiel Systems Analysis Activity**



## TECHNICAL REPORT NO.  TR-2015-26

## DISTRIBUTED COMMON GROUND SYSTEM - ARMY (DCGS-A) TRADE SPACE ANALYSIS

## JULY 2015

DISTRIBUTION B: Distribution authorized to U.S. Government agencies; Administrative or Operational Use; JUNE 2015.
Other requests for this document shall be referred to Director, U.S. Army Materiel Systems Analysis Activity, APG, MD  21005-5071.

IAW Memorandum, Secretary of Defense, 27 December 2010, Subject: Consideration of Costs in DoD Decision-Making, the
cost of the study resulting in this report is $655,167.

## U.S. ARMY MATERIEL SYSTEMS ANALYSIS ACTIVITY
## ABERDEEN PROVING GROUND, MARYLAND  21005-5071

| | Form Approved |
|---|---|
| **REPORT DOCUMENTATION PAGE** | OMB No. 0704-0188 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing this collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0188), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. **PLEASE DO NOT RETURN YOUR FORM TO THE ABOVE ADDRESS.**

| 1. REPORT DATE (DD-MM-YYYY) | 2. REPORT TYPE | 3. DATES COVERED (From - To) |
|---|---|---|
| JUNE 2015 | Technical Report | |

| 4. TITLE AND SUBTITLE | 5a. CONTRACT NUMBER |
|---|---|
| DISTRIBUTED COMMON GROUND SYSTEM - ARMY (DCGS-A) TRADE SPACE ANALYSIS | |
| | 5b. GRANT NUMBER |
| | 5c. PROGRAM ELEMENT NUMBER |

| 6. AUTHOR(S) | 5d. PROJECT NUMBER |
|---|---|
| Thomas Koehler    John Burghardt    Sylvia Nguyen | |
| Andrew Regan    Amber Ferguson    Rhoda Wilson (ARL-HRED) | 5e. TASK NUMBER |
| Brian Wojtysiak    Timothy Biscoe    Diane Quarles (ARL-HRED) | |
| Ankit Joshi    Bryant Watkins | 5f. WORK UNIT NUMBER |

| 7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES) | 8. PERFORMING ORGANIZATION REPORT NUMBER |
|---|---|
| Director U.S. Army Materiel Systems Analysis Activity 392 Hopkins Road Aberdeen Proving Ground, MD | TR-2015-26 |

| 9. SPONSORING / MONITORING AGENCY NAME(S) AND ADDRESS(ES) | 10. SPONSOR/MONITOR'S ACRONYM(S) |
|---|---|
| | |
| | 11. SPONSOR/MONITOR'S REPORT NUMBER(S) |

**12. DISTRIBUTION / AVAILABILITY STATEMENT**
DISTRIBUTION B. Distribution authorized to U.S. Government agencies; Administrative or Operational Use; JULY 2015. Other requests for this document shall be referred to Director, U.S. Army Materiel Systems Analysis Activity, APG, MD 21005-5071.

**13. SUPPLEMENTARY NOTES**

**14. ABSTRACT**

AMSAA conducted a Trade Space Analysis (TSA) of the DCGS-A IS CDD to inform an upcoming Economic Analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. The TSA identified and evaluated technical functionality, cost, usability, schedule risk, and technical risk trade space for the following technical and operational capabilities that are beyond DCGS-A Increment 1: Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence Surveillance and Reconnaissance (ISR); Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise; Data Enterprise Architecture (DEA); and Intelligence Support to CO. Representative systems were assessed for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid.

**15. SUBJECT TERMS**

| 16. SECURITY CLASSIFICATION OF: | | | 17. LIMITATION OF ABSTRACT | 18. NUMBER OF PAGES | 19a. NAME OF RESPONSIBLE PERSON |
|---|---|---|---|---|---|
| a. REPORT | b. ABSTRACT | c. THIS PAGE | SAME AS REPORT | 289 | |
| UNCLASSIFIED | UNCLASSIFIED | UNCLASSIFIED | | | 19b. TELEPHONE NUMBER (include area code) |

Standard Form 298 (Rev. 8-98)
Prescribed by ANSI Std. Z39.18

A1931

**Introduction.**

The U.S. Army Materiel Systems Analysis Activity (AMSAA) was directed by Headquarters, Department of the Army Deputy Chief of Staff (HQDA DCS) G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (IS CDD) to support future requirements decisions. The TSA identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. The TSA results will inform the economic analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The TSA focused on targeted DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1 for: Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR); Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise (AGE); Data Enterprise Architecture (DEA); and Intelligence Support to Cyber Operations (CO).

Representative systems were assessed to reflect capabilities that are readily available for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid and are defined as follows:
- COTS - a singular software solution or compilation of commercially available software packages that provide an integrated solution, whereby the vendor owns the rights to the baseline software code.
- GOTS - a singular or compilation of software solutions, whereby the baseline software code was developed by and owned by the Government.
- Hybrid - a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS).

Specific software solutions were not evaluated to avoid the perception of a source selection process. The analysis did not compare vendor performance or perform a down selection. The primary objective was to show the trade space available for the software option alternative.

The trade space was assessed for five areas of analysis: technical functionality, cost, ease of use/usability, schedule risk, and technical risk which are described below.
- Technical functionality: Requirements from the draft Requirements Development Package (RDP) and/or metrics developed at area specific metric development workshops (MDW) were used to evaluate the technical functionality of software solutions. A four color coding system (Blue, Green, Yellow, and Red, where Blue is the highest score and Red is the lowest) based on a Subject Matter Expert (SME) evaluation of the ability to comply with the technical functionality metrics was used to evaluate and compare the alternatives.

- Ease of Use/Usability: User juries were conducted by Human Factors Engineers (HFEs) to ensure that target end users of the systems would be placed in the center of the design process to evaluate the usability of loading, managing, and disseminating geospatial data. A four color coding system (Blue, Green, Yellow, and Red, where Blue is the highest score and Red is the lowest) was used to compare and contrast usability measures across the alternatives. Heuristic evaluations, which are a discount usability technique, were conducted with HFE and system SMEs to inspect the extent to which alternative user interfaces met established usability guidelines.
- Cost: Estimates of development, testing, integration, and maintenance costs for each alternative were produced to compare the tradeoff costs of capabilities. The estimates were sufficient to support acquisition and investment decisions, but do not meet the standard of budget quality. Cost estimates were given in "Then Year" Millions of Dollars (TY$M).
- Schedule Risk: A questionnaire was submitted to Army and DoD SMEs to collect data to estimate the time required to mature each software alternative to higher states of Technology Readiness Level (TRL) and Integration Readiness Level (IRL) required by major DCGS-A Increment 2 program events. The projected software maturation times were then compared to the DCGS-A Increment 2 program schedule to ascertain risk for meeting the Increment 2 Release 1 fielding decision. A four color coding system (Blue, Green, Yellow, and Red, where Blue is the highest score (lowest risk) and Red is the lowest (highest risk)) was used to evaluate and compare the alternatives.
- Technical Risk: A questionnaire was submitted to Army and DoD SMEs to collect data to estimate the technical risk of software option alternatives. Survey participants were asked to assess the likelihood and consequence of pre-identified risks. The DoD Risk Reporting Matrix was used to categorize each risk as low (Green), moderate (Yellow), or high (Red). A three color coding system (Green, Yellow, and Red) based on an overall assessment of the individual risk drivers was used to evaluate and compare the alternatives.

In the follow sections, an overview and summary of the results are presented for the DEA, Intelligence Support to CO, and SSGF – AGE capabilities. For Mission Command Support for the PED of ISR, an agreement was reached between TCM Mission Command, ARCIC, PM DCGS-A, and G-3/5/7 to address this capability in the other three capability areas.

**DEA Overview.**

For the DEA capability, characteristics were identified to select a representative sample of software solutions that would provide the architectural foundation for the Fusion Brain to function under one cloud enterprise. The software solutions selected required a data management layer and an analytical layer. The data management layer required the ability to efficiently store data, implement intelligent resourcing as needed, federate with external data sources and meet data resiliency specifications. The data management layer also required the ability to be partnered with an analytical layer to conduct natural language processing, link analysis and geospatial analysis.

A1947

A representative sample of seven software options were selected and assigned in three categories: three COTS, two GOTS and two Hybrid. COTS and GOTS software options considered for Hybrid were not the same as the single source COTS and GOTS options. The two Hybrid software options considered are characterized as:

- Hybrid 1: COTS data management layer + GOTS analytical layer
- Hybrid 2: GOTS data management layer + COTS analytical layer

Two assumptions were identified which are specific to the TSA of DEA. First, the DCGS-A hardware infrastructure will be upgraded to provide sufficient computing resources to implement the software solutions. The TSA does not include an analysis of the hardware infrastructure upgrades required for the software solutions. Second, the technical functionality metrics were assumed to encapsulate architecture foundation required to support intelligence domain specific services such as Intelligence Support to Cyber Operations and Geospatial operations. These assumptions were made to focus the analysis on the data management and analytic software aspects which constitute the Fusion Brain.

**DEA Results.**

The COTS and Hybrid alternatives satisfy most of the technical functionality metrics, however, the Hybrid software solutions are currently functional in the DoD IC and provide the best "turn-key" functionality. Upper bound COTS solutions provide a turn-key technical functionality similar to that of the Hybrid solutions. The COTS solutions scored better than the Hybrid because of the ability to allow a user to simultaneously query all levels of classification and to provide results based on that user's clearance level. Due to the absence of historical requirements, the lower bound COTS solution needs major capability development for all technical functionality metric categories. All of the software solutions within the three software option alternatives are comparable in cost with the exception of one COTS solution. This COTS solution was significantly lower in cost. However, the predominant cost component, the maintenance cost, is based solely on an annual subscription for the amount of data storage required. This method for a vendor estimate may warrant further investigation to see if it is a viable option for costing future DCGS-A DEA alternatives. The GOTS options were the least capable turn-key solutions that demonstrated lower usability. There were several risk drivers identified for all three software option alternatives that were assessed to be of moderate to high risk. Table 1 summarizes the trade space analysis of the DEA software option alternatives.

**Table 1. DEA TSA Summary**

| Software Option Alternatives | Data Enterprise Architecture | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Technical Functionality Assessment | | Cost (TY$M) | Usability | | Development & Integration Risk | Programmatic Risk | Performance Risk | Schedule Risk |
| COTS | Y | G | $4.8 – $32.8 | Y | G | R | R | R | G |
| GOTS | Y | | $24.5 - $27.1 | R | | Y | R | R | G |
| Hybrid | G | | $26.9 - $37.3 | Y | G | G | R | R | B |

**Intelligence Support to Cyber Operations Overview.**

The objective of the Intelligence Support to CO capability is to expand full spectrum all-source intelligence analysis to be inclusive of intelligence support to cyberspace operations. This capability will not be used to perform defensive or offensive cyberspace operations. The requirements used to assess this capability were from the DCGS-A Increment 2 Requirements Definition Package (RDP). Several of these requirements were derived from characteristics within the U.S. Army Cyber Command Operational Needs Statement (ONS) for the DCGS-A Incorporation of CO. These characteristics call for the enhancement of the DCGS-A system to enable intelligence operations within, through, and in support of CO.

Two COTS solutions which are currently used by the government in applicable missions were identified and evaluated. For the purposes of the TSA, the COTS solutions were evaluated "as is." No GOTS solution was identified for evaluation; however, there is a government tool which is currently a risk-reduction prototype which is designed to meet the intelligence needs of U.S. Army Cyber Command (ARCYBER) as outlined in the ONS. The TSA also considered one Hybrid solution currently used by the U.S. military in a similar context. This Hybrid solution is completely independent of the COTS solutions and the government prototype, and is evaluated as is.

Two limitations were identified which are specific to the TSA of DEA. First, AMSAA could not share the metrics used to evaluate software solutions due to the close relation with DCGS-A Increment 2 requirements. This restriction was implemented to avoid the perception of a source selection. Second, this study was evaluated prior to release of Army Techniques Publication (ATP) 2-91.0 "Intelligence Support to Cyberspace Electromagnetic Activities (CEMA)," which is scheduled to be released by the Intelligence Center of Excellence (ICoE) in September 2015. This draft form of the ATP calls to attention the immaturity of Intelligence Support to CO in the Army, and the possibility that requirements and doctrine may evolve over time. One additional assumption made for the TSA is that the DEA software alternative implemented in DCGS-A Increment 2 will provide the architectural foundation for the Intelligence Support to CO tool. This assumption was made to focus the analysis on the capabilities of the Intelligence to Support CO software solutions.

**Intelligence Support to Cyber Operations Results.**

There are COTS solutions which satisfy most of the technical performance metrics, and one COTS solution is considered low-cost. The Hybrid solution also satisfies most technical performance metrics and is the least costly solution. Hybrid and COTS solutions scored comparably in the usability evaluation. There were no GOTS solutions, however there was a government developmental solution that was identified for inclusion in this study. This government solution is yet to be fully developed and therefore has higher cost than the Hybrid and one COTS solution. However, the government solution is designed to satisfy all technical

functionality metrics. The government solution is being designed to address the ARCYBER ONS (20 May 2013), which subsequently formed the basis of the draft DCGS-A IS RDP Cyber metrics that were used for this study. All solutions should be developed, tested, and integrated in a timely manner. There were several risk drivers identified for all three software option alternatives that were assessed to be of moderate risk. Table 2 summarizes the trade space analysis of the Intelligence Support to CO software option alternatives.

**Table 2. Intelligence Support to CO Summary**

| Software Option Alternatives | Intelligence Support to Cyber Operations | | | | | | |
|---|---|---|---|---|---|---|---|
| | Technical Functionality Assessment | Cost (TY$M) | Usability | Development & Integration Risk | Programmatic Risk | Performance Risk | Schedule Risk |
| COTS | G | $4-$186 | Y | Y | Y | Y | B |
| GOTS | B | $10.6 | R | Y | Y | Y | B |
| Hybrid | G | $1.7 | Y | R | Y | Y | B |

**SSGF - AGE Overview.**

AMSAA examined SSGF compliance for COTS and Hybrid software solutions for Common Operating Environment (COE) baseline 2.0 through 4.0. These different software options were evaluated on their ability to be compliant to the SSGF as part of the AGE, and also their ability to meet draft RDP Geospatial requirements that were determined to be related to the SSGF concept. Compliancy was determined by measuring software against SSGF standards obtained from the Army Geospatial Center (AGC). The ability for each of the software packages to meet the 109 draft RDP requirements was first evaluated by AMSAA Geospatial personnel, and their initial assessment was adjudicated during a metric development workshop held at AMSAA.

The capabilities of both the COTS and Hybrid alternatives are anchored by a base software package that provides most of the geospatial functionality required for DCGS-A. This base software package has been deployed in previous versions of DCGS-A, including the version that is currently being used. The COTS alternative consists of the latest version of this base software plus none, any, or all of five additional COTS software Add-ons from multiple vendors. The latest base software package plus all five Add-on constitutes the full COTS "out-of-the-box" capability. No viable GOTS alternatives could be identified by the Army/DoD Geospatial community. The geospatial SME participants at the MDW did identify several GOTS solutions which satisfied some of the metrics and/or provided niche capabilities; however, there was not a single or group of GOTS software solutions that would satisfy enough of the metrics to warrant further attention. Therefore a comprehensive GOTS alternative would require a new start effort. The Hybrid alternative consists of the full COTS out-of-the-box capability as well as a series of GOTS widgets that are developed outside the COTS software development framework. Currently there are seven GOTS Widgets available that have already been developed for DCGS-A Increment 1. However, these seven GOTS Widgets will require updates in order to be compatible with the latest version of the COTS Base software, identified as "COTS Base New." The Hybrid alternative also consists of an additional series of Widgets which given sufficient resources, would be developed in order to provide full technical functionality required for DCGS-A Increment 2.

There was one key constraint that impacted the Geospatial analysis. To avoid adversely affecting Increment 2 source selection, AMSAA could not communicate the geospatial requirements with the vendors. Therefore, the technical functionality and cost assessments are limited to the capabilities that exist today.

**SSGF - AGE Results.**

Although there are some GOTS solutions that can address a few targeted technical functionality metrics, there are no viable comprehensive GOTS solutions that were identified by the Army/DOD geospatial community. The COTS alternative was assessed to have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative. The COTS options won't address all Army Geospatial requirements with software out of the box. However, these capability gaps are anticipated to be closed with ongoing commercial upgrades and widgets that can be developed in the COTS Baseline software. There were several risk drivers for both the COTS and Hybrid alternatives that were assessed to be of moderate to high risk. Table 3 summarizes the trade space analysis of the Geospatial software option alternatives.

**Table 3. Geospatial TSA Summary**

| Software Option Alternatives | Geospatial Analysis | | | | | | |
|---|---|---|---|---|---|---|---|
| | Technical Functionality Assessment | Cost (TY$M) | Usability | Development & Integration Risk | Programmatic Risk | Performance Risk | Schedule Risk |
| COTS | G | $86 - $129 | Y  B | Y  G | R | R  Y | B |
| Hybrid | B | $130 | G | R | R | Y | Y |

The final results of the TSA were briefed at Senior Advisory Group (SAG) #4 on 27 MAY 2015. The SAG participants concurred with the results. The chair of the SAG directed a few changes which have been implemented in this final report as shown in Section 1.8.

# DISTRIBUTED COMMON GROUND SYSTEM - ARMY (DCGS-A) TRADE SPACE ANALYSIS

## 1. INTRODUCTION

**1.1 Background.** The Distributed Common Ground System-Army (DCGS-A) program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System Mission Area Initial Capabilities Document, which captured the initial requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems (FoS) that would contribute to Joint and Combined Warfighter needs. The Army intends for DCGS-A capabilities to continuously improve and remain relevant throughout the system's lifecycle. [Reference 1]

The Joint Requirements Oversight Council (JROC) approved the initial DCGS-A Capability Development Document (CDD) in October 2006. The Deputy Assistant Secretary of the Army-Cost and Economics (DASA-CE) approved an Economic Analysis for DCGS-A Increment 1 on 16 November 2012 to support the full deployment by the Under Secretary of Defense (Acquisition, Technology, and Logistics (OSD (AT&L)). To move the DCGS-A program into the next, and follow-on, increments the Headquarters, Department of the Army Deputy Chief of Staff (HQDA DCS) G-3/5/7 directed the TRADOC Capability Manager-Sensor Processing (TCM-SP) to update the original CDD with an Information System (IS) CDD. The IS CDD covers development, production, and fielding requirements for the entire DCGS-A program, for Increment 1 and following increments. [Reference 2]

DCGS-A, as an information system, will be developed across multiple increments as defined by the Requirements Definition Package (RDP) and Capability Drops (CD). The focus of Increment 1 is the development of a single software baseline for information and ISR Processing, Exploitation, and Dissemination (PED). These requirements were JROC approved in the DCGS-A Increment 1 Capability Production Document (CPD) which will serve as the Increment 1 RDP. Increment 1 begins a transition to Cloud-based advanced analytics to provide users with significantly enhanced ISR and Standard Sharable Geospatial Framework (SSGF) processing and exploitation capabilities, to reduce forward footprints, and maximize the user base at all echelons. Pre-Programmed Product Improvements (P3I) and new technologies will continue to be developed for insertion at the maturity level to meet those objective requirements defined in the Increment 1 CPD. [Reference 1] This study will focus on capabilities beyond those provided in Increment 1.

**1.2 Purpose.** The U.S. Army Materiel Systems Analysis Activity (AMSAA) was directed by HQDA DCS G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A IS CDD to support future requirements decisions. The TSA will identify and evaluate technical functionality, cost, schedule, risk, and ease of use/usability trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. The TSA will inform the economic analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. A final written report with results of the analysis is due no later than 30 June 2015.

A1953

**1.3     Scope.** DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The TSA will focus on targeted DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1 for: Mission Command Support for the PED of ISR; SSGF-Army Geospatial Enterprise (AGE); Data Enterprise Architecture (DEA); and Intelligence Support to Cyber Operations (CO). The SSGF-AGE capability area focuses on geospatial analysis tools and henceforth will be referred to as the "Geospatial" capability area throughout this report.

Representative systems were assessed to reflect capabilities that are readily available for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid. The analysis will not compare vendor performance or perform a down selection, it is merely intended to reflect the trade space available for these Software alternative categories.

**1.4     Alternatives.** The TSA assessed three software option alternatives for each capability area: COTS, GOTS, and Hybrid. These software option alternatives are defined below:

- COTS - a singular software solution or compilation of commercially available software packages that provide an integrated solution, whereby the vendor owns the rights to the baseline software code.
- GOTS - a singular or compilation of software solutions, whereby the baseline software code was developed by and owned by the Government.
- Hybrid - a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS).

These definitions apply to the ownership rights to the holistic software baseline and are not intended to represent ownership of elements of code (modules, models, toolboxes) developed by third parties for Government use.

**1.5     Overarching Study Plan.** The DCGS-A TSA Study Guidance and Directive was used to develop a study plan. The study plan is displayed graphically in Figure 1. AMSAA hosted Capability Working Groups (CWGs) with Subject Matter Experts (SMEs) from other government organizations for each capability area to gain knowledge and develop an initial list of potential representative software solutions. The CWGs also served the purpose of scoping each capability area and determining which other organizations would be able to provide study support. After identifying organizations that had the expertise and ability to support the study, Metric Development Workshops (MDWs) were held for each capability area. The purpose of the MDWs was to develop a set of metrics, based on SME/user desired capability enhancements, which would be used to evaluate the technical functionality of representative software solutions. Potential representative software solutions were also gathered at the MDWs. The trade space of each software option alternative was assessed for the five study analyses: technical functionality, cost, ease of use/usability, schedule risk, and technical risk.

2

A1954



**Figure 1. DCGS-A TSA Study Plan**

**1.6     Overarching Constraints, Limitations, and Assumptions.**  Listed below are several key overarching constraints, limitations, and assumptions (CLAs) that affected all three capability areas of the TSA.  Additional detailed CLAs that relate to a specific capability area will be described in their respective sections of the report.

**Constraints:** *A restriction imposed by the study sponsor that limits AMSAA's options in conducting the study.*

- Time limitations for the TSA provided a significant constraint on all aspects of the TSA. The study plan was approved at the first Senior Advisory Group (SAG) meeting, 19 November 2014, and final results were due by the fourth SAG, 27 May 2015.  This gave AMSAA six months to perform the study and package the results.   An additional month was provided to write this report, which had a delivery date of 30 June 2015.
- The scope of the DEA analysis is limited to enhancing and displacing the Fusion Brain to be functioning under one cloud enterprise, utilizing data from external data sources directly linked to the Fusion Brain.
- To avoid the appearance of a source selection, analysis was performed on representative software solutions, for each capability area, and then rolled up and only presented as one of three alternatives: COTS, GOTS, or Hybrid.

making ease of use judgements and ratings during the heuristic evaluation. During a heuristic evaluation, system functionality is demonstrated and HFEs rate the extent to which the system satisfies the predetermined set of usability criteria.

**2.2.1.1 Heuristic Evaluation Methodology.** The Human Systems Integration (HSI) Team chose this method for DEA and Intelligence Support to CO usability evaluations due to two limitations: time constraints to complete the study and limited access to systems under evaluation. Each system was assessed by 3-5 HSI evaluators. The system was demonstrated to the HSI team by either a representative from the company that created the application or a user of the application from a government agency. Most of the evaluations were conducted in the conference room setting; either at the vendor's location or in a conference room at Aberdeen Proving Ground, MD. Several of the COTS systems were evaluated at the government agency that currently uses them.

**2.2.1.2 Procedure.** Prior to each system demonstration, the vendor or government point of contact (POC) was provided a list of tasks that needed to be demonstrated. The POC's were also told that the evaluation focused on ease of use/usability and that it should take approximately 90 minutes. For each evaluation, each evaluator completed a heuristic evaluation form as shown in Table 64 of APPENDIX C. For each heuristic a rating of "0" Metric Not Met, "1" Metric Partially Met, "2" Metric Met, and "N/A" Not Applicable was provided by each evaluator. The person demonstrating the application completed the tasks as requested. If during the demonstration, one of the evaluators was unable to rate a heuristic based on the information provided, the demonstrator was asked to repeat the task. Once all the evaluators completed the form the evaluation was completed.

**2.2.1.3 Heuristic Evaluation Form.** The Heuristic Evaluation Form was designed to assess 36 usability principles or "heuristics" that were grouped into eight categories. The categories are described below:

- **Reliability:** The system should be available to the user and free from malfunctions (e.g., screen freezing, application closing by itself). System malfunctions should minimize the loss of data that a user may experience.
- **User Control:** As users navigate the application they should feel in control of their experience. If users should get lost and are unable to return to where they were they will likely become frustrated or just exit the application. A well designed application makes users comfortable as they work through the screens but they are also provided easy methods of exit at any point.
- **Visibility of System Status:** The system should always keep users informed about what is going on by providing feedback within a reasonable time.
- **Error Prevention, Recovery, and Correction:** The system should be designed to minimize the possibility of user error, with inbuilt facilities for detecting and handling those which do occur. Users should be able to check their inputs and correct any errors or potential error situations before the information is processed. Error messages should be written in plain language (no codes) that indicates the problem and provides instructions on how to resolve the problem.
- **Efficiency of Use and Flexibility:** The system needs to support both the novice and expert users, therefore accelerators, unseen by users, often speed up the expert user. By

9

providing the accelerators the system is catering to the needs of both the novice and expert user. The ability to tailor frequent actions also speeds up the interaction the user has with the system.

- **Minimalist Design and Aesthetic:** Dialogues should not contain information that is not relevant or rarely needed. Every extra unit of information in a dialogue competes with the relevant units of information and diminishes their relative visibility.
- **Consistency, Standards, and Language:** Users should not have to wonder whether different words, situations, or actions mean the same thing. Follow platform conventions.
- **Help:** Although it is better if the system can be used without documentation, it is beneficial to provide help. The Help information should be easy to access, searchable, and focused on user's tasks.

   **2.2.1.4 Scenarios.** For DEA and Intelligence Support to CO a list of tasks was generated so each demonstration covered the same material. It was requested that the tasks be presented as if working through a workflow.

**Tasks for DEA:**
Intelligence Analyst
- Completing queries of brain data with a variety of parameters (by source, wildcard, etc.).
- Viewing search results.
- Opening search results reports and attachments.
- Refining search results (additional queries on results).

Knowledge Manager
- Monitoring ingest of data from brain.
- Monitoring ingest sources.

**Tasks for Intelligence Support to CO:**
- Demonstrate Knowledge Management interface/dynamic entities/editing property value attributes.
- Demonstrate distributed central repository for entity data sharing/version control and history of entities.
- Utilize alarms to detect changes in system data/issue alerts.
- Utilize DoD standard (MIL-STD-2525) Symbology on a 2D Map.

   **2.2.1.5 Usability Measures and Targets.** Evaluators rated each heuristic by how well it met the usability metric. Ratings were analyzed by totaling the number of "2" Metric Met ratings made by all evaluators and computing its percentage of the total for each category. For measures falling below the targeted 80%, comments provided by evaluators were used to understand the rating.

An 85% agreement target is generally set as the objective based on industry best practices [Reference 4] [Reference 5] [Reference 6]. This target has been validated conducting usability testing with a variety of Army systems including the Joint Tactical Radio Handheld, Manpack, and Small Form Fit Manpack Radio [Reference 7] [Reference 3], Defense Advanced Global Positioning System Receiver [Reference 6], Maneuver Control System [Reference 13], Force

XXI Battle Command Brigade and Below system [Reference 8], Command Post of the Future [Reference 9], and the Base Expeditionary Targeting and Surveillance Systems – Combined [Reference 10]. The 85% target was relaxed to 80% due to the variability of evaluators (not having as least two consistent evaluators at every demonstration), not always having at least three evaluators, and since it was being applied to a heuristic evaluation rather than a usability test.

**2.3    User Jury Evaluation.** The primary purpose of the user jury/usability evaluation, was to collect Soldier feedback when using different systems to load, manage, and disseminate geospatial data. Results were used to inform the usability trade space for DCGS-A technical and operational capabilities.

**2.3.1    User Jury Evaluation Methodology.** Nine Soldiers with varying levels of Geospatial experience were recruited by the U.S. Army Geospatial Center (AGC). A summary of the participant demographics is shown in APPENDIX G. The user jury was held in the Army Geospatial Enterprise (AGE) Node at the AGC. Each Soldier performed geospatial data loading tasks using provided instructions (APPENDIX F). Instructions and tasks were tailored to each system since each had a different user interface and functionality. Soldiers performed tasks using systems in counterbalanced order to control for carryover effects as shown in Table 5.

**Table 5. Counterbalanced Presentation Order**

|  | STATION RED (ALPHA) | STATION BLUE (BRAVO) | STATION YELLOW (CHARLIE) | STATION GREEN (DELTA) | STATION PURPLE (ECHO) |
|---|---|---|---|---|---|
| Phase 1 | Team 1 | **EMPTY** | Team 2 | Team 4 | Team 3 |
| Phase 2 | Team 4 | Team 1 | **EMPTY** | Team 3 | Team 2 |
| Phase 3 | **EMPTY** | Team 3 | Team 1 | Team 2 | Team 4 |
| Phase 4 | Team 2 | Team 4 | Team 3 | Team 1 | **EMPTY** |
| Phase 5 | Team 3 | Team 2 | Team 4 | **EMPTY** | Team 1 |

The data loading process tools that were used for each scenario were as follows:
- Alpha – Hybrid Tool (Automated) running on legacy COTS software
- Bravo – COTS Tool (Automated) running on legacy COTS software
- Charlie – Legacy COTS software (No Automation)
- Delta – COTS Tool running on new COTS software (Automation)
- Echo – New COTS software (No Automation)

The tools used for the corresponding scenarios Alpha through Echo were categorized into software option alternatives used for the TSA (COTS/GOTS/Hybrid) and are shown in Table 6.

A1963

Appx11963



Figure 4. Draft DCGS-A Schedule for Increment 2

The trade space in regards to schedule risk was assessed by evaluating the COTS, GOTS, and Hybrid software option alternative(s) TRL and IRL against the PM-provided draft DCGS-A Increment 2 schedule. The schedule for each of the software option alternatives was modeled as a single phase. The starting point for this phase was Contract Award and the ending point for the phase was Increment 2 Release 1 Fielding; a total of 39 months. The readiness levels required to achieve the Increment 2 Release 1 Fielding are TRL 8 and IRL 9. Therefore, the technology development timelines elicited for each software option alternative are representative of the maturation time required to progress each alternative from its current readiness level up to TRL 8 and IRL 9. The maturation times are broken up into three segments:

1) Maturation to TRL 6 and IRL 6 (Development),
2) Maturation to TRL7 and IRL 8 (Integration), and
3) Maturation to TRL 8 and IRL 9 (Preparation for Fielding).

15

A1967

For each segment, the SME judgment is used to assess the most likely time estimates for each software option alternative to achieve the required readiness levels. The individual segment completion times are added and then compared to the DCGS-A Increment 2 overall program schedule to determine if the software option alternative meets the PM DCGS-A schedule. The rating criteria used in the schedule risk level assessment is shown in Table 8.

**Table 8. Schedule Risk Rating Criteria**

| Rating | Criteria |
|--------|----------|
| B | SME Estimate (Est) ≥ 6 months before Fielding Decision (FD) |
| G | 6 months before FD > SME Est ≥ 3 months before FD |
| Y | 3 months before FD > SME Est ≥ 3 months after FD |
| R | SME Est > 3 months after FD |

   **2.6    Technical Risk.**  AMSAA developed a set of survey questions to provide to the Army and DoD SMEs in the DEA, Intelligence Support to CO, and Geospatial communities to collect the information and data across software option alternatives for the risk assessment.  The survey was composed of the pre-identified general software development risk factors as well as additional various specific risk factors that SMEs from each of the specific study capability (DEA, Intelligence Support to CO, and Geospatial) associated with DCGS-A Increment 2.  The pre-identified general software development risk factors were developed through:
   1) A literature review of the historical DCGS-A studies (e.g., Defense Acquisition Executive Summary (DAES) reports, Universal Acquisition Data Display and Entry (UADDE) repository search, General Web Searches, DCGS-A Trade Space Studies).
   2) Consulting with PM DCGS-A, AMSAA SMEs, Carnegie Mellon University Software Engineering Institute, Tank and Automotive Research, Development and Engineering Center (TARDEC), and National Aeronautics and Space Administration (NASA).
   3) A literature review of software risks, methods, assessment white papers and reports (e.g., Software Cost Estimating Handbooks, Software Reliability Risk Assessment Report, AMSAA Software Reliability Scorecard).

AMSAA SMEs who work in the specific capability areas of DEA, Intelligence Support to CO, and Geospatial and also have experience with conducting Analysis of Alternative (AoA) type analysis, developed risk factors specific to their study area.

The DoD and Army SMEs were asked to assess the likelihood and consequence levels on a separate 1 to 5 scale for each pre-identified risk associated with each alternative of interest for each DEA, Intelligence Support to CO, and Geospatial capability associated with DCGS-A Increment 2.  A list of viable COTS, GOTS, and Hybrid software solutions that are representative of the spectrum of Geospatial, DEA, and Intelligence Support to CO software solutions available were identified for the risk assessment.  However, risk SMEs were not asked to assess risk of individual software solutions, just the COTS, GOTS, and Hybrid alternatives as a whole.

16

A representative sample of seven software solutions were selected and assigned in three categories: three COTS, two GOTS and two Hybrid. COTS and GOTS software solutions considered for Hybrid are not the same as the single source COTS and GOTS solutions. The two Hybrid software solutions considered are characterized as:

- Hybrid 1: COTS data management layer + GOTS analytical layer
- Hybrid 2: GOTS data management layer + COTS analytical layer

      **3.1.3   Additional Assumptions.** The following assumptions were identified which are specific to the TSA of DEA:

- The DEA did not analyze hardware infrastructure upgrades required for the software option alternatives. It was assumed that DCGS-A hardware infrastructure will be upgraded to provide sufficient computing resources to implement software option alternatives.
- The DEA technical functionality metrics encapsulate architecture foundation required to support intelligence domain specific services such as Intelligence Support to CO and Geospatial operations. For example, an Intelligence Support to CO metrics states "Allow user to quarantine USPI data once confirmed." The assumption is that the DEA will recognize and handle data type specific to USPI specifications and have the foundation to create a quarantine tool.

      **3.2    Technical Functionality.** AMSAA evaluated each software solution's technical functionality for the TSA. Each solution is evaluated individually and results are presented according to alternative: COTS, GOTS, and Hybrid.

      **3.2.1   Metrics.** AMSAA hosted a MDW attended by SMEs from U.S. Army Intelligence and Security Command (INSCOM), U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC), U.S. Army Intelligence Center of Excellence (ICoE), U.S. Army Training and Doctrine Command Capability Manager Sensor Processing (TCM-SP), Project Manager Distributed Common Ground System – Army (PM DCGS-A), DCS G-3/5/7 DAMO-CIA, and Army Research Labs (ARL). During the MDW, and subsequent discussions with the SMEs, 22 metrics were identified and categorized into four areas of enhancement (Ingest, Sync/Federate, Replicate, Query) which were defined as being critical to upgrade the Fusion Brain to be functional under one cloud enterprise. The four areas of enhancement are:

- **Ingest:** refers to the Fusion Brain's ability to connect to external data sources and obtain, import, and process data. The metrics address issues related to validating files, prioritizing sources, compatibility with data formats, information assurance (IA) compliance (cell level security, Authorization to Operate accreditation, etc.), metadata tagging and intelligent resource management.
- **Query:** addresses issues related to IA compliance, querying multiple sources and classifications and storing queries for future use.
- **Sync/Federate:** addresses Fusion Brain specific issues related to syncing data with other geo-disparate sites and/or IFSs located at lower echelons. The issues relate to data resiliency (number of copies stored), Public Key Infrastructure (PKI) support (single sign-in), process efficiencies (sequencing syncing with data sources), DIB compatibility and providing access to partner nations.

- **Replicate:** addresses Fusion Brain specific issues related to replicating data, to the IFSs located at lower echelons, such as how does a system react if connection is lost when replicating data from a higher to a lower echelon? Does the higher level system continue to queue the data so when connectivity is restored the replication continues from the stoppage point, or does the system simply crash?

The metrics were used to score a representative sample of three COTS, two GOTS and two Hybrid software solutions, as discussed in APPENDIX A. Eleven of the metrics were categorized as "Ingest" metrics, four of the metrics were categorized as "Query" metrics, and seven metrics were categorized as "Sync/Federate". One metric related to IA compliance fell into all four Areas of Enhancements. The metric is used to score how well a software option satisfies specifications related to IA compliance.

3.2.2 **Evaluation Methodology.** AMSAA developed a subjective scoring method as shown in Table 4 to score the software options. This method was used because the metrics developed at the DEA MDW were at a high level, and quantitative data, such as from a test were not available. AMSAA coordinated meetings with software developers and government users of the various software options to validate and score each of the COTS, GOTS and Hybrid software solutions. The government users were from the CERDEC Intelligence and Information Warfare Directorate (I2WD), Defense Intelligence Agency (DIA) and U.S. Marine Corps Forces Cyberspace (MARFORCYBER).

The scoring participants were asked to provide supporting rationale with the scores they provided. A summary of the rationale for each software option is provided in APPENDIX A. Scoring was not based solely on government feedback. Vendor feedback for some of the Hybrid and COTS software options was used to fill gaps as needed. The GOTS software solutions were scored with input from contractors working for the government.

3.2.3 **Technical Functionality Results.** Table 12 depicts results of the DEA technical functionality assessment. The two colors in a cell represent upper bound and lower bound scores for the software option alternatives. Overall, the Hybrid alternative was rated Green and scored the highest of the three alternatives. Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar "turn-key" technical functionality as Hybrid software solutions. They scored better than the Hybrid in the "Query" area of enhancement due to allowing a user to simultaneously query all levels of classification and providing results based on that user's clearance level. Due to the absence of historical requirements, the lower bound COTS solution needs major capability development in all four areas of enhancements.

24

A1976

**Table 12. DEA Technical Functionality Assessment Results**

| Software Option Alternatives | Data Enterprise Architecture Metrics | | | | | | | | Summary Score | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ingest (11) | | Query (4) | | Sync/Federate (7) | | Replicate (3) | | | |
| COTS | Y | G | Y | B | Y | G | Y | G | Y | G |
| GOTS | Y | | Y | G | Y | | Y | G | Y | |
| Hybrid | G | | G | | G | B | G | | G | |

Overall, the GOTS solutions scored the lowest of the three alternatives and requires major development to satisfy metrics. GOTS solutions are least capable of being "turn-key" solutions. GOTS solutions are undergoing capability demonstrations in an operational environment with military users. Both GOTS solutions require significant development in two of the four Areas of Enhancements; Ingest and Sync/Federate. Within Ingest, GOTS solutions are lacking in their ability to manage resources intelligently by not implementing a tiered storage architecture which allows more frequently used data to be cached for quicker access and less frequently used data to be compartmentalized for long term storage. Also within Ingest, the GOTS solutions are unable to cache data so that when connectivity lapses occur or a system crash is experienced, the user does not have to restart creation of a product or synching of data. Within Sync/Federate, the GOTS solutions ability to conduct data de-duplication requires significant development to make the process semi-autonomous so that the system provides alerts upon synching. At present, the alerts are not generated unless a user manually searches for a specific file name and/or product. Also within Sync/Federate, the GOTS solutions require significant development in providing users the ability to prioritize which data sources to sync to their respective system.

       **3.2.4    Linkage of TSA metrics to DCGS-A IS CDD KPP 2.** Nine of the 22 DEA technical functionality assessment metrics linked directly to KPP 2 (Fusion). Six Ingest metrics linked directly to KPP 2 (Fusion). The metrics addressed issues with data type compatibility, tiered storage architecture, metadata tagging, status updates and data de-duplication. One Query metric linked directly to KPP 2 (Fusion). This metric addressed a systems ability to query geo-disparate data sources. Two Replicate metrics linked directly to KPP 2 (Fusion). The metrics addressed issues with how a system reacts to intermittent connectivity lapses and connection status. Overall, Hybrid software option alternatives demonstrated the capability to satisfy KPP 2 but still require minor development. COTS and GOTS solutions require significant development to satisfy KPP 2. Table 13 summarizes the results of the technical functionality evaluation for the subset of metrics linked to KPP 2 Fusion.

**Table 13. DEA Metrics Linked to KPP 2 Fusion**

| Software Options Alternatives | Ingest (6) | Query (1) | Sync/Federate (0) | Replicate (2) | DEA KPP2 Summary Scores |
|---|---|---|---|---|---|
| COTS | 🟨 | 🟨 | N/A | 🟨 | 🟨 |
| GOTS | 🟨 | 🟨 | | 🟩 | 🟨 |
| Hybrid | 🟩 | 🟦 | | 🟩 | 🟩 |

**3.3    Usability.** For Data Enterprise Architecture, heuristic evaluations were conducted on three COTS, one GOTS, and two Hybrid software solutions. See APPENDIX E for individual results for each system. Only one of the two GOTS solutions was evaluated for usability since they share a common user interface. A Government SME confirmed that the usability would not differ even with different backend data management systems. Table 14 summarizes the results for the COTS, GOTS, and Hybrid alternatives and identifies the categories that did not meet the 80% target.

- COTS did not meet the 80% target for reliability (72%); user control (59%); visibility of system status (74%); error prevention, recovery and correction (46%); efficiency of use and flexibility (61%); minimalist design and aesthetics (68%); consistency, standards, language (76%); and Help (79%).
- GOTS did not meet the target for: user control (59%); error prevention, recovery and correction (61%); efficiency of use and flexibility (50%); minimalist design and aesthetics (68%); consistency, standards, language (60%); and Help (45%).
- Hybrid did not meet the target for: visibility of system status (75%); error prevention, recovery and correction (43%); efficiency of use and flexibility (73%); minimalist design and aesthetics (75%); and Help (37%).

A1978

Protected Information and/or Legends Redacted

**Table 14. Heuristic Evaluation Results for DEA**

| Heuristic Criteria | COTS | GOTS | Hybrid |
|---|---|---|---|
| Number of Evaluators | 5 - 6 | 4 | 4 |
| Reliability | 72% - 87% | 88% | 80% - 87% |
| User Control | 59% - 82% | 59% | 84% - 88% |
| Visibility of System Status | 74% - 82% | 83% | 75% - 85% |
| Error Prevention, Recovery and Correction | 46% - 80% | 61% | 43% - 54% |
| Efficiency of Use and Flexibility | 61% - 69% | 50% | 73% - 91% |
| Minimalist Design and Aesthetics | 68% - 93% | 68% | 75% - 100% |
| Consistency, Standards, and Language | 76% - 78% | 60% | 82% - 100% |
| Help | 79% - 96% | 45% | 37% - 84% |
| Overall Score | 72% - 81% | 64% | 76% - 79% |

| 0-64% | 65-79% | 80-94% | 95-100% |
|---|---|---|---|

**3.3.1 COTS Usability.** COTS solutions provided a well-integrated and comprehensive solution. Below are the strengths and limitations that were identified by the evaluators.

**Strengths:**
- Ability to save searches.
- Input fields provided tips/guidance on how to enter information (e.g., "Put exact words in quotes").
- Dashboards are customizable.
- Users involved in the design from the beginning.
- Ability to upload raw data.
- Given that not all options are available to all users, the system grays out options to a "user" that are only accessible to the "Admin."
- Ability to use searches completed by others
- Keeps the last 100 searches.
- Quick search will return results with various spellings of "Mohammed."

**Limitations:**
- Need to know SQL to understand some of the error messages that were presented.
- Layout is somewhat confusing, not immediately intuitive.
- The method shown for troubleshooting system connectivity was not user friendly, no data provided via log files.

A1979
Protected Information and/or Legends Redacted

- Only "Admin" level users can access system status indicators.
- Query highly customizable and seems to be very robust; however, for the novice user there should be more guidance provided.
- User needs to know how to use the program in order to use it well. For the novice user there is no assistance for quick and easy navigation of the interface.

      **3.3.2   GOTS Usability.** The GOTS solution needs to improve user control, error messages, and consistency for a more effective interface. Below are the strengths and limitations that were identified by the evaluators.

**Strengths:**
- Tracks workflow at the bottom of the screen.
- Can work in a disconnected state.

**Limitations:**
- Notifications are present but not very clearly noticeable to the user.
- System has built in features to help prevent errors (e.g., entering a letter as part of the date, entering a wrong time). However, the location of an error message is not clearly visible to the user. For example, when a user does not enter all the required fields and then clicks "Enter," an error message appears briefly across the top of the current window, and then disappears.

      **3.3.3   Hybrid Usability.** The Hybrid solutions need to improve error handling and help. Below are the strengths and limitations that were identified by the evaluators.

**Strengths:**
- Multiple ways to view data facets.
- User interface is customizable to user preferences.

**Limitations:**
- Tool tips are not available all of the time.
- The system ignores bad data that the user has entered and does not always make the user aware of what occurred.
- There is no quick way to see if a user is connected to the network.
- Error messages need to provide more feedback to the user on how to resolve the problem.
- The user interface is well organized and labeled, but training to learn the sequence of steps needed to perform tasks.

      **3.3.4   Best of Breed Usability.** Comparative usability results for "Best of Breed" are shown in Figure 8. Items falling in the "Red" and "Yellow" areas of the spider chart did not meet the 80% usability target, while those falling in the "Green" and "Blue" areas did. Items that failed to meet the usability target provide areas of opportunity for improvement.

A1980

Protected Information and/or Legends Redacted



**Figure 8. DEA "Best of Breed" Comparative Results**

  **3.3.5 DEA Usability Summary.** The COTS and Hybrid alternatives were evaluated to have better usability. The COTS alternative needs to improve user control, visibility of system status, efficiency of use and flexibility, consistency, standards, and language in order to increase usability. For the Hybrid alternative error prevention, recovery, and correction, minimalist design and aesthetics, and consistency, standards, and language all need to be addressed for usability. The GOTS alternative needs to address user control, error prevention, recovery, and correction, efficiency of use and flexibility, minimalist design and aesthetics, consistency, standards, and language, and help to provide a user-friendly interface.

  **3.4 Cost.** Table 15 was sent to the vendors with a request to provide associated costs for development, integration, testing and maintenance for the software solution to meet the included specifications. Once an estimate was provided by the vendor, discussion took place between the vendor and capability functional lead to ensure specifications used to estimate the cost of the software option matched specifications used for the technical functionality assessment. For the GOTS and portions of Hybrid alternatives, a request was sent to the developers for all costs associated with the software, to include those considered to be sunk. The fidelity of the cost estimates provided by the government developers was low and not sufficient for a complete cost estimate. There were three COTS software solutions assessed and two of both Hybrid and GOTS.

**A1981**

Protected Information
and/or Legends Redacted



**Figure 9. DCGS-A Increment 2 DEA Schedule Risk Assessment**

Table 18 provides a summary of the schedule risk assessment results. The results shown are based on the risk of the software option alternative completing the full schedule single phase from the starting point of Increment 2 Contract Award (3rd QTR FY 2016) to the end point of Increment 2 Release 1 Fielding Decision (1st QTR FY 2020); a total of 39 months. The COTS and GOTS alternatives are low risk for going from contract award to fielding decision in an average of 36 months. The Hybrid alternative is lowest risk from contract award to fielding decision in an average of 33 months. The Hybrid software option alternative is more mature and more aligned to the DEA military solutions than the COTS and GOTS alternatives; resulting in less development and integration effort. The assessment shows that the Hybrid software option alternative is less likely to impact the DCGS-A Increment 2 schedule.

**Table 18. Schedule Risk Summary**

| Software Option Alternatives | Total Months in Schedule | | | Summary Score |
|---|---|---|---|---|
| | Min | Max | AVE | |
| COTS | 27 | 45 | 36 | G |
| GOTS | 27 | 45 | 36 | G |
| Hybrid | 24 | 42 | 33 | B |

**3.6    Technical Risk.** SMEs from the following DEA MDW participating organizations were contacted to complete the risk questionnaire for the COTS, GOTS, and Hybrid software option alternatives.

- ARL
- CERDEC
- INSCOM
- PM DCGS-A
- TCM-SP

A1987

Protected Information and/or Legends Redacted

Three organizations responded to the questionnaire: PM DCGS-A, TCM-SP, and CERDEC. ARL declined to complete the risk assessment, because they did not feel qualified to do so. INSCOM was not able to complete the questionnaire; however, they did participate in follow-on risk adjudication sessions. The complete collection of questionnaire responses is located in APPENDIX H.

   **3.6.1   Technical Risk Drivers.** The risk assessment focused on the 26 pre-identified general software development risk factors and 11 DEA-specific risk factors – a total of 37 risk factors. The 37 risk factors were categorized into three major risk categories: Development and Integration (6), Programmatic (9), and Performance (22). During an initial risk adjudication session, participating SMEs identified risk drivers for each of the three major risk categories. These risk drivers were also used to assess comparative risk of the software alternatives; however, the comparative scores were removed per SAG guidance to show the actual risk scores. Table 19, Table 20, and Table 21 show the risk drivers and the corresponding rationale for the software alternatives for the three major risk categories. These risk drivers were used to score the actual technical risk shown in the next section.

### Table 19. DEA Development & Integration Risk Drivers

| Software Option Alternative | Risk Drivers | Rationale |
|---|---|---|
| COTS | Integration Complexity | COTS rated highly likely to present significant integration challenges and performance issues during acquisition. Significant issues integrating COTS software into Army solution, especially if attempting to have context aware data management/cloud solution. COTS products are more likely to fail integration as they were not purpose-built for the intended environment. Failure to integrate will most impact the ability of the system to perform. |
| | Development Difficulty | Risk rated highly likely to present significant cost impacts. The COTS software will most likely require custom development to meet the performance requirements. The greatest factor will be the cost for the vendor to make changes. Understanding of Army requirements, security requirements, and disconnected low bandwidth systems is a real issue usually only seen with mobile networks. |
| GOTS | Software Maturity | Risk rated likely of presenting moderate schedule risk impacts. GOTS software is most likely to be new work, developed for this purpose, therefore moderate schedule impacts likely during effort required to mature the software. |

**A1988**

Protected Information and/or Legends Redacted

**Table 22. Technical Risk Categorical Ratings**

| Software Option Alternatives | Technical Risk Categorical Ratings | | |
|---|---|---|---|
| | Development & Integration Risk | Programmatic Risk | Performance Risk |
| **COTS** | R | R | R |
| **GOTS** | Y | R | R |
| **Hybrid** | G | R | R |

For the Development and Integration Risk category, the Hybrid alternative was assessed to have low risk, GOTS to have moderate risk, and COTS to have high risk. The major risk driver for this area was the integration complexity within COTS software. COTS was assessed as highly likely to experience significant issues integrating software into an Army solution. COTS is likely to need significant custom development to provide Army specific capabilities. GOTS software is most likely to be new work and presents a moderate schedule risk involved with the effort required to mature the software. The Hybrid option does present some integration risk; however, it's currently being used in other government organizations, so the risk is more acceptable.

With respect to the Programmatic Risk category, accreditation and maintainability were two high risk factors for that drove an overall high programmatic risk rating for all alternatives. Both of these risk factors were ranked by SMEs among the top two most important risks. These risk factors strongly influence the program regardless of COTS, GOTS or Hybrid software. Due to the strong comments from the SMEs, AMSAA wants to emphasize the importance of these risk factors. According to SME input, it is near certain that these risk factors will occur and have significant impact to the program. The proper PM DCGS-A planning could help mitigate these risks and drop the overall programmatic risk to moderate levels.

The Performance Risk category resulted in a high risk for all three alternatives. The SMEs commented that the holistic system performance was a major driver for DEA. This risk driver focuses on the user's perspective of the system. When utilizing the software (whether COTS, GOTS, or Hybrid), the SMEs felt that the quality, speed and effectiveness of the software would have the most significant impact to DCGS-A. If these areas of performance are lacking in any way, the (holistic) system effectiveness will suffer. Two specific high risk performance factors were DIB (Framework) Connectivity for a COTS alternative and Reliability for a GOTS alternative. Both of these risks were ranked as a number one most important risk factor according to the SMEs. Also driving the high risk rating for all alternatives was a multitude of additional performance risk factors that were evaluated as likely to present moderate to significant negative impacts to system performance (e.g., COTS risk factors such as Metadata Standards, DoD Developed Tools Interoperability, PKI-enabled access, GOTS and Hybrid risk factors such as Intelligent Synching and Autonomous Data De-duplication, common risk factors such as Object Model Expansion, Network Latency, and incorporating new File Formats.)

    **3.7    Data Enterprise Architecture Summary.** Table 23 summarizes the trade space analysis of the DEA software option alternatives. The COTS and Hybrid alternatives satisfy

**A1992**

**Appx11992**

Protected Information and/or Legends Redacted

| | | | |
|---|---|---|---|
| | | Network Latency | Risk rated likely to present a significant performance issue to the acquisition program. Network latency could be an issue with a COTS option where a GOTS option is designed to work in environments with network latency between multiple geographic sites. |
| | | U.S. Army Workflow Process Familiarity | Risk rated likely to present a significant cost impact to the DCGS-A acquisition. The Army workflows are different than the commercial ones. For GOTS software option, the workflow tools have been developed to meet the Army requirements. |
| COTS, Hybrid | | Data Integration (Across DCGS-A Tools) | Risk is likely to present a significant schedule impact to COTS (and Hybrid) program. For COTS software alternative, the system data architecture needs to be updated to integrate with DCGS-A baseline. The Hybrid currently integrates via the DIB, which is prone to data loss when sharing entities. A better solution is needed. Failure to integrate data between tools will make use of the system cumbersome and time consuming, resulting in operators not using the system. For GOTS software alternative, the system tool sets are designed to be interoperable. |
| | | Data Interoperability (Cyberspace Attack Sensors) | Risk is likely to present a moderate cost impact to a COTS (and Hybrid) acquisition program with respect to the costs required to develop an alerting mechanism. The GOTS software is designed to be scalable and support a variety of data feeds. The Hybrid software may need to integrate an alerting mechanism. |
| | | Insider Threat Detection | Risk rated likely to present a significant cost impact to the DCGS-A acquisition with respect to the costs required to add a threat detection mechanism. A GOTS software option is designed to log and make user actions searchable. |
| | | PKI Enabled Access | Risk rated likely to present significant cost impact to the DCGS-A acquisition with respect to the costs required to provide PKI enabled access. A GOTS software option would come with a PKI Enabled Access capability. |
| COTS, GOTS, Hybrid | | USPI Data Handling | The USPI requirements will require a development of a role-based access capability, which is a complex feature. Risk was rated as |

A2007

Protected Information
and/or Legends Redacted

Table 57 reflect scores for the current Fusion Brain baseline system. The system was scored by a government user. Overall, the baseline requires a significant capability development in all four Area of Enhancements to satisfy the metrics. Within Ingest, minor development is required for making the system IA compliant and improving status displays. Major development is required to improve the system's ability to manage resources and store data intelligently, de-duplicate data, store original source documents, metadata tagging and recognize releaseability and handling instructions. Within Query, minor development is required for making the system IA compliant. Major development is required to improve the system's ability to query across all classification and geo-disparate data sources and providing a user the ability to customize the GUI. Within Replicate, minor development is required for making the system IA compliant and recovering from connectivity lapses. Major development is required to provide a user the ability to identify connection to a data source. Within Sync/Federate, minor development is required for making the system IA compliant, recovering from connectivity lapses and have DIB compatibility. Major development is required for the system to be able to share data with partner nations, improve data resiliency, PKI compatibility and providing user ability to prioritize syncing with data sources.

**Table 57**

**Table 49. DEA Metrics**



**Table 50. COTS 1 Scores and Rationale**

**A2033**

Protected Information and/or Legends Redacted



**Table 51. COTS 2 Scores and Rationale**

**A2034**

Protected Information and/or Legends Redacted



Table 52. COTS 3 Scores and Rationale

Protected Information and/or Legends Redacted



**Table 53. GOTS 1 Scores and Rationale**

A2036

Protected Information
and/or Legends Redacted



**Table 54. GOTS 2 Scores and Rationale.**

A2037

Protected Information
and/or Legends Redacted

**Table 55. Hybrid 1 Scores and Rationale**



A2038

Protected Information
and/or Legends Redacted



**Table 56. Hybrid 2 Scores and Rationale**

A2039

Protected Information
and/or Legends Redacted



A2040

Protected Information
and/or Legends Redacted

## Table 79. DCGS-A PM, DEA TRL-IRL Evaluation

| Question # | Questions | COTS | GOTS | HYBRID |
|---|---|---|---|---|
| 1 | Current TRL? | TRL 5: Module and/or subsystem validation in a relevant environment | TRL 4: Module and/or subsystem validation in a laboratory environment | TRL 5: Module and/or subsystem validation in a relevant environment |
| 2 | TRL Rationale? | COTS Software has been tested in relevant comparable environment, but not necessarily in a Military Environment | GOTS Software is matured through Science and Technology work, most of which are TRL 3-5 before transitioning to a Program of Record. | A Hybrid approach should build/integrate mature software components rather than new development. |
| 3 | Current IRL? | IRL 4: There is sufficient detail in the quality and assurance of the integration technologies | IRL 3: Integration features for integration technology elements have been modeled | IRL 4: There is sufficient detail in the quality and assurance of the integration technologies |
| 4 | IRL Rationale? | Standalone COTS Software integrated in comparable environments, but integrated into the military system is not demonstrated. | GOTS Software is matured through Science and Technology work, most of which are IRL 2-4 before transitioning to a Program of Record. | A Hybrid approach should build/integrate mature software components rather than new development. |
| 5 | Maturation Time from current TRL/IRL to TRL 6/IRL6 (Most Likely) in Months? [Assume 5 FTEs] | 9-12 Months | 9-12 Months | 6-9 Months |
| 5 | Rationale | Modification and Integration of Software to meet Military System Needs | Less Mature software may require more modifications than COTS, but on par with potential changes to non-military software. Integration times should be relatively static. | A Hybrid approach should build/integrate software that is more mature and more aligned to military solutions, resulting in less developmental effort. Integration times should be relatively static. |
| 6 | Maturation Time from TRL6/IRL6 to TRL 7/IRL 8 (Most Likely) in Months? | 6-9 Months | 6-9 Months | 6-9 Months |
| 6 | Rationale | Once the baseline changes are created and integrated, Testing the system in an Operational Environment will be required. | Once the software is matured and integrated, Testing the system in an Operational Environment will be required. | Once the software is matured and integrated, Testing the system in an Operational Environment will be required. |
| 7 | Maturation Time from TRL 7/IRL 8 to TRL 8/IRL9 (Most Likely) in Months? | 12-24 Months | 12-24 Months | 12-24 Months |
| 7 | Rationale | This will be dependent on the Program Deployment schedule. | This will be dependent on the Program Deployment schedule. | This will be dependent on the Program Deployment schedule. |

**A2114**

Appx12114

Protected Information and/or Legends Redacted

# Overview of the
# Data Integration Visualization and Analytics (DIVA) Market Study
# and
# DCGS-A Increment #2 Recommendations

**JULY 2014**

A2218

Protected Information
and/or Legends Redacted

# 1 Purpose

The purpose of this document is two-fold. First, to provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study. Second, to codify the DIVA Independent Mark Study into recommendations for the DCGS-A Increment #2 Acquisition effort and describe the top-level risks and mitigation strategies associated with adopting these recommendations.

## 1.1 Organization of this Document

Section 2 provides an overview of the ASA(ALT) DIVA Independent Market Study. Section 3 provides a brief overview of the DCGS-A Enterprise and goals of DCGS-A Increment #2. Section 4 provides an overview of the four key "components" for the DCGS-A Increment #2 to acquire. Sections 5-8 will describe each of these components and will identify risks and associated mitigation strategies. Section 9 will summarize conclusions.

**A2222**

Protected Information
and/or Legends Redacted

## 2   Data Integration, Visualization and Analytics (DIVA) Market Study

Information technology is a key enabler for the Army's Modernization for Force 2025.  Digital data is growing at an exponential rate.  Critical to the success of the Modernization of Army Information Systems is addressing issues associated with:

- Integration of high-volume; high-velocity; variety; and veracity of data sets
- Visualization technique of depicting Massive Amounts of Information to the end user
- Analytics applied across these data sets.

The commercial software industry is developing and evolving software platforms to address Data Integration, Visualization and Analytics associated with "Big" data.

The purpose of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Market Study was to provide situational awareness and market trends of the "state-of-the-practice" within  the DIVA software platform landscape.

### 2.1   Purpose and Scope

The purpose of the DIVA Independent Market Study was to provide situational awareness and market trends to the Army leadership of the "state-of-the-practice" within the commercial DIVA software platform landscape.

The scope of the DIVA Independent Market Study included:

- Conduct a market survey of representative sample of COTS vendors within the DIVA software landscape.
- Establish DIVA Functional and Architectural Considerations.
- Review COTS vendors' products and map into the DIVA Functional and Architectural Considerations
- Review DoD/IC Enterprise Architectures, Standards, and Capabilities to understand the potential leverage points for a DIVA software platform.
- Investigate the commercial industry pricing strategies and document industry trends
- Assess overall market trends and identify potential gaps.

Specifically, OUT of scope for the DIVA Independent Market Study included:

- Vendor comparison or vendor down selection
- Specific acquisition recommendations
- Detailed cost estimates to support form program solicitation
- Independent technical lab validation
- Independent validation of the capabilities in an operational environment.

**A2223**

Protected Information and/or Legends Redacted

## 2.3 DIVA Functional and Architectural Considerations

Information technology terminology such as "BIG data", "Cloud computing" can have a multitude of interpretations. In order to focus the Market Study, the DIVA Study team developed the DIVA Functional and Architectural Considerations. This section will provide an overview.

The diagram below provides an overview the Functional and Architectural considerations *potentially* available within a Data Integration, Visualization and Analytics (DIVA) Software Platform.



Figure 2 – DIVA Functional and Architectural Considerations

The functional capabilities are primarily in three areas:
1. **Data Integration Layer** –data integration framework that supports the integration of multitude of data sources, extensible and expressive data models of the underlying data; data management services (e.g, access, continuity of operations, disaster recovery, data distribution); information protection; and administration services.
2. **Visualization Layer** – applications to support visualization of information from a variety of perspectives (e.g., geo-spatial, temporally, historical, …).

A2226

Protected Information
and/or Legends Redacted

Appx12226

3. **Analytics Layer** – analytics framework to support search & analysis of large data sets.

Key architectural considerations are "baked into" the software platform and should be addressed in each of the Functional (e.g., Data Integration, Visualization, Analytics) layers. These architectural considerations are equally critical, if not more, than the above functional considerations to the "growth potential" of the COTS DIVA software platform. The architectural considerations are in the following areas:

- **Extensibility** – The data, visualization, and analytics needs are not static. So a key architectural consideration is an approach to add (or extend) new data sources, new applications, and new analytics.
- **Reliability** – It is envisioned that a DIVA software platform will be critical to many applications and workflows. As such the DIVA software platform must be dependable. The DIVA platform should incorporate reliability engineering approaches (e.g., design for redundancy, failure monitoring, …) to ensure the platform is dependable.
- **Usability** – Ease of use and the intuitiveness of the applications are essential. This applies not only for end-user applications but also for system administration applications. The platform should be easy to use and also easy to administer.
- **Scalability** – A key architectural consideration is the scalability of the software platform. The platform should "scale-up" to handle massive amounts of data. Additionally, the platform should "scale-down" to provide its capabilities (or a subset) within a small-end computing environment.
- **Security** – Cyber protection and appropriate access to information is critical. The DIVA platform should incorporate information techniques (e.g., "fine-grained" data access; auditing; role and attribute based access control; …) to provide the appropriate security protection.

A robust **Developer's Ecosystem** is important to support 3rd party developers. This Ecosystem should provide open & documented application programmer's interfaces (APIs); software development kits (SDKs); and code and application sharing repositories.

Key Observation:
   Architectural considerations must be "baked into" the COTS DIVA platform. Solid software architecture is essential to realize the "growth potential" of a DIVA platform.

A2227
Protected Information and/or Legends Redacted

### 2.5.3 Implementation Approach #3: Hybrid Approach



**Figure 5 -- Implementation Approach #3 – Hybrid Approach**

The key implementation steps of this approach are:

1. Adopt a Cloud Infrastructure Platform – Host a commercial cloud infrastructure platform (software) within a data center/cloud computing environment.
2. Adopt a DIVA "Turn Key" Platform – Host a DIVA "Turn Key" platform (software) across the enterprise.
3. Integrate the DIVA "Turn Key" Platform with the Cloud Infrastructure Platform
4. Develop/Integrate Data Integration, Analytics, and Visualization Applications
   a. Integrate data sources with the DIVA "Turn Key" Platform
   b. Extend DIVA applications (when required) to provide additional capabilities.
   c. Host and integrate COTS specialized application with the DIVA "Turn Key" Platform

12

A2233
Protected Information
and/or Legends Redacted

### 2.5.4 Summary

The table below compares the three implementation approaches.

| Category | Cloud Infrastructure | DIVA "Turn Key" | Hybrid |
|---|---|---|---|
| **Functionality** | No "out-of-the-box" Visualization and Analytics Apps | Core suite of Visualization and Analytics Apps | Core suite of Visualization and Analytics Apps |
| **Architectural Considerations** | Cloud infrastructure provides excellent scalability and reliability to address **GLOBAL** needs<br><br>Custom-developed applications may not adequately address the architectural considerations (e.g., usability, reliability, scalability) | DIVA "Turn Key" provides very good scalability and reliability to address **ENTERPRISE** needs<br><br>DIVA applications address the architectural considerations. | Architectural considerations addressed across global – enterprise – tactical environment. |
| **Tactical Edge Support** | No inherent support | May provide tactical edge support. | May provide tactical edge support. |
| **Software Development & Integration** | Significant development and integration effort.<br><br>All applications need to be developed and/or integrated.<br><br>Integrate data sources. | Moderate development and integration effort.<br><br>Integrate additional specialized apps.<br><br>Integrate data sources. | Moderate development and integration effort.<br><br>Integrate additional specialized apps.<br><br>Integrate data sources.<br><br>Integrate cloud infrastructure and DIVA "turnkey" platforms. |

Key Observation:
Hybrid Implementation approach blends the benefits of the other two implementation approaches. Provides the global scale of the cloud infrastructure with the "out-of-the-box" capabilities of the DIVA "Turn Key" platform. Also, better tactical edge support.

Requires integration of the DIVA "Turn Key" platform with the Cloud infrastructure.

A2234

Protected Information and/or Legends Redacted

### 2.6.5 DoD/IC Enterprise Architecture Summary

Key Observation:

DIVA platform could leverage DoD and IC modernization efforts.

DoD and IC standardizing on the same Commercial Cloud Infrastructure service provider would streamline integration of COTS DIVA "Turn Key" platform in the DoD and IC environments.

COTS DIVA "Turn Key" platform could be a key foundational element of the Army COE Command Post Computing Environment (CP CE)

**A2240**

Protected Information
and/or Legends Redacted

## 4   DIVA Approach for DCGS-A Increment #2

The section will outline an approach for applying the DIVA Implementation Approach #3
(hybrid approach) to the DCGS-A Enterprise Data Processing/Storage and User Capabilites.



DRAFT – For Official Use Only -- DRAFT                                        16

**Figure 12 – DIVA Hybrid Approach applied to the DCGS-A Enterprise**

Summarizing from Section 2.5 the key implementation steps of this approach are:
1.  Adopt a Cloud Infrastructure Platform – Host a commercial cloud infrastructure platform
    (software) within a data center/cloud computing environment.
2.  Adopt a DIVA "Turn Key" Platform – Host a DIVA "Turn Key" platform (software)
    across the enterprise.
3.  Integrate the DIVA "Turn Key" Platform with the Cloud Infrastructure Platform
4.  Develop/Integrate Data Integration, Analytics, and Visualization Applications
    a.  Integrate data sources with the DIVA "Turn Key" Platform
    b.  Extend DIVA applications (when required) to provide additional capabilities.
    c.  Host and integrate COTS specialized application with the DIVA "Turn Key"
        Platform

Applied to DCGS-A Increment #2 this approach required acquiring four primary components:

25

**Appx12246**

Protected Information
and/or Legends Redacted

1. COTS Cloud Infrastructure Service Provider
2. COTS DIVA Software Platform
3. Specialized Applications (e.g., for specific intelligence analyst capabilities)
4. System Integration

Section 3.2 outlined the DCGS-A Increment #2 capability plan with the key capabilities for DCGS-A Increment #2 Release 1 being:
- New Data Management Architecture and Technical Foundation
- Migration of "DCGS-A Inc1-like" capabilities with enhanced Usability and Stability
- Compatible with DoD/IC Enterprise Architectures/Standards/Capabilities (e.g., IC ITE, JIE, …)

The following will outline top-level transition steps to leverage the DIVA Implementation Approach #3 to support DCGS-A Increment #2 Release 1.

## 4.1 New Data Management Architecture and Technical Foundation

The DCGS-A Increment #1 data architecture consists of: DGCS-A "Brain" & data feeds; and the Intel Fusion Server data feeds.

The DGCS-A Increment #2 data management architecture should support across the entire DCGS-A Environment – Fixed Installation Sites – Regional Nodes – Tactical Nodes.

The DIVA Implementation Approach #3 supports this in the following ways:
- Integration of the Cloud Infrastructure Platform and the DIVA "Turn Key" Platform into Data Center environments to provide the backbone data management architecture to support the Fixed Installation and Enterprise "Big data" analytic needs.
- Deployment of the DIVA "Turn Key" Platform to Regional and Tactical Nodes to provide the Regional/Tactical Data Management capabilities.
- Extend the backbone data management architecture with the DIVA "Turn Key" Platform data distribution capabilities to provide an integrated data management architecture from the Enterprise -- Regional – Tactical Nodes.
- Integrated the DCGS-A Brain "data feeds" into the backbone data management architecture.
- Integrate the DCGS-A IFS tactical data feeds into the DIVA "Turn Key" Platform

## 4.2 Migration of DCGS-A Inc-1 capabilities

DCGS-A Increment 1 functional capabilities are primarily provided by Multi-Functional Workstation (MFWS) client applications; COTS Specialized Intel Analyst Applications; and COTS collaboration & office automation applications.

The DIVA Implementation Approach #3 supports this in the following ways:
- Deployment of DIVA "Turn Key" Platform with a core suite of Applications & Analytics Capabilities

Protected Information and/or Legends Redacted

- Migration of DGCS-A MFWS "plug-in" applications. As required, extend a DIVA "Turn Key" application to provide the missing capability or integrate the entire "plug-in" into the DIVA Visualization Application framework.
- Migration of DCGS-A COTS Specialized Intel Analyst Application. Host specialized application(s). Integrate with the DIVA "Turn Key" Platform data integration layer.
- Host COTS collaboration and office automation application(s)

## 4.3 DoD/IC Enterprise Architecture/Standard/Capabilities

Section 2.5 described ways a DIVA approach could leverage DoD/IC enterprise efforts:s
- DIVA Implement Approach #3 is compatible with the IC ITE commercial cloud services approach.
- DIVA Implementation Approach #3 is compatible with the JIE commercial cloud pilot efforts.
- DIVA "Turn Key" Platform could integrate with an external Identity and Access Management (IdAM) Capability. IC ITE and JIE provide Enterprise IdAM capabilities.
- Leverage the DIVA "Turn Key" data integration/analytics platform as a foundation component of the Army Command Post Computing Environment (CP CE)
- Incorporate mature DI2E specification as interface standards to DIVA cloud infrastructure services and/or DIVA "Turn Key" data integration, visualization and analytics services.
- Host JIE and/or IC ITE collaboration applications.

# 5   Key Risks and Considerations

## 5.1   Key Risks

### 5.1.1   Risk #1: DoD/IC Cloud Interoperability

#### 5.1.1.1   Overview

DCGS-A must operate in DoD/IC environments. Both, the DoD & IC communities are developing secure cloud capabilities. Key capabilities are: cloud infrastructure services; and Enterprise Identity and Access Management (IdAM) services.

The IC ITE has deployed operational cloud capabilities:
- IC Cloud (government) currently operational (NSA)
- IC Commercial Cloud Services (C2S) capability (Amazon Web Services) with initial operational capability (IOC) in July 2014

The IC C2S capability provides elastic computing services; data services; analytic processing services; and Identity and Access Management (IdAM) services.

Protected Information and/or Legends Redacted

The DoD/Joint Information Environment (JIE) is providing cloud capabilities. Associated with JIE are two commercial cloud infrastructure service pilots (Amazon Web Services and Microsoft Azure Services).

## 5.1.1.2 Issue: Standardization of Cloud Infrastructure Services Interfaces

Commercial cloud vendors have adopted numerous mature standards to promote interoperability. For instance, virtual machine (VM) standard interfaces exist that allow cloud users to migrate their VMs between cloud computing infrastructures. However, in other areas (e.g., IdAM; Big Data Analytics) these interfaces have not matured to the point that allows seamless migration from one cloud infrastructure provider to another.

A cloud infrastructure service provider provides a rich set of application programmer interfaces (APIs) to utilize their cloud infrastructure services. Each cloud service provider publishes an open API set to utilize its services (e.g., for an identity and access management services there would be APIs to create users; delete users; update user access privileges, and many other functions). The specific APIs are not standardized across COTS vendors; therefore separate software code must be developed to have applications that work with different cloud infrastructure providers.

The situation is analogous to the smart phone app market: Apple iPhone provides an API set that is different from the Android API set that is different from the Microsoft Phone API set. If an application developer wishes to operate in each of these smart phone environments, developers must develop three versions of their applications, each using the appropriate API set.

Risk:

> DCGS-A has to develop and integrate multiple cloud interfaces to interoperate in the DoD/IC/Army cloud environments.

## 5.1.1.3 Potential Strategy: DoD and IC Partnership

DCGS-A software capabilities will have to reside on DoD (SIPR/NIPR) and IC (JWICS). Ideally, the DoD and IC should partner to provide the same COTS cloud infrastructure service provider across these networks to *maximize* DoD and IC interoperability and to *minimize* software development/integration/test efforts.

If the DoD and IC do not leverage the same commercial cloud infrastructure services. The DoD and IC should focus on commercial cloud service providers with very stable APIs and SDKs. The commercial cloud infrastructure service provider should have a demonstrated record "future

**Appx12249**

Protected Information and/or Legends Redacted

proofing" their software interfaces (e.g., a track record of upgrading and adding new capabilities without causing breakage with existing software developed on top of their infrastructure).

### 5.1.1.4 Potential Strategy: Software Engineering Best Practices

Software engineering best-practices should be utilized by the Army development community to isolate to the maximum extent possible the software logic that accesses the cloud service API(s). This would minimize the effort to transition to a different cloud service provider or to support multiple cloud infrastructure service providers.

### 5.1.2 Risk #2: Systems Integration

### 5.1.2.1 Overview

The DCGS-A Increment 2 implementation will consist of key COTS software elements but will also have major integration activities:

- Integration of the DIVA "Turn Key" Platform with the Cloud Infrastructure Services (e.g., computing services; data base services; and analytic engine services)
- Integration of the DCGS-A Enterprise Data Management Architecture. Leveraging the cloud infrastructure data services to establish the enterprise data backbone. Integrating the DIVA "Turn Key" Platform data integration services/data distribution services to extend the data architecture to regional/tactical nodes. Integration of DCGS-A data sources into this data management architecture.
- Integration of DoD/IC enterprise services (e.g., email; collaboration) and COTS collaboration tools.
- Integration of Specialized Intel Analyst tools (e.g., applications, analytics and fusion capabilities)
- Integration of DCGS-A into the Command Post Computing Environment

### 5.1.2.2 Issue: Acquisition and Systems Integration Approach

The proposed implementation approach has four key components: COTS cloud infrastructure service provider; COTS DIVA "Turn Key" platform; Specialized Intel Analyst applications; and Systems Integration.

Different acquisition models could be utilized to procure and integrate the DCGS-A Increment #2.

- Prime Contractor   A traditional prime contractor acquisition model could be utilized.  In this approach, the prime contractor would acquire and integrate all the components.  Potentially, this may lead to selection of sub-optimal COTS components.

Protected Information and/or Legends Redacted

- Lead Systems Integrator (LSI)    In this approach, an LSI would have the responsibility of integrating the various components and integration activities identified above.  Potentially, an LSI may not have the necessary technical expertise to integrate the software components.  An LSI could be a government-lead or a contractor-lead activity.

### 5.1.2.3  Potential Strategy: Phased Acquisition and Integration Approach

The acquisition approach could be structured in a phased manner.  Initially, the two foundation components (e.g., COTS cloud infrastructure services and COTS DIVA "Turn Key" Platform) could be procured.  Establish an integration effort to:  integrate the COTS DIVA "Turn Key" platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture.  This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

Secondly, establish a systems integration contract to address the other integration efforts (e.g., DoD/IC enterprise services and collaboration tools; COTS Intel Analyst applications and analytics; …)

### 5.1.2.4  Potential Strategy: Agile Development Approach

DCGS-A Increment 2 is instantiating a new technology foundation in Release I. Additionally, DCGS-A Increment 2 Release I needs to "re-factor" DCGS-A Increment 1 capabilities on this new technology foundation. The risk is two-fold – fixating on the technology infrastructure to the disadvantage of delivering end-user capabilities. The other risk is porting over *all* existing capabilities and legacy interfaces without careful consideration of the need to do so.

A key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities. DCGS-A Increment 1 capabilities should be evaluated in terms of the proposed Increment 2 implementation approach to determine which, if any, come "free" with the DIVA approach and which others need to be ported. Detailed planning should emphasize maintaining existing capability in Release I while putting in the necessary foundation to allow for rapid introduction of new capabilities in Release II. By not porting legacy capabilities that already exist, it also may be possible to introduce *limited* new functionality in Release I.

30

Protected Information and/or Legends Redacted

## 5.2   Key Considerations

### 5.2.1   Consideration #1: Evaluation of COTS DIVA "Turn Key" Platform Functional and Architectural Considerations

#### 5.2.1.1   Overview

The  COTS DIVA "Turn Key" platforms will have similar functional capabilities. Key discriminators will be architectural considerations (extensibility; usability; reliability; scalability; and security); platform maturity; and enterprise management capabilities.

#### 5.2.1.2   Issue

An acquisition approach that inadequately considers these discriminators and consequently selects a COTS-based platform that has the necessary functional capabilities but does not have the technical architecture and/or product maturity to support future evolution.  It is very difficult to appropriately evaluate these architectural considerations from *solely* reviewing technical documentation.

#### 5.2.1.3   Potential Strategy: Challenge Based Acquisition

The acquisition strategy should incorporate a challenge-based acquisition approach to acquiring the COTS DIVA "Turn Key" Platform.  The product selection should be based on technical/laboratory/operational evaluations and product track record with other customers. A set of specific "challenges" should be established to evaluate the products in a realistic setting.

- Extensibility – Establish test cases that will require the vendor to demonstrate extensibility (e.g., incorporating new data sources; extending an application; …). Collect metrics related to time & effort to complete these challenges.

- Usability – Establish test cases that will require utilizing the vendor's product in a realistic operational setting solving real-world workflows. Establish test cases that will require performing administrative actions on the platform to assess ease of administration. Collect metrics related to time & effort to complete these challenges.

- Reliability -- Establish stress cases to collect statistics on reliability of the platform.

- Scalability – Establish test cases that will demonstrate the platform's ability to "scale-up" to a cloud environment.  Collect metrics related to how the platform scales within this environment.
  Also, establish test cases that will require the demonstration of the platform's ability to "scale-down" to a realistic tactical environment.  Collect metrics on the DIVA platform being utilized on small computing platform (e.g., laptop and mobile device). Collect metrics on the ability to replicate and synchronize data over a realistic tactical network (e.g., with limited bandwidth and intermittent connectivity).

- Security – Establish test cases that will demonstrate a platform's ability to do "fine-grained" security access, detect/report suspicious behavior, etc. Collect metrics related to any impacts on usability or system performance.

Protected Information and/or Legends Redacted



A2255

Protected Information
and/or Legends Redacted



As a system data architect, developer, and integrator, the contractor shall complete the design, development, integration, and test of the two (2) planned DCGS-A Increment 2 software baseline releases. Task orders will be issued against an IDIQ contract comprising of efforts associated with: Data Architecture Management, Visualization Framework, Data Integration, Data Fusion and Pattern Analysis, Intel Support to Cyber Operations, Counter Intelligence/Human Intelligence (HUMINT), Interoperability, Cloud Computing, Big Data Analytics, Intelligence Community Information Technology Enterprise (IC ITE) Joint Storefront Applications, Targeting, Signals Intelligence/NSA Network Operations, DCGS-A Integrated Backbone (DIB) Implementation, Weather Effects/Analysis, Full Motion Video/Static Imagery Intelligence, Geospatial Intelligence (Terrain and Mapping), Collection Management (Sensor Management), Workflow Management, Production Level 3 (PL3) Security Hardening, Ease of Use Initiatives, High/Ultra Reliability Program, Army/Joint Interoperability Certification, and Joint Interoperability Certification.



4

A2263

Protected Information
and/or Legends Redacted

**5. Delivery or Performance Period Requirements**

This acquisition is planned as a single award IDIQ contract with an ordering period of 72 months (with PARC approval to exceed the 5 year limit term as required by AFARS 5117.204(e)). Task Orders may be issued anytime within the 72-months. A 72 month ordering period of performance best supports the PM DCGS-A requirement to implement a two release strategy by establishing a 24-36 month performance timeframe better aligned with an agile acquisition approach. A 72 month ordering period enables PM DCGS-A to award timely orders and ensure that the emerging solutions keep pace with a continually changing COE. For example, because of the complexity of the acquisition requirements for this effort, software development cycles for design, development, test, and fielding required to keep current with emerging and prioritized operational requirements average two to three years. Limiting the contract to five years (vs. six years) does not allow for deployment support, engineering support, and resultant changes in the field as problems arise once production is enabled.

A2264

Protected Information
and/or Legends Redacted



Based on the Market Research to date, a 72 month (with PARC approval to exceed six years, as required by AFARS 5117.204(e)) Engineering and Manufacturing Development (EMD) effort consisting of two releases will best serve the needs of the Government. Release 1 will consist of an upgraded Data Architecture with some usability enhancements. Due to available funding, all other capability would be carried forward from Increment 1. Release 2 will include several capability enhancements including improvements to Data Fusion & Pattern Analysis and the addition of a Cyber analytics capability (Intelligence Support to Cyber).

A2271

Protected Information
and/or Legends Redacted

DETERMINATION & FINDINGS
For Authority to Use Cost-Plus-Fixed-Fee Contract

FINDING

1. The U.S. Army Contracting Command, Aberdeen Proving Ground, Maryland plans to procure support functions for the Distributed Common Ground System-Army (DCGS-A) Increment 2 program under a six (6) year Indefinite Delivery Indefinite Quantity (IDIQ) CPFF basis. The DCGS-A is the Army's primary system for posting of data, processing of information, and disseminating intelligence, Surveillance and Reconnaissance information about the threat, weather, and terrain to all components and echelons. Increment 2 will provide additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains (Imagery, Human Domain, Weather, etc.) to assist the operational Commanders' access to information. The proposed action is to acquire Engineering, Manufacturing and Development services in support of the Project Manager for DCGS-A (PM DCGS-A).

2. The use of a CPFF type contract is determined to be the most appropriate method of acquisition for this IDIQ acquisition. CPFF is intended to be used for the associated efforts required by the Contractor to provide ongoing and undefined systems support as there is a reasonable degree of uncertainty in contract performance and cannot be estimated with sufficient accuracy to use fixed price contracts. Pursuant to FAR 16.302-2, a cost type contract was selected due to the reasonable degree of uncertainty in contract performance and the services to be procured cannot be estimated with sufficient accuracy to use fixed price contracts. In accordance with FAR 16.306, a CPFF contract is suitable for us when (1) the contract is for the performance of research or preliminary exploration or study and the level of effort required is unknown or (2) the contract is for the development and test, and using a cost plus incentive contract is not practical. A cost plus incentive fee is not applicable to certain services, as depicted in the first paragraph, because the services acquired will not result in improved delivery or technical performance by relating the amount of fee payable under the contract to the Contractor's performance.

3. The Government will minimize the risk associated with the use of a cost reimbursement type contract by taking the following proactive measures:

   a. The Contracting Officer's Representative (COR) shall provide surveillance on the technical performance for this effort, and report their findings and any anomalies to the PCO.
   b. The COR and the Contract Specialist shall conduct a thorough analysis of the weekly and monthly CDRL reports that will ensure that the Contractor is performing this effort in accordance with the Performance Work Statement and cost, performance, and schedule parameters.

DETERMINATION

On the basis of the above findings, I hereby determine that no other contract type other than a CPFF contract is suitable for the acquisition of the services depicted above, pursuant to Federal Acquisition Regulation (FAR) Subpart 16.301 and 16.306.

FISHER.CHRISTOPH
ER.M.1387943605

Digitally signed by
FISHER.CHRISTOPHER.M.1387943605
DN: c=US, o=U.S. Government, ou=DoD,
ou=PKI, ou=USA,
cn=FISHER.CHRISTOPHER.M.1387943605
Date: 2015.12.10 15:53:26 -05'00'

Date: 10 December 2015

Chris Fisher
Procuring Contracting Officer

A2297

Protected Information and/or Legends Redacted

DETERMINATION & FINDINGS
FOR
Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award
Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army
Increment 2, Engineering Manufacturing and Development IAW DFARS
216.504(c)(1)(ii)(D)(i)

### FINDINGS

1. Title10 United States Code (U.S.C.), Section 2304a(d)(3), as implemented by Federal Acquisition Regulation (FAR) 16.504(c)(1)(ii)(D)(1), prohibits award of a Task Order or Delivery Order contract that exceeds $103 million (M) to a single source, unless the head of the agency determines in writing that the contract meets one (1) of four (4) exceptions listed. Pursuant to Defense Federal Acquisition Regulation Supplement (DFARS) 216.504(c)(1)(ii)(D)(i), the authority to make the determination shall not be delegated below the level of the Senior Procurement Executive.

2. The statute provides an exception under Title 10, U.S.C., Section 2304a(d)(3)(A), as implemented by FAR 16.504(c)(1)(ii)(D)(1)(i), to the prohibition against award of a single source task or delivery order contract, where the task orders and delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

3. The Army Contracting Command - Aberdeen Proving Ground (ACC-APG) proposes to award a single source IDIQ contract under FAR Part 16 that will enable ordering cost reimbursement, cost plus incentive fee, firm fixed price and fixed price incentive fee task orders or delivery orders as necessary. An indefinite delivery contract may be used to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award and it is inadvisable for the Government to commit itself for more than a minimum quantity. The DCGS-A Increment 2 will consist of multiple software releases, through different Task Order solicitations, to establish DCGS-A Increment 2 Requirements Definition Package requirements, and an IDIQ is the most appropriate contract vehicle for this type of work. The proposed IDIQ contract will be subject to full and open competition, with an estimated total ordering value of $205.9M. The IDIQ shall support a six year period of performance to acquire all supplies, hardware, or services associated with DCGS-A's Increment 2 Engineering, Manufacturing, and Development (EMD) requirements (the DCGS-A Information System Capabilities Development Document (IS CDD) approved by the Joint Requirements Oversight Council (JROC) on 6 July 2015). The DCGS-A Increment 2 contract initiative is comprised of system and software engineering, product design, development,

1

**A2298**

Appx12298

Protected Information
and/or Legends Redacted

integration, testing, and limited deployment support services to include software maintenance, configuration management, risk management, and quality assurance. As a system data architect, developer, and integrator, the contractor shall complete the design, development, integration and test of two (planned) software baseline releases.

4. DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture by a contractor as the systems integrator. The software development, integration, and testing activities are coupled to an evolutionary design planning, coding, integrating, and testing release process to build the software functionality and capabilities rapidly and to re-host Increment 1 fielded capabilities. Development of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems. This complexity adds to the criticality for a single software developer/integrator to ensure timely workflow completion. The data integration layer requires unified systems engineering and agile software development activities by a single contractor. Ad hoc or independently developed software activities cause technical risks, concerns and significant schedule risk and cost uncertainty given the software release build strategy and plan. As stated, the security and quality of the software development and integration requires inherently tight control and stable managed processes. To separate the systems engineering, software development, and integration activities would only undermine the cohesive development of a new data management and software architecture. For these reasons, the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

5. The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System Mission Area Initial Capabilities Document (MA ICD) dated 13 August 2004, which captured the overarching requirements for an ISR Family of Systems (FoS). That ICD was updated as the Distributed Common Ground/Surface System (DCG/SS) Enterprise ICD, and approved by the JROC on 27 February 2009. The JROC approved the DCGS-A Operational Requirements Document (ORD) on 9 July 2004. Later, that document was converted to the DCGS-A Capabilities Development Document (CDD), and approved by the JROC on 31 October 2005. The 2005 CDD was later converted into an Information System Capabilities Development Document (IS CDD) and was approved by the JROC on 6 July 2015.

6. A detailed lifecycle cost modeling was performed as part of the formal milestone review process. A significant component of the DCGS-A Increment 2 acquisition approach is the ability to grow system capability over time through a series of

software releases and hardware modernizations/refresh cycles to meet DCGS-A Increment 2 Requirements Definition Package (RDP) requirements. A multiple award IDIQ contract is not feasible for the following reasons, which support a competitive award resulting in a single-source IDIQ because the task or delivery orders expected under that IDIQ are so integrally related that only a single source can reasonably perform the work:

a. Impact to Performance:
- Use of a single-source IDIQ contract provides the Government with the most effective way to satisfy mission requirements to acquire hardware and services for system requirements yet defined along with providing flexibility in both quantities and delivery schedule.

- In order to ensure strong coordination during engineering and software support, it is critical that a single prime contractor be responsible for the effort. A multiple-award approach increases risk to the contractor, as well as the program, due to the splitting of developmental work of a highly complex nature.

- The software to be developed must be integrated and managed as a single system with unified software configuration management, interoperability, and backwards compatibility.

- A multiple-award approach would put undue burden on the Government to integrate deliverables from multiple contractors into a seamless unified system.

- A single-award contract simplifies management and oversight by enabling the Government to make a single contractor responsible for the overall software quality and performance of the delivered system.

b. Impact to Schedule:
- Competition at the order level would disrupt development, increase cost, compound integration challenges, and increase the Government's oversight burden.

- Additional process, cycle time, and quality complications would occur with multiple contractors providing the software maintenance and support.

- A single award vendor performing as system data architect, developer, and integrator would provide benefits that include cycle time reductions facilitated by the use of unified common processes for the Increment 2 work.

3

**A2300**

   c. Impact to Cost:
- A multiple-award approach would add future cost through increased complexity, integration cost, software maintenance, sustainment, and program management costs.

- A multiple-award approach would put undue burden on the Government to maintain configuration management, identify system interoperability gaps, and synchronize backwards compatibility while integrating multiple software modules. This would add development costs, integration complexity, future software maintenance costs, and sustainment costs.

- Receiving deliverables from multiple contractors would result in substantially more duplicative cost with less benefit.

7. Market research was accomplished in accordance with the procedures delineated in FAR Part 10, DFARS Part 210, and Army Federal Acquisition Regulation Supplement (AFARS) Part 5110. The DCGS-A Increment 2 Integrated Product Team (IPT) established a detailed schedule to guide research and contract planning activities. PM-DCGS-A released three Federal Business Opportunities (FBO) Request for Information (RFI) announcements. The RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying PM DCGS-A's Increment 2 requirements. In all, 84 different organizations, including 45 large businesses, 35 small businesses, three (3) non-profit organizations, and one (1) Federally Funded Research and Development Center responded to the FBO RFI announcements.

**Request for Information Efforts:**

- RFI 1 – 13 Aug 2014 – 12 Sep 2014: conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the program office in developing an acquisition plan.

- RFI 2 – 5 Dec 2014 – 29 Dec 2014: issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort.

- RFI 3 – 6 May 2015 – 22 May 2015: released to determine if the FAR 19.502 small business rule of two exists, and if a small business set-aside is appropriate.

**Industry Day Efforts:**

- Industry Day 1 – 20 Jan 2015: provided a forum to share emerging

4

requirements with Industry.

- Industry One-on-Ones – 20 Jan 2015 - 12 May 2015: provided a forum to answer Industry's questions and elicit feedback regarding elements of Increment 2's acquisition strategy and acquisition plan.

- Industry Day 2 – 25 Jun 2015: provided an opportunity to discuss the draft Increment 2 requirements with industry.

Market research verified that Industry as a whole is able and interested in supporting this requirement. Competition is expected as multiple sources cited applicable experiences and competencies associated with the type of support required. Besides competencies, industry sources offered helpful acquisition strategy input, explicitly expressing the use of multiple software releases and signifying the significance of the use of DCGS-A Increment 1 Government Furnished Information (GFI) to leverage current DCGS-A capabilities. Additionally, the release of DCGS-A Increment 1 GFI promotes full & open competition, avoiding the preclusion of other sources and limiting unduly restrictive requirements that otherwise may have been present with consideration of current DCGS-A industry partner's working knowledge of the program. Technical/programmatic analysis of the market research indicates that a full and open competition resulting in a single award IDIQ contract is the most advantageous method for satisfying this requirement.

8. Based on the above analysis, issuing a single award IDIQ contract will mitigate many of the risks identified herein and is in the best interest of the Government. Due to the complex developmental efforts this work entails, further competition at the task order level would interrupt development, ultimately increase price, and cause schedule slippages. A multiple award IDIQ contract is not feasible, since a single source is necessary to maintain software configuration management, system interoperability, and backwards compatibility until the software development is completed and a mature baseline release is delivered to the Government. The FAR exception authorizing award of a single task or delivery order contract over $103M where the task or delivery orders are so integrally related that only a single source can reasonably perform the work is applicable to the DCGS-A Increment 2 EMD contract requirements. This contracting strategy provides for full and open competition of the single award, while mitigating risk to the performance, schedule, and cost of the program.

5

A2302

Reviews: I have reviewed the D&F for Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System-Army Increment 2, Engineering Manufacturing and Development and find it adequate to support the findings as stated.

Contracting Officer: _____   22 Sep 2015
Chris M. Fisher, PCO          Date Signed

Legal Office: _____   22 September 2015
David R. White, Legal Counsel       Date Signed

COCO: _____   9/22/2015
Gregory L. Davies, COCO        Date Signed

Principal Assistant:
Responsible for   _____   9/23/2015
Contracting   Bryon J. Young, PARC       Date Signed

6

**A2303**

## DETERMINATION

Based on the foregoing findings, I hereby determine pursuant to Title 10 United States Code, Section 2304a(d)(3)(A), as implemented by Federal Acquisition Regulation 16.504(c)(1)(ii)(D)(1)(i), that a single-source task or delivery order contract estimated to exceed $103 million for the Distributed Common Ground System-Army, Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

21 OCT 15
_____
Date

_____
Heidi Shyu
Senior Procurement Executive

7

CCAP-CCC                                                    16 September 2015

MEMORANDUM FOR RECORD

SUBJECT: Principal Assistant Responsible for Contracting (PARC) Approval to Award a New
Contract Beyond the Five Year Regulatory Limit for Distributed Common Ground System –
Army Increment 2, Engineering, Manufacturing and Development (DCGS-A Inc 2 EMD)

1. PURPOSE: In accordance with the Army Federal Acquisition Regulation Supplement
(AFARS) 5117.204(e), approval is granted by the PARC of the Army Contracting Command –
Aberdeen Proving Ground (ACC-APG) to use a six (6) year ordering period, which extends the
DCGS-A Inc 2 EMD single award indefinite-delivery indefinite-quantity (IDIQ) contract vehicle
beyond the five-year regulatory limit per DFAR 217.204(c)(i).

2. DISCUSSION: Program Executive Office Intelligence Electronic Warfare & Sensors (PEO
IEW&S), Project Manager Distributed Common Ground System – Army (PM DCGS-A) has a
requirement to procure Engineering, Manufacturing, and Development (EMD) for development
of data management architecture, integration, documentation, test, and sustainment of DCGS-A
Increment 2 capabilities. This includes standards based enhanced visualization and analytical
tools, and "big data" analytic capabilities, cyber analytics and data integration, Intelligence
Support to Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence
(HUMINT), Geospatial Intelligence (GEOINT), and Sensor Management. The Contracting
Officer proposes to award to a single offeror that provides the best value to the Government for a
single award IDIQ contract. The anticipated ordering period is 72 months.

3. JUSTIFICATION:

   a. An Engineering, Manufacturing, and Development (EMD) effort consisting of two
   releases will best serve the needs of the Government. Release 1 will consist of an
   upgraded Data Architecture, a CI/HUMINT Single Software Baseline, and some usability
   enhancements. Due to available funding, all other capabilities will be carried forward
   from Increment 1. Release 2 will include several capability enhancements including
   improvements to Data Fusion & Pattern Analysis and the addition of a Cyber analytics
   capability (Intelligence Support to Cyber). The software baseline will be updated and
   fielded every 24-36 months to address emerging and prioritized operational requirements
   as approved by the Army Requirements Oversight Council (AROC) Process Review
   Board (APRB). Phasing will allow for alignment of the releases with the technological
   readiness of targeted enhancements and will support low-risk development and test cycle
   times in accordance with an agile acquisition approach. By utilizing an agile acquisition
   approach, the Government will reduce schedule risk. After both releases are
   accomplished, PM DCGS-A also plans to award an additional TO for deployment,
   engineering, and fielding support.

**A2305**

Protected Information
and/or Legends Redacted




Distributed Common Ground System - Army



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

## PM DCGS-A Increment 2
## Technical Deep Dive
## for
## Mr. Pino

**7 Oct 15**



COL Robert M. Collins| Project Manager, DCGS-A | COM: 443-861-2442 | DSN: 848-2442 | robert.m.collins4.mil@mail.mil

LTC Laura N. Poston | PdM, DCGS-A | COM: 443-861-2580 | DSN: 861-2580 | laura.n.poston.mil@mail.mil

A2307

**Appx12307**

Protected Information
and/or Legends Redacted

# Tailored Acquisition Strategy




- Contracting vehicle is a full & open competitively awarded contract
- <u>Single Award IDIQ</u> contract for the software development, integration, and test
  - 72 month IDIQ Indefinite Delivery Indefinite Quantity base contract with the concurrent award of Task Order 0001 as a Cost Plus Incentive Fee (CPIF) contract type
  - IDIQ contract vehicle allows flexibility for funding adjustments, evolving IC ITE standards, and capability priority adjustments
- The foundational elements are "Data Integration and Analytics" & "Visualization"
  - Focusing on modernized Data Integration architecture enables <u>greater flexibility</u> and growth to meet evolving needs and scalable across echelons
  - Single award for data and analytical layer reduces "integration" risk
- Government oversight and testing conducted with Government Acceptance Testing, Developmental Test (DT), and Operational Testing (OT)
- Sustainment Approach leverages common hardware and field support structure
- Knowledge point (20 months after award) identified to leverage Inc 2 IDIQ, other existing contract, or selectively complete new contract for Release 2

Protected Information
and/or Legends Redacted

# Increment 2 Capability Blocks





**Data Analytics Platform (Fusion)**

**Software & Services**

**Visualization Framework**

| Imagery and Motion Imagery | Targeting | Information Collection |
| Weather | Geospatial | Workflow Management |
| Signals Intelligence | Counter-Intelligence & Human Domain | Cyber Operations |

**Data Integration Layer**

Data Access Layer

Entity | Report | Sensor | Binary | CYBER (INGEST)

Operating Systems / Infrastructure

Servers, Network, Storage, etc.

**Interoperability**

COTS Solutions Exist for these Segments

COTS Solutions Can meet a portion of these Segments

No COTS Solutions Exist for these Segments

A2322

**Appx12322**

Protected Information and/or Legends Redacted



# DCGS×A

## Distributed Common Ground System - Army





PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE
WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

## DCGS-A INC 2 Acquisition Contract Strategy Review to PEO Management Council

### 15 May 2015

COL Robert M. Collins| Project Manager, DCGS-A | COM: 443-861-2442 | DSN: 848-2442 | Fax 443-861-2466 | robert.m.collins4.mil@mail.mil

LTC Laura N. Poston| Product Manager, INC 2 | COM: 443-861-2580 | DSN: 861-2580 | laura.n.poston.mil@mail.mil

A2326

Protected Information
and/or Legends Redacted




# Market Research Results

**RFI 1 (August 2014 – November 2014)**

- Elicited Acquisition Strategy input from Industry

- Results support use of contractor as systems Integrator

- Most respondents provided additional information about previous software development experience and corporate capabilities

**RFI 2 (December 2014 – April 2015)**

- Focused on measuring Industry experience in developing relevant capabilities, with particular attention to Small Business responses

- Combination of capability focused questions and cross-referencing government POCs provided a more accurate capability assessment

**Industry One-on-Ones (January 2015 – May 2015)**

- Served as alternate venue for companies to explain their capabilities

- Provided additional feedback on Acquisition Strategy

   – GFE and GFI: Participants recommend Inc 2 leverage investments made in Inc 1

   – Data Architecture: Participants recommend an Acquisition Strategy that incorporates an open data architecture and separates Data Architecture development from Application development

*PPBE DOCUMENT – PREDECISIONAL – FOR OFFICIAL USE ONLY – CLOSE HOLD FOR INTERNAL ARMY USE ONLY*

4



A2329

Protected Information and/or Legends Redacted



# Potential Task Orders by Capability



| Capability | Contract Type | Discriminating Factors |
|---|---|---|
| **Data Integration Layer:** Single Task Order | CPIF CPFF FFP | • Schedule and performance could be incentivized<br>• Critical capability (Foundation of Inc 2 Baseline)<br>• Data requirements well defined for some portions |
| **Data Analytics Platform (Fusion):** Single Task Order | CPIF CPFF | • Data requirements not well defined<br>• Schedule and performance could be incentivized<br>• Critical capability (Impacts KPP) |
| **Interoperability:** Multiple Task Orders | CPIF CPFF FFP | • Data requirements well defined in the SV – 6<br>• Critical capability (KPP)<br>• Schedule and performance could be incentivized |
| **Cyber Operations:** Multiple Task Orders | CPFF CPIF | • Data requirements not well defined<br>• Performance measures can be identified and incentivized<br>• Possible to grow capability in future releases |
| **Visualization Framework:** Multiple Task Orders | CPIF CPFF FFP | • Commercial Solutions exist for some requirements<br>• Schedule and performance could be incentivized<br>• Impacts usability KSA and will standardize user experience |
| **CI/HUMINT:** Single Task Order | CPIF | • Solution will be built from scratch<br>• Performance could be incentivized<br>• Possible to grow capability in future releases |

*PPBE DOCUMENT – PREDECISIONAL – FOR OFFICIAL USE ONLY – CLOSE HOLD*
*FOR INTERNAL ARMY USE ONLY*

17  ARMY STRONG.

A2342

Appx12342

Protected Information
and/or Legends Redacted



# Contract Type Comparison



| Capability | Is requirement well defined? (FFP) | Is the capability critical enough that quality should not be traded for cost savings? (CPFF) | Can an objective relationship be established between a fee and measures of performance ie cost savings, delivery dates, or performance benchmarks? (CPIF) | Would it be feasible and beneficial to incentivize a continued performance period? |
|---|---|---|---|---|
| Data Integration Layer | Data requirements are well defined for some portions | Foundation for Inc 2 baseline | Schedule critical | Pending no change in compliance standards, development will be one time effort |
| Data Analytics Platform (Fusion) | Fusion is well defined, approach to data analytics is still undefined | Impacts KPP | Schedule critical | It is possible to continue to grow capability in future releases |
| Interoperability | Defined in the SV-6 | Net ready is a KPP | Schedule critical | Pending no change in compliance standards, development will be one time effort |
| Cyber Operations | Cyber role is still not completely defined; Cyber Ops tool will have to be developed | KSA that does not exist in Inc 1 | Performance measures can be identified (# of requirements met) | It is possible to continue to grow capability in future releases |
| Visualization Framework | Commercial solutions exist for some requirements | Impacts usability KSA and will standardize user experience | Schedule critical; Must finalize visualization framework before integrating additional apps | It is possible to continue to grow capability in future releases |
| CI/HUMINT | Application will be built from scratch | Not KPP or KSA, Material solution part of Inc 1 baseline | Performance measures can be identified (number of requirements met) | It is possible to continue to grow capability in future releases |

- CI/HUMINT – Cyber Intelligence/Human Intelligence
- CPFF – Cost-Plus-Fixed-Fee
- CPIF – Cost-Plus-Incentive-Fee
- FFP – Firm-Fixed-Price
- KPP – Key Performance Parameter
- KSA – Key System Attribute
- SV-6 – System View 6

| | |
|---|---|
| Yes | |
| Partial | |
| No | |

– FOR OFFICIAL USE ONLY – CLOSE HOLD

**FOR INTERNAL ARMY USE ONLY**

18 ARMY STRONG.

A2343

Protected Information and/or Legends Redacted



# Acquisition Strategy Options



## 1. Today



## 2. Fixed & Tactical Contracts



## 3. Data & System Int. Contracts



## 4. Industry LSI



*PPBE DOCUMENT – PREDECISIONAL – FOR OFFICIAL USE ONLY – CLOSE HOLD*
*FOR INTERNAL ARMY USE ONLY*

ARMY STRONG.

A2347

**Appx12347**

Protected Information
and/or Legends Redacted



# 1. Today: Government LSI





Gov't LSI

Industry Application Vendor

**Pro:**
- Supports competition at the subcomponent level but result in significant administrative burden
- Maximizes government flexibility and supports IT Box model
- Leverages current competencies/processes/government investments
- Less overhead costs (contractor overhead/management)
- Limits proprietary end products and increases government insight into development progress
- Most responsive to changing requirements/promotes agile development process
- Reduces risk of Intellectual Property conflicts

**Con:**
- Performance/Cost/Schedule risk on Government Integrator
- Limits full and open competition opportunities
- Potential for misaligned period of performance on contracts
- Challenge associated with Government management of multiple tasks/contracts
- Turnover of key personnel after individual task orders end
- Potential integration process limitations under current environment
- Significant risk due to second/third order affects of changes on one task order to the work being executed on other task orders

A2348

**Appx12348**

Protected Information
and/or Legends Redacted

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this <u>11th</u> day of August, <u> 2017 </u>, a copy of the foregoing Joint Appendix was filed electronically.

<u> X </u> This filing was served electronically to all parties by operation of the Court's electronic filing system.

<u>/s/</u>Domenique Kirchner