UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PALANTIR USG, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in case no. 16-cv-00784C,
Judge Horn

JOINT APPENDIX

Volume II

Pages Appx12363 – Appx20104

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-1111
Fax: (202) 514-8624

August 11, 2017          Attorneys for Defendant-Appellant

**PALANTIR USG, INC.**

v.

**UNITED STATES**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
**CASE NO. 17-1465**

**NONCONFIDENTIAL JOINT APPENDIX TABLE OF CONTENTS[1]**

| I. Docket Entries – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| **Document** | **ECF No.** | **Appendix Page(s)** |
| Court of Federal Claims Revised Protective Order | | |
| Redacted Opinion (November 9, 2016) | 113 | Appx1-104 |
| Judgment (November 10, 2016) | 114 | Appx105 |
| Docket Sheet – Court of Federal Claims | | Appx106-119 |
| Complaint (June 30, 2016) | 1 | Appx120-202 |
| Palantir MJAR (July 27, 2016) | 37 | Appx448, Appx 484 |
| Court Hearing Transcript (September 15, 2016) | | Appx750, Appx795-796 |
| Joint Stipulations of Facts (April 24, 2017) | 125 | Appx816 |
| Government's Cross-Motion JOAR (July 17, 2016) | 19 | Appx861, Appx898-909 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 92 | Appx958-962 |
| Defendant's Response to September 16, 2016 Court Order (September 21, 2016) | 91 | Appx 969 Appx974 |

---

[1] The Confidential Joint Appendix contains material subject to a Court of Federal Claims Protective Order. A copy of this Protective Order is included immediately following the Table of Contents. This protected material includes source selection sensitive information of the Department of the Army; information that poses operational security concerns, including identify of particular military personnel or units involved; information marked as confidential by potential offerors; information marked with the dissemination control "For Official Use Only" (FOUO), and other documents covered by the Court of Federal Claims protective order that have not been released to the public.

The U.S. Court of Federal Claims's public opinion is at Appx1-104. The U.S. Court of Federal Claims's sealed opinion is at Appx20001-20104. Citations in the briefs are to the public version.

**NONCONFIDENTIAL VERSION**

| II. Administrative Record – Court of Federal Claims No. 16-784C | | |
|---|---|---|
| **Document** | **AR Tab** | **Appendix Page(s)** |
| Agency Report (AR) Tab A - Contracting Officer's Statement/Legal Analysis (March 21, 2016) | 1 | Appx10001-52 |
| AR Tab B - Declaration of Stephen Morton (March 17, 2016) | 2 | Appx10056-57 |
| AR Tab C - Declaration of Christopher Fisher (March 16, 2016) | 3 | Appx10058-60 |
| AR Tab E - Approved Recommendation for a change to DCGS-A Increment 1 Acquisition Strategy (December 4, 2014) | 5 | Appx10091-92 |
| AR Tab F - Acquisition Strategy Report DCGS-A Increment 2 | 6 | Appx10093 Appx10107 Appx10125 |
| AR Tab H - DCGS-A Inc 2 Incentive Fee Contract Type D&F (December 14, 2015) | 8 | Appx10150-153 |
| AR Tab J - DCGS-A COTS Software List- DCGS-A Increment 1 | 10 | Appx10243-250 |
| AR Tab K - DCGS-A IS CDD | 11 | Appx10251 Appx10270 |
| AR Tab M - DCGS-A Inc 2 Draft Base PWS (July 15, 2015) | 13 | Appx10410 Appx10418-19 Appx10464 |
| AR Tab N - DCGS-A Inc 2 Draft TO 0001 | 14 | Appx10539, Appx10594 |
| AR Tab O - DCGS-A (Palantir) Draft TO 0001 Response | 15 | Appx10687 Appx10690 Appx10693-94 Appx10698.1 |
| AR Tab R - DCGS-A Inc 2 Palantir Section L&M White Paper | 18 | Appx10707-13 |
| AR Tab S - DCGS-A Inc 2 DRAFT RFP W56KGY-16-R-0001 | 19 | Appx10719 Appx10819-41 |
| AR Tab T - DCGS-A Inc 2 W56KGY-16-R-0001 RFP (December 23, 2105) | 20 | Appx10842-43 Appx10880 Appx10909 Appx10960 Appx10968-69 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| AR Tab V - Solicitation attachment 0001 Performance Work Statement Distributed Common Ground System - Army Inc 2 (December 18, 2015) | 22 | Appx11042<br>Appx11051-53<br>Appx11072-73<br>Appx11075<br>Appx11081<br>Appx11101<br>Appx11123-39 |
| AR Tab W - Solicitation attachment 0003 Performance Based Specification | 23 | Appx11229 |
| AR Tab X - Solicitation attachment 0010 DCGS-A Increment 2 Task Order 0001 (Includes PWS) | 24 | Appx11294-<br>Appx11385 |
| AR Tab AB - DCGS-A Inc 2 RFP Amendment 0003 (Conformed Copy) (0001 thru 0003) (December 23, 2015) | 28 | Appx11479<br>Appx11599 |
| AR Tab AD - DCGS-A Inc 2 Industry day 1 Brief Part Two | 30 | Appx11661<br>Appx11686<br>Appx11688 |
| AR Tab AG - DCGS-A Inc 2 Market Research Report (Approved) (July 13, 2015) | 33 | Appx11792-<br>Appx11841 |
| AR Tab AH - DCGS-A Inc 2 RFI One-On-One Response Analysis (December 2014) | 34 | Appx11844-<br>Appx11874 |
| AR Tab AI - DCGS-A Inc 2 RFI # 1 | 35 | Appx11876-<br>Appx11881 |
| AR Tab AJ - Palantir DCGS-A Inc 2 RFI # 1 Response | 36 | Appx11882-11899 |
| AR Tab AK - DCGS-A Inc 2 RFI # 2 | 37 | Appx11900-07 |
| AR Tab AL - Palantir DCGS-A Inc 2 RFI # 2 Response | 38 | Appx11908-11 |
| AR Tab AM - DCGS-A Inc 2 RFI # 3 | 39 | Appx11912-11917 |
| AR Tab AN - Palantir DCGS-A Inc 2 RFI # 3 Response | 40 | Appx11918-11922 |
| AR Tab AO - DCGS-A Inc 2 DIVA Study Findings Brief AAE to DAE | 41 | Appx11923-11928 |
| AR Tab AP - DCGS-A Inc 2 Trade Space Analysis (July 2015) | 42 | Appx11929-12114 |
| AR Tab AQ - DIVA Independent Market Study -- FINAL Report V1 1 (July 2014) | 43 | Appx12218-12252 |
| AR Tab AR - DCGS-A INC 2 Acquisition Plan 9 December v2 approved | 44 | Appx12255,<br>Appx12263-64<br>Appx12271 |
| AR Tab AS - DCGS-A Inc 2 D&F for CPFF Contract Type (December 10, 2015) | 45 | Appx12297 |
| AR Tab AT - D&F (DCGS-A Inc 2) Single Award | 46 | Appx12298-12304 |

**NONCONFIDENTIAL VERSION**

| IDIQ Final (October 21, 2015) | | |
|---|---|---|
| AR Tab AU - DCGS-A Inc. 2 D&F Exceed 5 Year POP (December 15, 2015) | 47 | Appx12305 |
| AR Tab AV - DCGS- Increment 2 Technical Deep Dive with Mr. Pino (October 7, 2015) | 48 | Appx12307 Appx12312 Appx12322 |
| AR Tab AW - DCGS-A Inc 2 Contract Strategy Review to PEO Management Council (May 15, 2015) | 49 | Appx12326, Appx12329, Appx12342-48 |
| AR Tab AX - DCGS-A Inc 2 Information Paper Inc 2 Key Objectives and Approach | 50 | Appx12363-66 |
| AR Tab AZ - DCGS-A Inc 2 D&F for Government Furnished Property (November 25, 2015) | 52 | Appx12369 |
| AR Tab BL - DCGS-A Inc 2 DIVA Market Study Criteria | 64 | Appx12633-34 |
| AR Tab BN - DCGS-A Inc 2 RFI Press Release (December 5, 2014) | 66 | Appx12641 |
| AR Tab BY - DCGS-A Increment 1 Acquisition Strategy (April 2013) | 77 | Appx13096 Appx13104 |
| AR Tab CP - DAB Action Memo (December 16, 2015) | 94 | Appx14244-46 |
| AR Tab DJ - Industry Responses to RFI_ALL (December 29, 2014) | 114 | Appx14611-12, Appx14804-07, Appx15197, Appx15318, Appx15455-60, Appx15464, Appx15589, Appx15595, Appx15766 |
| Protest of Palantir Hearing Transcript dated (April 26, 2016) | 121 | Appx16253-16459 |
| PALANTIR USG INC PUBLIC DECISION issued on (May 25, 2016) | 122 | Appx16560-66 |
| Determination of Non-Commercial Item (July 1, 2016) | 134 | Appx16626-27 |
| GAO Protest No. B-412746 Exhibit 1 – Email (Feb. 3, 2016) | 135 | Appx16629 |
| GAO Protest No. B-412746 Exhibit 2 – SASCA-02-002-IFG, Information from U.S. Army to Senator Thomas Cotton (Apr. 14, 2015) | 136 | Appx16631 |
| GAO Protest No. B-412746 Exhibit 3 – Operational Needs Statement (Feb. 9, 2015) | 137 | Appx16633-40 |
| GAO Protest No. B-412746 Exhibit 4 – Operational Needs Statement (Dec. 8, 2014) | 138 | Appx16642-46 |

**NONCONFIDENTIAL VERSION**

| | | |
|---|---|---|
| GAO Protest No. B-412746 Exhibit 5 – Operational Needs Statement (Sept. 20, 2014) | 139 | Appx16648-52 |
| GAO Protest No. B-412746 Exhibit 6 – Memorandum (Oct. 17, 2012) | 140 | Appx16654, Appx16658, Appx16719 |
| Industry Day Slide COL_Collins_2014 | 148 | Appx16797, Appx16802-03 |
| Signed Palantir Letter w encls 25 Sept 2014 | 149 | Appx16807-09 |
| EX. 23- 2015 DOTE Annual Report | 151 | Appx17226, Appx17268, Appx17357 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (April 2012) | 153 | Appx17701, Appx17708 |
| Email from Rachael Phillips ordering April 25, 2012 ATEC report to be rescinded and destroyed | 154 | Appx17752 |
| Army testing and Evaluation Command Palantir Operational Assessment Report (May 2012) | 155 | Appx17754, Appx17761-62 |
| Palantir Platform Information Brief (July 2013) | 156 | Appx17805-06, Appx17851 |
| GAO 2013 Report on Distributed Common Ground System | 157 | Appx17863, Appx17874, Appx17878-79 Appx17885-89 |
| Virginia Contracting Activity (Defense Intelligence Agency), Contract No. HHM402-14-A-0005 (22 Sep 2014) | 164 | Appx18137, Appx18151, Appx18153 |
| September 2014, CPARS Review Army Research Laboratory Contract No. W911QX12F0022 | 165 | Appx18183-84 |
| SOCOM - Bridge to DCGS SOF Contract - PO (29 May 2016) | 167 | Appx18247, Appx18270-71 |
| Email of Mr. Philippone to LTG Williamson (October 7, 2015) | 168 | Appx18312 |
| Email of COL Collins to LTG Williamson and Mr. Kreider (November 4, 2015) | 169 | Appx18327, Appx18329-30 |
| Email of COL Dills to LTG Williamson (November 6, 2015) | 173 | Appx18360, Appx18362-64 |
| Expert Report of Mr. Choung (August 5, 2016) | 177 | Appx18391-18428 |
| Supplemental Expert Report of Mr. Choung (September 7, 2016) | 178 | Appx18441, Appx18450, Appx18452-72 |
| Corrected Expert Report of Mr. Cronen (August 18, 2016) | 180 | Appx18619, Appx18623, Appx18638, Appx18643-48 Appx18650-54 |

**NONCONFIDENTIAL VERSION**

| Deposition Transcript of Mr. Choung (August 11, 2016) | 184 | Appx18867, Appx18874-75 Appx18880-81, Appx18887, Appx18900 |
| Sealed Opinion (November 3, 2016) | | Appx20001-104 |

**NONCONFIDENTIAL VERSION**

Increment 2 Key Objectives

1. Modernize the Data Enterprise to a Data Integration Platform
2. Easier to use visualization framework
3. Best Leverage industry to deliver these capabilities with a commercially supported infrastructure
4. Execute in a funding constrained environment

Three-Phase Approach (DIVA Competition, Domain-specific Capabilities Updates, Integration Environment)

**1. DIVA Competition**

Compete a Full and Openly Competed Contract for the key objectives of DCGS-A Increment 2 (Data Enterprise Modernization and an easier to use visualization framework):

1. Industry to deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A to displace the Entity (TED) and Document (MSG) - infrastructure that interoperates with the Geospatial and other Intelligence data-specific data sources using standards such as Open Geospatial Consortium (OGC), Motion Imagery Standards Profile (MISP), etc. This infrastructure could be a commercial stand-alone solution (Palantir, IBM) or it could be a collection of capabilities (RDMS + Hadoop +...) as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data.

2. Industry to deliver a 'Visualization Framework,' with the documentation, maturity, and code snippets, etc, and a very minimal set of analytics (defined by what Multi-Function Workstation does today) and built on top of the data integration framework for a thick and thin client implementation support.

3. Support for the data synchronization across the disconnected, intermittent, and high latency tactical environment

4. The services and support for the integration of this platform to both the Fixed and Tactical Infrastructure

What is not:

1. The integration environment for every and all DCGS-A visual or capacities (e.g Intelligence-specific domains (IMINT, GEOINT, etc))
2. The integration team to meld the Increment 1 components for re-use and the DIVA platform
3. The entire package that would be integrated to the hardware components (IFS, etc)

**2. Domain-Specific Updates / 'Fact of Life' Upgrades**

Compete an IDIQ-like contract (New, R23G, etc) to assemble an industry team to update / upgrade the domain capabilities (SIGINT, IMINT, GEOINT, All Source, etc.). The Domain updates would provide the

commercial solution upgrades to ensure that the respective Increment 1 re-used components are updated by the industry partner in the best position to update their respective capability to the modern infrastructure. Integrate these capabilities to the DIVA platform to ensure data publishing and the eventual integration to the visualization environment.

An IDIQ will ensure a diverse team to update the respective components, an example is the update of the ESRi product will require infrastructure integration to the DIVA and other platforms across the Intelligence Enterprise. The IDIQ will provide the competitive platform to deliver these updated capabilities for Increment 2. The IDIQ will also allow for scope growth or contraction through the acquisition process pending the availability of funding. This also is the right approach to evolve capability based on the priority of the requirements.

What it is not:

1. The domain-specific capabilities are not the DIVA – integration will be required for each of these capabilities that will be determined by priority and sequencing of the task orders.

### 3. Integration Environment

Government retain the lead integration role for the program. This role would be the integration of the domain-specific capabilities and the Data Integration and Visualization Environments. The integrator would integrate these COTS, GOTS, and legacy applications to echelon-tailored solutions for the hardware platforms.

The government integrators would also take the lead for the integration to the Common Operating Environment. The government is poised to do this role, especially since the COE Command Post Computing Environment is an ever-changing environment for data and platforms that would potentially cause issues long term with a prime integrator and the stability of requirements.

The government would also take the lead to deliver the software to the fixed and strategic locations. The Army and the IC have not solidified the requirements for on/off premise hosting, the Service Intelligence to IC hosting locations, and the specific data interchange standards between IC-ITE, JIE, and DI2E. The lack of solid requirements in this domain leads to the flexibility offered by the government integrating the DIVA platforms to conform to the interface exchanges and integrating the government components that might be a part of the final JIE/IC-ITE/DI2E environments.

The complexity of the Intelligence Enterprise, specifically the accreditation of an integrated product and the competency for the integration of these components further lends credence to an approach that leverages this core competency gained from Increment 1 as the government as the lead integrator.



This three-phase approach clearly, in a competitive environment, addresses the critical concerns that DCGS-A needs a modernized data enterprise based on commercial technology, requires an up-to-date user interface, and to leverage from Increment 1 as much as possible to decrease the costs to the taxpayer. This approach infuses competition to best leverage the competency of industry to achieve these objectives and increases the flexibility in an ever contracting/expanding funding environment in the POM and sequestration environment.

**Appendix Thoughts:**

Functional Flow of the Deliveries of this 3 – Phase Approach. Critical to the success of this approach is the sequencing of the technology deliveries and the contractual mechanics to make this a success. Below is two different 'first-look' at how these products could nest to get an Increment 2 'package' to an operational test.



Functional Flow #1 depicts a bifurcation of the approach for the data integration layer to address the unique data volume issues at the strategic vs. tactical implementations. Furthermore, the strategic approach identifies the perturbation of the requirement for the platform locations and co-hosting with the Army Enterprise and the Intelligence Community. Critical to these flows is ensuring that the government has direct insight to the maturity (and other 'illities') to independently monitor and measure the progress of the infrastructure so that the domain capabilities can adequately develop / upgrade for a more integrated environment.

FOR OFFICIAL USE ONLY

Jan 7, 2015 – Mark Kitz

A2365

Appx12365

Protected Information
and/or Legends Redacted



Functional Flow #2 depicts a government integration method for the fixed location and single approach to the product deliveries to the government. This approach is inherently similar though includes the Government integration environment as a step the process to delivering to the fixed infrastructure.

Protected Information
and/or Legends Redacted



**DEPARTMENT OF THE ARMY**
PROGRAM EXECUTIVE OFFICE
INTELLIGENCE, ELECTRONIC WARFARE AND SENSORS
PROJECT MANAGER
DISTRIBUTED COMMON GROUND SYSTEM-ARMY
ABERDEEN PROV NG GROUND, MD 21005-0017

REPLY TO
ATTENTION OF

SFAE-IEW-DCG                                                          25 November 2015

MEMORANDUM FOR Commander, CECOM Life Cycle Management Command, Software Engineering Center, Attn: AMSEL-SE-WS-AI-H (Mr. Alex V. Romero), Fort Huachuca, AZ 85613-5000

SUBJECT: DETERMINATION & FINDINGS for Providing Government Furnished Property (GFP) to a contractor for the Distributed Common Ground System- Army (DCGS-A) Increment 2 (Inc 2) Indefinite Delivery Indefinite Quantity (IDIQ) Contract for Continued Engineering and Manufacturing Development Phase (EMD).

1. Based on the following findings and determination which I hereby make pursuant to paragraph 245.103-70 of the Department of the Defense (DoD) Federal Acquisition Regulation Supplement (DFARS), DoD Procedures, Guidance and Information (PGI), the following property attached may be furnished by the Government to the successful offeror for its use in performance of a single award IDIQ contract with an ordering period of 72 months period for software development and software maintenance and engineering support for the DCGS-A INC 2.

2. FINDINGS:

    a. Subject requirement is for the Distributed Common Ground System-Army (DCGS-A) Increment 2, Engineering, Manufacturing, and Development (EMD). DCGS-A is the Army's primary system for ISR tasking of sensors, processing, exploitation and dissemination (TPED) of collected data converted into warfighting information and intelligence regarding the threat, weather, and terrain at all Army echelons. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and fusion capabilities across Intelligence domains in order to assist the operational Commanders' access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets.

    b. A high percentage of the Increment 2 functionality has been developed under the DCGS-A Increment 1 efforts. By utilizing Commercial Off-the-Shelf (COTS), Government Off-the-Shelf (GOTS), and DCGS-A Increment 1 capabilities as GFI, the Government will recognize significant cost efficiencies. In addition to the Increment 1 baseline, DCGS-A Increment 2 will provide new data architecture and additional capabilities to enhance the Intelligence processing and fusion capabilities across the Intelligence domains. It is in the best interest of the Government to provide, on a rent-free, non-interference use basis, the above described property based on the following rationale:

A2369
Protected Information
and/or Legends Redacted

# Data Integration & Visualization and Analytics (DI&VA)

## Software Platform
## Evaluation Criteria

A2633

Protected Information
and/or Legends Redacted

## 1. BACKGROUND

The purpose of the Data Integration & Visualization and Analytics (DI&VA) Software Platform Market Study is to provide situational awareness and market trends to the Army leadership of the current "state-of-the-practice" within the DI&VA software platform landscape. It is beyond the scope for this effort to make specific Acquisition recommendations.

This scope of the study will include the following goals:

- Review commercial vendor's DI&VA software infrastructure platforms.

- Review DNI's IC ITE architecture and standards.

- Review Army Requirements/Capabilities/Systems relevant to the DI&VA software platform landscape.

- Review INSCOM cloud software platform.

Provide general trends (e.g., architectural patterns; capabilities; strengths and weaknesses; future directions) of the DI&VA software platform landscape.

## 2. Data Integration & Visualization and Analytics (DI&VA) Software Platform -- Overview

[NOTE: Update diagram]

The below diagram provides an overview the spectrum of functional capabilities *potentially* available within a Data Integration & Visualization and Analytics (DI&VA) Software Platform. The functional capabilities are primarily in three areas:

1. Data Integration Layer –data integration framework that supports the integration of multitude of data sources, extensible and expressive data models of the underlying data; data management services (e.g, access, COOP/DR, data distribution); information protection; and administration services.
2. Visualization Layer – applications framework to support visualization of information from a variety of perspectives (e.g., geo-spatial, temporally, historical, ...).
3. Analytics Layer – analytics framework to support search & analysis of large data sets.

Some of the architectural questions across all three DI&VA layers are:

- Extensibility – The data, visualization, and analytics needs are not static.  So a key architectural consideration is an agile approach to add new data sources, new applications, and new analytics.
- Scalability – A key architectural consideration is the scalability to handle massive amounts of data.  Ability to ingest, store, access large repositories.  Perform analytics on these data sets.  Applications that support the visualization of large data sets.
- 3rd Party Developer's Ecosystem – Open and documented API's based on key commercial and government standards.  Development tools that enable 3rd party development activities.

A2634

Protected Information and/or Legends Redacted



December 5, 2014

## Army Continues Preparation for DCGS-A Competition

The Army continues its pivot to a full and open competition for the Distributed Common Ground System – Army (DCGS-A) program, releasing a second Request for Information (RFI) soliciting industry input for DCGS-A Increment 2. DCGS-A is the Army's current enterprise system for intelligence information sharing, processing, operational use, and storage.

Following extensive Soldier feedback, the Army is soliciting input from industry. The full and open competition for Increment 2 seeks to incorporate "best of breed" commercial capabilities into DCGS-A. This second Request for Information seeks industry feedback on specific capabilities such as cloud computing, ease-of-use initiatives, "big data" analytics, data fusion and pattern analysis, defensive and offensive cyber operations, sensor management, and on-the-move operations. These capabilities are among those that DCGS-A will incorporate and/or upgrade in its second increment. Increment 2 will improve the tools Soldiers use to analyze, process and visualize information on the battlefield and maintain the Army's interagency intelligence links by complying with Intelligence Community Information Technology Enterprise (IC ITE) standards.

To provide more information on the process and requirements for the Increment 2 competition, a joint Industry Day is planned for DCGS-A and the Army Communications-Electronics Research, Development and Engineering Center (CERDEC) Intelligence and Information Warfare Directorate (I2WD) at Aberdeen Proving Ground, MD on January 20, 2015. The Government will consider all industry inputs as it prepares for and executes the solicitation process for Increment 2, including at least one additional Request for Information. The Army expects to formally conduct a full and open competition for DCGS-A Increment 2 development in Fiscal Year 2016.

The RFI can be found on the Federal Business Opportunities website at:
https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=410b2c1ab2c148696aa53
4ee673456de&_cview=1.

**A2641**

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



Appx13104

A3104

Protected Information and/or Legends Redacted



A4244

Protected Information
and/or Legends Redacted



Appx14245

A4245

Protected Information and/or Legends Redacted



A4246

Protected Information
and/or Legends Redacted



A4611

Protected Information
and/or Legends Redacted



A4612

Protected Information
and/or Legends Redacted



A4804

Protected Information
and/or Legends Redacted



A4805

Protected Information
and/or Legends Redacted



A4806

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



A5197

Protected Information
and/or Legends Redacted



A5318

Protected Information
and/or Legends Redacted



A5455

Protected Information
and/or Legends Redacted



A5456

Protected Information
and/or Legends Redacted



A5457

Protected Information
and/or Legends Redacted



A5458

Protected Information
and/or Legends Redacted



A5459

Protected Information
and/or Legends Redacted



A5460

Protected Information
and/or Legends Redacted



A5464

Protected Information
and/or Legends Redacted



A5589

Protected Information
and/or Legends Redacted



Appx15595

A5595

Protected Information
and/or Legends Redacted



and/or Legends Redacted

**A5766**

Appx15766

1

2

3

4

5

6

7  IN RE:  PROTEST OF PALANTIR USG, INC.

8      GAO No. B-412746

9

10      Washington, D.C.

11      Tuesday, April 26, 2016

12

13    The above-entitled cause came on for hearing

14  before Nicole Willems, Hearing Official, at the

15  Government Accountability Office, 441 G Street,

16  N.W., Washington, D.C., at 9:00 a.m., when were

17  present on behalf of the respective parties:

18

19

20

21  Reported by:  Bonnie L. Russo

22  Job No. J0347398



Protected Information
and/or Legends Redacted

1    alternative analysis of -- analysis of

2    alternative AOA to determine that a procurement

3    was necessary to meet those requirements that

4    were called out in the requirements document.

5    In our case, there is an information systems

6    capability development document for the

7    DCGS-Army program, and then specific to the

8    Increment 2 component there's a requirements

9    definition package, RDP.  That RDP defines

10   approximately 400 unique requirements that need

11   to be met in order to satisfy the overarching

12   DCGS-Army Increment 2 requirements.

13              HEARING OFFICIAL:  And where do

14   those requirements come from?

15              THE WITNESS:  The Army Training and

16   Doctrine Command, TRADOC, is the author of the

17   requirements.  They are the user representative

18   and they, you know, go around and query and

19   survey users to determine if there's any gaps

20   and capability or needs in terms of

21   intelligence within the Army.

22              BY MS. TALLEY:



A6268

Appx16268

Protected Information
and/or Legends Redacted

1    Q.    Okay.  And can you tell us what --

2  how many -- what does Increment 2 include?

3    A.    So DCGS-A Increment 2 is -- it's not

4  just a single piece of software or a single

5  item.  There are a number of platforms, as we

6  refer to them, that make up the whole

7  foundation.  As I mentioned before, the

8  DCGS-A is the intelligence foundation within

9  the Army.  So there is equipment or platforms

10  that are located at each of the echelons of --

11  starting at the echelons above corps which is

12  the highest echelon in the Army.  At each

13  corps, which is where the combatting commanders

14  for the specific regions of the world they're

15  located.  Then you have divisions, brigades,

16  and battalions.

17       So each of those levels of

18  organization, each of those echelons, there is

19  components of Distributed Common Ground

20  System-Army.  In addition to that, there are

21  specific platforms that are related to each of

22  those echelons.



Protected Information
and/or Legends Redacted

1          HEARING OFFICIAL:  And then that

2     system is available to the other services and

3     the intel communities?

4          THE WITNESS:   In the mechanism for

5     how we share that information is something

6     referred to as the DCGS integration backbone.

7     We refer to it as the DIB.  Each of the DCGS

8     plat -- the joint DCGS systems across the

9     enterprise use the same DCGS integration

10    backbone or DIB to discover and -- and to --

11    well, to provide information and then to

12    discover information.

13          So if there's a federation of all

14    these different platforms across all the

15    services.  So far as one query call, you can

16    then, therefore, find information across all

17    the services, across all those different types

18    of intelligence products, whether it's CI human

19    or signal intelligence or imagery intelligence,

20    et cetera.

21          HEARING OFFICIAL:  Thank you.

22          BY MS. TALLEY:


Protected Information
and/or Legends Redacted

1    A.    So DCGS-A Increment 1 and DCGS-A

2    Increment 2 are following what's known as

3    the -- it's an incremental program approach

4    that's new to the DoD 5000 as far as for

5    specifically software-based programs.  So it's

6    a sort of a natural progression of one program

7    to the next.

8          So DCGS Increment 2 will actually,

9    you know, be built on top or follow on.  So

10   most of the functionality or capability that

11   exists in DCGS Increment 1 will be included in

12   DCGS Increment 2.  There's an additional

13   capability and gaps that were discovered that

14   will be included and then there'll be

15   enhancements done to most of the portions that

16   were part of DCGS Increment 1.

17         Across the board, I don't believe

18   there's any capability that's being lost.

19   We're gaining some additional new capability.

20   For instance, cyber operations has become sort

21   of a buzzword in terms of what that means and

22   there's a -- there's defensive cyber operations



Appx16282

Protected Information
and/or Legends Redacted

1  and offensive cyber operations, and then

2  DCGS-Army has the requirements to provide

3  what's known as the intelligence support to

4  cyber operations.  So we have to be aware of

5  what's happening defensively as well as

6  offensively and also aiding the commander and

7  understanding the cyber battlefield as well.

8  So that's a new capability that's part of DCGS

9  Increment 2 that was not part of Increment 1.

10     Q.    What was your role in -- if any, in

11  defining the requirement for Increment 2?

12     A.    So, actually, as the product manager

13  or program manager, we don't have necessarily a

14  role.  Again, training -- the doctrine command,

15  TRADOC, developer rate the requirements and

16  then they provide them to us and then -- you

17  know, it's our role then to take that

18  requirement which is written in user language

19  and then decompose that into a specification

20  language which is a -- so we've taken the

21  requirements and said -- I'll use an example.

22  You know, the requirements is to, again,



800.211.DEPO (3376)
EsquireSolutions.com

A6283

Appx16283

Protected Information
and/or Legends Redacted

1   provide full-motion video, you know,

2   connectivity within 60 seconds.  So that then

3   gets further decomposed into specific language

4   that a contractor will understand and then be

5   tested to as far as how we'll be able to

6   satisfy that requirement.  So...

7           HEARING OFFICIAL:  So I know in the

8   Agency reports there are a couple of references

9   to JCIDS.  How is JCIDS involved in that

10  process of getting the requirements?

11          THE WITNESS:  JCIDS is the joint

12  requirement for development of requirements

13  across all of the services.

14          HEARING OFFICIAL:  So do you have

15  the option to change the requirements that you

16  receive through that process?

17          THE WITNESS:  Not as the PM.  We'd

18  have to go back to the -- and the JCIDS is at

19  the -- at the joint level.  So the joint --

20  vice chairman and joint chief of staff actually

21  would -- individual would sign our requirements

22  document.  So at the four-star level at the



A6284

Appx16284

Protected Information
and/or Legends Redacted

1    joint level to get our requirements validated

2    and vetted.

3              HEARING OFFICIAL:  And then how do

4    those requirements differ from the requirements

5    that you would define for procuring the system?

6              I don't mean specifics.  I guess I

7    mean in a general way.  The -- let me try to

8    explain it better.  It sounds like they're

9    telling you we need a widget that does X, Y,

10   and Z.  Is that --

11             THE WITNESS:  They would -- in the

12   requirements, they define it in user terms.  We

13   need something that does -- not necessarily a

14   widget, that's more of a material solution.  So

15   the -- the widget would be a -- but they would

16   say something -- we need something that --

17   again, we need someone to help the cyber

18   operations, you know.  So that's a new

19   requirement.

20             So there's approximately 15 to 20

21   new specific user requirements that had been

22   developed for that big particular capability --



800.211.DEPO (3376)
EsquireSolutions.com

A6285
Appx16285

Protected Information
and/or Legends Redacted

1   automation is applied to each of those levels.

2   So that's a -- another key performance

3   parameter.

4           HEARING OFFICIAL:  Could you explain

5   what fusion is?  I don't know quickly the way

6   to explain to you, but could you explain that?

7           THE WITNESS:  In a very -- in a real

8   high level it's -- one example I use is -- so

9   ISIS and ISIL are two organizations, and

10  because they both have different names fusion

11  would be the technical -- there's a -- there's

12  actually a computer algorithm that look at all

13  the different bits of information, compare

14  those things, and when there's a high degree of

15  similarity they actually will, you know,

16  propose to an operator and all-source analyst

17  to say, hey, I've got this -- these two things:

18  One is called ISIS, one is called ISIL.  I

19  think they're the same thing.  And then if we

20  determine yes, then that entity then becomes

21  fused.  That's a really high level, but there's

22  a lot of --



Protected Information
and/or Legends Redacted

1    trade-based analysis and then ESOL did a study,

2    for instance, the data integration

3    visualization analytics, where they looked at

4    approximately eight or nine different

5    commercial products that were out there that

6    provide some of the capability that is used

7    with DCGS-A to determine whether it is

8    commerciality or what the extent of commercial

9    products were that exist.

10          HEARING OFFICIAL:  Did you rely on

11   information in the -- in the trade-based

12   analysis and in the study when you were

13   drafting your RFIs for determining how to go

14   about your market research with the industry?

15          THE WITNESS:  Certainly, they

16   were -- we -- absolutely.  And then, of course,

17   the responses to the RFI we received from

18   industry, I think were maybe equally if not

19   more helpful.  The one concern I had -- my

20   concern with the DIVA, it didn't look at the

21   full breadth and scope of the program.  It only

22   looked at some portions, so there was some gaps



Protected Information
and/or Legends Redacted

1   or holes there in terms of what -- as an

2   approach.  And then with the TSA, that only

3   looked, again, at specific -- there was only

4   four specific areas they looked at.  They

5   didn't look at the entire breadth and scope.

6   They looked at the geospatial capability, the

7   data architecture, the interoperability.  I'm

8   forgetting the fourth piece.  But, again, it

9   was not 400 requirements of capabilities.  The

10  market research that we did in the RFI where we

11  specifically asked for 25 to 30 different, you

12  know, unique areas and what capability exists

13  were much more extensive or thorough.

14          BY MS. TALLEY:

15      Q.    What market research was done

16  specifically with regard to whether commercial

17  items could meet this requirement?

18      A.    So the DIVA primarily looked at

19  commercial items, and then in our RFI and our

20  responses back from the RFI, that's where we

21  primarily looked at the -- again, as far as the

22  full breadth and scope of everything that we're



Protected Information
and/or Legends Redacted

1    doing.  So in response to that, there was

2    certainly gaps and some capabilities.  There's

3    some -- some areas that are just -- you just

4    can't go and on a GSA schedule or an ESI

5    schedule and find a capability that supports a

6    single CI human -- a counterintelligence, human

7    intelligence capability that works seamlessly

8    with the Defense Intelligence Agency CHROME

9    program and also interacts with specific

10   devices being managed by PDO soldier, things

11   like that.  So that's one area in particular

12   where there was, you know, a lack of

13   commerciality, if you will.

14       Q.    Let's turn to Slide 16 that the GAO

15   said they wanted you to address.  Tab AV, do

16   you have that in front of you?

17       A.    I don't have it in front of me.

18       Q.    Do you have the books?

19            HEARING OFFICIAL:  I have many

20   books.  See if I can find the correct one.

21            MS. TALLEY:  Tab AV.

22            THE WITNESS:  Can you direct me



Protected Information
and/or Legends Redacted

1  again?

2          MS. TALLEY:  AV, Albert, Victor.

3  That's not our binder, so I don't know if

4  you're going got find it there or not.  That's

5  Protestor's binder.

6          MR. FLETCHER:  Yeah, it should have

7  the same tab lettering.  So Tab AV.

8          You've found it.  Okay.

9          BY MS. TALLEY:

10     Q.    You've got the slide?

11     A.    Yes.

12     Q.    Okay.  So what I would like to do is

13  I would like, first of all, for you to explain

14  what all this means in terms that we can

15  understand, and then I will ask you to address

16  the Palantir portion, what Palantir could have

17  done with this.  Okay?

18     A.    Okay.

19     Q.    So, first of all, can you tell us in

20  really simple terms what this chart means from

21  the bottom up and -- and what the two side

22  portions are?



800.211.DEPO (3376)
EsquireSolutions.com

A6296
Appx16296

Protected Information
and/or Legends Redacted

1    A.    Okay.  This is a high-level

2  architectural diagram for the program.  It

3  incorporates the key functionality or

4  capability that's required to satisfy those 400

5  requirements that make up the RDP.

6          Looking at -- if you think of it as

7  a -- if you were building a house or as a -- as

8  a way of thinking of it on the bottom is your

9  foundation or your -- you know, where you have

10  your -- your concrete or your cinder blocks.

11  So at the very bottom you see that there's

12  physical hardware devices, servers, network and

13  storage things.  Just above that is what we

14  refer to as the overarching software

15  infrastructure which includes the operating

16  systems.  So that would be, in our case,

17  Windows or Linux or the two primary operating

18  systems that we use.

19          And then just above that is what we

20  refer to as the data integration layer.  This

21  is where we talked about earlier where all the

22  different data sources provide data and then



A6297
Protected Information
and/or Legends Redacted

Appx16297

1  actually can be queried or reviewed or

2  discovered by others.  You will see that

3  there's multiple stores of data based on the

4  types of data that are, you know, entity and

5  report data and binary data are things that may

6  be commercial capabilities, you know, out of

7  the box support those.  That's why they're

8  color coded in the white.  And you will see

9  that the sensor data -- and we talked about

10 those direct feeds coming in off of UAVs or

11 through a hand-held device that some soldier is

12 using that's providing information, has some

13 uniqueness there that has the, you know, either

14 significant modification or some unique

15 capability there that's necessary.  And then

16 cyber ingest, as well, there is certain things

17 there and a lot of it has to do because these

18 DCGS-A is a national security system.  There is

19 certain markets and caveats and things like

20 that that are -- you know, you're not going to

21 find in a commercial product out of the box.

22         As we go on the left side you'll see



800.211.DEPO (3376)
EsquireSolutions.com

Protected Information
and/or Legends Redacted

1  the data analytics platform scopes both the

2  data integration layer as well as the

3  visualization framework layer.  When the data

4  is brought into the system and information

5  about those specific inside those reports and

6  those entities, there can be analysis being

7  performed on that, you know, sort of

8  unbeknownst to the operator.  So that we call

9  them the back -- you know, in the back end

10 or -- so that's one aspect of the data

11 analytics.  So as information is brought in,

12 there is stuff going on, you know,

13 automatically to start processing some of that

14 information.

15         HEARING OFFICIAL:  Oh, and this

16 chart has the word "fusion" beside it.

17         Would fusion be the only thing going

18 on in the background?

19         THE WITNESS:  No, it was -- it was

20 highlighted for purposes of this presentation

21 because it was one of the KPPs, key performance

22 parameters.  So that and then interoperability



Protected Information
and/or Legends Redacted

1    on the right is mentioned, net-centric is the

2    other KPP, technical KPP that we have to meet.

3    So those two things were sort of highlighted.

4            Fusion in particular was sort of --

5    and, again, the concept of as information is

6    being brought in there is some automated

7    activity that's going on that's related to the

8    fusion.  And, again, looking at those -- all

9    those bits of information and then fusion,

10   there are algorithms that compare all those

11   bits, and again, if there's some -- and,

12   actually, what the -- the capability that is

13   existing in DCGS-A Increment 1 is referred to

14   as the fused exploitation framework, you can

15   actually -- the operator can sort of adjust the

16   algorithm so they can see what happens if we

17   turn it up a little.  We still give it a few --

18   if it is determined that those entities should

19   be fused or we turn it down a little, maybe

20   they should be kept as separate things.  So

21   those are -- so the analytics platform, again,

22   scopes across both the data integration layer



Protected Information
and/or Legends Redacted

1  and the visualization framework.

2          And then next to the -- there's a --

3  what we refer to as services.  So there's

4  certain key elements, things like access

5  control and what we referred to -- it's a

6  Microsoft product.  It's the active directory.

7  So how individuals sign in and log in to

8  platforms and things like that.  So there's

9  commercial services that provide many of those

10  capabilities that, again, scope across the

11  integration layer to the visualization.

12          The visualization framework you can

13  consider that or look at that as a -- as what

14  the user is going to be seeing in terms of what

15  they have to do as part of their job and then

16  they'll have tools that are specifically

17  aligned or that -- that focus on those

18  particular areas.  So we'll just -- you know,

19  so, for instance, in -- in the case of

20  geospatial, there is many commercial products.

21  Google Earth is a good example that support

22  that type of a capability.  There's many



A6301
Protected Information
and/or Legends Redacted

Appx16301

1    imagery, motion imagery as well as static

2    imagery capabilities that are available through

3    commercial.  And then the one that DCGS-A uses

4    for -- for the geospatial or mapping is a

5    product called Archos, which a company called

6    Edgrey builds.

7           So, again, those are -- so there's a

8    large number of commercial capabilities that

9    support that right out of the box.  So that's

10   why that's color coded.  So the same with

11   imagery and motion imagery.  It just talks

12   about those two areas.

13          Information collection, you will see

14   it's shaded into kind of two-tone.  There's a

15   number of different tools that support that.

16   There's the -- what we refer to as link

17   analysis, which is if you've seen a police

18   blotter or if you go to any of the police shows

19   and they've got these -- the crime syndicate,

20   you know, and the picture in the middle, and

21   they have strings drawn to each other to the

22   individual, that's referred to as a link



A6302

Appx16302

Protected Information
and/or Legends Redacted

1   analysis chart.  And so that -- there are

2   commercial capabilities like Palantir that

3   support that particular capability.

4         There's also other things that go to

5   information collection in terms of there's a

6   collection management function which is a --

7   another -- is a title of a person in the all

8   source cell who is responsible for knowing and

9   understanding where all the different sensors

10  are on the battlefield.  So that's something,

11  again, that you don't find necessarily

12  commercially off the shelf.  But under the

13  overarching area of information collection, you

14  find that there are a different number of

15  capabilities that are covered there.

16        I think on the data platform I -- I

17  just mentioned Palantir under collection.  I

18  neglected to say that, you know, Palantir does

19  support, you know, the data analytics.  They

20  do -- I know when the information reports come

21  in, they have ability to extract information

22  automatically and things like that.  That would



Protected Information
and/or Legends Redacted

1   be an example of an analytic -- data analytic

2   that's covered there.  And then also,

3   obviously, in the -- in the data integration

4   layer, as far as entities and reports -- and

5   I'm not sure about binary information, but

6   certainly entities and reports.

7       Q.    Let's talk about sensors for just a

8   little bit because I don't really understand

9   how all that works in this -- in this process.

10          Can you identify a particular sensor

11  that we can visualize and explain how the

12  information it collects is processed through

13  this system and becomes accessible to a user?

14      A.    Sure.

15          So we talked about the tactical

16  grounds station as we refer to as the catcher's

17  mitt, that the brigades will have this ability.

18  So a sensor, in this case, I'll use the example

19  of the Air Force's Joint STARS aircraft is a --

20  has imagery and moving target indicator sensors

21  on board, and then all that information can

22  then be pulled into this platform.  That data


A6304

Appx16304

Protected Information
and/or Legends Redacted

1   would be collected.  And then depending on

2   if -- the moving target indicator would be part

3   of the sensor data store and then the imagery

4   or full-motion video would be part of the

5   binary store.

6           So the operator, after the

7   information has been collected and put into the

8   database and tagged, when the operator does his

9   query he'll be able to find that information.

10  And then in the case of the imagery, there is a

11  process called "tagging" where they -- they can

12  take a look at a picture and they can see

13  there's some -- they have tools that do things

14  called "change detection" so they can look at a

15  piece of earth and notice that, you know,

16  yesterday when we flew over it was flat.

17  Today, there's a mound of dirt there, or

18  something like that.  So that kind of -- you

19  know, so that kind of information would then be

20  tagged to an image and then that information

21  would be shared over to the information

22  collection cell where the all-source analyst or



Protected Information
and/or Legends Redacted

1   sometimes referred to as the battle captain,

2   the guy who's actually collecting the

3   information from all the different intelligence

4   disciplines.

5           So the -- the weather and signals

6   intelligence, the counterintelligence, human

7   intelligence all are -- finds its way up to the

8   information collection cell.  He is putting

9   together that report to the commander so he

10  knows that -- you know, that in this area

11  there's a piece of dirt that's been moved based

12  on sensor.  You know, we've got some real-time

13  sensor feeds that says, you know, so we

14  probably don't want to -- either we're going to

15  send a team out there to, you know, look for,

16  you know, evidence of IEDs or something like

17  that.  So maybe you just want to avoid that

18  area altogether today and pick a different

19  route for your route planning.

20          So that information that -- the

21  information collection our all-source analyst

22  is putting together then has to be shared with



A6306

Protected Information
and/or Legends Redacted

1  that -- that -- with the -- with the commander.

2  So over on the far right we have the

3  interoperability piece.  So there are multiple

4  ways that we share information.  There is what

5  we refer to as direct messaging.  So there are

6  certain platforms that we actually send a

7  structured message to.  A lot of the cases it's

8  the Army aviation, you know, the helicopters

9  require direct messaging.  So we produce a

10 message and report that gets sent directly to

11 them in that structure format.

12           There's also published and

13 subscribed services that information gets --

14 think of an RSS feed that you have where you,

15 you know, just basically any time you want to

16 -- you know, you can have a Web site or

17 something like that that you want to receive

18 information from when there's some bit of --

19 you know, that's tied to a specific topic, or

20 something, you can tag information like that.

21 And then I also -- we talked about the DCGS

22 integration backbone is the other mechanism and



A6307

Appx16307

Protected Information
and/or Legends Redacted

1    means of sharing or being interoperable.  So

2    all those components are -- and then from

3    there, the commander makes the decision on the

4    information.  That's just a simple thread of

5    how data is pulled into the system, processed,

6    exploited, and then eventually disseminated.

7              HEARING OFFICIAL:  So does the

8    system automatically disseminate certain

9    information, or is there always some person

10   putting together a report?

11             THE WITNESS:  It depends on the type

12   of information.  There's actually -- for the

13   most part, it's actually a man in the loop.

14   There is -- there is one thread that I'm aware

15   of that's a direct targeting.  So I mentioned

16   Joint STARS aircraft.  They have the ability,

17   based on a moving target indicator, to send

18   a -- what's called a direct fire message from

19   the targeting center without any man in the

20   loop to a program called FATIGS.  FATIGS will

21   then, you know, direct the Army men to launch

22   a -- a rocket or missile, or whatever.  I'm not



800.211.DEPO (3376)
EsquireSolutions.com

A6308
Appx16308

Protected Information
and/or Legends Redacted

1  sure the type of armor, but that's the direct

2  fire message.

3          So there's actually no man in the

4  loop in that particular scenario.  But for the

5  most part, most of it is there's a -- there's

6  an individual, or people, actually, multiple

7  people that are processing data and then

8  intelligence is more of an art than a -- than a

9  science in many cases, so it's -- it's a lot of

10 people involved.

11         HEARING OFFICIAL:  And can I ask one

12 more thing, which is that I know that you said

13 the interoperability rate piece goes to the net

14 centricity key performance parameter?

15         THE WITNESS:  Correct.

16         HEARING OFFICIAL:  I'm not

17 altogether sure that I understand what net

18 centricity means exactly.

19         Can you tell me that -- can you

20 explain that and tell me how those two operate?

21         THE WITNESS:  Yeah.  Net-centric KPP

22 really is -- I mean, better title would have



800.211.DEPO (3376)
EsquireSolutions.com

A6309

Appx16309

Protected Information
and/or Legends Redacted

1  been the interoperability KPP.

2          HEARING OFFICIAL:  And that's

3  interoperability between?

4          THE WITNESS:  So we have three

5  levels of interoperability defined in that KPP.

6  It's Army to Army.  So I mentioned that --

7  that --

8          HEARING OFFICIAL:  Right.

9          THE WITNESS:  -- sending that direct

10  message to that helicopter, that's one aspect

11  of it in order to satisfy our -- in order to

12  pass a test, we have to go through a process

13  called "Army interoperability certification."

14  And there's a full testing organization down at

15  Fort Hood that does that.  And then there's

16  what's known as "joint interoperability" or

17  messages that we have to share with -- outside

18  of the DIB, there's other direct messages

19  and -- and so there's a GCCS, which is Global

20  Command Control System-J, joint requirement

21  that we satisfy.  And then there's a number of

22  joint messages and message interfaces that we



Protected Information
and/or Legends Redacted

1  have to support that's part of the

2  interoperability or net-centric KPP.  And then

3  the third element is -- that's called out into

4  that central KPP is the DCGS integration

5  backbone.  So we have to -- again, it's the

6  mechanisms that we can all share.

7          MS. TALLEY:  Did you understand

8  that, ma'am, because I didn't?

9          HEARING OFFICIAL:  I understood some

10  of it.  I think, to be honest, I get the

11  general sense.

12          MS. TALLEY:  Maybe if I ask him

13  something more --

14          HEARING OFFICIAL:  Yes.

15          MS. TALLEY:  And I didn't mean

16  anything derogatory by that, but it's --

17  obviously, we're here for you to understand.

18          HEARING OFFICIAL:  Yes.

19          MS. TALLEY:  So if I don't

20  understand it, it just means I'm stupid.

21          HEARING OFFICIAL:  No, I understand

22  why you're asking and I suspect that you've



Protected Information
and/or Legends Redacted

1    taken time to come up with questions to help

2    him really --

3            MS. TALLEY:  Yes.

4            HEARING OFFICIAL:  -- explain it to

5    me well.  So I would welcome your questions.

6    I'm just sort of asking as I go because I start

7    to feel like I'm understanding and then like to

8    go back and check my understanding.

9            MS. TALLEY:  Thank you.

10           HEARING OFFICIAL:  So please go

11   ahead.

12           BY MS. TALLEY:

13       Q.    Okay.  Mr. Morton, just really

14   simply and just with regard to this word, tell

15   us what net centricity is?

16       A.    It is interoperability.

17       Q.    Are they interchangeable?

18       A.    Yes.

19       Q.    Okay.

20           HEARING OFFICIAL:  Net centricity is

21   just fancy, I guess.

22           MS. TALLEY:  I guess so.



800.211.DEPO (3376)
EsquireSolutions.com

A6312

Appx16312

Protected Information
and/or Legends Redacted

```
 1              HEARING OFFICIAL:  Thank you.

 2              BY MS. TALLEY:

 3         Q.    Okay.  All right.  So you have

 4    Increment 1.

 5              Does Increment 1 use any commercial

 6    products?

 7         A.    Yes, actually I think I referenced a

 8    couple of them.  Google Earth and --

 9         Q.    Without getting specific.

10         A.    Oh, okay.  Absolutely, yes.  There's

11    a significant number of commercial products.

12         Q.    Okay.  When you say, "a significant

13    number," are we talking about ten, hundreds,

14    thousands?  What are we talking about?

15         A.    And if you -- if you're counting

16    things like operating systems, like Microsoft

17    and, you know, Windows or Linux and things

18    like -- those types.  Java, and those, it's

19    probably in -- over a hundred.

20         Q.    Okay.  And did you look at the

21    likelihood of having commercial items that will

22    be a part of Increment 2?
```



Protected Information
and/or Legends Redacted

1        A.      Absolutely.

2        Q.      And can you give us a rough idea of

3   how many commercial items you would expect to

4   be a part of Increment 2?

5        A.      I would think it would be similar to

6   what we have in DCGS-A Increment 1.

7        Q.      Okay.

8        A.      In that same ballpark.

9        Q.      Okay.  Can you describe -- you have

10  here on -- on your chart on your slide what

11  COTS items are available for different parts of

12  this program?

13           Can you describe how they work

14  together, just in very general terms?

15       A.      Okay.  That's a key component of

16  what DCGS-A tried to accomplish, is that

17  instead of having a separate capability with a

18  separate service with a separate database with

19  a separate mechanism for interoperating, it's

20  done in a cohesive environment.  Looking at

21  the -- at the far left, the services, for

22  example -- so if we only have to log in once in



Protected Information
and/or Legends Redacted

1  order to access all the different data through

2  some role-based or access-based control

3  mechanism, that's a good thing.  But if we

4  had -- the system were broken into actual

5  individual components sometimes that, you know,

6  we refer -- think of as -- we used to call them

7  stovepipes, if you're familiar with that term.

8  But if you took a line and drew kind of

9  straight down and said, okay, we have all these

10  different stovepipes, they may, in fact, have

11  multiple different services or access control

12  mechanisms or passwords.  So that's one of the

13  key tenets of what DCGS and the requirements

14  say.  It doesn't have to be this comprehensive

15  or kind of homogenous environment so that it

16  limits the amount of user intervention in terms

17  of some of these, you know, I'll call them less

18  fun kind of activities, you know, where you

19  have to memorize, you know, six or seven

20  different passwords and -- and you're having to

21  open up and then remembering what the

22  connection or the path was to connect to a



A6315
Protected Information
and/or Legends Redacted

1   specific data store or something like that.

2         HEARING OFFICIAL:  So when you talk

3   about it being stovepiped, looking at this

4   chart, what would be an example of something

5   here that could be its own -- I guess what I'm

6   saying is -- is what you're describing like

7   back to the geospatial example like you -- that

8   was separate from everything else, and if you

9   wanted geospatial information you had to log

10  into a system that would only provide you with

11  that information, and then there were similar

12  systems for each of these things?

13        THE WITNESS:  Right.

14        So that's actually -- so prior to

15  DCGS-A, there were nine different programs of

16  record within the Army that provided capability

17  that was pretty much aligned to -- there was

18  a -- there was a weather system, there was a

19  signal intelligence system, there was a

20  geospatial system, there was an imagery system.

21  So you had -- you an all-source system.  So all

22  those different things, and they did not



A6316

Appx16316

Protected Information
and/or Legends Redacted

1   interoperate or communicate well with one

2   another.  So that's -- again, having this in a

3   singular environment is a significant advantage

4   to the user.

5          BY MS. TALLEY:

6      Q.    Okay.  Let's -- let's take Palantir

7   as an example of a COTS item, what part of this

8   chart could the Palantir product satisfy?

9      A.    So Palantir is what we refer to as a

10  crosscutting product.  It actually supports --

11  from the data integration layer.  And I

12  mentioned, I guess, the data analytics

13  platform, it supports portions of that as well

14  as portions of the information collection.  And

15  then even beyond that I -- you know, there's --

16  there's a Web interface and things like that

17  that Palantir supports for how they disseminate

18  information.  Though they don't support the

19  direct messaging and some of the other DIB

20  interface.  I don't believe that's supported

21  either.

22     Q.    So let's -- let's take in the data



Protected Information
and/or Legends Redacted

1    access layer.  Which of these cylinders would

2    Palantir fall into?

3        A.    So they would fall into the entity

4    and report data -- databases.

5        Q.    Now, if -- if they fell into that,

6    would they completely cover the entire

7    requirement for entity and report?

8        A.    No.  There is other -- the entity

9    and report is a category of data, so there's

10   other aspects of entity and report.  For

11   purposes of this slide in that there are

12   some -- there are commercial products that

13   could support the breadth and scope, but

14   Palantir out of the box is not the -- it would

15   have to be some minor modification, which, I

16   think, under commercial is covered.

17       Q.    So I'm not clear and I -- I really

18   want to be clear on this.

19            Is there one product that would

20   support -- provide the entire requirement for

21   entity and report?

22       A.    No.



800.211.DEPO (3376)
EsquireSolutions.com

A6318

Appx16318

Protected Information
and/or Legends Redacted

1    Q.    Okay.  All right.  Individualization

2   framework, does Palantir play -- could Palantir

3   play a role there?

4    A.    So in the information collection

5   there is -- that's why it's color coded.  I

6   mentioned before that there are a link analysis

7   capability that's covered under information

8   collection is covered by Palantir.  The

9   collection manager function, which is the other

10  big all-source analyst requirements, is really

11  not available through commercial mechanism

12  means.

13   Q.    So is the Palantir software, for

14  example, capable of collecting all of the

15  information required for Increment 2 program?

16   A.    No.

17        I mentioned the direct sensor feed

18  and the connections to the CI human area and

19  central intelligence area.  In particular,

20  signals intelligence is an area that NSA sort

21  of dictates and controls.  So that's a -- you

22  have to work through them anyway.



800.211.DEPO (3376)
EsquireSolutions.com

A6319
Appx16319

Protected Information
and/or Legends Redacted

1   individual software packages that will be used

2   and buy those separately, and buy the

3   integration interoperability components from

4   someone else?

5        A.    So through our market research and

6   through interviews with the other programs, it

7   was based on risk, cost and scheduling and

8   performance risk.  When you provide or take a

9   collection of capabilities, the guarantee that

10  they're all going to work together seamlessly

11  or, you know, uniformly is not really there.

12  You need someone to sort of be the belly button

13  that's going to take responsibility for that,

14  so that's why we chose the system integrator

15  approach to lead that activity and -- and be

16  the responsible party for determining, you

17  know, how it's going to be pulled together.

18       Q.    Okay.  You mentioned earlier that

19  when we had the stovepipe systems that you had

20  to access each one separately.

21            With Increment 2, in addition to the

22  benefit of being able to access just one



A6321
Protected Information
and/or Legends Redacted

Appx16321

1    system, do these various components on your

2    chart work together in any way?

3        A.    Yes.

4              So that's -- there's a term "modular

5    open system architecture," MOSA, that is used

6    to describe things that sometimes are referred

7    to as plug-and-play.  So you have -- if

8    everything is built on standards and has a

9    common interface control that they all follow,

10   then you're able to share information much more

11   seamlessly.  If you have some nonstandard

12   things, then you have to either do some work

13   around or have the build capability to sort of

14   be the middleware between those things, and

15   that becomes more compensated.

16             So the -- the visualization

17   framework has, you know -- one of the other key

18   system attributes is something called

19   "usability."  So DCGS Increment 1 was not as

20   clean as this architecture is, I'll say that.

21   It works but it's a -- has some work.  So by

22   having this visualization framework that all



A6322
Protected Information
and/or Legends Redacted

Appx16322

 1   the systems will have a common -- you know, at

 2   the -- there will be some common looking feel

 3   or some common access control or things like

 4   that, that is really important to the user so

 5   they don't have to have memorized all these

 6   passwords.  They don't have to have all these

 7   different credentials and things that they have

 8   to keep to use the different systems or

 9   applications.

10      Q.    Protestor has made much of

11   solicitation language.  They have alleged

12   prefers that the proposals not include

13   proprietary and commercial items.

14          Can you address that?

15      A.    So in the -- in the performance work

16   statement there is a specific statement that

17   calls to the attention with the exception that

18   without approval from the contracting officer.

19   So one of the things I know in the Army is we

20   are cognizant of the cost, so the commercial

21   products do have, you know, a bill associated

22   with them.  So that's why you need contracting



A6323
Protected Information
and/or Legends Redacted

1  performance work statement and the requirements

2  called out in the PWS.

3      Q.    And what did they indicate -- what

4  did they recommend to the Army?

5      A.    So, in particular, there were a

6  number of items that they recommended either

7  removing or deleting from a performance work

8  statement, and most importantly two of the key

9  performance parameters were called out; the

10  fusion and the interoperability.

11     Q.    They wanted that deleted?

12     A.    Correct.

13     Q.    Without those two items, would there

14  -- what would the impact on the program be if

15  we deleted those two items?

16     A.    In order for a system to be

17  considered, you know, acceptable to the user it

18  has to go to a test and -- and the requirements

19  have to be validated and the key performance

20  parameters are those things that cannot be

21  traded.  So those things have to be met in

22  order for the system to be fielded.



Protected Information
and/or Legends Redacted

1   analysis.

2              HEARING OFFICIAL:  And what was the

3   impetus for it then?

4              THE WITNESS:  So they are -- at that

5   point they are determining whether or not --

6   besides materiel solution, there could be other

7   things that could be done, either doctrinally

8   or through training or -- or whether the

9   requirement even -- you know, there's -- so

10  it's -- materiel solution are the -- to go

11  forward with a procurement for an item is like

12  the last alternative that they are looking at.

13  They're looking at if there's other things that

14  could be done in lieu of sort of, whether --

15  you know, sort of validate the requirement.

16             So -- but it was the trade space

17  analysis that did, in fact, look at specific

18  commercial and government-owned and other

19  things that I mentioned, four areas in

20  particular, that -- not the full breadth and

21  scope of the program.

22             And then sort of, I guess, further



Protected Information
and/or Legends Redacted

1    answer your question as far as, at the same

2    time, between Increment 1 and Increment 2, the

3    Secretary of the Army For Acquisition,

4    Logistics and Technology, who -- otherwise

5    known as ASA(ALT), they were looking at the

6    commercial marketplace for some data

7    integration and visualization and integration

8    components.  So that was the DIVA study that

9    ASA(ALT) had commissioned.

10         That was prior to the RDP being

11   validated or completed.  So it was between the

12   ISCDD being completed and the RDP being

13   written.  So there was a little bit of a gap

14   there.  And that certainly influenced

15   that there were commercial or other things

16   that, you know, could be used as well.

17         BY MR. FLETCHER:

18   Q.    Okay.  So we'll -- I appreciate you

19   bringing up the ASA(ALT) DIVA market study

20   report because I want to come back and ask some

21   more questions about that.

22         But before we get to that, I think,



A6346
Protected Information
and/or Legends Redacted

Appx16346

1  capabilities within the Increment 2 effort

2  overall?

3        A.    So for RFI No. 2, we specifically

4  put in a template for offers to fill out that

5  align to approximately 20 -- 20-plus different

6  capability groups or components, if you will,

7  and to give us information associated with

8  that.

9            And we did essentially what we do in

10 a past performance review.  We went and

11 actually had -- have a major that works for me

12 there went and validated the claims that a

13 different offer was made in terms of what --

14 the components that they had and that they

15 claim that they met for those capability

16 requirements.

17       Q.    And were there any questions in

18 those RFIs that were specific to the

19 availability of commercial items generally or

20 commercial software that could provide the

21 capabilities that you're talking about?

22       A.    Not to that level of specificity.  I



800.211.DEPO (3376)
EsquireSolutions.com

Appx16350

A6350
Protected Information
and/or Legends Redacted

1        Q.      Are you there?

2        A.      I am.

3        Q.      So if you could turn to Page 12 for

4    me, please.

5                And then do you see where that

6    paragraph starts with the numeral 2?

7        A.      Yes.

8        Q.      Can you read for me that first --

9    just that first sentence.

10       A.      "This model will apply in cases

11   where commercial off-the-shelf software, such

12   as commercial business systems with multiple

13   modular capabilities, are acquired and adapted

14   for DOD application."

15       Q.      Okay.  So can you describe how this

16   acquisition is described by that sentence that

17   you just read?

18       A.      In regard to DCGS-A Increment 2?

19       Q.      Right.

20       A.      So DCGS-A Increment 2 uses a

21   significant amount and expects to use a

22   significant amount of commercial technology,



800.211.DEPO (3376)
EsquireSolutions.com

A6354

Appx16354

Protected Information
and/or Legends Redacted

1   commercial off-the-shelf software.

2          There's -- I guess there's a -- I'm

3   sorry.  Can you repeat the question?  Because I

4   want to make sure I answer it completely.

5      Q.   Yeah.  I think you answered it,

6   actually.

7          MS. TALLEY:  For the record, the

8   army would note that this is not a regulation.

9          BY MR. FLETCHER:

10     Q.   Mr. Morton, I will take you back to

11  the DIVA market study that you mentioned

12  before.

13         Can you tell us how you understood

14  that study to fit into the process leading up

15  to issuing the Increment 2 RFP?

16     A.   Okay.  At the time, the -- Ms. Shyu,

17  who was the ASA(ALT) -- the person in charge of

18  ASA(ALT), was -- she had asked Miter to conduct

19  a study to look at what -- and it was actually

20  initially only a 30-day study.  So it was not a

21  very -- it wasn't a very lengthy study.

22         And their response -- I know Miter



Protected Information
and/or Legends Redacted

1    considered -- I think it was seven or nine

2    different companies or applications.  And it

3    was not directly aligned to the DCGS

4    Increment 2 RDP because the document didn't

5    actually exist yet.

6            But in particular, she was

7    interested in understanding if there were

8    either commercial or hybrid capabilities -- and

9    "hybrid" meaning, you know, a combination of

10   both commercial and some government

11   development -- that was required -- or could be

12   used to satisfy what she was looking at from a

13   data integration basis.

14           The focus really was more on the

15   data integration side as opposed to the

16   visualization.  I know the V part.

17           HEARING OFFICIAL:  So when you said

18   earlier that the DIVA study was limited in

19   scope, the parts that it wouldn't have

20   addressed would be the visualization?

21           THE WITNESS:  So it was -- some of

22   the specific capabilities that are unique to



A6356
Protected Information
and/or Legends Redacted

Appx16356

1    Q.    Okay.  Mr. Morton, I think I

2  remember you saying before that you had been

3  aware of the DIVA market study at the time you

4  were writing the RFI questions for industry.

5  Or did I not remember that correctly?

6    A.    Certainly between 1 and 3, I

7  suspect.  Yeah, I don't recall the exact dates

8  of when I -- the DIVA market research was

9  actually released.

10    Q.    Okay.  Did anything in the DIVA

11  market study report -- again, to TAB AQ.  Just

12  make sure we're using the right terminology --

13  inform any of the questions that were asked?

14    A.    I honestly can't say I recall that.

15    Q.    Do you know whether the DIVA market

16  study report informed the RDP or the CDD or any

17  of those requirements documents you were

18  talking about before?

19    A.    I'm not aware of, but that's also --

20  it's not my -- my requirements or my documents

21  to develop.

22    Q.    So to know for sure, it would have



Protected Information
and/or Legends Redacted

1      Q.     Okay.

2      A.     And then the author -- this

3  actually -- I'm sure it was a collaborative

4  effort, but I'm sure I had something to do with

5  it.

6            Mr. Pino is the assistant secretary

7  of defense for C3I and cyber.  Used to work for

8  Dr. Jost, now works directly for Mr. Kendall.

9            This was one of the briefings that

10  -- we did several briefings for Mr. Pino

11  leading up to the approval of the acquisition

12  strategy.

13     Q.     Okay.  So sounds like you probably

14  coauthored it, at least, or were involved

15  somehow in putting it together.

16     A.     Correct.

17     Q.     Okay.  So let's try to break this

18  down a little bit more into detail that I can

19  understand.

20            Starting with the data integration

21  layer, can you give us some more detailed

22  explanation of what this cylinder that contains



A6370
Protected Information
and/or Legends Redacted

1   the word "entity" really involves?

2      A.    Sure.  The data integration layer --

3   each of the cylinders represents a database.

4   There are specific types of information that is

5   common.

6         So the entity -- think about an

7   entity as a -- either as a person, place,

8   thing, organization, location -- sorry.  Take

9   back location.  That's more binary in terms of

10   spatially rectified in binary.

11         But anything that's associated with

12   a person, place or thing would be an entity.

13   So that information would be stored in that

14   database.

15      Q.    And so -- and so from the shading in

16   that cylinder, as I understand the labels or

17   the legend at the bottom, that is a database

18   that -- how -- rather than put words in your

19   mouth, let me ask the question.

20         How would you explain the reason

21   that the entity cylinder is lacking any shading

22   there, so it's a white background?



Protected Information
and/or Legends Redacted

1    A.    The white background represents that

2    it's a commercial off-the-shelf.  So that means

3    that -- whether it's an Oracle database or Web

4    Logic database or a SQL database or a Mongo

5    database or a Duke David file system, one of

6    those, you know, databases, literally you could

7    take that off the shelf and then be able to

8    import entities into that database.

9    Q.    So it sounds like that difficult

10   describes the different types of information

11   that would be in a database or characteristics

12   of the data that's in that database?

13   A.    So a database is usually -- think of

14   it as a -- well, you're probably familiar with

15   -- but, you know, it contains, you know, rows

16   and columns, kind of like a spreadsheet, but in

17   a table where you can access it and manipulate

18   it a little differently than a spreadsheet.  So

19   there will be -- yes.

20   Q.    Okay.  What about the report

21   cylinder?

22   A.    So under reports you have -- there's



Protected Information
and/or Legends Redacted

1    those reports -- CIDNE reports would be pulled

2    into that report database.

3         Q.    Okay.  So is it -- so the first two

4    of these we've talked about have a white

5    background.

6              So is it the nature of the data, or

7    is it the nature of the database that makes it

8    a white background?

9         A.    It's the nature of the database that

10   makes it a white background.  Whether a report

11   or -- a database, in order to pull information

12   in -- databases are essentially blank pages,

13   right?

14             So you can structure them or create

15   them -- you know, you can manipulate them

16   without actually changing the code of the

17   database.  So that's why they would be color

18   coded white in this particular case.

19        Q.    So moving on to the sensor cylinder,

20   first, what is involved -- what is part of that

21   database?

22        A.    That database would be pulling in



A6375

Protected Information
and/or Legends Redacted

1   information that is coming in off of -- I

2   mentioned -- you know, we talked about the

3   drone for the UAVs as a source.  So there's

4   bits of information that is, you know, military

5   unique.

6           So there are types of information

7   and things like that that are -- that you would

8   not necessarily or you wouldn't be able to just

9   buy off the shelf.

10          I guess I'll jump to the cyber

11  ingestion.  We have the same kind of quandary.

12  There's components that -- any database, but

13  then there's things that are unique that make

14  it necessary for that.  There's manipulation or

15  changes to the database itself that need to be

16  implemented.

17      Q.    So let's go back to the sensor

18  cylinder.

19          Can you give us specific examples --

20  I know you mentioned UAVs being the source of

21  data that would be in this database, so

22  censored generated data --



Protected Information
and/or Legends Redacted

1      A.    Correct.

2      Q.    -- effectively.

3          What other kinds of sensors are we

4  talking about here?

5      A.    So the other -- another major one

6  is -- I mentioned the counterintelligence and

7  human intelligence.  So reports coming in from

8  those teams that go out.

9          You know, they have refer to

10 human -- I forgot the acronym, but there's --

11 sometimes referred as the guys that knock down

12 doors and stuff like that and interrogate

13 people and things like that.  They have

14 information and things like that.

15         The other thing that's critical in

16 that particular domain and that sensor --

17 that's covered under sensor as well -- is that,

18 because of the nature of that information,

19 there's certain things that have to be done to

20 layer the data so that it's protected.

21         So there's what's referred to as

22 public, private and protected, the three Ps.



Protected Information
and/or Legends Redacted

1    There's levels of information that have to be

2    sort of sequestered.

3        Q.    So what is it that is unique about

4    sensor data, the way the cylinder is labeled,

5    that makes it not susceptible to commercial

6    software or a commercial solution for the data

7    integration layer?

8        A.    I think, as I just kind of said

9    about -- from the CI human, there's levels of

10   protection that have to be applied.  And then,

11   because of the -- when you're talking safety.

12   And then security also is another aspect of it

13   that you have to make sure there's the

14   components within the -- obviously, you know,

15   from a national security perspective, you need

16   to protect things in certain ways.

17            So there's -- perhaps -- I hate to

18   use the word -- or use the term "middleware,"

19   but you know the kind of -- it's associated or

20   tied to that particular information.

21            HEARING OFFICIAL:  So just to be

22   clear then, there are instances where the



Protected Information
and/or Legends Redacted

1  yes, with -- with a modification, yes.

2      Q.    So are there -- are there any

3  sensors that would need to be accommodated in

4  this data integration layer that are not of the

5  sort you're talking about?

6          You talked about military unique,

7  things that would require some kind of

8  modification.

9          Are there sensors in this database

10  that would not be of that variety?

11      A.    Yes, there are some.  Sure.

12      Q.    Do you know some examples?

13      A.    Actually, off the top of my head,

14  I'm kind of hard pressed.  But I would agree

15  that there is probably some sensor data that

16  could be pulled in directly to a -- directly

17  out of the box.

18      Q.    Okay.  So shouldn't then -- or do

19  you think then that the sensor cylinder here

20  should be -- should not be dark blue; maybe it

21  should be light blue?

22      A.    I would not -- yeah, that's correct,



Protected Information
and/or Legends Redacted

1    yeah.

2        Q.    Who -- actually, that's -- these --

3    so we're talking about these labels, these

4    legends at the bottom of the slide.

5            Do you know who made the

6    determinations as to which ones should be dark

7    blue, which ones should be light blue, which

8    ones should be white background?

9            MS. TALLEY:  Objection.  Relevance.

10           HEARING OFFICIAL:  I'm not sure that

11   that's relevant.  I'm interested in his

12   understanding as opposed to --

13           MR. FLETCHER:  Okay.  That's fair.

14           BY MR. FLETCHER:

15       Q.    Mr. Morton, did you decide which

16   should be shaded which colors?

17       A.    No.  That was -- I mean I mentioned

18   this earlier.  It was a team effort that

19   Colonel Collins presented.  So I don't -- there

20   was a number of engineers that were, you know,

21   looking at this.

22       Q.    Got it.  Okay.  Thanks.  I



800.211.DEPO (3376)
EsquireSolutions.com

A6381

Appx16381

Protected Information
and/or Legends Redacted

1    appreciate that.

2              What about -- I know you already

3    mentioned cyber, and I want to get to that.

4              But let's -- can you tell me about

5    the binary cylinder before we move on?

6       A.    So binary is -- if you think of

7    things that require -- well, it's the -- mostly

8    the imagery is -- and then full-motion video

9    and those types of things.

10             So again, it's something that a

11   database could -- could perform out of the box

12   as far as storing that in a database.

13      Q.    Okay.  And finally, the cyber

14   cylinder here -- and actually, before you

15   describe generally what it is, this one is

16   unique from the others in that it has a

17   parenthetical underneath it.  It says "ingest."

18             What does that tell you?

19      A.    So in terms of the cyber domain,

20   when we go and start analyzing that, when

21   you're looking at people, places, things,

22   organizations, that type of information, it's



A6382

Appx16382

Protected Information
and/or Legends Redacted

1  similar to the DIVA kind of looking field.

2          Let me, if I can, just for a moment,

3  sort of balance where -- how we came up with

4  this as a view.

5          In the DCGS-Army Increment 2, we

6  have 27 of these cylinders.  So when we go to

7  Increment 1, we know it's not going to be one,

8  because there are different types of data, and

9  they do have to be processed and managed in

10 slightly different or different ways.  So

11 that's why you see.

12         But this is a significance

13 consolidation for where DCGS Increment 1 is

14 today.  And so -- and again, this is notional.

15 This is not the -- the end state for DCGS

16 Increment 2 will be whatever winning contract

17 decides is the best approach.  That, you know,

18 is the -- becomes the winning offer.

19         HEARING OFFICIAL:  So you could have

20 more and/or different cylinders.

21         THE WITNESS:  Correct.  Yes.

22         Now, and getting back to your



A6385
Appx16385
Protected Information
and/or Legends Redacted

1  collecting data not only from the national

2  sensors or the air force, in this case, the

3  military, but we also have local weather

4  sensors that he's -- what he's able to do then

5  is actually come up with a more accurate

6  prediction.

7          So there's specific tools there and

8  capabilities that are unique to things like

9  wind patterns at certain altitudes based on --

10  you know, for prediction.

11          So for ballistic purposes and stuff

12  like that, when we're firing mortars and

13  rockets and things like that, we have to know

14  exactly what the wind condition are and

15  temperatures and humidity and things like that.

16  That all impacts the projectile's path.

17          So there's capabilities associated

18  with army weather in this particular case

19  that's very specific that you just cannot buy

20  commercially.

21      Q.    Okay.  And -- but because -- okay.

22          So because it's in this box, is



Protected Information
and/or Legends Redacted

1    software services, there will be, you know,

2    mechanisms for how you retrieve and -- and

3    interact with the data and the databases.

4            So I mentioned earlier about what

5    they called ICDs, interface control documents.

6    And then there's also application program

7    interfaces that describe how information is

8    shared between the databases and the tools on

9    the top of the visualization framework.

10       Q.    Okay.  What about the box in the

11   visualization framework block labeled

12   "Counterintelligence and Human Domain"?

13           I think you used that term before,

14   maybe when we were talking about the data

15   integration layer.

16       A.    Right.

17       Q.    So it appears also here in the

18   visualization framework.

19       A.    So there are, again, a set of tools

20   that the counterintelligence and human

21   intelligence personnel need to use primarily to

22   process the data that comes in from those



Protected Information
and/or Legends Redacted

1   collection teams.

2            And also, from the national

3   perspective, they have to have direct interface

4   with the DIA, Defense Intelligence Agency, and

5   their Chrome program.

6            So that's the -- and there's

7   actually -- under CI and human area, there's

8   approximately 30 different programs that we

9   have to interoperate and interface with.

10           So it's a fairly complicated thing.

11  And again, those tools and capabilities

12  necessary to process that information is not

13  something that is commercially available.

14       Q.    Who determined that?

15       A.    So we have the army G2.  That's the

16  intelligence leg of the army.  We have -- they

17  are the SMEs for intelligence, and they help

18  us.

19       Q.    Sorry, Mr. Morton.  SME?

20       A.    Oh, subject matter expert.  I

21  apologize.

22       Q.    No.  Just for the court reporter?


ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A6391
Appx16391

Protected Information
and/or Legends Redacted

1    show us the basis for that or how those

2    decisions got made?

3              MS. TALLEY:  Objection.  Relevance.

4    The protest issues have to do with procurement

5    as the army has proceeded and the acquisition

6    strategy.  And now we're into who prepared

7    charts that were -- had nothing to do with

8    these documents.

9              MR. FLETCHER:  It's specifically

10   relevant to the issue of commercial item

11   availability for these various capabilities,

12   which is the essence of what this protest is

13   about.

14             HEARING OFFICIAL:  I'm going to go

15   ahead and allow your question.

16             THE WITNESS:  I'm sorry.  You'll

17   have to restate.

18             BY MR. FLETCHER:

19   Q.    It had to do with the documentation.

20             So you were talking about who -- or

21   you were talking about how the determinations

22   were made of which of these boxes and blocks


A6393

Appx16393

Protected Information
and/or Legends Redacted

1   were to be shaded dark blue and otherwise.

2           And my question was where would I

3   look in the Agency report or the documentation

4   of what we're talking about here today to know

5   about the basis for those decisions?

6       A.    I would say the market research

7   report that we conducted would probably be the

8   primary document.

9       Q.    And when you say the market research

10  report, that is not the DIVA market study; that

11  is something different.

12      A.    Correct.  The one that the PM

13  conducted.

14      Q.    And that's the July 2015 market

15  research report?

16      A.    Yes.

17      Q.    Okay.  And I believe that

18  document --

19          MS. TALLEY:  AG, I believe.

20          MR. FLETCHER:  Right.  Thanks very

21  much.  Tab AG.  That's right.

22          BY MR. FLETCHER:



800.211.DEPO (3376)
EsquireSolutions.com

Appx16394

A6394
Protected Information
and/or Legends Redacted

1    are computer aided or computer assisted.  Some

2    are fully automated.  Some are very manual in

3    process.  So yes, that's correct.

4        Q.    So help me understand, if you will,

5    what it is about, say, for example, the weather

6    data.  We talked about that before.

7            But what is it that's special about

8    the weather data that can't be visually

9    represented with the help of commercial

10   software?

11       A.    So the visual representation, it'd

12   probably be a map.  So that piece of it is --

13   there is commercial software for mapping.  We

14   talked about the geospatial.

15           As far as -- but there's the tools

16   that are associated.  I mentioned before that

17   this senior weather -- staff weather officer is

18   responsible for doing the forensics.

19           So they have to -- there's a number

20   of actual applications, if you will, that

21   assist in terms of providing the forensics of

22   the weather and then the prediction of the



A6405
Protected Information
and/or Legends Redacted

Appx16405

1   weather and weather warnings and things like

2   that.

3          So there is a set of requirements

4   and then -- and associated with that, tools or

5   applications that support that function.

6       Q.    And can you tell me what the box

7   that is labeled "Targeting" means?

8       A.    Sure.  That is the -- as I talked

9   before, there is a -- when you have a -- now,

10  "target" can mean several things.  For one, it

11  could be a physical location, you know, a grid

12  coordinate on a map.  It could be a person.

13         So we have something we refer to as

14  XOI, blank -- something of -- sorry.  XOI.

15  I've forgotten the acronym.  But the X can be,

16  you know, a named area of operation or

17  there's -- but "target" can mean different

18  things.

19         So it could -- again, in the case --

20  for a CI units person, it could be a person

21  that they're tracking or focused on.  And then

22  in some cases it's the physical map location or



800.211.DEPO (3376)
EsquireSolutions.com

A6406
Appx16406

Protected Information
and/or Legends Redacted

1   geocoordinate on a map, you know, where you're

2   going to send some ordnance of some type, a

3   rocket and mortar, missile or something like

4   that.

5          So the targeting function is there

6   is, you know, a person or responsibility to

7   send off -- you know, based on information

8   that's collected, that they, you know, alert

9   someone that there is a -- you know,

10  information has been collected that says this

11  is the spot we need to, you know, focus some

12  attention to, whether it is a physical -- you

13  know, sending troops to that spot or some type

14  of ordnance or something like that.  That's

15  what is referred to as targeting.

16     Q.    Okay.  And so, as it's depicted in

17  this box, it's the visual representation to the

18  end user of the system of the intended target

19  based on the data that indicates that that

20  person or thing is a target?

21     A.    So the tools that this individual

22  would use to describe -- now we go back to the


A6407
Protected Information
and/or Legends Redacted

1    visual representation you talked about -- you

2    said earlier about a map.  But that is a -- you

3    know, everyone has a map.  That is not

4    necessarily a unique capability.

5            So -- but yes.  But there are

6    certain specific aspect of the targeting

7    function that would be a unique visualization

8    representation not on a map that, but obviously

9    the target would use a map as well.

10       Q.    Okay.  And what about work flow

11   management; what is represented by that term in

12   that box?

13       A.    So earlier today we went through

14   what I referred to as a thread or a work flow.

15   So when an analyst has a job to do, normally

16   information comes in through higher

17   headquarters or from the commander that says,

18   "Hey, I have a requirement to find out

19   information about something."  That's referred

20   to as a PIR or a priority intelligence request.

21           So when that comes in, then the

22   analyst has to first figure out what tools he



800.211.DEPO (3376)
EsquireSolutions.com

A6408
Appx16408

Protected Information
and/or Legends Redacted

1   needs to, you know, use in order to help answer

2   that question.

3           Work flow manager is actually

4   basically a step-by-step guideline that assists

5   the operator in achieving that end.

6           So it will help them in knowing

7   that, after I complete this step, then I need

8   to go do this and complete this step.  So

9   that's the work flow management tool is.  It's

10  a -- basically step-by-step guide for the

11  operator.

12          So it's really -- and how it's

13  represented, it's in words, but someone has to

14  actually go through and actually create this

15  template, if you will.  And then, because

16  operations are always changing, we have to be

17  able to modify that template and things like

18  that.

19      Q.    And those things that you're

20  describing are visually depicted; that's why

21  it's in the visualization framework?

22      A.    Right.



Protected Information
and/or Legends Redacted

1    Q.    And what they're depicting is data

2  that lives somewhere down in the data

3  integration layer.

4    A.    So in the case of the work flow

5  management tool, chances are that that's

6  actually -- resides in the visualization

7  framework area.

8        There is not necessarily data that

9  it's pulling from.  It's actually, again, a

10  template or a collection of steps that the

11  operator would have to follow in order to

12  complete their mission.

13    Q.    Do you know which of these boxes in

14  the visualization framework block need to draw

15  from the data integration layer and which ones

16  don't?

17    A.    So the only one that does not need

18  to necessarily pull from the data in the data

19  access layer would be the work flow management.

20    Q.    What about cyber operations?

21    A.    I think I've described this in terms

22  of the --



A6410
Appx16410

Protected Information
and/or Legends Redacted

1    Q.   I was remembering you describing the

2  cylinder cyber rather than the visualization.

3    A.    So cyber operations actually has --

4  there's a couple areas there.  I talked about

5  defensive cyber operations.  That's protecting

6  the equipment and protecting your network in

7  the environment that we have.

8          Then there's the offensive cyber

9  operations, in which case we're looking at what

10  we could do to the bad -- you know, the guy who

11  is, you know, attacking our system from the

12  cyber domain, things like that.

13          So this would be a tool to visualize

14  that environment and as well as, you know,

15  process and analyze the data that's associated

16  with that.

17    Q.    All right.  Sorry, Mr. Morton.  Give

18  me just a second.

19          So would every capability depicted

20  anywhere in this box have to be acquired at the

21  same time?

22    A.    At the same time as the --



A6411
Appx16411          Protected Information
                   and/or Legends Redacted

1    orders you see there -- this chart actually has

2    been updated.  There's more than two task

3    orders right now in the current version of this

4    particular slide.

5              But regardless of that, the first

6    task order was the task order to develop the

7    data integration layer as well as what we see

8    here as select applications.  In this

9    particular case, the CI and human domain in

10   that task order is specifically called out in

11   Paragraph 2.2.27.

12             And then in Task Order 2, software

13   port, that's the task order where we will be

14   requesting the vendor to incorporate the

15   capabilities that are -- besides the CI and

16   human that are a part of the visualization

17   framework.

18             And then the holistic combination of

19   task order 1, 2 -- and then I mentioned there

20   are other task orders now that are under this

21   particular strategy slide -- will constitute

22   that Release 1, at which point there might be



A6414
Protected Information
and/or Legends Redacted

Appx16414

1   would you expect the Palantir software product

2   to do?  What functions would it perform if you

3   were to acquire it?

4        A.    We're back to Chart 16.  I know

5   there's some aspects of the data integration

6   platform.  Some of the data analytics, I know

7   that there's a capability within Palantir to

8   auto extract information from unstructured

9   textual messages.

10             And the, as far as the

11   visualization, in the upper right in the

12   information collection area there, I mentioned

13   that the link analysis capability is a

14   capability that Palantir satisfies.

15             And then there's a mechanism for how

16   they distribute that information, which would

17   be part of the interoperability band on the far

18   right.

19        Q.    And as far as the cost goes, do you

20   recall having looked at Palantir's RFI response

21   related to potential pricing of a COTS

22   solution?



800.211.DEPO (3376)
EsquireSolutions.com

A6416
Appx16416

Protected Information
and/or Legends Redacted

1    study.

2           Is that a regulatory requirement?

3      A.    No.  The DIVA study was conducted at

4    the discretion of the army acquisition

5    executive, not mandated or required as a

6    regulatory requirement.

7      Q.    Was there any mandate for you to

8    follow the DIVA suggestions?

9      A.    No.  And as I, I think, mentioned

10   earlier, that the report itself took a while to

11   actually find its way to the PM shelf.  And Ms.

12   Shyu, as far as I know, never actually signed

13   or blessed the report.

14     Q.    In talking about Slide 16, now, Ms.

15   Willems identified that as sort of a visual aid

16   to help explain this process.

17           Were these slides made to inform the

18   procurement process?

19     A.    Yes.  As going through the -- in

20   order to get the acquisition strategy approved

21   by OSD, Office of Secretary of Defense, this

22   was part of the documentation or artifacts that



Protected Information
and/or Legends Redacted

1    regarding the procurement strategy for this

2    requirement?

3         A.    Yes, I did.  I reviewed the

4    acquisition strategy for Increment 2 because I

5    knew -- and having been involved in different

6    procurements associated with not only the DCGS

7    Increment 1 but also in some cases with the

8    Palantir product that we provided through the

9    army research lab to certain COCOMS and war

10   fighter organizations, I knew that there was a

11   potential for some discussion as to what was

12   the appropriate acquisition strategy, whether

13   it would be a government at FAR Part 15

14   acquisition strategy or whether it could

15   possibly be done under FAR Part 12.

16        Q.    The acquisition strategy that you

17   reviewed, did it recommend a Part 12 buy for

18   this?

19        A.    No.  It recommended a FAR Part 15

20   because there were substantial portions of

21   integration and interoperability considerations

22   that were deemed to be a very



1   government-specific requirement for what was

2   going to be a product that was a government

3   intelligence sensor analysis data infusion and

4   reporting -- reporting system.

5        Q.    Okay.  If the acquisition strategy

6   had been to server out things that are

7   available as commercial items, COTS products or

8   products that could be subject to minor

9   modification, how would you have viewed that

10  strategy?

11       A.    I would have viewed that as a risky

12  strategy with respect to performance.  While

13  there are commercially available products in

14  some components of software, the -- what this

15  requirement really is is to integrate all of

16  that together.

17           And if the government were to buy

18  the commercial components and then issue them

19  as government-furnished equipment or

20  information, then the government would be

21  infusing itself into the role of the systems

22  integrator.



A6437
Protected Information
and/or Legends Redacted

Appx16437

1       And that would be a role in which a

2  preponderance of the risk would fall on the

3  government, both for the performance of the

4  subcomponents as well as the interoperability

5  for how they would be fit together and

6  integrated together.

7       And I would have viewed that as

8  being a substantially greater risk and a risk

9  on the part of the government, both from a

10  complexity point of view and from a -- just the

11  performance of the systems and the ability of

12  the system integrator to take all of those

13  different pieces which were issued to it by the

14  government, not by their own analysis and

15  assess.  And it would have been a more

16  difficult strategy to implement.

17       Q.    What experience have you had in your

18  career in commercial item acquisitions say in

19  the software arena?

20       A.    So one of the positions I had prior

21  to being at the mission and installation

22  contracting center was at an organization



A6438
Protected Information
and/or Legends Redacted

Appx16438

1  called the information technology -- it was

2  ITEC4.  See if I can remember what the four Cs

3  stood for.  Commercial contracting --

4  commercial computer contracting.

5           But it was, in essence, an

6  organization that bought IT services for the

7  army, for the pentagon, internal to the

8  pentagon, and bought largely commercial IT

9  systems for the program executive officer

10 information -- EIS, enterprise information

11 systems.

12     Q.    Was a commercial item contract used

13 for that?

14     A.    Frequently it was.  Frequently we

15 used FAR Park 12.

16     Q.    And did your experience with that

17 inform your opinion?

18     A.    It did in the sense that we would

19 buy components and procure them for the army

20 and use those at the component level.

21     Q.    What is your understanding of the

22 COTS items that will be used in Increment 2 of



A6439
Protected Information
and/or Legends Redacted

1  DCGS-A?

2      A.     So I don't have a detailed

3  understanding of the components that will be

4  worked together for this procurement, in part

5  because the government has issued the

6  solicitation in a way that the prime

7  contractors who respond to it will, in fact,

8  respond with a collection of capabilities, some

9  of it commercial; some of it government; or

10  some of it contractor developed, which will

11  then become government.

12          But I do understand that there

13  certainly will be an underlying capability that

14  is commercially available at the subcontract

15  level.

16          And just as we do oftentimes in the

17  components that we buy, whether they are

18  routers or servers, those are also commercial.

19      Q.     I'd like to go to the second item

20  that Ms. Willems sent out for discussion at

21  this hearing.  I believe you're familiar with

22  that.



A6440
Protected Information
and/or Legends Redacted

1     A.    Yes.

2     Q.    She asked:  "The agency should

3  explain the extent to which it was required to

4  define its requirements in such a way that

5  commercial items could be procured to fulfill

6  the requirements and/or to consider the

7  availability of commercial solutions."

8          So could you do that?  Could you

9  explain the extent to which the army was

10 required to do that?

11    A.    Okay.  So in the initial stage of

12 that assessment, we are asked to look and see

13 if there are -- given our requirement, if there

14 are commercially available systems or solutions

15 that can meet that requirement.  That analysis

16 was done really over a period of months on the

17 part of the program office.

18         They -- Ms. Shu, who was the then

19 army acquisition executive, instituted a study

20 to just -- to look specifically at that and

21 also then to inform what may be the acquisition

22 approach that was taken.  I think that was



Protected Information
and/or Legends Redacted

1   called the DIVA study. And I do not know what

2   that stands for. It's an acronym.

3           Then program office did a series of

4   market researches and also industry engagements

5   with different -- open to all industry that

6   were interested in participating. And they did

7   about 84 one-on-one sessions with various

8   contractors.

9           So that -- the results of that were

10  that there was no one available system that

11  could meet the needs articulated by the army in

12  -- for all of the requirements.

13          Then the next step would be, okay,

14  what do you do then to take your requirement,

15  and how do you modify it as appropriate or when

16  appropriate or as practical so that there might

17  be a commercial solution that would meet a

18  certain percentage of that.

19          And it's not expressed in the

20  regulations anywhere as a percentage. It just

21  says do this when appropriate.

22          So the analysis that looked at had



Protected Information
and/or Legends Redacted

1    varying components that might be or were

2    available commercially.  But at the overarching

3    level, the integration piece of this, taking

4    the different parts that would exist in the

5    DCGS Increment 2 or may exist as other new

6    components were developed or became available

7    throughout the lifecycle of the contract, that

8    was pretty much determined to be the capability

9    that we could not modify in order to allow the

10   use of commercial components as a prime

11   contractor.

12          What could have happened would have

13   been a substantial change to the acquisition

14   strategy that would have put the government not

15   as the lead or would have put the government as

16   the lead system integrator.  And that would

17   have been a very substantial change to the

18   acquisition strategy.

19          So the requirement then to modify

20   the FAR dictate -- and it's really under the

21   market research part of the FAR.  It says, once

22   you do this market research, then -- and you



Protected Information
and/or Legends Redacted

1    determine that there is no commercial available

2    system, can you modify your -- the requirements

3    to do that.

4           It was determined that modifying the

5    requirement would substantially change the

6    acquisition strategy; and therefore, it was not

7    done.

8        Q.    You have been asked in this question

9    from Ms. Willems to identify the sources of the

10   requirements for using commercial items -- or

11   for buying commercial items.

12       A.    Well, there's the FAR requirement.

13   I think is it FAR Park 2 that says here is how

14   to -- here are the things to consider in using

15   the FAR.

16          And then there's also underlying

17   statute, U.S. code, that tells us to do it,

18   tells us to do market research, and tells us

19   preferentially to use commercial acquisition to

20   meet our requirements.

21       Q.    Do you know if this particular

22   program is an information technology system?


ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com

Appx16444

A6444
Protected Information
and/or Legends Redacted

1    A.    It is a program that is managed

2  under the DOD 5000 series as a weapons system.

3  So it's not technically a weapons system that

4  fires.  But just like a cargo helicopter is

5  managed under that same program, major

6  communications and sensor systems are managed

7  under that too.

8         It's an ACAT 1D program, which is

9  acquisition category 1, D meaning that it has

10  Department of Defense oversight.

11        So that people who review the

12  acquisition strategy, in addition to myself as

13  the peer review, are the army acquisition

14  executive at the time, Ms. Heidi Shyu, and the

15  defense acquisition executive, Mr. Frank

16  Kendall.

17    Q.    So you said that there's a

18  preference for commercial items that you're

19  required to make.

20        What about for subcontractors?

21    A.    So there is a DFARS clause that --

22  one of the things we're required to do, if we



A6445
Protected Information
and/or Legends Redacted

Appx16445

1  are unable to have the prime contract be a

2  commercial item, there is a DFARS clause that

3  requires us to require prime contractors for

4  any acquisition above the simplified

5  acquisition threshold to first seek and

6  determine if they can use commercial

7  components.

8      Q.    Now, are you familiar at all with

9  this protest?

10     A.    Yes, I am.

11     Q.    The Protestor has indicated that the

12 solicitation showed a preference to exclude or

13 minimize the use of commercial or proprietary

14 software.

15          Are you familiar with that?

16     A.    Yes, I am.

17     Q.    Can you address that with regard to

18 the requirement for the preference of

19 commercial items?

20     A.    Sure.  There are a number of

21 consequences of going with pure commercial

22 product.  Most of those affect the



Protected Information
and/or Legends Redacted

1   post-production lifecycle support of that piece

2   of equipment.

3         And so the -- I believe it's in the

4   statement of work that those statements exist

5   in a couple of different places.

6         And the primary intent of that is to

7   ensure that the prime contractor puts together

8   a collection of capabilities and then

9   integrates them in a way that is sustainable

10  for the army in the post-production

11  environment.

12        And so, while it says that there is

13  a preference for the prime contractor to not

14  use proprietary information, it also says that

15  it can do so if -- by identifying that to the

16  government and getting government approval to

17  do that.

18    Q.    So from your perspective, is the

19  army seeking to not use commercial items in

20  this procurement?

21    A.    No, I don't think so.  I think, when

22  we look at the communications equipment that we



Protected Information
and/or Legends Redacted

1   have, first of all at the equipment level, it's

2   also completely based, at the component level,

3   on commercially available power supplies,

4   transistors, circuit cards, that type of thing.

5          What the designer will typically do

6   then, because those are what are available,

7   will design a product that is a military-unique

8   product that does things for the military for a

9   military application, but it's based upon

10  commercial components.

11         The software components or pieces of

12  a lot of our systems are similarly based upon

13  commercial software.  And so what the army is

14  trying to do is to have a level of data that is

15  government-owned data so that, when we

16  eventually end up supporting this piece of

17  equipment in the post-production environment,

18  we've got some ability to maintain currency

19  with that equipment.

20         MS. TALLEY:  I don't have anything

21  more from Mr. Young at this time.

22         HEARING OFFICIAL:  Okay.  It's 10 to



A6448
Appx16448
Protected Information
and/or Legends Redacted

1    2:00.  Why don't we go ahead and let you start.

2              MR. FLETCHER:  Actually, could we

3    take a short break just to huddle up before we

4    start?

5              HEARING OFFICIAL:  Let's take

6    another short break.  That's fine.

7              MR. FLETCHER:  Right.  Short.

8              HEARING OFFICIAL:  Let's take a

9    five-minute break.

10             We were going to discuss whether or

11   not we thought we need to continue to tomorrow.

12   I would like to wrap it up today if possible.

13   Then we won't have to worry about getting a new

14   court reporter.

15             Okay.  So it looks like everyone is

16   nodding their head in agreement that we can

17   wrap up today.  That would be our preference.

18             Okay.  Let's go off the record for

19   five minutes.  Thank you very much.

20             (A short recess was taken.)

21             HEARING OFFICIAL:  Let's go back on

22   the record.



800.211.DEPO (3376)
EsquireSolutions.com

Appx16449

A6449
Protected Information
and/or Legends Redacted

```
 1              And can I ask you to please state

 2     your full name again.

 3              We are reassuming after a break, and

 4     we have a witness on the stand.

 5              THE WITNESS:  Bryon John Young.

 6              HEARING OFFICIAL:  Thank you.

 7              MR. FLETCHER:  Thanks, Ms. Willems.

 8              I'm actually going to have my

 9     colleague, Ms. Estevez, ask a few questions.

10                   CROSS-EXAMINATION

11              BY MS. ESTEVEZ:

12       Q.    Hi, Mr. Young.  My name is Erin

13     Estevez.  Thank you for being here today.

14              HEARING OFFICIAL:  Let me make sure

15     the microphone is close enough to you, just to

16     be sure for the court reporter.

17              MS. TALLEY:  If I can ask one

18     question.

19              Are you planning to have just one

20     attorney question Mr. Young?

21              MR. FLETCHER:  Yes.

22              MS. TALLEY:  Okay.  That's fine.
```



800.211.DEPO (3376)
EsquireSolutions.com

A6450
Appx16450

Protected Information
and/or Legends Redacted

1          BY MS. ESTEVEZ:

2      Q.    Mr. Young, you described your

3   involvement in this acquisition as having

4   reviewed the acquisition strategy and the

5   details of the solicitation prior to its

6   release; is that accurate?

7      A.    Yes.  That's accurate.

8      Q.    So did you have any involvement in

9   defining the requirements for the solicitation

10  in the first place?

11     A.    No, I did not.

12     Q.    So you briefly described sort of two

13  steps or I guess maybe two portions of meeting

14  the regulatory and statutory requirements that

15  Ms. Talley described to review the availability

16  of commercial items and consider modifying

17  requirements as a result of that; is that

18  correct?

19     A.    Yes, that's correct.

20     Q.    So beginning with the first step,

21  first it was they were asked to see if any --

22  if, given the requirements, there were any



A6451
Protected Information
and/or Legends Redacted

Appx16451

1  commercial items available that could meet

2  those requirements.

3         And you said that that was -- that

4  analysis was done by the program office?

5     A.    Fundamentally, it was.  I mean they

6  incorporated inputs from other sources, but the

7  responsibility for doing the market research

8  that determines whether or not there is a

9  commercially available item that can meet that

10  requirement is a requiring activity

11  responsibility; and therefore, in this case,

12  the program office is responsible.

13     Q.    So did you personally have any

14  involvement in conducting that market research?

15     A.    No, I did not.

16     Q.    And you said that the result of the

17  market research was a conclusion that no one

18  available system could meet the needs for all

19  requirements for the DCGS-A Increment 2; is

20  that correct?

21     A.    Yes, that's correct.

22     Q.    And was that a conclusion that was



800.211.DEPO (3376)
EsquireSolutions.com

Appx16452

A6452
Protected Information
and/or Legends Redacted

1   drawn by the program office?

2       A.    That was a -- that was a conclusion

3   -- I would have to think that through for a

4   second because I believe it's the contracting

5   officer who would make a determination of

6   commerciality if it were determined that it was

7   a commercial item.

8           So the reverse of that doesn't

9   result in a specific determination that it's

10  not commercial, but the analysis is based

11  fundamentally upon the market research.

12      Q.    Okay.  So were you personally

13  involved in making that decision that no one

14  system was available to meet the needs or all

15  requirements?

16      A.    No, I was not.

17      Q.    So the second stage of the analysis

18  was how, if at all, modifications could be made

19  to the requirement such that a commercial

20  solution could be acquired for all or part of

21  the requirements, correct?

22      A.    Yes.  That would be correct.



800.211.DEPO (3376)
EsquireSolutions.com

Appx16453

A6453
Protected Information
and/or Legends Redacted

1     Q.    Okay.  And so, again, you described

2   analysis of the varying components, the

3   availability of commercial items for those

4   components.

5         Were you involved personally in

6   conducting that analysis?

7     A.    No, I was not.

8     Q.    And you said that the ultimate

9   determination was the capability couldn't be

10   modified so as to use a commercial offer, in

11   part because of the significant changes of the

12   strategy that it would require?

13     A.    That would be correct.  In order to

14   change the requirement, it would have been such

15   a substantial change that it would have altered

16   the acquisition strategy, which had the service

17   provider performing the role of the integration

18   of the different elements and responsible for

19   choosing those elements.  And that would have

20   been a very significant change to the strategy.

21         HEARING OFFICIAL:  And I was going

22   to ask could you explain again -- and I know



Protected Information
and/or Legends Redacted

1   you got into this earlier -- but what would

2   make that so significant.

3              THE WITNESS:  Well, it would start

4   with the -- so let me back up a minute.  So the

5   role of the system integrator would be an

6   entity that was responsible for selecting the

7   components that would be assembled as part of

8   the solution, writing the software that would

9   integrate those pieces so that they were

10  interoperable.

11             And that changes and focuses the

12  risk of that solution onto the entity providing

13  that or the contractor that would provide it

14  versus the government.

15             And what it really enables that

16  entity to do and, in fact, requires them to do

17  is to be responsible for ensuring that all of

18  the components that are selected do, in fact,

19  interoperate and to ensure that the code

20  associated with that was made available to the

21  government, because it would have been

22  developed at the government expense, therefore


A6455
Appx16455                               Protected Information
                                        and/or Legends Redacted

1    ensuring that we had the capability of

2    supporting it in the post-production

3    environment.

4          So in order to substantially change

5    that where the government would buy some of the

6    components and then provide them to an

7    integration element changes the fundamental

8    relationship.  It puts the government in the

9    middle of selecting certain components and

10   certain pieces, thereby implicitly warranting

11   not only that they will work but they are able

12   to be integrated by the integrator, who would

13   be separate and different.

14         That's a more complex arrangement,

15   often entails more risk, and the risk being on

16   the part of the government.  And it was not the

17   strategy that had been approved by both Ms.

18   Shyu and Mr. Kendall.

19         BY MS. ESTEVEZ:

20   Q.    Mr. Young, you said that the second

21   stage, determining if the requirement could be

22   modified such that commercial items could be



Protected Information
and/or Legends Redacted

1    acquired, were you involved personally in

2    making that determination, whether those

3    modifications could be made?

4        A.    No.

5            MS. ESTEVEZ:  We have no further

6    questions for this witness.

7            HEARING OFFICIAL:  Okay.

8    Ms. Talley, do you have any redirect?

9            MS. TALLEY:  Just one.

10           HEARING OFFICIAL:  Okay.

11               REDIRECT EXAMINATION

12           BY MS. TALLEY:

13       Q.    So even though you did not design

14   the acquisition strategy, what was your role in

15   it, if any?

16           And if it had been to break out

17   these parts, what would you have done?

18       A.    So in a program that's managed under

19   the 5000 series, the approver of the

20   acquisition strategy is the milestone decision

21   authority.  And there are different milestones

22   in the acquisition process.  That milestone



A6457

Protected Information
and/or Legends Redacted

1   decision authority was Mr. Frank Kendall, the

2   defense acquisition executive.

3        So when the program folks and my

4   contracting folks come together and come up

5   with a strategy, they then bring it through me

6   to Ms. Shyu and to Mr. Kendall.

7        So I'm kind of the -- for that type

8   of program, an ACAT 1D program, I'm really the

9   first person as an SES that puts eyes on it and

10   says, "This makes sense.  We're complying both

11   regulatory, and it makes business sense for

12   what we're going to do."

13        So presumptively, if I were to not

14   agree with that strategy, I would remand it

15   back to the requiring activity on the

16   contracting team to come up with an

17   alternative.

18        But I typically wouldn't do that by

19   just saying, "Hey, this is a no-go.  Go back

20   and try it again."  I give them things to

21   consider, you know, different aspects to

22   consider and how they would approach it.



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Appx16458

A6458
Protected Information
and/or Legends Redacted

1    And they could come back to me with

2    the same strategy just showing how they had

3    demonstrated an opportunity to address those

4    issues.

5    But in my case, it would have purely

6    been an advisory on this particular acquisition

7    because the approving authority for that

8    acquisition strategy was Mr. Frank Kendall.

9    MS. TALLEY:  That's all I have.

10    HEARING OFFICIAL:  Anything else

11    from Protestor?

12    MS. ESTEVEZ:  Nothing further.

13    HEARING OFFICIAL:  Thank you very

14    much for your testimony.  You may step down.

15    I want to thank everyone for coming

16    today.  It's been very useful for me.  And I

17    think I certainly have a much better

18    understanding certainly of the chart.

19    If anyone has any questions, we can

20    address those now.

21    Post-hearing comments, if we could

22    have those filed on Monday, May 2nd, it would



Protected Information
and/or Legends Redacted



**United States Government Accountability Office
Washington, DC 20548**

**DOCUMENT FOR PUBLIC RELEASE**

The decision issued on the date below was subject to
a GAO Protective Order. This version has been
approved for public release.

# Decision

**Matter of:**   Palantir USG, Inc.

**File:**   B-412746

**Date:**   May 18, 2016

David E. Fletcher, Esq., Christopher J. Kimball, Esq., Erin M. Estevez, Esq., and
Thomas O. Mason, Esq., Cooley LLP, for the protester.
Debra J. Talley, Esq., and David White, Esq., Department of the Army, for the
agency.
K. Nicole Willems, Esq., and Jennifer D. Westfall-McGrail, Esq., Office of the
General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

Protest that agency failed to implement the statutory and regulatory preference for
the acquisition of commercial items, resulting in a solicitation that unduly restricts
competition by offerors of commercial items that could partially meet the
requirements of the solicitation, is denied where the agency conducted adequate
market research into the use of commercial items and had a reasonable basis for its
acquisition approach.

## DECISION

Palantir USG, Inc., located in Palo Alto California, challenges the terms of request
for proposals (RFP) No. W56KGY-16-R-0001, issued by the Department of the
Army, Army Contracting Command, Aberdeen Proving Ground, for engineering,
manufacturing, and development services in support of the Army's Distributed
Common Ground System-Army Increment 2 (DCGS-A2) requirement. Palantir
argues that the agency failed to implement the statutory and regulatory preference
for the acquisition of commercial items, resulting in a solicitation that unduly restricts
competition.

We deny the protest.

BACKGROUND

On December 23, 2015, the agency issued the RFP, in accordance with Federal
Acquisition Regulation (FAR) part 15 procedures. RFP at 1-2. The RFP

**A6560**

Protected Information
and/or Legends Redacted

contemplates the award of a single indefinite-delivery, indefinite-quantity (IDIQ) contract, with the simultaneous issuance of a cost-reimbursement type task order. RFP at 2. The solicitation seeks a single contractor to be the system data architect, developer, and integrator of DCGS-A2, which is the second increment of the DCGS-A. DCGS-A is the Army's primary system for the processing and dissemination of multi-sensor intelligence and weather information to the warfighter.[1] Agency Report (AR), Tab V, Performance Work Statement (PWS), at 10-11.

DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program with the ability to access and be accessed by, not only Army intelligence and command components, but also the other members of the broader distributed common ground/surface system.[2] It is composed of many software products--commercial, government, and open source--as well as software integration that allows all the different products and components to communicate and operate seamlessly. Agency's Post-Hearing Comments at 3.

DCGS-A Increment 1 (DCGS-A1) is currently deployed worldwide in support of intelligence operations in all theaters of operations. AR, Tab V, PWS, at 11. With regard to DCGS-A2, the PWS explains that the successful offeror will be responsible for, among other things, the development of new data architecture; standards based enhanced visualization and analytical tools; cloud computing and big data analytic capabilities; cyber analytics and data integration; visualization capabilities; cyber operations; interoperability counter intelligence/human intelligence; signals intelligence; weather; geospatial intelligence; and sensor

---

[1] According to the PWS, DCGS-A contributes to visualization and situational awareness, which enhances tactical maneuver, maximizes combat power, and enhances the warfighter's ability to operate in an unpredictable and changing environment throughout the operational spectrum. AR, Tab V, PWS at 11. The PWS further explains that DCGS-A facilitates the rapid planning, execution, and synchronization of all war fighting functions, resulting in the current and future force's ability to operate within the enemy's decision cycle. Id.

[2] DCGS-A is part of a larger distributed common ground/surface system, which also includes systems fielded by the Air Force, Navy, Marine Corps, Special Operations Command, the Intelligence Community, and the National Geospatial-Intelligence Agency. AR, Tab CG, DCGS Concept of Operations 2016-2019, at 7. Because the DCGS-A system works in conjunction with these other systems, the PWS requires that the DCGS-A system conform to and leverage the Army common operating environment, DCGS integration backbone, joint information environment, intelligence community information technology enterprise, and defense intelligence information enterprise standards to enhance interoperability of information through the use of common enterprise standards and services. AR, Tab V, PWS, at 12.

A6561

Protected Information and/or Legends Redacted

management.  Id. at 18.  These efforts include software development, capability enhancements, integration, limited fielding and training support, maintenance, and support for logistics development.  The period of performance is six years from contract award.  Id.

Award is to be made on a best-value basis, considering the following factors: (1) technical; (2) cost/price; (3) past performance; and (4) small business participation plan.  RFP at 129.  The technical factor is divided into the following five subfactors:  (1) data architecture; (2) fusion data analytics; (3) interoperability; (4) visualization framework/usability; and (5) data rights.  Id.  Prior to consideration of the evaluation factors listed above, offerors will be required to provide a software capability demonstration, which will be evaluated on an acceptable/unacceptable basis.  Id.  Offerors who receive an unacceptable rating for their demonstration will not be considered further for award.  Id.  The closing date for the submission of quotations was February 16, and this protest was filed on that date, prior to closing.

DISCUSSION

Palantir argues that the agency failed to conduct market research in accordance with the statutory and regulatory preference for the use of commercial items. According to the protester, this resulted in an unduly restrictive solicitation that prevents offerors of commercial products, such as Palantir, from competing for a prime contract.  While the protester does not argue that it could provide a commercial solution that would meet all of the agency's needs, the protester argues that the agency should have used a phased approach for this procurement, whereby the agency would acquire a commercial data integration, visualization, and analytics platform from an offeror like Palantir, followed by separate procurements for integration and development services needed to obtain, integrate, and/or enhance individual capabilities in the DCGS-A2 system.  Based on our review of the record, as well as information gathered during a hearing convened by our Office on April 26, 2016, we find the protester's argument to be without merit.[3]

The Federal Acquisition Streamlining Act of 1994 established, among other things, a preference and specific requirements for the acquisition of commercial items that are sufficient to meet the needs of an agency.[4]  Federal Acquisition Streamlining

---

[3] The protester also argues that the agency's use of a cost-reimbursement type contract is unjustified, and that the solicitation will result in the award of an unlawful IDIQ contract.  While we do not address these arguments in our decision, focusing instead on the protester's principal arguments, we have considered all the arguments proffered by the protester and find that they do not form a basis for sustaining the protest.

[4] The definition of "commercial item" can be found in section 2.101 of the FAR.

A6562

Appx16562

Protected Information and/or Legends Redacted

Act of 1994 (FASA), Pub. L. No. 103-355 § 8104, 108 Stat. 3243 (codified, as amended, at 10 U.S.C. § 2377). This section of FASA is implemented in FAR part 12, and allows agencies to use solicitation terms, and other procedures, that more closely resemble the commercial marketplace when procuring commercial items. Section 12.101 of the FAR directs agencies to, among other things, conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements.[5] Section 2377 of Title 10 of the United States Code directs agencies to use the results of market research to determine whether there are commercial items that: (1) meet the agency's requirements; (2) could be modified to meet the agency's requirements; or (3) could meet the agency's requirement if those requirements were modified to a reasonable extent. 10 U.S.C. § 2377(c)(2). Determining whether a product or service is a commercial item is largely within the discretion of the contracting agency, and such a determination will not be disturbed by our Office unless it is shown to be unreasonable. Aalco Forwarding, Inc., et al., B-277241.8, B-277241.9, Oct. 21, 1997, 97-2 CPD ¶ 110 at 11.

Prior to the issuance of the solicitation here, the agency conducted market research to inform its acquisition strategy. The market research included consideration of the availability of commercial items to meet the agency's needs. There were two studies completed that addressed DCSG-A2 requirements in relation to commercially available solutions: (1) the Data Integration, Visualization and Analytics (DIVA) market study; and (2) a trade space analysis (TSA).[6] The DIVA study was intended to provide situational awareness and information about market trends regarding the "state-of-the-practice" within the commercial DIVA software

---

[5] Section 12.101 of the FAR also requires agencies to acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency, and requires prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practicable, commercial items or nondevelopmental items as components of items supplied to the agency.

[6] The TSA identified and evaluated technical functionality, cost, usability, schedule risk, and technical risk trade space for the following technical and operational capabilities that went beyond DCGS-A1: mission command support for the processing, exploitation, and dissemination of intelligence surveillance and reconnaissance; standard sharable geospatial framework-Army geospatial enterprise; data enterprise architecture; and intelligence support. Representative systems were assessed for the following software option alternatives: commercial off the shelf (COTS), government off the shelf (GOTS), and hybrid. AR, Tab AP, TSA, at 3. While both the DIVA study and the TSA addressed various aspects of the DCGS-A2 program, including the possibilities for the use of commercial software, neither of these studies looked at the entire breadth and scope of the DCGS-A2 procurement. Transcript (Tr.) at 42.

A6563

Appx16563

Protected Information and/or Legends Redacted

platform landscape, and possible uses of commercial DIVA software in the DCGS-A2 context. AR, Tab AQ, DIVA Study, at 2. The study described a number of potential approaches involving the use of commercial DIVA software, including the approach favored by the protester, whereby the agency could first acquire the commercial software platform necessary for DCGS-A2 data integration, visualization, and analysis capabilities, and could then acquire, separately, the systems integration and development or enhancement work necessary to provide or supplement other DCGS-A2 requirements. Id., at 30. In addition to the two studies mentioned above, the agency performed market research by reaching out to industry, including Palantir, through requests for information, industry day events, and industry government one-on-one meetings.[7] AR at 9.

While the market research revealed that commercial items were available to meet some of the DCGS-A2 requirements, the agency concluded that there was no commercial solution that could meet all the requirements of DCGS-A2. As the agency explained in its report, the DCGS-A2 contractor will need to do a great deal of development and integration work, which will include importing capabilities from DCGS-A1 and designing mature interfaces for them. AR at 44. Because the agency concluded that significant portions of the anticipated DCSG-A2 scope of work were not available as a commercial product, the agency determined that the DCGS-A2 development effort could not be procured as a commercial product under FAR part 12 procedures.[8] AR, Tab AG, Market Research Report, at 50. The protester has failed to show that the agency's determination in this regard was unreasonable.[9]

---

[7] The results of these efforts are summarized in a market research report that was issued on July 13, 2015. AR, Tab AG, Market Research Report. While Palantir complains that the requests for information did not directly solicit information about commercial solutions, Palantir nonetheless provided the agency with information and recommendations regarding potential solutions that would involve the use of commercial software for data integration, processing, visualization, and analysis. AR, Tab AJ, Palantir's Response to Request for Information Number One, at 5.

[8] Specifically, the agency concluded that data fusion, intelligence support to cyber, and the DCGS integrated backbone upgrade were not available as a commercial product. AR, Tab AG, Market Research Report, at 50.

[9] While this is not a commercial item procurement under FAR part 12, we note that the solicitation anticipates that the contractor will use commercial items. For example, the PWS instructs offerors that in the DCGS-A2 effort, they should maximize the use/reuse of COTS and GOTS products currently being used in DCGS-A1, which reflects the fact that there are approximately one hundred commercial-off-the-shelf products in use in DCGS-A1. AR, Tab V, PWS, at 60; Tr. at 84.

A6564

Protected Information and/or Legends Redacted

The protester next argues that the agency failed to adequately consider whether a commercial product could meet the agency's requirement if those requirements were modified to a reasonable extent. In this regard, the protester contends that, rather than awarding a single-award IDIQ contract in conjunction with a cost-reimbursement type task order, the agency should have sought to meet the DCGS-A2 requirements using a phased approach that would have allowed offerors of commercial solutions, like Palantir, to compete to provide the commercial software platform necessary for DCGS-A2 data integration, visualization, and analysis capabilities, possibly at a fixed-price. The protester argues that the agency could then acquire, separately, the systems integration and development or enhancement work necessary to provide or supplement other DCGS-A2 requirements.

A contracting agency has the discretion to determine its needs and the best method to accommodate them. General Electrodynamics Corporation, B-298698, B-298698.2, November 27, 2006, 2006 CPD ¶ 180 at 3. In preparing a solicitation, a contracting agency is required to specify its needs in a manner designed to achieve full and open competition, and may include restrictive requirements only to the extent they are necessary to satisfy the agency's legitimate needs. Id. When an agency seeks to procure separate and multiple requirements under a single contract, there is potential for restricting competition by excluding firms that furnish only a portion of the requirement; we therefore review challenges to such solicitations to determine whether the approach is reasonably required to satisfy the agency's needs. See Northrop Grumman Tech. Servs. Inc., B-406523, June 22, 2012, 2012 CPD ¶ 197 at 7. A protester's mere disagreement with the agency's judgment concerning the agency's needs and how to accommodate them does not show that the agency's judgment is unreasonable. General Electrodynamics Corporation, supra.

Here, the record shows that the agency reasonably decided on its approach of having a single contractor, who would be responsible for selecting all the components of DCGS-A2, and who would bear the responsibility for making certain that those components are integrated, in contrast to the phased approach favored by Palantir. In the written justification for the agency's use of a single-award IDIQ contract for this procurement, the Senior Procurement Executive explained that the "data integration layer requires unified systems engineering and agile software development activities by a single contractor. Ad hoc or independently developed software activities cause technical risks, concerns and significant schedule risk and cost uncertainty . . . To separate the systems engineering, software development, and integration activities would only undermine the cohesive development of a new data management and software architecture." AR, Tab AT, Determination and Findings for use of Single Source IDIQ Contract, at 2.

A6565

Protected Information and/or Legends Redacted

At the hearing GAO conducted in connection with this protest, the executive director and principal assistant responsible for contracting (PARC) at Aberdeen Proving Ground provided greater explanation regarding the need to have a single contractor with responsibility for selecting the components that would be assembled to meet the DCGS-A2 requirements, and writing the software that would be needed in order to integrate the different components and make them interoperable. Tr. at 203. According to the PARC, the strategy would require the contractor to "be responsible for ensuring that all of the components that are selected . . . interoperate and to ensure that the code associated with that was made available to the government, because it would have been developed at the government expense, therefore ensuring that we had the capability of supporting it in the post-production environment." Tr. at 203-204. The PARC further explained that, if the government were to buy some of the components and then provide them to a separate system integrator for integration, it would shift risk to the government that the items might not work or might not be able to be integrated. Id. According to the PARC, that approach "puts the government in the middle of selecting certain components and certain pieces, thereby implicitly warranting not only that they will work but they are able to be integrated by the integrator, who would be separate and different." Id. at 204.

Here, the agency's approach is reasonably related to its need for a fully integrated and interoperable system made up of a number of specific capabilities, some of which are commercially available and some of which are not. While the agency considered several potential approaches to this procurement, including the phased approach favored by the protester, the agency ultimately concluded that it would have a greater likelihood of success (in that it could avoid certain technical risks, concerns and significant schedule risk and cost uncertainty) by opting to have a single contractor serve as the system integrator in charge of developing and selecting the components and making sure that they can be successfully integrated. AR, Tab AT, Determination and Findings for Use of Single Source IDIQ Contract, at 2. As such, we have no reason to question the approach chosen by the agency or to conclude that the solicitation is unduly restrictive of competition.

The protest is denied.

Susan A. Poling
General Counsel

A6566

Appx16566

Protected Information
and/or Legends Redacted

## DETERMINATION OF NON-COMMERCIAL ITEM

### FINDINGS

1. This procurement is for the acquisition of services for the development and integration of Distributed Common Ground System-Army (DCGS-A) Increment 2 Engineering, Manufacturing, and Development (EMD). The requirements for Increment 2, EMD include, development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management. DCGS-A Increment 2 is considered a national security system as defined in the OMB-A130 and not an information technology product or service.

2. Market research was accomplished in accordance with the procedures delineated in Federal Acquisition Regulation (FAR) Part 10, Defense Federal Acquisition Regulation Supplement (DFARS) Part 210, and Army Federal Acquisition Regulation Supplement (AFARS) Part 5110. PM-DCGS-A released three Federal Business Opportunities (FBO) Request for Information (RFI) announcements. The RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements. In response, 84 different organizations, including 45 large businesses, 35 small businesses, three (3) non-profit organizations, and one (1) Federally Funded Research and Development Center responded the FBO RFI announcements.

3. Based upon market research conducted by Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

4. I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the

Source Selection Information – See FAR 2.101 and 3.104
For Official Use Only

**A6626**

Appx16626

Protected Information
and/or Legends Redacted

general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement. Furthermore, the acquisition of the military-unique capabilities required of DCGS-A Increment 2 does not fit the definition of installation services, maintenance services, repair services, training services, or other services in support of a commercial item, as significant portions of the DCGS-A Increment 2 requirement are not commercial items. Nor are the required services provided to the general public. Furthermore, the developmental services required to integrate the capabilities into the overall DCGS-A Increment 2 requirement are not sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices.

## DETERMINATION

Upon the basis of the results above, I hereby determine, pursuant to Title 41 U.S.C. 1906, 1907, and 3307 and Title 10 U.S.C. 2375-2377, as implemented by the FAR 10.002(e) and 12.101(a), DFARS 212.101 and AFARS 5112.101, the following:

1. This requirement for DCGS-A Increment 2 will include numerous commercial items as part of the final solution.

2. The full requirement cannot be met by a commercial item or combination of items, and minor modifications to commercially available items will not satisfy this requirement.

3. This procurement is not appropriate for acquisition under FAR Part 12 procedures for the acquisition of commercial items.

SIGNATURE: FISHER.CHRISTOPHER.M.1387943605
Digitally signed by FISHER.CHRISTOPHER.M.1387943605
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=FISHER.CHRISTOPHER.M.1387943605
Date: 2016.07.01 14:37:21 -04'00'
Date: 01 July 2016

Christopher M. Fisher
Procurring Contracting Officer

SIGNATURE: YOUNG.BRYON.JOHN.1040415714
Digitally signed by YOUNG.BRYON.JOHN.1040415714
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=YOUNG.BRYON.JOHN.1040415714
Date: 2016.07.01 14:40:45 -04'00'
Date: 01 July 2016

BRYON J. YOUNG
Principal Assistant Responsible For Contracting

Source Selection Information – See FAR 2.101 and 3.104
For Official Use Only

A6627

Appx16627

Protected Information
and/or Legends Redacted



A6629

Protected Information
and/or Legends Redacted

Hearing Date: Apr 14, 2015
Hearing: Army Modernization
Member: Senator Cotton
Insert: (Page 66, Line 6)
Witness: MG Cheek
File Name: SASCA-02-002-IFR

(The information follows):
As of April 2015, 19 deploying units have submitted 28 requests for commercial, advanced
analytic capabilities, to include Palantir. Requesting units used the Operational Needs Statement
(ONS) process ten times and the Rapid Equipping Force (REF) 10-Liner process on eighteen
occasions. Of the ten ONS requests, seven were endorsed by intermediary Commanders and
passed to the Department of the Army for decision. In those cases, the requirements were
validated and the requests approved. The remaining three ONS are still being reviewed by
subordinate, intermediary headquarters. Of the eighteen requests submitted through the 10-Liner
process, six were approved. Of those approved, REF equipped four units with the Palantir
capability, supported one unit with Field Support Representatives and reachback capability, and
one unit declined the Palantir equipment once it was available for delivery. REF did not support
six 10-Liner requests and redirected four others into the ONS process. The final two 10-Liners
were passed to PM DCGS-A for action.



A6633

Protected Information
and/or Legends Redacted



2

A6634

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



A6636

Protected Information
and/or Legends Redacted



5

A6637

Protected Information
and/or Legends Redacted



A6638

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



A6642

Protected Information
and/or Legends Redacted



A6643

Protected Information
and/or Legends Redacted



A6644

Protected Information
and/or Legends Redacted



A6645

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



A6648

Appx16648

Protected Information
and/or Legends Redacted



A6649

Appx16649

Protected Information
and/or Legends Redacted



A6650

Protected Information
and/or Legends Redacted



Protected Information
and/or Legends Redacted



A6652

Appx16652

Protected Information
and/or Legends Redacted



**DEPARTMENT OF THE ARMY**
OFFICE OF BUSINESS TRANSFORMATION
102 ARMY PENTAGON
WASHINGTON, DC 20310-0102

SAUS-OBT                                                                    17 October 2012

MEMORANDUM FOR LTG WILLIAM J. TROY, DIRECTOR, ARMY STAFF, 201 Army
Pentagon, Washington, DC 20310-0201

SUBJECT: AR 15-6 Report of Findings and Recommendations regarding the Army Test and
Evaluation Command's Forward Operational Assessment of the Palantir System

1. **Purpose.** On 23 July 2012, you directed me to conduct an investigation into the facts and
circumstances surrounding the Army's 2012 conduct of an informal battlefield assessment of
Palantir, a commercial front-end data mining analytic system produced by Palantir Technologies,
Inc. Specifically, you directed me to examine the facts and circumstances surrounding creation
of one or more Forward Operational Assessment (FOA) reports by the Army Test and Evaluation
Command (ATEC) related to the Palantir system, and any alleged efforts by one or more
members of the Army G-2 to disrupt ATEC's objective assessment of Palantir.



Protected Information
and/or Legends Redacted



5

UNCLASSIFIED//FOUO//LIMDIS
FOR COMMITTEE USE ONLY

A6658

Protected Information
and/or Legends Redacted

SAUS-OBT
SUBJECT: AR 15-6 Report of Findings and Recommendations regarding the Army Test and
Evaluation Command's Forward Operational Assessment of the Palantir System

(1)  Based on the evidence collected, I find that there was no intent on the part of any
member of the Army G-2 to deceive any Army decision maker regarding the effectiveness of the
Palantir commercial system.

(2)  After reviewing the facts and circumstances of this event, it is my opinion that the
Army G-2 team is passionate and a little defensive about DCGS-A and its relationship with
Palantir and that this attitude resulted in their desire to ensure that any Army discussion of
Palantir be precise concerning capabilities, training and future acquisitions. At times, some
members of the G-2 staff lost some of their objectivity with respect to how they presented
information on Palantir and DCGS-A to Army senior leaders. However,
it is clear that the Army G-2 team, along with other staff leaders, wanted the Army's senior
leaders to understand the capabilities of each system and ensure that our warfighters received the
best possible product to accomplish their mission.



Protected Information
and/or Legends Redacted




# DCGS-A Inc 2

# The Evolving Environment &
# Transition to Open Competition

DESIGN • DEVELOP • DELIVER • DOMINATE
*SOLDIERS AS THE DECISIVE EDGE*

A6797 [1]

Protected Information
and/or Legends Redacted

# DCGS-A 'System of 'Systems'



**DCGS-A Inc 2 Focus**
1 – Integrated data and access layer
2 – Enhance visualization tools/display
3 – Address (Disconnected, Intermittent and
   Limited) bandwidth environment

**DCGS-A is a robust 'System of Systems'; Inc 2 will focus on <u>data integration</u> and access, while enhancing <u>Visualization</u> tools and fully leveraging existing investments.**



DESIGN • DEVELOP • DELIVER • DOMINATE
SOLDIERS AS THE DECISIVE EDGE

A6802 <sup>6</sup>

Protected Information
and/or Legends Redacted

# DCGS-A Incremental Capabilities




| Increment 1 | Increment 2 |
|---|---|
| • Government integrator<br>• Geospatial, Imagery, FMV ingest — **Rel 1 Griffin**<br>• All Source - Multi-INT Fusion<br>• Data Enterprise - 700 data sources<br><br>• NSAnet and JWICS<br>• Some Ease of use enhancements — **Rel 2 Hunte**<br>• Domain Upgrades (SIGINT, HUMINT, and GEOINT)<br><br>**Rel 3**<br>**Transition to Inc 2**<br>• Tactical Cloud Implementation<br>• Automated System Management<br>• Increase Intelligence Fusion | • Full and open competition w/ Industry<br>• Enhanced visualization & analytical tools<br>• Incorporate "cloud computing" and "big data" analytic capabilities<br>• Less complex architecture (easier to maintain and utilize)<br>• Cyber Analytics & Data Integration<br>• Commercial product based<br>• IC ITE, DI2E , and JIE compliant |

**Focus on usability improvements, <u>visualization</u> tools, <u>analytical</u> tools, and data integration of the system while upgrading the infrastructure with the <u>leading edge data integration</u> technologies.**


DESIGN • DEVELOP • DELIVER • DOMINATE
*SOLDIERS AS THE DECISIVE EDGE*

**A6803** [7]

Protected Information and/or Legends Redacted

The Honorable Heidi Shyu                                    September 25, 2014
Assistant Secretary of the Army
101 Army Pentagon
Washington, D.C. 20310

Assistant Secretary Shyu:

Thank you for your keynote address at Army Intelligence Industry Day earlier this month. I am writing in response to your invitation for vendors to engage in an open and candid dialogue with the Army *before* the initiation of a new program or acquisition. Thank you also for your willingness to continue our dialogue with the Army on the DCGS-A Increment 2 acquisition process. That dialogue has included hosting you at Palantir in January, holding a series of discussions with your staff, and responding to the Increment 2 Request for Information.

At this early stage in the process, I would very much appreciate the opportunity to meet with you on three issues concerning the acquisition of Increment 2. These issues are consistent with your stated desire to increase openness and competition, and they address key goals in all three versions of the Department's Better Buying Power efforts.

First – the Army's acquisition strategy for delivering core capabilities. We are encouraged that the Army's focus for Increment 2 is to reset the Intelligence foundation layer, because we continue to believe that the delivery of a core data integration platform is fundamental to the ultimate success of DCGS-A. And we appreciate your efforts to accelerate the delivery of Increment 2 capabilities. However, we are concerned that the Army intends to conduct a two-year competition, followed by a multi-year development project to deliver foundational capabilities. The Army has acknowledged a data fusion capability gap as part of the DCGS-A Increment 1 baseline; this capability gap has existed for years, and will persist for years in the future unless the Army closes the gap through accelerated procurement of existing solutions.

Because a proven commercial data integration platform is available today for procurement through ESI and GSA, the Army does not need to conduct a two-year competition to reset the Intelligence foundation layer; nor does it need to *build* the core functions of Increment 2. At Industry Day, you stated that the Army seeks to harvest best-of-breed capabilities from industry rather than redeveloping them. However, by holding a two-year competition, the Army is signaling to industry that it is not interested in harvesting current best-of-breed technologies, but rather is intent on re-inventing, from scratch, unproven technologies – which we know is not your intent. Instead, we believe that the Army can deliver the foundation layer on a commercial software platform and add applications in parallel, which would result in significant savings to the taxpayer and enhanced near-term warfighter capabilities. This strategy would be designed to avoid many of the problems that plagued Increment 1.

Second – the alignment of the Army's strategy with Department of Defense acquisition guidance. The Department's guidance includes the Better Buying Power (BBP) series and program competition documents issued by Under Secretary of Defense for Acquisition, Technology, and Logistics (AT&L) Frank Kendall. It is clear that the Army is seeking to align its Increment 2 acquisition strategy with BBP 2.0 and now the draft of BBP 3.0, but we are concerned that the Army is maintaining, not removing, barriers to commercial technology utilization in DCGS-A. Such an approach, if sustained, will fail to take advantage of the significant commercial, not taxpayer, development funds which have benefited so many other government and corporate entities and is in keeping with the goals articulated by Secretary Kendall on September 19th at the Center for Strategic and International Studies.

A6807

By acquiring an existing commercial software platform as the Intelligence foundation layer, the Army can fully align the Increment 2 acquisition with Secretary Kendall's guidance to achieve affordability, control costs throughout the program lifecycle, bring more innovation and commercial technology into government, and eliminate unproductive processes. For example, one of the tenets of Secretary Kendall's BBP 3.0 is incentivizing companies to invest in R&D. However, pursuing a multi-year development cycle incentivizes the opposite; it indicates that the Army is willing to shoulder the costs of innovation. As you are aware, companies like Palantir have invested hundreds of millions of dollars in R&D precisely so that we can be best positioned to deliver mature, proven capabilities to the Department. A multi-year full spectrum development places disincentives on Industry R&D, slows the process of development, and requires taxpayers to pay more for the same (if not inferior) capabilities. Unfortunately, we do not believe Secretary Kendall was ever made aware of the results of the effort he initiated.

Third – the openness and interoperability of the Palantir platform. We appreciate your personal efforts and commitment to get ground truth about Palantir. As you know, Palantir has proven interoperability with Defense Intelligence Information Enterprise (DI2E) standards, and operates today within the Intelligence Community Information Technology Enterprise (IC ITE) framework. In addition, official government assessments have concluded that Palantir is an open architecture system, including a review initiated by Secretary Kendall and conducted by the MITRE Corporation in late 2013.

In spite of these independent assessments, we remain concerned that false and misleading information about Palantir continues to be circulated in the Pentagon, including within a memo prepared for Secretary Kendall himself, which states that Palantir "is a proprietary system – it does not integrate with other deployed systems" and "one of the key areas where Palantir comes up short is interoperability. Sharing of Palantir data is difficult between Army users and with the larger intelligence community."

We are concerned that the erroneous memo, which apparently served as the basis for Congressional testimony by Secretary Kendall, and other inaccurate information undermine the ability of the Army and Mr. Kendall to foster fair and open competition as any attempt to do so is impaired by the continued propagation of unfounded information. We are frustrated, in particular, by the persistent and improper use of the term "proprietary," which some officials apply to Palantir to imply a lack of interoperability. In reality, the term refers to the licensing of source code and Intellectual Property, and it does not relate to its interoperability, functionality, extensibility, ease-of-management, code quality, or cost-of-ownership. As we have shared with you previously, false statements about Palantir hurt our ability to compete in the Army, across the Government, and with foreign customers, despite what most truly independent assessments consider a superior, less-costly, and more dynamic offering.

To conclude, we are confident that on the basis of full and open competition, the Army can deliver the foundation layer on a commercial software platform – and make Increment 2 a powerful example of technology acquisition done right. As you know, many commercial companies as well as a number of major government agencies are adopting Palantir, to include the largest U.S. intelligence agencies, the FBI, DHS, SEC, the Department of Justice, Foreign Mission Partners, and local law enforcement agencies. These agencies have conducted fair and open competitions, and have awarded contracts based on official assessments and comprehensive investigation of the ground truth.

For your information and review, we have enclosed the following documents:
  (1) Alignment of Army Increment 2 Acquisition Strategy and Better Buying Power
  (2) Alignment of Army Increment 2 Acquisition Strategy and AT&L Competition Guidelines
  (3) Summary of a Memo for Secretary Kendall that Contradicts Official Assessments of Palantir

A6808

We look forward to engaging with you and your staff in person as you continue the process of delivering Increment 2 and as you align the Army's acquisition strategy with industry best practices and the Department's initiatives.

Thank you once again for your leadership and commitment to ensuring warfighters have the tools they need to accomplish their missions. We look forward to speaking with you again and continuing to support your efforts on behalf of the warfighter and the taxpayer.

Sincerely,

Douglas Philippone
Head of Global Defense
Palantir Technologies, Inc.

A6809

# Director, Operational Test and Evaluation

# FY 2015 Annual Report



## January 2016

This report satisfies the provisions of Title 10, United States Code, Section 139. The report summarizes the operational test and evaluation activities (including live fire testing activities) of the Department of Defense during the preceding fiscal year.

J. M. Gilmore

J. Michael Gilmore
Director

Protected Information
and/or Legends Redacted

- Joint Battle Command – Platform (JBC-P)
- Manpack Radio
- Mark XIIA Mode 5 Identification Friend or Foe (IFF)
- MK 54 Lightweight Torpedo

**No fixes planned, or no fixes planned to be tested in the next two years**
- AN/PRC-117G
- Distributed Common Ground System – Marine Corps (DCGS-MC)
- F-15E Radar Modernization Program (RMP)
- RQ-21A Blackjack (formerly Small Tactical Unmanned Aerial System (STUAS))

In FY14, I also identified 23 systems that had significant issues in early testing that should be corrected before operational testing. The following provides an update on the progress these systems made in implementing fixes to those problems.

**Fixes verified in OT – No other problems observed**
- Distributed Common Ground System – Army (DCGS-A)
- Key Management Infrastructure (KMI)
- Precision Guidance Kit (PGK)

**Fixes verified in OT – New problems discovered**
- AN/SQQ-89A(V)15 Integrated Undersea Warfare (USW) Combat System Suite

**Fixes verified in OT – Known problems re-observed**
- Ballistic Missile Defense System (BMDS)
- Infrared Search and Track (IRST)
- LHA 6 New Amphibious Assault Ship (formerly LHA(R))
- Littoral Combat Ship (LCS)
- Mobile Landing Platform (MLP) Core Capability Set (CCS) (Expeditionary Transfer Dock) and Afloat Forward Staging Base (AFSB) (Expeditionary Mobile Base)

**Fixes tested in OT – Both new problems discovered and known problems re-observed**
- AC-130J Ghostrider
- Air Force Distributed Common Ground System (AF DCGS)
- Defense Enterprise Accounting and Management System (DEAMS)
- Defense Medical Information Exchange (DMIX)
- Warfighter Information Network – Tactical (WIN-T)

**Fixes not planned to be tested in the next two years**
- F-35 Joint Strike Fighter (JSF)

**Fixes currently being tested or planned to be tested in the next two years**
- M829E4 Armor Piercing, Fin Stabilized, Discarding Sabot – Tracer (APFSDS-T)
- Public Key Infrastructure (PKI)
- RQ-4B Global Hawk High-Altitude Long-Endurance Unmanned Aerial System (UAS)
- AGM-88E Advanced Anti-Radiation Guided Missile (AARGM)
- MQ-4C Triton Unmanned Aircraft System
- MQ-9 Reaper Armed Unmanned Aircraft System (UAS)
- Patriot Advanced Capability-3 (PAC-3)
- Remote Minehunting System (RMS)

Problem Discovery Affecting OT&E A7268

Protected Information
and/or Legends Redacted

- The U.S. Army Test and Evaluation Command (ATEC) conducted an FOT&E at Fort Bliss, Texas, during the Army's Network Integration Evaluation 15.2 in May 2015.
- ATEC failed to adequately collect, reduce, and analyze FOT&E test data in accordance with the DOT&E-approved test plan.
- The Program Office conducted a laboratory test September 14 – 24, 2015 to provide data for more rigorous evaluation of DCGS-A Release 2 data synchronization.
- DOT&E will issue a report on the DCGS-A Release 2 FOT&E in early FY16.

## Assessment

- DT2 data were not sufficient for DOT&E to evaluate DCGS-A system performance. The Army's data collection, reduction, and analysis process failed to provide adequate quantitative answers to the key measures of performance.
- During the FOT&E, the test unit successfully employed DCGS-A to locate and take actions on all of the injected terrorist activities. The unit also accurately tracked the enemy troops and equipment movements, but did not always attribute the troops and equipment to the correct enemy unit. The Army injected supporting intelligence data for 10 intelligence vignettes into the test database, which also contained terabytes of other operationally representative intelligence data. During the test, the test unit successfully discovered and exploited the supporting data for all 10 vignettes and drew appropriate conclusions from the data within hours.
- FOT&E data collected by ATEC were not adequate to quantitatively evaluate fusion, targeting, and database synchronization. The program manager conducted a test of data synchronization in an operationally realistic laboratory facility in September 2015 and provided data to supplement the evaluation of data synchronization. Positive results of the vignettes indicate the fusion capability was adequate to support the mission during FOT&E.
- The data from the excursion showed that DCGS-A data synchronization can work effectively if the most efficient method is used. Users can choose from four different ways of synchronizing the data. During the FOT&E, the unit chose to use the ad-hoc Datamover method because they perceived this to be the most flexible method. The lab test showed using this method with a large number of entities (about 900 entities; the number emulates the database used during the FOT&E) could take about 2 hours, whereas moving the same data

with a scheduled Datamover can be completed in less than 20 minutes. The Army plans to modify training to use the scheduled Datamover to synchronize large numbers of entities.
- DCGS-A availability was 0.99, satisfying the requirement of 0.90. Reliability, in terms of Mean Time Between Failure, ranged from 16 to 360 hours depending on the location and functions. Reliability and maintainability were sufficient to conduct the mission, but improvement in reliability would improve DCGS-A suitability.
- The system usability scale indicated system usability to be low-marginal.
- The system was not survivable against cybersecurity threats because of the vulnerabilities in the Army's tactical network.

## Recommendations

- Status of Previous Recommendations. The Army did not successfully implement the FY14 recommendation to incorporate lessons learned from DT2 to conduct the FOT&E; the FOT&E data collection, reduction, and analysis had significant systematic shortfalls similar to those experienced during DT2.
- FY15 Recommendations. The Army should take the following actions:
  1. Institutionalize the training provided to the FOT&E test unit, so that all DCGS-A equipped units receive intensive, scenario-driven, collective training.
  2. Maintain DCGS-A unit readiness via continuous use of DCGS-A in garrison.
  3. Improve the cybersecurity posture in all Army tactical networks.
  4. ATEC should resolve systematic shortfalls with data collection, reduction, and analysis during testing.
     - Demonstrate the end-to-end process of collecting, reducing, and analyzing the data before an operational test.
     - Conduct a developmental test with operationally representative networks and the operational test instrumentation before an operational test of complex networked systems.
     - Attribute all performance anomalies to system performance, test process, or data collection and reduction before the test ends.
     - Analyze data sufficiently to identify and resolve anomalies and inconsistencies during the test.

Protected Information
and/or Legends Redacted



**APRIL 2012**

*Army Test and Evaluation Command*

## (U) Forward Operational Assessment

## (U) Palantir

### (U) Operational Assessment Report



U//FOUO

U//FOUO

Approved: LAURA J. RICHARDSON    Date: 25 APR 12
Brigadier General, USA
Commander, U.S. Army Operational Test Command

This report is a product of the Army Test and Evaluation Command (ATEC) Forward Operational Assessment Team XVIII and is not to be construed as the ATEC operational test agency evaluation report for this system. The use of trade names in this document does not constitute an official endorsement or approval of the use of such commercial hardware or software. Do not cite this document for the purposes of advertisement.

This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the Freedom of Information Act. Exemption 5 (predecisional materials) applies.

A7701
Protected Information and/or Legends Redacted

4. (U//FOUO) SAMPLE POPULATION. FOA XVIII surveyed 57 operators and 43 intermediate supervisors, exceeding the ATEC system team-requested sample size of 14 operators and 24 intermediate supervisors, experienced with the use of Palantir. The military respondents were in grades E–2 through E–8, W–1 through W–3, O–1 through O–4, and the 33 civilian respondents were a combination of contractors and Department of Defense civilians.

5. (U//FOUO) FINDINGS. Palantir supported units in Operation Enduring Freedom (OEF) by providing intelligence tools to assist analysts and Warfighters in different missions (e.g., intelligence operations, military police (significant activity studies for patrol routes), engineers (route clearance), and female engagement team (FET) area assessments). Ninety-six of the 100 personnel surveyed agreed that Palantir was effective in supporting their mission. The overall feedback from the operators and intermediate supervisors was that Palantir is a user-friendly and reliable program that enables analysts to save time and provide accurate data to commanders. However, it was noted that the mapping tool has fewer capabilities than other programs such as ArcGIS.[1] One supervisor stated, "Palantir is very effective for my mission; but, right now it does not replace all systems because it still doesn't have all the abilities as ArcGIS. But it is much more user-friendly." When asked if Palantir saves time when performing analysts' tasks, 90 of the 100 personnel surveyed agreed that it did.

    a. (U//FOUO) Strengths. Respondents identified the following key strengths during the Palantir assessment:

       (1) (U//FOUO) The software was easy to learn and was user-friendly. Some respondents had less than 1 hour training; but they were able to perform program functions that allowed them to complete their duties quickly and effectively.

       (2) (U//FOUO) Field-service representatives (FSRs) were effective. The allocation of FSRs made them readily available to all locations that were authorized the Palantir software. The FSRs assisted with one-on-one training of personnel using Palantir and they tailored the training to user needs. One respondent said, "Some FSRs have added mission-specific information/options like FET Engagement and various other options that help keep my Commander informed." Of the 100 operators/intermediate supervisors surveyed, 95 agreed that the FSRs were adequate and responsive in providing the support needed to complete their missions.

       (3) (U//FOUO) Easy search tools within Palantir allow Warfighters to simultaneously search CIDNE, M3, MX (British Human Intelligence (HUMINT) system), BATS, etc. This capability enables analysts to rapidly execute necessary data mining and create products, that are requested by units for operations and missions, more efficiently.

---

[1] (U) ArcGIS is the name of a group of geographic information system software product lines produced by ESRI. At the desktop GIS level, ArcGIS can include: ArcReader, which allows one to view and query maps created with the other Arc products; ArcView, which allows one to view spatial data, create maps, and perform basic spatial analysis; ArcEditor which includes all the functionality of ArcView, includes more advanced tools for manipulation of shapefiles and geodatabases; or ArcInfo the most advanced version of ArcGIS, which includes added capabilities for data manipulation, editing, and analysis.

4

**A7708**

Protected Information
and/or Legends Redacted

Sir,

As per the attached memorandum, the ATEC Forward Operational Assessment Report (FOAR) for the Palantir System, dated 25 April 2012 is rescinded and replaced by the FOAR dated 25 May 2012. Please ensure that any and all copies of the 25 April report are destroyed and not distributed.

Upon destruction of the previous report, please confirm to me in email that all copies of the original report dated 25 April has been destroyed.

If possible, can you please provide me the names of the individuals that the 25 April report was sent to.

Your immediate assistance in this matter would be greatly appreciated.

V/R

Rachel Phillips
SFC, USA
ATEC FOA 18 Data Collector
DSN: 318-436-8536
SVOIP: 308-449-0398
CENTRIX: 611-260-6132
NIPR: rachel.l.phillips@afghan.swa.army.mil
SIPR: rachel.l.phillips@afghan.swa.army.smil.mil
CENTRIX: rachel.l.phillips@afgn.centcom.isaf.cmil.mil

A7752
Protected Information
and/or Legends Redacted



**May 2012**

Army Test and Evaluation Command

## (U) Forward Operational Assessment

# (U) Palantir

### (U) Operational Assessment Report



Approved: LAURA J. RICHARDSON
Brigadier General, USA
Commander, U.S. Army Operational Test Command

Date

This report is a product of the Army Test and Evaluation Command (ATEC) Forward Operational Assessment Team XVIII and is not to be construed as the ATEC operational test agency evaluation report for this system. The use of trade names in this document does not constitute an official endorsement or approval of the use of such commercial hardware or software. Do not cite this document for the purposes of advertisement.

This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the Freedom of Information Act. Exemption 5 (predecisional materials) applies.

4. (U//FOUO) SAMPLE POPULATION. FOA XVIII surveyed 57 operators and 43 intermediate supervisors, exceeding the ATEC system team-requested sample size of 14 operators and 24 intermediate supervisors, experienced with the use of Palantir. The military respondents were in grades E–2 through E–8, W–1 through W–3, O–1 through O–4, and the 33 civilian respondents were a combination of contractors (not employed by Palantir Technologies) and Department of Defense civilians. Note in paragraph 1 above, (PURPOSE), the diverse U.S. Army units throughout the CJOA-A that utilize the Palantir system do so to augment their intelligence estimations, but do not necessarily employ Palantir as their primary tool for analysis.

5. (U//FOUO) FINDINGS. Palantir supported units in Operation Enduring Freedom (OEF) by providing intelligence tools to assist analysts and Warfighters in different missions (e.g., intelligence operations, military police (significant activity studies for patrol routes), engineers (route clearance), and female engagement team (FET) area assessments). Ninety-six of the 100 personnel surveyed agreed that Palantir was effective in supporting their mission. The overall feedback from the operators and intermediate supervisors was that Palantir is a user-friendly and reliable program that enables analysts to save time and provide accurate data to commanders. However, it was noted, by multiple respondents that augment the use of Palantir for their intelligence assessments, that the mapping tool has fewer capabilities than other programs, such as a common Commercial Off The Shelf (COTS) product called ArcGIS.[1] One supervisor stated, "Palantir is very effective for my mission; but, right now it does not replace all systems because it still doesn't have all the abilities as ArcGIS. But it is much more user-friendly." When asked from a question within the FOA survey questionnaire if Palantir saves time when performing analysts' tasks, 90 of the 100 personnel surveyed agreed that it did.

    a. (U//FOUO) Strengths. Respondents identified the following key strengths during the Palantir assessment:

        (1) (U//FOUO) The software was easy to learn and was user-friendly. Some respondents had less than 1 hour training; but they were able to perform program functions that allowed them to complete their duties quickly and effectively.

        (2) (U//FOUO) Field-service representatives (FSRs) were effective. The allocation of FSRs made them readily available to all locations that were authorized the Palantir software. The FSRs assisted with one-on-one training of personnel using Palantir and they tailored the training to user needs. One respondent said, "Some FSRs have added mission-specific information/options like FET Engagement and various other options that help keep my Commander informed." Of the 100 operators/intermediate supervisors surveyed, 95 agreed that the FSRs were adequate and responsive in providing the support needed to complete their missions.

---

[1] (U) ArcGIS is the name of a group of geographic information system software product lines produced by ESRI. At the desktop GIS level, ArcGIS can include: ArcReader, which allows one to view and query maps created with the other Arc products; ArcView, which allows one to view spatial data, create maps, and perform basic spatial analysis; ArcEditor which includes all the functionality of ArcView, includes more advanced tools for manipulation of shapefiles and geodatabases; or ArcInfo the most advanced version of ArcGIS, which includes added capabilities for data manipulation, editing, and analysis.

4

A7761
Protected Information and/or Legends Redacted

(3) (U//FOUO) Allows plotting of current and historical insurgent activities, which allows analysts to quickly develop assessments based upon identified trends. Eighty-nine of the 100 surveyed personnel agreed that using Palantir allowed them to visualize trends based on time, location, or individuals.

(4) (U//FOUO) As an analysis tool, users of Palantir are able to discover new links and associations that aid analysts in targeting high-value individuals (HVIs) and to build intelligence products, which provide course of action input to commanders when determining how to proceed in capturing or obtaining intel on these individuals. Ninety-three percent (40/43) of the intermediate supervisors surveyed, agreed that Palantir increased their ability to support the intelligence requirement of the maneuver commander.

b. (U//FOUO) Weaknesses and Recommendations. Respondents identified the following key weaknesses during the Palantir assessment:

(1) (U//FOUO) Inability to Import/Export. Palantir lacks the capability to import/export into different file formats, such as ANB, for other programs to use. Some users are required to use different programs for their tasks, but prefer to use Palantir to build certain products. Recommendation: Allow link diagrams to be imported/exported to ANB or map products to be exported to ArcGIS with Shape files.

(2) (U//FOUO) Any User Can Add or Change Data. Any user with publishing rights can add or change data after a product is published, sometimes adding incorrect information. This becomes a problem for the originator of the product who may have to correct wrong information, or who did not want alterations made to their product. One operator stated, "Palantir is a great tool for linking, searching, and visualizing information. One issue is that any user can add or change data, sometimes adding incorrect information." Recommendation: Suggest that the Materiel Developer explore means to restrict the ability to alter products.

(3) (U//FOUO) Limited Plotted Item Options. Plotted item options are limited in the Palantir mapping tool. To resize, shape, or change color of an item, the plotted item has to be altered in the *paint* feature and then uploaded. Labels on imported KMZ or KML files do not show up on the map. Recommendation: Allow users the ability to change size, color, shape, or label options for each item in maps. Also, allow labels on items such as routes to be turned on and off at will. One of the operators/intermediate supervisors suggested, "Palantir is a great, efficient, easy-to-use software; the only addition I would ask [for] is more options on maps. Example: changing icons, size, color, moving the map at a different angle similar to Google Earth."

(4) (U//FOUO) Outdated Maps. The maps on Palantir are outdated. Palantir incorporates BuckEye imagery, but only updates it once a year. In a quickly changing counter-insurgency environment, this can be detrimental to planning missions and operations. One of the operators/intermediate supervisors made this statement about Palantir, "Although the imagery allows us to zoom in at great lengths and gives details, it is no where up to date, and due to the outdated imagery it can only give a general idea of the battlefield." Recommendation: Schedule periodic updates (monthly, quarterly, or by request) from the National Geospatial-Intelligence Agency database. Palantir should replace old imagery of the same area on their servers.

5

**A7762**

Protected Information
and/or Legends Redacted

# Palantir Platform Information Brief

**Kevin M. Kelly**

**July 2013**

**MITRE**

**A7805**

Protected Information and/or Legends Redacted

# Palantir Platform
# Bottom Line up Front (BLUF)

1. **Is Palantir an _OPEN_ system?  YES**
   Palantir is an **open system.**  Palantir employs a **blend** of open/DoD-IC/company specified standards accessible via **open** API's.
   Palantir is **NOT** an open source software.  They do not distribute the source code.

2. **Is Palantir _ONLY_ a link analysis tool?    NO**
   Palantir provides a Data Integration & Analytics (DI&A) platform applicable to wide spectrum of domains (e.g. DoD/IC; Finance; HealthCare; and Law Enforcement)

   Palantir's has a **robust DI&A capabilities** applicable to DCGS-A "Data Processing & Storage" capabilities and a **rich suite** of apps applicable to DCGS-A's "User Experience & Interface" capabilities.

3. **How does Palantir support DoD-IC Interoperability?**
   Palantir provides DoD-IC interoperability via DIB Query support.  DCGS-A/Palantir CRADA has demonstrated Palantir/DCGS-A Standard Cloud Interop.  Participates in IC ITE and DI2E forums for incorporation of emerging IC Community Standards.  Military MSG support (no formal Army certification)

4. **What is the Palantir cost-model?**
   Software licensing based per server-core.
   Per GSA schedule, a BDE configuration would be: ~2.7M (Year1)/~800K (Year2-N)
   Enterprise licensing/alternative configurations could lower price point.

© 2012 The MITRE Corporation. All rights reserved.　　　　　For internal MITRE use

**MITRE**

A7806

Protected Information and/or Legends Redacted

# Drill Down #3:
# Palantir → DCGS-A Info Systems CPD (5 of 9)

| Category | Rating | Comments |
|---|---|---|
| Mission Support (9) | 3 | Palantir/Palantir FWD/Palantir Mobile provide a scale-able approach. Palantir FWD could be used in en-route mission planning scenarios. Garrison users could use Palantir Workspace and/or Palantir Web apps to "plug-into" remote training and/or operational nodes. Minimal support with Mission Command systems and Army Training Systems. |
| Security (9) | 4 | Palantir has been deployed on: Unclassified (JTF-N); Secret (Army, USMC, SOF, …); TS: DIA (PL-3); and Coalition (CX-I and BICES). Palantir has NETOPS capability to audit/log potential cyber events and has Cyber Analysis Tools to detect/analyze suspicious Cyber events. Palantir has fine-grained security controls and can leverage Organization/Unit provided authorization & authentication service. Palantir has mechanisms for securely processing and storing classified information. Cross-domain Palantir-Palantir replication has been |

© 2012 The MITRE Corporation. All rights reserved.

For internal MITRE use

A7851

Protected Information and/or Legends Redacted

FOR OFFICIAL USE ONLY

United States Government Accountability Office



Report to Congressional Committees

June 2013

# DISTRIBUTED COMMON GROUND SYSTEM

## Better Measures and Plans Needed to Help Achieve Enterprise Intelligence Sharing Goals

FOR OFFICIAL USE ONLY: This Document contains sensitive information and can be disseminated only to persons whose official duties require access to the information.

GAO-13-327SU

FOR OFFICIAL USE ONLY

A7863

Appx17863

(FOUO)The overall goal, or end-state, for the DCGS Enterprise is to provide an integrated intelligence information sharing system where analysts from across the military can access intelligence data from hundreds of sources, analyze it, and make the resulting intelligence products discoverable and available to other users in real time. The DCGS Enterprise is intended to consist of a network infrastructure—servers, data links, routers, and computer workstations—for storing and maintaining a repository of intelligence data, and software tools and techniques that enable the data to be searched and manipulated to prepare products to aid the warfighter. DOD also anticipates that Enterprise data and products will be accessible to deployed combat units through laptop computers and networking links. Figure 2 depicts an operational overview of DCGS and shows how DCGS is intended to link ISR systems to ground processing systems and to intelligence analysts.

**Figure 2: Distributed Common Ground/Surface System Operational Overview**



Source: GAO analysis of DOD data.

A7874

Appx17874



Figure 3: Schedule for the Completed and Ongoing DCGS Programs in Fiscal Years (F0U0)

Legend:
- —— Completed program
- —— Ongoing program
- // Restructure of program acquisition strategy
- ■ Full deployment decision
- ◆ Full deployment

Source: GAO analysis of DOD data

FOR OFFICIAL USE ONLY

**AF-DCGS**

The Air Force has had a fully deployed DCGS system in the field for several years to process and disseminate intelligence data and is currently upgrading the system through four interrelated acquisition programs.

The Air Force operates several national level ISR systems that collect large volumes of GEOINT and SIGINT data and provide support to joint and coalition forces around the world. This mission led to the need for a network of large, fixed AF-DCGS centers to process, analyze, and disseminate intelligence data, mainly in the United States.

(FOUO) AF-DCGS began in the late-1990s as a deployable ISR data processing capability supporting the U2 aircraft. The Air Force expanded DCGS to facilitate the processing and analysis of intelligence data from a number of other ISR systems. The system was declared operational in fiscal year 2009, and has been supported since then through sustainment. In fiscal year 2012, the Air Force decided to upgrade the

A7878

AF-DCGS system to address the following issues: The AF-DCGS data processing centers have different configurations of the system consisting of different hardware, software, and networking infrastructures, which Air Force officials told us are costly to sustain. In addition, many of the ISR systems that were fielded in recent years to support operations in Iraq and Afghanistan are not integrated with AF-DCGS. Further, the system does not meet all current and evolving DCGS Enterprise standards and software architecture.

(FOUO) The Air Force plans to upgrade DCGS by making incremental improvements to the system while it is in sustainment, with minimal impact on current ISR operations. In fiscal year 2012, USD (AT&L) approved an Air Force acquisition strategy to initiate four ACAT III AF-DCGS upgrade programs. According to Air Force officials, upgrading the system through these smaller programs provides greater flexibility to respond to requirements than combining the work into a single, larger program. While the four programs combined would equal an acquisition category one program under the department's cost criteria, USD (AT&L) agreed with the Air Force's strategy. The four programs are intended to provide upgrades to AF-DCGS network communications, data management, GEOINT, and SIGINT capabilities. The Air Force has structured the programs to field capabilities on a 3-year rolling basis. Additional system upgrade projects are expected to be addressed in subsequent years, based on requirements identified by the Air Force and available funding.

DCGS-A

The Army has been developing and fielding components of its DCGS system since fiscal year 2000 to address the multiple intelligence needs of the force. The program has gone through several modifications over time due to changing requirements and is now focused on providing a mobile, integrated ISR ground processing system composed of common components that are interoperable with sensors and other information sources. DCGS-A is intended to support Army commanders at multiple levels of the force structure.

(FOUO) Because the Army force structure is large, widely dispersed, and conducts disconnected operations, DCGS-A capabilities are needed throughout the force structure to support a broad range of military operations around the globe. The Army's fielding strategy for DCGS includes establishing several fixed-site data processing centers where large databases of intelligence information will reside (called fusion brains) as well as different DCGS system configurations, with different equipment and capabilities for deployed forces, from the company level to

A7879

Appx17879

Figure 4: Development and Procurement Costs for Completed and Ongoing DCGS Programs

Program of record



Dollars (in base year fiscal year 2013 millions)

- Procurement
- Research & development

Source: GAO analysis of DOD data

**(FOUO)** Of the $10.6 billion in total DCGS Enterprise costs, about $6.0 billion was obligated prior to fiscal year 2013. Under their current, approved programs of record, the services plan to obligate about $4.6 billion in fiscal years 2013 and beyond. The costs to develop and field the Army and Navy systems have changed over time as the programs were restructured for various reasons, but Army and Navy officials could not provide us information on how much the costs changed because the programs established new cost baselines when they restructured. The current costs for the programs of record in the above graphic do not reflect future amounts needed for follow-on program increments the services plan to develop, since those costs have not yet been defined.

Several of the Military Services Have Faced Challenges Integrating Urgent and Emerging Needs and Technologies with DCGS

Over the past several years, as the military services planned and developed their DCGS systems, they have faced challenges in being adaptive enough to address urgent and emerging user needs for improved intelligence analysis capabilities and to take advantage of the rapid pace in which commercial technology improvements occur.

A7885

Appx17885

| | |
|---|---|
| Services Fielded Military and Commercial Systems to Help Meet Urgent Needs | A key challenge facing the military services is providing users with the capabilities to analyze the huge amount of intelligence data being collected. The number and variety of ISR systems that have been developed and fielded to collect intelligence data, particularly in support of military operations in Iraq and Afghanistan, has grown dramatically. For example, rapid advances in technology have led to the proliferation of unmanned aerial systems, such as the Air Force Predator and Army Hunter aircraft, which can loiter over the battlefield for considerable periods of time and take photographs, provide live video, or collect infrared or other imagery. From 2002 to 2010, the number of unmanned aerial systems in DOD's inventory has increased about forty fold, from about 170 to 7,500 aircraft. Similarly, military capabilities to collect communications and electronic data transmissions have also grown with the development of new technologies and sensors. Many of the ISR systems used to support operations in Iraq and Afghanistan were acquired as quick reaction capabilities in response to urgent operational needs for improved capabilities. In addition, the nature of military operations, with an emphasis on counter-insurgency operations, changed some of the traditional ways intelligence information was used. The need to integrate the large amount of available intelligence data, including the ability to synthesize information from different types of intelligence sources (e.g., HUMINT, SIGINT, GEOINT, and open source), has become increasingly important in addressing, for example, improvised explosive device threats and tracking the activities of certain components of the local population. |

Concurrent with the fielding of these new ISR systems, joint and military service commanders in Afghanistan began submitting urgent need requests to DOD for better tools to enable their analysts to determine the relationships among a wide array of disparate intelligence data and to view the data in different graphical formats. According to the requests, intelligence analysts in Afghanistan had to search many databases individually, and existing tools did not allow for the timely synthesis and analysis of the data. The requests also emphasized the need for user-friendly, intuitive software products and tools so analysts could respond rapidly to operational requests.

(FOUO) A key request, submitted in July 2010 by United States forces in Afghanistan, was a Joint Urgent Operational Needs Statement (JUONS) for improved theater-wide advanced analytic capabilities. The request identified the need for (1) tools to search and link multiple data sources and visually depict data relationships, (2) collaborative capabilities so analysts could share data and products, and (3) the ability to conduct

A7886

Appx17886

intelligence data analysis in areas with limited bandwidth.[9] Other service-level urgent operational requests, from the Army and Marine Corps, as well as requirements from the Special Operations Forces in Afghanistan, highlighted similar needs. Most of these requests identified a specific commercial analytic software system that was being used in selected joint and coalition operations centers in Afghanistan as the preferred solution. The commercial software system had been adapted by some parts of the government, such as the Centers for Disease Control and the Federal Bureau of Investigations, to analyze data. Further, the Joint Improvised Explosive Device Defeat Organization had begun acquiring this system in 2008 for use in counter improvised explosive device detection efforts. The software had gained a reputation for being intuitive and easy to use, while also providing effective tools to link and visualize data.

(FOUO) The Army responded to the 2010 joint urgent needs request by accelerating the development and fielding of certain DCGS capabilities, including improved terrain analysis and methods for analyzing multiple types of intelligence. In addition, the Army accelerated development of a related cloud computing effort that was underway.[10] It deployed two cloud computing nodes to Afghanistan, which provided additional computing power, data storage, and tools to support users, including those in limited bandwidth areas. Army officials also assessed whether to acquire the commercial software analytic system and determined that while the commercial system had some characteristics that were superior to DCGS-A, it did not provide the extent of capabilities that DCGS-A did for processing, analyzing, and disseminating intelligence data. For example, DCGS-A provided a wider range of capabilities—such as more robust tools for conducting GEOINT analysis and access to a greater number of data sources—than the commercial system. In addition, the Army determined that due to proprietary software licensing and technical compatibility issues, the commercial system could not be easily integrated with DCGS-A. Of concern to the Army was the incompatibility of the

---

[9]Limited bandwidth generally occurs during remote operations when forward units may be less connected to central servers and thus may not have access to data held by the central servers or other distributed nodes (a node is a network connection point where data reside).

[10]Cloud computing is a model for delivering computing services through access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly released with minimal management effort or service provider interaction.

A7887

Appx17887

commercial software system's proprietary data format with the data standards used in DCGS-A and other intelligence community systems. Although data and products from the commercial system could be uploaded into DCGS-A, additional manual efforts were needed to fully integrate them. Army officials concluded that actions taken to accelerate and field the additional DCGS-A components and cloud computing capabilities met all the requirements in the joint urgent needs statement, and the Army closed it in 2011.

(FOUO) Nevertheless, in response to continued demand from certain field commanders in Afghanistan the Army and other DOD organizations began purchasing the commercial product on a limited basis for several units, spending approximately $33 million. At the same time, however, Army leaders expressed concern about having multiple systems in the field and the large investment already committed to DCGS-A. In 2012, the Army conducted assessments of intelligence analysts in Afghanistan to gain a better understanding of the strengths and limitations of DCGS-A versus the commercial analytic software product. Users reported that the commercial product was easier to operate and saved them time in conducting intelligence tasks. In addition, the commercial software company had field service representatives in theater who provided tailored training and support which users viewed as a benefit. Although the ease of use issue surfaced in the earlier urgent needs requests, the Army did not fully grasp the significance of the issue until after collecting feedback from users in the field. According to Army requirements officials, the DCGS-A system requires 80 hours of basic training to learn how to use the system and can be difficult to operate because there are multiple components and data screens to manipulate. Users also voiced concerns that the performance of the DCGS-A multi-function workstation, a key component of the system, was unreliable and that the different versions of DCGS-A in use in the field impeded the flow of intelligence information.

(FOUO) As a result of these field assessments, Army requirements and program officials recognized that DCGS-A needed to be a more intuitive, user-friendly system. After conducting a pilot, Army officials told us that user interface improvements will begin to be integrated into DCGS-A this year. The Army is also currently assessing ways to improve DCGS-A training for users and is re-exploring the feasibility of integrating the commercial software analytic product with DCGS-A. The Army entered into a joint research and development agreement with the commercial vendor in May 2012, to assess ways to mature data information sharing between the systems. In October 2012, the two systems demonstrated that collaboration is feasible. A second phase of the agreement assessed

A7888

Appx17888

additional levels of interoperability, including data discovery, sharing documents, and deploying link analysis tools. A third phase of the agreement to explore ways of improving user collaboration between the two systems is in the planning stages and will be conducted by the end of September 2013.

**(FOUO)** The Marines and SOCOM, which were just getting started on developing DCGS systems, found that the commercial analytic software system met their needs. The Marine Corps, which did not yet have a DCGS system fielded and had limited capabilities for conducting intelligence analysis, initially acquired the commercial system for selected units through DOD's Combating Terrorism Technical Support Office (CTTSO) as a stopgap and proof-of-concept measure.[11] Following its fielding, CTTSO initiated an independent assessment of the commercial system in 2011, surveying Marine Corps, Army, and other users. The assessment concluded that the commercial system was able to meet the critical performance requirements of the 2010 joint urgent need request and that overall user feedback about the system was positive. Demand for the commercial system continued and in 2012, the Marine Corps decided to provide the system to its entire force. However, to meet the operational needs, the Marines determined that acquiring the system through a deliberate, acquisition program of record approach would take too long and rapid acquisition would be better accomplished through the urgent needs process. The Marine Corps estimated it would take 24-36 months to complete the studies, analyses, and documentation necessary to establish formal requirements and support to get a program of record underway. Instead, the Marine Corps approved an urgent need request in 2012, to expand the use of the commercial system. In total, DOD organizations, such as CTTSO, have invested about $35 million to acquire the system as a bridging capability for the Marine Corps until 2014, when it is expected that a longer term solution can be worked out through a program of record approach to provide advanced analytic capabilities. One approach under consideration is to integrate the commercial system into future increments of the DCGS-MC system.

SOCOM also acquired the commercial analytic software system for its forces and is currently working to integrate it into the DCGS-SOF system

---

[11]The CTTSO mission is to provide a forum for discussion of mission requirements and possible solutions for combating terrorism. The agency funds and delivers potential solutions for the warfighter.

A7889

Appx17889

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | | 1. CONTRACT ID CODE | | PAGE | OF PAGES |
|---|---|---|---|---|---|---|
| | | | | | 1 | 46 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (if applicable) |
|---|---|---|---|
| 01 | SEP 29, 2015 | 637-0023-15-Z | |

| 6. ISSUED BY | CODE | HHQ402 | 7. ADMINISTERED BY (if other than Item 6) | CODE | ZD60 |
|---|---|---|---|---|---|
| Virginia Contracting Activity<br>ATTN: CFO-HQ<br>Bolling AFB, Bldg. 6000<br>Washington DC 20340-5100<br>Todd A. Tapper 202-231-5449 df21869@dodiis.ic.gov | | | Virginia Contracting Activity<br>ATTN: CFO-HQ<br>Building 6000<br>Washington DC 20340-5100 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and ZIP Code) | | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|
| PALANTIR USG, INC.<br>100 HAMILTON AVE<br>SUITE 300<br>PALO ALTO CA 94301 | DUNS: 825284321<br>Cage Code: 51W88 | | |
| | | | 9B. DATED (SEE ITEM 11) |
| | | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>GS-35F-0085U/HHM402-14-A-0095/0001 |
| CODE 00001261 | FACILITY CODE | | 10B. DATED (SEE ITEM 13)<br>SEP 22, 2014 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (if required) | Modification Amount ▮▮▮ |
|---|---|
| See Schedule | Modification Obligated Amount ▮▮▮ |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF<br>52.217-9 Option to Extend the Term of the Contract |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return _____ 1 _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

See Page #2

...See Continuation Page

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Matt Long, Legal Counsel | Don Camden, Contracting Officer<br>202-231-2159  donald.camden@dodiis.mil |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *Matt Long* (signature)<br>(Signature of person authorized to sign) | Sep. 28, 2015 | *Donald Camden* (signature)<br>(Signature of Contracting Officer) | 9/28/2015 |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

Protected Information A8137 and/or Legends Redacted

## 4. CONCEPT OF OPERATIONS

This BPA allows ordering agencies to acquire Palantir software and professional services to address the most challenging data problems affecting agencies' ability to prosecute their critical missions.

Task Order 1 is the ODNI sponsored IC ITE Knowledge Management Tool (IC ITE KMT) that services authorized JWICS users. IC ITE KMT enables a new generation of analytic processes that is centered on tying intelligence data directly to intelligence targets. This capability includes both material and services that serve as a bridge between cloud "analytics" and traditional intelligence analysis.

IC ITE KMT enables object-based analysis by interfacing with cloud services to provide high-quality data to intelligence analysts, targeteers; and watch standards that are flexible enough to solve individual mission needs. Object based analysis is a mission-centric concept that allows users to solve a variety of problems by providing consistent data and powerful characterization and processing tools. The organizing principle behind IC ITE KMT is the constantly evolving ontology of existential and thematic metadata. This ontology describes real world objects, events in the life of those objects, relationships between objects, and the data that describes those object, events, and relationships. It then creates the interface to fuse automated processing "analytics" and human judgments by exposing this knowledgebase in a variety of ways and capturing a "story" of intelligence interest as designed by a subject matter expert.

Emerging "big data" technology holds tremendous potential, of which the IC ITE KMT will take full advantage to enable human interpretation, synthesis and judgment of large volumes of disparate data. Object based analysis is a concept of context. The net result of a network of tens of thousands of substantive experts worldwide contributing knowledge across common themes enables the users to embrace a new generation of quantitative and "big data" analysis techniques. It enables users to import complex "raw" data integrate it with more traditional reporting formats by normalizing it against real-world objects and events.

Subsequent task orders will provide material enrichment to IC ITE KMT or deploy additional capabilities to ordering agencies including subject experts equipped to solve some of the most challenging data problems in use cases such as but not limited to Defense and National Intelligence.

## 5. SOFTWARE AGREEMENT PRICING MODEL

The contractor's proposed pricing discounts under Task Order 1 will be binding to the BPA and all subsequent Task Orders as follows: a 36% to GSA Part

2

A8151
Protected Information and/or Legends Redacted

//UNCLASSIFIED//

SECTION C
DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

Task Order 1

Statement of Work for the IC ITE Knowledge Management Tool
DIA Analytic Enterprise Operations

## 1. Purpose

1.1 The Intelligence Community Information Technology Enterprise Knowledge
Management Tool (IC ITE KMT) provides a single technical infrastructure for a
unified intelligence community through data integration, analysis, and
knowledge management. IC ITE KMT users are able to collaboratively analyze
and exploit both structured and unstructured data from multiple repositories
into a single operational picture in an integrated fashion. In addition to
providing advanced analytic capabilities, IC ITE KMT also offers robust security
features to include auditing, access control, and metrics reporting capabilities.

## 2. Background

2.1 Since 2010 the ICITE-KMT program has forged a common workspace where
intelligence officers from any organization can collaborate and share knowledge
and analysis for a broad swath of missions. Over the last five years the program
has organically grown to become a common work space where collectors and
analysts from NSA, NGA, DIA, DHS, FBI, DOE, a variety of operational elements,
and thirty-six other Government organizations collaborate on their common
interests

2.2 IC ITE KMT Consists of four primary functions:
- Workspace: the primary data integration and analytics workspace that
  contains a suite of investigative tools and provides the architecture for the
  web-based features
- Reader: a web application for searching document, emails, and cables
- Geospatial: a high-performance web-based map for large-scale geographical
  applications
- Web: a web-based application for searching and viewing data in the full
  Palantir IC ITE KMT repository.

4

//UNCLASSIFIED//

Protected Information
and/or Legends Redacted

A8153

For Official Use Only / Source Selection Sensitive Information, See FAR 2.101, 3.104, and 42.1503

# CONTRACTOR PERFORMANCE ASSESSMENT REPORT (CPAR)
## SYSTEMS

Name/Address of Contractor:
Company Name: PALANTIR TECHNOLOGIES INCORPORATED
Division Name:
Street Address: 1530 PAGE MILL RD
City, State, Zip Code: PALO ALTO, CA, 94304
Country: US
DUNS Number: 362130952
PSC: 5895 NAICS Code: 811212
Evaluation Type: FINAL
Contract Percent Complete:
Period of Performance Being Assessed: 2012-09-28 - 2013-09-27
Contract Number: GS35F0086UW911QX12F0022
Business Sector & Sub-Sector: SYSTEMS, OTHER SYSTEMS
Contracting Office: W6QK ACC-APG ADELPHI

Location of Work:
Award Date: 2012-09-28
Effective Date: 2012-09-28
Completion Date: 2013-09-27
Actual Completion Date: 2013-09-27
Total Dollar Value: $19,243,057.00 Current Contract Dollar Value: $19,243,057.00
Complexity: MEDIUM Termination Type: NONE
Competition Type: NOT AVAILABLE FOR COMPETITION Contract Type: FIRM FIXED PRICE
Key Subcontractors and Effort Performed:
Project Number:
Project Title: INTEGRATED FUSION AND ANALYSIS PLATFORM (IFAP)
Contract Effort Description: THE CONTRACTOR PROVIDES THE INSTALLATION AND
DEMONSTRATION OF AN INTEGRATED FUSION AND ANALYSIS PLATFORM (IFAP) AT
MULTIPLE LOCATIONS IN THEATRE. THE WEB-BASED ADVANCED ANALYTICAL
PLATFORM INTRODUCES TOOLS THAT ENABLE ANALYSTS TO STORE, ORGANIZE,
ACCESS, AND RETRIEVE LARGE AMOUNTS OF INTELLIGENCE FROM DISPARATE
DATA SETS. THIS ALLOWS THE RAPID ANALYSIS OF MASSIVE AMOUNTS OF DATA IN
ORDER TO PROVIDE THEIR COMMANDERS WITH A COMPREHENSIVE
UNDERSTANDING OF THE HIGHLY COMPLEX AND DYNAMIC COUNTERINSURGENCY
(COIN) ENVIRONMENT. THE CONTRACTOR PROVIDES THE INITIAL OPERATION OF
THE IFAP AS WELL AS A HELPDESK WHICH PROVIDES TECHNICAL SUPPORT.
Small Business Utilization:
Does this contract include a subcontracting plan? NO
Date of last Individual Subcontracting Report (ISR) / Summary Subcontracting Report (SSR):
N/A

A common five level assessment rating system is used to evaluate a contractor's performance. Ratings range from Unsatisfactory to Exceptional. Here's a breakdown of each category:

| Rating | Definition |
|---|---|
| Exceptional | Performance meets contractual requirements and exceeds many to the Government's benefit. The element being assessed was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective. |
| Very Good | Performance meets contractual requirements and exceeds some to the Government's benefit. The element being assessed was accomplished with some minor problems for which corrective actions taken by the contractor were effective. |
| Satisfactory | Performance meets contractual requirements. The element being assessed contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory. |

A8183

Appx18183

| | |
|---|---|
| Marginal | Performance does not meet some contractual requirements. The element being assessed reflects a serious problem for which the contractor has not yet identified corrective actions. |
| Unsatisfactory | Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The element being assessed contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective. |

## Evaluation Areas:      Rating

| | |
|---|---|
| Quality | EXCEPTIONAL |
| Schedule | EXCEPTIONAL |
| Cost Control | N/A |
| Management | EXCEPTIONAL |
| Utilization of Small Business | N/A |
| Regulatory Compliance | N/A |
| Other Areas | Rating |
| (1) | |
| (2) | |
| (3) | |
| Variance | (Contract to Date) |
| Current Cost Variance (%): | Completion Cost Variance (%): |
| Current Schedule Variance (%): | Completion Schedule Variance (%): |

Assessing Official Comments:

QUALITY: This contract is for software licenses and services which will enable the Government to collaborate intelligence information from disparate sources effectively and efficiently. As part of its services, Palantir (Contractor) is required to provide the Government with the installation, demonstration, and initial operations of an IFAP at up to four(4) different sites in theatre. The Contractor has provided software and services that exceed the Government¿s expectations with minimal issues. The software services has enabled Intelligence Analysts to collaborate complex intelligence from multiple sources giving the Government a tactical advantage in a hostile environment. The Contractor has provided an IFAP that enables the analyst to manipulate collaborated data into custom formats. The implementation of the IFAP has reduced analyst man hours by 50%. The Contractor also displayed exceptional quality of service by replacing the Government¿s existing laptops with laptops that were able to meet the software requirement without hesitation in order to meet the service requirements specified in the contract.

SCHEDULE: The Contractor successfully provided the installation, demonstrations, and support of the IFAP at all of the required locations in an effective and timely manner. For example, the installation of the IFAP system was completed ahead of schedule at all of the installation sites. The Contractor fulfilled the deliverables within the allotted time.

COST CONTROL: Fixed Price

MANAGEMENT: The Contractor provided software and services of superb quality. The Contractor provided helpdesk troubleshooting and technical support which resolved any issue within a 72 hour window. Significant issues or disruption of services were not observed due to the quality of installations and demonstrations from Palantir¿s technicians. The ongoing technical support proves to be effective in delivering simple troubleshooting and resolving minor issues. The customers are satisfied with the products and services provided by the Contractor. The Contractor continues to mitigate risk by maintaining a line of communication with the end users.

RECOMMENDATION: Given what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I WOULD recommend him for similar requirements in the future.

Name and Title of Assessing Official:

Title: ASSOCIATE BRANCH CHIEF
Organization: ARMY RESEARCH LABORATORY

A8184

Appx18184

# SOLICITATION, OFFER AND AWARD

| | | | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | RATING | PAGE | OF | PAGES |
|---|---|---|---|---|---|---|---|
| | | | | | 1 | | 65 |

| 2. CONTRACT NO. H92222-16-C-0078 | 3. SOLICITATION NO. H92222-16-R-0019 | 4. TYPE OF SOLICITATION [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP) | 5. DATE ISSUED 22 Apr 2016 | 6. REQUISITION/PURCHASE NO. SEE SCHEDULE |
|---|---|---|---|---|

| 7. ISSUED BY | CODE | H92222 | 8. ADDRESS OFFER TO | (If other than Item 7) | CODE |
|---|---|---|---|---|---|
| HQ USSOCOM SOF-AT&L-K ATTN: ASHLEY FARRIER 7701 TAMPA POINT BLVD TAMPA FL 33825-3323 | | TEL: 813-826-7335 FAX: 813-826-7504 | See Item 7 | | TEL: FAX |

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. Sealed offers in original and _____ copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in _____ until 02:00 PM local time 09 May 2016
(Hour) (Date)

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME ASHLEY FARRIER | B. TELEPHONE (Include area code) (NO COLLECT CALLS) 813-826-7335 | C. E-MAIL ADDRESS Ashley.farrier@socom.mil |
|---|---|---|---|

## 11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| X | A | SOLICITATION/ CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 40 - 64 |
| X | B | SUPPLIES OR SERVICES AND PRICES/ COSTS | 2 - 17 | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS** | |
| X | C | DESCRIPTION/ SPECS./ WORK STATEMENT | 18 - 29 | X | J | LIST OF ATTACHMENTS | 65 |
| | D | PACKAGING AND MARKING | | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | INSPECTION AND ACCEPTANCE | 30 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 31 - 33 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 34 - 37 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 38 - 39 | | M | EVALUATION FACTORS FOR AWARD | |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52.232-8) | Net 30 Days | | | | |
|---|---|---|---|---|---|
| 14. ACKNOWLEDGMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated) | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |

| 15A. NAME AND ADDRESS OF OFFEROR | CODE 470F5 | FACILITY | 16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|
| PALANTIR TECHNOLOGIES INC. MATT LONG 100 HAMILTON AVE STE 300 PALO ALTO CA 94301-1651 | | | MATT LONG, LEGAL COUNSEL |

| 15B. TELEPHONE NO. (Include area code) 650-815-0200 | 15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE [ ] | 17. SIGNATURE Matt Long | 18. OFFER DATE May 24, 2016 |
|---|---|---|---|

## AWARD (To be completed by Government)

| 19. ACCEPTED AS TO ITEMS NUMBERED | 20. AMOUNT ▓▓▓ | 21. ACCOUNTING AND APPROPRIATION See Schedule | |
|---|---|---|---|
| 22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION [ ] 10 U.S.C 2304(c)( ) [ ] 4 U.S.C 253(c)( ) | | 23. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM |
| 24. ADMINISTERED BY (If other than Item 7) CODE See Item 7 | | 25. PAYMENT WILL BE MADE BY CODE F87700 ACCT GDISB ST NR 387700 DFAS DEAMS 27 ARKANSAS RD LIMESTONE ME 04751-0216 | |

| 26. NAME OF CONTRACTING OFFICER (Type or print) Ashley M. Farrier TEL: 813-826-7335 EMAIL: ashley.farrier@socom.mil | 27. UNITED STATES OF AMERICA Ashly M. Farrier (Signature of Contracting Officer) | 28. AWARD DATE 25 May 2016 |
|---|---|---|

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

| Previous Edition is Usable | 33-134 | STANDARD FORM 33 (REV. 9-97) Prescribed by GSA FAR (48 CFR) 53.214(c) |
|---|---|---|

A8247

Appx18247

Protected Information and/or Legends Redacted

3.1.12.11     

3.1.13     Interoperability Capabilities

3.1.13.1

3.1.13.2

3.1.13.3

3.1.13.4

3.1.13.5

3.1.13.6

3.1.13.7

3.1.13.8

3.1.14     Ease of Use Capabilities

3.1.14.1
3.1.14.2
3.1.14.3

3.1.15     Continuous System Monitoring

3.1.15.1

3.1.15.2
3.1.15.3

3.1.16     Forward Laptop Support

3.1.16.1

3.1.16.2

3.1.17     Data/Enterprise Availability

3.1.17.1

A8270

Protected Information
and/or Legends Redacted



3.1.17.2

3.1.18     Data/Enterprise Transition Support

3.1.18.1

3.1.18.2

3.1.18.3

## 3.2     ENTERPRISE-WIDE LICENSE AGREEMENT

The Contractor shall provide a license agreement supporting an installed base of Palantir software defined in Section 3.4 "Initial Fielding Locations". The Contractor's license agreement is included as Attachment 1 hereto, and provision of all software licenses is subject to USSOCOM's ongoing compliance with this license agreement.

## 3.3     SOFTWARE ASSURANCE AND ANNUAL LICENSE RENEWAL

In addition to the service levels identified in the Contractor's license agreement included as Attachment 1 hereto, as part of the annual license renewal, the Contractor shall provide the following:

3.3.1     Version Upgrades: The Contractor shall provide ASIF version upgrades as they are released.

3.3.2     Software Assurance (SA): The Contractor shall track, update, and validate a list of bug fixes, confirm version compatibility, perform configuration management, provide Tier 3 help desk support, and provide revision control.

3.3.3     Ad Hoc Integration Support: The Contractor shall provide support as required to integrate ASIF version changes into the SOF Palantir environment.

## 3.4     INITIAL FIELDING LOCATIONS

3.4.1     The Contractor shall field 3 regionally focused Fixed Sites. Fixed Sites shall be the core capability for the SOF Enterprise architecture. Initial fielding locations of the Fixed Sites shall be:

| From: | Doug Philipcone |
|---|---|
| To: | Williamson, Michael E LTG USARMY HQDA ASA ALT (US) |
| Subject: | RE: Palantir follow up |
| Date: | Wednesday, October 07, 2015 4:31:20 PM |
| Attachments: | Palantir USG, Inc. Response to DCGS-A PM-DCGS-INC2-TASKORDER0001-DRAFTPW....pdf |

This email was sent from a non-Department of Defense email account, and contained active links. All links are disabled, and require you to copy and paste the address to a Web browser. Please verify the identity of the sender, and confirm authenticity of all links contained within the message.

----

LTG Williamson,

I want to thank you again for the candid discussion at our offices. I had intended to follow up with you sooner, but had been told by your office that you wouldn't be able to meet until sometime in 2016. It sounds like we both want to figure out the "how" of moving forward to mutual benefit, if it's even possible. To that end, I'd like to work with your office to schedule a time to have that conversation before 2016.

It was unfortunate that we got bogged down in a discussion over the history with DCGS-A - although I feel that the presence of the PM made that unavoidable. I have no desire to revisit that discussion in follow on meetings, but we would like the opportunity to show you our technology and talk about the problem sets Palantir is being applied against. Then take that paradigm and offer a few ideas on innovation challenges where there is real competition around existing deliverable technology where a vendor has limited time to show an outcome, weed out pretenders and get real results to the government. Based on that display and discussion, we would love to get your take on what might be done to create a more rational pathway for the Army to get Palantir to those who have a requirement for the outcomes we deliver, even if that's outside of the intelligence problem space. Right now, that process involves a lot of mutual pain, wasted time, and increased costs and I have to believe there's another way. We have our own ideas for what that way looks like, but would appreciate your thoughts.

Separately, to close the door on this issue, I do want to share with you the attached feedback we gave to the Army on the Increment 2 documents that have been released. To be frank, the draft Increment 2 documents released clearly signal that the individuals currently in charge of the program are not serious about doing something different. The way these are written, we can't submit a bid as a prime contractor or most likely even as a sub-contractor due to the burdensome accounting/compliance hurdles we spoke about during your visit. We've tried to work constructively with the Army throughout this process, but our feedback seems to have fallen on deaf ears and the program is determined to follow a developmental path. Given our last conversation, I want to make sure you had a full accounting of what we've told the program to date.

Regardless of what happens with Increment 2, Palantir works right now and soldiers and commanders are asking for it. Those basic facts have prevailed

A8312

Protected Information and/or Legends Redacted

| From: | Collins, Robert M COL USARMY PEO IEWS (US) |
|---|---|
| To: | Kreider, Stephen Daniel SES USARMY PEO IEWS (US); Williamson, Michael E LTG USARMY HQDA ASA ALT (US) |
| Cc: | Hallock, Harry P SES USARMY HQDA ASA ALT (US) |
| Subject: | RE: notes from our call (UNCLASSIFIED) |
| Date: | Wednesday, November 04, 2015 5:38:15 PM |
| Attachments: | DCGS-A, Info Paper - SASC Questions v5.docx |

LTG Williamson/Mr. Kreider,

Just to augment, I did receive some similar questions on the DCGS-A Inc 2 RFP (i.e., "why FAR Part 15 vs 12", "why EVMS", "why a Certified Accounting System", "why data rights", etc) during a recent SASC engagement with Mr. Kirk McConnell. Indications were that Palantir had visited the SASC Staffers, the week prior to our meeting.

During the SASC engagement, believe we were able to lay out the facts and the Staffers understood our approach.

We developed an information paper (attached) to give some additional context to those questions.

v/r  Rob

-----Original Message-----
From: Kreider, Stephen Daniel SES USARMY PEO IEWS (US)
Sent: Wednesday, November 04, 2015 1:12 PM
To: Williamson, Michael E LTG USARMY HQDA ASA ALT (US)
Cc: Collins, Robert M COL USARMY PEO IEWS (US); Hallock, Harry P SES USARMY HQDA ASA ALT (US)
Subject: RE: notes from our call (UNCLASSIFIED)

We usually do n0t respond directly to RFI inputs other than in our updates to RFP - posted L&M s etc so all see them at the same time.

v/r

Stephen Kreider
SES
PEO Intelligence, Electronic Warfare and Sensors
443-861-7881

-----Original Message-----
From: Williamson, Michael E LTG USARMY HQDA ASA ALT (US)
Sent: Wednesday, November 04, 2015 9:20 AM
To: Kreider, Stephen Daniel SES USARMY PEO IEWS (US)
Cc: Hallock, Harry P SES USARMY HQDA ASA ALT (US)
Subject: FW: notes from our call (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Steve,

Spoke with Palantir last week. Based on the document that you provided me I did not hear anything new. Do you have any plans to have someone respond to their concerns/comments? I've copied Harry because there are some assertions regarding contract types that I believe to be incorrect.

Thanks.

W

**A8327**

Protected Information and/or Legends Redacted

FOR OFFICIAL USE ONLY

INFORMATION PAPER

October 30, 2015

SUBJECT: DCGS-A Request For Proposal (RFP) Feedback Topics

1. The DCGS-A Inc 2 RFP has been iteratively released to Industry for comment. The items below provide additional information on recent industry and congressional feedback.

2. Federal Acquisition Regulations (FAR) Part 12 vs. Part 15. FAR Part 12 supports policies and procedures unique to the acquisition of "existing" commercial items. FAR Part 15 supports policies and procedures governing competitive and negotiated acquisitions. FAR Part 15 is used when negotiated contracts are needed to meet requirements, even if using standard commercial items. The Army has conducted extensive and independent market research and determined that no "single" or "existing" commercial item can meet all existing Joint Requirements Oversight Committee (JROC) approved requirements. Therefore, DCGS-A Increment 2 will involve a FAR Part 15 full and open competitively awarded and negotiated Indefinite Delivery Indefinite Quantity (IDIQ) contract, which will involve the integration of "multiple" commercial off-the-shelf solutions, along with limited vendor development.

3. Fixed Price vs. Cost Plus Incentive Fee. A fixed-price contract is suitable for acquiring commercial items when there are definite specifications and firm prices can be established at the outset. Cost contracts are more appropriate for efforts that are more broad, include integration, and can be negotiated, and when incentives are available to motivate the Contractor. An IDIQ contract vehicle allows flexibility and the opportunity to support both FFP and CPIF. Therefore, DCGS-A will use an IDIQ contract, with the initial Delivery Order #1 for a Data Integration Layer using CPIF, with incentives for cost and software quality. Making Delivery Order #1 a firm fixed-price (FFP) is not practical or prudent as there are too many unknowns for a contractor without significantly overinflating the proposal to cover their risk.

4. Certified Accounting System (CAS). The RFP does not require certified accounting system (CAS), but does require the awardee to have an "adequate" accounting system to ensure a company can properly segregate labor costs, material, overhead, and subcontracts. Having an "adequate" accounting system is not required for an Offeror to submit a proposal, but is required prior to final contract award. The Defense Contract Management Agency (DCMA) is responsible for determining adequacy and the process takes approximately 45 days.

5. Past Performance Factor. Past Performance is one of the Factors for evaluation during source selection. Offerors are "not" limited to Engineering and Manufacturing Development (EMD) past performance. Relevant past performance other than prior EMD or system development experience can be included as past performance.

    a. The draft Request for Proposals (RFP) uses the language "and/or" to enable companies to submit past performance that is focused on non-federal work in the areas of cloud computing, data architecture, cyber, etc. The RFP language states.... "and/or integration of some or all of

A8329

Protected Information and/or Legends Redacted

FOR OFFICIAL USE ONLY

the following components: data architecture, visualization and analytical tools, cloud computing and big data analytic capabilities, cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence (CI), Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT), and Sensor Management."

b. Since the initial draft was provided to industry, past performance rating has changed to pass/fail. A commercial entity with no past performance would still get a neutral rating and obtain a "passing" rating.

6. Earned Value Management System (EVMS). EVMS is a Department of Defense tool used to manage contract costs and schedule requirements. The use of EVMS is required for cost type contracts/task orders over $100M and is applicable for DCGS-A Inc 2 contract, which is planned at approximately $206M.

7. Data Rights. The DCGS-A Inc 2 RFP uses standard Federal Acquisition Regulation (FAR) language to address data rights requirements for Offerors. The Army will ask Offerors to provide a list of all software in the proposal, whether it is commercial or non-commercial, whether it is developed or to-be developed, software license costs, and whether the Government will have unlimited rights, limited rights or no rights.

a. In addition to the above, a Data Rights Subfactor has been incorporated that will evaluate the offerors' proposals based on the Government's ability to competitively procure software sustainment and maintenance services from third parties. The Offeror's proposal will be given a strength for a proposed software rights approach that permits the Government to competitively procure maintenance and sustainment services for DCGS-A Increment 2 software deliverables from third parties. The Offeror's proposal will be given a weakness for a proposed software rights approach that does NOT permit the Government to competitively procure maintenance and sustainment services for DCGS-A Increment 2 software deliverables from third parties. This strategy highlights the Government's desire to establish a DCGS-A Inc 2 capability with a modular open system architecture (MOSA).

b. Finally, the Government recognizes limits to gaining rights to all commercial technology data and software. In the Data Rights sub-factor, the Government seeks to understand what software is being proposed and what rights will be provided with the proposed DCGS-A Increment 2 capability.

Protected Information and/or Legends Redacted

| From: | Dills, Jack E COL USARMY HQDA ASA ALT (US) |
|---|---|
| To: | Williamson, Michael E LTG USARMY HQDA ASA ALT (US) |
| Cc: | Ostrowski, Paul A MG USARMY HQDA ASA ALT (US); Rasch, Robert A Jr COL USARMY HQDA ASA ALT (US); Cervantes, Marcos A MAJ USARMY HQDA ASA ALT (US) |
| Subject: | FW: DRAFT_DCGS-A Brief to AUSAv3.pptx (UNCLASSIFIED) |
| Date: | Friday, November 06, 2015 3:13:34 PM |
| Attachments: | DRAFT_DCGS-A Brief to AUSAv4.pptx |

Sir,

Today, Mr. Camarillo briefed DCGS-A to CSA and AUSA. Apparently LTG Legere had some issues with the brief and afterward expressed her issues to MG Ostrowski. I have attached the brief used for the engagement should LTG Legere try to talk to you. I have scheduled an O/C for MG Ostrowski to come talk with you Monday morning 0800 before O&I.

R/
Jack

COL Jack E. Dills
Executive Officer
Principal Military Deputy to the Assistant Secretary of the Army
(Acquisition, Logistics, and Technology)
(703) 697-0356 (Office)
(703) 679-2071 (BB)
(703) 697-4003 (Fax)
103 Army Pentagon, Room 2E532
Washington, DC 20310


-----Original Message-----
From: Fortier, Gregory S LTC USARMY HQDA ASA ALT (US)
Sent: Friday, November 06, 2015 7:32 AM
To: Rasch, Robert A Jr COL USARMY HQDA ASA ALT (US) <robert.a.rasch2.mil@mail.mil>; Dills, Jack E COL USARMY HQDA ASA ALT (US) <jack.e.dills.mil@mail.mil>; Warnick, David A COL USARMY HQDA ASA ALT (US) <david.a.warnick2.mil@mail.mil>
Subject: DRAFT_DCGS-A Brief to AUSAv3.pptx (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Gentlemen,

Please see the latest version of the DCGS-A briefing for today.

V/R
Greg

LTC(P) Gregory S. Fortier
Executive Officer
Principal Deputy for the Assistant Secretary of the Army (Acquisition,
Logistics & Technology)
103 Army Pentagon, Rm 2E516
Office: 703-614-7395 (DSN: 224)
BB: 571-224-8779
gregory.s.fortier.mil@mail.mil

**A8360**

Protected Information and/or Legends Redacted



# Distributed Common Ground Systems - Army (DCGS-A)

## November 6, 2015



DESIGN • DEVELOP • DELIVER • DOMINATE
SOLDIERS AS THE DECISIVE EDGE

A8362

Protected Information and/or Legends Redacted

Appx18363

Protected Information
and/or Legends Redacted

 

# DCGS-A Program Overview

- DCGS-A is the Army's flagship Intelligence System for analysis and fusion fielded to every Corps, Division, and Brigade deploying and across the globe

- Is a 'System of Systems' that includes hardware (laptops, servers), software (analysis, collaboration) and fixed sites

- Provides approximately 129 all-source analysis tools and access to over 700 data sources, which deliver actionable information to Warfighting Commanders

  - Weather, Terrain, Link Analysis, etc.

  - Access to Army/Joint ISR and sensor data

  - Full Domain support for HUMINT, SIGINT, GEOINT, COMINT, ELINT

  - Supports Full Spectrum Operations (Low and High Intensity)



Robust Multi-INT Tools

- Capabilities are commercial products and solutions (hardware and software)

- Builds to open architecture and compliant with Intelligence and Army standards

 DESIGN • DEVELOP • DELIVER • DOMINATE
SOLDIERS AS THE DECISIVE EDGE                                                    2

Appx18364

Protected Information
and/or Legends Redacted



# DCGS-A Inc 1 ATEC Report Results



- DCGS-A Increment 1 Release 1 completed Initial Operational Test & Evaluation (IOT&E) in early 2012, and was found to be effective with significant limitations, not suitable, and not survivable based on Army Test & Evaluation Command (ATEC) feedback

  - **Effective with significant limitations** – ineffective at sharing intel between classification levels, complicated fusion workflow, toolset limitations, TS/SCI limitations
  - **Not suitable** – Did not demonstrate reliability requirements, poor user interfaces, inadequate training, sluggish performance/poor system stability
  - **Not survivable** – vulnerable to information assurance and cyber attacks

- DCGS-A Increment 1 Release 2 completed Follow on Test and Evaluation (FOT&E) during the Network Integration Exercise (NIE) 15.2, and was found to be effective, suitable and survivable based on ATEC feedback

  - **Effective** – supported the commander's situational awareness and decision making process by providing a set of automated tools across multiple classification levels by delivering timely and accurate information about the operational environment
  - **Suitable** – the system can be sustained in an operational environment but requires support from Field Service Representatives
  - **Survivable** – system provided adequate evidence to prove the ability to survive in the operational environment in which it is intended to be used

- ATEC and DOT&E final reports on Increment 2 expected to be released to Congress within 30 days



DESIGN • DEVELOP • DELIVER • DOMINATE
SOLDIERS AS THE DECISIVE EDGE                                                                3

## EXPERT REPORT

**Submitted by Bryant Choung**

Bryant Choung
August 5, 2016



**A8391**

Appx18391

Protected Information
and/or Legends Redacted

████████████████████████

## TABLE OF CONTENTS

EXPERT QUALIFICATIONS ............................................................................................................... 2

SUMMARY OF CONCLUSIONS ......................................................................................................... 5

ANALYSIS ......................................................................................................................................... 7

I.      The Army Has A Requirement For A Data Management Platform That Could Be Met By
        The Palantir Gotham Platform. .......................................................................................... 7

        A.      A Data Management Platform Is A Software Product That Integrates Data
                From Disparate Sources To Facilitate The Management, Storage, Analysis,
                And Visualization Of The Data. ................................................................................ 7

        B.      The Army Has Articulated A Need For A Data Management Platform As The
                Central Component Of Increment 2 Of DCGS-A. ................................................. 11

        C.      Palantir Offers A Data Management Platform That Meets The Army's Needs.
                ............................................................................................................................... 15

        D.      The Army Could Have Acquired The Data Management Platform It Needs In
                One Procurement And Enhancements To The Data Management Platform
                Through A Separate Procurement. ........................................................................ 22

II.     The Army Could Acquire Both The Data Management Platform It Needs And Any
        Enhancements, Modifications, Or Customizations It Requires Through A Single Fixed-
        Price Contract ................................................................................................................... 23

III.    The Army Incorrectly States That Certain Capabilities Are Not Available From The
        Commercial Marketplace ................................................................................................. 25

        A.      Intelligence Support to Cyber ............................................................................... 26

        B.      Data Fusion .......................................................................................................... 29

        C.      DIB Upgrade ......................................................................................................... 30

        D.      Interoperability .................................................................................................... 31

        E.      Signals Intelligence .............................................................................................. 33

        F.      Human Intelligence .............................................................................................. 35

        G.      Military Weather ................................................................................................... 36

I

Protected Information
and/or Legends Redacted

████████████████████████████████

## EXPERT QUALIFICATIONS

I received a B.S./B.A. in computer science and business economics from Brown University in 2004, and I also have a number of industry certifications, including certifications from Microsoft and CompTIA. While at Brown University, I supported a number of efforts in advanced data visualization and information processing research. This included providing research engineering support to a large-scale database technology that was being jointly developed by Brown University and the Massachusetts Institute of Technology (MIT). Through this experience I gained an understanding of databases and information systems and also gained an understanding of how the next generation of information processing systems should be architected to meet the growing number and volume of data sources used in information technology.

From May 2002 to August 2002, I worked as a software engineer at Microsoft Corporation as part of the SQL Server team. SQL Server is one of the leading database solutions for organizations worldwide. At the time Microsoft was building a capability as part of SQL Server that would allow for organizations to automatically alert their customers whenever new information was collected that was flagged as relevant. While at Microsoft, I developed a number of interoperability extensions that allowed for these automatic notifications to be sent to customers using a number of industry standard messaging formats. In my time at Microsoft, I worked as part of an information management system that is commercially developed and in use with thousands of enterprise customers worldwide.

From May 2004 to January 2005, I worked as a Software Developer at Mooring Financial Corporation, where I served as a software architect and engineer in designing software systems that manage all of the information related to the investment portfolios of Mooring Financial. Mooring Financial has several databases that track the performance of all of the investments their portfolio; I built tools for accountants and financial analysts to access, analyze, and generate reporting based upon the data that is stored across the organization.



2

A8393

Appx18393

Protected Information
and/or Legends Redacted



3

Protected Information
and/or Legends Redacted



I also was a regular participant in the solicitation development process for DCGS-Army Increment 2 (DCGS-A2). I helped draft responses to the Army's Requests for Information (RFI), attended Industry Days, and helped produce and share information about the capability of the Palantir Gotham Platform. In written and verbal feedback to the Army throughout the solicitation process, I helped Palantir convey information to the Army relating to many of the topics I cover below, including the overall acquisition structure and enterprise software development principles.

4

Protected Information and/or Legends Redacted

███████████████████ ▪l ███████████

Beyond my direct support to clients, I have also spoken at industry conferences and authored white papers describing industry best practices and approaches on big data and enterprise information systems. I also hold a Top Secret security clearance.

## SUMMARY OF CONCLUSIONS

In this report, I have been asked to address the following questions:

1.  Based on the Army's description of its requirements for DCGS-A2, does the Army have a requirement that can be met by the acquisition of the Palantir Gotham Platform? In answering this question, I address the following related questions:

    a.  Do the documents that the Army has pointed to as defining its requirements for DCGS-A2 contain a requirement for a Data Management Platform?[1]

    b.  Is the Palantir Gotham Platform a Data Management Platform that meets the Army's need for a Data Management Platform?

    c.  Could the Army have practicably procured a Data Management Platform through a separate contract than its procurement of the other requirements it references in its list of requirements for DCGS-A2?

2.  Does Palantir have the ability to meet all of the Army's requirements for DCGS-A2 (including both the requirement for a Data Management Platform and all other ancillary or additional requirements the Army has identified) through a fixed price commercial contract?

3.  Can Palantir perform the specific capabilities that the Army has asserted Palantir cannot perform?

In answering these questions, I have reviewed a number of materials. In particular, I have reviewed the documents that the Army has pointed to as setting forth its DCGS-A2 requirements, which are: (1) the Capabilities Development Document (CDD), Tab 11; (2) the Requirements Definition Package (RDP), Tab 12; and (3) the Performance-Based Specification (PBS), Tab 23. In addition, I have reviewed the Performance Work Statement (PWS) dated December 18, 2015 and attached to Solicitation No. W56KGY-16-R-0001. I also have reviewed Palantir's submissions to the Army as part of the DCGS-A2 solicitation development process, including Tabs 15, 18, 36, 38, and 40, and I have reviewed the Army's recent "Report to

---

[1] By the term "Data Management Platform," I am referring to a system that integrates data from various disparate sources into one data layer, provides analytic and management capabilities for that data, and presents the data in a user-facing visualization framework.

██████████████████████████████████████

**A8396**

**Appx18396**

Protected Information
and/or Legends Redacted

Congress On The Distributed Common Ground System-Army Increment 2," which is attached as Exhibit A.

My conclusions and expert opinions in response to the questions above are as follows:

1.    The Army's central requirement for DCGS-A2 is the acquisition of a Data Management Platform, and that requirement could be satisfied through the acquisition of the Palantir Gotham Platform (and perhaps through the acquisition of other commercially available Data Management Platforms) as a commercial product on a fixed-price basis.

     a.    The documents the Army has pointed to as setting forth the requirements for DCGS-A2 contain as their central feature a requirement for a Data Management Platform.

     b.    The Palantir Gotham Platform is a Data Management Platform that meets the Army's DCGS-A2 requirement for a Data Management Platform. In fact, the architecture that Palantir told the Army it could provide in its response to the first RFI is functionally identical to the architecture that the Army told Congress would comprise the "primary components of DCGS-A Increment 2."

     c.    The Army could practicably have satisfied its need for a Data Management Platform through a procurement that was separate from the procurement of the other requirements it has included in its listing of DCGS-A2 requirements. The only justification the Army has given for why it did not procure a Data Management Platform through a separate contract is to say that it wanted a single contractor to develop the "Data Integration Layer" of the Data Management Platform. The Data Integration Layer of the Palantir Gotham Platform is already developed, as is the Data Integration Layer of any commercially available Data Management Platform. Since there are Data Management Platforms that are available as commercial items and that already have fully developed Data Integration Layers, it is not necessary—and indeed would be counterproductive and likely to create unnecessary technical problems—for any contractor "to develop" a Data Integration Layer. Thus, the Army has not identified a plausible reason for not procuring a Data Management Platform separately from any additional enhancements, configurations, or modifications it wishes to acquire as part of DCGS-A2, and it is my expert opinion that there is no reason, technological or otherwise, for not doing so.

2.    Palantir has the ability to satisfy all of the Army's DCGS-A2 needs through a fixed-price commercial contract. Palantir often provides customers in both the private and public sectors with both the Palantir Gotham Platform and any necessary enhancements, configurations, or modifications of the type the Army lists in its DCGS-A2 requirements.

**A8397**

Protected Information
and/or Legends Redacted

3.  The Army has asserted that Palantir does not have certain capabilities relating to Intelligence Support to Cyber, Data Fusion, DIB Upgrade, Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, and Interoperability. That assertion is incorrect. Palantir can provide each of these capabilities, and it has demonstrated its capabilities in these areas through contracts with military and intelligence agencies.

## ANALYSIS

I.  **The Army Has A Requirement For A Data Management Platform That Could Be Met By The Palantir Gotham Platform.**

   A.  **A Data Management Platform Is A Software Product That Integrates Data From Disparate Sources To Facilitate The Management, Storage, Analysis, And Visualization Of The Data.**

The sheer volume and diversity of information spread across large organizations, especially United States Government agencies, is a significant challenge for analysts and users of information. Indeed, the challenge most organizations face is not that more information is needed or that the required information is not available; rather, the biggest challenge is often allowing users to find insights in the data that already exists. Compared to the proverbial needle in the haystack, the modern user of information needs to find the needle across multiple haystacks distributed across multiple fields.

The challenges of diffuse amounts of data held in various databases apply as well in the military intelligence context, where the purpose of the intelligence mission is to connect dots from every possible source. For example, information gathered by troops in the field might be generated and stored in one location, information gathered from satellites might be generated and stored in a different location, information gathered from cellular towers may be generated and stored in a different location, and so on. The separation of information is a common characteristic within and across large institutions; this general phenomenon is sometimes referred to as intelligence "stove piping."

Without a means to help manage information, an analyst naturally finds it difficult, if not impossible, to ensure they have reviewed all relevant information or to create a single, unified view of a situation. Because an analyst is often forced to search across separate databases, the analytic process is manual, error-prone, laborious, and time-consuming. This stove piping problem is depicted in the following Army graphic, which was included in a slide deck that Lieutenant General Mary Legere brought to her deposition:

A8398

**Appx18398**

Protected Information and/or Legends Redacted

Protected Information to be Disclosed Only in Accordance with
the United States Court of Federal Claims Protective Order

*Figure 1: Army Illustration of Stove Pipe Problem*



The figure above uses bubbles to represents data—whether SIGINT, GEOINT, HUMINT, or otherwise—that comes from various sensors, but the data but are segregated from each other in "stovepipes."

Significant advances in the sophistication of software engineering technology have allowed companies such as Palantir to create Data Management Platforms to help provide a solution to this problem. The advent of Data Management Platforms has allowed people to delegate progressively more complex processing tasks to machines; that in turn has freed people from clerical tasks and created tremendous potential for organizations to solve even harder and more complex problems—and to do so in the most efficient manner possible.

8

A8399

Protected Information
and/or Legends Redacted

████████████████████████████

A Data Management Platform is a software program or collection of software programs that enables the collection, analysis, and visualization of various types of data from various sources in a manner that enables the accomplishment of the user's goals. In the military context, such data might range from human observations recorded in a Microsoft Word, Excel, or Powerpoint file to data from a sensor or satellite image. Such data might be stored on a hard drive and then communicated via infrastructure such as a military network to the server that is hosting the Data Management Platform. While the software can be designed in different ways, the basic software components of a Data Management Platform are a data integration layer, a data analytics layer, and a visualization layer. Other critical features of a Data Management Platform that I discuss below are extensibility, interoperability, and scalability.

The data integration component of the Data Management Platform is responsible for collecting the data and preparing it for searching, analysis and visualization. At the initial phase of data integration, the program copies and stores the file and is indifferent to the type of data or the content of the data. It simply treats the file as a string of digital 1s and 0s, which is what a file is at its core. An analogy would be a library that receives a shipment of books and first simply moves them into the library and stores them as an undifferentiated set of books.

Under the next phase of data integration, the program finds out as much about the file as it can to enable it to be catalogued and searched. This includes both the file's metadata (i.e., data about the file such as when it was introduced to the platform and who introduced it, as well as the creator of the file and when it was produced) as well as the contents of the file. The process for accessing and cataloguing the content depends upon the type of file. For example, a text file in an industry standard format (such as ASCII or Unicode) is searchable using publicly available software algorithms whereas a proprietary file format requires application of programming instructions often provided by the software developer. Where such instructions do not exist, the developer of the Data Management Platform can apply "parsers"—i.e., software programs that translate the file into a text format. There are a number of software programs that provide these functions and where necessary, a custom parser can be created as Palantir did in a case involving data captured from cellular phones. In this case, Palantir had to write a custom parser that allowed users of the Data Management Platform to view data such as call history, contacts, and text messages.

The next relevant component of a Data Management Platform is data analytics and fusion. This refers to the component of the platform that analyzes and processes the data. Data fusion is sometimes referred to separately from data analytics, but refers essentially to the processing of data from multiple sources to extract common entities such as people, places, events, and the relationship between them. An effective Data Management Platform will identify either automatically or through additional configurations the specific or relevant analytics that are appropriate for the type of data that are being ingested and the needs of the user of the Data Management Platform. The level of analytics of which a Data Management Platform is capable will vary based upon the platform and configurations required by the user of the platform, and there are many types of data analytics that are available. Examples include software that

A8400

Protected Information
and/or Legends Redacted

██████████████████████ [a] ████████████████

translates words from one language to another, can measure positive or negative sentiment of social media posts, identifies and extracts phone numbers from written documents, or processing images.

Moreover, for a Data Management Platform to be effective, it must be "extensible." In the software sense, extensibility defines the degree to which the software can be modified to suit a new purpose such as the ability to read new file formats or perform new forms of analytics or data fusion. Any Data Management Platform should be built with extensibility in mind by which it can evolve and be configured to meet the needs of the purchaser of the Data Management Platform as well as anew advances in those areas. Some of the hallmarks of an extensible platform include open Application Programming Interfaces (APIs), which allow software written by others to be made compatible with the Data Management Platform and open file formats, meaning there are no restrictions on who can write data for the Data Management Platform or who can read data generated by the platform.

The last step in the process is the visualization component of the software, which enables the data to be depicted in a way that is user friendly and allows the ready manipulation and analysis of the data by the user. A Data Management Platform provides the ability for users to fuse many different types of data from different sources into a single view. As with analytics, there are a wide range of visualization capabilities that are available in the marketplace, including the capability to view documents and images, represent data in charts and graphs, and display information geographically on a map. This can include the ability to map out all known enemy safe houses, known Improvised explosive device (IED) creation facilities, known incidents of radio communications, and known incidents of IED activity all on a single map.

Two other concepts that must be applied to the Data Management Platform are interoperability and scalability. Interoperability refers to the ability for two information systems to exchange information. Typically systems interoperate through APIs or file formats. If a system is designed to be interoperable, it will have publicly available and open APIs that allow other computer programs to easily exchange information. Where two computer systems need to communicate using files, an interoperable system will have open file formats that can be easily read and consumed by other systems. An example of interoperability would be the ability for an independently developed map application to be able to display information that has been retrieved from a Data Management Platform.

Scalability, on the other hand, refers to the ability for a system to be flexible enough to meet growth in data and users. If a system isn't built to be scalable will not be able to function or respond to requests if it becomes overloaded with data or if too many users try to use the system at once. Software that has been built to be scalable will be able to expand to run on additional hardware as it is added. Core components of a scalable platform can be "mirrored" or duplicated across additional servers to service growing numbers of users. Core components of a scalable platform can also be "sharded" or distributed across multiple servers as data grows beyond the capacity of a single server. Designing a software platform to be both

10

Protected Information
and/or Legends Redacted

mirrored and sharded is complex, and requires that the components were initially designed with scalability in mind.

**B.**   **The Army Has Articulated A Need For A Data Management Platform As The Central Component Of Increment 2 Of DCGS-A.**

The documents I have reviewed show that a Data Management Platform that integrates data from many different sources and facilitates the analysis and visualization of that data is the foundation of DCGS-A2. For example, the PWS states as follows:

> "The requirements for Increment 2, EMD include, development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management."

Tab 22 at A1051. The list before the semi-colon in the passage above—the "development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities"—defines the need for a Data Management Platform; it explains that the Army is seeking a data management architecture with enhanced analytical and visualization tools to work with "big data," which is precisely what a Data Management Platform does.

The list following the semi-colon—"cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management"—describe various types of data, workflows, and concepts that the Data Management Platform supports. In other words, each of these things is a task or capability that a Data Management Platform provides. For example, an analyst can use a Data Management Platform to perform data analysis relating to cyber operations or to weather. As another example, a Data Management Platform can interoperate with other systems and perform cyber analytics. In fact, there are countless other tasks or capabilities that a Data Management Platform provides that are not listed.

Various other items in the PWS further explain the Army's need for a Data Management Platform. Some examples include the following:

11

A8402

Appx18402

Protected Information and/or Legends Redacted

- "DCGS-A Increment 2 shall provide the capability to support situation understanding and visualization of the operational environment using all available, relevant information and data sources." Tab 22 at A1070

- "Data Ingestion from disparate sources has a significant role in DCGS-A, and DCGS-A INC 2 must be able to interface with and import data from various systems and applications." Tab 22 at A1094.

- "Design and implement system and software architectures, software components and software functionality needed to support a robust, massively distributed, real-time collaboration system." Tab 22 at A1079.

My conclusion that a Data Management Platform is the foundation of DCGS-A2 is confirmed by the Army's recent Report to Congress, which says, "The primary components of DCGS-A Increment 2 are depicted" in the following illustration:

*Figure 2: Army's Depiction of a Data Management Platform*



Figure 1 - Increment 2 High Level System Architecture

12

A8403

Appx18403

Protected Information
and/or Legends Redacted

████████ ▌▐ ██

This figure from the Army's recent Report to Congress represents a Data Management Platform. In other words, the Army can obtain what it describes as "the primary components of DCGS-A Increment 2"—i.e., everything in this diagram—by obtaining a Data Management Platform. The Army's conception of DCGS-A2 envisions the basic components of a Data Management Platform discussed in Section IA above, namely, a Data Integration Layer that draws on a variety of sources, forms, and types of data; data search, analysis, and fusion capabilities, which the Army depicts in the Data Analytics Platform; and a Visualization Framework that surfaces the data so analysts can investigate, examine, and work with it.

My conclusion that the Army can satisfy its central DCGS-A needs by acquiring a Data Management Platform is further supported by the following language from the Army's Report to Congress, which describes the illustration above:

> "There are three (3) fundamental components to the architecture: Data Integration Layer (DIL), Data Analytics Platform (DAP), Visualization Framework (VF). The DIL and DAP are collectively referenced as the Data Management Architecture (DMA) and serve as the architectural foundation for the system. The DMA integration and development is therefore the focus of the first task order executed under the DCGS-A Increment 2 Engineering, Manufacturing and Development (EMD) contract scheduled for award in 4QFY16."

Exh. A at 3. This language from the Report to Congress is nearly identical to language from the Contracting Officer's Statement, which describes the Data Management Architecture as "the architecture foundation and the heart with which the rest of the capabilities will depend on to function." Tab 1 at A16. A Data Management Platform consists of the Data Management Architecture (which consists of the DAP and DIL as shown above) and the Visualization Framework, as these terms are described by the Army and depicted in Figure 1. In other words, a Data Management Platform consists of the three components described by the Army above as the central components of the DCGS-A2 procurement.

Therefore, when the Army is acknowledging that the Data Management Architecture is the "architectural foundation," "the focus," or "the heart" of DCGS-A2, the Army is stating that it needs a Data Management Platform.[2]

---

[2] Most of the items in the PWS relate to the Government's need for a Data Management platform. The exception is (i) requirements that relate to the Government's decision to develop a new platform rather than purchase a commercially available one and that would therefore be irrelevant if the Government were required to solicit commercial items to fulfill the requirements and (ii) certain Additional Enhancements that the Government could either have procured as a separate contract or acquired from Palantir on a fixed-price basis.

████████

Protected Information and/or Legends Redacted

My conclusion that the Army requires a Data Management Platform is further illustrated by the following image, which comes from a slide that Lieutenant General Mary Legere brought to her recent deposition:

*Figure 3: Army Illustration of Stove Pipe Solution*



Whereas the bubbles representing data in Figure 1 were segregated into different stovepipes, the bubbles representing data in Figure 3 are now integrated into one common data layer. This illustration shows that the Army wants to integrate data from disparate sources into a common data layer to allow users to access and exploit the data with various analytical tools and capabilities in a collaborative environment. That is precisely what a Data Management Platform does.

14

A8405

**Appx18405**

Protected Information and/or Legends Redacted

███████████████████████

**C.      Palantir Offers A Data Management Platform That Meets The Army's Needs.**

In Palantir's response to the Army's first RFI, Palantir provided the following representative illustration of how the Palantir Gotham platform would operate within the Army enterprise. Tab 36 at A1893. This depiction of what Palantir can offer is the functional equivalent of Figure 2 above, which is what the Army later told Congress it was hoping to develop through the DCGS-A2 procurement.

*Figure 4: Depiction of the Palantir Gotham Platform*



Next, I discuss each component in Figure 4, and I explain how it corresponds to the Army's depiction in Figure 2. This exercise shows that Army's needs, as represented to Congress, can be met by the Palantir Gotham Platform.



15

Protected Information and/or Legends Redacted



16

A8407

Protected Information
and/or Legends Redacted

Generally, there are three types of file types that need to be ingested and integrated: industry standard file formats, (i.e. PDF, DOC, and PPT), variants of text file formats (i.e. txt, csv, xml), and binary formats (these are file formats that are typically unique to a specific program). Palantir has automated capability and tools that are designed to easily and efficiently open and process information from these three file types for storage into the Palantir Data Management Platform.

Palantir has designed the Palantir Gotham Platform to be as flexible as possible with respect to the types and formats of data it can ingest and bring into the Palantir Gotham Platform. As a result, the Palantir Gotham Platform allows a user to integrate, analyze, and visualize HUMINT, SIGINT, GEOINT, MASINT, weather, and any other type of data. The integration or correlation of intelligence from across these multiple intelligence disciplines and domains is sometimes called Multi-INT; the Palantir Gotham Platform is a Multi-INT platform because it is designed to be flexible enough to support integration, management, and exploitation of information from all sources of data with minimal configuration and enhancements.



17

Protected Information and/or Legends Redacted

██████████████████████

This is similar to the way an organization may choose to store data in a database or in a network share drive. The primary difference is that a Data Management Platform provides additional infrastructure to ensure that data from a variety of formats and sources can be correctly catalogued and secured according to industry best practices and the rules and policies set forth by the data and information system owners.

For example, since information security is important to all of Palantir's customers, the data that is stored by the Data Management capability is secured so that data is only accessible by users that have the appropriate qualifications to access the data.  In the commercial world the division of access to data might be determined by job function. The data a Nurse, Doctor, or Billing Administrator should have access to in a unified patient care database varies because there is information that is sensitive to the patient, not all parties have a need to know for all of the information, and there are certain patient privacy regulations that health systems need to adhere to.

Once the data has been stored in a central location and secured, it also needs to be accessible. The Data Management capability provides the functionality that allow for users to search, discover, and retrieve the data that is stored.

The Data Management Platform should be flexible enough to support discovery of data through any number of means to support the various workflows that a user may have. This includes the ability to search documents by keywords, the ability to search for entities, like people, by their properties, like name, gender, and social security number.  This also includes the ability to discover data based upon temporal and geospatial criteria as well, like being able to ask the system to return all improvised explosive device (IED) attacks that occurred within a specified map area for the past month.

**Data Analytics and Fusion**



18

**A8409**

Protected Information and/or Legends Redacted

██████████████████████████████████

An example of an analytic that can enrich data by using additional contextual information is the capability to geographically identify and locate Internet Protocol (IP) addresses. Often, when computer or network information has been collected in a forensics examination, the report from the subpoena only includes the network address of the computers and networks. This information is represented as an IP address. In order for this data to be more useful to an investigator, an example of an analytic that has been used as part of the Palantir Gotham Platform is to process the IP addresses through analytics that can associate IP addresses with geographic locations and physical addresses. This makes it so that an analyst can tie entities and persona that exist in cyberspace into the real world.

Another example of an analytic that can improve the quality of data through additional processing is the various image enhancement algorithms that Palantir can configure for its Data Management Platform. Aerial imagery of positions on the ground often come in many different formats, resolutions, and orientations. In order for the imagery to be useful and accurate to an analyst, often the imagery needs to be corrected for a number of factors. For example, one analytic might identify and classify images that have cloud cover that obscure the view of the ground. Another analytic may take imagery that is of a lower resolution and enhance and sharpen the imagery with filters that improve the image. Another analytic might process the imagery to display appropriately on the map given the 3D to 2D projection used for the map.

The "Data Fusion" portion of the architecture allows for entity extraction and correlation algorithms to be run against the data. This includes the automatic identification and extraction of names, entities, dates and location from document data. I discuss data fusion capabilities in Section III(B) below.

*Data Visualization*

Next, the Data Management Platform allows for the visualization of data, which facilitates the user's analysis. ████████████████████████████████

██████████████████████████████████

██████████████████████████████████

19

██████████████████████████████████

A8410

Protected Information
and/or Legends Redacted

"Data Visualization" component allows the analyst to see any type of data that was ingested into the Data Management Platform from "Sensors & Sources" to "Data Integration," and combine those data visually in a wide variety of ways that are useful to the user. Some examples of visualizations available through the Palantir Gotham Platform are provided in Section III below.

*Data Sharing*

One mechanism by which information can be shared between information systems is through the use of files and another is through the use of APIs. Files are the primary structure that allows users to store information on a computer. Computer users are typically familiar with the files that are created by consumer applications like their word processing and spreadsheet software

Another mechanism by which information systems share information is through the use of APIs. APIs allow computer systems to directly talk to one another through a bi-directional communication channel. This communications channel typically is a network connection or similar connection that is established between two computer programs. In order for the two computer programs to communicate with each other, there needs to be a common protocol and a common contract of services that are available. The common protocol requirement establishes the communication mechanism through which the two computer programs will communicate. This is similar to how web browsers around the world can connect to web servers around the world. Web browsers have agreed upon transmission protocols that they will all communicate through.

Protocols can be something that is specific to a type of computer programming language, like Java or Microsoft .Net, or this could be a more general communications format that is not tied to a specific programming language, like web services that are based on SOAP or REST. In industry, a system is considered to be interoperable if it offers APIs through web services like

A8411

Appx18411

Protected Information and/or Legends Redacted

SOAP and REST and also through a major programming language like Java. For example, mobile phone application and gaming companies extend the functionality of Android Smart Phones by utilizing the Java APIs that were published by Google. Web application and gaming companies exchange information with Facebook through the use of REST web services that were published by Facebook.

Beyond defining the protocol that an API will use, a company will also need to determine the functions or capability that is exposed through its API. For example on Android, there may be certain API functions that allow the program to get information from the GPS chip to determine location, there may be certain API functions that allow the program to access contact information from the address book, and there may be certain API functions that allow data to be sent and received through text messaging.

For APIs that are owned or developed for a particular program or by a particular organization, the organization has to make the decision as to whether or not the APIs are public or private. Private APIs mean the APIs are meant for internal use only and are not meant to be accessed by external users or programs. If a system only has private APIs, a system is generally considered to be closed and not interoperable. Alternatively, a software developer can choose to make their APIs open and fully documented. This allows other developers to read the documentation on the APIs and utilize the functionality exposed by the APIs. Palantir hosts a robust set of public APIs that allow for comprehensive access to the data and core functionality of the Data Management Platform. There are many external entities, including government and commercial organizations, that have used Palantir's APIs to exchange data and interoperate with the Palantir Gotham Platform.

Beyond APIs that are developed for specific applications or programs, sometimes there are standard APIs that are established by standards bodies for use across a community. Examples of these standard APIs include the World Wide Web Consortium or W3C that standardizes the APIs that are in use to communicate on the internet. This makes it so that web browsers on all computers on all operating systems can communicate with web servers that reside on a variety of server types and operating systems. Similarly, there are standards that exist within the DOD and IC context. Specifically in the DCGS realm, DI2E and DIB are the main standards organizations that exist. For example, the DIB standard for how data is queried and retrieved is adopted as one of the DI2E standards. These DI2E and DIB standards are supposed to ensure that databases and Data Management Platforms across the DCGS community could discover and share information. If data in a system is available via DIB interface, the system is generally considered interoperable with the DCGS community.

███████. The result is that all data within the Palantir Gotham Platform is accessible and the overall Data

A8412

Appx18412

Protected Information
and/or Legends Redacted

Management Platform is designed to be interoperable with industry and government standards. I discuss interoperability further in Section III(D) below.

*Core Infrastructure*

The Data Management Platform is connected to the "Core Infrastructure" component in Figure 4, which corresponds with the "Operating System/Infrastructure" and "Servers, Network, Storage, etc." components in Figure 2. These components represent the various types of infrastructure that the Palantir Gotham Platform can be deployed upon, including the servers, networks, and power that support the Data Management Platform. The Palantir Gotham Platform is designed to be scalable to a wide variety of infrastructure environments and flexible enough to work with any infrastructure. ████

**D.      The Army Could Have Acquired The Data Management Platform It Needs In One Procurement And Enhancements To The Data Management Platform Through A Separate Procurement.**

As I discuss in Section II below and in Section I in connection with the concept of extensibility, once an organization procures a Data Management Platform such as Palantir's, it is straightforward to integrate additional enhancements, configurations, or modifications that the organization may require. Thus, because the Palantir Gotham Platform satisfies the Army's need for a Data Management Platform, the Army could have contracted with Palantir (or another commercial provider with similar open and interoperable capabilities) to acquire a Data Management Platform and then entered into a separate contract (or multiple contracts) to acquire any additional enhancements, configurations, or modifications that the Army may have wanted.

It is my understanding that the Army has taken the position that the Army could not feasibly adopt such an acquisition approach because, according to the Army:

> "Development of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems. This complexity adds to the criticality for a single software developer/integrator to ensure timely workflow completion. The data integration layer requires unified systems engineering and agile software development activities by a single contract. Ad hoc or independently developed software activities cause technical risks,

A8413

Appx18413

Protected Information and/or Legends Redacted

concerns and significant schedule risk and cost uncertainty given the software release build strategy and plan. As stated the security and quality of the software development and integration requires inherently tight control and stable managed processes. To separate the systems engineering, software development, and integration activities would only undermine the cohesive development of a new data management and software architecture."

Dkt. 19 at 5-6 (citing Tab 46). This discussion does not explain why the Army declined to pursue one contract to purchase the Data Management Platform and a separate contract for any enhancements, configurations, or modifications it wanted. As explained above, the Data Integration Layer is a component of a Data Management Platform. That means that the procurement of a Data Management Platform from one entity (such as Palantir) would also necessarily include the procurement of the Data Integration Layer from one entity. Thus, the Army's stated desire to have a single entity provide the Data Integration Layer does not explain or justify the Army's decision not to acquire the Data Management Platform from a single entity. If anything, the Army's desire to have a single entity provide the Data Integration Layer should have encouraged the Army to procure the entire Data Management Platform from a single entity and avoid a developmental contract that will involve a multitude of different providers.

The Army's statements also conflict with the procurement approach of DCGS-A2 because the PWS calls for the various components to be developed and then glued together. In essence, the Army is rejecting the procurement of an already developed and integrated Data Management Platform in favor of developing and gluing together functional components like a Data Integration Layer, Data Analytics Platform, and Visualization Framework. It is my expert opinion that given the past performance of the DCGS-A system, which also relied on a glue code approach, the Army's overall integration approach will defeat its goal of achieving a seamless user experience.

II.     **The Army Could Acquire Both The Data Management Platform It Needs And Any Enhancements, Modifications, Or Customizations It Requires Through A Single Fixed-Price Contract.**

As I explain above, the Army could have acquired a Data Management Platform to meet the needs that it describes as the "architectural foundation" of DCGS-A2, by acquiring the Palantir Gotham Platform as a commercial item on a fixed-price basis. In addition, the Army could have acquired both the Data Management Platform from the commercial marketplace *and* modifications necessary to fulfill any other requirements by procuring a commercial item on a fixed-price basis. Like most software, the Palantir Gotham Platform is readily extensible and can be configured for the customer environment in which it is operating. These configurations can include integration of particular data sources, additional analytics capabilities, and

A8414

Protected Information and/or Legends Redacted

████████████████████

customized visualizations of data. Overall, Palantir has provided thousands of data integrations, analytics, and visualizations configurations on all relevant security levels from Unclassified to Top Secret through firm fixed price contracts. In each of these cases, a customer purchases the Palantir Gotham Platform and also acquires from Palantir enhancements, configurations, and modifications to meet particular needs.   These include Palantir's fixed-price commercial contracts with the DIA, SOCOM, and the USMC, and they include a recent fixed-price commercial contract with a customer in the IC to provide additional enhancements, configurations, and modifications on a commercial item basis to further extend the Palantir Gotham Platform that was previously sold to that customer.



As already discussed, items in the PWS relate to the Army's core need for a Data Management Platform and could be satisfied by the procurement of Palantir's Data Management Platform without the need for additional enhancements, configurations, and modifications.  Other items relate to the Army's decision to *develop* a Data Management Platform rather than acquire one in the commercial marketplace and thus would be irrelevant if the Army elected instead to procure a Data Management Platform in the commercial marketplace.  As to the remaining items, Palantir could readily configure or enhance its platform to provide those items on a firm fixed-price basis.   The Army specifically labels certain of these items as "Additional Enhancements."  For example, the Army states that it "may" issue a task order asking the DCGS A-2 contractor to: "Design and implement a chat capability within the DCGS-A environment that integrates with chat systems available outside the DCGS-A environment. Some examples are eXtensible Messaging and Presence Protocol (XMPP) and Internet Relay Chat (IRC)."  Tab 22 at

████████████████████

As another example, the PWS states that a task order may be issued for DCGS A-2 to "Support voice recognition and transcription capabilities." Tab 22 at A1098. The Palantir Gotham Platform already provides support for voice recognition and transcription capabilities, ████

████████████████████

24

████████████████████

A8415

Protected Information
and/or Legends Redacted

Appx18415

Other items that could be addressed through enhancements to the Data Management Platform include:

- "Design and implement interfaces with thin-client or Web-based systems or frameworks that have been or may be developed by the Government." Tab 22 at A1077.

- "Design and implement approved improvements to the DCGS-A system interoperability architecture." Tab 22 at A1077.

These requirements specifically contemplate that whatever the Army procures for DCGS A-2 will need to be interoperable with systems that are later developed—meaning it would need to be able to communicate with those systems, manage data from those systems, and provide data to those systems. As discussed in greater detail in Section III(D), Palantir's Data Management Platform is designed to be extensible and interoperable with current and future systems.

Accordingly, the Army could satisfy its DCGS-A2 needs by acquiring a Data Management Platform together with additional enhancements, configurations, or modifications as commercial items on a fixed price basis, or it could acquire the Data Management Platform as a commercial product to satisfy its central needs, as discussed in Section I above, and separately contract for any additional enhancements, modifications, or customization it might require.

### III.   The Army Incorrectly States That Certain Capabilities Are Not Available From The Commercial Marketplace.

I have reviewed the portion of the Army's Market Research Report that states: "Significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 effort cannot be procured as a commercial product." Tab 33 at 1840. I also have reviewed the Army's July 1, 2016 "Determination of Non-Commercial Item," which states that "significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items." Tab 134 at A6626. It is my expert opinion that the conclusions in these documents are wrong; all of these capabilities are available through the commercial marketplace—at a minimum, they are available from Palantir, which is able to provide each of these functions through the Palantir Gotham Platform on a fixed-price commercial item basis.

A8416

Protected Information and/or Legends Redacted

████████████████████

### A.   Intelligence Support to Cyber

Palantir can provide Intelligence Support to Cyber, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" Intelligence Support to Cyber. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that Intelligence Support to Cyber cannot be provided by commercial items, and there is nothing in the PWS relating to Intelligence Support to Cyber that cannot be provided by commercial items on a fixed-price basis, including by Palantir's commercial items.

Intelligence Support to Cyber generally refers to the ability to support understanding, awareness of, and defense against malicious cyber actors (e.g., hackers) and also includes the ability to provide intelligence support to offensive cyber operations. Thus, the PWS says that "DCGS-A shall support the Army Cyber Command intelligence analysis effort by providing cyber data ingest, management, and access to support the Cyber Electromagnetic (CEM) Cell in both Defensive Cyber Operations (DCO) and Offensive Cyber Operations (OCO)." Tab 22 at A1073. (The "CEM Cell" is the management team that tracks and manages the Army's cyber forces.) As this requirement suggests, and as with other forms of data that must be analyzed to support the Army's missions, Intelligence Support to Cyber starts with cyber-related information being ingested into the Data Management Platform and integrated with all other information in the Data Management Platform. Analysts then use search, analysis, and fusion tools to identify and map information about the cyber actors, threats, and vulnerabilities. This type of information is visualized through various dashboards and similar features.

The Palantir Gotham Platform has the capability to perform Intelligence Support to Cyber as described in the PWS and in fact has a contract with Army Cyber Command under which it serves as the information and analytic platform for Army Cyber Command to research and track cyber threats.[3] ████████



---

[3] The July 2013 MITRE report similarly recognized that "Palantir has NETOPS capability to audit/log potential cyber events and has Cyber Analysis Tools to detect/analyze suspicious Cyber events." Tab 156 at A7851. ████████████

████████████████████

**A8417**

Protected Information
and/or Legends Redacted



27

Protected Information and/or Legends Redacted



It should be noted that it is the very point of a Data Management Platform to enable a user to assimilate and analyze a large amount of disparate types of data to accomplish a mission, regardless of the mission type. In this respect, the data that must be managed and analyzed to prevent cyber-attacks is functionally the same as the satellite, UAV, human, sensor, or other data that is used to plan and prevent physical attacks. As explained in Palantir's comments to the Army on the draft PWS for DCGS-A2, if "the Army acquires a working data platform, they can extend and adapt that platform to accommodate any mission area," which would include Intelligence Support to Cyber. Tab 15 at A694. In other words, the Army would acquire Intelligence Support to Cyber capabilities by acquiring a Data Management Platform, which is why a *separate* requirement for cyber Intelligence functionality is unnecessary. Tab 15 at A694.[4]

---

[4] I understand that the Government has taken the position that Palantir's response to the draft PWS suggested that Palantir believed that Intelligence Support to Cyber was unnecessary or that Palantir was not willing or able to provide Intelligence Support to Cyber. That characterization is not correct. As discussed in the text, there is no question that Palantir can provide this capability. The point of the comment in the response to the PWS is that a Data Management Platform such as the Palantir Gotham Platform can readily accommodate all types of data and use that data to support the Army's various missions (including cyber missions); it was therefore unnecessary to have a separate requirement for *developing a separate* capability for Intelligence Support to Cyber.

28

A8419

**Appx18419**

Protected Information
and/or Legends Redacted

### B.   Data Fusion

Palantir can provide the required capabilities of Data Fusion, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" Data Fusion. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that Data Fusion cannot be provided by commercial items, and there is nothing in the PWS relating to Data Fusion that cannot be provided by commercial items, including by Palantir's commercial items. For example, the PWS says that "DCGS-A shall be capable of performing automated fusion Level 0, 1, and 2 functions," which it defines as "Source Processing," "Entity Refinement," and "Situation Refinement." Tab 22 at A1072-73. Palantir can deliver these capabilities, as they are described in the PWS, as a commercial item on a fixed price basis.

As explained in Sections I(A) and I(C) above, once data has been ingested into the Data Management Platform (through the Data Integration Layer in Figure 2 or the Data Integration component in Figure 4), there are many different ways that a user might wish to analyze the integrated data using automated or semi-automated processing or algorithms. Data Fusion is one of these capabilities. Palantir provides Data Fusion capabilities through the Palantir Gotham Platform, and those capabilities can be readily enhanced, configured, and extended through the use of additional tools. Because the Palantir Gotham Platform was designed to be open and extensible (as discussed above in Section I(C)), its API allows for additional processing and analytic engines and products (including Data Fusion products) to be easily plugged into our platform, so the platform can be easily customized to provide both current and future Data Fusion capabilities. For example, Palantir has integrated the Palantir Gotham Platform with a number of free open source tools as well as commercially available software products to deliver enhanced Data Fusion capabilities. Palantir has provided enhanced data fusion capabilities for customers in the IC, including through its contract with the DIA.

In Palantir's comments on the draft PWS, Palantir conveyed to the Army that Data Fusion was available on the commercial market, "yet the Task Order, as written envisions building this capability from scratch." Tab 15 at A694. Palantir further explained that, instead of having requirements for evaluation or design of Data Fusion capabilities, the Army should require that the Data Management Platform be able to exploit and use various Data Fusion capabilities.[5] Moreover, the diagram that Palantir provided to the Army to illustrate the capabilities available through a Data Management Platform expressly identified Data Fusion as one such capability.

---

[5] I understand that the Government has taken the position that Palantir's response to the draft PWS suggested that Palantir believed that Data Fusion was unnecessary or that Palantir was not willing to provide Data Fusion. That position is not correct, as explained in the text.

29

Protected Information
and/or Legends Redacted

### C. DIB Upgrade

Palantir can provide the required capabilities of DIB Upgrade, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" DIB Upgrade. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that DiB Upgrade cannot be provided by commercial items, and there is nothing in the PWS relating to DIB Upgrade that cannot be provided by commercial items, including by Palantir's commercial items.

The DIB is the primary mechanism through which multiple DCGS sites can share information. There are many DCGS databases spread around the world. The Army owns and operates many of these databases, but the other military services, like Navy, Air Force, and SOCOM also operate their own version of DCGS around the world as well. The DIB effectively serves as a federated index or "card catalog" of military intelligence stored in various sites around the world in a heterogeneous mix of databases.

Because the DIB defines a standard by which users can submit search queries and by which search results are returned, an analyst is able to query as many databases as the analyst wishes with a single query instead of having to construct new queries for each individual database.

The MITRE report also recognized that "Palantir provides DoD-IC interoperability via DIB Query support." Tab 156 at A7816.

In its response to the draft PWS, Palantir specifically recommended that the "DIB should be treated as an interoperability standard, not a software platform that should be integrated," Tab 15 at A694, because achieving interoperability with the DIB is the primary and most technologically sound approach to achieving the Army's stated goal. Ultimately, it would be technologically feasible for Palantir to either install the DIB software or to be interoperable with

30

A8421

Appx18421

Protected Information
and/or Legends Redacted

### D.   Interoperability

Palantir can provide the required capabilities relating to interoperability, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" interoperability. The Market Research Report and July 1 determination do not specify the basis for the Army's conclusion that commercial items cannot satisfy the Army's interoperability requirements, and there is nothing in the PWS relating to interoperability that cannot be provided by commercial items, including by Palantir's commercial items.

As discussed in Section I(C), interoperability in the context of software and Data Management Platforms defines the ability for independent systems to exchange data and information with each other. To say two systems are interoperable is to say that data and information can be exchanged between them. In order to facilitate and expand interoperability to a broader community, government and industry groups rely on interoperability standards that define how specific types of information that are relevant to the community can be exchanged.

Because Palantir operates in a variety of industries and contexts requiring data exchange with a range of new systems, it has designed its Data Management Platform to be open and readily interoperable with new systems and standards███████████████████████████████████████
███████████████████████████████████████████████████ Palantir also offers a number of endpoints or interfaces to its Data Management Platform known as APIs. APIs allow third party developers and engineers the ability to connect to and interact with a system. An industry standard way to promote interoperability is to both expose APIs and also provide full and open documentation of the APIs. Palantir provides these APIs and the associated documentation to all of its customers, and they are also available via the internet. Palantir's APIs allow for customers and third party developers the ability to extend the

---

[6] I understand that the Government has taken the position that Palantir's response to the draft PWS suggested that Palantir believed that DIB Upgrade was unnecessary or that Palantir was not willing to provide DIB Upgrade. That position is not correct. The comments to the draft PWS, responded to a requirement that the contractor "integrate the DCGS integration Backbone (DIB) Version 4.x (or other versions as directed) into the DCGS-A Increment 2 baselines for interoperability with the Joint DCGS Family of Systems (FoS)." Tab 15 A694, Tab 22 A1075. As explained in the text, Palantir did not say that DIB Upgrade was unnecessary or that Palantir could not provided but rather recommended one approach to achieving it.

31

A8422

Protected Information
and/or Legends Redacted

functionality of the Palantir Data Management Platform and to import and export data using the API. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Palantir to incorporate new interoperability standards into the Palantir Gotham Platform with minimal configuration.[7] As explained in the MITRE report, "Palantir is an open system. Palantir employs a blend of open/DoD-IC/company specified standards accessible via open API's." Tab 156, A7816 (bolded text omitted).

As a result, Palantir has repeatedly demonstrated its interoperability with a variety of systems in the defense context, including interoperability when deployed on Army, joint, and coalition networks. There are no established standards that Palantir has not been able to meet. Palantir also has been a leader in the development of interfaces that implement the standards that the Defense and Intelligence Communities have been working to develop.

For example, as part of the role of the OUSD(I) to oversee all military intelligence, there is an initiative called the Defense Intelligence Information Enterprise (DI2E) that is an effort to standardize intelligence and information collaboration and sharing. As described by then-USD(I), Michael Vickers, DI2E, "is the unifying construct between the Department of Defense, the Intelligence Community (IC), and Coalition intelligence information enterprises." DI2E includes DCGS-A and the DCGS programs of Navy, SOCOM, Air Force, Marine Corps and the IC. DI2E attempts to create this standardization by defining the portfolio of common services and capabilities across the defense intelligence space, defining the individual specifications that describe unique services or capabilities, and developing conformance tests for measuring adherence to the standards.

For the past four years, OUSD(I) has held its annual DI2E conference, called DI2E PlugFest. Palantir has been an active participant of each of these events. These events are the primary means by which vendors and government can qualify for recognition by USD(I) on alignment to the stated goals and objectives of DI2E. Through these events, Palantir has been awarded the most "gold stars" out of all participants and also has been designated as an "early adopter" as recognition of the Palantir Gotham Platform's alignment to the stated goals of interoperability and collaboration set forth by the USD(I).[8] Palantir also is aligned to the stated goals of other

---

[7] There is often a misconception that software built by commercial companies are inherently "closed" or non-interoperable platforms. However, there is no technical reason why a government owned or government developed software platform would be more "open" or interoperable than a commercial platform. Many of the industry standards for interoperability have been developed for use by commercial companies.

[8] Because USD(I) has not developed tests for determining conformance with the various standards, it does not authorize industry to claim overall conformance with DI2E. Palantir, however, has met the requirements of all tests that USD(I) has promulgated, and is authorized to claim alignment with DI2E interoperability requirements.

Protected Information and/or Legends Redacted

developing interoperability and standards initiatives across the DoD including JIE, IC ITE, and others.[9]

### E. Signals Intelligence

Palantir can provide the required capabilities relating to SIGINT, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" SIGINT. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that SIGINT capabilities cannot be provided by commercial items, and there is nothing in the PWS relating to Signals Intelligence that cannot be provided by commercial items, including by Palantir's commercial items. For example, the PWS says: "DCGS-A Increment 2 shall provide the capabilities to process, exploit, and disseminate SIGINT data, information, and products." Tab 22 at A1070. Palantir can deliver these capabilities, as they are described in the PWS, through the Palantir Gotham Platform on a fixed price basis.

In the DCGS-A2 PWS, the SIGINT requirement is divided into two categories: "1) SIGINT Externals—which provides SIGINT analysis, data management, and data dissemination functionality. 2) COMINT Internals—Composed of sensor data processing elements and audio management to include data exploitation and data management, which exists entirely within the TS/5 Eyes Security Domain." Tab 22 at A1070. Generally, this division reflects two main ways in which SIGINT is collected and exploited: external SIGINT focuses on the nature of the electronic transmission, which might include the frequency on which the message was transmitted or the particular sent and received locations of a transmission; internal COMINT focuses on the nature of the intercepted communication or what the target was saying in the transmission. The Palantir Gotham Platform supports processing, exploitation, and dissemination of both of these types of SIGINT. As explained above in Section I(C), the Palantir Gotham Platform is designed to integrate, analyze, and visualize any type of data, and this includes SIGINT.



---

[9] The Intelligence Community Information Technology Enterprise (IC ITE) is an initiative by the Director of National Intelligence to enhance integration, collaboration and to achieve efficiencies in how the intelligence community operates. Palantir has been awarded the contract to be the IC ITE Knowledge Management Tool. The Joint Information Enterprise is an initiative managed by the Defense Information Systems Agency (DISA) to create a consolidated and consistent Information Technology enterprise for the Department of Defense.

**A8424**

Protected Information and/or Legends Redacted

34

Protected Information
and/or Legends Redacted



### F. Human Intelligence

Palantir can provide the required capabilities relating to HUMINT, including any "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" HUMINT. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that HUMINT capabilities cannot be provided by commercial items, and there is nothing in the PWS relating to HUMINT that cannot be provided by commercial items, including by Palantir's commercial items. For example, the PWS states: "DCGS-A Increment 2 shall provide the capabilities to process, exploit, report, manage, and disseminate CI and HUMINT data, information, and products. This shall consist of Consolidating legacy CI and HUMINT data analysis, exploitation, reporting, and dossier management thick and thin client capabilities to a unified software solution compatible with the new Data Architecture." Tab 22 at A1071. The Palantir Gotham Platform can provide this capability.

In fact, the Palantir Gotham Platform is routinely used by IC customers to integrate, analyze, and visualize HUMINT. As explained above, an analyst can use the Data Management Platform to do this for any type of data, including HUMINT data. Most of the data that supports HUMINT is represented as what is called "message traffic." Message traffic consists of text documents that represent reporting from sources that provide intelligence on people, organizations, and events. There are a variety of types of message formats that are used in military intelligence depending upon the topic of the message, the reporting agency, and how the information was

35

Protected Information
and/or Legends Redacted

collected. Over many years, Palantir has ingested millions of HUMINT reports. An unclassified example of how a sample HUMINT report would look in Palantir is represented below:



### G.   Military Weather

Palantir can provide the "military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with" Military Weather. The Market Research Report and July 1 Determination do not specify the basis for the Army's conclusion that Military Weather capabilities cannot be provided by commercial items, and there is nothing in the PWS relating to Military Weather that cannot be provided by commercial items, including by Palantir's commercial items.

For example, the DCGS-A2 PWS states: "DCGS-A Increment 2 shall provide interoperability with the DoD DCGS FoS and all current intelligence, weather, and COE Computing Environment (CE) systems that consume, produce, analyze or display ISR and geospatial data, information, and intelligence at the requisite classification levels/security domains." Tab at A1069. It further states: "DCGS-A Increment 2 shall provide a computer-assisted capability to display (in 2D and 3D globe) relevant geospatial (including Standard and Sharable Geospatial Foundation (SSGF)) data, weather data, and single, multi and all-source fused intelligence and information on the

36

Protected Information and/or Legends Redacted

███████████████████████

enemy, non-aligned and friendly forces." Tab 22 at 1069. The PWS also states that DCGS-A2 "shall provide the capabilities to use and disseminate weather data and information for mission planning purposes." Tab 22 at A1071. The Palantir Gotham Platform provides these capabilities.

As described previously, Palantir is designed to ingest and display information from a variety of sources and in a variety of formats.



###

37

A8428

Appx18428

Protected Information
and/or Legends Redacted

## UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| PALANTIR USG, INC.<br><br>                    Plaintiffs,<br><br>-vs.-<br><br>THE UNITED STATES<br><br>                    Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

## SUPPLEMENTAL DECLARATION OF BRYANT CHOUNG

**A8441**

Protected Information
and/or Legends Redacted

22.     In his Expert Report, Mr. Cronen also asserts: "Had the Government procured the Data Management Platform as a single item and procured any additional 'enhancements, configurations, or modifications' as separate items, *there is the potential* that these separate items will require changes to the Data Management Platform. *If* the Government is not able to utilize third parties to perform software sustainment and maintenance due to data rights restrictions on the Data Management Platform, any changes required to this software item may need to be performed by the original provider of the software." Dkt. 58-1 at 22 (emphasis added). Mr. Cronen acknowledges that this issue would not prevent use of commercial products but asserts that it would need to be "weighed against the merit of the technical solution provided." *Id.*

23.     Mr. Cronen's assertion disregards the technical architecture of Data Management Platforms in general and of the Palantir Gotham Platform in particular. As I have explained, the



Platform." Dkt. 58-1 at 22. Nor is there any technical or software engineering reason why the Army could not acquire a Data Management Platform as a commercial item in one procurement

A8450

Protected Information and/or Legends Redacted



## II. Mr. Cronen Has Offered No Valid Technical Or Software Engineering Reason Why The Army Cannot Procure The Entirety Of DCGS-A2 By Procuring The Palantir Gotham Platform Plus Additional Enhancements Together As A Commercial Item.

28.     In my Expert Report, I explained how the Army could acquire both the Data Management Platform *and* any additional configurations, modifications, and enhancements *together* as a commercial item through a single fixed-price contract. *See* Dkt. 44-2 at § II.  Mr. Cronen did not conclude otherwise in his Expert Report, stating instead that he had insufficient information to say whether the Palantir Gotham Platform could meet all of the DCGS-A2 requirements with minor modifications.  See Dkt. 58-1 at 30.

29.     In his Expert Report, Mr. Cronen relies on Mr. Stock's declaration, in which Mr. Stock referred to 909 Increment 2 requirements from the PBS (i.e., the Performance Based Specification).  Dkt. 49-3.  Mr. Stock attached to his declaration a chart listing out each of these requirements.  Mr. Stock's chart actually contains 909 *rows* in the underlying Excel spreadsheet; once you exclude the rows that do not contain specific PBS requirements, there are actually 898 PBS requirements.  The other 11 rows, found at the end of the chart, correspond to high-level "Key Performance Parameters," "Key Systems Attributes" or other entries that Mr. Stock agreed in his deposition were not the PBS requirements.  Dkt. 80-1 at 34:18-35:10.

30.     Mr. Stock testified that 681 of the PBS requirements were "the same as" requirements from DCGS Increment 1.  Dkt. 80-1 at 53.  Mr. Stock also labelled 146 of the PBS

Protected Information
and/or Legends Redacted

requirements in his list as "DMA only." *See* Dkt. 68-1. However, he admitted that his judgments about what constitutes a DMA requirement are "subjective" and involve "gray" areas. Dkt. 80-1 at 81, 59. It is unclear whether Mr. Stock believes other requirements also relate to the DMA (i.e., whether he believes other requirements are for the DMA plus other components and therefore are not "DMA only"). In any event, not every requirement has equal significance, as evident from the fact that the Data Management Architecture is described as the heart and the architectural foundation of DCGS-A2, and the Solicitation says that the Data Management Architecture has as much significance as all of the other technical subfactors *combined*. Thus, even if it were true that only 146 of the PBS requirements in Mr. Stock's list relate to the "DMA only," that would say nothing about the overall significance of those requirements in comparison to the other requirements.

31.     Moreover, Mr. Stock did not address how many of the PBS requirements in his table could be met by the Palantir Gotham Platform or by any other commercially available Data Management Platform. As I explain next, and as is set forth in the Appendix to this Declaration, Palantir can meet all of the PBS requirements listed in Mr. Stock's table on a commercial item, fixed-price basis.[1]

32.     First, without any configuration work at all, the Palantir Gotham Platform is capable of providing the functionalities of a Data Management Platform that I described in my

---

[1] My Appendix is a table consisting of rows for each of the PBS requirements Mr. Stock identified (and the columns from his chart containing the "Trace ID" for each requirement and the description of each requirement). In addition, my Appendix contains three additional columns that I describe in this Declaration.

Protected Information and/or Legends Redacted

Expert Report, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

22.   Based on this "out-of-the-box" capability, and without any configuration work or enhancements or even minor modifications, the Palantir Gotham Platform could meet 581 of the PBS requirements.  These requirements are noted with an "X" in the "out-of-the-box" column in my Appendix.  These 581 requirements correspond to the baseline Data Management Platform that the Army requires, and that Palantir can meet without doing even the most minor, customary configuration work we regularly do for our customers.

33.   Second, Palantir customarily deploys the Palantir Gotham Platform into a customer's environment by installing and configuring the platform and plugging in existing "helpers."  I explained this during my deposition when I stated: "There is a process by which we plug in our helpers into the environment, and the process by which we take our entire data management platform and plug it into the customer environment.  That's called deployment, installation, configuration."  Dkt. 54-1, Choung Depo. Tr. at 125:20-126:5.  ████████████████



A8454

Protected Information
and/or Legends Redacted

███████████████████████████████████████████

Choung Depo. Tr. at 132:3-16.  In addition to the 581 PBS requirements in Mr. Stock's list that Palantir could meet with the Palantir Gotham Platform "out-of-the-box," Palantir could meet an additional 242 of the PBS requirements in Mr. Stock's list through customary configurations and installations of existing helpers.  These 242 requirements are noted with an "X" in the "existing helpers" column in my Appendix.  Thus, through its "out-of-the-box" capabilities and through customary configurations and installations of existing helpers, Palantir would satisfy a total of 823 of the 898 PBS requirements in Mr. Stock's list, leaving only 75 more to be met.  As explained in the next paragraph, Palantir could meet these 75 requirements by providing "new helpers" on a commercial item basis.



Palantir could meet the remaining 75 PBS requirements from Mr. Stock's list by providing new helpers on a fixed-price basis as part of a commercial item contract with the Army, as we have done for other customers.  *See* Dkt. 44-2 at 24.  These requirements are noted with an X in the "new helpers" column of the Appendix.  ████████████████████

████████████████████████████████████████████

A8455

Protected Information and/or Legends Redacted

35.     Therefore, the Army could have met the entirety of the DCGS-A2 PBS requirements in Mr. Stock's table by entering into one commercial item contract for Palantir to meet all of those requirements:  823 of the requirements would be met with the Palantir Gotham Platform with its "out-of-the-box" capability plus the use of minor configurations and existing helpers, and the remaining 75 would be met through new helpers that are of the same nature and type as those we regularly and customarily provide to new customers on a commercial item, fixed price basis.

**A8456**

Protected Information
and/or Legends Redacted



38.     These are precisely the type of questions that the Army never asked Palantir or other commercial item providers to answer; it also is precisely the type of dialogue that Palantir invited the Army to have in Palantir's RFI responses.   In particular, the Army never asked Palantir or commercial item providers generally to explain whether the entire procurement could be met on a commercial item, fixed-price basis, and it never asked about the specific factors that Mr. Cronen asserts would be relevant to determining whether any enhancements could be provided on a fixed-price commercial item basis.   Instead, the Army issued RFIs that assumed that DCGS-A2 would need to be a software development project.   Nonetheless, Palantir explained that the Army's DCGS-A needs could be met by commercial items and offered to demonstrate the capabilities of its product, but the Army never accepted that invitation.

39.     Mr. Cronen recognized at his deposition that the Army structured its research to ask only about past development projects without asking commercial item providers how they could meet the Army's new requirements on a commercial item basis. See Dkt. 75-1, Cronen Depo. Tr. at 194:11-14. Mr. Cronen did not explain why this was the case.   He referred in his deposition to the "acquisition strategy" of having a "lead system integrator to manage the risk of all of the new development," Dkt. 75-1 at 118, but he never explains why a system integrator

A8457
Protected Information
and/or Legends Redacted

would be needed if a commercial item can meet all the needs; nor does he ever explain why a system integrator could not integrate the Palantir Gotham Platform with any enhancements the Army may require that it does not procure from Palantir. There is no technical reason why the Army could not have done this, nor any other reason of which I am aware. In that regard, I do recall a meeting between Palantir and both Colonel Collins and LTG Williamson on or around August 7, 2015, in which we highlighted our concerns with the Army's developmental approach to the Increment 2 procurement. In a conversation that occurred shortly after the meeting ended, Colonel Collins told me and my colleague ███████ that he believed Palantir should "team up" with another contractor to submit a joint bid. This comment is representative of the opinion where the Army believes that Palantir's commercial item could meet many of the needs of DCGS-A2, yet the Army has decided to structure the acquisition approach for Increment 2 to be impossible for Palantir to participate, without the need for another contractor acting as an intermediary or "teammate."

### III. Mr. Cronen Says That He Has "Insufficient Information" To Determine Whether The Palantir Gotham Platform Can Provide Particular Capabilities, But There Is Extensive Information Demonstrating These Capabilities.

40.     The Army's Market Research Report says that Intelligence Support to Cyber, Data Fusion, and DIB upgrade are not available from commercial products. *See* Tab 33 at A1840. The Army's July 1 "Determination of Non-Commercial Items" says that Signals Intelligence, Human Intelligence, Military Weather, and Interoperability also are not available from commercial products. *See* Tab 134 at A6626. In my Expert Report, I explained why these conclusions were incorrect. *See* Dkt. 44-2 at 25-36.

41.     None of the documents or testimony provided by the Army since I submitted my Expert Report undermines my conclusion. Mr. Cronen does not conclude that Palantir *cannot*

Protected Information and/or Legends Redacted

provide all of the listed capabilities.  *See* Dkt., 75-1 Cronen Depo. Tr. at 386:2-6.  Instead, he

asserts only that he has "insufficient information" to determine whether Palantir *can* provide the

capabilities.  *See* Dkt. 58-1 at 25, 26, 27, 28, 29.  He therefore does not dispute my conclusion

that Palantir can provide all of the listed capabilities, and he does not attempt to defend the

Army's conclusion that there were no commercial products that were available to provide these

capabilities.  Mr. Cronen also is incorrect that there is insufficient information in my Expert

Report to support the conclusion that Palantir can meet the requirements in these areas.  I have

stated that Palantir can meet these requirements based on my expertise with the Palantir Gotham

Platform and based upon its demonstrated capabilities in each of these areas.  Mr. Cronen offers

no basis for calling into question my conclusions.  I address Mr. Cronen's specific comments

with respect to each requirement below.

### A.    Intelligence Support to Cyber

42.    In my Expert Report, I explained that Palantir could satisfy the requirements of

Intelligence Support to Cyber as set forth in the Performance Work Statement.  Dkt. 44-2 at 26-



43.    Mr. Cronen's discussion of Intelligence Support to Cyber simply asserts that

"there is insufficient information that demonstrates that Palantir fully meets the Intelligence

Support Cyber Operations Requirements as laid out within the Solicitation."  Dkt. 58-1 at 26.  He

Protected Information
and/or Legends Redacted

offers no explanation of why he reached that conclusion, and he does not identify which requirements he is unsure whether Palantir can satisfy.

44.     From a technical standpoint, Mr. Cronen acknowledged during his deposition that the Palantir Gotham "probably could" provide Intelligence Support to Cyber.  He was asked whether he thought there was anything "unique about cyber-related data that would support a conclusion that Palantir is unable to integrate, visualize, and facilitate analysis of that data." Dkt. 75-1, Cronen Depo. Tr. at 353:18-21.  Mr. Cronen responded that cyber-data is not "special in any way" and that he believes "with some level of configuration that the Palantir Gotham Platform probably could incorporate that, as well as visualize it." *Id.* at 354:4-16.  Mr. Cronen thus appears to agree with my technical analysis that intelligence support to cyber is available from a commercial Data Management Platform.



Army Cyber Command.  Dkt. 75-1, Cronen Depo. Tr. at 109:8-10; 353:12-17.  Mr. Cronen has thus asserted there is insufficient information about Palantir's Intelligence Support to Cyber

A8460
Protected Information
and/or Legends Redacted

capabilities without examining how Palantir provides intelligence support to cyber for Army Cyber Command.

**B.      DIB Upgrade**

46.      In my Expert Report, I explained that Palantir can meet all of the DCGS-A2 requirements relating to the DCGS Integrated Backbone, or DIB. *See* Dkt. 44-2 at 30-31.  Mr. Cronen does not dispute my conclusion, stating only that "there is insufficient information that demonstrates that Palantir meets the DIB Upgrade Requirements as laid out within the Solicitation." Dkt. 58-1 at 26.  Mr. Cronen offers just two explanations for this conclusion.

47.      First, Mr. Cronen states that he reviewed Patricia Lee's declaration, *see id.* 58-1, which in turn states that Palantir was deemed "minimally conformant" to the DIB Management Office (DMO) specifications, *see* Dkt. 49-1 at ¶ 5.  However, the reason Palantir was deemed "minimally conformant" and not "fully conformant" is because Palantir did not take all of DMO's tests, as would be required to obtain a score of "fully conformant."  Palantir took only a subset of the tests—those involving query—because those are the only tests that SOCOM asked Palantir to take (and Palantir was taking the test at SOCOM's request in furtherance of a contract with SOCOM).  As the DMO Conformance Test Report attached to Ms. Lee's declaration shows, Palantir passed all of the tests it took, and as I testified during my deposition, Palantir could support all of the DIB capabilities today.  Dkt. 54-1, Choung Depo. Tr. at 271:12-10.  Ms. Lee acknowledged during her deposition that "minimally conformant" was the highest score Palantir could have achieved on the May 2012 conformance test, given the scope of the tests Palantir took at the time.  Ex. 76-1, Lee Depo. Tr. at 44:18-21.

**A8461**

Protected Information and/or Legends Redacted



### C.   Data Fusion

49.    I explained in my Expert Report that Palantir can provide the required DCGS-A2 capabilities for Data Fusion as a commercial item on a fixed-price basis. *See id.* at 29.    Mr. Cronen does not dispute this, and he thus offers no defense of the Army's assertion that the Data Fusion requirements cannot be fully satisfied by commercial items.  Instead, Mr. Cronen asserts only that "there is insufficient information that demonstrates that the Palantir Gotham Platform fully meets the Data Fusion Requirements as laid out within the solicitation." Dkt. 58-1 at 25.



Protected Information
and/or Legends Redacted



52.     If anything, Mr. Cronen's Expert Report provides additional support for my conclusion that Palantir can satisfy the DCGS-A2 Data Fusion requirements.  In particular, Mr. Cronen's report provides a lengthy illustration of the type of analysis that he claims is required by the Data Fusion requirements of the PBS.  *See* Dkt. 58-1 at 8-14. ████████



Protected Information
and/or Legends Redacted

54.   At his deposition under questioning from the Government's counsel, Mr. Cronen added allegations that were not in his report that he "did not see any information that demonstrated Palantir's ability to currently meet the requirements for data fusion" specifically



A8464

Protected Information
and/or Legends Redacted



**D.      Interoperability**

56.      In my Expert Report, I explained that the Palantir Gotham Platform was designed to be interoperable and has achieved alignment with the DI2E interoperability standards.  Dkt. 44-2 at 10, 16-17, 31-33.  I also provided my expert opinion that Palantir can meet all of the interoperability requirements for DCGS-A2. *See id.* at 31-33.  Mr. Cronen does not dispute that Palantir can meet these requirements and thus offers no support for the Army's assertion that there are no commercial products that are capable of meeting the DCGS-A2 interoperability requirements.

57.      Mr. Cronen also expressly acknowledges that "the Palantir Gotham Platform has 'repeatedly demonstrated its interoperability with a variety of systems'" and recognizes "the

███████████████████████████████████████████

- "There are no established standards that Palantir has been unable to meet," and Palantir has met all tests that USD(I) has promulgated, Dkt. 44-2 at 31-32;

Protected Information and/or Legends Redacted

- ████████████████████████████████████
  ████████████████████████████████████
  ██████████████

- ████████████████████████████████████
  ██████████████████████████

- Palantir has been awarded the most "Gold Stars" out of all participants in the DI2E Plugfest and also has been designated an early adopter in recognition of Palantir Gotham's alignment to USD(I)'s stated interoperability goals, *id.*; and

- ████████████████████████████████████
  ██████████████████████████

58.     Mr. Cronen fails to explain why in light of the foregoing there would be any reasonable doubt about Palantir's ability to meet the DCGS-A2 interoperability requirements. He notes only DI2E's web-site disclaimer that "Gold Star Recognition" is an informal process and that Gold Stars are not the same as certification or endorsement of a product. This may be true, but Mr. Cronen fails to acknowledge this informal process exists only because DI2E has not yet developed formal tests for all of its requirements. He does not dispute that getting the most "Gold Stars" of any participants and being designated an "early adopter" are both strong indicators of Palantir's interoperability, which was the entire point. As stated previously without dispute from Mr. Cronen, DI2E Plugfest events "are the primary means by which vendors and government can qualify for recognition by USD(I) on alignment to the stated goals and objectives of DI2E." Dkt. 44-2 at 32. DI2E Plugfest also was just one of various data points I provided to support my opinion that Palantir can meet the Army's interoperability requirements.

Protected Information and/or Legends Redacted

59.     Mr. Cronen asserts without additional explanation that "there is insufficient information provided to determine [sic] scope of the changes required to conform to the hundreds of required information exchanges as documented within the Systems View–6 (SV-6)."



61.     What is absent from Mr. Cronen's report is any explanation of why the interoperability requirements of DCGS-A2 would present a special problem that would call into question Palantir's ability to meet the DCGS-A2 interoperability standards given the data points I have identified, the design of the Palantir system, its repeated success in interoperating with new systems, my knowledge of those standards, and my unequivocal statements that it can meet

A8467

Protected Information and/or Legends Redacted

these requirements.  Those statements are based upon my expertise with Palantir, software development and engineering, and my experience at Booz Allen supporting the DCGS Enterprise Focus Team, which is in charge of defining and managing the portfolio of interoperability standards for all of the DCGS programs across the DOD and IC, as I explained in my Expert Report.  Dkt. 44-2 at 3.  By contrast, Mr. Cronen admitted at his deposition that he was unaware even of Palantir's basic Kea software offering ███████████████████████████ ███████████████████ and he said that he is not an expert on the "detailed specifics of interoperability."  Dkt. 75-1, Cronen Depo. Tr. at 44:3-6, 363:8-364:8.

### E.    Signals Intelligence

62.    In my Expert Report, I explained that Palantir can provide the required capabilities related to Signals Intelligence, and I provided various examples of Palantir's capabilities with respect to Signals Intelligence, including its prior work with the Army and SOCOM.  *See* Dkt. 44-2 at 33-34.  Mr. Cronen does not dispute that Palantir can provide these capabilities, provides no basis for doubting my conclusion, and provides no support for the Army's assertion that there are certain Signals Intelligence requirements that are unavailable from commercial products.  Further, Mr. Cronen admitted at his deposition that he could not identify any Signals Intelligence data source from which Palantir could not ingest and integrate data, Dkt. 75-1, Cronen Depo. Tr. at 361:12-18, and he acknowledged that he does not have expertise on signals intelligence, *see id.* at 43:14-17.

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

Protected Information and/or Legends Redacted



65.     Mr. Cronen otherwise refers to eight Performance Based Specifications "on the ability to task and manage the Army's SIGINT collection systems." Dkt. 58-1 at 28.  Again, he does not dispute that Palantir could meet those requirements but instead states only that "there is insufficient information that demonstrates that Palantir fully meets the SIGINT Requirements as laid out within the Solicitation." Dkt. 58-1 at 28.  As with the other requirements in the PBS, Palantir could readily meet these requirements.  As I discussed in my Expert Report, the Palantir

Protected Information
and/or Legends Redacted

Gotham Platform is designed to integrate, visualize, and facilitate analysis of any type of data, and signals intelligence data is no different. *See* Dtk. 44-2 at 15-18.



Protected Information
and/or Legends Redacted

F.     **Human Intelligence**

68.     In my Expert Report, I explained that Palantir could meet the DCGS-A2 requirements relating to Human Intelligence, and I further explained that Palantir "is routinely used by IC customers to integrate, analyze, and visualize HUMINT." Dkt 44-2 at 35-36. Mr. Cronen does not dispute that Palantir can provide these capabilities, provides no basis for doubting my conclusion, and provides no support for the Army's assertion that commercial products cannot provide Human Intelligence capabilities. Further, Mr. Cronen admitted at his deposition that he could not identify any human intelligence data source from which the Palantir Gotham Platform could not ingest and integrate data, *see* Dkt. 75-1, Cronen Dep. at 361:19-362:18, and he stated that he is not an expert on human intelligence, *see id.* at 43:14-17.

69.     Rather than dispute any of my conclusions, Mr. Cronen states that there "are many additional requirements beyond supporting the integration, analysis and visualization of HUMINT data," but each of the requirements he cites represents a standard data management issue that the Palantir Gotham Platform could address. *See* Dkt. 58-1 at 28. For example, inasmuch as the Army seeks to manage data relating to source operations, assets, personnel, vehicles, and equipment, those data are no different in type from a technical standpoint than any other type of data the Data Management Platform would be needed to address.

G.     **Military Weather**

70.     In my Expert Report, I explained that Palantir could meet the DCGS-A2 requirements relating to Military Weather, and I further explained that the Palantir Gotham Platform "is designed to ingest and display information from a variety of sources and a variety of formats," and this "includes weather data." Dkt. 44-2 at 37. I also stated that Palantir "has

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**A8471**

Protected Information and/or Legends Redacted

that Palantir can provide these capabilities, provides no basis for doubting my conclusion, and provides no support for the Army's assertion that commercial products cannot provide Military Weather capabilities.   Further, Mr. Cronen has not identified any weather data source from which the Palantir Gotham Platform could not ingest and integrate data, and he stated that he is not an expert on weather data, *see id.* at 43:14-17.

A8472

Protected Information and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

PALANTIR TECHNOLOGIES, INC., and )
PALANTIR USG, INC.,                )
                                   )
         Plaintiffs,               )
                                   )
         v.                        )   No. 16-784
                                   )   (Judge Marian Blank Horn)
THE UNITED STATES,                 )
                                   )
         Defendant.                )
                                   )

## EXPERT REPORT OF SHAUN M. CRONEN

**A8619**

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

Gotham Platform, and information provided on Palantir's other contracts (TAB 158-167), there is insufficient information that demonstrates that the Palantir Gotham Platform fully meets the DCGS-A Increment 2 Requirements as laid out within the five subfactors for technical evaluation within the DCGS-A Increment 2 Solicitation (i.e. Data Architecture, Fusion Data Analytics, Interoperability, Visualization Framework and Usability, and Data Rights) (TAB 28 A1607), nor is there information that demonstrates that the Palantir Gotham Platform is compliant with all the requirements within the Performance Based Specification (PBS) (TAB 23) and can be successfully tested as per the Formal Qualification Test (FQT) task within the Base Performance Work Statement (PWS) (TAB 22 A1124).

**Subfactor 1: Data Architecture**

The DCGS-A Increment 2 Data Architecture is described in the Solicitation (TAB 28) in terms of:

- **Data Ingress** – Getting Data into the System
- **Data Persistence** – Writing Down the Data and Indexing it for Retrieval
- **Data Egress & Visualization** – Getting Data out of the System and Displaying it to the User
- **Data Analytics** – Analyzing the Data to Understand what is happening
- **Data Integrity** – Understanding how reliable the Data is
- **Data and User Authorization Services** – Only allowing Users to access the Data they are allowed to access
- **Counter Intelligence & Human Intelligence (CI&HUMINT) single Software (SW) baseline** – The first user Application of DCGS-A Increment 2 which provides the ability to perform CI & HUMINT reporting and analysis.

In addition, the CI&HUMINT single SW baseline defines several military-unique requirements within the Task Order 0001 Performance Work Statement (PWS) (TAB 24). For Example:

       o  Development of the Single CI & HUMINT Software Solution shall be in accordance with (IAW) the DCGS-A unified data model

       o  Provide doctrinally correct collection, reporting, mission support, Source Operations, investigations, and force protection functions

       o  Develop an integrated workflow capability, for seamless Automation, standardization, and management of CI and HUMINT operational information, in accordance with DIA and Army policies and regulation

       o  Develop a bidirectional interface with external National Enterprise CI and HUMINT systems, (i.e. HUMINT On-line Tasking and Reporting (HOT-R), CI HUMINT Requirements and Operations Management Module (CHROME), Cross-Domain Interface Repository (CDIR), Source Operations Management Module (SOMM), and Army Counterintelligence Operations Portal (ACOP))

5

**A8623**

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims Protective Order

There is insufficient information in Mr. Choung's Expert Report or Deposition to determine if the "enhancements, configurations, or modifications" required to the data management platform to fully meet the Increment 2 Requirements within the Solicitation (TAB 28), Performance Base Specification (TAB 23), Base Performance Work Statement (TAB 22), or Task Order 0001 Performance Work Statement (TAB 24) would be considered "minor modification" of a "commercial item" under the FAR.

Furthermore, by procuring any "enhancements, configurations, or modifications" required to fully meet the requirements on a commercial item basis, the Government is limited in its ability to utilize Software Developmental Metrics as laid out within the Solicitation and Performance Work Statement to monitor and track the development to ensure the success of the program, to include System Engineering Technical Reviews (SETR) as well as System Functional Review, Preliminary Design Review, and the Critical Design Review. (TAB 28 A1609) In addition, the PWS section 3.3 defines all the Software development requirements for contractor-developed components within the DCGS-A Increment 2 Solicitation:

"The contractor must plan and schedule software activities based upon realistic assessments of technical challenges and risks. The contractor must plan, schedule and manage appropriate work activities to accomplish the work, including the activities necessary for the identification and resolution of uncertainty. In performing the effort, the contractor should ensure that the technical and operational requirements are complete and traceable in the software design; and demonstrable during the software development and implementation." (TAB 24 A1343)

The PWS goes on to require (but not limited to):

- **Development and Maintenance of a "Product Roadmap"** – This defines the capabilities planned for each release
- **Maximum re-use of GOTS/COTS Products** – This ensures reutilization of Government and Commercial components that fulfil requirements are used to avoid unnecessary new development
- **Iterative Incremental Builds** – Each release will build upon the capabilities of the previous
- **Management of Release requirements with the Users and Program Office** – This keeps the user and the Program Office informed and involved in the selection of requirements included in each release
- **Human Factors Engineering, Heuristics, and Usability Studies** - This ensures that Human Factors and "Ease of Use" is consistent throughout the development of the System
- **Contractor Performed Unit and Integration Testing** – The Contractor shall demonstrate the requirements for each build are met at the end of the development cycle.
- **Contractor Internal Issue Management** – The Contractor shall manage any issues and address resolution

20

A8638
Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

currently meets the fusion requirements within the Performance Based Specification (PBS)
(TAB 23).

Therefore there is insufficient information that demonstrates that the Palantir Gotham Platform
fully meets the Data Fusion Requirements as laid out within the Solicitation.

**Intelligence Support to Cyber**

Intelligence Support to Cyber is a Key System Attribute (KSA) as defined within the Information
Systems Capability Definition Document (IS CDD) for DCGS-A (TAB 11 A279), the DCGS-A
Increment 2 Requirements Definition Package (RDP) as:

> **8. (U//FOUO) KSA 4. Intelligence Support to Cyber Operations.**
> DCGS-A shall support the Army Cyber Command intelligence analysis effort by
> providing cyber data ingest, management, and access to support the Cyber
> Electromagnetic (CEM) Cell in both Defensive Cyber Operations (DCO) and
> Offensive Cyber Operations (OCO). The data shall be filterable and selectable to
> support geographical metadata and built upon an ontology supporting the
> cyberspace domain. DCGS-A shall integrate cyber intelligence data, allow
> designated workflows and processes, and provide users the ability (capability) to
> enrich data/knowledge within a central repository for storing or referencing
> knowledge. Globally distributed analysts will update information within the
> database and those updates will be tagged to provide data history over time
> (Initial Minimum). [KSA 4]
> **Rationale**: Cyber intelligence analysis is multifaceted and relies on close
> collaboration between all areas of cyberspace operations (CO). From network
> maintenance and defense of the network to threat monitoring and providing
> predictive analysis to determine threat future actions, DCGS-A needs to provide
> globally accessible, collaborative cyber-space data that incorporates a multitude
> of cyber related information sources into a dedicated cyber ontology within single
> topic-centered database.

(TAB 11 A279) (TAB 82 A3423)

Mr. Choung's Expert Report in Section III.A states that there is nothing in the PWS relating to
Intelligence Support to Cyber that cannot be provided by commercial items on a fixed-price
basis, including by Palantir's commercial items and references their contract with █████████
█████████████████████ and an unnamed major financial institution. Mr Choung's Expert Report
then goes on to provide two screenshots (Figure 6A and 6B) that portray how Intelligence
Support to Cyber "might" be visualized through the Palantir Gotham Platform. (Choung Expert
Report, Sec III.A, pg. 26-28)

After reviewing the referenced statement within MITRE Report (TAB 156 A7851) as well as the
███████████████████contract Statement of Requirements (ENCLOSURE A) and reviewing
the █████████████████████████████████████ Contracts (TAB 162-163)

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

which reference support to ████████████ as well as the screenshots within the Expert
Report, there is insufficient information that demonstrates that Palantir fully meets the
Intelligence Support Cyber Operations Requirements as laid out within the Solicitation.

## DIB Upgrade

Mr. Choung's Expert Report in Section III.C states that there is nothing in the PWS relating to
DIB Upgrade that cannot be provided by commercial items on a fixed-price basis, including by
Palantir's commercial items. Mr. Choung goes on to state that "Palantir's DIB interface is
compatible with all current versions of the DIB (2.x, 3.x, and 4.x). (Version 4.x is what the Army
refers to as the "DIB upgrade.") The implementation of this interface to the DIB standard was
certified by the DIB Management Office (DMO) to be conformant," and that they have delivered
their DIB interface to DOD customers including the ████ and ████ as part of its
commercial solution and that Palantir has been part of the DIB federation since 2012. (Choung
Expert Report, Sec. III.C, Pg. 30)

However, I have examined a Declaration provided by Ms. Patricia Lee from the DCGS
Multiservice Execution Team Office (DMO) (Lee Declaration, pg. 2), and it is stated that
Palantir's DIB interface was tested against DIB 2.0 and was found to be "minimally
conformant". The Report also noted that Ingest, event, and event subscription services were not
provided by Palantir for conformance testing, which are required for "full" conformance. In
addition, case sensitive queries were not tested. Finally, Ms. Lee stated that the May 2012 test
was the last time the DMO tested Palantir's DIB adapter software. (Lee Declaration, pg. 4)

During Mr. Choung's deposition on 11 AUG 2016, he acknowledged that Ingest, Event, and
Event Subscriptions are required for "Full Conformance" with the DIB 2.0. (Choung Dep. 224:6-
15) and that while Mr. Choung states that the Palantir Gotham Platform performs these
capabilities (Choung Dep. 260:11-20), he acknowledges that the DMO has not tested the Palantir
Gotham Platform for DIB Compliance since 2012. (Choung Dep. 264:3-8)

After reviewing the ████ Contract (TAB 158-159) there is no mention of providing an interface
to the DIB.

After reviewing the ████ Contract (TAB 167), Palantir had Statement of Work (SOW)
requirements for:
- 3.1.13.2 - Software shall enable all customer data in the system to be discoverable
  through DoD standard query interfaces (DIB and CDR).
- 3.1.18.2 - Data structure shall support evolving DIB standards and upgrade to new DIB
  versions within 1 year of adoption by the DMO.
  (TAB 167 A8270-A8271)

However, there is no information as to whether or not these requirements from the ████
Contract were met and/or were certified in any way.

Therefore there is insufficient information that demonstrates that Palantir meets the DIB Upgrade
Requirements as laid out within the Solicitation.

A8644

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

**Interoperability**

Mr. Choung's Expert Report in Section III.D states that there is nothing in the PWS relating to
interoperability that cannot be provided by commercial items on a fixed-price basis, including by
Palantir's commercial items and references Palantir's usage of eXtensible Markup Language
(XML) and Application Programming Interfaces (APIs) to allow the incorporation of new
interoperability standards into the Palantir Gotham Platform with minimal configuration.

Mr Choung also discusses their participation within the Defense Intelligence Information
Enterprise (DI2E) "Plugfest" for the past four years and that "Palantir has been awarded the most
"gold stars" out of all participants and also has been designated as an "early adopter" as
recognition of the Palantir Gotham Platform's alignment to the stated goals of interoperability
and collaboration set forth by the USD(I)." (Choung Expert Report, Sec III.D, pg. 31-32)

It is important to note that the DI2E defines on their website (www.di2eplugfest.org) "Gold
Stars" as follows:

> Gold Star Recognition is an informal process and as such does not indicate or
> imply in any way certification or compliance with the DI2E standards or
> specifications, nor does it imply endorsement of your product(s) by the DI2E
> EFT, DI2E Framework team, OUSD(I), or the Defense Department.

(Available at: http://di2eplugfest.org/home/about-2/vendor-gold-stars/, on 10 AUG 16)

In addition, given the ability to extend the Palantir Gotham Platform via XML and APIs to
incorporate new interoperability standards, there is insufficient information provided to
determine scope of the changes required to conform to the hundreds of required information
exchanges as documented within the Systems View – 6 (SV-6) (TAB 58).

So while it is understood that the Palantir Gotham Platform has "repeatedly demonstrated its
interoperability with a variety of systems" (Choung Expert Report, Sec. III.D, Pg. 32), there is
insufficient information provided to determine whether or not the Palantir Gotham Platform
meets the Interoperability Requirements as laid out within the DCGS-A Increment 2 Solicitation.

**Signals Intelligence (SIGINT)**

Mr. Choung's Expert Report in Section III.E states that there is nothing in the PWS relating to
Signals Intelligence that cannot be provided by commercial items, including by Palantir's
commercial items. The Expert Report then provides information about how the Palantir Gotham
Platform can support the two SIGINT requirements listed within the Base PWS (TAB 22
A1070), and discusses their work with the ███████████████ on how they can provide SIGINT
Integration, analysis, and visualization. Mr Choung's Expert Report then provides two
screenshots (Figure 7A and 7B) that depict unclassified examples of how radio communications
captured as SIGINT are analyzed in the Palantir Gotham Platform. (Choung Expert Report, Sec.
III.E, pg. 33-35)

**A8645**

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims Protective Order

After reviewing the [REDACTED] Contract (TAB 158-159) there is no mention of providing SIGINT Capabilities.

After reviewing the [REDACTED] Contract (TAB 167), Palantir had a Statement of Work (SOW) requirement for:

[REDACTED]

However, there is no information as to what this capability actually provided at a detailed requirements level or whether or not this requirement was met.

In addition, there are a number of additional requirements within the Performance Based Specification (PBS) (TAB 23) that go into further detail of the SIGINT requirements for Increment 2. For example, 8 PBS statements on the ability to task and manage the Army's SIGINT collection systems (PBS 880-887) (TAB 23 1226). Given the above, there is insufficient information that demonstrates that Palantir fully meets the SIGINT Requirements as laid out within the Solicitation.

**Human Intelligence (HUMINT)**

Mr. Choung's Expert Report in Section III.F states that there is nothing in the PWS relating to HUMINT that cannot be provided by commercial items, including by Palantir's commercial items. The Expert Report then provides information about how the Palantir Gotham Platform can provide the capability described within the HUMINT Requirement in the Base PWS (TAB 22 A1071) and discusses that the Palantir Gotham Platform is routinely used by unnamed Intelligence Community (IC) customers to integrate, analyze, and visualize HUMINT. Mr. Choung also states that "Most of the data that supports HUMINT is represented as what is called "message traffic." Message traffic consists of text documents that represent reporting from sources that provide intelligence on people, organizations, and events," and provides a screenshot (Figure 8) that depicts an unclassified example of how a sample HUMINT report would look in Palantir. (Choung Expert Report, Sec III.F, Pg. 35-36).

As detailed above in section 1, Counter Intelligence and Human Intelligence (CI & HUMINT) has many additional requirements beyond supporting the integration, analysis and visualization of HUMINT data. The CI & HUMINT Task Order 0001 PWS requirements are laid out in section 3.2.27 (TAB 24 A1343-A1343) and furthermore, there are even more detailed requirements within the Performance Based Specification (PBS) (TAB 23) For example, in addition to the PWS statements referenced above in Section 1, the system must provide an interrogation operations capability for HUMINT Managers and Collectors (PBS 705-706) (TAB 23 A1224), must provide a capability to manage Source Operations by CI and HUMINT Managers (PBS 992) (TAB 23 A1228) and HUMINT Managers must be able to track qualifications and status of personnel, vehicles, and equipment (PBS 993) (TAB 23 A1228).

A8646

**Appx18646**

Protected Information and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

Given the above, there is insufficient information that demonstrates that the Palantir Gotham
Platform fully meets the HUMINT Requirements as laid out within the Solicitation.

## Military Weather

Mr. Choung's Expert Report in Section III.G states that there is nothing in the PWS relating to
Military Weather that cannot be provided by commercial items, including by Palantir's
commercial items. The Expert Report then provides information about how the Palantir Gotham
Platform can support three Military Weather Requirements from within the Base PWS (TAB 22
A1069, A1071) and then discusses how Palantir has integrated weather data for [REDACTED] Mr
Choung's Expert Report then provides a screenshot (Figure 9) that depicts weather data "fused"
with SIGINT data along with a view of enemy and friendly forces. (Choung Expert Report, Sec.
III.G, Pg. 36-37). After reviewing the [REDACTED] Contract (TAB 167) there is no mention of
providing Military Weather Capabilities. In regards to the DCGS-A Increment 2 requirements,
there are a number of additional requirements within the Performance Based Specification (PBS)
(TAB 23) that provide further detail of the Military Weather requirements for Increment 2. For
example, determining weather impacts on operations, units, and personnel (PBS 229-234) (TAB
23 A1219), determining weather effects on information collection (PBS 694) (TAB 23 1224),
and determining weather operational impacts on the mission (PBS 241) (TAB 23 A1219).

Given the above, there is insufficient information that demonstrates that Palantir fully meets the
Military Weather Requirements as laid out within the Solicitation.

### 4. Technical Comparison of Palantir's Contractual Agreements Against DCGS-A Increment 2 Requirements

The following table includes the Palantir Contractual documents that have been submitted as part
of the record.

| Agency | Title | Award Date | Functional Requirements | TAB |
|--------|-------|-----------|------------------------|-----|
| | Integrated Fusion and Analysis Platform (IFAP) | 21-Dec-10 | Yes | 158 159 165 |
| | NSG Expeditionary Architecture (NEA) Integrated Program Office (IPO) Integration | 20-Sep-12 | Yes | 160 161 |
| | Services & Supplies | 28-Sep-14 | No | 162 163 |
| | ICITE Knowledge Management Tool (KMT) | 22-Sep-14 | Yes | 164 |
| | DCIPHER | 4-Mar-16 | Yes | 166 |
| | All Source Information Fusion (ASIF) | 25-May-16 | Yes | 167 |

A8647

Protected Information
and/or Legends Redacted

Protected Information to Be Disclosed Only in Accordance With the United States Court of Federal Claims
Protective Order

After reviewing the six contractual documents (TAB 158-167), only five of them had functional
software requirements stated within them. After reviewing the functional requirements within all
five documents, it is my opinion that while there is partial overlap with some of the DCGS-A
Increment 2 Requirements, none of these contracts, individually or together, fully meet the
DCGS-A increment 2 Requirements as laid out within the Solicitation.

In addition, the functional requirements within these contractual documents also do not fully
meet the requirements identified as "new" in Increment 2 in Mr. Stock's Declaration.

Note: This analysis was done by comparing the requirements within the aforementioned
contractual documents. There is no information provided that articulate any success or failure of
Palantir in meeting these requirements.

### Summary

In my Expert Opinion, it is clear that:

A) The Palantir Gotham Platform does not fully meet the requirements as laid out within the
   DCGS-A Increment 2 Solicitation.
B) Mr. Choung recognizes that the Palantir Gotham Platform would require some amount of
   enhancements, configurations, and modifications to fully meet the requirements as laid
   out within the DCGS-A Increment 2 Solicitation, however there is insufficient
   information provided in Mr. Choung's Report or Deposition to determine whether or not
   any changes to the Palantir Gotham Platform would maintain the definition of a
   "commercial item" after necessary enhancements, configurations, and/or modifications
   were made by Palantir.
C) After comparing the Requirements within the submitted Contracts, none of these
   contracts fully cover the requirements as laid out within the DCGS-A Increment 2
   Solicitation.

Signed: CRONEN.SHAUN.M.12 _____
        41942011

Shaun M Cronen

Date: ____18 AUG 2016_____

30

A8648
Protected Information
and/or Legends Redacted



UNCLASSIFIED//FOR OFFICIAL USE ONLY

A8650

Protected Information
and/or Legends Redacted



UNCLASSIFIED//FOR OFFICIAL USE ONLY

A8651

Protected Information
and/or Legends Redacted



UNCLASSIFIED//FOR OFFICIAL USE ONLY

A8652
Protected Information
and/or Legends Redacted

UNCLASSIFIED//FOR OFFICIAL USE ONLY

A8653
Protected Information
and/or Legends Redacted



UNCLASSIFIED//FOR OFFICIAL USE ONLY

A8654

Protected Information
and/or Legends Redacted

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

--------------------------------:
PALANTIR TECHNOLOGIES, INC. and :
PALANTIR USG, INC.              :
                                :
            Plaintiffs,         :
        vs.                     :Case No. 16-784C
                                :
THE UNITED STATES,              :Judge Marian Blank Horn
                                :
            Defendant.          :
--------------------------------:

                            Washington, D.C.

                        Thursday, August 11, 2016

Videotaped Deposition of:

                BRYANT CHOUNG,

called for oral examination by counsel for

Defendant, pursuant to notice, at the office of

Boies, Schiller & Flexner, LLP, 5301 Wisconsin

Avenue, N.W., Washington, D.C. before SUSAN L.

CIMINELLI, CRR, RPR, a Notary Public in and for the

District of Columbia, beginning at 9:53 a.m., when

were present on behalf of the respective parties:



A8867
Protected Information
and/or Legends Redacted

Page 26

| | | |
|---|---|---|
| 0:15:46 | 1 | start analyzing the data |
| 0:15:47 | 2 | They do this by discovering the data |
| 0:15:49 | 3 | that's in the platform   They do this by |
| 0:15:51 | 4 | collaborating with other people through the |
| 0:15:53 | 5 | platform   And then lastly, after they have come up |
| 0:15:55 | 6 | with analysis that they would like to share, then |
| 0:15:59 | 7 | they share information that they have either |
| 0:16:00 | 8 | generated in the platform or other information that |
| 0:16:04 | 9 | they think is relevant in the platform with other |
| 0:16:07 | 10 | users or their customers |
| 0:16:09 | 11 | Q   Do you have an understanding of DCGS-A |
| 0:16:19 | 12 | Increment 1? |
| 0:16:20 | 13 | MR RILEY: Object to form   You can |
| 0:16:22 | 14 | answer |
| 0:16:22 | 15 | THE WITNESS:  I do have familiarity with |
| 0:16:28 | 16 | DCGS-A or DCGS-A Increment 1 |
| 0:05:46 | 17 | BY MS KIRCHNER: |
| 0:16:31 | 18 | Q   And what's your understanding of that |
| 0:16:33 | 19 | system? |
| 0:16:33 | 20 | A   Yeah, my understanding is overall the |
| 0:16:38 | 21 | DCGS enterprise, or the family of systems that |
| 0:16:41 | 22 | comprise all the DCGS programs across the DOD, |

Page 27

| | | |
|---|---|---|
| 10:16:43 | 1 | whether or not it's Army's versions of DCGS or |
| 10:16:49 | 2 | Navy's version of DCGS, the primary goal was to try |
| 10:16:51 | 3 | and consolidate this information, as I just |
| 10:16:53 | 4 | described that was either collected or stored in a |
| 10:16:56 | 5 | variety of sources or from a variety of sensors |
| 10:17:00 | 6 | So in the case of the military or in the |
| 10:17:03 | 7 | Army specifically, there are a number of initiatives |
| 10:17:07 | 8 | before to do data collection and also do data |
| 10:17:10 | 9 | processing   I believe one of the predecessors to |
| 10:17:13 | 10 | DCGS-A was the ASAS program   And really the |
| 10:17:16 | 11 | initiative of the DCGS programs was to facilitate |
| 10:17:20 | 12 | better discovery of information that is held within |
| 10:17:24 | 13 | an enterprise like the Army, where they have a |
| 10:17:26 | 14 | number of sources within the Army |
| 10:17:27 | 15 | But beyond that, also how do you better |
| 10:17:29 | 16 | enable sharing of data across all the military |
| 10:17:33 | 17 | services as well   So how does Army share data with |
| 10:17:36 | 18 | Navy   How does Navy share data with Army, et |
| 10:17:40 | 19 | cetera   So the DCGS or the DCGS, Distributed Common |
| 10:17:46 | 20 | Ground Systems, were a series of initiatives by the |
| 10:17:49 | 21 | DOD to enable that very purpose |
| 10:17:51 | 22 | Q   Do you have an understanding of what a |

Page 28

| | | |
|---|---|---|
| 10:17:55 | 1 | link analysis tool is? |
| 10:17:57 | 2 | MR RILEY: Objection to form   You can |
| 10:17:58 | 3 | answer |
| 10:17:58 | 4 | THE WITNESS: I am familiar with link |
| 10:18:00 | 5 | analysis |
| 10:18:01 | 6 | BY MS KIRCHNER: |
| 10:18:01 | 7 | Q   Could you give me your understanding of a |
| 10:18:03 | 8 | link analysis tool? |
| 10:18:04 | 9 | A   Yes   A link analysis tool is really just |
| 10:18:07 | 10 | a way to visualize -- a single way to visualize |
| 10:18:13 | 11 | data   So inasmuch as you are tracking, let's say |
| 10:18:16 | 12 | for example, a person and the activities and the |
| 10:18:20 | 13 | relationships of that person, you might want to |
| 10:18:23 | 14 | visually depict as part of your investigation that |
| 10:18:27 | 15 | this person is linked to this activity, and then |
| 10:18:33 | 16 | linked to this other person |
| 10:18:35 | 17 | And you would draw lines between them |
| 10:18:36 | 18 | So this is similar to, if you think of the movies |
| 10:18:39 | 19 | back in the day where they would have the board, the |
| 10:18:42 | 20 | bulletin board with the push pins, where you take a |
| 10:18:45 | 21 | picture, you have a string of yarn and you tie it to |
| 10:18:47 | 22 | a report, another string of yarn and you put it to |

Page 29

| | | |
|---|---|---|
| 10:18:50 | 1 | another picture of another person   It's really a |
| 10:18:52 | 2 | visual way to represent a drawing or logical drawing |
| 10:18:56 | 3 | of how things are related to each other |
| 10:18:58 | 4 | Q   And what's your understanding of what a |
| 10:19:02 | 5 | solicitation is, what a government solicitation is? |
| 10:19:05 | 6 | MR RILEY: Objection to form   You can |
| 10:19:07 | 7 | answer |
| 10:19:07 | 8 | THE WITNESS: My understanding, and I'm |
| 10:19:08 | 9 | not a solicitation or acquisition expert, but my |
| 10:19:12 | 10 | understanding is that this is how the government |
| 10:19:16 | 11 | says that they have a need for a capability or a |
| 10:19:20 | 12 | service, and they are soliciting responses either |
| 10:19:25 | 13 | for information or for proposals from industry as to |
| 10:19:30 | 14 | how they would best fulfill the identified need |
| 10:19:34 | 15 | BY MS KIRCHNER: |
| 10:19:35 | 16 | Q   And what's your understanding of what a |
| 10:19:36 | 17 | proposal is in the world of government contracting? |
| 10:19:39 | 18 | MR RILEY: Objection to form   You can |
| 10:19:41 | 19 | answer |
| 10:19:41 | 20 | THE WITNESS: In the world of government |
| 10:19:44 | 21 | contracting, typically a proposal is how the vendor |
| 10:19:51 | 22 | responds to the technical requirements that were |



MAGNA
LEGAL SERVICES

A8874

Protected Information
and/or Legends Redacted

Page 30

| | | |
|---|---|---|
| 0:19:54 | 1 | presented in the request for proposal and submits to |
| 0:20:00 | 2 | the government how they plan on complying or |
| 0:20:04 | 3 | providing a solution, rather, to the requirements |
| 0:20:07 | 4 | that were set forth in the request for proposal |
| 0:20:11 | 5 | BY MS. KIRCHNER: |
| 0:20:11 | 6 | Q   Do you have an understanding of what a |
| 0:20:13 | 7 | commercial item is in the world -- in the world of |
| 0:20:15 | 8 | government contracting? |
| 0:20:16 | 9 | A   My understanding -- again, it's not an |
| 0:20:20 | 10 | expert opinion, but just through how I've -- in my |
| 0:20:24 | 11 | job duties, the understanding that I have learned is |
| 0:20:28 | 12 | that a commercial item is a capability and service |
| 0:20:35 | 13 | that is available and provided in the commercial |
| 0:20:39 | 14 | marketplace, and is available to the government in |
| 0:20:42 | 15 | similar configuration of capability |
| 0:20:47 | 16 | MR. RILEY:  And counsel, I'm just going |
| 0:20:48 | 17 | to object to this line of questioning insofar as |
| 0:20:52 | 18 | you're asking questions that would seek legal |
| 0:20:54 | 19 | confusions |
| 0:20:57 | 20 | MS. KIRCHNER:  I'm asking his |
| 0:20:58 | 21 | understanding   I think the witness understands |
| 0:21:00 | 22 | that |

Page 31

| | | |
|---|---|---|
| 10:21:00 | 1 | BY MS. KIRCHNER: |
| 10:21:00 | 2 | Q   Going back to DCGS-A Increment 1, what's |
| 10:21:05 | 3 | your understanding of the capabilities that |
| 10:21:07 | 4 | Increment 1 provided to the Army in the time frame |
| 10:21:16 | 5 | December of 2015? |
| 10:21:19 | 6 | MR. RILEY:  Objection to form   You can |
| 10:21:20 | 7 | answer |
| 10:21:20 | 8 | THE WITNESS:  Could you please repeat the |
| 10:21:22 | 9 | question?  So specifically you're looking for DCGS-A |
| 10:21:27 | 10 | Increment 1 capability as it exists in 2015? |
| 10:21:31 | 11 | BY MS. KIRCHNER: |
| 10:21:32 | 12 | Q   Yes |
| 10:21:33 | 13 | A   Okay   So DCGS-A Increment 1 is a |
| 10:21:37 | 14 | capability that's existed for many years and has |
| 10:21:39 | 15 | gone through many iterations from the government |
| 10:21:42 | 16 | So there are many versions that have been released |
| 10:21:45 | 17 | over the years, and sometimes it's a little bit |
| 10:21:48 | 18 | difficult to keep track of all the different |
| 10:21:50 | 19 | attempts that the government has done at DCGS-A |
| 10:21:53 | 20 | Increment 1 |
| 10:21:54 | 21 | So specifically, I think in 2015, there |
| 10:21:57 | 22 | were versions that were both in development, |

Page 32

| | | |
|---|---|---|
| 10:22:00 | 1 | versions that were being tested, and versions that |
| 10:22:01 | 2 | were also potentially fielded as well, too  So |
| 10:22:05 | 3 | there is a wide variety of -- in the types of |
| 10:22:09 | 4 | capabilities, both in maturity and also in function, |
| 10:22:12 | 5 | that in 2015 Increment 1 was either capable of |
| 10:22:17 | 6 | providing or was providing to users |
| 10:22:20 | 7 | But specifically here, DCGS-A Increment |
| 10:22:26 | 8 | 1, the overall top line capability that all the kind |
| 10:22:30 | 9 | of different versions were providing was how do you |
| 10:22:32 | 10 | gather information from a variety of sources, |
| 10:22:35 | 11 | whether it's sensors or other military or |
| 10:22:38 | 12 | non-military sources, bring them into the DCGS-A |
| 10:22:43 | 13 | system, provide that data in a number of tools that |
| 10:22:47 | 14 | were glued together  Whether or not they are |
| 10:22:50 | 15 | presented as widgets or whether or not they are |
| 10:22:52 | 16 | presented as other capabilities in the MFWS or the |
| 10:22:55 | 17 | multifunction work station, or through other |
| 10:22:57 | 18 | applications that just happen to be part of the |
| 10:23:00 | 19 | DCGS-A family or system of systems |
| 10:23:04 | 20 | And then, yeah, basically -- yeah, if |
| 10:23:08 | 21 | it's useful, we could go through some of the -- I |
| 10:23:11 | 22 | think there is over a hundred, maybe even 200 |

Page 33

| | | |
|---|---|---|
| 10:23:13 | 1 | different software packages that were glued together |
| 10:23:17 | 2 | as part of Increment 1, and we could go through |
| 10:23:20 | 3 | those capabilities if it's useful |
| 10:23:22 | 4 | Q   In 2015, had you seen DCGS-A Increment 1 |
| 10:23:36 | 5 | being operated on, for example, a laptop |
| 10:23:40 | 6 | A   Specifically in 2015, I personally had |
| 10:23:50 | 7 | not seen DCGS-A in 2015 on a laptop |
| 10:23:56 | 8 | Q   I assume it operates on a computers, too? |
| 10:24:01 | 9 | A   Actually, I take that back |
| 10:24:02 | 10 | MR. RILEY:  Objection  Objection to |
| 10:24:04 | 11 | form |
| 10:24:04 | 12 | THE WITNESS:  In 2015, I did see the |
| 10:24:06 | 13 | DCGS-A program  So yeah, there are portions of the |
| 10:24:10 | 14 | DCGS-A program that do run on a laptop  But DCGS-A |
| 10:24:16 | 15 | also doesn't operate a number of capability that |
| 10:24:19 | 16 | exists on essentially the networks, the secret level |
| 10:24:24 | 17 | networks that the program runs as well, too  So |
| 10:24:30 | 18 | one example is the Ozone widget framework  This is |
| 10:24:35 | 19 | a series of web tools that DCGS-A does provide and |
| 10:24:40 | 20 | provides on the SIPRNet, which is a Secret military |
| 10:24:44 | 21 | network  And so I had used and seen those tools |
| 10:25:00 | 22 | Actually, there is more  As I'm |



A8875

Protected Information
and/or Legends Redacted

Page 46

```
10:38:16   1   BY MS KIRCHNER:
10:38:16   2       Q   Is there a specific part, for example,
10:38:18   3   that you were responsible for  For example, I'll
10:38:20   4   point you to starting on page A1887, going over to
10:38:30   5   page A1888, you see certain contracts are
10:38:35   6   identified  Do you see that?
10:38:35   7       A   I do see that
10:38:36   8       Q   And were you responsible for identifying
10:38:39   9   the contracts that would be inserted here?
10:38:41  10           MR RILEY: Objection to form
10:38:42  11           THE WITNESS: I really wouldn't say that
10:38:45  12   there was any single person responsible  Really
10:38:47  13   like we were -- we were developing this as a team
10:38:50  14   So there weren't -- if you're asking if there were
10:38:54  15   certain sections that were authored by a single
10:38:57  16   individual and if we divided the work up by specific
10:39:00  17   section to that degree, that definitely wasn't the
10:39:03  18   case  This document was short enough where we had
10:39:05  19   involved -- everybody had involvement for all the
10:39:09  20   portions
10:39:10  21   BY MS KIRCHNER:
10:39:10  22       Q   And before it was submitted to the
```

Page 47

```
10:39:12   1   government, did you review it, the complete
10:39:14   2   document?
10:39:14   3       A   I did review the complete document.
10:39:16   4       Q   And were you satisfied with the document
10:39:19   5   before it was submitted to the government?
10:39:22   6           MR. RILEY: Objection to form.
10:39:23   7           THE WITNESS: Yeah, I thought the
10:39:25   8   document was -- was good.
10:39:27   9   BY MS. KIRCHNER:
10:39:28  10       Q   Okay. Now, are you familiar with the
10:39:31  11   contracts that are identified on pages A1887 to
10:39:40  12   A1888?
10:39:41  13       A   Yes. I have a familiarity with these
10:39:46  14   contracts.
10:39:46  15       Q   All of them?
10:39:48  16       A   I have a familiarity with all of them.
10:39:55  17       Q   Okay. Let's take the -- I'm on page
10:40:02  18   A1887. Do you see there are -- there is a contract
10:40:06  19   there Defense Intelligence Agency. It states prime
10:40:11  20   contractor, and it gives a time period from July
10:40:15  21   2014 to July 2019. Do you see that item?
10:40:19  22       A   I do see that item.
```

Page 48

```
10:40:20   1
                                                   (redacted)
10:41:00  12   BY MS KIRCHNER:
10:41:00  13       Q   And this would be for what period of
10:41:03  14   time?
10:41:04  15           MR RILEY: Objection to form  You can
10:41:06  16   answer
10:41:06  17   BY MS KIRCHNER:
10:41:07  18       Q   Your involvement
10:41:07  19       A   My involvement?  It would be hard to
10:41:06  20   definitively define, but I was working with the team
10:41:17  21   probably here and there probably from the start,
10:41:22  22   2014 to current date
```

Page 49

```
10:41:24   1
10:41:34   2
                                                   (redacted)
```



A8879

Protected Information
and/or Legends Redacted

Page 50

| | |
|---|---|
| 10:42:34 | 1 |
| 10:42:38 | 2 |
| 10:42:43 | 3 |
| 10:05:46 | 4 |

specifically some of the initiatives, inasmuch as
that they are supporting IC ITE through the KMT
platform, how that work was being performed
BY MS KIRCHNER:

5  Q   Okay  Were you a member of the DIA team?
6      MR RILEY:  Objection to form
7      THE WITNESS:  What do you mean member of
8  the DIA team?
9  BY MS KIRCHNER:
10     Q   Okay  I'm referring to the contract, the
11 Defense Intelligence Agency contract and I believe
12 you used the term that there was a DIA team  Were
13 you a member of that DIA team?
14     A   Again, our job functions are a little bit
15 nebulous, but I do believe specifically I was
16 probably put on the name of a contract at DIA  I'm
17 not sure specifically if it was this contract or the
18 contract previous to it, but I believe I was --
19 actually, I think I've been part of the team in both
20 instances, actually
21     Q   Now, you said that this team, the DIA
22 team, was working to develop solutions, I believe

Page 51

1  you used the word  Can you -- as you used the word
2  solution, can you tell us what that is?
3      A   Yes  Absolutely  So again, as I had
4  mentioned before, there is an initiative by the
5  Director of National Intelligence, DNI, James
6  Clapper, to establish IC ITE or the intelligence
7  community information technologies enterprise  So
8  specifically here on the challenges, again, we have
9  all these data sources across the IC, how do we
10 bring them into a knowledge management tool or a KMT
11 as the IC designates it, or as we would describe it
12 here, a data management platform  How do you bring
13 all that data in and how do you make all that data
14 available for analysis and discovery and
15 collaboration with the broader intelligence
16 community which sometimes includes the United States
17 Army
18     So specifically here, this IC ITE KMT
19 tool was providing an all source -- or all source
20 multi-INT capability to over ███ analysts in the
21 intelligence community  What I mean by all source
22 is that this looks at all types of data that the

Page 52

1  intelligence community deals with  So this might be
2  data that is being collected by the DOD down range
3  It might be data that's being collected from
4  intelligence sources around the world  It also
5  might be open source data, so data that's being
6  published in a newspaper  Data that's being
7  published to social media, et cetera
8      What I mean by multi-INT, it means that
9  there are multiple intelligence disciplines that
10 exist out there, so whether or not it is GEOINT,
11 whether or not it's MASINT, whether or no it's
12 SIGINT, all these different intelligence disciplines
13 are also supported by the IC ITE KMT tool, so we
14 provided a number of solutions to provide this data
15 management platform that supports the all source
16 information analysis to support the multi-INT
17 intelligence work flows present at DIA and to the
18 broader IC
19     Q   So in doing this work, did Palantir write
20 or create software code for the DIA?
21     A   So as part of this tool, as part of this
22 contract, there are a number of capabilities that we

Page 53

1  identified that would be useful for the Defense
2  Intelligence Agency, and to the people that are
3  being covered under this data management platform,
4  so there are a number of examples of capabilities
5  that we deployed, that we developed and deployed in
6  support of this contract
7      Q   So are these new tools developed during
8  the course of the contract?
9      A   These were capability that were developed
10 as part of the Palantir Gotham platform that were
11 deployed essentially as enhancements or additional
12 capability that extended the functionality of the
13 data management platform as a configuration into the
14 DIA'S IC ITE KMT
15     MR RILEY:  Counsel, we've been going for
16 about an hour  Would now be a good time?
17     MS KIRCHNER:  If the witness would like
18 to take a break, I'll take a break  If he wants to
19 go on --
20     THE WITNESS:  Sure  We can take a break
21     MS KIRCHNER:  Okay, sure
22     THE VIDEOGRAPHER:  The time is 10:47 am



14  (Pages 50 to 53)

A8880

Protected Information
and/or Legends Redacted

Page 54

10:46:50 1 We are going off the record
10:46:51 2 (Recess)
10:55:37 3 THE VIDEOGRAPHER: The time is 10:56
10:55:44 4 a m, and we are back on the record
10:55:46 5 BY MS KIRCHNER:
10:55:47 6 Q Mr Choung, you used the term
10:55:50 7 enhancements and you also use that term in your
10:55:53 8 report Could you give me your definition of
10:55:55 9 enhancements?
10:55:56 10 A Sure So in any piece of software, like
10:56:00 11 in our data management platform, the Palantir Gotham
10:56:03 12 Platform, there is base functionality that is
10:56:06 13 included as part of the data management platform
10:56:10 14 And then we offer a number of accessibility points
10:56:13 15 to our platform And so these extend the
10:56:16 16 functionality of our tool in specific ways that
10:56:18 17 might be useful to our customers
10:56:21 18 So Palantir offers an entire library or a
10:56:23 19 suite of tools and enhancements that plug in and
10:56:26 20 support the data management, the core Palantir
10:56:30 21 Gotham data management platform, so that we can
10:56:33 22 appropriately configure whether or not we are

Page 55

10:56:35 1 operating in a bank for financial regulation or
10:56:39 2 looking at mortgages or looking at a fraud, the same
10:56:43 3 way we can configure the platform form the Defense
10:56:47 4 Intelligence Agency in support of their missions or
10:56:48 5 the same way that we can configure our platform with
10:56:52 6 additional enhancements for a health care company,
10:56:57 7 for example These additional enhancements allow us
10:57:01 8 to tailor and configure our platform for the
10:57:03 9 specific uses of our customers
10:57:05 10 Q Is enhancement a technical term in the
10:57:10 11 world of software engineering?
10:57:12 12 A I think if you asked any technical person
10:57:17 13 about enhancements, they would have a general
10:57:17 14 understanding of what that means
10:57:23 15 Q Okay Now, in your report, you also used
10:57:26 16 another term You used configurations Can you
10:57:29 17 tell me what your understanding is of a
10:57:32 18 configuration?
10:57:33 19 A Yeah So in terms of configuration, any
10:57:37 20 software that is written needs to be appropriately
10:57:41 21 configured when it's installed into an environment
10:57:46 22 So for example, if you're on your home computer, and

Page 56

10:57:49 1 you want to install Microsoft Word you're going to
10:57:53 2 have to tell and configure Microsoft Word where to
10:57:56 3 be installed, how you want it to be set up, et
10:57:56 4 cetera
10:57:59 5 At the enterprise level, if you're
10:58:01 6 installing something like an exchange or an email
10:58:04 7 server, again, you're going to have to configure
10:58:07 8 different things, like what types of security
10:58:09 9 policies you have, the number of users that you
10:58:13 10 have, input the actual users that you have into
10:58:17 11 there So configuration basically means taking
10:58:20 12 software and then making it useful or appropriate or
10:58:23 13 properly configured, for lack of a better term, for
10:58:27 14 the function that it's supposed to provide
10:58:30 15 Q And does configuration involve creating
10:58:36 16 software code?
10:58:37 17 A How would you define software code?
10:58:45 18 Q Well, I'm not quite sure -- I don't think
10:58:47 19 I could do that
10:58:48 20 A I mean, so --
10:58:49 21 MR RILEY: There is no question
10:58:52 22 BY MS KIRCHNER:

Page 57

10:58:52 1 Q Do you have a definition of software
10:58:54 2 code?
10:58:54 3 A I think software code -- so there is --
10:58:59 4 software code essentially tells the computer
10:59:03 5 instructions on how to operate In some cases,
10:59:07 6 computer code might be in the form of a
10:59:11 7 configuration file and sometimes it might be in the
10:59:15 8 form of a -- what we call a script So essentially,
10:59:20 9 a simple set of instructions for the computer And
10:59:25 10 other times, it might be in the form of a
10:59:28 11 programming language where we are defining more
10:59:33 12 complex functions
10:59:34 13 So in terms of computer code, I think
10:59:37 14 there is multiple levels, so I was just trying to
10:59:39 15 set the appropriate context whether or not we are
10:59:40 16 talking about the configuration code that is
10:59:43 17 necessary in some circumstances or if we are talking
10:59:46 18 about -- or in other cases, the development of
10:59:48 19 actual software code from like a software language,
10:59:52 20 programming language, enterprise software
10:59:55 21 development type perspective
10:59:56 22 Q Well, if we could just stick with



15 (Pages 54 to 57)

Page 78

Page 80

11:25:03

Page 79

11:24:10   2        MR. RILEY:   And counsel, just to be
11:24:11   3   clear, you're free to ask him about the contracts,
11:24:13   4   but we've established that he is not here as a
11:24:15   5   procurement expert

Page 81



A8887

Protected Information
and/or Legends Redacted

Page 130

| | |
|---|---|
| 13:24:17 | 1 |
| 13:24:21 | 2 |
| 13:24:22 | 3 |
| 13:24:24 | 4 |
| 13:24:24 | 5 |
| 13:24:26 | 6 |
| 13:24:29 | 7 |
| 13:24:31 | 8 |
| 13:24:34 | 9 |
| 13:24:36 | 10 |
| 13:24:40 | 11 |
| 13:24:43 | 12 |
| 13:24:46 | 13 |
| 13:24:47 | 14 |
| 13:24:49 | 15 |
| 13:24:51 | 16 |
| 13:24:53 | 17 |
| 13:24:56 | 18 |
| 13:24:58 | 19 |
| 13:25:02 | 20 |
| 13:25:07 | 21 |
| 13:25:09 | 22 |

| | |
|---|---|
| 13:25:14 | 1 |
| 13:25:17 | 2 |
| 13:25:20 | 3 |
| 13:25:23 | 4 |
| 13:25:27 | 5 |
| 13:25:30 | 6 |
| 13:25:32 | 7 |
| 13:25:34 | 8 |
| 13:25:42 | 9 |
| 13:25:46 | 10 |
| 13:25:50 | 11 |
| 13:25:56 | 12 |
| 13:25:59 | 13 |
| 13:26:05 | 14 |
| 13:26:10 | 15 |
| 13:26:16 | 16 |
| 13:26:17 | 17 |
| 13:26:20 | 18 |
| 13:26:23 | 19 |
| 13:26:27 | 20 |
| 13:26:31 | 21 |
| 13:26:34 | 22 |

Page 132

| | | |
|---|---|---|
| 13:26:37 | 1 | customer's needs |
| 13:26:38 | 2 | BY MS KIRCHNER: |
| 13:26:39 | 3 | |
| 13:26:40 | 4 | |
| 13:26:43 | 5 | |
| 13:26:43 | 6 | |
| 13:26:45 | 7 | |
| 13:26:49 | 8 | |
| 13:26:53 | 9 | |
| 13:26:54 | 10 | |
| 13:26:55 | 11 | |
| 13:26:59 | 12 | |
| 13:27:00 | 13 | |
| 13:27:06 | 14 | |
| 13:27:09 | 15 | |
| 13:27:12 | 16 | |
| 13:27:16 | 17 | BY MS KIRCHNER: |
| 13:27:17 | 18 | Q   Could you turn to page 8 of your report |
| 13:27:29 | 19 | You have an image here of -- as I understand it, |
| 13:27:36 | 20 | this image comes from a slide deck that Lieutenant |
| 13:27:42 | 21 | General Mary Legere brought to her deposition, is |
| 13:27:44 | 22 | that correct? |

Page 133

| | | |
|---|---|---|
| 13:27:44 | 1 | A   Yes, that is |
| 13:27:46 | 2 | Q   Okay  Now, in this Army illustration of |
| 13:27:51 | 3 | the stove pipe problem, if you had to put Palantir |
| 13:27:56 | 4 | on this image, where would you put it? |
| 13:27:58 | 5 | MR RILEY: Objection to form |
| 13:28:00 | 6 | THE WITNESS: So this is a logical |
| 13:28:03 | 7 | representation of the problem that I described |
| 13:28:08 | 8 | before that Army is facing and many organizations |
| 13:28:11 | 9 | face  So at the top of this diagram, we have |
| 13:28:14 | 10 | external agencies  For example, I see the logos |
| 13:28:18 | 11 | here for the CIA, for the NSA, the DIA, NRO and NGA |
| 13:28:22 | 12 | listed above  So these are clearly outside of the |
| 13:28:27 | 13 | boundaries of both Army, of what they provide |
| 13:28:29 | 14 | That being said, we are bringing |
| 13:28:31 | 15 | information in from all these external sources into |
| 13:28:34 | 16 | the Army in this diagram  And as this diagram |
| 13:28:38 | 17 | depicts, it lists stove pipes that exist within this |
| 13:28:42 | 18 | system  Specifically, those stove pipes exist all |
| 13:28:46 | 19 | the way down to the bottom of here where it goes to |
| 13:28:49 | 20 | exploitation and analysis tools, where it shows |
| 13:28:52 | 21 | individual users on different types of work stations |
| 13:28:55 | 22 | performing processing or analysis based on this |



A8900

Protected Information
and/or Legends Redacted

▇▇▇▇▇ **OPINION**

# In the United States Court of Federal Claims

### No. 16-784C
### Filed: November 3, 2016

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| **PALANTIR USG, INC.,** | * | |
| | * | **Pre-Award Bid Protest; Cross-** |
| **Protestor,** | * | **Motions for Judgment on the** |
| | * | **Administrative Record;** |
| v. | * | **Commercial Availability; 10 U.S.C.** |
| | * | **§ 2377; Bad Faith; Supplementation** |
| **UNITED STATES,** | * | **to the Administrative Record;** |
| | * | **Permanent Injunction.** |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

**Hamish Hume**, Boies, Schiller & Flexner LLP, Washington, D.C., for protestor. With him were **Stacey K. Grigsby**, and **Jon R. Knight**, Boies, Schiller & Flexner LLP, Washington, D.C.

**Domenique G. Kirchner**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Scott A. MacGriff**, Trial Attorney, Commercial Litigation Branch, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Scott N. Flesch**, **Major Lawrence P. Gilbert**, **Evan C. Williams**, and **Frank A. March**, United States Army Legal Services Agency, and **Debra J. Talley** and **Daniel J. Beuke**, United States Army Materiel Command.

## O P I N I O N

**HORN, J.**

Palantir USG, Inc.[1] (Palantir) and Palantir Technologies Inc.[2] filed a pre-award bid protest in this court on June 30, 2016, challenging the United States Department of the Army, Army Contracting Command, Aberdeen Proving Group's (the agency) Request for Proposals No. W56KGY-16-R-0001 (the solicitation). Protestor Palantir USG, Inc. "is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California." Palantir USG, Inc. and Palantir Technologies

---

[1] Palantir Technologies Inc. "owns one hundred percent of the stock" of Palantir USG, Inc.

[2] As discussed below, on August 22, 2016, the court granted defendant's motion to dismiss Palantir Technologies Inc. from the above captioned protest.

Protected Information
and/or Legends Redacted

Inc. filed suit in the United States Court of Federal Claims after the United States Government Accountability Office (GAO) denied Palantir USG, Inc.'s GAO protest. See generally Palantir USG, Inc., B-412746, 2016 WL 3035029 (Comp. Gen. May 18, 2016).[3]

As indicated at the GAO, "[t]he solicitation seeks a single contractor to be the system data architect, developer, and integrator of DCGS–A2 [Army's Distributed Common Ground System-Army Increment 2], which is the second increment of the DCGS–A. DCGS–A is the Army's primary system for the processing and dissemination of multi-sensor intelligence and weather information to the warfighter." Id. at *1.

Palantir asserts that the Army acted arbitrarily and capriciously when it issued the DCGS-A Increment 2 solicitation for a developmental contract, because Palantir claims it had identified to the Army a commercially available technology that Palantir believes can satisfy the Army's requirements. According to Palantir, "Palantir has developed a technology that solves the needs of DCGS." Palantir claims that the data management platform that Palantir has to offer, also called the Palantir Gotham Platform, was "initially developed between 2004 and 2009 with the help of an investment from, and a partnership with, the venture capital arm of the Central Intelligence Agency." According to Palantir, since "2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ('SOCOM'), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies)." The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." Palantir argues that, as written, "[t]he Solicitation for DCGS-A2 makes it impossible for Palantir to offer its Data Management Platform as a commercial or nondevelopmental item to satisfy the Army's requirements" (capitalization and emphasis removed) because the solicitation only requested proposals for the development of the required technology.

## FINDINGS OF FACT

In explaining the origin and development of the DCGS-A, the contracting officer's statement during the GAO protest indicated:

> Combat operations in Kuwait and Iraq in the early 1990's demonstrated the military potential of information dominance, and sparked a transformation in the use of information technology in intelligence operations. Subsequently, the Department of Defense instituted an initiative to unify Intelligence,

---

[3] Although the undersigned has high regard for GAO decisions, this court is not bound by decisions of the GAO. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")).

Protected Information and/or Legends Redacted

Surveillance and Reconnaissance architectures, and enhance the acquisition of manned and unmanned airborne sensors and associated ground processing systems. This initiative resulted in a requirement for a Distributed Common Ground/Surface Systems (DCGS), made up of Army, Air Force, Navy and Marine Corps ground processing systems that can share information across the Joint Force. The Army component of DCGS is the Distributed Common Ground System – Army (DCGS-A). Today, DCGS-A has become the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information. It is deployed worldwide in support of intelligence operations including all Theaters of Operation.

The background section of the Performance Work Statement for the solicitation at issue explained:

The DCGS-A program was created in response to the Department of Defense (DoD) Distributed Common Ground/Surface System (DCG/SS) Mission Area Initial Capabilities Document (MA ICD), which captured the overarching requirements for an Intelligence, Surveillance, and Reconnaissance (ISR) Family of Systems that will contribute to Joint and combined Warfighter needs. The MA ICD has since been updated to an Enterprise ICD. DCGS-A facilitates "Seeing and Knowing" on the battlefield—the fundamental precursor to the understanding that underpins the Army's Mission Command concept. DCGS-A contributes to visualization and situational awareness (SA), thereby enhancing tactical maneuver, maximizing combat power and enhancing the ability to operate in an unpredictable and changing environment throughout the operational spectrum. It facilitates the rapid planning, execution, and synchronization of all war fighting functions resulting in the Current and Future Force's ability to operate within the enemy's decision cycle.

DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.  DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications.

DCGS-A Increment 1 is the ISR component of the modular and future force Mission Command System (MCS) and the Army's primary system for ISR tasking of sensors, processing and exploitation of data, and dissemination of intelligence (TPED) information about the threat, weather, and terrain at all echelons. A high percentage of Increment 2 functionality has already been developed under the DCGS-A Increment 1 efforts. DCGS-A Increment 2 will leverage the DCGS-A hardware components fielded across the Army under DCGS-A Increment 1.

3

Protected Information and/or Legends Redacted

According to the defendant, DCGS-A Increment 2, the subject of the solicitation at issue, "will introduce a new and modernized data management architecture (DMA) using a modular system approach to perform Army intelligence analysis capabilities." As reflected in the Army's post-hearing comments submitted to the GAO, and quoted in the GAO decision:

> DCGS-A is intended to combine all intelligence software/hardware capabilities within the Army into one program with the ability to access and be accessed by, not only Army intelligence and command components, but also the other members of the broader distributed common ground/surface system. It is composed of many software products-commercial, government, and open source-as well as software integration that allows all the different products and components to communicate and operate seamlessly.

Palantir USG, Inc., B-412746, 2016 WL 3035029, at *2.

The Performance Work Statement for the solicitation at issue stated that the requirements of DCGS-A Increment 2 included the "development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/HUMINT, Weather, GEOINT, Geospatial Engineering and Sensor Management," and that "[t]hese efforts include Software Development, Capability Enhancements, Integration, Limited Fielding and Training support, Maintenance, and Support for logistics development, for a period of performance of six years from contract award." The draft version of the Performance Work Statement for the solicitation at issue stated that "[t]he DCGS-A Increment approach utilizes spiral deliveries to maintain interoperability with Army and Joint ISR [Intelligence, Surveillance and Reconnaissance] architectures and to address capability insertion and enhancements. This system must remain interoperable and compatible with the Joint command system infrastructure and mission applications." As indicated by the contracting officer who issued the solicitation, "[t]he DMA [i.e., Data Management Architecture] will serve as the architecture foundation and the heart with which the rest of the capabilities will depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract."

The parties have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers on a commercial item basis," and that other "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis." As further detailed below, in responses to the government's Requests for Information, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claims that "Palantir is currently in use by tens of thousands of users across the DOD [Department of Defense] and IC [intelligence

4

Protected Information and/or Legends Redacted

community].” The Administrative Record filed in the above captioned protest includes a February 9, 2015 “Operational Needs Statement for Palantir Platform” from Special Forces Group (Airborne), █████████████, requesting the Palantir Gotham Platform. The Statement indicated: “The Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations,” and concluded that “Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units █████████████████        as well as various U.S. Government agencies. ████████████████████████
████████

<u>Pre-Solicitation Activity</u>

The parties have stipulated that in July 2014, prior to the issuance of the DCGS-A Increment 2 solicitation, the Army Acquisition Executive, Heidi Shyu,[4] chartered a Data Integration, Visualization and Analytics (DIVA) Independent Market Study which was completed by the MITRE Corporation, a not-for-profit research and development organization. The joint stipulations of fact indicate:

> The purpose of the DIVA study was to “provide situational awareness and market trends to the Army leadership of the 'state-of-the-practice' within the commercial DIVA software platform landscape.” As stated in the DIVA study, the DIVA study was intended to: (1) provide a high-level overview of the ASA(ALT) Data Integration, Visualization and Analytics (DIVA) Independent Market Study; and (2) provide recommendations for the DCGS-A Increment 2 Acquisition effort and describe the top- level risks and mitigation strategies associated with adopting recommendations. The DIVA study assessed the following acquisition approaches:
>
> a. Cloud Infrastructure Platform Provider: Provide highly-scalable and reliable computing infrastructure services (e.g., data bases; analytic engines; computing and storage; identity management);
>
> b. Turn-Key: Procure a commercial product as basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure,

---

[4] Ms. Shyu is referred to by several different titles throughout the Administrative Record and filings with the court. The joint stipulations of fact indicate that when Ms. Shyu chartered the DIVA Market Study in July 2014 and when she signed the October 21, 2015 Determination & Finding, her title was the Army Acquisition Executive. On October 20, 2014, when Ms. Shyu issued a “Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy,” her title was “Assistant Secretary of the Army (Acquisition, Logistics and Technology).” The joint stipulations of fact also indicate when she issued the December 16, 2015 recommendation for issuance of the solicitation, her title was listed as Assistant Secretary of Defense (Acquisition).

**Appx20005**

Protected Information and/or Legends Redacted

    c. Hybrid approach: both an Enterprise Cloud Platform and a Turn-Key Platform, including integration of additional applications. . . .

(all internal citations omitted). The DIVA Market Study included a "Potential Strategy: Phased Acquisition and Integration Approach," which recommended that the DCGS-A Increment 2 approach

> could be structured in a phased manner. Initially, the two foundation components (e.g., COTS[5] cloud infrastructure services and COTS DIVA "Turn Key" Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA "Turn Key" platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original).

    On January 7, 2015, also before the solicitation was issued, the Army generated an Information Paper, which identified key objectives and approaches to DCGS-A Increment 2. The "Increment 2 Key Objectives" listed were: "1. Modernize the Data Enterprise to a Data Integration Platform[,] 2. Easier to use visualization framework[,] 3. Best Leverage industry to deliver these capabilities with a commercially supported infrastructure[,] 4. Execute in a funding constrained environment." The Information Paper envisioned a "Three-Phase Approach (DIVA Competition, Domain-specific Capabilities Updates, Integration Environment)." For the first phase, the DIVA Competition, the Information Paper stated:

> Industry to deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A to displace the Entity (TED) and Document (MSG) - infrastructure that interoperates with the Geospatial and other Intelligence data-specific data sources using standards such as Open Geospatial Consortium (OGC), Motion Imagery Standards Profile (MISP), etc. This infrastructure could be a commercial stand-alone solution (<u>Palantir</u>, IBM) or it could be a collection of capabilities (RDMS + Hadoop +...) as long as the infrastructure has the

---

[5] COTS, although not defined in the DIVA Market Study, appears to be an abbreviation for "commercial off the shelf." Palantir refers to "COTS" in the DIVA Market Study as commercial off the shelf, without objection from defendant. Furthermore, the Trade Space Analysis, discussed below, includes a list of acronyms and defines COTS as "Commercial off the shelf."

Protected Information and/or Legends Redacted

'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data.

(emphasis added).

Although conducted later in time, in July 2015, after the Army issued all three of the Requests for Information, described below, and around the time the Army issued the Market Research Report, the Army Materiel Systems Analysis Activity produced a Trade Space Analysis, which evaluated capabilities that could be leveraged for the DCGS-A Increment 2 procurement. Defendant explained that: "The TSA [Trade Space Analysis], dated July 2015, identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1." The Army Materiel Systems Analysis Activity explained:

The U.S. Army Materiel Systems Analysis Activity (AMSAA) was directed by Headquarters, Department of the Army Deputy Chief of Staff (HQDA DCS) G-3/5/7 to conduct a Trade Space Analysis (TSA) of the DCGS-A Information System Capability Development Document (IS CDD) to support future requirements decisions. The TSA identified and evaluated technical functionality, cost, ease of use/usability, schedule risk, technical risk, and trade space for specific DCGS-A technical and operational capabilities that are beyond DCGS-A Increment 1. The TSA results will inform the economic analysis and Request for Proposal (RFP), supporting a potential Milestone B acquisition decision for DCGS-A Increment 2. DCGS-A Increment 2 will provide additional capabilities to enhance the Intelligence processing and Fusion capabilities across intelligence domains to assist the operational commander's access to information, task organic sensors, and synchronize non-organic sensor assets with their organic assets. The TSA focused on targeted DCGS-A IS CDD capabilities that are beyond those provided by DCGS-A Increment 1 for: Mission Command Support for the Processing, Exploitation, and Dissemination (PED) of Intelligence, Surveillance, and Reconnaissance (ISR); Standard Sharable Geospatial Framework (SSGF)- Army Geospatial Enterprise (AGE); Data Enterprise Architecture (DEA); and Intelligence Support to Cyber Operations (CO).

The Trade Space Analysis further explained:

Representative systems were assessed to reflect capabilities that are readily available for the following software option alternatives: Commercial off the shelf (COTS), Government off the shelf (GOTS), and Hybrid and are defined as follows:

• COTS - a singular software solution or compilation of commercially available software packages that provide an integrated solution, whereby the vendor owns the rights to the baseline software code.

7

Protected Information and/or Legends Redacted

• GOTS - a singular or compilation of software solutions, whereby the baseline software code was developed by and owned by the Government.

• Hybrid - a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS).

The Trade Space Analysis determined that: "Overall, the Hybrid alternative was rated Green and scored the highest of the three alternatives. Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions."[6] Specifically, regarding the Data Enterprise Architecture results, the Trade Space Analysis stated: "The COTS and Hybrid alternatives satisfy most of the technical functionality metrics, however, the Hybrid software solutions are currently functional in the DoD IC and provide the best 'turn-key' functionality. Upper bound COTS solutions provide a turn-key technical functionality similar to that of the Hybrid solutions." For another capability, the Standard Sharable Geospatial Framework (SSGF)-Army Geospatial Enterprise compatibility, the Trade Space Analysis determined:

Although there are some GOTS solutions that can address a few targeted technical functionality metrics, there are no viable comprehensive GOTS solutions that were identified by the Army/DOD geospatial community. The COTS alternative was assessed to have greater usability, lower cost, and lower schedule risk as compared to the Hybrid alternative. The COTS options won't address all Army Geospatial requirements with software "out of the box". However, these capability gaps are anticipated to be closed with ongoing commercial upgrades and widgets that can be developed in the COTS Baseline software. There were several risk driver [sic] for both the COTS and Hybrid alternatives that were assessed to be of moderate to high risk.

On August 13, 2014, the Army issued the first Request for Information, which was "conducted to assess the level of relevant competition and capabilities in the market place

---

[6] The "Technical Risk Categorical Rating Criteria" in the Trade Space Analysis was:

- Green: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

- Yellow: "Moderate Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

- Red: "High Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance"

8

Protected Information and/or Legends Redacted

and elicit industry feedback to assist the Program Office in developing the Acquisition Plan," for the potential DCGS-A Increment 2 procurement and "request[ed] respondents' corporate overview information and basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program."[7] (emphasis added). The August 13, 2014 Request for Information indicated that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years."[8] (emphasis added). Palantir responded to the August 13, 2014 Request for Information and stated:

> The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(emphasis in original; footnote omitted). Palantir explained "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." In its response to the August 13, 2014 Request for Information, Palantir argued that:

> The most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP). FFP vehicles shift performance risk to the contractor, reduce the risk of cost overruns to the Government, and shorten delivery schedules.

The parties have stipulated that "Palantir USG recommended among other things a Firm-Fixed Price (FFP) model in conjunction with 'an outcomes-based Performance Work Statement based on a proven product and incorporating support services,'" and, further, "Palantir USG stated that 'the FFP model can be used in conjunction with a Cost-Plus model for optional system enhancements. CPIF and CPFF contracts should total less than 20 percent of the total contract value.'" Palantir indicated:

---

[7] Palantir states that the August 13, 2014 Request for Information "failed to inquire about the availability of commercial or nondevelopmental items that could meet the requirements of DCGS-A2."

[8] Palantir believes this statement demonstrates that "[t]he Army conceded in the first RFI [the August 13, 2014 Request for Information] that it was not even contemplating the possibility of a fixed-price contract for the procurement of commercial items."

9

Protected Information and/or Legends Redacted

Examples of successful FFP contracts include our work at the U.S. Marines Corps, where enhancements are included as part of our regular software releases and small businesses fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC agencies and affording a COTS solution at a FFP.

After receiving the responses to the first Request for Information, the Army produced a December 2014 RFI Response Analysis which indicated that the "[v]ast majority of respondents support hiring a contractor as the LSI [Lead Systems Integrator] due to efficiencies in industry decision making and resource-marshaling processes." The 2014 RFI Response Analysis summarized Palantir's submission by noting that:

> The Palantir response listed several contracts they have been awarded, but did not include scope or description of work. However, Palantir has developed an intelligence fusion system that has been used by various entities within the Department of Defense. Palantir was found capable to provide Data management and Workflow Management upgrades, and partially capable of providing Data Fusion and Cyber capabilities to Increment 2.

The conclusion of the 2014 RFI Response Analysis stated: "Based on the responses to the first RFI, and analysis of the resulting information conducted by the DCGS-A Increment 2 Contract IPT [Solicitation Integrated Product Team], the overall conclusion of this Market Research Report is that a more capability focused RFI needs to be issued to industry."

Prior to the issuance of the 2014 RFI Response Analysis, on October 20, 2014, Ms. Shyu, Assistant Secretary of the Army (Acquisition, Logistics and Technology), issued a memorandum to the Under Secretary of Defense (Acquisition, Logistics and Technology) regarding a "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy." In the memorandum she requested approval to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." Ms. Shyu explained that:

> I believe allocating the remaining Increment 1 RDT&E funding to support potential required fixes from the Increment 1 Release 2 Limited User Test results and moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently

Protected Information and/or Legends Redacted

available.  In addition, Increment 1 Release 2 will deliver approximately 90 percent of the planned Increment 1 capability.

On December 5, 2014, the Army issued a second Request for Information, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." As in the August 13, 2014 Request for Information, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development</u> projects that are similar in scope and process to the DCGS-A program." (emphasis added). For the December 5, 2014 Request for Information, the Army sought "information regarding your corporate capabilities and experience related to the delivery of capabilities." Question 3.0(d) of the December 5, 2014 Request for Information asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience <u>developing</u> and integrating with these types of software applications/capabilities." (emphasis added). A copy of the table referenced in Question 3.0(d) is included below:

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company |
|---|---|---|---|---|---|---|---|
| Cloud Computing | | | | | | | |
| Big Data Analytics | | | | | | | |
| Data Architecture & Management | | | | | | | |
| Data Fusion & Pattern Analysis | | | | | | | |
| Applications for IC ITE Joint Storefront | | | | | | | |
| Targeting | | | | | | | |
| Signals Intelligence/NS A-Net Operations | | | | | | | |
| Defensive Cyber Operations | | | | | | | |
| Offensive Cyber Operations | | | | | | | |
| Counter Intelligence & Human Intelligence | | | | | | | |

Appx20011

Protected Information and/or Legends Redacted

| | | | | | | |
|---|---|---|---|---|---|---|
| DCGS Integration | | | | | | |
| Backbone (DIB) implementation | | | | | | |
| Weather Effects/Analysis | | | | | | |
| GEOINT (Full Motion Video/Static Imagery Intelligence) | | | | | | |
| Geospatial Intelligence (Terrain & Mapping) | | | | | | |
| Collection Management (Sensor Management) | | | | | | |
| On-the-Move Operations | | | | | | |
| Workflow Management | | | | | | |
| Role/Attribute Base Access Control | | | | | | |
| Protection level 3 (PL 3) security hardening | | | | | | |
| Ease of Use Initiatives | | | | | | |
| High/Ultra Reliability Program | | | | | | |
| Army Interoperability Certification | | | | | | |
| Joint Interoperability Certification | | | | | | |

Question 3.0(f) asked: "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" Question 3.0(h) asked, "[w]hat is your company's current rate of personnel retention over the last five (5) years?"

Protected Information
and/or Legends Redacted

Palantir again responded[9] to try to explain the value of a commercial, not a developmental, approach:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's capability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Palantir recommended "that the Government pursue a different acquisition strategy than the long-term development used in Increment 1. We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities." Palantir emphasized:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD and the IC. However, the request for information on software series contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

After the responses to the second Request for Information were received, on January 20, 2015, the Army held an "Industry Day," characterized by the Army as a "forum to share emerging requirements with Industry," which "helped to ensure the Government's requirements are defined adequately to promote high quality proposals and adequate

---

[9] As discussed below, defendant argues that, although "Palantir USG responded to RFI No.2," Palantir did not "complete the Army's chart and identify its specific capabilities across the various DCGS-A." Defendant states that Palantir "declined to answer question 3.0(d) in RFI No.2," and "question 3.0(f) in RFI No.2," and "question 3.0(h) in Request for Information No.2." Palantir responds that the Army did not in fact request that bidders "complete the Army's chart and identify its specific capabilities across the various DCGS-A," "[r]ather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts. There was no reason to do so again." (emphasis in original; internal citations omitted).

13

Protected Information and/or Legends Redacted

competition." Between January 20, 2015 and May 12, 2015, the "Government conducted a one on one engagements [sic] with 78 different organizations,"[10] which the Army stated was an opportunity to "[p]rovide a forum to answer Industry's questions and elicit their feedback regarding to [sic] the elements of the Increment 2 Acquisition Strategy and Acquisition Plan such as small business involvement and Data Management considerations."

On May 6, 2015, the Army issued a third Request for Information, which "[w]as released to determine if [the] rule of two exists, as defined in FAR [Federal Acquisition Register] 19.502, and if a small business set-aside is appropriate for Increment 2 development." Palantir indicated that it was not a small business and, as with the previous Requests for Information, responded:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.

Palantir also indicated in its response:[11]

> Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a

---

[10] The joint stipulations of fact reflect that the Army conducted "[o]ver 80 one-on-one sessions with the Program Manager and industry." Neither the joint stipulations of fact nor any document in the Administrative Record establish whether or not any of the more than 80 meetings included Palantir.

[11] In responding to the question in the May 6, 2015 Request for Information, "[e]xplain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development," Palantir indicated:

> As a privately owned company, Palantir Technologies, the parent company of Palantir USG, Inc., does not typically release financial information. We will provide audited statements as reasonably necessary for the purposes of determining our ability to perform our obligations under the agreement subject to the appropriate confidentiality provisions being put in place.

Protected Information and/or Legends Redacted

central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?[12]

As noted above, Palantir explained that "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community."

After a second Industry Day, held on June 25, 2015, which the Army characterized as "an opportunity to discuss the draft Increment 2 requirements with industry," in July 2015, the Army issued a Market Research Report, which determined that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[13] The Market Research Report stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[14] Addressing Palantir specifically, the Market Research Report[15] stated in the "RFI Respondent Capability Assessment" that "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." (emphasis removed). The parties have stipulated that:

> A November 6, 2015 paper to the Chief of Staff of the Army stated that "Extensive market research efforts were conducted to ensure requirements were achievable" and then listed "4-month independent DIVA study lead [sic] by MITRE, SEI, DNI, and DAU," "3 Requests for Information," "2 industry days with over 500 attendees and 224 companies," and "Over 80 one-on-one sessions with the Program Manager and industry."

---

[12] In the complaint, protestors allege that "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

[13] A chart included in the Market Research Report briefly summarized the role of each of the Requests for Information. The Market Research Report indicated: "**RFI 1** To determine level of competition and industry feedback of Acquisition Strategy[,] **RFI 2** To determine capability of individual businesses to perform as prime contractor[,] **RFI 3** Inform Increment 2 on the role of small business[.]" (emphasis in original).

[14] The Market Research Report also indicated that in September 2015, the Army would have an "Industry Engagement," which would be to "serve as a venue to discuss the Draft Increment 2 Request for Proposal (RFP) with industry following its release."

[15] Of the 43 respondents to the December 5, 2014 Request for Information, the only responder to the December 5, 2014 Request for Information the Market Research Report labeled as "non-responsive" was Palantir.

Protected Information and/or Legends Redacted

Even after responding to the three Requests for Information, Palantir continued to try to express to the Army its views and frustration with the direction of the developmental procurement choice by the Army and with the Army's apparent disinterest in consideration of commercially available alternatives. In response to the draft Performance Work Statement, Palantir indicated:

> Palantir USG, Inc. . . . has reviewed the Performance Work Statement (PWS) for DCGS-A Increment 2 Task Order 0001. As written, Task Order 0001 prevents companies with commercially available technology from direct participation in the program and will result in failure. Task Order 0001 will lock the Army into an irrelevant and unusable "flagship" intelligence architecture for the next decade. Increment 1 failed because the Army attempted to build a foundational data platform from scratch while refusing to adopt proven commercial technology for core system components. After spending fifteen years and billions of dollars, the Army has not delivered a working intelligence platform to soldiers. Army ASA(ALT) acknowledged this reality and directed DCGS-A's leadership to halt Increment 1 and adopt a new strategy for Increment 2. Despite this direction, and in direct violation of Congressional intent, the Army has deliberately chosen to repeat the same strategy that resulted in the failure of Increment 1 and is once again ignoring commercially available technology that works for soldiers today. Increment 2 is an opportunity to correct this failure, but only if the Army changes its fundamental acquisition strategy. This is a consequential moment for the DCGS-A program. There is little time remaining to change the strategy, and current program leadership appears unwilling to take necessary action.

(internal reference omitted).

On October 21, 2015, Ms. Shyu, as the Army Acquisition Executive, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)." The Determination & Findings noted that "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture by a contractor as the systems integrator," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." The Determination & Findings concluded that:

> Based on the above analysis, issuing a single award IDIQ contract will mitigate many of the risks identified herein and is in the best interest of the Government. Due to the complex developmental efforts this work entails, further competition at the task order level would interrupt development, ultimately increase price, and cause schedule slippages.

Appx20016

Protected Information and/or Legends Redacted

Ms. Shyu determined:

> that a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

Finally, on July 1, 2016, notably one day after the above captioned protest was filed in this court, and significantly after the issuance of the solicitation and the conclusion of the GAO protest, Christopher Fisher, the contracting officer for the solicitation at issue and Bryon Young, the Principal Assistant Responsible for Contracting, issued a "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed). The Determination of Non-Commercial Item stated that market research was conducted and the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item stated:

> Based upon market research conducted by the Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

> I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

### The Solicitation, GAO Protest, and Filing in this Court

On December 16, 2015, the Army issued a recommendation for issuance of the solicitation, in which Ms. Shyu, as the Assistant Secretary of Defense (Acquisition), stated that DCGS-A Increment 1 was "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Ms. Shyu continued: "Increment 2 will provide a new Data Management

Protected Information and/or Legends Redacted

Architecture, a new Workflow Management capability, improved fusion and pattern analysis, cyber security upgrades, upgrades to the DCGS Integrated Backbone and usability enhancements." After Ms. Shyu's recommendation for issuance of the solicitation, on December 23, 2015, the Army issued the solicitation at issue in this protest, Request for Proposals No. W56KGY-16-R-0001, for engineering, manufacturing, and development services. The solicitation required a single contractor to be the system data architect, developer, and integrator for DCGS-A Increment 2. The solicitation had four evaluation factors: (1) Technical; (2) Cost/Price, (3) Past Performance, and (4) Small Business Participation Plan. The solicitation contemplated the award, on a best value basis, of a single indefinite-delivery, indefinite-quantity contract, with the simultaneous issuance of a cost-reimbursement type task order and the period of performance contemplated a six year term from contract award.

The closing date for the solicitation was February 16, 2016. That same day, February 16, 2016, Palantir filed a timely protest at the GAO. The GAO subsequently issued its decision on May 18, 2016, denying the protest. See generally Palantir USG, Inc., 2016 WL 3035029. In a short decision, the GAO indicated that "[w]hile the market research revealed that commercial items were available to meet some of the DCGS–A2 requirements, the agency concluded that there was no commercial solution that could meet all the requirements of DCGS–A2," and "[b]ecause the agency concluded that significant portions of the anticipated DCSG–A2 [sic] scope of work were not available as a commercial product, the agency determined that the DCGS–A2 development effort could not be procured as a commercial product under FAR part 12 procedures." According to the GAO, "[t]he protester has failed to show that the agency's determination in this regard was unreasonable." Id. at *3 (footnote omitted). The GAO also determined "the record shows that the agency reasonably decided on its approach of having a single contractor, who would be responsible for selecting all the components of DCGS–A2, and who would bear the responsibility for making certain that those components are integrated, in contrast to the phased approach favored by Palantir." Id. at *4. The GAO concluded:

> [T]he agency's approach is reasonably related to its need for a fully integrated and interoperable system made up of a number of specific capabilities, some of which are commercially available and some of which are not. While the agency considered several potential approaches to this procurement, including the phased approach favored by the protester, the agency ultimately concluded that it would have a greater likelihood of success (in that it could avoid certain technical risks, concerns and significant schedule risk and cost uncertainty) by opting to have a single contractor serve as the system integrator in charge of developing and selecting the components and making sure that they can be successfully integrated. As such, we have no reason to question the approach chosen by the agency or to conclude that the solicitation is unduly restrictive of competition.

Id. at *5 (internal citation omitted).

Protected Information and/or Legends Redacted

On June 30, 2016, Palantir USG, Inc. and Palantir Technologies Inc. filed the current pre-award bid protest in this court. The complaint has seven counts. Count one alleges that the Army violated 10 U.S.C. § 2377 (2012) and 48 C.F.R. § 10.002 (2016) and 48 C.F.R. § 11.002 (2016) by refusing to solicit the data management platform as a commercial item. Similarly, count two alleges that the Army violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002 by refusing to solicit a commercial item for the entirety of DCGS-A Increment 2. Count three alleges that the Army violated 10 U.S.C. § 2377(c) by failing to determine whether its needs could be met by commercial items. Count four contends that the Army violated 48 C.F.R. § 16.301-2(a) (2016) by soliciting a cost-plus contract instead of a fixed price contract, and states:

> Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable 'to define its requirements sufficiently to allow for a fixed-price contract' or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

Count five alleges that the Army violated 10 U.S.C. § 2304a(f) (2012) and DFARS Part 217.204 (2016) by soliciting a task order contract with a base period of six years. Count six alleges that the Army violated 48 C.F.R. § 16.504 (2016) by soliciting an impermissibly expensive task order exceeding $112.0 million. Finally, count seven alleges that "the Army engaged in arbitrary, capricious, and unlawful conduct by refusing to allow Palantir to bid, by resisting innovation, by insisting on the failed approach of DCGS-A1, and by engaging in bad faith conduct[.]" (emphasis and capitalization removed).

The complaint alleges that:

> [T]he Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2 [sic]. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

The complaint asks this court to enter

> a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal

Protected Information and/or Legends Redacted

violations, including at a minimum through the issuance of a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements.

Initially, in response to the complaint, defendant filed a motion to dismiss Palantir USG, Inc. and Palantir Technologies Inc.'s complaint and argued that Palantir USG, Inc. and Palantir Technologies Inc. lacked standing to bring this protest and that even if Palantir USG, Inc. and Palantir Technologies Inc. had standing, they had waived any objections to the solicitation. After the parties fully briefed the motion to dismiss, the court determined that the timely protest filed at the GAO did not cause Palantir USG, Inc.'s claims to become subject to waiver in this court, and, that Palantir had standing to bring its claims in this court. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. 21, 46 (2016). The court determined, however, that Palantir Technologies Inc. had not filed a timely protest with the GAO, and, therefore, its claims were subject to waiver, and granted defendant's motion to dismiss Palantir Technologies Inc. for lack of subject matter jurisdiction.

In addition to defendant's motion to dismiss, the parties now have filed cross-motions for judgment on the Administrative Record. In response to the allegations in the complaint, the defendant generally responds that agencies have "substantial discretion" both to determine the requirements and how best to acquire those requirements. Defendant also argues that the Army's market research, and the determination based on the market research, were appropriate and that the documents in the Administrative Record do not support Palantir's argument that the Army erred in not soliciting the DCGS-A Increment 2, including the data management platform, as a commercial item. Finally, defendant argues that there is no evidence of bias and/or bad faith by the Army towards Palantir.

Supplementation to the Administrative Record

After Palantir filed its complaint and moved for judgment on the Administrative Record, on July 15, 2016, Palantir moved to supplement the existing Administrative Record in order to support Palantir's allegations regarding bias and/or bad faith, as well as regarding the Army's failure to comply with 10 U.S.C. § 2377. Palantir sought to supplement the Administrative Record with discovery, including depositions, interrogatories, and document production requests. In its motion to supplement the Administrative Record, Palantir argued that the Administrative Record filed by defendant was "deficient in a number of respects." Palantir argued that the Administrative Record did "not include documents that the Army must have, or at a minimum should have, considered when it prepared the Solicitation;" "omits documents that were 'close at hand' and highly relevant to the Solicitation;" "omits documents demonstrating that the Army's DCGS Program Owners made inaccurate assertions or assumptions about the Palantir Gotham Platform;" and "omits documents demonstrating the bias and bad faith conduct alleged by Palantir in its Complaint." Palantir argued that supplementation of the Administrative Record was necessary to conduct effective judicial review of the Army's

20

Protected Information and/or Legends Redacted

decision-making process. Specifically regarding Palantir's bias and/or bad faith allegations, Palantir asserted that the "currently assembled Administrative Record is inadequate to assess" bias and/or bad faith. In arguing that supplementation to the Administrative Record was justified to effectively review Palantir's bias and/or bad faith allegations, Palantir pointed to past alleged efforts of "certain Army personnel to delete and suppress favorable evaluations of the Palantir Gotham Platform, resist the deployment of commercial items to Soldiers in the field, and disseminate inaccurate information about Palantir's technology."

Palantir attached 53 exhibits with which it sought to supplement the Administrative Record. Of the 53 exhibits, Palantir identified 43 exhibits that were relevant to Palantir's allegations that the Army failed to comply with 10 U.S.C. § 2377. According to Palantir, with these 43 exhibits, Palantir was "seeking to add to the record material that should have been of central importance to the market research § 2377 required the Army to conduct, the process § 2377 required the Army to follow, and the determinations and inquiries § 2377 required the Army to make."

Palantir specifically identified 12 exhibits[16] as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct."[17] Palantir moved to supplement the Administrative Record with materials that allegedly "document the DCGS-A Program Owners' years-long efforts to protect their failing program, by resisting an innovative solution and blocking the deployment of the Palantir Gotham Platform to the field."

In addition to the exhibits with which Palantir sought to supplement the Administrative Record, Palantir also requested leave of the court to conduct what it described as limited discovery, including seven requests for production of documents, seven interrogatories, and four depositions. Palantir argued that discovery was needed to resolve the central factual predicate "to the Army's decision to issue a developmental solicitation rather than to define its requirements so they could be met by a commercial or nondevelopmental item." Palantir also asserted that "[t]argeted discovery is needed to get to the bottom of the bias and bad faith that infected this solicitation process" and that Palantir had "presented allegations of bad faith and bias that rest on 'a strong evidentiary footing,' and that are more than sufficient to warrant discovery." Additionally, Palantir argued that in order "[t]o engage in effective judicial review of Palantir's ability to offer a commercial item that satisfies the Army's requirements, the Court should permit testimony

---

[16] Palantir indicated that Exhibits 2-7 related to both the allegations that the Army failed to comply with 10 U.S.C. § 2377 and to the allegations of bias and/or bad faith.

[17] Although Palantir's motion to supplement the Administrative Record originally listed Exhibits 2-7 and 35-39 as "necessary to conduct judicial review of Palantir's allegations of bad faith and biased conduct," it appears that Palantir also intended to include Exhibit 52 as essential to the court's consideration of Palantir's bias and/or bad faith allegations. Exhibit 52 was not included in Palantir's motion to supplement the Administrative Record. Palantir added Exhibit 52 to its reply brief in support of its motion to supplement the Administrative Record.

Protected Information and/or Legends Redacted

from individuals who have the expertise needed to translate the technical information in the Solicitation, the PWS [Performance Work Statement], and related documents into plain English." Palantir also sought leave of the court to depose four government individuals: Contracting Officer Christopher Fisher, Lieutenant General Mary Legere (now retired), the "Army's Deputy Chief of Staff for Intelligence (G-2), the Program Owners of DCGS-A," Major General Laura Richardson, who "signed the April 25, 2012 ATEC [United States Army Test and Evaluation Command] report," and Kevin Kelly, "the author of the MITRE study."

Although defendant agreed initially to supplement the Administrative Record with three of the exhibits Palantir proposed to add, defendant otherwise opposed Palantir's motion to supplement the Administrative Record and for discovery. Defendant argued that Palantir sought to supplement the Administrative Record with "stale" documents and otherwise substitute its own judgment for that of the agency's contracting personnel. Defendant further argued that Palantir "fail[ed] to demonstrate evidence of bias, much less meet the standard of 'strong evidentiary footing' needed to give this Court a basis to permit supplementation of the administrative record." According to defendant, Palantir "attempt[s] to weave a bad faith argument and bias argument into [its] disagreement with the overall Army policy decision on the type of overarching platform and other requirements for which it wanted to solicit offers." Defendant also asserted that Palantir's "mere disagreement with the overall agency policy decision does not demonstrate an individual, must [sic] less an institutional, bias or bad faith." Defendant also maintained that Palantir should not be permitted to offer testimony about its technical capabilities because "this protest is not about the capabilities of [Palantir's] software product," and those capabilities "are irrelevant to this Court's judicial review of the administrative record." Defendant also opposed Palantir's request to conduct limited discovery through interrogatories and document requests and to conduct depositions of Contracting Officer Fisher, Lieutenant General Legere, Major General Richardson, and Kevin Kelly.

In deciding whether or not to supplement the Administrative Record with the exhibits and to allow any of the additional discovery proposed by the protestor, the court considered whether the exhibits and discovery were necessary for effective judicial review. The court recognized that "the parties' ability to supplement the administrative record is limited" in a bid protest. Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. 1, 2 (2016). In a bid protest, the court should review the Administrative Record already in existence to determine whether the agency procurement action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2012). In Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that supplementation of the Administrative Record, generally, should be limited to cases in which the omission of extra-record evidence would preclude effective judicial review. See id.; see also L-3 Commc'ns Integrated Sys., L.P. v. United States, 98 Fed. Cl. 45, 49 (2011). "[T]he administrative record in a bid protest 'should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA.'" Tech Sys., Inc. v. United States, 97 Fed. Cl. 262, 265 (2011) (citing Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381). "[A]lthough the Federal Circuit's holding in Axiom makes clear that supplementation of the administrative record should occur rarely, it is not

Protected Information
and/or Legends Redacted

prohibited and may be used when it is necessary for the Court to gain a complete understanding of the issues before it." Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. at 2. "One of the basic reasons a record may be insufficient is when it is missing 'relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations.'" Tech Sys., Inc. v. United States, 97 Fed. Cl. at 265 (citing Orion Int'l Techs. v. United States, 60 Fed. Cl. 338, 343-44 (2004)).

Specifically concerning Palantir's motion to supplement the Administrative Record to support its bias and/or bad faith allegations, the court considered whether Palantir's allegations had a sufficiently strong evidentiary foundation to justify supplementation. "Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation." See Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. 327, 332 (2010). "This Court and other fora resolving bid protests have traditionally considered extra-record evidence in assessing alleged bias or bad faith" because allegations of bias, prejudice and bad faith may "depend upon a Government official's past conduct toward a bidder," which "cannot be subsumed within the record of a challenged award decision." Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. 38, 41-42 (2004); see also Starry Assocs., Inc. v. United States, 125 Fed. Cl. 613, 621 (2015) ("Effective judicial review is not possible when the administrative record 'is missing 'relevant information that by its very nature would not be found in an agency record— such as evidence of bad faith. . .'.'" (quoting InfoReliance Corp. v. United States, 118 Fed. Cl. 744, 747 (2014))). However, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. at 43. "[A]llegations of bad faith must rest on a strong evidentiary footing to overcome the normal presumption of regularity and good faith conduct by agency officials." Orion Int'l Techs., v. United States, 60 Fed. Cl. at 344. "[T]o address bias, the court will entertain extrarecord evidence . . . when there has been a 'strong showing of bad faith or improper behavior,'" and the strong showing must have an evidentiary foundation and "not rest merely on counsel's argument, suspicion, or conjecture." Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. at 332 (quoting Ala. Aircraft Indus., Inc. v. United States, 82 Fed. Cl. 757, 766 (2008)); see also Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. at 332 ("Essentially what is required is 'a threshold showing of either a motivation for the [g]overnment[al] employee to have acted in bad faith or of conduct that is hard to explain absent bad faith.'" (quoting L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. 347, 356 (2010))). "'[T]o put facts relating to bad faith in play'" and supplement the administrative record, allegations of bias and/or bad faith must be based on "hard facts" and sufficiently well-grounded, and not merely innuendo or suspicion. See Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010) (quoting Beta Analytics Int'l, Inc. v. United States, 61 Fed. Cl. 223, 226 (2004)); see also Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. at 332; Tech Sys., Inc. v. United States, 97 Fed. Cl. at 265-66. Additionally, in considering whether extra-record evidence should be included in an administrative record, the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that documents which the agency omitted from the administrative record, but should have included in the first place, or are agency-generated, should be included for

Appx20023

Protected Information and/or Legends Redacted

completeness).

The court held a hearing regarding Palantir's motion to supplement the Administrative Record. At the hearing, together with the parties, the court reviewed each exhibit and discovery request that Palantir proposed for supplementation to the Administrative Record to determine whether any of the exhibits or discovery requests were necessary for effective judicial review. Of the 53 exhibits proposed for supplementation, the parties only were able to agree that three of the exhibits (Exhibits 1, 22, 23 in the motion to supplement the Administrative Record) should be added to the Administrative Record in this protest. Additionally, at the hearing, Palantir withdrew, "without prejudice," eight of the exhibits proposed for supplementation, Exhibits 29-33, 35, 37-38.

After reviewing the Administrative Record, as well as Palantir's proposed exhibits, and after careful consideration, the court concluded that some, but not all, of the exhibits were necessary for effective judicial review, and, thus, supplementation to the Administrative Record was justified for only certain exhibits. Specifically, the court denied Palantir's motion to supplement the Administrative Record regarding proposed Exhibits 2, 7, 8-21, 25-28, 34, 36, 39, and 50-53 because the court found that these exhibits were not necessary for effective judicial review.[18]

The court found that Exhibits 3-6, 24, and 40-49 were necessary for effective judicial review and these exhibits were added to the Administrative Record. Exhibits 3-6 pertained to Palantir's allegations of bias and/or bad faith. As stated above, "allegations of bad faith must be based on hard facts in order to justify discovery and supplementation of the administrative record." Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. at 43. Thus, the court considered whether Palantir's bias and/or bad faith allegations were based on sufficient evidentiary footing to justify discovery and supplementation to the Administrative Record. The court also concluded that Exhibit 24 was necessary to effectively review the reasonableness of the Army's decision to issue a solicitation only for a developmental contract. Exhibits 40-49 were excerpts of government contracts held by Palantir that purportedly could demonstrate the potential capabilities of Palantir's commercially available product, which protestor argues the agency should have considered when it made its determination under 10 U.S.C. § 2377. Because the parties dispute whether or not Palantir has a commercially available product with the capabilities to satisfy the requirements in the DCGS-A Increment 2 solicitation, and Exhibits 40-49 contain contracts that could illustrate Palantir's capabilities, the court determined that these contracts were necessary for effective judicial review. Additionally, as discussed further below, the court determined that limited supplementation of the Administrative Record regarding the technical requirements of the DCGS-A Increment 2 solicitation, and Palantir's ability to potentially meet those requirements, was justified and the court permitted the parties each to select one expert to submit an expert report and permitted the parties to depose each side's designated expert. Subsequently, defendant proffered

---

[18] In denying Palantir's motion to supplement the Administrative Record with these exhibits the court allowed the exhibits to be used in depositions.

Protected Information and/or Legends Redacted

Shaun Cronen, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)," as its expert witness, and Palantir proffered Bryant Choung, Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc.

Before the court, regarding bias and/or bad faith, Palantir offered a summary of what it alleged were its "main points providing a 'strong evidentiary footing' for Palantir's allegations of bad faith," including:

- The order from the head of the Army's G-2 unit (the chief DCGS-A Program Owner) for the destruction of the findings in the April 25, 2012 ATEC report that were favorable to Palantir.

- The Army's decision to cease funding for another independent evaluation of the Palantir Gotham Platform by the MITRE Corporation. . . . That order came after the MITRE Corporation produced an initial slide deck showing extremely favorable findings regarding Palantir that directly contradict the inaccurate information the DCGS-A Program Owners were circulating to senior DOD management and to Congress.

- The fact that, after the MITRE Corporation study with its favorable findings on Palantir was shut down, the DCGS-A Program Owners created slide decks and talking points about Palantir that were directly contradicted by the MITRE Corporation study.

- An email from October 7, 2014, in which Palantir's Doug Philippone set forth forty-four bullet points of specific instances spanning more than two years in which Army personnel associated with the Program Owners of DCGS-A were engaged in "blocking" requests from the field for Palantir, and otherwise thwarted and openly expressed their hostile bias against Palantir.

- The fact that the Army's supposed "market research" in 2014-15 never took cognizance of the ATEC or MITRE reports, never asked questions about the information in those reports, never asked questions about the existence of Palantir's commercial products, and was all based on the predetermination that the Solicitation would be crafted as a cost-plus developmental services contract, rather than a fixed-price acquisition of a commercial or nondevelopmental item.

(emphasis removed). Palantir sought to use Exhibits 3-6 and Exhibit 52 included in Palantir's motion to supplement the Administrative Record, as well as Tabs 33, 35, 37, and 39 of the existing Administrative Record, to demonstrate the above listed allegations. Exhibits 3-5 contain the April 25, 2012 ATEC report on Palantir's capabilities, the revised May 25, 2012 ATEC report on Palantir's capabilities, and an e-mail directing the April 25,

25

Protected Information
and/or Legends Redacted

2012 ATEC report to be rescinded and destroyed. Exhibit 6 is an information brief regarding Palantir's capabilities created by the MITRE Corporation. Exhibit 52 is an e-mail from Palantir's Douglas Philippone to an Army official recounting numerous alleged instances of "blocking" events by Army personnel to avoid using Palantir's technology.

Palantir's allegation that the Army was biased against it appears to rest, in part, on the history between Palantir and the Army that occurred prior to the issuance of the solicitation at issue in this bid protest, including during the time the market research was conducted. Included in that history are the reports on Palantir's capabilities by ATEC in April and May 2012 and the MITRE Corporation that were allegedly shut down or otherwise influenced by Army personnel who allegedly did not want to publicize favorable findings regarding Palantir's capabilities. Because these allegations of bias pertain to the past conduct of certain Army personnel that occurred in the years before the DCGS-A Increment 2 solicitation was issued, any evidence of this past conduct normally would not have been included in the Administrative Record surrounding the 2015 DCGS-A Increment 2 procurement at issue. As such, the court considered that the Administrative Record regarding Palantir's allegations of past biased conduct might be incomplete. Nonetheless, the court found that the Administrative Record originally submitted to the court by defendant included an Army investigative report regarding the April 25, 2012 ATEC report and the circumstances surrounding the rescission and modification of that report in the revised May 25, 2012 ATEC report conducted by Lieutenant General William Grisoli. Thus, the Administrative Record contained some information relevant to Palantir's allegations of past, biased conduct by Army personnel. The court reviewed the investigative report in the Administrative Record, which indicated that "the Army G-2 team is passionate and a little defensive about DCGS-A and its relationship with Palantir" and that, at times, "some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders." The investigative report also indicated that the relevant G-2 staff included Lieutenant General Legere and the Chief Information Officer of G-2, Lynn Schnurr. Although the investigative report concluded that the April 25, 2012 ATEC report was not changed because of undue influence from the G-2 staff, the court found that the need to conduct an investigative report surrounding the circumstances of the April 25, 2012 ATEC report and the findings concerning the G-2 staff in that report were a sufficient, factual predicate to justify limited supplementation to the Administrative Record.[19]

Thus, after hearing from the parties, reviewing the Administrative Record, and carefully considering the proposed evidence of possible bias and/or bad faith, the court concluded that Palantir's allegations of bias and/or bad faith surrounding the April 25, 2012 ATEC report and the 2013 MITRE Corporation information brief demonstrated sufficient foundation to justify supplementation to the Administrative Record with Exhibits 3-6 for further effective review of the issues and for limited discovery of documents and depositions. The court also concluded that further inquiry into Palantir's allegations of

---

[19] Moreover, at the hearing on July 25, 2016, defendant acknowledged that Exhibits 3, 4, and 5, which Palantir sought to add to the Administrative Record, were underlying documents to the investigative report already contained in the Administrative Record.

Protected Information
and/or Legends Redacted

biased conduct by Lieutenant General Legere and Lynn Schnurr was necessary to effectively review Palantir's allegation that there was a long history of biased conduct towards Palantir by Army personnel. The court, therefore, permitted Palantir to seek limited document discovery related to "the modification or destruction" of the April 25, 2012 ATEC report, as well as the opportunity to take the depositions of Lieutenant General Legere and Ms. Schnurr. With regard to Exhibits 2, 7, and 52, which Palantir sought to add to the Administrative Record to support its bias and/or bad faith allegations, the court determined that there was not a sufficient factual predicate to supplement these exhibits into the Administrative Record.

Subsequently, on August 5, 2016, Palantir submitted to the court a declaration by Palantir employee Douglas Philippone, the Global Defense Lead for Palantir USG, Inc. and Palantir Technologies Inc., and an expert report written by Palantir employee Bryant Choung, the Global Defense Engineering Lead for Palantir USG, Inc. and Palantir Technologies Inc. Mr. Philippone's declaration was intended to support Palantir's bias and/or bad faith allegations and Mr. Choung's expert report was submitted to assist the court with evaluating the technical issues raised in the complaint. On August 12, 2016, defendant filed a motion to strike the declaration of Douglas Philippone and the expert report of Bryant Choung. Although defendant moved to strike Mr. Philippone's declaration and the expert report of Mr. Choung, the court notes that, at the time defendant filed its motion, neither of those documents had been included in the Administrative Record by the court. Regardless, the issue for this court's consideration as to whether the declaration of Mr. Philippone and Mr. Choung's expert report should be included in the Administrative Record remained the same. This court reviewed the substance of the parties' submissions to determine whether the Administrative Record in this case should be supplemented to include Mr. Philippone's resubmitted declaration[20] and/or Mr. Choung's expert report.

The court considered whether the addition of Mr. Philippone's declaration to the Administrative Record, and the exhibits attached thereto, was necessary for the court to effectively review the agency procurement decisions at issue and whether they individually contained sufficient "hard facts" to support protestor's bias and/or bad faith allegations and justify supplementation to the Administrative Record. As noted above, suspicion and innuendo is not sufficient to warrant supplementation to the Administrative Record. Notwithstanding protestor's argument that "Mr. Philippone's declaration includes ample evidence of bias and/or bad faith that are the factual predicate for

---

[20] Prior to this August 5, 2016 submission, Palantir had attached two declarations, one by Douglas Philippone and one by Bryant Choung as Exhibits 50 and 51 to its motion to supplement the Administrative Record. At the hearing on July 25, 2016, the court denied Palantir's motion to supplement the Administrative Record with the two declarations because they included legal conclusions, however, the court explained that Palantir could re-file its declarations after removing the legal conclusions and the court would review and reconsider adding the declarations to the Administrative Record. Palantir did not submit a revised declaration of Mr. Choung, thus, the court only considered whether Mr. Choung's expert report is admissible to the Administrative Record.

Protected Information and/or Legends Redacted

supplementation," the statements in the declaration do not allege reliably supported facts sufficient to support protestor's bias and/or bad faith allegations. In his declaration, Mr. Philippone also refers to hearsay evidence, continues to assert legal conclusions, and makes other statements and opinions that do not appear to be based on his personal knowledge or necessary for effective judicial review. Accordingly, the court finds that supplementation to the Administrative Record with Mr. Philippone's declaration is not appropriate.

With regard to Mr. Choung's expert report, defendant argues that "[t]he Court by entertaining expert testimony on the issues in the case goes far beyond the administrative record, all without the predicate of first determining that the agency's market research clearly violated any law or regulation." Defendant also argues that "there is a serious question of credibility regarding both Mr. Choung's declaration and his expert report," and that, "[b]ecause of the credibility issues inherent in Mr. Choung's declaration and expert report," the court should refuse to consider Mr. Choung's expert report. In arguing that this court should not consider Mr. Choung's expert report because of credibility issues, defendant focuses on statements made by Mr. Choung in his expert report and deposition about testing by the Defense Integrated Backbone (DIB) Management Office (DMO) in May 2012. According to defendant, "Mr. Choung misrepresented the conclusions of the DMO as a result of the May 2012 testing of Palantir DIB adapter," and, because of that misrepresentation, the court should not consider any part of Mr. Choung's expert report. Defendant argues that "the Court has the discretion to disregard Mr. Choung's entire declaration, expert report and deposition testimony because of discrepancies between his declaration, expert report, and deposition testimony and the reported results of the DMO tests in May 2012."

In response, protestor argues that Mr. Choung's expert report should be admitted to the Administrative Record because "[t]his Court has already noted that it would benefit from expert testimony to assist in evaluating the technical issues raised in this bid protest." Protestor asserts that "Mr. Choung's report is designed to assist the Court by explaining technical issues relating to DCGS and the Palantir Gotham Platform." Additionally, protestor argues that "[t]he Government does not dispute that Mr. Choung is qualified to offer an expert opinion," and protestor contends that defendant's accusations about the credibility of Mr. Choung's expert report are baseless and have "nothing to do with whether Mr. Choung's report should be admitted." According to protestor, "a careful review of the relevant documents and testimony establishes that the Government either misunderstands or misrepresents both Mr. Choung's testimony and Palantir's DIB-related capabilities."

As explained above, the United States Court of Appeals for the Federal Circuit has held that the "focus of judicial review of agency action remains the Administrative Record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA [Administrative Procedure Act, 5 U.S.C. §§ 701-706]." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381. When necessary for meaningful judicial review, the court may supplement an administrative record with an expert report in order to improve or clarify the court's understanding of an important issue in a bid protest. See Dyncorp Int'l, LLC v. United States, 125 Fed. Cl. at

Protected Information and/or Legends Redacted

3 (including expert report in the administrative record that aided "the Court in better understanding the record"). As noted in <u>FirstLine Transportation Security, Inc. v. United States</u>, "[s]everal post-<u>Axiom</u> decisions have allowed supplementation of the record when necessary for the Court to have a complete understanding of the issues before it." <u>FirstLine Transp. Sec., Inc. v. United States</u>, 116 Fed. Cl. 324, 326 (2014). Other judges of this court have held "that it is appropriate to supplement the record with expert testimony when necessary to assist the Court in understanding technical or complex information involved in a challenged procurement." <u>NCL Logistics Co. v. United States</u>, 109 Fed Cl. 596, 613 (2013); <u>see also</u> <u>Lab. Corp. of Am. Holdings v. United States</u>, 116 Fed. Cl. 386, 390 (2014) (admitting expert declaration because the "expertise will greatly assist the Court in understanding the evidence in the administrative record"); <u>Guzar Mirbachakot Transp. v. United States</u>, 104 Fed. Cl. 53, 63 (2012) (holding that "[e]ffective judicial review would be impeded where technical aspects of the procurement process remain unexplained, preventing the parties from engaging in informed advocacy and the Court from developing a full judicial record and accurate context for its decision"); <u>East West, Inc. v. United States</u>, 100 Fed. Cl. 53, 57 (2011) (explaining that information necessary for effective judicial review "might include tacit knowledge possessed by offeror and agency personnel of a highly technical and complex nature. . ."). Expert testimony may be offered to assist the court in understanding complex or technical information. <u>See NCL Logistics Co. v. United States</u>, 109 Fed. Cl. at 613.

In this bid protest, although the court acknowledges some of defendant's concerns with regard to Mr. Choung's credibility as an employee of protestor and as an expert witness, the court finds that, given the highly technical nature of the Army's requirements and Palantir's capabilities, expert reports are necessary for the court to effectively review aspects of the challenged agency procurement action at issue in this bid protest. Specifically, in order to determine whether Palantir may have a commercially available product that would satisfy the Army's requirements, such that Palantir was prejudiced by the Army's decision to issue a development-only solicitation, the court finds it appropriate to consider the expert reports offered by both protestor and defendant. Defendant's arguments about Mr. Choung's credibility, while noted by the court, did not eliminate the probative value of Mr. Choung's report, so as to warrant a decision to exclude Mr. Choung's expert report. The court evaluated Mr. Choung's expert report in relation to all the evidence in the Administrative Record. In this pre-award bid protest, which the agency and protestor were eager to resolve as fast as possible, both parties were allowed to designate one available expert witness, and then permitted to depose the opposing party's designated expert witness. Defendant had the opportunity to challenge Mr. Choung's allegedly inaccurate statements about the 2012 DMO testing results during the deposition of Mr. Choung. The deposition transcript was available for the court's consideration and has been reviewed by the court. Accordingly, the Administrative Record in this bid protest has been supplemented with the expert report of Mr. Choung, as well as with the expert report of Mr. Shaun Cronen, the government's designated expert, a "Team Lead in the Intelligence Enterprise Branch of the Intelligence and Systems Processing (ISP) Division of the Intelligence and Information Warfare Directorate (I2WD) within the Communications-Electronics, Research, Development and Engineering Center (CERDEC)" of the Army.

Protected Information
and/or Legends Redacted

Two days before defendant filed its motion to strike Douglas Philippone's declaration and Bryant Choung's expert report, defendant filed a motion for leave to file three declarations of its own. Defendant sought to file the declarations of "Patricia L. Lee, Lead Engineer for the DCGS Multiservice Execution Team Office"; "Michael Sherick, contract specialist, U.S. Army Contracting Command Aberdeen Proving Ground"; and "Jeff Stock, Chief Engineer for DCGS-A Increment 2, U.S. Army."[21] Palantir opposed defendant's motion unless the court afforded Palantir the opportunity to depose each of the three declarants and defendant was required to produce any documents referred to by one of the declarants, Mr. Sherick. The court held a status conference with the parties to discuss defendant's motion, and, as discussed with the parties during the status conference, after careful review and consideration, the court issued an Order on August 24, 2016 granting defendant's motion for leave to file the three declarations and Palantir was permitted to take depositions of each of the three declarants.

Subsequently, after conducting the limited discovery that the court had permitted at the July 25, 2016 hearing and the additional discovery permitted by the August 24, 2016 court Order, Palantir moved for additional discovery on August 26, 2016 "relating to Palantir's allegations of bad faith and bias." The court held another status conference on August 30, 2016 to discuss Palantir's subsequent motion for additional discovery. After hearing from the parties, the court denied Palantir's motion because Palantir's discovery requests were too broad and not based on sufficient evidentiary footing, but indicated it would reconsider Palantir's motion for additional discovery. Shortly thereafter, at a status conference on September 6, 2016, Palantir proposed narrower discovery requests and defendant produced nine additional documents. The parties agree that these nine documents should be added to the Administrative Record and the nine documents are now part of the Administrative Record. Thereafter, the parties filed supplemental briefs to include references to the limited discovery permitted by the court, after which, the court held oral argument on the parties' cross-motions for judgment on the Administrative Record.

## DISCUSSION

### Bias and/or Bad Faith

As a threshold issue, the court considers Palantir's argument that the solicitation at issue in this bid protest should be set aside because, allegedly, "the Army engaged in arbitrary, capricious, and unlawful conduct . . . by engaging in bad faith conduct." (emphasis and capitalization removed). Palantir argues that, pursuant to 5 U.S.C. § 706, "this Court must set aside as unlawful any solicitation" that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Throughout this bid protest, Palantir has alleged that a long-term pattern of bias and/or bad faith against Palantir "infected" the agency's decision-making process that led to the DCGS-A Increment 2

---

[21] Although defendant refers to the declaration of "Jeff Stock," in the declaration included with defendant's motion for leave to file declarations, the individual's name is "Jess Stock."

Protected Information and/or Legends Redacted

solicitation, which Palantir is challenging in this bid protest. Palantir alleges in its complaint that the DCGS-A Increment 2 solicitation is the product of years of irrational and bad faith conduct by program owners in certain sectors of the Army,[22] and alleges that such conduct includes "bureaucratic inertia, resistance to innovation, bias against Palantir, the destruction of evidence, and the creation of misleading and deceptive information." (emphasis and capitalization removed). According to Palantir, "there is ample evidence of malicious, bad faith conduct" that "reveals a deep-seated level of bias against Palantir," and that "[s]uch bias is irrational, arbitration [sic], and capricious." Accordingly, Palantir argues, "the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct."

Palantir contends that the DCGS-A program owners have spent years "protecting their own failed program," and are resistant to any innovation from the commercial software industry that could replace the DCGS-A, such as Palantir, and the Palantir Gotham Platform. According to Palantir, "program owners in the Army—particularly within the Army's G-2 office, Intelligence and Security Command, and Intelligence and Information Warfare Directorate of the Communications-Electronics Research and Development Center—have resisted the Palantir Gotham Platform." Palantir's complaint alleges that evidence of the Army's bad faith conduct includes the "consistent hostility that certain DCGS 'program owners' within the Army have shown to Palantir's innovative technology," the suppression of "independent reports that were critical of DCGS-A and complimentary of the Palantir Gotham Platform," and the creation of "misleading presentations for Congress and senior Department of Defense officials with inaccurate descriptions of Palantir's capabilities."

In opposition to Palantir's bias and/or bad faith allegations, defendant argues that "Palantir's claims are not supported by the administrative record." Defendant also asserts that "[t]he contracting officer and agency decision is entitled to a presumption of regularity." According to defendant, "[i]n order to overcome the presumption of good faith and administrative regularity, the protestor must present 'almost irrefragable proof'" of bias or bad faith. (quoting <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1330 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2004)). Although defendant acknowledges that "[t]he

---

[22] In its complaint, Palantir states:

> The list of DCGS program owners involved in or associated with the DCGS-A program include, among others, the following: Office of the U.S. Army Intelligence Directorate (G-2, oversight and "customer" of DCGS-A); Training and Doctrine Command; Program Executive Office Intelligence, Electronic Warfare, and Sensors (PEO IEW&S) (parent office of PM DCGS-A); Program Management Office, DCGS-A; U.S. Army Intelligence and Security Command (INSCOM) (responsible for all the cloud projects, etc.); Office of the Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)); and various actors within the Defense Acquisition System, including the Joint Requirements Oversight Council (JROC), the Joint Capabilities Integration and Development System (JCIDS), and others.

Protected Information
and/or Legends Redacted

discovery permitted by the Court revealed a tension in the business relationship between the Army and Palantir," defendant asserts that "Palantir's arguments do not meet the stringent standard for proving bad faith." Defendant argues that none of the limited discovery that the court had permitted produced any evidence of bias and/or bad faith, and Palantir's mere disagreement with the overall agency policy decision does not demonstrate an individual, much less institutional, bias and/or bad faith.

In order to prove that a government official's actions were biased, a protestor must overcome the well-established presumption that government officials act in good faith. See Croman Corp. v. United States, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1337. A protestor must offer "clear and convincing evidence" that the government did not act in good faith in order to prevail. See Croman Corp. v. United States, 724 F.3d at 1364; see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The United States Court of Appeals for the Federal Circuit has addressed the standard for overcoming the presumption of good faith as follows:

> Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" Kalvar Corp., Inc. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting Librach v. United States, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" Id. at 1301-02 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [a protestor] must offer clear and convincing evidence that [the government] did not act in good faith in order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364; see also Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239 ("The presumption that government officials act in good faith is nothing new to our jurisprudence. See, e.g., Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954) (stating 'we start out with the presumption that the official acted in good faith')."); Square One Armoring Serv., Inc., v. United States, 123 Fed. Cl. 309, 329 (2015) (holding that a plaintiff alleging that the government has acted in bad faith must offer well-nigh irrefragable proof in support of its claim); Austin v. United States, 118 Fed. Cl. 776, 790 (2014) ("To overcome this presumption, the plaintiffs must produce 'well-nigh irrefragable proof' of bad faith on the part of the government."); Kogan v. United States, 112 Fed. Cl. 253, 266 (2013) ("The presumption of good faith 'is valid and binding unless well-nigh irrefragable proof is offered to rebut or overcome it.' McEachern v. Office of Pers. Mgmt., 776 F.2d 1539, 1545 (Fed. Cir. 1985).").

The presumption that government officials act in good faith, however, is rebuttable and not automatically accepted by the court. The Federal Circuit in Am-Pro Protective Agency defined the "clear and convincing" standard of proof a protestor must meet to prevail as:

Appx20032

Protected Information
and/or Legends Redacted

> A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "*highly probable*."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (internal citations omitted in original and emphasis in original). Moreover, the Federal Circuit described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, as

> equated with evidence of some specific intent to injure the plaintiff. Thus, in Gadsden v. United States, [111 Ct. Cl. 487, 489-90 (1948),] the court compared bad faith to actions which are "motivated alone by malice." In Knotts, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy . . . to get rid of plaintiff." Similarly, the court in Struck Constr. Co. v. United States, [96 Ct. Cl. 186, 222 (1942),] found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in Librach, [v. United States, 147 Ct. Cl. 605 (1959),] the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."
>
> ...
>
> Nothing in Brown's affidavit [whereby Am-Pro attempted to show bad faith], moreover, suggests that the government "had a specific intent to injure" Am-Pro. Caldwell [& Santmyer, Inc. v. Glickman,] 55 F.3d [1578,] 1581 [(Fed. Cir. 1995)]. And Am-Pro has not alleged that these threats were "motivated alone by malice," Gadsden v. United States, 111 Ct. Cl. 487, 489, 78 F. Supp. 126 (1948); as part of a proven "conspiracy . . . to get rid of [Am-Pro]," Knotts, 128 Ct. Cl. at 500, 121 F. Supp. 630; as part of a course of governmental conduct which was "designedly oppressive," Struck, 96 Ct. Cl. at 222; or as "actuated by animus toward" Am-Pro, Librach, 147 Ct. Cl. at 614.

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240, 1241 (quoting in part Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976), cert. denied, 434 U.S. 830 (1977)) (citations omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'[A]llegations of bad faith . . . ha[ve] been equated with evidence of some specific intent to injure the plaintiff.'" (quoting Torncello v. United States, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982))); Info. Tech. & Applications Corp. [ITAC] v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir.) ("ITAC has pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome

Protected Information and/or Legends Redacted

the presumption that the contracting officer acted in good faith.") (citations omitted), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2003); <u>Dekatron Corp. v. United States</u>, No. 15-1167C, 2016 WL 4939574, at *3 (Fed. Cl. Sept. 16, 2016) ("Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent judgment or remedy the contracting officer representative's animus. . . ."); <u>Madison Servs. Inc. v. United States</u>, 94 Fed. Cl. 501, 507 (2010) ("Because plaintiff submits as evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a 'clear and convincing' standard, the court must deny plaintiff's requests for relief.") (citations omitted); <u>id.</u> at 511 & 511 n.8 (adding unreliable hearsay and attorney arguments to the list of what will not meet the standard for demonstrating bad faith); <u>L-3 Commc'ns Integrated Sys., L.P. v. United States</u>, 91 Fed. Cl. at 354 (innuendo or suspicion is not enough to demonstrate bad faith); <u>N. Star Alaska Hous. Corp. v. United States</u>, 76 Fed. Cl. 158, 187-88 ("Courts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' <u>Struck Constr. Co. v. United States</u>, 96 Ct. Cl. 186, 222, 1942 WL 4411 (1942), or that 'initiated a conspiracy' to 'get rid' of a contractor, <u>Knotts v. United States</u>, 128 Ct. Cl. 489, 121 F. Supp. 630, 636 (1954)."), <u>appeal dismissed</u>, 226 F. App'x 1004 (Fed. Cir. 2007).

To support its theory that a long-term climate of bias against Palantir "infected" the path towards the solicitation, Palantir points to specific instances of alleged bias that it asserts occurred between 2009 and the present, and asks "the Court to give particular consideration to" those instances. According to Palantir, those instances cannot "be explained away, and can only mean that there was an entrenched bias against Palantir among certain DCGS-A program owners and G-2 staff within the Army." Palantir suggests that "the supplemental record supports a finding that certain personnel within the Army had a bias against Palantir." Palantir asserts that these alleged instances include: the Army's efforts to "block" Palantir from participating in certain "important" evaluations between 2009 and 2011; false statements by the DCGS Program Manager to Congress about Palantir; an e-mail from Army Major Greg Moore stating that there is an "entrenched animosity" towards Palantir; the creation and distribution of documents by G-2 staff that contained inaccurate statements about Palantir's capabilities; efforts by Army personnel to rescind and alter a report with favorable findings and recommendations regarding Palantir; and the Army's failure to investigate Palantir's specific allegations of senior Army personnel "blocking" requests in the field for Palantir's technology.

According to Palantir, the Army's G-2 staff and DCGS-A program owners blocked Palantir from participating in Joint Intelligence Laboratory (JIL) and DCGS-A Systems Integration Laboratory (SIL) evaluations between 2009 and 2011 that, according to Palantir, would have helped to demonstrate Palantir's ability to satisfy the requirements set forth in the DCGS-A Increment 2 procurement, prior to the issuance of the solicitation. Palantir alleges that, in 2009, "Palantir attempted to undertake an evaluation at the Joint Intelligence Laboratory." Palantir alleges, however, that "[j]ust before Palantir's JIL evaluation was scheduled to take place," an Army official e-mailed a Palantir employee, Douglas Philippone, notifying him that the evaluation was cancelled. Similarly, according to Palantir, in November 2010, a contract was in place for Palantir to undergo testing at the SIL. Palantir alleges that the SIL evaluation also never occurred. Palantir alleges that

Protected Information and/or Legends Redacted

it was "repeatedly blocked" from participating in testing at the SIL, which would have demonstrated Palantir's capabilities to the Army. Palantir alleges that "the Army has never given a plausible explanation for why it blocked Palantir from participating" in either a JIL or SIL evaluation.

Defendant asserts that the Army gave reasonable explanations for why the JIL and SIL evaluations did not occur and that the deposition testimony of Ms. Schnurr and Mr. Cronen corroborated those explanations. Defendant also argues that "the majority of events that Palantir claims constitute 'blocking' are events that are 4 to 11 years prior to the solicitation at issue, and are outside the relevant period of time to have any impact on the current procurement." Additionally, according to defendant, "Palantir has failed to demonstrate what, if any, impact these events had" with respect to the choices made regarding the DCGS-A Increment 2 solicitation.

The e-mail sent from the Army to Palantir cancelling the JIL evaluation on February 27, 2009, more than six years before the solicitation was issued, explains that:[23]

> Lynn [Schnurr] is out of the office dealing with personal matters right now and has authorized me to handle this matter. As of right now, the JIL evaluation is cancelled.
>
> . . .
>
> The rationale for this decision is that the best way to focus your efforts at this time is with the DCGS-A Mobile lead systems integrator, Northrup Grumman. My understanding is that you have already begun discussions with them so there should be no disconnect there. This provides the most direct route to potential DCGS-A integration and fits cleanly into their established business process. I understand that Palantir has a lot to offer and ask that you concentrate your efforts on this vector and allow the PM process to work and enable their LSI [lead systems integrator] to build the best system possible for our Soldiers.

During the deposition of Ms. Schnurr, counsel for Palantir asked Ms. Schnurr about the cancellation of the JIL evaluation, and referenced the above e-mail as an exhibit to the deposition. Palantir points to the deposition testimony of Lynn Schnurr as support for its allegation that the Army blocked Palantir from undergoing the JIL evaluation. The deposition transcript of Ms. Schnurr indicates that she had difficulty recalling the reason that the JIL evaluation was cancelled. When Palantir's counsel asked Ms. Schnurr the reason for the cancellation of the 2009 JIL evaluation, Ms. Schnurr responded: "My understanding -- and again, that's a long time ago -- was that it was a funding issue." After Palantir's counsel showed Ms. Schnurr the e-mail cancelling the JIL evaluation, however,

---

[23] Although Palantir did not move to supplement the Administrative Record with this e-mail, counsel for Palantir used this e-mail as an exhibit during the deposition of Lynn Schnurr, which deposition the court has deemed necessary for effective judicial review.

Protected Information and/or Legends Redacted

Ms. Schnurr stated: "Sitting here today, based on what you've shown me, it looks as if the recommendation was to not move forward with a JIL evaluation but to have them work directly with Northrup Grumman to move things forward in a direct manner to help get Palantir capability into the program." Ms. Schnurr also was asked:

> Q. Do you have any reason to believe that a company, which is a subcontractor, would be precluded from participating in the Joint Intelligence Laboratory evaluations?
>
> A. I don't know, but I would assume it would be okay.
>
> Q. You'd assume it would be okay?
>
> A. Uh-huh. But I don't know.
>
> . . .
>
> Q. Why is working with Northrop Grumman mutually exclusive from getting an evaluation under the JIL?
>
> A. I wouldn't think it is mutually exclusive.
>
> Q. Then why did you cancel the JIL evaluation?
>
> A. I did not cancel it personally.

Palantir asserts that, by testifying that Palantir could have been evaluated at the JIL and simultaneously have worked with Northrup Grumman, "Ms. Schnurr effectively admitted that the rationale given" for cancelling the JIL evaluation "did not make any sense." Palantir, however, mischaracterizes Ms. Schnurr's testimony. While Ms. Schnurr did, in fact, testify that Palantir might have been able to simultaneously work with Northrup Grumman and undergo evaluation at the JIL, she did not, either directly or indirectly, concede that the reason for the cancellation put forth in the e-mail to Palantir "did not make any sense."

Palantir argues that "the Army has never given a plausible explanation for why it 'blocked' Palantir from participating in this evaluation" and points to Mr. Schnurr's deposition testimony to argue that the cancellation of the JIL evaluation was motivated by bias and/or bad faith. Palantir further asserts that Ms. Schnurr's testimony reflects "shifting and contradictory explanations that reveal a lack of candor and credibility as to the reasons why this evaluation was cancelled." Without further evidence, however, Palantir's position remains based only on allegations and suspicions of bias. The apparent inconsistencies with Ms. Schnurr's testimony could be attributed to her failed memory after the passage of approximately seven years from the events in question to the date of the deposition. Moreover, Ms. Schnurr testified that she "did not cancel the JIL evaluation personally." Without more evidence of intent, the e-mail sent to Palantir cancelling the JIL evaluation on February 27, 2009 does not offer sufficient evidence of bias and/or bad faith on the part of the agency as it relates to the developmental

Protected Information and/or Legends Redacted

solicitation for DCGS-A Increment 2.

Palantir's counsel also asked Ms. Schnurr about the SIL evaluation cancellation during her deposition. Ms. Schnurr was asked: "Did Palantir ever undergo an evaluation in the SIL?" To which she responded: "I think they did, but I don't recall all the details of it. It's been so long, but I know they did." Palantir's counsel asked additional questions about the SIL evaluation, but it is apparent from her deposition testimony that Ms. Schnurr was not involved with the SIL. Ms. Schnurr stated: "I don't recall because I didn't work the SIL, didn't have any responsibility for the SIL;" "Again, that SIL work was totally separate in my office. We had nothing to do with that;" "Again, I did not work the SIL;" and, later, "I don't know the details of what happened in the SIL." Given her testimony that she was not involved with the SIL and did not remember anything about the SIL evaluation, her testimony as to why the SIL evaluation did or did not occur does not provide support for protestor's allegations. In addition, the JIL and SIL evaluations were cancelled between 2009 and 2011, years before the solicitation at issue in this bid protest was released. Given the lapse in time, it is unclear, without further evidence, whether those cancellations between 2009 and 2011 were directly related to the decision to issue the DCGS-A Increment 2 procurement as a developmental one. Therefore, Palantir's allegations of "blocking" of the JIL and SIL evaluations do not provide sufficient evidence to demonstrate bias or bad faith. As stated above, a protestor must show "clear and convincing evidence" to prevail on a claim of bias and/or bad faith and Palantir has failed to do so with regards to the JIL or SIL evaluations. See Croman Corp. v. United States, 724 F.3d at 1364.

Related to Palantir's allegations that the Army "blocked" the JIL and SIL evaluations, Palantir alleges that "[a]fter Palantir was blocked from conducting the SIL evaluation, the DCGS-A Program Manager, Colonel Wells" made inaccurate statements to Congress about the SIL evaluation. Specifically, Palantir alleges that Army Colonel Charles Wells told Congress, not only that the SIL evaluation had occurred, but also, "that Palantir was unwilling to fully integrate its product with DCGS-A," and that the evaluation revealed that Palantir's features limited intelligence collaboration and sharing. According to Palantir, Colonel Wells communicated this inaccurate information to Congress via Information Papers on September 30, 2011 and October 18, 2011. Defendant argues, however, that the statements in the Information Papers submitted to Congress do not demonstrate bias and/or bad faith. Similar to Palantir's allegations that the JIL and SIL evaluations were "blocked" by the Army, Palantir's allegation that inaccurate statements made to Congress are evidence of the Army's bias and/or bad faith is not supported by the Administrative Record. Palantir's assertion that the Army communicated to Congress information that may have been inaccurate does not, without further evidence, establish that the representations made to Congress were motivated by bias and/or bad faith on the part of the critical decision makers regarding the DCGS-A Increment 2 solicitation. It is not clear in the Administrative Record what was the source of the alleged incorrect information or whether the information was utilized by the decision makers who produced the developmental procurement at issue in this protest.

Protected Information
and/or Legends Redacted

In addition to the allegedly "blocked" JIL and SIL evaluations, Palantir also alleges that the "former Chief Information Officer for G-2," Lynn Schnurr, and the "former Deputy Chief of Staff of the Army for G-2 (Intelligence)," Lieutenant General Mary Legere, were biased against Palantir and acted on that bias. To support Palantir's allegations, Palantir points to several instances that allegedly occurred after 2011. For example, Palantir points to an e-mail sent on November 6, 2015, that pertained to a slide presentation on the DCGS-A Program and Palantir's capabilities. The author of the e-mail, Colonel Jack Dills, stated: "Apparently LTG Legere had some issues with the brief and afterward expressed her issues to MG [Major General] Ostrowski." According to Palantir, in an e-mail sent on March 10, 2012 to Douglas Philippone of Palantir, Army Major Greg Moore admitted that G-2's Chief Information Officer, Lynn Schnurr, had an "entrenched animosity" toward Palantir "which has been spread and inculcated into the DA staff." (emphasis removed). Additionally, Palantir alleges that, at some unidentified point prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir that led a defense contractor to decide against working with Palantir. To support this allegation, Palantir relies on another e-mail from Army Major Greg Moore, dated December 15, 2011, in which he stated that "[n]egative feedback from the DA G2 CIO [Lynn Schnurr] at the time caused Lockheed Martin [the contractor] to wave off" and enter into discussions with companies other than Palantir. Palantir also alleges that Lynn Schnurr and Lieutenant General Mary Legere circulated various documents that contained "inaccurate" and "misleading" information about Palantir, including, but not limited to, a July 2012 memorandum that discussed Palantir's capabilities and an undated venn diagram that was allegedly distributed among Army officials and purported to compare Palantir's capabilities with that of DCGS-A. (internal citations omitted). The venn diagram depiction appeared as follows:

Protected Information and/or Legends Redacted



Defendant argues that Palantir's claim that the Army G-2 circulated inaccurate information about Palantir's capabilities lacks merit because the information was believed to be accurate at the time it was distributed. Defendant further argues that Palantir has misstated or mischaracterized the deposition testimony of Lieutenant General Legere in its attempt to support its allegations of bias and bad faith. Defendant asserts that Ms. Schnurr's deposition testimony "demonstrates the Army [sic] intent to work with Palantir and integrate the Palantir Platform into the DCGS."

As indicated above, Palantir was given the opportunity to depose Lieutenant General Legere and Ms. Schnurr. During the depositions, counsel for Palantir asked Lieutenant General Legere and Ms. Schnurr about the allegedly inaccurate information

**Appx20039**

Protected Information
and/or Legends Redacted

that was circulated about Palantir within the Army. Specifically, Lieutenant General Legere was asked about a July 2012 Information Paper to Congress and slide presentation that included the venn diagram depicting Palantir's capabilities. Palantir's counsel asked Lieutenant General Legere about the accuracy of these documents and several of the statements contained therein. In response to questions about the accuracy of certain statements in the 2012 Information Paper, Lieutenant General Legere explained that the statements reflected the understanding of Palantir's capabilities in 2012. Similarly, when questioned regarding the information about Palantir depicted in the venn diagram, Lieutenant General Legere responded that the venn diagram reflected "our understanding based on how we were using it [Palantir]," which was "[b]ased on the way the soldiers were using it and the way they were describing it." Ms. Schnurr was asked about the accuracy of the venn diagram by Palantir's counsel during her deposition, she stated that "it appears to be" accurate "[b]ased on what I was told by engineers." Similarly, during Ms. Schnurr's deposition, Palantir's counsel asked her about the accuracy of statements in the July 2012 Information Paper she had signed, and she explained that the statements were based on "knowledge that engineers in the field had assessed" regarding Palantir's capabilities. Ms. Schnurr testified that as of July 2012, the July 2012 Information Paper was a fair and accurate representation of Palantir's capabilities, and "[a]s of February of 2012," the venn diagram was a fair and accurate representation of Palantir's capabilities.

Although Lieutenant General Legere admitted during her deposition that "everybody was sort of talking past each other," and that, referring to Palantir and the Army, "[b]oth sides misrepresent the capabilities of both," her deposition testimony does not amount to clear and convincing evidence of bias and/or bad faith.[24] Instead, as even defendant has agreed, the deposition testimony suggests lack of communication and tension between the Army and Palantir. Lieutenant General Legere explained during her

---

[24] During her deposition, Lieutenant General Legere was asked if she was

> familiar with the fact that the solicitation that was ultimately issued in December 2015 for the procurement of Increment 2 for DCGS sought bids from offerors who would enter into a developmental contract on some kind of cost-plus basis and did not seek bids from people who wanted to sell a commercial item[.]

Lieutenant General Legere answered "no." Although the court has serious doubts about Lieutenant General Legere's purported lack of knowledge regarding DCGS-A Increment 2, considering her leadership role within G-2 and her involvement with the DCGS-A program, during her deposition, Lieutenant General Legere denied having ever said each of the statements in the e-mail that were attributed to her, and which Palantir alleges demonstrated the Army's bias against Palantir. Although Lieutenant General Legere's credibility may be diminished in the view of the court, some of her testimony was uncontroverted. Regarding the issues of bias and/or bad faith, her testimony, and the testimony about her purported views, was not sufficient to carry protestor's high burden of proof on the issue.

Protected Information and/or Legends Redacted

deposition that the Army's presentation of Palantir's capabilities evolved and improved over time as the Army continued to communicate with Palantir.  According to Lieutenant General Legere:

> I think in our conversations in relationship with the company over time, because really there were some serious objections to the way we were describing this, and I absolutely understand from a stakeholder in the company perspective why we got a little bit more -- we got much more precise. And in turn Palantir got more precise about what DCGS is and how what we do relates. So I think we made some progress. But in 2012, this is kind of how we talked past each other.

Additionally, although Palantir points to the November 6, 2015 e-mail asserting that "LTG Legere had some issues with the brief" on the DCGS-A program overview, the e-mail is not clear as to what Lieutenant General Legere's "issues" were with the brief. The fact that Lieutenant General Legere may have expressed issues or concerns, in and of itself, is insufficient to support a finding of bias and/or bad faith.

As referred to above, Palantir also relies on various e-mails written by Army Major Greg Moore to support its allegation that Ms. Schnurr held a bias against Palantir, specifically, Major Moore's e-mail statements that Ms. Schnurr held an "entrenched animosity" towards Palantir and that at some time prior to December 2011 Ms. Schnurr gave negative feedback about Palantir to another contractor, Lockheed Martin. Major Moore's e-mail statements, including that Ms. Schnurr had an "entrenched animosity" towards Palantir, is expressed as Major Moore's impression of Ms. Schnurr's attitude at the time the e-mail was sent in 2012, and by itself cannot support a finding of bias or bad faith, even animosity without further confirmation. It also is not evident from the Administrative Record if this statement was based on any personal knowledge on the part of Major Moore, or if he was merely repeating information obtained second-hand. The court has not been provided any context directly from Major Moore about his statement. Based on the limited information provided to the court regarding Major Moore's e-mail, the court may not depend on the accuracy or reliability of Major Moore's statement about Ms. Schnurr's alleged feelings in 2012. See L–3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. at 358 (explaining that the court should apply the Federal Rules of Evidence to the extra-record materials in order to ensure their reliability). Moreover, the court permitted Palantir to depose Ms. Schnurr and the information derived from that deposition regarding her alleged bias is more reliable and probative than what Major Moore expressed in the 2012 e-mail. In fact, Palantir's counsel asked Ms. Schnurr about Major Moore's e-mail:

> Q. Is it true that you have an entrenched animosity towards Palantir?
>
> A. No.
>
> Q. Do you have an explanation as to why someone would say that you did?
>
> A. That's Major Moore.

Appx20041

Protected Information and/or Legends Redacted

Q. Do you have any explanation as to why he would say something like that?

A. No. This is -- this is Major Moore saying this. This is not Lieutenant Colonel Gloor saying this.

. . .

Q. Do you disagree with this statement that the DA [Department of the Army] staff -- that an entrenched animosity toward Palantir has spread and inculcated into the DA staff? Do you agree with that statement?

A. I disagree with that.

Q. Why?

A. I just – staff -- working in the Army staff, it's a very, very busy place, a lot of short suspenses, high optempo. And it's just not something that people do, is sit around and talk like that.

As the deposition transcript reflects, Ms. Schnurr rejected the notion that she had an "entrenched animosity" towards Palantir or that a culture of animosity had spread among "the DA staff" towards Palantir. Without more evidence to support Major Moore's allegation of an "entrenched animosity," the court cannot find evidence of bias and/or bad faith on this basis.

Moreover, Major Moore's e-mail statement that, at some time prior to December 15, 2011, Ms. Schnurr gave negative feedback about Palantir to Lockheed Martin, another contractor, is not sufficient proof of bias and/or bad faith. Even if the court assumes that Major Moore's statement is accurate, negative feedback is not itself indicative of bias and/or bad faith. Additionally, the court is not satisfied that this e-mail is reliable, and Palantir was given the opportunity to question Ms. Schnurr about this alleged negative feedback during her deposition. At her deposition, Palantir's counsel asked Ms. Schnurr if she gave Lockheed Martin negative feedback about Palantir. Ms. Schnurr responded: "I do not remember that" and "I don't think so." Even given the tentative nature of her answer, this is simply not enough to support a finding of bias and/or bad faith on the part of the Army regarding the DCGS-A Increment 2 procurement.

Additionally, to further support its allegations of bias and/or bad faith, specifically against Lieutenant General Legere and Ms. Schnurr, Palantir points to the revision of a report on Palantir's capabilities created and published by the Army Test and Evaluation Command (ATEC) on April 25, 2012. ATEC is "responsible for planning and conducting developmental, independent operational test and independent evaluations and assessments of assigned Army material, information, and acquisition systems." "ATEC plans, integrates, and conducts experiments, developmental testing, independent operational testing, and independent evaluations and assessments to provide essential information to acquisition decision makers and commanders." (internal quotations omitted). From March 9, 2012 to March 21, 2012, ATEC conducted "face-to-face surveys

Protected Information and/or Legends Redacted

and collected data on Palantir from 57 operators and 43 intermediate supervisors. . . ." After this data was collected, ATEC started drafting the Palantir Forward Operational Assessment Report. "The ATEC Forward Operational Assessment Report on Palantir was approved and signed by BG [Brigadier General] Laura Richardson, the OTC [Operational Test Command] Commanding General, **on 25 April 2012**." (emphasis in original). The approved report was "emailed directly to key individuals within USFOR-A for their information," distributed on the "USFOR-A SIPR Sharepoint portal," and sent to two Palantir field service representatives. According to Palantir, the April 25, 2012 ATEC report on Palantir contained highly favorable recommendations and findings about Palantir's capabilities and was critical of DCGS-A.

Palantir alleges, however, that "[s]hortly after the ATEC Report was published, staff within G-2 demanded that it be rescinded, destroyed, and replaced." Specifically, Palantir alleges that Lieutenant General Legere "directed the deletions of information favorable to Palantir and other changes that were made to the April 25, 2012 ATEC report." Palantir alleges that, because the Army's G-2 staff insisted upon the rescission and alteration of the favorable findings and recommendations about Palantir in the April 25, 2012 ATEC report, the report was replaced "with a modified report that removed the most favorable language recommending Palantir and reporting on its success." The Administrative Record reflects that a revised ATEC report was issued on May 25, 2012.[25]

Defendant, however, argues that "Palantir has not alleged or demonstrated that the program and contracting officials for the DCGS-A Increment 2 procurement had anything to do with either the original or the corrected ATEC 2012 report." Moreover, defendant relies on an investigation conducted in 2012 regarding the ATEC report, which

> affirmatively found that the changes to the ATEC Report were not the result of any improper motives, but instead, the report was edited to ensure it was prepared in accordance with the purpose of the report and to ensure that the warfighters received the best possible product to accomplish their mission.

Defendant asserts that "irrespective of the spin Palantir now attempts to put on the fact that the ATEC report was edited," allegations that the report was changed as a result of improper influence or interference have already been laid to rest. The Administrative Record reflects that, between July 2012 and October 2012, the Army conducted an investigation into the circumstances surrounding the rescission and alteration of the April 25, 2012 ATEC report. Lieutenant General William Grisoli conducted the independent investigation and produced a report with his findings and conclusions, which is contained in the Administrative Record. According to the investigative report, Lieutenant General Grisoli was directed

---

[25] As with the original April 25, 2012 ATEC report, the revised May 25, 2012 ATEC report is included in the Administrative Record.

Protected Information and/or Legends Redacted

to conduct an investigation into the facts and circumstances surrounding the Army's 2012 conduct of an informal battlefield assessment of Palantir. . . [and] to examine the facts and circumstances surrounding creation of one or more Forward Operational Assessment (FAO) reports by the Army Test and Evaluation Command (ATEC) related to the Palantir system, and any alleged efforts by one or more members of the Army G-2 to disrupt ATEC's objective assessment of Palantir.

As part of his investigation, Lieutenant General Grisoli identified a list of 21 "key individuals related to the events" under investigation, which included, among others, "LTG Mary Legere, Army Deputy Chief of Staff, G-2" and "Ms. Lynn Schnurr, Army Intelligence Chief Information Officer and Director, Intelligence Community Information Management, Office of the DCS, G-2."

As a result of his investigation, Lieutenant General Grisoli confirmed that ATEC approved, and published, an initial report on Palantir on April 25, 2012 and that the ATEC Commanding General, Major General Gino Dellarocco, subsequently directed that the report be rescinded. Lieutenant General Grisoli concluded "that the 25 April 2012 Palantir FOAR [Forward Operational Assessment Report] was retracted, revised and reissued as a result of [a] determination that the recommendations contained in the initial report were improper and were beyond the scope of what ATEC should recommend in a FOAR." Lieutenant General Grisoli found that:

> [T]he changes made to the 25 April 2012 FOAR were not attributable to anyone attempting to improperly advance the Army's DCGS-A program of record but, rather, to the ATEC leadership's intent to ensure that the FOAR properly reflected the strengths and weaknesses of Palantir and that the recommendations in the report were in line with the report's purpose.

Lieutenant General Grisoli concluded that, based on his investigation, "no member of ATEC experienced undue or improper pressure to change the earlier FOAR, and that no one within the Army G-2 requested that ATEC change the earlier FOAR." Lieutenant General Grisoli found "no communication between any member of the Army G-2 and ATEC that was actually in furtherance of retracting and reissuing the Palantir FOA report." Lieutenant General Grisoli explained, "none of the emails I reviewed, or in any of the phone conversations described by the participants, did any member of the Army G-2 specifically demand, suggest or even encourage ATEC to retract or destroy the April Palantir FOAR." Instead, according to Lieutenant General Grisoli, "[t]he decision to retract, revise, and reissue the April FOAR was clearly made by ATEC leadership." Specifically, "[t]he decision to revise the 25 April 2012 FOAR was made by MG Dellarocco on 2 May 2012 after a discussion with LTG Legere, the DCS, G-2."

Additionally, Lieutenant General Grisoli explained that "there is no indication that there was any undue or improper pressure from the Army G-2 to 'destroy' the April Palantir FOAR." Lieutenant General Grisoli found that the "'destruction' of the April

44

Protected Information
and/or Legends Redacted

Palantir FOAR" was "intended only to avoid any confusion that likely would result from having two published FOARs simultaneously available."

Moreover, Lieutenant General Grisoli concluded that "there was no intent on the part of any member of the Army G-2 to deceive any Army decision maker regarding the effectiveness of the Palantir commercial system." Lieutenant General Grisoli explained in his report:

> [I]t is my opinion that the Army G-2 team is passionate and a little defensive about DCGS-A and its relationship with Palantir and that this attitude resulted in their desire to ensure that any Army discussion of Palantir be precise concerning capabilities, training and future acquisitions. At times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders. . . . However, it is clear that the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission.

Lieutenant General Grisoli ultimately concluded that "the coordination between the ATEC leadership and the Army G-2, was professional and that there was no undue or improper influence exerted by any member of the Army G-2 towards any member of ATEC."

By alleging that the ATEC report was changed because of interference by Lieutenant General Legere and/or Ms. Schnurr, both of whom Palantir alleges were motivated by their bias against Palantir, Palantir would apparently have this court set aside Lieutenant General Grisoli's investigation and re-investigate the circumstances surrounding the changes to the April 25, 2012 ATEC report. This court, however, is tasked with reviewing the Administrative Record, with limited supplementation, if appropriate and necessary for effective judicial review, and making findings based on that Administrative Record. It would not be appropriate for this court to ignore Lieutenant General Grisoli's findings, which occurred much closer in time to the events under review, and the depositions of Lieutenant General Legere and Ms. Schnurr despite their imperfect memories.   Thus, the court considers Palantir's allegations in light of the entire Administrative Record.

Lieutenant General Grisoli's investigative report documents a thorough inquiry into the circumstances surrounding the rescission and modification of the April 25, 2012 ATEC report. Indeed, Lieutenant General Grisoli was specifically directed to investigate whether there was any undue influence, pressure, or intent to deceive on the part of Army G-2 personnel to change the ATEC report that was originally distributed. Lieutenant General Grisoli's investigative report indicates that he spoke with multiple individuals, including Lieutenant General Legere and Ms. Schnurr, about their roles in the rescission and/or modification of the ATEC report. Based on the information he received, Lieutenant General Grisoli set forth comprehensive remarks in his report that directly address the

Protected Information and/or Legends Redacted

allegations that Palantir asserts in this court. Although Palantir raised issues about the completeness of Lieutenant General Grisoli's rationale behind his findings in its submissions to the court, Palantir did not question Lieutenant General Grisoli's ability to conduct an independent investigation.

To support its bias and/or bad faith allegations, Palantir further points to the statements in Lieutenant General Grisoli's report that certain G-2 personnel could be "a little defensive about DCGS-A and its relationship with Palantir" and that "[a]t times, some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders." In referring to these statements, however, Palantir omits Lieutenant General Grisoli's conclusion that the cause of this defensiveness and lack of objectivity was that "the Army G-2 team, along with other staff leaders, wanted the Army's senior leaders to understand the capabilities of each system and ensure that our warfighters received the best possible product to accomplish their mission." Lieutenant General Grisoli ultimately concluded that the G-2 staff were not motivated by bias or bad faith, but, indeed, by a strong desire to provide warfighters with the best products. Moreover, when asked during her deposition if she was "defensive about Palantir," Lieutenant General Legere responded "no, I'm not defensive. . . . I'm not defensive at all. You have an opinion that I don't share." Ms. Schnurr stated at her deposition that she disagreed with Lieutenant General Grisoli's assertion that members of the G-2 staff sometimes lost their objectivity with respect to how they presented information on Palantir.

In arguing that the Army insisted upon the rescission and alteration of favorable findings and recommendations about Palantir included in the original April 25, 2012 ATEC report, Palantir points to three specific statements that were removed from the April 25, 2012 ATEC report.[26] Palantir argues that this language "removed from the April 25, 2012

---

[26] Palantir's supplemental brief highlights the following language that was allegedly favorable towards Palantir and removed from the April 25, 2012 ATEC report:

1. "Easy search tools within Palantir allows Soldiers to simultaneously search CIDNE, M3, MX (British Human Intelligence (HUMINT) system), BAT, etc."

2. "(1) (U/FOUO) Due to connectivity issues and bandwidth restrictions in Afghanistan, some users experienced the inability to connect to servers that are located on different Forward Operating Bases (FOB) from where the user operates. Recommendation: Install more Palantir servers in Afghanistan at multiple locations to mitigate issues."

3. "As compared to other analysis tools, 'Palantir is far superior to the DCGS suite. DCGS is overcomplicated, requires lengthy classroom instruction and is an easily perishable skill set if not being used constantly.' Recommendation: Incorporate a short training class on Palantir at the 35F (Intelligence Analyst) Military Occupational Specialty (MOS) Advanced Individual Training (AIT) and Company Intelligence Teams (COIST) training. Users are able to learn the system and use the analysis tools with

46

Protected Information and/or Legends Redacted

ATEC report directly contradicts what the Army is arguing in this case." Palantir asserts that Lieutenant General Grisoli's "investigation into the rescission and alteration of the April 2012 ATEC report provides *no explanation* for the removal of this language." (emphasis in original). Palantir appears to be arguing that, in 2012, the Army intentionally, and in bad faith, removed language in the April 25, 2012 ATEC report about Palantir's capabilities because the Army was biased against Palantir and sought to prevent Palantir from receiving a future award. To the extent Palantir is asserting this argument, the court finds it to be insufficiently supported and heavily reliant on speculation and suspicion.

In considering Palantir's bias and/or bad faith allegations, the court considered all of the evidence in the Administrative Record pertaining to the 2012 ATEC reports. As a result of supplementation, the Administrative Record contained Lieutenant General Legere's sworn statement given on August 7, 2012 as part of Lieutenant General Grisoli's investigation. The sworn statement was attached as Exhibit 3 to Lieutenant General Legere's deposition transcript. Lieutenant General Legere explained that the

> 25 April draft ATEC report contained one recommendation that concerned me. . . . [T]he particular recommendation that concerned me suggested our Intelligence Center add 40 hours of Palantir training at Fort Huachuca as part of our DCGS core curriculum. I believed this recommendation was not appropriate or helpful to our Intelligence Center. . . .

Lieutenant General Legere stated that she provided her recommendation because she

> assumed as the Senior Intelligence Officer (SIO) for the Army I had an obligation to read the report and bring any concerns with recommendations to ATEC so they could review, weigh the merits, see if any/all should be included in what I assume will stand as a document of record.

Lieutenant General Legere also explained that, prior to April 2012, she had "no previous exposure to the way ATEC coordinate[d] its reports." In her sworn statement, Lieutenant General Legere stated:

> At no point did I intend to do anything to hinder or influence ATEC's critical mission to the Army as its independent test and evaluation organization. My suggestion was a minor one in the context of the report and I was comfortable that it could either be accepted as a constructive suggestion or ignored as immaterial.

Although Palantir is correct that the information contained in the first and second ATEC reports is different, the changes in the reports and the circumstances surrounding the changes, although perhaps unusual, are not clear and convincing evidence of bias and/or bad faith against Palantir.

---

minimal training. Offer an advanced class for NCO's with intelligence MOSs who may be deploying to an area with Palantir use."

Protected Information and/or Legends Redacted

As evidence of bias and/or bad faith against Palantir, Palantir further alleges that in October 2014 it notified the Army of specific alleged "'blocking' actions against Palantir" by "G2 or DCGS program owners," and that "the Army has not said whether it has investigated any of those allegations." Palantir's allegation refers to an e-mail sent by Palantir's Douglas Philippone to an Army official in October 2014 in which he allegedly listed "45 separate instances in which G2 or DCGS program owners engaged in specific 'blocking' actions against Palantir, dating back to September 2012." Throughout this bid protest, Palantir has attempted to admit this e-mail into the Administrative Record as support for its bias and/or bad faith allegations. Specifically, Palantir attached the e-mail to its July 15, 2016 motion to supplement the Administrative Record as Exhibit 52, and also attached it to its motion for additional discovery. Defendant argues that this e-mail is not appropriate for supplementation to the Administrative Record. Although the court did not permit Palantir to supplement the Administrative Record with this e-mail, at the hearing on July 25, 2016, Palantir referred to the e-mail as an exhibit when it deposed Lieutenant General Legere.

The e-mail contains a list of alleged instances of "blocking," however, the information in the e-mail was communicated to the e-mail writer, Mr. Philippone, by various individuals, and, as a result, the e-mail contains multiple levels of inadmissible hearsay. Protestor argues that the e-mail and the statements contained therein are not inadmissible hearsay because they are "being submitted to establish the simple fact that Mr. Philippone sent these allegations" to the Army in October 2014, and not for the truth of the matters asserted in the e-mail. Whether or not the e-mail was sent is not at issue. If Palantir is not seeking to admit the allegations for the truth of the matters asserted, including that the Army engaged in numerous efforts of "blocking" against Palantir, the fact that the e-mail was sent does not establish that any or all of the alleged "blocking" efforts ever occurred. Similarly, whether the Army investigated the allegations is not clear and convincing proof of bias and/or bad faith.

In his deposition, Mr. Philippone even stated that he could not recall the specific sources of the information contained in the e-mail:

Q. Now, these [sic] information that you're conveying in the email dated October 7th, 2014 to Gabe [Camarillo], did this information come to you through other persons?

A. Yes.

Q. And who gave you this information?

A. I don't recall specifically. But we received these reports all the time, and so I just kept track of them. And since Gabe had requested it in very specific form, where he literally told me, send this to me, I -- at his request, I put all of these things -- all of the reports that I had heard in one email to send to him.

Q. And from whom did you hear these reports?

Protected Information and/or Legends Redacted

A. So I mean, from a variety of sources. From -- from either soldiers, FSRs [Field Service Representatives], Palantir employees. Some of them came from Congress.

When defendant's counsel went through each allegation in the e-mail, and asked who reported each allegation to Mr. Philippone, he responded to nearly each question: "I don't remember" and could not specifically identify the source of all of the allegations. Because Palantir's counsel referred to the e-mail during the deposition of Lieutenant General Legere, and that deposition testimony is included in the Administrative Record, the court reviewed the e-mail again and, once again, concludes that the e-mail is made up of a series of uncorroborated allegations many of which are based on hearsay, is not appropriate for supplementation to the Administrative Record and cannot support a finding of clear and convincing evidence of bias and/or bad faith.

As discussed above, to succeed on its allegations of bias and/or bad faith, Palantir must prove its claims of bias and/or bad faith by clear and convincing evidence. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240. Even after permitting limited supplementation to the Administrative Record with some of Palantir's multiple requests for discovery and several depositions, although it appears that the relationship between Palantir and the Army was strained at times, as even defendant conceded there was "a tension in the business relationship between the Army and Palantir," and the Army representatives struggled during the depositions to remember or explain potentially unfavorable e-mails or statements about Palantir, Palantir has not produced clear and convincing evidence of bias and/or bad faith against Palantir. This procurement has been the subject of extensive discussion at the Department of Defense, particularly within the Army, before Congress, and in the press. The court is mindful that the only relevant information to be reviewed by the court is the record before the court, as supplemented in accordance with the court's rulings described above. The court, therefore, turns to consider Palantir's allegations regarding the Army's failure to comply with 10 U.S.C. § 2377.

10 U.S.C. § 2377

The parties also have filed cross-motions for judgment on the Administrative Record on the issue of the Army's compliance with 10 U.S.C. § 2377. Rule 52.1(c) of the Rules of the United States Court of Federal Claims (2016) (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the

Protected Information and/or Legends Redacted

United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), "by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]""); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319. The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), "provides a broad grant of jurisdiction because '[p]rocurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d at 1363 ("'[T]he proper standard to be applied

Protected Information and/or Legends Redacted

[to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[27] see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013);

---

[27] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> > (1) compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> >
> > > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > >
> > > (B) contrary to constitutional right, power, privilege, or immunity;
> > >
> > > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > >
> > > (D) without observance of procedure required by law;
> > >
> > > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> > >
> > > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Protected Information and/or Legends Redacted

COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d at 1285–86; Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

Protected Information and/or Legends Redacted

expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see

Protected Information
and/or Legends Redacted

also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Const. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech

Protected Information and/or Legends Redacted

Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is

Protected Information and/or Legends Redacted

whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted

Protected Information and/or Legends Redacted

interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562; see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

In the context of a pre-award bid protest, however, the protestor has to demonstrate that it has suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'"  See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7 ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a pre-award' protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. at 647; Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797 (2013).  This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice."  Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Protestor Palantir argues that, by failing to properly evaluate whether the Army's needs could be met by procuring commercial items, including commercial items identified to the Army by Palantir, and, thereafter, by refusing to solicit either the data management platform, or the entirety of DCGS-A Increment 2, as a commercial item, the Army violated 10 U.S.C. § 2377. Palantir raises related questions about the Army's approach to the procurement, including: "Did the Army violate § 2377(c) by failing to conduct market research that was designed to determine whether there were commercial or nondevelopmental items that could meet the Army's requirements, and by assuming from the outset that the procurement would be for a developmental contract?" Palantir also asks: "Did the Army violate § 2377(c) by failing to analyze and failing to make any

Protected Information and/or Legends Redacted

determination as to whether modifications to existing commercial or nondevelopmental items could fulfill the Army's requirements?" and "[d]id the Army violate § 2377(c) by failing to analyze and failing to make any determination as to whether modifications to its requirements could be made that would allow the requirements to be fulfilled by commercial or nondevelopmental items?"

The "Preference for acquisition of commercial items" statute, 10 U.S.C. § 2377, states:

**(a) Preference.**--The head of an agency shall ensure that, to the maximum extent practicable--

**(1)** requirements of the agency with respect to a procurement of supplies or services are stated in terms of--

**(A)** functions to be performed;

**(B)** performance required; or

**(C)** essential physical characteristics;

**(2)** such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

**(3)** offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

**(b) Implementation.**--The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable--

**(1)** acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

**(2)** require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

**(3)** modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

Protected Information and/or Legends Redacted

**(4)** state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

**(5)** revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

**(6)** require training of appropriate personnel in the acquisition of commercial items.

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

Protected Information and/or Legends Redacted

10 U.S.C. § 2377 (emphasis in original).

The regulation implementing 10 U.S.C. § 2377, 48 C.F.R. § 10.002, states:

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see part 19).

Appx20060

Protected Information and/or Legends Redacted

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at https://www.contractdirectory.gov/contractdirectory/ and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part 12 shall not be used. When publication of the notice at 5.201 is

Protected Information and/or Legends Redacted

required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

48 C.F.R. § 10.002. The FAR also provides a definition of a "commercial item":

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101 (2016).[28]

In general, this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). As noted above, this language in 28 U.S.C.

---

[28] The court notes that the United States Code at 41 U.S.C. § 103 provides a substantially similar definition of commercial item. See 41 U.S.C. § 103 (2012).

Protected Information and/or Legends Redacted

§ 1491(b)(1) provides "a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381 (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))) (emphasis in original); see also Distrib. Solutions, Inc. v. United States, 539 F.3d at 1346 ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"); Nat'l Air Cargo Grp., Inc. v. United States, 126 Fed. Cl. 281, 289 (2016) (quoting 41 U.S.C. § 111 (2012)) ("[T]he term 'procurement' is itself broad, meaning 'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'"). Therefore, so long as "any stage" of the procurement is at issue, this court has jurisdiction to adjudicate the protest.

The language of 10 U.S.C. § 2377(a) instructs that "[t]he head of an agency shall ensure that, to the maximum extent practicable" the "requirements of the agency with respect to a procurement of supplies or services are stated in terms of" the functions, the characteristics, and the required performance, and that "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a) (emphasis added). As the statute contemplates that offerors of commercial items[29] have an opportunity to compete in any procurement, the court interprets an issue of 10 U.S.C. § 2377 to fall within the court's bid protest jurisdiction and proper for consideration.

As an initial matter, the court notes that the application of 10 U.S.C. § 2377 has not been squarely addressed in this court in the context of a bid protest.[30] Turning to the

---

[29] Throughout this opinion, the court uses the shorthand of "commercial items" to refer to "commercial items or nondevelopmental items."

[30] The statute, 10 U.S.C. § 2377, has been cited in two prior bid protests. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. 215 (1998), rev'd, 175 F.3d 1365 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448 (1997). In Alfa Laval, the United States Court of Federal Claims only cited 10 U.S.C. § 2377 in a footnote for defendant's statement that "one factor militating in favor of competitive bidding" was 10 U.S.C. § 2377. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. at 217 n.2. In Hydro Engineering, a decision by the undersigned, the protestor argued that the United States Army's Chemical and Biological Defense Command "violated the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, 108 Stat. 3243 (1994) (FASA), as codified at 10 U.S.C. § 2377, by giving Centech [the awardee] a technical advantage for its heating coil, which allegedly is a sole source part." Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. at 473. In Hydro Engineering, this court noted that "not only is 10 U.S.C. § 2377 introduced by the words 'to the maximum extent practicable,' but the solicitation also contemplated that the offerors could use sole source or proprietary parts" in the designs. Id. at 474. The court did not discuss the degree of discretion afforded by

63

Protected Information and/or Legends Redacted

language of 10 U.S.C. § 2377, Palantir first focuses on the two instances of the phrase "to the maximum extent practicable." In 10 U.S.C. § 2377(a), the statute instructs: "The head of an agency shall ensure that, to the maximum extent practicable . . . such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements," and "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." Id. In 10 U.S.C. § 2377(b), the statute requires that "[t]he head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable," "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency," and "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b). Palantir argues that:

> [T]he Army has a requirement for a Data Management Platform; Palantir has a Data Management Platform that is available as a commercial item; and the law requires the Army to meet its requirements through the procurement of commercial items "to the maximum extent practicable." 10 U.S.C. § 2377. Yet the Army chose to issue a Solicitation that makes it impossible for Palantir to compete through a bid that meets the Army's requirements by supplying its commercial item. That is a blatant violation of § 2377.

Palantir further argues that: "The use of the word 'maximum' in the phrase 'to the maximum extent practicable' cannot be ignored." (footnote omitted). Defendant, by contrast, argues that "[t]he language, 'to the maximum extent practicable,' qualifies all of the agency's responsibilities, e.g., its responsibility to define requirements in terms of functions, performance, or essential physical characteristics, and its responsibility to define requirements so that commercial items may be procured to fulfill such requirements."[31] In addition, defendant argues, citing Hydro Engineering, Inc. v. United States, 37 Fed. Cl. at 474, that "[t]his discretionary language – 'to the maximum extent practicable [sic] - qualifies the agency's obligations."

The phrases "to the maximum extent practicable" and "appropriate to the

---

the phrase "to the maximum extent practicable," or specifically analyze the phrase. Recently, this court also referred to 10 U.S.C. § 2377 in its prior standing decision in the above captioned protest brought by Palantir USG, Inc. and Palantir Technologies Inc. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 27.

[31] Defendant makes a related argument, arguing that "the statutory provision that addresses defining requirements and contains language that 'requirements are defined so that commercial or nondevelopmental items may be procured to fulfill such requirements' is qualified by the language 'to the maximum extent practicable,' which acknowledges agency discretion."

64

Protected Information and/or Legends Redacted

circumstances" in 10 U.S.C. § 2377 are not further defined in the statute or the implementing regulations. Moreover, the same phrases "to the maximum extent practicable" and "appropriate to the circumstances" in the context of 10 U.S.C. § 2377, have not been judicially defined to date[32] and are not easily subject to bright line tests. Turning to dictionary definitions, "maximum" is defined as "as great, high or intense as possible as permitted" New Oxford American Dictionary 1082 (3d ed. 2010); "practicable" is defined as "able to be done or put into practice successfully," id. at 1372; and "appropriate" is defined as "suitable in the circumstance." Id. at 77.  Although these dictionary definitions provide little further clarification, the words chosen by Congress make it clear that a factual, case-by-case, compliance approach with the statutory dictate that an agency consider commercially available alternatives is expected.

The court also notes that the specific word "maximum" was a deliberate choice by Congress. In the House Report for the Federal Acquisition Streamlining Act of 1994, the House of Representatives proposed the following language regarding the acquisition of commercial items:

SEC. 111. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS

Section 16 of the Office of Federal Procurement Policy Act (41 U.S.C. 414) is amended by redesignating paragraphs (2), (3), and (4) in order as paragraphs (3), (4), and (5), respectively, and by inserting after paragraph (1) the following new paragraph:

(2) implement a preference for the acquisition of commercial items by–

(A) whenever practicable, stating specifications in solicitation for bids and proposals in terms such that bidders and offerors are enabled and encouraged to offer to supply commercial items in response to agency solicitations[.]

H. Rep. 103-545(I), at 41 (1994), 1994 WL 261997 (emphasis added). By contrast, the Senate Report first proposed the following language:

PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS AND NONDEVELOPMENTAL ITEMS

SEC. 33. (a) PREFERENCE.—The head of each executive agency shall ensure that, to the maximum extent practicable—

(1) requirements of the executive agency with respect to a procurement of supplies are stated in terms of—

---

[32] The court notes, as the parties describe in their respective briefs, other courts have discussed the phrase "maximum extent practicable" in other contexts. See, e.g., SMS Data Products Grp. v. United States, 853 F.2d 1547 (Fed. Cir. 1988).

Protected Information and/or Legends Redacted

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items may be procured to fulfill such requirements; and

(3) offerors of commercial items and other nondevelopmental items are provided an opportunity to compete in any procurement to fill such requirements.

(b) IMPLEMENTATION.—The head of each executive agency shall ensure that procurement officials in that executive agency, to the maximum extent practicable—

(1) acquire commercial items or other nondevelopmental items to meet the needs of the executive agency;

(2) require prime contractors and subcontractors at all levels under the executive agency contracts to incorporate commercial items or other nondevelopmental items as components of items supplied to the executive agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items[.]

S. Rep. 1587, at 282-83 (1994) (emphasis added). The House Conference Report, from August 21, 1994, after both the House and the Senate Reports, adopted the approach of the Senate Report, and crucially, adopted the phrase "maximum extent practicable." The House Conference Report stated:

SEC. 8104. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS.

(a) In General.-Chapter 140 of title 10, United States Code, as amended by section 8103, is further amended by adding after section 2376 the following new section:

S 2377. Preference for acquisition of commercial items

Appx20066

Protected Information
and/or Legends Redacted

(a) Preference.-The head of an agency shall ensure that, to the <u>maximum extent practicable</u>-

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of-

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

(b) Implementation.-The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable-

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

(2) require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items[.]

H.R. Conf. Rep. 103-712, at 154 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 2607 (emphasis added). The court notes that the language of the House Conference Report closely tracked the final language of the Federal Acquisition Streamlining Act of 1994, and tracks the language at 10 U.S.C. § 2377. The word "maximum" in the phrase "to the maximum extent practicable," therefore, should not be ignored and read out of the statute. Given the congressional choice of the word "maximum," even when coupled with words like "practicable" and "appropriate," agencies cannot ignore or superficially comply with the requirement to review the availability of commercial products to meet agency needs as

Protected Information and/or Legends Redacted

the statute instructs agencies to make serious and genuine efforts to review the availability of commercial products to meet their needs. Although the statute grants discretionary authority to the agency, and agency discretionary authority can be the most difficult kind of action to test in the courts, government contract law is replete with challenges to the exercises of agency discretion as alleged to be arbitrary and capricious; the current challenge to the implementation of 10 U.S.C. § 2377 is in the same category.

Separate from the "maximum extent practicable" language, the defendant's briefs submitted in this protest focus on the language of 10 U.S.C. § 2377(c) regarding market research and emphasize the phrase: "The head of an agency shall conduct market research appropriate to the circumstances," to argue that the undertaken "market research was clearly 'appropriate in the circumstances.'" Palantir argues that "[t]he Government asks this Court to render § 2377 a nullity," regarding the "maximum extent practicable" language, and that "the clause 'appropriate to the circumstances' does not give the agency discretion to ignore § 2377(c)'s requirements." (capitalization and emphasis removed). As noted above, 10 U.S.C. § 2377(c) states:

(c) **Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial

68

Protected Information and/or Legends Redacted

items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377(c) (emphasis in original).

The solicitation relevant to this protest was issued on December 23, 2015. As discussed above, the Army did conduct its version of market research before issuing the solicitation. Prior to the issuance of the solicitation, in July 2014, the DIVA Market Study recommended as a "Potential Strategy: Phased Acquisition and Integration Approach:"

> The acquisition approach could be structured in a phased manner. Initially, the two foundation components (e.g., COTS [commercial off the shelf] cloud infrastructure services and COTS DIVA 'Turn Key' Platform) could be procured. Establish an integration effort to: integrate the COTS DIVA 'Turn Key' platform with the COTS cloud infrastructure services; and integrate the DCGS-A Enterprise data management architecture. This would establish a baseline DCGS-A Increment #2 baseline – a core suite of applications and analytics functions; a new Data Management Architecture.

(emphasis and capitalization removed). The DIVA Market Study explained that "[a] key advantage of leveraging COTS cloud infrastructure services and a COTS DIVA platform is that doing so provides a significant amount of technical infrastructure *and* end-user capabilities." (emphasis in original). Therefore, initially on the recommendation of the MITRE Corporation, a not-for-profit research and development organization, the Army was aware of a possible commercial approach for at least portions of the DCGS-A Increment 2 procurement.[33]

The initial Request for Information, issued August 13, 2014, was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan." The August 13, 2014 Request for Information, however, "request[ed] respondents' corporate overview information and basic qualifications in managing software <u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). Instead of asking about commercial items, or asking more open-ended questions about

---

[33] Subsequently, in the Army Materiel Systems Analysis Activity's July 2015 Trade Space Analysis, "the Hybrid alternative was rated Green and scored the highest of the three alternatives." As noted above, the Green designation indicated: "Low Risk of alternative experiencing significant negative impacts to program cost, schedule, or performance." "Hybrid software option alternatives are currently functioning in the DoD IC and will only require minor development to fill capability gaps. Upper bound COTS software solutions provide similar 'turn-key' technical functionality as Hybrid software solutions." As noted in the Trade Space Analysis, Hybrid was "a compilation of commercially available software packages augmented with integrated tools/widgets written by a third-party using requirements/specifications generated by the Government (i.e., combination of COTS and GOTS)."

Protected Information and/or Legends Redacted

the approach to the procurement, potential respondents only were asked about developmental projects similar to the existing DCGS-A Increment 1 program.[34]

After the August 13, 2014 Request for Information, the Army issued a second Request for Information on December 5, 2014, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the <u>DCGS-A development effort</u>." (emphasis added). "In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development projects</u> that are similar in scope and process to the DCGS-A program." (emphasis added). As with the first Request for Information, the Army's focus in the December 5, 2014 Request for Information was on "the DCGS-A development effort" and not on the possibility of procuring commercial items. The goal of this second Request for Information was for the Army to understand the respondent's "<u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information, the third issued by the Army, stated, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information also asked respondents: "For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described" earlier in the May 6, 2015 Request for Information. Like the previous two Requests for Information, the May 6, 2015 Request for Information did not seek information for commercial items from the respondents, suggesting to the court that the agency likely already had decided that the DCGS-A Increment 2 was going to be another developmental project.

After the three Requests for Information, the Army generated the July 2015 Market Research Report, which, although it was over fifty pages long, contained only two sentences about "Commercial Services." Regarding "Commercial Services," the Market Research Report stated in its entirety: "Significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product. As such, the DCGS-A Increment 2 development effort cannot be procured as a commercial product." The Market Research Report also separately discussed each respondent, and for Palantir, only stated: "The Palantir response did not provide any examples of past experience relevant to the <u>development</u>

---

[34] The focus on development is consistent with Ms. Shyu's October 20, 2014 "Recommendation for a Change to the Distributed Common Ground System-Army (DCGS-A) Increment 1 Acquisition Strategy" which sought to "[e]nd the Increment 1 program at Release 2, remove Release 3 from the program plan, and allocate the remaining Research, Development, Test and Evaluation (RDT&E) funds to . . . Initiate Increment 2 preparatory activities." The October 20, 2014 Recommendation also stressed that "moving forward with Increment 2 efforts as soon as possible will provide a higher return on investment on the limited RDT&E funds currently available." Therefore, the focus of the Recommendation was on development and the use of Research, Development, Test and Evaluation funds, rather than on consideration of purchasing commercial items to meet the agency's needs.

Protected Information and/or Legends Redacted

of Increment 2, and was therefore found non-responsive." (emphasis added). Just as the Market Research Report dismissed a commercial product approach, the Army's focus on Palantir's short comings centered on Palantir's lack of experience related to development.

The focus on development continued as reflected in the draft Performance Work Statement distributed by the Army in July 2015. The Scope of the Performance Work Statement begins:

> This Performance Work Statement (PWS) defines the efforts required for the acquisition of services for the <u>development</u> and integration of Distributed Common Ground System – Army (DCGS-A) Increment 2, Engineering, Manufacturing and Development (DCGS-A INC2 EMD). The requirements for Increment 2, EMD include, <u>development</u> of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and "big data" analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management.

(emphasis added).

Furthermore, the July 1, 2016 "DETERMINATION OF NON-COMMERCIAL ITEM" (capitalization in original; emphasis removed), authored by Contracting Officer Christopher Fisher for the solicitation at issue, and Bryon Young, the Principal Assistant Responsible for Contracting, stated that regarding the market research, the three "RFIs were to canvas the market and determine the availability of commercial/non-developmental items/services available for satisfying the DCGS-A's Increment 2 requirements." The Determination of Non-Commercial Item continued:

> Based upon market research conducted by Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items.

The Determination of Non-Commercial Item concluded:

> I find, based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

Appx20071

Protected Information and/or Legends Redacted

Palantir argues that "the Army felt the need to create and execute such a document *after* Palantir filed its lawsuit reveals that the Army knew it had not made the 'determinations' <u>required</u> by § 2377(c)," (first emphasis in original; second emphasis added). The court notes that, certainly, the timing is unusual. The Determination of Non-Commercial Item,[35] was made the day after the protest was filed in this court. Defendant attempts to argue that the Determination of Non-Commercial Item could be made any time, and asserts that "there is no statutory language addressing the documentation of agency determinations based on market research, and the implementing regulation, FAR 10.002(e), does not require that such determinations must be documented, or that they must be documented before issuance of a solicitation." The court agrees that there is not a specific documentation requirement in 10 U.S.C. § 2377 or the implementing regulations, but disagrees with defendant that "the July 1, 2016 D&F was not a *post-hoc* document as asserted by Palantir." (emphasis in original). The direction of a developmental approach and conclusion that no commercial items were available to meet the Army's requirements was evident in the October 21, 2015 Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding \$103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," signed by Ms. Shyu. And, clearly, when the Army issued Request for Proposals No. W56KGY-16-R-0001 for engineering, manufacturing, and development services, seeking a single contractor to be the system data architect, developer, and integrator of DCGS–A Increment 2, the decision that no suitable commercial items were available was definitively made. Furthermore, although there is a not a documentation requirement in 10 U.S.C. § 2377, the Army cannot point to any contemporaneous document issued before the solicitation was issued that demonstrates that, in compliance with 10 U.S.C. § 2377, the Army had carefully considered whether commercial items were available. The absence of any determination or indication that the Army had seriously considered whether a commercial item was available at any point in the procurement process, prior to the issuance of the solicitation, together with the numerous documents in the Administrative Record documenting the choice for a developmental approach, is a strong indication that the Army had not met the requirements of 10 U.S.C. § 2377 prior to the July 1, 2016 Determination of Non-Commercial Item, which, as noted above, was issued after the closing date of the solicitation.

Even if the court were to consider the July 1, Determination of Non-Commercial Item as timely, it does not meet the requirements of compliance with 10 U.S.C. § 2377. Palantir argues that "[t]he July 1, 2016 Declaration appears to be merely parroting what the July 13, 2015, Summary of Market Research found. That document used exactly the same words—with exactly the same lack of any support whatsoever – in making the unsubstantiated assertion about the unavailability of commercial or nondevelopmental items." (internal citation omitted). The court agrees that the language in the determination mirrors that of the Market Research Report, and, although slightly longer, the court agrees

---

[35] Although defendant refers to the July 1, 2016 document as a "D&F" the July 1, 2016 document is titled: "DETERMINATION OF NON-COMMERCIAL ITEM." (capitalization in original; emphasis removed).

Protected Information and/or Legends Redacted

with Palantir that "[t]here is no evidence . . . to support this repeated assertion" of the unavailability of a commercial item sufficient to meet the Army's needs. Although the Determination of Non-Commercial Item cites the Requests for Information to support the finding that a commercial item was not available, the Administrative Record reflects that even the first Request for Information was seeking information for "development projects," and, therefore, the court does not consider the Requests for Information as demonstrable evidence that no commercial items were available. This is consistent with all the market research, and, on balance, the court disagrees with defendant that the market research was "clearly appropriate" to the circumstances. The focus of the market research was only on development and did not consider the possibility of commercial or nondevelopmental items. Although it is perhaps laudable that the Army issued three separate Requests for Information, as well as held multiple Industry Days, all of the market research appears to have been designed to elicit responses about the offerors <u>developmental</u> capabilities and did not address commercial items or seek information from respondents about their commercially available products even after commercially available alternatives were suggested to the Army in responses to the Requests for Information. The market research, therefore, was not appropriate for the circumstances because the market research did not appear to examine what, if any, commercial items were available.

As stated above, the standard articulated in the implementing regulations, after the needs of the agency are identified, is "[m]arket research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs." 48 C.F.R. § 10.002. As noted above, 10 U.S.C. § 2377(c)(2) provides that—

> The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--
>
> **(A)** meet the agency's requirements;
>
> **(B)** could be modified to meet the agency's requirements;
>
> **(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c)(2) (emphasis in original).[36] There does not appear to be any contemporaneous document in the Administrative Record, nor did defendant credibly

---

[36] As discussed below, as it relates specifically to Palantir, defendant argues that even if Palantir has a commercial item, it required too many modifications to meet the Army's needs. The court concludes, however, that the Army did not make even an initial determination of what commercial items might be available, much less whether or not the

Protected Information and/or Legends Redacted

argue that any such document exists, which evidences that the Army used the results of the market research to determine whether there were, in fact, commercial items available. Even if the statute did not state to the "maximum extent practicable," or the language to the "maximum extent practicable," allows for the broadest of discretion, as defendant appears to allege, or even if the only direction to agencies was to do what was "appropriate to the circumstances," the Army would not have met its burden to determine if commercial items were available to meet the Army's needs pursuant to 10 U.S.C. § 2377.

Defendant suggests that "Palantir asserts that the statute deprives the Army of discretion to define its requirements as it wishes." As a defense to the approach the Army took with the procurement at issue, defendant claims "agencies have substantial discretion to determine how best to acquire their requirements," and cites to Lockheed Missiles & Space Co. for the proposition that "[e]ffective contracting demands broad discretion." (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; emphasis removed).[37]  The defendant also contends that Palantir fails to meet its heavy burden of demonstrating that the Army's substantial discretion was abused, or that there was any clear and prejudicial violation of statutes or regulations." Defendant cites to Savantage Financial Services, Inc. v. United States, 595 F.3d 1282, for the proposition that a protestor has the burden to show an agency decision "is so plainly unjustified as to lack a rational basis." Id. at 1287. Although the Army has substantial procurement discretion, it still must act in a rational, and legally compliant way when determining its requirements, including that the agency must comply with 10 U.S.C. § 2377.

In Savantage Financial Services, Inc. v. United States, the protestor challenged "the terms of a request for proposals from the Department of Homeland Security. . . . The request sought proposals to implement an agency-wide financial, acquisition, and asset management system. The request required proposers to offer a system that is integrated and currently fully operational within the federal government." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (internal reference omitted). By way of background, the Federal Circuit noted that:

> DHS was established in 2003 through the merger of 22 federal agencies. As a result of the merger, DHS inherited five different financial management software systems and a number of different acquisition management and asset management systems. The use of different financial systems within the agency has caused logistical difficulties and has been the subject of criticism and concern from federal auditors and lawmakers. As a result, DHS has devoted considerable effort to obtaining an integrated financial, acquisition, and asset management system. In January 2004, DHS

---

existing commercial items, such as Palantir's, could have been utilized or modified to meet the Army's needs.

[37] The proposition is a generally accepted principle for bid protests, but it does not offer unlimited discretion, as discussed above.

Protected Information and/or Legends Redacted

launched its first effort to integrate its financial systems through a project entitled Electronically Managing Enterprise Resources for Government Effectiveness and Efficiency (eMerge$^2$). The plan underlying the eMerge$^2$ project was to purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components. That project was a complete failure; in December 2005, after spending $52 million with no discernible results, the agency abandoned the eMerge$^2$ program.

Id. (footnote omitted).  After the agency in <u>Savantage</u> attempted an improper sole source:

DHS spent 10 months conducting market research regarding the integration and implementation of financial systems in an effort to develop a new solicitation. The result was a new request for proposals, issued on January 9, 2009, and amended on February 14, 2009. The new request sought a financial, acquisition, and asset management system that "will be provided as an integrated solution that is currently fully operational in the Federal government."

Id. at 1285.  Before the Federal Circuit, the <u>Savantage</u> protestor claimed that "by requiring a system that is integrated and currently operational in the federal government, the new solicitation unduly restricts competition. Savantage contends that DHS's attempts to justify those requirements are based on conclusory statements lacking factual support in the administrative record." Id. After noting that agencies have discretion and procurement decisions are subject to highly deferential review, the Federal Circuit determined:

With respect to the requirement that the system be integrated, we agree with the trial court that it is "logical that [DHS] would want to ensure its success by seeking a fully integrated system, both on the basis of its own experiences and those of other agencies and departments." <u>Savantage II</u>, 86 Fed. Cl. at 706. As the administrative record amply shows, the failure of DHS's own eMerge$^2$ project—largely due to the contractors' inability to provide functional integration among components—underscored the risks of building an entirely new system using separate, unintegrated, off-the-shelf components. Internal DHS documents indicate that the Department responded to that failure by rejecting a piecemeal approach and electing to acquire a core financial system pre-integrated with other key systems. As we have held, an agency "has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review . . . [as CICA does not require the agency] to supply a historical record of failures to substantiate a risk."

<u>Savantage Fin. Servs., Inc. v. United States</u>, 595 F.3d at 1286 (quoting <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d 1351, 1355 (Fed. Cir. 2008)). The Federal Circuit continued:

Appx20075

Protected Information and/or Legends Redacted

On a question such as whether to implement a pre-integrated system or to build a system by beginning with a core financial system and then integrating other systems afterwards, an agency's preferences are entitled to great weight. As the trial court noted, "competitors do not dictate an agency's minimum needs, the agency does." Savantage II, 86 Fed. Cl. at 706. And determining an agency's minimum needs "is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004). We agree with the trial court that Savantage has failed to meet its burden of showing that the agency's decision to require a fully integrated system is so plainly unjustified as to lack a rational basis.

Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1286-87. Although defendant points to Savantage for support that it does not have to substantiate "its concerns in order to survive rational basis review," as noted above, there is a deficit in the Administrative Record in the above captioned protest of information to contemporaneously demonstrate how the Army reached the decision not to pursue commercial items.[38]

Although, as discussed above, 10 U.S.C. § 2377 does not have an explicit requirement to, or how to, document a decision after proper consideration of whether there are commercially available alternatives, in order to "survive rational basis review," the agency must be able to demonstrate how it rationally reached its decision. The limited information included in the Requests for Information, the Market Research Report, or even in the July 1, 2016 Determination, does not meet the minimal requirement of demonstrating that the defendant conducted a genuine inquiry that could enable it to reach a rational conclusion not to consider commercial items, even after Palantir had urged the Army to consider its product as a commercially available alternative. The statute at 10 U.S.C. § 2377 requires "[t]he head of an agency shall use the results of market research to determine whether there are commercial items." As noted above, the Market Research Report only stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial product. As such, the DCGS-A

---

[38] The court notes that the facts and history in each bid protest are unique. In Savantage, the prior procurement involved a plan to "purchase commercial off-the-shelf software products and to integrate them so as to facilitate communication among all the Department's components," and, as the Federal Circuit noted: "That project was a complete failure." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284. Regarding the DCGS-A Increment 2 procurement, the procurement indicated that it seeks to build on Increment 1 which is "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." Unlike the plan in Savantage to purchase "commercial off-the-shelf software products," as alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

Protected Information and/or Legends Redacted

Increment 2 development effort cannot be procured as a commercial product."[39] This language in the Market Research Report is conclusory, and without any examples or support for the conclusions. The Market Research Report does not identify which respondents indicated commercial items were available, that Palantir had repeatedly tried to inform the Army of its capabilities to provide a commercial item, or that Palantir did, in fact, provide commercial items to other Department of Defense agencies.

In addition to requiring that an agency use the results of market research to determine whether there are commercial items available, 10 U.S.C. § 2377(c)(2), indicates that:

> [T]o the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--
>
> **(A)** meet the agency's requirements;
>
> **(B)** could be modified to meet the agency's requirements; or
>
> **(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c) (emphasis in original). Not only did the agency fail to explain or indicate what commercial items possibly were available or had been considered, the Market Research Report is devoid of any information regarding the possible commercial items that could be modified to meet the Army's requirements. As discussed below, defendant now claims that Palantir's data management platform would require too many modifications to meet the agency's needs, however, there is no evidence that the agency made such a determination after the market research was complete or prior to issuing the solicitation. The total absence of any discussion regarding commercial items, or possible modifications to commercial items, reinforces the court's understanding that the Army was focused on a developmental approach to the DCGS-A Increment 2 at an early point in the procurement process, to the exclusion of commercially available alternatives. Therefore, the Army did not comply with the requirements of 10 U.S.C. § 2377.

Defendant also cites to a pre-award decision in <u>Tyler Construction Group v. United States</u>, in which the United States Army Corps of Engineers used "Indefinite Deliver/Indefinite [sic] Quantity Contracts . . . for the design and construction of military

---

[39] Although the Market Research Report specifically mentioned Palantir, in the "RFI Respondent Capability Assessment," the Report only stated "[t]he Palantir response did not provide any examples of past experience relevant to the <u>development</u> of Increment 2, and was therefore found non-responsive." (emphasis added). In addition to providing a cursory statement on the decision-making process regarding available commercial items, the Market Research Report also was searching only for evidence of past performance related to development.

Appx20077

Protected Information and/or Legends Redacted

buildings (barracks and related structures) in an eight-state area in the southeastern United States." Tyler Constr. Grp. v. United States, 570 F.3d at 1330 (internal reference omitted). The Tyler protestor, which did not submit a proposal in response to the solicitation, id. at 1331, contended that "the FAR does not authorize the use of IDIQ contracts for a major construction project," relying on "the anti-bundling provision of the Small Business Act, 15 U.S.C. § 631(j)(3), which requires 'each Federal agency' to 'avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors,' and the similar limitation on 'consolidation' of procurement in 10 U.S.C. § 2382(a)." Tyler Constr. Grp. v. United States, 570 F.3d at 1332.  The Federal Circuit noted:

> The Corps was faced with an unusually large and novel procurement that had to meet the Army's unusual and demanding standards and requirements. The Army was seeking what the Corps viewed as "a fundamental change in military construction strategy designed" to make the Army "a more modular expeditionary and effective fighting force." Tyler Constr. Group., 83 Fed. Cl. [94], 95 [(2008)]. The Army's new approach to housing construction required a 20% reduction in cost and a 30% reduction in the time required until the facilities could be occupied."

Tyler Constr. Grp. v. United States, 570 F.3d at 1333-34.  In light of the unusually large and novel procurement,

> the Corps carefully studied, analyzed and evaluated the situation. It conducted a research program which included a nationwide forum, four regional fora, and "a specialized forum with representatives of the pre-fabricated/pre-engineered/modular construction industry, as well as the implementation of an internet-based research questionnaire." Tyler Constr. Group, 83 Fed. Cl. at 96. The Corps concluded that there was "an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale."

Tyler Constr. Grp. v. United States, 570 F.3d at 1334. The Federal Circuit determined:

> As we have noted, the Corps conducted extensive market research before determining that consolidation of the procurement requirements was "necessary and justified." We agree with the Court of Federal Claims that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes . . . the Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Protected Information and/or Legends Redacted

Id. at 1335 (quoting Tyler Constr. Grp. v. United States, 83 Fed. Cl. at 103) (emphasis in original). Therefore, the Federal Circuit determined:

> The Corps, like other federal procurement entities, has broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation. The Corps did not abuse that discretion in concluding that in the situation here, the use of IDIQ contracts to obtain this large military construction was the most appropriate method of proceeding and therefore best served the interests of the United States. Nor did the Corps violate or ignore any statutory or regulatory requirements, prohibitions or standards in so acting.

Id. at 1334. In the protest currently before the court, the Army did market research, including three Requests for Information, Industry Days, and one-on-one meetings with potential respondents and generated reports based on the information that it learned from its market research. Unlike the Corps in Tyler, in the procurement now at issue before the court, the Army did not comply with the requirements of 10 U.S.C. § 2377, and did not evaluate whether a suitable commercial item could meet the agency's needs, even after protestor Palantir attempted to offer such an alternative.

The court notes that the facts in the above captioned bid protest are unique and distinguishable from the facts in Savantage and Tyler Construction. While the record in Savantage demonstrated that the agency made multiple attempts to satisfy its requirements by using different procurement methods, including a commercial item and an attempted sole source approach, the Administrative Record in the above captioned protest demonstrates that the Army has been singularly focused on a developmental procurement. As also alleged in the complaint in this protest, "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors." Similar to Savantage, in Tyler Construction, the agency demonstrated a genuine interest and openness to using the procurement approach that would best meet its needs for building and designing military buildings. The record in Tyler Construction indicated that the agency conducted market research and pursued industry input before deciding on the procurement method to use. Distinguishable from the agencies' actions in Savantage and Tyler Construction, in this bid protest, the Army conducted market research based on the presumption that the procurement would be developmental and the procurement decisions that followed were based on the same presumption to the exclusion of consideration of commercially available alternatives, even when such possible commercial items were identified to the Army.

In a supplemental brief, defendant argues that "[t]he market research demonstrated that only one industry respondent, ████████████████████ ████████ other than Palantir, supported reliance on GSA Schedule 70, applicable to commercial items, and recommended Increment 2 be procured utilizing commercial procedures." The number of respondents supporting a development approach or the

Protected Information and/or Legends Redacted

number trying to offer a commercially available alternative is irrelevant. Regardless if only two companies suggested commercial alternatives might be available, whether accurate or not, the Army was obligated, pursuant to 10 U.S.C. § 2377, to investigate, determine, and conclude whether an appropriate commercial item was available for all or part of the procurement. In fact, defendant's argument demonstrates that the Army was aware that commercial items were potentially available. The statute at 10 U.S.C. § 2377 instructs that that the Army should investigate whether commercial items to meet the agency's needs are available, or could be modified. This obligation is especially true if respondents such as Palantir or ████ identify such a possibility during the agency's own market research. As demonstrated above, the Army did not determine what commercial items were available or could be modified to meet the agency's needs, and, therefore, did not properly comply with 10 U.S.C. § 2377.

In this protest, the government was on notice that, at a minimum, at least two respondents claimed to have a commercial item to meet the Army's requirements. The Administrative Record reflects that Palantir repeatedly tried to inform the Army of its capabilities to provide a commercial item. In its response to the draft Performance Work Statement, and in response to the May 6, 2015 Request for Information, Palantir communicated to the Army that, "[i]n cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command, representing over 15,000 accounts at peak usage across the Marine Intelligence community." Palantir also claimed that such usage is currently employed "by tens of thousands of users across the DOD and IC" in order to further inform the Army of a commercial option for the procurement instead of the Army's developmental approach. In Palantir's response to the August 13, 2014 Request for Information, Palantir stated:

> The acquisition cycle should fully leverage existing commercial solutions. Prioritizing the rapid procurement of commercial capabilities minimizes the anticipated scope of development needed to deliver Increment 2 capabilities. Narrowing the development scope requires expanding the use of commercially available COTS capabilities—it does not require narrowing the overall scope of the DCGS-A program. The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications.

(footnote omitted; emphasis in original). Palantir also emphasized, "we recommend the Government pursue a different acquisition strategy than the strategy behind the Increment 1 challenges." Then, in response to the December 5, 2014 Request for Information, Palantir reiterated its belief in its ability to offer a commercially available alternative to the developmental approach chosen by the Army for the procurement, as an alternative to the Army's apparent developmental approach, explaining to the Army that:

> We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time

Protected Information
and/or Legends Redacted

and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's ability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Moreover in response to the question in the December 5, 2014 Request for Information: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," Palantir stated:

> Our commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients. We have provided our solution in support of many of the domains listed under "Software Solutions or Services Delivered" for our deployments with Army, DoD, and the IC. However, the request for information on software services contracts performed across USG is not relevant to an acquisition strategy targeting a COTS-based solution. If the Government has questions on how our platform functionally fulfills the specific domains, we would be happy to provide demonstrations or arrange a discussion.

Palantir again encouraged the Army to consider a commercial approach in its response to the May 6, 2015 Request for Information, stating:

> We believe the Government should select a proven solution that is measured on metrics derived from operational success. The data integration, visualization and analytic environment required for Increment 2 should use a fielded commercial solution that is accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DoD, IC, and commercial industry.

In its response to the May 6, 2015 Request for Information, Palantir also stressed that the Army might be too focused on a developmental approach at the expense of a commercial one, observing that:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.[40]

---

[40] Palantir also posed a question to the Army in its response to the May 6, 2015 Request for Information:

Appx20081

Protected Information
and/or Legends Redacted

In each of the three responses to the Requests for Information, Palantir tried to convey to the Army that it could offer a commercial solution, and, in its view, that such was a preferable option to the developmental approach the Army was seemingly intent on pursuing.

The court notes that defendant argues that "Palantir USG responded to RFI No.2, but declined to answer question 3.0(d) in RFI No.2 or complete the Army's chart and identify its specific capabilities across the various DCGS-A domains listed." Defendant also points out that "Palantir USG declined to answer question 3.0(f) in RFI No.2," and that "Palantir USG declined to answer question 3.0(h) in Request for Information No.2." Palantir responded that "is not what the Army requested. Rather, it asked prospective bidders for which 'Agency or Gov't Customer'—including procurement 'contract number'—they had certain experience within 'the last three (3) years.' Palantir had *already provided* the Army with information about its prior Government contracts," and argues that "[t]here was no reason to do so again." (emphasis in original; internal citations omitted). The court agrees with Palantir that the Army's request was more specific than just identifying specific capabilities as Question 3.0(d) asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities," and the headings of the table were:

| Software Solutions or Services Delivered: | Government POC for this work (email/ phone No.) | Agency or Gov't Customer | % of Work Performed | Period of Performance | Prime or Sub | Contract Number / Value | If you have no experience have you partnered with anyone with experience (Company Name)? |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Even if the court were to agree with defendant that Palantir did not fully respond to Question 3.0 of the December 5, 2014 Request for Information, that does not remove the Army's obligation to comply with 10 U.S.C. § 2377. Moreover, Palantir had already made its views on the availability of commercial items appropriate to this procurement clear in response to the August 13, 2014 Request for Information, and would do so again in response to the May 6, 2015 Request for Information. Furthermore, in response to the December 5, 2014 Request for Information, which defendant characterizes as incomplete, as noted above, Palantir still emphasized: "We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget," and, in response to Question 3.0, Palantir

---

Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?

**Appx20082**

Protected Information and/or Legends Redacted

highlighted "[o]ur commercially developed data integration and analytic platform is designed for use in a variety of use cases and domains across our commercial and government clients."

The defendant also points out that in the Market Research Report, the Army stated "[t]he Palantir response did not provide any examples of past experience relevant to the development of Increment 2, and was therefore found non-responsive." The court first notes that of the 43 respondents to the December 5, 2014 Request for Information, the only one the Market Research Report labeled as "non-responsive" was Palantir. Moreover, the language of the Market Research Report reinforces the court's view that the Army was focused only on a developmental approach, and not on commercially available alternatives. Although Palantir was labeled "non-responsive" because it did not provide past performance examples related to the <u>development</u> of DCGS-A Increment 2, Palantir's goal during the entire market research process was to try to highlight for the Army the availably of its products on a commercial basis, not to provide examples of development contracts. The court notes that in its October 2015 response to the draft Performance Work Statement, Palantir was its most blunt:

> The Army has had multiple opportunities to change the strategy for Increment 2, satisfy Congressional intent, and deliver working technology to soldiers in months, not years. The Army should alter its strategy for Increment 2 to reflect the following realities:
>
> 1. The first priority of Increment 2 should be the rapid delivery of a foundational data platform;
>
> 2. The Army does not need to build that platform, as it can buy it today; and
>
> 3. The Army should use FAR Part 12 commercial contract structures to buy this platform.

Concurrently, in its response to the draft Request for Proposals in October 2015, Palantir also bluntly informed the Army:

> The Army has not corrected critical deficiencies in the overall acquisition structure of Increment 2. As written, Increment 2 will commit the Army to an acquisition strategy that will prevent companies with commercially available technologies from direct participation in the program. Increment 2 will commit the Army to the same lengthy, high-risk development effort that failed in Increment 1. We have offered our feedback to program leadership at every step of the Increment 2 process because we want the Army to succeed. But ultimately it is not in our interest or in the Army's interest for it to commit to a program that so clearly violates fundamental principles of successful enterprise software delivery.

Protected Information and/or Legends Redacted

In addition, the Administrative Record reflects three separate Operational Needs Statements requesting Palantir's data management platform. Two of the Operational Needs Statements were from 2014, and the most recent request, from the ████████ ████████████████████████, was from February 2015. The February 2015 request was from ████████████████████████████ requesting the Palantir Gotham Platform, stating that "[t]he Palantir Command platform is a proven capability that is currently in use to provide COP, data integration, and staff integration capabilities across multiple commercial and government organizations," and concluding that "Palantir Technologies, Inc. offers a solution that meets all of our requirements and has fielded the same platform across multiple units ████████████████████████ as well as various U.S. Government agencies."

The Army was, or should have been, aware of Palantir's data management platform from the requests from other Department of Defense personnel who were utilizing the Palantir product, or seeking permission to use Palantir's data management platform, as well as from Palantir's submissions in response to the Requests for Information. Also included in the Administrative Record before this court are numerous contracts with the Department of Defense and other federal agencies for which Palantir's data management platform was utilized. Regarding the Department of Defense contracts which utilized Palantir's product, the contracts could have, or should have, been identifiable by the Army, during the market research process and known, as well as reviewed by the Army, before it made a determination that no commercial item was available to meet the agency's needs.[41] The Administrative Record also reflects that, at a minimum, the Army was aware of at least three such contracts, as shown in Palantir's response to the August 13, 2014 Request for Information, in which Palantir asserted that "[t]he most cost-effective and lowest-risk procurement approach is the acquisition of an open architecture data fusion platform through open competition for an existing software solution at a Firm-Fixed Price (FFP)," and informed the Army:

> Examples of FFP contracts include our work at the U.S. Marines [sic] Corps, where enhancements are included as part of our regular software releases and small business [sic] fulfill highly custom development requests by building the top of the foundation layer. Likewise, U.S. Immigration and Customs Enforcement continues to expand Palantir capabilities through a FFP contract that includes regular software updates and custom enhancements requiring less than a set number of development hours. More recently, following open competition, we were awarded a BPA [Blanket Purchase Agreement] for the IC ITE expansion at DIA [Defense Intelligence Agency] available to all IC [intelligence community] agencies and affording a COTS solution at a FFP.[42]

---

[41] The court notes that two of the contracts included in the Administrative Record were executed in 2016, and, therefore, after the market research was conducted and after the solicitation was issued.

[42] The court also points out that the parties in this litigation have stipulated that "[t]he Palantir Gotham Platform is a Data Management Platform that is licensed to customers

**Appx20084**

Protected Information and/or Legends Redacted

Also, in response to the third Request for Information, Palantir communicated to the Army that:

> In cooperation with the government, Palantir fields and manages 25 Palantir deployments at every major Marine Corps command,[43] representing over 15,000 accounts at peak usage across the Marine Intelligence community. Palantir helps the Marine Corps implement these deployments with the support of only eight total contractors. The very small ratio of contractors to military users demonstrates the sustainability of the Palantir platform across a large enterprise.

Finally, the court notes that, in the Army's January 7, 2015 Increment 2 Information Paper, in considering the key objectives of Increment 2, which included "Modernize the Data Enterprise to a Data Integration Platform," the Army specifically identified the possibilities of "a commercial stand-alone solution (Palantir, IBM)" for a way to "deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A." (emphasis added). Therefore, almost a year prior to the decision to issue the solicitation, the Army specifically had identified a possible solution utilizing a commercial item, and had specifically named Palantir as offering "a commercial stand-alone solution." Despite this, the Administrative Record reflects an absence of Army correspondence with Palantir regarding any follow up to review Palantir's capabilities or even obtain an in-depth description of Palantir's capabilities.

Given the protestor's multiple responses to the Requests for Information, the multiple references to the existing government contracts for Palantir's commercial platform, and the Operational Needs Statements, the Army was demonstrably aware of the possibility of a commercial option for the procurement and appears to have chosen early on to pursue a developmental option instead. As noted above, defendant repeatedly argues that:

> There are no statutory or regulatory requirements that address that mention [sic] which acquisition strategy is in the best public interest. Indeed,

on a commercial item basis," and that "[g]overnment agencies have procured the Palantir Gotham Platform and related services on a commercial item basis."

[43] The Performance Work Statement for one of the Palantir's United States Marine Corps contract, Contract No. N00104-13-A-ZF34-V782, indicated that:

> Palantir USG Incorporated will be providing supplies and services to the United States Marine Corps (USMC) units. The Palantir software will be operating on the Secret Internet Protocol Router Network (SIPRNet), the Nonsecure Internet Protocol Router Network (NIPRNET), identified coalition networks, and with the potentiality of Joint Worldwide Intelligence Communication System (JWICS) installations of Palantir software post contract award.

Protected Information
and/or Legends Redacted

adopting Palantir's position, *i.e.*, the Army must base its acquisition strategy here on speculation as to what modifications Palantir might deem appropriate to develop for the Palantir Gotham Platform would be folly as it would switch the roles here by making Palantir the master of determining the Army's acquisition needs.

The court does not agree with defendant's characterization that fully considering the available commercial options would make "Palantir the master of determining the Army's acquisition needs." The Army had a statutory obligation to consider whether the commercially available options could meet all or some of the Army's requirements, especially when the Army was explicitly informed of the possible availability of commercial options. At no point in this opinion does the court state that the Army must accept Palantir's data management platform. The court only determines that the Army failed in its obligation under 10 U.S.C. § 2377 to fully investigate if Palantir, or any other potential offeror, could meet the requirements of the Army's procurement needs on a commercial basis, in part or in full. In sum, the Army had a statutory obligation to consider commercial items before issuing the developmental solicitation and failed to do so. The Army's failure to conduct a proper 10 U.S.C. § 2377 evaluation was "so plainly unjustified as to lack a rational basis." Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1287.

Without a doubt, there are circumstances in which it is clear that a "commercial alternative" offered by a prospective commercial bidder is not suitable for a procurement. The overwhelming evidence in the Administrative Record in this protest, however, demonstrates that the Army was on notice of a realistic, possible, commercially available alternative product, placing the onus on the Army to more fully consider the potential commercial options suggested before pursuing a developmental only approach to the procurement. The Army did not do so, and, therefore, acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to full investigate possible commercially available alternatives to meet the requirements of the Army's acquisition.

National Defense Authorization Act for Fiscal Year 2016

Palantir raises an additional issue regarding 10 U.S.C. § 2377. Palantir notes that "Congress recently gave the Army specific instructions with respect to the application of § 2377(c) to DCGS." (internal reference omitted). According to Palantir, the National Defense Authorization Act for Fiscal Year 2016 instructs the Department of Defense to issue guidance regarding 10 U.S.C. § 2377 to prohibit agencies from entering into contracts for "information technology products or services that are not commercial items unless the head of the agency determines in writing that no commercial items are suitable to meet the agency's needs." National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 855(a)(1), 129 Stat. 919 (2015).[44] Palantir argues that "Palantir's

---

[44] Relatedly, Palantir points to an additional requirement in the National Defense Authorization Act for Fiscal Year 2016 at section 222, which instructs that "[t]he Secretary shall submit to the appropriate congressional committees a report on the review of the distributed common ground system of the Army conducted under subsection (a)(1)."

Protected Information and/or Legends Redacted

understanding is that the Army issued the § 222 report only after Palantir filed its notification of intent to file this lawsuit, and the Army has still not issued the issued the [sic] § 855 guidance despite a January 23, 2016 deadline." (footnote omitted). Defendant responds that "there is substantial question whether such provisions apply to the DCGS-A Increment 2 procurement," arguing that the National Defense Authorization Act for Fiscal Year 2016 "requires a determination, before contract award, that for a contract (a) in excess of the simplified acquisition threshold and (b) for 'information technology products or services that are not commercial items,' that no commercial items are suitable to meet the agency's needs as provided in subsection (c)(2) of section 2377 of title 10." Defendant claims that "Palantir fails to demonstrate any clear and prejudicial violation of the provisions of NDAA, Fiscal Year 2016," because "the provision relied upon by Palantir is applicable only before contract award. There has been no contract award for DCGS-A Increment 2, and protest grounds that merely anticipate improper agency action are speculative and premature." (footnote omitted). Defendant also argues that "the fact that the guidance contemplated by the act has not yet been issued by the Department of Defense does not give Palantir any rights." As the court has found that the agency acted arbitrarily and capriciously in violation of 10 U.S.C. § 2377, the court does not need to determine if Palantir can rely on the National Defense Authorization Act for Fiscal Year 2016 to support its argument that the Army violated 10 U.S.C. § 2377.

Prejudice

    Having determined that the agency acted arbitrarily and capriciously, and in violation of 10 U.S.C. § 2377, by neglecting to fully investigate the commercial availability of products that could meet at least some of the requirements of the procurement, the court proceeds to the next step of the bid protest analysis, "to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d at 1351; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367.  As noted in FirstLine Transportation Security, Inc. v. United States, 107 Fed. Cl. 189 (2012):

> "Prejudice is a question of fact," which the plaintiff again bears the burden of establishing. Id. [Bannum, Inc. v. United States, 404 F.3d] at 1353, 1358. This prejudice determination is based on the same standard as the initial one made at the standing stage; however, at this step, the plaintiff must prove its allegations by a preponderance of the evidence. Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 207 (2011); Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 707 n.15 (2011). Thus, in order to prevail on the merits, Plaintiff must demonstrate, by a preponderance of the evidence, that the unlawful or irrational terms in the solicitation caused it to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, 575 F.3d at 1362.

---

National Defense Authorization Act for Fiscal Year 2016, P.L. 114-92, § 222(a)-(b), 129 Stat. 919.

Protected Information and/or Legends Redacted

FirstLine Transp. Sec., Inc. v. United States, 107 Fed. Cl. at 197; see also Gear Wizzard, Inc. v. United States, 99 Fed. Cl. 266, 273 (2011) ("[T]o establish prejudice in the context of a pre-award bid protest, the plaintiff must show only 'that an unreasonable agency decision created a non-trivial competitive injury which can be redressed by judicial relief.'") (quoting Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007), rev'd on other grounds, Weeks Marine, Inc. v. United States, 575 F.3d 1352 (Fed. Cir. 2009)).

As earlier determined by this court after the protest was filed, Palantir had standing to proceed to the merits of the above captioned protest. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Palantir now bears the burden, by a preponderance of the evidence, of demonstrating that it was prejudiced by the actions of the Army and the Army's actions caused Palantir to suffer "a non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. As indicated above, this is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

Defendant argues that Palantir did not offer a "proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal." Defendant argues that "both the Army market research requests and the RFQ solicitation requirements were applied equally to all parties. Palantir, by failing to respond fully to Army Request for Information No.2,[45] and by failing to submit a proposed solution that would meet all of the Army's requirements in response to the RFP, 'becomes a stranger to the process, and is disqualified from the procurement,'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009)), and, "[a]ccordingly, Palantir fails to establish prejudice." Defendant also argues that "Palantir's assertion of prejudice is further attenuated by the fact that the Army has received multiple proposals in response to the solicitation. Palantir cannot demonstrate that 'but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d at 1378) (internal citations omitted). [46] In response, Palantir argues that "[t]he Government's contentions

---

[45] Although defendant's briefs suggests that the failure to respond to the Request for Information might disqualify Palantir from the solicitation, at oral argument, counsel for the defendant admitted that "I don't think it's a finding that they couldn't qualify. All it is is a statement of fact . . . that they didn't respond. That's all it is." Moreover, the court agrees with Palantir that "[b]ecause the Government itself made clear that there was no legal significance to responding to or even failing to respond to the RFI and that it was purely for information-gathering purposes, the Government has no basis for arguing that Palantir's RFI response somehow barred Palantir from the procurement."

[46] Defendant alternatively claims that "[a]pplication of the alternative 'non-trivial competitive injury' test should also result in a determination that Palantir does not have the requisite economic interest to establish prejudice."

Protected Information and/or Legends Redacted

are uniformly wrong and they ignore Palantir's claims. . . . [T]he Army's Solicitation prejudiced Palantir by preventing it from offering to provide a commercial item to meet the Government's requirements."

The court first notes that, as a pre-award protest of a solicitation, it considers the proper standard for prejudice to be a "non-trivial competitive injury which can be addressed by judicial relief" and not the "but for" standard. Moreover, the court believes that the failure to submit a proposal is not dispositive in this case. As the court determined in the earlier opinion, Palantir timely filed a protest in this court before the Army made an award. See Palantir Techs., Inc., et al. v. United States, 128 Fed. Cl. at 46. Furthermore, the Army failed to properly conduct an evaluation as to whether commercial items were available to meet any of the requirements of the solicitation, and issued the solicitation as a developmental requirement, with no opportunity to respond to the solicitation with an offer of a commercial item for all, or part of, the solicitation. Palantir's failure to submit a proposal in response to a developmental solicitation in this protest does not preclude Palantir from challenging the nature of the solicitation on a pre-award basis, nor does it prevent a showing of prejudice. Palantir contends that defendant's representation that "the Army has received multiple proposals in response to the development solicitation," is not relevant. The court agrees with Palantir that "[t]he fact that Palantir did not submit a proposal in this protest because the very illegalities that Palantir challenges prevented it from doing so." The court also agrees with Palantir's observation that although the Army received multiple proposals, those "proposals responded to a solicitation that sought proposals for a development effort on a cost-plus basis, not a solicitation for commercial items on a fixed-price basis." Palantir did not respond to the developmental solicitation also because the solicitation required the winning bidder to comply with Cost Accounting Standards (CAS) and to have in place an Earned Value Management System (EVMS). "As an offeror of commercial items on a fixed price basis, Palantir does not have in place the cost accounting standards and procedures, including CAS and EVMS, that are common among the typical defense contractors that engage in extensive 'cost-plus' developmental work."[47] Palantir's "failure" to submit a proposal was because the Army only offered a developmental solicitation that contemplated award of a cost plus contract, without consideration of a commercial item alternative on a firm-fixed price basis.

The parties both agree that, "[w]ithout a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue," as explained in Labatt Food Service, Inc. v. United States, 577 F.3d at 1381. Although defendant cites Labatt for support that "Palantir also did not submit a proposed solution to the Government's requirements in response to the solicitation, and the Army did not preclude Palantir from submitting a proposal," Palantir cites the language of Labatt to demonstrate that "harm specific to the asserted error" is "the loss of the ability to bid to supply commercial items

---

[47] The solicitation at issue in this bid protest contemplates the award of a cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts.

Protected Information and/or Legends Redacted

as the result of defects in the Solicitation." The court believes the foregoing discussion demonstrates that Palantir lost the opportunity to offer the Army commercial items because of the developmental approach the Army took in designing the DCGS-A Increment 2 solicitation, to the exclusion of consideration of commercial items. As demonstrated above, Palantir identified a possible, commercially available product and tried to encourage the Army to consider commercial items, to no avail.

Palantir claims that "Palantir also has demonstrated the requisite economic interest. Palantir has sustained a non-trivial competitive injury because the Government's illegal actions have prevented it from bidding to satisfy the requirements of the DCGS-A program by providing commercial items." Defendant asserts that Palantir has not demonstrated a "non-trivial competitive injury," as Palantir "has not demonstrated that it could have and would have submitted a proposal with a solution that met all of the Army's requirements with only commercial or nondevelopmental items." To meet the prejudice requirement, Palantir must make a showing that its commercial capabilities could be sufficient to allow Palantir to offer a product which could meet all or part of the DCGS-A Increment 2 procurement. In considering if Palantir potentially could meet the requirements of the DCGS-A Increment 2 procurement, the court looks to the information in the Administrative Record. Most significantly, the court looks to the admitted[48] expert report of Bryant Choung, his deposition testimony, and to the expert report and deposition testimony of defendant's expert, Shaun Cronen. In his expert report, Mr. Choung[49] stated that "Palantir offers a data management platform that meets the Army's needs," (emphasis removed), Mr. Choung specified that:

> The data integration layer is both interoperable with existing intelligence systems and capable of integrating the various types of data that the Army has stated that it wishes to include in its system, including both the data handled by DCGS A-Increment 1 (DCGS-A1) as well as the additional data sources and systems contemplated by the DCGS-A2 requirements.

---

[48] As explained above, defendant moved to strike Mr. Choung's expert report, which the court denied. Mr. Choung's expert report is a part of the Administrative Record, and now properly before the court and available for the court's consideration.

[49] As noted above, the court acknowledges that Mr. Choung is an employee of Palantir. As noted in his expert report:

> From July 2012 to the present, I have been the Global Defense Engineering Lead for Palantir Technologies Inc. and its domestic subsidiary corporations, including Palantir USG, Inc. In that role, I am responsible for the deployment and management of the Palantir Gotham Platform as a functional Data Management Platform for clients in the Department of Defense (DOD) and the Intelligence Community (IC), with primary responsibility for clients in the United States Army and Special Operations Command (SOCOM).

Appx20090

Protected Information and/or Legends Redacted

Regarding Palantir's data management platform, Mr. Choung explained that:

Palantir has designed the Palantir Gotham Platform to be as flexible as possible with respect to the types and formats of data it can ingest and bring into the Palantir Gotham Platform. As a result, the Palantir Gotham Platform allows a user to integrate, analyze, and visualize HUMINT, SIGINT, GEOINT, MASINT, weather, and any other type of data.

Mr. Choung also explained[50] that:

[B]ecause the Palantir Gotham Platform satisfies the Army's need for a Data Management Platform, the Army could have contracted with Palantir (or another commercial provider with similar open and interoperable capabilities) to acquire a Data Management Platform and then entered into a separate contract (or multiple contracts) to acquire any additional enhancements, configurations, or modifications that the Army may have wanted.

At his deposition, Mr. Choung noted that "[t]hose could be requirements that are supported by the data management platform, but that are enhancements or would be enhancements or additional configurations, rather, for the data management platform." Defendant takes issue with Mr. Choung's claims, and specifically argues that it is unclear whether Palantir can in fact deliver a commercial product to the Army that meets the Army's requirements. In arguing that Palantir cannot provide the Army with a product on a commercial basis, defendant cites to the definition of a commercial item in the FAR.  As noted above:

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

---

[50] Similarly, Mr. Choung explained that:

[T]he Army could have acquired a Data Management Platform to meet the needs that it describes as the "architectural foundation" of DCGS-A2, by acquiring the Palantir Gotham Platform as a commercial item on a fixed-price basis. In addition, the Army could have acquired both the Data Management Platform from the commercial marketplace *and* modifications necessary to fulfill any other requirements by procuring a commercial item on a fixed-price basis. Like most software, the Palantir Gotham Platform is readily extensible and can be configured for the customer environment in which it is operating.

(emphasis in original).

Protected Information
and/or Legends Redacted

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101.

Before this court, the government tries to argue that the definition of a commercial item is a narrow one, and, it appears even more narrow than the one the Army used in the July 1, 2016 Determination of Non-Commercial Item. As noted above, the Determination of Non-Commercial Item concluded,

> based upon the requirements of this procurement and the market research performed, that this requirement is not appropriate as a commercial item procurement because no single commercial item of a type customarily used by the general public or one that can meet the Government's requirement through minor modification is available; nor is there a combination of commercial items that can satisfy the DCGS-A Increment 2 requirement.

At oral argument, however, defendant's counsel suggested that the language of "Modifications of the type customarily available in the commercial marketplace" and "Minor modifications of a type not customarily available in the commercial market place made to meet Federal Government requirements" in 48 C.F.R. § 2.101 must be read together, despite the clauses being separated by an "or." Defendant's counsel stated that: "I understand, it is 'or,' but it talks about customarily available in the commercial marketplace," and "the language is very similar where it talks about being customarily available in the commercial marketplace." Defendant's counsel stated:

92

Protected Information and/or Legends Redacted

I recognize it's an 'or.' I am saying that you should read them together because you see the same long, [sic] "customarily available." What we're saying is that in terms of construing customarily available in the commercial marketplace, that's not -- that's not a government contract. That's not making modifications in order to meet government-peculiar requirements.

Despite defendant's counsel's argument, the court interprets the "or" as not requiring all subparts to be read together.[51] Moreover, even considering defendant's more restrictive version of 48 C.F.R. § 2.101, Mr. Choung's supplemental declaration indicates Palantir's products would meet the requirements with only minor modifications. Mr. Choung identified 898 requirements in the solicitation, and stated that for 581 of them, Palantir could meet those requirements "out-of-the-box," without any configuration work or enhancements or even minor modifications, "or by any other commercially available Data Management Platform," "on a commercial item, fixed-price basis." Regarding an additional 242 requirements, Mr. Choung stated Palantir could meet those requirements "through customary configurations and installations of existing helpers," with a process that "typically takes at most a matter of hours, and often less, because it just requires Palantir to plug the enhancements into the platform." Mr. Choung explained:

> Palantir customarily deploys the Palantir Gotham Platform into a customer's environment by installing and configuring the platform and plugging in existing "helpers." I explained this during my deposition when I stated: "There is a process by which we plug in our helpers into the environment, and the process by which we take our entire data management platform and plug it into the customer environment. That's called deployment, installation, configuration."

Therefore, Mr. Choung concluded, "through its 'out-of-the-box' capabilities and through customary configurations and installations of existing helpers, Palantir would satisfy a total of 823 of the 898 PBS [Performance Based Specifications] requirements," and "Palantir could meet these [additional] 75 requirements by providing 'new helpers' on a commercial item basis."[52]

---

[51] If the court believed a statutory construction analysis was required, the court notes the first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)), and "[a]s with any question of statutory interpretation, our analysis begins with the plain language of the statute." Jimenez v. Quarterman, 555 U.S. 113, 118 (2009). It is apparent to the court that plain language of "or" is, as the New Oxford American Dictionary indicates, "used to link alternatives," "otherwise," and "either." See New Oxford American Dictionary 1232.

[52] In his expert report Mr. Choung also offered the following opinion referring to the defendant's conclusions that Palantir could not meet the Army's requirements: "It is my expert opinion that the conclusions in these documents are wrong; all of these capabilities are available through the commercial marketplace—at a minimum, they are available

Protected Information and/or Legends Redacted

Addressing the defendant's expert witness, Shaun Cronen, Mr. Choung also stated that defendant's designated expert "Mr. Cronen has not offered any valid technical reason why the Army has chosen to develop software products that are available for purchase as commercial items in the commercial marketplace."

Defendant's expert witness, Shaun Cronen, stated in the defendant's expert report:

After reviewing Palantir's submitted documentation, Mr. Choung's Expert Report, listening to Mr. Choung's Deposition on 11 AUG 2016, as well as the documentation I reviewed on Palantir's public website, coupled with my previous experience with the Palantir Gotham Platform, and information provided on Palantir's other contracts, there is insufficient information that demonstrates that the Palantir Gotham Platform fully meets the DCGS-A Increment 2 Requirements as laid out within the five subfactors for technical evaluation within the DCGS-A Increment 2 Solicitation (i.e. Data Architecture, Fusion Data Analytics, Interoperability, Visualization Framework and Usability, and Data Rights), nor is there information that demonstrates that the Palantir Gotham Platform is compliant with all the requirements within the Performance Based Specification (PBS) and can be successfully tested as per the Formal Qualification Test (FQT) task within the Base Performance Work Statement (PWS).

(internal reference omitted). Palantir responded that the

Army's expert (a) makes no effort to dispute Mr. Choung's conclusion that there is no technical reason why the Army could not practicably have met its core need for a Data Management Platform by acquiring the Palantir Gotham Platform on a commercial item basis, (b) does not identify any DCGS-A2 requirement that he has determined Palantir is incapable of doing.

(internal citations omitted). Regarding the defendant's expert, it does not appear that Mr. Cronen conclusively stated that Palantir could not provide a data management platform, or that it is not compliant with "all the requirements." Therefore, it appears defendant has not conclusively stated that Palantir could not meet at least some of the requirements for DCGS-A Increment 2 through a commercial item. Moreover, it is the Army's failure to fully explore the commercial availability to determine if Palantir or any other entity could meet the agency's program requirements that is at issue here. Defendant's actions, at a minimum, put Palantir in a position in which it was unable to succeed regarding the DCGS-A Increment 2 procurement the moment the Army chose a developmental only approach without fully exploring the possibility of commercially available alternatives,

---

from Palantir, which is able to provide each of these functions through the Palantir Gotham Platform on a fixed-price commercial item basis."

94

Protected Information and/or Legends Redacted

Defendant also notes that, on October 21, 2015, Ms. Shyu, signed a Determination & Findings for "Award of a Single Source Indefinite-Delivery Indefinite-Quantity (IDIQ) Single Award Contract Exceeding $103M for Distributed Common Ground System (DCGS)-Army Increment 2, Engineering Manufacturing and Development IAW DFARS 216.504(c)(1)(ii)(D)(i)," which determined:

> [T]hat a single-source task or delivery order contract estimated to exceed $103 million for Distributed Common Ground System [DCGS]-Army Increment 2, Engineering Manufacturing and Development contract is authorized because the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work.

The court first notes the Determination & Findings does not address 10 U.S.C. § 2377, but instead, is only the justification for exceeding the DFARS stated maximum amount for a single source contract. Further, although the Determination & Findings does state "the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work," the determination is premised on a single, integrated developmental contract. The Determination & Findings stated that: "DCGS-A Increment 2 is heavily focused on design and development of a new data management architecture," and "[d]evelopment of the data integration layer is pivotal and complicated by multiple interfaces and interoperability requirements with external intelligence systems." (emphasis added). The Determination & Findings does not consider utilization of a commercial item, and, therefore, is not useful to demonstrate that modifications to Palantir's commercial platform would be inappropriate or inapplicable to the procurement at issue.

Finally, defendant argues that DCGS-A Increment 2 is

> not only a Data Management Platform, as Palantir argues. The total requirements for DCGS-A Increment 2 are compiled in three documents, which should be read together: (1) the Capabilities Development Document; (2) the Requirements Definition Package; and (3) and the Performance Based Specification.  Palantir ignores the "glue code," addressed by Stephen Morton, Deputy Product Manager, that must be built to tie everything together. Increment 2 includes a Data Integration Layer, without which the whole software system, including a Data Analytics Platform, could not function.

(internal citations omitted). Defendant emphasizes that it "is key to the development of DCGS-A Increment 2 that all of the components and respective subcomponents be selected or built with interoperability and usability throughout the lifecycle of the software development process." In his expert report, Mr. Choung took issue with this characterization and stated that:

> [I]tems in the PWS [Performance Work Statement] relate to the Army's core need for a Data Management Platform and could be satisfied by the procurement of Palantir's Data Management Platform without the need for

Appx20095

Protected Information and/or Legends Redacted

additional enhancements, configurations, and modifications. Other items relate to the Army's decision to *develop* a Data Management Platform rather than acquire one in the commercial marketplace and thus would be irrelevant if the Army elected instead to procure a Data Management Platform in the commercial marketplace. As to the remaining items, Palantir could readily configure or enhance its platform to provide those items on a firm fixed-price basis.

(emphasis in original). Even if defendant turns out to be correct, which remains speculative at this point, the Army failed to explore whether commercial alternatives were available, including the one offered by Palantir. Alternative commercial products were not reviewed before the decision was made that a developmental solicitation would be issued. It appears that Palantir potentially could have submitted a product that would have met some, or all, of the agency's needs. The loss of that opportunity resulted in a non-trivial competitive injury.

Therefore, based on the Administrative Record, including Mr. Choung's representations in his expert report and deposition testimony, the court determines that the Army's actions caused Palantir to suffer a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, Inc. v. United States, 575 F.3d at 1362. Despite this conclusion, the court does not reach a determination as to whether Palantir, in fact, can offer a commercial item that can meet some, or all, of the requirements for Army's DCSG-A Increment 2. The Army failed to conduct a proper commercial availability evaluation in the first instance, and this court should not make one in its place. In this decision, not only is the court not taking a position on whether or not Palantir can offer the Army an appropriate commercially available alternative, nor does the court instruct the Army to accept Palantir's data management platform. As noted by the Federal Circuit in Savantage, determining an agency's minimum needs "'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. at 662); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1384.

Just as the court will not second guess the program requirements of the Army, the court will not dictate to the Army the specifics of how to conduct a proper commercial availability determination in accordance with 10 U.S.C. § 2377. Palantir, in its submissions to the court and in the multiple conferences and arguments before the court, has represented that if only given the opportunity to present its capabilities to the Army, Palantir could demonstrate how it meets or exceeds the Army's requirements for the DCGS-A Increment 2. Given the failures to properly conduct an analysis pursuant to 10 U.S.C. § 2377, and reach a considered, commercial availability determination, as well as the unfortunate conduct of some of the Army personnel reflected in the Administrative Record, it would be wise for the Army to seriously consider reviewing the commercially

Protected Information and/or Legends Redacted

available products of Palantir, or any other potential offeror, before concluding that no commercially available product can meet the Army's requirements.[53]

Permanent Injunction

Having found that the Army failed to properly determine, pursuant to 10 U.S.C. § 2377, whether there are commercially available items suitable to meet the agency's needs for the procurement at issue, and having found that by its failure to do so, the Army acted in an arbitrary and capricious manner, the court turns to consider whether Palantir is entitled to the injunctive relief that it seeks, and, if so, the scope of such relief. As noted above, Palantir requests that this court "[e]nter a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations." Palantir asserts that, at a minimum, the Army should issue "a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements."

As discussed above, this court has jurisdiction to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2). In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, , 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); Remington Arms Co., LLC v. United States,

---

[53] Palantir also points to the deposition of defendant's expert for support than Palantir might have some additional capabilities to offer, if given the opportunity. Mr. Cronen had the following exchange with Palantir's counsel:

Q. I'm not asking you to give an opinion about all of them. Don't you think -- DIB upgrade, DIB interface, interoperability, those are all issues relating to increment 2. And there is some overlap between those, isn't there, and what would have been evaluated if this SIL [Systems Integration Laboratory] evaluation had been done in a comprehensive fashion?

A. I think that probably would have demonstrated some of the additional increment 2 requirements.

97

Protected Information and/or Legends Redacted

126 Fed. Cl. 218, 232 (2016); <u>MVS USA, Inc. v. United States</u>, 111 Fed. Cl. 639, 649 (2013); <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. 462, 494 (2013); <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 34 (citing <u>Centech Grp., Inc. v. United States</u>, 554 F.3d at 1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." <u>Dellew Corp. v. United States</u>, 108 Fed. Cl. 357, 369 (2012) (citing <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See <u>Contracting, Consulting, Eng'g v. United States</u>, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing <u>PGBA, LLC v. United States</u>, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." <u>FMC Corp. [v. United States]</u>, 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. <u>Id.</u>

<u>Sheridan Corp. v. United States</u>, 94 Fed. Cl. 663, 668 (2010); <u>see also</u> <u>Wallace Asset Mgmt., LLC v. United States</u>, 125 Fed. Cl. 718, 727 (2016); <u>Amidon, Inc. v. United States</u>, 124 Fed. Cl. 517, 522 (2015).

In the above captioned pre-award bid protest, as discussed above, Palantir has established success on the merits by demonstrating that the Army acted arbitrarily and capriciously when the Army failed to determine, in accordance with the requirements of 10 U.S.C. § 2377, whether there were commercially available items suitable to meet the Army's procurement requirements prior to issuing the solicitation at issue. Having concluded that Palantir has succeeded on the merits of its bid protest, the court considers the additional factors to determine whether Palantir is entitled to a permanent injunction. Palantir alleges that it will suffer irreparable harm if the court does not issue an injunction and that the balance of the hardships and the public interest weigh in favor of granting an injunction. Defendant argues that Palantir has not demonstrated irreparable harm, that the balance of hardships does not weigh in Palantir's favor, and that an injunction will not serve the public interest.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" <u>Insight Sys. Corp. v. United States</u>, 110 Fed. Cl. 564, 582 (2013) (quoting <u>Magellan Corp. v. United States</u>, 27 Fed. Cl. 446, 447 (1993)); <u>see also</u> <u>Rush Constr., Inc. v. United States</u>, 117 Fed. Cl. 85, 101 (2014); <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. at 494; <u>Overstreet Elec. Co. v. United States</u>, 47 Fed. Cl. 728, 743 (2000). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." <u>CW Gov't Travel, Inc.</u>

Protected Information and/or Legends Redacted

_v. United States_, 110 Fed. Cl. at 494 (citing _CRAssociates, Inc. v. United States_, 95 Fed. Cl. 357, 390–91 (2010); _Serco, Inc. v. United States_, 81 Fed. Cl. at 501–02; _Impresa Construzioni Geom. Domenico Garufi v. United States_, 52 Fed. Cl. 826, 828 (2002)); see also _Remington Arms Co., LLC v. United States_, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); _BINL, Inc. v. United States_, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); _HP Enter. Servs., LLC v. United States_, 104 Fed. Cl. at 245 (citing several cases); _Magnum Opus Techs., Inc. v. United States_, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), _motion to amend denied_, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See _Overstreet Elec. Co. v. United States_, 47 Fed. Cl. at 744 (citing _United Int'l Investigative Servs., Inc. v. United States_, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.")); see also _KWR Constr., Inc. v. United States_, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm; _Impresa Construzioni Geom. Domenico Garufi v. United States_, 52 Fed. Cl. at 828. According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." _BINL, Inc. v. United States_, 106 Fed. Cl. at 49 (quoting _Furniture by Thurston v. United States_, 103 Fed. Cl. 505, 520 (2012) (citing _BayFirst Sols., LLC v. United States_, 102 Fed. Cl. 677, 696 (2012))); see also _MORI Assocs., Inc. v. United States_, 102 Fed. Cl. 503, 552–53 (2011).

Palantir argues that it "will suffer irreparable harm if the Court does not issue an injunction" and stop the Army from proceeding with a contract award under the current solicitation. Palantir asserts that "[a]bsent such relief, Palantir will be deprived of an opportunity to compete for the DCGS-A2 contract, which in and of itself constitutes irreparable harm." Defendant argues, however, that Palantir could have competed for the DCGS-A Increment 2 contract by submitting a proposal in response to the solicitation, but Palantir voluntarily chose not to do so. According to defendant, this "is not a case where a potential offeror was prevented or precluded from submitting a proposal in a competitive procurement because of agency action." Defendant argues that "Palantir had an opportunity equal to all other potential offerors to tender a technical proposal that would meet the DCGS-A Increment 2 requirements," but that Palantir "made their own business choices" not to compete. According to defendant, because Palantir chose not to submit a proposal in response to the solicitation, Palantir cannot now argue that it will be irreparably harmed if it is not able to compete for the contract.

Although defendant is technically correct that Palantir could have submitted a proposal in response to the solicitation in order to participate in the DCGS-A Increment 2 competition, as described above in the prejudice analysis, it is a somewhat disingenuous argument. Because Palantir was attempting to offer the Army a commercially available product, once the solicitation was designed only as a developmental solicitation, Palantir

Protected Information and/or Legends Redacted

was not able to meaningfully compete for the contract award. Even if Palantir had submitted a proposal offering a commercial item, that proposal would not have complied with all the solicitation's material terms because the solicitation at issue in this bid protest contemplates the award of a developmental, cost plus incentive fee task order and incorporates requirements and FAR clauses, such as compliance with Cost Accounting Standards, which are unique to cost reimbursement contracts. Many of these clauses, including a clause requiring compliance with Cost Accounting Standards, would not be included in a firm-fixed price contract to procure a commercial item.[54] As Palantir asserts, it is only an "offeror of commercial items on a fixed price basis," thus, "Palantir does not have in place the cost accounting standards and procedures" that the solicitation required. It is well-established in this court that "a procuring agency may only accept an offer that conforms to the material terms of the solicitation." Furniture by Thurston v. United States, 103 Fed. Cl. at 518. Defendant's argument that Palantir simply chose not to submit a proposal in response to the solicitation does not reflect the nature of the solicitation, the strict requirements of the solicitation as issued, or the award process set out in the solicitation. Moreover, as demonstrated throughout this opinion, Palantir advised the Army on multiple occasions, in advance of the issuance of the solicitation, that it was trying to offer a commercially available product to meet the agency's needs.

Palantir also asserts that "[i]f the Army is permitted to proceed with an award under the Solicitation, Palantir . . . would lose the opportunity to earn revenues and profits from the potential sale of the Palantir Gotham Platform to the Army." Without an injunction, the Army likely will award, in the near future, a contract to develop the DCGS-A Increment 2 to an offeror who submitted a developmental proposal in response to the solicitation, as represented to the court by the Army's representatives. That pool of offerors does not include Palantir. Thus, Palantir would have lost the opportunity to compete for the DCGS-A Increment 2 contract for the life of DCGS-A Increment 2 developmental contract, which could extend for five years or more.

Additionally, a contract award will diminish, if not entirely quash, the likelihood that Palantir will have the opportunity to compete for a future commercial item contract with the Army to satisfy the DCGS-A Increment 2 requirements. Once the Army executes a contract to develop DCGS-A Increment 2, it would appear to be a significant period of time before the Army would seek commercial items related to DCGS-A Increment 2. If the

---

[54] The solicitation incorporates FAR clause 52.230-2, Cost Accounting Standards. Certain contracts are, by regulation, exempt from FAR clause 52.230-2, Cost Accounting Standards, including firm-fixed price contracts awarded on the basis of adequate price competition without submission of cost or pricing data. See 48 C.F.R. § 9903.201-1 (2016). An agency issuing a firm-fixed price contract awarded on the basis of adequate price competition cannot require an offeror to be compliant with FAR clause 52.230-2. To that end, when purchasing commercial items, agencies are required to use firm-fixed price contracts. See 48 C.F.R. §12.207 (2016). Put together, these rules direct that a contract to acquire commercial items normally will be a firm-fixed price contract, which is by regulation exempt from complying with FAR clause 52.230-2, Cost Accounting Standards.

Protected Information
and/or Legends Redacted

agency is permitted to move forward with awarding a contract based on the solicitation issued on December 23, 2015, Palantir will have been deprived of an opportunity to compete for the contract award. As a result, Palantir will likely lose any potential profits it would have earned from selling its commercial items to the Army in order to satisfy the DCGS-A Increment 2 requirements. Moreover, the loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work with the Army for the DCGS-A Increment 2. See BINL, Inc. v. United States, 106 Fed. Cl. at 48 ("Irreparable harm is established by a lost opportunity to fairly compete."); see also Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. at 544. Palantir's lost business opportunity and loss of potential profits establishes irreparable harm.

Assessing the balance of hardships between the parties, the court recognizes the possible negative impact on the Army if the DCGS-A Increment 2 contract award is delayed. As indicated in the Administrative Record before this court, the Army appears to have a functioning system, albeit defendant has indicated that the system would benefit from an update. If no injunction is issued, however, then Palantir will be foreclosed from the opportunity to submit a proposal for the DCGS-A Increment 2 contract likely for at least five years. According to defendant, the "balance of hardships substantially tips in the Army's favor." Defendant asserts that "[t]he harm to the Government from enjoining award of a DCGS-A Increment 2 contract is substantial and greatly outweighs any asserted injury to Palantir." Defendant asserts that the "Court should defer to the military's professional judgment concerning both the risks and harms posed by enjoining the award of a contract for the DCGS-A Increment 2 procurement." Defendant submitted the declaration of Colonel Robert Collins to address the impact of a permanent injunction on the Army. Colonel Collins is the Project Manager for the DCGS-A programs and is "the Army's point of contact for the entire DCGS-A family of systems." According to Colonel Collins' declaration, a delay in the procurement of DCGS-A Increment 2 will negatively affect "the program by delaying the needed capabilities for enhanced situational awareness for military analysts and commanders." In his declaration, Colonel Collins stated:

> The enhanced DCGS-A, Increment 2, is needed to retain the interoperability of existing systems and bring on emerging Intelligence data feeds, which are expected to have significantly larger volumes of data. . . . The new DCGS-A Increment 2 DMA is desperately needed to improve data synchronization across all Army echelons. DCGS-A Increment 2 will implement cyber security measures to protect and monitor data access and activities to a significantly larger degree than the current DCGS-A Increment 1 is even capable.

Colonel Collins also stated that "[i]f the court issues an injunction enjoining the Army from awarding the contract, then the Army will be forced to use and maintain the existing Increment 1 systems," which "will become increasingly difficult to keep up with as technology becomes unsupportable over time."

Appx20101

Protected Information and/or Legends Redacted

Notwithstanding Colonel Collins' declaration, in its cross-motion for judgment on the Administrative Record, defendant states that the Army does not intend to immediately use or deploy DCGS-A Increment 2. Defendant explains that "it is anticipated that there would be a lengthy developmental period for Increment 2, and also testing." Additionally, defendant asserts that "DCGS-A Increment 1 is fully operational" and deployed in the field, although it is "nearing obsolescence." Based on this information from defendant, it appears that, although an injunction may cause some delay in the procurement of the capabilities that the Army seeks to acquire through the DCGS-A Increment 2 procurement, the delay, which is in defendant's control, is manageable, assuming the Army moves quickly to comply with the requirements of 10 U.S.C. § 2377. Moreover, the impact of the delay on the "military analysts and commanders" appears speculative because the Army already anticipates a "lengthy developmental period for Increment 2, and also testing." Indeed, given that the Army intends to award a developmental contract, it would be difficult to know when Increment 2 capabilities will be available and deployable. A review of the Administrative Record indicates that DCGS-A Increment 1 took several years to develop, and DCGS-A Increment 2 is expected to be more technically advanced than Increment 1, thus it appears likely that there could be delays due to testing or other issues that typically arise during a complicated developmental process. Furthermore, if Palantir actually is capable of providing a commercial item that can meet the Army's requirements, then, most likely, the Army could more rapidly acquire the commercial technology to meet its needs either in whole or in part. Although an injunction may somewhat slow the award of a contract to satisfy the Army's requirements, "the Court of Federal Claims has observed that '"only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."'" <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. at 495 (quoting <u>Reilly's Wholesale Produce v. United States</u>, 73 Fed. Cl. 705, 715–16 (2006) (quoting <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. at 399)); <u>see also</u> <u>Insight Sys. Corp. v. United States</u>, 110 Fed. Cl. at 582. Thus, the court concludes that the balance of hardships does not weigh in favor of the defendant in this protest.

As to the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. at 495 (quoting <u>PGBA, LLC v. United States</u>, 57 Fed. Cl. 655, 663 (2003)); <u>see also</u> <u>Cohen Fin. Servs., Inc. v. United States</u>, 110 Fed. Cl. 267, 289 (2013); <u>United Int'l Investigative Servs., Inc. v. United States</u>, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing <u>Parcel 49C Ltd. P'ship v. United States</u>, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); <u>Am. Safety Council, Inc. v. United States</u>, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); <u>Applied Bus. Mgmt. Sol., Inc., LLC v. United States</u>, 117 Fed. Cl. 589, 608 (2014); <u>BINL, Inc. v. United States</u>, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. <u>See</u> <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief

Protected Information
and/or Legends Redacted

where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)).

As Palantir argues, there is a public interest "in preserving the integrity of the competitive process." Insight Sys. Corp. v. United States, 110 Fed. Cl. at 583. "A permanent injunction is properly employed where there is an overriding public interest in maintaining the integrity of the federal procurement process." Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. at 608 (internal quotations omitted). Palantir argues that the public interest weighs in favor of a permanent injunction because the public "has an interest in ensuring that the Army's Solicitation complies with the law." Defendant points to national security concerns to support its position that an injunction will not serve the public interest. Defendant asserts that the "public interest factor is of 'paramount import' especially regarding national defense and national security," and that this "paramount interest is directly implicated when a procurement action involves the acquisition of services critical to the success of future military operations and to the health and safety of our servicemen and women in the field." Defendant is correct that "when military and national security interests are implicated, the public interest factor gains inflated importance in the court's balancing of the equities." Worldwide Language Res., LLC v. United States, 127 Fed. Cl. 125, 135 (2016) (internal citations omitted). The court recognizes, and respects, that in exercising jurisdiction over bid protests "the courts shall give due regard to the interests of national defense and national security. . . ." 28 U.S.C. § 1491(b)(3). Yet, "merely conclusory assertions of national security do not suffice to defeat motions for injunctive relief." Crowley Tech. Mgmt., Inc. v. United States, 123 Fed. Cl. 253, 266 (2015); see also GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 493 (2012) (explaining that "when the Government makes a claim of national security" the court "will not blindly accede to such claim" and must give the claim careful consideration) (internal quotations omitted). Although in this protest the court recognizes improvement to DCGS-A is an important part of the Army's future performance capabilities, and defendant discusses the intersection of national security and the public interest generally in its briefs, defendant does not sufficiently address how an injunction in this protest would cause a national security disruption or convince the court that efficiently taking the time to address the requirements of 10 U.S.C. § 2377 would negatively impact national security. As noted above, in his declaration, Colonel Collins explained the importance of DCGS-A Increment 2 and states that it is "desperately needed," however, Colonel Collins does not specifically assert that a delay in making an award pursuant to the DCGS-A Increment 2 solicitation will create national security concerns. In fact, the solicitation explains that the expected performance period for the DCGS-A Increment 2 development contract is six years, thus, it appears that the Army anticipates that developing DCGS-A Increment 2 could take multiple years. Therefore, the Army has not offered evidence of immediate tactical or strategic national security consequences that would sway the court from entering an injunction in this bid protest so that the Army can comply with 10 U.S.C. § 2377. As discussed above, the Army failed to satisfy the requirements of 10 U.S.C. § 2377 before issuing the December 23, 2015

Protected Information
and/or Legends Redacted

solicitation, compromising the integrity of the procurement process.

Palantir asserts that the public interest weighs in favor of an injunction because the "Army's Solicitation doubles down on development efforts that have taken fifteen years and cost billions of taxpayer dollars without equipping Commanders with the capabilities they need." As directed by 10 U.S.C. § 2377, and as is intuitively obvious, it is in the public interest to investigate whether commercial items exist that can satisfy the government's needs, in whole or in part, so as to avoid investing time and taxpayer money into developing a product that already exists. As such, the court finds that there is a public interest in permanently enjoining the Army from awarding a contract under the December 23, 2015 solicitation.

## CONCLUSION

Accordingly, because Palantir has demonstrated success on the merits, and because the equitable factors weigh in Palantir's favor, a permanent injunction is warranted and awarded. The Army is permanently enjoined from issuing a contract award under solicitation number W56KGY-16-R-0001, as issued on December 23, 2015. The Army must satisfy the requirements of 10 U.S.C. § 2377, which, thus far, the Army has failed to do. Only after the Army has properly and sincerely complied with 10 U.S.C. § 2377 should defendant proceed to award a contract to meet its DCGS-A Increment 2 requirements.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
*Judge*

Appx20104

Protected Information
and/or Legends Redacted

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this <u>11th</u> day of August, <u> 2017 </u>, a copy of the foregoing Joint Appendix was filed electronically.

<u>   X   </u> This filing was served electronically to all parties by operation of the Court's electronic filing system.

<u>/s/</u>Domenique Kirchner